# Exhibit B

## FORM 1.997. CIVIL COVER SHEET

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law.  This form must be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to section 25.075, Florida Statutes.  (See instructions for completion.)

---

**I.  CASE STYLE**

IN THE CIRCUIT COURT OF THE <u>THIRTEENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>HILLSBOROUGH</u>  COUNTY, FLORIDA

Case No.:_____
Judge: _____

<u>Smart Communications Holding, Inc.</u>
 Plaintiff
          vs.
<u>Correct Solutions, LLC</u>
Defendant

---

**II.  TYPE OF CASE**

- ☐ Condominium
- ☒ Contracts and indebtedness
- ☐ Eminent domain
- ☐ Auto negligence
- ☐ Negligence – other
  - ☐ Business governance
  - ☐ Business torts
  - ☐ Environmental/Toxic tort
  - ☐ Third party indemnification
  - ☐ Construction defect
  - ☐ Mass tort
  - ☐ Negligent security
  - ☐ Nursing home negligence
  - ☐ Premises liability – commercial
  - ☐ Premises liability – residential
- ☐ Products liability
- ☐ Real Property/Mortgage foreclosure
  - ☐ Commercial foreclosure $0 - $50,000
  - ☐ Commercial foreclosure $50,001 - $249,999
  - ☐ Commercial foreclosure $250,000 or more
  - ☐ Homestead residential foreclosure $0 – 50,000
  - ☐ Homestead residential foreclosure $50,001 - $249,999
  - ☐ Homestead residential foreclosure $250,000 or more
  - ☐ Non-homestead residential foreclosure $0 - $50,000
  - ☐ Non-homestead residential foreclosure $50,001 - $249,999

- ☐ Non-homestead residential foreclosure $250,00 or more
- ☐ Other real property actions $0 - $50,000
- ☐ Other real property actions $50,001 - $249,999
- ☐ Other real property actions $250,000 or more

- ☐ Professional malpractice
  - ☐ Malpractice – business
  - ☐ Malpractice – medical
  - ☐ Malpractice – other professional
- ☐ Other
  - ☐ Antitrust/Trade Regulation
  - ☐ Business Transaction
  - ☐ Circuit Civil - Not Applicable
  - ☐ Constitutional challenge-statute or ordinance
  - ☐ Constitutional challenge-proposed amendment
  - ☐ Corporate Trusts
  - ☐ Discrimination-employment or other
  - ☐ Insurance claims
  - ☐ Intellectual property
  - ☐ Libel/Slander
  - ☐ Shareholder derivative action
  - ☐ Securities litigation
  - ☐ Trade secrets
  - ☐ Trust litigation

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**III.**  **REMEDIES SOUGHT** (check all that apply):
  ☐   Monetary;
  ☒   Non-monetary declaratory or injunctive relief;
  ☐   Punitive

**IV.**  **NUMBER OF CAUSES OF ACTION: (      )**
  (Specify)

  4

**V.**  **IS THIS CASE A CLASS ACTION LAWSUIT?**
  ☐   Yes
  ☒   No

**VI.**  **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
  ☒   No
  ☐   Yes – If "yes" list all related cases by name, case number and court:

**VII.**  **IS JURY TRIAL DEMANDED IN COMPLAINT?**
  ☐   Yes
  ☒   No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature s/ Brad F. Barrios       FL Bar No.: 35293
  Attorney or party                                            (Bar number, if attorney)

  Brad F. Barrios          08/02/2019
    (Type or print name)                                        Date

# CIVIL COVER SHEET

Form 1.997    The civil cover sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law. This form shall be filed by the plaintiff or petitioner for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute section 25.075. (See instructions for completion.)

1.    CASE STYLE

In the Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County, Florida

Smart Communications Holding, Inc.                    Case Number: _____

                    Plaintiff(s),                     Division: _____

vs.

Correct Solutions, LLC a/k/a
Correct Solutions Group, LLC

                    Defendant(s).

2.   TYPE OF CASE          (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an X in both the main category and subcategory boxes.

- [ ] Condominium
- [x] Contracts and indebtedness
- [ ] Eminent domain
- [ ] Auto negligence
- [ ] Negligence – other
  - [ ] Business governance
  - [ ] Business torts
  - [ ] Environmental/Toxic tort
  - [ ] Third party indemnification
  - [ ] Construction defect
  - [ ] Mass tort
  - [ ] Negligent security
  - [ ] Nursing home negligence
  - [ ] Premises liability – commercial
  - [ ] Premises liability – residential
  - [ ] Products liability
- [ ] Real property / Mortgage foreclosure
  - [ ] Commercial foreclosure $0-$50,000
  - [ ] Commercial foreclosure $50,001 - $249,999
  - [ ] Commercial foreclosure $250,000 or more
  - [ ] Homestead residential foreclosure $0 - $50,000
  - [ ] Homestead residential foreclosure $50,001 - $249,999
  - [ ] Homestead residential foreclosure $250,000 or more
  - [ ] Nonhomestead residential Foreclosure $0 - $50,000
  - [ ] Nonhomestead residential Foreclosure $50,001 - $249,999
  - [ ] Nonhomestead residential Foreclosure $250,000 or more
  - [ ] Other real property actions $0 – $50,000
  - [ ] Other real property actions $50,001 – $249,999
  - [ ] Other real property actions $250,000 or more
- [ ] Professional malpractice
  - [ ] Malpractice – business
  - [ ] Malpractice – medical
  - [ ] Malpractice – other professional
- [ ] Other
  - [ ] Antitrust / trade regulation
  - [ ] Business transactions
  - [ ] Constitutional challenge – statute or ordinance
  - [ ] Constitutional challenge – proposed amendment
  - [ ] Corporate trusts
  - [ ] Discrimination – employment or other
  - [ ] Insurance claims
  - [ ] Intellectual property
  - [ ] Libel / Slander
  - [ ] Shareholder derivative action
  - [ ] Securities litigation
  - [ ] Trade secrets
  - [ ] Trust litigation

☐ THIS CASE IS APPROPRIATE FOR ASSIGNMENT TO THE COMPLEX LITIGATION BUSINESS DIVISION. PLEASE SEE ATTACHED COMPLEX BUSINESS LITIGATION DIVISION ADDENDUM FORM.

3.   REMEDIES SOUGHT (Check all that apply):

☐ Monetary;

☑ Non-monetary declaratory or injunctive relief;

☐ Punitive

4.   NUMBER OF CAUSES OF ACTION: [3  ]

(Specify) 1-Declaratory Relief (Mutual Confidentiality & Nondisclosure Agreement), 2-Declaratory

Relief (Master Services Agreement), 3-Breach of Contract (Master Services Agmt-Injunctive Relief)

4 - Breach of Implied Covenant of Good Faith and Fair Dealing (Master Services Agmt - Injunctive Relief)

5.   IS THIS CASE A CLASS ACTION LAWSUIT?

☐ Yes

☑ No

6.   HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☑ No

☐ Yes    If "yes", list all related cases by name, case number and court.

_____

_____

_____

7.   IS JURY TRIAL DEMANDED IN COMPLAINT?

☐ Yes

☑ No

8.   IS TRIAL EXPECTED TO LAST MORE THAN TEN (10) TRIAL DAYS (2 WEEKS)?

☐ Yes

☑ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____   FL. Bar Number 035293 _____

Attorney or Party                                                   (Bar Number if attorney)

Brad F. Barrios                                          8 / 2 / 19
_____                    _____

Type or Print Name                                                Date

## IN THE THIRTEENTH JUDICIAL CIRCUIT OF THE
## STATE OF FLORIDA, IN AND FOR HILLSBOROUGH COUNTY

Smart Communications Holding, Inc.

CASE NO.: _____

DIVISION: _____

_____
Plaintiff/Petitioner(s)

vs.

Correct Solutions, LLC a/k/a

Correct Solutions Group, LLC
_____
Defendant/Respondent(s)

## REQUEST FOR DIVISION ASSIGNMENT

**This is a request based on local Administrative Order(s) for the Clerk of the Court to assign the above styled case in the:**

[✓] **Tampa Division**

[ ] **East Division**

[ ] **Prior Division (Please indicate Case Number and Division of previously filed action:** _____ **)**

**I understand that the actual division assignment will be in accordance with the <u>Hillsborough County Administrative Orders</u>.  If there is no supported request for specific division assignment, this action will be assigned a division based on a random and equitable distribution system.**

**Name of Attorney:** Brad F. Barrios
_____

**Address:** Bajo Cuva Cohen Turkel P.A., 100 N. Tampa
_____

Street, Suite 1900, Tampa, FL  33602
_____

**Phone Number:** 813-443-2199
_____

**Email Address(es):** bbarrios@bajocuva.com
_____

Case 8:20-cv-01469-WFJ-TGW Document 1-2 Filed 06/26/20 Page 8 of 217 PageID 40

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
CIRCUIT OF THE STATE OF FLORIDA, IN AND FOR HILLSBOROUGH COUNTY
CIRCUIT CIVIL DIVISION

Smart Communications Holding, Inc.
_____
Plaintiff(s)

CASE NO.:_____

VS.

DIVISION:_____

Correct Solutions, LLC a/k/a Correct Solutions Group, LLC
_____
Defendant(s)

## REQUEST FOR ISSUANCE OF SUMMONS –CIRCUIT CIVIL

This is a request for issuance of service of process by the Clerk of court as follows:

<span style="color:red">*PLEASE NOTE THAT A SEPARATE REQUEST
IS REQUIRED FOR EACH PARTY TO BE SERVED*</span>

**Type of Process: (choose one)**

[✔] Initial Summons    [ ] Alias Summons    [ ] Pluries Summons

**Type of Summons: (choose one)**

Circuit Court Summons:

Indicate days to respond   [✔] 20   [ ] 30   [ ] 45   [ ] 60    [ ] Other____

Non-Residential Eviction:   [ ] Mailing   [ ] No Mailing

Residential Eviction -    [ ] 5 day only    [ ] 5 day with 20 day attached

   [ ] Mailing   [ ] No Mailing

**Party information:**

Party To Be Served:

Name: Correct Solutions, LLC a/k/a Correct Solutions Group, LLC c/o NRAI Services, Inc. as Registered Agent

Address: 1200 South Pine Island Road

City/State/Zip: Plantation, FL 33324

Email Address to Return Issued Summons: garnold@bajocuva.com

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                                     Case No:

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

## **VERIFIED COMPLAINT**

Plaintiff, Smart Communications Holding, Inc. ("Smart Communications") hereby files this complaint against Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("Correct Solutions") and alleges as follows:

### **Introduction**

1.      Smart   Communications   and   Correct   Solutions   both   provide   inmate communications services to correctional facilities. The parties have mutually benefitted from a successful business arrangement for the last two years in which Smart Communications is the exclusive provider of certain services to the parties' joint customers. However, having found other sources for Smart Communications' services, Correct Solutions has endeavored to deprive Smart Communications' of its significant investment in the exclusive relationship and its ability to realize the benefits of the parties' bargain.

2.      Correct Solutions' bad faith conduct recently culminated in improperly attempting to terminate the parties' master agreement. However, as described below, Correct Solutions' stated

grounds for termination have no merit and, in any event, do not qualify as grounds for termination under the exclusive agreement.

3.     Smart Communications seeks a declaration and injunctive relief order prohibiting Correct Solutions from causing Smart Communications continuing and irreparable harm throughout the inmate communications industry by improperly terminating the agreement.

## Parties, Jurisdiction, and Venue

4.     Smart Communications is a Florida corporation with its principal place of business in Pinellas County, Florida. Smart Communications provides various services to correctional facilities throughout the country, including in the state of Florida.

5.     Correct Solutions is a foreign limited liability company registered to do business in Florida. Its principal place of business is in Lincoln Parish, Louisiana. This Court has jurisdiction over Correct Solutions: (a) pursuant to section 48.193(1)(a)(1), Florida Statutes, because it has a registered agent in Florida at 1200 South Pine Island Road, Plantation, Florida 33324; (b) pursuant to section 48.193(1)(a)(7), Florida Statutes, because it has breached a contract in this state by failing to perform acts required by the contract to be performed in this state; and (c) pursuant to section 48.193(2) because it is engaged in substantial and not isolated activity within Florida.

6.     The Florida Public Service Commission has granted Correct Solutions a certificate to provide pay telephone services in Florida. Correct Solutions solicits business from Florida institutions and has obtained contracts to provide services to Florida governmental entities. For example, Correct Solutions provides inmate telephone communications services in Florida pursuant to a contract with the Nassau County Sheriff's Office and the Monroe County Sheriff's Office. Accordingly, Correct Solutions is engaged in substantial business activity in Florida, such that it should anticipate being haled into court in Florida.

7.     Venue is proper in Hillsborough County pursuant to Section 47.011, Florida Statutes because the cause of action accrued in Hillsborough County and because the contracts upon which this action is based both include mandatory forum selection clauses identifying Hillsborough County as the exclusive venue for litigation arising under the contracts.

## Background of the Parties' Relationship

8.     Correct Solutions provides an inmate telephone platform through which it installs telecommunications equipment at correctional facilities and charges inmates or their contacts on a per-call basis. Correct Solutions derives revenue from its platform, a portion of which it agrees to share with the correctional facilities pursuant to a commission arrangement.

9.     Historically, Correct Solutions has provided products and services focused on telephone communications. Correct Solutions did not offer alternative methods of communication, such as electronic mail or text messaging, to be deployed for the benefit of inmates at its customers' correctional facilities. As a result, Correct Solutions was unable to fully service its customers who desired a broader spectrum of communications options for their inmates.

10.     Historically, Smart Communications has provided a suite of services available to inmates through kiosks and tablets, including electronic messaging, grievance and medical forms, video visitation, a law library, entertainment, and educational content. Smart Communications has also provided correctional facilities with the ability to monitor and control inmate communications through a proprietary and trade secret technology package and with patented mail scanning services to eliminate or control the flow of physical postal mail into facilities. Until early 2019 Smart Communications did not provide telephone communication services.

11.     To meet the needs of their existing customers and remain competitive in the inmate communications industry, Correct Solutions approached Smart Communications in 2017 about an

arrangement whereby Correct Solutions' customers could obtain the benefits of Smart Communications' state-of-the-art communications system. Correct Solutions pursued Smart Communications for many reasons. First, correctional facilities desired to provide inmates with communication options other than telephone calls, such as electronic messaging. Second, facilities sought a system that was easy to use and provided inmates with direct access to necessary forms, entertainment, and educational content. Third, facility staff desired more investigative features to easily monitor and track their inmates' routine, non-legal communications with the outside world. Correct Solutions could not meet these needs and knew that Smart Communications had pioneered inmate messaging with a system, developed and refined over time, which presented an unmatched collection of features and functions. To be associated with Smart Communications in the eyes of their customers was to be connected with innovation and quality and only served to increase Correct Solutions' ability to continue their customer relationships through contract renewals.

12.     Upon information and belief, Correct Solutions would have lost many of its customers if it could not provide the type of messaging services which Smart Communications provided. Ultimately, due to its relationship with Smart Communications, Correct Solutions was able to satisfy their existing customers and was also able to obtain new customers.

13.     The intent of the proposed business relationship was that Correct Solutions and Smart Communications would each provide their respective services directly to a pool of customers. As opposed to Correct Solutions incorporating Smart Communications' system into its own system, the products and services of the parties remained separate and distinct. Neither an inmate nor a facility staff member had to access Correct Solutions' telephone system in order to access Smart Communications' messaging system. Smart Communications trained and interfaced with facility staff on all issues related to Smart Communications' services. Smart Communications

collected revenue in its ordinary course when facility inmates exchanged messages with outside contacts, without involvement of Correct Solutions. The facility customers, some of which were existing Correct Solutions customers, became Joint Customers of both parties.[1]

14.     In contemplation of this potential business arrangement, on June 15, 2017, Smart Communications and Correct Solutions entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA"). A partial copy of the NDA is attached as **Exhibit A**.[2]

15.     Pursuant to the NDA, the parties excluded from the definition of Confidential Information "any materials or information…generally known…by the public…", among other exclusions.

16.     Upon execution of the NDA, Correct Solutions did not disclose any Confidential Information to Smart Communications. Such disclosure was unnecessary because many of the Joint Customers were already using Correct Solutions' services and equipment. Smart Communications, on the other hand, was to provide and install its proprietary technology and messaging services at Joint Customer facilities, which would potentially require some disclosure of Confidential Information (including trade secrets) to Correct Solutions to ensure a smooth and workable transition to the newly-added services.  Indeed, the NDA was provided by Smart Communication and was its standard non-disclosure agreement that it required every employee and potential business partner to sign before moving forward.

---

[1] The group of facility customers that obtained the services of both Correct Solutions and Smart Communications shall be hereinafter referred to as the Joint Customers, more specifically identified in Paragraph 19.
[2] Given that Correct Solutions is a party to, and has accused Smart Communications of violating, the NDA, Correct Solutions likely possesses a complete copy of the NDA.

### The Parties' Exclusive Dealing Contract

17.     On or about September 13, 2017, Correct Solutions and Smart Communications executed a Master Services Agreement (the "Agreement"). A true, complete, and authentic copy of the Agreement is attached as **Exhibit B**.

18.     Pursuant to the Agreement, Smart Communications obtained the ***exclusive right*** to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer. Each Schedule is incorporated into the Agreement. In exchange, Correct Solutions was able to maintain its relationships with the Joint Customers by providing for them the high-quality alternative inmate communications services they desired. In addition, Smart Communications granted Correct Solutions a non-exclusive license to access and use its communications system software.

19.     The Agreement incorporates Schedules for the following Joint Customers:

a.     City of St. Louis, Missouri
b.     Sebastian County, Arkansas Sheriff's Office
c.     Washington County, Arkansas
d.     Bowie County, Texas
e.     Wayne County, Georgia
f.     Avoyelles Parish, Louisiana
g.     Lamar County, Mississippi
h.     Moore County, Tennessee

20.     The term of the Agreement is "co-terminous" with and thus mirrors the term of each agreement between Correct Solutions and a Joint Customer.[3] Smart Communications does not know the precise terms of each Joint Customer's agreement with Correct Solutions. However, many of the contracts have a significant amount of time remaining on their initial terms. By way of example, the initial term of Correct Solutions' contract with Bowie County, Texas does not expire until February 9, 2021.

---

[3] Exhibit B, at Section 6.

21.     The Agreement *does not include* a termination without cause or termination on convenience clause.

22.     Section 9 of the Agreement provides the only grounds for termination, as follows:

> <u>Default and Termination.</u>   If either party defaults *in the performance of any obligation* under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has [sic] made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. *Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.*
> (emphasis added).

23.     Accordingly, pursuant to the Agreement, Smart Communications, as the Provider, may terminate the Agreement if Correct Solutions breaches the confidentiality or non-disclosure provisions of the Agreement. This right logically flows from the fact that Smart Communications provided (and licensed) its trade secret and proprietary technology as part of its business arrangement with Correct Solutions. Correct Solutions does not have a reciprocal termination right, consistent with the fact that it did not contribute or license any confidential information.

24.     Indeed, Correct Solutions has no right to terminate the Agreement during the term of any of the contracts with Joint Customers other than by identifying a legitimate default in Smart Communications' performance of the service obligations of the Agreement, which are set forth in more detail in the Schedules to the Agreement, and then providing a reasonable opportunity to cure the default.

**Correct Solutions' Attempts to Seize Smart Communications' Revenue and Market Share**

25.     By early 2018, it became apparent that Smart Communications was exceeding both parties' expectations under the Agreement. The Joint Customers were satisfied with Smart Communications' services and Smart Communications was earning significant revenue due to the popularity of its messaging platform with inmates.

26.     As a result, Correct Solutions became determined to acquire for itself the business and market share that it had promised to Smart Communications on an exclusive basis. Knowing that it had no basis or ability to terminate the Agreement, Correct Solutions first tried lawful means.

27.     In March 2018, Correct Solutions attempted to purchase Smart Communications; however, Smart Communications was not interested in any such acquisition. Correct Solutions then attempted to hire multiple key employees of Smart Communications. Presumably, Correct Solutions sought to obtain valuable business information or relationships with customers; however, the Smart Communications employees were not interested in working for Correct Solutions and rejected its offers.

28.     After these rejections, each party has begun providing new services that it did not provide at the time of the effective date of the Agreement. In or around January 2019, Smart Communications expanded its portfolio to offer telephone communication services to correctional facilities. Correct Solutions had knowledge of Smart Communications' intent to provide telephone services even before Smart Communications obtained the ability to do so. Correct Solutions never expressed displeasure with Smart Communications about its technology or services.  Indeed, to the contrary, Correct Solutions was so impressed with Smart Communications' technology and services that it undertook efforts to purchase the company and continued to market Smart Communications' services to current and prospective customers.

29.     More recently, and following its failed attempts to acquire Smart Communications, Correct Solutions has obtained the ability to provide electronic messaging services similar to those provided by Smart Communications to the Joint Customers. According to its website, *correctsolutionsgroup.com*, Correct Solutions has introduced its "newest technology for correctional facilities," which it refers to as an "iMate E-Device." The iMate E-Device is a tablet that Correct Solutions touts as "an all-in-one solution for inmate communications, entertainment, and eLearning." Undoubtedly, the iMate E-Device was designed to mimic the suite of services provided by Smart Communications' system. Whether through the iMate E-Device or through partnerships with other providers of messaging services, Correct Solutions could now, at least theoretically, self-perform the services granted to Smart Communications in the Agreement.

30.     Now that Correct Solutions can provide electronic messaging services, it has become even more determined to displace Smart Communications as the exclusive provider of these services to the Joint Customers. Indeed, Correct Solutions was willing to unlawfully terminate the Agreement based on contrived and illegitimate reasons unsupported by fact or law.

31.     On or about April 8, 2019, Smart Communications sent a mass marketing email to all of its customers. The email was a general advertisement—it was not tailored toward or directed to any particular customer. A true, complete, and authentic copy of the marketing email is attached as **Exhibit C**.

32.     Despite the fact that it had never complained about Smart Communications offering telephone services, Correct Solutions decided to use this email as the springboard for its unlawful termination. Correct Solutions believed that if it could characterize this general advertisement as some sort of breach of the Agreement, then it could eliminate Smart Communications' exclusivity and abscond with the Joint Customers' messaging business.

33.     By way of a letter dated July 17, 2019, Correct Solutions informed Smart Communications that it purportedly violated the NDA and breached the Agreement.[4] The letter also purports to terminate the Agreement. A true, complete, and authentic copy of Correct Solutions' letter dated July 17, 2019 letter is attached as **Exhibit D.**

34.     The letter does not raise any performance-related issues or ask Smart Communications to cure any service-related deficiencies. Instead, the letter sets forth the untenable position that, because Smart Communications sent a mass email advertising that it pays 100% commission on telephone revenue, it must have stolen and used Correct Solutions' confidential information.

35.     With no contractual grounds by which to complain about Smart Communications' telephone offerings, Correct Solutions based the entirety of its accusations on Smart Communications' alleged use of Correct Solutions' Confidential Information, as that term is defined in the NDA and/or Agreement.

36.     But Correct Solutions does not even identify the Confidential Information that Smart Communications supposedly used. At most, Correct Solutions infers that Smart Communications may have used its knowledge of the commission rate offered by Correct Solutions to a Joint Customer, the City of St. Louis. The sum of the factual predicate for Correct Solutions' accusations is as follows:

> Specifically, Smart [Communications] employee Jennifer Tongate has made contact with current [Correct Solutions] customer, city of St. Louis facility, offering greater commission to the facility than [Correct Solutions] pays to the customer. Smart [Communications] employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by [Correct Solutions] as a result of the

---

[4] Because it was sent only by way of certified mail, it was not actually received by Smart Communications until a week later, on July 24, 2019.

contractual relationship between Smart [Communications] and [Correct Solutions].

37.     By stating that Smart Communications' employee had "no prior relationship," Correct Solutions admits that the employee has a current relationship with the Joint Customer. Indeed, due to its regular and ongoing services, Smart Communications has substantial relationships with all Joint Customers.

38.     Further, the implication that Smart Communications must have used secret information about its commission structure with the Joint Customer in order to calculate and convey a better offer to the Joint Customer is fatally flawed for two reasons: (a) the commission provided by Correct Solutions to the City of St. Louis is publicly known or available; and (b) Smart Communications' mass marketing email offers a 100% commission on telephone services, which is obviously at least as high as every offer from any competitor and requires no secret information upon which to calculate a more favorable offer than Correct Solutions provides.

39.     Nor does Smart Communications' entry into the telephone market provide a basis to terminate the Agreement. Neither the NDA nor the Agreement prohibits either party from offering services in competition with the other party. If such a prohibition existed, then Correct Solutions would have violated the provision when it began marketing and selling its iMate E-Device or another similar service.

40.     The motivation behind the letter is clear: Correct Solutions wants the business it expressly and exclusively promised to Smart Communications.

41.     Accordingly, Correct Solutions' claims that Smart Communications violated the NDA and breached the Agreement are based on accusations that have no merit as a matter of law.

42.     Relying on only these meritless allegations, Correct Solutions purports to terminate the Agreement and all Schedules, effective immediately.

43.     Correct Solutions also demands, without any legal basis whatsoever, that Smart Communications cease "all contact with [Correct Solutions'] customers either in person, by phone, text, email or direct mail." Constitutional concerns aside, Smart Communications has ongoing business relationships with the Joint Customers and provides essential services for the inmates at the Joint Customers' facilities, such that Smart Communications cannot simply stop communicating with them.

44.     Finally, Correct Solutions demands that Smart Communications exit all Joint Customer facilities and remove all Smart Communications systems from the facilities.

45.     On July 26, 2019, just two days after Smart Communications received Correct Solutions' July 17, 2019 letter, Smart Communications sent a response letter. A true, complete, and authentic copy of the July 26, 2019 response letter is attached as **Exhibit E.**

46.     In its letter, Smart Communications informed Correct Solutions that Correct Solutions may not terminate the Agreement for a breach of a confidentiality or non-disclosure provision of the Agreement or NDA.

47.     Later on July 26, 2019, Correct Solutions responded by email to Smart Communications and stated that "Correct Solutions has not slandered Smart [Communications], or spoken ill of Smart [Communications] to any Smart [Communications] customers or potential customers." However, Correct Solutions response did not substantively address to Smart Communications' letter.

48.     Despite repeated requests for an answer, as of the time of this filing, Correct Solutions never provided a substantive response to Smart Communications' position with respect to the purported termination of the Agreement, and never provided a reasonable identification of the purported confidential information it alleged was obtained and misused.

49.     Moreover, Correct Solutions never asserted any other ground(s) for termination of the Agreement and never identified a specific default in Smart Communications' performance under the Agreement.

50.     However, Correct Solutions has not been silent because it is retreating from its position. To the contrary, Correct Solutions has been engaging in a concerted effort to turn Joint Customers against Smart Communications, including by secretly informing them that Correct Solutions and Smart Communications no longer have a business relationship and has been urging Joint Customers to manufacture or exaggerate complaints. Worse yet, Correct Solutions informed Smart Communications' own direct customer, Miller County, that the parties do not have a relationship.

51.     Correct Solutions' statements regarding the lack of business relationship with Smart Communications are demonstrably false because, as described above, Correct Solutions did not and cannot effectively terminate the Agreement.

52.     Correct Solutions' false statements are causing harm to Smart Communications' reputation and good will in the industry. Miller County has accused Smart Communications of being "misleading" and "not truthful" as a direct result of Correct Solutions' bad faith conduct. A true, complete, and authentic copy of the July 29, 2017 email from Miller County is attached as **Exhibit F.**

53.     On July 31, 2019, Smart Communications received an email from a Joint Customer, Washington County, complaining about supposed service issues and advising Smart Communications it will be "actively looking for a new vendor to replace Smart Communications." A true, complete, and authentic copy of the July 31, 2019 email is attached as **Exhibit G.**

54.     Prior to Smart Communications informing Correct Solutions that its attempted termination was ineffective, Washington County did not have any significant issues with Smart Communications' services. Any minor issues had been addressed or were in the process of being addressed when Washington County abruptly changed its position and informed Smart Communications of its decision to seek a new vendor.

55.     The conduct of the Joint Customers in the immediate aftermath of Correct Solutions' purported termination demonstrates that Correct Solutions has breached or repudiated the Agreement, which obligates Correct Solutions to grant Smart Communications the exclusive right to maintain and derive revenue from messaging services in the Joint Customers' facilities, as long as the Joint Customers are contractually obligated to Correct Solutions.

56.     As a result, Smart Communications has suffered irreparable harm for which it has no adequate remedy at law and will continue to suffer irreparable harm if the harmful conduct is not enjoined. Smart Communications bargained for and received exclusive relationships with the Joint Customers throughout the terms of Correct Solutions' agreements with the Joint Customers. Smart Communications has no ability to measure the losses it will incur if Correct Solutions is not enjoined from improperly terminating the Agreement and disavowing Smart Communications' exclusive rights. In addition to lost profits, Smart Communications will incur immeasurable losses in goodwill and reputation if its equipment is removed from the facilities of Joint Customers or if Joint Customers continue to be informed that Smart Communications has been terminated or has no relationship with Correct Solutions. Further, Smart Communications will not be able to realize or recoup the substantial investment it has made in its exclusive relationship with Correct Solutions and in installing and providing services to the Joint Customers. Smart Communications will also

lose market share, the ability to sell additional services to customers, and the ability to fairly compete for future contracts.

57.     Correct Solutions' conduct will continue to cause irreparable harm to Smart Communications unless restrained, restricted, and enjoined by this Court.

58.     Entry of an injunction will serve the public interest, prevent further and continuing breach of the Agreement, and maintain the *status quo* of services being provided to Joint Customers.

59.     At all material times, Smart Communications has performed all of its duties and obligations pursuant to the NDA and Agreement and remains ready, willing, and able to continue to perform such duties and obligations.

60.     All conditions precedent to the bringing and maintenance of this lawsuit have been met, have occurred, or have been waived.

61.     Plaintiff has retained the law firm of Bajo | Cuva | Cohen | Turkel to prosecute this action and is obligated to pay the firms' fees and costs for their services.

**COUNT I**
**DECLARATORY RELIEF**
(Mutual Confidentiality and Nondisclosure Agreement)

62.     Smart Communications realleges paragraphs 1 through 61.

63.     This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

64.     In its July 17, 2019 letter, Correct Solutions alleged that Smart Communications violated the terms of the NDA by using Confidential Information obtained through Smart Communications' contractual relationship with Correct Solutions.

65.     The NDA was executed on June 15, 2017, in contemplation that the parties may enter other agreements with each other.

66.     Subsequently, the parties entered into the Agreement. The Agreement also includes a Confidential Information and Non-Disclosure provision.

67.     The Agreement provides that it supersedes the NDA and that it is the complete agreement, together with the Schedules, between the parties.

68.     However, Correct Solutions has accused Smart Communications of violating the NDA and has used the alleged violation, at least in part, as a predicate to purportedly terminate the Agreement.

69.     Therefore, Smart Communications is in doubt concerning its rights under the NDA and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart Communications and Correct Solutions concerning the proper interpretation of the NDA.

70.     Smart Communications is entitled to have its uncertainty removed with respect to its rights and obligations under the NDA.

71.     The parties have an actual, present, or adverse and antagonistic interest regarding the NDA.

72.     All interested parties and potential adverse interests are before this Court.

73.     The relief sought by Smart Communications in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

74.     Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart Communications may obtain a declaration of rights under the NDA.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that the Agreement superseded the NDA such that neither party can be in violation of the NDA; (b) declaring that Correct Solutions may not rely on a violation of the NDA as a predicate to terminate the Agreement and that the termination was

ineffective; (c) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; (d) prohibiting Correct Solutions from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct Solutions, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart Communications' status as the exclusive provider of messaging and related services for the Joint Customers; (e) awarding Smart Communications its attorneys' fees and costs pursuant to Section 13 of the NDA; and (f) for such further relief as the Court deems just and proper.

## COUNT II
## DECLARATORY RELIEF
(Master Services Agreement)

75.     Smart Communications realleges Paragraphs 1 through 61.

76.     This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

77.     In its July 17, 2019 letter, Correct Solutions alleged that Smart Communications violated the terms of the Agreement by using Confidential Information obtained through Smart Communications' contractual relationship with Correct Solutions.

