18. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

19. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

20. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

21. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

22. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

23. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

24. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

25. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

26. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

27. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

28. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Customer Responsibilities

29. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

30. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

31. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

32. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

33. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

34. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By:

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By:

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   City of Saint Louis, Missouri

City Justice Center – 200 South Tucker Boulevard, Saint Louis, Missouri 63102

Medium Security Institution – 7600 North Hall Street, Saint Louis, Missouri 63147

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided.  Customer shall determine which inmates have access to the SmartTablets.  The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment.  We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled.  We utilize a defense-in-depth strategy which employs many layers of security.  If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

8. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

9. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The

PmT

inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

10. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

11. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

12. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

### Maintenance and Support Plan

13. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

14. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

15. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

16. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

17. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

18. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

19. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

20. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

21. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

22. Electronic Messaging. Each email message is billed at one credit ($0.50).

23. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

24. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

25. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

26. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

27. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

28. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

29. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

30. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

31. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

32. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

33. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

34. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

35. We will provide at no cost to Customer the labor for the installation of the video visitation system.

36. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

37. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

38. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

39. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

40. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

41. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

42. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

43. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

44. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

45. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

46. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

47. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

### MailGuard™ Patent Pending Postal Mail Elimination System

48. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

49. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

50. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

51. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

52. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

53. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

54. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

55. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

56. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

57. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

58. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

59. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

60. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with

electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

61. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

62. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11/7/17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11/13/17

Email: jon.logan@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Washington County, Arkansas - 1155 W Clydesdale Dr, Fayetteville, AR 72701

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

9. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

10. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

*PMT*

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

11. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Distribution and Refurbishment Plan

12. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

13. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

14. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

15. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

16. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

17. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

18. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

19. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

20. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

21. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

22. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

23. Electronic Messaging. Each email message is billed at one credit ($0.50).

24. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

25. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

26. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

27. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

28. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

29. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

30. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

<u>Grievances, General and Medical Requests</u>

31. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

32. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

33. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

34. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law; as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11 / 7 / 17

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11 / 15 / 17

Email: jon.logan@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Wayne County, Georgia – 1892 South Macon Street, Jesup, Georgia 31545

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

## SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize kiosks that are from assigned to their housing unit in designated classroom areas.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Maintenance and Support Plan

6. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each kiosk checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

7. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

8. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

9. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

10. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

11. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

12. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

13. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

14. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

15. Electronic Messaging. Each email message is billed at one credit ($0.50).

16. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

17. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

18. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

19. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

20. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

21. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

22. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

23. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

24. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

25. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

26. We shall provide access via the SmartKiosk to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

29. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

30. We will provide at no cost to Customer the labor for the installation of the video visitation system.

31. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

32. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

33. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation. Audio Files will be stored for 180 days and Video Files will be stored for 90 days.

34. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

35. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

36. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

37. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

38. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

39. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

40. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

41. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

42. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

43. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

44. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

45. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

46. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

47. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Kiosk Solutions™.

48. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

49. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

50. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

51. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

52. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

53. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

54. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

55. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

56. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

57. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 3/16/18

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 3/16/18

Email: jon.logan@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                    Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

### STIPULATION TO PRESERVE THE *STATUS QUO* PENDING FINAL HEARING ON THE MERITS

Plaintiff, Smart Communications Holding, Inc. and Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC (hereinafter the "Parties"), hereby stipulate and agree as follows:

1.     Plaintiff filed its Verified Complaint on August 2, 2019 relating to certain contracts described in the Complaint; specifically a Mutual Confidentiality and Nondisclosure Agreement attached to the Complaint as Exhibit A ("NDA") and a Master Services Agreement attached to the Complaint as Exhibit B ("MSA").

2.     Defendant filed its Answer, Affirmative Defenses and Counterclaim to Verified Complaint on August 28, 2019.

3.     Based on their positions set forth in the pleadings, the Parties dispute whether a purported termination letter sent by Defendant to Plaintiff was proper and/or effective.

4.     The Parties have agreed to extend the preservation of the status quo for the full pendency of this action, as set forth herein.

5.      This Court has subject matter jurisdiction over this action and personal jurisdiction over Defendant.

6.      The Parties agree that, until a Court Order permits otherwise, (a) the Parties shall perform under the MSA; (b) Defendant shall not direct the disconnecting or removing of Plaintiff's equipment or services based on Defendant's purported "Notice of Termination" letter dated July 17, 2019 from any of the customers identified in the MSA, including the Schedules to the MSA; (c) Defendant shall not induce or solicit complaints about Plaintiff from any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office; (d) the Parties shall not inform any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office that they do not have a contractual relationship with each other or otherwise disavow the other Party's status under the MSA; and (e) neither of the Parties shall solicit or attempt to hire an employee directly employed by the other; however, this provision does not apply to Bruce Johnson in the event he is an employee of Plaintiff.

7.      The Parties do not waive any rights or remedies as set forth in the MSA or the NDA including any based upon any default or failure to perform by a Party prior to or subsequent to the execution of this Stipulation.

8.      This Stipulation does not constitute an admission by any of the Parties as to any of the allegations or legal arguments contained in Plaintiff's Verified Complaint or Motion for Temporary Injunction or in Defendant's Answer, Affirmative Defenses and Counterclaim. The Parties expressly reserve their rights to argue or raise any of the issues raised in the Verified Complaint, the Motion for Temporary Injunction, and the Defendant's Answer, Affirmative Defenses and Counterclaim at any time.

9.      Subject to any intervening motions, which the Parties retain all rights to file and schedule for hearing, the Parties shall schedule a final hearing on the merits of the Verified Complaint and the Answer, Affirmative Defenses and Counterclaim as soon as practicable. However, so long as Defendant does not violate the terms of this Stipulation, Plaintiff agrees to cease pursuing Court intervention on the Motion for Temporary Injunction, including seeking an expedited hearing for the relief requested therein. Defendant understands that any violation of this Stipulation will result in Plaintiff immediately scheduling a hearing on its Motion for Temporary Injunction to occur as soon as the Court's schedule permits.

10.     Defendant waives the defenses of lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and insufficiency of process. Defendant preserves all other defenses to the Verified Complaint and Motion.

Executed this 30th day of August, 2019.

/s/ Brad F. Barrios
Brad F. Barrios – FBN 35293
E-mail:  bbarrios@bajocuva.com
David A. Hayes – FBN 96657
E-mail:  dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Tel:  (813) 443-2199
Fax:  (813) 443-2193
*Attorneys for Plaintiff*

/s/ Kimberly A. Bald
Kimberly A Bald – FBN 434190
E-mail:  kab@harlleebald.com
James E. Lynch – FBN 46219
HARLLEE & BALD, P.A.
202 Old Main Street
Bradenton, FL  34205-7817
Tel:  (941) 744-5537
Fax:  (941) 744-5547
*Attorneys for Defendant*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## NOTICE OF CANCELLATION OF EVIDENTIARY HEARING

**PLEASE TAKE NOTICE** that the evidentiary hearing upon Plaintiff's Motion for

Temporary Injunction before the Honorable Rex M. Barbas, on **September 4, 2019, at 1:30 p.m.**

has been cancelled.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

{BC00256824:1}

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 30th day of August, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                         Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY**
**<u>JUDGMENT ON COUNTS I AND II OF THE COMPLAINT</u>**

      Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to

Florida Rule of Civil Procedure 1.510(c), files its Motion for Partial Summary Judgment on Counts

I and II of the Verified Complaint (this "Motion"). The grounds upon which this Motion is based

and the reasons it should be granted are as follows.

**<u>Statement of Undisputed Facts</u>**

      1.      On or about June 15, 2017, Smart and Defendant Correct Solutions, LLC

("Correct") entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA"). *See*

Complaint, ¶¶ 14, 65 (admitted in Answer).[1]

      2.      On September 13, 2017, Smart and Correct entered into a Master Services

Agreement (the "Agreement"). *See* Complaint, ¶ 17 (admitted in Answer).

      3.      An introductory paragraph of the Agreement provides:

            *This Agreement supersedes any and all other agreements made*
            *between the Parties, written, oral or otherwise.*

---

[1] An undisputed complete and authentic copy of the NDA is attached to the Counterclaim as Exhibit A.

(emphasis added).

4.       Further, section 8 of the Agreement, titled Confidential Information and Non-Disclosure, includes detailed confidentiality and non-disclosure obligations that encompass the same subject matter as the NDA. *See* Complaint, ¶ 17 (authenticity of Agreement admitted).

5.       Section 9 of the Agreement provides the only grounds for termination, as follows:

> Default and Termination.   If either party defaults **in the performance of any obligation** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has [sic] made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. **Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.**

(emphasis added) (authenticity of Agreement admitted).

6.       Finally, Section 25 of the Agreement provides:

> **Completeness of Agreement.**   This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

7.       On July 17, 2019, Correct sent a letter to Smart alleging that Smart violated the NDA and breached the Agreement "through the misuse of Confidential Information to directly solicit [Correct's] customers," and providing that "this letter is formal notice to Smart that

[Correct] hereby terminates the [Agreement] and all Schedules thereto effective immediately." *See* Complaint, ¶ 33 (authenticity of letter admitted).

8.      On August 2, 2019, Smart filed its Verified Complaint for Declaratory Relief (Counts I and II), Breach of Contract (Count III), and Breach of the Implied Covenant of Good Faith and Fair Dealing (Count IV).

9.      Count I is an action for Declaratory Relief on the NDA and specifically seeks, in part, a declaration that (a) the Agreement superseded the NDA such that neither party can be in violation of the NDA; and (b) Correct Solutions may not rely on a violation of the NDA as a predicate to terminate the Agreement and that the termination was ineffective.

10.     Count II is an action for Declaratory Relief on the Agreement and specifically seeks, in part, a declaration that (a) Correct Solutions may not rely on a violation of the Confidential Information and Non-Disclosure provision of the Agreement as a predicate to terminate the Agreement and that the termination was ineffective.

11.     On August 28, 2019, Correct filed its Answer, Affirmative Defenses, and Counterclaim to Verified Complaint ("Answer").

## Introduction

Smart seeks a declaration that Correct may not terminate the Agreement for the reasons stated in the purported termination letter. Correct claims that it has terminated the Agreement based on a violation of the confidentiality provisions of the NDA and Agreement.  Neither party pleads that the NDA or Agreement is ambiguous. Rather, each party asserts that the language of the contracts supports their position. Accordingly, this Court need only interpret two unambiguous contracts to partially resolve the declaratory relief actions as a matter of law. As described below, Smart is entitled to partial summary judgment in its favor on Counts I and II of the Complaint

because the Agreement superseded the NDA and Correct may not terminate the Agreement based on a purported violation of the confidentiality provision of the Agreement.

**Argument**

Pursuant to Florida Rule of Civil Procedure 1.510(c), a summary judgment in favor of the movant "must be rendered immediately if the pleadings and summary judgment evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Summary judgment is appropriate if the facts are "so crystalized that nothing remains except for the questions of law." *Coral v. Gerrard Crane Service, Inc.*, 62 So. 2d 1270, 1273 (Fla. 2d DCA 2011).  "[W]here the determination of the issues of a lawsuit depends upon the construction of a written instrument and the legal effect to be drawn therefrom, the question at issue is essentially one of law only and determinable by entry of summary judgment." *Volusia County v. Aberdeen at Ormond Beach, L.P.*, 760 So. 2d 126, 131 (Fla. 2000) (affirming summary judgment) (quoting *Angell v. Don Jones Ins. Agency,* 620 So.2d 1012, 1014 (Fla. 2d DCA 1993)).

A.   **The Interpretation of the NDA and Agreement is a Pure Question of Law.**

Only pure questions of law remain to be decided on the declarations related to the NDA and the Agreement requested in Counts I and II.

"The cardinal rule of contractual construction is that when the language of the contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning." *Columbia Bank v. Columbia Developers, LLC*, 127 So. 3d 670, 673 (Fla. 1st DCA 2013); *see also Ferreira v. Home Depot/Sedgwick CMS,* 12 So.3d 866, 868 (Fla. 1st DCA 2009) ("Contracts are to be construed in accordance with the plain meaning of the words therein, and it

is never the role of the trial court to rewrite a contract to make it more reasonable for one of the parties.")

When a court examines the plain language of a contract, it must not read a term or group of words in isolation and should instead arrive at a reasonable interpretation of the entire agreement, giving a lawful and effective meaning to all terms. *Nabbie v. Orlando Outlet Owner, LLC,* 237 So.3d 463, 466 (Fla. 5th DCA 2018) (finding that court must interpret contracts as a whole and refusing to read lease provision in a manner that rendered another provision superfluous).

As described below, the language of the NDA and Agreement is unambiguous. The Court's interpretation of these contracts should end with their plain language, which prohibits Correct from terminating the Agreement for an alleged disclosure of confidential information.

### 1.    The Agreement superseded the NDA.

When the parties entered into the NDA, they memorialized the fact that "they may enter other agreements with each other." *See* NDA, Recital A. Consistent with that expressed intent, the Agreement provides that it supersedes "any and all other agreements made between the Parties…" The NDA was a pre-existing agreement made between the parties. As a result, there can be no doubt that the Agreement supersedes the NDA with respect to the confidentiality and nondisclosure terms between the parties. Moreover, the parties included an integration or merger clause as Section 25 of the Agreement, which provides that "no other agreements…shall have any validity or bind any of the Parties hereto."

Accordingly, the Agreement superseded the NDA and the NDA is no longer enforceable. Thus, the NDA cannot serve as a basis for termination of the Agreement and Smart is entitled to declaratory relief as a matter of law.

2.      **Correct may not terminate the Agreement based on an alleged confidentiality violation.**

The Default and Termination provision of the Agreement includes two potential grounds for termination—breach of the confidentiality provision of the Agreement and default in the performance of the Agreement. However, the first ground is only available to Smart, as it is the "Provider" under the Agreement. Agreement at Section 9. Specifically, the Agreement plainly provides that Smart (and only Smart) may immediately terminate the Agreement if Correct (as the "Customer"), breaches the confidentiality or non-disclosure provisions of the Agreement. *Id.* Had the parties intended that right to be reciprocal, they would have crafted the language accordingly. *See Shumrak v. Broken Sound Club, Inc.,* 898 So.2d 1018, 1020 (Fla. 4th DCA 2005) ("It is a fundamental principle of contract construction, known as *expression unius est exclusion alterius,* that the expression of one thing is the exclusion of the other.") (internal quotes and citations omitted).

The remainder of Section 9 provides termination rights only for defaults *in the performance* of any obligation of the Agreement. Obligations in the performance of the MSA relate to the services provided by each party. Before either party may terminate the Agreement for a default in the performance of the Agreement, it must "specifically describe[e] the nature of the [alleged] default," upon which the allegedly defaulting party "shall have thirty (30) days after receipt of the notice of default to cure."

Correct's July 17, 2019 letter did not identify a default in Smart's performance of the Agreement. Nor did Correct provide a thirty day notice and opportunity to cure period. As a result, Correct does not and cannot take the position that it terminated Smart based on a performance default. Instead, Correct only identifies an alleged disclosure or misuse of supposedly confidential

information as its grounds for terminating the Agreement.[2] However, even if Smart misused Correct's confidential information (which it did not), such misuse cannot serve as a termination predicate pursuant to the plain language of the Agreement. Thus, Smart is entitled to the declaration it seeks as a matter of law.

**B.      Correct's Pertinent Defenses Can be Resolved as a Matter of Law.**

Because Smart asks the Court to simply interpret the unambiguous NDA and Agreement, most of Correct's defenses are irrelevant. For example, Correct's First Affirmative Defense (Unclean Hands), Second through Fifth Affirmative Defenses (variations of Prior Breach), and Sixth Affirmative Defense (regarding the relationship of the parties) are not defenses to an action for declaratory relief. These defenses rely on factual assertions that may, at best, be relevant in adjudicating Smart's Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing claims. However, the defenses do not relate to the specific relief sought based on language of the NDA or Agreement and add nothing to the Court's reading or analysis of the language of these contracts.

Correct's Seventh Affirmative Defense relates to the remedy of injunctive relief and, thus, is not at issue in this Motion. The Eighth and Ninth Affirmative Defenses are directed at Counts III and IV of the Complaint. Therefore, none of the Affirmative Defenses prevent the Court from ruling on Counts I and II as a matter of law.

**D.      Discovery is Not Required.**

Counts I and II raise a simple issue:  Do either the NDA or the Agreement permit Correct to terminate the Agreement based on an alleged violation of confidentiality terms? Neither party

---

[2] Smart disputes Correct's assertion that the information referenced in the purported termination letter was actually confidential.  However, because the confidentiality of that information is not relevant to the instant motion, Smart will not address that issue here.

alleges that these contracts are ambiguous. Further, because the Agreement includes an integration clause, the parties may not rely on extrinsic evidence to support their positions about the unambiguous contractual terms. *See Carlon, Inc. v. Southland Diversified Co*., 381 So.2d 291, 293 (Fla. 4th DCA 1980) (parol evidence is inadmissible to vary or contradict plain terms of a contract); *See Jenkins v. Eckerd Corp.,* 913 So.2d 43, 48 (Fla. 1st DCA 2005) (interpreting unambiguous lease term without resort to extrinsic evidence).

As a result, any parol evidence obtained in discovery would be inadmissible to vary or contradict the plain terms of the NDA and the Agreement. Accordingly, discovery is unnecessary to and the Court may thus resolve Counts I and II as a matter of law.

### Conclusion

Smart is entitled to partial summary judgment against Correct on Counts I and II. There are no disputed issues of fact and the Court may interpret the unambiguous NDA and Agreement as a matter of law. Smart respectfully requests the Court enter judgment in its favor (a) declaring that the Agreement superseded the NDA such that neither party can be in violation of the NDA; (b) declaring that Correct may not rely on a violation of the NDA as a predicate to terminate the Agreement and that the termination was ineffective; (c) declaring that Correct may not rely on a violation of the Confidential Information and Non-Disclosure provision of the Agreement as a predicate to terminate the Agreement and that the termination was ineffective; (d) awarding Smart its attorneys' fees and costs pursuant to Section 13 of the NDA; and (e) for such further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Brad F. Barrios
Kenneth G. Turkel
Florida Bar No. 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios
Florida Bar No. 035293
E-mail: bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax:  (813) 443-2193
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
            JEL@harlleebald.com
            DDF@harlleebald.com
            CL@harlleebald.com

/s/ Brad F. Barrios
Attorney

10

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                       Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.
_____/

### PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT

Pursuant to Florida Rule of Civil Procedure 1.350, Plaintiff, Smart Communications

Holding, Inc. ("Smart") requests Defendant, Correct Solutions, LLC, to produce for inspection and

copying each of the documents or categories of documents described hereafter at the law offices

of Bajo Cuva Cohen & Turkel, P.A., 100 North Tampa Street, Suite 1900, Tampa, Florida 33602,

within 30 days of the date of service.

### Definitions and Instructions

As used in these Requests:

(a)     "YOU" or "YOUR" or "DEFENDANT" or "CORRECT" means Defendant,
Correct Solutions, LLC a/k/a Correct Solutions Group, LLC, as well as any agents, representatives,
attorneys, employees, and all other PERSONS acting or purporting to act on its behalf.

(b)     "PERSON" means any individual, firm, partnership, association, proprietorship,
joint venture, corporation, governmental agency, or other organization or legal or business entity,
as well as any agents, attorneys and consultants therefor, and all other PERSONS acting or
purporting to act on its behalf.

(c)     "COMMUNICATION" means any correspondence, contact, discussion, or
exchange between any two or more PERSONS. Without limiting the foregoing,
"COMMUNICATION" includes all DOCUMENTS, telephone conversations or face-to-face
conversations, electronic messages, meetings and conferences.

{BC00258777;1}

(d)    "DOCUMENT" means the original and any copy (except for identical copies) of any document or thing subject to production under the Florida Rules of Civil Procedure, that is in your actual or constructive possession, custody, or CONTROL, including any written, printed, recorded, typed, mechanical, electronic, computer stored or graphic matter of any kind however produced or reproduced and all drafts thereof.  Any copy containing thereon or attached thereto any alterations, notes, comments, or other material not included in any original or other copy shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

(e)    "RELATE TO," "RELATED TO" or "REFER TO" means concerning, respecting, summarizing, digesting, embodying, reflecting, establishing, tending to establish, delegating from, tending not to establish, evidencing, not evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including, or having any connection with.

(f)    "JOINT CUSTOMERS" means Avoyelles Parish Sheriff's Office, LaSalle Corrections-Bowie County Jail, Lamar County Jail, Moore County Jail, Sebastian County Sheriff's Office, City of Saint Louis, Missouri, Washington County, Arkansas, Wayne County, Georgia, and Miller County, Arkansas. This should be construed broadly when any of the foregoing are referenced in Requests to include any entity related to the foregoing list which has contracted with Correct for inmate communication services and such entities' agents, attorneys and consultants therefor, and all other PERSONS acting or purporting to act on its behalf.

(g)    In the event any request herein calls for information or for the identification of a DOCUMENT which you deem to be privileged, in whole or in part, the information should be given or the DOCUMENT identified to the fullest extent possible consistent with such claim of privilege, and you should state the nature of the privilege claimed and specify the grounds relied upon for the claim of privilege.

