


# Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

    (i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

    (ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

    (iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

    (iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

    (v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

    (vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

    (vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

    (vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

<u>Miscellaneous</u>

12. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. <u>Provider Personnel.</u> All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. <u>Access to Management Information.</u> Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. <u>Public Entity Crime.</u> Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: _____9/13/17_____

Email: ████ @correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: _____8-31-17_____

Email: ████ @smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609



## PROPOSAL CONTRACT AND AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Avoyelles Parish Sheriff's Office**, for the **Avoyelles Parish Marksville Detention Center (DC1)**, located at 675 Government St., Marksville, LA 71351, herein known as the "Customer" and Correct Solutions, LLC, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-call telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment at the Avoyelles Parish facility for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.

4. CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the full duration of the contract.

5. CSG shall provide the Customer with a Polycom unit (pair) for the Facility to use with Court visitations and remote arraignments.

Customer initials:

CSG initials:

1



6. CSG shall provide the Customer with 1 Cellsense cell phone detector.

7. In consideration for this exclusive license and lease agreement CSG shall pay the Customer a Commission Fee of __70 %__ of the Total Gross Revenue; all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.
   a. CSG shall also pay the Customer a $10,000 signing bonus.

8. CSG will follow all rulings, regulations and orders set forth by the FCC and the state's Public Service Commission.

9. CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Louisiana. On-line Revenue reports will be available to Customer at any time.

10. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

11. If the FCC makes any regulation changes on rates and/or commissions, then CSG must comply with those regulations. However, the Customer will be able to keep any offered incentives, such as the Polycom, Cellsense, and the cash bonus.

12. CSG shall provide assistance with the inside wiring, programming, and replacement of the ESI administrative phone system at the Facility.

13. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.

14. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

Customer initials: 

CSG initials: 

2



15. This agreement shall be deemed to be a contract made under the laws of the State of Louisiana and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

16. The **Term** of this agreement shall be for 48 calendar months starting at install date and expiring October 1, 2020. This agreement will automatically renew for 48 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 3 months prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

17. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth above.

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA 71270

By: _____

Name: _____

Title: _____

Date: _____, 2016

Avoyelles Parish Sheriff's Office
675 Government Street
Marksville, LA 71351

By: _____

Name: _____

Title: _____

Date: _____, 2016

Customer initials: _____

CSG initials: _____

3



## PROPOSAL CONTRACT AND AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Avoyelles Parish Sheriff's Office**, for the **Avoyelles Bunkie Detention Center (DC2)** located at 7807 LA-115, Bunkie, LA 71322, herein known as the "Customer" and Correct Solutions, LLC, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-call telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment at the Avoyelles Parish facility for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.

4. CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the full duration of the contract.

5. CSG shall provide the Customer with 1 Cellsense cell phone detector.

Customer initials:

CSG Initials:

1



6. In consideration for this exclusive license and lease agreement CSG shall pay the Customer a Commission Fee of **70 %** of the Total Gross Revenue; all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.

7. CSG will follow all rulings, regulations and orders set forth by the FCC and the state's Public Service Commission.

8. CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Louisiana. On-line Revenue reports will be available to Customer at any time.

9. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

10. If the FCC makes any regulation changes on rates and/or commissions, then CSG must comply with those regulations. However, the Customer will be able to keep any offered incentives, such as the Cellsense.

11. CSG shall provide assistance with the inside wiring, programming, and replacement of the ESI administrative phone system at the Facility.

12. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.

13. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

14. This agreement shall be deemed to be a contract made under the laws of the State of Louisiana and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

Customer initials:

CSG initials:

2



15. The **Term** of this agreement shall be for 48 calendar months starting at install date and expiring October 1, 2020. This agreement will automatically renew for 48 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 3 months prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

16. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth above.

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA 71270

By: _____

Name: _____

Title: _____

Date: _____ , 2016

Avoyelles Parish Sheriff's Office
675 Government Street
Marksville, LA 71351

By: _____

Name: _____

Title: _____

Date: _____ , 2016

Customer initials: _____

CSG Initials: _____

3



## PROPOSAL CONTRACT AND AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Avoyelles Parish Sheriff's Office**, for the **Avoyelles Correctional Center (DC3)** located at 1630 Prison Rd., Cottonport, LA 71327, herein known as the "Customer" and Correct Solutions, LLC, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-call telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein;

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment at the Avoyelles Parish facility for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.

4. CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the full duration of the contract.

5. CSG shall provide the Customer with 1 Cellsense cell phone detector.

Customer initials: _____

CSG initials: _____

1



6. In consideration for this exclusive license and lease agreement CSG shall pay the Customer a Commission Fee of **70 %** of the Total Gross Revenue; all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.

7. CSG will follow all rulings, regulations and orders set forth by the FCC and the state's Public Service Commission.

8. CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Louisiana. On-line Revenue reports will be available to Customer at any time.

9. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

10. If the FCC makes any regulation changes on rates and/or commissions, then CSG must comply with those regulations. However, the Customer will be able to keep any offered incentives, such as the Cellsense.

11. CSG shall provide assistance with the inside wiring, programming, and replacement of the ESI administrative phone system at the Facility.

12. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.

13. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

14. This agreement shall be deemed to be a contract made under the laws of the State of Louisiana and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

Customer initials:

CSG initials:

2

Correct Solutions 00008



15. The **Term** of this agreement shall be for 48 calendar months starting at install date and expiring October 1, 2020. This agreement will automatically renew for 48 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 3 months prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

16. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth above.

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA 71270

By: _____

Name: _John Hemphill_

Title: _Sales_

Date: _May 5th_, 2016

Avoyelles Parish Sheriff's Office
675 Government Street
Marksville, LA 71351

By: _____

Name: _Doug Anderson_

Title: _Sheriff_

Date: _May 5_, 2016

Customer initials: _____

CSG initials: _____

3



## FIRST AMENDMENT TO CONTRACT AND AGREEMENT

This FIRST AMENDMENT is effective as of the last date signed by either Party and amends and supplements that certain CONTRACT AND AGREEMENT ("Agreement") fully executed as of May 5, 2016, by and between Avoyelles Parish Sheriff's Office, located at 675 Government Street, Marksville, LA 71315 ("Customer") and Correct Solutions Group, LLC., located at 182 Bastille Lane, Ruston, Louisiana 71270 ("CSG").

WHEREAS, Customer desires and CSG agrees to amend the Agreement and provide inmate video visitation solutions ("Equipment").

WHEREAS, this FIRST AMENDMENT will become effective as of the date of the last signature by an authorized representative of each party ("Effective Date").

NOW, THEREFORE, as of the FIRST AMENDMENT Effective Date, the parties agree as follows:

    1.   CSG will provide equipment and services as listed in Attachment A.

All terms and conditions of the original Agreement not amended by this FIRST AMENDMENT remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this FIRST AMENDMENT as of the date of the last signature by an authorized representative of each party.

Correct Solutions, LLC.                     Avoyelles Parish Sheriff's Office
192 Bastille Lane, Suite 200                675 Government St.
Ruston, LA 71270                         Marksville, LA 71315

BY: _____          BY: _____

NAME: _John Hemphill_         NAME: _Doug Anderson_

TITLE: _Sales_                 TITLE: _Sheriff_

DATE: _8-22-17_               DATE: _8-14-17_

## ATTACHMENT A

## PROVIDED FEATURES

CSG will provide all current features of the inmate telephone system which include, but are not limited to, all investigative features, reporting, logging, scheduling of inmate phone calls.

In addition to the inmate phone system, CSG will provide:

### SmartKiosks and Secure Network

The SmartKiosk system and its entire supporting infrastructure are provided at no cost to Customer or inmate.
CSG will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

### Electronic Messaging

CSG will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. CSG is responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. CSG shall be entitled to all revenue derived from electronic messaging and photo delivery.

### Grievances, General and Medical Requests

CSG shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

### Law Library

CSG shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to Customer and inmates at no cost.  The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case.  Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

CSG will provide at no cost to Customer a fully functional remote video visitation system. CSG is exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. CSG shall be entitled to all revenue derived from remote video visitation system.

## MailGuard™ Patent Pending Postal Mail Elimination System

CSG shall provide MailGuard™, the patent pending postal mail elimination system exclusive to SmartKiosk.

CSG shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility.

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.


Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270


Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: ████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# COMPOSITE EXHIBIT C

### *to Amended Complaint*

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   City of Saint Louis, Missouri

City Justice Center – 200 South Tucker Boulevard, Saint Louis, Missouri 63102

Medium Security Institution – 7600 North Hall Street, Saint Louis, Missouri 63147

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided.  Customer shall determine which inmates have access to the SmartTablets.  The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment.  We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled.  We utilize a defense-in-depth strategy which employs many layers of security.  If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

8. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

9. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The

PMT

inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

10. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Distribution and Refurbishment Plan

11. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

12. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

13. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

14. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

15. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

16. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

17. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

18. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

19. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

20. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

21. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

22. Electronic Messaging. Each email message is billed at one credit ($0.50).

23. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

24. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

25. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

26. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

27. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

28. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

29. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

<u>Grievances, General and Medical Requests</u>

30. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

31. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

32. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

33. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

34. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

35. We will provide at no cost to Customer the labor for the installation of the video visitation system.

36. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

37. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

38. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

39. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

40. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

41. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

42. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

43. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

44. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

45. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

46. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

47. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

48.  Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

49. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

50. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

51. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

52. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

53. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

54.  MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

55. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

56.  Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

57. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

58. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

59. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

60. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with

electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

61. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

62. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11/7/17

Email: ▇▇▇@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11/13/17

Email: ▇▇▇@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Sebastian County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartTablet on a 1:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. Provider reserves the right to periodically evaluate and adjust the ratio based on usage and with agreement of Customer.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

6. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases can be permanently installed into a housing area (e.g. wall mounted) or can be provided as mobile carts to allow for bulk transportation of tablets as needed. Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

7. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

8. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

9. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

10. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

11. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

12. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

13. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

14. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

15. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

16. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

17. Electronic Messaging. Each email message is billed at one credit ($0.50).

18. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

19. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

20. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

21. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

22. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

23. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

24. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

25. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

26. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

27. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

28. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Customer Responsibilities

29. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

30. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

31. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

32. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

33. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

34. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: ████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Washington County, Arkansas - 1155 W Clydesdale Dr, Fayetteville, AR 72701

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

9. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

10. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

*PMT*

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

11. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

12. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

13. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

### Maintenance and Support Plan

14. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

15. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

16. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

17. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

18. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

19. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

20. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

21. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

22. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

23. Electronic Messaging. Each email message is billed at one credit ($0.50).

24. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

25. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

26. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

27. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

28. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

29. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

30. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

31. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

32. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

33. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

34. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11/7/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11/15/17

Email: ████@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   LaSalle Corrections-Bowie County Jail 105 W Front Street, Texarkana, TX, 75501

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided.  Customer shall determine which inmates have access to the SmartTablets.  The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment.  We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security.  If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

8. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

9. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

PmT

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

10. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Distribution and Refurbishment Plan

11. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

12. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

13. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

14. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

15. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

16. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

17. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

18. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

19. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

20. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

21. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

22. Electronic Messaging. Each email message is billed at one credit ($0.50).

23. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

24. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

25. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

26. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

27. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

28. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

29. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

30. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

31. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

32. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook.  The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

33. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case.  Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

34. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

35. We will provide at no cost to Customer the labor for the installation of the video visitation system.

36. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

37. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

38. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

39. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website.  The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

40. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

41. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

42. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

43. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

44. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

45. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

46. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

47. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

48. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

49. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

50. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

51. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

52. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

53. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

54. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

55. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

56. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

57. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

58. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

59. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

60. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with

electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

61. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

62. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11/7/17

Email: [REDACTED]@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11/15/17

Email: [REDACTED]@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Wayne County, Georgia – 1892 South Macon Street, Jesup, Georgia 31545

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize kiosks that are from assigned to their housing unit in designated classroom areas.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Maintenance and Support Plan

6. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each kiosk checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

7. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

8. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

9. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

10. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

11. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

12. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

13. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

14. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

15. Electronic Messaging. Each email message is billed at one credit ($0.50).

16. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

17. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

18. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

19. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

20. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

21. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

22. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

23. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

24. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

25. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

26. We shall provide access via the SmartKiosk to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

29. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

30. We will provide at no cost to Customer the labor for the installation of the video visitation system.

31. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

32. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

33. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation. Audio Files will be stored for 180 days and Video Files will be stored for 90 days.

34. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

35. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

36. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

37. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

38. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

39. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

40. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

41. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

42. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

43. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

44. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

45. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

46. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

47. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Kiosk Solutions™.

48. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

49. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

50. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

51. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

52. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

53. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

54. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

55. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

56. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

57. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 3/16/18

Email: ▮▮▮▮▮rrectsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 3/16/18

Email: ▮▮▮▮▮@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

  

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: Lamar County Jail - 201 Main St, Purvis, MS 39475

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Lamar County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

PmT

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

PMT

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

PMT

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

     **IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 10/28/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 10-25-17

Email: ████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: Moore County Jail - 58 Elm St S, Lynchburg, TN 37352

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Lamar County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Provider will provide five (5) housing unit kiosks and one (1) lobby kiosk for Video Visitation.

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

#### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

#### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

**Customer Responsibilties**

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

   **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 1/26/18

Email: ▮▮▮▮@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 1/29/2018

Email: ▮▮▮▮@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT D

### *to Amended Complaint*

**Mark Turner**
_____

From:               Mark Turner
Sent:               Monday, April 01, 2019 01:25 PM
To:                 Rick Ferguson
Subject:            Re: Tablets


We have to get Smart out first though don't we?
MT

?On 4/1/19, 12:12 PM, "Rick  Ferguson"  ████████ @lasallecorrections.com> wrote:

    FYI

    Rick Ferguson
    Correct Solutions Group
    www.correctsolutionsgroup.com
    www.lasallecorrections.com
    (903) ████████

    "Something Amazing is going to happen to You today"

    -----Original Message-----
    From: ████:@co.sebastian.ar.us < █████ @co.sebastian.ar.us>
    Sent: Monday, April 1, 2019 12:12 PM
    To: Rick Ferguson < ███████ @lasallecorrections.com>
    Subject: Tablets


    Good day,

    Happy Monday, Thank you for dinner and lunch last week.   I spoke with the
Sheriff and I have permission to move forward with the tablets.  At your
convenience we can start the process.

    Thanks again for all you do.

    William Dumas
    Jail Administrator
    Cell: ████████
    Office 479 ████████

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT E

### *to Amended Complaint*



Imagine a World with 100% Phone Revenue...
a Complete Inmate Technology Platform...
and Zero Expense...

## 100% phone commissions? How do we do it?

Simply put, we do not need your phone revenue to operate.
Other ITS providers, with lesser technology platforms, do need your phone revenue.

With our 10 years of expertise in electronic inmate communication, our technology is not just good, it is great.
The results: our usage is higher, and the maintenance is lower, creating a self-supporting electronic platform
that is unmatched by any other vendor in corrections. This means Smart Communications can **guarantee** the
return of phone revenue to your agency, sky rocketing your agency's phone revenue.

Smart Communications is dedicated to providing our clients with **more features**, **more intelligence**, and
**more revenue** than any other platform offered in corrections.

## Facts First

✓ Fastest growing company in corrections with **532.33%** growth per year

✓ 100% phone commission. Smart Communications returns all phone revenue to agency

✓ 2009 developed first two-way inmate electronic communications platform in corrections

✓ 2010 developed first electronic request system in corrections

✓ 2015 developed MailGuard® corrections first and only Patent Pending postal mail elimination system

✓ 2017 developed MailGuardLegal™ corrections first and only Patent Pending legal mail system

✓ 2018 acquired the first and longest running inmate calling platform in corrections est. 1986

✓ 2018 acquired the first VOIP inmate calling platform in corrections est. 2002

## Why Did We Get into the Phone Business?

Tired of the commission games and false technology promises made by current ITS providers? So are we!
Smart Communications enters the ITS industry to **end the games**

Smart Communications acquired the most proven inmate calling platform in corrections and is reinventing
**inmate communication**. As the true innovator in corrections technology, we don't need the phone revenue to
operate. Instead we pioneered new technology and generate new streams of revenue while
maximizing facility automation, security and revenue.

No other vendor can offer **100% phone revenue**, because no other vendor has technology that performs to the
level of Smart Communications technology package. The days of smoke and mirrors is over,
Smart Communications is the new leader in inmate communications.

Click Here to Request More Information

Corrections, Simplified
Copyright © 2018 by Smart Communications Holding, Inc.

Smart Communications | 10491 72nd Street, Seminole, FL 33777

5

Unsubscribe ████ @stlouis-mo.gov

Update Profile | About our service provider

Sent by ████████ @smartcommunications.us in collaboration with

**Constant Contact**

Try it free today

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT F

### *to Amended Complaint*

| From: | Rick Ferguson ▇▇▇@lasallecorrections.com] |
|-------|--------------------------------------------|
| Sent: | Friday, May 17, 2019 4:28 PM |
| To: | Mark Turner |
| Subject: | FW: Smart/Sebastian |

Hey Mark
Please draft a 30 day cure letter to Smart re extreme poor performance at Sebastian County AR, and
failure to meet expectations..... or however you want to put it.    They're last comment to me on
this matter was "we want them out"

See Capt Dumas email below.

Rick Ferguson
Correct Solutions Group
www.correctsolutionsgroup.com
www.lasallecorrections.com
(903) ▇▇▇

"Something Amazing is going to happen to You today"

-----Original Message-----
From: ▇▇▇@co.sebastian.ar.us ▇▇▇@co.sebastian.ar.us>
Sent: Monday, April 22, 2019 12:47 PM
To: Rick Ferguson <▇▇▇@lasallecorrections.com>
Subject: Re: Smart

Good day,

* Failed to install books, games,  (it's been almost a year)
* Failed to move to new platform for better performance ( same )
* Constant tablet failures and issues
* Poor service, unstable product (seldom is there a prompt call back)
* No increase on credits for revenue sharing The last update we had to ship over a 100 tablets
back Anything we have requested could not be done.
Anytime there was an issue they didnt send someone to fix it.  They would instruct us how to fix
it

If you need more I'm sure we can think of it.

Thank you for your time.

William Dumas
Jail Administrator
Cell: ▇▇▇
Office 479 ▇▇▇

1

Correct Solutions 00631

| | |
|---|---|
| From: | Rick Ferguson ████████@lasallecorrections.com] |
| Sent: | Monday, April 22, 2019 5:55 PM |
| To: | Mark Turner |
| Cc: | Rick Pruitt |
| Subject: | Fwd: Smart |

Sent from my iPhone

Begin forwarded message:

> **From:** <████████@co.sebastian.ar.us>
> **Date:** April 22, 2019 at 12:46:47 PM CDT
> **To:** Rick Ferguson ████████@lasallecorrections.com>
> **Subject: Re: Smart**
>
> Good day,
>
> Never put books or games
> Still waiting on the important update
> The last update we had to ship over a 100 tablets back
> Anything we have requested could not be done.
> Anytime there was an issue they didnt send someone to fix it.  They would
> instruct us how to fix it
>
> If you need more I'm sure we can think of it.
>
> Thank you for your time.
>
> William Dumas
> Jail Administrator
> Cell: ████████
> Office 479 ████████
>
>
> From:  "Rick Ferguson" <████████@lasallecorrections.com>
> To:    "████████co.sebastian.ar.us" <████████@co.sebastian.ar.us>
> Date:  04/22/2019 10:35 AM
> Subject:  Smart
>
>
> Hey Capt
> Please forward me bullets on smart issues, non functioning applications
> that were promised and anything else you need to add.
>
> I appreciate you very much

1

Correct Solutions 00406

Rick

Sent from my iPhone

2

Correct Solutions 00407

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT G

### *to Amended Complaint*

| From: | Rick Ferguson < ████ @lasallecorrections.com > |
|---|---|
| Sent: | Friday, May 17, 2019 5:54 PM |
| To: | Mark Turner |
| Subject: | Fwd: smart tablet system |

From Washington County AR

We can discuss this weekend

Sent from my iPhone

Begin forwarded message

> **From:** Alan Johnson < ████ @co.washington.ar.us>
> **Date:** May 17, 2019 at 4:55:52 PM CDT
> **To:** Rick Ferguson < ████ @lasallecorrections.com>
> **Subject: Re: smart tablet system**
>
> Made it home safe and really appreciate you Rick
>
> It has been one problem after another every since the beginning. They are always helpful on working on the problems but there is always problems
>
> Sent from my iPhone
>
> On May 17, 2019, at 3:32 PM, Rick Ferguson < ████ @lasallecorrections.com> wrote:
>
>> <image001.gif>
>> Hey Alan
>> I hope you made it back safe. I hobbled home yesterday afternoon 
>>
>> I'm getting a lot of calls from my SMART customers complaining about product, service, and overall performance. To the point where I might be replacing them... Soon. I have not heard from you but I wanted to follow up and see how you were being serviced by them
>>
>> I appreciate ya brother
>>
>> *Rick Ferguson*
>> *Correct Solutions Group*
>> *www.correctsolutionsgroup.com*
>> *www.lasallecorrections.com*
>> (903) ████
>>
>> *"Something Amazing is going to happen to You today"*

1

Correct Solutions Subpoena 0004

Correct Solutions 00553

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT H

### *to Amended Complaint*

**Mark Turner**

| | |
|---|---|
| **From:** | Rick  Ferguson |
| **Sent:** | Saturday, June 22, 2019 10:49 AM |
| **To:** | Mark Turner; Johnny Hemphill; Travis Sterling; Rick Ferguson; Steve Whitmill |
| **Cc:** | Rick Pruitt |
| **Subject:** | RE: Smart Communications |

I'm all for terminating the agreement especially since it was ST Louis that they
initially targeted.  However, I believe a very strategic plan with Tech Friends
is going to be necessary due to implications it may cause with the customers.
I.E. Bowie County with the AR DOC inmates, and the sheer size of Bowie and ST
Louis and Avoyelles.  Logistics will need to be addressed prior to the take out
and take over, however, it shouldn't take long to configure.   I feel we should
have a plan in place and brief the customer before the blade falls, because when
it does, the only panic taking place should be in Smart's conference room.

Rick Ferguson
Correct Solutions Group
www.correctsolutionsgroup.com
www.lasallecorrections.com
(903) ████████

"Something Amazing is going to happen to You today"

From: Mark Turner <████████@correctsolutionsgroup.com>
Sent: Friday, June 21, 2019 4:45 PM
To: Johnny Hemphill <████████@correctsolutionsgroup.com>; Travis Sterling
<████████correctsolutionsgroup.com>; Rick Ferguson
<█████████correctsolutionsgroup.com>; Steve Whitmill
<█████████correctsolutionsgroup.com>
Subject: Re: Smart Communications

Anyone have a problem with pulling the plug on all Smart devices on a set day?
We are proceeding with the discontinuance of our MSA and subjective Schedules as
a result of a breach of contract with regard to our NDA.  Smart reached out to
the City of St. Louis in an email showing where they are now in the phone
business and are offering 100% Commission.  Utilizing a contact CSG brought
them to in an effort to steal the business from CSG is a direct violation of the
NDA.  The NDA offers no "cure" period so I want to make the disconnect effective
immediately (upon Smart being served).  What negative ramifications do we
expect?  Know that we have TF lined up to come in but it can't all happen at
once.

Feedback?
MT

From: Johnny Hemphill <████████@correctsolutionsgroup.com>
Date: Thursday, May 16, 2019 at 4:34 PM
To: Mark Turner ████████@correctsolutionsgroup.com>
Cc: Travis Sterling ████████@correctsolutionsgroup.com>, Rick Ferguson
████████@correctsolutionsgroup.com>, Steve Whitmill
████████@correctsolutionsgroup.com>
Subject: Re: Smart Communications

Avoyelles Parish, Wayne County, Richland Parish,  Lamar County
Johnny Hemphill
Account Executive
Correct Solutions
318-████████-Cell
318-████████-Office
318-████████-Fax

"Knowledge Speaks. Wisdom Listens. Action Wins"

On May 16, 2019, at 4:11 PM, Mark Turner <████████@correctsolutionsgroup.com>
wrote:
Guys,
I'm collecting data on Smart Communications.  Please respond with the sites where
we are engaged together.  I could find them but would have to look at ever
folder and this easier.

