| From: | Alan Johnson |
|---|---|
| To: | Rick Ferguson |
| Cc: | W████@co.sebastian.ar.us; A████@co.sebastian.ar.us; E████@co.sebastian.ar.us; Randall Denzer; J████@co.sebastian.ar.us |
| Subject: | Re: Smart Communication |
| Attachments: | image001.gif |
|  | image001.gif |

Will do. Thanks

Captain Alan Johnson
1155 W. Clydesdale
Fayetteville, AR 72701
Office - (479) ███████
Cell - (479) ███████
████████@co.washington.ar.us

On Aug 15, 2019, at 2:50 PM, Rick Ferguson ████████@lasallecorrections.com> wrote:

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Team
In order to move our plight quickly along please note the following instruction:
Send all your Smart needs for repairs, questions, complaints (and don't hold back other than 4 letter words or graphic sentences) etc to:
████████@correctsolutionsgroup.com
please do not send to Smart
CSG will now put them on the clock each time a ticket is opened and forwarded. Feel free to use a spread sheet or direct sentences. Also, be very specific in your request when necessary, ie, cell, issue, wiring….etc. If it's a generic fix just use your usual correspondence.
Please call me if you have questions or need additional information. I sincerely apologize for this most disappointing service provider but we are on the downhill run and I want to keep up the momentum
I really appreciate your assistance
See y'all soon
Rick
**Rick Ferguson**
**Correct Solutions Group**
**www.correctsolutionsgroup.com**
**www.lasallecorrections.com**
**(903) ████████**
**"Something Amazing is going to happen to You today"**

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT O

*to Amended Complaint*

## Tony Schaffer

| | |
|---|---|
| **From:** | Rick  Ferguson |
| **Sent:** | Thursday, August 15, 2019 2:52 PM |
| **To:** | Eric  Nelson |
| **Subject:** | FW: Smart Communication |

Major/Albert Cantu

In order to move our plight quickly along please note the following instruction:

Send all your Smart needs for repairs, questions, complaints (and don't hold back other than 4 letter words or graphic sentences) etc to:

██████:@correctsolutionsgroup.com

please do not send to Smart

CSG will now put them on the clock each time a ticket is opened and forwarded.  Feel free to use a spread sheet or direct sentences.  Also, be very specific in your request when necessary, ie, cell, issue, wiring....etc.  If it's a generic fix just use your usual correspondence.

Please call me if you have questions or need additional information.  I sincerely apologize for this most disappointing  service provider but we are on the downhill run and I want to keep up the momentum

I really appreciate your assistance

See y'all soon
Rick


*Rick Ferguson*
*Correct Solutions Group*
*www.correctsolutionsgroup.com*
*www.lasallecorrections.com*
*(903)* ██████

*"Something Amazing is going to happen to You today"*

i

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT P

### *to Amended Complaint*

| | |
|---|---|
| **From:** | Johnny Hemphill |
| **Sent:** | Thursday, August 15, 2019 1:43 PM |
| **To:** | Mark Turner |
| **Subject:** | Fwd: Smart Trouble Reporting |

Mark,

I don't have the time to do this. I am too busy on road putting out fires and picking up new business. This is the constant issue I am having with the service team. We do what we are told and there are five other layers of additional information to do something. We are becoming too corporate with all this red tape. I am not one to whine and complain but it has gotten out of hand.

Johnny Hemphill
Account Executive
Correct Solutions
318-███████-Cell
318-███████-Office
318-███████-Fax

"Knowledge Speaks. Wisdom Listens. Action Wins"

Begin forwarded message:

> **From:** Rick Pruitt <███████@correctsolutionsgroup.com>
> **Date:** August 15, 2019 at 12:35:35 PM CDT
> **To:** Vince West <███████@correctsolutionsgroup.com>, Daniel Wyatt <███████@correctsolutionsgroup.com>
> **Cc:** Mark Turner ███████@correctsolutionsgroup.com>, "Rick Ferguson"
> <███████@lasallecorrections.com>, Johnny Hemphill ███████@correctsolutionsgroup.com>, Steve
> Whitmill ███████@correctsolutionsgroup.com>, Travis Sterling ███████correctsolutionsgroup.com>, Chris
> Davis ███████@correctcommissary.com>
> **Subject: Smart Trouble Reporting**

Sales and FSMs,

***SALES:*** Account Executives are to brief our customers using Smart products to start using CSG support email system to report issues. Please do not call field service person to tell them to contact customer about Smart Issues . If you would get specifics when you get the call then please make the list and email to the support group. You know as much if not more about their products then most of the field service personnel as they have not been responsible for any of Smart's products.
*When briefing our customers, please ensure the customers report specific details about their problems. We cannot report generic issues. We need dorms and a description of the issue. There may be a laundry list, but we need specifics to report. IF they want to send a spreadsheet that is fine also.*

***FSMs:*** Brief your people on this new process. This change is due to CSG having primary responsibility for these contracts and CSG needs to start documenting to safeguard our accounts.

If you get an email with generic issues you must go back to the sender and ask for specifics.

EMAIL SPECIFICS

1

- The email address for reporting issues is ████████@smartjailmail.com

- CC: The account executive and state support email

- Under Outlook Options:  Select a **Request a Delivery Receipt** and **Request a Read Receipt** – When/If you receive confirmation back, put these in a folder for future reference.

- The subject line of the email should be facility name, state and Repair Service Requested.   Example: Sebastian, AR – Repair Service Requested

- In the body of the email
  - o First Line:  Facility Name, State Customer is requesting a dispatch to repair the following Issues:
    - ▪ Example:  Sebastian, AR Customer is requesting a dispatch to repair the following Issues:
  - o Put the contents of the email from the  customer with any additional explanation.
  - o Facility POC information. (Name and Number of facility contact)

- If you get a return email and the account executive is not on the distribution forward to them.

 Use your Outlook Follow Up feature to check with the customer on the status after 7 days.  If customer has not heard from Smart technicians, forward the original email to the smart and cc AE and State Support email with a note requesting status.

If the customer reports the issue has been resolved, let the original group email know.

I understand this will place a burden on our already hectic schedule.  This will be long enough for either Smart to comply with their service obligations or for their equipment to be removed/turned off by the customers due to frustrations.

**Rick Pruitt**
**Director of Field Services**
**Correct Solutions Group**
(501) ████████
████████correctsolutionsgroup.com

www.correctsolutionsgroup.com

2

Correct Solutions 00570

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT Q

*to Amended Complaint*

| | |
|---|---|
| From: | Rick Ferguson [■■■■■]@lasallecorrections.com] |
| Sent: | Friday, August 16, 2019 9:53 AM |
| To: | Mark Turner |
| Subject: | Fwd: Email from smart jail and response |
| Attachments: | Document2.docx; ATT00001.htm |

Good question.  Before I advise him to forward to our support email I wanted to get your input

Ty
R

Sent from my iPhone

Begin forwarded message:

> **From:** Alan Johnson [■■■■■]@co.washington.ar.us>
> **Date:** August 16, 2019 at 8:12:51 AM CDT
> **To:** "'Rick Ferguson'" [■■■■■]@lasallecorrections.com>
> **Subject: FW: Email from smart jail and response**
>
> Rick,
> Here is an email Justin Scott sent to my Lieutenant and Lt. Ake's response. We have not sent the response to Justin. What do you advise? Do you want us to send the response or do you want to handle it?
>
> Captain Alan Johnson
> 1155 W. Clydesdale
> Fayetteville, AR 72701
> Office – (■■■■■)
> Cell – ■■■■■
> ■■■■■@co.washington.ar.us
>
> **From:** Nolan Ake
> **Sent:** Friday, August 16, 2019 8:10 AM
> **To:** Alan Johnson <[■■■■■]@co.washington.ar.us>
> **Subject:** Email from smart jail and response
>
> Here is Justin email  and the response

1

Correct Solutions 00571

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT R

### *to Amended Complaint*

| | |
|---|---|
| **From:** | Rick Pruitt |
| **Sent:** | Thursday, August 22, 2019 5:46 AM |
| **To:** | Rick Ferguson; Mark Turner |
| **Cc:** | Vince West; Daniel Wyatt |
| **Subject:** | FW: Message from Eddy Lisa (+1912███████) |
| **Attachments:** | VoiceMessage.wav; ATT00001.htm |

FYI – From the latest correspondence from Miller, Avoyelles and now from Washington (VM) Lisa Eddy (formerly Lattice) looks to be running the service for Smart.

Both tickets submitted (Avoylles –Dispatch next day and Washington – VM for more info) Smart has responded within 24 hours.

Their ticket system is the same as ours and is returning a receipt for ticket submitted with follow-up from a support person within 4 hours.  They look to be building a true field support system based off of ours which Lisa tagged along on during our Lattice VV installs, training and service buildup.

Have a nice day.

**Rick Pruitt**
**Director of Field Services**
**Correct Solutions Group**
(501)████████
████████@correctsolutionsgroup.com

www.correctsolutionsgroup.com


**From:** Nolan Ake [mailto:████@co.washington.ar.us]
**Sent:** Wednesday, August 21, 2019 5:56 PM
**To:** AR Support <████████@correctsolutionsgroup.com>
**Subject:** Fwd: Message from Eddy Lisa (+1912████████)

What do you advise I do with this phone call Do you want me to respond


      Lt. Nolan Ake #408
      Washington County
      Detention Center
      1155 Clydesdale Drive
      Fayetteville, AR 72701
      (479)████ - Office
      (479)████ - Cell
      (479)████ - Fax
      ████@co.washington.ar.us

Begin forwarded message:

1

**From:** Cisco Unity Connection Messaging System <█████████@cuxn-pub.so.washington.ar.us>
**Date:** August 21, 2019 at 5:09:53 PM CDT
**To:** <n███@cuxn-pub.so.washington.ar.us>
**Subject: Message from Eddy Lisa (+1912█████**

Correct Solutions 00307

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT S

### *to Amended Complaint*

| From: | Rick Ferguson [⬛@lasallecorrections.com] |
|---|---|
| Sent: | Saturday, August 24, 2019 1:07 PM |
| To: | Mark Turner; Rick Pruitt |
| Subject: | FW: Tablets |
| Attachments: | IMG_1730.jpg |

Busted!!!  lol

Rick Ferguson
Correct Solutions Group
www.correctsolutionsgroup.com
www.lasallecorrections.com
(903) ⬛

"Something Amazing is going to happen to You today"

-----Original Message-----
From: ⬛h@co.sebastian.ar.us ⬛co.sebastian.ar.us>
Sent: Friday, August 23, 2019 9:23 AM
To: c⬛@smartjailmail.com
Subject: RE: Tablets

I am not understanding.... the battery's are removable.
I have several broken tablets with battery's hanging and a battery that is no longer in a tablet.

(See attached file: IMG_1730.jpg)

That is a picture of a broken tablet and a battery from another tablet....

Thanks,
Ashley Smith
Director of Inmate Management Assistant
Sebastian Co. Detention Center
Phone: 479-⬛ ⬛ ⬛
Fax: 479-⬛ ⬛
email: ⬛@co.sebastian.ar.us


From:<c⬛@smartjailmail.com>
To:<⬛h@co.sebastian.ar.us>
Date:08/23/2019 09:16 AM
Subject:RE: Tablets


What do you mean by battery back? The battery's in the tablets are not removable.

-----Original Message-----
From: ⬛h@co.sebastian.ar.us <⬛h@co.sebastian.ar.us>
Sent: Friday, August 23, 2019 10:09 AM
To: c⬛@smartjailmail.com
Subject: Re: Tablets

1

"Good morning,

I am needing to send in 23 tablets and a single battery back in to be repaired or replaced.
Let me know if you need anything else."

This was my original request.

I need to have them repaired or replaced.
Sometimes you send tablets w/shipping labels.
Sometime you email labels then send tablets after you got the broken ones.


Ashley Smith
Director of Inmate Management Assistant
Sebastian Co. Detention Center
Phone: 479-███████ ██ ███
Fax: 479-███
email: ████████ ▌.sebastian.ar.us



From: <
https://urldefense.proofpoint.com/v2/url?u=http-3A__chris.mzhickteno-
40smartjailmail.com&d=DwICAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=rzzv0EZ-StePWOxF-
JnRXZ0WmNDIUJ_AGPPqfMFTh4o&m=mE6TXHJMqaVsjjvM-
lVV2i3SX35FW99vMaDJ09qcr3U&s=Dh6cGf1jAL2BrRAIsUyJq6SJWUWSHkzvzl5J_JjzDU0&e=
>
To: ████ █o.sebastian.ar.us>
Date: 08/23/2019 09:04 AM
Subject: Tablets


Do you just need a shipping label to send back the 24 tablets and 1 battery?

Chris Mzhickteno, IT Support Specialist

████████ ██████ @SmartComunications.us
904-███████

Correct Solutions 00481



Correct Solutions 00482

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT T

### *to Amended Complaint*

## Tony Schaffer

| | |
|---|---|
| From: | Rick Ferguson |
| Sent: | Tuesday, August 27, 2019 7:46 AM |
| To: | Albert Cantu |
| Cc: | ▮@correctsolutionsgroup.com; ▮@correctsolutionsgroup.com |
| Subject: | Smart Reporting |

Albert
Please send all Smart issues through the TX Support email address.  We need to keep track of everything.  Don't hesitate to request an onsite tech for issues regardless of what they are

Ty
Rick

Sent from my iPhone

1

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT U

### *to Amended Complaint*

| | |
|---|---|
| From: | Rick Ferguson |
| Sent: | Thursday, September 12, 2019 9:53 AM |
| To: | Alan Johnson |
| Subject: | RE: |

I haven't forgotten you... awaiting call

*Rick Ferguson*
*Correct Solutions Group*
*www.correctsolutionsgroup.com*
*www.lasallecorrections.com*
*(903) ████*

*"Something Amazing is going to happen to You today"*

From: Alan Johnson <████ @co.washington.ar.us>
Sent: Wednesday, September 11, 2019 4:45 PM
To: Rick Ferguson <████ lasallecorrections.com>
Subject: Fwd:

What do you want me to say to this?

Captain Alan Johnson
1155 W. Clydesdale
Fayetteville, AR 72701
Office - (479)████
Cell - (479)████
████ co.washington.ar.us

Begin forwarded message:

> From: Jon Logan <████ @smartjailmail.com>
> Date: September 11, 2019 at 3:48:24 PM CDT
> To: Alan Johnson <████ @co.washington.ar.us>
>
> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe
>
> Hello Capt;
>
> I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.
>
> We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop In and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart*



www.smartcommunications.us

2

Correct Solutions Subpoena 0006

Correct Solutions 00555

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT V

### *to Amended Complaint*

| | |
|---|---|
| From: | Rick  Ferguson |
| Sent: | Thursday, September 12, 2019 11:46 AM |
| To: | Mark Turner |
| Subject: | Fwd: FW: RE: |

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** Alan Johnson <███████n@co.washington.ar.us>
> **Date:** September 12, 2019 at 10:40:51 AM CDT
> **To:** "'Rick  Ferguson'" <████████@lasallecorrections.com>
> **Subject: FW: RE:**

**From:** Jon ████████@smartjailmail.com>
**Sent:** Thursday, September 12, 2019 10:40 AM
**To:** Alan Johnson <████████@co.washington.ar.us>
**Subject:** Re: RE:

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Capt,

Well I think it's a necessary step to keeping the relationship healthy with our customers. My goals is to discuss your agency goals and our on going services and to solidify our relationship going forward.

Does that work for you?

Thank you

Jon
Smartjailmail.com

On Sep 12, 2019, at 11:20 AM, Alan Johnson <████████@co.washington.ar.us> wrote:

What do you expect to accomplish from this meeting?

**From:** Jon Logan ████████@smartjailmail.com>
**Sent:** Wednesday, September 11, 2019 3:48 PM
**To:** Alan Johnson <████████@co.washington.ar.us>
**Subject:**

1

Correct Solutions 00499

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Capt,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart Communications*



**www.smartcommunications.us**
*Corrections Simplified*

Correct Solutions 00500

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT W

### *to Amended Complaint*

**From:** ████@co.sebastian.ar.us
**Date:** September 13, 2019 at 12:40:46 PM EDT
**To:** Jon Logan ████@smartjailmail.com>
**Subject: Re:**

Mr. Logan,

At this time I am going to have to pass on meeting with your representative.

Respectfully,
John D. Miller
Operations Major
Sebastian County Sheriff's Office
479-████

From:   Jon Logan <████@smartjailmail.com>
To:   ████@co.sebastian.ar.us
Date:   09/11/2019 04:04 PM
Subject:

Hello Major,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- Smart Communications


www.smartcommunications.us
Corrections Simplified

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT X

### *to Amended Complaint*

ROEDEL PARSONS KOCH
BLACHE BALHOFF & McCOLLISTER

A   L A W   C O R P O R A T I O N

roedelparsons.com

**Luke F. Piontek, Partner**
*Lpiontek@roedelparsons.com*
*Baton Rouge Office*

*Telephone: (225) 929-7033*
*Direct Dial: (225) 329-1293*
*Facsimile: (225) 928-4925*

September 13, 2019

**VIA CERTIFIED MAIL**
**#7016 0750 0000 6885 1345**
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan

> RE:   Notice to Cure pursuant to Master Services Agreement between
> Correct Solutions, LLC and Smart Communications Holding, Inc.
> (Correct Solutions, LLC's customer: Sebastian County)

Dear Mr. Logan:

You are hereby notified that Smart Communications Holding, L.L.C. ("Smart") is in default under the terms of the Master Services Agreement ("MSA") with Correct Solutions, LLC ("Correct Solutions"), dated August 31, 2017, and Schedule 1 – Sebastian County, AR ("Schedule 1") of the MSA, also dated August 31, 2017, respecting the provision of equipment and services to Correct Solutions' customer, Sebastian County Detention Center ("Sebastian County").

Specifically, Paragraph 3 of Schedule 1 provides that the "SmartTablet" unit provided by Smart "is a custom, wireless, ruggedized and correctional grade tablet of [Smart's] custom specification..." Meanwhile, Paragraph 8 of Schedule 1 states, in part, that, "Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. … We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remoted infrastructure 24/7 and alert our technicians in real-time if any issues are detected."

