| | |
|---|---|
| From: | Rick Ferguson [████]@lasallecorrections.com] |
| Sent: | Friday, August 16, 2019 9:53 AM |
| To: | Mark Turner |
| Subject: | Fwd: Email from smart jail and response |
| Attachments: | Document2.docx; ATT00001.htm |

Good question.  Before I advise him to forward to our support email I wanted to get your input

Ty

R

Sent from my iPhone

Begin forwarded message:

**From:** Alan Johnson [████]@co.washington.ar.us>
**Date:** August 16, 2019 at 8:12:51 AM CDT
**To:** "'Rick Ferguson'" [████]@lasallecorrections.com>
**Subject: FW: Email from smart jail and response**

Rick,
Here is an email Justin Scott sent to my Lieutenant and Lt. Ake's response. We have not sent the response to Justin. What do you advise? Do you want us to send the response or do you want to handle it?

Captain Alan Johnson
1155 W. Clydesdale
Fayetteville, AR 72701
Office – (████)
Cell – [████]
[████]@co.washington.ar.us

**From:** Nolan Ake
**Sent:** Friday, August 16, 2019 8:10 AM
**To:** Alan Johnson <[████]@co.washington.ar.us>
**Subject:** Email from smart jail and response

Here is Justin email  and the response

1

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT R

### *to Amended Complaint*

From:         Rick Pruitt
Sent:         Thursday, August 22, 2019 5:46 AM
To:           Rick Ferguson; Mark Turner
Cc:           Vince West; Daniel Wyatt
Subject:      FW: Message from Eddy Lisa (+1912    )
Attachments:  VoiceMessage.wav; ATT00001.htm

FYI – From the latest correspondence from Miller, Avoyelles and now from Washington (VM) Lisa Eddy (formerly Lattice) looks to be running the service for Smart.

Both tickets submitted (Avoylles –Dispatch next day and Washington – VM for more info) Smart has responded within 24 hours.

Their ticket system is the same as ours and is returning a receipt for ticket submitted with follow-up from a support person within 4 hours.  They look to be building a true field support system based off of ours which Lisa tagged along on during our Lattice VV installs, training and service buildup.

Have a nice day.

**Rick Pruitt**
**Director of Field Services**
**Correct Solutions Group**
(501)
      @correctsolutionsgroup.com

www.correctsolutionsgroup.com


**From:** Nolan Ake [mailto   @co.washington.ar.us]
**Sent:** Wednesday, August 21, 2019 5:56 PM
**To:** AR Support <​      ​@correctsolutionsgroup.com>
**Subject:** Fwd: Message from Eddy Lisa (+1912

What do you advise I do with this phone call Do you want me to respond


      Lt. Nolan Ake #408
      Washington County
      Detention Center
      1155 Clydesdale Drive
      Fayetteville, AR 72701
      (479)      - Office
      (479)      - Cell
      (479)      - Fax
           @co.washington.ar.us

Begin forwarded message:

1

Correct Solutions 00306

**From:** Cisco Unity Connection Messaging System <███████████@cuxn-pub.so.washington.ar.us>
**Date:** August 21, 2019 at 5:09:53 PM CDT
**To:** <n██@cuxn-pub.so.washington.ar.us>
**Subject: Message from Eddy Lisa (+1912████████**

Correct Solutions 00307

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT S

### *to Amended Complaint*

| | |
|---|---|
| From: | Rick Ferguson [████████@lasallecorrections.com] |
| Sent: | Saturday, August 24, 2019 1:07 PM |
| To: | Mark Turner; Rick Pruitt |
| Subject: | FW: Tablets |
| Attachments: | IMG_1730.jpg |

Busted!!!  lol

Rick Ferguson
Correct Solutions Group
www.correctsolutionsgroup.com
www.lasallecorrections.com
(903) ████████

"Something Amazing is going to happen to You today"

-----Original Message-----
From: ████h@co.sebastian.ar.us ████|████co.sebastian.ar.us>
Sent: Friday, August 23, 2019 9:23 AM
To: c████████@smartjailmail.com
Subject: RE: Tablets

I am not understanding.... the battery's are removable.
I have several broken tablets with battery's hanging and a battery that is no longer in a tablet.

(See attached file: IMG_1730.jpg)

That is a picture of a broken tablet and a battery from another tablet....

Thanks,
Ashley Smith
Director of Inmate Management Assistant
Sebastian Co. Detention Center
Phone: 479-████████ ████ ████
Fax: 479-████████ ████
email: ████████@co.sebastian.ar.us


From:<c████████@smartjailmail.com>
To:<████h@co.sebastian.ar.us>
Date:08/23/2019 09:16 AM
Subject:RE: Tablets


What do you mean by battery back? The battery's in the tablets are not removable.

-----Original Message-----
From: ████h@co.sebastian.ar.us <████h@co.sebastian.ar.us>
Sent: Friday, August 23, 2019 10:09 AM
To: c████████@smartjailmail.com
Subject: Re: Tablets

i

Correct Solutions 00480

"Good morning,

I am needing to send in 23 tablets and a single battery back in to be repaired or replaced.
Let me know if you need anything else."

This was my original request.

I need to have them repaired or replaced.
Sometimes you send tablets w/shipping labels.
Sometime you email labels then send tablets after you got the broken ones.


Ashley Smith
Director of Inmate Management Assistant
Sebastian Co. Detention Center
Phone: 479-███ ██ ██
Fax: 479-████
email: ██████ b.sebastian.ar.us


From: <
https://urldefense.proofpoint.com/v2/url?u=http-3A__chris.mzhickteno-
40smartjailmail.com&d=DwICAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=rzzv0EZ-StePWOxF-
JnRXZ0WmNDIUJ_AGPPqfMFTh4o&m=mE6TXHJMqaVsjjvM-
lVV2i3SX35FW99vMaDJ09qcr3U&s=Dh6cGf1jAL2BrRAIsUyJq6SJWUWSHkzvzl5J_JjzDU0&e=
>
To: ████ co.sebastian.ar.us>
Date: 08/23/2019 09:04 AM
Subject: Tablets


Do you just need a shipping label to send back the 24 tablets and 1 battery?

Chris Mzhickteno, IT Support Specialist

████████ @SmartComunications.us
904-███

2

Correct Solutions 00481



Correct Solutions 00482

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT T

### *to Amended Complaint*

**Tony Schaffer**

| | |
|---|---|
| **From:** | Rick  Ferguson |
| **Sent:** | Tuesday, August 27, 2019 7:46 AM |
| **To:** | Albert Cantu |
| **Cc:** | ██████@correctsolutionsgroup.com; ████@correctsolutionsgroup.com |
| **Subject:** | Smart Reporting |

Albert
Please send all Smart issues through the TX Support email address.  We need to keep track of everything.  Don't hesitate to request an onsite tech for issues regardless of what they are

Ty
Rick

Sent from my iPhone

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT U

### *to Amended Complaint*

**From:** Rick Ferguson
**Sent:** Thursday, September 12, 2019 9:58 AM
**To:** Alan Johnson
**Subject:** RE:

I haven't forgotten you... awaiting call

*Rick Ferguson*
*Correct Solutions Group*
*www.correctsolutionsgroup.com*
*www.lasallecorrections.com*
(903) ▒▒▒▒

*"Something Amazing is going to happen to You today"*

From: Alan Johnson <▒▒▒@co.washington.ar.us>
Sent: Wednesday, September 11, 2019 4:45 PM
To: Rick Ferguson <▒▒▒ lasallecorrections.com>
Subject: Fwd:

What do you want me to say to this?

Captain Alan Johnson
1155 W. Clydesdale
Fayetteville, AR 72701
Office - (479)▒▒▒
Cell - (479)▒▒▒
▒▒▒ co.washington.ar.us

Begin forwarded message:

> From: Jon Logan <▒▒▒@smartjailmail.com>
> Date: September 11, 2019 at 3:48:24 PM CDT
> To: Alan Johnson <▒▒▒@co.washington.ar.us>
>
> CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe
>
> Hello Capt;
>
> I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.
>
> We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

Correct Solutions Subpoena 0005

Correct Solutions 00554

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart*



www.smartcommunications.us

2

Correct Solutions Subpoena 0006

Correct Solutions 00555

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT V

### *to Amended Complaint*

From:          Rick  Ferguson
Sent:          Thursday, September 12, 2019 11:46 AM
To:            Mark Turner
Subject:       Fwd: FW: RE:

FYI

Sent from my iPhone

Begin forwarded message:

> **From:** Alan Johnson <████████h@co.washington.ar.us>
> **Date:** September 12, 2019 at 10:40:51 AM CDT
> **To:** "'Rick  Ferguson'" <████████@lasallecorrections.com>
> **Subject: FW: RE:**

**From:** Jon ███████ @smartjailmail.com>
**Sent:** Thursday, September 12, 2019 10:40 AM
**To:** Alan Johnson <███████ @co.washington.ar.us>
**Subject:** Re: RE:

CAUTION: This email originated from outside of the organization. Do not click links or open
attachments unless you recognize the sender and know the content is safe.

Good morning Capt,

Well I think it's a necessary step to keeping the relationship healthy with our customers. My goals is to
discuss your agency goals and our on going services and to solidify our relationship going forward.

Does that work for you?

Thank you

Jon
Smartjailmail.com

On Sep 12, 2019, at 11:20 AM, Alan Johnson <████████ @co.washington.ar.us> wrote:

    What do you expect to accomplish from this meeting?

    **From:** Jon Logan ████████@smartjailmail.com>
    **Sent:** Wednesday, September 11, 2019 3:48 PM
    **To:** Alan Johnson <███████ @co.washington.ar.us>
    **Subject:**

1

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Capt,

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- *Smart Communications*



**www.smartcommunications.us**
*Corrections Simplified*

Correct Solutions 00500

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT W

### *to Amended Complaint*

**From:** ████████ @co.sebastian.ar.us
**Date:** September 13, 2019 at 12:40:46 PM EDT
**To:** Jon Logan ████████ @smartjailmail.com>
**Subject: Re:**

Mr. Logan,

At this time I am going to have to pass on meeting with your representative.

Respectfully,
John D. Miller
Operations Major
Sebastian County Sheriff's Office
479-████████


From:    Jon Logan <████████ @smartjailmail.com>
To:    ████████ @co.sebastian.ar.us
Date:    09/11/2019 04:04 PM
Subject:


Hello Major,

1

I hope you're doing great! I wanted to check in with you regarding our services at your agency. We have had a good working relationship in the past and we are committed to continuing our service at the level you expect from a partnering vendor.

We seem to have had a disconnect lately on communication with your agency and I wanted to check in and see if there are any changes we were not aware of?

I have a Smart Communications Rep that will be in your area over the next two weeks, we wanted to stop in and meet with your team and talk with you about our system and on going services to build our relationship and communication. Is it ok with you if we stop in and say hello sometime in the next few weeks?

Jon Logan,
CEO- Smart Communications


www.smartcommunications.us
Corrections Simplified

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT X

### *to Amended Complaint*

# ROEDEL PARSONS KOCH
## BLACHE BALHOFF & MCCOLLISTER

### A   LAW   CORPORATION

roedelparsons.com

**Luke F. Piontek, Partner**
*Lpiontek@roedelparsons.com*
*Baton Rouge Office*

*Telephone: (225) 929-7033*
*Direct Dial: (225) 329-1293*
*Facsimile: (225) 928-4925*

September 13, 2019

**VIA CERTIFIED MAIL**
**#7016 0750 0000 6885 1345**
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan

 RE:   Notice to Cure pursuant to Master Services Agreement between
  Correct Solutions, LLC and Smart Communications Holding, Inc.
  (Correct Solutions, LLC's customer: Sebastian County)

Dear Mr. Logan:

You are hereby notified that Smart Communications Holding, L.L.C. ("Smart") is in default under the terms of the Master Services Agreement ("MSA") with Correct Solutions, LLC ("Correct Solutions"), dated August 31, 2017, and Schedule 1 – Sebastian County, AR ("Schedule 1") of the MSA, also dated August 31, 2017, respecting the provision of equipment and services to Correct Solutions' customer, Sebastian County Detention Center ("Sebastian County").

Specifically, Paragraph 3 of Schedule 1 provides that the "SmartTablet" unit provided by Smart "is a custom, wireless, ruggedized and correctional grade tablet of [Smart's] custom specification..." Meanwhile, Paragraph 8 of Schedule 1 states, in part, that, "Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. … We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remoted infrastructure 24/7 and alert our technicians in real-time if any issues are detected."

In fact, the tablets and supporting equipment provided by Smart to Correct Solutions' customer, Sebastian County, were not "correctional grade" in any functional sense. The tablets provided by Smart have been rather easily dismantled and fashioned into crude weapons. Additionally, inmates at Sebastian County have readily removed the batteries from Smart's tablets which batteries have been used to charge illegal cell phones in the facility. The attached exhibits, supplied by Sebastian County, provide photographic evidence of the defectiveness of Smart's equipment. As you are well aware, safety and security are top priorities for Correct Solutions'

customer, Sebastian County, and the defective tablets provided by Smart allow inmates to easily circumvent these priorities. As such, Smart is in violation of Paragraph 3 of Schedule 1.

In addition, Smart has failed to timely install and/or provide electronic education and/or entertainment options (*e.g.,* electronic books and games) on the tablets provided to Sebastian County. Sebastian County requested the installation of electronic education and/or entertainment options over a year ago, but Smart has neglected to carry out such installment. Paragraph 2 of the MSA provides that Smart "shall be the sole and exclusive provider" of, among other services, "electronic education, electronic self-help, … [and] electronic entertainment…" to Correct Solutions' customer facilities. Smart's failure to timely install and/or provide electronic education and/or entertainment options violates Paragraph 2 of the MSA.

Further, according to Sebastian County, the tablets Smart provided to Sebastian County experience near constant failures and performance deficiencies. Smart has also directed Sebastian County regarding how to allegedly repair the inoperable, broken, or defective tablets rather than repairing the tablets itself. Paragraph 7 of the MSA states, in part, that "In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet", and that Smart "will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office." Paragraph 8 of the MSA sets forth Smart's "Maintenance and Support Plan" regarding the tablets. Smart's provision of tablets that are in a state of near constant failure, as well as its failure or refusal to repair inoperable, broken, or defective tablets, violates Paragraphs 7 and 8 of the MSA.