78.     The information Correct Solutions accuses Smart Communications of using is not confidential as a matter of law.

79.     Even if Smart Communications used Correct Solutions' Confidential Information, Correct Solutions may not terminate the Agreement for such a violation.

80.     However, Correct Solutions has accused Smart Communications of violating the Agreement and has used the alleged violation, at least in part, as a predicate to purportedly terminate the Agreement.

81.     Therefore, Smart Communications is in doubt concerning its rights under the Agreement and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart Communications and Correct Solutions concerning the proper interpretation of the Agreement.

82.     Smart Communications is entitled to have its uncertainty removed with respect to its rights and obligations under the Agreement.

83.     The parties have an actual, present, or adverse and antagonistic interest regarding the Agreement.

84.     All interested parties and potential adverse interests are before this Court.

85.     The relief sought by Smart Communications in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

86.     Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart Communications may obtain a declaration of rights under the Agreement.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that Correct Solutions may not rely on a violation of the Confidential Information and Non-Disclosure provision of the Agreement as a predicate to terminate the Agreement and that the termination was ineffective; (b) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; (c) prohibiting Correct Solutions from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct Solutions, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart Communications' status as the exclusive

provider of messaging and related services for the Joint Customers; (d) awarding Smart Communications its costs; and (e) for such further relief as the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
### (Master Services Agreement – Injunctive Relief)

87.     Smart Communications realleges Paragraphs 1 through 61.

88.     Correct Solutions improperly attempted to terminate the Agreement and has been falsely representing to Joint Customers that Smart Communications has no relationship with Correct Solutions and, as a result, no right to provide services to Joint Customers.

89.     As a result, certain Joint Customers have since indicated that they will be actively looking for a new vendor to replace Smart Communications.

90.     Pursuant to section 2 of the Agreement, Correct Solutions granted Smart Communications the exclusive right to provide the inmate communications services identified in the Schedules to the Joint Customers. Correct Solutions may not permit a third party to provide the same types of services to the Joint Customers.

91.     Pursuant to the Schedules, Correct Solutions promised to provide Smart Communications with access to the Joint Customers.

92.     Correct Solutions breached the Agreement, including the Schedules, by informing the Joint Customers that Correct Solutions does not have an ongoing business relationship with Smart Communications, permitting Joint Customers to attempt to replace Smart Communications, and by unlawfully attempting to terminate the Agreement, thereby preventing Smart Communications from having meaningful access to the Joint Customers.

93.     As a direct and proximate cause of the breach, Smart Communications has been and will continue to be irreparably harmed, as described above.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; (b) prohibiting Correct Solutions from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct Solutions, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart Communications' status as the exclusive provider of messaging and related services for the Joint Customers; and (c) for such further relief as the Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Master Services Agreement – Injunctive Relief)

94.    Smart Communications realleges Paragraphs 1 through 61.

95.    In every contract, including the Agreement, an implied covenant of good faith and fair dealing exists.

96.    Correct Solutions agreed that Smart Communications had the exclusive right to provide messaging and related services to the Joint Customers during the terms of its agreements with the Joint Customers.

97.    Correct Solutions also agreed that it would not terminate the Agreement without cause related to the performance of the Agreement and without following the proper procedures, including a cure period.

98.    Correct Solutions breached the covenant of good faith and fair dealing implied in the exclusivity and termination provisions of the Agreement by manufacturing improper grounds to purportedly terminate the Agreement.

99.     As a direct and proximate cause of the breach, Smart Communications has been and will continue to be irreparably harmed, as described above.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; (b) prohibiting Correct Solutions from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct Solutions, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart Communications' status as the exclusive provider of messaging and related services for the Joint Customers; and (c) for such further relief as the Court deems just and proper.

## **VERIFICATION**

I have read every statement made in this complaint and each statement is true and correct. I understand that the statements made in this complaint are being made under penalty of perjury, punishable as provided in section 837.02, Florida Statutes.

Jon Logan
CEO, Smart Communications

Dated this 2nd day of August, 2019.

/s/ Brad F. Barrios
Brad F. Barrios
Florida Bar No. 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes
Florida Bar No. 96657
E-mail: dhayes@bajocuva.com
**BAJO | CUVA | COHEN | TURKEL**
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT A

*to Verified Complaint*



## MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Mutual Confidentiality and Nondisclosure Agreement (this "Agreement") is entered this _15TH_ day of June 2017 between Smart Communications Holding, Inc. ("SCH"), a Florida corporation, located at 4522 West North B Street, Tampa, Florida 33609 and Correct Solutions Group, ("COMPANY"), a Louisiana corporation, located at 192 Bastille Lane, #200, Ruston, Louisiana 71270. SCH and COMPANY are sometimes hereinafter referred to in this Agreement as a "Party" or, collectively, as the "Parties."

### RECITALS:

A.    The Parties contemplate certain discussions with the potential that they may enter other agreements with each other.

B.    To facilitate such discussions certain confidential and/or proprietary information that is the property of, or used by, SCH or COMPANY may be disclosed to or discovered by the Other party. The Parties acknowledge that the disclosing party will not disclose such information unless the receiving party agrees to maintain such in strict confidence and in accordance with this Agreement.

NOW THEREFORE, the Parties agree as follows:

1.    "Confidential Information" shall mean any and all information relating to the business and operations of the disclosing party owned, licensed or controlled by the disclosing party, including, but not limited to, any or all of the following: know how, products, product ideas, properties, data, technologies, methods, procedures, plans, business plans, forecasts, financial and other business information, including without limitation pricing, fees and programming fees offered to the receiving party or other customers or potential customers by the disclosing party; identities of actual customers, investors or other individuals and entities having a current business relationship with the disclosing party; trade secrets, consisting of confidential and proprietary information not generally known to the public including without limitation software (e.g., source, object and executable code in hard copy and electronic format) and hardware relating to implementation of any of the technology of the disclosing party; technical specifications; manuals, diagrams, charts and other descriptive materials relating to the technology of the disclosing party; and any and all patentable or non-patentable inventions or ideas, and all copyrightable or non-copyrightable subject matter and derivative works thereof. Confidential Information also includes information that derives independent economic value, actual or potential, from being not generally known to the public or to other persons who can obtain economic value from its disclosure or use, and which is the subject of reasonable efforts to maintain its non-disclosure. Confidential Information includes documents, drawings, reports and other records in any media that incorporate, reference or are based upon any "Confidential Information" provided by the disclosing party, including, without limitation, any such documents, drawings, reports or records that are generated because of or as a part of the Parties discussing and considering a business relationship between each other. It is agreed that these definitions shall be construed together where applicable, and separately where necessary, in whatever manner is the most inclusive and best protects any information which may be considered by the disclosing party to be Confidential Information.

7.     Without the prior written consent of the disclosing party, the receiving party will not, and the receiving party will direct all of its partners, officers, employees, agents and representatives not to, disclose to any person or entity either the fact that discussions or negotiations are taking place in connection with the purpose of this Agreement or any other potential transactions between the Parties, or any of the terms, conditions or other facts with respect to any such purpose or potential transactions, including the status thereof.

8.     The receiving party acknowledges and agrees that any breach of this Agreement would cause immediate and irreparable injury to the disclosing party and monetary damages would be difficult if not impossible to ascertain. The receiving party agrees that should the receiving party violate any of the terms and conditions of this Agreement, the disclosing party shall be entitled to seek and obtain immediate, preliminary and permanent injunctive relief to enjoin further and future violations of this Agreement without a requirement to post a security bond. Nothing contained in this Agreement shall affect the right of the disclosing party to seek and obtain monetary damages in addition to such equitable relief.

9.     This Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of the Parties and shall be construed as if written jointly by both Parties and pursuant to the laws of the State of Florida. The Parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Hillsborough County, Florida. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought in the courts of record of the State of Florida in Hillsborough County or the United States District Court, Middle District of Florida. The Parties consent to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court.

10.    The provisions of this Agreement are severable, and if any provision is held to be invalid, unenforceable or void, the remaining provisions shall not be invalidated thereby.

11.    The terms of this Agreement shall remain in full force notwithstanding the completion of the evaluations contemplated by the Parties or the achievement or abandonment of the purpose of this Agreement, the termination of relationships between the Parties or the return of all written materials containing Confidential Information to the Parties.

12.    The terms of this Agreement shall survive for five (5) years after the date of this Agreement; provided, however, that non-disclosure and non-use obligations shall not terminate for any trade secret until such trade secret is no longer a trade secret.

13.    If any civil action, arbitration or other legal proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, sales and use taxes, court costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs and expenses incident to arbitration, appellate, bankruptcy

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT B

*to Verified Complaint*

 

# Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i)  permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

<div align="center">Miscellaneous</div>

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: 9/13/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: 8-31-17

Email: ████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT C

### *to Verified Complaint*



**Smart** Communications

# 100% PHONE COMMISSION
THE NEW LEADER IN INMATE COMMUNICATIONS

**CORRECTIONS SIMPLIFIED**

PHONES

TABLETS

KIOSKS

MAILGUARD

VIDEO VISITATION

EDUCATION

## Imagine a World with 100% Phone Revenue...
## a Complete Inmate Technology Platform...
## and Zero Expense...

## 100% phone commissions? How do we do it?

Simply put, we do not need your phone revenue to operate.
Other ITS providers, with lesser technology platforms, do need your phone revenue.

With our 10 years of expertise in electronic inmate communication, our technology is not just good, it is great.
The results: our usage is higher, and the maintenance is lower, creating a self-supporting electronic platform
that is unmatched by any other vendor in corrections. This means Smart Communications can **guarantee** the
return of phone revenue to your agency, sky rocketing your agency's phone revenue.

Smart Communications is dedicated to providing our clients with **more features**, **more intelligence**, and
**more revenue** than any other platform offered in corrections.

## Facts First

✓ Fastest growing company in corrections with **532.33%** growth per year

✓ 100% phone commission. Smart Communications returns all phone revenue to agency

✓ 2009 developed first two-way inmate electronic communications platform in corrections

✓ 2010 developed first electronic request system in corrections

✓ 2015 developed MailGuard® corrections first and only Patent Pending postal mail elimination system

✓ 2017 developed MailGuardLegal™ corrections first and only Patent Pending legal mail system

✓ 2018 acquired the first and longest running inmate calling platform in corrections est. 1986

✓ 2018 acquired the first VOIP inmate calling platform in corrections est. 2002

## Why Did We Get into the Phone Business?

Tired of the commission games and false technology promises made by current ITS providers? So are we!
Smart Communications enters the ITS industry to **end the games**.

Smart Communications acquired the most proven inmate calling platform in corrections and is reinventing
**inmate communication**. As the true innovator in corrections technology, we don't need the phone revenue to
operate. Instead we pioneered new technology and generate new streams of revenue while
maximizing facility automation, security and revenue.

No other vendor can offer **100% phone revenue**, because no other vendor has technology that performs to the
level of Smart Communications technology package. The days of smoke and mirrors is over,
Smart Communications is the new leader in inmate communications.

[ Click Here to Request More Information ]

Corrections, Simplified
Copyright © 2018 by Smart Communications Holding, Inc.

Smart Communications | 10491 72nd Street, Seminole, FL 33777

Unsubscribe ████@stlouis-mo.gov

Update Profile | About our service provider

Sent by ████@smartcommunications.us in collaboration with

**Constant Contact**

Try it free today

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT D

*to Verified Complaint*

# ROEDEL PARSONS KOCH
# BLACHE BALHOFF &MCCOLLISTER

A  L A W  C O R P O R A T I O N

roedelparsons.com

**Christina B. Peck, Attorney**
*CPeck@RoedelParsons.com*
**Baton Rouge Office**

*Telephone:  (225) 929-7033*
*Direct Dial: (225) 329-1281*
*Facsimile:  (225) 928-4925*

July 17, 2019

## VIA CERTIFIED MAIL, RETURN RECEIPT NO. <u>7011 0470 0002 4894 0540</u>

Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan

> Re: Mutual Confidentiality and Nondisclosure Agreement and
> Master Services Agreement between Correct Solutions, LLC and
> Smart Communications Holding, Inc

Dear Mr. Logan:

This firm represents Correct Solutions, LLC (CSG) in connection with the Mutual Confidentiality and Nondisclosure Agreement (NDA) and the Master Services Agreement (MSA) between CSG and Smart Communications Holding, Inc. (Smart).  As you are aware, both the NDA and the MSA prohibit Smart from using Confidential Information, as defined by the NDA and the MSA, for any purpose except the purposes specified in the NDA, and prohibit Smart from using Confidential Information in any fashion except to perform its duties under the MSA.

CSG has discovered that Smart has violated the terms of both the NDA and the MSA within the past few months by entering, or attempting to enter, the inmate phone market as a competitor to CSG using Confidential Information Smart obtained through Smart's contractual relationship with CSG. Specifically, Smart employee Jennifer Tongate has made contact with current CSG customer, City of St. Louis facility, offering greater commission to the facility than CSG pays to the customer. Tongate also sent advertisement directly to the St. Louis facility offering a better commission. Smart employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by CSG as a result of the contractual relationship between Smart and CSG.

The use of Confidential Information by Smart's employee to solicit CSG's customers violates Smart's obligations under the NDA and the MSA to take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in these agreements, and is a direct interference with CSG's contractual agreement with the St. Louis facility.

1

In light of Smart's egregious breach of the NDA and the MSA through the misuse of Confidential Information to directly solicit CSG's customers in an attempt to lure the customers from CSG to Smart, this letter is formal notice to Smart that CSG hereby terminates the MSA and all Schedules thereto effective immediately. This letter is also a formal demand that Smart and its employees cease all activities that are in violation of the confidentiality provisions of the NDA and the MSA immediately, including but not limited to ceasing all contact with CGS's customers either in person, by phone, text, email or direct mail.

In addition to termination of the MSA and all Schedules thereto, CSG reserves its right to seek any and all remedies provided to CSG under the NDA and the MSA, including but not limited to the right to seek and obtain immediate, preliminary and permanent injunctive relief to enjoin further and future violations of the NDA and MSA, plus monetary damages, attorneys' fees, court costs and all expenses incurred by CSG should legal action be required.

Upon receipt of this letter, please contact Rick Pruitt at CSG to make arrangements to exit all facilities currently being serviced by Smart and to remove all Smart systems from these facilities.

Sincerely,

Christina B. Peck

CBP/clb

cc:     Correct Solutions, LLC (via email)

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT E

*to Verified Complaint*



*David L. Gann*
*General Counsel*
*Smart Communications*
*10491 72nd St.*
*Seminole, FL 33777*
*david.gann@smartcommunications.us*
*Not licensed to practice in Florida*

July 26, 2019

**Via email and UPS Mail**

Christina B. Peck
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, St. 301
Baton Rouge, LA 70809
cpeck@roedelparsons.com

*Re: Smart Communications' Agreement with Correct Solutions*

Dear Ms. Peck:

I am General Counsel for Smart Communications and am in receipt of your letter dated July 17, 2019, regarding our agreement with Correct Solutions (CSG). As an initial matter, we are surprised that you would choose to send such a time sensitive and critical communication only via certified US mail (which required our staff to obtain it from the post office several days later), without providing a courtesy copy to any of our company representatives via email. Given the exaggerated nature of your client's allegations and the baselessness of your apparent legal positions, we can only surmise you hoped to gain some advantage by delaying our ability to respond.

As to the substance of the allegations, Smart Communications flatly denies having committed any violation or default of the parties' agreement. As we understand from CSG's accusations, at least to the limited extent they were described in your letter, it appears CSG is claiming Ms. Tongate somehow misused CSG's confidential information to solicit business from the City of St. Louis. But your letter fails to identify with any degree of specificity the alleged confidential information that CSG claims was obtained and then misused. Certainly, the fact that St. Louis operates a correctional facility that contracts for various services does not qualify as "Confidential Information," as that is well known throughout the public domain.

Moreover, as you are no doubt aware, St. Louis is an existing customer of ours and we have an ongoing business relationship with them. That Ms. Tongate is in communication with St. Louis is quite unremarkable, given she regularly provides in-person support and training for our systems and products for all of our customers in her region. In addition, we have looked into the alleged solicitation that you referenced, which was a mass marketing email that was blasted out to all of our customers. This can hardly be characterized either as a targeted solicitation or one that had anything to do with information obtained from your client, confidential or



otherwise.  Nor could the communication be construed as an unjustified interference with CSG's relationship with any particular party.  Your effort to portray this mass email as a default of the parties' agreement is nothing more than a transparent attempt to manufacture a contractual dispute that CSG apparently hopes will permit termination.  There simply has been no violation or default by Smart Communications, from its mass marketing email or otherwise.  Moreover, as outlined below, CSG has no power to terminate the agreement for any alleged breach of its confidentiality provisions.  And even if it had such power (it clearly does not), CSG must first provide Smart Communications with specific notice and an opportunity to cure.

For your reference, Section 9 of the MSA provides:

> 9.  Default and Termination.  If **either party defaults in the performance of any obligation** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. **Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement**. (emphasis added).

Accordingly, only Smart Communications (as the Provider) may terminate the agreement for breaches of its confidentiality or non-disclosure provisions—which logically flows from the fact that we are providing our proprietary and trade secret-protected technology as part of the business arrangement.  Had the parties intended this right to be reciprocal, they would have crafted the language accordingly.  The remainder of Section 9 provides for termination rights only for defaults *in the performance* of any obligation of the MSA.  As you are no doubt aware, the performance obligations relate primarily to the technology and services we are to provide and to the subsequent cooperation that CSG must give so that we may derive revenue from our contribution.  Consistent with these performance obligations, and not with any alleged breach of confidentiality or non-disclosure, the agreement provides for a thirty-day cure period.

Even assuming for the sake of argument that the contract allowed CSG to identify a breach of confidentiality that may serve as grounds for termination (which is not allowed by the plain terms of the agreement as explained above), it must still "*specifically* describ[e] the nature of the [alleged] default."  In that instance, upon our receipt of such specific description and notice, we would have a good faith opportunity to cure the alleged default during a period of thirty days after receipt, extended as reasonably necessary.  Your July 17 letter fails to provide adequate notice sufficient to trigger the cure period in accordance with this provision, at least because it fails to identify with any reasonable degree of specificity the alleged confidential information that CSG alleges was obtained and misused.



Finally, as you may be aware, there has been a strain on the parties' business relationship that has developed over some time as a result of a dispute concerning a specific mutual customer's demands as it relates to our products and services.  As we have conveyed to your client in the past, we are willing to engage in business discussions in an effort to resolve this specific customer issue.  And we remain willing to do so.  However, your client's transparent, bad faith efforts to manufacture and contrive a termination of our contract and to interfere with our business relationships to get out of the arrangement will not be tolerated.  To reiterate, the parties' agreement remains in full force and effect, and we have yet to receive sufficient notice of any alleged default as required in order to trigger our cure period, even assuming for the sake of argument an alleged breach of confidentiality could do so.

We demand that CSG immediately cease and desist its bad faith conduct in our business relationship, including its bad faith efforts to terminate the MSA.  We further demand that CSG immediately cease and desist any and all efforts to intentionally harm and interfere with our business relationships involving our mutual customers.  We further demand that CSG immediately cease and desist any and all efforts to harm the reputation or good will of Smart Communications, both to our mutual customers and throughout the marketplace.  Please be advised that we will vigorously protect our customer relationships, our business, and our reputation and good will, and we will not abide your client's continued bad faith conduct.  We reserve our rights to take all appropriate legal action, including seeking a temporary restraining order and preliminary injunction to protect and prevent against this type of irreparable harm.

Please immediately confirm that your client has not slandered or spoken ill of Smart Communications to any of our mutual customers, or to any potential customers, and that it will conduct itself in good faith in furtherance of our agreements going forward.  If we do not hear from you by close of business on Monday, July 29, 2019, we will assume that your client has no intention of so confirming.

Very truly yours,

David L. Gann

cc:     Brad F. Barrios, Esq.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT F

*to Verified Complaint*

On Jul 29, 2019, at 8:37 AM, Jeffie Walker ████████@millercountyso.us> wrote:

Lisa………..

First of all, I would like to thank Justin for all he did………..

Secondly, I have a concern that has bothered those of us in the meeting that we had with you and Justin……..I had asked you if you all were still partners with Correct Solutions and you stated in front of me, Captain Adams, Lt. Miller and Justin that 'Yes, we are still partners with Correct Solutions'……..when, in fact, you all are not partners with them………..I verified this with Rick Ferguson on Thursday, July 25…………..I have spoken with the Sheriff about your misleading us in our meeting and he is not happy………..those of us who were in the meeting are not happy that you stated an untruth and really don't see how we can move forward with a company who is not truthful with us……….. you can give me a call and we can discuss this matter……….

Jeffie Walker, Warden

Miller County Sheriff's Office

Detention Division

2300 East Street

Texarkana, AR  71854

Ph ██████████████

Fax ████████████

1

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  [NEW]

# EXHIBIT G

*to Verified Complaint*

From: **Alan Johnson** <▮▮▮▮▮@co.washington.ar.us>
Date: Wed, Jul 31, 2019 at 10:14
Subject: Complaints
To: Jennifer Tongate ▮▮▮▮▮▮▮@smartcommunications.us>

Jennifer,

     I am writing this email to inform you of Washington County Sheriff's Office displeasure with Smart Communications. Since we have come online with Smart Communications we have had nothing but problems. Customer support has been very disappointing to say the least. One of the biggest selling points of Smart Communications was video visitation and tablet system. The tablets have never work correctly and the video visitation on the tablets has never worked (approximately a year later). We have had continuous problems with the regular visitation of locking up, unable to hear and facial detection to list a few. We attempt to contact Smart Communications on an almost daily basis asking for help and relief from the constant problems with your company. We are receiving complaints from the public on a regular basis in regards to Smart Communications. For the reasons listed above, I wanted to advise you the Washington County Sheriff's Office will be actively looking for a new vendor to replace Smart Communications.

Best Regards,

Captain Alan Johnson

--

Case 8:20-cv-01469-WFJ-TGW   Document 1-2   Filed 06/26/20   Page 56 of 217 PageID 88

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                     Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## MOTION FOR TEMPORARY INJUNCTION

       Plaintiff, Smart Communications Holding, Inc. ("Smart Communications") by counsel and pursuant to Florida Rule of Civil Procedure 1.610, hereby files this Motion for Temporary Injunction ("Motion"). The grounds upon which this Motion is based and the reasons it should be granted are as follows.

### Statement of Facts[1]

       1.       To meet the needs of their existing customers and to remain competitive in the inmate communications industry, Correct Solutions approached Smart Communications in 2017 about an arrangement whereby Correct Solutions' customers could obtain the benefits of Smart Communications' state-of-the-art communications system. Correct Solutions pursued Smart Communications for many reasons. First, correctional facilities desired to provide inmates with communication options other than telephone calls, such as electronic messaging. Second, facilities sought a system that was easy to use and provided inmates with direct access to necessary forms, entertainment, and educational content. Third, facility staff desired more investigative features to

---

[1] Smart Communications verified these facts in the Verified Complaint.

easily monitor and track their inmates' routine, non-legal communications with the outside world. Correct Solutions could not meet these needs and knew that Smart Communications had pioneered inmate messaging with a system, developed and refined over time, which presented an unmatched collection of features and functions. To be associated with Smart Communications in the eyes of their customers was to be connected with innovation and quality and only served to increase Correct Solutions' ability to continue their customer relationships through contract renewals.

2.     Upon information and belief, Correct Solutions would have lost many of its customers if it could not provide the type of messaging services which Smart Communications provided. Ultimately, due to its relationship with Smart Communications, Correct Solutions was able to satisfy their existing customers and was also able to obtain new customers.

3.     The intent of the proposed business relationship was that Correct Solutions and Smart Communications would each provide their respective services directly to a pool of customers. As opposed to Correct Solutions incorporating Smart Communications' system into its own system, the products and services of the parties remained separate and distinct. Neither an inmate nor a facility staff member had to access Correct Solutions' telephone system in order to access Smart Communications' messaging system. Smart Communications trained and interfaced with facility staff on all issues related to Smart Communications' services. Smart Communications collected revenue in its ordinary course when facility inmates exchanged messages with outside contacts, without involvement of Correct Solutions. The facility customers, some of which were existing Correct Solutions customers, became Joint Customers of both parties.[2]

---

[2] The group of facility customers that obtained the services of both Correct Solutions and Smart Communications shall be hereinafter referred to as the Joint Customers, more specifically identified in Paragraph 9 of this Motion.

4.       In contemplation of this potential business arrangement, on June 15, 2017, Smart Communications and Correct Solutions entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA"). A partial copy of the NDA is attached as **Exhibit A** to the Verified Complaint.

5.       Pursuant to the NDA, the parties excluded from the definition of Confidential Information "any materials or information…generally known…by the public…", among other exclusions.

6.       Upon execution of the NDA, Correct Solutions did not disclose any Confidential Information to Smart Communications. Such disclosure was unnecessary because many of the Joint Customers were already using Correct Solutions' services and equipment. Smart Communications, on the other hand, was to provide and install its proprietary technology and messaging services at Joint Customer facilities, which would potentially require some disclosure of Confidential Information (including trade secrets) to Correct Solutions to ensure a smooth and workable transition to the newly-added services.  Indeed, the NDA was provided by Smart Communications and was its standard non-disclosure agreement that it required every employee and potential business partner to sign before moving forward with any discussions.

<u>The Parties' Exclusive Dealing Contract</u>

7.       On or about September 13, 2017, Correct Solutions and Smart Communications executed a Master Services Agreement (the "Agreement"). A true, complete, and authentic copy of the Agreement is attached as **Exhibit B** to the Verified Complaint.

8.       Pursuant to the Agreement, Smart Communications obtained the ***exclusive right*** to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer. Each Schedule is incorporated into the

Agreement. In exchange, Correct Solutions was able to maintain its relationships with the Joint Customers by providing for them the high-quality alternative inmate communications services they desired. In addition, Smart Communications granted Correct Solutions a non-exclusive license to access and use its communications system software.

9.      The Agreement incorporates Schedules for the following Joint Customers:

      a.      City of St. Louis, Missouri
      b.      Sebastian County, Arkansas Sheriff's Office
      c.      Washington County, Arkansas
      d.      Bowie County, Texas
      e.      Wayne County, Georgia
      f.      Avoyelles Parish, Louisiana
      g.      Lamar County, Mississippi
      h.      Moore County, Tennessee

10.     The term of the Agreement is "co-terminous" with and thus mirrors the term of each agreement between Correct Solutions and a Joint Customer.[3] Smart Communications does not know the precise terms of each Joint Customer's agreement with Correct Solutions. However, many of the contracts have a significant amount of time remaining on their initial terms. By way of example, the initial term of Correct Solutions' contract with Bowie County, Texas does not expire until February 9, 2021.

11.     The Agreement **does not include** a termination without cause or termination on convenience clause.

12.     Section 9 of the Agreement provides the only grounds for termination, as follows:

> <u>Default and Termination.</u>     If either party defaults **in the performance of any obligation** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has [sic] made good faith attempts to

---

[3] Verified Complaint, Exhibit B, at Section 6.

cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. ***Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.*** (emphasis added).

13.     Accordingly, pursuant to the Agreement, Smart Communications, as the Provider, may terminate the Agreement if Correct Solutions breaches the confidentiality or non-disclosure provisions of the Agreement. This right logically flows from the fact that Smart Communications provided (and licensed) its trade secret and proprietary technology as part of its business arrangement with Correct Solutions. Correct Solutions does not have a reciprocal termination right, consistent with the fact that it did not contribute or license any confidential information.

14.     Indeed, Correct Solutions has no right to terminate the Agreement during the term of any of the contracts with Joint Customers other than by identifying a legitimate default in Smart Communications' performance of the service obligations of the Agreement, which are set forth in more detail in the Schedules to the Agreement, and then providing a reasonable opportunity to cure the default.

### Correct Solutions' Attempts to Seize Smart Communications' Revenue and Market Share

15.     By early 2018, it became apparent that Smart Communications was exceeding both parties' expectations under the Agreement. The Joint Customers were satisfied with Smart Communications' services and Smart Communications was earning significant revenue due to the popularity of its messaging platform with inmates.

16.     As a result, Correct Solutions became determined to acquire for itself the business and market share that it had promised to Smart Communications on an exclusive basis. Knowing that it had no basis or ability to terminate the Agreement, Correct Solutions first tried lawful means.

17.     In March 2018, Correct Solutions attempted to purchase Smart Communications; however, Smart Communications was not interested in any such acquisition. Correct Solutions then attempted to hire multiple key employees of Smart Communications. Presumably, Correct Solutions sought to obtain valuable business information or relationships with customers; however, the Smart Communications employees were not interested in working for Correct Solutions and rejected its offers.

18.     After these rejections, each party has begun providing new services that it did not provide at the time of the effective date of the Agreement. In or around January 2019, Smart Communications expanded its portfolio to offer telephone communication services to correctional facilities. Correct Solutions had knowledge of Smart Communications' intent to provide telephone services even before Smart Communications obtained the ability to do so. Correct Solutions never expressed displeasure with Smart Communications about its technology or services.  Indeed, to the contrary, Correct Solutions was so impressed with Smart Communications' technology and services that it undertook efforts to purchase the company and continued to market Smart Communications' services to current and prospective customers.

19.     More recently, and following its failed attempts to acquire Smart Communications, Correct Solutions has obtained the ability to provide electronic messaging services similar to those provided by Smart Communications to the Joint Customers. According to its website, *correctsolutionsgroup.com*, Correct Solutions has introduced its "newest technology for correctional facilities," which it refers to as an "iMate E-Device." The iMate E-Device is a tablet that Correct Solutions touts as "an all-in-one solution for inmate communications, entertainment, and eLearning." Undoubtedly, the iMate E-Device was designed to mimic the suite of services provided by Smart Communications' system. Whether through the iMate E-Device or through

partnerships with other providers of messaging services, Correct Solutions could now, at least theoretically, self-perform the services granted to Smart Communications in the Agreement.

20.     Now that Correct Solutions can provide electronic messaging services, it has become even more determined to displace Smart Communications as the exclusive provider of these services to the Joint Customers. Indeed, Correct Solutions was willing to unlawfully terminate the Agreement based on contrived and illegitimate reasons unsupported by fact or law.

21.     On or about April 8, 2019, Smart Communications sent a mass marketing email to all of its customers. The email was a general advertisement—it was not tailored for or directed to any particular customer. A true, complete, and authentic copy of the marketing email is attached as **Exhibit C** to the Verified Complaint.

22.     Despite the fact that it had never complained about Smart Communications offering telephone services, Correct Solutions decided to use this email as the springboard for its unlawful termination. Correct Solutions believed that if it could characterize this general advertisement as some sort of breach of the Agreement, then it could eliminate Smart Communications' exclusivity and abscond with the Joint Customers' messaging business.

23.     By way of a letter dated July 17, 2019, Correct Solutions informed Smart Communications that it purportedly violated the NDA and breached the Agreement.[4] The letter also purports to terminate the Agreement. A true, complete, and authentic copy of Correct Solutions' letter dated July 17, 2019 letter is attached as **Exhibit D** to the Verified Complaint.

24.     The letter does not raise any performance-related issues or ask Smart Communications to cure any service-related deficiencies. Instead, the letter sets forth the untenable position that, because Smart Communications sent a mass email advertising that it pays 100%

---

[4] Because it was sent only by way of certified mail, it was not actually received by Smart Communications until a week later, on July 24, 2019.

commission on telephone revenue, it must have stolen and used Correct Solutions' confidential information.

25.     With no contractual grounds by which to complain about Smart Communications' telephone offerings, Correct Solutions based the entirety of its accusations on Smart Communications' alleged use of Correct Solutions' Confidential Information, as that term is defined in the NDA and/or Agreement.

26.     But Correct Solutions does not even identify the Confidential Information that Smart Communications supposedly used. At most, Correct Solutions infers that Smart Communications may have used its knowledge of the commission rate offered by Correct Solutions to a Joint Customer, the City of St. Louis. The sum of the factual predicate for Correct Solutions' accusations is as follows:

> Specifically, Smart [Communications] employee Jennifer Tongate has made contact with current [Correct Solutions] customer, city of St. Louis facility, offering greater commission to the facility than [Correct Solutions] pays to the customer. Smart [Communications] employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by [Correct Solutions] as a result of the contractual relationship between Smart [Communications] and [Correct Solutions].