(h)    A separate answer shall be furnished for each request.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1)    All existing contracts and agreements, including all addenda and schedules between Avoyelles Parish Sheriff's Office and Correct.

2)    All communications and documents between Avoyelles Parish Sheriff's Office and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

3)    All communications between Avoyelles Parish Sheriff's Office and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

4)    All communications between Avoyelles Parish Sheriff's Office and Correct relating to a potential replacement for Smart's services, systems, or equipment.

5)      All existing contracts and agreements, including all addenda and schedules between LaSalle Corrections-Bowie County Jail and Correct.

6)      All communications and documents between LaSalle Corrections-Bowie County Jail and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

7)      All communications between LaSalle Corrections-Bowie County Jail and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

8)      All communications between LaSalle Corrections-Bowie County Jail and Correct relating to a potential replacement for Smart's services, systems, or equipment.

9)      All existing contracts and agreements, including all addenda and schedules between Lamar County Jail and Correct.

10)     All communications and documents between Lamar County Jail and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

11)     All communications between Lamar County Jail and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

12)     All communications between Lamar County Jail and Correct relating to a potential replacement for Smart's services, systems, or equipment.

13)     All existing contracts and agreements, including all addenda and schedules between Moore County Jail and Correct.

14)     All communications and documents between Moore County Jail and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

15)     All communications between Moore County Jail and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

16)     All communications between Moore County Jail and Correct relating to a potential replacement for Smart's services, systems, or equipment.

17)     All existing contracts and agreements, including all addenda and schedules between Sebastian County Sheriff's Office and Correct.

18)     All communications and documents between Sebastian County Sheriff's Office and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

19)     All communications between Sebastian County Sheriff's Office and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

20)   All communications between Sebastian County Sheriff's Office and Correct relating to a potential replacement for Smart's services, systems, or equipment.

21)   All existing contracts and agreements, including all addenda and schedules between City of Saint Louis, Missouri and Correct.

22)   All communications and documents between City of Saint Louis, Missouri and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

23)   All communications between City of Saint Louis, Missouri and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

24)   All communications between City of Saint Louis, Missouri and Correct relating to a potential replacement for Smart's services, systems, or equipment.

25)   All existing contracts and agreements, including all addenda and schedules between Washington County, Arkansas and Correct.

26)   All communications and documents between Washington County, Arkansas and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

27)   All communications between Washington County, Arkansas and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

28)   All communications between Washington County, Arkansas and Correct relating to a potential replacement for Smart's services, systems, or equipment.

29)   All existing contracts and agreements, including all addenda and schedules between Wayne County, Georgia and Correct.

30)   All communications and documents between Wayne County, Georgia and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

31)   All communications between Wayne County, Georgia and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

32)   All communications between Wayne County, Georgia and Correct relating to a potential replacement for Smart's services, systems, or equipment.

33)   All existing contracts and agreements, including all addenda and schedules between Miller County, Arkansas and Correct.

34)   All communications and documents between Miller County, Arkansas and Correct relating to amending or supplementing a contract between the parties to include messaging or other services to be provided by Smart.

35)      All communications between Miller County, Arkansas and Correct relating to Smart's services, systems, or equipment from January 1, 2019 to the present.

36)      All communications between Miller County, Arkansas and Correct relating to a potential replacement for Smart's services, systems, or equipment.

37)      All instructions or directives to any or all of the Joint Customers from Correct about Smart, including, but not limited to, whether or how to communicate with Smart from January 1, 2019 to the present.

38)      All internal communications and documents relating to Smart's services, systems, or equipment and/or the potential termination or replacement of Smart's services from January 1, 2019 to the present.

39)      All internal communications and documents about Correct terminating or considering termination of Smart's services from January 1, 2019 to the present.

40)      All internal communications and documents relating to the Smart advertisement attached to the Complaint as Exhibit C.

41)      All communications and documents through which Correct conveyed purportedly confidential information to Smart from June 15, 2017 to the present.

42)      All communications and documents in your possession which display the email address of Frank Turner from June 15, 2017 to the present.

43)      All purportedly confidential information and/or documents which you allege Smart disclosed or misused in order to solicit a Correct customer.

44)      All documents which demonstrate how Correct protected the confidentiality of the information and/or documents which you allege Smart disclosed or misused in order to solicit a Correct customer.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

 

                                 */s/ Brad F. Barrios*
                                 Kenneth G. Turkel – FBN 867233
                                 E-mail:  kturkel@bajocuva.com
                                 Brad F. Barrios – FBN 35293
                                 E-mail: bbarrios@bajocuva.com
                                 David A. Hayes – FBN  96657
                                 E-mail: dhayes@bajocuva.com
                                 BAJO | CUVA | COHEN | TURKEL
                                 100 North Tampa Street, Suite 1900
                                 Tampa, Florida 33602
                                 (813) 443-2199 (telephone)
                                 (813) 443-2193 (facsimile)
                                 *Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION TO DEFENDANT

Pursuant to Florida Rule of Civil Procedure 1.350, Plaintiff, Smart Communications Holding, Inc. ("Smart") requests Defendant, Correct Solutions, LLC, to produce for inspection and copying each of the documents or categories of documents described hereafter at the law offices of Bajo Cuva Cohen & Turkel, P.A., 100 North Tampa Street, Suite 1900, Tampa, Florida 33602, within 30 days of the date of service.

## Definitions and Instructions

As used in these Requests:

(a)    "YOU" or "YOUR" or "DEFENDANT" or "CORRECT" means Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC, as well as any agents, representatives, attorneys, employees, and all other PERSONS acting or purporting to act on its behalf.

(b)    "PERSON" means any individual, firm, partnership, association, proprietorship, joint venture, corporation, governmental agency, or other organization or legal or business entity, as well as any agents, attorneys and consultants therefor, and all other PERSONS acting or purporting to act on its behalf.

(c)    "COMMUNICATION" means any correspondence, contact, discussion, or exchange between any two or more PERSONS. Without limiting the foregoing, "COMMUNICATION" includes all DOCUMENTS, telephone conversations or face-to-face conversations, electronic messages, meetings and conferences.

{BC00258977;1}

(d)    "DOCUMENT" means the original and any copy (except for identical copies) of any document or thing subject to production under the Florida Rules of Civil Procedure, that is in your actual or constructive possession, custody, or CONTROL, including any written, printed, recorded, typed, mechanical, electronic, computer stored or graphic matter of any kind however produced or reproduced and all drafts thereof.  Any copy containing thereon or attached thereto any alterations, notes, comments, or other material not included in any original or other copy shall not be deemed an identical copy but shall be deemed a separate document within the foregoing definition.

(e)    "RELATE TO," "RELATED TO" or "REFER TO" means concerning, respecting, summarizing, digesting, embodying, reflecting, establishing, tending to establish, delegating from, tending not to establish, evidencing, not evidencing, comprising, connected with, commenting on, responding to, disagreeing with, showing, describing, analyzing, representing, constituting or including, or having any connection with.

(f)    "JOINT CUSTOMERS" means Avoyelles Parish Sheriff's Office, LaSalle Corrections-Bowie County Jail, Lamar County Jail, Moore County Jail, Sebastian County Sheriff's Office, City of Saint Louis, Missouri, Washington County, Arkansas, Wayne County, Georgia, and Miller County, Arkansas. This should be construed broadly when any of the foregoing are referenced in Requests to include any entity related to the foregoing list which has contracted with Correct for inmate communication services and such entities' agents, attorneys and consultants therefor, and all other PERSONS acting or purporting to act on its behalf.

(g)    In the event any request herein calls for information or for the identification of a DOCUMENT which you deem to be privileged, in whole or in part, the information should be given or the DOCUMENT identified to the fullest extent possible consistent with such claim of privilege, and you should state the nature of the privilege claimed and specify the grounds relied upon for the claim of privilege.

(h)    A separate answer shall be furnished for each request.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

1)    A copy of the https://www.correctsolutionsgroup.com/services webpage as it existed on or before August 2, 2019.

2)    All communications related to deleting or altering content on the https://www.correctsolutionsgroup.com/services webpage, including content that referenced the "iMate E-Device" and/or "an all-in-one solution for inmate communications, entertainment, and eLearning" from August 2, 2019 to the present.

3)    An exemplar of the iMate E-Device.

4)    All communications related to the design, construction, or development of the iMate E-Device, including, but not limited to, communications about the materials used in constructing the device.

5)    All communications between Correct and Sebastian County related to the September 13, 2019 letter from Correct to Smart re: Notice to Cure, including all communications related to issues cited therein.

6)    All communications and documents which demonstrate any concerns or issues about the construction or durability of Smart's tablets.

7)    All trouble tickets and/or documents originating from Sebastian County which demonstrate or relate to complaints or issues with Smart's tablets.

8)    All communications or documents in which Correct conveys to Smart any trouble tickets and/or documents originating from Sebastian County which demonstrate or relate to complaints or issues with Smart's tablets.

9)    All communications from Sebastian County which request that Correct, Smart, or any other provider provide educational and/or entertainment content on tablets from September 13, 2017 to the present.

10)   All communications between Correct and any other tablet provider, including, but not limited to, GTL, Securus, Telmate, Tech Friends, and JPay, related to providing tablets for Sebastian County, AR.

11)   Correct's Inmate Handbook for each of the Joint Customers.


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
           JEL@harlleebald.com
           DDF@harlleebald.com
           CL@harlleebald.com

_/s/ Brad F. Barrios_
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
_Counsel for Plaintiff_

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

CIVIL DIVISION

SMART COMMUNICATIONS HOLDING,
INC.,

     Plaintiff,

v.                                Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.
_____/

### DEFENDANT'S NOTICE OF SERVICE OF
### FIRST INTERROGATORIES TO PLAINTIFF

Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC, by and

through its undersigned counsel and pursuant to Florida Rule of Civil Procedure, hereby

gives notice of serving Defendant's First Interrogatories, number 1 through 8, to Plaintiff,

Smart Communications Holding, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-

filing Portal for service via e-mail to Brad F. Barrios, Esq., David A. Hayes, Esq., and

Kenneth G. Turkel, Esq., Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900,

Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com; kturkel@bajocuva.com;

tdeleo@bajocuva.com on ___17ᵗʰ day of September, 2019.

HARLLEE & BALD, P.A.

By: _____
KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941-744-5537
Facsimile: 941-744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033
Facsimile Number 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

2

Case 8:20-cv-01469-WFJ-TGW   Document 1-3   Filed 06/26/20   Page 47 of 187 PageID 296

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                                 Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## DEFENDANT'S FIRST REQUEST FOR ADMISSIONS

Pursuant to Florida Rule of Civil Procedure 1.370, Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC (herein "Correct Solutions"), requests Plaintiff, Smart Communications Holding, Inc. (herein "Smart Communications"), to serve its written Admissions within thirty (30) days after service of this Request.

### DEFINITIONS

1.     The term "you" or "your" shall mean Smart Communications Holding, Inc. to whom this First Request for Admissions is addressed, and all other persons acting on behalf of Smart Communications Holding, Inc.

2.     The term "communication(s)" means any documents that are, or which relate to or refer to, correspondence, letters, notes, memoranda, telegrams, inquiries, discussions, conversations, translations, telephone conversations, facsimiles, electronic mail messages, instant messages, text messages, negotiations, agreements, meetings, and any other forms of written communication or documents that in any way relate to or refer to verbal or other communications.

3.     The term "document(s)" means any written or graphic material or other means of preserving thought or expression, any tangible thing and electronically stored information (ESI) from which information can be obtained, including but not limited to the complete original or true copy thereof and any non-identical copy and all drafts of correspondence, electronic mail (e-mail), social media postings, social media communications (i.e. direct messages), memoranda, notes, messages, bulletins, notes of meetings or other communications, notes of interoffice and intraoffice telephone calls, diaries, calendars, logs, chronological data, minutes, books, reports, appraisals, charts, ledgers, invoices, worksheets, data compilations, data sheets, data processing cards, receipts, tax returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, agreements, transcripts, statistics, surveys, magazine or newspaper articles, photographs, graphs, microfiche, microfilm, videotape, recordings, and electronic, mechanical or electric recordings or representations of any kind (including without limitation, tapes, cassettes, discs and recordings), hard copy printouts of any "e-mail" communications or the equivalent and "deleted" but recoverable electronic files.

4.     The term "document(s)" also includes all data (even if available only in computer readable form), text, or information stored on a computer, computer disk, CD-ROM, USB memory stick, e-mail, e-mail file, voicemail, or other archive medium and all information in any computer database although not yet printed out.

5.     If any document has been prepared in several copies which are not identical, or if the original identical copies are no longer identical by reason of subsequent notation or other modification, including, but not limited to, notations on the backs of pages thereto, each non-identical copy is a separate document within the meaning of the term "document(s)" as defined above.

6.     All responsive electronically stored information (ESI) shall be provided in a reasonably usable native format with metadata preserved and shall be free from any impediment affecting access and evaluation of the information. Excel® spreadsheets shall be provided in native format.

## ADMISSIONS REQUESTED

1.     Please admit that, prior to the execution of the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and the Master Services Agreement signed by Smart Communications on August 31, 2017 with Correct Solutions, LLC, Smart Communications had not provided any services, including but not limited to, the "electronic messaging, grievance and medical forms, video visitation, ... law library, entertainment, [or] educational content," to the City of St. Louis, Missouri, and, in particular, the detention facility owned and/or operated by the City of St. Louis, Missouri.

2.     Please admit that the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 between Smart Communications and Correct Solutions, LLC defines as "Confidential Information" the "pricing, fees and programming fees offered to the receiving party or other customers or potential customers by the disclosing party".

3.     Please admit that the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 between Smart Communications and Correct Solutions, LLC defines as "Confidential Information" the "identities of actual customers, investors or other individuals and entities having a current business relationship with the disclosing party".

4.     Please admit that the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 between Smart Communications and Correct Solutions, LLC defines as "Confidential Information" "trade secrets, consisting of confidential and proprietary information not generally known to the public".

3

5.      Please admit that Smart Communications was introduced to the City of St. Louis, Missouri by and through Correct Solutions, LLC, and/or its employees and agents, which introduction arose out of the business relationship between Smart Communications and Correct Solutions, LLC resulting from the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and/or the Master Services Agreement signed by Smart Communications on August 31, 2017.

6.      Please admit that Smart Communications had never met Frank Turner – the employee of the City of St. Louis to whom Smart Communications directed its solicitation email – prior to its introduction to the City of St. Louis by and through Correct Solutions, LLC and/or its employees and agents.

7.      Please admit that Smart Communications came into possession of the email address of Frank Turner – the employee of the City of St. Louis to whom Smart Communications directed its solicitation email – after its introduction to the City of St. Louis by and through Correct Solutions, LLC and/or its employees and agents.

8.      Please admit that Smart Communications only learned of the email address of Frank Turner – the employee of the City of St. Louis to whom Smart Communications directed its solicitation email – as a result of Smart Communications' work for the City of St. Louis arising out of the business relationship between Smart Communications and Correct Solutions, LLC resulting from the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and/or the Master Services Agreement signed by Smart Communications on August 31, 2017.

9.      Please admit that Smart Communications was aware at the time it made its offer to provide inmate telephone services to the City of St. Louis at a 100% phone commission that such commission was higher than the commission Correct Solutions,

4

LLC provided to the City of St. Louis for such services.

    10.    Please admit that Smart Communications only learned the amount of the commission that Correct Solutions, LLC provided to the City of St. Louis for inmate telephone services as a result of the business relationship between Smart Communications and Correct Solutions, LLC resulting from the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and/or the Master Services Agreement signed by Smart Communications on August 31, 2017.

    11.    Please admit that Smart Communications was aware at the time it made its offer to provide inmate telephone services to the City of St. Louis that Correct Solutions, LLC had the exclusive right to provide such services to the City of St. Louis.

    12.    Please admit that Smart Communications was aware at the time it made its offer to provide inmate telephone services to the City of St. Louis that Correct Solutions, LLC earned revenues from providing such services to the City of St. Louis.

    13.    Please admit that neither the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 nor the Master Services Agreement signed by Smart Communications on August 31, 2017 contains the phrases "Joint Customer" or "Joint Customers".

    14.    Please admit that the term "Customer" in the Master Services Agreement signed by Smart Communications on August 31, 2017 refers solely to Correct Solutions, LLC.

## CERTIFICATE OF SERVICE

    I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Esquire, Bajo Cuva Cohen & Turkel, 100 North Tampa

Street, Suite 1900, Tampa, FL  33602; bbarrios@bajocuva.com; dhayes@bajocuva.com;

kturkel@bajocuva.com; tdeleo@bajocuva.com on ___17th___ day of September, 2019.

HARLLEE & BALD, P.A.

By: _____

KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941-744-5537
Facsimile: 941-744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033
Facsimile Number 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

{826-2245-8790, v. 1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                         Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## DEFENDANT'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Florida Rule of Civil Procedure 1.350, Defendant, Correct Solutions, LLC, a/k/a Correct Solutions Group, LLC (herein "Correct Solutions"), requests Plaintiff, Smart Communications Holding, Inc. (herein "Smart Communications"), to serve its written Response within thirty (30) days after service of this Request and to produce the documents for inspection and copying on Thursday, October 24, 2019 beginning at 9:30 A.M. at the offices of Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL 33602, or at such other reasonable time and place as mutually agreeable by the parties, the originals and all non-identical copies of the following designated documents in your possession, custody or control or which can be discovered by reasonably diligent efforts.

## DEFINITIONS

1.    The term "you" or "your" shall mean Smart Communications Holding, Inc. to whom this First Request for Production of Documents is addressed, and all other persons acting on behalf of Smart Communications Holding, Inc.

2.     The term "communication(s)" means any documents that are, or which relate to or refer to, correspondence, letters, notes, memoranda, telegrams, inquiries, discussions, conversations, translations, telephone conversations, facsimiles, electronic mail messages, instant messages, text messages, negotiations, agreements, meetings, and any other forms of written communication or documents that in any way relate to or refer to verbal or other communications.

3.     The term "document(s)" means any written or graphic material or other means of preserving thought or expression, any tangible thing and electronically stored information (ESI) from which information can be obtained, including but not limited to the complete original or true copy thereof and any non-identical copy and all drafts of correspondence, electronic mail (e-mail), social media postings, social media communications (i.e. direct messages), memoranda, notes, messages, bulletins, notes of meetings or other communications, notes of interoffice and intraoffice telephone calls, diaries, calendars, logs, chronological data, minutes, books, reports, appraisals, charts, ledgers, invoices, worksheets, data compilations, data sheets, data processing cards, receipts, tax returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, agreements, transcripts, statistics, surveys, magazine or newspaper articles, photographs, graphs, microfiche, microfilm, videotape, recordings, and electronic, mechanical or electric recordings or representations of any kind (including without limitation, tapes, cassettes, discs and recordings), hard copy printouts of any "e-mail" communications or the equivalent and "deleted" but recoverable electronic files.

4.     The term "document(s)" also includes all data (even if available only in computer readable form), text, or information stored on a computer, computer disk,

CD-ROM, USB memory stick, e-mail, e-mail file, voicemail, or other archive medium and all information in any computer database although not yet printed out.

5.      If any document has been prepared in several copies which are not identical, or if the original identical copies are no longer identical by reason of subsequent notation or other modification, including, but not limited to, notations on the backs of pages thereto, each non-identical copy is a separate document within the meaning of the term "document(s)" as defined above.

6.      All responsive electronically stored information (ESI) shall be provided in a reasonably usable native format with metadata preserved and shall be free from any impediment affecting access and evaluation of the information. Excel® spreadsheets shall be provided in native format.

## INSTRUCTIONS AS TO ELECTRONIC DATA

Electronic data is a source for discovery and/or evidence. Florida law and court rules pertaining to the preservation of records applies to electronic data in substantially the same manner as applied to paper records. Therefore, electronic data pertaining in any manner whatsoever to this lawsuit, whether stored on-line or archived off-line, should be preserved.

## INSTRUCTIONS AS TO CLAIM OF PRIVILEGE, WORK PRODUCT, ETC.

With respect to those documents withheld from production as being privileged or subject to protection as trial preparation material, please submit with your response to the document production a "Privilege Log" as required by Fla. R. Civ. P. 1.280(b)(5).

## DOCUMENTS REQUESTED

1.      Any communications between Smart Communications and the City of St.

Louis, Missouri pertaining to the provision or prospective provision of telephone services by Smart Communications to the City of St. Louis, Missouri, and, in particular, the detention facility owned and/or operated by the City of St. Louis, Missouri.

2.      Any communications between Smart Communications and the City of St. Louis, Missouri pertaining to Correct Solutions, LLC, its employees and agents, the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and/or the Master Services Agreement signed by Smart Communications on August 31, 2017.

3.      Any communications between Smart Communications and Lattice, Inc. pertaining to Correct Solutions, LLC, its employees and agents, the Mutual Confidentiality and Nondisclosure Agreement dated June 15, 2017 and/or the Master Services Agreement signed by Smart Communications on August 31, 2017.