Thanks
MT

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT I

### *to Amended Complaint*

## MASTER SERVICES AND SUPPLY AGREEMENT

This Master Services and Supply Agreement ("Agreement") is made and entered into as of the Effective Date by and between TECH FRIENDS, INC., an Arkansas corporation ("Tech Friends"), and CORRECT SOLUTIONS, LLC, a Louisiana limited liability company, for itself and its Affiliates ("Correct Solutions").

## RECITALS

A.      Tech Friends is engaged in the business of, among other things, providing Services, Software and Hardware, each as more fully described on Exhibit A to this Agreement attached hereto an incorporated herein by this reference, for use in Corrections Agency facilities throughout the United States.

B.      Correct Solutions is engaged in the business of, among other things, providing inmate telephone (doing business as Correct Solutions Group), commissary (doing business as Correct Commissary), and deposit services (doing business as Regent Pay) services to Corrections Agencies throughout the United States, as well as corrections facility management services through its Affiliate LaSalle Management Company, LLC.

C.      Correct Solutions now desires to offer and provide Tech Friends Products to its current and future Corrections Agency customers, and Tech Friends desires to so provide its Products as a subcontractor to Correct Solutions, on the terms and conditions stated in this Agreement.

**NOW THEREFORE**, in consideration of the foregoing premises, the mutual covenants and undertakings contained in this Agreement, and other good and valuable consideration, the Parties agree as follows:

1.      <u>Definitions</u>.  The following terms and corresponding definitions apply in this Agreement:

      a.      *ACH.* Automated Clearing House.

      b.      *ADP.* Average daily population.

      c.      *Affiliate(s).*  Any person or entity directly or indirectly controlling, controlled by, or under common control with a Party, with "control" meaning a Controlling Interest or the power to otherwise direct the affairs of the applicable entity.  LaSalle Management Company, LLC, is an Affiliate of Correct Solutions.

      d.      *Authorized Users.*  The employees, agents and independent contractors of Correct Solutions who are authorized by Correct Solutions to use the Services or Software as the case may be, and the third party Corrections Agencies who have entered into Prime Contracts with Correct Solutions for the Services or Software.  The term "Authorized Users" also includes the

third party inmates who are housed in facilities operated by a Customer, and the inmates' friends and family members who are end users of certain Services or Software.

        e.    *Controlling Interest*.  Over 50% of the voting equity interests of the applicable entity.

        f.    *Corrections Agency*.  The authorized operator of a public or private jail, prison, or other place for the government-sponsored incarceration, holding or detention of individuals.  The term "Corrections Agency" includes, without limitation, Correct Solutions' Affiliate LaSalle Management Company, LLC.

        g.    *Customer*.  A Corrections Agency that has a Prime Contract with Correct Solutions.

        h.    *Discloser*.  The Party disclosing Proprietary Information to a Recipient.

        i.    *Documentation*.  The documentation made available by Tech Friends for use by Correct Solutions in hard copy or electronic format which sets out a description of the Services or Software and the user instructions for the Services or Software, as applicable.

        j.    *Effective Date*.  June 1, 2019.

        k.    *Existing Accounts*.  Accounts where, as of the Effective Date, Correct Solutions was already providing one or more Tech Friends Products pursuant to the following contracts previously executed by and between the Parties:  (i) that certain Subcontractor Services Agreement dated as of June 1, 2018, pertaining to the Tulsa County, Oklahoma, Sheriff's Office and (ii) that certain Subcontractor Services Agreement dated as of October 1, 2018, pertaining to the Franklin Parish, Louisiana, Sheriff's Office.

        l.    *Extended Term*.  A period of time continuing for the longer of:

        i.    The period of time commencing on the closing date of a sale of a Controlling Interest under Paragraph 9.b, below, and continuing for a period of five years thereafter with no right of renewal; or

        ii.    The longest term of any Prime Contract existing as of the closing date of a sale of a Controlling Interest under Paragraph 9.b., below, including all renewals, modifications, amendments or extensions thereof.

        m.    *Gross Revenue*. The total gross revenue generated by all user fees paid for the applicable Service or Software application in the immediately preceding calendar month.

        n.    *Hardware*.  The hardware that may be provided by Tech Friends pursuant to this Agreement, as more fully described on Exhibit A, attached hereto and incorporated herein by this reference.

Correct Solutions 00697

      o.     *IVR.* An Interactive Voice Response system, as more fully described on Exhibit A, which may be provided as a Service by Tech Friends to Correct Solutions under this Agreement.

      p.     *Legacy Accounts.* Certain accounts where, as of the Effective Date, Correct Solutions was providing deposit services under its own name or doing business as Regent Pay at facilities managed by Correct Solutions' Affiliate LaSalle Management Company, LLC. These accounts are identified on Exhibit B, attached hereto and incorporated herein by this reference.

      q.     *Net Revenue.* The Gross Revenue received and retained by Tech Friends for all user fees paid for the applicable Service or Software application, less the Service Fee (if applicable), chargebacks, credits, refunds, sales tax (if any) and other similar pass-through taxes or fees assessed by a government entity in connection with the transactions that gave rise to Gross Revenue.

      r.     *New Accounts.* Accounts for which the Prime Contract was entered into on or after the Effective Date.

      s.     *Party or Parties.* Tech Friends and Correct Solutions are sometimes each referred to in this Agreement as a "Party" and, collectively, as the "Parties."

      t.     *PIPM.* Per inmate per month, calculated based upon the ADP of inmates housed in all of the applicable Customer's facilities combined during a given month.

      u.     *Prime Contract.* A contract entered into by and between Correct Solutions as the prime contractor and a Corrections Agency, for which Tech Friends is a subcontractor to Correct Solutions pursuant to this Agreement. The term "Prime Contract" includes but is not limited to any contract entered into by Correct Solutions with a Corrections Agency, at any time, for a Legacy Account but not for an Existing Account.

      v.     *Procurement.* A procurement for goods and/or services (i) made under a public or private purchasing mechanism such as an Invitation to Bid, Request for Proposals or similar document issued by or on behalf of a Corrections Agency or (ii) to meet the needs of a Customer arising after the Effective Date.

      w.     *Proposal.* A bid, proposal or other similar offer submitted by Correct Solutions in response to a Procurement.

      x.     *Proprietary Information.* Any trade secret or other information that is not generally available to the public and that is either (i) conspicuously marked or otherwise expressly identified as confidential or proprietary when received by the Recipient or (ii) of a kind or nature, or is transmitted or communicated under such circumstances, as would cause a reasonable person to believe that the information is Proprietary Information of the Discloser. The Parties acknowledge that Proprietary Information may be disclosed in written or other tangible form (including on magnetic media) or by oral, visual or other means. Notwithstanding the foregoing, Proprietary Information does not include Information that (w) is already known to the Recipient without restriction when received, or thereafter is developed independently by the Recipient

Correct Solutions 00698

without the use of the Proprietary Information; (x) was obtained by Recipient from a source other than the Discloser through no breach of this Agreement by the Recipient; (y) was in the public domain when received, or thereafter enters the public domain through no fault of the Recipient; or (z) was disclosed by the Discloser to a third party without restriction.

    y. *Products*.  The Services, Software and/or Hardware that may be provided by Tech Friends under this Agreement, each as more fully described on Exhibit A.

    z. *Recipient*.  The Party who receives Proprietary Information from a Discloser.

    aa. *Service Fee*.  Ten percent (10%) of the Gross Revenue generated by the user fees that are included in Gross Revenue.

    bb. *Services*.  The Back-up Recovery, Deposit (aka Money Transfer) and Payment, IVR, Reconciliation Support, Remote Access, Tablet Rental, and Web Pack services, as more fully described on Exhibit A, which may be provided by Tech Friends to Correct Solutions pursuant to this Agreement.

    cc. *Software*.  The cloud-based or downloadable software, as more fully described on Exhibit A, which may be provided by Tech Friends to Correct Solutions pursuant to this Agreement.

    dd. *Tablet(s)*.  A mobile computing device with Internet access capability, and related accessories such as charging stations and secure routers, supplied by Tech Friends under this Agreement for use by inmates housed in Corrections Agency facilities, as more fully described on Exhibit A.

    ee. *Term*.  The period of time commencing on the Effective Date and continuing for one year with successive, automatic one-year renewals, until terminated pursuant to Paragraph 9, below.

    ff. *Termination Date*.  The date upon which this Agreement terminates, for any reason.

    gg. *Virus*.  Any thing or device (including without limitation any software, code, file or program) which may prevent, impair or otherwise adversely affect (i) the operation of any computer software, hardware or network, any telecommunications service, equipment or network, or any other service or device; (ii) access to the operation of any program or data, including the reliability of any program or data (whether by re-arranging, altering or erasing the program or data in whole or in part or otherwise); or (iii) the user experience, including worms, Trojan horses, and other similar things or devices.

4

Correct Solutions 00699

2.    Proposals.

a.    *Procurements.*  Correct Solutions may from time to time identify an opportunity to submit a Proposal for goods and/or services that includes one or more of the Tech Friends Products.  Upon identifying a Procurement opportunity, Correct Solutions shall advise Tech Friends in writing (which may be an email) of the Procurement, specify the required Products, and provide such other supporting information and materials as Tech Friends reasonably requests. Tech Friends shall have five business days after receiving the requested materials to advise Correct Solutions orally or in writing (which may be an email) whether it will participate with Correct Solutions in the Procurement.  If Tech Friends does not respond to Correct Solutions within five business days, then Correct Solutions may team with another provider for all purposes related to that Procurement.

b.    *Proposal Preparation.*  If Tech Friends agrees that Correct Solutions may offer Tech Friends Products for a given Procurement, then Correct Solutions shall prepare and submit a Proposal to the Corrections Agency in response to the Procurement.  Correct Solutions shall be identified in the Proposal as the proposed prime contractor; Tech Friends shall be identified in the Proposal as a subcontractor to Correct Solutions.

c.    *Proposal Support.*  Tech Friends shall provide Correct Solutions with reasonable information, materials, and assistance for the development, preparation and submission of any Proposal(s), including but not limited to any best and final offer(s).  Except as otherwise set forth herein, Correct Solutions shall have responsibility for the content of any Proposal(s) and Correct Solutions shall determine all aspects of each Proposal, including but not limited to the manner and mode of meeting the substantive requirements of the Procurement opportunity, the manner of preparing the Proposal, and the terms and conditions Correct Solutions will propose to the Corrections Agency as the prime contractor provided that such terms and conditions are consistent with, and would not create a breach of, this Agreement.  Notwithstanding the foregoing, Correct Solutions shall at all times present Tech Friends and the Products in a favorable, fair and accurate manner, and shall not change any substantive information provided by Tech Friends for inclusion in a Proposal, including without limitation about the Products, pricing, their performance or their use, without Tech Friends' prior written approval.

d.    *Meetings.*  Upon request by Correct Solutions, Tech Friends may, but is not required, to make its management and technical personnel reasonably available to participate in and/or attend any presentations, discussions and negotiations with a Corrections Agency concerning a Proposal or the award of a prime contract to Correct Solutions.  Payment of Tech Friends' expenses to attend such meetings shall be mutually agreed upon on a case-by-case basis.

e.    *Cost of Procurements.*  Each Party shall be responsible for and bear the cost of its own efforts in the preparation and support of its portion of any Proposal.

f.    *Obligation to Team.*  Each Party may, in its sole discretion, choose not to participate in a particular Procurement with the other Party.  Whenever the Parties are not teaming with one another on a given Procurement, either Party may, in its sole discretion, choose to submit its own independent proposal in connection with that Procurement or submit a proposal with

5

another person or entity, provided that submitting such Proposal does not otherwise violate the terms of this Agreement. Contracts (including without limitation contracts existing as of the Effective Date) entered into at any point in time by one Party independent of the other Party, or without the other Party's goods or services, shall not be considered part of or subject to this Agreement for any purpose, including without limitation for the purpose of calculating or remitting fees or revenue shares due under this Agreement.

      3.     Rights and Obligations. The rights and obligations of the Parties with respect to each Prime Contract shall be governed by the provisions of Exhibit C, attached hereto and incorporated into this Agreement by this reference. The rights and obligation of the Parties with respect to the terms of sale for Hardware by Tech Friends to Correct Solutions for a particular Prime Contract shall be governed by the provisions of Exhibit D, attached hereto and incorporated into this Agreement by this reference.