In fact, the tablets and supporting equipment provided by Smart to Correct Solutions' customer, Sebastian County, were not "correctional grade" in any functional sense. The tablets provided by Smart have been rather easily dismantled and fashioned into crude weapons. Additionally, inmates at Sebastian County have readily removed the batteries from Smart's tablets which batteries have been used to charge illegal cell phones in the facility. The attached exhibits, supplied by Sebastian County, provide photographic evidence of the defectiveness of Smart's equipment. As you are well aware, safety and security are top priorities for Correct Solutions'

customer, Sebastian County, and the defective tablets provided by Smart allow inmates to easily circumvent these priorities. As such, Smart is in violation of Paragraph 3 of Schedule 1.

In addition, Smart has failed to timely install and/or provide electronic education and/or entertainment options (*e.g.*, electronic books and games) on the tablets provided to Sebastian County. Sebastian County requested the installation of electronic education and/or entertainment options over a year ago, but Smart has neglected to carry out such installment. Paragraph 2 of the MSA provides that Smart "shall be the sole and exclusive provider" of, among other services, "electronic education, electronic self-help, … [and] electronic entertainment…" to Correct Solutions' customer facilities. Smart's failure to timely install and/or provide electronic education and/or entertainment options violates Paragraph 2 of the MSA.

Further, according to Sebastian County, the tablets Smart provided to Sebastian County experience near constant failures and performance deficiencies. Smart has also directed Sebastian County regarding how to allegedly repair the inoperable, broken, or defective tablets rather than repairing the tablets itself. Paragraph 7 of the MSA states, in part, that "In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet", and that Smart "will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office." Paragraph 8 of the MSA sets forth Smart's "Maintenance and Support Plan" regarding the tablets. Smart's provision of tablets that are in a state of near constant failure, as well as its failure or refusal to repair inoperable, broken, or defective tablets, violates Paragraphs 7 and 8 of the MSA.

Under Paragraph 9 of the MSA, "If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default." This letter serves as Correct Solutions' notice to Smart of the nature of the default, set forth above. Paragraph 9 continues, stating, "The defaulting Party shall have thirty (30) days after receipt of notice of default to cure." This letter also serves as Correct Solutions' notice to cure the default with respect to the defective tablets provided to Sebastian County within thirty (30) days of receipt of this letter. Failure to cure may result in immediate termination of the MSA and other agreement(s) between Smart and Correct Solutions.

As the attached photographs very clearly suggest, allowing the intended end-users of Smart's equipment to have continued access to these apparently defective and/or substandard products may very well lead to consequences considerably more grave than mere customer dissatisfaction. Therefore, Smart must provide Sebastian County with "ruggedized and correctional grade tablet[s]", which naturally must be tamper-proof, with electronic education, and electronic entertainment (books and games) installed, and must repair any inoperable, broken, or defective tablets, within thirty (30) days of receipt of this notice to cure. With that in mind, your prompt attention to the matter is greatly appreciated.

Sincerely,

Luke F. Piontek
*Counsel for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
General Counsel
Smart Communications Holding, Inc.





*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT Y

### *to Amended Complaint*



182 Bastille Lane • Ruston, Louisiana 71270

October 4, 2019

CERTIFIED MAIL RECEIPT # 7015 3430 0000 8938 0153

Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ██████@smartjailmail.com)

RE:   Notice of Non-Renewal of Master Services Agreement between
      Correct Solutions, LLC and Smart Communications Holding, Inc.
      (Correct Solutions, LLC's customer: Washington County)

Dear Mr. Logan:

        You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Washington County, Arkansas ("Schedule 1") of the MSA, dated November 15, 2017, with respect to Correct Solutions' customer, the Washington County, Arkansas facility ("Washington County Facility"). Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA, Schedule 1 and the contract between Correct Solutions and the Washington County Facility, dated September 25, 2014, are attached hereto.

        Pursuant to paragraph 14 of the Washington County Facility contract, the term of said contract "shall be for 12 calendar months starting when CSG platform is installed and first call is successful." The first successful call under the Washington County Facility contract was placed January 4, 2015, therefore, January 4, 2015 is the start date of the Washington County Facility contract. The current contract between Correct Solutions and the Washington County Facility expires January 3, 2020, at midnight. Consequently, this written notice of non-renewal of the MSA and Schedule 1 with respect to the Washington County Facility is timely.

        The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via registered or certified United States mail, postage prepaid, to the following address for Smart: 4522 W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we received when our general counsel's office sent correspondence to Smart back in June of this year that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ██████@smartcommunications.us. Finally, we are delivering this notice of non-renewal to Smart by hand delivery via courier.



182 Bastille Lane • Ruston, Louisiana 71270

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Washington County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Patrick Temple

*Managing Director for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
      General Counsel
      Smart Communications Holding, Inc.
      ██████@smartjailmail.com

      Kenneth Turkel (via email only)
      Brad Barrios (via email only)
      Bajo Cuva Cohen & Turkel
      100 North Tampa Street, Suite 1900
      Tampa, FL 33602
      kturkel@bajocuva.com
      bbarrios@bajocuva.com

 

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and educational, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. <u>Title.</u> Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. <u>Term.</u> This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. <u>Limitation of Liability.</u>  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. <u>Confidential Information and Non-Disclosure.</u> The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11 Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

Page 4 of 6

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: 9/13/17

Email: ██████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: 8-31-17

Email: ██████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

### Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Washington County, Arkansas - 1155 W Clydesdale Dr, Fayetteville, AR 72701

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided.  Customer shall determine which inmates have access to the SmartTablets. The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment.  We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled.  We utilize a defense-in-depth strategy which employs many layers of security.  If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

9. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

10. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present.  The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

*PMT*

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

11. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

12. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

13. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

### Maintenance and Support Plan

14. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

15. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

16. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

17. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

18. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

19. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

20. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

21. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

22. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

23. Electronic Messaging. Each email message is billed at one credit ($0.50).

24. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

25. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

26. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

27. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

28. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

29. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

30. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

31. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

32. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

33. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

34. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11 / 7 / 17

Email: ██████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 1 / 15 / 17

Email: ██████@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609



## CORRECTIONAL COMMUNICATIONS SERVICE AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Washington County Sheriff's Office**, located at 1155 W. Clydesdale Drive, Fayetteville, Arkansas 72701, herein known as the "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston Louisiana 71270, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-cal telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment and phones at the Facility, or any affiliated Facilities, for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.
   a. CSG shall install 75 (seventy-five) inmate phones in inmate housing area

4. Customer further agrees to allow CSG to install a Lobby Kiosk in the Facility to accept phone payments from friends and family, at no cost to Washington County Sheriff's Office.
   CSG will assess the following fees for Kiosk transactions:
   $3.00 per cash transaction, $0 - $100 and
   $9.95 for all Credit Card transactions with cap limit of $100 per transaction.
   All funds mailed direct, via Money Order, to CSG will have NO FEE assessed.

5. CSG shall provide the Customer with $10,000 annual fee for VuGate video visitation maintenance and support

1



6.  CSG shall provide Customer with value-added features discussed in proposal including: PIN interface with M&M Software for active PIN push and deactivation, Offender voice mail at $1.00 per message, of which Washington County will receive 50% *(fifty percent)* and activation of investigator/web administration for system access.

7.  CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the duration of the term of this contract, plus an additional 2 years after the term.

8.  In consideration for this exclusive license and lease agreement CSG shall pay **Washington County** a Commission Fee of **73% (Seventy-Three Percent)** of the Total Gross Revenue for all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.

    **Phone Rates** will be as follows for the call types below:
    Local calls - $5.00 flat rate;
    Interlata and intralata calls - $5.00 flat rate;
    Interstate calls - $3.15 flat rate for Pre-paid, $3.75 flat rate for Collect *(according to FCC ruling/rate change)*

9.  CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Arkansas. On-line Revenue reports will be available to Customer at any time.

10. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

11. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.



12. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

13. This agreement shall be deemed to be a contract made under the laws of the State of Arkansas and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

14. The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

15. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth below.

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA 71270

Washington County Sheriffs Office
1155 West Clydesdale Drive
Fayetteville, AR 72701

By: _Patrick H. Temple_

Name: _Patrick H Temple_

Title: _Managing Member_

Date: _9/25_, 2014

By: _Marilyn Edwards_

Name: _Honorable Judge Marilyn Edwards_

Title: _Washington County Judge_

Date: _9/25/2014_, 2014

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT Z

### *to Amended Complaint*



**C⭑RRECT**
SOLUTIONS GROUP
PHONES  KIOSKS

182 Bastille Lane + Ruston, Louisiana 71270

November 21, 2019

**CERTIFIED MAIL RECEIPT #**<u>7014 2870 0002 3604 6688</u>
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ▮▮▮▮▮@smartcommunications.us)

    RE:    Notice of Non-Renewal of Master Services Agreement between
             Correct Solutions, LLC and Smart Communications Holding, Inc.
             (Correct Solutions, LLC's customer: Sebastian County)

Dear Mr. Logan:

      You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew
the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications
Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Sebastian County,
Arkansas ("Schedule 1") of the MSA, also dated September 13, 2017, with respect to Correct
Solutions' customer, the Sebastian County, Arkansas facility ("Sebastian County Facility").
Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's
Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with
written notice of non-renewal at least ninety (90) days prior to expiration of the then current term."
The MSA, Schedule 1, and the contract between Correct Solutions and the Sebastian County
Facility, dated April 24, 2017, are attached hereto.

      Pursuant to paragraph 1 of the Sebastian County Facility contract, the contract "is effective
on the latest signature date ('Effective Date'), and shall continue in effect for a period of two (2)
years ('Initial Term') from the Effective Date." Paragraph 1 from the Sebastian County Facility
contract goes on to state that, "Upon completion of the Initial Term, Facility will have the option
to renew this Agreement with annual extensions for up to four (4) additional years." The last
signature on the Sebastian County Facility contract is dated April 24, 2017, therefore, April 24,
2017 is the start date of the Sebastian County Facility contract. The current contract between
Correct Solutions and the Sebastian County Facility expires April 23, 2020. Consequently, this
written notice of non-renewal of the MSA and Schedule 1 with respect to the Sebastian County
Facility is timely.

      The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via
registered or certified United States mail, postage prepaid, to the following address for Smart: 4522
W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we
received when our general counsel's office sent correspondence to Smart back in June of this year

that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ▮▮▮▮ @smartcommunications.us. Finally, we are emailing a courtesy copy of this letter to your counsel in the litigation, Kenneth Turkel and Brad Barrios, at the addresses below.

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Sebastian County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Mark Turner

*Director of Sales for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
       General Counsel
       Smart Communications Holding, Inc.
       ▮▮▮▮ @smartjailmail.com

       Kenneth Turkel (via email only)
       Brad Barrios (via email only)
       Bajo Cuva Cohen & Turkel
       100 North Tampa Street, Suite 1900
       Tampa, FL 33602
       kturkel@bajocuva.com
       bbarrios@bajocuva.com

 

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1.  Systems. This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2.  Use of Systems.  Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3.  Hardware and Software License. For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. License Restrictions: The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

## Attachment  A to Notice of Non-Renewal

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: _____9/13/17_____

Email: ██████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: ____8-31-17_____

Email: ██████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

### Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Sebastian County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartTablet on a 1:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. Provider reserves the right to periodically evaluate and adjust the ratio based on usage and with agreement of Customer.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

6. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases can be permanently installed into a housing area (e.g. wall mounted) or can be provided as mobile carts to allow for bulk transportation of tablets as needed. Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

7. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office

## Maintenance and Support Plan

8. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

9. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

10. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

11. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

12. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

13. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

14. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

15. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

16. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

17. Electronic Messaging. Each email message is billed at one credit ($0.50).

18.  Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

19. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

20. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

21. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

22. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

23. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

24. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

25. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

26. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

27. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

28. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Customer Responsibilities

29. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

30. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

31. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

32. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

33. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

34. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

      **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: [redacted]@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: [redacted]@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between Sebastian County Sheriff's Office located at 800 South A Street, Fort Smith, AR 72901, herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective on the latest signature date ("Effective Date"), and shall continue in effect for a period of two (2) years ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement with annual extensions for up to four (4) additional years. Each renewal will be based on a yearly review of services provided by CSG.

2. **SCOPE OF AGREEMENT**

   2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems within its building or on its private property ("Location") during the term of this Agreement. CSG and Facility have agreed upon specific rates for inmate collect, debit and advance pay calls as described in Attachment A of this Agreement.

   2.2 This Agreement includes all other premises, whether now existing (if a competing provider has a contract and equipment at such premises, this clause applies at the earliest termination opportunity) or subsequently acquired, under the control of Facility. Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

   2.3 CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility

equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated unbillable.

2.4 CSG shall install and maintain Equipment in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5 CSG agrees to provide Equipment as indicated in Attachment B for the Term of this Agreement.

2.6 CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.5 Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility. CSG will install and maintain all necessary infrastructure equipment at no cost to Sebastian County.

2.7 Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.8 Facility agrees to allow CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.9 Facility agrees to allow CSG access to and use of house cable and inside wire at no cost where available in order to install and provide inmate telephone service.

2.10 Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be agreed to by CSG in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11 Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.12 CSG shall provide Facility with value-added features as listed in Attachment C.

2.13 In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment D.

3. **OWNERSHIP.** Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment. Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment. Facility shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4. **LEGAL ENFORCEMENT.** If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5. **LAWFULNESS OF AGREEMENT.** The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6. **NONWAIVER.** The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7. **GOVERNING LAW.** This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State in which the Equipment is provided.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment B must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy such default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of telephones as described in Attachment B, must be in writing and signed by an authorized representative from each Party.

15. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**

Attn: Honorable David Hudson

Address:
800 South A Street
Fort Smith, AR 72901

**FOR CSG**

Attn: Patrick Temple

Address:
182 Bastille Lane
Ruston, LA 71270

16. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

For Sebastian County Sheriff's Office

_Bill Hollenbeck_ _____ **Signature**

_Sebastian County Judge_

_David Hudson County Judge_

Bill Hollenbeck _____ Print

3/27/17 _____ Date

For Correct Solutions Group

_____ Signature

Patrick M. Temple _____ Print

4/24/17 _____ Date

ATTACHMENT A

RATE SCHEDULE

Rates for calls within the Inmate Call Control Platform will be programmed per the table below:

Rates -
Sebastian
County, AR

#### PREPAID CALLS

|  | Minute |
| --- | --- |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |

#### PIN DEBIT CALLS

|  | Minute |
| --- | --- |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |

#### PREPAID CARDS

|  | Minute |
| --- | --- |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |

Simple two fee structure for account funding:
$5.95 for Account Funding utilizing live operator
$3.00 for Account Funding utilizing IVR, Web, Kiosk

## ATTACHMENT B

### PROVIDED EQUIPMENT

**Inmate Call Control Platform.** The CSG provided Platform will be installed to accommodate the 31 inmate telephones or more as needed and portable telephones as listed in the Sebastian County RFP. Platform will be programmed per the requirements of the County to reflect times of operation. This includes all existing facilities, future expansions or locations.

Inmate call platform, servers, routers and switches are the property of CSG and will be provided at no cost to Customer.

**Video Visitation Platform** – The CSG provided Video Visitation Platform equipment will consist of fifteen (15) inmate side video visitation terminals, seven (7) public side video visitation terminals, one (1) cart video visitation terminal, one (1) Lobby Scheduling Monitor and one (1) Lobby Registration and Scheduling Terminal.

The Video Visitation Platform will be installed by CSG. All equipment will remain the property of CSG and will be provided at no cost to Customer for the duration of Initial Term and Annual Renewals. The following table is demonstrates Customers obligation in the event that this Agreement is not renewed or cancelled for any reason prior to the Initial Term and Annual renewals not being met.

In the event that Agreement is not extended, cancelled or otherwise made to be not in effect, Customer agrees to the following schedule, based on six (6) years, as a payment for equipment and services. Customer agrees that, should the aforementioned actions negating the original Agreement take place within the given year listed below, the scheduled amount shown would be paid to CSG in full.

a.  Year 1 – beginning with installation and lasting one (1) year, Customer agrees to pay $129,000 to CSG.

b.  Year 2 – beginning with the second year following installation, Customer agrees to pay $107,436 to CSG.

c.  Year 3 – beginning with the third year following installation, Customer agrees to pay $85,872 to CSG.

d.  Year 4 – beginning with the fourth year following installation, Customer agrees to pay $64,308 to CSG.

e.  Year 5 – beginning with the fifth year following installation, Customer agrees to pay $42,744 to CSG.

f.  Year 6 – beginning with the sixth year following installation, Customer agrees to pay $21,180 to CSG.

Customer agrees to pay CSG monthly maintenance and support cost per the following table. Monthly maintenance and support costs will be deducted from inmate telephone commission payments from CSG to Customer.

a.  Year 1 -- There will be no monthly maintenance and support cost charged to Customer during the first year of this Agreement.

b.  Year 2-6 – A monthly maintenance and support cost of $1,290.00 per month will be deducted from inmate telephone commission payable to Customer by CSG.

c.  After Year 6, the maintenance and support cost paid by Customer to CSG ceases. Any support arrangements from this time period going forward will be negotiated between Customer and CSG at that time.

Provided Equipment and Value-Added Equipment will be installed and implemented per the timeline listed below:



### Correct Solutions Group
### Sebastian County, AR Implementation Timeline

## ATTACHMENT C

### VALUE-ADDED FEATURES

CSG will provide the CELLMATE Platform to Customer. The Cellmate platform provides tablets to inmates for daily use.

Features included are:
- Talk – inmates will be able to place inmate phone calls, which adhere to all security measures, from the tablets.
- Text – inmates will be able to text numbers and receive text from numbers. All security measures apply and all text will be available to investigators. Family members must have an account established with CSG in order to receive or send texts.
- Games – inmates will be provided with games.
- Books – CSG utilizes a public domain repository of books that the inmate can choose and read on the tablet.

The tablet is manufactured with a clear back cover for security purposes.

No access to outside internet will be available for inmates utilizing tablets.

Charging stations for tablets will be provided by CSG as needed by Customer.

An initial 500 tablets will be provided to Customer. Initial inventory will be enough to supply each inmate with a tablet and provide Customer a spares inventory.

Tablets will not be repaired and should only be replaced. Once spares inventory is depleted, Customer and CSG will negotiate replacement program.