Under Paragraph 9 of the MSA, "If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default." This letter serves as Correct Solutions' notice to Smart of the nature of the default, set forth above. Paragraph 9 continues, stating, "The defaulting Party shall have thirty (30) days after receipt of notice of default to cure." This letter also serves as Correct Solutions' notice to cure the default with respect to the defective tablets provided to Sebastian County within thirty (30) days of receipt of this letter. Failure to cure may result in immediate termination of the MSA and other agreement(s) between Smart and Correct Solutions.

As the attached photographs very clearly suggest, allowing the intended end-users of Smart's equipment to have continued access to these apparently defective and/or substandard products may very well lead to consequences considerably more grave than mere customer dissatisfaction. Therefore, Smart must provide Sebastian County with "ruggedized and correctional grade tablet[s]", which naturally must be tamper-proof, with electronic education, and electronic entertainment (books and games) installed, and must repair any inoperable, broken, or defective tablets, within thirty (30) days of receipt of this notice to cure. With that in mind, your prompt attention to the matter is greatly appreciated.

Sincerely,

Luke F. Piontek
**Counsel for Correct Solutions, LLC**

CC:    David L. Gann (via email only)
       General Counsel
       Smart Communications Holding, Inc.





*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT Y

### *to Amended Complaint*



182 Bastille Lane • Ruston, Louisiana 71270

October 4, 2019

CERTIFIED MAIL RECEIPT # 7015 3430 0000 8938 0153

Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ████@smartjailmail.com)

RE:    Notice of Non-Renewal of Master Services Agreement between
       Correct Solutions, LLC and Smart Communications Holding, Inc.
       (Correct Solutions, LLC's customer: Washington County)

Dear Mr. Logan:

        You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Washington County, Arkansas ("Schedule 1") of the MSA, dated November 15, 2017, with respect to Correct Solutions' customer, the Washington County, Arkansas facility ("Washington County Facility"). Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA, Schedule 1 and the contract between Correct Solutions and the Washington County Facility, dated September 25, 2014, are attached hereto.

        Pursuant to paragraph 14 of the Washington County Facility contract, the term of said contract "shall be for 12 calendar months starting when CSG platform is installed and first call is successful." The first successful call under the Washington County Facility contract was placed January 4, 2015, therefore, January 4, 2015 is the start date of the Washington County Facility contract. The current contract between Correct Solutions and the Washington County Facility expires January 3, 2020, at midnight. Consequently, this written notice of non-renewal of the MSA and Schedule 1 with respect to the Washington County Facility is timely.

        The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via registered or certified United States mail, postage prepaid, to the following address for Smart: 4522 W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we received when our general counsel's office sent correspondence to Smart back in June of this year that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ████@smartcommunications.us. Finally, we are delivering this notice of non-renewal to Smart by hand delivery via courier.



182 Bastille Lane • Ruston, Louisiana 71270

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Washington County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Patrick Temple

*Managing Director for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
      General Counsel
      Smart Communications Holding, Inc.
      ██████@smartjailmail.com

      Kenneth Turkel (via email only)
      Brad Barrios (via email only)
      Bajo Cuva Cohen & Turkel
      100 North Tampa Street, Suite 1900
      Tampa, FL 33602
      kturkel@bajocuva.com
      bbarrios@bajocuva.com





## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

> (i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

> (ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

> (iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

> (iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

> (v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

> (vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

> (vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

> (vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. <u>Term</u>. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. <u>Limitation of Liability</u>. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11 Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: __9/13/17__

Email: ▮▮▮▮@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: __8-31-17__

Email: ▮▮▮▮@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement; the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:    Washington County, Arkansas - 1155 W Clydesdale Dr, Fayetteville, AR 72701

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartTablet on a 6:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. The ratio will be continuously adjusted to keep pace with demand.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### SmartKiosks and Secure Network

6. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

7. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

9. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

10. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize tablets that are

*PMT*

from assigned to their housing unit in designated classroom areas. Provider will install the required wireless access points for this area.

11. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Distribution and Refurbishment Plan

12. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases will be permanently installed into the housing areas (e.g. wall mounted). Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

13. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

## Maintenance and Support Plan

14. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

15. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

16. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

17. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

18. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

19. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

20. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

21. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

22. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

23. Electronic Messaging. Each email message is billed at one credit ($0.50).

24. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

25. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

26. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

27. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

28. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

29. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

30. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

31. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

32. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

33. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

34. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

| | |
|---|---|
| Customer: Correct Solutions Group | Provider: Smart Communications Holding, Inc. |
| By: | By: |
| Name: Patrick Temple | Name: Jon Logan |
| Title: Managing Director | Title: CEO |
| Date: 11/7/17 | Date: 1/15/17 |
| Email: ▇▇▇@correctsolutionsgroup.com | Email: ▇▇▇@smartcommunications.us |
| Notice Address: | Notice Address: |
| 182 Bastille Lane | 4522 West North B Street |
| Ruston, LA 71270 | Tampa, FL 33609 |



## CORRECTIONAL COMMUNICATIONS SERVICE AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Washington County Sheriff's Office**, located at 1155 W. Clydesdale Drive, Fayetteville, Arkansas 72701, herein known as the "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston Louisiana 71270, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-cal telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment and phones at the Facility, or any affiliated Facilities, for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.
   a. CSG shall install 75 (seventy-five) inmate phones in inmate housing area

4. Customer further agrees to allow CSG to install a Lobby Kiosk in the Facility to accept phone payments from friends and family, at no cost to Washington County Sheriff's Office.
   CSG will assess the following fees for Kiosk transactions:
   $3.00 per cash transaction, $0 - $100 and
   $9.95 for all Credit Card transactions with cap limit of $100 per transaction.
   All funds mailed direct, via Money Order, to CSG will have NO FEE assessed.

5. CSG shall provide the Customer with $10,000 annual fee for VuGate video visitation maintenance and support.

1



6.  CSG shall provide Customer with value-added features discussed in proposal including: PIN interface with M&M Software for active PIN push and deactivation, Offender voice mail at $1.00 per message, of which Washington County will receive 50% *(fifty percent)* and activation of investigator/web administration for system access.

7.  CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the duration of the term of this contract, plus an additional 2 years after the term.

8.  In consideration for this exclusive license and lease agreement CSG shall pay **Washington County** a Commission Fee of **73% (Seventy-Three Percent)** of the Total Gross Revenue for all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.

    **Phone Rates** will be as follows for the call types below:
    Local calls -  $5.00 flat rate;
    Interlata and intralata calls -  $5.00 flat rate;
    Interstate calls -  $3.15 flat rate for Pre-paid, $3.75 flat rate for Collect  *(according to FCC ruling/rate change)*

9.  CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Arkansas. On-line Revenue reports will be available to Customer at any time.

10. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

11. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.



12. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

13. This agreement shall be deemed to be a contract made under the laws of the State of Arkansas and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

14. The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

15. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth below.

Correct Solutions, LLC                      Washington County Sheriffs Office
182 Bastille Lane                           1155 West Clydesdale Drive
Ruston, LA 71270                            Fayetteville, AR 72701


By: _____                   By: _____

Name:    Patrick H Temple                   Name:   Honorable Judge Marilyn Edwards

Title:   Managing Member                    Title:   Washington County Judge

Date:    9/25        , 2014                  Date:    9/25/2014    , 2014

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT Z

*to Amended Complaint*



**182 Bastille Lane • Ruston, Louisiana 71270**

November 21, 2019

**CERTIFIED MAIL RECEIPT #**7014 2870 0002 3604 6688
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ▮▮▮▮▮@smartcommunications.us)

RE:   Notice of Non-Renewal of Master Services Agreement between
       Correct Solutions, LLC and Smart Communications Holding, Inc.
       (Correct Solutions, LLC's customer: Sebastian County)

Dear Mr. Logan:

You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Sebastian County, Arkansas ("Schedule 1") of the MSA, also dated September 13, 2017, with respect to Correct Solutions' customer, the Sebastian County, Arkansas facility ("Sebastian County Facility"). Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA, Schedule 1, and the contract between Correct Solutions and the Sebastian County Facility, dated April 24, 2017, are attached hereto.

Pursuant to paragraph 1 of the Sebastian County Facility contract, the contract "is effective on the latest signature date ('Effective Date'), and shall continue in effect for a period of two (2) years ('Initial Term') from the Effective Date." Paragraph 1 of the Sebastian County Facility contract goes on to state that, "Upon completion of the Initial Term, Facility will have the option to renew this Agreement with annual extensions for up to four (4) additional years." The last signature on the Sebastian County Facility contract is dated April 24, 2017, therefore, April 24, 2017 is the start date of the Sebastian County Facility contract. The current contract between Correct Solutions and the Sebastian County Facility expires April 23, 2020. Consequently, this written notice of non-renewal of the MSA and Schedule 1 with respect to the Sebastian County Facility is timely.

The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via registered or certified United States mail, postage prepaid, to the following address for Smart: 4522 W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we received when our general counsel's office sent correspondence to Smart back in June of this year

that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ▓▓▓▓@smartcommunications.us. Finally, we are emailing a courtesy copy of this letter to your counsel in the litigation, Kenneth Turkel and Brad Barrios, at the addresses below.

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Sebastian County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Mark Turner

*Director of Sales for Correct Solutions, LLC*

CC:     David L. Gann (via email only)
        General Counsel
        Smart Communications Holding, Inc.
        ▓▓▓▓@smartjailmail.com

        Kenneth Turkel (via email only)
        Brad Barrios (via email only)
        Bajo Cuva Cohen & Turkel
        100 North Tampa Street, Suite 1900
        Tampa, FL 33602
        kturkel@bajocuva.com
        bbarrios@bajocuva.com

 

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1.  Systems. This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2.  Use of Systems.  Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3.  Hardware and Software License. For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4.  License Restrictions: The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

## Attachment  A to Notice of Non-Renewal

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer.  Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. <u>Provider Personnel.</u> All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. <u>Access to Management Information.</u> Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. <u>Public Entity Crime.</u> Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: _9/13/17_

Email: ███████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: _8-31-17_

Email: ███████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

### Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Sebastian County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartTablet on a 1:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. Provider reserves the right to periodically evaluate and adjust the ratio based on usage and with agreement of Customer.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

6. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases can be permanently installed into a housing area (e.g. wall mounted) or can be provided as mobile carts to allow for bulk transportation of tablets as needed. Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

7. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office

## Maintenance and Support Plan

8. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

9. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

10. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

11. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

12. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

13. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

14. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

15. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

16. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

17. Electronic Messaging. Each email message is billed at one credit ($0.50).

18. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

19. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

20. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

21. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

22. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

23. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

24. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

25. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

26. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

27. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

28. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Customer Responsibilities

29. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

30. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

31. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

32. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

33. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

34. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: ███████correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: ███████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between Sebastian County Sheriff's Office located at 800 South A Street, Fort Smith, AR 72901, herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective on the latest signature date ("Effective Date"), and shall continue in effect for a period of two (2) years ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement with annual extensions for up to four (4) additional years. Each renewal will be based on a yearly review of services provided by CSG.

2. **SCOPE OF AGREEMENT**

   2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems within its building or on its private property ("Location") during the term of this Agreement. CSG and Facility have agreed upon specific rates for inmate collect, debit and advance pay calls as described in Attachment A of this Agreement.

   2.2 This Agreement includes all other premises, whether now existing (if a competing provider has a contract and equipment at such premises, this clause applies at the earliest termination opportunity) or subsequently acquired, under the control of Facility. Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

   2.3 CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility

equipment, handle all billing and payments.  CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated unbillable.

2.4 CSG shall install and maintain Equipment in good working order.  CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5 CSG agrees to provide Equipment as indicated in Attachment B for the Term of this Agreement.

2.6 CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue.  All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.5 Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility. CSG will install and maintain all necessary infrastructure equipment at no cost to Sebastian County.

2.7 Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.8 Facility agrees to allow CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.9 Facility agrees to allow CSG access to and use of house cable and inside wire at no cost where available in order to install and provide inmate telephone service.

2.10 Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be agreed to by CSG in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11 Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.12 CSG shall provide Facility with value-added features as listed in Attachment C.

2.13 In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment D.

3. **OWNERSHIP.** Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment. Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment. Facility shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4. **LEGAL ENFORCEMENT.** If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5. **LAWFULNESS OF AGREEMENT.** The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6. **NONWAIVER.** The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7. **GOVERNING LAW.** This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State in which the Equipment is provided.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment B must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy such default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of telephones as described in Attachment B, must be in writing and signed by an authorized representative from each Party.

15. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**

Attn: Honorable David Hudson

Address:
800 South A Street
Fort Smith, AR 72901

**FOR CSG**

Attn: Patrick Temple

Address:
182 Bastille Lane
Ruston, LA 71270

16. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

For Sebastian County Sheriff's Office

_____ **Signature**

*Sebastian County Judge*

*David Hudson County Judge*

Bill Hollenbeck _____ Print

3/27/17 _____ Date

**For Correct Solutions Group**

_____ Signature

Patrick M. Temple _____ Print

4/24/17 _____ Date

ATTACHMENT A

RATE SCHEDULE

Rates for calls within the Inmate Call Control Platform will be programmed per the table below:

| Rates - Sebastian County, AR | |
|---|---|
| **PREPAID CALLS** | Minute |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| **PIN DEBIT CALLS** | Minute |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| **PREPAID CARDS** | Minute |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |

Simple two fee structure for account funding:
$5.95 for Account Funding utilizing live operator
$3.00 for Account Funding utilizing IVR, Web, Kiosk

## ATTACHMENT B

## PROVIDED EQUIPMENT

**Inmate Call Control Platform.** The CSG provided Platform will be installed to accommodate the 31 inmate telephones or more as needed and portable telephones as listed in the Sebastian County RFP. Platform will be programmed per the requirements of the County to reflect times of operation. This includes all existing facilities, future expansions or locations.