27.     By stating that Smart Communications' employee had "no prior relationship," Correct Solutions admits that the employee has a current relationship with the Joint Customer. Indeed, due to its regular and ongoing services, Smart Communications has substantial relationships with all Joint Customers.

28.     Further, the implication that Smart Communications must have used secret information about its commission structure with the Joint Customer in order to calculate and convey a better offer to the Joint Customer is fatally flawed for two reasons: (a) the commission

provided by Correct Solutions to the City of St. Louis is publicly known or available; and (b) Smart Communications' mass marketing email offers a 100% commission on telephone services, which is obviously at least as high as every offer from any competitor and requires no secret information upon which to calculate a more favorable offer than Correct Solutions provides.

29.     Nor does Smart Communications' entry into the telephone market provide a basis to terminate the Agreement. Neither the NDA nor the Agreement prohibits either party from offering services in competition with the other party. If such a prohibition existed, then Correct Solutions would have violated the provision when it began marketing and selling its iMate E-Device or another similar service.

30.     The motivation behind the letter is clear: Correct Solutions wants the business it expressly and exclusively promised to Smart Communications.

31.     Accordingly, Correct Solutions' claims that Smart Communications violated the NDA and breached the Agreement are based on accusations that have no merit as a matter of law.

32.     Relying on only these meritless allegations, Correct Solutions purports to terminate the Agreement and all Schedules, effective immediately.

33.     Correct Solutions also demands, without any legal basis whatsoever, that Smart Communications cease "all contact with [Correct Solutions'] customers either in person, by phone, text, email or direct mail." Constitutional concerns aside, Smart Communications has ongoing business relationships with the Joint Customers and provides essential services for the inmates at the Joint Customers' facilities, such that Smart Communications cannot simply stop communicating with them.

34.     Finally, Correct Solutions demands that Smart Communications exit all Joint Customer facilities and remove all Smart Communications systems from the facilities.

35.     On July 26, 2019, just two days after Smart Communications received Correct Solutions' July 17, 2019 letter, Smart Communications sent a response letter. A true, complete, and authentic copy of the July 26, 2019 response letter is attached as **Exhibit E** to the Verified Complaint.

36.     In its letter, Smart Communications informed Correct Solutions that Correct Solutions may not terminate the Agreement for a breach of a confidentiality or non-disclosure provision of the Agreement or NDA.

37.     Later on July 26, 2019, Correct Solutions responded by email to Smart Communications and stated that "Correct Solutions has not slandered Smart [Communications], or spoken ill of Smart [Communications] to any Smart [Communications] customers or potential customers." However, Correct Solutions response did not substantively address to Smart Communications' letter.

38.     Despite repeated requests for an answer, as of the time of this filing, Correct Solutions never provided a substantive response to Smart Communications' position with respect to the purported termination of the Agreement, and never provided a reasonable identification of the purported confidential information it alleged was obtained and misused.

39.     Moreover, Correct Solutions never asserted any other ground(s) for termination of the Agreement and never identified a specific default in Smart Communications' performance under the Agreement.

40.     However, Correct Solutions has not been silent because it is retreating from its position. To the contrary, Correct Solutions has been engaging in a concerted effort to turn Joint Customers against Smart Communications, including by secretly telling them that Correct Solutions and Smart Communications no longer have a business relationship and by urging Joint

Customers to manufacture or exaggerate complaints. Worse yet, Correct Solutions informed Smart Communications' own direct customer, Miller County, that the parties do not have a relationship.

41.     Correct Solutions' statements regarding the lack of business relationship with Smart Communications are demonstrably false because, as described above, Correct Solutions did not and cannot effectively terminate the Agreement.

42.     Correct Solutions' false statements are already causing demonstrable harm to Smart Communications' reputation and good will in the industry. For example, Miller County has accused Smart Communications of being "misleading" and "not truthful" as a direct result of Correct Solutions' bad faith conduct. A true, complete, and authentic copy of the July 29, 2017 email from Miller County is attached as **Exhibit F** to the Verified Complaint.

43.     On July 31, 2019, Smart Communications received an email from a Joint Customer, Washington County, complaining about supposed service issues and advising Smart Communications it will be "actively looking for a new vendor to replace Smart Communications." A true, complete, and authentic copy of the July 31, 2019 email is attached as **Exhibit G** to the Verified Complaint.

44.     Prior to Smart Communications informing Correct Solutions that its attempted termination was ineffective, Washington County did not have any significant issues with Smart Communications' services. Any minor issues had been addressed or were in the process of being addressed when Washington County abruptly changed its position and informed Smart Communications of its decision to seek a new vendor.

45.     The conduct of the Joint Customers in the immediate aftermath of Correct Solutions' purported termination demonstrates that Correct Solutions has breached or repudiated the Agreement, which obligates Correct Solutions to grant Smart Communications the exclusive

right to maintain and derive revenue from messaging services in the Joint Customers' facilities, as long as the Joint Customers are contractually obligated to Correct Solutions.

46.     As a result, Smart Communications has suffered irreparable harm for which it has no adequate remedy at law and will continue to suffer irreparable harm if the harmful conduct is not enjoined. Smart Communications bargained for and received exclusive relationships with the Joint Customers throughout the terms of Correct Solutions' agreements with the Joint Customers. Smart Communications has no ability to measure the losses it will incur if Correct Solutions is not enjoined from improperly terminating the Agreement and disavowing Smart Communications' exclusive rights. In addition to lost profits, Smart Communications will incur immeasurable losses in goodwill and reputation if its equipment is removed from the facilities of Joint Customers or if Joint Customers continue to be informed that Smart Communications has been terminated or has no relationship with Correct Solutions. Further, Smart Communications will not be able to realize or recoup the substantial investment it has made in its exclusive relationship with Correct Solutions and in installing and providing services to the Joint Customers. Smart Communications will also lose market share, the ability to sell additional services to customers, and the ability to fairly compete for future contracts.

## Memorandum of Law

Smart Communications entered into an exclusive dealing contract with Correct Solutions and significantly invested into the relationship. Smart Communications bore the costs associated with equipping eight different correctional facilities with infrastructure and hardware, including kiosk terminals and hundreds of tablets, to deliver the communications options and services the Joint Customers demanded. When Smart Communications finally began to realize the fruits of its investment, Correct Solutions purportedly terminated the Agreement and demanded that Smart

Communications remove its equipment and services from all eight facilities. Correct Solutions had

no legitimate, contract-based reason to terminate the Agreement with Smart Communications.

Instead, it manufactured a reason, unsupported by fact or law, to mask its real motivation—Correct

Solutions wants the business for itself now that it has the ability to provide similar services.

The result of Correct Solutions' bad faith conduct is not a simple breach of contract that

can be remedied with money damages. Rather, Smart Communications will be severely impaired

in its ability to compete for future contracts on an industry-wide basis, for example, because

government requests for proposals often require disclosure of previous customer terminations.

Further, Smart Communications will suffer immeasurable reputational damages, lose market share

and goodwill in the industry, and lose the profits that would have been earned during the remainder

of the term, which are regularly renewed or extended and thus difficult to measure.

Smart Communications is entitled to temporary injunctive relief to maintain the *status quo*,

*i.e.*, prohibiting Correct Solutions from terminating the Agreement, until a trial on the merits.

## Legal Standard for a Temporary Injunction

A trial court has broad discretion to grant a temporary injunction. *Bailey v. Christo,* 453

So.2d 1134, 1136 (Fla. 1st DCA 1984). The purpose of a temporary injunction is to preserve the

*status quo*, which is "the last peaceable noncontested condition that preceded the controversy,"

and "to prevent injury so that a party will not be forced to seek redress for damages after they have

occurred." *Id.* at 1137 (affirming temporary injunction that preserved the status quo by prohibiting

party from closing a club and requiring club to be operated consistent with past practices).

A party should be awarded a temporary injunction when it establishes that (i) irreparable

harm will result if the injunction is not granted; (ii) an adequate remedy at law is unavailable; (iii)

there is a substantial likelihood of success on the merits; and (iv) entry of the temporary injunction

will serve the public interest.  *Sacred Family Investments, Inc. v. Doral Supermarket, Inc.*, 20 So.3d 412, 415 (Fla. 3d DCA 2009).

Upon a showing that the elements of injunctive relief are met, the remedy is available to prevent or cure the breach of a contract. *See Melbourne Ocean Club Condo. Ass'n, Inc. v. Elledge*, 71 So. 3d 144, 146 (Fla. 5th DCA 2011) (injunction is proper remedy for breach of negative covenant); *ASA College Inc. v. Dezer Intracoastal Mall, LLC*, 250 So.3d 731, 736 (Fla. 3d DCA 2018) (affirming trial court's decision to temporarily enjoin ASA from operating a business in violation of contractual easement pending a final decision on the merits.). An injunction is also an available remedy in actions for declaratory relief. *See Inphynet Contracting Services, Inc. v. Matthews*, 196 So. 3d 449, 463 (Fla. 4th DCA 2016).

<div align="center">

**Argument**

</div>

**I.**     **Smart Communications is Entitled to Injunctive Relief.**

A temporary injunction is appropriate to prohibit an improper termination of an exclusive dealing contract. *Starlite Aviation Operations Ltd. v. Erickson Inc.,* No. 3:15-cv-00497-HZ, 2015 WL 2367998, at *13 (D. Oregon May 15, 2015). *Starlite* is nearly-identical to the case at issue. There, the defendant, EHI, provided the plaintiff, Starlite, with the exclusive right to provide aircraft and flight managers for EHI to comply with EHI's contract with the government. *Id.* at *1. Three years into the agreement, EHI began hiring its own flight managers in an effort to "self-perform" the remainder of the agreement. *Id.* at *2-3. EHI then provided a notice of termination to Starlite, claiming that Starlite failed to perform under the agreement, which was contradicted by the evidence.

Starlite sought a declaration that the notice was ineffective to terminate the agreement and that Starlite was entitled to perform the agreement without interference from EHI. *Id.* at *3. The

court held that Starlite proved the elements of injunctive relief, including the likelihood of success on its declaratory relief action, and entered a preliminary injunction restraining EHI from terminating the agreement and from taking any further steps to implement such termination. *Id.* at *13.

Like Starlite, Smart Communications is entitled to a temporary injunction prohibiting Correct Solutions from terminating the Agreement. Correct Solutions should not be permitted to destroy Smart Communications' exclusive rights by advancing illegitimate grounds which mask its true intention to profit from the business it unambiguously contracted away.

### A.      Entry of an Injunction will Preserve the *Status Quo.*

Smart Communications currently provides messaging and related services for the Joint Customers. *See* Declaration of Jon Logan ("J. Logan Declaration"), ¶¶ 4-5. Correct Solutions has breached or repudiated the Agreement by demanding that Smart Communications remove its equipment, such that the messaging services would be unavailable to the facilities until those services were replaced with an alternative provider.  Entry of an injunction prohibiting Correct Solutions from severing access between Smart Communications and the Joint Customers will preserve the *status quo* until a trial on the merits on the validity of Correct Solutions' purported termination of the Agreement. If the *status quo* is not preserved, eight different correctional facilities will contract with another provider of messaging services, who will then provide its own related system and equipment.[5]

Assuming Smart Communications ultimately prevails on the merits, then it will be declared the exclusive service provider for the Joint Customers, which will require the removal of the new provider's equipment and the re-installation of Smart Communications' services. Such an

---

[5] Correct Solutions would obtain the benefits of the new contract, but may use a different subcontractor to actually provide the equipment.

endeavor will cost all parties—and perhaps taxpayers—time, money, and resources. Accordingly, this scenario is the classic example of when a temporary injunction is appropriate.

**B.     Smart Communications will Suffer Irreparable Harm Absent an Injunction and Does Not Have an Adequate Remedy at Law.**

Absent a temporary injunction, Smart Communications will suffer irreparable harm, for which it would not have an adequate remedy at law, for several reasons. First, it will lose the ability to fairly compete for future government contracts. Second, it will suffer reputational damages and lose goodwill and market share due to the termination of the Agreement resulting in eight lost customers. Third, it will suffer significant monetary damages, including the inability to recoup its investments in the Joint Customers, which will be difficult, if not impossible, to calculate with certainty.

**1.     Smart Communications will lose the ability to fairly compete for future government contracts.**

As noted above, when Smart Communications seeks to procure a contract with a state agency, it is frequently required to disclose the termination of any prior contracts. *See* J. Logan Declaration, ¶ 19. Thus, if Correct Solutions were permitted to terminate the Agreement, Smart Communications' obligation to disclose the termination would forever be required, regardless of the fact that such termination was improper.  With such a blemished record, it would be extremely difficult to obtain new contracts in such a highly competitive industry. *Id.* at ¶¶ 21-23. A future adjudication by this Court that the termination was improper will likely do little to undo the damage that will be caused in the interim. Indeed, Smart Communications would have to disclose the terminations on responses to requests for proposals submitted between now and the final adjudication, and it is impossible to determine how many contracts Smart Communications may lose due to a termination disclosure.

Due to the structure of the relationship between the parties, Correct Solutions controls Smart Communications' destiny with eight separate accounts. Accordingly, it is likely that Smart Communications would be required to disclose not one, but eight customer terminations, depending on the scope of a given RFP's requirement. *See, e.g.*, J. Logan Declaration, Exhibit 1, p. 7 (exemplary RFP requiring bidders to disclose their three most recent lost or terminated contracts). A required disclosure of this magnitude would be a death knell to a provider's ability to win future bids in this highly competitive industry. *Id.* at ¶ 23.

Not only would termination of the Agreement immediately harm Smart Communications, it would also simultaneously provide an unfair advantage to Correct Solutions for every ongoing scenario in which the parties compete for the same contract, either from Smart Communications' express disclosure of the prior termination as required or from the marketplace's general awareness of the termination. *Id.* at ¶ 24.  It is thus not difficult to surmise Correct Solutions' motivation behind its bad faith conduct. But wielding an improper termination to force an opponent to identify prior lost contracts amounts to unfair competition and such a tactic should not be permitted by this Court, even on a temporary basis.

The *Starlite* case is instructive and supports this position.  *See Starlite Aviation Operations, Ltd.,* 2015 WL 2367998.  In *Starlite,* the defendant contractor, EHI, purported to terminate its agreement with Starlite based on an alleged failure to perform.  Although the plaintiff, Starlite, objected to the termination, the contractor was clear that it intended to self-perform the remainder of the agreement.  Plaintiff filed a motion for preliminary injunction asking the court to enjoin the contractor from terminating the agreement and from taking further steps to implement such termination.  In support of its injunction motion, Starlite argued that it would suffer irreparable harm to its reputation and ability to win bids for future contracts in the absence of

preliminary relief.  In particular, Starlite stated that its business required "an unblemished record of reliability and integrity" and that its obligation to disclose this termination would devastate its ability to win contracts.  *Id.* at *9.  After considering testimony and argument, the Court concluded that the plaintiff "demonstrated that past performance, including a termination for default, can be a determining factor in a subcontractor or contractor's ability to win contracts and that the likelihood of irreparable harm is imminent for plaintiff."  *Id.* at *11.

The irreparable harm that Smart Communications would suffer is nearly identical to that of Starlite.  If Correct Solutions is permitted to improperly terminate the Agreement, Smart Communications' record will be blemished throughout the marketplace, regardless of whether it is expressly required to disclose such terminations on future bids (*e.g.,* J. Logan Declaration, Ex. 1, at p. 7), which will put it at a substantial competitive disadvantage.  This is particularly unjust because Correct Solutions stands to gain a significant windfall both with respect to seizing Smart Communications' revenue from the Joint Customers and from facing reduced competition on future bids.

### 2. Smart Communications will suffer reputational and other intangible damages.

Not only will the improper termination create a substantial impediment to Smart Communications' ability to obtain future contracts, but it will also damage Smart Communications' record and reputation in the industry—critical factors to success of the company. If Correct Solutions is permitted to terminate the contract, other customers and potential clients in the industry will be left with the misguided impression that Smart Communications was unable to perform under its contracts and is otherwise unreliable.  In an environment as competitive as the correctional facilities communications marketplace, concerns and questions about a company's reliability, integrity, or ability to perform have disastrous effects on the company's reputation and

goodwill. *See* J. Logan Declaration, ¶ 16.  This type of harm unquestionably constitutes irreparable injury.  *See Ferrellgas Partners, L.P. v. Barrow*, 143 Fed.Appx. 180, 190 (11th Cir. 2005) ("'grounds for irreparable injury include loss of control over reputation, loss of trade, and loss of goodwill'" (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998)).

Smart Communications' reputation and goodwill will also be negatively impacted if the injunction is not entered due to its loss of the exclusivity aspect of its relationship with Correct Solutions.  Exclusivity is an intangible asset that is part of a company's reputation. *Douglas Dynamics, LLC v. Buyers Products Co.,* 717 F.3d 1336, 1344-45 (Fed. Cir. 2013). When a competitor sells what should be a product exclusive to the plaintiff, there can be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors. *Id.* Accordingly, if Correct Solutions itself (or with a third party) provides the services that Smart Communications has been providing, Smart Communications will suffer reputational harm in the marketplace in connection with the loss of its exclusive relationship.  A temporary injunction is an appropriate and necessary mechanism to prevent this type of harm.  *See REV Recreation Group, Inc. v. LDRV Holdings Corp.,* 259 So.3d 232, 235 (Fla. 2d DCA 2018) (affirming temporary injunction prohibiting manufacturer from promoting products through other dealers that were subject to an exclusive agreement with plaintiff dealer); *see also Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir.1977) (threatened loss of customers and goodwill from manufacturer's termination of supply of a brand of products to distributor posed irreparable injury); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (holding that [i]n a competitive industry

where consumers are brand-loyal,…loss of market share is a potential harm which cannot be redressed by a legal or equitable remedy following a trial…).

Further, the loss of exclusivity will impact Smart Communications' ability to sell additional services to certain customers.  The Second Circuit summarized the inadequacy of money damages for plaintiffs who lose the ability to sell additional products or services as follows:

> We believe that the governing principle is as follows. **Where the availability of a product** is essential to the life of the business *or* **increases business of the plaintiff beyond sales of that product— for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss**. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. **Where the loss of a product will cause** the destruction of a business itself or **indeterminate losses in other business**, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (emphasis added). Smart Communications provides additional products and services that are not currently used by all Joint Customers, including, in some cases, video visitation and various mail scanning products and services. Indeed, some Smart Communications customers have elected to purchase mail scanning as a stand-alone product. *See* J. Logan Declaration, ¶ 10. Similarly, customers often add new services and, in consideration, agree to extend the term of Smart Communications' revenue-generating messaging services. *Id.* Being unlawfully removed from its ongoing relationships with the Joint Customers means that Smart Communications loses the opportunity to

earn revenue in additional ways not directly measurable as lost contractual proceeds. In other words, money damages are a hollow and incomplete remedy at best.

> 3. **Smart Communications' money damages would be substantial but difficult to calculate.**

The irreparable harm that Smart Communications would suffer should Correct Solutions not be enjoined from improperly terminating the Agreement can also be demonstrated by the significant amount of time, energy, resources—most of which are difficult to accurately quantify— that have been invested into the relationship with Correct Solutions. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc*., 753 F. Supp. 2d 1233, 1236–37 (S.D. Fla. 2010) ("A plaintiff may establish irreparable harm where the total damages associated with plaintiff's losses would be difficult to calculate.")  Here, Smart Communications invested almost $1.5 million to install its equipment and services at the facilities of the Joint Customers. *See* J. Logan Declaration, ¶ 6. However, its installment costs are only a portion of Smart Communications' true investment in the Agreement and the Joint Customers. Smart Communications has invested hundreds of hours training staff on how to operate its systems, developing personal relationships with Joint Customers, providing customer service, marketing, and updating its products and services for the Joint Customers. *Id.* at ¶ 7.  Based on the foregoing, Smart Communications' substantial non-monetary investment in connection with its relationship with Correct Solutions also establishes irreparable harm and the lack of an adequate remedy at law.

> C. <u>**Smart Communications Should Easily Prevail on its Declaratory Relief and Breach of Contract Claims.**</u>

Smart Communications' declaratory relief and breach of contract claims are based on unambiguous contractual provisions, against which Correct Solutions has no legitimate argument.[6]

---

[6] Indeed, Smart Communications has repeatedly sought a response to its July 26, 2019 letter, which identified the flaws in Correct Solutions' contractual position. Yet, as of the time of this filing, Correct

"The cardinal rule of contractual construction is that when the language of the contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning." *Columbia Bank v. Columbia Developers, LLC*, 127 So. 3d 670, 673 (Fla. 1st DCA 2013); *see also Ferreira v. Home Depot/Sedgwick CMS*, 12 So.3d 866, 868 (Fla. 1st DCA 2009) ("Contracts are to be construed in accordance with the plain meaning of the words therein, and it is never the role of the trial court to rewrite a contract to make it more reasonable for one of the parties.")

## 1.    The NDA was superseded and is no longer effective.

Here, the initial agreement between the parties, the NDA, was superseded by the Agreement. *See* Agreement, ¶ 2 ("This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise"); Agreement, § 25 ("This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto").

In addition to its clear and unambiguous statement that it supersedes all other agreements, the Agreement also includes a Confidentiality and Non-Disclosure provision. *See* Agreement, § 8. Accordingly, the Agreement addresses the same subject matter as the NDA, and is superseded for that reason as well. Smart Communications is thus substantially likely to succeed on Count I of the Verified Complaint.

---

Solutions still has not addressed or attempted to rebut these issues, much less provided any legitimate argument that the Agreement has been terminated.

**2.      Correct Solutions may not terminate the Agreement for an alleged breach of confidentiality or non-disclosure.**

In its termination letter, Correct Solutions identified only one alleged default under the Agreement—the use of Correct Solutions' confidential information. However, such a default, even if true, cannot be grounds for termination as a matter of law.

Section 9 of the MSA provides:

> 9. Default and Termination. If **either party defaults in the performance of any obligation** under this agreement, then the nondefaulting Party must give written notice to the defaulting Party specifically describing the nature of the default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. **Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement**. (emphasis added).

Accordingly, the plain language of the Agreement includes two types of potential grounds for termination: performance defaults and breaches of confidentiality. "Either party" may provide notice of a performance default, but that notice must include a right to cure the default within thirty days of the notice. On the other hand, ***only*** Smart Communications (as the Provider) may terminate the agreement for breaches of its confidentiality or non-disclosure provisions. This language is unambiguous and requires no reference to rules of construction. *See State Farm Fire & Cas. Co. v. Metro. Dade County,* 639 So.2d 63, 65 (Fla. 3d DCA 1994) (stating that a court may resort to construction of a contract only when the language in its ordinary meaning is indefinite or ambiguous).

Even so, principles of construction also dictate that only Smart Communications has the unilateral right to terminate the Agreement upon breach of confidentiality. First and foremost, had the parties intended this right to be reciprocal, they would have crafted the language accordingly. *See Moonlit Waters Apartments, Inc. v. Cauley,* 666 So.2d 898, 900 (Fla. 1996) (discussing principle of *expressio unius est exclusio alterius*, the mention of one thing implies the exclusion of another).

Second, a unilateral termination right based on the disclosure of confidential information is consistent with the fact that Smart Communications was to license its proprietary and trade secret technology to Correct Solution as part of the Agreement. Thus, a construction where Correct Solutions has no termination right based on confidentiality gives meaning and context to the Agreement as a whole. *See Heiny v. Heiny,* 113 So.3d 897, 900 (Fla. 2d DCA 2013) (finding a court must not read a term or group of words in isolation and should instead arrive at a reasonable interpretation of the entire agreement, giving a lawful and effective meaning to all terms).

The remainder of Section 9 provides for termination rights only for defaults ***in the performance*** of any obligation of the Agreement. Correct Solutions did not assert a default in the performance of any obligation as grounds for terminating the Agreement, and has never asserted such a default. Clearly, Correct Solutions has not identified a specific performance-related issue coupled with an opportunity to cure the default. As such, Correct Solutions' stated grounds for terminating the Agreement are inadequate and fail as a matter of law.

      **3.**      **The Agreement requires Correct Solutions to grant exclusive access to the Joint Customers to Smart Communications.**

The heart of the Agreement is to provide Smart Communications with the exclusive right to provide messaging and other related services (identified on the Schedules) to the Joint Customers during the entire terms of Correct Solutions' agreements with the Joint Customers.

Section 2 of the Agreement specifically grants Smart Communications the **exclusive right** to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer.  Correct Solutions repudiated the contract through its letter; demanding that Smart Communications remove its equipment and halt its services, and making it clear that Correct Solutions intended to use another provider.  This refusal to provide Smart Communications with the exclusive right to service the Joint Customers is a material breach of the Agreement. As described above, the Agreement is unambiguous with respect to each party's obligations and any potential grounds for termination. Correct Solutions' breach is not excused because, even if it had attempted to terminate in accordance with the Agreement, it has never provided Smart Communications with a proper default notice which includes an opportunity to cure. Thus, no discovery or resolution of fact issues is required for Smart Communications to establish its breach of contract claim. Smart Communications is substantially likely to succeed on the merits of its breach of contract claim.

   **D.**   **Entry of an Injunction Would Serve the Public Interest.**

Finally, the entry of a temporary injunction would serve the public interest. The injunction would not harm the public in any way; rather, Florida citizens have an interest in seeing that parties obey their contracts and act in good faith. *See, e.g., Sacred Family,* 20 So.3d at 417. Similarly, "the public has an interest in preserving the integrity of the competitive process" in government contract bidding. *See Starlite* at *13 (quoting *Cherokee Nation Techs., LLC v. United States,* 116 Fed. Cl. 636, 641 (2014).

There are no countervailing equitable interests which could weigh against granting the equitable remedy of injunctive relief in favor of Smart Communications. In addition, Smart Communications has demonstrated a likelihood of success on the merits, and, "[t]he more likely

the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir.1996).

      **E.**     <u>**Smart Communications will provide a bond as determined by the Court.**</u>

Pursuant to Florida Rule of Civil Procedure 1.610(b), Smart Communications will provide a bond in an amount the Court deems proper.

**II.**     <u>**Request for Attorneys' Fees**</u>

Smart Communications requests its attorneys' fees from Correct Solutions pursuant to the NDA, applicable Florida law, and the inherent authority of the Court.

**III.**     <u>**Conclusion**</u>

Smart Communications has unquestionably established each element of temporary injunctive relief. This Court should thus enter an injunction to maintain the *status quo* and require the parties to comply with the unambiguous provisions of their Agreement. Correct Solutions should not be permitted to irreparably harm its competitor by declaring an illegitimate termination of an exclusive dealing contract and reap a significant, two-fold windfall from the harm it has caused.

Wherefore, Smart Communications respectfully requests this Court to enter an Order (a) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; and (b) prohibiting Correct Solutions from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct Solutions, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart Communications' status as the exclusive provider of messaging and related services for the Joint Customers; (c) awarding Smart Communications its attorneys' fees and costs

pursuant to Section 13 of the NDA; and (d) for such further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Brad F. Barrios*
Brad F. Barrios
Florida Bar No. 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes
Florida Bar No. 96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 6, 2019, a true and correct copy of the foregoing was emailed to counsel for Defendant:

Christina B. Peck
Roedel Parsons Koch Blache Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809-7654
E-mail:  cpeck@roedelparsons.com

*/s/ Brad F. Barrios*
Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                       Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## **DECLARATION OF JON LOGAN**

      I, Jon Logan, declare under penalty of perjury as follows:

      1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

      2.     I am currently the CEO of Smart Communications Holding, Inc. ("Smart Communications").  I make this Declaration based on my personal knowledge and my review of the business records of Smart Communications, created and maintained in the ordinary course of Smart Communications' regularly conducted business activities

      3.     I am familiar with the contractual and business relationship between Smart Communications and Correct Solutions, LLC ("Correct Solutions") and, specifically, the Master Services Agreement ("Agreement") between the parties, which is attached to the Verified Complaint as Exhibit B.

{BC00253904:1}

**Smart Communications' Investments in Reliance on the Agreement**

4.       In support of its relationship with Correct Solutions, Smart Communications has invested substantial money, time, and energy to develop relationships with and deliver its services to certain Joint Customers (as that term is defined in the Motion for Temporary Injunction).

5.       In particular, Smart Communications provides messaging and related services to correctional facilities in the following counties as part of its exclusive relationship with Correct Solutions: Washington County, Arkansas; Sebastian County, Arkansas; St. Louis, Missouri; Bowie County, Texas; Wayne County, Georgia; Avoyelles Parish, Louisiana; Lamar County, Mississippi, and Moore County, Tennessee.

6.       Since the inception of the contractual relationship with Correct Solutions, Smart Communications has invested nearly $1.5 million in hardware and infrastructure costs to outfit the aforementioned facilities to be capable of providing Smart Communications' secure messaging services to their inmates. This included installing cabling for power and connectivity, numerous kiosk terminals, and hundreds of tablets.

7.       In addition to the funds spent for infrastructure and hardware, Smart Communications has invested hundreds of hours training staff on how to operate its systems, developing personal relationships with Joint Customers, providing customer service, marketing, and updating its products and services for the Joint Customers.

8.       Smart Communications' willingness to invest such significant time and funds into the facilities of the Joint Customers was predicated on its exclusive relationship with Correct Solutions. Correct Solutions promised that Smart Communications would be the exclusive provider of inmate messaging and related services to each of the Joint Customers.

9.      As a result, Smart Communications knew that, as long as Correct Solutions had a contract with the Joint Customers, Smart Communications would be providing messaging services to the Joint Customers. Smart Communications earns its revenue from providing such services. A termination of the Agreement would result in Smart Communications losing monthly revenue across eight facilities for the remainder of the terms, as well as ongoing renewals and extensions of terms in accordance with Correct Solutions' renewals and extensions of its agreements with those facilities.

10.     Smart Communications provides additional products and services that are not currently used by all Joint Customers, including video visitation and various mail scanning products and services. Some Smart Communications customers have elected to purchase mail scanning as a stand-alone product. Similarly, customers often add new services and, in consideration, agree to extend the term of Smart Communications' revenue-generating messaging services. Being unlawfully removed from its ongoing relationships with the Joint Customers means that Smart Communications loses the opportunity to earn revenue in additional ways not directly measurable as lost contractual proceeds.

11.     If the termination of the Agreement is upheld and Smart Communications' access to the Joint Customers is severed, then the inmates at the Joint Customers' facilities will not have access to the communications services that Smart Communications currently provides, including electronic messaging, until a substitute provider is engaged.

### Smart Communications' Reputation

12.     Smart Communications prides itself on the high quality of services, products, and customer service that it provides to its customers.

13.     Smart Communications' efforts have proven effective as it has never lost a customer contract for failing to perform or comply with the terms of a contract over the past ten years.

14.     The exclusive relationship with Correct Solutions increased Smart Communications' market share and helped to bolster its reputation in the industry. Through its training and customer service, Smart Communications has also developed personal relationships with the Joint Customers.

15.     Accordingly, the removal of Smart Communications' status as an exclusive provider of messaging services for Correct Solutions and the Joint Customers would have a significant impact on Smart Communications' goodwill, reputation, market share and ability to attract new customers.

16.     Being required to remove our services and equipment from the facilities of the Joint Customers will negatively impact Smart Communications' ability to ever have a relationship with each of the Joint Customers again. Our other customers, prospective customers, and competitors will hear about our removal from eight different facilities and see it as being indicative of poor service. In an environment as competitive as the correctional facilities communications marketplace, concerns and questions about a company's reliability, integrity, or ability to perform have disastrous effects on the company's reputation and goodwill. It is impossible to determine how many prospective customers or potential partnerships with other providers Smart Communications may lose as a result of the improper termination of the Agreement.

## Smart Communications' Bidding Process and Disclosure Obligations

17.     Smart Communications and Correct Solutions each derive their business and revenue, in large part, by responding to requests for proposals ("RFPs") or bids from government entities.

18.     Smart Communications anticipates that it and Correct Solutions will be responding to the same RFPs in the near future and, thus, competing for the same government contracts.