4.      Any documents pertaining to the allegations set forth in paragraph 12 of your Verified Complaint.

5.      Any documents pertaining to the allegations set forth in paragraph 13 of your Verified Complaint, particularly with regard to your allegation that, "The facility customers, some of which were existing Correct Solutions customers, became Joint Customers of both parties." Included in this request is all documents containing the phrase "Joint Customers" or "Joint Customer" and/or identifying Correct Solutions, LLC's facility customers as Smart Communications' customers.

6.      Any documents pertaining to the allegations set forth in paragraph 27 of your Verified Complaint.

7.      Any documents pertaining to the allegations that Correct Solutions had knowledge of Smart Communications' intent to provide telephone services as described

in paragraph 28 of the Verified Complaint.

8.      Any documents pertaining to the allegations contained in paragraph 29 of the Verified Complaint that Correct Solutions has introduced new technology at correctional facilities referred to as iMate E-Device including but not limited to e-mails, correspondence, marketing materials.

9.      Any communications between Smart Communications and the City of St. Louis regarding the mailing described in paragraph 31 of the Verified Complaint, including but not limited to any discussions, including follow-up emails from Smart Communications and responses from the City of St. Louis, regarding the service purposed and commissions paid.

10.      To the extent not provided in response to the preceding Request for Production No. 9, produce any document pertaining to Smart Communication's acquisition of the email address of Frank Turner – the employee of the City of St. Louis to whom Smart Communications directed its email solicitation.

11.      To the extent not provided in response to the preceding Request for Production No. 9, produce any document pertaining to Smart Communication's decision to offer a 100% commission to the City of St. Louis for the provision of inmate telephone services, as stated in Smart Communication's email solicitation.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Esquire, Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com;

kturkel@bajocuva.com; tdeleo@bajocuva.com on _17TH_ day of September, 2019.

HARLLEE & BALD, P.A.

By: _____
    KIMBERLY A. BALD
    Florida Bar No. 0434190
    JAMES E. LYNCH
    Florida Bar No. 046219
    202 Old Main Street
    Bradenton, FL 34205
    Telephone: 941-744-5537
    Facsimile: 941-744-5547
    KAB@harlleebald.com
    JEL@harlleebald.com
    DDF@harlleebald.com
    CL@harlleebald.com

    and

    LUKE F. PIONTEK
    Roedel, Parsons, Kock, Blache,
    Balhoff & McCollister
    Louisiana Bar No. 19979
    8440 Jefferson Highway, Suite 301
    Baton Rouge, LA. 70809
    Telephone Number 225/929-7033
    Facsimile Number 225/928-4925
    LPiontek@roedelpartons.com

    Attorneys for Correct Solutions, LLC

4838-5333-1875-3, 2

6

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                             Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

**AGREED ORDER APPROVING STIPULATION TO PRESERVE**
**THE *STATUS QUO* PENDING FINAL HEARING ON THE MERITS**

THIS CAUSE came before the Court on the Parties' Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits. The Court, having reviewed the Stipulation, being advised of the agreement of counsel and the affected parties, and being otherwise duly advised in the premises, it is hereby

ORDERED AND ADJUDGED that:

1.     The Court has subject matter jurisdiction over this action and personal jurisdiction over Defendant.

2.     The Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits is ADOPTED and APPROVED.

DONE AND ORDERED, in Chambers, at Hillsborough County, Florida this _____ day of August, 2019.

19-CA-008089 9/10/2019 10:47:34 AM

     **19-CA-008089 9/10/2019 10:47:34 AM**_____
     REX M. BARBAS
     Circuit Court Judge

{BC00254457:1}

Copies to:

Brad F. Barrios, Esq.
Kimberly A. Bald, Esq.

Case 8:20-cv-01469-WFJ-TGW   Document 1-3   Filed 06/26/20   Page 61 of 187 PageID 310

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                              Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.
_____/

## **NOTICE OF HEARING**

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing Room 514, Tampa, FL  33602, on **November 25, 2019, at 2:00 p.m.**, or as soon thereafter as counsel can be heard the following:

**Plaintiff's Motion for Partial Summary Judgment on Counts I and II of Complaint**

    Time Reserved:           30 minutes

    Court Reporter:           U.S. Legal Support

    JAWS Confirmation No.:    12J-34964201912

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

Case No: 19-CA-008089

## PLAINTIFF'S EMERGENCY MOTION TO TEMPORARILY ENJOIN IMPROPER TERMINATION OF AGREEMENT AND TO ENFORCE COURT APPROVED STIPULATION

Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Florida Rule of Civil Procedure 1.610 and the Court's inherent authority to enforce its orders, files its Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation (the "Motion") against Defendant/Counter-Plaintiff, Correct Solutions, LLC ("Correct"). The grounds upon which this Motion is based and the reasons it should be granted are as follows.

### Introduction

1.      This <u>emergency</u> arose when Correct sent Smart a Notice to Cure pursuant to Master Services Agreement at 6:52 p.m. on Friday, September 13, 2019 (the "Notice to Cure"). The Notice to Cure purports to trigger a <u>thirty-day period</u> in which Smart must cure purported defaults; otherwise, Correct threatens to terminate the Agreement between the parties, which would result in Smart being removed from <u>eight different customer facility accounts</u>.

2.      As described below, the Notice to Cure is a sham. After Correct failed in its first attempt to terminate the Agreement, which gave rise to this lawsuit, it has systematically attempted to cut off Smart's ability to service customers, which culminated in a second improper termination attempt. The Notice to Cure is premised upon two alleged breaches of contractual obligations that Smart simply does not have—the obligation to provide tablets that are impervious to destruction from unsupervised inmates with access to multiple forms of contraband and the obligation to provide entertainment content on tablets.

3.      Unless the Court prohibits Correct from terminating the Agreement based on the Notice to Cure, Smart will be irreparably harmed, including from the industry-wide damage to its reputation if it becomes branded as an inmate services provider who has been kicked out of correctional facilities, even if improperly, as well as ongoing disclosure requirements that will impact Smart's ability to fairly compete for future government contracts.

### The Relationship of the Parties

4.      On or about September 13, 2017, Correct and Smart executed a Master Services Agreement (the "Agreement"). A true, complete, and authentic copy of the Agreement is attached to the Verified Complaint as Exhibit B.[1]

5.      Pursuant to the Agreement, Smart obtained the *exclusive right* to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer (as defined in the Complaint). Each Schedule is incorporated into the Agreement. In exchange, Smart agreed to provide the Joint Customers with the services identified in the Schedules.[2] In some facilities, Smart agreed to install kiosks through which

---

[1] The pertinent facts alleged herein have been verified in either the Verified Complaint, Declaration of Jon Logan, Second Declaration of Jon Logan, or Declaration of Justin Longenberger.

[2] A copy of each Schedule for the Joint Customers is attached to the Counterclaim as its Exhibit B. Smart has admitted the authenticity of the Schedules.

inmates could access Smart's services. In other facilities, such as Sebastian County, Smart agreed to provide tablets for the same purpose. Each Schedule for those facilities receiving tablets provides: "The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network." *See* Counterclaim, Exhibit B.

6.     The Agreement incorporates Schedules for the following Joint Customers:

    a.     City of St. Louis, Missouri
    b.     Sebastian County, Arkansas Sheriff's Office
    c.     Washington County, Arkansas
    d.     Bowie County, Texas
    e.     Wayne County, Georgia
    f.     Avoyelles Parish, Louisiana
    g.     Lamar County, Mississippi
    h.     Moore County, Tennessee

7.     The term of the Agreement is "co-terminous" with and thus mirrors the term of each agreement between Correct and a Joint Customer. Smart does not know the precise terms of each Joint Customer's agreement with Correct. However, many of the contracts have a significant amount of time remaining on their initial terms. By way of example, the initial term of Correct's contract with Bowie County, Texas does not expire until February 9, 2021.

8.     The Agreement ***does not include*** a termination without cause or termination on convenience clause.

9.     Section 9 of the Agreement provides the only grounds for termination, as follows:

> Default and Termination.     If either party defaults ***in the performance of any obligation*** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has [sic] made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer.

> ***Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.***
> (emphasis added).

10.     Accordingly, pursuant to the Agreement, Smart, as the Provider, may terminate the Agreement if Correct breaches the confidentiality or non-disclosure provisions of the Agreement. This right logically flows from the fact that Smart provided (and licensed) its trade secret and proprietary technology as part of its business arrangement with Correct. Correct does not have a reciprocal termination right, consistent with the fact that it did not contribute or license any confidential information.

11.     Indeed, Correct has no right to terminate the Agreement during the term of any of the contracts with Joint Customers other than by identifying a legitimate default in Smart's performance of the service obligations of the Agreement, which are set forth in more detail in the Schedules to the Agreement, and then providing a reasonable opportunity to cure the default.

12.     Near the time of the execution of the Agreement, Smart demonstrated its systems, services, and equipment, including the Smart tablets, to Correct and the Joint Customers. *See* Second Declaration of Jon Logan. Smart demonstrated its products and technology to every key employee of Correct at Correct's headquarters in Louisiana, including executives, sales, and IT personnel, and they were able to inspect and handle the tablets. *Id.* Correct was very impressed with their design and construction. *Id.* Indeed, Correct was so impressed by Smart's products and technology, it later attempted to buy the company outright. *Id.* As a result and in reliance on Correct's acceptance of the tablets, Smart provided approximately 920 tablets to the four facilities that requested tablets instead of or in addition to kiosks. *Id.*

**Correct Solutions' Attempts to Seize Smart Communications' Revenue and Market Share**

13.      By early 2018, it became apparent that Smart was exceeding both parties' expectations under the Agreement. The Joint Customers were satisfied with Smart's services and Smart was earning significant revenue due to the popularity of its messaging platform with inmates.

14.      As a result, Correct became determined to acquire for itself the business and market share that it had promised to Smart on an exclusive basis. Knowing that it had no basis or ability to terminate the Agreement, Correct first tried lawful means.

15.      In March 2018, Correct attempted to purchase Smart; however, Smart Communications was not interested in any such acquisition. Correct then attempted to hire multiple key employees of Smart. Presumably, Correct sought to obtain valuable business information or relationships with customers; however, the Smart employees were not interested in working for Correct and rejected its offers.

16.      After these rejections, each party has begun providing new services that it did not provide at the time of the effective date of the Agreement. In or around January 2019, Smart expanded its portfolio to offer telephone communication services to correctional facilities. Correct had knowledge of Smart's intent to provide telephone services even before Smart obtained the ability to do so. At this time, Correct never expressed displeasure with Smart about its technology or services.  Indeed, to the contrary, Correct was so impressed with Smart's technology and services that it undertook efforts to purchase the company and continued to market Smart's services to current and prospective customers.

17.      More recently, and following its failed attempts to acquire Smart, Correct has obtained the ability to provide electronic messaging services similar to those provided by Smart to

the Joint Customers. According to its website, *correctsolutionsgroup.com,* as it existed on the date Smart filed this lawsuit, August 2, 2019, Correct Solutions had introduced its "newest technology for correctional facilities," which it refers to as an "iMate E-Device." The iMate E-Device is a tablet that Correct Solutions touts as "an all-in-one solution for inmate communications, entertainment, and eLearning."[3]  Undoubtedly, the iMate E-Device was designed to mimic the suite of services provided by Smart's system. Whether through the iMate E-Device or through partnerships with other providers of messaging services, Correct could now, at least theoretically, self-perform the services that were exclusively granted to Smart in the Agreement.

18.     Now, it has become even more determined to displace Smart as the exclusive provider of these services to the Joint Customers. Indeed, as described below, Correct has engaged in multiple contrived attempts to terminate the Agreement, including (a) sending a termination letter based on an alleged confidentiality violation that, pursuant to the plain language of the Agreement, cannot form the basis of a termination of Smart; (b) cutting off direct communication between Smart and the Joint Customers contrary to the parties' established course of dealing; (c) failing to provide access to Joint Customers and Joint Customer facilities so that Smart may respond to service issues; (d) allowing third party facilities to destroy Smart's equipment; and (e) attempting to use a facility's failure to supervise its inmates and failure to prevent its inmates from using illegal contraband to destroy Smart's equipment as the basis of yet another illegitimate attempt to terminate the Agreement.

**The Events Leading up to the Lawsuit –
Correct's First Improper Attempt to Terminate the Agreement**

19.     On or about April 8, 2019, Smart Communications sent a mass marketing email to all of its customers. The email was a general advertisement—it was not tailored toward or directed

---

[3] Correct deleted this portion of its website—relevant evidence—after Smart filed this lawsuit.

to any particular customer. A true, complete, and authentic copy of the marketing email is attached to the Verified Complaint as Exhibit C.

20.     Despite the fact that it had never complained about Smart offering telephone services, Correct decided to use this email as the first potential springboard for its unlawful termination. Correct believed that if it could characterize this general advertisement as some sort of breach of the Agreement, then it could eliminate Smart's exclusivity and abscond with the Joint Customers' messaging business.

21.     By way of a letter dated July 17, 2019, Correct informed Smart that it purportedly violated the NDA and breached the Agreement. The letter also purported to terminate the Agreement. A true, complete, and authentic copy of Correct's letter dated July 17, 2019 letter is attached to the Verified Complaint as Exhibit D.

22.     The letter did not raise any performance-related issues or ask Smart to cure any service-related deficiencies. Instead, the letter set forth the untenable position that, because Smart sent a mass email advertising that it pays 100% commission on telephone revenue, it must have stolen and used Correct's confidential information.

23.     The implication that Smart must have used secret information about its commission structure with the Joint Customer in order to calculate and convey a better offer to the Joint Customer is fatally flawed for two reasons: (a) the commission provided by Correct to the City of St. Louis is publicly known or available; and (b) Smart's mass marketing email offers a 100% commission on telephone services, which is obviously at least as high as every offer from any competitor and requires no secret information upon which to calculate a more favorable offer than Correct provides. Nor is the identity of government facilities or employees confidential.

24.     Nor did Smart's entry into the telephone market provide a basis to terminate the Agreement. Neither the NDA nor the Agreement prohibits either party from offering services in competition with the other party. If such a prohibition existed, then Correct would have violated the provision when it began marketing and selling its iMate E-Device or another similar service.

25.     On July 26, 2019, just two days after Smart received Correct's July 17, 2019 letter, Smart sent a response letter. A true, complete, and authentic copy of the July 26, 2019 response letter is attached as to the Verified Complaint as Exhibit E.

26.     In its letter, Smart informed Correct that Correct may not terminate the Agreement for a breach of a confidentiality or non-disclosure provision of the Agreement or NDA.

27.     Despite Smart's repeated requests for an answer, Correct never provided a substantive response to Smart's position with respect to the purported termination of the Agreement. Instead, Correct was busy telling the Joint Customers that Correct and Smart did not have a contractual relationship, which was false because the Agreement had not been properly terminated. Correct even informed Smart's own direct customer, Miller County, that the parties do not have a relationship. Correct's false statements led to Miller County accusing Smart of being "misleading" and "not truthful," as demonstrated by the email from Miller County to Smart attached to the Verified Complaint as Exhibit F.

28.     As a result, Smart was forced to file this lawsuit on August 2, 2019 and its initial Motion for Temporary Injunction on August 6, 2019.

## Procedural Background

29.     Counsel for Smart then engaged in a good faith dialogue with counsel for Correct to negotiate a stipulation to preserve the contracted *status quo* between the parties until a final hearing on the merits. In exchange for a mutually agreeable stipulation, Smart agreed to refrain

from prosecuting its Motion for Temporary Injunction and to cancel a September 4, 2019 hearing it had scheduled on the motion.[4]

30.     On August 30, 2019, the parties executed and filed a Stipulation to Preserve the *Status Quo* Pending Final Hearing on the Merits (the "Stipulation"). Concurrently, the parties uploaded an Agreed Order Approving Stipulation to Preserve the *Status Quo* Pending Final Hearing on the Merits, which the Court has since entered (the "Order"). A true, complete, and authentic copy of the Stipulation and Order are attached as **Composite Exhibit A**.

31.     On September 13, 2019, Smart filed a Motion for Partial Summary Judgment on Counts I and II of the Complaint. Smart seeks a declaratory judgment that Correct's first termination attempt was ineffective because it was based on a purported confidentiality violation, which cannot serve as a basis for termination under the Agreement. The motion is pending.

**Obligations under the Stipulation and Agreement**

32.     The Stipulation requires the parties to observe and maintain the *status quo* and perform under the Agreement until an adjudication on the merits. As a result, the Agreement remains in full force and effect. The Stipulation also prohibits either party from disavowing the other party's status under the Agreement.

33.     Pursuant to the Agreement, Smart has the exclusive right to install, provide, and derive revenue from various inmate communications systems, including electronic messaging and email services, for the Joint Customers. (Agreement, ¶ 2).

---

[4] Smart's counsel reserved a three hour block of time that was available on the Court's calendar through the JAWS system prior to counsel appearing for Correct. Once Correct's counsel appeared, Smart's counsel indicated the hearing time had been reserved; however, Smart did not file a notice of hearing until August 23, 2019 after it appeared that the parties may not agree on a stipulation. Correct did not agree to the hearing taking place on the scheduled date, but the issue became moot when the parties agreed to the Stipulation.

34.     Further, Smart is obligated to "maintain regular communications with the Customer [Correct] and all contracted clients [the Joint Customers]…" (Agreement, ¶ 15).

35.     In addition, the Schedules to the Agreement provide, in various provisions, that Correct will provide access to the client jail facilities for purposes of Smart maintaining its systems and services. (*See, e.g.*, Schedule for City of Saint Louis, Missouri, ¶¶ 24, 42).

36.     Accordingly, pursuant to the Stipulation and the Agreement, Correct shall not (a) impair Smart's ability to communicate with or impede access to the Joint Customers in order to maintain its systems and services; or (b) disavow Smart's status as the exclusive provider of certain services under the Agreement.

## Events Since the Stipulation

37.     Since the Stipulation was executed, numerous Joint Customers have reversed their long-standing and standard operating procedures of communicating any issues related to Smart's services or systems directly to Smart. Now, many if not all of these Joint Customers refuse to communicate directly with Smart. *See* Second Declaration of J. Logan. Moreover, Correct has failed to provide Smart with the access to the Joint Customers that is required by the Agreement so that Smart can timely remedy any issues. *Id.*

38.     In early September, just days after the Stipulation was executed, Smart became concerned that Correct was instructing Joint Customers to refrain from communicating with Smart. One Joint Customer, Avoyelles, told Smart that if it wanted some of its damaged kiosks to be reconnected, it would have to talk to Correct. *See* Declaration of J. Longenberger. Since that conversation, Avoyelles has presented Smart with conflicting information and appears to be confused about how it should or should not be communicating with Smart. Initially, when Smart followed up on the issue related to the damaged kiosks, Avoyelles responded that "[t]he kiosks

can be picked up. We no longer need the service." *See* Second Declaration of J. Logan. Then, Avoyelles reversed course again and informed Smart that there was a miscommunication and that Smart could visit the facility to replace the kiosks. *Id.* The confusion amongst Avoyelles representatives indicates that the facility is being instructed on how to handle Smart.

39.     Another Joint Customer, St. Louis, made an abrupt and unannounced departure from its long history of handling any issues regarding Smart's systems and services. *See* Second Declaration of J. Logan. Instead of directly contacting Smart to resolve an issue, it appears the facility implemented a new policy to inform Correct personnel. For example, on September 3, 2019, a trouble ticket was originated by Correct and was sent to several Correct employees before it was ultimately forwarded to a Smart. Smart contacted St. Louis on two separate occasions to address the trouble ticket and, on both occasions, Correct refused to provide more information and refused to communicate with Smart. *Id.*

40.     Smart thus had a legitimate concern that it could be seriously damaged and prejudiced in its ability to respond to customer issues if direct customer contact was terminated or if issues were filtered second-hand through Correct. Obviously, Correct had already attempted to terminate the Agreement with Smart just weeks earlier. And while the attempted termination was not valid, the Agreement does provide for termination based on performance defaults, after a notice and cure period. If Correct prevents Smart from direct contact with the Joint Customers, and instead intercepts all issues that are raised with its service, Correct could sabotage Smart's ability to respond to those issues.  For example, Correct could fail to accurately convey service issues, or it could hold and compile numerous issues before unloading a pile of tickets all at once, thereby making it difficult for Smart to resolve the issues in a timely fashion, whether they are legitimate or not. Simply put, direct communication between Smart and the Joint Customers is not only

mandated by the Agreement, it is essential to Smart's ability to service the Joint Customers and perform under the Agreement.  And by preventing Smart from efficiently or effectively addressing any issues related to its service, Correct is causing harm to Smart's reputation—both to the Joint Customers as well as to any potential customers that may hear of its difficulties in addressing service requests.

41.     Smart raised these concerns by presenting a draft motion to enforce the Stipulation and for contempt to counsel for Correct as part of a good faith meet-and-confer process. Counsel for Correct dismissed Smart's concerns as stemming from miscommunication, confusion, and stale information as it urged Smart not to file its motion. Counsel for the parties specifically discussed that (a) Smart was free to send its employees to Avoyelles to remedy the situation with its kiosks and (b) the trouble ticket or issue notification procedure for the Joint Customers would be such that Smart and Correct would receive contemporaneous notice of any issues related to Smart's systems or services. Accordingly, Smart did not file the motion.