      4.     Development Restrictions. Correct Solutions agrees that it shall not develop its own tablet product or work with a third party, directly or indirectly, to develop a tablet product for use in Corrections Agency facilities, during the Term or any Extended Term.

      5.     Independent Contractors. This Agreement is not intended to constitute, create, effect or otherwise establish a joint venture, partnership, principal-agent, or any other relationship of any kind, other than that of independent contractors, and the rights and obligations of the Parties shall be only those expressly set forth in this Agreement. Neither Party is, by virtue of this Agreement, authorized as an agent, employee or legal representative of the other, and neither Party shall have the power to bind or commit the other except as specifically set forth in this Agreement. At all times, Correct Solutions and Tech Friends shall each be responsible for its own employees and operations. Except as otherwise set forth herein, neither Party assumes responsibility to the other for costs, expenses, risks and liabilities arising out of the efforts of the other Party under this Agreement or under a Prime Contract.

      6.     Subcontractors. Tech Friends is authorized to engage the services of any third party person or entity as it reasonably determines are necessary to aid or assist in the performance of its obligations under this Agreement.

      7.     Proprietary Information. If in the course of performing this Agreement either Party or its Affiliate discloses its proprietary or confidential information to the other Party or its Affiliate, such disclosure shall be governed by the following provisions.

           a.     *Use of Proprietary Information.* Proprietary Information shall be used by the Recipient only in the performance of this Agreement and shall not be disclosed to any third party, person or entity or used for any other purpose other than those contemplated by this Agreement, without the prior written consent of the Discloser.

           b.     *Protection of Proprietary Information.* The Recipient will protect Proprietary Information of the Discloser against any unauthorized use or disclosure to the same extent that the Recipient protects its own information of a similar nature against unauthorized use or disclosure, but in no event with less than reasonable care.

Correct Solutions 00701

c.      *Return of Proprietary Information.*  Upon expiration or termination of this Agreement, each Party shall cease use of Proprietary Information received from the other Party and shall at the Discloser's option: (i) destroy all such Proprietary Information, including copies thereof, then in its possession or control, promptly furnishing the Discloser with written certification of such destruction or (ii) return all such Proprietary information and copies to the Discloser.  The rights and obligations of the Parties under this Paragraph 7 shall survive any such return or destruction of Proprietary Information.

d.      *Breach.*  The Parties agree that, in the event of a breach or threatened breach of the terms of this Paragraph 7, the Discloser shall be entitled to seek an injunction or other equitable relief prohibiting any such breach, without the necessity of posting a bond or demonstrating monetary harm.  Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of money damages.  The Parties acknowledge that Proprietary Information is valuable and unique and that its unauthorized use or disclosure in breach of this Paragraph 7 would result in irreparable injury to the Discloser.

e.      *Ownership of Proprietary Information.*  All Proprietary Information disclosed in connection with this Agreement shall remain the property of the Discloser.  Nothing contained in this Agreement, nor any disclosure hereunder, shall be construed as a grant or establishment of any right or license, express or implied, under any patent, copyright or other proprietary right of the Discloser.

8.      <u>Indemnification</u>.  Each Party shall be solely responsible for all liability arising out of its own acts or omissions.  Each Party shall indemnify, defend and hold harmless the other from all demands, damages, liabilities, fines, costs and expenses (including reasonable attorney's fees), judgments, settlements, and penalties of every kind arising out of or related to its performance or non-performance in connection with this Agreement or (in Correct Solutions' case) any Prime Contract, including, without limitation, damages for personal injury or death or loss or damage to property due, or claimed to be due, to the gross negligence or willful misconduct of the indemnifying Party.  The indemnified Party may elect to participate in the defense of any suit, claim, or demand by employing attorneys at its own expense, without waiving the other Party's obligations to indemnify, defend, or hold harmless.

9.      <u>Term and Termination</u>.

a.      *Term.*  Unless otherwise terminated as provided for in Paragraph 9.c, this Agreement shall be in full force and effect for: (i) the Term unless either Party terminates the Agreement by giving written notice of termination to the other Party at least sixty (60) days in advance of each one-year anniversary date of the Effective Date or (ii) the Extended Term, if applicable by operation of Paragraph 9.b, below.  Notwithstanding the foregoing, if either Party terminates this Agreement during the Term then this Agreement shall nevertheless remain in effect as to each Prime Contract existing of the Termination Date and continue as to each Prime Contract for its duration, including all renewals, modifications, amendments or extensions thereof.

Correct Solutions 00702

b.   *Extended Term Upon Sale*.  If at any time during the Term Tech Friends (or any equity owner(s) thereof) sells a Controlling Interest in itself to a third party (regardless of the form of the transaction) then the Term of this Agreement shall be automatically converted to the Extended Term, commencing on the closing date of the sale; provided, however, that sales of a Controlling Interest made to one or more Tech Friends' employees, to an Affiliate, and/or to the spouse or child of an Affiliate, singly or combined, shall be exempt from the provisions and operation of this Paragraph 9.b for all purposes and, accordingly, shall not effect an extension or conversion of the Term.

c.   *Termination of Agreement*.  A Party may immediately terminate this Agreement for cause by providing written notice to the other Party at any time after the occurrence of any of the following events:  (a) for material breach and failure of the breaching party to cure such breach within thirty (30) days after receiving written notice of such breach from the non-breaching party;  (b) the taking of control or possession of some or all of the assets of a Party by any governmental authority; (c) the dissolution, liquidation (partially or wholly) of a Party; (d) in the event that a Party knowingly makes a false representation to the other Party and that representation is relied upon by the other Party in entering into or continuing to perform under this Agreement; or (e) in the event of any of the following:  a Party (i) becomes insolvent and is unable to pay its obligations as they become due (ii) suffers or permits the appointment of a receiver for its business or assets (iii) becomes subject to any proceeding under the federal bankruptcy laws or any statute of any state relating to insolvency or the protection of the rights of creditors, which appointment or proceeding is not dismissed within ninety (90) days or (iv) makes a general assignment for the benefit of creditors, or avails itself of any proceeding under the federal bankruptcy laws or any statute of any state relating to insolvency or the protections of the rights of creditors.

d.   *Rights and Obligations on Termination*.  Upon termination of this Agreement in whole, or termination services for a Prime Contract, for any reason, Tech Friends may on the termination date stop providing Services to, and disconnect and remove Hardware and Software from, Correct Solutions or the affected Customer(s) as applicable. Tech Friends' costs of termination shall be its sole responsibility if the termination is for any reason other than Correct Solutions' default. Upon termination of the Agreement or a Prime Contract for Correct Solutions' default, in addition to any other rights or remedies Tech Friends may have, Correct Solutions shall, within ten (10) days' written demand for payment, reimburse Tech Friends for its costs (including without limitation employee and contractor work hours) of terminating access to the Services and disconnecting and removing the Hardware and Software. In either event and at all times, Correct Solutions shall provide, and as applicable shall work with each affected Customer to provide, safe access to Correct Solutions' premises and to each Customer facility for Tech Friends' disconnection of the Software from hardware or other equipment, and disconnection and removal of Hardware, if and as needed.  Correct Solutions agrees to cooperate, and not to interfere, with Tech Friends' termination of Services and disconnection and removal of the Hardware and Software.

10.   Limitation of Liability.  WITH THE EXCEPTION OF A BREACH OF PARAGRAPH 7 AND INDEMNITY OBLIGATIONS UNDER PARAGRAPH 8, ABOVE, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INDIRECT, SPECIAL OR

Correct Solutions 00703

CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOST PROFITS) ARISING OUT OF THIS AGREEMENT OR THE FURNISHING, FUNCTIONING, USE, DISTRIBUTION OR MARKETING OF THE PRODUCTS OR ANY RELATED ITEM OR OTHER SERVICE PROVIDED BY TECH FRIENDS OR CORRECT SOLUTIONS.

11.    Notices.  Except as otherwise provided herein, all notices to be given pursuant to this Agreement shall be personally delivered, delivered by certified mail (return receipt requested), or delivered by a nationally recognized overnight express delivery service (such as Federal Express), to the pertinent address set forth below.  Notices shall be deemed given as of the later of the date of actual receipt for personal delivery or delivery by certified mail or as of the next business day after the date of sending for delivery by overnight courier.

*If to Tech Friends*:

Tech Friends, Inc.
2225 E. Highland Drive
Jonesboro, AR 72401
Attn:  Bob Shipman, President

*With a copy to*:

Tech Friends, Inc.
PO Box 16480
Jonesboro, Arkansas 72403
Attn:  Bob Shipman, President

*If to Correct Solutions*:

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA  71270
Attn:  Patrick Temple, Managing Member

Either Party may change its address or addressee at any time, by written notice to the other Party given in accordance with this provision.

12.    Assignment.  Neither Party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  No assignment, with or without such consent, will relieve any Party from its obligations under this Agreement. Subject to the foregoing, this Agreement shall bind and inure to the benefit of the respective principals, Affiliates, successors, heirs and permitted assigns of the Parties.

13.    Compliance with Laws.  Correct Solutions and Tech Friends shall each comply with applicable federal, state and local laws and regulations and will each retain sole responsibility for its own compliance with all applicable federal, state and local laws and regulations.

14.    Force Majeure.  Either Party may be excused from performance under this Agreement to the extent that its performance is prevented by any act of God, war, civil disturbance, terrorism, strikes, riots, failure of a third party's performance outside of the Party's control, failure,

9

Correct Solutions 00704

fluctuation or non-availability of electrical power, heat, light, air conditioning or telecommunications equipment, other equipment failure or similar event beyond its reasonable control; provided, however, that the affected Party shall use reasonable efforts to remove such causes of non-performance.

15.    Uncontrollable Circumstances.  The Parties reserve the right to renegotiate or terminate this Agreement in whole, or in part as to one or more Prime Contracts, upon sixty (60) days advance written notice if circumstances outside a Party's control related to a Prime Contract (including, without limitation, changes in services, fees, rates, regulations, or operations mandated by law; material reduction in inmate population or capacity; material changes in Corrections Agency policy or economic conditions; or acts of God) materially and negatively impact that Party's business; however, neither Party shall unreasonably exercise such right.  Further, the Parties acknowledges that their respective provision of equipment or services is subject to certain federal, state, or local regulatory requirements and restrictions that are subject to change from time to time, and nothing contained herein to the contrary shall restrict either Party from taking any steps reasonably necessary to perform in compliance with applicable laws, rules and regulations, or, notwithstanding any other provision of this Agreement, constitute a breach of this Agreement if a Party must unilaterally alter its fees, equipment, software or services so as to comply with such federal, state or local requirements and restrictions.

16.    No Third-Party Beneficiaries. This Agreement is for the benefit of, and will be enforceable by, the Parties only. This Agreement is not intended to confer any right or benefit on any third party, including without limitation any Corrections Agency or third party Authorized User. No action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

17.    Authority.  The signatories executing this Agreement each represent that they have the full right, capacity and authority to enter into this Agreement on behalf of their respective Parties and Affiliates.  Each Party represents and warrants that it has the full right and authority to enter into and perform this Agreement and, furthermore, that such performance shall not constitute a breach of, or otherwise unlawfully interfere with, any contract that the Party has with a Corrections Agency or other third party.

18.    Entire Agreement.  This Agreement supersedes and replaces all prior discussions and agreements by and between Tech Friends, or any of its officers, directors, shareholders, employees, Affiliates, attorneys and/or agents, and Correct Solutions, or any of its officers, directors, members, Affiliates, employees, attorneys and/or agents, with respect to any and all matters relating to the hardware, software or services contemplated herein.  This Agreement constitutes the sole and entire agreement between the Parties as to its subject matter. Notwithstanding anything to the contrary in this Agreement, this Agreement does not supersede or replace the following Existing Account contracts executed by and between the Parties: (i) that certain Subcontractor Services Agreement dated as of June 1, 2018 pertaining to the Tulsa County, Oklahoma, Sheriff's Office and (ii) that certain Subcontractor Services Agreement dated as of October 1, 2018, pertaining to the Franklin Parish, Louisiana, Sheriff's Office.  The terms and conditions of the Parties' rights and obligations as to each Existing Account shall be governed

Correct Solutions 00705

solely by the respective contract previously executed as to that Existing Account and not by this Agreement.