KIOSKS – CSG will provide, at no charge to the Customer, three (3) kiosks. Two (2) kiosks will be placed in the unsecured area of the facility and will be accessible to family and friends for deposit of funds onto inmate accounts. One (1) kiosk will be placed on the secured side of the facility within the booking area. This kiosk will be utilized for inmate fund acquisition at the time of booking and will be equipped to accept coins and cash and must be interfaced with appropriate Customer software to maintain accounting. All kiosks will accept U.S. currency only.

## ATTACHMENT D

### FINANCIAL SCHEDULE

In consideration for this exclusive Contract and Agreement, CSG shall pay Customer a Commission Fee of 74% (Seventy-Four Percent) of the Total Gross Revenue for completed inmate telephone calls regardless of call type, with exception to Interstate Calls due to FCC ruling.

CSG shall provide Customer with a monthly commission report that details all call types, call volumes and call rates. All rates and charges under this Agreement shall conform to the Public Service Commission regulations of Arkansas.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT AA

### *to Amended Complaint*

**C★RRECT**
SOLUTIONS GROUP
PHONES   KIOSKS

182 Bastille Lane • Ruston, Louisiana 71270

November 21, 2019

**CERTIFIED MAIL RECEIPT #** 7014 2870 0002 3604 6695
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ███████@smartcommunications.us)

RE:   Notice of Non-Renewal of Master Services Agreement between
      Correct Solutions, LLC and Smart Communications Holding, Inc.
      (Correct Solutions, LLC's customer: Wayne County)

Dear Mr. Logan:

You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Wayne County, Georgia ("Schedule 1") of the MSA, dated March 16, 2018, with respect to Correct Solutions' customer, the Wayne County, Georgia facility ("Wayne County Facility"). Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA, Schedule 1, and the contract between Correct Solutions and the Wayne County Facility, dated February 6, 2018, are attached hereto.

Pursuant to paragraph 1 of the Wayne County Facility contract, the contract "is effective upon the date of installation of equipment ('Effective Date'), and shall continue in effect for a period of 1 year ('Initial Term') from the Effective Date." The installation of Correct Solutions' equipment at the Wayne County Facility contract was completed March 15, 2018, therefore, March 15, 2018 is the start date of the Wayne County Facility contract. The current contract between Correct Solutions and the Wayne County Facility expires March 14, 2020. Consequently, this written notice of non-renewal of the MSA and Schedule 1 with respect to the Wayne County Facility is timely.

The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via registered or certified United States mail, postage prepaid, to the following address for Smart: 4522 W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we received when our general counsel's office sent correspondence to Smart back in June of this year that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the

address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ████████@smartcommunications.us. Finally, we are emailing a courtesy copy of this letter to your counsel in the litigation, Kenneth Turkel and Brad Barrios, at the addresses below.

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Wayne County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Mark Turner

*Director of Sales for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
      General Counsel
      Smart Communications Holding, Inc.
      ████████@smartjailmail.com

      Kenneth Turkel (via email only)
      Brad Barrios (via email only)
      Bajo Cuva Cohen & Turkel
      100 North Tampa Street, Suite 1900
      Tampa, FL 33602
      kturkel@bajocuva.com
      bbarrios@bajocuva.com





## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

## Attachment A to Notice of Non-Renewal

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i)  permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii)  Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii)  alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv)  connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v)  distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi)  reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii)  defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii)  remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

## Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: ___9/13/17___

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: ___8-31-17___

Email: ████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Wayne County, Georgia – 1892 South Macon Street, Jesup, Georgia 31545

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize kiosks that are from assigned to their housing unit in designated classroom areas.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Maintenance and Support Plan

6. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each kiosk checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

7. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

8. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

9. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

10. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

11. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

12. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

13. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

14. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

15. Electronic Messaging. Each email message is billed at one credit ($0.50).

16. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

17. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

18. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

19. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

20. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

21. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

22. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

23. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

24. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

25. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

26. We shall provide access via the SmartKiosk to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

29. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

30. We will provide at no cost to Customer the labor for the installation of the video visitation system.

31. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

32. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

33. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation. Audio Files will be stored for 180 days and Video Files will be stored for 90 days.

34. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

35. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

36. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

37. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

38. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

39. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website

40. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

41. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

42. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

43. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

44. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

45. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

46. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

47. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Kiosk Solutions™.

48. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

49. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

50. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

51. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

52. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

53. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

54. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

55. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

56. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

57. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

 **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 3/16/18

Email: [REDACTED]@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 3/16/18

Email: [REDACTED]@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609



## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between **Wayne County Sheriff's Office** located at 266 East Walnut Street, Jesup, GA 31546 herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective upon the date of installation of equipment ("Effective Date"), and shall continue in effect for a period of 1 year ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement for a period of 4 (four) successive one year periods. Each renewal will be based on a yearly review of services provided by CSG. This Agreement will automatically renew under the terms described as Initial Term unless either party notifies the other in writing of its intent to terminate this Agreement at least 90 days prior to the final date of expiration. Upon termination of this Agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this Agreement.

2. **SCOPE OF AGREEMENT**

   2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems and /or inmate video visitation within its building or on its private property ("Location") during the term of this Agreement.

2.2  This Agreement includes all other premises, whether now existing or subsequently acquired, under the control of Facility.  Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

2.3  CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments.  CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated  unbillables.

2.4  CSG shall install and maintain Equipment in good working order.  CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5  CSG agrees to provide Equipment as indicated in Attachment A for the Term of this Agreement.

2.6  CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue.  All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.7  Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility.  In the event Facility is not the owner of the premises, Facility shall, where necessary, obtain permission from building owner or owner's agent for the placement of CSG's Equipment, and shall be responsible for any fees for use of required riser cable and electric power.

2.8  Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.9  Facility agrees to all CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.10  Facility agrees to allow CSG access to and use of house cable and inside wire at no cost, in order to install and provide inmate telephone service.  Any new house cable or inside wire pertaining to the commnications services expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11  Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.12  Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.13  CSG shall provide Facility with value-added features as listed in Attachment A.

2.14  In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment B.

3.  **OWNERSHIP.**  Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense.  CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment.  Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment.  Facility shall restore the premises to their original condition.  CSG shall not be responsible for damage to the premises that occur due to vandalism.  CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4.  **LEGAL ENFORCEMENT.**  If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5.  **LAWFULNESS OF AGREEMENT.**  The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6.  **NONWAIVER.**  The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7.  **GOVERNING LAW.**  This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State of Georgia.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment A must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy usch default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**                    **FOR CSG**

Attn:    John Carter, Sheriff       Attn:    Patrick Temple

Address: 266 East Walnut Street     Address: 182 Bastille Lane
         Jesup, GA 31546                     Ruston, LA 71270

## ATTACHMENT A

## PROVIDED EQUIPMENT

Telephone/Video Communication Service-Related Equipment/Systems

Correct Solutions ITS Call Processing, including:
- Inmate Telephones
- Cart Phones
- TDD/TTY units
- Inmate Visitation Phones
- Offender & Public Video Visitation Kiosks (Law Library, Requests\Grievances, etc)
- Unlimited ITS User Licenses
- Unlimted SMART User Licenses
- Interface to JMS Platform
  - Automated Inmate ID\PIN\Voice Recognition
  - Automated Offender access JMS Information via Kiosk (Court Date, Bond Amount, Charges, etc.)
- Interface to Commissary Platform
  - Automated Debit Calling
  - Kiosk Commissary Ordering
- Inmate Voice Mail
  - Messages priced at $.50 per Message with 60% Revenue Share

**ATTACHMENT B**

**FINANCIAL COMPENSATION**

| ALL CALLING RATES | | |
|---|---|---|
| Call Type | Per Call Charge | Per Minute Charge |
| Local | $0.00 | $0.18 |
| Intrastate/Intralata | $0.00 | $0.31 |
| Intrastate/Interlata | $0.00 | $0.31 |
| Interstate | $0.00 | $0.25 |

Compensation

Correct Solutions shall pay County a commission of 60% of the gross call revenue for all call types with the exception of interstate calls due to FCC ruling. Correct Solutions will also pay County 60% for any service fees collected for Inmate voicemail.

15. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**Signatures:** **The persons signing below signify that they have the authority from their respective business entities to execute this Agreement.**

Wayne County Sheriff's Office

_____
*Signature*

John G. Carter
*Printed Name*

Sheriff
*Title*

2/6/2018
*Date*

CSG

_____
*Signature*

Roddy L. McLemore     Patrick M. Temple
*Printed Name*

Sales Consultant     Manager
*Title*

2/6/2018     2/6/18
*Date*

March 15, 2018 - Last Day for Paytel Contract

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT BB

### *to Amended Complaint*

**Tony Schaffer**

| | |
|---|---|
| **From:** | Seth Doser < █████ @techfriends.com> |
| **Sent:** | Friday, August 23, 2019 3:37 PM |
| **To:** | Albert Cantu |
| **Cc:** | █████ @a.jailatm.com;'Lee Aspinwall;'Joseph Schaefer' |
| **Subject:** | Tablet/Kiosk Installation 9-16-19 |

Good afternoon,

The current plan is to arrive onsite with hardware on 9/16 to install tablets and kiosks. If possible we would like to install our wall mounted tablets in the same place as the smart tablets so as to avoid unnecessary work with running electric and network cables. Do you know if by chance the previous vendor will come onsite to uninstall their tablets?

Thanks,

--



**Seth Doser**
*Operations Technician*
Integrations
**Tech Friends, Inc**
p: 870-█████   f: 815-█████
e: █████@techfriends.com

1

Case 8:20-cv-01469-WFJ-TGW   Document 1-6   Filed 06/26/20   Page 96 of 181 PageID 968

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                          Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

## **MOTION FOR TEMPORARY INJUNCTION**

      Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Florida Rule of Civil Procedure 1.610, files this Motion for Temporary Injunction ("Motion") against Defendants, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("CSG"). The grounds upon which this Motion is based and the reasons it should be granted are described below.

### **Introduction**

      1.     This urgent matter arose when CSG sent Smart three Notices of Non-Renewal of the contracts between CSG and Smart dealing with three customers: Washington County, Sebastian County, and Wayne County. Based upon an interpretation of the contracts at issue that is inconsistent with their plain language and entirely contrary to the expressed intent of Smart and CSG, CSG has demanded that Smart remove its systems and equipment from these Joint Customer facilities, beginning with Washington County on or before **January 3, 2020**.[1]

      2.     Although Smart has the exclusive right to provide inmate messaging services to these customers for a duration that is co-terminous with CSG's terms with the customers, CSG has

---

[1] CSG demanded that Smart remove its systems and equipment from Sebastian County on or before April 23, 2020 and from Wayne County on or before March 14, 2020.

taken the position that it may terminate Smart's services under the guise of a "non-renewal," while continuing to service the Joint Customers under the same contract with which Smart's term is co-terminous.

3.     An examination of the Washington County Agreement[2] in its entirety, along with clear evidence of the expressed intent of Smart and CSG, demonstrates that CSG and Washington renewed their contract and, as a result, the co-terminous term of the MSA for Washington County between CSG and Smart continued. CSG cannot now attempt to terminate Smart's services by noticing a purported "non-renewal" of its agreement with Smart.

<u>**The Contractual Relationship of Smart, CSG, and Joint Customers**</u>

4.     Smart and CSG both provide inmate communications services to correctional facilities. There are eight different facilities to which CSG provides telephone services and Smart provides messaging and related services, which are identified and defined in the Amended Complaint as the Joint Customers.

5.     For each Joint Customer, the relationships of the parties are structured in the same manner. By way of example, Smart and CSG are parties to a Master Services Agreement ("MSA") for Washington County (which defines the general terms of the relationship between Smart and CSG and which is the same for each Joint Customer relationship), which incorporates a services contract between CSG and Washington County (which defines the general terms of the relationship and obligations between CSG and Washington County) and a Schedule of Services (which identifies the services that Smart is obligated to provide to Washington County).

---

[2] The MSA between Smart and CSG for Washington County, the services contract between CSG and Washington County, and the Schedule of Services between Smart and CSG for Washington County are collectively referred to as the Washington County Agreement.

6.      Due to the significant financial investment Smart was going to undertake in installing its equipment and services and necessary infrastructure into each Joint Customer facility, Smart originally requested a seven year term for each exclusive dealing contract to ensure it had adequate time to recoup and obtain a return on its investment. However, given that CSG had existing agreements with some of the Joint Customers, all of which included favorable renewal terms, Smart and CSG instead agreed that the term of each MSA between Smart and CSG would be "co-terminous" with each services contract between CSG and the Joint Customer. That is, Smart and CSG agreed that, as long as CSG provided services to a Joint Customer pursuant to the original or any subsequent renewal term of a CSG/Joint Customer contract, then Smart would exclusively provide the services identified in the Schedule to the Joint Customer.

7.      Accordingly, the term of the MSA for each Joint Customer Agreement is "co-terminous" with the term of the Joint Customer's contract with CSG, including any ongoing renewal periods between CSG and the Joint Customer. Specifically, Paragraph 6 of the MSA provides:

> Term. This Agreement shall commence on the "Effective Date" and **shall be co-terminous with Customer's Agreement with Facility** as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

(emphasis added).

8.      Each services contract between a Joint Customer and CSG includes an initial term and subsequent optional renewal terms. In most instances, the renewal terms begin automatically if one of the parties does not notify the other party of its intention to not renew the agreement.

9.      For example, Paragraph 14 of the services contract between CSG and Washington County provides:

> The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

(emphasis added).

10.     Accordingly, the **only way** that the contract between CSG and Washington County does not renew is if either party provides the other party with written notice of non-renewal at least 90 days prior to the date of expiration.

11.     If CSG and Washington County renew the term of their contract, then the MSA between Smart and CSG for Washington County also continues because Smart's term is "co-terminous."

12.     If, and only if, either CSG or Washington County elects not to renew their contract, then CSG may provide corresponding notice to Smart of non-renewal of the MSA with respect to Washington County pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and Washington County for Smart to be "co-terminous" with.

**Background and Facts**

13.     Smart earns revenue from the messaging services it provides to the Joint Customers. Pursuant to the MSA, Smart retains the revenue and has no obligation to share it with CSG.

14.     Beginning at least as early as April 2019, CSG developed a relationship with another provider of messaging services, Tech Friends, Inc. ("Tech Friends") who, unlike Smart, promised to share its messaging revenue with CSG.

15.     On April 1, 2019, Captain William Dumas of Sebastian County thanked CSG for dinner and lunch the prior week and indicated that he had permission from the Sheriff to move forward with the Tech Friends tablets. Ferguson forwarded the email to Mark Turner, one of CSG's senior leaders and a main point of contact to Smart, and Turner responded: "We have to get Smart out first though don't we?" A copy of the April 1, 2019 email exchange is attached to the Amended Complaint as **Exhibit D**.

16.     Following CSG's decision to "get Smart out," CSG embarked on a series of pretextual paths to manufacture reasons to replace Smart with Tech Friends. CSG's efforts, which included soliciting complaints about Smart from the Joint Customers, attempting to characterize a public employee's email address as "confidential" in order to justify terminating Smart's services in all Joint Customer facilities, and labeling unsupervised inmates' destruction of Smart's tablets as Smart's default under the MSA, are described in detail in the Amended Complaint.

17.     On June 21, 2019, CSG's leadership team discussed using a Smart mass email advertisement as grounds for "pulling the plug on all Smart devices on a set day." Turner indicated that "we have TF [Tech Friends] lined up to come in…" Ferguson agreed that CSG should have "a very strategic plan with Tech Friends…in place and brief the customer before the blade falls, because when it does, the only panic taking place should be in Smart's conference room." A copy of the June 21-22, 2019 CSG email exchange is attached to the Amended Complaint as **Exhibit H.**

18.     Effective June 1, 2019, CSG and Tech Friends executed a Master Services and Supply Agreement (the "CSG/Tech Friends Agreement"), which is attached to the Amended Complaint as **Exhibit I**.

19.     The CSG/Tech Friends Agreement provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by Web Pack shipping fees" for the Legacy Accounts, which include four Joint Customers—Bowie County, Moore County, Sebastian County, and St. Louis County.

20.     The CSG/Tech Friends Agreement further provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals."

21.     Importantly, the revenue sharing arrangement between Tech Friends and CSG was made possible at least in part because Smart had already installed the necessary infrastructure (e.g., networking and power distribution) for its equipment at the Joint Customer facilities, which was a significant upfront expense Tech Friends could avoid.

22.     To date, CSG's bad faith schemes and efforts to "get Smart out" have proven unsuccessful, as Smart continues to provide its services to each of the Joint Customers. So CSG has shifted to its new strategy and has begun sending non-renewal notices that run afoul of the understanding and agreements between the parties.

23.     On October 4, CSG sent Smart a Notice of Non-Renewal of Master Services Agreement with respect to Washington County ("Notice of Non-Renewal"). A copy of the Notice of Non-Renewal is attached to the Amended Complaint as **Exhibit X**.

24.     The Notice of Non-Renewal attaches the Service Agreement between CSG and Washington County. Both parties signed the Service Agreement on September 25, 2014.

25.      The Notice of Non-Renewal asserts that the first successful call under the Service Agreement was placed on January 4, 2015, which, if true, is the start date of the Service Agreement.

26.     Upon receipt of the Notice of Non-Renewal, Smart requested proof of the first successful call and the start date of the Service Agreement. CSG never responded.

27.     Moreover, CSG does not claim in the Notice of Non-Renewal, or attach proof thereof, that either CSG or Washington County provided the other with timely written notice of its intent to terminate the Service Agreement. Assuming the accuracy of CSG's statement that the Service Agreement started on January 4, 2015, such written notice would have been due by October 4, 2019 in order for the Service Agreement to not automatically review. Based on CSG's failure to include written notice of intent to terminate from either CSG or Washington County, neither CSG nor Washington County terminated the Service Agreement. Thus, the Service Agreement for Washington County, which includes Smart's "co-terminous" services, renewed for another year, at least until January 4, 2021.

28.     On November 21, 2019, CSG sent Smart Notices of Non-Renewal of the Sebastian County and Wayne County agreements. Copies of the Notices are attached to the Amended Complaint as **Exhibit Y** and **Exhibit Z**.

29.     The Notices of Non-Renewal for Sebastian and Wayne County also fail because CSG has not terminated or elected not to renew its contracts with either of those counties. As a result, the "co-terminous" agreements with Smart remain in effect with these Joint Customers as well.