Inmate call platform, servers, routers and switches are the property of CSG and will be provided at no cost to Customer.

**Video Visitation Platform** – The CSG provided Video Visitation Platform equipment will consist of fifteen (15) inmate side video visitation terminals, seven (7) public side video visitation terminals, one (1) cart video visitation terminal, one (1) Lobby Scheduling Monitor and one (1) Lobby Registration and Scheduling Terminal.

The Video Visitation Platform will be installed by CSG. All equipment will remain the property of CSG and will be provided at no cost to Customer for the duration of Initial Term and Annual Renewals. The following table is demonstrates Customers obligation in the event that this Agreement is not renewed or cancelled for any reason prior to the Initial Term and Annual renewals not being met.

> In the event that Agreement is not extended, cancelled or otherwise made to be not in effect, Customer agrees to the following schedule, based on six (6) years, as a payment for equipment and services. Customer agrees that, should the aforementioned actions negating the original Agreement take place within the given year listed below, the scheduled amount shown would be paid to CSG in full.
>    a. Year 1 -- beginning with installation and lasting one (1) year, Customer agrees to pay $129,000 to CSG.
>    b. Year 2 – beginning with the second year following installation, Customer agrees to pay $107,436 to CSG.
>    c. Year 3 – beginning with the third year following installation, Customer agrees to pay $85,872 to CSG.
>    d. Year 4 – beginning with the fourth year following installation, Customer agrees to pay $64,308 to CSG.
>    e. Year 5 – beginning with the fifth year following installation, Customer agrees to pay $42,744 to CSG.
>    f. Year 6 -- beginning with the sixth year following installation, Customer agrees to pay $21,180 to CSG.

Customer agrees to pay CSG monthly maintenance and support cost per the following table. Monthly maintenance and support costs will be deducted from inmate telephone commission payments from CSG to Customer.

a. Year 1 -- There will be no monthly maintenance and support cost charged to Customer during the first year of this Agreement.

b. Year 2-6 – A monthly maintenance and support cost of $1,290.00 per month will be deducted from inmate telephone commission payable to Customer by CSG.

c. After Year 6, the maintenance and support cost paid by Customer to CSG ceases. Any support arrangements from this time period going forward will be negotiated between Customer and CSG at that time.

Provided Equipment and Value-Added Equipment will be installed and implemented per the timeline listed below:



# ATTACHMENT C

## VALUE-ADDED FEATURES

CSG will provide the CELLMATE Platform to Customer. The Cellmate platform provides tablets to inmates for daily use.

Features included are:

- Talk – inmates will be able to place inmate phone calls, which adhere to all security measures, from the tablets.
- Text – inmates will be able to text numbers and receive text from numbers. All security measures apply and all text will be available to investigators. Family members must have an account established with CSG in order to receive or send texts.
- Games – inmates will be provided with games.
- Books – CSG utilizes a public domain repository of books that the inmate can choose and read on the tablet.

The tablet is manufactured with a clear back cover for security purposes.

No access to outside internet will be available for inmates utilizing tablets.

Charging stations for tablets will be provided by CSG as needed by Customer.

An initial 500 tablets will be provided to Customer. Initial inventory will be enough to supply each inmate with a tablet and provide Customer a spares inventory.

Tablets will not be repaired and should only be replaced. Once spares inventory is depleted, Customer and CSG will negotiate replacement program.

KIOSKS – CSG will provide, at no charge to the Customer, three (3) kiosks. Two (2) kiosks will be placed in the unsecured area of the facility and will be accessible to family and friends for deposit of funds onto inmate accounts. One (1) kiosk will be placed on the secured side of the facility within the booking area. This kiosk will be utilized for inmate fund acquisition at the time of booking and will be equipped to accept coins and cash and must be interfaced with appropriate Customer software to maintain accounting. All kiosks will accept U.S. currency only.

## ATTACHMENT D

### FINANCIAL SCHEDULE

In consideration for this exclusive Contract and Agreement, CSG shall pay Customer a Commission Fee of 74% (Seventy-Four Percent) of the Total Gross Revenue for completed inmate telephone calls regardless of call type, with exception to Interstate Calls due to FCC ruling.

CSG shall provide Customer with a monthly commission report that details all call types, call volumes and call rates. All rates and charges under this Agreement shall conform to the Public Service Commission regulations of Arkansas.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT AA

### *to Amended Complaint*

**C★RRECT**
SOLUTIONS GROUP
PHONES   KIOSKS

182 Bastille Lane • Ruston, Louisiana 71270

November 21, 2019

**CERTIFIED MAIL RECEIPT #** <u>7014 2870 0002 3604 6695</u>
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: ▮▮▮▮▮@smartcommunications.us)

    RE:    Notice of Non-Renewal of Master Services Agreement between
                 Correct Solutions, LLC and Smart Communications Holding, Inc.
                 (Correct Solutions, LLC's customer: Wayne County)

Dear Mr. Logan:

       You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew
the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications
Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Wayne County,
Georgia ("Schedule 1") of the MSA, dated March 16, 2018, with respect to Correct Solutions'
customer, the Wayne County, Georgia facility ("Wayne County Facility"). Paragraph 6 of the
MSA states that it "shall automatically renew in accordance with the Customer's Agreement with
facility, listed in Attachment A, unless either Party notifies the other Party with written notice of
non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA,
Schedule 1, and the contract between Correct Solutions and the Wayne County Facility, dated
February 6, 2018, are attached hereto.

       Pursuant to paragraph 1 of the Wayne County Facility contract, the contract "is effective
upon the date of installation of equipment ('Effective Date'), and shall continue in effect for a
period of 1 year ('Initial Term') from the Effective Date." The installation of Correct Solutions'
equipment at the Wayne County Facility contract was completed March 15, 2018, therefore, March
15, 2018 is the start date of the Wayne County Facility contract. The current contract between
Correct Solutions and the Wayne County Facility expires March 14, 2020. Consequently, this
written notice of non-renewal of the MSA and Schedule 1 with respect to the Wayne County
Facility is timely.

       The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via
registered or certified United States mail, postage prepaid, to the following address for Smart: 4522
W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we
received when our general counsel's office sent correspondence to Smart back in June of this year
that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the

address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: ███████@smartcommunications.us. Finally, we are emailing a courtesy copy of this letter to your counsel in the litigation, Kenneth Turkel and Brad Barrios, at the addresses below.

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Wayne County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Mark Turner

*Director of Sales for Correct Solutions, LLC*

CC:    David L. Gann (via email only)
       General Counsel
       Smart Communications Holding, Inc.
       ████████@smartjailmail.com

       Kenneth Turkel (via email only)
       Brad Barrios (via email only)
       Bajo Cuva Cohen & Turkel
       100 North Tampa Street, Suite 1900
       Tampa, FL 33602
       kturkel@bajocuva.com
       bbarrios@bajocuva.com




## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1.  <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2.  <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

## Attachment  A to Notice of Non-Renewal

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. <u>Term.</u> This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. <u>Limitation of Liability</u>. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: ___9/13/17___

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: ___8-31-17___

Email: ████@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Wayne County, Georgia – 1892 South Macon Street, Jesup, Georgia 31545

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize kiosks that are from assigned to their housing unit in designated classroom areas.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Maintenance and Support Plan

6. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each kiosk checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

7. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

8. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

9. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

10. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

11. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

12. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

13. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

14. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

15. Electronic Messaging. Each email message is billed at one credit ($0.50).

16. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

17. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

18. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

19. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

20. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

21. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

22. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

23. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

24. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

25. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

26. We shall provide access via the SmartKiosk to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

29. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

30. We will provide at no cost to Customer the labor for the installation of the video visitation system.

31. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

32. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

33. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation. Audio Files will be stored for 180 days and Video Files will be stored for 90 days.

34. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

35. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

36. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

37. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

38. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

39. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

40. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

41. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

42. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

43. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

44. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

45. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

46. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

47. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Kiosk Solutions™.

48. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

49. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

50. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

51. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

52. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

53. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

54. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

55. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

56. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

57. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 3/16/18

Email: ███████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 3/16/18

Email: ███████ smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609



## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between **Wayne County Sheriff's Office** located at 266 East Walnut Street, Jesup, GA 31546 herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective upon the date of installation of equipment ("Effective Date"), and shall continue in effect for a period of 1 year ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement for a period of 4 (four) successive one year periods. Each renewal will be based on a yearly review of services provided by CSG. This Agreement will automatically renew under the terms described as Initial Term unless either party notifies the other in writing of its intent to terminate this Agreement at least 90 days prior to the final date of expiration. Upon termination of this Agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this Agreement.

2. **SCOPE OF AGREEMENT**

   2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems and /or inmate video visitation within its building or on its private property ("Location") during the term of this Agreement.

2.2  This Agreement includes all other premises, whether now existing or subsequently acquired, under the control of Facility.  Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

2.3  CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments.  CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated  unbillables.

2.4  CSG shall install and maintain Equipment in good working order.  CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5  CSG agrees to provide Equipment as indicated in Attachment A for the Term of this Agreement.

2.6  CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue.  All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.7  Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility.  In the event Facility is not the owner of the premises, Facility shall, where necessary, obtain permission from building owner or owner's agent for the placement of CSG's Equipment, and shall be responsible for any fees for use of required riser cable and electric power.

2.8  Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.9  Facility agrees to all CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.10  Facility agrees to allow CSG access to and use of house cable and inside wire at no cost, in order to install and provide inmate telephone service.  Any new house cable or inside wire pertaining to the commnications services expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11  Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.12  Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.13  CSG shall provide Facility with value-added features as listed in Attachment A.

2.14  In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment B.

3. **OWNERSHIP.**  Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense.  CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment.  Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment.  Facility shall restore the premises to their original condition.  CSG shall not be responsible for damage to the premises that occur due to vandalism.  CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4. **LEGAL ENFORCEMENT.**  If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5. **LAWFULNESS OF AGREEMENT.**  The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6. **NONWAIVER.**  The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7. **GOVERNING LAW.**  This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State of Georgia.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment A must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy usch default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**                    **FOR CSG**

Attn:    John Carter, Sheriff        Attn:       Patrick Temple

Address: 266 East Walnut Street      Address:    182 Bastille Lane
         Jesup, GA 31546                         Ruston, LA 71270

## ATTACHMENT A

## PROVIDED EQUIPMENT

Telephone/Video Communication Service-Related Equipment/Systems

Correct Solutions ITS Call Processing, including:
- Inmate Telephones
- Cart Phones
- TDD/TTY units
- Inmate Visitation Phones
- Offender & Public Video Visitation Kiosks (Law Library, Requests\Grievances, etc)
- Unlimited ITS User Licenses
- Unlimted SMART User Licenses
- Interface to JMS Platform
  - Automated Inmate ID\PIN\Voice Recognition
  - Automated Offender access JMS Information via Kiosk (Court Date, Bond Amount, Charges, etc.)
- Interface to Commissary Platform
  - Automated Debit Calling
  - Kiosk Commissary Ordering
- Inmate Voice Mail
  - Messages priced at $.50 per Message with 60% Revenue Share

**ATTACHMENT B**

**FINANCIAL COMPENSATION**

| ALL CALLING RATES | | |
|---|---|---|
| Call Type | Per Call Charge | Per Minute Charge |
| Local | $0.00 | $0.18 |
| Intrastate/Intralata | $0.00 | $0.31 |
| Intrastate/Interlata | $0.00 | $0.31 |
| Interstate | $0.00 | $0.25 |

Compensation

Correct Solutions shall pay County a commission of 60% of the gross call revenue for all call types with the exception of interstate calls due to FCC ruling. Correct Solutions will also pay County 60% for any service fees collected for inmate voicemail.

15. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**Signatures: The persons signing below signify that they have the authority from their respective business entities to execute this Agreement.**

Wayne County Sheriff's Office

_____
*Signature*

John G. Carter
*Printed Name*

Sheriff
*Title*

2/6/2018
*Date*

CSG

_____
*Signature*

Roddy L. McLemore      Patrick M. Temple
*Printed Name*

Sales Consultant      Manager
*Title*

2/6/2018      2/6/18
*Date*

March 15, 2018 - Last Day for PAYTEL Contract

*Smart Communications Holding, Inc. v. Correct Solutions, LLC and Rick Ferguson*
Case No.  19-CA-008089

# EXHIBIT BB

### *to Amended Complaint*

## Tony Schaffer

| | |
|---|---|
| **From:** | Seth Doser < ████ @techfriends.com> |
| **Sent:** | Friday, August 23, 2019 3:37 PM |
| **To:** | Albert Cantu |
| **Cc:** | ████ @a.jailatm.com;Lee Aspinwall;'Joseph Schaefer' |
| **Subject:** | Tablet/Kiosk Installation 9-16-19 |

Good afternoon,

The current plan is to arrive onsite with hardware on 9/16 to install tablets and kiosks. If possible we would like to install our wall mounted tablets in the same place as the smart tablets so as to avoid unnecessary work with running electric and network cables. Do you know if by chance the previous vendor will come onsite to uninstall their tablets?

Thanks,

--



**Seth Doser**
*Operations Technician*
Integrations
**Tech Friends, Inc**
p: 870-████   f: 815-████
e: ████ @techfriends.com

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                                 Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

## EMERGENCY MOTION FOR TEMPORARY INJUNCTION

      Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Florida Rule of Civil Procedure 1.610, files this Emergency Motion for Temporary Injunction ("Motion") against Defendants, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("CSG"). The grounds upon which this Motion is based and the reasons it should be granted are described below.

## Introduction

      1.     Smart filed this lawsuit after CSG attempted to terminate Smart's services in eight Joint Customers' correctional facilities based on an alleged violation of a confidentiality provision. After Smart moved for temporary injunctive relief, the parties stipulated to the entry of an order preserving the *status quo*. Then, CSG sent Smart a Notice to Cure and demanded that Smart provide one Joint Customer, Sebastian County, with indestructible tablets and entertainment content within 30 days or risk "immediate termination of the MSA and other agreement(s) between Smart and Correct Solutions." Because Smart did not have a contractual obligation to meet either of CSG's demands, it filed another motion for temporary injunctive relief.