19.     When Smart Communications seeks to procure a contract with a state agency, it is frequently required to disclose the termination of any prior contracts. For example, Smart Communications recently bid for an inmate telephone services contract with Lassen County Sheriff's Office, which had such a requirement. A true, complete, and authentic copy of the Lassen County Sheriff's Office's Request for Proposals is attached as **Exhibit A**.

20.     The Lassen County RFP required Smart Communications to disclose "the three (3) most recently lost or terminated contracts." If the unlawful termination of the Agreement had occurred and been upheld before Smart Communications responded to this RFP, then it would have been required to disclose the termination.

21.     Based on my experience in and familiarity with the industry, I know that a service provider's past terminations, or lack thereof, is a significant factor when correctional facilities evaluate responses to RFPs and award contracts for services.

22.     If Correct Solutions' termination of the Agreement were allowed to stand, Smart Communications would have an ongoing and unending obligation to disclose the termination whenever required in an RFP or requested by a potential customer, regardless of the fact the termination was not proper.

23.     If an RFP required Smart Communications to disclose all eight of the Joint Customers as lost or terminated accounts, then a disclosure of such magnitude would be a death knell to its ability to win that bid and future bids in this highly competitive industry.

24.     For that same reason, Correct Solutions would unfairly gain a significant advantage in all future RFPs for which it competes with Smart Communications if the RFPs require disclosure of the termination of the Agreement, because the improper termination, including the general awareness of the termination in the marketplace, would effectively eliminate Smart Communications from competition on the RFP.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true.  Executed August 6, 2019.

Jon Logan
CEO, Smart Communications

Filing # 93709176 E-Filed 08/06/2019 10:26:46 AM

*Smart Communications Holding, Inc. v. Correct Solutions, LLC a/k/a Correct Solutions Group, LLC*
Case No.  19-CA-008089

# EXHIBIT A

*to Declaration of Jon Logan*

# Lassen County Sheriff's Office
## Request for Proposal
### Inmate Telephone Services



John McGarva, Lieutenant
1415 Sheriff Cady Lane
Susanville, CA 96130

**Proposal due May 22, 2019**

1

## TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE**

Profile                                                           3

Schedule of Events                                               4

Proposal Assistance Information                                  5

Format of Proposal                                               6

       Section I:      Transmittal Letter                    6
       Section II:     Overview                             6
       Section III:    Management                           8
       Section IV:     General Information                  10
       Section V:      General Conditions                   11
       Section VI:     System Requirements                  21
       Section VII:    Cost                                 39
       Section VIII:   Identification of Subcontractors     39
       Section IX:     Model of Contract/Insurance          39


**ATTACHMENTS**

Exhibit A          County Contract                    43
Exhibit B          Facility Specifications             45
Exhibit C          Calling Rates and Commission        47

Attachment I       Insurance                           48
Attachment II      Scope of Work                       51
Attachment III     Terms and Condition                 52
Attachment IV      Professional Credentials            56
Attachment V       Business Associate Addendum         57

**PROPOSAL PURPOSE**

The Lassen County Sheriff's Office ("Lassen County") invites responses to this Request for Proposal ("RFP") from qualified, experienced Vendors who can provide reliable, cost effective inmate telephone service solution which meets the requirements described in this RFP at the following facilities:

Lassen County Jail
1405 Sheriff Cady Lane
Susanville, CA 96130

Lassen County Juvenile Hall
1415B Chestnut Street
Susanville, CA 96130

Lassen County is seeking an experienced vendor to provide, install and maintain a turn-key inmate telephone system, recording and monitoring at the Jail and Juvenile Hall.  Vendor shall provide telephone services to the inmates utilizing an inmate telephone system in accordance with the requirements and provisions set forth in this RFP.

**COUNTY PROFILE**

Lassen County was incorporated in 1864. Susanville serves as the county seat. The legislative body is a five member Board of Supervisors elected by district. A County Administrative Officer, appointed by the Board of Supervisors, administers County business.

Lassen County encompasses approximately 4,500 square miles. Agriculture, outdoor recreation, and plus 2 state prisons and a federal prison, are the County's major economic contributors. The current estimate of population is 34,000. Susanville, the county seat, is the only incorporated city in the county.

**JAIL PROFILE**

The Lassen County Sheriff is responsible for operation of the jail. The county jail is a type II facility housing both pre-trial and sentenced inmates.  The rated capacity of the county jail is 188.

Inmate Population - the average daily population is reflected for the past five years as follows:

2014--106
2015--88
2016--101
2017--95
2018--124

The jail currently houses inmates in both pod and dorm style units.  The Special Housing Unit comprises two dorms housing female inmates, six lower pods with both single and double bunk

3

cells.  The pods range from housing three (3) to seven (7) inmates.  There is a mezzanine level comprising 20 double bunk cells and a large open dayroom comprising the length of the tier.  Three large dormitories housing 32 inmates each make up the rest of the housing area of the facility.

## JUVENILE HALL PROFILE

The Lassen County Chief Probation Officer is responsible for operation of the Juvenile Hall. The Juvenile Hall is located at 1415B Chestnut Street in Susanville, CA.  It is foreseeable the facility will be staffed for an overall rated capacity of 10 juveniles.  The facility is located approximately one-eighth of a mile from the Lassen County Jail.  Admission and average daily population from 2014-2018 are listed in the following chart.

| YEAR | ADMISSIONS | ADP |
|------|------------|-----|
| 2014 | 133 | 11 |
| 2015 | 105 | 18 |
| 2016 | 62 | 5 |
| 2017 | 61 | 5 |
| 2018 | N/A | 4 |

Juvenile Hall is under a **separate contract** than the Lassen County Jail.  The current RFP is a joint RFP resulting in **separate contracts** for the Jail and Juvenile Hall.

## SCHEDULE OF EVENTS

Issuance of RFP        April 1, 2019

Tour of facilities        April 25, 2019

Q & A Closed        May 10, 2019

Proposals due        **May 22, 2019**

Vendor selection        15 to 30 days after the proposal due date (as determined by County)

Contract approval        15 to 30 days after vendor selection (as determined by County)

Services begin        90-120 days after contract approval (as determined by County) but no later than September 1, 2019.

4

## PRE-PROPOSAL ASSISTANCE

Questions and County responses shall be posted to Lassen County's website at
www.lassencounty.org and will be visible to all potential respondents.  Questions must be e-
mailed to jmcgarva@co.lassen.ca.us and will be posted to www.lassencounty.org with the
question and county response.  This is to assure the question is interpreted correctly and the
benefit of the response available to all potential respondents.

John McGarva will serve as the County's contact person for this project.  Submit questions and
inquiries in writing via e-mail no later than 5:00 p.m., May 10, 2019.

If and when appropriate, an addendum to this solicitation will be published.  Contractor is
responsible to incorporate any addenda into their proposal.

Vendors interested in participating in the proposal process are advised not to contact members of
the Lassen County Board of Supervisors or any other Lassen County employees.

## PRE-PROPOSAL MEETING

Vendors interested in submitting a proposal should plan to attend a meeting to be held at the
Lassen County Sheriff's Office, at 1415 Sheriff Cady Lane, Susanville, CA on **April 25, 2019 at
10:00am**. This meeting will provide prospective respondents with an opportunity to tour both the
Jail facility and Juvenile Hall including housing areas and to ask questions and receive more
detailed explanations and information on issues of interest and concern. Attendance is
**mandatory** to submit a proposal.

## MANDATORY SITE EVALUATION

Lassen County requires Vendor attend the site evaluation on the date and time specified in the
Schedule of Events.  It is mandatory for vendor to attend the site evaluation to submit a proposal.
Oral responses to questions during the site evaluations shall be considered non-binding on
Lassen County.  Vendor's questions regarding the site evaluation and/or this RFP must be
submitted by Vendor in writing via email to jmcgarva@co.lassen.ca.us .


## SUBMITTAL OF PROPOSAL

One electronic proposal and five (5) printed copies to:

> John McGarva, Lieutenant
> Lassen County Sheriff's Office
> 1415 Sheriff Cady Lane
> Susanville, CA 96130
> jmcgarva@co.lassen.ca.us

Each proposal must be signed by an official authorized to bind the Vendor to its provisions.

*Lassen County is not liable for any costs incurred by any Vendor in preparation of their proposal in response to this Request for Proposal.*

**FORMAT OF PROPOSAL**
Each proposal shall include the following:

## Section I.    TRANSMITTAL LETTER

 This shall be a brief introductory letter providing the following information:

1. The full name and address of your firm and, if applicable, the branch offices or subordinate element that will perform or assist in performing the work hereunder.

2. Name, title, telephone number and email address of the contact person for the respondent.

3. Statement that the proposal is in response to this RFP.

4. Signature and typed name and title of the individual who is authorized to commit the respondent to the proposal.

5. Assurance of firm's ability to comply with County's model contract and insurance requirements as disclosed in Exhibit A.

## Section II.   OVERVIEW

Respondents should submit proposals which are clear, comprehensive and fully descriptive to enable the County to make a sound and objective evaluation of respective qualifications and capabilities and of respective services and methodologies, support systems, and commitments.

The Vendor shall be the sole supplier and/or coordinator of all inmate telephone services affecting the Lassen County Jail and, as such, shall have the authority and responsibility for the implementation, modification, and/or continuation of any and all telephone services for the Jail.

This portion of the proposal submission must address each of the items listed below:

1. Introduction

   a. Company Profile:

      i. Date organized to provide inmate telephone services.

      ii. Corporate Experience:
      iii. Number of years doing business

iv.  Number of years providing services in California

v.  Number of current operations/contract services

vi.  Organization Structure (include chart):
1. Span of Control, levels of management
2. Structure of national or local supervision
3. Number of employees

vii.  Describe Current Contracts:
1. Client
2. Date of original contract
3. Type/size
4. Name of facility
5. Contact person, phone number and address

viii.  Identify the three (3) most recently lost or terminated contracts

ix.  Legal:

1. Description and disposition of any and all civil litigation involving the company, contractors and/or subcontractors pending or actual in any form, including all instances where your organization was named a defendant and/or indemnified or defended an entity or whom your organization furnished medical services during the past five years.

2. Furnish the number of investigations per year, over the past five years, by any state, federal or local licensing agency and the results of said investigation(s). E.g. sustained or sustained allegations, and fines imposed, etc.

x.  Operating Procedures:

1. Have effective written procedures; describe and provide example.
2. Purchasing, by headquarters and/or at local level.
3. Accounting approach plus degree of audit and cost analysis support for local level.
4. Invoicing and payment, from headquarters or local level.
5. Frequency of communications and visits to local sites.

xi.  Company achievements in providing Inmate Telephone services.

xii.  Portfolio listing contact information of references for vetting purposes.

# SECTION III.     MANAGEMENT

1.  Vendor Information

1.   In this section respondents shall discuss the following topics:

    a.   Documentation that Vendor is registered to do business in the State of California.

    b.   Documentation that all necessary requirements of the Public Service commission and the Federal Communications commission ("FCC") are met.

    c.   A copy of its telecommunications service tariff for the State of California.

    d.   Vendor's current annual report and its two (2) most recent Dun and Bradstreet (or similar) reports.

    e.   If Vendor has operated under a different name, or affiliate, in the past three (3) years, provide names, dates, addresses and state where incorporated.

    f.   If Vendor is for sale or is considering an acquisition or merger in the next six (6) months, provide information about the acquiring company or the company to be acquired and information regarding the stage of negotiations.

    g.   A synopsis of any litigation(s) within the last five (5) years where Vendor or Vendor's ITS is a party.  Include venue, style of case and status of litigation.

    h.   The names and resumes of Vendor's employees, consultants, and subcontractors which will be involved in providing the requirements in this RFP and the Agreement.

    i.   Vendor expressly understands and agrees that it assumes and is solely responsible for all legal and financial responsibilities related to the execution of a subcontract.  Vendor agrees that utilization of a subcontractor to provide any of the products/services in the RFP and the Agreement shall in no way relieve Vendor of the responsibility for providing the products/services as described and set forth herein.

    j.   Vendor shall disclose, with percentages clearly shown, what work for the Facility(s) will be subcontracted and what work will be performed by Vendor employees.

    k.   The name, years of service, qualifications, addresses and telephone number(s) for the Vendor's main point(s) of contact for the Facility(s).

    l.   The names, addresses, telephone numbers and distance from Facility(s) for the technicians who will be maintaining, servicing and performing work under the Agreement.

    m.   The number of technicians directly employed by Vendor as well as those which will be subcontracted for service at the Facility(s).

    n.   Indicate the manufacturer which will provide the spare equipment and replacement parts for the proposed ITS, VVS and kiosk solution applicable components.

    o.   Vendor shall comply with all applicable laws, rules, regulations, and orders of any authorized agency, commission, unit of the federal government, and state, county or municipal government.

    p.   Vendor shall detail its Disaster Recovery Plan ("DRP") and provide its processes, policies and procedures relating to the preparation for recovery of the requirements in this RFP preceding and/or following a natural or human-induced disaster.

    q.   Vendor shall provide any and all notices as may be required under the Drug-Free workplace Act of 1998, 28 CFR Part 67, Subpart F, and any applicable Lassen County laws, to the employees and all subcontractors to ensure the Facility(s) maintains a drug

free workplace.  Lassen County reserves the right to require, at Vendor's expense, drug testing of Vendor's personnel if no drug testing records exist or if such test results are older than six (6) months.

2.  Vendor References:

1. Provide a list of agreements not renewed, lost or prematurely cancelled in the last five (5) years.

2. If applicable, include the reason for non-renewal and/or cancellation(s) of the agreement(s). A response indicating this information is confidential and/or proprietary will be considered an Exception.

3. Provide a list of entities who have notified Vendor of additional commissions owed within the last three (3) years and the status of resolution of those claims.

4. A response indicating this information is not monitored, confidential and/or proprietary will be considered an Exception.

5. Provide three (3) client references for facilities where Vendor provides the equipment and services comparable to the requirements in their RFP.  The references provided must be currently under contract with Vendor and have been operating under that contract for at least six (6) months.  The references may be contacted at any time during the RFP process. Vendor shall ensure updated references and accurate contract information is provided.

6. Provide the following information for each reference:  facility name, Facility address, contact name, contact title, telephone number and email address, average daily population ("ADP"), agreement effective date and number of inmate telephones.

7. Lassen County prefers the contact person provided for each of the references be the individual who utilizes Vendor's software application.

3. Vendor Customer Service

1. Provide the following information regarding Vendor's processes for handling end-user/customer service matters:

2. Describe procedure(s) for handling end-user complaints.

3. Indicate whether Vendor's customer service center defaults to an Interactive Voice Response ("IVR") or a live customer service representative.

4. If applicable, supply the hours of availability for a live customer service representative and location of the customer service call center.

5. Indicate the average on-hold time to reach a live representative

6. Describe procedure(s) for handling refund requests and the timeframe for completing such requests.

## SECTION IV.    GENERAL INFORMATION

1. Validation

1.  State whether validation is performed real-time or by batch.

2.  Specify the process for unblocking a phone number which was originally restricted for non-payment or exceeding a daily/weekly/monthly collect calling limit ("Collect Call Threshold").

3.  Include the timeframe for removing a restriction once payment is received by the Local Exchange Carrier ("LEC").

4.  Lassen County prefers the Collect Call Threshold be a monthly minimum of $*** per unique telephone number.  Vendor shall provide an explanation should it propose an alternative Collect Call Threshold process.

2. Billing

1.  Specify how collect calls are billed and the name and phone number of billing company.

2.  Specify how taxes and required fees are applied to the total cost of a collect call in preparation for billing.

3.  Describe the process for collecting, rating sorting, distributing and billing of collect calls.

4.  Describe any and all additional fees (including those from third parties) which may be charged to the end user's telephone bill (e.g. monthly billing fee, carrier administrative fee, cost recovery fee, etc.)

5.  Provide the amount specific to each fee in Exhibit C-Calling Rates and Commissions

6.  Describe all of the types of payment options available to the end-users (e.g. Visa, MasterCard/debit card, money order, etc.)

7.  Vendor shall specify the amount of the fees (including those from third parties) associated with the payment options (e.g. transaction disclose fee, refund fee, etc.)

8.  Specify the timeframe for a pre-paid account to become dormant/expire.  If applicable, Vendor shall state whether the timeframe is configurable.

9. Lassen County requires that upon the occurrence of any of the following:  Agreement termination or expiration, six (6) months of account inactivity or account refund/closure request from the end-user, any funds remaining in any pre-paid account be refunded, in accordance with Lassen County's direction, to the end-user as appropriate and at no cost to Lassen County.  Vendor shall provide the capability to reactivate inmate accounts at no cost to the inmate or Lassen County, for inmates that re-enter the Facility(s).  Vendor shall not retain any monies not refunded in the manner specified and shall treat such monies in accordance with the California's unclaimed property laws.

10. Vendor shall provide an explanation should it propose an alternative process for how remaining dormant/expired pre-paid funds are handled.

11. Describe Vendor's direct bill option.

12. Specify the minimum amount required on a pre-paid collect account to complete a call.

13. Vendor shall not prevent the completion of a pre-paid collect call if the end-user's pre-paid collect balance is less than the average cost of a call (regardless of call type) from the Facility(s).

14. Vendor shall describe in detail what happens when an inmate attempts to call to a pre-paid collect account that has insufficient funds.

<u>3. Vendor Retention of Account Information</u>

For the purpose of aiding in investigation, Vendor must retain information pertaining to an end-user's pre-paid collect, direct bill, and similar accounts for a period of three (3) years after the expiration/termination of the Agreement.  The information shall include, but not be limited to, the end-user's billing name, address and telephone number.

## V.  GENERAL CONDITIONS

<u>1. Scope</u>

1. Lassen County requires a turnkey inmate calling solution which shall include, without limitation, collect, pre-paid collect, pre-paid cards, debit, free and visitation sessions.  Vendor shall install and operate inmate telephones and related equipment.  Vendor shall without cost to Lassen County, provide all wiring for the inmate and visitation telephones, install the inmate and visitation telephones and the related hardware and software specifically identified herein, to enable inmates at the Facility(s) to complete, without limitation, local, long distance and/or international collect, pre-paid collect, pre-paid cards, debit and free calls as well as visitation sessions from the Facility(s).

2.    Vendor shall supply details of Vendor's proposed ITS which shall include, but not be limited to:  system version (if Vendor uses multiple ITS versions and/or release), system design (centralized vs. premise based), technical specifications, software applications, hardware architecture and networking capabilities.

3.    Include a description, as well as visual aids, of the inmate and visitation telephone sets, TDD units and cart/portable sets proposed for installation at the Facility(s).

## 2. Agreement Length

Lassen County intends to award a three (3) year agreement ("Initial Term") with the option to renew for two (2) additional one (1) year terms or on month-to-month basis.  All terms and conditions, requirements and specifications of the agreement shall remain the same and apply during any renewal terms.  The agreement shall not automatically renew.

## 3. Surety Bond

1.    Within 10 calendar days after the award of the RFP/Agreement execution date and prior to any installation work or equipment delivery, the awarded Vendor shall furnish a bond in the form of a surety Bond, Cashier's check, or Irrevocable Letter of Credit, issued by a surety company authorized to do business in the State of California, and payable to Lassen County.

2.    The Surety bond must be made payable to Lassen County in the amount of $50,000.00 and will be retained during the full term of the agreement and any renewal terms.  Personal or company checks are not acceptable.  The agreement number (if applicable) and/or dates of performance must be specified on the Surety Bond.

3.    In the event Lassen County exercises its option to renew the agreement for an additional term, Vendor shall be required to maintain the Surety bond for the renewal term, pursuant to the provisions of this section, in an amount stipulated at the time of the agreement renewal.

## 4. Compensation and Reporting

1.    Vendor shall pay commission on all Gross Revenue generated by and through the proposed ITS and VVS.  Gross revenue consists of all compensation, earnings, gain, income, generated revenue, payment, proceeds or receipts paid to or received by Vendor that are in any way connected to the provision of service pursuant to the RFP and Agreement.  Gross Revenue includes, by way of example and not limitation, all the following:  all surcharges, per minute fees and any additional fees and/or charges generated by the completion of all calls (including any combination of free, collect, debit, and pre-paid local, INTRAlata/INTRAstate, INTRAlata/INTERstate, InTERlata/InTRAstate, INTERlata/INTERstate and International calls), additional fees and/or charges added to the total cost of a

12

call/visit or added to the called party's bill or any other compensation received by Vendor.

2.  Vendor shall pay commission on total gross Revenue (as defined above) before any deductions are made for unbillable calls/visits, bad debt, uncollectible calls/visits, fraudulent calls, LEC adjustments or any other Vendor expense.

3.  Vendor shall specify any additional fees to be added to the called party's bill or paid by the calling or called party (including those associated with establishing/funding pre-paid collect accounts) for inmate telephone calls from the Facility.  All fess must be approved by Lassen County prior to implementation.  Lassen County and Vendor shall mutually agree on the method for compensation associated with the additional charges/fees due to Lassen County.

4.  Any charges/fees added to the called party's bill without the express written consent of Lassen County shall incur a fine of $350.00 per day from the date the additional charge/fees were first added through the date the charges/fees were discontinued.

5.  Lassen County shall notify Vendor of any unapproved additional fees, fee amounts and/or charges of which Lassen County becomes aware of and shall provide Vendor with an invoice for the total fine due, for which Vendor shall remit payment to Lassen County within 30 days.

6.  Should Lassen County and Vendor mutually agree that the charges/fees will remain, Lassen County and Vendor shall mutually agree on a method for compensation.

7.  Should Lassen County and Vendor mutually agree that the charges/fees are to be discontinued, Vendor shall refund each called party for the unapproved charges/fees from the date the charges/fees were implemented until the date the charges/fees were discontinued.

8.  Notwithstanding the foregoing, Gross Revenue does not include:

9.  Pre-paid Collect fee.  A Pre-paid collect fee is defined as a fee imposed on called parties who set up and/or fund a pre-paid collect account with Vendor to accept calls.  All Pre-paid collect fees must be approved by Lassen County and are subject to the penalty identified above if not approved by Lassen County in advance. Vendor shall specify these amounts.

10. Billing Statement Fee.  A billing Statement Fee is defined as a fee tariffed by Vendor and charged to called parties for processing a collect call on a LEC telephone bill.  All billing Statement Fees must be approved by Lassen County and are subject to the penalty identified above if not approved by Lassen County in advance.  Vendor shall specify these amounts.

13

11.    A "Free" call shall be defined as a call not generating any revenue or compensation for the Vendor.  Calls to telephone numbers that appear on the free call list supplied by Lassen County shall not generate revenue or compensation for Vendor and shall not be commissionable to Lassen County.  Only those numbers designated by Lassen County on the free call list shall be marked as "Free" in the ITS and designated as such in the call detail records.  In the event Vendor receives revenue or compensation, notwithstanding the source, from any third party related to a completed free call, such revenue shall be included in Gross Revenue and commissionable to Lassen County.  Lassen County reserves the right to enter a free number in the ITS as deemed appropriate by Lassen County and without the assistance of Vendor.

   a.    Unauthorized free calls which are completed by and through the ITS shall be considered part of Gross Revenue and commissionable to Lassen County.

12.    Complimentary calls associated with Vendor's pre-paid collect program are not commissioned.  Vendor shall specify the duration of and the frequency between each complimentary calls are labeled in the call detail records.

13.    A call is deemed complete, and considered part of Gross Revenue (as described above), when a connection is made between the inmate and the called party, whether such connection is established by positive acceptance or by live or automated machine pick-up (e.g. when the ITS considers a tone from an answering machine, voicemail, etc. as acceptance).  The call shall be deemed complete and commissionable regardless if Vendor can bill or collect revenue on the call.

14.    Vendor agrees that it is entirely responsible for calculating, collecting and remitting all fees and taxes, including sales tax where applicable, on all services and items provided to the inmates.  This includes all taxes as applicable for collect, debit, pre-paid and any other calls or services provided.

15.    Vendor may, upon request from Lassen County, utilize the onsite commissary provider to distribute and charge for inmate telephone services, provided there is a written agreement regarding the form and manner of how the associated taxes are to be collected and remitted.  In the event the commissary provider collects and remits taxes for inmate telephone services, Vendor is solely responsible for obtaining a resale certificate from the commissary provider.  Vendor is responsible for obtaining all proper documentation from the commissary provider.  Vendor's agreement with the commissary provider must address the requirements set forth in this section.

16.    It is expressly understood the Lassen County is not responsible in any way, manner or form for any of Vendor's costs, including but not limited to taxes (including sales tax), shipping charges, network charges, insurance, interest, penalties, attorney fees, liquidated damages, licenses, fees, tariffs or other costs related to Vendor's services.

14

17.     Commission for pre-paid cards shall be based on the face value of the pre-paid cards purchased by Lassen County. Commission shall be due to Lassen County in the traffic month Lassen County placed the pre-paid card order and payable under <u>Payment and Reporting</u>.

     a.  Vendor shall invoice Lassen County the full amount of the pre-paid cards purchases within 15 days of receipt of the pre-paid cards.

     b.  Should Lassen County cancel the pre-paid card series at the Facility, Vendor shall deactivate and refund to Lassen County the amount of any unused pre-paid cards which have a full balance at the time of the cancellation of the pre-paid card program.

18.     Commission for debit calls shall be based upon total Gross Revenues (as defined above) generated from debit call purchase or usage and is payable under <u>Payment and Reporting</u>.

19.     On the 5th day of the month of traffic, Vendor shall submit a monthly invoice and corresponding debit purchase or usage report to Lassen County for the full amount of the debit purchased or used (less any issued refunds) for the prior traffic month.

20.     Vendor may, at its own option, include a financial incentive offer in addition to the commission proposal shown in <u>Exhibit C-Calling Rates and Commission.</u>

21.     Vendor may, at its own option, include an up-front Minimum Annual Guarantee ("MAG") payment to be specified in <u>Exhibit C-Calling Rates and Commission</u>.

## 4. Rate Requirements

1.  Vendor must agree to provide the required calling rates specified in <u>Exhibit C-Calling Rates and Commissions</u> and must be in compliance with California laws and applicable regulations.

2.  Before any new calling rate increases or decreases are implemented, Vendor must submit a written request to receive approval from Lassen County. Lassen County will respond in writing to Vendor's request.

     a.  If Vendor decreases the calling rates without the written approval of Lassen County, Vendor shall be responsible for applying commission on the Gross Revenue calculated by applying the calling rates prior to the unapproved change.

     b.  If Vendor increases the calling rates without the express written approval of Lassen County, Vendor shall be responsible for paying commission on the Gross Revenue calculated by applying the increased rates. Vendor must also issue refunds to all overcharged end-users or inmates within five (5) business days; a list of the issued credits must be provided to Lassen County as documentation. Lassen County will not issue a refund of commission paid to Vendor for unapproved rate increases. If Vendor is unable to issue refunds and/or provide the

15

required documentation, Vendor shall issue a payment to Lassen County as concession.  The payment amount shall be in the amount of Vendor's portion of the Gross Revenue generated from the overbilled calls.

3. Vendor will implement any rate adjustments requested by Lassen County within 10 calendar days of said request, subject to regulatory approval.

4. Vendor shall calculate the raw duration of each inmate telephone call in seconds based on the time the call is accepted and the time the call is terminated by the ITS ("Duration Rounding").  For calls where the duration is at least 10 seconds, Vendor shall indicate as much in its response to the RFP.

5. During the call rating process, Vendor shall round the raw calculated call amount to the nearest hundredth decimal place (up or down) using normal accounting practices ("Calling Rate Rounding").

6. For call rating purposes, mileage calculations shall be completed using airline distance between serving wire centers associated with the originating and terminating points of a call ("Mileage Rounding").  The ser4vicing wire centers shall be determined by the area codes and exchanges of the origination and destination points.  The formula for calculating airline distance is as follows; "V" and "H" coordinates shall be obtained for the wire centers serving Vendor and the destination point.  Indicate if Vendor utilizes a different formula for calculation purposes.

7. Should the number resulting from the formula be a fraction, Vendor shall round the fraction value to the next higher whole number.

5.  Payment and Reporting

1. Vendor shall provide monthly commission payments and traffic detail reports to Lassen County on or before the 25th day of the month following the traffic month.  Lassen County requests commission payments are sent via wire transfer.  Lassen County requires the traffic detail reports be sent electronically in an exploitable format.

$$\sqrt{\frac{(V_1 V_2)^2 + (H_1 H_2)^2}{10}}$$

2. Traffic detail reports shall include a detailed breakdown of all traffic, including but not limited to all collect, pre-paid and debit calls down to the inmate level and for each inmate telephone at the Facility:

   a. Facility Name
   b. Facility Identification Number/Site Identification Number;
   c. Facility Address (Street, City, State and ZIP);
   d. Automatic Number Identifier;

e.  Inmate Telephone Station Port/Identifier;
f.  Inmate Telephone Location Name;
g.  Local Call, Minutes, gross Revenue and Commission (per inmate telephone);
h.  INTRAlata/INTRAstate Call, Minutes, Gross Revenue and commission (per inmate telephone);
i.  INTERlata/INTRAstate Call, Minutes, Gross Revenue and commission (per inmate telephone);
j.  INTRAlata/INTERstate Calls, Minutes, Gross Revenue and Commission (per inmate telephone);
k.  INTERlata/INTERstate Calls, Minutes, Gross Revenue and commission (per inmate telephone);
l.  International Calls, Minutes Gross Revenue and Commission (per inmate telephone);
m.  Commission Rate (%);
n.  Total Calls, Minutes, Revenue and Commission Amount (per inmate telephone); and
o.  Traffic Period and Dates

3.  Vendor shall supply a report of all pre-paid card orders processed during the traffic month to include (at a minimum) the order date, invoice number, invoice date, gross amount of the order, commission rate and commission total.

4.  Vendor shall provide a sample report showing how all of the above requirements will be met.  Vendor shall indicate if any of the required fields above cannot be provided or supplied in the Exceptions addendum section of its response to this RFP.

5.  Vendor shall provide monthly system platform Call Detail Records ("CDRs") billing files and a miscellaneous charges/fees report to Lassen County no later than the 25th day of the month following the moth of traffic.  The billing files shall also include all collect charges/fees report each month.

6.  The billing files, in EMI format, shall contain all fields which are legally permitted to be released, with the contents of said fields in the exact format and exact content as those files prepared and submitted for billing to the billing company and ultimately delivered to the called party.  The billing files shall be accompanied by a complete file map and complete field legend.  The billing files shall include, without limitation, the following fields:

a.  Record ID;
b.  Facility Name;
c.  Facility ID;
d.  From ANI;
e.  To ANI;
f.  Batch Number/ID;
g.  Seconds;
h.  Revenue Period;

17

      i.   Date (yymmdd);
      j.   Connect Time (hhmmss);
     k.   Billable Time (mmmmss);
      l.   Multiple Rate Indicator;
     m.  Personal Identification Number digits;
     n.   Originating City;
     o.   Originating State;
     p.   Bill City;
     q.   Bill State;
      r.   Rounded Bill Time Indicator;
      s.   Bill Number;
      t.   LATA ID;
     u.   Settlement Code;
     v.   Message type;
     w.  Charge Amount,
     x.   Additional Fees and Line Surcharges;
     y.   Specialized Calling Indicator;
     z.   Validation Indicator;
    aa. Tax Exempt Indicator;
    bb. Rate Period; and
    cc. Rate Class.

7. Vendor shall also provide a sample billing file in EMI format (showing all fields available, including those specified above) to demonstrate how Vendor shall meet the above requirements.  Vendor shall provide a listing of all fields that will not be released in the Exceptions addendum section of its response to this RFP.

8. The miscellaneous charges/fees report shall contain, without limitation, the following information for all fees applied to calls from the Facility:

     a.   Facility ID;
     b.   Date;
     c.   From ANI;
     d.   To ANI;
     e.   Fee type; and
      f.   Fee Amount

9. The raw CDRs shall contain all calls (both attempted and completed), and inbound voicemail messages and voicemail retrievals, which originate from the Facility(s) for each day and each time of the day for the period said raw CDRs are requested.  The raw CDRs shall contain the unedited data including all fields and all field content which is legally permitted to be released.  When requested, the CDRs shall be accompanied with a complete file map and complete file legend.  The raw CDRs shall include, without limitation, the following fields:

     a.   Facility Name;

    b.  Facility ID;
    c.  From ANI;
    d.  Batch Number/ID;
    e.  From city;
    f.  From State;
    g.  Station ID;
    h.  Phone Name or Location;
    i.  Inmate ID;
    j.  Personal Identification Number;
    k.  Pre-Paid Card ID;
    l.  Revenue Period;
    m.  Call Start (yymmdd; mmss);
    n.  Call End (yymmdd; mmss);
    o.  Seconds;
    p.  Call Type (e.g. local, etc.);
    q.  Bill Type (e.g. free, collect, etc);
    r.  Cost;
    s.  Tax;
    t.  Validation Result;
    u.  Termination Reason;
    v.  LIDB Status; and
    w.  Completion Indicator.