42.     Instead, Smart reached out to each Joint Customer to demonstrate Smart's dedication to servicing the Joint Customers and, in some cases such as Avoyelles, to arrange for on-site service or repairs. *See* Second Declaration J. Logan. Almost immediately, it became clear that the Joint Customers would no longer be communicating directly with Smart on a going forward basis or cooperating with Smart in any respect.

43.     More Joint Customers, including St. Louis, Washington, and Sebastian, expressly refused to communicate with Smart, instead informing Smart that they will only communicate with Correct about Smart's systems and/or that all issues related to Smart's systems must go through Correct. *Id.* Others have simply ignored Smart's attempts to reach out and to visit with

their facilities. This approach is contrary to the entire operating history between Smart and the Joint Customers, who have always had a direct line of communication. *Id.*

44.     Before the first improper termination letter from Correct, Smart enjoyed professional, mutually-beneficial relationships supported by direct contact with each of these facilities. That nearly every Joint Customer would independently become unsatisfied with Smart and/or refuse to communicate with Smart since the Stipulation is highly improbable, particularly given the highly suspect nature of that timing.

45.     Based on the abrupt and across-the-board changes to Smart's relationship with the Joint Customers, Correct has almost certainly coordinated these responses through disavowing its relationship with Smart, its maligning of Smart's reputation, or through its instructions to the Joint Customers. There is simply no other credible explanation for a near universal and sudden change in the nature of Smart's relationship with the Joint Customers—a wedge has clearly been driven between each of them.  Moreover, in coordinating these sudden changes, Correct has violated its contractual obligation to ensure that Smart could communicate with and access the Joint Customers in order to perform its services under the Agreement.

### The Notice to Cure – Correct's Second Improper Attempt to Terminate the Agreement

46.     On the evening of September 13, 2019, after Smart had reached out directly to Sebastian County and after Sebastian County refused to allow Smart access to its facility, Correct sent the Notice to Cure. A true, complete, and authentic copy of the Notice to Cure is attached as **Exhibit B**.

47.     The Notice to Cure includes two primary complaints: (a) Smart's tablets are not indestructible; and (b) Smart has failed to install education or entertainment options on the tablets. Neither complaint is rooted in a contractual obligation of Smart's.

48.     Moreover, as described below, neither of Correct's complaints are legally or factually sufficient to serve as grounds to trigger a cure period or to terminate the Agreement.

49.     As a result, Smart has suffered irreparable harm for which it has no adequate remedy at law and will continue to suffer irreparable harm if the harmful conduct is not enjoined. Smart bargained for and received exclusive relationships with the Joint Customers throughout the terms of Correct's agreements with the Joint Customers, which should not be destroyed by an illegitimate termination. Smart has no ability to measure the losses it will incur if Correct is not enjoined from improperly terminating the Agreement and disavowing Smart's exclusive rights. In addition to lost profits, Smart will incur immeasurable losses in goodwill and reputation if its equipment is removed from the facilities of Joint Customers or if Joint Customers continue to be informed that Smart has been terminated or has no relationship with Correct. Further, Smart will not be able to realize or recoup the substantial investment it has made in its exclusive relationship with Correct and in installing and providing products and services to the Joint Customers. Smart will also lose market share, the ability to sell additional services to customers, and the ability to fairly compete for future contracts.

50.     Correct's conduct will continue to cause irreparable harm to Smart unless restrained, restricted, and enjoined by this Court.

51.     Entry of an injunction will serve the public interest, prevent further and continuing breach of the Agreement, and maintain the *status quo* of services being provided to Joint Customers.

52.     At all material times, Smart has performed all of its duties and obligations pursuant to the Agreement and remains ready, willing, and able to continue to perform such duties and obligations.

## Legal Standard for a Temporary Injunction

A trial court has broad discretion to grant a temporary injunction. *Bailey v. Christo,* 453 So.2d 1134, 1136 (Fla. 1st DCA 1984). The purpose of a temporary injunction is to preserve the *status quo*, which is "the last peaceable noncontested condition that preceded the controversy," and "to prevent injury so that a party will not be forced to seek redress for damages after they have occurred." *Id.* at 1137 (affirming temporary injunction that preserved the status quo by prohibiting party from closing a club and requiring club to be operated consistent with past practices).

A party should be awarded a temporary injunction when it establishes that (i) irreparable harm will result if the injunction is not granted; (ii) an adequate remedy at law is unavailable; (iii) there is a substantial likelihood of success on the merits; and (iv) entry of the temporary injunction will serve the public interest. *Sacred Family Investments, Inc. v. Doral Supermarket, Inc.*, 20 So.3d 412, 415 (Fla. 3d DCA 2009).

Upon a showing that the elements of injunctive relief are met, the remedy is available to prevent or cure the breach of a contract. *See Melbourne Ocean Club Condo. Ass'n, Inc. v. Elledge,* 71 So. 3d 144, 146 (Fla. 5th DCA 2011) (injunction is proper remedy for breach of negative covenant); *ASA College Inc. v. Dezer Intracoastal Mall, LLC*, 250 So.3d 731, 736 (Fla. 3d DCA 2018) (affirming trial court's decision to temporarily enjoin ASA from operating a business in violation of contractual easement pending a final decision on the merits.). An injunction is also an available remedy in actions for declaratory relief. *See Inphynet Contracting Services, Inc. v. Matthews*, 196 So. 3d 449, 463 (Fla. 4th DCA 2016).

## Argument

## I.     Smart Communications is Entitled to Injunctive Relief.

A temporary injunction is appropriate to prohibit an improper termination of an exclusive dealing contract. *Starlite Aviation Operations Ltd. v. Erickson Inc.,* No. 3:15-cv-00497-HZ,

2015 WL 2367998, at *13 (D. Oregon May 15, 2015). *Starlite* is nearly-identical to the case at issue. There, the defendant, EHI, provided the plaintiff, Starlite, with the exclusive right to provide aircraft and flight managers for EHI to comply with EHI's contract with the government. *Id.* at *1. Three years into the agreement, EHI began hiring its own flight managers in an effort to "self-perform" the remainder of the agreement. *Id.* at *2-3. EHI then provided a notice of termination to Starlite, claiming that Starlite failed to perform under the agreement, which was contradicted by the evidence.

Starlite sought a declaration that the notice was ineffective to terminate the agreement and that Starlite was entitled to perform the agreement without interference from EHI. *Id.* at *3. The court held that Starlite proved the elements of injunctive relief, including the likelihood of success on its declaratory relief action, and entered a preliminary injunction restraining EHI from terminating the agreement and from taking any further steps to implement such termination. *Id.* at *13.

Like Starlite, Smart is entitled to a temporary injunction prohibiting Correct from terminating the Agreement. Correct should not be permitted to destroy Smart's exclusive rights by advancing illegitimate grounds which mask its true intention to profit from the business it unambiguously contracted away.

A.    **Entry of an Injunction will Preserve the *Status Quo*.**

Smart currently provides messaging and related services for the Joint Customers, including Sebastian County. *See* Declaration of Jon Logan, ¶¶ 4-5. Correct sent its Notice to Cure, which, if acted upon, will disturb the status quo by requiring Smart to remove its services and equipment from eight different correctional facilities.

Entry of an injunction prohibiting Correct from terminating the Agreement based on the Notice to Cure will preserve the *status quo* until a trial on the merits on the validity of Correct's stated grounds for termination. If the *status quo* is not preserved, eight different correctional facilities will contract with another provider of messaging services, who will then provide its own related system and equipment.[5]

Assuming Smart ultimately prevails on the merits, then it will be declared the exclusive service provider for the Joint Customers, which will require the removal of the new provider's equipment and the re-installation of Smart's services. Such an endeavor will cost all parties—and perhaps taxpayers—time, money, and resources. Accordingly, this scenario is the classic example of when a temporary injunction is appropriate.

### B. Smart will Suffer Irreparable Harm Absent an Injunction and Does Not Have an Adequate Remedy at Law.

Absent a temporary injunction, Smart will suffer irreparable harm, for which it would not have an adequate remedy at law, for several reasons. First, it will lose the ability to fairly compete for future government contracts. Second, it will suffer reputational damages and lose goodwill and market share due to the termination of the Agreement resulting in eight lost customers. Third, it will suffer significant monetary damages, including the inability to recoup its investments in the Joint Customers, which will be difficult, if not impossible, to calculate with certainty.

#### 1. Smart will lose the ability to fairly compete for future government contracts.

As noted above, when Smart seeks to procure a contract with a state agency, it is frequently required to disclose the termination of any prior contracts. *See* J. Logan Declaration, ¶ 19. Thus, if Correct were permitted to terminate the Agreement, Smart's obligation to disclose the

---

[5] Correct would obtain the benefits of the new contract, but may use a different subcontractor to actually provide the equipment.

termination would forever be required, regardless of the fact that such termination was improper. With such a blemished record, it would be extremely difficult to obtain new contracts in such a highly competitive industry. *Id.* at ¶¶ 21-23. A future adjudication by this Court that the termination was improper will likely do little to undo the damage that will be caused in the interim. Indeed, Smart would have to disclose the terminations on responses to requests for proposals submitted between now and the final adjudication, and it is impossible to determine how many contracts Smart may lose due to a termination disclosure.

Due to the structure of the relationship between the parties, Correct controls Smart's destiny with eight separate accounts. Accordingly, it is likely that Smart would be required to disclose not one, but eight customer terminations, depending on the scope of a given RFP's requirement. *See, e.g.*, J. Logan Declaration, Exhibit 1, p. 7 (exemplary RFP requiring bidders to disclose their three most recent lost or terminated contracts). A required disclosure of this magnitude would be a death knell to a provider's ability to win future bids in this highly competitive industry. *Id.* at ¶ 23.

Not only would termination of the Agreement immediately harm Smart, it would also simultaneously provide an unfair advantage to Correct for every ongoing scenario in which the parties compete for the same contract, either from Smart's express disclosure of the prior termination as required or from the marketplace's general awareness of the termination. *Id.* at ¶ 24.  It is thus not difficult to surmise Correct's motivation behind its bad faith conduct. But wielding an improper termination to force an opponent to identify prior lost contracts amounts to unfair competition and such a tactic should not be permitted by this Court, even on a temporary basis.

The *Starlite* case is instructive and supports this position. *See Starlite Aviation Operations, Ltd.,* 2015 WL 2367998. In *Starlite,* the defendant contractor, EHI, purported to terminate its agreement with Starlite based on an alleged failure to perform. Although the plaintiff, Starlite, objected to the termination, the contractor was clear that it intended to self-perform the remainder of the agreement. Plaintiff filed a motion for preliminary injunction asking the court to enjoin the contractor from terminating the agreement and from taking further steps to implement such termination. In support of its injunction motion, Starlite argued that it would suffer irreparable harm to its reputation and ability to win bids for future contracts in the absence of preliminary relief. In particular, Starlite stated that its business required "an unblemished record of reliability and integrity" and that its obligation to disclose this termination would devastate its ability to win contracts. *Id.* at *9. After considering testimony and argument, the Court concluded that the plaintiff "demonstrated that past performance, including a termination for default, can be a determining factor in a subcontractor or contractor's ability to win contracts and that the likelihood of irreparable harm is imminent for plaintiff." *Id.* at *11.

The irreparable harm that Smart would suffer is nearly identical to that of Starlite. If Correct is permitted to improperly terminate the Agreement, Smart's record will be blemished throughout the marketplace, regardless of whether it is expressly required to disclose such terminations on future bids (*e.g.,* J. Logan Declaration, Ex. 1, at p. 7), which will put it at a substantial competitive disadvantage. This is particularly unjust because Correct stands to gain a significant windfall both with respect to seizing Smart's revenue from the Joint Customers and from facing reduced competition on future bids.

### 2.      Smart will suffer reputational and other intangible damages.

Not only will the improper termination create a substantial impediment to Smart's ability to obtain future contracts, it will also damage Smart's record and reputation in the industry—critical factors to success of the company.  If Correct is permitted to terminate the contract, other customers and potential clients in the industry will be left with the misguided impression that Smart was unable to perform under its contracts and is otherwise unreliable.  In an environment as competitive as the correctional facilities communications marketplace, concerns and questions about a company's reliability, integrity, or ability to perform have disastrous effects on the company's reputation and goodwill. *See* J. Logan Declaration, ¶ 16.  This type of harm unquestionably constitutes irreparable injury.  *See Ferrellgas Partners, L.P. v. Barrow*, 143 Fed.Appx. 180, 190 (11th Cir. 2005) ("'grounds for irreparable injury include loss of control over reputation, loss of trade, and loss of goodwill'" (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc*., 143 F.3d 800, 805 (3d Cir.1998)).

Smart's reputation and goodwill will also be negatively impacted if the injunction is not entered due to its loss of the exclusivity aspect of its relationship with Correct.  Exclusivity is an intangible asset that is part of a company's reputation. *Douglas Dynamics, LLC v. Buyers Products Co.,* 717 F.3d 1336, 1344-45 (Fed. Cir. 2013). When a competitor sells what should be a product exclusive to the plaintiff, there can be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors. *Id.* Accordingly, if Correct itself (or with a third party) provides the services that Smart has been providing, Smart will suffer reputational harm in the marketplace in connection with the loss of its exclusive relationship.  A temporary injunction is an appropriate and necessary mechanism to prevent this type of harm.  *See REV Recreation Group, Inc. v. LDRV Holdings Corp.,* 259 So.3d 232, 235 (Fla. 2d DCA 2018)

(affirming temporary injunction prohibiting manufacturer from promoting products through other dealers that were subject to an exclusive agreement with plaintiff dealer); *see also Jacobson & Co. v. Armstrong Cork Co*., 548 F.2d 438, 444–45 (2d Cir.1977) (threatened loss of customers and goodwill from manufacturer's termination of supply of a brand of products to distributor posed irreparable injury); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (holding that [i]n a competitive industry where consumers are brand-loyal,…loss of market share is a potential harm which cannot be redressed by a legal or equitable remedy following a trial…).

Further, the loss of exclusivity will impact Smart's ability to sell additional services to certain customers.  The Second Circuit summarized the inadequacy of money damages for plaintiffs who lose the ability to sell additional products or services as follows:

> We believe that the governing principle is as follows. **Where the availability of a product** is essential to the life of the business *or* **increases business of the plaintiff beyond sales of that product— for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss**. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. **Where the loss of a product will cause** the destruction of a business itself or **indeterminate losses in other business**, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (emphasis added). Smart provides additional products and services that are not currently used by all Joint Customers, including, in some cases, video visitation and various mail scanning products and

services. Indeed, some Smart customers have elected to purchase mail scanning as a stand-alone product. *See* J. Logan Declaration, ¶ 10. Similarly, customers often add new services and, in consideration, agree to extend the term of Smart's revenue-generating messaging services. *Id.* Being unlawfully removed from its ongoing relationships with the Joint Customers means that Smart loses the opportunity to earn revenue in additional ways not directly measurable as lost contractual proceeds. In other words, money damages are a hollow and incomplete remedy at best.

**3.      Smart's money damages would be substantial but difficult to calculate.**

The irreparable harm that Smart would suffer should Correct not be enjoined from improperly terminating the Agreement can also be demonstrated by the significant amount of time, energy, resources—most of which are difficult to accurately quantify—that have been invested into the relationship with Correct. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc*., 753 F. Supp. 2d 1233, 1236–37 (S.D. Fla. 2010) ("A plaintiff may establish irreparable harm where the total damages associated with plaintiff's losses would be difficult to calculate.")  Here, Smart invested almost $1.5 million to install its equipment and services at the facilities of the Joint Customers. *See* J. Logan Declaration, ¶ 6. However, its installment costs are only a portion of Smart's true investment in the Agreement and the Joint Customers. Smart has invested hundreds of hours training staff on how to operate its systems, developing personal relationships with Joint Customers, providing customer service, marketing, and updating its products and services for the Joint Customers. *Id.* at ¶ 7.  Based on the foregoing, Smart's substantial non-monetary investment in connection with its relationship with Correct also establishes irreparable harm and the lack of an adequate remedy at law.

**C.**     **Smart is Likely to Succeed on the Merits of its Declaratory Relief and Breach of Contract Claims and the Invalidity of the Notice to Cure.**

Smart's Complaint includes declaratory relief and breach of contract claims that request an injunction prohibiting Correct from improperly terminating the Agreement, which is exactly what is happening again.[6] In its latest attempt, Correct bases its purported default and termination on two supposed breaches of the Agreement and Schedule for Sebastian County: (1) a failure to provide a "customized, wireless, ruggedized and correctional grade tablet;" and (2) a failure to include entertainment and educational content on its tablets. Neither claim has merit.

**1.**     **Smart delivered ruggedized and correctional grade tablets.**

In approximately 2016, Smart began providing tablets to customer facilities. Tablets are hand-held touch-screen computers. The tablets allow an inmate to perform the same functions they could perform on the kiosks; however, many facilities prefer the convenience and mobility of tablets over the fixed kiosks. Correctional facilities consistently inform Smart that tablets increase facility safety in many ways. Tablets that perform multiple functions allow facilities to minimize the movement of inmates around a facility, which results in less violence, less opportunities for disturbances and confrontations, and less opportunities to distribute contraband. Facilities have also confirmed that interactive tablet use has led to reduced recidivism, decreased violence, increased education, and improved behavior and attitude among inmates. *See* Second Declaration of J. Logan.

Schedule 1 – Sebastian County, AR (the "Sebastian Schedule")[7] to the Agreement requires Smart to furnish its SmartTablet on a 1:1 inmate to tablet ratio to the facilities.  As described in the Schedule, the tablet provided is "a custom, wireless, ruggedized and correctional grade tablet

---

[6] Smart intends to seek leave to amend its Complaint to include claims directly based on the Notice to Cure.
[7] *See* Counterclaim, Exhibit B.

of our custom specifications that will connect to our secure network." *See* Sebastian Schedule, ¶ 3. And that is precisely what has been provided to Sebastian County and all of the other Joint Customers. *See* Second Declaration of J. Logan.

Correct claims that the SmartTablet is not corrections-grade because they have been dismantled and fashioned into crude weapons. *See* Notice to Cure. However, "corrections-grade" is not synonymous with indestructible. All tablets—including those provided to other correctional facilities by Smart's competitors—have a glass touch-screen, which is a requirement for any operable tablet. As such, the glass portion of every tablet can be broken. *See* Second Declaration of J. Logan. Smart is not aware of any practical alternatives in the market to a plastic or rubber housing on a glass-screened tablet. In fact, an alternative casing, such as metal, would create a more dangerous condition by equipping inmates with a hard object that could easily be used as a weapon. *Id.*

Rather, within the industry, a "corrections-grade" tablet means two things: (a) a rugged casing such as plastic or rubber which requires special tools to open; and (b) software that makes certain functions of ordinary tablets, *e.g.*, internet web browsers, system settings, app stores, inaccessible to inmates. *Id.* Smart's tablet's meet both of these requirements. *Id.*

Smart's tablets being "corrections-grade" is further evidenced by the fact that Smart's tablets are no different than those offered by any other communications provider in the industry. For example, Smart's two largest competitors, Global Tel Link ("GTL"), and Securus Technologies ("Securus") make up approximately 80% of the corrections tablet services market share and both offer tablets that are substantially the same as those provided by Smart. *Id.*

GTL's newest tablet released in January 2017 was the GTL Inspire 1.5 which GTL proclaims is "an upgraded ruggedized external housing that improves Inspire's ability to withstand the rigors of a corrections environment" and touts it as "corrections-grade." *Id.*

Securus's subsidiary that operates its tablet services, JPay, refers to its tablets as "corrections-grade" and also states that the tablet is a "[r]ugged device designed for use in corrections." *Id.*  GTL's tablets, Securus's tablets, and Smart's tablets are all constructed in the same fashion. *Id.*  Each of these tablets is "corrections-grade" and none of them are indestructible.

Accordingly, Smart has unquestionably provided tablets that are consistent with Smart's representation in the Sebastian Schedule and which are comparable to those provided by Smart's competitors in the industry.

> ## 2.   The Sebastian Schedule does not provide for education or entertainment content.

Correct also asserts Smart has breached the Sebastian Schedule by failing "to timely install and/or provide electronic education and/or entertainment options" to Sebastian County. *See* Notice to Cure.  However, there is no obligation in the Agreement or in the Sebastian Schedule that obligates Smart to provide such services.  Indeed, the Sebastian Schedule is specific to the numerous services, including electronic messaging, that Smart will provide.

Noticeably absent from that schedule is any requirement for Smart to provide entertainment or educational content, other than a law library.  And the Sebastian Schedule has never been amended and Correct has never requested an amendment to the Sebastian Schedule in order to incorporate entertainment or educational content.  And even more telling as to the merits of Correct's assertion, Sebastian has never itself previously raised this issue.

While the Agreement does provide that Smart shall be the sole and exclusive provider of such services, that provision merely requires Correct to utilize Smart as opposed to some other vendor in the event Sebastian seeks to have those services included.

3.       **Correct has Waived the Purported Breaches**

Even if the conduct identified in the Notice to Cure could amount to a breach of the Agreement or the Sebastian Schedule, Correct has waived its right to enforce these breaches through its conduct.