19.    Amendment and Waiver.  This Agreement cannot be amended or modified except by the mutual written agreement of the Parties to it.  The failure of either Party to insist upon or enforce strict performance by the other of any provision of this Agreement, or to exercise any right or remedy under this Agreement, will not be interpreted or construed as a waiver or relinquishment to any extent of that Party's right to assert or rely upon any such provision, right or remedy in that or any other instance; rather, the same will be and remain in full force and effect.

20.    Headings.  The headings preceding each of the sections, paragraphs, or sub-paragraphs in this Agreement are for convenience only and shall not be considered in the construction or interpretation of this Agreement.

21.    Applicable Law.  This Agreement, including all matters relating to the validity, construction, performance, and enforcement of it, shall be governed by the laws of the State of Arkansas without regard to its choice of law provisions.

22.    Severability.  If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality, or enforceability of the remaining provisions shall be in no way be affected or impaired thereby, shall remain in full force and effect, and shall be interpreted to the greatest extent possible to maximize the Parties' original intent.

23.    Execution.  For purposes of execution of this Agreement, the Parties agree that original signatures copied and transmitted electronically shall have the same force and effect as original signatures.  This Agreement may be executed in counterparts, and when each Party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and, when taken together with the other executed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to both Parties.

Correct Solutions 00706

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be signed as of the Effective Date.

"TECH FRIENDS"                                        "Correct Solutions"

TECH FRIENDS, INC.                                CORRECT SOLUTIONS, LLC


By: _____        By: _____
Name:  Bob Shipman                              Name:  Patrick Temple
Title:  President                                       Title:  Managing Member

12

Correct Solutions 00707

## EXHIBIT A

### PRODUCTS

#### SERVICES:

- **Back-up Recovery**
  - Assistance in recovering and rebuilding information in the case of data loss due to disruption of systems located onsite at Customer or Correct Solutions facilities

- **Deposit (aka Money Transfer) and Payment Services**
  - Debit phone time transfer from bank/trust account by inmate
  - Cash, credit or debit card deposits into inmate bank/trust account through lobby kiosk
  - Bond/fine/fee/debt payments

- **IVR**
  - Commissary ordering
  - Inmate information
  - Debit phone time purchase
  - Phone attendant (for inmate friends and family members – provides bonding and incarceration information)

- **Reconciliation Support**
  - Assistance with reconciliation of outstanding items and issues in existing Customer bank account upon implementation of Lockdown Resident Inmate Banking System

- **Remote Access**
  - Allows remote access from designated location(s) to computers in the field for technical support

- **Tablet Rentals**

- **Web Packs**
  - Sale through Tech Friends' website of pre-packaged commissary gift packs assembled, stored and delivered by Correct Solutions

A-1

**SOFTWARE:**

- **Provided either**:
  - Cloud-based as a service; Tech Friends hosts the underlying software and users access Software applications through a link to Tech Friend's website; or
  - In executable code only with Software downloaded to local server(s) owned or controlled by Correct Solutions, the Corrections Agency, or a third party commissary provider

- **Applications/Functionality:**
  - Lockdown™ Resident Banking System
  - Lockdown™ Warehouse Software
  - Electronic mail
  - Digital, character-based communication (such as texting)
  - Video visitation
  - Link to Correct Solutions' inmate calling application
  - Debit phone time transfer by inmate
  - Family purchase of debit or pre-paid phone time
  - Grievances
  - Law library
  - Medical scheduling
  - Information
  - Entertainment – Tablets only (such as games and e-books)
  - Internet access

**HARDWARE:**

- Titan™ inmate kiosk
- JailATM™ lobby kiosk
- Booking/intake kiosk
- Tablets (any screen size; handheld, wall mounted, or capable of being, or is, mounted into a kiosk)
  - Accessories
    - Tablet charging stations
    - Secure routers
    - Other hardware supporting Tablet implementation and use

From time to time during the Term, Tech Friends may develop and offer to Correct Solutions new or modified Services, Software or Hardware in its sole and absolute discretion. Any such new or modified Services, Software or Hardware shall be deemed added to this Exhibit A without the need for a formal amendment to the Agreement unless such new or modified Services, Software or Hardware will materially affect the fees or revenue shares paid under Exhibit C, Paragraphs 11 or 12.

Correct Solutions 00709

## EXHIBIT B

## LEGACY ACCOUNTS
### (by facility)

| Facility Description | City | State |
|---|---|---|
| Bowie County Correctional Center | Texarkana | AR |
| Catahoula Correctional Center | Harrisonburg | LA |
| Crawford County Jail | Van Buren | AR |
| Comal County Jail | New Braunfels | TX |
| Independence County | Batesville | AR |
| Irwin County Detention Center | Ocilla | GA |
| Jackson Parish Correctional Center | Jonesboro | LA |
| LaSalle Correctional Center | Olla | LA |
| Limestone County Detention Center | Groesbeck | TX |
| Little River County | Ashdown | AR |
| IAH Secure Adult Detention Center | Livingston | TX |
| Madison Parish Detention Center Men/JV3/JV4 | Tallulah | LA |
| Madison Parish Women Detention Center | Tallulah | LA |
| Moore County Jail | Dumas | TX |
| Morgan City Jail | Morgan City | LA |
| Miller County Jail | Texarkana | AR |
| Ouachita Correctional Center | Richwood | LA |
| Poinsett County Jail | Harrisburg | AR |
| Pope County Jail | Russellville | AR |
| Prairieland Detention Center | Alvarado | TX |
| Pulaski County Jail | Little Rock | AR |
| Richwood Correctional Center | Monroe | LA |
| River Correctional Center | Ferriday | LA |
| Rolling Plains Regional Jail | Haskell | TX |
| San Luis Regional Detention Center | San Luis | AZ |
| Sebastian County Jail | Fort Smith | AR |
| St Louis City Justice Center | St. Louis | MO |
| Taylor County Jail | Abilene | TX |
| Tensas Parish Detention Center | Waterproof | LA |
| Van Zandt County Detention Center | Canton | TX |
| Jack Harwell Detention Center | Waco | TX |
| West Texas Detention Facility | Sierra Blanca | TX |
| Williamson County | Georgetown | TX |
| Winn Correctional Center | Winnfield | LA |
| Wise County Jail | Decatur | TX |

## EXHIBIT C

### RIGHTS AND OBLIGATIONS OF THE PARTIES
### WITH RESPECT TO A PRIME CONTRACT

1.    <u>Service Request</u>.  Upon execution of a Prime Contract, Correct Solutions shall submit a service request for the installation and/or implementation of the Products to be supplied by Tech Friends, as Correct Solutions subcontractor, in connection with the Prime Contract.  The service request shall be submitted through Tech Friends' online customer service portal.  If Tech Friends does not agree to the terms of any service request, the Parties promptly shall cooperate to arrive at mutually agreeable terms.  Tech Friends shall be under no obligation to provide Products if Correct Solutions fails to submit an acceptable service request.

2.    <u>Exclusivity</u>.  Correct Solutions grants to Tech Friends the exclusive right during the Term and any Extended Term to provide, maintain, operate and manage the designated Services and Software, and provide the chosen Hardware, required of or offered by Correct Solutions under the Prime Contract, for the duration of the Prime Contract including all renewals, modifications, amendments and extensions of it. Subject to the terms of this Agreement, Tech Friends agrees during the Term or Extended Term to provide, maintain, operate and manage the Services and Software, and to supply Hardware, consistent with the terms of this Agreement. In the event that there is a conflict between the terms of this Agreement and those of any other document created with respect to the provision of Products, the terms of this Agreement shall prevail.

3.    <u>Grant of Rights</u>.

a.    *Subscription to Services*.  As to all Customers for whom Software is made available to Authorized Users on a cloud basis by accessing a Tech Friends' website through an Internet connection, Tech Friends grants to Correct Solutions a revocable, non-exclusive, non-transferable, limited right to use, and to permit Authorized Users to use, the applicable Software and Documentation under a Prime Contract during, as the case may be, the Term or the Extended Term solely for Correct Solutions and the Corrections Agency's internal business operations and, as applicable, the Authorized Users' personal use, consistent with the terms and conditions of this Agreement; <u>provided, however</u>, that in no event may any use exceed the scope of the rights granted herein and all Prime Contracts and terms of use must contain the same restrictions as contained herein.

b.    *License for Software*.  As to all Customers for whom a copy of Software is installed on a local server(s) located at the premises and/or under the control of a Corrections Agency or Correct Solutions, Tech Friends grants to Correct Solutions a revocable, non-exclusive, non-transferable, limited license to distribute and use, and to sublicense each Customer to use under a Prime Contract, the applicable Software, in executable code only, and Documentation for, as the case may be, the Term or the Extended Term, solely for Correct Solutions and the Customer's internal business operations and, as applicable, the Authorized Users' personal use consistent with the terms and conditions of this Agreement; <u>provided, however</u>, that in no event

Correct Solutions 00711

may any sublicense exceed the scope of the license herein and all sublicenses must contain the same restrictions as contained herein.

4.   Right to Modify.  Tech Friends reserves the right to substantially modify or remove all of any portion of the Services or Software at any time upon written notice given to Correct Solutions for the purpose of eliminating features, designs or code that infringe or may infringe any third party's proprietary rights.  Any such action will not constitute a breach of this Agreement.

5.   Warranties and Disclaimer.

a.   *Hardware*.  ALL HARDWARE IS SOLD OR SUPPLIED "AS-IS," EXCEPT FOR SUCH HARDWARE THAT MAY BE SUBJECT TO A THIRD PARTY MANUFACTURER WARRANTY.   TECH FRIENDS SHALL PASS THROUGH TO CORRECT SOLUTIONS ANY APPLICABLE THIRD PARTY HARDWARE WARRANTY KNOWN TO TECH FRIENDS AS ALLOWED BY LAW AND THE TERMS OF THE THIRD PARTY WARRANTY. TECH FRIENDS ITSELF DOES NOT MAKE ANY WARRANTY AS TO ANY HARDWARE'S USE, PERFORMANCE OR RESULTS OBTAINED BY USING THE HARDWARE.  TECH FRIENDS ITSELF MAKES NO WARRANTIES, CONDITIONS, GUARANTEES OR REPRESENTATIONS WHATSOEVER (EXPRESS OR IMPLIED, WHETHER BY STATUE, COMMON LAW, CUSTOM, USAGE OR OTHERWISE) AS TO ANY MATTER INCLUDING, WITHOUT LIMITATION, FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, DURABILITY, TITLE, ACCURACY, NON-INFRINGEMENT, INTEGRATION, OR SATISFACTORY QUALITY.  TECH FRIENDS ITSELF MAKES NO WARRANTY AS TO HARDWARE SUPPLIED BY CORRECT SOLUTIONS OR A THIRD PARTY.  CORRECT SOLUTIONS OR ITS CORRECTIONS AGENCY CUSTOMER MAY BE ENTITLED TO WARRANTIES UNDER THE LAW OF ITS JURISDICTION.

b.   *Services and Software*.  Tech Friends warrants that when it delivers Services or Software, they will conform in all material respects to the Documentation for the Services or Software, if any and as applicable, when used or operated (i) on and with the equipment agreed to by Tech Friends at the time of implementation and (ii) in conformity with the training and Documentation provided by Tech Friends to Correct Solutions at the time of implementation or thereafter.  Tech Friends reserves the right to correct Documentation due to typographical or clerical error.  NOTWITHSTANDING THE FOREGOING, TECH FRIENDS DOES NOT WARRANT THAT USE OF THE SERVICES OR SOFTWARE WILL BE UNINTERRUPTED, COMPLETELY ERROR-FREE, COMPLETELY SECURE, OR THAT ALL DEFECTS WILL BE CORRECTED.