30.     With the renewals and/or continuation of CSG's agreements with these Joint Customers, Smart's exclusive rights to provide services to Washington County, Sebastian County, and Wayne County renewed and/or continue as well in accordance with the MSAs, Schedules, and CSG/Joint Customer contracts.

## Elements of Injunctive Relief

31.     If CSG is permitted to remove Smart's systems and equipment on **January 3, 2020**, then Smart will suffer immediate and irreparable harm and will not have an adequate remedy at law.

32.     Smart will suffer reputational damages and lose goodwill and market share due to the termination, under the guise of non-renewal, of the MSAs resulting in lost customers. Further, Smart will suffer significant monetary damages, including the inability to recoup its investments in the Joint Customers, which will be difficult, if not impossible, to calculate with any degree of certainty. This is especially true because Smart has no way of determining how many renewal periods it may lose due to CSG's attempted termination. CSG has a long history of consistently renewing its contracts with the Joint Customers, which is a fact CSG itself used to entice Smart to sign their respective agreements with a "co-terminous" term. Smart should obtain the benefit of every future renewal, and, as such, there is no way to measure Smart's damages related to being excluded from an unknown number of subsequent renewal terms.

33.     As described above, Smart is substantially likely to succeed on the merits of Count IX of the Amended Complaint for declaratory relief due to the plain language of the MSAs and CSG/Joint Customer contracts, in addition to the intent of the parties.

34.     Finally, the entry of a temporary injunction would serve the public interest. The injunction would not harm the public in any way; rather, Florida citizens have an interest in seeing that parties obey their contracts and act in good faith.

35.     Pursuant to Florida Rule of Civil Procedure 1.610(b), Smart will provide a bond in an amount the Court deems proper.

## Conclusion

36.     CSG has demonstrated that it will stop at nothing to acquire Smart's revenue derived from the Joint Customer facilities and ruin Smart's reputation along the way.

37.     Smart seeks a declaration and temporary injunctive relief prohibiting CSG from improperly terminating Smart's services at the Joint Customer facilities under the guise of notices of non-renewal.

38.     Smart will file a memorandum of law and declarations in support of this Motion.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order declaring that (a) CSG may not non-renew the MSAs and Schedules with respect to Washington County, Sebastian County, or Wayne County given the renewals or continuations of CSG's contracts with these Joint Customers; (b) Smart is entitled to be the exclusive provider of its services in Washington County, Sebastian County, and Wayne County during each initial and renewal term of the contracts between CSG and Washington County, Sebastian County, and Wayne County; and (c) for such further relief as the Court deems just and proper.

## Good Faith Conference Certification

The undersigned certify that they conferred with counsel for CSG about the issues raised in this Motion, although a motion for injunctive relief is an exception to Paragraph 11 of Administrative Order S-2019-007. CSG opposes the relief requested and has also opposed Smart's request to file the Amended Complaint, which includes the claims upon which this Motion is based.

Respectfully submitted,

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of November, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                    Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

**PLAINTIFF'S AMENDED RESPONSE TO DEFENDANT'S**
**SECOND REQUESTS FOR ADMISSION**

      Plaintiff, Smart Communications Holding, Inc. ("Smart"), responds to Defendant, Correct

Solutions, LLC's, Second Requests for Admission as follows:

**GENERAL OBJECTIONS**

      A.      Smart objects to these Requests for Admission to the extent they seek disclosure

of information protected from discovery by the attorney-client privilege and/or the work-product

doctrine, or any other applicable privilege or exemption. Inadvertent disclosure of privileged or

protected information shall not waive any applicable privilege or work-product protection.

      B.      Smart objects to these Request for Admission to the extent that they purport to,

or in fact, alter or enlarge their obligations pursuant to the Florida Rules of Civil Procedure and/or

Florida case law.

      C.      To the extent that these Request for Admissions seek information involving

topics other than those addressed by the pleadings, Smart objects to the Requests for Admission

as irrelevant to the subject matter of the pending litigation and not reasonably calculated to lead to the discovery of admissible evidence.

D.        All responses are made without waiving any objections as to relevance, privilege or admissibility. These general objections shall be deemed continuing as to each interrogatory and are neither waived nor limited in any way by the following responses.

## RESPONSES AND OBJECTIONS

1.    At no time since June 15, 2017 has Correct Solutions, LLC offered to perform to any of the eight facilities described in paragraph 19 of the Verified Complaint any of the services granted to Smart Communications under the Master Service Agreement.

   **Response:**     **Denied.**

2.    At no time since June 15, 2017 has Correct Solutions, LLC offered to provide to any facility the iMate E-Device referenced in paragraph 29 of your Verified Complaint.

   **Response:**     **Denied.**

3.    As of January 2019, the iMate E-Device was no longer serviced by Lattice, Inc.

   **Response:**     **Denied.**

4.    As of the filing of the Verified Complaint, Smart Communications knew that Correct Solutions, LLC did not provide electronic messaging services other than through a third party vender.

   **Response:**     **Denied.**

5.    At no time since June 15, 2017 has Correct Solutions, LLC sold or offered for sale a tablet that performed the services granted to Smart Communications in the agreement.

   **Response:**     **Denied.**

6.    At the time of the filing of the Verified Complaint, Smart Communications was aware that the iMate E-Device was no longer available in the market.

   **Response:**     **Denied.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails: KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

Filing # 99666447 E-Filed 12/02/2019 05:13:22 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## NOTICE OF TAKING DEPOSITION OF CORPORATE
## REPRESENTATIVE OF CORRECT SOLUTIONS, LLC

PLEASE TAKE NOTICE that, pursuant to Rule 1.310(b)(6), Florida Rules of Civil

Procedure and applicable law, Plaintiff, Smart Communications Holding, Inc. ("Smart"), will take

the deposition of the following person upon oral examination at the time and place set forth below

before the herein described Court Reporter designated by U.S. Legal Support, or before any other

notary public or officer authorized by law to take depositions:

| WITNESS | DATE AND TIME | PLACE | COURT REPORTER/ VIDEOGRAPHER |
|---|---|---|---|
| **Corporate Representative of Correct Solutions, LLC** | December 19, 2019 9:00 a.m. | Bajo \| Cuva \| Cohen \| Turkel 100 N. Tampa Street Suite 1900 Tampa, FL  33602 | U.S. Legal Support (954-463-2933) |

The oral examinations will continue until completed.  The deposition(s) are being taken for

the purpose of discovery, for use at trial and for all other purposes as are permitted under the

Florida Rules of Civil Procedure.

Pursuant to Rule 1.310(b)(6), Florida Rules of Civil Procedure, Defendant Correct Solutions, LLC ("CSG") shall designate one or more of its officers, directors or managing agents or other persons to give testimony regarding the following areas of inquiry:

1. The negotiation and execution of the Master Services Agreement and Schedules between CSG and Smart (the "MSA").

2. The communications and negotiations regarding Paragraph 6 of the MSA, including the intent of the parties with respect to and meaning of Paragraph 6.

3. CSG's position regarding the meaning of Paragraph 6 of the MSA and "co-terminous."

4. The communications and intent of the parties with respect to the interplay between or effects of the MSA, CSG's agreement with each Joint Customer, and the Schedule of services for each Joint Customer.

5. Any communications between the parties regarding the terms of CSG's agreements with the Joint Customers.

6. Any communications between CSG and the Joint Customers regarding the addition of Smart's services and the exclusivity and/or term of Smart's services.

7. CSG's October 4, 2019 Notice of Non-Renewal of Master Services Agreement between Correct Solutions, LLC and Smart Communications Holding, Inc. (Correct Solutions, LLC's customer: Washington County).

**PLEASE BE GOVERNED ACCORDINGLY.**

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*If you are a person with a disability who needs any accommodation to participate in this deposition, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Brad F. Barrios, Esq., Bajo | Cuva | Cohen | Turkel, 100 N. Tampa St., Suite 1900, Tampa, FL  33602, (813) 443-2199 at least 7 days before your scheduled deposition, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com


*/s/ Brad F. Barrios*
Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                                    Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

## **PLAINTIFF'S MOTION TO COMPEL DEPOSITION**

      Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Rules 1.310(b) and 1.380, Florida Rules of Civil Procedure, moves this court for entry of an order compelling Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("CSG") to provide available dates for the deposition of its corporate representative, and in support states as follows:

      1.     This case involves CSG's attempts to terminate Smart's contractual rights to exclusively provide inmate messaging services to a group of Joint Customers. Smart filed this lawsuit after CSG sent a notice purporting to terminate the relationship between Smart and CSG. While a status quo stipulation relating to the notice was pending, CSG then sent a Notice to Cure relating to Smart's tablets at Sebastian County, one of the Joint Customer facilities. The parties attended a hearing on Smart's Emergency Motion related to the Notice to Cure, which was resolved pursuant to an agreement which has not yet been memorialized by Court Order.

      2.     On October 4, 2019, CSG sent Smart a Notice of Non-Renewal with respect to a different Joint Customer, Washington County. In the Notice, CSG contends that the contract

between CSG and Washington County expires on January 3, 2020, that CSG elected not to renew the Master Services Agreement and Schedule between CSG and Smart with respect to Washington County, and that Smart should remove its equipment by that date.

3.     Upon information and belief, CSG and Washington County have renewed their services contract and CSG intends to provide the messaging services previously provided by Smart through another vendor, Tech Friends, Inc.

4.      Upon receipt of the Notice of Non-Renewal, Smart asked for evidence of the first successful call under the Washington County facility contract because such date would have served as the effective date of the contract and would have ultimately triggered the expiration and renewal dates of the contract. CSG did not provide any such evidence to Smart.

5.     Smart also informed CSG that it did not agree with CSG's interpretation of the Terms of the contracts at issue. For example, the Master Services Agreement for each Joint Customer includes a Term (Paragraph 6) that is "co-terminous" with the services contract between CSG and the Joint Customer.

6.     Due to the January 3, 2020 deadline in the Washington County Notice of Non-Renewal and Smart's position that its Master Services Agreement renewed with CSG's renewal of the Washington County services contract, Smart requested the deposition of CSG's corporate representative on the non-renewal issue.

7.     On November 11, 2019, Smart sent CSG a Notice of Taking Deposition of Corporate Representative of Correct Solutions, LLC. Smart identified seven topics about which Smart sought testimony from the corporate representative. Smart asked for the deposition to take place by mid-December, 2019, given the deadline in CSG's Notice of Non-Renewal. A true, complete, and authentic copy of Smart's request and deposition notice is attached as **Exhibit A**.

8.      CSG refused to provide deposition dates. CSG indicated that Smart was not entitled to the deposition because the non-renewal issue raised by CSG was not currently framed by the pleadings.

9.      On November 21, 2019, CSG sent Smart Notices of Non-Renewal of the Master Services Agreements and Schedules for two additional Joint Customers, Sebastian County and Wayne County.

10.      Despite CSG's refusal to provide a deposition date being contrary to the broad scope of permissible discovery under Florida law, Smart nevertheless sent CSG a proposed Amended Complaint on November 25, 2019. The proposed Amended Complaint includes a claim for declaratory relief related to the Notices of Non-Renewal.

11.      CSG still refused to provide Smart with deposition dates for the requested corporate representative deposition. Indeed, despite the fact that pleadings may be freely amended under Florida law, CSG refused to consent to the filing of the proposed Amended Complaint and forced Smart to file a Motion for Leave to File Amended Complaint, which Smart filed on November 27, 2019.

12.      CSG informed Smart that it would not provide the requested deposition until the Court granted Smart's Motion for Leave to File Amended Complaint.

13.      Smart attempted to schedule its Motion for Leave to File Amended Complaint for the only available hearing date before CSG's January 3, 2020 deadline—December 3, 2019. However, CSG stated that it was not available on that date.

14.      CSG is attempting to limit Smart's ability to refute and defend against CSG's Notices of Non-Renewal by refusing to agree to common procedural mechanisms—a deposition and an amended complaint—in hopes that the Notice of Non-Renewal for Washington County will

expire before Smart can obtain CSG's testimony on the issue and hearing time in order to frame and contest the non-renewal issue before the Court.

15.     "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter of the pending action. . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Fla. R. Civ. P. 1.280(b)(1). "[T]he test is relevancy to the subject matter of the action rather than to the precise issues framed by the pleadings." *Charles Sales Corp. v. Rovenger*, 88 So.2d 551, 553 (Fla. 1956).

16.     Here, Smart's deposition notice is relevant to the subject matter of the action, even if not yet precisely framed by the operative pleadings. Moreover, CSG initiated the need for the deposition based on its Notices of Non-Renewal and the issue is framed by a cause of action included in a proposed amended pleading that has been provided to CSG.

17.     Due to the urgency of the situation and CSG's refusal to provide any potential deposition dates, Smart is concurrently noticing the deposition for December 19, 2019. Smart remains willing to reschedule the deposition on another date in December in the event CSG is not available on December 19, 2019.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests that this Court enter an order: (i) compelling CSG to provide available dates in December for the deposition of its corporate representative; (ii) awarding Smart its attorneys' fees and costs; and (iii) granting such further relief as the Court deems just and proper.

## <u>Certificate of Good Faith Conference</u>

Counsel for Smart has requested dates for CSG's corporate representative deposition on several occasions in writing and during telephone conferences. As described above, CSG has not agreed to provide dates.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*_____
Attorney

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

*to Plaintiff's Motion to Compel Deposition*

| | |
|---|---|
| **From:** | Brad Barrios |
| **Sent:** | Monday, November 11, 2019 11:00 AM |
| **To:** | Kimberly Bald; James Lynch |
| **Cc:** | David Hayes; Ken Turkel; Lisa Meriwether; Donna Etter; Gayla Arnold |
| **Subject:** | CSG Deposition |
| **Attachments:** | DISC - Notice of CSG Corp. Rep. Deposition (00265926xBEB76).pdf |

Kim and James,

Attached is a notice for deposition of CSG's corporate representative. The topics relate to the Notice of Non-Renewal re: Washington County and the contractual terms relied upon by CSG. Given your Jan. 3, 2020 deadline, we need this deposition to take place by mid-December. Please provide some potential dates and location for the deposition.

Thank you,
Brad

**Brad F. Barrios**
Bajo | Cuva | Cohen | Turkel
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
P: (813) 443-2199 | F: (813) 443-2193
D: (813) 868-6168

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

           Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## NOTICE OF TAKING DEPOSITION OF CORPORATE
## REPRESENTATIVE OF CORRECT SOLUTIONS, LLC

PLEASE TAKE NOTICE that, pursuant to Rule 1.310(b)(6), Florida Rules of Civil

Procedure and applicable law, Plaintiff, Smart Communications Holding, Inc. ("Smart"), will take

the deposition of the following person upon oral examination at the time and place set forth below

before the herein described Court Reporter designated by U.S. Legal Support, or before any other

notary public or officer authorized by law to take depositions:

| WITNESS | DATE AND TIME | PLACE | COURT REPORTER/ VIDEOGRAPHER |
|---|---|---|---|
| Corporate Representative of Correct Solutions, LLC | December ___ , 2019 _____ a.m. | | U.S. Legal Support (954-463-2933) |

The oral examinations will continue until completed.  The deposition(s) are being taken for

the purpose of discovery, for use at trial and for all other purposes as are permitted under the

Florida Rules of Civil Procedure.

{BC00265760:1}

Pursuant to Rule 1.310(b)(6), Florida Rules of Civil Procedure, Defendant Correct Solutions, LLC ("CSG") shall designate one or more of its officers, directors or managing agents or other persons to give testimony regarding the following areas of inquiry:

1.   The negotiation and execution of the Master Services Agreement and Schedules between CSG and Smart (the "MSA").

2.   The communications and negotiations regarding Paragraph 6 of the MSA, including the intent of the parties with respect to and meaning of Paragraph 6.

3.   CSG's position regarding the meaning of Paragraph 6 of the MSA and "co-terminous."

4.   The communications and intent of the parties with respect to the interplay between or effects of the MSA, CSG's agreement with each Joint Customer, and the Schedule of services for each Joint Customer.

5.   Any communications between the parties regarding the terms of CSG's agreements with the Joint Customers.

6.   Any communications between CSG and the Joint Customers regarding the addition of Smart's services and the exclusivity and/or term of Smart's services.

7.   CSG's October 4, 2019 Notice of Non-Renewal of Master Services Agreement between Correct Solutions, LLC and Smart Communications Holding, Inc. (Correct Solutions, LLC's customer: Washington County).

**PLEASE BE GOVERNED ACCORDINGLY.**

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602

(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*If you are a person with a disability who needs any accommodation to participate in this deposition, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Brad F. Barrios, Esq., Bajo | Cuva | Cohen | Turkel, 100 N. Tampa St., Suite 1900, Tampa, FL 33602, (813) 443-2199 at least 7 days before your scheduled deposition, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.*

## <u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this 7th day of November, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

                                 */s/ Brad F. Barrios*
                                   Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                                        Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

## EMERGENCY AMENDED MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

        Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Florida Rule of Civil Procedure 1.190, files this Emergency Amended Motion for Leave to File Amended Complaint and states as follows:

        1.      On August 2, 2019, Smart filed this lawsuit after Defendant, Correct Solutions, LLC ("CSG") attempted to terminate the contractual and business relationship between the parties.

        2.      Since Smart filed the Complaint, CSG has sent Smart additional notices, including a Notice to Cure and three Notices of Non-Renewal, with the continued intent of terminating the relationship of the parties.

        3.      Smart has obtained some documents from non-parties and CSG has produced a partial document production in response to discovery requests from Smart, a number of which Smart has relied on to support the additional claims included in the proposed Amended Complaint. *See, e.g.,* Exhibit F – I and M - W of (Proposed) Amended Complaint.

        4.      Upon receiving CSG's first Notice of Non-Renewal, counsel for Smart informed counsel for CSG that Smart did not agree with CSG's position on non-renewal and that Smart

would pursue filing an amended complaint to address the notices and a motion to prohibit CSG from acting in furtherance of the notices of non-renewal. Smart also requested documents to support the allegations made in the notices of non-renewal and CSG never provided any such documents. Smart has also repeatedly requested a corporate representative deposition on the non-renewal issue and CSG stated it would not produce a witness until Smart amended its complaint to frame the issue by the pleadings.

5.      On November 25, 2019, counsel for Smart provided counsel for CSG with a copy of Smart's proposed Amended Complaint and asked CSG to consent to Smart filing the Amended Complaint consistent with earlier discussions.