2. On September 20, 2019, the Court held a hearing on Smart's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement. During the hearing, the Court questioned CSG's conduct of sending a notice to cure, which may lead to a termination, shortly after entering a *status quo* agreement, especially when CSG had known about the purported issues with tablets for an extended length of time and never previously raised them. The Court ultimately elicited an agreement between the parties which prohibits CSG from terminating any agreements between CSG and Smart without first filing a motion and obtaining Court approval. The Court's order was clear: **"I'm enjoining termination subject to my subsequent order and hearing."** *See* Transcript, p. 53.[1]

3. The purpose of the Order was to define a procedural mechanism by which the Court would resolve disputes that may result in the termination of Smart's services. Now, contrary to such purpose and the Court's instruction, CSG has begun sending Smart Notices of Non-Renewal (the "Notices"), with the purpose of terminating Smart's services, without seeking Court approval.

4. The Notices are premised on two contractual provisions—the Term provision of the contract between the Joint Customer and CSG and the Term provision of the Master Services Agreement ("MSA") between CSG and Smart. The parties dispute the meaning of these provisions. Smart has informed CSG of its position that the Notice related to Washington County amounts to an improper termination because CSG and Washington renewed their contract and, thus, the co-terminous MSA between CSG and Smart remains in effect. Rather than filing a motion in accordance with the Court's Order, CSG has stood by its Notice, which includes a deadline for

---

[1] The parties submitted competing proposed orders and the Court has not yet reduced its oral ruling to a written order.

Smart to remove its equipment and services from Washington County on or before **January 3, 2020**.[2]

5.      CSG's position is based upon an interpretation of the contracts at issue that is inconsistent with their plain language and entirely contrary to the expressed intent of Smart and CSG. Although Smart has the exclusive right to provide inmate messaging services to these customers for a duration that is co-terminous with CSG's terms with the customers, CSG has taken the position that it may terminate Smart's services under the guise of a "non-renewal," while continuing to service the Joint Customers under the same contract with which Smart's term is co-terminous.

6.      An examination of the Washington County Agreement[3] in its entirety, along with clear evidence of the expressed intent of Smart and CSG, demonstrates that CSG and Washington renewed their contract and, as a result, the co-terminous term of the MSA for Washington County between CSG and Smart continued. CSG cannot now attempt to terminate Smart's services by noticing a purported "non-renewal" of its agreement with Smart, especially in light of the Court's prior Order.

### Emergency Nature of this Motion

7.      CSG sent the Notice of Non-Renewal for Washington County on October 4, 2019. The expiration date of the CSG/Washington Contract is dependent upon the installation of the CSG system and the first successful call in Washington County. The Notice, without any backup documentation or evidence of any kind, alleges that the first successful call at Washington County

---

[2] CSG demanded that Smart remove its systems and equipment from Sebastian County on or before April 23, 2020 and from Wayne County on or before March 14, 2020.
[3] The MSA between Smart and CSG for Washington County, the CSG/Washington Contract between CSG and Washington County, and the Schedule of Services between Smart and CSG for Washington County are collectively referred to as the Washington County Agreement.

occurred on January 4, 2015. Because that alleged date was essential to CSG's position on the upcoming expiration of the CSG/Washington Contract, and because Smart had no way of knowing whether that date was accurate, Smart immediately requested verification of the CSG's allegation. A copy of Smart's October 4, 2019 email is attached as Exhibit A. CSG never responded to Smart or provided the requested supporting discovery.

8.      Smart knew that it would need to file an amended complaint to include a claim related to the Notice of Non-Renewal. However, at this point in time, CSG's document production in response to Smart's requests for production was past due and CSG had repeatedly represented that it would produce the responsive documents for weeks. Smart preferred to wait to receive the production so it could include or support claims based on CSG's documents. Smart finally received a limited (incomplete) production of documents on November 15, 2019. Indeed, Smart ended up using many of CSG's documents as exhibits to its proposed Amended Complaint.  Smart was forced to file a motion to compel for the remaining documents, which has not yet been heard.

9.      By at least November 11, 2019, Smart had informed CSG of its position that the Notice of Non-Renewal was improper. Smart sent CSG a draft notice requesting the deposition of CSG's corporate representative on the non-renewal issue. A copy of the November 11 email is attached as **Exhibit B**. On November 13, 2019, Smart again asked for dates for the deposition of CSG's corporate representative on this issue and described Smart's position in even greater detail. Smart also requested proof of the first successful call once again. A copy of the November 13 email is attached as **Exhibit C**.

10.     On November 15, 2019, Smart again requested dates for the deposition of CSG's corporate representative. This time, CSG finally responded, but only to indicate that, if the case did not settle, CSG would continue to send non-renewal notices and would not want to produce a

corporate representative for each notice. Smart immediately responded that Smart would only need one deposition. When counsel for the parties discussed the issue on a follow-up call, CSG informed Smart that it would not produce the requested corporate representative for deposition because the non-renewal notice was not framed by the pleadings. Even though Smart long-ago had disclosed its intention to amend the complaint, CSG would not participate in the requested discovery. Counsel for Smart asked whether CSG would consent to the amendment, but counsel for CSG said it needed to see the proposed amendment before indicating its position.

11.     On November 25, 2019, Smart sent CSG a copy of its proposed Amended Complaint, which includes a count for declaratory relief related to the Notices of Non-Renewal, and again asked CSG to consent to the filing. CSG refused and forced Smart to file a motion for leave to amend the complaint. Moreover, CSG still refused to provide deposition dates for its corporate representative because the amended complaint was not yet operative (by CSG's refusal to consent).

12.     On November 27, 2019, Smart filed its Motion for Leave to File Amended Complaint and Motion for Temporary Injunction. Smart did not initially style the motions as emergency motions because there was more than five weeks until the alleged expiration of Smart's term in Washington County. However, having been informed that no lengthy hearing times are available until February, Smart now files this Motion, along with its Motion for Leave to File Amended Complaint, as emergency motions.

13.     Each time Smart emailed about or discussed the non-renewal issue with CSG, Smart let CSG know that it needed to schedule the deposition as soon as possible, and by mid-December at the latest, so that Smart could obtain testimony about CSG's position and could file a motion before the expiration of the CSG/Washington Contract alleged in the Notice of Non-

Renewal. Despite Smart repeatedly informing CSG of its position, CSG never informed Smart of its position in return, other than by eventually saying CSG disagreed. Nor did CSG ever respond with the essential information about the first successful call that Smart had requested since the date of the Notice.

14.     Moreover, on several occasions, Smart suggested a brief *status quo* agreement so the parties had ample time to engage in targeted discovery related to the renewal issue and not have to scramble to schedule a hearing around the holidays. CSG declined Smart's reasonable proposal and thwarted Smart's attempts to engage in relevant discovery at every turn, including by saying it would not produce a witness for deposition until Smart amended the complaint and then refusing to consent to the amendment.  Through its maneuvering, CSG is attempting to run out the clock on the Notice of Non-Renewal for Washington County before Smart has a chance to discover CSG's position and bring the matter before the Court. After ignoring Smart's repeated requests and refusing to cooperate on basic procedural formalities for the last two months, CSG cannot now claim that this Motion does not qualify as an emergency.

### The Contractual Relationship of Smart, CSG, and Joint Customers

15.     Smart and CSG both provide inmate communications services to correctional facilities. There are eight different facilities to which CSG provides telephone services and Smart provides messaging and related services, which are identified and defined in the Amended Complaint as the Joint Customers.

16.     For each Joint Customer, the relationships of the parties are structured in the same manner. By way of example, Smart and CSG are parties to a Master Services Agreement ("MSA") for Washington County (which defines the general terms of the relationship between Smart and CSG and which is the same for each Joint Customer relationship), which incorporates the

CSG/Washington Contract (which defines the general terms of the relationship and obligations between CSG and Washington County) and a Schedule of Services (which identifies the services that Smart is obligated to provide to Washington County).

17.     Due to the significant financial investment Smart was going to undertake in installing its equipment and services and necessary infrastructure into each Joint Customer facility, Smart originally requested a seven year term for each exclusive dealing contract to ensure it had adequate time to recoup and obtain a return on its investment. However, given that CSG had existing agreements with some of the Joint Customers, all of which included favorable renewal terms, Smart and CSG instead agreed that the term of each MSA between Smart and CSG would be "co-terminous" with each services contract between CSG and the Joint Customer. That is, Smart and CSG agreed that, as long as CSG provided services to a Joint Customer pursuant to the original or any subsequent renewal term of a CSG/Joint Customer contract, then Smart would exclusively provide the services identified in the Schedule to the Joint Customer.

18.     Accordingly, the term of the MSA for each Joint Customer Agreement is "co-terminous" with the term of the Joint Customer's contract with CSG, including any ongoing renewal periods between CSG and the Joint Customer. Specifically, Paragraph 6 of the MSA provides:

> Term. This Agreement shall commence on the "Effective Date" and **shall be co-terminous with Customer's Agreement with Facility** as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

(emphasis added).

19.    Each services contract between a Joint Customer and CSG includes an initial term and subsequent optional renewal terms. In most instances, the renewal terms begin automatically if one of the parties does not notify the other party of its intention to not renew the agreement.

20.    For example, Paragraph 14 of the CSG/Washington Contract provides:

> The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

(emphasis added).

21.    Accordingly, the **only way** that the CSG/Washington Contract does not renew is if either party provides the other party with written notice of non-renewal at least 90 days prior to the date of expiration.

22.    If CSG and Washington County renew the term of their contract, then the MSA between Smart and CSG for Washington County also continues because Smart's term is "co-terminous."

23.    If, and only if, either CSG or Washington County elects not to renew their contract, then CSG may provide corresponding notice to Smart of non-renewal of the MSA with respect to Washington County pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and Washington County for Smart to be "co-terminous" with.

## Background and Facts

24.    Smart earns revenue from the messaging services it provides to the Joint Customers. Pursuant to the MSA, Smart retains the revenue and has no obligation to share it with CSG.

25. Beginning at least as early as April 2019, CSG developed a relationship with another provider of messaging services, Tech Friends, Inc. ("Tech Friends") who, unlike Smart, promised to share its messaging revenue with CSG.

26. On April 1, 2019, Captain William Dumas of Sebastian County thanked CSG for dinner and lunch the prior week and indicated that he had permission from the Sheriff to move forward with the Tech Friends tablets. Ferguson forwarded the email to Mark Turner, one of CSG's senior leaders and a main point of contact to Smart, and Turner responded: "We have to get Smart out first though don't we?" A copy of the April 1, 2019 email exchange is attached to the proposed Amended Complaint as **Exhibit D**.

27. Following CSG's decision to "get Smart out," CSG embarked on a series of pretextual paths to manufacture reasons to replace Smart with Tech Friends. CSG's efforts, which included soliciting complaints about Smart from the Joint Customers, attempting to characterize a public employee's email address as "confidential" in order to justify terminating Smart's services in all Joint Customer facilities, and labeling unsupervised inmates' destruction of Smart's tablets as Smart's default under the MSA, are described in detail in the Amended Complaint.

28. On June 21, 2019, CSG's leadership team discussed using a Smart mass email advertisement as grounds for "pulling the plug on all Smart devices on a set day." Turner indicated that "we have TF [Tech Friends] lined up to come in…" Ferguson agreed that CSG should have "a very strategic plan with Tech Friends…in place and brief the customer before the blade falls, because when it does, the only panic taking place should be in Smart's conference room." A copy of the June 21-22, 2019 CSG email exchange is attached to the Amended Complaint as **Exhibit H.**

29.     Effective June 1, 2019, CSG and Tech Friends executed a Master Services and Supply Agreement (the "CSG/Tech Friends Agreement"), which is attached to the Amended Complaint as **Exhibit I**.

30.     The CSG/Tech Friends Agreement provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by Web Pack shipping fees" for the Legacy Accounts, which include four Joint Customers—Bowie County, Moore County, Sebastian County, and St. Louis County.

31.     The CSG/Tech Friends Agreement further provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals."

32.     Importantly, the revenue sharing arrangement between Tech Friends and CSG was made possible at least in part because Smart had already installed the necessary infrastructure (e.g., networking and power distribution) for its equipment at the Joint Customer facilities, which was a significant upfront expense Tech Friends could avoid.

33.     To date, CSG's bad faith schemes and efforts to "get Smart out" have proven unsuccessful, as Smart continues to provide its services to each of the Joint Customers. So CSG has shifted to its new strategy and has begun sending non-renewal notices that run afoul of the understanding and agreements between the parties.

34.     On October 4, CSG sent Smart a Notice of Non-Renewal of Master Services Agreement with respect to Washington County ("Notice of Non-Renewal"). A copy of the Notice of Non-Renewal is attached to the Amended Complaint as **Exhibit X**.

35.     The Notice of Non-Renewal attaches the CSG/Washington Contract. Both parties signed the CSG/Washington Contract on September 25, 2014.

36.     The Notice of Non-Renewal asserts that the first successful call under the CSG/Washington Contract was placed on January 4, 2015, which, if true, is the start date of the CSG/Washington Contract.

37.     Upon receipt of the Notice of Non-Renewal, Smart requested proof of the first successful call and the start date of the CSG/Washington Contract. CSG never responded.

38.     Moreover, CSG does not claim in the Notice of Non-Renewal, or attach proof thereof, that either CSG or Washington County provided the other with timely written notice of its intent to terminate the CSG/Washington Contract. Assuming the accuracy of CSG's statement that the CSG/Washington Contract started on January 4, 2015, such written notice would have been due by October 4, 2019 in order for the CSG/Washington Contract to not automatically review. Based on CSG's failure to include written notice of intent to terminate from either CSG or Washington County, neither CSG nor Washington County terminated the CSG/Washington Contract. Thus, the CSG/Washington Contract, which includes Smart's "co-terminous" services, renewed for another year, at least until January 4, 2021.

39.     On November 21, 2019, CSG sent Smart Notices of Non-Renewal of the Sebastian County and Wayne County agreements. Copies of the Notices are attached to the Amended Complaint as **Exhibit Y** and **Exhibit Z**.