10. The system CDRs shall be stored in a minimum of three (3) locations to avoid a possibility of CDRs being lost.

11. Vendor shall provide a sample CDR (showing al raw fields available, including those specified above) to demonstrate how Vendor shall meet the above requirements.  Vendor shall provide a listing of all fields that will not be released in the Exceptions addendum section of its response to this RFP.

12. Commission Discrepancies must be resolved by Vendor, and to Lassen County's reasonable satisfaction, within 30 days of receipt of discrepancy notification from Lassen County or its Designated Agent.  If not resolved satisfactorily, such discrepancy will be subject to late charges described below and/or the Agreement may be terminated at the sole discretion of Lassen County.  Lassen County further retains the right to pursue any other legal remedies it deems necessary.

13. Commission payments, traffic detail reports, billing files, CDRs and/or reports not containing the required fields, received by Lassen County after the date specified in <u>Payment and Reporting</u> are subject to late charges and/or fines.

    a.  Late charges and/or fines for commission payments shall be equal to 5% per month of the commission due.
    b.  Late charges and/or fines for reporting shall be a fee of $750.00 per month for each report not received by the 25th day of the month following the traffic month

or for each report that does not contain all of the fields and information identified above.

    c. If the commission payment is late, reporting is late and/or reports do not contain all required fields, late charges and/or fines for all three shall apply.

6.  Reconciliation

    1. From the Effective Date of the Agreement and for a period of two (2) years after the termination of the Agreement, upon 10 business day's written notice, Lassen County shall have the right to examine and/or reconcile Vendor's information (records, data, compensation records) pertaining the Agreement.

    2. Lassen County requires Vendor to maintain accurate, complete and reconcilable records, in electronic format, detailing the Gross Revenues from which commission can be determined. The records shall include all CDRs, EMI billing files, pre-paid card sales and associated invoices, debit usage reports and associated invoices and commissioning reports during the term of the Agreement.

    3. Lassen County reserves the right to delegate such examination and/or reconciliation of records to its Designated Agent or another third party of Lassen County's sole choice.

7.  Assignments and Mergers/Acquisition

    1. The services to be performed under the Agreement shall not be assigned, sublet or transferred without 30 days advance written notification to Lassen County and then only upon Vendor's receipt of Lassen County's written consent.

    2. Upon receipt of Lassen County's written consent, any such purchaser, assignee, successor, or delegate shall thereupon assume all rights and responsibilities of Vendor. However, Lassen County may assign any and/or all of its rights and obligations hereunder without Vendor's written consent but upon Lassen County's written notice thereof to Vendor (1) to any Affiliate; (2) pursuant to any sale or transfer or all substantially all of its business or assets; (3) pursuant to any merger, acquisition or reorganization; or (4) as part of a bona fide pledge to a third party lending institution of collateral of the assignor's rights hereunder.

    3. If subsequent to this RFP and the execution of the Agreement, Vendor merges or is acquired by another entity, the following documents must be submitted to Lassen County:

        a. Corporate resolutions prepared by the awarded Vendor and the new entity ratifying acceptance of all of the Agreement and its terms, conditions and processes;

        b. New Vendor's Federal Identification Number (FEIN) if applicable; and,

        c. Other documentation requested by Lassen County.

8. Independent Contractor

Nothing in this RFP is intended nor shall be construed to create an employer/employee relationship, a joint venture relationship or any other relationship allowing Lassen County to exercise control over the manner or method by which Vendor or its subcontractors perform under the Agreement.

# VI. SYSTEM REQUIREMENTS

1. Standards

Inmate telephone services are to be provided and shall comply with the most current applicable Federal Communication and/or Public Service commission regulations relating to inmate telephone service in correctional facilities.  Vendor shall be responsible for maintaining and monitoring the most current regulations relating to inmate telephone service though the term of an Agreement.

2. Installation Requirements

1.  In its response to this RFP, Vendor shall submit an implementation plan, which shall include an installation schedule, for the Facility.  Initial installations must be completed within 60 days of the effective date of the Agreement.  The implementation plan will become a part of the Agreement and must be followed.

    a.  If any portion of the installation is not completed within the timeframe allowed in the agreed-upon implementation plan, Vendor may incur liquidated damages in the amount of $500.00 for each day beyond the installation date until the installation is complete.  However, Vendor shall not incur liquidated damages if the cause of the delay is beyond the Vendor's reasonable control.
    b.  Should Vendor incur liquidated damages, Lassen County will invoice Vendor.  Payment of the invoice shall be made to Lassen County within 30 day of Vendor's receipt of the invoice.

2.  Vendor shall be responsible for all costs associated with the inmate telephone visitation system, which shall include but not be limited to, the necessary labor, parts, materials, transportation purchase of equipment, wiring, new electrical circuits, cables, installation, service, maintenance, voice network and transmission, data network and day-to-day operation to maintain all proposed telephone sin good working order and in compliance with the equipment manufacturer's specifications.

3.  Vendor's ITS shall not be configured to reside on or use Lassen County's network.

4.  Vendor agrees to obtain Lassen County's written approval before making any physical changes to the Facility, such as drilling into walls, floors, ceilings or any other portion of the Facility.  This includes existing, newly constructed and/or expanded Facility.

5. Vendor shall install the telephones, pedestals, enclosures and ITS equipment and software in accordance with the manufacturer's specifications.

6. All telephone equipment provided shall be fully operational at the time of the initial installation.

7. The telephone sets shall be suitable for a correctional environment, stainless steel, sturdy, non-coin, and vandal and tamper resistant; the cord length for the inmate telephones is specified in Exhibit B-Facility Specifications. Placards containing dialing instructions in both English and Spanish shall be placed on each phone and shall be replaced each time an inmate telephone set is replaced. The telephones must not contain any exterior removable parts.

8. Vendor shall post calling rates near each inmate telephone or group of inmate telephones. Calling rate flyers and/or additional inmate telephone related information shall be provided by Vendor upon Lassen County's request at no cost.

9. Use of existing conduit, raceways, cable wiring, switches and terminal within the Facility is at the risk of Vendor. Exposed wiring is not permitted. Ownership of any wiring or conduit installed under the Agreement by Vendor becomes Lassen County's property upon termination and/or expiration of the Agreement.

10. Vendor agrees that if any cabling work is required as part of any installation, all new cables shall be used and marked clearly and legibly at both ends, and meet all applicable Electronic Industries Alliance/Telecommunications Industry Alliance ("EIA/TIA") wiring standards for commercial buildings and must be approved by the Facility maintenance personnel.

11. At no cost to Lassen County, Vendor shall install additional inmate telephones, monitoring and recording equipment as needed, within 30 days of request. This includes a newly constructed or expanded Facility.

    a. If the installation of the additional inmate telephones is not completed within 30 days, Vendor may incur liquidated damages in the amount of $500.00 for each day beyond the 30-day installation date until the installation is complete. However, Vendor shall not incur liquidated damages if the cause of the delay is beyond the Vendor's reasonable control.
    b. Should Vendor incur liquidated damages, Lassen County will invoice Vendor. Payment of the invoice shall be made to Lassen County within 30 days of Vendor's receipt of the invoice.
    c. Vendor shall provide, install, maintain, replace and upgrade adequate surge and lightening protection equipment on all lines used for the ITS.

12. All telephone equipment shall be powered by the telephone line, not require an additional power source and shall have an Uninterruptible Power Supply ("UPS") back-up power.

22

A separate power supply shall not be required.  A power source will be available at the demarcation location.

    a.  Vendor shall provide the UPS back-up power source to ensure there is no loss of recording or real time call data in the event o fa power failure.

13. Installation of all telephones and related equipment shall be accomplished during normal business hours at the Facility or as otherwise specified by Lassen County.

14. Vendor shall clean-up and remove all trash and packaging materials resulting from work performed.  Unless otherwise specified by Lassen, no equipment, inventory or spare parts shall be stored by Vendor at the Facility.

15. Vendor shall correct any damage to Lassen County's property caused by maintenance or installation associated with the ITS, including repairs to walls, ceilings, etc.

16. Vendor shall install, repair and maintain all vendor provided equipment and lines, including but not limited to, any wiring or cable work required from the demarcation through the Facility.  All Vendor provided equipment, installation, maintenance, repair costs and all costs or losses due to vandalism shall be the total responsibility of Vendor.

17. Upon completion of the initial installation and any ongoing installations, Vendor shall provide Lassen County with a list of telephone numbers, equipment specifications and locations of each device/unit.

18. Vendor shall indicate any environmental conditions required for the proposed ITS; indicate whether Vendor proposes to make any changes to the phone room at the Facility based on the site evaluation.

19. Vendor must indicate the physical size of the ITS equipment to be installed at the Facility and provide a diagram or visual aid.

20. Vendor shall provide written documentation indicating that all circuits have been tested and all cables, pairs, fiber strands, blocks, etc. are legibly marked after the completion of each installation.

21. Vendor shall install/mount its equipment in accordance with Lassen County's requirements.

3. Transition

1. For the initial installation, Vendor will work with Lassen County and the incumbent inmate telephone service provider to ensure an orderly transition of services, responsibilities and continuity of the services required by Lassen County.

    a.  All phone installation locations must be approved by Lassen County.

2. Upon expiration, termination, or cancellation of the Agreement, Vendor shall accept the direction of Lassen County to ensure inmate telephone services are smoothly transitioned. At a minimum, the following shall apply:

   a. Vendor acknowledges that CDRs, call and visitation recordings, documentation, reports, data, etc., contained in the ITS are the property of Lassen County.  Lassen County acknowledges the ITS hardware and software are the property of Vendor.
      i. The CDRs, call and visitation recordings, documentation, reports, data, etc. shall be provided to Lassen County by Vendor on a storage medium and in a user-friendly, searchable and electronic format at no cost to Lassen County within 15 days following the expiration and/or cancellation of the Agreement.  Vendor shall accept Lassen County's reasonable decision whether the solution provided is acceptable.
   b. Vendor shall discontinue providing service or accepting new assignments under the terms of the Agreement, on the date specified by Lassen County.  Vendor agrees to continue providing all services in accordance with the terms and conditions, requirements and specifications of the Agreement for a period not to exceed 90 calendar days after the expiration, termination or cancellation date of the Agreement.  Commissions will be due and payable by Vendor to Lassen County at the percentage provided in the Agreement until collect, debit and/or pre-paid calls are no longer handled by Vendor.

3. Vendor agrees to remove its equipment at the conclusion of the Agreement in a manner that will allow the reuse of wiring/cabling associated with the ITS.

4. Upon expiration, termination or cancellation of the Agreement, all VVS equipment and wiring shall become property of Lassen County.

## 4. ITS and User Application Specifications

1. The ITS shall be capable of providing all operational features and system requirements applicable to all calls placed through the system, including local, long distance, and international calling.

2. The ITS shall be configured to process all or any combination of the following bill types, without limitation:  collect, free, pre-paid collect, pre-paid card, debit and/or speed dial.

3. Vendor agrees to install the quantity of telephones, pedestals, enclosures, booths, etc. required by Lassen County as outlined in Exhibit B-Facility Specifications.

4. Vendor shall provide a sufficient number of lines, ports, channels, etc. to ensure inmates are allowed to place calls 99.5% of the time.  Lassen County reserves the right to require Vendor to revise its configuration to a 1:1 (telephone to line, port, etc.) ration should the configuration installed by Vendor at no cost to Lassen County.

24

5. The reception quality shall meet telecommunication industry standards and shall be at least equal to the quality available to the general public.  All telephones installed must include volume control.  Vendor shall accept Lassen County's reasonable decision regarding whether the reception is acceptable.

6. Call acceptance by the called party shall be accomplished for all calls through Dual-Tone Multi-Frequency ("DTMF") confirmation ("positive acceptance").  Voice recognition is not an acceptable method for positive acceptance.

7. The ITS shall be capable of recognizing and distinguishing standard or irregular busy signals, standard or irregular ringing signals, answering machines, digital voicemail, cellular telephones, ring-back tones, chain dialing, etc.  Vendor shall provide information on how the proposed ITS will be able to meet this requirement.

8. The ITS shall be configured to monitor the switch hook on the telephone sets.  If the switch hook is pushed down or moved from its idle position, the call must be disconnected immediately and the call prompts must come on to prevent fraud or unauthorized dialing.  Vendor must assume all responsibility for fraud or unauthorized dialing occurring as a result of the ITS failing to meet this requirement.

9. With each call, the ITS must provide an automated message to advise the called party that:

   a. The call is coming from a correctional facility;
   b. The call is coming from a specific inmate; and
   c. The call may be monitored and recorded.

10. With each call, the ITS shall clearly identify the type of call being placed to the called party:  Collect, free, etc.  This recording must be free of any charges.

11. The ITS shall be able to accommodate any of the following options for recording and playback of an inmate's name to the called party:

   a. The inmate may record a name each time a call is placed.  Lassen County requires no more than two (2) seconds be allowed for the inmate to record a name; this setting shall be configurable in the ITS.
   b. The inmate may record a name only once (with the first call attempted); the recorded name will be stored in the ITS and shall be played back with all subsequent call attempts.  Lassen County requires no more than two (2) seconds be allowed for the inmate to record a name; this setting shall be configurable in the ITS.
   c. No name is recorded.  If Lassen County selects this options, the announcement to the called party should not include silence or an interruption where the name recording would normally be included.

12. Vendor shall indicate the number of times the ITS plays the call acceptance information to the called party and whether the called party may interrupt the prompts by selecting a digit on the keypad.  Vendor shall provide a script of the call acceptance information provided to the called party.

13. The ITS shall process calls on a selective bilingual basis:  English and Spanish.  The inmate must be able to select the preferred language at the time the call is initiated.  Vendor shall indicate whether the called party will be able to select the preferred language for call prompts.

14. Vendor shall subscribe to the LEC Line Information Data Base ("LIDB").  Vendor shall query this database for each collect inmate call and process only those calls which do not have Billed Number Screening ("BNS").  Vendor must assume all responsibility for the cost and accuracy of validation.

15. For calls that are not completed, the ITS shall play a recorded message to the inmate detailing why the call was no completed.  Vendor shall provide a list of the available recordings as well as a complete description of each.  Lassen County reserves the right to request Vendor to modify/revise the recordings at any time during the Agreement at no cost to Lassen County and within 30 days of the request.

16. The ITS shall allow free calls to select consulate telephone numbers as listed in Exhibit B-Facility Specifications.

17. Vendor shall provide information on any security configurations available within ITS to prevent fraud relative to automated phone trees (e.g. inmates pressing digits and getting to a live operator, etc).

18. Following the dialing sequence, Vendor shall indicate whether the ITS can be configured to:

   a.  Allow inmates to remain muted while still being able to hear the call progress (ex. Ringing on the line, voicemail pick-up, etc.);
   b.  Place the inmate on-hold and not permit the inmate to hear the call progress.

19. In no event shall the inmate be allowed to communicate with the called party until the call is positively accepted.

20. The ITS shall be able to program a specific speed dial code to selected telephone numbers as determined by Lassen County and at no cost to Lassen County and without the assistance of the Vendor.

21. The ITS shall be capable of processing and completing international collect calls.  Vendor must specify how international collect calls are processed and completed via the proposed ITS.

22. Vendor must specify its process for completing calls that would otherwise be blocked because of Competitive Local Exchange Carriers ("CLEC"), cell phones and unbillable issues.  Vendor shall also identify the average percentage of calls that fail validation because of CLEC, cell phones and unbillable issues.

23. The ITS user application shall allow Lassen County to query the CDRs of inmate activities and calling patterns.

24. The ITS user application shall allow the following search criteria and filters to be applied to the CDR queries:

    a.  Inmate Name (First, Last);
    b.  Inmate Personal Identification Number;
    c.  Record Identified;
    d.  Date Range (Start Date/Time and End Date/Time);
    e.  Facility;
    f.  Called Number;
    g.  Originating Number;
    h.  Station Port;
    i.  Station Name;
    j.  Call Type;
    k.  Bill Type;
    l.  Duration (minimum and maximum);
    m.  Call Amount;
    n.  Flagged Calls;
    o.  Monitored Calls;
    p.  Recording Type;
    q.  Completion type;
    r.  Termination Type;
    s.  Validation Result;
    t.  Pre-Paid Card ID Number;
    u.  Phone Group(s); and
    v.  Custom Search.

25. The ITS user application shall allow CDR query results to be exported in a format selected by Lassen County (.csv, PDV, Microsoft Excel 2010 or greater, etc.).  Provide screen shots of the user application to demonstrate Vendor is able to meet this requirement.

26. The ITS user application shall be equipped, at a minimum, to generate the following standard reports in addition to the CDRs:

    a.  Call Statistics by Date Range;
    b.  Frequently Called Numbers;
    c.  Frequently Used Personal Identification Numbers;
    d.  Commonly Called Numbers;

    e.  Call Detail Report
    f.  Gross Revenue Report by Date Range;
    g.  Facility Totals and Statistics;
    h.  Called Party/Number Accepting Report;
    i.  Fraud/Velocity Report;
    j.  Total Calls;
    k.  Calling List (PAN) Report
    l.  Pre-Paid Card Report
    m.  Debit Usage Report;
    n.  Debit Balance and Funding Report;
    o.  Bill and Call Type Distribution;
    p.  Phone Usage;
    q.  Reverse Look-Up; and
    r.  User Audit Trail.

27. The ITS shall have the capability to customize reports in a form mutually agreed upon by Lassen County and Vendor.

28. The ITS shall have the capability to customize reports in a form mutually agreed upon by Lassen County and Vendor.

29. Vendor's ITS user application shall at a minimum allow:

    a.  The creation, modification and deactivation of user accounts;
    b.  The creation, modification and deactivation of inmate accounts;
    c.  The creation and modification of telephone numbers in the ITS;
    d.  Assignment of inmates or an inmate type to an agency, inmate telephone or a group of inmate telephones;
    e.  Locating and accessing a specific recording by utilizing a unique recording/call identifier;
    f.  Block/unblock telephone numbers without the assistance of Vendor; and,
    g.  Configure an alert that will detect and prohibit a call made to a restricted number, a call using a restricted Personal Identification Number, or a call made from a restricted telephone.

30. Vendor shall indicated whether the ITS has the capability to allow Lassen County to create, view and track service tickets associated with the ITS or Facility.

31. Vendor shall comply with the Americans with Disabilities Act ("ADA") requirements including, but not limited to, providing telephones which are accessible to persons in wheelchairs and providing devices that are compatible with Telephone Devices for the Deaf ("TDD").

    a.  Vendor shall provide the number of TDD telephones and ports specified in <u>Exhibit B-Facility Specifications.</u>
    b.  Vendor must indicate how the TDD telephones work with the proposed ITS.

c. Vendor shall provide detail on how TDD calls can be recorded and monitored via the ITS.

d. Vendor shall provide detail on how call controls configured in the ITS are preserved for calls placed via relay service (E.G. blocked telephone numbers, etc.).

e. Vendor shall indicate whether TDD calls can be billed.  If so, Vendor shall provide detailed information on the billing process used for TDD calls.

32. The ITS must offer the called party an option to receive a rate quote during the call acceptance process.

33. The ITS shall be able to accommodate pro-bono calls to consulates for all countries which may be required for ICE detainees.  This option, when requested by Lassen County, shall be provided at no cost to Lassen County.  Vendor shall accept Lassen County's direction for how pro-bono calling services are configured via the ITS.

34. Vendor shall be able to establish an informant line at no cost to Lassen County.  Calls to the informant line shall be free and shall be routed via the ITS to a destination designated by Lassen County.  Vendor shall accept Lassen County's direction for how the informant line is configured though the ITS.

35. Vendor shall work with Lassen County to implement a reporting line which complies with the Prison Rape Elimination Act of 2003 (PREA).  At a minimum, Vendor shall:

a. Route free calls via the ITS to a destination provided and designated by Lassen County which may be the same as that used for the Lassen County informant line.

b. At no cost to Lassen County, provide a telephone line to Lassen County dedicated for PREA calls to which the calls will be routed as free.

c. ITS shall have the capability of allowing inmates to place PREA calls or leave messages anonymously.  Lassen County, at its sole discretion, may or may not choose to monitor and record PREA calls.

5. Security Features

1. The ITS shall prohibit:

a. Direct-dialed calls of any type;

b. Access to a live operator for any type of calls;

c. Access to "411" information services

d. Access to 800, 866, 888, 877, 900, 911, and any other 800 or 900 type services; and

e. Access to multiple long distance carriers via 950, 800 and 10 10-XXX numbers.

2. The ITS shall prevent call collision or conference calling among telephone stations.

29

3. The ITS shall be able to shut down and/or disable an individual telephone or telephone group(s) quickly and selectively without affecting other telephones or telephone group(s). Lassen County must be able to shut down the ITS via workstation, the ITS user application and/or by cut-off switches at several locations including, but not limited to:

    a. At demarcation location;
    b. Central Control; and
    c. By select housing units.

4. The ITS shall not accept any incoming calls. Vendor shall work with the LEC to ensure such control.

5. Vendor shall provide a detailed explanation of the information displayed on the called party's caller ID each time a call from the Facility(s) is placed (e.g. unknown number, Vendor's customer service number, B-4, ANI, etc.)

6. Upon detection of such, the ITS shall have a fraud prevention feature that can interject pre-recorded announcements, at any time during the conversation, informing the parties that the call is from a correctional facility, extra digits were identified, the parties have been silent, etc. Vendor shall provide a list of the available pre-recorded announcements. Vendor shall describe its process for adjusting the duration of the call or excluding the pre-recorded announcements from the cost of a call.

7. The ITS, upon detection of a three-way call, forwarded call, conference call, etc. shall be able to flag and/or terminate the call immediately. These calls shall be flagged in the CDRs as such.

    a. Indicate whether the ITS plays a message to the inmate and/or the called party prior to terminating the call.
    b. Specify the method used by Vendor to detect three-way calls, specifically if the called party is utilizing a cell phone to place the three-way call.

8. Indicate whether the ITS is capable of detecting and terminating Remote Call Forwarding ("RCF") calls. If Vendor's ITS is unable to detect RCF, provide the status of Vendor's research and development relative to the detection of RCF calls.

9. The ITS shall allow the called party to block their telephone number during the call acceptance process.

10. As specified by Lassen County, the ITS shall have the capability to allow calls to specific numbers at specified times during the day.

11. The ITS shall be capable of limiting the length of a call, providing service at specified times of the day and allowing a maximum number of minutes or seconds per inmate, per month. The current call time limit for the Facility is specified in Exhibit B-Facility Specifications.

6. Personal Identification Number Application

1. The Personal Identification Number ("PIN") application shall work with the ITS allowing inmates to use PINs to complete calls via the ITS and include all of the following features and functionalities:

   a. The capability to provide collect, pre-paid and debit, free and speed dial calling utilizing a PIN;
   b. The capability to interface with the Facility's Jail Management System ("JMS"). The JMS provider is Crimestar.  It is the Vendor's responsibility to contact the JMS provider, establish a working business relationship and identify the requirements necessary to interface with the JMS to ensure Vendor will be able to meet the PIN requirements listed below with the initial implementation.  Lassen County shall not be responsible for paying any amount associated with the required interface.
   c. The capability to receive, accept and apply or strip alphanumeric characters in the inmates' ID.
   d. The capability of accommodating any of the following options for how PINs are received and/or generated by ITS:
       i. JMS generates and sends to the ITS an inmate ID.  The ITS stores the inmate ID and generates and additional unique identifier to be added to the inmate ID.  The combination of the inmate ID and the additional unique indenter shall be the PIN;
       ii. JMS generates and sends to the ITS an inmate ID along with additional inmate data.  The ITS stores the inmate ID and utilizes the additional inmate data to create the complete PIN;
       iii. JMS generates and sends the complete PIN to the ITS.  The ITS stores the complete PIN;
       iv. The ITS, without an interface with the JMS, auto-generates the complete PIN;
       v. The ITS accepts a manually entered PIN.
   e. If applicable, the interface between the JMS and ITS shall automatically update the status of the PIN in the ITS based on the inmate's status in the JMS (e.g. newly booked, transferred, released, etc.).
   f. The ITS shall be capable of accepting a bulk data import of existing PIN information from the incumbent Vendor.
   g. The ITS shall be capable of providing PINs in the ITS immediately upon booking.
   h. The Facility(s) does not currently utilize PINs.
   i. PINs shall not be required for booking/intake phone(s).
   j. Once a PIN has been activated in the ITS, the inmate shall be allowed to place calls from any of the Facility or from any inmate telephone located at the Facility.
   k. Once a PIN has been activated in the ITS, the inmate shall only be allowed to place calls from a designated Facility or group of inmate telephones located at the Facility.

31

l.  The ITS shall be capable of documenting the date/time when an individual PIN was added or modified in the ITS and the user making the change.

m.  The ITS shall be capable of deactivating a PIN upon an inmate's release and reactivating the same PIN if the inmate reenters the Facility at a future date.

n.  ITS shall propose a possible solution to circumvent PIN trading such as voice-to-PIN combinations which may be addressed in Section 13:  Additional Technology.

2.  The ITS shall have the capability to store a list of Personal Allowed Number ("PAN") associated with each PIN.  Lassen County may or may not choose to implement PANs.

3.  PANs shall allow a set quantity of approved telephone numbers for each PIN.

    a.  The quantity of approved telephone numbers within a PAN shall be configurable.

        i.  Vendor shall indicate whether the quantity of approved telephone numbers within a PAN can be configured by PIN.

    b.  Vendor shall indicate whether the proposed ITS is capable of documenting all updates, modification sand/or details for a PAN (e.g. user name, modification made, time/date stamp, etc.).

    c.  ITS shall be capable of storing the following information (at a minimum) for each telephone number on the PAN:  telephone number, called party name, address and relationship to inmate.

    d.  Vendor shall indicate whether the ITS is capable of auto-enrolling PANs to avoid manual entry.

    e.  Vendor shall indicate whether the ITS can accommodate a specific timeframe (e.g. quarterly, monthly, every 120 days, etc.) for allowing PAN updates/changes.

## 7. Monitoring and Recording Requirements

1.  The ITS shall be capable of monitoring and recording all inmate calls from any telephone within the Facility unless there are restriction s that prohibit the recording and monitoring of certain calls such as attorney-client privilege.  The ITS shall be able to exclude restricted or privileged calls and clearly designate non-recorded calls within the ITS user application.

2.  The ITS shall allow designated users at the Facility to play back a recorded call or a call in progress (e.g. live monitoring) via the ITS user application.

3.  The ITS shall be capable of recording calls in a manner allowing designated users to isolate the inmate or the end-user side of the recording for playback.

4.  The ITS shall provide simultaneous playback and continuous recording of calls.

5.  Live monitoring shall allow Lassen County to view, at a minimum, the following information in chronological order.  Vendor shall indicate whether the live monitoring information can be sorted real-time by any of the items listed below and whether the live recording can be paused while listening.

32

    a.  Call Start Time;
    b.  Facility;
    c.  Phone Location Name;
    d.  Inmate Name;
    e.  Inmate PIN;
    f.  Called Number;
    g.  Called city, State;
    h.  Call Type;
    i.  Bill Type;
    j.  Call Status;
    k.  Duration.

6. All CDRs, including all attempted and completed calls, shall be stored online for a minimum period of one (1) year and stored offline for a minimum period of one (1) year following the expiration of the Agreement.

    a.  Vendor shall provide detailed information of its offline storage process.

7. All call recording shall be stored online for a minimum period of one (1) year following the expiration or termination of the Agreement and any Addenda and/or Amendments.

    a.  Vendor shall provide a detailed description of its proposed method for storing call recordings, to include information on Vendor's data redundancy practices.
    b.  Vendor shall provide detailed information of its proposed offline storage process.

8. Vendor shall be responsible for supplying all storage media (CDs/DVDs, flash drives, etc.) at no cost to Lassen County throughout the life of the Agreement and any renewal terms.

9. Vendor shall pay Lassen County liquidated damages in the amount of $1,000.00 per each instance wherein Lassen County suffers one or more lost, unrecoverable or unusable recording(s). Lassen County agrees to notify Vendor of such instances and provide up to three (3) days per instance for Vendor to produce the call recordings. Vendor shall be notified of the total amount due within 30 days of Vendor's receipt of invoice.

10. Vendor shall provide remote access to the ITS at no cost to Lassen County.

    a.  The provision of remote access shall allow Lassen County, as well as other outside personnel who are authorized users, the same features and functionalities, permitted by the user's level of access.

11. For the term of the Agreement, Lassen County shall access to all CDRs and call recordings from all remote access computers, based on the user's access level.

12. The ITS hall be capable of providing alerts for certain calling events and, at a minimum, allow designated users to receive or be forwarded a live call to a specified destination. Vendor shall include detailed information on the ITS alert application and it shall include, at a minimum, the types of alerts available (cellphone, pager, SMS text, email, etc.), and whether a security PIN for accessing the live call is required.

13. The ITS user application shall transfer/copy/export recordings with no loss in quality and shall be capable of placing an audio and visual date/time stamp with the recording. Vendor shall provide a detailed description of the process for transferring/copying/exporting recordings.

14. The ITS shall be capable of emailing and copying recorded calls onto a CD/DVD or other storage medium in audio or MP3/data format with tamper free capabilities.

    a. Provide a listing of any other file types allowed by the ITS.
    b. Indicate whether the copying/burning process is built into the ITS user application or whether the ITS uses an external application/software.
    c. If Vendor proposes a centralized ITS solution, provide information on its capability to accommodate on-site storage of call recordings.

## 8. Pre-Paid/Debit Application

1. The pre-paid and/or debit application shall work with the ITS.  Indicate whether the pre-paid/debit application is part of the ITS or whether an external platform is utilized for the provision of pre-paid/debit calling.

2. The pre-paid and/or debit application shall allow for pre-payment to a specific telephone number or an inmate's account.  Provide a detailed description of all pre-payment/deposit methods available.

3. The ITS shall provide the inmate with the balance of the pre-paid or debit account at the time of the call.

4. The ITS shall provide the called party with the balance of their pre-paid collect account at the time of the call.

5. The pre-paid and/or debit application shall allow international calls.

6. Vendor shall be capable of configuring pre-paid cards for use outside of the Facility. Vendor must provide detailed information on this process.

7. Vendor shall describe its process for accommodating real-time refunds associated with pre-paid and/or debit accounts.

8. The ITS shall be capable of interfacing with the current commissary and/or JMS provide for ease of transferring money from the inmate's trust fund/commissary account to the

ITS debit account as well as refunding unused funds to the turs fund account upon the inmate's release.  The current commissary provider is Keefe.  The current JMS provider is Crimestar.  It is the Vendor's responsibility to initiate and establish a business relationship and necessary interfaces with Keefe and Crimestar.  Lassen County shall not be responsible for paying any amounts associated with the required interface.

9. Vendor shall supply, at Lassen County's request, signage, brochures, flyers regarding the ITS and/or Vendor's pre-paid and debit programs at no cost to Lassen County.

## 9. Security

All Vendor employees shall obtain, at Vendor's cost, the appropriate personnel background security clearance prior to arrival at the Facility.  All Vendor employees will comply with Lassen County's policies and procedures.  Entry to the Facility is subject to the approval of Lassen County.

## 10. Additional Investigative Tools

1. Vendor shall provide a detailed list of all investigative tools included in the ITS.  The ITS shall include at a minimum the following:

   a. The capability to insert and store notes on all call recordings.
   b. The capability to provide date/time stamps for specific durations of each call recording.
   c. The capability to increase or decrease the speed of a call recording.
   d. The capability to mute either the inmate or the called party when replaying a call recording.
   e. A report showing "frequently called telephone numbers" for all telephone numbers called more than four (4) times in 24 hours.
   f. A report showing "common telephone numbers called" for all telephone numbers called by more than one inmate.