"A party may waive any rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished." *Torres v. K-Site 500 Associates,* 632 So. 2d 110, 112 (Fla. 3d DCA 1994); *see also  Mark v. Hahn,* 177 So.2d 5 (Fla. 1965) (waiver of a contractual condition "may be inferred from conduct or acts putting one off his guard and leading him to believe that a right has been waived"); *Ferslew v. Relaford,* 351 So.2d 368 (Fla. 1st DCA 1977) (landlord waived strict performance of the lease contract when she "failed to complain of any of the alleged defaults within a reasonable time"); *Arbogast v. Bryan,* 393 So.2d 606 (Fla. 4th DCA 1981) (finding plaintiff waived strict compliance with an agreement where he "voiced no objection for over six years")

In this case, the purported breaches identified by Correct relate to issues that Correct could have fully appreciated from the outset of the relationship.  As described above, before Smart and Correct executed the Agreement, Smart demonstrated its tablets to Correct, including its IT and field personnel. In doing so, Smart allowed Correct to handle and operate a tablet so that Correct could see and feel the construction of the tablets. Based on this demonstration, Correct understood that the tablets had a glass touch-screen.

Correct accepted the tablets as satisfactory and, in reliance on Correct's acceptance, Smart delivered approximately 920 tablets to four different Joint Customers. Smart installed tablets in the facilities of the following Joint Customers on approximately the following dates:

a.    Sebastian County: September 13, 2017

b.    City of Saint Louis, Missouri: November 13, 2017

c.    Bowie County, Texas: November 15, 2017

d.    Washington County, Arkansas: November 15, 2017

From these initial installations until September 13, 2019, Correct never raised or identified a problem of any kind related to the construction or design of the tablets. Indeed, after an opportunity to inspect the tablets and with full knowledge of the construction of the tablets, Correct continued to market Smart's tablets to its customers and prospective customers. Correct signed contracts agreeing to provide Smart's tablets to customers and permitted Smart to provide several hundred tablets to Joint Customer facilities. Correct even tried to buy Smart—a clear sign that Correct did not believe Smart's tablets to be defective.

**D.    Entry of an Injunction Would Serve the Public Interest.**

Finally, the entry of a temporary injunction would serve the public interest. The injunction would not harm the public in any way; rather, Florida citizens have an interest in seeing that parties obey their contracts and act in good faith. *See, e.g., Sacred Family,* 20 So.3d at 417. Similarly, "the public has an interest in preserving the integrity of the competitive process" in government contract bidding. *See Starlite* at *13 (quoting *Cherokee Nation Techs., LLC v. United States,* 116 Fed. Cl. 636, 641 (2014).

There are no countervailing equitable interests which could weigh against granting the equitable remedy of injunctive relief in favor of Smart. In addition, Smart has demonstrated a

likelihood of success on the merits, and, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *NLRB v. Electro–Voice, Inc*., 83 F.3d 1559, 1568 (7th Cir.1996).

      **E.**      **Smart will provide a bond as determined by the Court.**

      Pursuant to Florida Rule of Civil Procedure 1.610(b), Smart will provide a bond in an amount the Court deems proper.

      **F.**      **The Court Should Enforce the Stipulation.**

      The Order adopts and approves the Stipulation, giving the full weight of a court order to the terms of the Stipulation. *O'Neill v. O'Neill*, 812 So. 2d 448, 452 (Fla. 5th DCA 2002) ("When appropriately made, stipulations are binding on the parties and the courts.  A court will enforce a stipulation unless good cause is shown, especially where parties have acted in reliance on the stipulation"); *EGYB, Inc. v. First Union Nat. Bank of Florida*, 630 So. 2d 1216, 1217 (Fla. 5th DCA 1994) ("It is well settled that a stipulation entered into between parties in good faith and without fraud, misrepresentation or mistake is binding on the parties and on the court").

      For the Stipulation to serve its desired purpose, and to have any meaning whatsoever, the parties must actually maintain the *status quo*. The *status quo* has always been that Smart maintains its systems and services through direct Joint Customer contact and communications. *See* Second Declaration of J. Logan; Declaration of J. Longenberger.

      Here, Smart relied on Correct's agreement to the Stipulation and execution of the same, including its promise to perform under the Agreement, in foregoing prosecution of its first Motion for Temporary Injunction. The Court adopted the Stipulation. Smart has attempted to proceed with business in the ordinary course, but it has been prevented from doing so. Instead, the Joint Customers have each changed their method of doing business—all at the same time and in the

same manner. Whether that change came at Correct's direction, which is the only credible explanation, is legally insignificant. Correct has a contractual obligation to provide Smart with access to the Joint Customers for purposes of maintaining Smart's systems and services. Correct confirmed its obligation to abide by those terms, and agreed not to induce complaints about Smart or disavow Smart's status under the Agreement in the Stipulation. Smart has spent considerable time and effort attempting to perform its own obligations under the Agreement and Correct has crippled its ability to do so. Worse yet, Correct has damaged Smart's reputation by disavowing the relationship of the parties to the Joint Customers—the exact conduct that is prohibited by both Court Order and contract. The Court should enforce the Stipulation and, specifically, require that Correct provide prompt access to each Joint Customer facility, including a direct line of communication, within 24 hours of becoming aware of a Joint Customer issue, so Smart has a fair chance to resolve any such issue.[8]

## II.       Request for Attorneys' Fees

Smart requests its attorneys' fees from Correct Solutions pursuant to the NDA, applicable Florida law, and the inherent authority of the Court.

## III.      Conclusion

Smart has unquestionably established each element of temporary injunctive relief. This Court should thus enter an injunction to maintain the *status quo* and require the parties to comply with their Agreement. Correct should not be permitted to irreparably harm its competitor by

---

[8] The Court has broad discretion to enforce its orders, including by a coercive civil contempt order. *See In the interest of SLT, RLT, RLT*, 180 So. 2d 374, 378-79 (Fla. 2d DCA 1965) ("The purpose of civil contempt proceedings is to preserve and enforce rights of private parties to suits and to compel obedience to orders and decrees made for benefit of such parties…They are essentially a remedy for coercing a person to do the thing required where the disobeyed order may still be obeyed.")

declaring an illegitimate termination of an exclusive dealing contract and reap a significant, two-fold windfall from the harm it has caused.

Wherefore, Smart respectfully requests this Court to enter an Order (a) prohibiting Defendant, Correct Solutions, LLC from terminating the Agreement; (b) prohibiting Correct from taking steps in furtherance of terminating the Agreement, including, disconnecting or removing Plaintiff's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with Correct, informing any Joint Customer that Plaintiff and Defendant do not have a contractual relationship, or otherwise disavowing Smart's status as the exclusive provider of messaging and related services for the Joint Customers; (c) enforcing the Stipulation and Order; (d) awarding Smart its attorneys' fees and costs; and (d) for such further relief as the Court deems just and proper.

## Good Faith Conference Certification

The undersigned certify that they conferred with counsel for Correct over an extended period of time about numerous issues raised in this Motion and that, although a motion for injunctive relief is an exception to Paragraph 11 of Administrative Order S-2019-007, requested Correct to agree to the specific relief requested in this Motion before filing this Motion and that Correct would not agree to the requested relief.

Respectfully submitted,

/s/ Brad F. Barrios
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602

(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails: KAB@harlleebald.com
         JEL@harlleebald.com
         DDF@harlleebald.com
         CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

***to Plaintiff's Emergency Motion to Temporarily Enjoin Improper
Termination of Agreement and to Enforce Court Approved Stipulation***

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## STIPULATION TO PRESERVE THE *STATUS QUO*
## PENDING FINAL HEARING ON THE MERITS

Plaintiff, Smart Communications Holding, Inc. and Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC (hereinafter the "Parties"), hereby stipulate and agree as follows:

1.     Plaintiff filed its Verified Complaint on August 2, 2019 relating to certain contracts described in the Complaint; specifically a Mutual Confidentiality and Nondisclosure Agreement attached to the Complaint as Exhibit A ("NDA") and a Master Services Agreement attached to the Complaint as Exhibit B ("MSA").

2.     Defendant filed its Answer, Affirmative Defenses and Counterclaim to Verified Complaint on August 28, 2019.

3.     Based on their positions set forth in the pleadings, the Parties dispute whether a purported termination letter sent by Defendant to Plaintiff was proper and/or effective.

4.     The Parties have agreed to extend the preservation of the status quo for the full pendency of this action, as set forth herein.

5.      This Court has subject matter jurisdiction over this action and personal jurisdiction over Defendant.

6.      The Parties agree that, until a Court Order permits otherwise, (a) the Parties shall perform under the MSA; (b) Defendant shall not direct the disconnecting or removing of Plaintiff's equipment or services based on Defendant's purported "Notice of Termination" letter dated July 17, 2019 from any of the customers identified in the MSA, including the Schedules to the MSA; (c) Defendant shall not induce or solicit complaints about Plaintiff from any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office; (d) the Parties shall not inform any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office that they do not have a contractual relationship with each other or otherwise disavow the other Party's status under the MSA; and (e) neither of the Parties shall solicit or attempt to hire an employee directly employed by the other; however, this provision does not apply to Bruce Johnson in the event he is an employee of Plaintiff.

7.      The Parties do not waive any rights or remedies as set forth in the MSA or the NDA including any based upon any default or failure to perform by a Party prior to or subsequent to the execution of this Stipulation.

8.      This Stipulation does not constitute an admission by any of the Parties as to any of the allegations or legal arguments contained in Plaintiff's Verified Complaint or Motion for Temporary Injunction or in Defendant's Answer, Affirmative Defenses and Counterclaim. The Parties expressly reserve their rights to argue or raise any of the issues raised in the Verified Complaint, the Motion for Temporary Injunction, and the Defendant's Answer, Affirmative Defenses and Counterclaim at any time.

9.    Subject to any intervening motions, which the Parties retain all rights to file and schedule for hearing, the Parties shall schedule a final hearing on the merits of the Verified Complaint and the Answer, Affirmative Defenses and Counterclaim as soon as practicable. However, so long as Defendant does not violate the terms of this Stipulation, Plaintiff agrees to cease pursuing Court intervention on the Motion for Temporary Injunction, including seeking an expedited hearing for the relief requested therein. Defendant understands that any violation of this Stipulation will result in Plaintiff immediately scheduling a hearing on its Motion for Temporary Injunction to occur as soon as the Court's schedule permits.

10.    Defendant waives the defenses of lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and insufficiency of process. Defendant preserves all other defenses to the Verified Complaint and Motion.

Executed this 30th day of August, 2019.

<table>
<tr><td>

*/s/ Brad F. Barrios*
Brad F. Barrios – FBN 35293
E-mail:  bbarrios@bajocuva.com
David A. Hayes – FBN 96657
E-mail:  dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL, P.A.
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Tel:  (813) 443-2199
Fax:  (813) 443-2193
*Attorneys for Plaintiff*

</td><td>

*/s/ Kimberly A. Bald*
Kimberly A Bald – FBN 434190
E-mail:  kab@harlleebald.com
James E. Lynch – FBN 46219
HARLLEE & BALD, P.A.
202 Old Main Street
Bradenton, FL  34205-7817
Tel:  (941) 744-5537
Fax:  (941) 744-5547
*Attorneys for Defendant*

</td></tr>
</table>

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

**AGREED ORDER APPROVING STIPULATION TO PRESERVE
THE *STATUS QUO* PENDING FINAL HEARING ON THE MERITS**

THIS CAUSE came before the Court on the Parties' Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits. The Court, having reviewed the Stipulation, being advised of the agreement of counsel and the affected parties, and being otherwise duly advised in the premises, it is hereby

ORDERED AND ADJUDGED that:

1.     The Court has subject matter jurisdiction over this action and personal jurisdiction over Defendant.

2.     The Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits is ADOPTED and APPROVED.

DONE AND ORDERED, in Chambers, at Hillsborough County, Florida this _____ day of August, 2019.

Electronically Conformed 9/10/2019
_____
REX BARBAS
Circuit Court Judge

{BC00254457:1}

Copies to:

Brad F. Barrios, Esq.
Kimberly A. Bald, Esq.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT B

***to Plaintiff's Emergency Motion to Temporarily Enjoin Improper
Termination of Agreement and to Enforce Court Approved Stipulation***

## ROEDEL PARSONS KOCH
## BLACHE BALHOFF  McCOLLISTER

### A  LAW  CORPORATION

roedelparsons.com

**Luke F. Piontek, Partner**
*Lpiontek@roedelparsons.com*
**Baton Rouge Office**

*Telephone: (225) 929-7033*
*Direct Dial: (225) 329-1293*
*Facsimile: (225) 928-4925*

September 13, 2019

**VIA CERTIFIED MAIL**
**#7016 0750 0000 6885 1345**
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan

RE:   Notice to Cure pursuant to Master Services Agreement between
Correct Solutions, LLC and Smart Communications Holding, Inc.
(Correct Solutions, LLC's customer: Sebastian County)

Dear Mr. Logan:

You are hereby notified that Smart Communications Holding, L.L.C. ("Smart") is in default under the terms of the Master Services Agreement ("MSA") with Correct Solutions, LLC ("Correct Solutions"), dated August 31, 2017, and Schedule 1 – Sebastian County, AR ("Schedule 1") of the MSA, also dated August 31, 2017, respecting the provision of equipment and services to Correct Solutions' customer, Sebastian County Detention Center ("Sebastian County").

Specifically, Paragraph 3 of Schedule 1 provides that the "SmartTablet" unit provided by Smart "is a custom, wireless, ruggedized and correctional grade tablet of [Smart's] custom specification..." Meanwhile, Paragraph 8 of Schedule 1 states, in part, that, "Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. … We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remoted infrastructure 24/7 and alert our technicians in real-time if any issues are detected."

In fact, the tablets and supporting equipment provided by Smart to Correct Solutions' customer, Sebastian County, were not "correctional grade" in any functional sense. The tablets provided by Smart have been rather easily dismantled and fashioned into crude weapons. Additionally, inmates at Sebastian County have readily removed the batteries from Smart's tablets which batteries have been used to charge illegal cell phones in the facility. The attached exhibits, supplied by Sebastian County, provide photographic evidence of the defectiveness of Smart's equipment. As you are well aware, safety and security are top priorities for Correct Solutions'

customer, Sebastian County, and the defective tablets provided by Smart allow inmates to easily circumvent these priorities. As such, Smart is in violation of Paragraph 3 of Schedule 1.

In addition, Smart has failed to timely install and/or provide electronic education and/or entertainment options (*e.g.,* electronic books and games) on the tablets provided to Sebastian County. Sebastian County requested the installation of electronic education and/or entertainment options over a year ago, but Smart has neglected to carry out such installment. Paragraph 2 of the MSA provides that Smart "shall be the sole and exclusive provider" of, among other services, "electronic education, electronic self-help, … [and] electronic entertainment…" to Correct Solutions' customer facilities. Smart's failure to timely install and/or provide electronic education and/or entertainment options violates Paragraph 2 of the MSA.

Further, according to Sebastian County, the tablets Smart provided to Sebastian County experience near constant failures and performance deficiencies. Smart has also directed Sebastian County regarding how to allegedly repair the inoperable, broken, or defective tablets rather than repairing the tablets itself. Paragraph 7 of the MSA states, in part, that "In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet", and that Smart "will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office." Paragraph 8 of the MSA sets forth Smart's "Maintenance and Support Plan" regarding the tablets. Smart's provision of tablets that are in a state of near constant failure, as well as its failure or refusal to repair inoperable, broken, or defective tablets, violates Paragraphs 7 and 8 of the MSA.

Under Paragraph 9 of the MSA, "If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default." This letter serves as Correct Solutions' notice to Smart of the nature of the default, set forth above. Paragraph 9 continues, stating, "The defaulting Party shall have thirty (30) days after receipt of notice of default to cure." This letter also serves as Correct Solutions' notice to cure the default with respect to the defective tablets provided to Sebastian County within thirty (30) days of receipt of this letter. Failure to cure may result in immediate termination of the MSA and other agreement(s) between Smart and Correct Solutions.

As the attached photographs very clearly suggest, allowing the intended end-users of Smart's equipment to have continued access to these apparently defective and/or substandard products may very well lead to consequences considerably more grave than mere customer dissatisfaction. Therefore, Smart must provide Sebastian County with "ruggedized and correctional grade tablet[s]", which naturally must be tamper-proof, with electronic education, and electronic entertainment (books and games) installed, and must repair any inoperable, broken, or defective tablets, within thirty (30) days of receipt of this notice to cure. With that in mind, your prompt attention to the matter is greatly appreciated.

Sincerely,

Luke F. Piontek
*Counsel for Correct Solutions, LLC*

CC:    David L. Gann (via email only)
       General Counsel
       Smart Communications Holding, Inc.





IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                  Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

### **ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM**

Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. ("Smart Communications"), by counsel, responds as follows to Defendant/Counter-Plaintiff, Correct Solutions, LLC's ("Correct Solutions"), Counterclaim as follows:

1.      Admitted.

2.      Admitted.

3.      Without knowledge; therefore denied.

4.      Admitted that Smart Communications provides services to eight facilities jointly with Correct Solutions (hereinafter, the "Joint Customers"). Otherwise, without knowledge; therefore denied.

5.      Admitted that Smart Communications had discussions with Correct Solutions in June 2017 about whether Smart Communications had the capability and equipment, including tablets, sufficient to provide the services desired by Correct Solutions. Otherwise, without knowledge; therefore denied.

{BC00259129:1}

6.     Admitted that Correct Solutions and Smart Communications executed the NDA attached to the Counterclaim as Exhibit A, which was provided by Smart Communications and was its standard NDA at that time.  The NDA, being a written instrument, is the best evidence of its contents and speaks for itself.

7.     Denied.

8.     Admitted that Smart Communications' services and products include electronic messaging on a secured network, grievances, requests, law library, and video visitation, among others, and that it made presentations to Joint Customers regarding its services.  Admitted that the scope of services for each Joint Customer were identified in a separate schedule. Denied that Smart Communications represented that it would provide each inmate a tablet that would be maintained and serviced by Smart Communications.  Otherwise, without knowledge; therefore denied.

9.     Admitted that Correct Solutions and Smart Communications executed the Master Services Agreement attached to the Counterclaim as Exhibit B.  Otherwise, without knowledge; therefore denied.

10.     Admitted that Correct Solutions and Smart Communications executed the Master Services Agreement and the Schedules attached to the Counterclaim as Exhibit B.  Being written instruments, the Master Service Agreement and Schedules are the best evidence of their contents and speak for themselves.

11.     Being written instruments, the Master Service Agreement and Schedules are the best evidence of their contents and speak for themselves.

12.     Denied.

13.     Smart Communications is without knowledge regarding Correct Solutions' discussions with St. Louis on or about April 8, 2019; therefore denied.  Denied that Smart

Communications or its representatives utilized any confidential information in a solicitation to the City of St. Louis or otherwise.  Smart Communications denies any remaining allegations.

14.     Admitted that Correct Solutions sent Smart Communications a letter that was dated July 17, 2019, which speaks for itself.  Smart Communications denies any remaining allegations.

15.     Denied.

16.     Denied.

17.     Denied.

18.     Admitted that the law firms of Harllee & Bald, P.A. and Roedel, Parsons, Koch, Blache, Balhoff & McCollister are acting on behalf of Correct Solutions in this action.  Smart Communications denies any remaining allegations.

## FIRST AFFIRMATIVE DEFENSE

The Counterclaim fails to state a cause of action.  First, to the extent Correct Solutions's claim is premised upon a breach of the NDA, such claim must fail because the NDA was superseded by the Master Services Agreement.  Second, Correct Solutions also appears to seek what essentially amounts to injunctive relief without alleging a proper predicate for such relief.  In particular, Part (a) of the *ad damnum* clause asks the Court to "direct and require" Smart Communications to take certain actions.  However, Correct Solutions has an adequate remedy at law, as evidenced by their claim for damages related to the purported breach of contract.  Further, Correct Solutions has failed to set forth any allegations which would substantiate irreparable harm.  Third, Correct Solutions has failed to allege any facts to support its bald assertion that an email address for a state employee constitutes "Confidential Information" under the Master Services Agreement.  Fourth, Correct Solutions has failed to set forth any factual allegations to support its assertion that it has suffered damages.

## SECOND AFFIRMATIVE DEFENSE

The Counterclaim fails because Correct Solutions committed the first material breach of the Master Services Agreement.  Counter to its obligations under the Master Services Agreement, Correct Solutions failed to provide access to the Joint Customers (as defined in the Complaint) and their facilities, failed to provide prompt and specific notice of irregularities with Smart Communications's equipment, and allowed third parties to modify, disassemble, and damage Smart Communications's equipment.

## THIRD AFFIRMATIVE DEFENSE

Correct Solutions is estopped from relying upon the terms of the NDA in support of any of its claims as the Master Services Agreement was a subsequent agreement entered into by the parties and addresses the same subject matter as the NDA.

## FOURTH AFFIRMATIVE DEFENSE

Correct Solutions failed to fulfill all conditions precedent prior to filing this action.  In particular, Correct Solutions has not provided proper notice of a purported breach of the Master Services Agreement as more specifically described in the Complaint, which is incorporated herein by reference.