In the event of any breach of this warranty, provided notice of the breach is given in writing to Tech Friends within thirty (30) days after the discovery of the breach, Tech Friends will, at its option, repair or replace Services or Software at no charge to Correct Solutions, the Customer, or the end user.  This warranty is given by Tech Friends and not by any of its third party suppliers.  Neither Tech Friends nor any of its third party suppliers warrants or guarantees the results from use of the Services or Software.  TECH FRIENDS MAKES NO WARRANTY

C-2

AS TO ANY GOODS OR SERVICES SUPPLIED BY CORRECT SOLUTIONS OR A THIRD PARTY.

   c. *DISCLAIMER*. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE WARRANTIES SET FORTH IN THIS EXHIBIT C, PARARAPH 5 ARE TECH FRIENDS' EXCLUSIVE WARRANTIES AND ARE IN LIEU OF ALL WARRANTIES, CONDITIONS, GUARANTEES OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR IN WRITING, (INCLUDING WITHOUT LIMITATION ANY EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, DURABILITY, TITLE, ACCURACY, NON-INFRINGEMENT, INTEGRATION, OR SATISFACTORY QUALITY) ARISING OUT OF OR RELATED TO ANY SOFTWARE OR HARDWARE SUPPLIED BY TECH FRIENDS, OR THE PERFORMANCE OR NON-PERFORMANCE OF ANY SERVICES (INCLUDING BUT NOT LIMITED TO ANY WARRANTY RELATING TO THIRD PARTY SERVICES, ANY WARRANTY WITH RESPECT TO THE PERFORMANCE OF ANY SOFTWARE, TABLETS OR HARDWARE USED IN PERFORMING SERVICES AND ANY WARRANTY CONCERNING THE RESULTS TO BE OBTAINED FROM THE SERVICES). THE REMEDIES STATED HEREIN ARE THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY. TECH FRIENDS' MAXIMUM LIABILITY FOR BREACH OF WARRANTY SHALL BE THE AMOUNT OF GROSS REVENUE (AS THAT TERM IS DEFINED IN PARAGRAPH 1 OF THE MAIN BODY OF THIS AGREEMENT) PAID TO TECH FRIENDS IN CONNECTION WITH THE APPLICABLE PRIME CONTRACT FOR THE THIRTY (30) DAY PERIOD IMMEDIATELY PRECEDING THE NOTICE OF BREACH. The foregoing exclusion and limitations will apply to the maximum extent permitted by applicable law, even if any remedy fails in its essential purpose.

   6. Contract Administration.

   a. *Training.* Tech Friends shall provide Documentation to, and train Correct Solutions on, the use of the Tech Friends Products as reasonably required. Such training may be conducted by a series of LiveMeeting, webinar or similar sessions, or in-person as reasonably requested by Correct Solutions. Tech Friends shall provide Correct Solutions with an electronic version of user manuals for the Services and Software, as revised from time to time to reflect any updates or upgrades. Correct Solutions shall be responsible for training and providing appropriate Documentation on the use of the Products to other Authorized Users.

   b. *Technical Support.*

   i. Legacy Accounts. For all Legacy Accounts, Tech Friends shall provide technical support directly to the Customer and to other Authorized Users of the Products in coordination with, as needed, Correct Solutions. Correct Solutions shall be solely responsible for all technical support and maintenance pertaining to the equipment, software and services provided independently by it in connection with a Prime Contract for a Legacy Account.

   ii. New Accounts. For all New Accounts, Correct Solutions shall provide the first level of technical support to other Authorized Users of the Products by providing a help desk staffed by Correct Solutions' personnel trained by Tech Friends. Other Authorized

Users will be directed to call the Correct Solutions' help desk to solve questions or issues with the Products. Tech Friends shall provide reasonable telephone and electronic mail support to assist Correct Solutions' staff with issues that are not resolved by Correct Solutions' staff alone. For issues that cannot be resolved by Correct Solutions' personnel at the first level, Tech Friends shall provide the next level of support directly to the Customer in coordination, as needed, with Correct Solutions. Correct Solutions shall be solely responsible for all technical support and maintenance pertaining to the equipment, software and services provided independently by it in connection with a Prime Contract for a New Account.

   c. *Implementation and Integration.* Tech Friends shall provide the Software, as applicable, either via a Web portal for downloading onto local server(s) as designated in a service request or by giving Authorized Users a link to a Tech Friends' website that the User may be access through appropriate hardware with an Internet connection. Tech Friends shall work cooperatively with Correct Solutions to integrate and operate Tech Friends Services and Software on and with Correct Solutions' hardware and systems. All hardware costs and the costs of installing or maintaining facility network, wiring, transmission lines, electricity, bandwidth, proper lighting, power and power sources shall be Correct Solutions' sole responsibility. Tech Friends may, at its sole option, upgrade or replace Hardware, Services or Software at any time provided that the applications or functionality of the Product remains unchanged or is enhanced. Neither Party shall charge a fee to the other for implementation or integration services.

   d. *Customizations.* Tech Friends agrees to use its reasonable efforts to provide customized Services or Software applications and functionality consistent with a Corrections Agency's unique requests or operating environment; provided, however, that Tech Friends shall have no obligation to provide such modifications if Tech Friends determines, in Tech Friends' sole and absolute discretion, that it cannot do so at an acceptable profit to itself.

   e. *Bug Fixes.* Any Software defect that Tech Friends determines materially and significantly impacts the performance or usability of the Software, also known as a "bug," shall be repaired by Tech Friends at no cost during the Term of the Prime Contract and any renewal, extension or modification of it.

   f. *Servers and Miscellaneous Equipment.* Downloaded Software shall be hosted on a local server(s) provided by Correct Solutions or the Corrections Agency. Correct Solutions may, but is not required, to purchase the server(s) or other miscellaneous equipment from Tech Friends at a price to be mutually agreed upon at that time. The number and location of server(s) or other miscellaneous equipment necessary to best meet the Corrections Agency's requirements shall be determined by the Parties on a case-by-case basis. The Software supporting applications made available on a cloud basis shall be securely hosted on offsite servers owned or controlled by Tech Friends.

   g. *Condition of Facilities.* If Tablets are sold or supplied for a Prime Contract, then Correct Solutions shall use commercially reasonable efforts to ensure that suitable space for Tablets is provided at each Customer facility. Correct Solutions shall work with its Customers to keep the Tablets readily accessible to inmates, and shall work with its Customers to permit the inmates to maximize the use of Tablets subject to each Customer's security procedures.

Correct Solutions 00714

h.    *Termination of Prime Contract.*  If for any reason the Prime Contract terminates in whole or in part, and Correct Solutions is not the successor contractor under a new prime contract for the terminated goods or services, then Correct Solutions agrees that it shall work cooperatively and in good faith with Tech Friends, and take all necessary and desirable steps, to smoothly transition to a new prime contractor whether or not Tech Friends itself continues to provide services in connection with a new prime contract or subcontract.  Correct Solutions further agrees that:  (i) Correct Solutions shall not directly or indirectly disrupt or interfere with Tech Friend's systems, operations, business or services being provided to the Customer; and (ii) Correct Solutions shall promptly (but in any event within three (3) business days) provide and release to Tech Friends all data and records in Correct Solutions' possession, custody or control belonging to or created for the Customer upon the Customer's request for such.  All data and records, and all actions taken, by Correct Solutions shall be without direct or indirect charge of any kind or nature to Tech Friends.

7.    Ownership Rights.

a.    *Services and Software.*  Correct Solutions has no rights in or to the Services or Software except as otherwise specifically set forth in this Agreement.  The Parties agree that Tech Friends (or its licensors) owns all proprietary rights, including copyrights, patents and trade secrets in and to the Services and Software and that this Agreement does not transfer ownership of any of these rights to Correct Solutions, its Affiliates, or to any third party.  Tech Friends furthermore shall own all proprietary rights in any modifications to the Services or Software, whether created by Tech Friends, Correct Solutions or a third party.  Correct Solutions hereby assigns to Tech Friends all proprietary rights, including without limitation copyright, patent and trade secret rights, to any Services or Software modifications created by or on behalf of Correct Solutions.

b.    *Hardware.*  The Parties agree that Tech Friends (or its licensors) owns all design, patent and related trade secrets rights in and to the Hardware, and that this Agreement does not transfer ownership of any of these rights to Correct Solutions, its Affiliates, or to any third party.  Tech Friends shall own all proprietary rights in any modifications to Tablets, whether created by Tech Friends, Correct Solutions or a third party.  Correct Solutions hereby assigns to Tech Friends all proprietary rights, including without limitation, copyright, patent and trade secret rights, to any Tablet modifications created by or on behalf of Correct Solutions.

c.    *Trademarks.*  Tech Friends (or its licensees) is and shall remain the owner of all right, title, and interest in and to any and all trademarks, trade names, trade dress, logos, graphics, photographs, artwork, and textual materials used in connection with the Products, including without limitation Lockdown$^{TM}$, Titan$^{TM}$ and JailATM$^{TM}$.

8.    General Restrictions and Limitations.

a.    *Access.*  Correct Solutions shall only: (i) provide Tech Friends Products pursuant to a Prime Contract; (ii) use Products, graphical designs, features, Documentation, designs, screen layouts, and information consisting of or containing Proprietary Information

Correct Solutions 00715

related to any Product, solely for the purpose of performing under this Agreement; (iii) allow access to the Software through a link, provided by Tech Friends, to Tech Friends' website; and (iv) if applicable, distribute the version of the Software provided by Tech Friends.

       b.    *Use of Tablets*. Correct Solutions acknowledges that Tablets are intended for the use of inmates in Customer facilities. Correct Solutions acknowledges and agrees that, as applicable, it will not, and it shall instruct its Customers not to, utilize the Tablets in the conduct of their own business or otherwise.

       c.    *Other Improper Uses*. Correct Solutions shall not, and shall use its best efforts to prevent others from engaging in conduct to: (i) modify, adapt, translate, or create derivative works based on, as applicable, the Software or Hardware in any manner or use any method or device to remove, modify or obscure any copyright, trademark or other proprietary rights notices (including without limitation removal of any Terms of Use or Privacy Policy) that appears on any Software or through use of the Software or Hardware; (ii) interfere with or disrupt the regular functionality, features, or functioning of the Software in any manner; (iii) use Products in an attempt to gain unauthorized access to computer systems (also known as "hacking"); (iv) decompile, disassemble, copy, attempt to discover the source code of, or otherwise reverse engineer any Product; (v) use Software or Hardware features, design, materials, graphical design, functionality, or reports to aid in th development of competing products; or (vi) use any of the Products to access, store, distribute or transmit any Virus.

      9.    Trade Restrictions. Correct Solutions acknowledges that the Software is subject to the U.S. Export Administration Regulations and other export laws, restriction and regulations. Correct Solutions agrees that it shall only distribute Products for use by Corrections Agencies, and in Corrections Agency facilities, located in the United States. Correct Solutions shall use commercially reasonable efforts to ensure that access to the Software will not be given, sold, leased, or in any way made available to any person, business, entity, governmental unit or government in or of any country which the United States Government, through the Department of Commerce or any other department, lists as a country to whom the sale or lease of the Software or access to the Services is prohibited by law.

      10.    Deposit Service Limits. In order to address, among other things, credit card fraud and regulatory matters as they may arise, Tech Friends reserves the right, in its sole discretion, to limit or modify the maximum amount that may be deposited into an inmate's bank/trust account from time to time based upon the Customer, inmate, depositor, regional trends, or other factors. Correct Solutions agrees to cooperate with Tech Friends in making these adjustments, including without limitation using commercially reasonable efforts to secure Customer approval for any changes. Correct Solutions further agrees to cooperate with Tech Friends in gathering data to combat credit card fraud as needed and in recovering funds from inmates who receive fraudulently deposited money, including without limitation working with the Customer to secure such recoveries through Customer's disciplinary procedures.

      11.    Fees and Revenue Shares – Legacy Accounts. Fees and revenue shares for Products provided by Tech Friends in qualifying Legacy Accounts shall be governed by this Exhibit C, Paragraph 11.