6.      Pursuant to Rule 1.190(a), a party may amend a pleading with written consent of the adverse party or with leave of court.  However, CSG would not consent to the filing on the stated basis that it disagreed with Smart's position on the non-renewal issue. Smart then suggested that CSG could argue the merits of the claim later, but CSG's disagreement on the merits did not serve as grounds to oppose the amendment. Nevertheless, CSG refused to consent to the amendment. As a result, Smart now seeks leave of court.

7.      Rule 1.190(a) provides that leave of court shall be given freely when justice so requires.

8.      "The failure to permit amendment constitutes an abuse of discretion unless it clearly appears the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile."  *EAC USA v. Kawa*, 805 So.2d 1, 5 (Fla. 2d DCA 2001).

9.      Here, the amendment would not prejudice CSG.  The case is in its infancy—there is no trial date and no depositions have occurred and only a limited amount of discovery has been taken.

10.     Smart has not abused the privilege to amend, as the proposed pleading would be the first Amended Complaint.

11.     Further, the amendment would not be futile because it adequately states a cause of action based on record evidence in this case. Specifically, the proposed Amended Complaint states a cause of action for declaratory relief on the non-renewal term of the Master Services Agreements between the parties.  *Meadows Community Ass'n, Inc. v. Russell-Tutty, App*. 928 So.2d 1276 (Fla. 2d DCA 2006) ("The test for the sufficiency of a complaint for declaratory judgment is not whether the plaintiff will succeed in obtaining the decree he seeks favoring his position, but whether he is entitled to a declaration of rights at all").

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests that the Court grant leave for Smart to file the attached Amended Complaint and for such further relief as the Court deems just and proper.

<u>**Good Faith Conference Certification**</u>

The undersigned certify that they conferred with counsel for CSG about the issues raised in this Motion and that CSG opposes the relief requested and has also opposed Smart's request to consent to the filing of the Amended Complaint.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
         JEL@harlleebald.com
         DDF@harlleebald.com
         CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT

***to Emergency Amended Motion for Leave to File Amended Complaint***

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

Plaintiff,

Case No: 19-CA-008089

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,
and RICK FERGUSON,

Defendants.

_____/

## AMENDED COMPLAINT

Plaintiff, Smart Communications Holding, Inc. ("Smart") files this Amended Complaint against Defendants, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("CSG") and Rick Ferguson, and alleges as follows:

### Introduction

1.     This is a case where one party to a series of contracts is so covetous of the other party's financial success under the contracts that it will stop at nothing to acquire a portion of those benefits for itself.

2.     Smart and CSG both provide inmate communications services to correctional facilities. The parties have mutually benefitted from a successful business arrangement for the last two years in which Smart is the exclusive provider of certain services to the parties' joint customers. However, having found another source for Smart's services that is apparently more financially lucrative, CSG concocted and engaged in a series of duplicitous, bad faith efforts to deprive Smart of its significant investment in the exclusive relationship and its ability to realize the benefits of the parties' bargain.

{BC00270317:1}

3.      In furtherance of its plot to wrongfully push Smart out of all the parties' joint customer facilities, CSG smeared Smart's name and reputation and solicited exaggerated complaints about Smart's products and services. CSG expanded its attack beyond stealing Smart's business from the parties' joint customers and additionally targeted Smart's own direct customers. CSG's stated goal was to replace Smart and deprive it of its exclusive relationships and significant revenue. On information and belief, CSG has systematically broadened its attack on Smart throughout the marketplace and has maligned Smart's reputation at every opportunity, especially when competing for the same business.

4.      Smart was forced to file this lawsuit when CSG recently attempted to terminate the parties' relationship and thereby remove Smart as the exclusive provider of certain services to the parties' several joint customers. However, as described below, CSG's stated grounds for termination have no merit and, in any event, do not qualify as grounds for termination under the exclusive agreements between the parties.

5.      With its first termination attempt halted, CSG continued to manufacture reasons to remove Smart and shift Smart's revenues to its own coffers. While doing so, CSG has repeatedly ignored its primary obligation under the parties' agreements—to provide exclusive access to the joint customers to allow Smart to provide its services and earn revenue. Worse yet, after realizing its termination attempts had no merit, CSG has begun sending non-renewal notices that run afoul of the understanding and agreements between the parties.

6.      Smart seeks a declaration and injunctive relief order prohibiting CSG from causing Smart continuing and irreparable harm throughout the inmate communications industry by improperly terminating or non-renewing the agreements between Smart and CSG relating to specific correctional facilities described below and enjoining CSG from continuing to tarnish

Smart's reputation to the parties' joint customers and throughout the industry. Smart also seeks damages for the harm CSG has caused.

## Parties, Jurisdiction, and Venue

7.     Smart is a Florida corporation with its principal place of business in Pinellas County, Florida. Smart provides various services to correctional facilities throughout the country, including in the state of Florida.

8.     CSG is a foreign limited liability company registered to do business in Florida. Its principal place of business is in Lincoln Parish, Louisiana. This Court has jurisdiction over CSG: (a) pursuant to section 48.193(1)(a)(1), Florida Statutes, because it has a registered agent in Florida at 1200 South Pine Island Road, Plantation, Florida 33324; (b) pursuant to section 48.193(1)(a)(7), Florida Statutes, because it has breached a contract in this state by failing to perform acts required by the contract to be performed in this state; and (c) pursuant to section 48.193(2) because it is engaged in substantial and not isolated activity within Florida.

9.     The Florida Public Service Commission has granted CSG a certificate to provide pay telephone services in Florida. CSG solicits business from Florida institutions and has obtained contracts to provide services to Florida governmental entities. For example, CSG provides inmate telephone communications services in Florida pursuant to a contract with the Nassau County Sheriff's Office and the Monroe County Sheriff's Office. Accordingly, CSG is engaged in substantial business activity in Florida, such that it should anticipate being haled into court in Florida.

10.     Ferguson is an individual employee of CSG. Upon information and belief, Ferguson resides in Louisiana. Upon information and belief, Ferguson travels to Florida on a regular basis to service CSG's Florida-based customers. Further, as described below, Ferguson

made defamatory comments about Smart, a Florida citizen, which he sent into Florida and which have caused harm to Smart in Florida.

11.     Venue is proper in Hillsborough County pursuant to Section 47.011, Florida Statutes because the cause of action accrued in Hillsborough County and because the contracts upon which this action is based both include mandatory forum selection clauses identifying Hillsborough County as the exclusive venue for litigation arising under the contracts.

<u>**Background of the Parties' Relationship**</u>

12.     CSG provides an inmate telephone platform through which it installs telecommunications equipment at correctional facilities and charges inmates or their contacts on a per-call basis. CSG derives revenue from its platform, a portion of which it agrees to share with the correctional facilities pursuant to a commission arrangement.

13.     CSG's contracts and communications with correctional facilities, including CSG's commission structure with each facility, are publicly-available documents. In particular, CSG's contracts and communications with correctional facilities and their corresponding governmental entities are subject to public disclosure under applicable state statutes.

14.     Historically, CSG has provided products and services focused on telephone communications. CSG did not offer alternative methods of communication, such as electronic mail or text messaging, to be deployed for the benefit of inmates at its customers' correctional facilities. As a result, CSG was unable to fully service its customers who desired a broader spectrum of communications options and services for their inmates.

15.     Historically, Smart has provided a suite of services available to inmates through kiosks and tablets, including electronic messaging, grievance and medical forms, video visitation, a law library, entertainment, and educational content. Smart has also provided correctional

facilities with the ability to monitor and control inmate communications through a proprietary and trade secret technology package and with patented mail scanning services to eliminate or control the flow of physical postal mail into facilities. Until early 2019, Smart did not provide telephone communication services.

16.     To meet the needs of their existing customers and remain competitive in the inmate communications industry, CSG approached Smart in 2017 about an arrangement whereby CSG's customers could obtain the benefits of Smart's state-of-the-art electronic communications system. CSG pursued Smart for many reasons. First, correctional facilities desired to provide inmates with communication options other than telephone calls, such as electronic messaging. Second, facilities sought a system that was easy to use and provided inmates with direct access to necessary forms, entertainment, and educational content. Third, facility staff desired more investigative features to easily monitor and track their inmates' routine, non-legal communications with the outside world. CSG could not meet these needs and knew that Smart had pioneered inmate messaging with a system, developed and refined over time, which presented an unmatched collection of features and functions. To be associated with Smart in the eyes of their customers was to be connected with innovation and quality and only served to increase CSG's ability to continue their customer relationships through contract renewals.

17.     Ultimately, due to its partnership arrangement with Smart, CSG was able to satisfy its existing customers and was also able to obtain new customers.

18.     The intent of the proposed business relationship was that CSG and Smart would each provide their respective services directly to a pool of customers. As opposed to CSG incorporating Smart's platform into its own system, the products and services of the parties remained separate and distinct. Neither an inmate nor a facility staff member had to access CSG's

telephone system in order to access Smart's messaging system. Smart trained and interfaced with facility staff on all issues related to Smart's services. Smart collected revenue in its ordinary course when facility inmates exchanged messages with outside contacts, without involvement of CSG. The facility customers, some of which were existing CSG customers, became Joint Customers of both parties by virtue of the services being directly provided by each party.[1]

19.      In contemplation of this potential business arrangement, on June 15, 2017, Smart and CSG entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA"). A true, complete, and authentic copy of the NDA is attached as **Exhibit A**.

20.      Pursuant to the NDA, the parties excluded from the definition of Confidential Information "any materials or information…generally known…by the public…", among other exclusions.

21.      Upon execution of the NDA, CSG did not disclose any Confidential Information to Smart.

22.      In the Fall of 2017, Smart demonstrated its products and services, including its correctional grade tablets, to CSG at CSG's headquarters in Louisiana. All of CSG's company executives, sales representatives, IT personnel, and field services representatives were in attendance.

23.      During the demonstration, CSG's employees handled and operated Smart's tablets and could see and feel the construction of the tablets. CSG's employees expressed to Smart that they were very impressed and satisfied with all of Smart products, including the tablets.

---

[1] The group of facility customers that obtained the services of both CSG and Smart shall be hereinafter referred to as the Joint Customers, more specifically identified in Paragraph 32.

## The Parties' Exclusive Dealing Contracts

24.    In August, 2017, Smart and CSG negotiated the terms of the parties' exclusive dealing contracts relating to the Joint Customers. The parties agreed that each contract would include a master services agreement, which included the general terms of the relationship between CSG and Smart and which attached and incorporated the contract between CSG and the Joint Customer, an amendment to the contract between CSG and the Joint Customer, which added Smart's services to the contract, and a Schedule, which defined the particular services that Smart was going to provide to the Joint Customer.

25.    Due to the significant financial investment Smart was going to undertake in installing its equipment and services and necessary infrastructure into each Joint Customer facility, Smart originally requested a seven year term for each exclusive dealing contract to ensure it had adequate time to recoup and obtain a return on its investment. However, given that CSG had existing agreements with some of the Joint Customers, all of which included favorable renewal terms, Smart and CSG instead agreed that the term of each master services agreement between Smart and CSG would be "co-terminous" with each contract between CSG and the Joint Customer. That is, Smart and CSG agreed that, as long as CSG provided services to a Joint Customer pursuant to the original or any subsequent renewal term of a CSG/Joint Customer contract, then Smart would exclusively provide the services identified in the Schedule to the Joint Customer.

26.    The first contract executed by Smart and CSG related to Avoyelles Parish, Louisiana, which was an existing CSG customer by virtue of the Proposal Contract and Agreement between CSG and Avoyelles (the "CSG/Avoyelles Contract").

27.     In late August, 2017, CSG sent Smart a copy of the CSG/Avoyelles Contract, a draft amendment which added the services to be provided by Smart, and a master services agreement for the Avoyelles project.

28.     On August 14, 2017 and August 22, 2017, Avoyelles and CSG, respectively, executed the First Amendment to Contract and Agreement (the "Amendment").

29.     On August 31, 2017, Smart executed the Master Services Agreement and Schedule for the Avoyelles project. As described above, although each agreement between Smart and CSG was to include a master services agreement, the master services agreement was the same in each case, as it described the general terms of the parties' relationship. Accordingly, the Master Services Agreement shall be referred to hereinafter as the "MSA" because its terms are the same whether it is the MSA for the Avoyelles agreement or the MSA for any other Joint Customer agreement.

30.     On September 13, 2017, CSG executed the MSA and Schedule for the Avoyelles project, completing the Avoyelles contract. A true, complete, and authentic copy of the CSG/Avoyelles Contract, Amendment, MSA, and Schedule (collectively, the "Avoyelles Agreement") is attached as **Exhibit B**.

31.     Smart and CSG subsequently executed Schedules for other Joint Customers, some of which were existing CSG customers and some of which CSG and Smart pitched and obtained as part of a collective effort. Rather than execute a new MSA for each Joint Customer, Smart and CSG agreed to use the same MSA as part of each Joint Customer agreement. Further, CSG did not continue to obtain amendments with the Joint Customers as it had done with Avoyelles. However, consistent with the expressed intent of the parties, each Joint Customer agreement included the MSA, the CSG/Joint Customer contract, and the Smart Schedule (collectively, a "Joint Customer Agreement").

32.     Smart and CSG executed a Schedule for the following Joint Customers:

     a.     City of St. Louis, Missouri
     b.     Sebastian County, Arkansas Sheriff's Office
     c.     Washington County, Arkansas
     d.     Bowie County, Texas
     e.     Wayne County, Georgia
     f.     Avoyelles Parish, Louisiana
     g.     Lamar County, Mississippi
     h.     Moore County, Tennessee

True, complete, and authentic copies of the Schedules for the remaining Joint Customers are attached as **Composite Exhibit C**.

33.     The term of the MSA for each Joint Customer Agreement was "co-terminous" with the term of the Joint Customer's contract with CSG, including any ongoing renewal periods between CSG and the Joint Customer. Specifically, Paragraph 6 of the MSA provides:

> <u>Term.</u> This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

34.     Accordingly, the **<u>only way</u>** that the contract between CSG and Washington County does not renew is if either party provides the other party with written notice of non-renewal at least 90 days prior to the date of expiration.

35.     Each contract between the Joint Customers and CSG includes an initial term and subsequent optional renewal terms. In most instances, the renewal terms begin automatically if one of the parties does not notify the other party of its intention to not renew the agreement.

36.     Accordingly, if CSG and a Joint Customer renew the term of their contract, then the MSA between Smart and CSG for that Joint Customer also renews because Smart's term is "co-terminous."

37.     If, and only if, either CSG or a Joint Customer elects not to renew their contract, then CSG may provide notice to Smart of non-renewal of the MSA with respect to that Joint Customer pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and the Joint Customer for Smart to be "co-terminous" with.

38.     Pursuant to the MSA, Smart obtained the **exclusive right** to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer. In exchange, CSG was able to maintain its relationships with the Joint Customers by providing for them the additional high-quality inmate communications services they desired.

39.     Pursuant to the MSA, Smart retains all revenue it generates from inmates using its messaging system through the Smart kiosks and tablets. In other words, CSG does not share in any revenue derived from messaging services at the Joint Customer facilities.

40.     The MSA for each Joint Customer does not include a termination without cause or termination on convenience clause.

41.     Paragraph 9 of the Agreement provides the only grounds for termination, as follows:

> Default and Termination.   If either party defaults **in the performance of any obligation** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has [sic] made good faith attempts to

cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.
(emphasis added).

42.     Accordingly, pursuant to the MSA, only Smart, as the Provider, may terminate an MSA for a particular Joint Customer if CSG breaches the confidentiality or non-disclosure provisions of that MSA with respect to that Joint Customer.  This term (or a substantially similar term) exists in all of Smart's service contracts so that it can protect its intellectual property and confidential information.  The MSA was created from Smart's standard service contract.

43.     Indeed, CSG has no right to terminate an MSA during the term of any of the Joint Customer Agreements other than by identifying a legitimate default in Smart's performance of the service obligations of the MSA, which are set forth in more detail in the Schedules, and then providing a reasonable opportunity to cure the default.

**CSG's Attempts to Seize Smart's Revenue and Market Share**

44.     By early 2018, the Joint Customers were satisfied with Smart's services and Smart was earning significant revenue due to the popularity of its messaging platform with inmates. Under the terms of its agreements with CSG, Smart was not obligated to share any of its messaging revenue with either CSG or the Joint Customers.

45.     As a result, CSG became determined to obtain a more profitable arrangement to acquire some of the business, revenue, and/or market share that it had promised to Smart on an exclusive basis. Knowing that it had no basis or ability to terminate the MSA for any of the Joint Customers, CSG first tried lawful means.

46.     In March 2018, CSG attempted to purchase Smart; however, Smart was not interested in any such acquisition. CSG then attempted to hire multiple key employees of Smart. Presumably, CSG sought to obtain valuable business information or relationships with customers; however, the Smart employees were not interested in working for CSG and rejected its offers.

47.     CSG also asked Smart to voluntarily relinquish its exclusive rights with respect to some Joint Customers, which Smart was not interested in doing.

48.     In or around January 2019, Smart expanded its portfolio to offer telephone communication services to correctional facilities. CSG had knowledge of Smart's intent to provide telephone services even before Smart obtained the ability to do so. CSG and Smart executives discussed Smart's new capabilities and CSG represented that it had no problem with Smart offering telephone services.

49.     Apparently, however, CSG was either not pleased with Smart's entry into the telephone business or believed it could leverage this fact in its quest to generate revenue from inmate messaging vendor partners. Within the next two months, CSG had already put a plan in motion to remove Smart from the Joint Customer facilities and replace it with a new partner who would share its revenue with CSG.

50.     In order to replace Smart's services, and in furtherance of its goal to derive substantial revenue from the replacement provider, CSG developed a relationship with Tech Friends, a competitor of Smart's which provides inmate communications, entertainment, and educational services through tablets.

51.     By April 1, 2019, CSG had already pitched the Tech Friends tablets to at least one Joint Customer—Sebastian County. On April 1, 2019, Captain William Dumas thanked CSG for dinner and lunch the prior week and indicated that he had permission from the Sheriff to move

forward with the Tech Friends tablets. Ferguson forwarded the email to Mark Turner, one of CSG's senior leaders and a main point of contact to Smart, and Turner responded: "We have to get Smart out first though don't we?" A true, complete, and authentic copy of the April 1, 2019 email exchange is attached as **Exhibit D**.