40.     The Notices of Non-Renewal for Sebastian and Wayne County also fail because CSG has not terminated or elected not to renew its contracts with either of those counties. As a result, the "co-terminous" agreements with Smart remain in effect with these Joint Customers as well.

41.     With the renewals and/or continuation of CSG's agreements with these Joint Customers, Smart's exclusive rights to provide services to Washington County, Sebastian County,

and Wayne County renewed and/or continue as well in accordance with the MSAs, Schedules, and CSG/Joint Customer contracts.

## **Elements of Injunctive Relief**

42.     If CSG is permitted to remove Smart's systems and equipment on **January 3, 2020**, then Smart will suffer immediate and irreparable harm and will not have an adequate remedy at law.

43.     Smart will suffer reputational damages and lose goodwill and market share due to the termination, under the guise of non-renewal, of the MSAs resulting in lost customers. Further, Smart will lose the ability to promote its relationships with the "non-renewed" customers, which is vital in competing for new business, especially in the same region of the country. Finally, Smart will suffer significant monetary damages, including the inability to recoup its investments in the Joint Customers, which will be difficult, if not impossible, to calculate with any degree of certainty. This is especially true because Smart has no way of determining how many renewal periods it may lose due to CSG's attempted termination. CSG has a long history of consistently renewing its contracts with the Joint Customers, which is a fact CSG itself used to entice Smart to sign their respective agreements with a "co-terminous" term. Smart should obtain the benefit of every future renewal, and, as such, there is no way to measure Smart's damages related to being excluded from an unknown number of subsequent renewal terms.

44.     As described above, Smart is substantially likely to succeed on the merits of Count IX of the Amended Complaint for declaratory relief due to the plain language of the MSAs and CSG/Joint Customer contracts, in addition to the intent of the parties.

45.     Finally, the entry of a temporary injunction would serve the public interest. The injunction would not harm the public in any way; rather, Florida citizens have an interest in seeing that parties obey their contracts and act in good faith.

46.     Pursuant to Florida Rule of Civil Procedure 1.610(b), Smart will provide a bond in an amount the Court deems proper.

## Conclusion

47.     CSG has demonstrated that it will stop at nothing to acquire Smart's revenue derived from the Joint Customer facilities and ruin Smart's reputation along the way.

48.     After two unsuccessful attempts to terminate Smart's services, CSG is trying again by couching its termination as a "non-renewal," and without following the procedure mandated by the Court.

49.     Smart seeks a declaration and temporary injunctive relief prohibiting CSG from improperly terminating Smart's services at the Joint Customer facilities under the guise of notices of non-renewal.

50.     Smart will file a memorandum of law and declarations in support of this Motion.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order declaring that (a) CSG may not non-renew the MSAs and Schedules with respect to Washington County, Sebastian County, or Wayne County given the renewals or continuations of CSG's contracts with these Joint Customers; (b) Smart is entitled to be the exclusive provider of its services in Washington County, Sebastian County, and Wayne County during each initial and renewal term of the contracts between CSG and Washington County, Sebastian County, and Wayne County; and (c) for such further relief as the Court deems just and proper.

## <u>Good Faith Conference Certification</u>

The undersigned certify that they conferred with counsel for CSG about the issues raised in this Motion, although a motion for injunctive relief is an exception to Paragraph 11 of Administrative Order S-2019-007. CSG opposes the relief requested and has also opposed Smart's request to file the Amended Complaint, which includes the claims upon which this Motion is based.

Respectfully submitted,

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*　　　　　　　　　　
Attorney

Filing # 99771125 E-Filed 12/04/2019 11:42:18 AM

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

### *to Emergency Motion for Temporary Injunction*

## Brad Barrios

| | |
|---|---|
| **From:** | Brad Barrios |
| **Sent:** | Friday, October 4, 2019 5:45 PM |
| **To:** | 'James Lynch'; Ken Turkel; david.gann@ ▇▇▇▇ |
| **Cc:** | Kimberly Bald; Luke Piontek; Donna Etter |
| **Subject:** | RE: Correct Solutions/Smart Communications: Washington County Notice of Non-Renewal |

James,

We will be responding to this Notice of Non-Renewal in more detail soon. However, I wanted to let you know that, as long as the parties are in litigation, all notices can be sent to me with a copy to David Gann. We understand that the MSA contains an old address.

Second, please provide documentary proof that the first successful call under the Washington County Facility contract was placed on January 4, 2015.

Thanks,
Brad

**Brad F. Barrios**
Bajo | Cuva | Cohen | Turkel
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
P: (813) 443-2199 | F: (813) 443-2193
D: (813) 868-6168


**From:** James Lynch [mailto:jel@harlleebald.com]
**Sent:** Friday, October 4, 2019 3:32 PM
**To:** Brad Barrios <brad.barrios@bajocuva.com>; Ken Turkel <kturkel@bajocuva.com>; david.gann@ ▇▇▇▇
**Cc:** Kimberly Bald <kab@harlleebald.com>; Luke Piontek <LPiontek@roedelparsons.com>; Donna Etter <ddf@harlleebald.com>
**Subject:** Correct Solutions/Smart Communications: Washington County Notice of Non-Renewal
**Importance:** High

Gentlemen,

Please see attached notice.  Thank you.

Sincerely,

*James E. Lynch, Esquire*

Harllee & Bald, P.A.
202 Old Main Street
Bradenton, Florida 34205
Telephone: (941) 744-5537

Facsimile: (941) 744-5547
JEL@harlleebald.com

NOTE: This e-mail and any attachment to this e-mail may contain confidential information that is legally privileged.  If you are not the intended recipient, you must not review, transmit, convert to hard copy, copy, use or disseminate this e-mail or any attachments to it.  If you have received this e-mail in error, please notify us immediately by return e-mail or by telephone at 941/744-5537 and delete this message.  Please note that if this e-mail message contains a forwarded message or is a reply to a prior message, some or all of the contents of this message or any attachments may not have been produced by Harllee & Bald, P.A.

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT B

### *to Emergency Motion for Temporary Injunction*

## Brad Barrios

| | |
|---|---|
| **From:** | Brad Barrios |
| **Sent:** | Monday, November 11, 2019 11:00 AM |
| **To:** | Kimberly Bald; 'James Lynch' |
| **Cc:** | David Hayes; Ken Turkel; Lisa Meriwether; Donna Etter; Gayla Arnold |
| **Subject:** | CSG Deposition |
| **Attachments:** | DISC - Notice of CSG Corp. Rep. Deposition (00265926xBEB76).pdf |

Kim and James,

Attached is a notice for deposition of CSG's corporate representative. The topics relate to the Notice of Non-Renewal re: Washington County and the contractual terms relied upon by CSG. Given your Jan. 3, 2020 deadline, we need this deposition to take place by mid-December. Please provide some potential dates and location for the deposition.

Thank you,
Brad

**Brad F. Barrios**
Bajo | Cuva | Cohen | Turkel
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
P: (813) 443-2199 | F: (813) 443-2193
D: (813) 868-6168

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                        Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

### NOTICE OF TAKING DEPOSITION OF CORPORATE
### REPRESENTATIVE OF CORRECT SOLUTIONS, LLC

      PLEASE TAKE NOTICE that, pursuant to Rule 1.310(b)(6), Florida Rules of Civil

Procedure and applicable law, Plaintiff, Smart Communications Holding, Inc. ("Smart"), will take

the deposition of the following person upon oral examination at the time and place set forth below

before the herein described Court Reporter designated by U.S. Legal Support, or before any other

notary public or officer authorized by law to take depositions:

| WITNESS | DATE AND TIME | PLACE | COURT REPORTER/ VIDEOGRAPHER |
|---|---|---|---|
| Corporate Representative of Correct Solutions, LLC | December ___, 2019 _____ a.m. | | U.S. Legal Support (954-463-2933) |

      The oral examinations will continue until completed. The deposition(s) are being taken for

the purpose of discovery, for use at trial and for all other purposes as are permitted under the

Florida Rules of Civil Procedure.

Pursuant to Rule 1.310(b)(6), Florida Rules of Civil Procedure, Defendant Correct

Solutions, LLC ("CSG") shall designate one or more of its officers, directors or managing agents

or other persons to give testimony regarding the following areas of inquiry:

1.  The negotiation and execution of the Master Services Agreement and Schedules between CSG and Smart (the "MSA").

2.  The communications and negotiations regarding Paragraph 6 of the MSA, including the intent of the parties with respect to and meaning of Paragraph 6.

3.  CSG's position regarding the meaning of Paragraph 6 of the MSA and "co-terminous."

4.  The communications and intent of the parties with respect to the interplay between or effects of the MSA, CSG's agreement with each Joint Customer, and the Schedule of services for each Joint Customer.

5.  Any communications between the parties regarding the terms of CSG's agreements with the Joint Customers.

6.  Any communications between CSG and the Joint Customers regarding the addition of Smart's services and the exclusivity and/or term of Smart's services.

7.  CSG's October 4, 2019 Notice of Non-Renewal of Master Services Agreement between Correct Solutions, LLC and Smart Communications Holding, Inc. (Correct Solutions, LLC's customer: Washington County).


**PLEASE BE GOVERNED ACCORDINGLY.**

/s/ Brad F. Barrios
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602

{BC00265760.1}

(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

    *If you are a person with a disability who needs any accommodation to participate in this deposition, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Brad F. Barrios, Esq., Bajo | Cuva | Cohen | Turkel, 100 N. Tampa St., Suite 1900, Tampa, FL 33602, (813) 443-2199 at least 7 days before your scheduled deposition, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of November, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
         JEL@harlleebald.com
         DDF@harlleebald.com
         CL@harlleebald.com

                                        /s/ Brad F. Barrios
                                        Attorney

Filing # 99771125 E-Filed 12/04/2019 11:42:18 AM

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT C

***to Emergency Motion for Temporary Injunction***

## Brad Barrios

| | |
|---|---|
| **From:** | Brad Barrios |
| **Sent:** | Wednesday, November 13, 2019 5:04 PM |
| **To:** | Kimberly Bald; James Lynch |
| **Cc:** | David Hayes; Ken Turkel; Lisa Meriwether |
| **Subject:** | Smart v. Correct issues |

Kim and James,

I wanted to identify a few issues that I hope to discuss with you soon:

- As you may have surmised, we disagree with your interpretation of the renewal provisions of the MSA and CSG's contract with Washington County and, therefore, the effectiveness of the Notice of Non-Renewal. Assuming that CSG and Washington renewed their contract, and the Notice of Non-Renewal does not indicate otherwise, then the renewal includes Smart's services. Unless you would consider stipulating that CSG and Washington will not disconnect Smart's services until the renewal dispute is resolved, then we need to schedule the deposition that we requested of CSG's corporate representative by mid-December so that we can file a motion before the early January deadline.
- We previously asked you for evidence of the first successful call in Washington County so we could confirm the effective date of the contract and have yet to receive that.
- We need to find dates that work for the facility depositions – I am pretty available throughout January and February. However, our decision as to whether we need to depose representatives from every facility may depend upon CSG's document production, which we are expecting by Friday. Upon review of CSG's documents, I can let you know who we still want to depose so that we can agree on dates and get our subpoenas out in a timely fashion. I am available for that call on Monday or Tuesday.
- Should we still expect the settlement communication you referenced last week?

We look forward to hearing back from you.

Thanks,
Brad

**Brad F. Barrios**
Bajo | Cuva | Cohen | Turkel
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
P: (813) 443-2199 | F: (813) 443-2193
D: (813) 868-6168

Filing # 99804270 E-Filed 12/04/2019 04:07:45 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                       Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

**AMENDED NOTICE OF TAKING DEPOSITION OF CORPORATE
REPRESENTATIVE OF CORRECT SOLUTIONS, LLC**

PLEASE TAKE NOTICE that, pursuant to Rule 1.310(b)(6), Florida Rules of Civil

Procedure and applicable law, Plaintiff, Smart Communications Holding, Inc. ("Smart"), will take

the deposition of the following person upon oral examination at the time and place set forth below

before the herein described Court Reporter designated by U.S. Legal Support, or before any other

notary public or officer authorized by law to take depositions:

| WITNESS | DATE AND TIME | PLACE | COURT REPORTER/ VIDEOGRAPHER |
|---|---|---|---|
| **Corporate Representative of Correct Solutions, LLC** | December 19, 2019 9:00 a.m. | Bajo \| Cuva \| Cohen \| Turkel 100 N. Tampa Street Suite 1900 Tampa, FL 33602 | U.S. Legal Support (954-463-2933) |

The oral examinations will continue until completed. The deposition(s) are being taken for

the purpose of discovery, for use at trial and for all other purposes as are permitted under the

Florida Rules of Civil Procedure.

{BC00270870:1}

Pursuant to Rule 1.310(b)(6), Florida Rules of Civil Procedure, Defendant Correct Solutions, LLC ("CSG") shall designate one or more of its officers, directors or managing agents or other persons to give testimony regarding the following areas of inquiry:

1.  The negotiation and execution of the Master Services Agreement and Schedules between CSG and Smart (the "MSA").

2.  The communications and negotiations regarding Paragraph 6 of the MSA, including the intent of the parties with respect to and meaning of Paragraph 6.

3.  CSG's position regarding the meaning of Paragraph 6 of the MSA and "co-terminous."

4.  The communications and intent of the parties with respect to the interplay between or effects of the MSA, CSG's agreement with each Joint Customer, and the Schedule of services for each Joint Customer.

5.  Any communications between the parties regarding the terms of CSG's agreements with the Joint Customers.

6.  Any communications between CSG and the Joint Customers regarding the addition of Smart's services and the exclusivity and/or term of Smart's services.

7.  CSG's October 4, 2019 Notice of Non-Renewal of Master Services Agreement between Correct Solutions, LLC and Smart Communications Holding, Inc. (Correct Solutions, LLC's customer: Washington County).

8.  CSG's November 21, 2019 Notices of Non-Renewal related to Wayne County and Sebastian County.

9.  CSG's December 4, 2019 Motions for Sanctions Pursuant to Florida Statute 57.105 related to Smart's Emergency Motion for Temporary Injunction and Emergency Motion for Leave to File Amended Complaint.