## 11.  Compensation, Invoicing, Payment and Reporting

1. **Compensation:**

   a. Vendor shall propose a commission, payable to Lassen County for all transaction s generated by and through Vendor's Applications.  Transaction shall include, but not be limited to, incoming and outgoing electronic messages.  If Vendor includes any additional transaction fees, Vendor shall list the transaction fees and their associated commission in the additional space provided in Exhibit C-Calling Rates and Commission.  Vendor shall pay commission on each completed transaction before any deductions are made for unbillable transactions, bad debt, rejected electronic messages, uncollectable transactions, fraudulent transaction, merchant adjustments, or any other vendor expenses.  A completed transaction shall be defined as the transmittal of funds by the general public to Vendor,

receipt of electronic messages by Vendor's system for processing to the Facility, sending an outgoing electronic message by the inmate to the facility mailroom. Additionally, Lassen County shall not be liable for any Vendor's costs including, but no limited to, taxes, shipping charges, network charges, insurance, interest, penalties, termination payments, attorney fees, or liquidated damages.

2. **Invoicing:**

   a. Vendor shall submit a detailed inmate transaction fee invoice on a monthly basis for payment by Lassen County for all transaction fees associated with inmate electronic messages which are to be paid by the inmate.  The invoice shall be for the activity associated with the previous calendar month.  The invoice will be due and payable to Lassen County within forty-five (45) days of receipt of the invoice. Lassen County shall make such payments only from a special transaction fees account established for this purpose, and in no case shall Lassen County be independently responsible for payment of transaction fees.

3. **Payment and Reporting:**

   a. Vendor shall remit commission payments and reports due to Lassen County no later than 25th day of the month following the month of activity.  Commission payments shall be sent via wire transfer and transaction detail reports shall be sent via electronic format to Lassen County or its designated agent.

   b. Vendor shall provide monthly transaction detail reports which shall include a detailed breakdown of the activity for all transaction types, including but not limited to, electronic messages for each unit.  Vendor shall identify its transaction detail reporting capabilities and provide sample reports with their response to this RFP.

12. Training

1. Vendor shall provide onsite training to Lassen County's staff.  Additional training (onsite or via the web) shall be provided to staff at no cost to Lassen County throughout the term of the Agreement.  Training manuals shall be provided to Lassen County's staff at all training meetings and will become the property of Lassen County.

2. When requested by Lassen County, informational pamphlets shall be available to inmates and shall describe the applicable features and functionalities of the ITS.

3. Vendor will also provide full documentation for all of the ITS.

13. Upgrades and Performance Process

1. Vendor shall provide Lassen County with written notice, including detailed information, of any new ITS software upgrades or features, within 30 days of the introduction of the new software or features into the industry.

2. Vendor shall adhere to the following performance process when upgrading the ITS software, equipment, or performing any damages incurred by Vendor.  Such liquidated damages will be equal to $300.00 per occurrence.  Vendor shall be notified of the total amount due via written notice from Lassen County.  Lassen County will invoice Vendor and payment shall be due with 30 days of Vendor's receipt of invoice.

3. Vendor shall perform extensive testing on all system changes or upgrades prior to introducing them to Lassen County.  At a minimum, this shall include the following:

   a. Extensive testing on systems identical to Facility applications;
   b. Circuit testing;
   c. Configuration/setting preservation testing;
   d. Call processing;
   e. International calling; and
   f. Debit/Pre-paid card calling.

4. Vendor shall receive written permission from Lassen County, before scheduling or proceeding with any functionality changes to the applications at the Facility, especially if the changes will cause an interruption in service.

5. Vendor shall provide Lassen County with written details regarding any change to voice prompts or dialing procedures.

6. Lassen County, at its option, shall have a minimum of two (2) weeks to notify inmates at the Facility of any application changes that affect the inmates.

7. Vendor shall work with the Facility to schedule changes and/or upgrades during a time when the telephones are not being used regularly by the inmates.  Vendor shall coordinate a convenient time and day with Lassen County to implement the changes or upgrades to the applications to avoid an interruption in service.

8. Vendor shall coordinate the presence of a technician at the Facility on the day of implementation to place test calls and ensure the applications are functioning properly.

9. All said changes shall be made by Vendor at no cost to Lassen County.

### 14. General Maintenance

1. Vendor shall respond to repair requests from Lassen County by arriving at the site promptly after reasonable notice has been given on a 24-hours a day, 7-days a week, 365-days a year basis.

2. Repairs or replacement of nonworking or damaged equipment or software shall be started by a qualified technician within 6-hours following notification of a service request or ITS failure. Vendor must exhibit to Lassen County a best effort approach to the completion of the repairs or replacement during the first 24-hours following notification of a problem. Lassen County shall be notified of progress and/or delays in progress until the problems are resolved. Vendor shall notify Lassen County any time a technician will be dispatched to the Facility and prior to the technician's arrival.

3. Lassen County may cancel the Agreement with Vendor if Vendor has not cured a service problem within 10-days of Vendor receiving notice of the problem from Lassen County.

4. Vendor shall provide the on-site response time, priority levels and escalation schedule for both normal maintenance and emergency outage/service issues at and/or related to the Facility.

5. Each party shall report to the other party any misuse, destruction, damage, vandalism, etc. to the ITS. Vendor will assume liability for any and all such damages.

6. All operation, maintenance and repair issues regarding the ITS service shall be reported by Vendor to Lassen County promptly.

7. Vendor shall provide a technician onsite, at a minimum, once a month to conduct preventative maintenance on the ITS.

### 15. Additional Technology

1. Provide information on any additional technology or optional features that may be of interest to Lassen County (e.g. Cell Phone Detection, Word Recognition, Administrative Phone System, Automated Access to Inmate Information, Inmate Trust Account Deposit Process, etc.). Provide detailed information on the functionalities of each as well as a complete description of the features and applications proposed.

    a. Detail any cost associated and/or commission with the additional technology or optional features offered/proposed.

# VII. COST

1. Respondents shall submit a cost proposal that includes both facilities, the Jail and Juvenile Hall.  The cost proposal shall include the pricing structure, the actual program costs(s) for the first year of operation under a contract and a formula for calculating the remaining four years of the contract.

2. A fixed ceiling contract will be required. The County anticipates a five year contract subject to annual appropriation by the Lassen County Board of Supervisors; however, Lassen County may opt for a three-year contract with two one year optional extensions to the contract.

# VIII. IDENTIFICATION OF SUBCONTRACTORS

Respondents shall identify all proposed services that will require the use of a subcontractor for the proposed scope of work.  For each subcontractor listed, respondents shall indicate (1) what products and/or services are to be supplies by that subcontractor and (2) what percentage of the overall scope of work that subcontractor will perform.  Respondents must simply identify the services that will require a sub-contractor, not the particular sub-contractor.  Once the RFP is awarded and negotiations begin, the provider will have to specifically identify subcontractors.

# IX. COUNTY MODEL AGREEMENT AND INSURANCE

Respondents must be prepared to accept and utilize the enclosed Model Agreement format, to include all required sections attached, if selected for services. **(Exhibit A)**

INSURANCES AND INDEMNIFICATIONS

The medical provider shall assume responsibility for any liability arising from the administration or delivery of health care services. The medical provider, not the County, shall handle all lawsuits and pay all associated legal costs and settlements, if any. The medical provider shall provide necessary professional and malpractice liability coverage.

The medical provider shall indemnify, hold harmless, and defend the County, its agents, servants, and employees from any and all claims, actions, lawsuits, damages, judgments, or liabilities of any kind whatsoever arising out of the operation and maintenance of the aforesaid program of health care services conducted by the medical provider, it being the express understanding of the parties hereto that the medical provider shall provide the actual health care services, and have complete responsibility for the health care services.

The provision for insurances and indemnifications for this contractual undertaking are included in **Exhibit A** - **ATTACHMENT I-STANDARD - INSURANCE REQUIREMENTS.**

Any new medical programs, implemented after commencement of a service agreement shall be decided by mutual agreement between the medical provider and the County. This shall include agreement on any additional program costs.

## EVALUATION/SELECTION CRITERIA

Respondents will be evaluated on their responses to the following categories and criterion for selection:

Contractor Experience (Sect. II)
      Service Experience
      Years providing services in California
      Client Satisfaction
      Contingent or geography to other vendor operated facilities for purpose of medical

Management of Firm (Sect. III)
      Transition Plan
      Exceptions to RFP

Plan to provide services (Sect. IV)
      Overall
      Jail
      Juvenile Hall

Staffing Plan (Sect. V)

Cost (Sect. VI)
      Jail
      Juvenile Hall

Overall Quality of RFP response
Suggested Alternate Proposals

A maximum rating of 100 points may be granted by using weighted evaluation criteria. Lassen County will assemble a committee of administrative and management personnel for the purpose of evaluating and rating proposals.

The County reserves the right to reject any or all proposals.

Alternate Proposals

In addition to providing a proposal in direct response to the requirements of this RFP, respondents are encouraged to submit an alternate proposal or proposal(s) that incorporate innovative approaches to minimizing the cost to the County while meeting all the County's obligations to provide health services as designated herein. Innovations and

the direct impact on County costs shall be fully described in the alternate proposal(s).

METHOD OF AWARD

If after receipt and evaluation of all proposals it is determined by the Lassen County Board of Supervisors in its sole discretion that to continue contracting for Jail and Juvenile Hall inmate telephone services would be in the interest of Lassen County and the Sheriff's Office and Juvenile Hall, then and only then will an award be made. Such award will be to the respondent whose proposal is determined by the County through an evaluation process to be the most responsive to the requirements specified in the RFP, in the best interest of Lassen County and most technically complete. For purposes of this RFP, "award" is defined as the right to negotiate a contractual relationship with Lassen County for services identified in the RFP. Award does not constitute an acceptance of a contract offer. The evaluation and selection process may include a request for additional information or an oral presentation to support the written proposal. The County reserves to itself the right not to award any contract regardless of the outcome of the proposal evaluation process.

While cost will be an important factor, it will not necessarily be the most important. In the event that a contract is executed, it will be with the respondent who in the opinion of the County demonstrates the best ability to fulfill all the requirements of the RFP. The criteria for selection are identified in the above section entitled – EVALUATION/SELECTION CRITERIA.

The Agreement to be awarded by the County to the successful contractor is expected to be substantially as presented  in response to this RFP.

The final decision will be made by the Lassen County Board of Supervisors on or about the time identified in the section of this RFP titled SCHEDULE OF EVENTS.

## MODEL CONTRACT

The firm selected shall be expected to execute a contract substantially as the one shown as Exhibit A.

## DISCLOSURE OF INFORMATION

All information and materials submitted to the County in response to this RFP may be reproduced by the County for the purpose of providing copies to authorized County personnel involved in the evaluation of the proposals, but shall be exempt from public inspection under the California Public Records Act until such time as a Contract is executed. Once a Contract is executed, the California Public Records Act limits the County's ability to withhold data relating to proprietary information or trade secrets, as defined by statute. If a Contractor's proposal contains any such proprietary information or trade secret that the Contractor does not want disclosed to the public, subsequent to the execution of the Contract, each sheet of such information SHALL be marked by the Contractor as "proprietary information" or "trade secret." If, after the Contract is executed, a third party requests a copy of any Contractor's proposal and such documents contain material marked "proprietary information" or "trade secret," the County shall withhold that information if it meets the statutory definition of proprietary information or trade secret and the Contractor agrees to defend, indemnify, and hold harmless the County in any subsequent legal action based on its withholding.

# **LEGAL NOTICE**

**Notice is hereby given by the County of Lassen that a "Request for Proposal (RFP) for Jail and Juvenile Hall Inmate Telephone Services" has been prepared and is available.**

Bid documents may be downloaded from www.lassencounty.org.

Bid documents may be picked up at the Lassen County Administration Building at 221 South Roop Street, Susanville, CA 96130 or requested by calling (530) 251-8333.

A pre-proposal conference will be held on April 25, 2019 at 10:00 am at the Lassen County Sheriff's Office, at 1415 Sheriff Cady Lane, Susanville, CA 96130.  The purpose of the conference is to tour the facilities and answer questions related to the Request for Proposal. Attendance at the pre-proposal conference is mandatory. Final written proposals are to be delivered to County contacts at the above addresses.

## Exhibit A
# PROFESSIONAL SERVICE CONTRACT GREATER THAN $25,000

This Contract, dated as of the last date executed by the County of Lassen is between the County of Lassen, a political subdivision of the State of California, hereinafter referred to as "COUNTY", and the professional service contractor indicated in the variable information table below, hereinafter referred to as "CONTRACTOR."

| VARIABLE INFORMATION TABLE | | | | | |
|---|---|---|---|---|---|
| **Term of This Contract** (Complete Dates in Just One of the Following Three Rows) | | | | | |
| **Term Begins** | | **Term Completion Date** | | | |
| On Following Date | | On Following Date | | | |
| County Department | | | | | |
| | | Basis of Price (**Do Not √ More Than One of the Following Four Blocks**) | | | |
| Price | $ | ☐ Fixed Price | ☐ Annual Price | ☐ Monthly Price | ☐ Hourly Rate |
| Not-to-Exceed Price | $ | ☐ √ if Reasonable Expenses are authorized in addition to Hourly Rate | | | |
| **CONTRACTOR Contact Information** | | **COUNTY Contact Information** | | | |
| CONTRACTOR | | Project Manager | | | |
| Address | | Address | | | |
| City, State & ZIP | | City, State & ZIP | | | |
| Telephone | | Telephone | | | |
| Facsimile | | Facsimile | | | |

**WHEREAS**, COUNTY, through the COUNTY Department identified above, desires to have work described in the Attachment II - Scope of Work performed; and

**WHEREAS**, CONTRACTOR possesses the necessary qualifications to perform the work described herein;

**NOW THEREFORE BE IT AGREED** between the parties to this Contract that this Contract is subject to the provisions contained in the following attachments, which are made a part of this Contract.  Should there be any conflicts between this Contract and the attachments that are incorporated herein precedence shall first be given to the provisions of this Contract followed by the attachments, in descending order, as indicated below:

> Attachment I –Insurance Requirements for Professional Services Contract
> Attachment II – Scope of Work
> Attachment III – Terms and Conditions (including Exhibit "A")
> Attachment IV – Professional Credentials
> Attachment V - Business Associate Addendum

By signature below, the department head or his or her deputy certifies that no unauthorized alterations have been made to the Attachment III – "Terms and Conditions" and/or the Attachment I – "Standard Insurance Requirements."

| Typed or Printed Name | Signature | Date |
|---|---|---|

This Contract and the above listed Attachments represent the entire undertaking between the parties.

**COUNTY**                                                      **CONTRACTOR**

_____               _____
Richard Egan, CEO          Date                                                    Date
County of Lassen


REVIEWED AS TO FORM
COUNTY COUNSEL


_____
                          Date

45

**Exhibit B:   Facility Specifications**

**Lassen County Jail 2018**

| Facility Specifications | |
|---|---|
| ADP: | 124 (2018) |
| Number of Beds: | 188 |
| Call Time Limit: | 15 Minutes |
| Hours of Availability for Inmate Telephones: | 7:00 am – 11:00 pm Daily |
| Inmate Telephones Required: | 23 |
| Required Telephone Cord Length (Inmate Telephones): | 18 inches |
| TDD/TDY Telephones Required: | 1 |

| | COLLECT | | PRE-PAID COLLECT | |
|---|---|---|---|---|
| CALL TYPE | # Calls | # Minutes | # Calls | # Minutes |
| Local | 123 | 573 | 2838 | 32,753 |
| INTRAlata/INTRAstate | 694 | 3,438 | 933 | 10,391 |
| INTERlata/INTRAstate | 59 | 392 | 694 | 3,438 |
| INTERlata/INTERstate | 0 | 0 | 0 | 0 |
| International | 0 | 0 | 0 | 0 |

46

**Lassen County Juvenile Hall**

| Facility Specifications | |
|---|---|
| ADP: | 4 |
| Number of Beds: | 10 |
| Call Time Limit: | 15 Minutes |
| Hours of Availability for Inmate Telephones: | 7:00 am – 10:00 pm M-Su |
| Inmate Telephones Required: | 4 |
| Required Telephone Cord Length (Inmate Telephones): | 15 1/2 inches |
| TDD/TDY Telephones Required: | 1 |

| | COLLECT | | PRE-PAID COLLECT | |
|---|---|---|---|---|
| CALL TYPE | # Calls | # Minutes | # Calls | # Minutes |
| Local | 10 | 81 | 4 | 58 |
| INTRAlata/INTRAstate | 46 | 590 | 21 | 238 |
| INTERlata/INTRAstate | 9 | 104 | 0 | 0 |
| INTERlata/INTERstate | 0 | 0 | 0 | 0 |
| International | 0 | 0 | 0 | 0 |

## Exhibit C-Calling Rates and Commission

Vendor shall provide a commission offer for the Facility(s) based on the calling rates and fees listed below in **Option #1**.  Vander may propose an additional commission offer based on alternative calling rates and fees as **Option #2**.  Lassen County is open to posturized calling rate structure.  Vendor must detail all charges and fees that will be assessed for all collect, pre-paid and debit inmate telephone calls including set up fees, funding fees and refund fees associated with pre-paid collect accounts.  Vendor may attach additional tables if Vendor chooses to provide more than two commission and calling rate options past those allowed below.  Failure to completed **Exhibit C** may cause Vendor's proposal to be reject.

| OPTION #1 | | | | | | |
|---|---|---|---|---|---|---|
| | COLLECT | | PRE-PAID COLLECT | | PRE-PAID CARDS | |
| CALL TYPE | First Minute | Additional | First Minute | Additional | First | Additional |
| Local | $3.00 | $0.50 | $3.00 | $0.50 | $0.50 | $0.50 |
| INTRAlata/INTRAstate | $3.00 | $0.50 | $3.00 | $0.50 | $0.50 | $0.50 |
| INTERlata/INTRAstate | $3.00 | $0.50 | $3.00 | $0.50 | $0.50 | $0.50 |
| INTERlata/INTERstate | $ - | $0.25 | $ - | $0.21 | $ - | $0.21 |
| Vendor's Proposed Commission | | | | | | |

**FINANCIAL INCENTIVE: $**_____  **MAG PAYMENT: $**_____

| OPTION #2 | | | | | | |
|---|---|---|---|---|---|---|
| | COLLECT | | PRE-PAID COLLECT | | PRE-PAID CARDS | |
| CALL TYPE | First Minute | Additional | First Minute | Additional | First | Additional |
| Local | | | | | | |
| INTRAlata/INTRAstate | | | | | | |
| INTERlata/INTRAstate | | | | | | |
| INTERlata/INTERstate | | | | | | |
| Vendor's Proposed Commission | | | | | | |

**FINANCIAL INCENTIVE: $**_____  **MAG PAYMENT: $**_____

**ATTACHMENT I**

INSURANCE REQUIREMENTS For Professional Services Contract

Before the commencement of work, Contractor shall submit to County: (1) **Certificates of Insurance** for all relevant coverage's listed in Section A below; (2) All **Endorsements** listed in Section B below; and (3) a "**Declarations Page**" listing the titles of all endorsements to the Commercial General Liability (CGL) policy.

*MINIMUM SCOPE LIMIT OF INSURANCE – Coverage shall be at least as broad as:*

1.) **Commercial General Liability.** Insurance Services Office (ISO) "occurrence" form CG 00 01 12 07 CGL or equivalent on an "occurrence" basis, including bodily injury, property damage, contractual liability, medical expenses for any one person, personal and advertising injury, products-completed operations coverage and policy limits of no less than **$1,000,000 per occurrence.** If a general aggregate applies, either the general aggregate shall apply separately to this project/location or the general aggregate shall be twice the required occurrence limit.

2.) **Automobile Liability Insurance.** ISO form CA 0001 covering (any auto) Code 1 or if Contractor has no owned autos, hired (Code 8) and non-owned autos (Code 9), with limits no less than $250,000 per passenger and $500,000 for all passengers. (*Not required if Contractor provides written verification he or she will not be using a vehicle to perform the scope of work described in the contract.*)

3.) **Workers' Compensation Insurance**. As required by the State of California with Statutory Limits and Employer's Liability Insurance with limits of no less than $1,000,000 per accident for bodily injury and disease. *(Not required if Contractor provides written verification he or she has no employees.)*

4.) **Professional Liability (Errors and Omissions) Insurance.** (If applicable. See <u>Note</u> below.)
Insurance appropriate to the Contractor's profession with limits no less than $1,000,000 per claim, and $2,000,000 aggregate. (*<u>Note:</u> Professional liability insurance coverage is normally required if the Contractor is providing a professional service regulated by the State. For example, insurance agents, professional architects and engineers, doctors, lawyers, nurses and certified public accountants. However, other professional Contractors not regulated by the State, such as computer or software designers, claims administrators, consultants, and others should also have professional liability insurance. If the contracted service requires "brain work, as opposed to "physical work", then professional liability insurance will most likely be required.*)

If Contractor maintains higher limits than the minimums shown above, County shall be entitled to the higher limits.

**B.  INSURANCE POLICY ENDORSEMENTS**

1. The Commercial General Liability policy shall contain or be **endorsed** to contain the following:

The County, its officers, officials, employees, and volunteers are covered as additional insured's on the CGL policy with respect to liability arising out of work performed or operations performed on behalf of Contractor including materials, parts, or equipment furnished in connection with such work or operations.

For any claims related to this contract, the Contractor's insurance coverage shall be primary insurance as respects the County, its officers, employees and volunteers. Any insurance or self-insurance maintained by the County, its officers, employees and volunteers shall be excess of the Contractor's insurance and shall not contribute with it.

The insurance afforded by this policy shall not be cancelled except after thirty days prior written notice by certified mall return receipt has been given to the County. (*<u>Note:</u> We recommend contractor's insurance carrier insert the language above into ISO form 20 10 11 85; or if that form is not available, later additions editions of ISO forms CG 20 10 and CG 20 37. We will also accept a Blanket Additional Insured Endorsement, as long as it provides*

49

*coverage equal to coverage's noted in Section A1 above and all items listed in Section B above.)*

2.  Workers' Compensation Insurance.

The Contractor's Workers' Compensation Insurance policy shall contain or be **endorsed** to contain a waiver of subrogation in favor of the County, for all work performed by Contractor, its employees, agents and subcontractors.

## C.  OTHER INSURANCE PROVISIONS

**1.  Primary Coverage -** For any claims related to this contract, Contractor's insurance shall be primary insurance as respects the County, its officers, employees and volunteers.  Any insurance or self-insurance maintained by the County, its officers, employees and volunteers shall be excess of the Consultant's insurance and shall not contribute with it. However, Contractor's insurance may contribute with other additional insured's providing primary insurance coverage for the same "occurrence", offense, claim or suit.

**2.  Notice of Cancellation -** Each insurance policy required above shall not be canceled, except after thirty (30) days' prior written notice (10 days for non-payment) has been given to the County.

**3.  Waiver of Subrogation -** Contractor hereby grants to County a waiver of any right to subrogation that an insurer of said Contractor may acquire against the County, by virtue of payment of any loss under such insurance. Contractor agrees to obtain any endorsement that may be necessary to affect this waiver of subrogation, but this provision applies regardless of whether or not the County received a waiver or endorsement from the insurer.

**4.  Deductibles and Self Insured Retentions -** Any deductibles or self-insured retentions must be declared and approved by the County. The County may require the Contractor to provide proof of ability to pay losses and related investigations, claims administration, and defense costs within the retention.

**5.  Acceptability of Insurance Carriers -** Insurance is to be placed with insurers with a current A.M. Best's rating of no less than A: VII, unless otherwise acceptable to County.  *(A.M. Best Ratings can be accessed over the internet for no cost at www.ambest.com).*

**6.  Claims Made Policies**

If any of the required policies provide coverage on a claims-made basis then the following requirements must be met:

> a.) The Retroactive Date of the policy must be shown and must be before the contract or beginning of contract work.

> b)  Insurance must be maintained and evidence of insurance must be provided **for at least five (5) years after completion of the contract work.**

> c)  If coverage is canceled or non-renewed, and not replaced with another claims-made policy form with a Retroactive Date prior to the contract effective date, the Consultant must purchase "extended  reporting" coverage for a minimum of five (5) years after the completion of contract work.

**7.  Verification of Coverage -** Contractor shall furnish the County certificates of insurance and original endorsements affecting coverage required by this clause. All certificates of insurance and endorsements are to be received by the County before work under the contract has begun. The County reserves the right to require complete, certified copies of all insurance policies required by this contract.

Certificates of insurance shall state that the insuring agency agrees to endeavor to mail to County written notice 30 days before any of the insurance policies described herein are cancelled.

50

Contractor agrees to notify County within two working days of any notice from an insuring agency that cancels, suspends, reduces in coverage or policy limits the insurance coverage described herein.

**8.  Subcontractors -** Contractor will require and verify that all subcontractors maintain insurance meeting all the requirements stated herein or cover subcontractors under their insurance policies.  Upon request, Contractor shall provide County proof that all subcontractors are covered by their own insurance or the Contractor's insurance policies.

**9.  Special Risk or Circumstances -** County reserves the right to modify these requirements, including limits, based on the nature of the risk, prior experience, insurer, coverage or special circumstances.

**Attachment II**
Scope of Work

Unless indicated otherwise herein, the CONTRACTOR shall furnish all labor, materials, transportation, supervision and management and pay all taxes required to complete the project described below:

At *(fill in the appropriate point)* prior to the end of the contract term an assessment may be made of the value of the professional services herein delineated and thus far received.  At the conclusion of the assessment, it may be determined that the CONTRACTOR owes certain fulfillment and/or deliverables for which the remaining payments may be withheld up to 20% of the contract.  The assessment may determine that there is additional work to be amended to this scope of work.  In the event of an amendment, the CONTRACTOR shall be notified and the amendment submitted and duly authorized in accordance with COUNTY Policy and Procedure.  Otherwise, pertaining to this contract's scope of work it is the CONTRACTOR's responsibility to remain within the term and amount of the contract. If the terms and/or conditions of this contract including the amounts, rates, time and/or duration are exceeded in any way without fully executed amendment, the CONTRACTOR may not be reimbursed.

*NOTE:  If detail rate schedules or other documents are appropriate to the Scope of Work and separate from this Attachment II they must be stipulated in this Attachment by specific reference and thereby made part of this contract, labeled accordingly (Attachment II, Exhibit A, (or whatever the appropriate specific reference), etc.).  They must also be included in the pagination of this contract.  Consequently, it is necessary to scan them into the body of the contract where pagination control can make them inclusive.*

Duties and obligations of the CONTRACTOR:

Since this is a professional service contract, this is the appropriate point in the contract to stipulate any subjective expectation that may be implied by their profession but once explicated become performance elements of the contract.

State all specific elements of the contract for which specific payment due as objectively as possible.  Whether contract is based on hourly, daily, weekly, monthly rates; flat rate for deliverables; project milestone incremental payments; charges for use of particular (i.e., therapeutic) equipment or implements; any reports, criteria and schedule

If expenses are allowed, specify what is reasonable and/or reimbursable AND always state that expenses (unless per diem) must be preapproved and accompanied by receipts.  There should be a cap to the expenses.

If "materials" are required, specify what they will (or might be) and some approximation not to exceed amount.  Unless the materials are provisions of the "house" of the contractor, they will require receipts to be presented with invoice stipulating their charge.

State any circumstances under which no payment will be made.

State if payments are contingent on specific delineation on the invoice(s) such as coding or regulatory designated description.

Recommend that rates be laid out in table format if possible for clarity and ease of processing payments.

State specifically that payments stipulated are the Contractor's only compensation.

Duties and obligations of the COUNTY:

COUNTY's obligations may be:
o   Make any relevant notification promptly
o   Provide data promptly
o   Provide schedules or set up meetings or respond to presentation of information promptly
o   Pay upon provision as herein stipulated and after presentation of appropriate receipts and/or invoice.
o   If possible avoid stipulating payment within specific period.  If absolutely necessary state no less than 30 days and 60 days is not atypical.
o   County does not pay interest or penalties.

**END SCOPE OF WORK**

52

**Attachment III**
**TERMS AND CONDITIONS**

1.  **Scope of Work**.  The work to be undertaken is identified in the attached "Attachment II – Scope of Work" which is made a part of this Contract.

2.  **Reimbursement**.  The work shall be performed for the Fixed price, Annual price, Monthly price or Hourly rate as indicated above in the variable information table, but shall not exceed the Not-to-Exceed Price if included in the variable information table.  Reasonable expenses if authorized and specified in addition to the Hourly Rate if both the Hourly Rate block and the block authorizing Reasonable Expenses are checked in the variable information table.  Payment shall be made after the Project Manager or designee reviews and approves the work and after submittal of an invoice by the CONTRACTOR.  Expenses and or materials if stipulated shall be paid only upon prior approval and with receipts and only after review and authorization by the Project Manager.

3.  **County Project Manager**.  The COUNTY Project Manager or designee for this undertaking who will receive payment invoices and answer questions related to the coordination of this undertaking is identified above in the variable information table.

4.  **Independent Contractor**.  CONTRACTOR is an independent contractor, working under his/her own supervision and direction and is not a representative or employee of COUNTY nor is the CONTRACTOR a partner or in any way directly affiliated with the COUNTY.  CONTRACTOR agrees to file tax returns, report compensation and pay all applicable taxes on amounts paid pursuant to this Contract.

5.  **Ownership**.  CONTRACTOR by execution of this contract acknowledges that this is a *Work for Hire* agreement and hereby grants ownership of all work performed by the CONTRACTOR under this agreement to the COUNTY.  The COUNTY shall retain the exclusive right of ownership to the work, products, inventions and confidential information produced in performance of this contract for the COUNTY by the CONTRACTOR.

6.  **Confidentiality**.  The CONTRACTOR shall comply as follows and in accordance with the required performance of this contract:

    a.  All applications, records, data or any information concerning any individual made or kept by any public office, officer or department obtained by the CONTRACTOR in the performance of duties or as a consequence of performing said duties, shall be the confidential property of the COUNTY and shall not be communicated, transmitted, reproduced or in any other way conveyed to any person not directly a party to this contract, its terms and conditions in accordance with all applicable laws and regulations including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any implications thereof including destruction of records or data as appropriate under compliance criteria.

    b.  No person will publish or disclose or permit or cause to be published or disclosed any data, facts, figures, list of persons or any other form of information obtained by the CONTRACTOR in the performance of duties or as a consequence of performing said duties.  No person shall publish, disclose, or use or permit, or cause to be published, disclosed or used any confidential information pertaining to any individual or group of individuals obtained by the CONTRACTOR in the performance of duties or as a consequence of performing said duties.

    c.  CONTRACTOR agrees to inform all employees, agents, associates and partners on the above provisions and that any person knowingly and intentionally violating the provisions of this clause is guilty of a misdemeanor.  CONTRACTOR shall bear equal responsibility for any violation of the provisions of this paragraph.

    d.  CONTRACTOR agrees and understands that if confidential information concerning any individual made or kept by any public office, officer or department is obtained by the CONTRACTOR and included on any memory device that may be housed in a computer, or other device (such as a "PDA") may become

53

subject to Federal HIPAA requirements and/or any state or local regulations that apply which could result in surrender of the hard drive, sanitization or the destruction thereof in accordance with Department of Defense (DoD) 5220.22-M standard and/or industry standards current to time of the release of the equipment which ever represents the greatest level of (permanent) information destruction. At the very least, at the end of this contract, CONTRACTOR may be required to stipulate to the fact that no such files exist.

7. **Termination**.  This Contract may be terminated by either the COUNTY or CONTRACTOR by a thirty day written notice.  Authorized costs incurred by the CONTRACTOR will be reimbursed up to the date of termination. Notwithstanding anything stated to the contrary herein, this Contract shall expire on the Completion Date indicated in the above Variable Information Table unless the Completion Date is modified by written amendment to this Contract.