## FIFTH AFFIRMATIVE DEFENSE

The claims are barred by the doctrine of unclean hands.  Correct Solutions has manufactured sham reasons to purport to terminate the Master Services Agreement as more specifically described in the Complaint which is incorporated herein by reference.

## SIXTH AFFIRMATIVE DEFENSE

Any claim for damages must be reduced because Correct Solutions failed to mitigate its damages.

## ENTITLEMENT TO ATTORNEYS' FEES AND COSTS

Smart has retained the undersigned attorneys to represent it in this action and is obligated to pay them a reasonable fee for their services.  To the extent permitted by law, Smart is entitled to the recovery of its reasonable attorneys' fees and costs incurred in defending this action.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
         JEL@harlleebald.com
         DDF@harlleebald.com
         CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail:  bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail:  dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

{BC00259129;1}                                     5

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                       Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

## PLAINTIFF'S REPLY TO AND MOTION TO STRIKE AFFIRMATIVE DEFENSES

        Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. ("Smart"), by counsel

and pursuant to Florida Rules of Civil Procedure 1.140(a) and (b), replies to Defendant/Counter-

Plaintiff, Correct Solutions, LLC's ("Correct") Affirmative Defenses to the Verified Complaint as

follows:

### First Affirmative Defense

        Correct's First Affirmative Defense is based on the obligation in the NDA to hold

"Confidential Information" in trust and confidence. Correct alleges that Smart has unclean hands

because it used "Confidential Information" in violation of the NDA. However, the Agreement

superseded the NDA and the NDA is no longer effective or enforceable. Accordingly, this

affirmative defense fails as a matter of law. Further, Correct does not identify any "Confidential

Information" used by Smart to allegedly solicit the customer of Correct.

        To the extent that Correct alleges that Smart improperly used the email address of Frank

Turner (as alleged in the Counterclaim), Mr. Turner's email address does not qualify as

"Confidential Information" under the NDA or Agreement for numerous reasons, including, but

{BC00259006:1}

not limited to: (a) Correct never designated Mr. Turner's email address as confidential or otherwise notified Smart Communications that Mr. Turner's email address was confidential. Correct, thus, did not protect the confidentiality of Mr. Turner's email address and waived the ability to enforce any confidentiality restrictions with respect to the email address. (b) Mr. Turner is a government employee with a government email address, which is readily ascertainable from public sources. (c) Mr. Turner's email address was or became generally known through no fault of Smart. For example, Mr. Turner voluntarily and repeatedly emailed Smart, including emails that did not copy Correct. (d) Smart independently developed a relationship with Mr. Turner. (e) Mr. Turner's email address was disclosed by a third party, City of St. Louis, who was not under or in violation of any confidentiality undertaking to Correct. (f) Mr. Turner's email address is not owned, licensed, or controlled by Correct.

### Second Affirmative Defense

Correct alleges that Smart breached the NDA and Agreement by using confidential/proprietary information to solicit a customer of Correct. However, the Agreement superseded the NDA and the NDA is no longer effective or enforceable. Accordingly, this affirmative defense fails as a matter of law. Further, Correct does not identify any "Confidential Information" used by Smart to allegedly solicit the customer of Correct.

To the extent that Correct alleges that Smart improperly used the email address of Frank Turner (as alleged in the Counterclaim), Mr. Turner's email address does not qualify as "Confidential Information" under the NDA or Agreement for numerous reasons, including, but not limited to: (a) Correct never designated Mr. Turner's email address as confidential or otherwise notified Smart that Mr. Turner's email address was confidential. Correct, thus, did not protect the confidentiality of Mr. Turner's email address and waived the ability to enforce any confidentiality

restrictions with respect to the email address. (b) Mr. Turner is a government employee with a government email address, which is readily ascertainable from public sources. (c) Mr. Turner's email address was or became generally known through no fault of Smart. For example, Mr. Turner voluntarily and repeatedly emailed Smart, including emails that did not copy Correct. (d) Smart independently developed a relationship with Mr. Turner. (e) Mr. Turner's email address was disclosed by a third party, City of St. Louis, who was not under or in violation of any confidentiality undertaking to Correct. (f) Mr. Turner's email address is not owned, licensed, or controlled by Correct.

Further, Correct alleges that, as a result of Smart's alleged breach, Correct was entitled to terminate the Agreement. However, the plain language of the Agreement contradicts this allegation. Section 9 of the Agreement provides the only grounds for either party to terminate the Agreement. Correct may not terminate the Agreement based on an alleged breach of the Confidentiality or Non-Disclosure provisions of the Agreement.

### Third Affirmative Defense

Correct attempts to create an affirmative defense by combining a non-existent cause of action (attempted tortious interference with a contractual agreement) with a defense (protection of its business interests) to a claim that has not been raised by Smart (tortious interference with an advantageous business relationship). The result is a legally insufficient defense. Accordingly, Smart moves to strike this defense pursuant to Florida Rule of Civil Procedure 1.140(b).

To the extent the defense is not stricken, Smart realleges and incorporates its Reply to the Second Affirmative Defense.

**Fourth Affirmative Defense**

Correct alleges that Smart breached the implied duty of good faith and fair dealing within the NDA and Agreement by using confidential/proprietary information to solicit a customer of Correct. However, the Agreement superseded the NDA and the NDA is no longer effective or enforceable. Accordingly, this affirmative defense fails as a matter of law. Further, Correct does not identify any "Confidential Information" used by Smart to allegedly solicit the customer of Correct.

To the extent that Correct alleges that Smart improperly used the email address of Frank Turner (as alleged in the Counterclaim), Mr. Turner's email address does not qualify as "Confidential Information" under the NDA or Agreement for numerous reasons, including, but not limited to: (a) Correct never designated Mr. Turner's email address as confidential or otherwise notified Smart that Mr. Turner's email address was confidential. Correct, thus, did not protect the confidentiality of Mr. Turner's email address and waived the ability to enforce any confidentiality restrictions with respect to the email address. (b) Mr. Turner is a government employee with a government email address, which is readily ascertainable from public sources. (c) Mr. Turner's email address was or became generally known through no fault of Smart. For example, Mr. Turner voluntarily and repeatedly emailed Smart, including emails that did not copy Correct. (d) Smart independently developed a relationship with Mr. Turner. (e) Mr. Turner's email address was disclosed by a third party, City of St. Louis, who was not under or in violation of any confidentiality undertaking to Correct. (f) Mr. Turner's email address is not owned, licensed, or controlled by Correct.

Further, Correct alleges that, as a result of Smart's alleged breach, Correct was entitled to terminate the Agreement. However, the plain language of the Agreement contradicts this

allegation. Section 9 of the Agreement provides the only grounds for either party to terminate the Agreement. Correct may not terminate the Agreement based on an alleged breach of the Confidentiality or Non-Disclosure provisions of the Agreement by Smart.

## Fifth Affirmative Defense

Correct alleges that Smart breached the Agreement by failing to perform services under the Agreement. However, Correct does not identify any services that Smart failed to perform orany defaults that Smart failed to cure. Thus, the affirmative defense fails to allege ultimate facts or put Smart on notice of the substance of the defense. Accordingly, Smart moves to strike this defense pursuant to Florida Rule of Civil Procedure 1.140(b).

To the extent the defense is not stricken, Smart alleges that Correct is estopped from asserting this defense due to its own prior material breach of the Agreement. Specifically, on numerous occasions, Correct has failed to provide Smart with access to the customers and access to the customer facilities so that Smart could address and remedy any issues with Smart's services or systems. The City of St. Louis, Avoyelles, and Sebastian County have informed Smart that they will only deal with Correct and other Joint Customers have rebuffed Smart's attempts to repair or address issues with Smart's equipment. Further, Correct breached the Agreement by allowing customer facilities, including Sebastian County and Avoyelles, to modify, disassemble, and otherwise damage Smart's equipment.

## Sixth Affirmative Defense

Correct wrongly alleges that Smart's claims are based on the assertion that the customers of Correct were joint customers. Smart's claims are based on the Agreement between Smart and Correct. Smart defined a group of facilities as "Joint Customers" because Smart and Correct both provide services to that group of facilities. However, Smart's claims do not depend upon any

particular definition of "customers." Correct also wrongly alleges that there is no contractual relationship between Smart and any of Correct's customers. For example, Smart has a direct contract with Miller County, Arkansas.

### Seventh Affirmative Defense

Correct alleges that Smart is not entitled to injunctive relief because its remedy is money damages. Smart realleges and incorporates its Motion for Temporary Injunction, which demonstrates that Smart will be irreparably harmed and left without an adequate remedy at law of Correct is not enjoined from acting on its improper termination letter or any similar bad faith attempts to contrive defaults to serve as a predicate to termination.

### Eighth Affirmative Defense

Correct wrongly alleges that Smart has not identified any contractual provision which Correct has not followed. But, for example, Smart alleged that Correct did not follow Section 9 of the Agreement, which governs default and termination, when it sent an improper and ineffective termination notice to Smart.

### Ninth Affirmative Defense

Correct wrongly alleges that Smart has not identified any contractual provision which Correct has not followed. But, for example, Smart alleged that Correct did not follow Section 9 of the Agreement, which governs default and termination, when it sent an improper and ineffective termination notice to Smart.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 17th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
           JEL@harlleebald.com
           DDF@harlleebald.com
           CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel
Florida Bar No. 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios
Florida Bar No. 035293
E-mail: bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
Tel:  (813) 443-2199
Fax:  (813) 443-2193
*Counsel for Plaintiff*

Case 8:20-cv-01469-WFJ-TGW   Document 1-3   Filed 06/26/20   Page 117 of 187 PageID 366

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                     Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

### SECOND DECLARATION OF JON LOGAN

I, Jon Logan, declare under penalty of perjury as follows:

1.      I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2.      I am currently the CEO of Smart Communications Holding, Inc. ("Smart"). I make this Declaration based on my personal knowledge and my review of the business records of Smart, created and maintained in the ordinary course of Smart's regularly conducted business activities.

3.      Smart has been providing inmate communications services for approximately 10 years. Since founding Smart Communications, I have devoted all of my working time and attention to communications services in correctional facilities.

4.      Smart first provided communications services to inmates through kiosks that are installed in jails. Our kiosks essentially consist of a computer protected by a heavy-duty metal casing that attaches to a wall. Through our kiosks, inmates can send and receive electronic messages to their friends and families. Inmates can also fill out medical, grievance, and

commissary forms, access a law library, and perform other functions by accessing our communication platform on the kiosks.

5.      In 2016, Smart began providing tablets to customer facilities. Tablets are hand-held touch-screen computers. The tablets allow an inmate to perform the same functions they could perform on the kiosks; however, many facilities prefer the convenience and mobility of tablets over the fixed kiosks. Correctional facilities consistently inform Smart that tablets increase facility safety in many ways. Tablets that perform multiple functions allow facilities to minimize the movement of inmates around a facility, which results in less violence, less opportunities for disturbances and confrontations, and less opportunities to distribute contraband. Facilities have also confirmed that interactive tablet use has led to reduced recidivism, decreased violence, increased education, and improved behavior and attitude among inmates.

6.      Smart provides tablets at a particular ratio of inmates-to-tablets that is set forth in contracts for each facility. Smart provides some facilities, including Sebastian County, Arkansas, a tablet for every inmate. This alleviates the need for inmates to share the kiosks, which could sometimes result in inmate lines or disputes about use of the kiosks.

**<u>Corrections Industry Standard Tablets</u>**

7.      As part of my job, I regularly monitor the product offerings of Smart's competitors. Smart's two largest competitors, Global Tel Link ("GTL"), and Securus Technologies make up approximately 80% of the corrections tablet services market share. GTL recently purchased another large provider, TelMate, which previously had its own tablet offering. Also, Securus operates tablet services through its subsidiary called JPay, which also previously had its own tablet offering.

8.      Attached as **Exhibit A** is a press release from GTL's website related to the launch of its newest tablet in January 2017, the GTL Inspire 1.5. GTL refers to its tablet as "corrections-grade." GTL further states, "The new device also has an upgraded ruggedized external housing that improves Inspire's ability to withstand the rigors of a corrections environment."

9.      Attached as **Exhibit B** is the JPay website page related to the JPay tablet. JPay refers to its tablets as "corrections-grade." JPay also states that the tablet is a "Rugged device designed for use in corrections."

10.     Attached as **Composite Exhibit C** are photographs of tablets from other inmate communications service providers, including GTL, Securus, JPay, and TelMate.

11.     Attached as **Composite Exhibit D** are photographs of Smart's tablets, which are identical to the tablets in use at the Sebastian facility.

12.     I have handled and inspected these competitors' tablets on numerous occasions at trade shows, in addition to reviewing these accurate photographs of the tablets, and have determined the tablets are all constructed in the same fashion.

13.     All of these tablets tout themselves as being "corrections-grade." However, none of the tablets are indestructible. All of the tablets have a glass touch-screen, which is a requirement for any operable tablet. As such, the glass portion of every tablet can be broken.

14.     Within the industry, a "corrections-grade" tablet means two things: (a) a rugged casing such as plastic or rubber which requires special tools to open; and (b) software that makes certain functions of ordinary tablets, *e.g*., internet web browsers, system settings, app stores, inaccessible to inmates.

15.     I am not aware of any tablets that exist in the market that do not use a plastic or rubber housing on a glass-screened tablet. Indeed, an alternative casing, such as metal, would

create a more dangerous condition by equipping inmates with a hard object that could easily be used as a weapon.  Moreover, in the three years since our first tablet deployment, we have not had a single complaint regarding a breach of our secure software.

### Tablets for the Joint Customers, including Sebastian County

16.    I am familiar with the contractual and business relationship between Smart and Correct Solutions, LLC ("Correct") and, specifically, the Master Services Agreement ("Agreement") between the parties, which is attached to the Verified Complaint as its Exhibit B, and the Schedule 1 – Sebastian County, AR, which is attached to the Counterclaim as part of its Exhibit B (the "Sebastian Schedule").

17.    I am also familiar with the Joint Customers, as defined in the Complaint, including Sebastian County, Arkansas.

18.    The Sebastian Schedule requires that Smart furnish its SmartTablet on a 1:1 inmate to tablet ratio.

19.    The Sebastian Schedule provides: "The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network."

20.    The Sebastian Schedule identifies numerous services, including electronic messaging, that will be provided by Smart. However, the Sebastian Schedule does not require Smart to provide entertainment or educational content, other than a law library. The Sebastian Schedule has never been amended and Correct has never requested an amendment to the Sebastian Schedule in order to incorporate entertainment or educational content.

21.    In September 2017, in accordance with the Sebastian Schedule, Smart provided ruggedized and correctional grade tablets to Sebastian on a 1:1 inmate to tablet ratio.

22.     Before Smart and Correct executed the Agreement, Smart demonstrated its tablets to Correct at their corporate headquarters in Louisiana, where all of Correct's company executives, sales representatives, IT personnel, and field services representatives were in attendance. During the demonstration, Correct employees and representatives handled and operated our tablets and could see and feel the construction of the tablets. Based on this demonstration, it was clear to me that Correct understood that the tablets had a glass touch-screen.   Moreover, Correct representatives expressed that they were very impressed and very happy with our products, including our tablets.  Indeed, Correct tried to purchase Smart because it was so impressed with our products and services.

23.     Suffice it to say, Correct accepted our tablets as satisfactory and, in reliance on Correct's acceptance, Smart delivered approximately 920 tablets in total across four different Joint Customers.

24.     Smart installed tablets in the facilities of the following Joint Customers on approximately the following dates:

      a.     Sebastian County: September 13, 2017

      b.     City of Saint Louis, Missouri: November 13, 2017

      c.     Bowie County, Texas: November 15, 2017

      d.     Washington County, Arkansas: November 15, 2017

25.     From these initial installations until September 13, 2019, Smart never received a performance related notice of any kind from any of these facilities related to the construction of the tablets.

26.     From the initial installation until September 13, 2019, Smart never received a performance related notice of any kind from Correct related to the construction of the tablets.

**Communications with the Joint Customers, including Sebastian County**

27.     From the date of the Agreement, September 13, 2017, through July 2019, the Joint Customers communicated directly with Smart with respect to any service or maintenance issues or questions related to Smart's systems, equipment, or services.

28.     Since Smart filed the Lawsuit, the Joint Customers have become increasingly difficult to communicate with and, for example, have repeatedly told Smart that all service issues had to go "through Correct."  Moreover, we have noticed a significant increase in the number of issues that are being reported.  And because many Joint Customers now refuse to speak directly to us, our ability to timely and efficiently address these issues has been impaired.

29.     On Wednesday, September 11, 2019, I emailed Major John Miller, Smart's contact person at Sebastian County, to ask if a Smart representative could visit the facility to service the account and to discuss any issues or questions they may be have with Smart's services. Sebastian had not previously notified Smart of any issues with our services; however, due to several of the other Joint Customers refusing to communicate with Smart, I wanted to affirmatively reach out to Sebastian to see if they needed anything at all and to maintain direct and friendly contact between Smart and Sebastian. A true, complete, and authentic copy of my September 11, 2019 email is attached as **Exhibit E.**

30.     Two days later, on Friday, September 13, 2019, Major Miller emailed me back and stated: "At this time I am going to have to pass on meeting with your representative."  A true, complete, and authentic copy of Major Miller's September 13, 2019 email is attached as **Exhibit F.**

31.     That same day, on Friday September 13, 2019, approximately six hours after Sebastian refused to meet with a Smart representative, counsel for Correct sent Smart a Notice to Cure pursuant to Master Services Agreement, which relates entirely to Sebastian County.

32.     I sent emails similar to my September 11, 2019 email to each of the Joint Customers. I received some responses that were very similar to the response I received from Major Miller. For example, on September 12, 2019, Commission Dale Glass with the City of St. Louis emailed me and stated:  "We have limited our communications to Correct Solutions…Any issues we may have will be directed to them." A true, complete, and authentic copy of Commissioner Glass's September 12, 2019 email is attached as **Exhibit G.**

33.     As another example, I followed up with Smart's contact at Avoyelles, Captain John Augustine, about the issues described in Mr. Longenberger's Declaration and specifically asked when Smart could send someone to replace the damaged kiosks. A true, complete, and authentic copy of my September 11, 2019 email to Captain Augustine is attached as **Exhibit H.**

34.     Captain Augustine responded as follows: "The Kiosks can be picked up. We no longer need the service." Then, two hours later, without explanation, Captain Augustine emailed, "Sorry it was a mistake. Please contact Chief Deputy Steve Martel…" True, complete, and authentic copies of Captain Augustine's September 12, 2019 emails are attached as **Composite Exhibit I.** When I contacted Chief Deputy Martel, he indicated that Smart could come to Avoyelles to replace the kiosks and blamed previous statements to the contrary on "a miscommunication."

35.     Another Joint Customer, Washington County, Arkansas, has recently bombarded Smart with trouble tickets, which is uncharacteristic of the normal course of business because Washington has rarely submitted trouble tickets in the past. On September 10, 2019, Washington sent a ticket directly to Correct, which Correct then forwarded on to Smart, with no further

explanation. A true, complete, and authentic copy of the ticket is attached as **Exhibit J**. On September 11, 2019, I emailed Washington County with an offer to send a Smart representative to the facility and to discuss any issues with Smart's services. A true, complete, and authentic copy of my September 11, 2019 email is attached as **Exhibit K**. Rather than accept my offer and engage in a good faith dialogue, Washington submitted seven (7) different trouble tickets on September 14, 2019 alone and an additional ticket on September 16, 2019. Smart had either already resolved the issue identified in a trouble ticket, such as a brief internet outage, or immediately addressed the issue upon receiving the tickets. All of the issues described on the trouble tickets were minor issues that would have been easily cured with a brief phone call or email to Smart in the past, if not automatically handled by our IT personnel through routine monitoring and maintenance, and never previously warranted the effort of creating a trouble ticket.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true. Executed September 17, 2019.

Jon Logan
CEO, Smart Communications

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

*to Second Declaration of Jon Logan*

**GTL**

Deposit Funds Now!

About GTL     Solutions     Contact Us

# GTL Inspire® 1.5 Launches Nationwide

### New version of corrections-grade tablet offering enhanced performance and features now available

**FOR IMMEDIATE RELEASE**

**Reston, Virginia** (PRNewswire) – **January 23, 2017** – GTL an innovation leader in correctional technology and payment services solutions for government, today announced the release of Inspire® 1.5 (TG701), an enhanced inmate-use tablet that builds upon the success of Inspire 1.0 (TG700). These secure tablets are now equipped with updated corrections-grade features.

"We made some key changes to improve the durability and overall user experience with Inspire 1.5 (TG701). The new version has more RAM, a higher resolution IPS display with reinforced backing, a 32-inch earbud/microphone combination, and nearly double the battery life," said Brian Peters, Executive Director of Inmate Applications and Hardware at GTL. Mr. Peters added "The new device also has an upgraded ruggedized external housing that improves Inspire's ability to withstand the rigors of a corrections environment."