Correct Solutions 00716

a.  *User Fees*.  Unless otherwise agreed to in writing by the Parties, Tech Friends may charge and collect the following fees for the use of each Service or Software application as implemented pursuant to a Prime Contract for a Legacy Account:

| Service/Application | User Fee |
|---|---|
| Debit movement (phone time account deposit by inmate) | $1.00 minimum |
| Electronic mail | $0.50 per email |
| Video visitation | $0.35 per minute |
| Tablet rental | $0.99 per Tablet per hour for extended rental after 15-minute free period |
| Phone Attendant | $3.00 PIPM*<br><br>* Fee paid by Customer or a third party services provider. |
| Web Pack | (1) 10% of total order value (before taxes and shipping) for processing; <u>plus</u><br>(2) $4.95 minimum per order for shipping |

b.  *Revenue Share Due to Correction Solutions*.  Tech Friends shall pay to Correct Solutions (or its mutually agreed-upon designee) fifty percent (50%) of the Net Revenue generated by Web Pack shipping fees only for so long as Tech Friends provides Web Pack services. Tech Friends shall not receive a Service Fee when calculating the Net Revenue generated by Web Pack shipping fees. With the exception of Web Pack shipping fees, there shall be no other revenue shares due or payable from Tech Friends in connection with revenue generated by any other user fees (including, without limitation, Web Pack processing fees) pursuant to a Prime Contract for Legacy Accounts.

c.  *Termination of Products*.  Tech Friends may, at its sole option, terminate the provision of any or all Products (including, without limitation, Lockdown Software) to a Legacy Account Customer if Tech Friends fails, for any reason, to receive User Fee revenue for one or more of electronic mail, video visitation, or Tablet rentals implemented at that Customer's facilities.  Notwithstanding the foregoing, Tech Friends may only terminate its provision of Products under the foregoing circumstances if: (i) Tech Friends fails to receive the applicable User Fee revenue for twenty-one (21) or more consecutive days and (ii) Tech Friends first provides Correct Solutions with written notice that states the Products to be terminated and the termination date, given at least twenty-one (21) days before such termination.

Correct Solutions 00717

12.   <u>Fees and Revenue Shares – New Accounts</u>.  The provisions of this Paragraph 12 shall govern all fees and revenues shares for Products provided pursuant to Prime Contracts for New Accounts.

a.   *Fees Paid to Tech Friends*.

i.   User Fees.  Unless otherwise agreed to in writing by the Parties, Tech Friends may charge and collect the following fees for the use of each Service or Software application implemented pursuant to a Prime Contract for a New Account:

| Service/Application | User Fee |
|---|---|
| Debit movement (phone time account deposit by inmate) | $1.00 minimum |
| Deposit to inmate trust/bank account – cash, lobby kiosk | $3.25 per deposit |
| Deposit to inmate trust/bank account – credit or debit card, any channel | $3.25 per deposit <u>or</u> ten percent (10%) of the deposit amount, whichever is greater |
| Deposit to debit or pre-paid phone time account – cash (lobby kiosk only), credit or debit card (any channel) | $3.25 per deposit |
| Electronic mail | $0.50 per email |
| Video visitation | $0.35 per video visitation minute |
| Tablet rental | $0.99 per Tablet per hour for extended rental after 15-minute free period |
| Phone Attendant | $3.00 PIPM*<br><br>* Fee paid by Customer or a third party services provider. |
| Web Pack | (1) 10% of total order value (before taxes and shipping); <u>plus</u><br>(2) $4.95 minimum per order for shipping |

ii.   Correct Solutions Fees.  In addition to any other fees due or payable to Tech Friends, Correct Solutions shall remit to Tech Friends the following fees for each listed Product as it may be implemented or supplied pursuant to a Prime Contract:

C-8

| Product | Correct Solutions Fee |
|---|---|
| Back-up Recovery | $75.00 per hour |
| Charging station - tablets | $50.00 per tablet charging station per month[1] |
| Commissary ordering by phone | $75.00 per every 200 inmates per month[2] |
| Inmate kiosk | $50.00 per kiosk per month[3] |
| Lockdown Resident Banking System | $2.17 PIPM[4] |
| Lockdown Warehouse System | $1.25 PIPM[5] |
| Reconciliation Support | $50.00 per hour[6] |
| Remote Access Service | $50.00 per month |
| Onsite video visitation | (1) $3,000.00 one-time set up fee, if applicable; plus <br> (2) $1.50 PIPM or $150.00 per month, whichever is greater |
| Eclipse™ video visitation filtering | $1.00 PIPM |

[1] Fee applies to each charging station supplied for a given Customer. **Waived if electronic mail is implemented at Customer's facilities.**

[2] Monthly inmate population shall be calculated based upon the ADP of inmates housed in all of the applicable Customer's facilities combined during a given month. **Fee waived if inmate debit phone time purchase option is implemented by Tech Friends.**

[3] Fee applies to each pod or inmate common area kiosk(s) provided for a given Customer without regard to whether Tech Friends supplied the kiosk. **Waived if electronic mail is implemented on each kiosk.**

[4] Fee waived on per month basis if Tech Friends' portion of revenue share after split with Correct Solutions meets or exceeds total Lockdown Resident Banking System fee that otherwise would have been due. Additional fees may apply for cloud hosting of data by Tech Friends.

[5] Fee waived on per month basis if Tech Friends' portion of revenue share after split with Correct Solutions meets or exceeds total Lockdown Warehouse System fee that otherwise would have been due.

[6] Fee waived if new Customer bank account opened in conjunction with implementation of Lockdown Resident Banking System so that reconciliation support is not needed.

Correct Solutions 00719

                iii.      Calculation of PIPM. The PIPM initially employed to calculate the Correct Solutions fee due for a given Product shall use the month in which the Product is implemented as a base for determining the Customer's ADP of inmates. The same PIPM shall thereafter be used to calculate the Correct Solutions fee due for that Product in each succeeding month. However, either Party shall have the right at any time to require a new calculation of PIPM for a given Product using the immediately preceding, closed calendar month as a new base for calculating the fee due for that month. The revised PIPM then shall be used going forward to determine the Correct Solutions fee due to Tech Friends for a particular Service each month until such time as a Party requests another calculation of PIPM, again using the immediately preceding, closed calendar month as a base. All PIPM calculations shall be diligently and accurately performed by Correct Solutions and immediately shared with Tech Friends upon request, using correct data from the Customer.

        b.    *Revenue Shares Due to Correction Solutions*. Tech Friends shall pay a share of the revenue generated by user fees to Correct Solutions (or its mutually agreed-upon designee) for certain Products implemented pursuant to a Prime Contract (other than for Legacy Accounts) for so long as Tech Friends provides the Product, as follows:

              i.      Deposit Services and Web Pack Shipping Fee. Tech Friends shall pay to Correct Solutions (or its mutually agreed-upon designee) fifty percent (50%) of the Net Revenue generated in connection with Web Pack shipping fees and cash deposits made though a lobby kiosk only. Tech Friends shall not charge or receive a Service Fee prior to calculating the Net Revenue generated by Web Pack shipping fees or cash deposits made through a lobby kiosk. There shall be no revenue share due or paid for deposits made through any channel with a payment method other than cash.

              ii.      Other Services/Applications. Tech Friends shall pay to Correct Solutions (or its mutually agreed-upon designee) a share of the revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals, calculated and paid as follows:

                    (1)      Tech Friends shall first receive the Service Fee;

                    (2)      Tech Friends shall then pay to Correct Solutions fifty percent (50%) of the Net Revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals.

    13.    Payment of Fees and Revenue Shares.

        a.    *Collection of User Fees*. All fees paid by Authorized Users of the Tech Friends' Products shall be collected by Tech Friends. Fees paid by inmate Authorized Users shall be debited from the inmates' respective facility accounts on a real time basis or as near to real time as possible.

Correct Solutions 00720

b.      *Payment of Revenue Shares.*  The revenue shares, if any, due to Correct Solutions or its designee shall be calculated monthly for the immediately preceding calendar month and shall be paid as soon as practicable after all required collections from the Customer are complete.  Revenue shares shall be calculated independently in connection with each Customer and paid after the optional deduction of monies owed by Correct Solutions to Tech Friends, if any, including without limitation for purchases made pursuant to Exhibit D to this Agreement. Notwithstanding anything to the contrary in this Agreement, Correct Solutions may designate another person or entity to receive any revenue shares due to Correct Solutions if it first obtains Tech Friends' written approval of the designation.

c.      *Facility Monies Due.*  Correct Solutions acknowledges and agrees that monies due for inmate transactions may be automatically transferred by ACH to Tech Friends from the inmate's trust/bank account held by the Customer.  Correct Solutions shall use commercially reasonable efforts to obtain Customer's approvals for such ACH transfers if and as required by Tech Friends in its sole discretion.  If the Customer cannot process ACH withdrawals for any reason, then Correct Solutions agrees that the monies due for inmate transactions shall be automatically transferred to Tech Friends by ACH from a bank account maintained by Correct Solutions and Correct Solutions shall be responsible for collecting reimbursement monies from the Customer.  In the latter circumstance, Correct Solutions further agrees that: (i) it shall promptly take all steps necessary or desirable to effect such transfers from its bank account, including without limitation providing its bank with authorization for the transfers and (ii) it shall maintain a minimum balance in the account sufficient to fully compensate Tech Friends for the user fees each month.  Tech Friends shall not be liable for the failure of a Customer to reimburse Correct Solutions in whole or in part for such user fees.

13.     No Other Fees.  Except as otherwise set forth herein, there shall be no other fees, revenue shares, costs or expenses due or payable from Tech Friends to Correct Solutions except those set forth in this Exhibit C, Paragraphs 11 and 12, and then only if the service which gives rise to the fee and corresponding revenue share is implemented pursuant to a Prime Contract. Fees and revenue shares for Existing Accounts shall be governed by the respective contracts existing between the Parties as to those Accounts.  Correct Solutions shall not be entitled to nor receive a revenue share for services or software implemented pursuant Tech Friends' own, or a third party provider's, contract with a Corrections Agency.

Correct Solutions 00721

## EXHIBIT D

### RIGHTS AND OBLIGATIONS OF THE PARTIES
### WITH RESPECT TO THE SALE OF HARDWARE TO CORRECT SOLUTIONS

1.    Sale of Hardware.  Correct Solutions and Tech Friends may agree from time to time that Correct Solutions shall purchase, and Tech Friends shall supply, certain Hardware in connection with a Prime Contract during the Term of this Agreement.

2.    Price.  Prices for Hardware shall be mutually agreed upon at the time of sale depending upon the pertinent Customer's unique requirements, the type of Hardware technology that Tech Friends has available, included components and market conditions.  Prices shall be quoted and payable in U.S. Dollars.

3.    Issuance of Purchase Orders.  Correct Solutions shall issue a written or electronic purchase order to Tech Friends for all agreed-upon purchases of Hardware.  Tech Friends shall accept all Purchase Orders that are submitted in conformance with this Agreement and, except as otherwise provided for below, shall deliver the Products on the reasonable terms stated in the Purchase Order.  Every Purchase Order issued by Correct Solutions to Tech Friends during the Term shall be governed by, and be deemed to include, the provisions of Tech Friends' Hardware Purchase Policy then in effect and the terms of this Agreement.  In the event of an inconsistency between any document created with respect to the transaction, the terms and conditions of this Agreement, followed by the terms of Tech Friends' Hardware Purchase Policy in effect at the time of sale, shall prevail over all other documents including without limitation the Purchase Order.

4.    Delivery and Transfer of Title.

     a.    *Delivery.*  Hardware shall be delivered to the delivery destination point designated by Correct Solutions in the Purchase Order.  Correct Solutions shall bear all freight and shipping costs associated with the shipment of Hardware, wherever its destination.

     b.    *Title.*  Title, and risk of loss or damage, to all Hardware supplied by Tech Friends under this Agreement shall pass from Tech Friends to Correct Solutions at the time the Hardware is delivered to the delivery destination point specified in each Purchase Order.  Tech Friends warrants to Correct Solutions that Correct Solutions shall receive, at the time of delivery, good and exclusive title to the delivered Hardware free of all liens, claims, and encumbrances.  Correct Solutions may designate another person or entity to receive title to the Hardware if it first obtains Tech Friends' written approval of such designation.

5.    Invoices.  Correct Solutions shall remit payment for all Hardware invoices within fifteen (15) calendar days of the date of each invoice.  Payments not made on or before the due date shall be subject to and accrue interest at the higher of:  (i) the weekly rate of two and one-half percent (2.5%) of the total amount delinquent as of the beginning of each week (including interest then accrued) or (ii) the maximum legal rate.