52.     By this time upon information and belief, CSG and Tech Friends had negotiated or were in the process of negotiating a revenue sharing deal whereby CSG would retain Tech Friends as the inmate messaging subcontractor in facilities where CSG provided telephone services, including the Joint Customer facilities. CSG's motivation to replace Smart with Tech Friends was simple—Tech Friends promised to share up to 50% of its messaging revenue with CSG. If CSG could "get Smart out," then CSG stood to gain significant revenue from a sharing mechanism that was not part of its agreements with Smart.

### CSG's Response to Smart's Marketing Email

53.     On or about April 8, 2019, Smart sent a mass marketing email to its customers. The email was a general advertisement—it was not tailored toward or directed at any particular customer. A true, complete, and authentic copy of the marketing email is attached as **Exhibit E**.

54.     CSG was already hatching a plan to "get Smart out" in the months prior, and it decided to use this email advertisement as a pretextual springboard for its unlawful termination, in in accordance with that plan.

55.     But first, CSG began tarnishing Smart's reputation and soliciting exaggerated complaints from the Joint Customers about Smart's services in an effort to generate support and additional pretext for its efforts to remove Smart.

56.     On April 22, 2019, Ferguson emailed Captain Dumas of Sebastian County and asked him to "forward me bullet points on smart issues…" Captain Dumas responded the same

day with a list, saying, "If you need more I'm sure we can think of it." A true, complete, and authentic copy of Ferguson's and Dumas's April 22, 2019 email exchange is attached as **Exhibit F.**

57.    Dumas's complaints can be categorized in three groups: (a) items that are not included in the Schedule for Sebastian County, *i.e.*, items Smart has no contractual obligation to provide ("Failed to install books, games" and "Failed to move to new platform for better performance"); (b) vague and unsubstantiated product and service issues ("Constant tablet failures and issues" and "Poor service, unstable product"); and (c) a blatant attempt to re-trade a deal to acquire a new source of revenue ("No increase on credits for revenue sharing").

58.    Ferguson did not forward Dumas's email to Smart to provide Smart with an opportunity to respond, including to clarify the services that Smart was contractually obligated to provide.   On information and belief, Ferguson made no effort to clarify or explain Smart's contractual obligations and instead continually reinforced the false notion that Smart was not meeting its service obligations.

59.    On May 17, 2019, at 3:28 p.m., Ferguson forwarded Dumas's email to Mark Turner and asked him to draft a 30 day cure letter to Smart. Mark Turner and Ferguson obviously did not think the issues identified in Dumas's April 22, 2019 email were urgent enough to address at that time. Instead, CSG only later decided to use these issues as grounds to threaten termination of the MSA by issuing a 30-day notice to cure approximately five months later, in September 2019.

60.    On May 17, 2019, at 3:32 p.m., Ferguson sent an email to one of the Joint Customers, Washington County, and stated:

> Hey Alan
> I hope you made it back safe. I hobbled home yesterday afternoon.☺
> I'm getting a lot of calls from my SMART customers complaining about product, service, and overall performance. To the point where I might be replacing them…Soon. **I have not heard from you** but I wanted to follow up and see how you were being serviced by them.

**I appreciate ya brother**.

A true, complete, and authentic copy of Ferguson's May 17, 2019 email is attached as **Exhibit G.**

61.     Ferguson's email admits that he had not heard from Washington County with any complaints about Smart. Yet, Ferguson went out of his way to tell his "brother" Alan Johnson about other customers supposedly complaining about Smart and his plans to terminate Smart.  The clear implication was: "Brother, can you please help me out by providing me with any complaints and issues you can think of that I can use to replace Smart."

62.     Upon information and belief, Ferguson sent similar emails to other Joint Customers soliciting complaints about Smart and implicitly, if not expressly, maligning Smart's reputation as a service provider. Upon information and belief, Ferguson also encouraged the Joint Customers to discuss such "complaints" and issues with each other, so that they could share ideas that may prove helpful in Ferguson's efforts to compile a list of complaints and to further spread his false narratives about Smart and harm Smart's reputation.

## CSG's First Improper Termination Attempt

63.     On June 21, 2019, CSG's leadership team discussed using Smart's advertisement as grounds for "pulling the plug on all Smart devices on a set day." Turner indicated that "we have TF [Tech Friends] lined up to come in…" Ferguson agreed that CSG should have "a very strategic plan with Tech Friends…in place and brief the customer before the blade fall, because when it does, the only panic taking place should be in Smart's conference room." A true, complete, and authentic copy of the June 21-22, 2019 CSG email exchange is attached as **Exhibit H.**

64.     On July 10, 2019, CSG and Tech Friends executed the Master Services and Supply Agreement, which was effective June 1, 2019 (the "CSG/Tech Friends Agreement"). A true, complete, and authentic copy of the CSG/Tech Friends Agreement is attached as **Exhibit I**.

65.     The CSG/Tech Friends Agreement provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by Web Pack shipping fees" for the Legacy Accounts, which include four Joint Customers—Bowie County, Moore County, Sebastian County, and St. Louis County.

66.     The CSG/Tech Friends Agreement further provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals."

67.     With the favorable CSG/Tech Friends Agreement in place, which provided a substantial source of revenue for CSG where it previously had none, it could now accelerate its efforts to "get Smart out." Importantly, the revenue sharing arrangement between Tech Friends and CSG was made possible at least in part because Smart had already installed the necessary infrastructure (e.g., networking and power distribution) for its equipment at the Joint Customer facilities, which was a significant upfront expense Tech Friends could avoid.

68.     By way of a letter dated July 17, 2019, CSG informed Smart that it purportedly violated the NDA and breached the MSA.[2] The letter also purports to terminate all Joint Customer Agreements. A true, complete, and authentic copy of CSG's letter dated July 17, 2019 is attached as **Exhibit J.**

69.     Despite the fact that Ferguson had been attempting to solicit performance complaints about Smart for the last few months, the letter does not raise any performance-related issues. Nor does the letter ask Smart to cure any service-related deficiencies. Instead, the letter sets forth the untenable position that, because Smart sent a mass email advertising that it pays 100% commission on telephone revenue, it must have stolen and used CSG's confidential information.

---

[2] Because it was sent only by way of certified mail, it was not actually received by Smart Communications until a week later, on July 24, 2019.

70.     CSG believed that if it could characterize this general advertisement as some sort of breach of the MSA, then it could eliminate Smart's exclusivity and abscond with the Joint Customers' messaging revenue via the CSG/Tech Friends Agreement.

71.     But CSG did not even identify the Confidential Information that Smart supposedly used. The sum of the factual predicate for CSG's accusations is as follows:

> Specifically, Smart employee Jennifer Tongate has made contact with current CSG customer, city of St. Louis facility, offering greater commission to the facility than CSG pays to the customer. Smart employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by CSG as a result of the contractual relationship between Smart and CSG.

72.     By stating that Smart's employee had "no prior relationship," CSG appears to take the position that the identity or contact information of the person at the City of St. Louis to whom the email was sent is somehow "confidential."

73.     Pursuant to Section 8 of the Agreement, "Confidential Information" does not include, among other things: "(a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party….or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party."

74.     In order to obtain the benefit of Smart's services, including regular direct communications on repair and maintenance issues, the City of St. Louis voluntarily identified and provided the contact information of Frank Turner as Smart's point of contact. Further, Frank Turner is a publicly-known government employee. His information is simply not "confidential,"

especially when he voluntarily communicated with Smart on a regular basis. As described below, Frank Turner later confirmed the public nature of his email address to CSG and its outside counsel.

75.     Nor does Smart's entry into the telephone market provide a basis to terminate the MSA. Neither the NDA nor the Agreement prohibits either party from offering services in competition with the other party. If such a prohibition existed, then CSG would have violated the provision when it began marketing or selling its iMate E-Device or similar services from Tech Friends.

76.     The motivation behind the letter is clear: CSG had a more profitable arrangement in place for the business it expressly and exclusively promised to Smart.

77.     Accordingly, CSG's claims that Smart violated the NDA and breached the MSA are based on accusations that have no merit as a matter of law.

78.     Relying on only these meritless allegations, CSG purports to terminate the MSA and all Schedules for all Joint Customer Agreements, effective immediately.

79.     CSG also demands, without any legal basis whatsoever, that Smart cease "all contact with CSG's customers either in person, by phone, text, email or direct mail." Constitutional concerns aside, Smart has ongoing business relationships with the Joint Customers and provides essential services for the inmates at the Joint Customers' facilities, such that Smart cannot simply stop communicating with them.

80.     Finally, CSG demands that Smart exit all Joint Customer facilities and remove all Smart systems from the facilities.

81.     On July 26, 2019, just two days after Smart received CSG's July 17, 2019 letter, Smart sent a response letter. A true, complete, and authentic copy of the July 26, 2019 response letter is attached as **Exhibit K.**

82.     In its letter, Smart informed CSG that CSG may not terminate the MSA or Schedules for a breach of a confidentiality or non-disclosure provision of the MSA or NDA.

83.     Later on July 26, 2019, CSG responded by its counsel's email to Smart and stated that "Correct Solutions has not slandered Smart, or spoken ill of Smart to any Smart customers or potential customers." However, CSG's response did not substantively address to Smart's letter.

84.     Moreover, CSG's counsel's statement was demonstrably false. As described above, just a couple of months earlier, Ferguson had not only slandered and spoken ill of Smart, he had solicited complaints about Smart from the Joint Customers.

## CSG's Continued Attack on Smart

85.     After Smart informed CSG of the futility of its termination attempt, CSG ramped up its concerted effort to turn Joint Customers against Smart, including by secretly informing them that CSG and Smart no longer have a business relationship.  Upon information and belief, CSG notified the Joint Customers that it terminated Smart's contract after its counsel sent the July 17, 2019 letter.

86.      CSG did not limit its misinformation and smear campaign to the Joint Customers. By way of example, CSG informed Smart's own direct customer, Miller County, that the parties did not have a relationship. In particular, upon information and belief, Ferguson claimed CSG terminated Smart as a business partner servicing the many different Joint Customer facilities due to all the complaints CSG received about Smart's poor service—complaints that Ferguson himself had solicited, encouraged, and amplified. But these statements and representations were false because, as described above, CSG had not effectively terminated any of the MSAs or Schedules. CSG and Smart, quite clearly, still had a business relationship. As a direct result of these false statements and bad faith conduct, Miller County has accused Smart of being "misleading" and "not

truthful." A true, complete, and authentic copy of the July 29, 2017 email from Miller County is attached as **Exhibit L.**

87.     CSG's false statements are causing harm to Smart's reputation and good will throughout the industry. Upon information and belief, CSG and/or Ferguson has systematically attacked and maligned Smart's reputation at every turn, and has wielded this false and contrived narrative to its advantage against Smart in attempting to gain new business, including, for example, at Greene County, Arkansas.

88.     In addition, Ferguson's previous solicitation email and further efforts to smear Smart prompted Washington County to join the attack on Smart. On July 31, 2019, Ferguson's "brother" Alan Johnson emailed complaining about supposed service issues and advising Smart that Washington County will be "actively looking for a new vendor to replace Smart Communications." Johnson immediately forwarded the email to Ferguson. A true, complete, and authentic copy of the July 31, 2019 email string is attached as **Exhibit M.**

89.     Prior to Ferguson's solicitations, Washington County did not have any significant issues with Smart's services. Any minor issues had been addressed or were in the process of being addressed when Washington County abruptly changed its position and informed Smart of its decision to seek a new vendor.

90.     On August 6, 2019, Smart filed a Motion for Temporary Injunction, seeking to prohibit CSG from terminating the MSA or Schedules. Shortly thereafter, counsel for Smart and CSG began discussing a stipulation to maintain the status quo in lieu of attending a hearing on the motion.

91.     On August 13, 2019, counsel for CSG confirmed that CSG would not disconnect Smart's services or inform the Joint Customers that Smart has been terminated *or otherwise disavow the relationship between CSG and Smart*.

92.     On August 15, 2019, two days after CSG's promise not to disavow its relationship with Smart to the Joint Customers, Ferguson emailed his "Team," which was some combination of the Joint Customers and CSG, and formally organized the conspiracy to terminate Smart based on contrived grounds:

> Team
> In order to move **our plight** quickly along please note the following **instruction**:
> Send all your Smart needs for repairs, questions, complaints (and **don't hold back** other than 4 letter words or graphic sentences) etc to:
> arsupport@correctsolutionsgroup.com
> please **do not send to Smart**
> **CSG will now put them on the clock each time a ticket is opened** and forwarded. Feel free to use a spread sheet or direct sentences. Also, be very specific in your request when necessary, ie, cell, issue, wiring…etc. If it's a generic fix just use your usual correspondence. Please **call me if you have questions** or need additional information. I sincerely apologize for **this most disappointing service provider but we are on the downhill run and I want to keep up the momentum**
> **I really appreciate your assistance**.
> See y'all soon.
> Rick

A true, complete, and authentic copy of Ferguson's August 15, 2019 email is attached as **Exhibit N**. [3]

---

[3] Washington County produced this email in response to a public records request. CSG did not produce this email in response to Smart's Notice to Produce Documents at September 20, 2019 Evidentiary Hearing, which sought "All Documents sent by Correct to any Joint Customer(s) from August 1, 2019 to September 17, 2019 that request or instruct the Joint Customer(s) to send complaints about Smart or Smart's services directly to Correct and/or not to Smart," or to additional requests to which this email is directly responsive.

93.     The attached version of Ferguson's email does not identify the recipients of the email. However, Ferguson's "brother" Alan Johnson's reply to the email copies numerous employees of Sebastian County, including Captain Dumas.

94.     Ferguson sent a similar email on the same day to another Joint Customer, Bowie County. In the email, Ferguson again referred to "our plight," solicited complaints about Smart from Bowie County, and directed Bowie to abstain from direct communication with Smart. A true, complete, and authentic copy of Ferguson's August 15, 2019 email is attached as **Exhibit O**.

95.     Also on August 15, 2019, Rick Pruitt with CSG sent an internal email to CSG's Sales team and Field Service Managers instructing them in detail on how to solicit, report, follow-up with, and document Joint Customer complaints about Smart. Pruitt concluded his email with: "This will be long enough for either Smart to comply with their service obligations or for their equipment to be removed/turned off by the customers due to frustrations." A true, complete, and authentic copy of Pruitt's August 15, 2019 email is attached as **Exhibit P**.

96.     Accordingly, contrary to the parties' course of dealing for the previous two years, CSG was now controlling the communication between the Joint Customers and Smart.

97.     It became immediately apparent that CSG was now coaching the Joint Customers on how to complain about Smart in a way that might help CSG with its "plight," For example, the following day, Ferguson's "brother" Alan Johnson forwarded an email Smart had sent to Washington County about some service upgrades, along with Washington County's draft response to Smart. Johnson stated that Washington had not sent the response and asked: "What do you advise? Do you want us to send the response or do you want to handle it?" A true, complete, and authentic copy of the August 16, 2019 email string is attached as **Exhibit Q.**

98.     While coaching Joint Customers on how to document complaints, CSG internally acknowledged that Smart was promptly responding to service issues and inquiries from Joint Customers. On August 22, 2019, Pruitt emailed the CSG leadership team that Smart had responded within 24 hours to tickets submitted by Avoyelles and Washington County. In other words, to the public, Smart was inept, but, behind closed doors, Smart was responsive and efficient. Ironically, and perhaps because he could not bear to recognize Smart's capabilities, Pruitt infers that Smart's prompt response time must be due to Smart copying CSG's filed support and ticketing system. A true, complete, and authentic copy of Pruitt's August 22, 2019 email is attached as **Exhibit R**.

99.     On August 23, 2019, "Team" member Sebastian County emailed Smart and requested "23 tablets and a single battery back in to be repaired or replaced." Smart immediately responded and tried to clarify Sebastian's request by questioning "What do you mean by battery back? The battery's [sic] in the tablets are not removable." Sebastian County's response was elusive: "I am not understanding…the battery's [sic] are removable. I have several broken tablets with battery's [sic] hanging and a batter that is no longer in a tablet." Sebastian attached a photograph described as "a picture of a broken tablet and a battery from another tablet."

100.    Smart promptly sent Sebastian County 24 new tablets.

101.    Sebastian County forwarded this email exchange to CSG. Ferguson then sent the Sebastian County email exchange to his co-workers Mark Turner and Rick Pruitt with the phrase "Busted!!!  lol" So, rather than showing concern about an issue at a Joint Customer facility, Ferguson laughed out loud and relished in the apparent destruction of Smart's property. A true, complete, and authentic copy of the August 23, 2019 email string between Sebastian County and Smart, along with the related CSG email, is attached as **Exhibit S**.

102.    On August 27, 2019, Dumas emailed Ferguson about Smart. Dumas mistakenly declared that Smart "claimed that their product is inmate proof." The Schedule between Smart and CSG does not claim that Smart's tablets are inmate proof. The Schedule describes the tablets as "ruggedized" and "corrections grade." Obviously, no tablet or similar electronic device is indestructible, particularly one placed in a corrections environment. Dumas also mistakenly claimed that Smart "has not fulfilled their agreement with Sebastian County to provide books and games on the tablets." The Schedule describes the services Smart is obligated to provide to Sebastian County, which do not include entertainment content on tablets.

103.    Ferguson did not forward Dumas's email to Smart to provide Smart with an opportunity to respond, including to clarify the services that Smart was contractually obligated to provide. Nor did CSG check the veracity of Sebastian County's claims and Smart's obligations under the MSA and Schedule. Instead, two weeks later, Ferguson used these issues as grounds to again threaten termination of the MSA by issuing a 30-day notice to cure, as he knew he would when he declared Smart was "busted."

104.    On August 27, 2019, Ferguson again instructed Bowie County to send complaints about Smart to CSG. Ferguson revealed his motivation for the instruction when he stated that "[w]e need to keep track of everything." Accordingly, Ferguson and CSG did not want the Joint Customers to send service issues or requests to CSG because CSG believed that procedure to be more efficient or effective. Rather, CSG wanted to "keep track of everything," so CSG could repeatedly "put Smart on the clock," in hopes of contriving or soliciting enough complaints to eventually terminate the relationship between Smart and CSG. Moreover, by inserting itself as a "gatekeeper" to filter through all complaints before Smart ever received them, CSG could

artificially add to the delay in response time and blame it on Smart's poor service.  A true, complete, and authentic copy of Ferguson's August 27, 2019 email is attached as **Exhibit T**.