**PLEASE BE GOVERNED ACCORDINGLY.**

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*If you are a person with a disability who needs any accommodation to participate in this deposition, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Brad F. Barrios, Esq., Bajo | Cuva | Cohen | Turkel, 100 N. Tampa St., Suite 1900, Tampa, FL  33602, (813) 443-2199 at least 7 days before your scheduled deposition, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 4th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails: KAB@harlleebald.com
        JEL@harlleebald.com
        DDF@harlleebald.com
        CL@harlleebald.com


*/s/ Brad F. Barrios*
Attorney

Filing # 99857250 E-Filed 12/05/2019 01:52:08 PM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

        Plaintiff,

Case No: 19-CA-008089

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

### MEMORANDUM OF LAW IN SUPPORT OF
### EMERGENCY MOTION FOR TEMPORARY INJUNCTION

### Introduction

Smart requests the Court to temporarily enjoin CSG from acting in furtherance of Notices

of Non-Renewal (the "Notices") provided to Smart relating to three Joint Customers: Washington

County, Sebastian County, and Wayne County.[1] The most imminent Notice for Washington

County is an improper termination attempt under the plain language of both the Master Services

Agreement ("MSA") between Smart and CSG and the Correctional Communications Service

Agreement between CSG and Washington County (the "CSG/Washington Contract"). CSG and

Washington County renewed the CSG/Washington Contract.[2] The parties understood that Smart's

---

[1] CSG has sent three notices of non-renewal and has indicated that it intends to send notices of non-renewal of the other five MSAs and Schedules between Smart and CSG. The Washington County MSA is the only one that has entered the next renewal period of the CSG/Joint Customer contract and, thus, this Motion will focus on the relevant Washington County agreements. However, the renewal provision of the MSA is the same for every Joint Customer. So, the same issue will eventually arise with every MSA, provided CSG and the Joint Customer continue to operate under their respective contracts.

[2] Smart has repeatedly made CSG aware of its position and CSG has given no indication that it did not renew its contract with Washington County. Smart has requested discovery of CSG by which it anticipates confirming the renewal between CSG and Washington County, including requesting the deposition of CSG's corporate representative and serving Requests for Admission. CSG has refused to produce a

services were part of the CSG/Washington Contract and drafted the MSA between Smart and CSG

to be co-terminous with that contract. Thus, the MSA for Washington County remains in effect.

CSG's Notice therefore amounts to an improper termination attempt of the MSA, which is also in

violation of this Court's Order that requires CSG to obtain court approval before attempting a

termination.

The MSA and parol evidence from the negotiation of the relevant agreements conclusively

demonstrate that CSG and Smart intended that Smart would provide its services under the MSA

as an integrated part of the CSG/Joint Customer Contracts and for as long as CSG operated under

the Joint Customer Contracts. *See* Third Declaration of Jon Logan, *passim*.

If CSG is not prohibited from acting in furtherance of their latest improper termination

attempt, then Smart will be irreparably harmed and will not have an adequate remedy at law.

Moreover, if left unchecked, CSG will be permitted to disregard this Court's Order enjoining any

attempted terminations by simply calling the terminations "non-renewals." The relationship

between the parties, which has been structured by the Court to protect Smart's ongoing interests

in several customer facilities, will be dramatically altered.

### Washington County Timeline

The following timeline describes the relationship between Washington County, CSG, and

Smart:

- September-October 2014:   Washington County and CSG execute the Correctional Communications Service Agreement (the "CSG/Washington Contract"). Paragraph 14 of the Service Agreement provides:

  The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party**

---

corporate witness on these issues and has forced Smart to filed a Motion to Compel on December 2, 2019. CSG's response to Smart's Request for Admission to confirm CSG's renewal with Washington County is due on December 23, 2019.

**notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

- <u>January 4, 2015</u>: The beginning of the Term of the CSG/Washington Contract, according to CSG.

- <u>January 4, 2016</u>: The automatic of renewal of the CSG/Washington Contract.

- <u>January 4, 2017</u>: The automatic of renewal of the CSG/Washington Contract.

- <u>August-September 2017</u>: Smart and CSG execute the MSA and agree that the Washington County Agreement (as with all Joint Customer Agreements) will include the MSA, the CSG/Joint Customer Contract, an amendment to the CSG/Joint Customer Contract adding Smart's services, and a Schedule of Smart's services. Paragraph 6 of the MSA provides:

  **Term.**  This Agreement shall commence on the "Effective Date" and shall be **co-terminous with Customer's Agreement with Facility** as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

- <u>November 2017</u>: Smart and CSG execute the Schedule for Washington County and Smart begins its services at the Washington County facility.

- <u>January 4, 2018</u>: The automatic of renewal of the CSG/Washington Contract.

- <u>January 4, 2019</u>: The automatic of renewal of the CSG/Washington Contract.

- <u>October 4, 2019</u>: CSG sends Smart a Notice of Non-Renewal for Washington County. The Notice does not allege that either CSG or Washington County has terminated or elected not to renew the CSG/Washington Contract.

- <u>October 5, 2019</u>: The deadline for either CSG or Washington County to provide written notice of non-renewal to the other party. No such notice has been provided to Smart.

- <u>January 4, 2020</u>: The automatic renewal of the CSG/Washington Contract. This automatic renewal should include Smart's services because the MSA for Washington County is co-terminous with the CSG/Washington Contract.

## Legal Standard for a Temporary Injunction

A trial court has broad discretion to grant a temporary injunction. *Bailey v. Christo,* 453 So.2d 1134, 1136 (Fla. 1st DCA 1984). The purpose of a temporary injunction is to preserve the *status quo*, which is "the last peaceable noncontested condition that preceded the controversy," and "to prevent injury so that a party will not be forced to seek redress for damages after they have occurred." *Id.* at 1137 (affirming temporary injunction that preserved the status quo by prohibiting party from closing a club and requiring club to be operated consistent with past practices).

A party should be awarded a temporary injunction when it establishes that (i) irreparable harm will result if the injunction is not granted; (ii) an adequate remedy at law is unavailable; (iii) there is a substantial likelihood of success on the merits; and (iv) entry of the temporary injunction will serve the public interest. *Sacred Family Investments, Inc. v. Doral Supermarket, Inc.*, 20 So.3d 412, 415 (Fla. 3d DCA 2009).

Upon a showing that the elements of injunctive relief are met, the remedy is available to prevent or cure the breach of a contract. *See Melbourne Ocean Club Condo. Ass'n, Inc. v. Elledge,* 71 So. 3d 144, 146 (Fla. 5th DCA 2011) (injunction is proper remedy for breach of negative covenant); *ASA College Inc. v. Dezer Intracoastal Mall, LLC,* 250 So.3d 731, 736 (Fla. 3d DCA 2018) (affirming trial court's decision to temporarily enjoin ASA from operating a business in violation of contractual easement pending a final decision on the merits.). An injunction is also an

available remedy in actions for declaratory relief. *See Inphynet Contracting Services, Inc. v. Matthews*, 196 So. 3d 449, 463 (Fla. 4th DCA 2016).

**Argument**

**I.      Smart Communications is Entitled to Injunctive Relief.**

A temporary injunction is appropriate to prohibit an improper termination of an exclusive dealing contract. *Starlite Aviation Operations Ltd. v. Erickson Inc.,* No. 3:15-cv-00497-HZ, 2015 WL 2367998, at *13 (D. Oregon May 15, 2015). *Starlite* is nearly-identical to the case at issue. There, the defendant, EHI, provided the plaintiff, Starlite, with the exclusive right to provide aircraft and flight managers for EHI to comply with EHI's contract with the government. *Id.* at *1. Three years into the agreement, EHI began hiring its own flight managers in an effort to "self-perform" the remainder of the agreement. *Id.* at *2-3. EHI then provided a notice of termination to Starlite, claiming that Starlite failed to perform under the agreement, which was contradicted by the evidence.

Starlite sought a declaration that the notice was ineffective to terminate the agreement and that Starlite was entitled to perform the agreement without interference from EHI. *Id.* at *3. The court held that Starlite proved the elements of injunctive relief, including the likelihood of success on its declaratory relief action, and entered a preliminary injunction restraining EHI from terminating the agreement and from taking any further steps to implement such termination. *Id.* at *13.

Like Starlite, Smart is entitled to a temporary injunction prohibiting CSG from effectively terminating the MSAs for Washington, Sebastian, and Wayne Counties while CSG continues to operate under its Service Agreements with these Joint Customers.

A. <u>**Entry of an Injunction will Preserve the *Status Quo*.**</u>

Smart currently provides messaging and related services for Washington, Sebastian, and Wayne Counties. CSG sent its Notices, which, if acted upon, will disturb the *status quo* by requiring Smart to remove its services and equipment from three different correctional facilities.

Entry of an injunction prohibiting CSG from terminating the MSAs based on the Notices will preserve the *status quo* until a trial on the merits on the validity of CSG's Notices. If the *status quo* is not preserved, then CSG will contract with a new messaging vendor (in this case, Tech Friends, Inc.), who will then install and provide its own related system and equipment in these three Joint Customer facilities.[3]

Assuming Smart ultimately prevails on the merits, then the Court will have declared that Smart's term is co-terminous with the term of the CSG/Joint Customer Service Agreements and, that, as long as CSG continues to operate under its Service Agreements with these Joint Customers, whether during the original or a subsequent renewal term, then Smart's services and equipment should not have been removed. The third party vendor (Tech Friends) will then have to remove its equipment and services, while Smart will have to re-install its own equipment and services. Such an endeavor will cost all parties—and perhaps taxpayers—time, money, and resources, in addition to creating an embarrassing logistical nightmare for Smart. Accordingly, this scenario is the classic example of when a temporary injunction is appropriate.

B. <u>**Smart will Suffer Irreparable Harm Absent an Injunction and Does Not Have an Adequate Remedy at Law.**</u>

Absent a temporary injunction, Smart will suffer irreparable harm, for which it would not have an adequate remedy at law, for several reasons. First, Smart will be unable to market its

---

[3] CSG would obtain the benefits of the new contract in the form of shared commission payments, as described in the CSG/Tech Friends Agreement attached to the proposed Amended Complaint.

ongoing contractual relationship with Washington County, which is a vital tool in obtaining future contracts in the same region.  Second, Smart will suffer reputational damages and lose goodwill and market share due to the effective termination of the MSAs resulting in three lost customers. Third, Smart will suffer significant monetary damages, including the inability to recoup its investments in the Joint Customers, which will be difficult, if not impossible, to calculate with a reasonable degree of certainty.

### 1. Smart will lose the ability to promote its relationship with Washington County.

When competing for business in the corrections industry, whether through a competitive bidding process or standard marketing practices, one of the most valuable tools is the ability to use other ongoing relationships, especially those in the same region, as a reference to a potential customer. *See* Third Declaration of Jon Logan ¶ 41. Potential customers almost always ask whether Smart services accounts of a certain size and in the customers' region when making their vendor selection decisions. *Id.*

The Washington County facility has over 900 inmate beds and one of the largest correctional facilities in Arkansas. As it stands, Smart can promote the fact that it currently provides services to a facility of this size in this region of the country. Smart can also affirmatively respond when potential customers, whether through a request for proposal or during an informal marketing presentation, ask if Smart has experience servicing facilities that share the characteristics of the Washington County facility. *Id* at ¶ 42.

### 2. Smart will suffer reputational and other intangible damages.

Not only will the improper termination create a substantial impediment to Smart's ability to obtain future contracts, it will also damage Smart's record and reputation in the industry— critical factors to success of the company.  If CSG is permitted to terminate these contracts under

the guise of a non-renewal, other customers and potential clients in the industry will be left with the misguided impression that Smart was unable to perform under its contracts and is otherwise unreliable.  In an environment as competitive as the corrections communication industry, concerns and questions about a company's reliability, integrity, or ability to perform have disastrous effects on the company's reputation and goodwill. *See* Third Declaration of Jon Logan Declaration, ¶ 40. This type of harm unquestionably constitutes irreparable injury.  *See, e.g., Ferrellgas Partners, L.P. v. Barrow*, 143 Fed.Appx. 180, 190 (11th Cir. 2005) ("'grounds for irreparable injury include loss of control over reputation, loss of trade, and loss of goodwill'" (quoting *Pappan Enters., Inc. v. Hardee's Food Sys., Inc*., 143 F.3d 800, 805 (3d Cir.1998)).

Smart's reputation and goodwill will also be negatively impacted if the injunction is not entered due to its loss of the exclusivity aspect of its relationship with CSG.  Exclusivity is an intangible asset that is part of a company's reputation. *Douglas Dynamics, LLC v. Buyers Products Co.,* 717 F.3d 1336, 1344-45 (Fed. Cir. 2013). When a competitor sells what should be a product exclusive to the plaintiff, there can be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors. *Id.* Accordingly, if Tech Friends provides the services that Smart has been providing, Smart will suffer reputational harm in the marketplace in connection with the loss of its exclusive relationship.  A temporary injunction is an appropriate and necessary mechanism to prevent this type of harm.  *See, e.g., REV Recreation Group, Inc. v. LDRV Holdings Corp.,* 259 So.3d 232, 235 (Fla. 2d DCA 2018) (affirming temporary injunction prohibiting manufacturer from promoting products through other dealers that were subject to an exclusive agreement with plaintiff dealer); *see also Jacobson & Co. v. Armstrong Cork Co*., 548 F.2d 438, 444–45 (2d Cir.1977) (threatened loss of customers and goodwill from manufacturer's termination of supply of a brand of products to distributor posed

irreparable injury); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir. 2002) (holding that [i]n a competitive industry where consumers are brand-loyal,…loss of market share is a potential harm which cannot be redressed by a legal or equitable remedy following a trial…).

Further, the loss of exclusivity will impact Smart's ability to sell additional services to certain customers. The Second Circuit summarized the inadequacy of money damages for plaintiffs who lose the ability to sell additional products or services as follows:

> We believe that the governing principle is as follows. **Where the availability of a product** is essential to the life of the business *or* **increases business of the plaintiff beyond sales of that product— for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss**. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. **Where the loss of a product will cause** the destruction of a business itself or **indeterminate losses in other business**, the availability of money damages may be a hollow promise and a preliminary injunction appropriate.