8. **Indemnification**.  CONTRACTOR agrees to accept responsibility for loss or damage to any person or entity, and to defend, indemnify, hold harmless and release the COUNTY, its officers, agents and employees from and against any and all actions, claims, damages, disabilities or expenses that may be asserted by any person or entity, including CONTRACTOR, to the extent arising out of or in connection with the negligent acts or omissions or willful misconduct in the performance by CONTRACTOR hereunder, whether or not there is concurrent negligence on the part of the COUNTY, but excluding liability due to the active negligence or willful misconduct of the COUNTY.  This indemnification obligation is not limited in any way by any limitation on the amount or type of damages or compensation payable to or for CONTRACTOR or its agents under worker's compensation acts, disability benefit acts, or other employee benefits acts.  CONTRACTOR shall be liable to COUNTY for any loss of or damage to COUNTY property arising out of or in connection with CONTRACTOR's negligence or willful misconduct.

9. **Right to Monitor/Audit and Associated Liability**.       It being understood by the parties hereto that the COUNTY's funding source herein may be COUNTY, State and/or Federal appropriation, and therefore CONTRACTOR is responsible for administering the program as described herein, CONTRACTOR agrees to accept responsibility for receiving, replying to and/or complying with an any audit of this project which may be deemed appropriate or required in compliance with COUNTY, State or Federal mandates and to reimburse the COUNTY for any liability upon the COUNTY for any discrepancy resultant from said audit exceptions or for any liability that result from a breach of contract, misrepresentation or inaccuracy.

10. **Record Retention and Availability.**  CONTRACTOR shall maintain and preserve all records related to this agreement in its possession (or will assure the maintenance of such records in the possession of any third party performing work related to this agreement) for a minimum period of three (3) years from the effective date of this agreement, or until all State and/or Federal audits are complete, whichever is later. Upon request, CONTRACTOR shall make available copies of these records to COUNTY, State or Federal Governments' personnel, including but not limited to the State Auditor General.  In the event that this contract is related to a FEMA grant record retention shall be three years from the date of the Grant Close-out letter.

11. **Insurance Requirements**.  CONTRACTOR shall procure and maintain for the duration of this Contract, insurance against claims for injuries to persons or damages to property which may arise from, or be in connection with the performance of the Work hereunder by CONTRACTOR, CONTRACTOR's agents, representatives, employees and subcontractors.  At the very least, CONTRACTOR shall maintain the insurance coverage, limits of coverage, and other insurance requirements as described in Attachment I to this Contract.

12. **Changes to the Contract**.  Changes to this Contract may only be approved by written amendment to this Contract. No alteration or variation of any term or condition of this agreement shall be valid unless made in writing, signed by the parties hereto in accordance with COUNTY Policies and Procedures.  No oral understanding or agreement not incorporated as a duly authorized written amendment shall be binding on any of the parties hereto.

13. **Representations and Warranties**.  CONTRACTOR by execution represents the skill, knowledge, proficiency and expertise to perform as herein stipulated and warrants that the credentials presented herein Attachment VI are authentic, current and duly granted.

14. **Contractor's Standard of Care**.  COUNTY has relied upon the professional ability, experience, and credentials presented and represented by the CONTRACTOR as a material inducement to enter into this Contract. CONTRACTOR hereby warrants that all of CONTRACTOR's work will be performed in accordance with generally accepted and applicable professional practices and standards as well as the requirements of applicable Federal, State and local laws, it being understood that acceptance of CONTRACTOR's work by COUNTY shall not operate as a waiver or release.  Where applicable, the CONTRACTOR shall maintain the appropriate certification(s), license(s) or accreditation(s) through the life of this contract, as submitted and stipulated herein Attachment VI and make them available for audit upon request by the COUNTY.

15. **Termination for Exceeding Maximum Level of Expenditures.**  Contracts exceeding the monetary limits delegated to the Purchasing Agent, or authorized deputies, are not valid unless duly executed by the Chair of the Board of Supervisors.  If this Contract was executed for the COUNTY of Lassen by the Purchasing Agent, or authorized deputy, this Contract shall automatically terminate on the date that the provision of services or personal property or incurring of expenses, the cumulative total of which, exceeds the amount prescribed by Government Code Section 25502.5 for personal services contracts or the amount prescribed by Public Contract Code Section 22032 (b) for public works contracts.

16. **Termination for Exceeding Maximum Term.**  Contracts exceeding the three year term delegated to the Purchasing Agent, or authorized deputies, are not valid unless duly executed by the Chair of the Board of Supervisors.  If this Contract was executed for the COUNTY of Lassen by the Purchasing Agent, or authorized deputy, this Contract shall automatically terminate on the date that the term exceeds three years.  Amendments to this Contract, or new Contracts for essentially the same purpose, shall not be valid beyond the three year limitation unless duly executed by the Chair of the Board of Supervisors.

17. **Compliance with Laws.**  CONTRACTOR shall comply with all Federal, State and local laws, rules and regulations including, without limitation, and not limited to any nondiscrimination laws.  Specifically, the CONTRACTOR by executing this agreement stipulates and certifies that as an individual or as an entity, complies in good faith as well as all actions the following regulatory requirements at least but not limited to:
    a. Non-discrimination with regard to minority, women, and disabled veteran-owned business enterprises; hiring practices on the basis of race, color or national origin, gender, handicaps or age.
    b. Environmental protection legislation and in particular regarding clean air and water, endangered species, handling or toxic substances and the public right to know.
    c. Drug Free workplace, Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment and Rehabilitation Act and Public Health Service Act
    d. National Labor Relations Board Public Contract Code 10296.
    e. Domestic Partners – Public Contract Code 10295.3.
    f. ADA 1990 42 USC 12101 et seq.

18. **Applicable Law and Forum.**  This Contract shall be construed and interpreted according to California law and any action to enforce the terms of this Contract for the breach thereof shall be brought and tried in the Superior Court of the County of Lassen.

19. **Contractor Performance and the Breach Thereof.**  The COUNTY may terminate this agreement and is relieved of the payment of any consideration to CONTRACTOR should CONTRACTOR fail to perform the covenants herein contained at the time and in the manner herein provided. CONTRACTOR shall be notified in a timely manner of default and provided 30 days in which to remedy the default.  If at the end of the 30 days, if remedy is not made or does not satisfy the default, the COUNTY shall notify the CONTRACTOR of the breach and thereby the termination of this contract.  In the event of such termination, the COUNTY may proceed with the work in any manner deemed proper by the COUNTY. The cost to the COUNTY shall be deducted from any sum due the CONTRACTOR under this agreement and the balance, if any, shall be retained by the COUNTY.

20. **Contradictions in Terms and Conditions.**  In the event of any contradictions in the terms and/or conditions of this Contract, these Attachment III TERMS AND CONDITIONS shall prevail.

21. **No Delegation Or Assignment.**  Provider shall not delegate, transfer or assign its duties or rights under this Agreement, either in whole or in part, directly or indirectly, by acquisition, asset sale, merger, change of control,

55

operation of law or otherwise, without the prior written consent of COUNTY and any prohibited delegation or assignment shall render the contract in breach. Upon consent to any delegation, transfer or assignment, the parties will enter into an amendment to reflect the transfer and successor to CONTRACTOR. COUNTY will not be obligated to make payment under the Agreement until such time that the amendment is entered into.

22. **Conflict of Interest.** CONTRACTOR and CONTRACTOR'S employees shall have no interest, direct or indirect, which will conflict in any manner or degree with the performance of services required under this contract.

    a. This contract is entered into by COUNTY upon the express representation that CONTRACTOR has no other contracts in effect with COUNTY except as described on Exhibit "A" hereto attached. Exhibit "A" is hereby made part of this contract by it reference herewith and hereby subjugated to these General Terms and Conditions (Attachment III).

    b. CONTRACTOR understands and will adhere to the COUNTY's policy that no contracts shall knowingly be issued to any current COUNTY employee or his/her immediate family or to any former COUNTY employee or his/her immediate family until two years after separation from employment, without notifying the County Personnel Department in writing:

<div align="center">
Regina Schaap<br>
221 South Roop Street<br>
Susanville, CA 96130
</div>

    c. CONTRACTOR stipulates by execution of this contract that they have no business or other interest that provides any conflict with the interest of the County of Lassen in the matters of this agreement. CONTRACTOR recognizes that it is a breach of ethics to not disclose any interest that may be a conflict to the COUNTY for the advice of County Counsel on the matter prior to executing this contract.

23. **Cannon of Ethics**. CONTRACTOR by execution of this contract agrees to act in the best interest of and on behalf of the County of Lassen and its constituents in all matters, honest, fair, prudent and diligent as dictated by reasonable standards of conduct for their profession.

24. **Severability**. The terms and conditions of this contract shall remain in force and effect as a whole separate from and even if any part hereof the contract is deemed to be invalidated.

25. **No Implied Waiver**. In the event that The COUNTY at any point ignores or allows the CONTRACTOR to break an obligation under the contract, it does not mean that COUNTY waives its future rights to require the CONTRACTOR to fulfill those obligations.

26. **Entirety of Agreement**. This contract inclusive of all Attachments herein in stipulated and made part of the contract constitutes the entire agreement between these parties.

<div align="center">

**END TERMS AND CONDITIONS**

</div>

**ATTACHMENT IV**
**PROFESSIONAL CREDENTIALS**

The CONTRACTOR herein presents the required and essential credentials for performance of this contract and warrants them to be authentic, current and duly granted.

List required and essential credentials which will be available in the contract file and may or may not be hereto attached and which may be but are not limited to:

Professional Degrees
Licenses
Certifications
Bonds

**Attachment V**

**COUNTY OF LASSEN**
**BUSINESS ASSOCIATE ADDENDUM**

This Business Associate Addendum (Addendum) supplements and is made a part of the contract (Contract) by and between **County of Lassen** (COUNTY), a covered entity and _____, a BUSINESS ASSOCIATE, and is effective as of the date of the Contract.

**RECITALS**

    A.  COUNTY wishes to disclose certain information to BUSINESS ASSOCIATE pursuant to the terms of the Contract, some of which may constitute Protected Health Information (PHI) as defined below.

    B.  COUNTY and BUSINESS ASSOCIATE intend to protect the privacy and provide for the security of PHI disclosed to BUSINESS ASSOCIATE pursuant to the Contract in compliance with the Health Insurance Portability and Accountability Act (HIPAA) of 1996, Public Law 104-191, the Health Information Technology for Economic and Clinical Health (HITECH) Act, Public Law 111-005, and regulations promulgated there under by the U.S. Department of Health and Human Services ("HIPAA Regulations") and other applicable laws.

    C.  As part of the HIPAA Regulations, the Privacy Rule and the Security Rule (defined below) require COUNTY to enter into a contract containing specific requirements with BUSINESS ASSOCIATE prior to the disclosure of PHI, as set forth in, but not limited to Title 45, Sections 164.314(a), 164.502(e) and 164.504(e) of the Code of Federal Regulations ("CFR") and continued in this Addendum.

**Definitions**

(a)  Unless otherwise noted, the following terms used in this Addendum shall have the same meaning as those terms in the HIPAA Rules: Breach, Data Aggregation, Designated Record Set, Disclosure, Health Care Operations, Individual, Minimum Necessary, Notice of Privacy Practices, Protected Health Information, Required By Law, Secretary, Security Incident, Subcontractor, Unsecured Protected Health Information, and Use.

(b) Business Associate. "BUSINESS ASSOCIATE" shall generally have the same meaning as the term "business associate" at 45 CFR 160.103, and in reference to the party to this Addendum, shall mean _____.

(c) Covered Entity. "Covered Entity" shall generally have the same meaning as the term "covered entity" at 45 CFR 160.103, and in reference to the party to this Addendum, shall mean the **County of Lassen (COUNTY)**.

(d) HIPAA Rules. "HIPAA Rules" shall mean the Privacy, Security, Breach Notification, and Enforcement Rules at 45 CFR Part 160 and Part 164.

**Obligations and Activities of Business Associate**

BUSINESS ASSOCIATE agrees to:

(a) Not use or disclose protected health information other than as permitted or required by the Contract or as required by law;

(b) Use appropriate safeguards, and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information, to prevent use or disclosure of protected health information other than as provided for by the Contract;

(c) Report to COUNTY any use or disclosure of protected health information not provided for by the Contract of

58

which it becomes aware, including breaches of unsecured protected health information as required at 45 CFR 164.410, and any security incident of which it becomes aware.  Reports are to be made by BUSINESS ASSOCIATE to COUNTY as follows:  1) by telephone within 24-hours of discovery of suspected breach or security incident; and 2) by written notice, in a form prescribed by the COUNTY, within three (3) business days of discovery of suspected breach or security incident.

BUSINESS ASSOCIATE agrees that COUNTY will be responsible for breach notification obligations resulting from BUSINESS ASSOCIATE'S breach of COUNTY's unsecured protected health information.  BUSINESS ASSOCIATE agrees to assist COUNTY in responding to, providing notification of, and mitigating any negative consequences of BUSINESS ASSOCIATE'S breach of COUNTY'S unsecured protected health information. BUSINESS ASSOCIATE is to contact _____ at _____ regarding notifications, written communications, and breach response activities required by this Addendum.

This section shall apply only to COUNTY data under BUSINESS ASSOCIATE'S care, custody or control.  BUSINESS ASSOCIATE will be responsible for breach notification obligations arising from the breach of BUSINESS ASSOCIATE'S protected health information.

BUSINESS ASSOCIATE agrees to defend, indemnify, hold harmless and release COUNTY, its officers, agents and employees from and against any and all actions, claims, damages, disabilities or expenses that may be asserted by any person or entity, arising out of or in connection with the negligent acts or omissions or willful misconduct by BUSINESS ASSOCIATE or BUSINESS ASSOCIATE'S officers, agents and employees, which results in a breach of COUNTY's unsecured protected health information;

(d) In accordance with 45 CFR 164.502(e)(1)(ii) and 164.308(b)(2), if applicable, ensure that any subcontractors that create, receive, maintain, or transmit protected health information on behalf of BUSINESS ASSOCIATE agree to the same restrictions, conditions, and requirements that apply to BUSINESS ASSOCIATE with respect to such information;

(e) Make protected health information in a designated record set available to the individual who is the subject of the protected health information or the authorized representative of the individual who is the subject of the protected health information, as necessary to satisfy COUNTY'S obligations under 45 CFR 164.524;

(f) Make any amendment(s) to protected health information in a designated record set as directed or agreed to by the COUNTY pursuant to 45 CFR 164.526, or take other measures as necessary to satisfy COUNTY'S obligations under 45 CFR 164.526;

(g) Maintain and make available the information required to provide an accounting of disclosures to the individual who is the subject of the protected health information or the authorized representative of the individual who is the subject of the protected health information, as necessary to satisfy COUNTY'S obligations under 45 CFR 164.528;

(h) To the extent  BUSINESS ASSOCIATE is to carry out one or more of COUNTY'S obligation(s) under Subpart E of 45 CFR Part 164, comply with the requirements of Subpart E that apply to the COUNTY in the performance of such obligation(s); and

(i) Make its internal practices, books, and records available to the Secretary for purposes of determining compliance with the HIPAA Rules.

**Permitted Uses and Disclosures by Business Associate**

(a) BUSINESS ASSOCIATE may only use or disclose protected health information as necessary to perform the services set forth in the Scope of Work included in the Contract.

(b) BUSINESS ASSOCIATE may use or disclose protected health information as required by law.

59

(c) BUSINESS ASSOCIATE agrees to make uses and disclosures and requests for protected health information consistent with COUNTY'S minimum necessary policies and procedures.

(d) BUSINESS ASSOCIATE may not use or disclose protected health information in a manner that would violate Subpart E of 45 CFR Part 164 if done by covered entity except for the specific uses and disclosures set forth below, to the extent those specific uses and disclosures are permitted by the Contract.

(e) BUSINESS ASSOCIATE may use protected health information for the proper management and administration of the BUSINESS ASSOCIATE or to carry out the legal responsibilities of the BUSINESS ASSOCIATE.

(f) BUSINESS ASSOCIATE may disclose protected health information for the proper management and administration of BUSINESS ASSOCIATE or to carry out the legal responsibilities of the BUSINESS ASSOCIATE, provided the disclosures are required by law, or BUSINESS ASSOCIATE obtains reasonable assurances from the person to whom the information is disclosed that the information will remain confidential and used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and the person notifies BUSINESS ASSOCIATE of any instances of which it is aware in which the confidentiality of the information has been breached.

(g) BUSINESS ASSOCIATE may provide data aggregation services relating to the health care operations of the COUNTY.

**Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions**

(a) COUNTY shall notify BUSINESS ASSOCIATE of any limitation(s) in the COUNTY'S notice of privacy practices under 45 CFR 164.520, to the extent that such limitation may affect BUSINESS ASSOCIATE'S use or disclosure of protected health information.

(b) COUNTY shall notify BUSINESS ASSOCIATE of any changes in, or revocation of, the permission by an individual to use or disclose his or her protected health information, to the extent that such changes may affect BUSINESS ASSOCIATE'S use or disclosure of protected health information.

(c) COUNTY shall notify BUSINESS ASSOCIATE of any restriction on the use or disclosure of protected health information that COUNTY has agreed to or is required to abide by under 45 CFR 164.522, to the extent that such restriction may affect BUSINESS ASSOCIATE'S use or disclosure of protected health information.

**Permissible Requests by Covered Entity**

COUNTY shall not request BUSINESS ASSOCIATE to use or disclose protected health information in any manner that would not be permissible under Subpart E of 45 CFR Part 164 if done by COUNTY.  BUSINESS ASSOCIATE is permitted uses and disclosures of protected health information for data aggregation or management and administration and legal responsibilities of the BUSINESS ASSOCIATE, if such uses or disclosures are permitted by the Contract.

**Term and Termination**

(a) Term. The Term of this Addendum shall be effective as of the effective date of the Contract, and shall terminate concurrent with the termination of the Contract, or on the date COUNTY terminates for cause as authorized in paragraph (b) of this Section, whichever is sooner.

(b) Termination for Cause. BUSINESS ASSOCIATE authorizes termination of the Contract by COUNTY if the COUNTY determines BUSINESS ASSOCIATE has violated a material term of the Contract and BUSINESS ASSOCIATE has not cured the breach or ended the violation within the time specified by COUNTY.

60

(c) <u>Obligations of Business Associate Upon Termination</u>.

Upon termination of the Contract for any reason, BUSINESS ASSOCIATE shall return to COUNTY (or, if agreed to by COUNTY in writing, destroy) all protected health information received from COUNTY, or created, maintained, or received by BUSINESS ASSOCIATE on behalf of the COUNTY, that the BUSINESS ASSOCIATE still maintains in any form. BUSINESS ASSOCIATE shall retain no copies of the protected health information.

If returning or destroying COUNTY protected health information is not feasible, and retention has been approved by the COUNTY in writing, or if the Contract authorizes BUSINESS ASSOCIATE to use or disclose protected health information for its own management and administration or to carry out its legal responsibilities and the BUSINESS ASSOCIATE needs to retain protected health information for such purposes after termination of the Contract, the following shall apply:

Upon termination of the Contract for any reason, BUSINESS ASSOCIATE, with respect to protected health information received from COUNTY, or created, maintained, or          received by BUSINESS ASSOCIATE on behalf of COUNTY, shall:

1. Retain only that protected health information which is necessary for BUSINESS ASSOCIATE to continue its proper management and administration or to carry out its legal responsibilities;
2. Return to COUNTY (or, if agreed to by COUNTY in writing, destroy)  the remaining protected health information that the BUSINESS ASSOCIATE still maintains in any form;
3. Continue to use appropriate safeguards and comply with Subpart C of 45 CFR Part 164 with respect to electronic protected health information to prevent use or disclosure of the protected health information, other than as provided for in this Section, for as long as BUSINESS ASSOCIATE retains the protected health information;
4. Not use or disclose the protected health information retained by BUSINESS ASSOCIATE other than for the purposes for which such protected health information was retained, and subject to the same conditions which applied prior to termination;
5. Return to COUNTY (or, if agreed to by COUNTY in writing, destroy) the protected health information retained by BUSINESS ASSOCIATE when it is no longer needed by BUSINESS ASSOCIATE for its proper management and administration or to carry out its legal responsibilities; and
6. BUSINESS ASSOCIATE shall obtain and return to COUNTY (or, if agreed to by COUNTY in writing, destroy or ensure the destruction of) all COUNTY protected health information created, received or maintained by any of BUSINESS ASSOCIATE'S subcontractors.

(d) <u>Survival</u>. The obligations of BUSINESS ASSOCIATE under this Section shall survive the termination of the Contract.

**Miscellaneous**

(a) <u>Regulatory References</u>. A reference in this Addendum to a section in the HIPAA Rules means the section as in effect or as amended.

(b) <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Addendum from time to time as is necessary for compliance with the requirements of the HIPAA Rules and any other applicable law.

(c) <u>Interpretation</u>. Any ambiguity in this Addendum shall be interpreted to permit compliance with the HIPAA Rules.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum.

**County of Lassen– Covered Entity**                                    **– Business Associate**

Signature: _____        Signature: _____

Name: _____            Name: _____

Title: _____           Title: _____

Date: _____            Date: _____

62

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT,
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

**Smart Communications Holding, Inc.**   Case No.: **19-CA-008089**
Plaintiff(s)
vs
**Correct Solutions, LLC**
**a/k/a Correct Solutions Group, LLC**   Division J
Defendant(s)

**SUMMONS**

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:
   **YOU ARE COMMANDED** to serve this summons and a copy of the complaint or petition in this action on defendant(s)

    **Correct Solutions, LLC**
    **a/k/a Correct Solutions Group, LLC**
    **c/o NRAI Services Inc. as Registered Agent**
    **1200 South Pine Island Road**
    **Plantation FL  33324**

   Each defendant is required to serve written defenses to the complaint or petition on **BRAD F BARRIOS** , plaintiff's attorney, whose address is **BAJO CUVA COHEN & TURKEL    100 N TAMPA ST STE 1900 TAMPA FL  33602**  within 20[1] days after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.
**DATED** on August 7, 2019.
Attorney: <u>BRAD F BARRIOS</u>    **PAT FRANK**
Attorney For: <u>Smart Communications Holding,</u> As Clerk of the Court
<u>Inc.</u>
Address: <u>BAJO CUVA COHEN & TURKEL</u>
<u>100 N TAMPA ST STE 1900</u>
<u>TAMPA FL  33602</u>     _Dana Caranante_

           Dana Caranante, Deputy Clerk
Florida Bar No: <u>35293</u>    Prepared By: Veronica Phillips, Deputy Clerk
          P.O. Box 3360    800 E Twiggs St
          Tampa, FL 33601   Room 101
                 Tampa FL 33602
         (813)276-8100

[1] Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, Hillsborough County Courthouse, 800 E. Twiggs St., Room 604, Tampa, Florida 33602, (813) 272-7040, at**

**least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711**.

Florida Rules of Civil Procedure Form 1.902(a), Summons (06/10)

IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named in the documents.

IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING,
INC.,

          Plaintiff,

v.                                 CASE NO. 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

          Defendant.

_____/

**VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE**
**PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

Comes now **Luke F. Piontek, Esquire**, Movant herein, and respectfully represents the following:

1.    Movant resides in Baton Rouge, Louisiana. Movant is not a resident of the State of Florida.

2.    Movant is an attorney and a member of the law firm of Roedel, Parsons, Koch, Blache, Balhoff & McCollister with offices at 8440 Jefferson Highway, Suite 301, Baton Rouge, LA 70809.

3.    Movant has been retained personally or as a member of the above-named law firm on January, 2015 by Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC.

4.    Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s):

| Jurisdiction | Attorney Bar Number |
|---|---|
| Louisiana | La. Bar Roll No. 19979 |

5.    There have been no disciplinary, suspension, disbarment, or contempt proceedings initiated against Movant in the preceding five (5) years, except as provided below (give jurisdiction of proceeding, date upon which proceeding was initiated, nature of alleged violation, statement of whether the proceeding has concluded or is still pending, and sanction, if any, imposed):

None _____

_____

6.    Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.    Movant is not an inactive member of The Florida Bar.

8.    Movant is not now a member of The Florida Bar.

9.    Movant is not a suspended member of The Florida Bar.

10.    Movant is not a disbarred member of The Florida Bar, nor has Movant received a disciplinary resignation or disciplinary revocation from The Florida Bar.

11.    Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510, except as provided below (give date of disciplinary action or contempt, reasons therefor, and court imposing contempt):

None _____

_____

12.     Movant has filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters:

| Date of Motion | Case Name | Case Number | Court | Date | Motion Granted/Denied |
|---|---|---|---|---|---|
| None | | | | | |

13.     Local counsel of record associated with Movant in this matter are Kimberly A. Bald, Esquire (FBN 0434190) and James E. Lynch, Esquire (FBN 046219), who are active members in good standing of The Florida Bar and have offices at Harllee & Bald, P.A., 202 Old Main Street, Bradenton, Florida, 34205 (Telephone: 941/744-5537).

14.     Movant has read the applicable provisions of Florida Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this Verified Motion complies with those rules.

15.     Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consent to the jurisdiction of the courts and the Bar of the State of Florida.

WHEREFORE, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 13th day of August 2019.

ROEDEL, PARSONS, KOCH, BLACHE, BALHOFF & McCOLLISTER

By: _____
LUKE F. PIONTEK
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809
Telephone: 225/929-7033
Facsimile: 225/928-4925
e-mail: LPiontek@roedelparsons.com

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

I, Luke F. Piontek, Esquire, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

_____
LUKE F. PIONTEK

We hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of Judicial Administration 2.510.

DATED this 13th day of August 2019.

HARLLEE & BALD, P.A.

By: _____
KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941/744-5537
Facsimile: 941/744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com
Attorneys for Defendant

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion was served by mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida, 32399-2333 accompanied by payment of the $250.00 filing fee made payable to The Florida Bar; and that this document has been filed through the Florida Courts E-filing Portal for service via e-mail upon:

**Brad F. Barrios, Esquire**
**David A. Hayes, Esquire**
Bajo │ Cuva │ Cohen │ Turkel
100 North Tampa Street, Suite 1900
Tampa, FL 33602
bbarrios@bajocuva.com
dhayes@bajocuva.com
Attorneys for Plaintiff

**Kimberly A. Bald, Esquire**
**James E. Lynch, Esquire**
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL 34205
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com
Attorneys for Defendant

this _15th_ day of August 2019.

ROEDEL, PARSONS, KOCH, BLACHE,
BALHOFF & McCOLLISTER

By: _____
LUKE F. PIONTEK
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809
Telephone: 225/929-7033
Facsimile: 225/928-4925
e-mail: LPiontek@roedelparsons.com



Hillsborough County
Clerk of Circuit Court
Circuit Civil Division
P.O. Box 3360
Tampa, FL 33601-3360

August 14, 2019

Kimberly A. Bald, Esquire
202 Old Main Street
Bradenton, FL 34205

IN RE: Smart Communications Holding, Inc. vs Correct Solutions, LLC

Case No: 19-CA-008089                    Division: Division J

Pursuant to Florida Statute 28.241 upon an attorney Kimberly Bald appearing PRO HAC VICE, the Clerk shall collect an additional fee of $100.00 to be deposited into the General Revenue Fund.

Please submit $100.00 to the Clerk of Courts, Hillsborough County for the PRO HAC VICE fee.

Sincerely,
Pat Frank,
Clerk of Circuit Court

Luis Jimenez, Deputy Clerk

CC: Court File

Circuit Civil Division, P.O. Box 3360, Tampa, Florida, 33601-3360

Filed 8/14/2019 Hillsborough County Clerk of the Circuit Court Circuit Civil Division

Filing # 94167630 E-Filed 08/14/2019 02:54:46 PM

## VERIFIED RETURN OF SERVICE

State of Florida                    County of HILLSBOROUGH                    Circuit Court

Case Number: 19-8089

Plaintiff:
SMART COMMUNICATIONS HOLDING, INC.

vs.

Defendant:
CORRECT SOLUTIONS, LLLC A/K/A CORRECT SOLUTIONS GROUP, LLC

For:
ATA PROCESS
1207 N. Franklin St.
Suite 104
Tampa, FL 33602

Received by ATA PROCESS on the 8th day of August, 2019 at 9:00 am to be served on CORRECT SOLUTIONS, LLC A/K/A  CORRECT SOLUTIONS GROUP, LLC C/O NRAI SERVICES INC. AS REGISTERED AGENT, 1200 S PINE ISLAND ROAD, PLANTATION, FL 33324.

I, ROBERT LITTLE, do hereby affirm that on the 8th day of August, 2019 at 10:25 am, I:

SERVED the within name corporation by delivering a true copy of the SUMMONS; COMPLAINT WITH EXHIBITS; PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION; AND DECLARATION OF JON LOGAN at the address of **1200 S PINE ISLAND ROAD, PLANTATION, FL 33324** with date and hour endorsed thereon by me to, DONNA MOCH, MANAGER as an employee of the Registered Agent listed with the Florida Division of Corporations, pursuant to F.S. 48.081 (3)(a).

I do hereby certify that I have no interest in the above action, that I am over the age of eighteen, and that I am a Special Process Server in the county in which it was served. Under penalty of perjury, I declare that I have read the foregoing Verified Returned of Service and that the facts stated in it are true. I am in good standing in the circuit in which document was served. PURSUANT TO F.S. 92.525(2), NOTARY NOT REQUIRED

ROBERT LITTLE
SPS #1406

ATA PROCESS
1207 N. Franklin St.
Suite 104
Tampa, FL 33602
(813) 900-3133

Our Job Serial Number: ARG-2019003838

Copyright © 1992-2019 Database Services, Inc. - Process Server's Toolbox V8.1c

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT,
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

**Smart Communications Holding, Inc.**                    Case No.: **19-CA-008089**
Plaintiff(s)
vs
**Correct Solutions, LLC**
**a/k/a Correct Solutions Group, LLC**                    Division J
Defendant(s)

**SUMMONS**

**THE STATE OF FLORIDA**:
To Each Sheriff of the State:
    **YOU ARE COMMANDED** to serve this summons and a copy of the complaint or petition in this
action on defendant(s)

                **Correct Solutions, LLC**
                **a/k/a Correct Solutions Group, LLC**
                **c/o NRAI Services Inc. as Registered Agent**
                **1200 South Pine Island Road**
                **Plantation FL  33324**

    Each defendant is required to serve written defenses to the complaint or petition on **BRAD F BARRIOS** ,
plaintiff's attorney, whose address is **BAJO CUVA COHEN & TURKEL   100 N TAMPA ST STE 1900
TAMPA FL  33602**  within 20[1] days after service of this summons on that defendant, exclusive of the day of
service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's
attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for
the relief demanded in the complaint or petition.
**DATED** on August 7, 2019.
Attorney: BRAD F BARRIOS                    **PAT FRANK**
Attorney For: Smart Communications Holding,    As Clerk of the Court
Inc.
Address: BAJO CUVA COHEN & TURKEL
100 N TAMPA ST STE 1900
TAMPA FL  33602

Florida Bar No: 35293                    Dana Caranante, Deputy Clerk
                            Prepared By: Veronica Phillips, Deputy Clerk
                            P.O. Box 3360            800 E Twiggs St
                            Tampa, FL 33601          Room 101
                                            Tampa FL 33602
                    (813)276-8100
[1] Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its
agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be
inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be
inserted is 30 days.
**If you are a person with a disability who needs any accommodation in order to
participate in this proceeding, you are entitled, at no cost to you, to the provision of
certain assistance. Please contact the ADA Coordinator, Hillsborough County
Courthouse, 800 E. Twiggs St., Room 604, Tampa, Florida 33602, (813) 272-7040, at**

**least 7 days before your scheduled court appearance, or immediately upon receiving
this notification if the time before the scheduled appearance is less than 7 days; if
you are hearing or voice impaired, call 711.**

Florida Rules of Civil Procedure Form 1.902(a), Summons (06/10)

IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a
written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your
written response, including the case number given above and the names of the parties, must be filed if you want
the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your
wages, money, and property may thereafter be taken without further warning from the court. There are other legal
requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an
attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you
must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named in the
documents.

IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para
contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera.
Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero
del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso
y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.
Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a
un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal,
debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como
"Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de
l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un
simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite,
avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal
entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la
cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur
du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si
vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau
d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette
formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney"
(Plaignant ou a son avocat) nomme ci-dessous.

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

    Plaintiff,

v.                               Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

    Defendant.