Inspire 1.5 (TG701) operates on the same secure operating system as Inspire 1.0 (TG700). It also has the protocols and best practices that are part of GTL's five-layer security standard, including secure physical and wireless networks, a customized operating system, and customized hardware and applications. Both the TG700 and TG701 devices use the same charging adapters, carts and lockers, and all inmate accessories work with both models.

As a portable communication device, GTL's Inspire inmate tablet features custom applications that provide a range of services, including e-learning, inmate phone calling, inmate messaging, inmate services such as commissary ordering and grievance filing, streaming music, a subscription game center, e-books, and access to a law library.

"Development has been underway for GTL's next-generation Inspire inmate tablet for some time now. Improvements have been made to nearly all aspects of Inspire 1.5. The result is a product that far outperforms the competition and allows for integration of future services. We are excited about deploying Inspire 1.5 to our many customers in the corrections market," concluded Mr. Peters.

The new Inspire 1.5 is on display in booth #327 at the American Correctional Association's (ACA) Winter Conference in San Antonio, Texas, January 22-24.

###

**About GTL**

GTL leads in the fields of correctional technology and government payment services with visionary solutions and customized products that integrate seamlessly to deliver security, financial value, and ease of operation for its customers. As a trusted industry leader, GTL provides service to 85 percent of inmates nationwide, including service to 30 state departments of corrections, the District of Columbia, Puerto Rico, the Federal Bureau of Prisons, and 73 of the 100 largest city/county facilities, including 39 of the top 50. GTL is headquartered in Reston, Virginia, and maintains several regional offices across the country. To learn more about GTL, please visit www.gtl.net or our social media sites on Facebook, Twitter and LinkedIn.

**About ConnectNetwork**

GTL's ConnectNetwork is the one-stop resource for friends and family members to connect with their incarcerated loved ones. Friends and family can deposit money into an inmate's accounts, schedule and conduct video visits, and send messages. To learn more about ConnectNetwork, please visit www.connectnetwork.com. You can also view us on Facebook and Twitter.

**Press Release Contact**
Vinnie Mascarenhas
phone: 703-955-3894

email: vinnie.mascarenhas@gtl.net

 Press Release Contact      Click Here to download a PDF version

## Industry Publications

"";s:16:"icon_box_element";s:0:"";s:23:"icon_box_title_position";s:0:"";s:20:"icon_box_title_color";s:0:"";s:16:"icon_box_content";s:1077:"

## Feature Articles

GTL's Inmate Calling Patent Survives AIA Review (via Law360) – Read Article

————————————————————————

Inmate Communication Device (ICD) promotes positive behavior proving to be a potent inmate management tool.

A first hand account of the impact the Inspire Tablet has on the inmates at Pima County Jail. Continue Reading

————————————————————————



Document title: GTL Inspire® 1.5 Launches Nationwide | GTL
Capture URL: https://www.gtl.net/about-us/press-and-news/gtl-inspire-1-5-launches-nationwide/
Capture timestamp (UTC): Tue, 17 Sep 2019 20:44:46 GMT

Inspire 1.5 (TG701) operates on the same secure operating system as Inspire 1.0 (TG700). It also has the protocols and best practices that are part of GTL's five-layer security standard, including secure physical and wireless networks, a customized operating system, and customized hardware and applications. Both the TG700 and TG701 devices use the same charging adapters, carts and lockers, and all inmate accessories work with both models.

As a portable communication device, GTL's Inspire inmate tablet features custom applications that provide a range of services, including e-learning, inmate phone calling, inmate messaging, inmate services such as commissary ordering and grievance filing, streaming music, a subscription game center, e-books, and access to a law library.

"Development has been underway for GTL's next-generation Inspire inmate tablet for some time now. Improvements have been made to nearly all aspects of Inspire 1.5. The result is a product that far outperforms the competition and allows for integration of future services. We are excited about deploying Inspire 1.5 to our many customers in the corrections market," concluded Mr. Peters.

The new Inspire 1.5 is on display in booth #327 at the American Correctional Association's (ACA) Winter Conference in San Antonio, Texas, January 22-24.

###

**About GTL**

GTL leads in the fields of correctional technology and government payment services with visionary solutions and customized products that integrate seamlessly to deliver security, financial value, and ease of operation for its customers. As a trusted industry leader, GTL provides service to 85 percent of inmates nationwide, including service to 30 state departments of corrections, the District of Columbia, Puerto Rico, the Federal Bureau of Prisons, and 73 of the 100 largest city/county facilities, including 39 of the top 50. GTL is headquartered in Reston, Virginia, and maintains several regional offices across the country. To learn more about GTL, please visit www.gtl.net or our social media sites on Facebook, Twitter and LinkedIn.

**About ConnectNetwork**

GTL's ConnectNetwork is the one-stop resource for friends and family members to connect with their incarcerated loved ones. Friends and family can deposit money into an inmate's accounts, schedule and conduct video visits, and send messages. To learn more about ConnectNetwork, please visit www.connectnetwork.com. You can also view us on Facebook and Twitter.

**Press Release Contact**
Vinnie Mascarenhas
phone: 703-955-3894

email: vinnie.mascarenhas@gtl.net

 **Press Release Contact**       Click Here to download a PDF version

## Industry Publications

":s:16:"icon_box_element";s:0:"";s:23:"icon_box_title_position";s:0:"";s:20:"icon_box_title_color";s:0:"";s:16:"icon_box_content";s:1077;"

## Feature Articles

GTL's Inmate Calling Patent Survives AIA Review (via Law360) – Read Article

———————————————————————

Inmate Communication Device (ICD) promotes positive behavior proving to be a potent inmate management tool.

A first hand account of the impact the Inspire Tablet has on the inmates at Pima County Jail. Continue Reading

———————————————————————



 GTL is the corrections industry's trusted, one-stop source for integrated technology solutions, delivering an innovative vision for the future while providing exceptional value today.

 Connect to your incarcerated loved one.

Go to ConnectNetwork

© 2014-2019 GTL. All Rights Reserved. | Legal and Privacy.

Document title: GTL Inspire® 1.5 Launches Nationwide | GTL
Capture URL: https://www.gtl.net/about-us/press-and-news/gtl-inspire-1-5-launches-nationwide/
Capture timestamp (UTC): Tue, 17 Sep 2019 20:44:46 GMT

Filing # 95870416 E-Filed 09/17/2019 09:07:52 PM

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT B

*to Second Declaration of Jon Logan*

| Home | Inmate Services | Parole & Probation |

Send Money
Email
Video Visitation
**Buy Media**
Education

## Buy Media

### JP5 Tablets

The JP5 family of tablets are the next generation of corrections-grade tablet computing. Having one of these tablets helps your loved ones pass the time, and stay connected to you.

All JP5 tablets work in conjunction with the JPay kiosks installed in common spaces or living units. Your loved ones can sync their JP5 tablet with the kiosk to as well as preview, purchase and download songs and other media content. In some locations, JP5 tablets may be WiFi-enabled for sending/receiving email and pre-ordering stamps and other media content.



**The tablet model that is available to your loved ones varies depending on their state, facility and other factors.** Log into your JPay account to see which version(s) of the JP5 are available in your loved one's location, and what the retail price of each tablet is.

The JP5mini is replacing the old JP4 device, which is being discontinued. Depending on the facility, you may have the opportunity to upgrade to the JP5. While existing JP4 devices will continue to work, we encourage you to upgrade to the JP5 family. You will receive additional communication if this is applicable in your loved one's location.

### What can they do with a JP5 tablet*?

- Listen to music and audiobooks
- Read and write emails
- Play games they have purchased
- View photos and videos
- Access educational materials
- Read the daily news
- Rent and watch movies

*Apps, capabilities and service availability vary by location

### Universal Features & Benefits

- Touchscreen and portable
- Simple to use and easy to understand
- Includes FM Radio, calculator, stopwatch and other apps
- Rugged device designed for use in corrections
- Includes accessories like earbuds, screen protector, and batteries or charger

Two distinct models of the JP5 are available in various locations: the JP5mini and the JP5S. Remember, not every model is available in every location. Here are some features of each.

### JP5mini



- 4.3" touch screen
- Compact and portable
- 16GB of storage
- Optimized email composition
- Music playlists

### JP5S



- 7" touch screen
- Perfect for reading and email
- 32GB of storage
- Optimized email composition
- Music playlists

### Ready to buy? Here is how it works:

1. Log in or create a JPay account to purchase the JP5 tablet for your loved one. If you know the JP5 tablet is available in your loved one's location and you don't see the option to purchase the tablet, fund their Media Account so they can purchase one within their facility.
2. JPay will prepare and ship the JPay Tablet. Then, the facility or prison will deliver it to your loved one. This process can take up to 45 business days from the date of purchase.

### Buying Music

Give your loved one the joy of music and help them pass the time with ease. With their JP5 Tablet, your loved one can download songs from a music library of more than 10 million titles, including hits from today's most popular artists. Just fund their Media Account so they can get

---

**Get Started (new customers)**

Select State...
Enter Inmate ID#   Find

Don't know the ID #?

**Download the Free JPay App**
Access JPay services on your smartphone

Download on the App Store

GET IT ON Google Play

**JP5mini**

- 4.3" touch screen
- Compact and portable
- 16GB of storage
- Optimized email composition
- Music playlists



**JP5S**

- 7" touch screen
- Perfect for reading and email
- 32GB of storage
- Optimized email composition
- Music playlists



**Ready to buy? Here is how it works:**

1. Log in or create a JPay account to purchase the JP5 tablet for your loved one. If you know the JP5 tablet is available in your loved one's location and you don't see the option to purchase the tablet, fund their Media Account so they can purchase one within their facility.
2. JPay will prepare and ship the JPay Tablet. Then, the facility or prison will deliver it to your loved one. This process can take up to 45 business days from the date of purchase.

**Buying Music**

Give your loved one the joy of music and help them pass the time with ease. With their JP5 Tablet, your loved one can download songs from a music library of more than 10 million titles, including hits from today's most popular artists. Just fund their Media Account so they can get started!

**Music features**

- Song library is constantly updated with the newest music
- Music catalog contains millions of song tracks for download
- Ability to create custom playlists on the JP5 tablet

**Media Account**

With the JPay Media Account (also known as JPay Credits), your loved one can purchase all things JPay from electronic stamps to the JP5 tablet to songs and other media content. Fund their media account today so they can get started!

**What can they buy with a Media Account?**

Depending on their location, your loved one may be able to access or purchase:

- JP5 Tablet
- Songs and music albums
- eBooks
- Games
- Electronic stamps
- Printouts

**How to fund their Media Account:**

- Log in or create a JPay account
- Select 'Music' or 'Send JPay Credits' from your home screen and follow the prompts OR
- Call 800-574-5729 to speak with a customer service representative
- Payments and Money Transfers post to the facility the next business day, or sooner.



**Friends & Family Forum**
Connect and share with others.
Join the conversation

**JPay.com**
- Home
- About
- Inmate Search
- Prison Search
- Contact Us
- Help

**Inmate Services**
- Money Transfer
- Email & VideoGram
- Education
- JPay Tablet
- Video Visitation

**Parole & Probation**
- Restitution
- Supervision Fees
- Court Fees
- Self-Report Fees
- Release Cards

**Social**
- blog.jpay.com
- forum.jpay.com
- Facebook
- Twitter
- Our Community

ACCREDITED BUSINESS
Are You a Corrections Agency?

Legal Agreements | Consumer Protection | Privacy Policy       A Securus Technologies Company       © 2002-2019 JPay Inc. All Rights Reserved

JPay Inc. is licensed by the Georgia Department of Banking and Finance; NMLS #926932.  We are also licensed as a Money Transmitter by the New York State Department of Financial Services.

Document title: JPay | Buy Media
Capture URL: https://www.jpay.com/PMusic.aspx
Capture timestamp (UTC): Tue, 17 Sep 2019 20:43:52 GMT

Page 2 of 2

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# COMPOSITE EXHIBIT C

***to Second Declaration of Jon Logan***











*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# COMPOSITE EXHIBIT D

***to Second Declaration of Jon Logan***







*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT E

*to Second Declaration of Jon Logan*

**From:** Jon Logan <███████@smartjailmail.com>
**Date:** September 11, 2019 at 5:04:36 PM EDT
**To:** ███████@co.sebastian.ar.us

Hello Major,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart* Communications

***www.smartcommunications.us***

*Corrections Simplified*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT F

*to Second Declaration of Jon Logan*

**From:** ███████ @co.sebastian.ar.us
**Date:** September 13, 2019 at 12:40:46 PM EDT
**To:** Jon Logan ██████ @smartjailmail.com>
**Subject: Re:**

Mr. Logan,

At this time I am going to have to pass on meeting with your
representative.

Respectfully,
John D. Miller
Operations Major
Sebastian County Sheriff's Office
479-██████████

From:   Jon Logan <██████ @smartjailmail.com>
To:   ██████ @co.sebastian.ar.us
Date:   09/11/2019 04:04 PM
Subject:

Hello Major,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- Smart Communications


www.smartcommunications.us
Corrections Simplified

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT G

*to Second Declaration of Jon Logan*

**From:** "Glass, Dale" <███████@stlouis-mo.gov>
**Date:** September 12, 2019 at 8:35:15 AM EDT
**To:** Jon Logan <███████@smartjailmail.com>
**Cc:** "Ross, Tammy" ███████@stlouis-mo.gov>, George Hayes ███████@stlouis-mo.gov>, Frank
Turner <███████@stlouis-mo.gov>, "Maloney, Kimberly" <███████@stlouis-mo.gov>, Jeffrey
Carson <███████@stlouis-mo.gov>, Adrian Barnes <███████@stlouis-mo.gov>
**Subject: Re:**

Thank you for your email.  We have limited our
communications to Correct Solutions.  They introduced
you to us as a value add on an existing contract.  Any
issues we may have will be directed to them.  Thank you
again for reaching out.

Dale Glass
Commissioner of Corrections
*To locate someone or check Bail amount Go to* _stlinmatelocator.net_

On Wed, Sep 11, 2019 at 3:51 PM Jon Logan <███████@smartjailmail.com> wrote:

 Hello Commissioner,

1

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart* Communications

[www.smartcommunications.us](www.smartcommunications.us)
*Corrections Simplified*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT H

*to Second Declaration of Jon Logan*

On Sep 11, 2019, at 5:07 PM, Jon Logan
███████@smartjailmail.com> wrote:

Hello Captain,

I wanted to check in with you on
your agency and our services. I am
following up regarding some kiosks
that have been damaged. We sent a
tech out there a few weeks ago and
we were told there was no need to fix
the kiosks as they were to be
replaced.

Is that still your plan?

We are ready to come fix the kiosks,
just let us know so we can make
arrangements.

Thank you,

Jon Logan,
CEO- *Smart* Communications

*www.smartcommunications.us*

*Corrections Simplified*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# COMPOSITE EXHIBIT I

*to Second Declaration of Jon Logan*

**From:** John Augustine <████████@avoyellesso.org>
**Date:** September 12, 2019 at 10:25:01 AM EDT
**To:** Jon <j██████@smartjailmail.com>
**Subject: Re:**

Sorry it was a mistake
Please contact Chief Deputy Steve Martel at
318-██████ or 318-███████
███████@avoyellesso.org

Sent from my iPhone

1

On Sep 12, 2019, at 8:41 AM, Jon ███████ @smartjailmail.com> wrote:

>Good morning sir,

>I guess I am confused. This is news to me. We have an agreement to provide these kiosks to your jail. What has changed?

>Thank you

>Jon
>Smartjailmail.com

>On Sep 12, 2019, at 8:20 AM, John Augustine ███████ @avoyellesso.org> wrote:

>>The Kiosks can be picked up. We no longer need the service.

>>Thanks,

>>Sent from my iPhone

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT J

### *to Second Declaration of Jon Logan*

**Randell Streeval** 41 minutes ago

Please see the below request from Washington County. Thanks

-------- Original message --------

From: Nolan Ake < ▮ @co.washington.ar.us>

Date: 9/10/19 7:27 AM (GMT-06:00)

To: AR Support < ▮ @correctsolutionsgroup.com>

Subject: Fwd: Smart Jail Mail KIOSK

Lt. Nolan Ake #408

Washington County

Detention Center

1155 Clydesdale Drive

Fayetteville, AR 72701

(479) ▮ <tel:(479) ▮    - Office

(479) ▮ <tel:(479) ▮    - Cell

(479) ▮ <tel:(479) ▮    - Fax

▮ @co.washington.ar.us <mailto: ▮ @co.washington.ar.us>

Begin forwarded message:

From: Seth Partain < ▮ @co.washington.ar.us <mailto: ▮ @co.washington.ar.us> >

Date: September 9, 2019 at 7:27:26 AM CDT

To: Nolan Ake < ▮ @co.washington.ar.us <mailto: ▮ @co.washington.ar.us> >

Subject: Smart Jail Mail KIOSK

51961: JASON HICE Q A on 09/08/2019 07:54 PM





*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT K

*to Second Declaration of Jon Logan*

**From:** Alan Johnson <██████@co.washington.ar.us>
**Date:** September 12, 2019 at 11:20:12 AM EDT
**To:** 'Jon Logan' <██████@smartjailmail.com>
**Subject: RE:**

What do you expect to accomplish from this meeting?

---

**From:** Jon Logan ██████@smartjailmail.com>
**Sent:** Wednesday, September 11, 2019 3:48 PM
**To:** Alan Johnson <██████@co.washington.ar.us>
**Subject:**

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Hello Capt,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart* Communications

*www.smartcommunications.us*
*Corrections Simplified*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

Case No: 19-CA-008089

## DECLARATION OF JUSTIN LONGENBERGER

I, Justin Longenberger, declare under penalty of perjury as follows:

1.    I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2.    I am currently the Director of Field Services of Smart Communications Holding, Inc. ("Smart Communications").  I make this Declaration based on my personal knowledge and my review of the business records of Smart Communications, created and maintained in the ordinary course of Smart Communications' regularly conducted business activities

3.    I am familiar with the contractual and business relationship between Smart Communications and Correct Solutions, LLC ("Correct Solutions") and, specifically, the Master Services Agreement ("Agreement") between the parties, which is attached to the Verified Complaint as Exhibit B.

4.    I am also familiar with the Joint Customers, as defined in the Complaint, including Avoyelles Parish Sheriff's Office (a/k/a Avoyelles Parish Jail) and the City of Saint Louis, Missouri.

5.     From the date of the Agreement until a few days ago, my team and I were in regular communication with all of the Joint Customers, including to discuss any issues with our system or equipment that needed repairs or service and to coordinate resolutions for the same. We trained the Joint Customers to use the Smart Communications systems and software, which are accessible to inmates via either a kiosk or tablet, depending on the arrangement with the customer. We also regularly answer questions from the Joint Customers and visit the customer facilities to service and maintain our systems and equipment.

6.     With respect to system repairs or maintenance, the standard practice and procedure has always been that the Joint Customer would communicate an issue directly to Smart Communications, either by submitting a trouble ticket or by calling or emailing me or a team member of mine directly.

7.     We recently encountered an issue at the Avoyelles Parish Jail due to inmates damaging the conduits and wiring therein, which provide electricity to multiple Smart Communications kiosks in at least two different areas of the facility.  The inmates also damaged multiple kiosks. About two weeks ago, we sent a technician to the Avoyelles Parish facility to repair the kiosks and to restore them to operating condition.  Although power was not reconnected to the kiosks while our technician was there, we were assured by the Deputy Warden that the facility staff would work to restore power soon so that the kiosks could return to operation.

8.     On September 4, 2019, after power still had not been restored, I called one of my contacts at the Avoyelles Parish Jail, Floyd Laprairie, for a status update. Mr. Laprairie informed me that he believed the area of the jail serviced by our kiosks would be getting tablets that would be provided by Correct Solutions (not by Smart Communications), so he was unsure of whether the kiosks in that area would even be needed. This is because the new tablets would presumably

provide access to the same or similar electronic services as our kiosks. He indicated he would call me back with more information. Shortly thereafter, Mr. Laprairie called me back, and told me that I would need to speak to Correct Solutions regarding whether and when power would be restored to our kiosks.

9.      To date, Avoyelles Parish Jail has not reconnected power to Smart Communications' kiosks and, as a result, Smart Communications is losing revenue we ordinarily generate from inmates' use of the kiosks.

10.     Also on September 4, 2019, I received a message from my team member, Chris Mzhickteno, an IT Support Specialist with Smart Communications. Mr. Mzhickteno forwarded me a service ticket related to the City of Saint Louis. The service ticket encompassed an email originated by Correct Solutions' Director of Field Services, Rick Pruitt. Mr. Pruitt wrote that Saint Louis was requesting a technician to repair issues with charging stations.

11.     Smart Communications maintains and services charging stations as part of our Agreement and service of the Joint Customers. The charging stations are used to charge tablets, which deliver our messaging system and other electronic services to inmates. Ordinarily, this type of repair or service request would come directly from a Joint Customer to Smart Communications and then my team would handle the issue remotely or by visiting the Joint Customer's facility.

12.     However, the ticket history indicated that it went through several Correct Solutions representatives, and did not originate from City of Saint Louis personnel.

13.     A true, complete, and authentic copy of the service ticket, including Mr. Pruitt's email, is attached as **Exhibit A**.