6.    Resale or Transfer – Consent or Purchase.  If Correct Solutions determines to sell, or otherwise transfer the title to, Hardware previously purchased from Tech Friends then Correct

D-1

Correct Solutions 00722

Solutions must first notify Tech Friends of the proposed transaction and obtain Tech Friends' written consent to the sale or transfer prior to the transaction's closing. Correct Solutions shall provide such information about the sale or transfer as Tech Friends may request, but at a minimum shall identify the proposed purchaser or transferee, the dollar amount of any sale, and describe the other material terms of the transaction. If Tech Friends refuses to approve the sale or transfer then Tech Friends must purchase the subject Hardware from Correct Solutions at the Hardware's fair market value calculated as of the date that Correct Solutions first notified Tech Friends of the proposed sale or transfer. The fair market value shall either be mutually agreed upon by the Parties or, if the Parties cannot agree, then by a qualified appraiser mutually selected by the Parties; in no event, however may the fair market value exceed the invoiced price paid by Correct Solutions for the Hardware. Even if approved by Tech Friends, all sale or transfer documentation must contain the same conditions on resales and transfers by the new title holder as are set forth in this Exhibit D, Paragraph 6.

D-2

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT J

### *to Amended Complaint*

# ROEDEL PARSONS KOCH
## BLACHE BALHOFF ⟨⟩ MCCOLLISTER

A LAW CORPORATION

roedelparsons.com

*Christina B. Peck, Attorney*
*CPeck@RoedelParsons.com*
*Baton Rouge Office*

*Telephone:  (225) 929-7033*
*Direct Dial: (225) 329-1281*
*Facsimile:  (225) 928-4925*

July 17, 2019

## VIA CERTIFIED MAIL, RETURN RECEIPT NO. <u>7011 0470 0002 4894 0540</u>

Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan

> Re: Mutual Confidentiality and Nondisclosure Agreement and
> Master Services Agreement between Correct Solutions, LLC and
> Smart Communications Holding, Inc

Dear Mr. Logan:

This firm represents Correct Solutions, LLC (CSG) in connection with the Mutual Confidentiality and Nondisclosure Agreement (NDA) and the Master Services Agreement (MSA) between CSG and Smart Communications Holding, Inc. (Smart).  As you are aware, both the NDA and the MSA prohibit Smart from using Confidential Information, as defined by the NDA and the MSA, for any purpose except the purposes specified in the NDA, and prohibit Smart from using Confidential Information in any fashion except to perform its duties under the MSA.

CSG has discovered that Smart has violated the terms of both the NDA and the MSA within the past few months by entering, or attempting to enter, the inmate phone market as a competitor to CSG using Confidential Information Smart obtained through Smart's contractual relationship with CSG. Specifically, Smart employee Jennifer Tongate has made contact with current CSG customer, City of St. Louis facility, offering greater commission to the facility than CSG pays to the customer. Tongate also sent advertisement directly to the St. Louis facility offering a better commission. Smart employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by CSG as a result of the contractual relationship between Smart and CSG.

The use of Confidential Information by Smart's employee to solicit CSG's customers violates Smart's obligations under the NDA and the MSA to take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in these agreements, and is a direct interference with CSG's contractual agreement with the St. Louis facility.

1

In light of Smart's egregious breach of the NDA and the MSA through the misuse of Confidential Information to directly solicit CSG's customers in an attempt to lure the customers from CSG to Smart, this letter is formal notice to Smart that CSG hereby terminates the MSA and all Schedules thereto effective immediately. This letter is also a formal demand that Smart and its employees cease all activities that are in violation of the confidentiality provisions of the NDA and the MSA immediately, including but not limited to ceasing all contact with CGS's customers either in person, by phone, text, email or direct mail.

In addition to termination of the MSA and all Schedules thereto, CSG reserves its right to seek any and all remedies provided to CSG under the NDA and the MSA, including but not limited to the right to seek and obtain immediate, preliminary and permanent injunctive relief to enjoin further and future violations of the NDA and MSA, plus monetary damages, attorneys' fees, court costs and all expenses incurred by CSG should legal action be required.

Upon receipt of this letter, please contact Rick Pruitt at CSG to make arrangements to exit all facilities currently being serviced by Smart and to remove all Smart systems from these facilities.

Sincerely,

Christina B. Peck

CBP/clb
cc:     Correct Solutions, LLC (via email)

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT K

### *to Amended Complaint*



*David L. Gann*
*General Counsel*
*Smart Communications*
*10491 72nd St.*
*Seminole, FL  33777*
████████*@smartcommunications.us*
Not licensed to practice in Florida

July 26, 2019

**Via email and UPS Mail**

Christina B. Peck
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, St. 301
Baton Rouge, LA 70809
cpeck@roedelparsons.com

*Re: Smart Communications' Agreement with Correct Solutions*

Dear Ms. Peck:

I am General Counsel for Smart Communications and am in receipt of your letter dated July 17, 2019, regarding our agreement with Correct Solutions (CSG).  As an initial matter, we are surprised that you would choose to send such a time sensitive and critical communication only via certified US mail (which required our staff to obtain it from the post office several days later), without providing a courtesy copy to any of our company representatives via email. Given the exaggerated nature of your client's allegations and the baselessness of your apparent legal positions, we can only surmise you hoped to gain some advantage by delaying our ability to respond.

As to the substance of the allegations, Smart Communications flatly denies having committed any violation or default of the parties' agreement.  As we understand from CSG's accusations, at least to the limited extent they were described in your letter, it appears CSG is claiming Ms. Tongate somehow misused CSG's confidential information to solicit business from the City of St. Louis.  But your letter fails to identify with any degree of specificity the alleged confidential information that CSG claims was obtained and then misused.  Certainly, the fact that St. Louis operates a correctional facility that contracts for various services does not qualify as "Confidential Information," as that is well known throughout the public domain.

Moreover, as you are no doubt aware, St. Louis is an existing customer of ours and we have an ongoing business relationship with them.  That Ms. Tongate is in communication with St. Louis is quite unremarkable, given she regularly provides in-person support and training for our systems and products for all of our customers in her region.  In addition, we have looked into the alleged solicitation that you referenced, which was a mass marketing email that was blasted out to all of our customers.  This can hardly be characterized either as a targeted solicitation or one that had anything to do with information obtained from your client, confidential or



otherwise.  Nor could the communication be construed as an unjustified interference with CSG's relationship with any particular party.  Your effort to portray this mass email as a default of the parties' agreement is nothing more than a transparent attempt to manufacture a contractual dispute that CSG apparently hopes will permit termination.  There simply has been no violation or default by Smart Communications, from its mass marketing email or otherwise.  Moreover, as outlined below, CSG has no power to terminate the agreement for any alleged breach of its confidentiality provisions.  And even if it had such power (it clearly does not), CSG must first provide Smart Communications with specific notice and an opportunity to cure.

For your reference, Section 9 of the MSA provides:

> 9.  <u>Default and Termination.</u>  If **either party defaults in the performance of any obligation** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. **Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement**. (emphasis added).

Accordingly, only Smart Communications (as the Provider) may terminate the agreement for breaches of its confidentiality or non-disclosure provisions—which logically flows from the fact that we are providing our proprietary and trade secret-protected technology as part of the business arrangement.  Had the parties intended this right to be reciprocal, they would have crafted the language accordingly.  The remainder of Section 9 provides for termination rights only for defaults *in the performance* of any obligation of the MSA.  As you are no doubt aware, the performance obligations relate primarily to the technology and services we are to provide and to the subsequent cooperation that CSG must give so that we may derive revenue from our contribution.  Consistent with these performance obligations, and not with any alleged breach of confidentiality or non-disclosure, the agreement provides for a thirty-day cure period.

Even assuming for the sake of argument that the contract allowed CSG to identify a breach of confidentiality that may serve as grounds for termination (which is not allowed by the plain terms of the agreement as explained above), it must still "*specifically* describ[e] the nature of the [alleged] default."  In that instance, upon our receipt of such specific description and notice, we would have a good faith opportunity to cure the alleged default during a period of thirty days after receipt, extended as reasonably necessary.  Your July 17 letter fails to provide adequate notice sufficient to trigger the cure period in accordance with this provision, at least because it fails to identify with any reasonable degree of specificity the alleged confidential information that CSG alleges was obtained and misused.



Finally, as you may be aware, there has been a strain on the parties' business relationship that has developed over some time as a result of a dispute concerning a specific mutual customer's demands as it relates to our products and services.  As we have conveyed to your client in the past, we are willing to engage in business discussions in an effort to resolve this specific customer issue.  And we remain willing to do so.  However, your client's transparent, bad faith efforts to manufacture and contrive a termination of our contract and to interfere with our business relationships to get out of the arrangement will not be tolerated.  To reiterate, the parties' agreement remains in full force and effect, and we have yet to receive sufficient notice of any alleged default as required in order to trigger our cure period, even assuming for the sake of argument an alleged breach of confidentiality could do so.

We demand that CSG immediately cease and desist its bad faith conduct in our business relationship, including its bad faith efforts to terminate the MSA.  We further demand that CSG immediately cease and desist any and all efforts to intentionally harm and interfere with our business relationships involving our mutual customers.  We further demand that CSG immediately cease and desist any and all efforts to harm the reputation or good will of Smart Communications, both to our mutual customers and throughout the marketplace.  Please be advised that we will vigorously protect our customer relationships, our business, and our reputation and good will, and we will not abide your client's continued bad faith conduct.  We reserve our rights to take all appropriate legal action, including seeking a temporary restraining order and preliminary injunction to protect and prevent against this type of irreparable harm.

Please immediately confirm that your client has not slandered or spoken ill of Smart Communications to any of our mutual customers, or to any potential customers, and that it will conduct itself in good faith in furtherance of our agreements going forward.  If we do not hear from you by close of business on Monday, July 29, 2019, we will assume that your client has no intention of so confirming.

Very truly yours,

David L. Gann

cc:    Brad F. Barrios, Esq.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT L

### *to Amended Complaint*

On Jul 29, 2019, at 8:37 AM, Jeffie Walker ███████@millercountyso.us> wrote:

Lisa………..

First of all, I would like to thank Justin for all he did………..

Secondly, I have a concern that has bothered those of us in the meeting that we had with you and Justin……..I had asked you if you all were still partners with Correct Solutions and you stated in front of me, Captain Adams, Lt. Miller and Justin that 'Yes, we are still partners with Correct Solutions'……..when, in fact, you all are not partners with them………..I verified this with Rick Ferguson on Thursday, July 25…………..I have spoken with the Sheriff about your misleading us in our meeting and he is not happy………..those of us who were in the meeting are not happy that you stated an untruth and really don't see how we can move forward with a company who is not truthful with us……….. you can give me a call and we can discuss this matter……….

Jeffie Walker, Warden

Miller County Sheriff's Office

Detention Division

2300 East Street

Texarkana, AR  71854

Ph ████████████

Fax ██████████

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT M

### *to Amended Complaint*

| | |
|---|---|
| **From:** | Rick Ferguson [████████@lasallecorrections.com] |
| **Sent:** | Wednesday, July 31, 2019 12:58 PM |
| **To:** | Mark Turner; Rick Pruitt |
| **Subject:** | Fwd: Complaints |

Sent from my iPhone

Begin forwarded message:

> **From:** Alan Johnson <████████@co.washington.ar.us>
> **Date:** July 31, 2019 at 9:15:47 AM MDT
> **To:** "'Rick Ferguson'" <████████@lasallecorrections.com>
> **Subject: FW: Complaints**
>
> This is what I sent to Jennifer with Smart Communications
>
>
> **From:** Alan Johnson
> **Sent:** Wednesday, July 31, 2019 10:15 AM
> **To:** 'Jennifer Tongate'
> **Subject:** Complaints
>
> Jennifer,
>
> I am writing this email to inform you of Washington County Sheriff's Office displeasure with Smart Communications. Since we have come online with Smart Communications we have had nothing but problems. Customer support has been very disappointing to say the least. One of the biggest selling points of Smart Communications was video visitation and tablet system. The tablets have never work correctly and the video visitation on the tablets has never worked (approximately a year later). We have had continuous problems with the regular visitation of locking up, unable to hear and facial detection to list a few. We attempt to contact Smart Communications on an almost daily basis asking for help and relief from the constant problems with your company. We are receiving complaints from the public on a regular basis in regards to Smart Communications. For the reasons listed above, I wanted to advise you the Washington County Sheriff's Office will be actively looking for a new vendor to replace Smart Communications.
>
>
> Best Regards,
>
> Captain Alan Johnson

1

Correct Solutions 00727

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT N

### *to Amended Complaint*