105.     Ferguson and CSG also set out to overburden Smart and make unreasonable service demands. For example, in his August 27, 2019 email, Ferguson specifically instructed Bowie County: "Don't hesitate to **request an onsite tech for issues regardless of what they are**." Upon information and belief, Ferguson gave a similar instruction to every Joint Customer.

106.     On August 29, 2019, outside counsel for CSG, Mark Turner of CSG, and Frank Turner of City of St. Louis participated in a telephone conference. CSG's attorneys asked Frank Turner if Smart was responsive to St. Louis's needs and Turner responded, "yes, they've always been quick to respond to my emails or phone calls." Further, on the call, Frank Turner confirmed that St. Louis City employee email addresses can be publicly obtained.

107.     On August 30, 2019, CSG and Smart finalized and entered into a Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits (the "Stipulation"). As part of the Stipulation, CSG agreed that is shall not induce or solicit complaints about Smart from any of the Joint Customers or Miller County. The Court entered the Stipulation on September 10, 2019.

108.     On September 3, 2019, just five days after Frank Turner confirmed to CSG and its counsel that Smart was always responsive to St. Louis's service communications, CSG initiated a service ticket to Smart stating that St. Louis "is requesting a technician on site to perform a walk through to repair numerous issues with charging stations…"

109.     On September 11, 2019, Smart emailed each of the Joint Customers to check in regarding Smart's services and the recent lack of communication from the Joint Customers. Smart offered to send a representative to each facility to discuss Smart's systems.

110.     The Joint Customers' responses, especially those of "Team" members Washington County and Sebastian County, demonstrate that CSG's "instruction" and plan to put Smart "on the clock" remained, even in light of the Stipulation.

111.     Ferguson's "brother" Alan Johnson immediately forwarded Smart's email to Ferguson and asked, "What do you want me to say to this?" A true, complete, and authentic copy of Johnson's September 11, 2019 email is attached as **Exhibit U**.

112.     Apparently upon Ferguson's instruction, Johnson responded to Smart's September 11, 2019 email with one question: "What do you expect to accomplish from this meeting?" Smart responded and then Washington ignored the response. A true, complete, and authentic copy of the email string between Washington and Smart is attached as **Exhibit V**.

113.     On September 13, 2019, "Team" member Sebastian County responded to Smart's email and stated, "I am going to have to pass on meeting with your representative." A true, complete, and authentic copy of Sebastian County's response email is attached as **Exhibit W**.

114.     Other Joint Customers, including the City of St. Louis, for example, also declined Smart's offers to engage in a productive dialogue about Smart's services and systems at the customers' facilities. City of St. Louis told Smart that they "have limited our communications to Correct Solutions…Any issues we may have will be directed to them."

115.     Incredibly, on the same day that Sebastian County declined a meeting with Smart's representative, September 13, 2019, CSG sent Smart a Notice to Cure pursuant to the MSA (the "Notice to Cure"). CSG demanded that Smart provide "tamper-proof" tablets and electronic entertainment content to Sebastian County. The MSA and Sebastian Schedule do not obligate Smart to comply with either of those demands. A true, complete, and authentic copy of the September 13, 2019 Notice to Cure is attached as **Exhibit X**.

116.    In response to the Notice to Cure, Smart filed an emergency motion to enjoin termination based on the Notice to Cure. At the hearing, Captain Dumas appeared to testify for CSG in opposition to Smart's motion.[4]

117.    Following CSG's second failed attempt to terminate the MSA through legal maneuvering, it has continued to engage in other bad-faith, coercive conduct, with the assistance of its "Team" members, calculated to force Smart out of Joint Customer facilities, including by fatiguing Smart with repeated service tickets (regardless of how minor), requests for on-site visits (which require travel and significant time and expense), and worse, by harming Smart's economic interests through disabling its services and source of income.

118.    For example, on or about September 19, 2019, Smart discovered that Sebastian County had disabled Smart's messaging system in numerous housing units within its facility. CSG either predicted this event the prior month (see Rick Pruitt's August 15, 2019 email foreshadowing that customers will "turn[] off" their equipment due to "frustrations"), or encouraged Sebastian County to take this approach. Yet, Sebastian County continued to use the other operational features of Smart's system, such as medical and grievance forms, intra-facility communication, and educational content, and continued to obtain the benefit of Smart providing its MailGuard Postal Mail Elimination® services free of charge. CSG and Sebastian understand that Smart can only provide these services because it generates revenue from its messaging services. Moreover, CSG and Sebastian understand that Smart incurred significant out of pocket expenses to make its systems and services accessible to Sebastian County in reliance on obtaining exclusivity on the revenue-generating messaging function.

---

[4] At the hearing, the Court did not permit a termination based on the Notice to Cure and fashioned a procedure, agreed to by CSG, by which it could not terminate the MSA without further Court order.

119.     Further, like laughing out loud at the destruction of Smart's tablets in Sebastian County, CSG stood by while inmates severely damaged and destroyed Smart's kiosks at Avoyelles. Despite its contractual obligation to prevent third parties from modifying and disassembling Smart's hardware, CSG failed to prevent third-party inmates from destroying Smart's kiosks. CSG even blamed Smart for its own contractual defaults and for Avoyelles' failure to supervise the destructive conduct of its inmates.

### CSG's Notices of Non-Renewal

120.     On October 4, CSG sent Smart a Notice of Non-Renewal of Master Services Agreement with respect to Washington County ("Notice of Non-Renewal"). A true, complete, and authentic copy of the Notice of Non-Renewal is attached as **Exhibit Y**.

121.     The Notice of Non-Renewal attaches a Correctional Communications Service Agreement between CSG and Washington County (the "Washington Agreement"). Both parties signed the Washington Agreement on September 25, 2014.

122.     Section 14 of the Washington Agreement provides:

> The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

123.     Accordingly, unless either CSG or Washington County notified the other party in writing of its intent to terminate the Washington Agreement at least 90 days prior to its expiration, the Washington Agreement renewed for an additional 12 months.

124.    The Notice of Non-Renewal asserts that the first successful call under the Washington Agreement was placed on January 4, 2015, which is thus the start date of the Washington Agreement.

125.    Upon receipt of the Notice of Non-Renewal, Smart requested proof of the first successful call and the start date of the Washington Agreement. CSG never responded.

126.    Moreover, CSG does not claim in the Notice of Non-Renewal, or attach proof thereof, that either CSG or Washington County provided the other with timely written notice of its intent to terminate the Washington Agreement. Assuming the accuracy of CSG's statement that the Washington Agreement started on January 4, 2015, such written notice would have been due by October 4, 2019 in order for the Washington Agreement to not automatically review. Based on CSG's failure to include written notice of intent to terminate from either CSG or Washington County, neither CSG nor Washington County terminated the Washington Agreement. Thus, the Washington Agreement renewed for another year, at least until January 4, 2021.

127.    As described above, each MSA is co-terminous with CSG's agreements with the Joint Customers. Because the Washington Agreement was not terminated and automatically renewed, the MSA automatically renewed in accordance with the Washington Agreement.

128.    The renewal of the MSA with respect to Washington County is consistent with the understanding of CSG and Smart when they executed the MSA. Due to Smart's significant investment in the Joint Customer facilities, CSG and Smart understood and intended Smart to maintain its exclusive rights as long as CSG renewed any Joint Customer agreement.

129.    On November 21, 2019, CSG sent Smart Notices of Non-Renewal of the Sebastian County and Wayne County agreements. True, complete, and authentic copies of the Notices are attached as **Exhibit Z** and **Exhibit AA**.

130.    The Notices of Non-Renewal for Sebastian and Wayne County also fail because CSG has not terminated its contracts with either of those counties. As a result, the "co-terminous" agreement with Smart remains in effect.

### Breaches of Smart's Exclusivity Agreements

131.    Pursuant to the CSG/Tech Friends Agreement, and notwithstanding its obligations to Smart under the MSAs, CSG has apparently begun dismantling Smart's exclusivity rights in some of the Joint Customer facilities.

132.    Within one month of the Smart marketing email, on April 19, 2019, Ferguson emailed Commissioner Dale Glass of Joint Customer City of St. Louis about scheduling a presentation of Tech Friends' products. The presentation occurred at the City of St. Louis facility on April 23, 2019.

133.    On May 24, 2019, CSG set up a webinar between City of St. Louis and Tech Friends. On June 21, 2019, Ferguson emailed St. Louis to set up another meeting about the Tech Friends presentations, which took place on June 24, 2019.

134.    As described above, on July 10, 2019, CSG and Tech Friends executed the CSG/Tech Friends Agreement.

135.    On August 23, 2019, Tech Friends emailed Bowie County, one of the Legacy Accounts identified in the CSG/Tech Friends Agreement, regarding a Tablet/Kiosk Installation and stated:

> The current plan is to arrive onsite with hardware on 9/16 to install tablets and kiosks. If possible we would like to install our wall mounted tablets in the same place as the smart tablets so as to avoid unnecessary work with running electric and network cables. Do you know if by chance the previous vendor will come onsite to uninstall their tables?

A true, complete, and authentic copy of the August 23, 2019 Tech Friends email is attached as **Exhibit BB**.

136.    It is not yet clear how many Joint Customers have met with Tech Friends or planned Tech Friends product installations. However, at least one Joint Customer, Washington County, is listed as a "participating facility" on the Tech Friends web portal. This means that third parties can communicate with inmates at Washington County via the inmates' use of Tech Friends messaging products, *e.g.,* tablets. Further, CSG may be collecting up to 50% of the revenue generated by these messages through its revenue-sharing agreement with Tech Friends.

137.    CSG's failure to provide Smart with exclusivity on the services set forth in the Schedules, including revenue-generating messaging services, is a breach of the Washington MSA and potentially other MSAs.

138.    The conduct of the Joint Customers in the immediate aftermath of CSG's attack on Smart's reputation, solicitation of complaints, and termination attempts demonstrates that CSG has breached the MSA, which obligates CSG to grant Smart the exclusive right to maintain and derive revenue from messaging services in the Joint Customers' facilities, as long as the Joint Customers are contractually obligated to CSG.

139.    At all material times, Smart has performed all of its duties and obligations pursuant to the NDA and each MSA and Schedule and remains ready, willing, and able to continue to perform such duties and obligations.

140.    All conditions precedent to the bringing and maintenance of this lawsuit have been met, have occurred, or have been waived.

141.    Plaintiff has retained the law firm of Bajo | Cuva | Cohen | Turkel to prosecute this action and is obligated to pay the firms' fees and costs for their services.

**COUNT I**
**DECLARATORY RELIEF**
Mutual Confidentiality and Nondisclosure Agreement
(Smart v. CSG)

142.   Smart realleges paragraphs 1 through 141.

143.   This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

144.   In its July 17, 2019 letter, CSG alleged that Smart violated the terms of the NDA by using Confidential Information obtained through Smart's contractual relationship with CSG.

145.   The NDA was executed on June 15, 2017, in contemplation that the parties may enter other agreements with each other.

146.   Subsequently, the parties entered into the various Joint Customer agreements, each of which includes an MSA. Like the NDA, the MSA includes a Confidential Information and Non-Disclosure provision.

147.   The MSA provides that it supersedes the NDA and that it is the complete agreement, together with the Schedules, between the parties with respect to the subject matter of each MSA.

148.   Further, each MSA is part of a separate contract between Smart, CSG, and a Joint Customer. CSG may not terminate every Joint Customer Agreement due to an alleged breach of the NDA as it relates to one of the Joint Customer Agreements.

149.   However, CSG has accused Smart of violating the NDA and has used the alleged violation, at least in part, as a predicate to purportedly terminate every MSA.

150.   Therefore, Smart is in doubt concerning its rights under the NDA and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart and CSG concerning the proper interpretation of the NDA.

151.     Smart is entitled to have its uncertainty removed with respect to its rights and obligations under the NDA.

152.     The parties have an actual, present, or adverse and antagonistic interest regarding the NDA.

153.     All interested parties and potential adverse interests are before this Court.

154.     The relief sought by Smart in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

155.     Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart may obtain a declaration of rights under the NDA.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that each MSA superseded the NDA regarding each Joint Customer agreement, such that neither Smart nor CSG can be in violation of the NDA; (b) declaring that CSG may not rely on a violation of the NDA as a predicate to terminate any MSA and that the termination was ineffective; (c) prohibiting CSG from terminating any MSA; (d) prohibiting CSG from taking steps in furtherance of terminating any MSA, including, disconnecting or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, informing any Joint Customer that Smart and CSG do not have a contractual relationship, or otherwise disavowing Smart's status as the exclusive provider of messaging and related services for the Joint Customers; (e) declaring that each MSA is part of a separate contract between Smart, CSG, and a Joint Customer, such that a termination of one cannot serve as a basis for a termination of any other contract; (f) awarding Smart its attorneys' fees and costs pursuant to Section 13 of the NDA; and (G) for such further relief as the Court deems just and proper.

**COUNT II**
**DECLARATORY RELIEF**
Master Services Agreement
(Smart v. CSG)

156.    Smart realleges Paragraphs 1 through 141.

157.    This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

158.    In its July 17, 2019 letter, CSG alleged that Smart violated the terms of the MSA by using Confidential Information obtained through Smart's contractual relationship with CSG.

159.    The information CSG accuses Smart of using is not confidential as a matter of law.

160.    Even if Smart used CSG's Confidential Information, CSG may not terminate the MSA for such a violation.

161.    Further, each MSA is part of a separate contract between Smart, CSG, and a Joint Customer. CSG may not terminate every Joint Customer Agreement due to an alleged breach of one of the Joint Customer Agreements.

162.    However, CSG has accused Smart of violating the MSA and has used the alleged violation, at least in part, as a predicate to purportedly terminate every MSA.

163.    Therefore, Smart is in doubt concerning its rights under the MSA and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart and CSC concerning the proper interpretation of the Agreement.

164.    Smart is entitled to have its uncertainty removed with respect to its rights and obligations under the MSA.

165.    The parties have an actual, present, or adverse and antagonistic interest regarding the Agreement.

166.    All interested parties and potential adverse interests are before this Court.

167.    The relief sought by Smart in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

168.    Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart may obtain a declaration of rights under the MSA.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that CSG may not rely on a violation of the Confidential Information and Non-Disclosure provision of the MSA as a predicate to terminate any MSA and that the termination was ineffective; (b) prohibiting CSG from terminating any MSA; (c) prohibiting CSG from taking steps in furtherance of terminating any MSA, including, disconnecting or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, informing any Joint Customer that Smart and CSG do not have a contractual relationship, or otherwise disavowing Smart's status as the exclusive provider of messaging and related services for the Joint Customers; (d) declaring that each MSA is part of a separate contract between Smart, CSG, and a Joint Customer, such that a termination of one cannot serve as a basis for a termination of any other contract; (e) awarding Smart its costs; and (f) for such further relief as the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
Master Services Agreement – Injunctive Relief
(Smart v. CSG)

169.    Smart realleges Paragraphs 1 through 141.

170.    CSG improperly attempted to terminate the MSA and has been falsely representing to Joint Customers that Smart has no relationship with CSG and, as a result, no right to provide services to Joint Customers.

171.    CSG improperly sent Smart a Notice to Cure and demanded that Smart provide products and services not required by the MSA or Sebastian Schedule.

172.    CSG improperly sent Smart Notices of Non-Renewal regarding Washington County, Sebastian County, and Wayne County and demanded that Smart remove its equipment and services even though CSG renewed or failed to terminate its contracts with these Joint Customers and, thus, the MSAs and Schedules for these Joint Customers.

173.    CSG has instructed Joint Customers to refrain from communicating with Smart and has failed to provide Smart with meaningful access to the Joint Customers.

174.    CSG has used other vendors to provide the services which are exclusive to Smart under the MSAs.

175.    As a result of CSG's breaches, Smart has suffered irreparable harm for which it has no adequate remedy at law and will continue to suffer irreparable harm if the harmful conduct is not enjoined. Smart bargained for and received exclusive relationships with the Joint Customers throughout the terms of CSG's agreements with the Joint Customers. Smart has no ability to measure the losses it will incur if CSG is not enjoined from improperly terminating the MSAs and disavowing Smart's exclusive rights. In addition to lost profits, Smart will incur immeasurable losses in goodwill and reputation if its equipment is removed from the facilities of Joint Customers or if Joint Customers continue to be informed that Smart has been terminated or has no relationship with CSG. Further, Smart will not be able to realize or recoup the substantial investment it has made in its exclusive relationship with CSG and in installing and providing services to the Joint Customers. Smart will also lose market share, the ability to sell additional services to customers, and the ability to fairly compete for future contracts.

176.     CSG's conduct will continue to cause irreparable harm to Smart unless restrained, restricted, and enjoined by this Court.

177.     Entry of an injunction will serve the public interest, prevent further and continuing breach of the Agreement, and maintain the *status quo* of services being provided to Joint Customers.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order prohibiting Defendant, Correct Solutions, LLC from (a) terminating any MSA; (b) taking steps in furtherance of terminating any MSA, including, disconnecting or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, informing any Joint Customer that Smart and CSG do not have a contractual relationship, or otherwise disavowing Smart's status as the exclusive provider of messaging and related services for the Joint Customers; (c) non-renewing the MSAs and Schedules with respect to Washington County, Sebastian County, Wayne County, and any other Joint Customer with which CSG has renewed or failed to terminate its contract; (d) contracting with or allowing any other vendor to provide the services which are exclusive to Smart under the MSAs and Schedules; and (e) for such further relief as the Court deems just and proper.

## COUNT IV
## <u>BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING</u>
### Master Services Agreement – Injunctive Relief
### (Smart v. CSG)

178.     Smart realleges Paragraphs 1 through 141.

179.     In every contract, including the MSAs, an implied covenant of good faith and fair dealing exists.

180.     CSG agreed that Smart had the exclusive right to provide messaging and related services to the Joint Customers during the terms of its agreements with the Joint Customers.

181.    CSG also agreed that it would not terminate the MSAs without cause related to the performance of the MSA at a particular facility and without following the proper procedures, including a reasonable cure period.

182.    CSG also agreed that the MSAs would be "co-terminous" with CSG's contracts with a Joint Customer.

183.    CSG breached the covenant of good faith and fair dealing implied in the exclusivity, termination, and renewal provisions of the MSAs by manufacturing improper grounds to purportedly terminate the MSAs and notice defaults under the MSAs and by sending nonrenewal notices regarding Washington County, Sebastian County, and Wayne County despite CSG's continued contractual relationship with those Joint Customers.