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) (emphasis added). Smart provides additional products and services that are not currently used by all Joint Customers, including, in some cases, video visitation and various mail scanning products and services. Indeed, some Smart customers have elected to purchase mail scanning as a stand-alone product. *See* Third Declaration of Jon Logan ¶ 34. Similarly, customers often add new services and, in consideration, agree to extend the term of Smart's revenue-generating messaging services. *Id.* Being unlawfully removed from its ongoing relationships with the Joint Customers means that

Smart loses the opportunity to earn revenue in additional ways not directly measurable as lost contractual proceeds. In other words, money damages are a hollow and incomplete remedy at best.

The termination of Smart's services would be particularly unjust and inequitable in this situation because CSG stands to gain a significant windfall through its new contracts with Tech Friends, which include revenue-sharing terms that are not part of its agreements with Smart.

### 3.  Smart's money damages would be substantial but difficult to calculate.

The irreparable harm that Smart would suffer should CSG not be enjoined from improperly terminating the Agreement can also be demonstrated by the significant amount of time, energy, resources—most of which are difficult to accurately quantify—that have been invested into the relationships with CSG, Washington, Sebastian, and Wayne Counties. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc*., 753 F. Supp. 2d 1233, 1236–37 (S.D. Fla. 2010) ("A plaintiff may establish irreparable harm where the total damages associated with plaintiff's losses would be difficult to calculate.")  Here, Smart invested approximately $650,000 to install its equipment and services at each of the facilities of these three Joint Customers. *See* Third Declaration of Jon Logan, ¶ 28 However, its installment costs are only a portion of Smart's true investment in the Joint Customers. Smart has invested hundreds of hours training staff on how to operate its systems, developing personal relationships with Joint Customers, providing customer service, marketing, and updating its products and services for the Joint Customers. *Id.* at ¶ 29.  Based on the foregoing, Smart's substantial non-monetary investment in connection with its relationship with CSG also establishes irreparable harm and the lack of an adequate remedy at law.

Further, it is impossible to measure with any reasonable degree of certainty Smart's damages due to being improperly carved out of future renewal terms between CSG and the Joint Customers. For instance, the CSG/Washington Contract was executed in 2014 and included a 12-

month term with automatic 12-month renewal terms. It is nearly 2020 and the CSG/Washington Contract has renewed each year—without ever being challenged through a competitive bidding process. In other words, the CSG/Joint Customer Contracts are renewing, without fail, exactly as Mark Turner of CSG represented that they would in inducing Smart to enter the agreement with a "co-terminous" term.

C.     **Smart is Likely to Succeed on the Merits of its Declaratory Relief Claim.**

Smart's proposed Amended Complaint includes declaratory relief and breach of contract claims that request an injunction prohibiting CSG from acting in furtherance of notices of non-renewal, which are effectively a termination of Smart's services while CSG continues to operate under the Joint Customer Contracts which include Smart's co-terminous services. Smart's position is supported by both the plain language of the relevant contracts and the evidence of the intent of the parties.

1.     **The Plain Language of the Contracts.**

"The cardinal rule of contractual construction is that when the language of the contract is clear and unambiguous, the contract must be interpreted and enforced in accordance with its plain meaning." *Columbia Bank v. Columbia Developers, LLC*, 127 So. 3d 670, 673 (Fla. 1st DCA 2013); *see also Ferreira v. Home Depot/Sedgwick CMS,* 12 So.3d 866, 868 (Fla. 1st DCA 2009) ("Contracts are to be construed in accordance with the plain meaning of the words therein, and it is never the role of the trial court to rewrite a contract to make it more reasonable for one of the parties.").

When a court examines the plain language of a contract, it must not read a term or group of words in isolation and should instead arrive at a reasonable interpretation of the entire agreement, giving a lawful and effective meaning to all terms. *Heiny v. Heiny,* 113 So.3d 897, 900

(Fla. 2d DCA 2013); s*ee also Nabbie v. Orlando Outlet Owner, LLC,* 237 So.3d 463, 466 (Fla. 5th DCA 2018) (finding that court must interpret contracts as a whole and refusing to read lease provision in a manner that rendered another provision superfluous).

The plain language of the CSG/Washington Contract provides that the contract will automatically renew unless one of two events occurs: (a) CSG sends Washington a written notice of its intent to terminate the contract at least 90 days before the contract expires; or (b) Washington sends CSG a written notice of its intent to terminate the contract at least 90 days before the contract expires. According to CSG, the deadline for such a notice to be served was October 5, 2019. The deadline passed and neither CSG nor Washington County sent the other a notice of non-renewal. As a result, the CSG/Washington Contract has been renewed.

The only question that remains is what effect the CSG/Washington Contract renewal has on Smart's services. The answer begins with a review of the language of the MSA between Smart and CSG as it relates to Washington County:

> **Term.** This Agreement shall commence on the "Effective Date" and **shall be co-terminous with Customer's Agreement with Facility** as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

First, the provision includes a straight-forward and independent statement that the MSA shall be co-terminous with CSG's (the Customer) contract with the facility (the Joint Customer). Next, the provision incorporates the CSG/Joint Customer agreement as Attachment A and, in the same sentence, indicates that either Party may notify the other Party of a non-renewal. The term "Party" is not defined in the MSA. However, based on the context and placement of the words in

the sentence, it is apparent that the word Party refers to the Parties of the Agreement that was just referenced—the CSG/Joint Customer Agreement.

If the Term provision was interpreted to provide CSG with the ability to send notices of non-renewal while maintaining its current contractual relationship with the Joint Customer, then it would include superfluous and nonsensical language. For example, the sentence on which CSG relies in its Notices of Non-Renewal begins with "After the original term…" However, the MSA does not have an original term. The only reference to a term that can be found in the MSA is that it is co-terminous with CSG's contracts. The sentence only makes sense if it is construed to refer entirely to the CSG/Joint Customer Contract—each of which include original terms and automatic renewal terms.

If, and only if, either CSG or a Joint Customer elected not to renew their contract with each other, then CSG may provide the referenced notice to Smart of non-renewal of the MSA with respect to that Joint Customer pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and the Joint Customer for Smart to be "co-terminous" with.  In other words, CSG would not continue to be obligated to provide Smart with a term to service the Joint Customer that they do not have.

> **2.     CSG and Smart intended for Smart's services to be included within CSG's Joint Customer Contracts and co-terminous with CSG's terms.**

In addition to the language of the relevant contracts, the communications between the parties during the negotiation of the contracts demonstrate that their real-time intent was to structure a relationship where Smart's services were incorporated into the contracts between CSG and the Joint Customers. *See* Third Declaration of Jon Logan, ¶¶ 14-25. To solidify that purpose, CSG agreed to obtain an amendment to each of its Joint Customer Contracts adding Smart's services to its contract. *See id.,* Ex. C and D. CSG did so for the first Joint Customer, Avoyelles,

and then apparently did not follow through with obtaining the amendments for the other Joint Customers. Nevertheless, CSG and Smart still memorialized the purpose and intent by including the "co-terminous" provision in the MSA. *See id.*

On August 29, 2017, Mark Turner of CSG sent Rob Deglman of Smart an email with the contract documents for Avoyelles. Turner attached and described the following:

- CSG's Current Agreement (where you will find the term) with Avoyelles

- CSG's First Amendment (which inserts your products) with Avoyelles

- CSG and Smart Master Agreement for this project

- CSG and Smart Schedule of Services.

*See* Third Declaration of Jon Logan, Ex. C.

Accordingly, in Turner's own words, Smart services and products were going to be **inserted into the CSG/Avoyelles Contract**, which is where you will find the term. Thus, Smart's services were intended to be part of the CSG/Joint Customer Contract and subject to the term of the CSG/Joint Customer Contract. Indeed, the referenced "First Amendment" provides that it "amends and supplements" the CSG/Avoyelles Contract. The only material term of the First Amendment is that "CSG will provide equipment and services as listed in Attachment A." Attachment A specifically describes Smart's products and services—SmartKiosks, Smart's electronic messaging and video visitation, and Smart's MailGuard® system, among others. *See* Declaration of James Logan, Ex. C.

Deglman forwarded Turner's August 29, 2017 email to James Logan and Jon Logan, along with further explanation of the structure of the relationship between CSG and Smart as follows:

- They [CSG] are signing a **Master and Schedule** of Services **for each client**.

- They [CSG] will also send us their contract with the client **and addendum including our services**.

- Once installed, we will Add Exhibit that will detail the hardware we are providing.

*See* Third Declaration of Jon Logan, Ex. C.

Accordingly, Deglman's email, sent at the time of the negotiation, expressed the intent that Smart's services would be **inserted into each CSG/Joint Customer Agreement** by virtue of an amendment. Turner confirmed this would be the structure for all Joint Customers on a going-forward basis. *See id.*, Ex. D. Each client relationship would also be governed by an MSA, which further defined the term of Smart's services as co-terminous with the term of the CSG/Joint Customer Contract. Turner expressly identified the term of the CSG/Avoyelles Contract as being where you will find the term, which entirely explains his inclusion of the co-terminous provision in the MSA. Moreover, Turner consistently explained to Smart that, as long as CSG operated under these Joint Customer Contracts, then Smart would be the messaging service provider. *See* Third Declaration of Jon Logan, ¶¶ 16, 24; Declaration of R. Deglman, ¶¶ 9-10.

**D.    Entry of an Injunction Would Serve the Public Interest.**

Finally, the entry of a temporary injunction would serve the public interest. The injunction would not harm the public in any way; rather, Florida citizens have an interest in seeing that parties obey their contracts and act in good faith. *See, e.g., Sacred Family,* 20 So.3d at 417. Similarly, "the public has an interest in preserving the integrity of the competitive process" in government contract bidding. *See Starlite* at *13 (quoting *Cherokee Nation Techs., LLC v. United States,* 116 Fed. Cl. 636, 641 (2014). Accordingly, if CSG wants to replace Smart's services in each of the Joint Customer facilities, then it should do so by not renewing its contracts with the Joint Customers and then bidding on new contracts with its new sub-contractor Tech Friends. Tech

Friends should not be permitted to slide into Smart's position because that arrangement would not constitute a renewal of the current agreement.

There are no countervailing equitable interests which could weigh against granting the equitable remedy of injunctive relief in favor of Smart. In addition, Smart has demonstrated a likelihood of success on the merits, and, "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir.1996).

### E. Smart will provide a bond as determined by the Court.

Pursuant to Florida Rule of Civil Procedure 1.610(b), Smart will provide a bond in an amount the Court deems proper.

## II. Conclusion

Smart has established each element of temporary injunctive relief. This Court should thus enter an injunction to maintain the *status quo* and require the parties to comply with their contractual obligations. CSG should not be permitted to irreparably harm its competitor by terminating its agreements with Smart and removing Smart's services from customer facilities when CSG agreed that Smart's services would be co-terminus with CSG's.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                            Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

**<u>NOTICE OF FILING</u>**

Plaintiff, Smart Communications Holding, Inc., by counsel, hereby files the following:

1.      Third Declaration of Jon Logan,

2.      Declaration of James Logan,

3.      Declaration of Rob Deglman, and

4.      Transcript of September 20, 2019 Hearing on Plaintiff's Emergency Motion to
Temporarily Enjoin Improper Termination of Agreement.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
              JEL@harlleebald.com
              DDF@harlleebald.com
              CL@harlleebald.com

/s/ Brad F. Barrios                        
Attorney

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT 1

### *to Notice of Filing*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## THIRD DECLARATION OF JON LOGAN

I, Jon Logan, declare under penalty of perjury as follows:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2.     I am currently the CEO of Smart Communications Holding, Inc. ("Smart"). I make this Declaration based on my personal knowledge and my review of the business records of Smart, which include the attached emails and which were created and maintained in the ordinary course of Smart's regularly conducted business activities. The emails are dated to show they were made at or near the time of the events described within the emails. Smart collected the emails from its email server, which has been maintained in the ordinary course of Smart's business since before the emails were created.

## Smart's Business Model

3.     As a founder of Smart, I am very familiar with the business model the company has employed since its inception.  Generally, we attempt to secure multi-year contracts with

government institutions that own and operate correctional facilities, such as county sheriff's offices. We offer to install our services and equipment free of charge and then we generate revenue based on inmates' use of our messaging products. We generate the vast majority of our revenue through electronic messaging, which is similar to email or text messaging, and through video visitation services. In some facilities, we generate revenue from providing mail scanning services.

4.     Because Smart's business model is to provide its equipment to the facility at no cost, it fronts a significant expense for each customer roll out.  Depending on the size of a facility, for example, Smart's upfront costs for installing its system could easily be in excess of three-hundred thousand dollars. On average, it costs Smart well over one hundred thousand dollars to install our equipment, which includes electrical conduit and wiring, our kiosk and/or tablet system, and all required networking and power infrastructure.  We also provide all labor for the installation and setup, including ongoing IT support, maintenance, and training. We slowly earn revenue at the rate of $0.50 per inmate message until we, hopefully, generate enough revenue to recoup our capital investment and earn a reasonable return on our investment in a particular facility.

5.     In most instances, it takes a few years of regular inmate use of our products in order to recoup the amount of our capital investment in a facility. This is why we require long-term contracts with a duration of several years, along with ongoing renewal terms.

6.     Smart generally enters into a master services agreement with each of its customers, which defines the general terms of the parties' relationship. Smart also enters into a schedule of services with each customer, which specifically identifies each of the services that Smart has agreed to provide for the customer.

## Smart's Relationship with Correct Solutions, LLC

7.      I am familiar with the contractual and business relationship between Smart and Correct Solutions, LLC ("CSG"). The relationship began in or around May 2017, when Mark Turner with CSG and I discussed the possibility of becoming vendor partners. Mark told me that CSG had telephone contracts with several customers but was unable to provide additional communications services like inmate messaging and video visitation. CSG wanted to be able to make these communications services available to its telephone customers and was looking for a vendor partner to that end. In addition, CSG wanted to partner with Smart to solicit new potential customers by marketing CSG's telephone services in conjunction with Smart's messaging platform.

8.      I assigned Smart's then-Director of Sales and Operations, Rob Deglman, to be a main point of contact for the purpose of negotiating an acceptable partnership arrangement with CSG. At all relevant times, Mr. Deglman worked under my direction and supervision and reported back to me about the status of the negotiations.

9.      One of the most important aspects of the proposed partnership agreement with CSG from Smart's perspective was to obtain an adequate contract duration so that Smart was guaranteed to recoup its capital investment in new customer facilities and was in the best possible position to generate a reasonable return on its investment at each customer facility.

10.      I personally made the fact that we needed a significant length of term clear to Mark Turner. In fact, I initially insisted on a seven-year term for Smart in each customer facility.

11.      The first customer that CSG and Smart discussed partnering on was CSG's existing customer Avoyelles Parish Sheriff's Office (Louisiana). Smart's intention was to modify our

standard master services agreement to define the general terms of the relationship between CSG and Smart, which would serve as the master agreement between CSG and Smart for Avoyelles.

12.     Mr. Deglman and I put together a draft Master Services Agreement ("MSA") between Smart and CSG with respect to the Avoyelles relationship. The initial draft included a seven-year term. We provided a copy of this draft agreement to CSG. A true, complete, and authentic copy of the August 8, 2017 email to CSG attaching the draft MSA is attached as **Exhibit A**.

13.     Mr. Turner explained that CSG could not define a specific length for our term because CSG had existing contracts with customers with different lengths of terms, at different points of time within their terms, and which were in a perpetual state of automatic renewal. For example, CSG had an existing contract with Avoyelles that was in an initial three-year term through October 1, 2020, but which would automatically renew for a new four-year term. According to Mr. Turner, it would be too complicated to have a fixed duration for the Smart/CSG agreements.

14.     Mr. Turner explained that the simplest way of defining the duration of Smart's term with CSG for a given facility was to insert Smart's services into CSG's contracts with the facilities and clarify in the MSA that Smart's agreements with CSG are "co-terminous" with CSG's contract with each facility. In that way, CSG's contract duration with Smart for a Joint Customer agreement would always be consistent with and reflecting of CSG's contract duration with the Joint Customer.

15.     Mr. Turner assured me that CSG had such good relationships with its telephone customers, including Avoyelles, that its contracts would undoubtedly be renewed for the automatic renewal terms.

16.     Mr. Turner further assured me that, as long as CSG and a Joint Customer renewed an existing contract, then CSG's agreement with Smart with respect to that Joint Customer would continue for the same duration. Since Smart's services were part of the CSG/Joint Customer agreements, then they would renew just like the rest of the contract would renew.

17.     Smart and CSG then began discussing adding Smart's services to other existing CSG customers and new customers under the same structure we had agreed upon for Avoyelles. On August 16, 2017, Mr. Deglman emailed Mr. Turner and stated: "Can you send me what contract documents you have sent to Avoyelles, LA and Lamar, MS for signature **that includes our services**?" Mr. Deglman also referenced getting the contract documents together so the parties could move forward with Sebastian County.

18.     On August 17, 2017, Mr. Turner responded and confirmed:  "Our Agreement with the account will be included as an Addendum to our Agreement with Smart since it will be referenced for term and deliverables." A true, complete, and authentic copy of the August 16-17, 2017 email exchange is attached as **Exhibit B**.

19.     On August 30, 2017, Mr. Deglman emailed me the contract documents for Avoyelles, which he received from Mr. Turner on August 29, 2017 and which included CSG's current agreement with Avoyelles, CSG's First Amendment with Avoyelles, the CSG and Smart Master Agreement for this project, and the CSG and Smart Schedule of Services. Mr. Deglman conveyed to me that Smart and CSG would be "signing a Master and Schedule of Services for each client," and that CSG "will also send us their contract with the client **and addendum including our services**." A true, complete, and authentic copy of the email is attached as **Exhibit C**.

20.     CSG's First Amendment with Avoyelles was a truncated version of Smart's Schedule of Services. On August 30, 2017, Mr. Deglman emailed Mr. Turner and asked: "Is there a reason you are not simply copying and pasting all the language from our Schedule of services into the Addendum you are having the client sign?"

21.     Mr. Turner responded:

> "In the future we will do this. For everything we already had in process, and depending on how much the Sheriff wanted to see (in the case of Avoyelles he wanted a one page don't raise awareness type thing) we are doing it this way. **For future contracts that start from the beginning we will place it in our document but it will still have to be in the document between our two companies which creates the tie-in**."

A true, complete, and authentic copy of the August 30, 2017 email exchange is attached as **Exhibit D**.

22.     Accordingly, Smart's services, by virtue of the Amendment, were made a part of the service contract between CSG and Avoyelles and would be made part of all future contracts between CSG, Smart, and the Joint Customers. The Amendment and this procedure was consistent with my understanding that, as long as CSG was providing its services to Avoyelles, then Smart would be providing its services as well because those services were part of the same contract.

23.     Later on August 30, 2017, Mr. Deglman emailed me the new "Term" paragraph that Mr. Turner prepared for the Master Services Agreement for Avoyelles and stated, consistent with my understanding and prior discussions: "This clause is in the Master agreement between CS[G] and SCH [Smart] that it follows the current CS[G] agreement and **it automatically renews with the customers renewals**." A true, complete, and authentic copy of the August 30, 2017 email is attached as **Exhibit E**.

24.     My understanding of the meaning of "co-terminous" based on my discussions with Mr. Turner and with Mr. Deglman and my review of the documents provided by Mr. Turner and emails exchanged between the parties was that, as long as CSG operated under its services contract with a Joint Customer, then Smart would provide the electronic messaging platform and services for that Joint Customer. If, and only if, either CSG or a Joint Customer elected not to renew their contract with each other, then CSG may provide notice to Smart of non-renewal of the MSA with respect to that Joint Customer pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and the Joint Customer for Smart to be "co-terminous" with.  In other words, CSG would not continue to be obligated to provide Smart with a term to service the Joint Customer that they do not have.  The arrangement with CSG was such that Smart was supposed to be able to provide services to a Joint Customer facility as long as CSG was in the facility, subject only to a performance-based termination, where we would have a reasonable opportunity to cure.

25.     I also understood that, because Smart's services were specifically referenced in the Avoyelles Amendment, which was now part of the contract between CSG and Avoyelles, that any renewal of that contract would include Smart's services. Because CSG was supposed to obtain an amendment adding Smart's services from every Joint Customer, then Smart's services would always be part of the contract between CSG and the Joint Customer and would always be co-terminous with CSG's services.

**Smart's Investments in Reliance on the Joint Customer Agreements**

26.     Based on my knowledge of the corrections industry, and my discussions with Mark Turner, CSG would continue to renew its contracts with the Joint Customers indefinitely. First, corrections agencies generally do not like change and any contractual change normally requires

several levels of approval. Second, if a public contract is terminated or non-renewed, a competitive bidding process is normally required before entering into a replacement contract for the same or similar services. Both the service provider, in this instance CSG, and the corrections agency have an incentive to continue operations under an existing contract by exercising renewal terms rather than opening up a time-consuming competitive business process. Obviously, CSG would prefer to remain in correctional facilities like Avoyelles and the other Joint Customer facilities for as long as possible without having to stave off competitors in a bidding process in this highly-competitive industry.  Moreover, Mark Turner repeatedly assured me that CSG had incredibly good relationships with its customers such that their accounts always renew and are never lost.

27.     In reliance on the "co-terminous" language of our Master Services Agreements, which was consistent with CSG's repeated representations and my understanding of renewals of service contracts in the corrections industry, Smart has invested substantial money, time, and energy to develop relationships with and deliver its services to the Joint Customers, including those for which CSG has sent Notices of Non-Renewal: Washington County, Sebastian County, and Wayne County.

28.     Since the inception of the contractual relationship with CSG and these three Joint Customers, Smart has invested approximately six-hundred and fifty thousand dollars in hardware and infrastructure costs to outfit these facilities so they are capable of providing Smart's secure messaging platform and services to their respective inmates. This included installing cabling for power and connectivity, numerous kiosk terminals, hundreds of tablets, and ongoing maintenance, including replacement hardware.

29.     In addition to the funds spent for infrastructure and hardware, Smart has invested hundreds of hours training Joint Customer staff on how to operate its systems, developing personal

relationships with these Joint Customers, providing customer service, maintenance, marketing, and updating its products and services for the Joint Customers.

30.     Smart's willingness to invest such significant time and funds into the facilities of these Joint Customers was predicated on its exclusive right to provide its services for a term that was co-terminous with CSG's term with the customers. CSG promised that Smart would be the exclusive provider of inmate messaging and related services to each of these Joint Customers as long as CSG was operating under its services contract with which Smart's term was co-terminous.

31.     Smart earns its revenue from providing such services. An improper non-renewal of the Master Services Agreement between Smart and CSG for Washington County, for example, which is effectively a termination during a renewal period, would result in Smart losing monthly revenue, as well as ongoing renewals and extensions of terms in accordance with CSG's renewals and extensions of its services contract with Washington County.

32.     Smart has no way of measuring with any reasonable degree of certainty how many renewal periods of the CSG/Joint Customer services contracts or how much revenue Smart would lose if CSG was permitted to renew its contract with a Joint Customer while not renewing Smart's services for that Joint Customer.

33.     According to Mr. Turner and consistent with industry standard, CSG would renew their Joint Customer services contracts indefinitely due to the strong relationships they had with the Joint Customers. Indeed, we relied on this fact in agreeing to a "co-terminous" term in lieu of a term of seven-years.

34.     Smart provides additional products and services that are not currently used by all Joint Customers, including video visitation and various mail scanning products and services. Some Smart customers have elected to purchase mail scanning as a stand-alone product. Similarly,

customers often add new services and, in consideration, agree to extend the term of Smart's revenue-generating messaging services. Being unlawfully removed from its ongoing relationships with Joint Customers means that Smart loses the opportunity to earn revenue in additional ways that are not directly measurable as lost contractual proceeds.

35.     If Smart's services and equipment are removed from these Joint Customer facilities, there will be considerable downtime and loss of communications between inmates at those facilities and their friends and families, including loss of access to prior photographs and emails that are stored on Smart's system, resulting in harm for inmates and their respective communities. then the inmates at the Joint Customers' facilities will not have access to the communications services that Smart currently provides, including electronic messaging, until a substitute provider's systems and equipment are installed.

### Smart's Reputation

36.     Smart prides itself on the high quality of services, products, and customer service that it provides to its customers.

37.     Through servicing the Joint Customers, Smart's market share increased, its customer base increased, and its reputation as a premier and reliable service provider was bolstered.  Smart's capabilities to service correctional facilities on a large scale was proven.

38.     Through its training and customer service, Smart has also developed personal relationships with the Joint Customers.

39.     Accordingly, the removal of Smart's status as an exclusive provider of messaging services for CSG and Washington, Sebastian, and Wayne Counties would have a significant impact on Smart's goodwill, reputation, market share, and ability to attract new customers.

40.     Being required to remove our services and equipment from the facilities of these Joint Customers will negatively impact Smart's ability to ever have a relationship with each of these Joint Customers again. Our other customers, prospective customers, and competitors will hear about our removal from these facilities and see it as being indicative of poor service. In an environment as competitive as the corrections communication industry, concerns and questions about a company's reliability, integrity, or ability to perform have disastrous effects on the company's reputation and goodwill. It is impossible to determine how many prospective customers or potential partnerships with other providers Smart may lose as a result of the effective terminations by way of CSG's improper Notices of Non-Renewal.

41.     Finally, losing an account like Washington County would have an impact on our ability to obtain other customers, especially in the regions surrounding Washington County, Arkansas. When competing for business in the corrections industry, whether through a competitive bidding process or standard marketing practices, one of the most valuable tools is the ability to use other ongoing relationships, especially those in the same region, as a reference to a potential customer. Potential customers almost always ask whether Smart services accounts of a certain size and in the customers' region when making their vendor selection decisions.

42.     The Washington County facility has over 900 inmate beds. As it stands, Smart can promote the fact that it provides its services to a facility of this size in Arkansas. Smart can also affirmatively respond when potential customers, whether through a request for proposal or during an informal marketing presentation, ask if Smart has experience servicing facilities that share the characteristics of the Washington County facility.  Indeed, Washington County has one of the largest facilities in the state of Arkansas.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true.  Executed December 5, 2019.

Jon Logan
CEO, Smart Communications

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

### *to Third Declaration of Jon Logan*

# Checking In

email: "████████@smartjailmail.com Rob Deglman"    **Tuesday, August 8, 2017 at 3:06:02 PM Eastern Daylight Time**
To: email: "████████@correctsolutionsgroup.com Mark Turner"

Good Afternoon Mark

I hope all is going well with your son.

My rep just asked me where we are at with getting a contract done for Avoyelles Parish. We got the go ahead from the Sheriff a couple weeks ago and I would like to get him a contract this week

I am attaching
1. Master Agreement between SCH and CS
2. Schedule of Services for Avoyelles Parish for you to incorporate into a CS Addendum

Let me know if there is anything from me you need

rob

--
Rob Deglman
Smart Communications
Director of Sales & Marketing
████████@smartcommunications.us
Cell (941)████████
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

Attachments:

**SCH-Avoyelles LA Schedule of Services Kiosk.docx** 21k
**SCH-Correct Solutions Master Services Agreement.docx** 31k

# Smart Communications
### Holding, Inc.

## Schedule 1

This Schedule is between The Avoyelles Parish Sheriff's Office hereinafter referred to as "you" or "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility Name and address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15.  Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing.  Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable).  Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded.  Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited.  Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook.  The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost.  The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case.  Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website.  The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

40.  Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42.  We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46.  MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48.  Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51.  The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer:_____

By: _____

Name: Sheriff Doug Anderson

Title:_____

Date: _____

Email:_____

Notice Address:

Provider: Smart Communications Holding, Inc.

By:_____

Name: James P. Logan

Title: Vice President

Date: _____

Email: ███████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609