_____/

### AGREED ORDER GRANTING VERIFIED MOTION
### FOR ADMISSION TO APPEAR *PRO HAC VICE*

THIS CAUSE came before the Court on the Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of Judicial Administration 2.510, which has been brought by Luke F. Piontek, Esquire, as counsel for Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC. The Court having reviewed the Court file, being advised that there are no objections to the Verified Motion, and being otherwise duly advised of the premises, it is

ORDERED AND ADJUDGED that:

A.     The Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of Judicial Administration 2.510 that has been brought by Luke F. Piontek, Esquire, is hereby GRANTED.

B.     Luke F. Piontek, Esquire is hereby permitted to appear in this action *pro hac vice* for all purposes relating to his representation of Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC.

Case No: 2019 CA 008089

DONE AND ORDERED in Chambers in Tampa, Hillsborough County, Florida, this

_____ day of _____, 2019.

**19-CA-008089 8/23/2019 1:24:46 PM**

_____

REX M. BARBAS, CIRCUIT JUDGE

Copies provided to:

Brad F. Barrios, Esquire
David A. Hayes, Esquire
Bajo Cuva Cohen & Turkel
100 North Tampa Street
Suite 1900
Tampa, FL  33602
bbarrios@bajocuva.com
dhayes@bajocuva.com
Attorneys for Plaintiff

Kimberly A. Bald, Esquire
James E. Lynch, Esquire
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com
Attorneys for Defendant

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                        Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.
_____/

## NOTICE OF EVIDENTIARY HEARING

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing Room 514, Tampa, FL 33602, on **September 4, 2019, at 1:30 p.m.**, or as soon thereafter as counsel can be heard the following:

### Plaintiff's Motion for Temporary Injunction

| | |
|---|---|
| Time Reserved: | 3 Hours |
| Court Reporter: | U.S. Legal Support |
| JAWS Confirmation No.: | 12J-34962851535 |

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of August, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

                                        */s/ Brad F. Barrios*
                                        Brad F. Barrios
                                        Florida Bar No. 35293
                                        E-mail: bbarrios@bajocuva.com
                                        David A. Hayes
                                        Florida Bar No. 96657
                                        E-mail: dhayes@bajocuva.com
                                        BAJO | CUVA | COHEN | TURKEL
                                        100 North Tampa Street, Suite 1900
                                        Tampa, Florida 33602
                                        (813) 443-2199 (telephone)
                                        (813) 443-2193 (facsimile)
                                        *Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                  Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

**NOTICE OF APPEARANCE AS ADDITIONAL COUNSEL FOR
PLAINTIFF AND DESIGNATION OF E-MAIL ADDRESSES**

      Kenneth G. Turkel, of the law firm of Bajo | Cuva | Cohen | Turkel hereby enters his

appearance as additional counsel of record for Plaintiff, Smart Communications Holding, Inc.

("Smart Comm").

      Smart Comm respectfully requests that any and all motions, pleadings, petitions,

applications, requests, demands, memoranda, briefs, notices, discovery, orders, opinions and all

such similar papers of any nature or description, made or filed by anyone pertaining to the above

styled case be served on its undersigned additional counsel Kenneth G. Turkel of the law firm of

Bajo | Cuva | Cohen | Turkel.

      Pursuant to Florida Rule of Judicial Administration 2.156, the email addresses for

receiving service are:

      Primary:      kturkel@bajocuva.com

      Secondary:   tdeleo@bajocuva.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of August, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

/s/ Kenneth G. Turkel
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
Counsel for Plaintiff

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                                                    Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

**DEFENDANT'S ANSWER, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM TO VERIFIED COMPLAINT**

     Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC (Correct

Solutions) hereby serves its Answer, Affirmative Defenses and Counterclaim to the

Verified Complaint as follows:

     1.     Correct Solutions admits that it provides inmate communication services to

correctional facilities pursuant to contracts between Correct Solutions and the facility and

that Correct Solutions has and continues to enjoy a successful business relationship with

its customers. Denied that Smart Communications has a written contractual relationship

with Correct Solutions' customers or that the customers constitute joint customers. The

remaining allegations are denied.

     2.     Denied.

     3.     Denied.

     4.     Correct Solutions admits that Smart Communications is a Florida

corporation with its principal place of business in Pinellas County, Florida. Correct

Solutions is without knowledge as to the remaining allegations.

5.    Correct Solutions admits that it is a Louisiana limited liability company registered to do business in Florida with its principal place of business in Lincoln Parish, Louisiana. Correct Solutions admits that this Court has jurisdiction over Correct Solutions but the remaining allegations are denied.

6.    Admitted.

7.    Admitted that venue is proper for this action in Hillsborough County, Florida. The remaining allegations are denied.

8.    Admitted.

9.    Correct Solutions admits that it has provided and continues to provide telephone communications products and services pursuant to contracts with its customers. The remaining allegations are denied.

10.   Correct Solutions admits that Smart Communications has provided certain services to inmates which include a number of the items described in paragraph 10. Correct Solutions is without knowledge as to the remaining allegations and therefore they are denied.

11.   Denied.

12.   Denied.

13.   Correct Solutions admits that Correct Solutions contracted directly with each facility to provide all services requested by the facility, that Smart Communications was permitted to provide its services directly to the inmates residing in the facilities as a subordinate to Correct Solutions and that the products and services of Smart Communications and Correct Solutions remain separate and distinct. Correct Solutions denies that its customers constitute joint customers or that any joint customers exist. The

remaining allegations are denied.

14.     Admitted that Correct Solutions and Smart Communications executed the NDA wherein each agreed that, in order to conduct discussions about potential contracts and business deals with each other, certain confidential and/or proprietary information, defined as Confidential Information, may be disclosed or discovered about each other, which included Confidential Information for the customers of Correct Solutions, and that they were prohibited from disclosing such information and would keep such information in strict confidence. Correct Solutions further admits that the NDA prohibited Smart Communications from using the Confidential Information for any purpose except for the purpose of the NDA. Correct Solutions admits that a partial copy of the NDA is attached to the Complaint as Exhibit A. The remaining allegations are denied as written.

15.     Denied on the basis that the NDA speaks for itself.

16.     Denied. Correct Solutions disclosed substantial confidential and propriety information including Confidential Information pertaining to the facilities and the management therein with the expectation pursuant to the NDA and the Agreement that the Confidential Information would not be improperly disclosed by Smart Communications or utilized by Smart Communications to try to steal Correct Solutions' customers and interfere with its contracts.

17.     Admitted.

18.     Denied as the Agreement speaks for itself and the customers of Correct Solutions are not joint customers. Correct Solutions is the "Customer" of Smart Communications as defined in the Agreement and the facilities are the "customers" of Correct Solutions. The Agreement granted Smart Communications the exclusive right to

install and maintain its systems "located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules." Under the Agreement, Correct Solutions and Smart Communications agreed that Smart Communications is "an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and [sic; an] employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which [Smart Communications] performs hereunder." Further, there is no contractual relationship between Smart Communications and any of Correct Solutions' customers. The remaining allegations are denied as written.

19.    Admitted that the Agreement incorporates Schedules for eight (8) customers of Correct Solutions. Denied that the customers constitute joint customers.

20.    Denied.

21.    Denied.

22.    Denied as the Agreement speaks for itself.

23.    Denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Correct Solutions admits that Smart Communications sent marketing

e-mails to Correct Solutions' customers using confidential and proprietary information disclosed by Correct Solutions in an attempt to solicit and steal Correct Solutions' customers for the benefit of Smart Communications and to interfere with Correct Solutions' contracts with its customers. The remaining allegations are denied.

32.     Denied.

33.     Admitted that Correct Solutions sent the letter dated July 17, 2019. Denied that the letter only purported to terminated the NDA and Agreement as the letter terminated both agreements effective immediately.

34.     Denied as the letter speaks for itself.

35.     Denied as the letter speaks for itself.

36.     Denied as the letter speaks for itself.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied as Correct Solutions terminated the NDA and Agreement by letter dated July 17, 2019.

43.     Denied as the letter speaks for itself.

44.     Denied as the letter speaks for itself.

45.     Admitted that Smart Communications sent the letter attached as Exhibit E.

46.     Denied on the basis that the letter speaks for itself.

47.     Denied on the basis that the e-mail speaks for itself.

48.    Denied.

49.    Denied.

50.    Denied. Correct Solutions and Smart Communications do not have any contractual relationship with regard to the Miller County facility.

51.    Denied.

52.    Denied.

53.    Correct Solutions admits that Washington County is a customer of Correct Solutions pursuant to a Correctional Communications Service Agreement between Washington County and Correct Solutions dated September 25, 2014 and that commencing in November, 2017, Smart Communications provided certain services to Washington County pursuant to the Schedule 1 Agreement between Correct Solutions and Smart Communications. Correct Solutions further admits that Washington County is unhappy with Smart Communications because of the defective services and poor performance by Smart Communications, that Washington County has provided notice directly to Smart Communications of Smart Communications' failure to provide the services required under the contract between Washington County and Correct Solutions and the Agreement, and that Exhibit G is a true and accurate copy of the e-mail sent by Washington County to Smart Communications. Denied that Smart Communications has any written contract with Washington County or that Washington County is a Joint Customer. Otherwise, denied.

54.    Denied.

55.    Denied.

56.    Denied.

57.    Denied.

58.    Denied.

59.    Denied.

60.    Denied.

61.    Without knowledge and therefore denied.

**Count I**
**Declaratory Relief**
**(Mutual Confidentiality and Nondisclosure Agreement)**

62.    Correct Solutions realleges its responses to paragraphs 1 through 61 in this paragraph 62.

63.    Admitted for jurisdictional purposes only.

64.    Admitted.

65.    Admitted that the NDA was executed on June 15, 2017. The remaining allegations are denied.

66.    Admitted.

67.    Denied as the document speaks for itself.

68.    Admitted.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Admitted.

73.    Denied.

74.    Denied.

**Count II**
**Declaratory Relief**
**(Master Services Agreement)**

75.     Correct Solutions realleges its responses to paragraphs 1 through 61 in this

paragraph 75.

76.     Admitted for jurisdictional purposes only.

77.     Admitted.

78.     Denied.

79.     Denied.

80.     Admitted that Smart Communications breached the Agreement. Denied

that Correct Solutions purported to terminate the Agreement as Correct Solutions

terminated the NDA and Agreement by letter dated July 17, 2019.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Admitted.

85.     Denied.

86.     Denied.

**Count III**
**Breach of Contract**
**(Master Services Agreement – Injunctive Relief)**

87.     Correct Solutions realleges its responses to paragraphs 1 through 61 in this

paragraph 87.

88.     Denied.

89.     Denied.

90.     Denied as the Agreement speaks for itself.

91.     Denied as the Schedules speak for themselves.

92.     Denied.

93.     Denied.

## Count IV
## Breach of Implied Covenant of Good Faith and Fair Dealing
### (Master Services Agreement — Injunctive Relief)

94.     Correct Solutions realleges its responses to paragraphs 1 through 61 in this paragraph 94.

95.     Admitted.

96.     Denied as the Agreement speaks for itself.

97.     Denied as the Agreement speaks for itself.

98.     Denied.

99.     Denied.

## First Affirmative Defense

Smart Communications has unclean hands and is not entitled to any of the relief sought in its Verified Complaint. The NDA required the parties to "hold all Confidential Information in trust and confidence" received by the opposing party. The NDA included safeguard provisions that prohibit Smart Communications and its employees from misusing the information disclosed by Correct Solutions without the prior written consent of Correct Solutions, other than in furtherance of its business agreement and to perform its duties under the NDA. Without the knowledge or consent of Correct Solutions, Smart Communications used the Confidential Information disclosed by Correct Solutions to directly solicit a customer of Correct Solutions in an effort to steal the customer of Correct Solutions.

## Second Affirmative Defenses

Smart Communications breached the NDA and the Agreement by improperly using confidential/proprietary information disclosed by Correct Solutions to Smart Communications pursuant to the NDA and the Agreement. The NDA and the Agreement prohibit Smart Communications from using the Confidential Information in any fashion except to perform its duties under the NDA and the Agreement or with Correct Solutions' express prior written consent. Without the knowledge or consent of Correct Solutions, Smart Communications utilized the Confidential Information disclosed by Correct Solutions to directly solicit a customer of Correct Solutions in an effort to steal the customer of Correct Solutions. As a result of the breach, Correct Solutions was entitled to terminate the Agreement.

## Third Affirmative Defense

Smart Communications attempted to tortiously interfere with Correct Solutions' contractual agreement with its customer which entitled Correct Solutions to terminate the Agreement. The NDA and the Agreement prohibit Smart Communications from using the Confidential Information in any fashion except to perform its duties under the NDA and the Agreement or with Correct Solutions' express prior written consent. Without the knowledge or consent of Correct Solutions, Smart Communications utilized the Confidential Information disclosed by Correct Solutions to directly solicit a customer of Correct Solutions in an effort to steal the customer from Correct Solutions. Florida law permits Correct Solutions to protect its own business interests and contractual agreements with its customers. Thus, Correct Solutions was entitled to terminate the Agreement to protect its interests and prevent further interference by Smart Communications.

### Fourth Affirmative Defense

Smart Communications breached its implied duty of good faith and fair dealing by improperly using confidential/proprietary information disclosed by Correct Solutions to Smart Communications pursuant to the NDA and the Agreement. The NDA and the Agreement prohibit Smart Communications from using the Confidential Information in any fashion except to perform its duties under the NDA and the Agreement or with Correct Solutions' express prior written consent. Without the knowledge or consent of Correct Solutions, Smart Communications utilized the Confidential Information disclosed by Correct Solutions to directly solicit a customer of Correct Solutions in an effort to steal the customer of Correct Solutions. As a result, Correct Solutions was entitled to terminate the Agreement.

### Fifth Affirmative Defense

Smart Communications breached the Agreement by failing to perform the services required under the Agreement or to correct the deficiencies disclosed by several facilities identified in the Schedules to the Agreement resulting in the facilities' desire to terminate their services, which is jeopardizing the contractual relationship between Correct Solutions and its customers.

### Sixth Affirmative Defense

Smart Communications' claims are based on its assertion that the customers of Correct Solutions were joint customers, which is negated by the agreements between the parties. Correct Solutions is the "Customer" of Smart Communications as defined in the Agreement and the facilities are the "customers" of Correct Solutions. The Agreement granted Smart Communications the exclusive right to install and maintain its systems "located in the Customer facilities and contractually obligated Customer facilities

identified on the Schedules." Under the Agreement, Correct Solutions and Smart Communications agreed that Smart Communications is "an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and [sic; an] employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which [Smart Communications] performs hereunder." Further, there is no contractual relationship between Smart Communications and any of Correct Solutions' customers.

### Seventh Affirmative Defense

Smart Communications is not entitled to the injunctive relief sought in its Complaint as the remedy for the causes of action plead is monetary damage.

### Eighth Affirmative Defense

Smart Communications has failed to allege a cause of action for breach of contract set forth in Count III as it failed to identify any contractual provision breached by Correct Solutions.

### Ninth Affirmative Defense

Smart Communications has failed to allege a cause of action for Breach of Implied Covenant of Good Faith and Fair Dealing as it failed to identify any contractual provision which Correct Solutions has not followed.

### Demand for Attorney's fees and Costs

Correct Solutions has retained the law firms of Harllee & Bald, P. A. and Roedel, Parsons, Koch, Blache, Balhoff & McCollister to represent its interests in this matter and pursuant to paragraph 13 of the NDA and applicable Florida law, Correct Solutions is

entitled to recover its attorney's fees and costs against Smart Communications.

## COUNTERCLAIM

Counterclaim Plaintiff, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC hereby sues Counterclaim Defendant, Smart Communications Holding, Inc., for breach of contract and states as follows:

1.      Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("Correct Solutions") is a Louisiana limited liability company authorized to do business in the State of Florida. Its principal place of business is located in Lincoln Parish, Louisiana.

2.      Smart Communications Holding, Inc. ("Smart Communications") is a Florida corporation with its principal place of business in Pinellas County, Florida.

3.      Correct Solutions provides an inmate telephone platform through which it installs telecommunications equipment at correctional facilities and charges inmates or their contacts on a per-call basis. Correct Solutions derives revenue from its platform, a portion of which it agrees to share with the correctional facilities pursuant to a commission arrangement.

4.      Since 2014, Correct Solutions has executed contracts with correctional facilities located throughout the United States for Correct Solutions to provide telecommunication equipment and pay-for-call telephones and services including automated operator assisted station-to-station or person-to-person collect telephone calls. Only eight (8) of those facilities involve Smart Communications.

5.      In early 2017, Correct Solutions began to interview vendors for the purpose of expanding the telephone related services it was providing for its customers. In June 2017, Correct Solutions met with Smart Communications to discuss whether Smart

Communications had the capability and equipment to provide the additional services desired by Correct Solutions including tablets allowing inmates access to e-mails and other services.

6.     On June 15, 2017, Correct Solutions and Smart Communications executed a Mutual Confidentiality and Nondisclosure Agreement ("NDA") pursuant to which they agreed to hold discussions and exchange confidential and/or proprietary information to determine if a future business agreement should be reached. The NDA required the parties to "hold all Confidential Information in trust and confidence" received by the opposing party. The NDA included safeguard provisions that prohibited Smart Communications and its employees from utilizing the information disclosed by Correct Solutions without the prior written consent of Correct Solutions, other than in furtherance of their business agreement and to perform its duties under the NDA. Under paragraph 8 of the NDA, Smart Communications acknowledged and agreed that any breach of the NDA would cause immediate and irreparable injury to Correct Solutions and that the NDA permitted the aggrieved party to seek and obtain monetary damages in addition to equitable relief. A full copy of the NDA is attached hereto as Exhibit A and by reference made a part hereof.

7.     Thereafter, Correct Solutions disclosed to Smart Communications confidential and proprietary information and data about Correct Solutions' customers to Smart Communications.

8.     After the execution of the NDA, Correct Solutions scheduled meetings for its customers to meet with Correct Solutions and Smart Communications during which Smart Communications made presentations of the services and products it would

provide. Specifically, Smart Communications represented that it had the ability to provide electronic messaging, a secure network and internet, grievance and medical record disclosures, a law library and video visitation and would provide each inmate a tablet that would be maintained and serviced by Smart Communications.

9.      On September 13, 2017, Correct Solutions and Smart Communications entered into a Master Services Agreement pursuant to which Smart Communications agreed to provide and perform certain inmate related services and systems for Correct Solutions. Subsequent to the execution of the Master Services Agreement, Correct Solutions executed Contracts and/or Amendment to Contracts with eight (8) of its customers wherein Correct Solutions was granted the exclusive license to install and operate the pay-for-call telephone communications equipment at the facilities and for Correct Solutions to provide inmate telephone systems including Smart Kiosks and secure network, electronic messaging, grievance, general, and medical requests, access to the law library and a fully functional remote video visitation system.

10.     For each of the eight (8) facilities, Correct Solutions and Smart Communications executed a Schedule which identified the hardware, software, systems and services required by the particular facility pursuant to the contract between that facility and Correct Solutions. The Schedules were part of and governed by the Master Services Agreement. A true and accurate copy of the Master Services Agreement and Schedules are attached hereto to as Exhibit B and by reference made a part hereof.

11.     The Master Services Agreement and the Schedules did not provide for Smart Communications to provide any telephone services to any of the eight (8) customers as the telephone services were being provided by Correct Solutions.

12.     Beginning in 2019, customers began to articulate complaints to Smart Communications about its poor service, faulty equipment, and slow response time. One customer, Washington County, provided Smart Communications with numerous notices of the poor performance, inoperable equipment, defective equipment, and untimely response time.

13.     On or about April 8, 2019, Frank Turner of the City of St. Louis, Missouri, one of Correct Solutions' customers, informed Correct Solutions that he had received an e-mail from Jennifer Tongate of Smart Communications wherein Ms. Tongate provided to Frank Turner solicitation materials on behalf of Smart Communications and offered to provide the same telephone services which Correct Solutions was providing under its existing contract with the City of St. Louis and quoted a 100% commission to be paid to the City of St. Louis which was higher than the commission agreement between the City of St. Louis and Correct Solutions. The e-mail address utilized by Jennifer Tongate for Mr. Turner was part of the confidential proprietary information disclosed by Correct Solutions pursuant to the NDA and the Master Services Agreement, is not available to the public and is not readily accessible.

14.     On July 17, 2019, Correct Solutions provided written notice to Smart Communications that it violated the material terms of both the NDA and Master Services Agreement by using the confidential information obtained from Correct Solutions to directly solicit and attempt to steal Correct Solutions' customer.

15.     The action by Smart Communications was a breach of a material term of the NDA and the Master Services Agreement, was an intentional attempt to interfere with Correct Solutions' contractual relationship with its existing contract with the City of St.

Louis, Missouri, and steal Correct Solutions' customer. Accordingly, the Master Services Agreement was properly terminated.

16.     As a direct and approximate cause of the breach, Correct Solutions has been damaged.

17.     All conditions precedent to bringing this action have been met or have occurred.

18.     Correct Solutions has retained the law firms of Harllee & Bald, P. A. and Roedel, Parsons, Koch, Blache, Balhoff & McCollister to represent its interests in this matter and is entitled to recover its attorneys' fees and costs.

Wherefore, Correct Solutions requests entry of a judgment:

a)  directing and requiring Smart Communications to remove all hardware and software systems except for the cabling and conduit which constitutes the property of Correct Solutions from Correct Solutions' customers' facilities identified on the Schedules and consistent with the Master Services Agreement.

b) awarding damages against Smart Communications in favor of Correct Solutions;

c) awarding Correct Solutions its attorneys' fees and costs; and

d) awarding such other relief as the Court deems proper.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL  33602; bbarrios@bajocuva.com; dhayes@bajocuva.com;

kturkel@bajocuva.com; tdeleo@bajocuva.com on August 28th, 2019.

HARLLEE & BALD, P.A.

By:  */s/Kimberly A. Bald_____*
KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941-744-5537
Facsimile: 941-744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033
Facsimile Number 225/928-4925
e-mail: LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

4853-0574-4288, v. 1



## MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Mutual Confidentiality and Nondisclosure Agreement (this "Agreement") is entered this _15th_ day of June 2017 between Smart Communications Holding, Inc. ("SCH"), a Florida corporation, located at 4522 West North B Street, Tampa, Florida 33609 and Correct Solutions Group, ("COMPANY"), a Louisiana corporation, located at 192 Bastille Lane, #200, Ruston, Louisiana 71270. SCH and COMPANY are sometimes hereinafter referred to in this Agreement as a "Party" or, collectively, as the "Parties."

### RECITALS:

A.    The Parties contemplate certain discussions with the potential that they may enter other agreements with each other.

B.    To facilitate such discussions certain confidential and/or proprietary information that is the property of, or used by, SCH or COMPANY may be disclosed to or discovered by the Other party. The Parties acknowledge that the disclosing party will not disclose such information unless the receiving party agrees to maintain such in strict confidence and in accordance with this Agreement.

NOW THEREFORE, the Parties agree as follows:

1.    "Confidential Information" shall mean any and all information relating to the business and operations of the disclosing party owned, licensed or controlled by the disclosing party, including, but not limited to, any or all of the following: know how, products, product ideas, properties, data, technologies, methods, procedures, plans, business plans, forecasts, financial and other business information, including without limitation pricing, fees and programming fees offered to the receiving party or other customers or potential customers by the disclosing party; identities of actual customers, investors or other individuals and entities having a current business relationship with the disclosing party; trade secrets, consisting of confidential and proprietary information not generally known to the public including without limitation software (e.g., source, object and executable code in hard copy and electronic format) and hardware relating to implementation of any of the technology of the disclosing party; technical specifications; manuals, diagrams, charts and other descriptive materials relating to the technology of the disclosing party; and any and all patentable or non-patentable inventions or ideas, and all copyrightable or non-copyrightable subject matter and derivative works thereof. Confidential Information also includes information that derives independent economic value, actual or potential, from being not generally known to the public or to other persons who can obtain economic value from its disclosure or use, and which is the subject of reasonable efforts to maintain its non-disclosure. Confidential Information includes documents, drawings, reports and other records in any media that incorporate, reference or are based upon any "Confidential Information" provided by the disclosing party, including, without limitation, any such documents, drawings, reports or records that are generated because of or as a part of the Parties discussing and considering a business relationship between each other. It is agreed that these definitions shall be construed together where applicable, and separately where necessary, in whatever manner is the most inclusive and best protects any information which may be considered by the disclosing party to be Confidential Information.

1

## Exhibit A

2.    "Confidential Information" shall not include any materials or information of the type specified in paragraph above to the extent that such materials or information: (a) are now or later become generally known and utilized by the public through means which do not constitute a breach of the receiving party's obligations pursuant to this Agreement; (b) are received by or are in the possession of the receiving party, prior to receipt of such information from the disclosing party, and were not so received or acquired through breach of any of the obligations of the receiving party pursuant to this Agreement; (c) are received from a third party under no obligation of confidentiality of the receiving party pursuant to this Agreement, and which third party was under no obligation of confidentiality to the disclosing party or (d) are required to be disclosed by the receiving party pursuant to judicial order or other compulsion of law; provided that the receiving party will provide to the disclosing party prompt notice of such order, cooperate with the disclosing party to maintain the confidentiality of the Confidential Information, and comply with any protective order imposed on disclosure of the Confidential Information.

3.    The receiving party shall hold all Confidential Information in trust and confidence always and shall not sell, transfer, publish, disclose, display, reveal, divulge or otherwise make available any Confidential Information, directly or indirectly, intentionally or negligently, to any third party, person, company or other entity, for any purpose or reason, without the express written consent from the disclosing party. The receiving party agrees to maintain all Confidential Information in strict confidence and to secure and protect that Confidential Information in the same manner as the receiving party protects its own most sensitive information or trade secrets, but in no event with less than reasonable care.

4.    The receiving party shall not use the Confidential Information for any purpose except the purpose of this Agreement as specified above, and shall restrict the disclosure of Confidential Information to persons within its own organization who: (a) have responsibility for or are directly concerned with such purpose of this Agreement; (b) are subject to non-disclosure or confidentiality obligations with the receiving party (the Confidential Information constituting protected information for purposes of such obligations); and (c) have been informed and are fully aware of the receiving party's obligations under this Agreement.

5.    The receiving party shall return all Confidential Information disclosed or supplied to it by the disclosing party, in whatever form or format so supplied or disclosed, including any documents containing any Confidential Information and all copies thereof or extracts or notes thereon, to the disclosing party immediately upon request of the disclosing party.

6.    About the purpose of this Agreement and the disclosure of Confidential Information, certain personnel, representatives or agents of the receiving party, as are authorized by the disclosing party, may be granted access to the facilities of the disclosing party at times and in numbers and identity as agreeable to the disclosing party. All such persons granted such access shall be subject to and comply with all requests and regulations of the disclosing party relating to safety, the taking of photographs and other special regulations as may be considered appropriate by the disclosing party for the security of Confidential Information or other technology or to avoid interference with the operation and administration of the facilities. .

2

7. Without the prior written consent of the disclosing party, the receiving party will not, and the receiving party will direct all of its partners, officers, employees, agents and representatives not to, disclose to any person or entity either the fact that discussions or negotiations are taking place in connection with the purpose of this Agreement or any other potential transactions between the Parties, or any of the terms, conditions or other facts with respect to any such purpose or potential transactions, including the status thereof.

8. The receiving party acknowledges and agrees that any breach of this Agreement would cause immediate and irreparable injury to the disclosing party and monetary damages would be difficult if not impossible to ascertain. The receiving party agrees that should the receiving party violate any of the terms and conditions of this Agreement, the disclosing party shall be entitled to seek and obtain immediate, preliminary and permanent injunctive relief to enjoin further and future violations of this Agreement without a requirement to post a security bond. Nothing contained in this Agreement shall affect the right of the disclosing party to seek and obtain monetary damages in addition to such equitable relief.

9. This Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of the Parties and shall be construed as if written jointly by both Parties and pursuant to the laws of the State of Florida. The Parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Hillsborough County, Florida. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought in the courts of record of the State of Florida in Hillsborough County or the United States District Court, Middle District of Florida. The Parties consent to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court.

10. The provisions of this Agreement are severable, and if any provision is held to be invalid, unenforceable or void, the remaining provisions shall not be invalidated thereby.

11. The terms of this Agreement shall remain in full force notwithstanding the completion of the evaluations contemplated by the Parties or the achievement or abandonment of the purpose of this Agreement, the termination of relationships between the Parties or the return of all written materials containing Confidential Information to the Parties.

12. The terms of this Agreement shall survive for five (5) years after the date of this Agreement; provided, however, that non-disclosure and non-use obligations shall not terminate for any trade secret until such trade secret is no longer a trade secret.

13. If any civil action, arbitration or other legal proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, sales and use taxes, court costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs and expenses incident to arbitration, appellate, bankruptcy

and post judgment proceedings), incurred in that civil action, arbitration or legal proceeding, in addition to any other relief to which such party or parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party.

14.   If the disclosing party ever fails to require, or delays requiring, the receiving party's performance of any provision of this Agreement, even if known, such failure or delay shall not affect the disclosing party's right to require performance of that provision, or to exercise any of its rights, powers or remedies pursuant to this Agreement. Any waiver by the disclosing party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right, power or remedy under this Agreement.

15.   Except as otherwise expressly provided in this Agreement, no remedy conferred upon the disclosing party pursuant to this Agreement is intended to be exclusive of any other remedy, and each such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

16.   This Agreement shall not be construed more strongly against SCH despite SCH's responsibility for its preparation.

17.   This Agreement represents the entire understanding and agreement between the Parties with respect to its subject matter and supersedes all other negotiations, understandings and representations (if any) made by and between the Parties regarding the same.

ACCEPTED AND AGREED:

**Smart Communications Holding**

By: _____

Name -Title: James Logan, President

Date: ___6 - 15 - 17___

~~LaSalle Management~~ Correct Solutions, LLC

By: _____

Name-Title: ___Manager___

Date: ___8/21/17___

4





## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

Page 1 of **6**

# Exhibit B

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

> (i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

> (ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

> (iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

> (iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

> (v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

> (vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

> (vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

> (vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

<div align="center">Miscellaneous</div>

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: 9/13/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: 8-31-17

Email: jim.logan@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.


Customer: Correct Solutions, LLC

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270


Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   LaSalle Corrections-Bowie County Jail 105 W Front Street, Texarkana, TX, 75501

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided.  Customer shall determine which inmates have access to the SmartTablets.  The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment.  We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled.  We utilize a defense-in-depth strategy which employs many layers of security.  If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

8. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

9. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

PmT

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

10. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Distribution and Refurbishment Plan

11. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

12. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

13. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

14. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

15. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

16. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

17. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

18. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

19. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

20. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

21. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

22. Electronic Messaging. Each email message is billed at one credit ($0.50).

23. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

24. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

25. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

26. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

27. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

28. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

29. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

30. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

31. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

32. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

33. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

34. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

35. We will provide at no cost to Customer the labor for the installation of the video visitation system.

36. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

37. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

38. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

39. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

40. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

41. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

42. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

43. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

44. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

45. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

46. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

47. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

48. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

49. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

50. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

51. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

52. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

53. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

54. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

55. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

56. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

57. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

58. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

59. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

60. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with

electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

61. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

62. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

        **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11/7/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11/15/17

Email: jon.logan@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: Lamar County Jail - 201 Main St, Purvis, MS 39475

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Lamar County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

PmT

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

PMT

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

PMT

### Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 10/25/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 10-25-17

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: Moore County Jail - 58 Elm St S, Lynchburg, TN 37352

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Lamar County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Provider will provide five (5) housing unit kiosks and one (1) lobby kiosk for Video Visitation.

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 1/26/18

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 1/29/2018

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Sebastian County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartTablet on a 1:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. Provider reserves the right to periodically evaluate and adjust the ratio based on usage and with agreement of Customer.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

6. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases can be permanently installed into a housing area (e.g. wall mounted) or can be provided as mobile carts to allow for bulk transportation of tablets as needed. Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

7. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

### Maintenance and Support Plan

8. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

9. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

10. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

11. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

12. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

13. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

14. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

15. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

16. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

17. Electronic Messaging. Each email message is billed at one credit ($0.50).