14.     When I received the service ticket, I immediately reached out to my contact at the City of Saint Louis, Frank Turner, so I could get more information about the issue and make sure

I fully understood the problem so that we could address it. Based on my past experiences with Mr. Turner, we were able to resolve any problems that arose at the Saint Louis facility very quickly because of our direct line of communication. However, Mr. Turner informed me that the City of Saint Louis can no longer deal with Smart Communications directly and that all services and repair issues would need to go through Correct Solutions. Mr. Turner's instructions contradict the entire operating history between Smart Communications and the City of Saint Louis because, up to this point in time, we had a direct line of communication with them. And up until this point, we were not aware of any ongoing or unresolved issues at Saint Louis because we were able to address them promptly given our direct line of communication.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true. Executed September 5, 2019.

Justin Longenberger

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

### *to Declaration of Justin Longenberger*

Correctsolutions... | Bob Owens | NEW Ticket #117807

**Assignee***

Support ▾

**CCs**

MO Support ✕   Support ✕

Frank Turner ✕

**Tags**

facility-support ✕

**Type**

- ▾

**Priority**

- ▾



## FW: Walk thru

Today 07:28 am • Bob Owens  ████@correctsolutionsgroup.com • Via ████@smartjailmail.com



**Support** Today 07:31 am

##- Please type your reply above this line -##

Your request (1607) has been updated. To add additional comments, reply to this email.
-----------------------------------------------

Cody Ibanez, Sep 4, 06:31 CDT

Bob, why did you submit a ticket to us for this?

Cody Ibanez
Director of IT
Correct Solutions
318████

--------------------------------
This email is a service from Correct Solutions Group.

[22440X-LZ4W]

**Bob Owens** Today 07:28 am



-----Original Message-----
From: Rick Pruitt
Sent: Tuesday, September 03, 2019 9:44 AM
To: Bob Owens <████████@correctsolutionsgroup.com>
Cc: MO Support <████████@correctsolutionsgroup.com>
Subject: Walk thru

St Louis customer is requesting a technician on site to perform a walk through to repair numerous issues with charging stations at the CJC and MSI facilities.

Please provide time and date of arrival so that escorts can be scheduled.

Contact; Bob Owens or Frank Turner AR facility.

Rick Pruitt
Director Field Services
████@correctsolutionsgroup.com

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                           Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## NOTICE OF EVIDENTIARY HEARING

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Courtroom 501, Tampa, FL 33602, on **September 20, 2019, at 9:30 a.m.**, or as soon thereafter as counsel can be heard the following:

**Plaintiff's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation**

      Time Reserved:            2.5 hours

      Court Reporter:           U.S. Legal Support

      JAWS Confirmation No.:    12J-34964237194

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
            JEL@harlleebald.com
            DDF@harlleebald.com
            CL@harlleebald.com

                                              /s/ Brad F. Barrios
                                              Kenneth G. Turkel – FBN 867233
                                              E-mail:  kturkel@bajocuva.com
                                              Brad F. Barrios – FBN 35293
                                              E-mail: bbarrios@bajocuva.com
                                              David A. Hayes – FBN  96657
                                              E-mail: dhayes@bajocuva.com
                                              BAJO | CUVA | COHEN | TURKEL
                                              100 North Tampa Street, Suite 1900
                                              Tampa, Florida 33602
                                              (813) 443-2199 (telephone)
                                              (813) 443-2193 (facsimile)
                                              *Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

### NOTICE TO DEFENDANT, CORRECT SOLUTIONS, LLC, TO PRODUCE DOCUMENTS AT SEPTEMBER 20, 2019 EVIDENTIARY HEARING

PLEASE TAKE NOTICE that, pursuant to Rule 1.410, *Fla. R. Civ. P.*, Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC, is hereby commanded to produce the following document(s) at the hearing scheduled before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Courtroom 501, Tampa, FL 33602 on **September 20, 2019 at 9:30 a.m.**, for purposes of the evidentiary hearing scheduled on Plaintiff's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation, as well as for a possible *in camera* review by the Court if any privilege objections are raised:

### Documents to be Produced:

### See Exhibit A

Good cause exists for the production of these documents at the September 20, 2019 hearing, including their relevance to and use as evidence concerning Plaintiff's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation, which is incorporated herein by reference.

{BC00259261:1}

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

/s/ Brad F. Barrios
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails: KAB@harlleebald.com
         JEL@harlleebald.com
         DDF@harlleebald.com
         CL@harlleebald.com

/s/ Brad F. Barrios
Attorney

## EXHIBIT A

### Definitions

(a)     "Joint Customers" means Avoyelles Parish Sheriff's Office, LaSalle Corrections-Bowie County Jail, Lamar County Jail, Moore County Jail, Sebastian County Sheriff's Office, City of Saint Louis, Missouri, Washington County, Arkansas, Wayne County, Georgia, and Miller County, Arkansas. This should be construed broadly when any of the foregoing are referenced in Requests to include any entity related to the foregoing list which has contracted with Correct for inmate communication services and such entities' agents, attorneys and consultants therefor, and all other persons acting or purporting to act on its behalf.

(b)     "Documents" means the original and any copy (except for identical copies) of any document or thing subject to production under the Florida Rules of Civil Procedure, that is in your actual or constructive possession, custody, or control. "Documents" specifically includes memoranda, letters, emails, faxes, text messages, and any other form of written communication.

### Documents to be Produced

1.      All Documents sent by Correct to any Joint Customer(s) in May 2019 referencing that Correct may replace or terminate Smart or the Master Services Agreement between Smart and Correct (the "MSA").

2.      All Documents sent by Correct to any Joint Customer(s) from August 1, 2019 to September 17, 2019 that request or instruct the Joint Customer(s) to send complaints about Smart or Smart's services directly to Correct and/or not to Smart.

3.      All responses from Joint Customers to any of the Documents responsive to Number 2 above.

4.      All Documents between Correct and any Joint Customer(s), from September 11, 2019 to September 17, 2019, that forwarded and/or discussed a September 11, 2019 email from Jon Logan to a representative of a Joint Customer, including documents from Joint Customer(s) asking Correct how to respond to Mr. Logan's email.

IN THE THIRTEENTH JUDICIAL CIRCUIT HILLSBOROUGH COUNTY, FLORIDA
CIRCUIT CIVIL DIVISION

IN RE:

SMART COMMUNICATIONS
HOLDING, INC.,
     Plaintiff(s),                         Case No. 19-A-008089
vs.
                                Division: J

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC.
     Defendant(s)
_____/

# EMERGENCY MOTION HANDLING ORDER:

**Plaintiff's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation**

Instructions by handling Judge (please initial as appropriate):

_____     The court finds entry of an immediate ex parte order is justified.

_____     The motion is set for hearing before Judge Rex M. Barbas in Hearing Room 514, Edgecomb Courthouse, 800 East Twiggs Street, Tampa, FL 33602.

_____     Determination of the status of the motion is deferred to the division to which case is assigned.  Parties shall call chambers at (813) 272-6991 for a hearing time.

_____     The matter is time sensitive and assigned to this division, and an expedited hearing will be held. Parties shall call chambers (813) 272-6991 for a hearing time.

_____     The matter is not an emergency and should be handled in the normal course. Fla. Prob. R. 5.648.

_____     The motion is legally insufficient on its face and is denied.

_____     (Other) _____

Done and Ordered on September 18, 2019.

_____
Circuit Court Judge

CASE NO: 19-CA-008089

Copies Furnished To:

Brad Barrios, Esq
bbarrios@bajocuva.com

Luke F. Piontek, Esq
lpiontek@roedelparsons.con

Kimberly A. Bald, Esq
KAB@harlleebald.com

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                        Case No: 19-CA-008089

    Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

    Defendant.
_____/

## AMENDED NOTICE OF EVIDENTIARY HEARING

### *(amended as to location only)*

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing Room 514, Tampa, FL  33602, on **September 20, 2019, at 9:30 a.m.**, or as soon thereafter as counsel can be heard the following:

**Plaintiff's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement
and to Enforce Court Approved Stipulation**

    Time Reserved:                2.5 hours

    Court Reporter:              U.S. Legal Support

    JAWS Confirmation No.:    12J-34964237194

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

{BC00259274:1}

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of September, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

<i>/s/ Brad F. Barrios</i>
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
<i>Counsel for Plaintiff</i>

IN THE CIRCUIT COURT OF THE THIRTHEENTH JUDICAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

     Plaintiff.                          Case No: 19-CA-008089

CORRECT SOLUTIONS, L.L.C. a/k/a
CORRECT SOLUTIONS GROUP, L.L.C.

     Defendant.
_____/

## CORRECT SOLUTIONS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION TO TEMPORARILY ENJOIN IMPROPER TERMINATION OF AGREEMENT AND TO ENFORCE COURT APPROVED STIPULATION

Defendant/Counter-Plaintiff, Correct Solutions, L.L.C. ("Correct Solutions"), respectfully submits this Memorandum for the Court's use at the hearing scheduled for Friday, September 20, 2019.

### Introduction

This Motion is not based on the Complaint filed in this action. Rather, it is filed in response to the Notice to Cure provided by Correct Solutions to Smart Communications Holding, Inc. ("Smart Communications") on September 13, 2019, as authorized and required by the contracts at issue and the Stipulation of the Parties filed in this action. The Notice to Cure, which was sent to address serious and dangerous issues at the Sebastian County Detention Facility ("Sebastian County") in Sebastian County, Arkansas, notified Plaintiff of its duty to cure the defective equipment and the software it is providing to Sebastian County. The cure is necessary so that the inmates are provided proper equipment which cannot be converted into weapons. Based on the pleadings, the allegations in the Emergency Motion, and Florida law, the Notice to Cure does not create

an emergency or any right to injunctive relief and Plaintiff cannot establish the necessary factors for entitlement to a temporary injunction.

## The Parties

1.      Correct Solutions is a Louisiana limited liability company that is authorized to do business in the State of Florida. Since 2014, Correct Solutions has provided inmate telephone platforms through installed telecommunication equipment at correctional facilities in numerous states. Correct Solutions derives its revenue by charging inmates or their contacts on a per-call basis and shares a substantial portion of this revenue with the correctional facilities pursuant to a commission agreement.

2.      Smart Communications is a Florida corporation that offers a suite of services which are provided by Correct Solutions to its correctional facility customers. Namely, Smart Communications makes available to inmates through kiosks and tablets electronic messaging, grievance and medical forms, video visitation, a law library, and entertainment and educational content. Contrary to the allegations in Plaintiff's Complaint and paragraph 17 of its Emergency Motion, Correct Solutions does not have the ability to provide through its company electronic messaging services to its correctional facility customers and has no plans to do so. Rather, those services are provided by third party vendors such as Plaintiff.

3.      On June 15, 2017, Correct Solutions and Smart Communications executed a Mutual Confidentiality and Nondisclosure Agreement ("NDA") pursuant to which they agreed to hold discussions and exchange confidential and/or proprietary information to determine if a future business agreement should be reached. The NDA required the parties to "hold all Confidential Information in trust and confidence" received by the opposing party.

4.    After the execution of the NDA, Correct Solutions scheduled meetings for its correctional facility customers to meet with Correct Solutions and Smart Communications during which Smart Communications made presentations of the equipment and services it would provide. Specifically, Smart Communications represented that it had the ability to provide electronic messaging, a secure network and internet, grievance and medical record disclosures, a law library and video visitation and with certain correctional facility customers would provide inmates with tablets that would be maintained and serviced by Smart Communications.

5.    On September 13, 2017, Correct Solutions and Smart Communications entered into a Master Services Agreement ("MSA") wherein Smart Communications, as the Provider, agreed to provide and perform certain inmate related services and systems for Correct Solutions, as the Customer. Pursuant to the MSA, Correct Solutions, as the Customer, agreed that Smart Communications, as the Provider, would be the sole and exclusive provider for the equipment and services described in paragraph 4 above during the duration of the contract and subject to the terms and conditions of the MSA.

6.    The MSA sets forth in paragraph 9 the provisions in the event either Party to the MSA is in default. The MSA expressly provides that if one Party defaults in the performance of any obligation under the MSA, then the non-defaulting Party must give written notice to the defaulting Party describing the nature of the default. The defaulting Party then has thirty (30) days to cure. If it is not reasonable to cure the default within thirty (30) days after receipt of the written Notice to Cure, then the right to cure period is extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. The Parties further agreed in paragraph 9 that upon

3

termination of the MSA, Smart Communications shall remove its hardware and software systems except for certain cabling and conduit.

7.     Subsequent to the execution of the MSA, Correct Solutions and Smart Communications executed agreements titled Schedules, copies of which are attached to the Counterclaim of Correct Solutions. Consistent with the MSA, under each Schedule, Correct Solutions is the customer of Smart Communications and Smart Communications is the Provider to Correct Solutions. Contrary to the assertions by Smart Communications, the correctional facility customers are not customers or "Joint Customers" of Smart Communications. Rather, each correctional facility customer is the customer of Correct Solutions.

### The Allegations in the Pleadings

8.     This action was originally filed by Smart Communications based on the termination letter dated July 17, 2019 sent by Correct Solutions after Correct Solutions learned that Smart Communications has used confidential information received from Correct Solutions pursuant to the NDA between the parties to send solicitation materials to one of Correct Solutions' customers located in St. Louis, Missouri. As set forth in the July 17, 2019 letter attached to Plaintiff's Complaint as Exhibit D, Correct Solutions asserted that the use of confidential information by Smart Communications to solicit the customers of Correct Solutions violated Smart Communication's obligations under the NDA and the MSA and was a direct interference with Correct Solutions' contractual agreement with the St. Louis, Missouri correctional facility customer. Correct Solutions has filed its counterclaim based on the same conduct of Smart Communications and asserts that the MSA was properly terminated.

4

9.     On August 30, 2019, the parties submitted to this Court a Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits. The parties acknowledged in paragraph 3 of the Stipulation that, based on the positions set forth in the pleadings, the Parties disputed whether the July 17, 2019 termination letter was proper and/or effective. A true and correct copy of the Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits is attached hereto as Exhibit A. Until the Court resolved the issues based on the July 17, 2019 termination letter, the Parties agreed to the following:

a)    the Parties shall perform under the MSA;

b)    Defendant shall not direct the disconnecting or removing of Plaintiff's equipment or services based on Defendant's purported "Notice of Termination" letter dated July 17, 2019 from any of the customers identified in the MSA, including the Schedules to the MSA;

c)    Defendant shall not induce or solicit complaints about Plaintiff from any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office;

d)    the Parties shall not inform any of the customers identified in the MSA and Schedules or the Miller County Sheriff's Office that they do not have a contractual relationship with each other or otherwise disavow the other Party's status under the MSA; and

e)    neither of the Parties shall solicit or attempt to hire an employee directly employed by the other; however, this provision does not apply to Bruce Johnson in the event he is an employee of Plaintiff.

10.     The Parties agreed in the Stipulation that they remained obligated to perform under the MSA. They further agreed in paragraph 7 of the Stipulation that the

5

Parties do not waive any rights or remedies as set forth in the MSA or the NDA including any based upon any default or failure to perform by a Party prior to or subsequent to the execution of the Stipulation. This Court approved the Stipulation by Order dated September 10, 2019. Plaintiff's argument that Correct Solutions is prohibited from sending a cure notice to address defaults and a failure to perform by Plaintiff as to its contract with Correct Solutions on any of the facilities is negated by the explicit language of the Stipulation of the Parties.

### Sebastian County Sherriff's Office

11.    Effective September 13, 2017, Correct Solutions, as the Customer, and Smart Communications, as the Provider, entered into an agreement for Smart Communications to install and provide the hardware, software, system and services required by Correct Solutions at Sebastian County, Arkansas. The agreement was in the form of a Schedule to the MSA. A copy of the Schedule for Sebastian County, Arkansas is attached hereto as Exhibit B.

12.    Pursuant to the Schedule, Smart Communications obligated itself to provide the Smart Tablet System and its entire supporting infrastructure to the Sebastian County facility for use by the inmates who are the users of the equipment, software and services. Smart Communications represented that the tablet would be provided on a 1:1 inmate ratio and would be a "custom, wireless, ruggedized and correctional grade tablet." Smart Communications also represented in the Schedule that its operating system and applications are all custom compiled for a corrections environment to control access by the inmates. The Schedule also detailed the maintenance and support plan to be provided by Smart Communications and explained the following services to be provided to

Sebastian County: electronic messaging, electronic grievance and medical requests, an electronic law library, and a postal mail inspection system.

13.     Smart Communications has provided defective equipment to Sebastian County throughout the entirety of the contract with Sebastian County. The tablets that have been provided to Sebastian County since inception were of inferior quality and despite repeated notice from Sebastian County about the issues with the tablets, Smart Communications has failed to remedy the complaints. The inferior quality tablets have been exploited by inmates of Sebastian County and as a result present serious and dangerous threats to other inmates and Sebastian County staff.

14.     On September 13, 2019, Correct Solutions sent the Notice to Cure which is at issue. A true and correct copy of the Notice to Cure is attached as Exhibit C. The Notice was sent pursuant to the MSA and the Schedule 1 for the Sebastian County. In the Notice, Correct Solutions quoted the applicable contractual language from the Schedule and the MSA where Smart Communications represented it maintained its systems "remotely" so that it would see any issues in "real time." In the Notice, Correct Solutions advised Smart Communications that the tablets it provides to the Sebastian County Detention Facility are not "correctional grade" in any functional sense and that the tablets were being easily dismantled by inmates and fashioned into crude weapons. The Notice additionally advised that the batteries were readily removed from the tablets which allowed them to be used by inmates to charge illegal cell phones in the facility. This Notice, which was sent pursuant to the MSA and the Schedule, and authorized by the Stipulation of the Parties, was a proper exercise by Correct Solutions of its contractual rights and commenced the time period for Smart Communications to cure the defects. Correct Solutions submits that the Emergency Motion was filed by Smart Communications because it either has no

intention to address the issues at the Sebastian County Detention Facility or it is unable to cure the default. Correct Solutions' exercise of its contractual rights to address the issues of its customer correctional facilities need to be resolved by Smart Communications, and Smart Communications' refusal or inability to cure does not entitle it to injunctive relief.

### Smart Communications is Not Entitled To Injunctive Relief

15.     Despite the terms of the contracts and the Stipulation entered in this case, Smart Communications is asking this Court to prohibit Correct Solutions from asserting its contractual rights and address the concerns of Correct Solutions' customer who is encountering inmates turning the equipment provided by Smart Communications into weapons. While Smart Communications may be concerned that its failure to remedy the deficiencies which are at issue in Sebastian County may result in a termination of the MSA, that does not create any entitlement to injunctive relief.

16.     As this Court is aware, a temporary injunction is an extraordinary remedy which should be sparingly granted and only after the moving party has alleged and proven facts entitling it to relief. *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci*, 162 So. 3d 68 (Fla. 4th DCA 2014).

17.     In order for a party to be entitled to a temporary injunction, that party must prove (a) the party will suffer irreparable harm unless the status quo is maintained; (b) there is no adequate remedy at law; (c) the party has a clear legal right to the relief granted and (d) a temporary injunction will serve the public interest. *Agency for Health Care Administration v. Continental Car Services, Inc.*, 650 So. 2d 173 (Fla. 2d DCA 1995). All four elements prove no injunction can and should be granted.

*Plaintiff has an Adequate Remedy at Law*

8

18.     Plaintiff's "showing" of an adequate remedy at law is that it may lose future earnings with future governmental contracts or suffer harm to its reputation if the MSA is terminated. This argument ignores the fact that the MSA will only be terminated if Plaintiff fails or refuses to perform under the MSA or the Schedule or correct the deficiencies that Sebastian County has and continues to endure. No damages or harm has or could result to Plaintiff while it decides if it intends to cure, and Correct Solutions has simply provided the contractual notice to cure. Thus, injunctive relief is not available to address an injury that is eventual or contingent. *Jacksonville Electric Authority v. Beemik Builders & Constructors, Inc.*, 487 So. 2d 372 (Fla. 1st DCA 1986), citing *First National Bank in St. Petersburg v. Ferris*, 156 So. 2d 421 (Fla. 2d DCA 1963).

19.     If Plaintiff does not or cannot cure and Correct Solutions then elects to terminate the MSA, injunctive relief is not available. Any loss of future earnings or harm to reputation would be caused by Smart Communication's intentional decision not to cure or inability to cure but it is not result of any actionable conduct of Correct Solutions. Moreover, potential loss of future earnings and harm as a result of a termination of a contract does not constitute irreparable injury to warrant injunctive relief. As the First District held in *Jacksonville Electric Authority*, irreparable injury will not be found if money damages are available as a remedy. *Jacksonville Electric Authority v. Beemik Builders & Constructors, Inc.*, 487 So. 2d 372 (Fla. 1st DCA 1986) (testimony that the contract's cancellation might have a detrimental effect upon the plaintiff's ability to obtain construction bids in the future is pure speculation, is not irreparable  injury and cannot justify the issuance of a temporary injunction).

20.     Plaintiff finally asserts that it has no adequate remedy at laws because its monetary damages are "substantial." Where the potential loss can be compensated by a