184.    CSG breached the covenant of good faith and fair dealing implied in the MSAs by disparaging Smart's reputation, soliciting complaints about Smart, controlling the communications from Joint Customers, and enlisting the Joint Customers in its "plight" to terminate Smart.

185.    CSG breached the covenant of good faith and fair dealing by using other vendors to provide the services which are exclusive to Smart under the MSAs and Schedules.

186.    As a result of CSG's breaches, Smart has suffered irreparable harm for which it has no adequate remedy at law and will continue to suffer irreparable harm if the harmful conduct is not enjoined. Smart bargained for and received exclusive relationships with the Joint Customers throughout the terms of CSG's agreements with the Joint Customers. Smart has no ability to measure the losses it will incur if CSG is not enjoined from improperly terminating the MSAs and disavowing Smart's exclusive rights. In addition to lost profits, Smart will incur immeasurable losses in goodwill and reputation if its equipment is removed from the facilities of Joint Customers or if Joint Customers continue to be informed that Smart has been terminated or has no relationship

with CSG. Further, Smart will not be able to realize or recoup the substantial investment it has made in its exclusive relationship with CSG and in installing and providing services to the Joint Customers. Smart will also lose market share, the ability to sell additional services to customers, and the ability to fairly compete for future contracts.

187.    CSG's conduct will continue to cause irreparable harm to Smart unless restrained, restricted, and enjoined by this Court.

188.    Entry of an injunction will serve the public interest, prevent further and continuing breach of the Agreement, and maintain the *status quo* of services being provided to Joint Customers.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order prohibiting Defendant, Correct Solutions, LLC from (a) terminating any Agreement; (b) taking steps in furtherance of terminating any MSAs, including, disconnecting or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, informing any Joint Customer that Smart and CSG do not have a contractual relationship, or otherwise disavowing Smart's status as the exclusive provider of messaging and related services for the Joint Customers; (c) non-renewing the MSAs and Schedules with respect to Washington County, Sebastian County, Wayne County, and any other Joint Customer with which CSG has renewed or failed to terminate its contract; (d) contracting with or allowing any other vendor to provide the services which are exclusive to Smart under the MSAs and Schedules; and (e) for such further relief as the Court deems just and proper.

### COUNT V
### BREACH OF CONTRACT
### Master Services Agreement – Damages
### (Smart v. CSG)

189.    Smart realleges Paragraphs 1 through 141.

190.    CSG improperly attempted to terminate the MSAs and has been falsely representing to Joint Customers that Smart has no relationship with CSG and, as a result, no right to provide services to Joint Customers.

191.    CSG improperly sent Smart a Notice to Cure and demanded Smart to provide products and services not required by the Sebastian MSA or Sebastian Schedule.

192.    CSG improperly sent Smart Notices of Non-Renewal regarding Washington County, Sebastian County, and Wayne County and demanded that Smart remove its equipment and services even though CSG renewed or did not terminate its contracts with these Joint Customers and, thus, the MSAs and Schedules for these Joint Customers.

193.    CSG has instructed Joint Customers to refrain from communicating with Smart and has failed to provide Smart with meaningful access to the Joint Customers.

194.    CSG has used other vendors to provide the services which are exclusive to Smart under the MSAs and Schedules.

195.    CSG entered into the CSG/Tech Friends contract and agreed to provide exclusive rights to Tech Friends that belong to Smart.

196.    As a result of CSG's breaches, Smart has been damaged.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT VI
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Master Services Agreement – Damages
### (Smart v. CSG)

197.    Smart realleges Paragraphs 1 through 141.

198.    In every contract, including the MSA, an implied covenant of good faith and fair dealing exists.

199.    CSG agreed that Smart had the exclusive right to provide messaging and related services to the Joint Customers during the terms of its agreements with the Joint Customers.

200.    CSG also agreed that it would not terminate the MSAs without cause related to the performance of the MSA at a particular facility and without following the proper procedures, including a cure period.

201.    CSG also agreed that each MSA would be "co-terminous" with CSG's corresponding contract with a Joint Customer.

202.    CSG breached the covenant of good faith and fair dealing implied in the exclusivity and termination provisions of the MSAs by manufacturing improper grounds to purportedly terminate the MSAs and notice defaults under the MSAs.

203.    CSG breached the covenant of good faith and fair dealing implied in the MSAs by disparaging Smart's reputation, soliciting complaints about Smart, controlling the communications from Joint Customers, and enlisting the Joint Customers in its "plight" to terminate Smart.

204.    CSG breached the covenant of good faith and fair dealing by using other vendors to provide the services which are exclusive to Smart under the MSAs and Schedules and by entering into the CSG/Tech Friends Agreement.

205.    As a result of CSG's breaches, Smart has been damaged.

WHEREFORE, Plaintiff, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT VII
## DEFAMATION
### (Smart v. CSG and Ferguson)

206.    Smart realleges Paragraphs 1 through 141.

207.    CSG and Ferguson have made false statements about Smart, as described above.

208.    CSG's and Ferguson's false statements were published to third parties, including, but not limited to, Miller County, Washington County, Sebastian County, and Bowie County.

209.    CSG's and Ferguson's statements were explicitly false or impliedly false by carrying an insinuation that was false. In addition, CSG's and Ferguson's statements created a false impression by omitting facts that would tend to negate an implied defamatory meaning, including CSG and Ferguson omitting the facts that it had only sent a notice of termination to Smart, which was both legally and factually improper, and that CSG has solicited the complaints (if any) it had received about Smart in an effort to contrive a termination of the parties' relationship.

210.    CSG's and Ferguson's statements were made with express malice and in an effort to improperly terminate its relationship with Smart in order to pursue a more favorable and profitable relationship with Tech Friends.

211.    CSG and Ferguson knew or reasonably should have known that their statements were likely to result in inducing others, including for example the Joint Customers and Miller County, not to deal with Smart.

212.    CSG's and Ferguson's false statements played a material and substantial part in inducing others not to deal with Smart.

213.    As a direct and proximate cause of CSG's and Ferguson's false and defamatory statements, Smart has been damaged in the form of reputational harm and lost profits.

WHEREAS, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendants, Correct Solutions, LLC and Rick Ferguson, for damages, special damages, lost profits, interest, costs, an injunction prohibiting further publication of the false and defamatory statements, and for such further relief as the Court deems just and proper.

**COUNT IX**
**DECLARATORY RELIEF**
**Washington, Sebastian, and Wayne County Agreements**
**(Smart v. CSG)**

214.    Smart realleges Paragraphs 1 through 141.

215.    CSG's Notices of Non-Renewal assert that CSG will not renew the MSAs and Schedules with respect to Washington County, Sebastian County.

216.    However, upon information and belief, neither CSG nor Washington County notified the other in writing of its intent to terminate the CSG/Washington County contract at least 90 days prior to the date of expiration of the then-current term. As a result, CSG and Washington County renewed their contract for an additional twelve calendar months, which includes Smart's services.

217.    Upon information and belief, neither CSG nor Sebastian County has terminated the CSG/Sebastian contract. As a result, Smart's services have not been terminated and remain in effect.

218.    Upon information and belief, neither CSG nor Wayne County notified the other in writing of its intent to terminate the CSG/Wayne County contract at least 90 days prior to the date of expiration of the then-current term. As a result, CSG and Wayne County renewed their contract for an additional twelve calendar months, which includes Smart's services.

219.    With the renewals and/or continuation of CSG's agreements with these Joint Customers, Smart's exclusive rights to provide services to Washington County, Sebastian County,

and Wayne County renewed and/or continue as well in accordance with the MSAs, Schedules, and CSG/Joint Customer contracts.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order declaring that (a) CSG may not non-renew the MSAs and Schedules with respect to Washington County, Sebastian County, or Wayne County given the renewals or continuations of CSG's contracts with these Joint Customers; (b) Smart is entitled to be the exclusive provider of its services in Washington County, Sebastian County, and Wayne County during each initial and renewal term of the contracts between CSG and Washington County, Sebastian County, and Wayne County; and (c) for such further relief as the Court deems just and proper.

## COUNT X
## UNFAIR COMPETITION
### (Smart v. CSG and Ferguson)

220.    Smart realleges Paragraphs 1 through 141.

221.    Aside from partnering on providing services for the Joint Customers, Smart and CSG are competitors for purposes of marketing and selling their products—they compete for a common pool of customers.

222.    In the event that a Joint Customer either terminates CSG or does not renew CSG's services (which currently incorporate Smart's services), then CSG and Smart will be competitors with respect to the Joint Customers as well.

223.    CSG has and continues to engage in the conduct described above, including soliciting complaints about Smart, making false claims about Smart, disparaging Smart's reputation, improperly attempting to terminate Smart's relationships with CSG and the Joint Customers, and conveying exclusive rights that belong to Smart to other competitors.

224.    As the direct and proximate result of the CSG's unfair competition, Smart has suffered damages, including, but not limited to, loss of goodwill and loss of sales.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated this ___ day of _____, 2019.

*/s/ Brad F. Barrios*
Kenneth G. Turkel
Florida Bar No. 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios
Florida Bar No. 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes
Florida Bar No. 96657
E-mail: dhayes@bajocuva.com
**BAJO | CUVA | COHEN | TURKEL**
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT A

*to Amended Complaint*



## MUTUAL CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Mutual Confidentiality and Nondisclosure Agreement (this "Agreement") is entered this $15\overline{m}$ day of June 2017 between Smart Communications Holding, Inc. ("SCH"), a Florida corporation, located at 4522 West North B Street, Tampa, Florida 33609 and Correct Solutions Group, ("COMPANY"), a Louisiana corporation, located at 192 Bastille Lane, #200, Ruston, Louisiana 71270. SCH and COMPANY are sometimes hereinafter referred to in this Agreement as a "Party" or, collectively, as the "Parties."

## RECITALS:

A.    The Parties contemplate certain discussions with the potential that they may enter other agreements with each other.

B.    To facilitate such discussions certain confidential and/or proprietary information that is the property of, or used by, SCH or COMPANY may be disclosed to or discovered by the Other party. The Parties acknowledge that the disclosing party will not disclose such information unless the receiving party agrees to maintain such in strict confidence and in accordance with this Agreement.

NOW THEREFORE, the Parties agree as follows:

1.    "Confidential Information" shall mean any and all information relating to the business and operations of the disclosing party owned, licensed or controlled by the disclosing party, including, but not limited to, any or all of the following: know how, products, product ideas, properties, data, technologies, methods, procedures, plans, business plans, forecasts, financial and other business information, including without limitation pricing, fees and programming fees offered to the receiving party or other customers or potential customers by the disclosing party; identities of actual customers, investors or other individuals and entities having a current business relationship with the disclosing party; trade secrets, consisting of confidential and proprietary information not generally known to the public including without limitation software (e.g., source, object and executable code in hard copy and electronic format) and hardware relating to implementation of any of the technology of the disclosing party; technical specifications; manuals, diagrams, charts and other descriptive materials relating to the technology of the disclosing party; and any and all patentable or non-patentable inventions or ideas; and all copyrightable or non-copyrightable subject matter and derivative works thereof. Confidential Information also includes information that derives independent economic value, actual or potential, from being not generally known to the public or to other persons who can obtain economic value from its disclosure or use, and which is the subject of reasonable efforts to maintain its non-disclosure. Confidential Information includes documents, drawings, reports and other records in any media that incorporate, reference or are based upon any "Confidential Information" provided by the disclosing party, including, without limitation, any such documents, drawings, reports or records that are generated because of or as a part of the Parties discussing and considering a business relationship between each other. It is agreed that these definitions shall be construed together where applicable, and separately where necessary, in whatever manner is the most inclusive and best protects any information which may be considered by the disclosing party to be Confidential Information.

1

2.     "Confidential Information" shall not include any materials or information of the type specified in paragraph above to the extent that such materials or information: (a) are now or later become generally known and utilized by the public through means which do not constitute a breach of the receiving party's obligations pursuant to this Agreement; (b) are received by or are in the possession of the receiving party, prior to receipt of such information from the disclosing party, and were not so received or acquired through breach of any of the obligations of the receiving party pursuant to this Agreement; (c) are received from a third party under no obligation of confidentiality of the receiving party pursuant to this Agreement, and which third party was under no obligation of confidentiality to the disclosing party or (d) are required to be disclosed by the receiving party pursuant to judicial order or other compulsion of law; provided that the receiving party will provide to the disclosing party prompt notice of such order, cooperate with the disclosing party to maintain the confidentiality of the Confidential Information, and comply with any protective order imposed on disclosure of the Confidential Information.

3.     The receiving party shall hold all Confidential Information in trust and confidence always and shall not sell, transfer, publish, disclose, display, reveal, divulge or otherwise make available any Confidential Information, directly or indirectly, intentionally or negligently, to any third party, person, company or other entity, for any purpose or reason, without the express written consent from the disclosing party. The receiving party agrees to maintain all Confidential Information in strict confidence and to secure and protect that Confidential Information in the same manner as the receiving party protects its own most sensitive information or trade secrets, but in no event with less than reasonable care.

4.     The receiving party shall not use the Confidential Information for any purpose except the purpose of this Agreement as specified above, and shall restrict the disclosure of Confidential Information to persons within its own organization who: (a) have responsibility for or are directly concerned with such purpose of this Agreement; (b) are subject to non-disclosure or confidentiality obligations with the receiving party (the Confidential Information constituting protected information for purposes of such obligations); and (c) have been informed and are fully aware of the receiving party's obligations under this Agreement.

5.     The receiving party shall return all Confidential Information disclosed or supplied to it by the disclosing party, in whatever form or format so supplied or disclosed, including any documents containing any Confidential Information and all copies thereof or extracts or notes thereon, to the disclosing party immediately upon request of the disclosing party.

6.     About the purpose of this Agreement and the disclosure of Confidential Information, certain personnel, representatives or agents of the receiving party, as are authorized by the disclosing party, may be granted access to the facilities of the disclosing party at times and in numbers and identity as agreeable to the disclosing party. All such persons granted such access shall be subject to and comply with all requests and regulations of the disclosing party relating to safety, the taking of photographs and other special regulations as may be considered appropriate by the disclosing party for the security of Confidential Information or other technology or to avoid interference with the operation and administration of the facilities. .

2

7.    Without the prior written consent of the disclosing party, the receiving party will not, and the receiving party will direct all of its partners, officers, employees, agents and representatives not to, disclose to any person or entity either the fact that discussions or negotiations are taking place in connection with the purpose of this Agreement or any other potential transactions between the Parties, or any of the terms, conditions or other facts with respect to any such purpose or potential transactions, including the status thereof.

8.    The receiving party acknowledges and agrees that any breach of this Agreement would cause immediate and irreparable injury to the disclosing party and monetary damages would be difficult if not impossible to ascertain. The receiving party agrees that should the receiving party violate any of the terms and conditions of this Agreement, the disclosing party shall be entitled to seek and obtain immediate, preliminary and permanent injunctive relief to enjoin further and future violations of this Agreement without a requirement to post a security bond. Nothing contained in this Agreement shall affect the right of the disclosing party to seek and obtain monetary damages in addition to such equitable relief.

9.    This Agreement shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns of the Parties and shall be construed as if written jointly by both Parties and pursuant to the laws of the State of Florida. The Parties acknowledge that a substantial portion of the negotiations, anticipated performance and execution of this Agreement occurred or shall occur in Hillsborough County, Florida. Any civil action or legal proceeding arising out of or relating to this Agreement shall be brought in the courts of record of the State of Florida in Hillsborough County or the United States District Court, Middle District of Florida. The Parties consent to the jurisdiction of such Florida court in any such civil action or legal proceeding and waives any objection to the laying of venue of any such civil action or legal proceeding in such Florida court.

10.    The provisions of this Agreement are severable, and if any provision is held to be invalid, unenforceable or void, the remaining provisions shall not be invalidated thereby.

11.    The terms of this Agreement shall remain in full force notwithstanding the completion of the evaluations contemplated by the Parties or the achievement or abandonment of the purpose of this Agreement, the termination of relationships between the Parties or the return of all written materials containing Confidential Information to the Parties.

12.    The terms of this Agreement shall survive for five (5) years after the date of this Agreement; provided, however, that non-disclosure and non-use obligations shall not terminate for any trade secret until such trade secret is no longer a trade secret.

13.    If any civil action, arbitration or other legal proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, sales and use taxes, court costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, taxes, costs and expenses incident to arbitration, appellate, bankruptcy

3

and post judgment proceedings), incurred in that civil action, arbitration or legal proceeding, in addition to any other relief to which such party or parties may be entitled. Attorneys' fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party.

14.    If the disclosing party ever fails to require, or delays requiring, the receiving party's performance of any provision of this Agreement, even if known, such failure or delay shall not affect the disclosing party's right to require performance of that provision, or to exercise any of its rights, powers or remedies pursuant to this Agreement. Any waiver by the disclosing party of any breach of any provision of this Agreement shall not be construed as a waiver of any continuing or succeeding breach of such provision, a waiver of the provision itself, or a waiver of any right, power or remedy under this Agreement.

15.    Except as otherwise expressly provided in this Agreement, no remedy conferred upon the disclosing party pursuant to this Agreement is intended to be exclusive of any other remedy, and each such remedy shall be cumulative and shall be in addition to every other remedy given pursuant to this Agreement or now or hereafter existing at law or in equity or by statute or otherwise. No single or partial exercise by any party of any right, power or remedy pursuant to this Agreement shall preclude any other or further exercise thereof.

16.    This Agreement shall not be construed more strongly against SCH despite SCH's responsibility for its preparation.

17.    This Agreement represents the entire understanding and agreement between the Parties with respect to its subject matter and supersedes all other negotiations, understandings and representations (if any) made by and between the Parties regarding the same.

ACCEPTED AND AGREED:

**Smart Communications Holding**

By: _____

Name -Title: James Logan, President

Date: _6 - 1 5 - 17_

~~LaSalle Management~~ Correct Solutions, LLC

By: _____

Name-Title: _Manager_

Date: _8/21/17_

4

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT B

### *to Amended Complaint*

  

# Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Systems, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

> (i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

> (ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

> (iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

> (iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

> (v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

> (vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

> (vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

> (vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary