# Smart Communications Holding, Inc.

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, hereinafter referred to as "you" or "Customer," located at 192 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services County Jail to access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i)  permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the effective date and shall continue for a period of seven (7) years from the date of system going live. After the original seven (7) year term, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability.  To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party").  As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to

any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its

employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

<u>Miscellaneous</u>

12. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. <u>Provider Personnel</u>. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. <u>Access to Management Information.</u> Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. <u>Public Entity Crime.</u> Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. <u>Waiver of Breach</u>. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. <u>Compliance with Laws</u>. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. <u>Governing Law</u>. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. <u>Attorney Fees</u>. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. <u>Completeness of Agreement</u>. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. <u>Force Majeure</u>. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. <u>Assignment</u>. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. <u>Matters to be Disregarded</u>. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. <u>Notices</u>. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

**THIS PORTION INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions                    Provider: Smart Communications Holding, Inc.

By: _____                  By: _____

Name: _____                  Name: James P. Logan

Title: _____                 Title: Vice President

Date: _____                  Date: _____

Email: _____                  Email: ▮▮▮▮▮@smartjailmail.com

Notice Address:                                 Notice Address:
                                                4522 W. North B Street
                                                Tampa, Florida 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT B

*to Third Declaration of Jon Logan*

# Re: Contract Documents

**email: "‌▌▌▌▌r@correctsolutionsgroup.com Mark Turner" Thursday, August 17, 2017 at 9:00:45 AM Eastern Daylight Time**
To: email: "▌▌▌▌▌@smartjailmail.com Rob Deglman"

When we get the signed ones back, I will forward.  These guys can take some time to get things signed even though they give the thumbs up. Sending anything other than the completed agreement
 would be premature as you know how things can change.  Our Agreement with the account will be included as an Addendum to our Agreement with Smart since it will be referenced for term and deliverables.

MT

---

**From:**
Rob Deglman <▌▌▌▌@smartjailmail.com>

**Date:** Wednesday, August 16, 2017 at 7:58 PM

**To:** Mark Turner <▌▌▌@correctsolutionsgroup.com>

**Subject:** Contract Documents

Mark

Can you send me what contract documents you have sent to Avoyelles, LA and Lamar, MS for signature that includes our services?

Also, if you could get us the contract documents for Sebastian that you will be signing so we can move forward on this account

Thanks for all these opportunities

rob

--

Rob Deglman

Smart Communications

Director of Sales & Marketing

██████████@smartcommunications.us

Cell ████████████

10491 72nd Street

Seminole, Florida 33777

http://www.mailguardkiosk.com/

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT C

### *to Third Declaration of Jon Logan*

email: "█████@smartjailmail.com Rob Deglman"
To: email: "█████@smartjailmail.com Jim Logan" , email: "█████@smartjailmail.com Jon Logan"

**Wednesday, August 30, 2017 at 8:39:52 AM Eastern Daylight Time**

Jim

Avoyelles, LA Contract documents for your signature.

They are signing a Master and Schedule of Services for each client.

They will also send us their contract with the client and addendum including our services.

Once installed, we will Add Exhibit that will detail the hardware we are providing

Thanks

rob


---------- Forwarded message ----------
From: **Mark Turner** <█████@correctsolutionsgroup.com>
Date: Tue, Aug 29, 2017 at 5:18 PM
Subject: Avoyelles Agreements
To: Rob Deglman <█████@smartjailmail.com>

Rob,

Please find attached the following:

CSG's Current Agreement (where you will find the term) with Avoyelles

CSG's First Amendment (which inserts your products) with Avoyelles

CSG and Smart Master Agreement for this project

CSG and Smart Schedule of Services.


When you get the last two signed, scan and forward back to me and I will get our side signed as well.  If you would, print two copies and sign them and after scanning and sending one, mail the two originals
 to us and we will sign and send one back so we can have originals somewhere.


Thanks

MT



--
Rob Deglman
Smart Communications
Director of Sales & Marketing
█████smartcommunications.us
Cell (
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT D

### *to Third Declaration of Jon Logan*

# Re: Schedule of Services - CS Contract Addendum



**email:** "████@correctsolutionsgroup.com Mark  **Wednesday, August 30, 2017 at 2:24:50 PM Eastern Daylight Time Turner"**
To: email: "████@smartjailmail.com Rob Deglman"

In the future we will do this.  For everything we already had in process, and depending on how much the Sheriff wanted to see (in the case of Avoyelles he wanted a one page don't raise
 awareness type thing) we are doing it this way.  For future contracts that start from the beginning we will place it in our document but it will still have to be in the document between our two companies which creates the tie-in.

MT

**From:**
Rob Deglman <r████@smartjailmail.com>

**Date:** Wednesday, August 30, 2017 at 12:53 PM

**To:** Mark Turner <████@correctsolutionsgroup.com>

**Subject:** Schedule of Services - CS Contract Addendum

Mark

Is there a reason you are not simply copying and pasting all the language from our Schedule of services into the Addendum you are having the client sign?

rob

--

Rob Deglman

Smart Communications

Director of Sales & Marketing



@smartcommunications.us

Cell (

10491 72nd Street

Seminole, Florida 33777

http://www.mailguardkiosk.com/

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT E

### *to Third Declaration of Jon Logan*

# CS Partnership

@smartjailmail.com Rob Degiman"
To: email @smartjailmail.com Jon Logan"

The clause is in the Master agreement between CS and SCH that it follows the current CS agreement and it automatically renews with the customers renewals.

It will be up to us to get in and develop a relationship so that if CS loses, we stay.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with Facility listed as Attachment A, unless either Party notifies the other Party in writing notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

Rob Degiman
Smart Communications
Director of Sales & Marketing
@smartcommunications.us
Cell:
1040 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT 4

### *to Notice of Filing*

```
 1    IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
               IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
 2                    CASE NO. 19-CA-008089

 3   SMART COMMUNICATIONS
     HOLDING, INC.,
 4
               Plaintiff,
 5   vs.

 6   CORRECT SOLUTIONS, LLC, a/k/a
     CORRECT SOLUTIONS GROUP, LLC,
 7
               Defendant.
 8   _____/

 9    HEARING ON PLAINTIFF'S EMERGENCY MOTION TO TEMPORARILY
            ENJOIN IMPROPER TERMINATION OF AGREEMENT
10                  (Pages 1 through 61)

11

12      DATE TAKEN:  September 20, 2019

13      TIME:        9:29 a.m. - 10:41 a.m.

14      PLACE:       Hillsborough County Courthouse
                     800 East Twiggs Street
15                   Tampa, Florida  33602

16      BEFORE:      The Honorable Rex M. Barbas
                     Circuit Court Judge
17

18

19

20

21

22

23              Stenographically Reported by:
                    Stephanie A. Walters
24             Stenographic Shorthand Reporter
                Notary Public, State of Florida
25               U.S. Legal Support, Inc.
```

Page 2

```
 1              A-P-P-E-A-R-A-N-C-E-S
 2   PRESENT ON BEHALF OF PLAINTIFF:
 3      KENNETH G. TURKEL, ESQUIRE
        BRAD F. BARRIOS, ESQUIRE
 4      BAJO | CUVA | COHEN | TURKEL
        100 North Tampa Street, Suite 1900
 5      Tampa, Florida 33602
        (813)443-2199
 6      kturkel@bajocuva.com
        bbarrios@bajocuva.com
 7
 8   PRESENT ON BEHALF OF DEFENDANT:
 9      KIMBERLY A. BALD, ESQUIRE
        JAMES LYNCH, ESQUIRE
10      Harllee & Bald, P.A.
        202 12th Street West
11      Bradenton, Florida  34205-7817
        (941)744-5537
12      kab@harlleebald.com
        jel@harlleebald.com
13
14   ALSO PRESENT:
15      DAVID GANN, IN-HOUSE COUNSEL
        Smart Communications Holding, Inc.
16
        JOHN LOGAN, OFFICER/REPRESENTATIVE
17      Smart Communications Holding, Inc.
18
19
20
21
22
23
24
25
```

Page 3

```
 1              P-R-O-C-E-E-D-I-N-G
 2         The following hearing in the matter of
 3   Smart Communications Holding, Inc. vs. Correct
 4   Solutions, LLC, a/k/a Correct Solutions Group, LLC was
 5   taken on the September 20, 2019, in the courtroom of the
 6   Honorable Rex M. Barbas, Circuit Court Judge, at
 7   800 E. Twiggs Street, Tampa, Florida, commencing at
 8   9:34 a.m. before Stephanie A. Walters, Stenographic
 9   Shorthand Reporter, Notary Public in and for the State
10   of Florida at Large.
11                    * * * * *
12         THE COURT:  All right.  This is on Smart
13   Communications Holding, Inc. vs. Correct Solutions
14   for temporary -- well, instead of a TRO, we'd have
15   to come back anyway within 10 days, so I figured
16   have the opportunity to do it this afternoon -- this
17   morning.  So I thought I'd do it this morning --
18         Mr. Turkel, are you going to be presenting for
19   the plaintiff?
20         MR. TURKEL:  Yes, Judge, Ken Turkel with Bajo
21   Cuva Cohen Turkel.  My partner, Brad Barrios, is
22   with me.  With us in the courtroom, David Gann,
23   in-house counsel for Smart, and John Logan, who is
24   an officer and representative for Smart.
25         THE COURT:  All right.
```

Page 4

```
 1         Okay, Counsel.
 2         MS. BALD:  Good morning, Your Honor, Kim Bald
 3   with the Harllee & Bald law firm down in Bradenton.
 4   I'm here with my partner, James Lynch.  We are
 5   counsel for Correct Solutions.
 6         We have a witness today.  This is Captain
 7   William Dumas from the Sebastian County Detention
 8   facility.
 9         Unfortunately, we do not have -- we provided
10   Your Honor with affidavits.  Mark Turner, who is the
11   principal with Correct Solutions, who is verse and
12   the most knowledgeable about the Sebastian County
13   situation.
14         As opposing counsel is aware, we let him know
15   in August that he's out of the country on a
16   preplanned trip, so we could not get him here.
17         We have an affidavit of Patrick Temple, who is
18   one of the other principals with Correct Solutions,
19   and set forth why Mr. Turner is not available today.
20   We also, because of the short notice, were unable to
21   get Mr. Temple here.  We do have an affidavit that
22   we provided for Mr. Temple, just addressing three of
23   the factual issues for today.
24         THE COURT:  All right.
25         MR. LYNCH:  Your Honor, I have copies of those
```

Page 5

```
 1   affidavits.
 2         THE COURT:  You may bring them up.
 3         Is there going to be a lot of evidence
 4   introduced?  If there is a lot, then I'll go ahead
 5   and get a clerk.  That's why I was asking.
 6         MR. TURKEL:  Relatively speaking --
 7         THE COURT:  Because every time you enter a
 8   piece of evidence, I have to stop and mark it and so
 9   on, which will delay matters.
10         MR. TURKEL:  As these things can go, I wouldn't
11   say it's a lot but I think you may be dealing with
12   10 to 20 exhibits, I would say.
13         MS. BALD:  We have 17.
14         THE COURT:  James, will you get a clerk here,
15   please?
16         THE BAILIFF:  Yes, Your Honor.
17         MR. LYNCH:  Your Honor, permission to approach?
18         THE COURT:  You may.
19         MR. LYNCH:  They're attached to the notice of
20   filing.
21         THE COURT:  Thank you.
22         All right.  Mr. Turkel, you may proceed.
23         MR. TURKEL:  Yeah, Judge, and if it may please
24   the Court, Your Honor, may I approach?  I have a
25   binder.
```

Page 6

1    THE COURT:  Yes, sir.
2    MR. TURKEL:  Judge, this is just a binder with
3  the subject pleadings and some of the exhibits,
4  contracts and various other things we may be
5  referring to.
6    And, Your Honor, I know we're here on an
7  emergent basis, and I understand it's your practice
8  normally to read, but have you had time to read --
9    THE COURT:  I read the initial motions.  I have
10  not read everything else --
11    MR. TURKEL:  Okay.
12    THE COURT:  -- and I apologize, but normally I
13  do read everything in advance.  This time, I have
14  not had the opportunity to do that.
15    MS. BALD:  We understand.
16    MR. TURKEL:  And the way these things go, it's
17  not -- I've seen more, but I understand.  That's why
18  I wanted to make sure, so I know when to refer to
19  something or not.
20    But, Judge, obviously, you know, we're here on
21  an emergent basis for a reason, and we don't take
22  moving for an emergency lightly.
23    I can tell you at the onset, I think you know
24  me and my firm well enough, we didn't try to ambush
25  anybody or set a hearing on a day we knew people

Page 7

1  were not going to be here, Judge.  We just had to
2  get before the Court.
3    THE COURT:  And for the record, I'm the one who
4  said today because I had a nonjury trial that was
5  supposed to go Wednesday, Thursday, Friday, and it
6  settled Wednesday afternoon, so...
7    MR. TURKEL:  Yeah, when we have these, we do
8  what we can, and we appreciate you taking the time,
9  Judge, and we wouldn't have invoked the emergency
10  procedures of the circuit unless we felt it was
11  truly an emergency.
12    And we thought we had the emergency solved a
13  few weeks ago, and maybe, you know, had just sort of
14  set a playing field by which we sit here and have
15  you call the balls and strikes in this case and move
16  to a final resolution of some kind, but that is
17  isn't the case, Judge.
18    And we're here today seeking an injunction.
19  The injunction we're seeking, Your Honor, is both
20  enforcing a status quo stipulation, that is styled
21  as "Stipulation to Preserve the Status Quo Pending
22  Final Hearing on the Merits," which was entered into
23  between the parties on August 30th, and approved by
24  order of this Court and became a court order on
25  September 10th of 2019, Your Honor.

Page 8

1    And further, Judge, in addition to enforcing
2  that status quo stipulation, an order enjoining the
3  defendant from terminating the subject contracts
4  during the pendency of this case without further
5  court order.
6    The stipulation, Your Honor, is set forth in
7  the binder that I've given you at -- as Exhibit A to
8  our motion.
9    THE COURT:  That, I've seen.
10    MR. TURKEL:  What's that?
11    THE COURT:  That, I have seen.
12    MR. TURKEL:  Okay.  And, Judge, you know, it's
13  intended to basically what I just said, which is to
14  keep this playing field leveled, not create more
15  problems, and go forward and litigate the issues
16  framed by the pleadings in this case without any
17  more of what we would characterize, Judge, as
18  unilateral, invalid attempts to terminate these
19  contracts.
20    And, you know, Judge, we waived -- we had this
21  thing, I think, set.  We had time reserved for an
22  injunction relief hearing on September 4th.
23    And the whole genesis of the stipulation was in
24  an effort, during the meet-and-confer process, to
25  avoid going forward with that hearing.  We spoke to

Page 9

1  defense counsel and, you know, set forth a
2  framework, which, you know, obviously, Your Honor,
3  it's a stipulation everybody agreed.
4    Importantly, Your Honor, in paragraph 4 of the
5  stipulation, the parties have agreed to extend the
6  preservation of the status quo for the full pendency
7  of this action as set forth herein.
8    And then there on paragraph 6, Your Honor,
9  there's a much more detailed --
10    THE COURT:  Wait.  I'm missing page 2 of your
11  exhibits.  I've seen it; I've read it, but it's
12  missing from --
13    MR. TURKEL:  The stipulation?
14    THE COURT:  Yes, in here, in this binder.
15    MS. BALD:  I have an extra copy.
16    THE COURT:  That's okay.  I've read it.  Now,
17  you can bring it up.
18    MR. TURKEL:  Judge, here, if I can approach,
19  you can use my page 2 and just put it in there.
20    THE COURT:  Thanks.
21    MR. TURKEL:  And, Judge, the point of the
22  stipulation -- and if there is one thing that's
23  simple about this case, it's why we're here to begin
24  with, in the sense that this defendant, Correct, who
25  we've had a contractual relationship with since

## Page 10

1 2017, sent a letter on July 17th, attempting to
2 terminate our contract.
3     And we responded through our in-house counsel
4 shortly thereafter, I believe on July 26, and
5 pointed out the deficiencies, Judge.
6     Now, those are the more mackerel issues in the
7 case.  Those are subject of our dec action.  And
8 they are, Your Honor, as simple as a de novo reading
9 of the contract, that they can't terminate the
10 contract for any reason other than what it says, and
11 that wasn't what was in their letter, and they
12 misread it.
13     It's -- you know, that whole issue gets
14 resolved, Judge, because we entered into a
15 stipulation where they say they're not going to push
16 forward on that termination.
17     Judge, we framed our complaint fairly well in
18 this case, okay, in the sense that we have dec
19 actions on that specific event of termination.  But
20 in paragraphs 2 and 3, as we start pleading the
21 story here, we discuss that Smart seeks a
22 declaration, an injunctive relief, prohibiting
23 Correct from causing Smart Communications continuing
24 an irreparable harm throughout the inmate
25 communications' industry by improperly terminating

## Page 11

1 the agreement, okay.
2     And one of the positions they've got today is,
3 well, it's not framed by the pleadings.  Well, it's
4 because we entered into a stipulation and they
5 decided to drum up yet another bogus attempt to
6 terminate this contract.
7     Our pleadings framed improperly terminating the
8 agreement.  We obviously are on an emergent basis.
9 I don't have time to go amend, but, you know, it's
10 one of their arguments.  It's a bit silly because
11 the whole idea here was to enter into a status quo
12 stipulation, approved by the Court, that could be
13 enforced by direct contempt, prohibiting these exact
14 kind of, you know, unilateral, bogus attempts to try
15 and terminate this contract.
16     So, Judge, against that background, you know,
17 we're here today because after we entered into that
18 stip, and after you approved by court order, within
19 that same time period, while you were literally --
20 while the agreed-upon order was in the que, we start
21 hearing from the joint customers that they're being
22 told not to communicate with us; that they're being
23 told not to do business with us; that they're being
24 told to forward any complaints about us directly to
25 Correct Solutions.

## Page 12

1     Now, when I say the "joint customers," Judge,
2 the general background of the industry is, these are
3 inmate services and products.  They provide
4 telecommunications' services and products
5 specifically for telephones.  We do private
6 messaging, among other things, but those are the
7 two, you know, main areas here.
8     And this whole relationship starts because they
9 need a complementary set of services for their
10 telephones.  They don't do the messaging; we do.
11 That's what we do.  We do it two ways: through these
12 kiosks or through tablets.
13     Back when this whole thing starts, we show them
14 everything we have.  We show them our tablets.  We
15 show them all of our goods.  We go through the
16 regular due diligence and they sign a contract.  And
17 it's not like they signed it, you know, with some
18 mid-manager guy.  Everybody looked at it.  We
19 presented everything to them.
20     And the contract, Judge, basically says that
21 our services are going to be provided coterminous
22 with theirs, meaning --
23     THE COURT:  I know what coterminous means.
24     MR. TURKEL:  -- they have these contracts with
25 the -- the jails.  These are county jails.  And we

## Page 13

1 don't know basically how long they run because they
2 haven't given us copies of these.  We've actually
3 asked because we think we have rights under them,
4 third-party beneficiary rights, among other things,
5 and we don't know if they're enforcing them, but the
6 bottom line is, those terminate, we terminate with.
7     And, you know, not knowing what they say is
8 obviously an issue right now, but that's how a
9 relationship starts.
10     You know, it's going swimmingly.  2018, first
11 half of the year, they approach us and try to buy
12 us.  We don't want to sell the company, okay.  My
13 client want to keep its company, keep growing its
14 business, and refuses to do it.
15     The relationship continues without any incident
16 until May of this year.  And in May of this year,
17 the word gets to us -- and these facts, Your Honor,
18 are set forth in the two declarations of John Logan,
19 which we filed, and he's here also -- but these --
20 to speak in more general terms, that customers are
21 telling us that they're hearing we're not in
22 partnership or they're not supposed to talk to us,
23 just various chatter.
24     But what we do know, Judge, and what we found
25 out recently from our production we got today, and

**Page 14**

1  that we have gotten through a public records'
2  request, also -- so if I may approach the bench,
3  Judge?
4        THE COURT:  Yes, sir.
5        MR. TURKEL:  And, Judge, these were -- a copy
6  of this document I'm about to give you was just
7  produced pursuant to a request of production that we
8  served upon the defendant.
9        THE COURT:  That's my clerk.
10       MR. TURKEL:  No, I figured, Judge.
11       Judge, if I can approach?
12       THE COURT:  Yes.
13       Can I have this marked as Petitioner's [sic]
14  No. 1?
15       MR. TURKEL:  Yes, that's fine, Judge, and I
16  apologize for not premarking it.
17       Judge, we would offer that right now into
18  evidence, if you want us to offer it.
19       THE COURT:  Okay.  Would you mark that as
20  Plaintiff's No. 1?
21       THE CLERK:  Yes.
22       (Plaintiff's Exhibit 1 is marked for
23  identification.)
24       THE COURT:  Do you have them marked by any
25  chance?

**Page 15**

1        MR. TURKEL:  No, we didn't premark, Judge.  We
2  got these pursuant to production today and a public
3  records' request recently.
4        THE COURT:  All right.
5        MR. TURKEL:  The -- I don't know if they have
6  any objection to whether it's admitted.
7        THE COURT:  Do you have any objection?
8        MS. BALD:  Your Honor, no, they served us with
9  a request to produce today.  I think we got it
10  Wednesday, and we just provided it to them this
11  morning.
12       THE COURT:  It will be so received, then.
13       (Plaintiff's Exhibit 1 is received into
14  evidence.)
15       MR. TURKEL:  In full transparency, Judge, we've
16  done a public records' request, also, seeking these
17  same type of documents, and it came from that
18  source, also.
19       But if you look at it, Judge, on May 17th of
20  2019 refers to Correct sending an e-mail to one of
21  the customers, and you'll see where he gratuitously
22  throws into this e-mail that apparently references
23  somewhere they may have been together.
24       It starts with, "I hope you made it back safe.
25  I hobbled home yesterday afternoon.  I'm getting a

**Page 16**

1  lot of calls from our Smart customers complaining
2  about product service and overall performance to the
3  point where I might be replacing them soon.  I have
4  not heard from you but I wanted to follow up and see
5  how you were being serviced by them.  I appreciate
6  you, brother."
7        Now, Judge, at this point in time, to the
8  extent that Mr. Ferguson was getting a lot of
9  complaints or that it rose to the level of replacing
10  us, we had not heard anything.  There had been no
11  letters, no macro sort of discussion.  There
12  certainly hadn't been a termination letter likely
13  sent in July, or the more recent one that brings us
14  here today, but obviously our client's got some
15  concern in this time frame.
16       And then, Judge, in July 17th, we get their
17  termination letter, which was -- we'll call it the
18  first termination letter, and it was sent from a law
19  firm in Louisiana.  It's attached to our complaint,
20  the actual complaint, Judge, as Exhibit D.
21       In it, Correct attempts to terminate the
22  nondisclosure and master services' agreement, you
23  know, based upon basically confidential --
24  confidentiality breaches, that aren't confidential
25  information, and readings of the termination

**Page 17**

1  provision that aren't correct.  That's an easy way
2  to summarize it.  That's why we filed this lawsuit.
3        The bottom line is, we responded.  We tell
4  them, "You're wrong."  We never hear back.  And on
5  July 31st, Your Honor, we received -- and we'll have
6  a copy of this to put in during our case in chief --
7  an e-mail from Washington County, saying,
8  "Washington will actively be looking for a new
9  vendor to replace us."
10       Now, Judge, these contracts do have mechanisms
11  for breaching, for termination, and they have cure
12  periods, and 30 days on those types of breaches, and
13  we're supposed to get notice and all that, but we're
14  told from a joint customer at this point in time
15  that they're actively looking for a new vendor.
16       We filed a complaint -- that's July 31st.  We
17  filed a complaint on August 2nd.  At that point in
18  time, Judge, we're seeking injunctive relief.  We
19  entered into the status quo stipulation, the premise
20  of which is fairly simple:  They're not going to
21  continue to push the positions in the July 17
22  termination letter.  We're going to status quo it.
23  We're not going to tell customers not to talk to us.
24  We're going to do business as usual.
25       Of course, everybody reserves rights, as they

Page 18

1  always do, but the idea was, is to get this contract
2  issue in front of you and have you read these
3  contacts and you, you know, move forward from there.
4      Unfortunately, as I was saying at the beginning
5  of my presentation, that's not how it panned out,
6  Judge.
7      And on September 11, so a day after you signed
8  the order approving our stipulation, our client sent
9  an e-mail to each of the joint customers, basically
10  reaching out and saying, "Hey, if there are any
11  problems, you know, please tell us.  We'd like to
12  help solve them.  We'll come out there, whatever."
13      Judge, you know, mind you, at this time, just
14  so the Court has some general idea of the fact that
15  we didn't do this precipitously, as we're hearing
16  these things after the stipulation, that the
17  customers are not talking to our client, that
18  they're not working with us, that they're not
19  telling us directly of any problems they have,
20  right, we're meeting and confirming with the
21  opposing side.  You know, "What's up?  We just did
22  the stipulation."
23      But what's happening over and over again is --
24  through reasons we don't know, you can speculate
25  that maybe the defendant didn't instruct them

Page 19

1  appropriately, maybe they did it and the customers
2  didn't pay attention, it's not working, alright?
3      And if I may approach, Judge, with Exhibit 2 --
4      THE COURT:  Are you showing it to Counsel?
5      MR. TURKEL:  Yes, and I believe these were also
6  in the documents that they were also producing
7  today.
8      THE COURT:  Any objection to me receiving this
9  Plaintiff's No. 2?
10      MS. BALD:  No, Your Honor.
11      THE COURT:  All right.  It will be received as
12  No. 2.
13      (Plaintiff's Exhibit 2 is received into
14  evidence.)
15      THE COURT:  Go ahead.
16      MR. TURKEL:  So I reference, Judge, an e-mail
17  our client sent, John Logan, on behalf of Smart on
18  September 11th at 3:48 p.m., and this went to --
19  versions of this went to the customers.
20      In general, Judge, if you look at it, it is a
21  very, you know, noncombative customer service e-mail
22  and represents that we're here.  We're committed to
23  this.  We want to talk.
24      What happens is, as you see here, this Captain
25  Alan Johnson in Fayetteville sends it back to

Page 20

1  Correct and says, "What do you want me to say to
2  this," right, and refers to Correct and says, "Well,
3  I haven't forgotten you.  I'm awaiting a call,"
4  right?
5      And so with this point, Judge, there is no
6  denying we're under the status quo, right?  We're
7  under the stipulation.  We've agreed at that point
8  in time that we're allowed to talk to the customers,
9  that there will be contemporaneous notices given to
10  us, and we're going to be given a chance to perform.
11  And to the extent we do something wrong, our bargain
12  for opportunity to cure against the background of
13  good faith, because that's really what this is
14  about.  This is a contract, right?
15      You know, the way it should work is that
16  everybody is working to have it performed, not sit
17  there and set landmines and work with clients behind
18  your back at that time.
19      But we send this.  We don't get a response,
20  Judge.  We don't get a response.  Now, Judge, we're
21  in the preliminary injunctive stage.  Obviously,
22  we're going to drill down on what Correct was
23  telling all these customers.
24      But if you look at the May e-mail, that I
25  showed as Exhibit 1, and the September one, they

Page 21

1  create somewhat nice bookends for our case and for
2  the evidence we're going to show you, because on the
3  one hand you see this unsolicited e-mail in May from
4  Correct customers, saying, "We've been having a lot
5  of problems."
6      You know, jump on the bash bandwagon here.  It
7  almost looks contrived and not organic.  And then in
8  September, you see the customers -- after you've
9  approved an order -- after you've approved by court
10  order stipulation, saying that this kind of hijinks
11  wasn't going to happen.  They were going to be told
12  to respond to us.
13      Now, we were considering, you know, contempt,
14  Judge, and it's just, you know, while that order was
15  pending, you hadn't signed it yet, but obviously it
16  was agreed upon, and we went through a
17  meet-and-confirm.  We got, you know, defense's
18  explanation, but the bottom line is, Judge, this
19  still was happening.
20      And that's why we're here today.  I mean, we're
21  not here today because we want to be.  We would have
22  been very happy if everybody just had abided by the
23  stipulation, but we get this letter, sort of, while
24  I think you can argue we're still in the middle of
25  the meet-and-confer process, really, which is

Page 22

1  another termination letter.
2      It's not from Bradenton -- from Harllee & Bald,
3  Ms. Bald's firm, but, again, it's from this
4  Louisiana firm, and that's what's attached to the
5  motion as Exhibit -- I think it's Exhibit B, Judge,
6  from the Roedel Parsons firm, and I think they're in
7  Baton Rouge.
8      So, Judge, just to kind of at the risk of being
9  redundant, not to push for a timeline, but we
10 entered into a stipulation towards the end of
11 August. That's approved by court order on
12 September 10th.
13     That agreed-upon court order, the
14 representation of this Court, that they could
15 approve that by court order, had been pending and it
16 just been in the que.
17     We, again, start hearing -- and you'll here
18 from John Logan, and he'll tell you what we were
19 hearing, and it's in the declarations of Mr. Logan
20 and of Justin Longenberger, but we were hearing that
21 the same type of conduct was happening. The jails
22 still weren't talking to us. The jails were telling
23 us we're not their vendor anymore.
24     And, you know, while we're in the middle of the
25 meet-and-confer, we get this -- this ridiculous

Page 23

1  attempt, again, to try and terminate this contract.
2      And, Judge, in this one, if you've had a chance
3  to read it, they basically set forth two reasons.
4  They attempt to set forth two reasons. The first
5  one of which, is that because the inmates are taking
6  our tablets and turning them into prison weapons, we
7  have somehow breached the contract.
8      Now, we have put forth a few in the motion and
9  the declarations, Judge, the fact that we were using
10 the industry-standard tablet. It's a tablet that
11 was presented to them. It's a tablet that they
12 approved when we did the deal.
13     The idea that somehow we're responsible for the
14 fact that county jail inmates are breaking these
15 things into pieces and turning them into shanks,
16 it's absurd. I'm not sure how they think we can
17 control unmanaged, unsupervised jails, but there's
18 no evidence that we used anything other than what
19 everybody in the industry used, and it was
20 ruggedized to corrections' standards, but that's one
21 of their reasons they're saying.
22     Now, mind you, Judge, this is when we hear
23 about it, is in this next attempt to try and
24 terminate this.
25     The other thing that they say is, that we

Page 24

1  didn't put basically entertainment, I think,
2  electronic books and so forth on the tablets, which
3  is even more ridiculous, because attached to the
4  contract is a schedule of what we're supposed to
5  load into these things. That was never in the
6  contract. Literally, not in the contract.
7      And so, Judge, you know, what becomes obvious
8  to us -- and I'm going to end on this, you know, in
9  trying to frame this story for you and these issues
10 for you -- is that this company realizes back in
11 2018 that they can do what we do or they can buy us
12 to try and just bring it in house. They don't like
13 the deal.
14     They ultimately, by the way, Judge, have
15 expanded into the messaging stuff, and we've
16 expanded into phones, but they try and buy us. We
17 don't sell, and it's obvious they don't like this
18 contract, okay, and they try and terminate it and
19 send us a -- just a silly letter with silly reasons
20 in July. And we take care of that and say, "Let's
21 get it in front of the judge. Let's let a judge
22 make the call."
23     Then, after we go through that exercise and you
24 approve the stipulation, leveling the field, letting
25 everybody do their business so we can litigate this

Page 25

1  case, they come up with this new one, which is the
2  whole, "It's your fault that unsupervised prisoners
3  are turning iPads or tablets into shanks, and you've
4  breached because you didn't provide software that we
5  have in the contract for you to provide."
6      So, Judge, that's why we want the relief. We
7  want you to approve the court order approving this
8  stipulation, and we want an injunction, and we want
9  the injunction to enjoin them from unilaterally
10 terminating this contract during the pendency of
11 this case, without further court order.
12     And, Judge, we cited the Starlight case. It is
13 almost identical; granted, it's from another
14 jurisdiction, but the facts are so identical, and
15 it's not like there is any peculiarity. It's pretty
16 standard law. It's pretty standard contract law.
17     And so, Judge, that's what we'll be asking for.
18 I think we've got good cause, and we will meet the
19 elements of 1.610.
20     THE COURT: All right. Counsel.
21     MS. BALD: Thank you, Your Honor.
22     Good morning, Your Honor.
23     THE COURT: Good morning, Counsel.
24     MS. BALD: Kim Bald on behalf of Correct
25 Solutions. We are not here because Correct

Page 26

1    Solutions has sent a termination notice; we are here
2    because Correct Solutions, in accordance with its
3    contractual rights and in accordance with the
4    stipulation of the parties approved by this Court,
5    is requiring Smart Communications to perform under
6    the master service agreement and to cure the defects
7    at Sebastian County, which is creating grave danger
8    to the inmates and the deputies that are running the
9    facility.
10       They've been put on a notice to cure, with no
11   termination at this point.  We would respectfully
12   submit that this motion is not even appropriate for
13   an injunction.  But I want to point out, what is
14   Correct Solutions, and why, really, are -- has Smart
15   represented to Your Honor as to why we're here?
16       Correct Solutions is a company in Louisiana
17   that provides the telephone communication system and
18   the visitation -- the video visitation for its
19   inmates.
20       As we set forth in the affidavit of Patrick
21   Temple, it does not provide, and has never provided,
22   the electronic messaging that Smart and the other
23   vendors provide.  It doesn't; it can't, so it has to
24   go to a vendor to provide that for its facilities.
25   It doesn't generate income on that.  Smart does.

Page 27

1    That's just how they have to provide the service to
2    their inmates.
3        But what was filed for Your Honor, in order to
4    be here today, is a -- the affidavit from John Logan
5    on behalf of Smart Communications, and they're
6    asserting in that motion that they have -- after
7    receiving the notice to cure, that they have never
8    had any problems, never heard any problems from
9    Sebastian County from September of 2017 until now.
10   Never reported a problem; never were aware of any
11   problems with their equipment.
12       We have Captain Dumas from Sebastian County to
13   tell you that that is completely not true.
14       They also said that they have absolutely no
15   communication with Sebastian County, and that has
16   all been cut off, and so they need this injunctive
17   relief because of that.
18       Again, Captain Dumas is not only going to
19   testify to that, but he's going to show you the
20   communications that have continued with Smart
21   Communications, primarily about the defective
22   equipment that they are providing Sebastian County,
23   and how they are doing nothing to fix that.
24       THE COURT:  Counsel brings up plaintiff's
25   counsel -- and maybe I need to short circuit this a

Page 28

1    little bit -- the equipment that is being provided
2    to Sebastian County and the other facilities, was
3    that equipment part of the approval process between
4    Smart and -- I'm sorry -- Correct Solutions?
5        MS. BALD:  There is a statement from Mr. --
6    counsel -- or from the CEO, in his affidavit, that
7    it was presented at a meeting.  Captain Dumas is
8    going to testify about how easily they can be
9    broken.
10       The contract requires it to be correction-grade
11   proper facility -- proper tablet, and Captain Dumas
12   is going to testify that the inmates can literally
13   just twist it and break it.  So it is not -- and he
14   also can testify about the quality of the other
15   products that another vendor provides that you
16   cannot do that.  So we do have -- are planning on
17   presenting evidence today --
18       THE COURT:  Do you have the actual products of
19   both?  I mean, I'm talking about not just what Smart
20   provides, but what the captain says is one which is
21   indestructible.
22       MS. BALD:  We do not, Your Honor.
23       MR. TURKEL:  Judge, we have an exemplar of ours
24   here.
25       THE COURT:  Okay.

Page 29

1        MR. TURKEL:  We'll probably address it with
2    Mr. Logan during his direct.
3        THE COURT:  Okay.  Go ahead, but I'm curious
4    about the ones he said -- because he said,
5    Mr. Turkel said, that this is the standard one used
6    within the industry.  You're saying there are others
7    in the industry which are indestructible.
8        MS. BALD:  Yes.
9        THE COURT:  So --
10       MS. BALD:  I'm not sure -- I'm not sure -- I
11   don't ever want to state that anything that you give
12   an inmate is indestructible.
13       THE COURT:  No, and I know that's not true,
14   having dealt with that.
15       MS. BALD:  And I think certainly because of
16   that, it's your user.  I mean, we're not dealing
17   with school children that have a teacher in front of
18   them.  You're dealing with a user who is an inmate
19   in a correctional facility, and so you recognize
20   that the user you're servicing, or that is going to
21   use your product, is going to require that to be a
22   correctional grade product.
23       And Captain Dumas is going to be able to tell
24   you a huge difference between what was -- what they
25   have provided, from the beginning, and how it's been

Case 8:20-cv-01469-WFJ-TGW   Document 119   Filed 06/26/20   Page 28 of 74 PageID 1358
Honorable Rex M. Lamb, et al.
September 20, 2019                    30 to 33

Page 30

1  broken, since the beginning, versus what he has seen
2  recently and what is more -- what is appropriate for
3  a correctional facility.
4      THE COURT:  Well, I'm curious, though, I mean,
5  if -- I'm assuming that Smart -- I went blank on --
6  and Correct Solutions would have had wanted to make
7  sure in the initial phases, you know.  I mean, just
8  common sense tells me this, alright?  I've got a
9  vendor out there.  They're going to be providing the
10  hardware; and providing the hardware, I want to make
11  sure that had hardware meet the standards I want it
12  to meet because it's going in under my name, right?
13      So they provide the -- Smart provides the
14  Correct corrections -- I'm going to use the two
15  first names -- Smart provides the corrections.  The
16  tablet that they're going to be providing, does
17  Corrections [sic] do anything to verify its
18  viability for utilization in the corrections'
19  facility or --
20      MS. BALD:  None of that has been pled.  None of
21  that has been raised as an issue in this case.
22      THE COURT:  Well, it is an issue of the case
23  because rugged -- what does ruggedized mean?  I
24  mean, that's the whole issue.
25      MS. BALD:  And quite frankly, Your Honor, I

Page 31

1  think that's going to have to be tried.  I go back
2  to what we're here for today.  The only thing that
3  has been provided is a notice to cure, and if you --
4  they keep representing it's a termination notice.
5  The contract's been terminated.  The contract has
6  not been terminated.
7      THE COURT:  Well, it's not -- is it --
8  corrections' notice, Counsel.  I've dealt with a lot
9  of those.  A corrections' notice is, basically, "You
10  don't do this within 30 days, we're going to correct
11  it."
12      Well, you're basically saying that they're
13  providing the wrong tablets.  They say they are
14  providing the right tablets, so that is the
15  correction.  So if they keep continuing to provide
16  the wrong -- quote, the wrong tablets, as you
17  provide, then I know what your company is going to
18  do.  I mean, it's logical.  It's not rocket science.
19      MS. BALD:  But they haven't done that yet, and
20  the notice to cure that came out, that is pursuant
21  to the master service agreement, says you have 30
22  days.
23      If you look at the master service agreement, if
24  they, in good faith and it's not reasonable to cure
25  it within 30 days, you have more time.

Page 32

1      And the notice says we may -- "may" --
2  terminate.  And what they represented is that is --
3  that contract has been terminated.  And we're not
4  there yet.
5      And so what they're asking this Court to say
6  today is, they don't have to cure.  They're asking
7  this Court to say, through an injunction, despite
8  the stipulation -- I want to walk through the
9  stipulation -- they don't have to cure.  They don't
10  even have to try to cure.
11      So they don't have to perform under the master
12  service agreement, even though all the parties
13  signed a stipulation and said all the parties will
14  perform under the master service agreement.
15      They're also saying, "Please enjoin Correct
16  Solutions," even though they just agreed in the
17  stipulation that all the parties shall perform under
18  the master service agreement.  All the parties
19  reserve their rights under the contracts for any
20  prior defaults and any future defaults that Correct
21  Solutions writes, that they have not --
22      THE COURT:  Let me ask you a question as an
23  officer of the court:  When did Corrections [sic]
24  become aware of the alleged deficiency in the
25  ruggedized nature of the tablets?

Page 33

1      MS. BALD:  I believe the first time that
2  they -- that it became really an issue was April of
3  2019.  We have the e-mails that we are going to
4  submit --
5      THE COURT:  So this all -- so this all -- hold
6  on.  So this all existed prior to the stipulation
7  entered into between the two companies?
8      MS. BALD:  Yes.
9      THE COURT:  Well, why would I then -- if that
10  was one of the issues back then, why am I addressing
11  it now?  Actually, that should have been addressed
12  as part of the stipulation, Counsel.
13      I mean, if you didn't bring it up then, to me,
14  a stipulation is saying, "We're holding steady right
15  now, and we already know about this existing back
16  then, why are we addressing it subsequent to it?"
17      That sounds like a --
18      MS. BALD:  Your Honor, the stipulation was
19  based upon the complaint that was filed and the
20  termination letter that was dated July 17th of 2019.
21  There was a termination letter.  They sued on that
22  termination letter.  That's the lawsuit before Your
23  Honor.
24      In the stipulation, it says, "The defendant
25  shall not direct the discontinuing the removing of

Page 34

1  plaintiff's equipment or services based on
2  defendant's purported notice of termination dated
3  July 17th from any of the customers identified in
4  the MSA, including the schedules to the MSA."
5        That termination notice is what we cannot
6  direct them to remove their equipment for.  There
7  has been no direction by the defendant for them to
8  remove their equipment since the stipulation.
9        We also agreed, in paragraph 6(a), "The parties
10 shall perform under the MSA."
11       We also agreed in paragraph 7, "The parties do
12 not waive any rights or remedies as set forth in the
13 MSA or the MDA, including any based upon a default
14 or failure to perform by a party prior to or
15 subsequent to the execution of the stipulation."
16       We were aware of problems with Smart's services
17 to our customers, and so that was very important to
18 us to have that provision in the stipulation, that
19 this -- we agree; Correct Solutions cannot order
20 Smart to remove its equipment based upon the
21 termination letter that was sent July 17th of 2019.
22       We agreed Correct cannot do that.  They have
23 not done that, but we also had the right, and
24 expressly ensure that it was in the stipulation,
25 that they have defaulted in any other manner, or if

Page 35

1  they --
2        THE COURT:  So you're -- so I understand,
3  you're saying they defaulted in April.  You give a
4  correction notice in May, not including that
5  particular aspect -- no, let me finish my question,
6  Counsel -- in July, and you haven't mentioned the
7  alleged default in April.
8        So you don't mention that; so you hold that one
9  back, enter into an agreement on the 17th -- on the
10 July 17th termination contract, and now, subsequent
11 to that, literally days after that, you bring
12 another notice of noncompliance --
13       MS. BALD:  I think I -- I think I --
14       THE COURT:  I mean, this goes back now four
15 months.
16       MS. BALD:  I think I mis -- I understood your
17 question to be, "When did they first learn of this
18 problem?"
19       They first learned of this problem in April of
20 2019.
21       THE COURT:  Right.
22       MS. BALD:  There were events that occurred in
23 September of 2019, including -- and we, again, are
24 introducing these into evidence and Captain Dumas is
25 going to testify to those -- the events that

Page 36

1  occurred in September of 2019 are what prompted the
2  notice to cure.  The -- the --
3        THE COURT:  How many complaints did you have
4  between April and -- April and July, on those -- on
5  that type of -- on that issue?
6        MS. BALD:  There was a meeting -- and Captain
7  Dumas will testify about it -- there was a meeting
8  in April between Captain Dumas and Correct Solutions
9  where it was discussed.  The severity of the
10 situation did not apply until after the stipulation.
11 And again, we will provide Your Honor with those
12 e-mails from Sebastian County --
13       THE COURT:  You didn't answer my question.
14       MS. BALD:  I'm sorry.
15       THE COURT:  Other than with Sebastian County,
16 did you have any other notices, from any other
17 sources, between April and July 17th?
18       MS. BALD:  We knew they were unhappy and --
19       THE COURT:  You learned it from other counties,
20 correctional facilities.
21       MS. BALD:  I believe we did, but we really were
22 focused on the Sebastian County today since that's
23 the notices that went out and whether there was an
24 issue.  I believe that we have --
25       THE COURT:  No, my problem, Counsel, is --

Page 37

1        MS. BALD:  Yes.
2        THE COURT:  -- when you're talking about
3  deficiencies in a contract, why -- why did you hold
4  back if you know about not just Sebastian County but
5  other correctional facilities, and you're supposed
6  to give a notice to correct within a reasonable
7  period of time?  Why did you wait until September,
8  five months later, to give notice of the
9  requirements to correct?
10       MS. BALD:  Mr. Dumas is going to -- or Captain
11 Dumas is going to testify --
12       THE COURT:  No, I'm talking about -- forget
13 about Captain Dumas.  You've got to answer my
14 question, alright?
15       MS. BALD:  Correct Solutions was encouraging
16 Sebastian County to continue working with Smart, and
17 it wasn't until we learned that the batteries could
18 be removed in September of 2019, and that we saw the
19 photo of the knife in 2019, in September 2019, that
20 it became serious enough and a risk factor enough
21 for Sebastian County, that we had to put the --
22 Smart on notice.
23       Those e-mails and that information -- again, we
24 have the documents that we will introduce in
25 evidence -- shows --

Page 38

1  THE COURT: Nothing like what -- nothing like
2  what -- that particular -- and I apologize for
3  pointing at you, Captain -- other than -- so there
4  are no as-serious allegations from any other
5  corrections' facility other than Captain -- Dumas?
6  MR. DUMAS: Yes, sir.
7  THE COURT: -- Captain Dumas regarding the
8  weaponized nature of the, quote, defective lap --
9  what do you call them? You know what I'm saying.
10  MS. BALD: Right. That is the only county,
11  that we're aware of, and that is the county that we
12  put them on notice of to cure because --
13  THE COURT: Is that the only county, that you
14  know of, that's having that problem?
15  MS. BALD: Every county is having problems with
16  the tablets breaking all the time.
17  THE COURT: Well, that's what I'm trying to get
18  at, Counsel.
19  MS. BALD: Yes.
20  THE COURT: You seem to -- I'm trying to get
21  down to the bottom line of this, because if they --
22  if you know of these problems going on now for five
23  months, why is it you're waiting until September of
24  -- if his is not the only one -- and I'm not saying
25  it's not happening, right? I'm not saying that, but

Page 39

1  if he's having that problem and these other
2  correctional facilities are having this problem, why
3  are you waiting five months to notice them after a
4  stipulation is entered into regarding corrections?
5  MS. BALD: We did not know about the batteries
6  and the actual knives until we saw the e-mails and
7  the photographs in September of 2019.
8  THE COURT: You say you're having complaints
9  from other correctional facilities --
10  MS. BALD: Yes.
11  THE COURT: -- regarding the weaponization --
12  and I'm using that term because I don't know if it's
13  a real one -- the weaponization of these tablets?
14  MS. BALD: No, the destructibility of the
15  tablets and that they're breaking all the time,
16  that's what we were aware of.
17  And we were also aware of their lack of
18  response time, but, again, Correct Solutions has
19  been trying to get their customers to continue
20  working with Smart until, in September 2019, when
21  they learned of the fact that they can take the
22  batteries out.
23  And you have the e-mail from Smart saying,
24  "That can't happen. The batteries can't come out."
25  And Sebastian County had to send the e-mail and

Page 40

1  photographs in September of 2019, "Here they are.
2  Yes, the batteries come out of your tablets. That's
3  a problem."
4  They sent them the photograph of the aluminum
5  that's coming from the inside of the tablet, that
6  you would not see if you're looking at a tablet.
7  You don't know that when you break that tablet open
8  they can pull the aluminum that's inside, and that's
9  what's being used to make these knives. Again,
10  that's not something you're going to see looking at
11  the --
12  THE COURT: They make shanks out of everything.
13  They make shanks out of brushes, alright?
14  MS. BALD: And I think that's the issue, Your
15  Honor, is, can they cure or not, or will they cure
16  or not? But we're in that window where they're the
17  ones that have to make that decision, and I don't
18  think today was for this Court to determine that
19  they should not have to make that cure; they cannot
20  make that cure.
21  Again, this motion was entirely based upon the
22  fact that we have terminated a contract. And we
23  have the contract the termination notice. The only
24  termination notice that has gone out is the one that
25  was in July of 2019. That's their lawsuit.

Page 41

1  So this is a notice to cure, whether they can
2  or can't. If they take reasonable steps and it
3  shows, under the contract, under the terms that
4  these parties agree to, that reasonable steps it's
5  not able to do it, then they've got rights under the
6  contract. But the contract has not been terminated.
7  And again, it's -- their -- this motion is asking --
8  THE COURT: You know, to -- do you follow
9  football?
10  MS. BALD: Some.
11  THE COURT: All right. Do you know what
12  "offside" means?
13  MS. BALD: Yes.
14  THE COURT: What it sounds like you're arguing,
15  frankly, is a lineman goes offsides and there is no
16  problem until the flag is thrown. The problem
17  occurs when the guy goes offsides because that gives
18  an advantage to one side or the other, and that
19  sounds like what you're doing, is, you're saying,
20  "I'm giving it" -- "We're not giving a termination
21  notice now," which is the flag, "but there's a
22  breach here and the problem has already occurred."
23  MS. BALD: And I guess the bottom -- what
24  concerns me, Your Honor, is, in their motion,
25  they're saying, "Okay. We're notified in September

Page 42

1  of 2019 by our customer" -- it's our customer --
2  "that the vendor that is providing these tablets,
3  look what the inmates are doing with these tablets.
4  They're ripping out" --
5      THE COURT:  I got that part.  I'm not doubting
6  what he's going to say, that they're doing it,
7  because I've been amazed over the years, or over the
8  last 24 years that I've been on the bench, how
9  creative prisoners can be when they're confined, in
10 trying to develop either means of escape or means of
11 weaponizing items that they use on a day-to-day
12 basis.  I mean, I've seen garrote created from
13 floss.
14     MS. BALD:  And I would submit, Your Honor, that
15 Correct Solutions has to address that with its
16 customer, and the only way they can address that
17 with this customer is to notify their vendor that
18 you've got a time to cure.
19     If Smart says, "Those tablets cannot be fixed,"
20 or, "We've tried and they cannot be made any
21 better," than the contract says you get more
22 reasonable time, and then it becomes an issue of
23 whether is that a basis for Correct Solutions to
24 terminate or not.  And if they terminate and it
25 wasn't a basis, then they've got a suit for breach

Page 43

1  of contract and monetary damages.
2      Quite frankly, right now, Correct Solutions has
3  to address its customer's problem, especially with
4  what they were provided in September of 2019.  The
5  only way they can do that --
6      THE COURT:  Well, let me ask the question,
7  Counsel, wouldn't the more appropriate thing to be
8  for me to prohibit the termination of any contract
9  until further order of the Court and allow everybody
10 to correct what is supposed to be corrected?
11 Wouldn't that be more appropriate, since that's the
12 issue?
13     MS. BALD:  I think they're saying --
14     THE COURT:  I can fashion an order that says,
15 allow the correction to go forward.  Have the
16 discussions take place.  Find out what the solutions
17 are supposed to be.  And if you find that they're
18 not doing it, we come back.  I'll give you another
19 emergency hearing.  We'll do it on a Saturday or
20 Sunday if you want.
21     But, you know, terminate the contract with
22 what's -- frankly, with what's going on, it sounds
23 very suspicious when you have one -- you know,
24 literally, you enter into a stip today, and then,
25 you know, literally right after that you give

Page 44

1  another notice -- a notice to correct, which leads
2  to a termination.  And like you said, we're not at
3  the termination stage yet.
4      MS. BALD:  Your Honor, if you entered an order
5  requiring Smart to correct the problems that
6  Sebastian County is having, I think that's our
7  biggest concern.
8      THE COURT:  That's not what I said, Counsel.
9  He knows better than to try to rephrase my orders.
10 You don't get to be this old by not listening.
11     What's the problem with me issuing an order
12 prohibiting termination of the contract, without any
13 other prohibitions?
14     In other words, there's still a requirement for
15 them to comply with the contract, which is always --
16 it still remains in effect, even with my previous
17 order.  They still have to comply.
18     For instance, if you've got a new client and
19 they were supposed to supply a product, and they
20 didn't supply a product, alright, that's a
21 termination.
22     And like I said, I'll give you an emergency
23 hearing.  I'll give it to you on Saturdays.  You
24 know, my wife loves it when I do that stuff.
25     MS. BALD:  I guess my question, then, is, if

Page 45

1  they --
2      THE COURT:  I shouldn't put that on the record.
3  I get in trouble for saying things like that.  Can
4  you strike that last portion about my wife, please?
5      MS. BALD:  I guess my question, Your Honor,
6  would be, then, what is -- other than the contract
7  and Correct Solutions' rights under the contract to
8  require its vendor to perform, what is the mechanism
9  for Smart -- other than it's supposed to do it, what
10 is the mechanism to make Smart do it?
11     THE COURT:  Just what you did.  I'm not
12 prohibiting you from sending letters requiring
13 correction of action -- taking corrective action.
14 All I'm prohibiting is, you terminating a contract
15 until I have a hearing.
16     And, Mr. Turkel, what do you think about that?
17     MR. TURKEL:  Judge, I think that's why I made
18 the initial suggestion.  What we're trying to avoid
19 is this:  I mean, I've got other things to say --
20     THE COURT:  Well, I'm making a suggestion here.
21     MR. TURKEL:  -- if this was known in April, why
22 wasn't it in the July letter, because then we would
23 have put it in the pleadings.
24     But I think the bottom line is this, Judge:
25 The way we look at the current letter that got us

Page 46

1    here, there are two grounds: one was this idea --
2         THE COURT:  Mr. Turkel.
3         MR. TURKEL:  Yeah?
4         THE COURT:  You're avoiding my question now.
5    What do you think of me prohibiting them from
6    terminating the contract without further order of
7    the Court, which basically is what we're talking
8    about anyway with the final hearing, and I'll give
9    you -- and it will end up being a final hearing much
10   more rapidly if they want to try and terminate, but
11   I'm not going to prohibit them from giving you a
12   letter, saying, "You're not doing this in
13   compliance."  I'm not making findings that they're
14   noncompliant, or you're not in compliance.
15        MR. TURKEL:  Yeah, Judge, I think to answer,
16   that's why I suggested -- when I framed the relief,
17   right, pending further order of the Court -- because
18   I can't enforce a stipulation that's preserving
19   status quo and ask you to police it and then say,
20   "Well, nobody can exercise their contractual
21   rights" --
22        THE COURT:  Right.
23        MR. TURKEL:  -- but I think with this specific
24   thing, the specific breach, and this would be the
25   answer to your question, Judge, one thing you'll see

Page 47

1    in the evidence, and you should see in the
2    declaration, we have reached out to these gentlemen.
3    We have tried to communicate.  We have tried to fix
4    this.
5         This is part of the reason why we did the stip,
6    was that they would tell these people not to talk to
7    us.  I don't know how we fix --
8         THE COURT:  So your answer is, no, you don't
9    want me -- you don't want the stipulation?
10        MR. TURKEL:  No, it just depends, Judge.  I
11   think there is two levels to your question.  The
12   broader one, do I have a problem?  It was my
13   suggestion with you enjoining them from these
14   unilateral termination notices until further order
15   of the Court.  They should have the right to come to
16   court and say this one is valid.  That's ultimately
17   where it's we're going to end up trying the case in
18   a final hearing or a final trial.
19        THE COURT:  That's why I'm trying because I can
20   see this going way beyond the captain's testimony.
21        MR. TURKEL:  Right, and that's my general
22   issue, specifically, because I don't know how we
23   cure inmates taking a ruggedized, what we would
24   testify to is, the correction's-grade,
25   industry-standard tablet.  I don't know how anyone

Page 48

1    would cure that.  What do we do?
2         THE COURT:  Well --
3         MR. TURKEL:  One thing is to ask them to
4    supervise their jails better.  Yeah, I don't know
5    what we --
6         THE COURT:  Well, I mean, I'm not making
7    findings, but, for instances, there's a claim by
8    them -- and I don't know if it's true or not -- that
9    there are other tablets out there that -- which are
10   much more, quote, rugged than that one.  I don't
11   know.  I don't test tablets for being ruggedized or
12   not.  Maybe I ought to give it to one of my
13   grandchildren.
14        MS. BALD:  That is exactly what the captain
15   bought for his grandchild.
16        Your Honor, you know, one of the things that's
17   we have -- and I'm a little disturbed that it
18   appears we knew about this problem in April and said
19   nothing, and that's just not the case.  We --
20        THE COURT:  You just said that, Counsel.
21        MS. BALD:  We knew that they were unhappy with
22   Smart.  The battery issue is an e-mail exchange
23   between Smart and Sebastian County, and it's between
24   them, not us, between them, August 23 of 2019, and
25   that's when Smart said, "You cannot pull the

Page 49

1    batteries out of this tablet."  That is not --
2         THE COURT:  Were you aware of that on
3    August 23.
4         MS. BALD:  No, Your Honor, we were not.
5         THE COURT:  When did you become aware of that?
6         MS. BALD:  I don't think we became aware of the
7    severity of it until --
8         THE COURT:  See, you keep using the term
9    "severity of it."
10        MS. BALD:  I don't -- I can tell you we were
11   not aware of the weapons and the battery issue
12   that -- until, really, September, I believe.
13        MR. LYNCH:  And, Your Honor, I have a book that
14   has a few -- this is the --
15        THE COURT:  We're going beyond that right now.
16   All I wanted to know is whether you guys will
17   stipulate to me issuing an order that there can be
18   no termination or termination notices given until
19   further order of the Court.  You can give
20   corrections, and you've got 30 days to do it, but
21   there is no termination.
22        MS. BALD:  And then can Your Honor also address
23   that if the corrections have not been made in 30
24   days that we can --
25        THE COURT:  You come back to court, yeah --

Page 50

1    MS. BALD: Okay.
2    THE COURT: -- and I said I will give you an
3  emergency hearing.
4    MR. TURKEL: I think we're --
5    THE COURT: Off the record.
6    (Off the record.)
7    THE COURT: Back on.
8    MR. TURKEL: Judge, I think that would be
9  acceptable to us, with the caveat that if we get to
10 the point where there is a dispute over cure or
11 something like that, then that's going to have to be
12 vetted out here.
13   THE COURT: Well, that's going to be part of
14 the final hearing, too, right?
15   MR. TURKEL: And, Judge, here's the bigger
16 problem -- and forget the money and all of that
17 stuff -- because if we get terminated by one of
18 these contracts, we're constantly bidding on
19 government contracts. We have to disclose
20 terminations.
21   THE COURT: Well, I know that.
22   MR. TURKEL: So if there is -- just to use our
23 version of the case here, if they're that jacked up
24 to terminate this contract, and they're going to do
25 it no matter what we do, that's what brought us

Page 51

1  here. That's where the irreparable harm is.
2    And so as long as we know that we're coming in
3  here, if they're trying to contrive a breach or
4  contrive a favorable cure, and I've got the ability
5  for you to call balls and strikes on that, then I
6  think we'll --
7    THE COURT: Well, that's what I'm saying.
8  What's going to happen here is, I'm going to get a
9  partial hearing today on allegations that have taken
10 place, and I can see where both sides are going to
11 make some tremendous, great arguments.
12   And conceivably, I could make a ruling. Big
13 mistake because I'm not seeing the overall picture,
14 which is really what's necessary.
15   MS. BALD: And my concern, Your Honor, is, we
16 are the ones that are contractually obligated to
17 provide the services to each of the facilities.
18   And we are -- if we now do not have a vendor
19 that is going to provide those services, what will
20 happen is the facilities are going to terminate the
21 contract with Correct Solutions, which I understand
22 that's what they would like, because they are now a
23 competitor in the telecommunications business.
24   We're not a competitor in their -- so that is a
25 real concern at Correct Solutions. If you're

Page 52

1  looking at this at both a public policy as well as
2  the harm to the defendant, if these folks are not
3  going to do -- and we've got -- we've now got
4  Sebastian County very unhappy, wanting them gone,
5  Correct Solutions will be the one that gets
6  terminated by these facilities, not Smart, and that
7  helps them.
8    THE COURT: Well, I would think if Sebastian
9  County terminates the contract -- it's a coterminous
10 contract -- it would actually harm both companies
11 very dearly, especially in regards to other
12 government -- because Mr. Turkel is correct; when
13 you make applications to provide governmental
14 entities with a product, they want to know if you've
15 had problems with being terminated by other
16 governmental entities, because the likelihood you're
17 going to be put -- you're going to lose points. So
18 you both are harmed by not making Sebastian County
19 happy.
20   MS. BALD: Yes.
21   THE COURT: I mean, that doesn't take a
22 businessman or a lawyer or a judge to figure that
23 out, because you both are in contract to them. So
24 if they're not happy, it's like mama not being
25 happy. Ain't nobody going to be happy after that.

Page 53

1  I've got to quit making those analogies.
2    MR. TURKEL: I don't know if that means you're
3  proposal to enter an order preserving status quo
4  subject to our qualifications or enjoining
5  termination subject to your qualifications --
6    THE COURT: Yeah, I'm enjoining termination
7  subject to my subsequent order and hearing.
8    MS. BALD: With no prohibition of providing the
9  notice to cure authorized under the contract?
10   THE COURT: No, I allowed you to give notice to
11 cure. You know, if I find that, you know, what he's
12 alleging is that this is all a sham, if I find that
13 it is a sham, then there is another problem.
14   MS. BALD: I think, Your Honor, when you see
15 the facts, you're going to see it is --
16   THE COURT: Well, I'm not saying it is,
17 Counsel. All I'm saying is, he's saying it is a
18 sham. If it's a sham, then there is a real problem
19 there. If it's not a sham, then it's another thing,
20 but I would suggest that Smart talk to -- in fact,
21 why don't you-all -- you should be part of this
22 discussion with the captain over there.
23   What parish are you from?
24   MR. DUMAS: Sebastian County, Arkansas.
25   THE COURT: Oh, Arkansas? See, I thought you

Page 54

1  were from Louisiana.
2      All right.  Agreed?
3      MS. BALD:  I think I have agreed.
4      THE COURT:  All right.  Agreed?
5      MR. TURKEL:  Yes, Judge, we'll prepare an
6  order.
7      THE COURT:  Yes, please.
8      MR. TURKEL:  Okay.
9      THE COURT:  Now, can we do something before
10 you-all leave?  I'm going to give you my courtroom.
11 I would like all of you to sit and talk with each
12 other, and with the captain, to find out.  And also,
13 you know, I'm curious about the tablets, just not --
14 you don't have to tell me anything about the
15 tablets.
16     MR. DUMAS:  I'd be happy to tell you about the
17 tablets, sir.
18     THE COURT:  But, I mean, I'm trying to get
19 you-all --
20     MR. TURKEL:  Judge, go ahead.
21     THE COURT:  No, go ahead.
22     MR. TURKEL:  Judge, procedurally, forget --
23 well, let's use two scenarios.  Forget -- I mean,
24 assume they send a letter purporting to terminate
25 us --

Page 55

1      THE COURT:  We're not going to -- that's part
2  of the prohibition: no notice of terminations.
3      MR. TURKEL:  Where does the burden lie to raise
4  the issue?
5      THE COURT:  For what?
6      MR. TURKEL:  Let's say we go through the cure.
7  Let's say we think -- we go through the cure and we
8  think the cure's out and then don't, is it --
9      THE COURT:  Then it's incumbent upon them to
10 file a motion to bring it back to me, saying, "We
11 need to terminate because they're not complying with
12 the contract."
13     MR. TURKEL:  And, Judge, for argument's sake,
14 assuming it's something like this, where we believe
15 the proposed cure asked for is futile and
16 unattainable, okay -- again, I'm not trying to get
17 into the merits that Captain Dumas --
18     THE COURT:  Let me put it to you this way:  If
19 you're asked to make the tablet better, it's got to
20 be reasonable, too.
21     I mean, if the tablet, which is indestructible,
22 is $10,000 per tablet -- and I hope that doesn't
23 cost $10,000 -- you know, per unit versus a thousand
24 dollars per unit, then, you know, that becomes an
25 issue, too.  You know what I'm saying?

Page 56

1      So, I mean, you can have it -- you can make
2  something totally indestructible --
3      MS. BALD:  I mean, you get on the internet and
4  you can see some of the tablets, how they're
5  military approved.  I mean, they're very different
6  than --
7      THE COURT:  Yeah, my son is a tactical staff
8  sergeant, so I know.  I've seen his.
9      MR. TURKEL:  And, Judge, where I was at on the
10 other half of this is, if we get into a situation
11 where we think it's futile or something, and they're
12 asking for -- like I said, if it's --
13     THE COURT:  Again, if it's an unreasonable
14 cure, then what's the alternative?  In other words,
15 I'm not going to require somebody -- and I'll use
16 the extremes, alright?
17     Let's say what the standard industry -- the
18 average standard industry is $1500.  To make it
19 totally indestructible, it costs a hundred thousand
20 dollars.  I think that's unreasonable.
21     MR. TURKEL:  Right.
22     THE COURT:  I mean, this is just off the top of
23 my head.
24     MR. TURKEL:  In that scenario --
25     THE COURT:  On a per-unit basis.

Page 57

1      MR. TURKEL:  -- who do you want to bring the
2  issue?  In other words, if our response to a notice
3  for cure is, this is kind of like this --
4      THE COURT:  Well, the thing is, you have no
5  problem until they wanted to terminate.
6      MR. TURKEL:  Right, until they wanted to
7  terminate.
8      THE COURT:  So the ball is in their court to
9  bring the motion to terminate.
10     MR. TURKEL:  Got it.
11     Alright, Judge, that's acceptable.  I'll
12 prepare an order.  That's fine.
13     THE COURT:  Now, what I started to say before
14 was, I want everybody to sit here and actually talk
15 to each other, including the captain.
16     And, Mr. Turkel, you're usually very
17 reasonable, so I know --
18     MR. TURKEL:  Yeah, I'm a former prosecutor.  I
19 speak the language.  I feel good with it.  I'm going
20 to jump right in.
21     THE COURT:  Yeah, so I want everybody to talk.
22 I want him to talk to you-all.  I want him to tell
23 you what the problems are and what he thinks is a
24 possible cure, you know.  You know, to me, you're
25 both making money off the system, from what I'm

Page 58

1  seeing.
2      MS. BALD:  We're not; they are.  We make no
3  money off of it.
4      THE COURT:  You make no money off Sebastian
5  County?
6      MR. DUMAS:  They're the only ones.
7      MS. BALD:  We make money off the telephones,
8  but we make no money off the services that they
9  provide.
10     MR. DUMAS:  And neither do we.
11     THE COURT:  Well, I know you don't.
12     MS. BALD:  They get a hundred percent.
13     MR. TURKEL:  I would argue that that's probably
14  their big problem with the contract because we're
15  the only one making money.
16     MS. BALD:  Your Honor, if Smart is not doing
17  it, another vendor is going to do it, and the other
18  vendor is going to get all the money.  This is not a
19  financial benefit to Correct Solutions.  They have a
20  contractual obligation to their customers, and
21  that's why they're here.
22     THE COURT:  Well, that's a discussion for
23  another day.  We can discuss it, but I guarantee
24  you, if they terminate -- Sebastian County
25  terminates the contract, you both are going to get

Page 59

1  hurt.
2      MS. BALD:  Yeah.
3      THE COURT:  So it absolutely does not benefit
4  anybody else, alright?  And if you're not making
5  mony off of a contract, then what's your company
6  doing?
7      MS. BALD:  We're making money off of the
8  services that we provide, the telephones and the
9  video visitation.  That's the only thing they
10  provide to these prisons.  All of the other stuff
11  they have to go to a third-party vendor, such as
12  Smart, and Smart is the one that bills.
13     THE COURT:  So what is the relationship?  Maybe
14  I'm not understanding the relationship, then,
15  between you-all.
16     MS. BALD:  There is no contract between
17  Sebastian and Smart.  The contract is with Correct
18  Solutions.
19     THE COURT:  I know that, so Correct Solutions
20  is the one who contracts with Smart to provide the
21  services.
22     MS. BALD:  Yes, sir.
23     THE COURT:  So why isn't Smart making money?
24  That doesn't make since to me -- not Smart, Correct
25  Solutions.  Why isn't Correct Solutions making

Page 60

1  money?
2      MS. BALD:  That's the industry.  That's the way
3  it works.
4      MR. TURKEL:  No, that's the deal they
5  negotiated.
6      MS. BALD:  But they get a hundred percent of
7  the income off of the services, off of the tablets.
8      MR. BARRIOS:  Off of the tablets, but they keep
9  their customers happy by providing our services, and
10  we make our revenue.
11     MS. BALD:  The customer pays Smart.
12     I think you pay Smart directly?
13     MR. DUMAS:  Yeah, the money that the inmates
14  spend on the tablet goes directly to Smart.
15     THE COURT:  Okay.  All right.  Provide me with
16  the order, okay?
17     MR. TURKEL:  Yes, Judge.
18     (The hearing was concluded at 10:41 a.m.)
19
20
21
22
23
24
25

Page 61

1              CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA        )
4  COUNTY OF HILLSBOROUGH )
5
6      I, Stephanie A. Walters, Stenographic Shorthand
7  Reporter, do hereby certify that I was authorized to and
8  did stenographically report the foregoing proceeding
9  held on September 20, 2019; and that the foregoing
10  transcript is a true record of my stenographic notes.
11     I FURTHER CERTIFY that I am not a relative,
12  employee, or attorney, or counsel for any of the
13  parties, nor am I a relative or employee of any of the
14  parties' attorney or counsel connected with the action,
15  nor am I financially interested in the outcome of this
16  action.
17     DATED THIS 29th day of September, 2019, at
18  Tampa, Hillsborough County, Florida.
19
20
21
22     STEPHANIE A. WALTERS
23
24
25

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT 2

*to Notice of Filing*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

Case No: 19-CA-008089

     Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

## <u>DECLARATION OF JAMES LOGAN</u>

I, James Logan, declare under penalty of perjury as follows:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2.     I am currently the President of Smart Communications Holding, Inc. ("Smart Communications"). I make this Declaration based on my personal knowledge and my review of the business records of Smart Communications, created and maintained in the ordinary course of Smart Communications' regularly conducted business activities.

3.     On August 30, 2017, Rob Deglman emailed me the contract documents for Avoyelles for my signature, which he received from Mr. Turner on August 29, 2017 and which included CSG's current agreement with Avoyelles, CSG's First Amendment with Avoyelles, the CSG and Smart Master Agreement for this project, and the CSG and Smart Schedule of Services. Mr. Deglman conveyed to me that Smart and CSG would be "signing a Master and Schedule of Services for each client," and that CSG "will also send us their contract with the client **and**

**addendum including our services**." A true, complete, and authentic copy of the email is attached as **Exhibit A**.

4.     Based on my discussions with Mr. Deglman, Jon Logan, and CSG personnel, and my review of communications between Smart and CSG, I understood that we would execute the same documents and structure each future deal with CSG and the Joint Customers (as defined in the Complaint) in the same manner as the Avoyelles deal.

5.     Later on August 30, 2017, Mark Turner with CSG confirmed my understanding of the structure of the arrangements with CSG and the Joint Customers when he emailed documents related to the next Joint Customer, Sebastian County. Mr. Turner stated:  "Same process as last time (with the exception that we don't have [to] do the MSA again)." A true, complete, and authentic copy of Mr. Turner's August 30, 2017 email, forwarded to me by Mr. Deglman, is attached as **Exhibit B**.

6.     On September 21, 2017, after I had signed and Mr. Deglman had obtained CSG's signatures, Mr. Deglman emailed me fully-executed copies of the documents that comprised the agreement between Correct Solutions ("CSG"), Smart, and Avoyelles Parish, Louisiana: (a) CSG and Smart Master Services Agreement for the project; (b) Smart's Schedule of Services; (c) the Contract between CSG and Avoyelles; and (d) the First Amendment, adding Smart's services to the Contract between CSG and Avoyelles. A true, complete, and authentic copy of the September 21, 2017 email, with attachments, is attached as **Exhibit C**.

7.     The First Amendment and this procedure was consistent with my understanding that, as long as CSG was providing its services to Avoyelles and the other Joint Customers, then Smart would be providing its services as well because those services were part of the same contract.

8.      My understanding of the meaning of "co-terminous" based on Smart's discussions with CSG and my review of the documents provided by Mr. Turner and emails exchanged between the parties was that, as long as CSG operated under its services contract with a Joint Customer, then Smart would provide the electronic messaging platform and services for that Joint Customer. If, and only if, either CSG or a Joint Customer elected not to renew their contract with each other, then CSG may provide notice to Smart of non-renewal of the MSA with respect to that Joint Customer pursuant to Paragraph 6 of the MSA, because in that instance there would be no ongoing term between CSG and the Joint Customer for Smart to be "co-terminous" with.  In other words, CSG would no longer be obligated to provide Smart with a term to service the Joint Customer that they no longer had. Our partnership arrangement with CSG was for Smart to be able to provide services to a Joint Customer facility as long as CSG was in that facility, subject only to termination by way of performance default, but where Smart would have a reasonable opportunity to cure.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true.  Executed December 5, 2019.

James Logan,
President, Smart Communications

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

### *to Declaration of James Logan*

email: [REDACTED]@smartjailmail.com Rob Deglman"                                              **Wednesday, August 30, 2017 at 8:39:52 AM Eastern Daylight Time**
To: email: [REDACTED]@smartjailmail.com Jim Logan" , email: [REDACTED]@smartjailmail.com Jon Logan"

Jim

Avoyelles, LA Contract documents for your signature.

They are signing a Master and Schedule of Services for each client.

They will also send us their contract with the client and addendum including our services.

Once installed, we will Add Exhibit that will detail the hardware we are providing

Thanks

rob


---------- Forwarded message ----------
From: **Mark Turner** <[REDACTED]@correctsolutionsgroup.com>
Date: Tue, Aug 29, 2017 at 5:18 PM
Subject: Avoyelles Agreements
To: Rob Deglman [REDACTED]@smartjailmail.com>


Rob,

Please find attached the following:

CSG's Current Agreement (where you will find the term) with Avoyelles

CSG's First Amendment (which inserts your products) with Avoyelles

CSG and Smart Master Agreement for this project

CSG and Smart Schedule of Services.


When you get the last two signed, scan and forward back to me and I will get our side signed as well.  If you would, print two copies and sign them and after scanning and sending one, mail the two originals
 to us and we will sign and send one back so we can have originals somewhere.


Thanks

MT


--
Rob Deglman
Smart Communications
Director of Sales & Marketing
[REDACTED]@smartcommunications.us
Cell [REDACTED]
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT B

*to Declaration of James Logan*

# Fwd: Sebastian County, AR

**email: "            @smartjailmail.com Rob Deglman" Wednesday, August 30, 2017 at 10:44:53 AM Eastern Daylight Time**
To: email: "        @smartjailmail.com Jim Logan" , email:          @smartjailmail.com Jon Logan"

Jim

Hopefully your signature hand will stay tired signing contract documents

rob

---------- Forwarded message ----------
From: **Mark Turner** <            @correctsolutionsgroup.com>
Date: Wed, Aug 30, 2017 at 10:40 AM
Subject: Sebastian County, AR
To: Rob Deglman <            @smartjailmail.com>

Rob,

Here is the information we need to move forward with Sebastian County, AR.

Same process as last time (with the exception that we don't have do the MSA again).

We do need to get that MSA back quickly though as these Schedules will come quickly now.

I have attached the signed Agreement between CSG and Sebastian.


Thanks


MT


--
Rob Deglman
Smart Communications
Director of Sales & Marketing
██████████@smartcommunications.us
Cell (██████████
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

---

**Attachments:**

**Sebastian County signed agreement.pdf** 1.2M

**CSG and SCH Schedules Sebastian County Final.docx** 104k

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT C

### *to Declaration of James Logan*

# Correct Solutions - Avoyelles Parish Contract Documents

**email: "███████@smartjailmail.com Rob Deglman"**    **Thursday, September 21, 2017 at 5:26:40 PM Eastern Daylight Time**
To: email: "██████@smartjailmail.com Jim Logan"

--
Rob Deglman
Smart Communications
Director of Sales & Marketing
██████@smartcommunications.us
Cell (████████
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

**Attachments:**
**CSG and Smart Avoyelles Fully Executed.pdf** 2.5M
**Avoyelles Parish, LA Correct Solutions Schedule of Services SC.pdf** 2.0M
**Avoyelles Parish, LA Correct Solutions First Amendment-Smart Communications Products.pdf** 466k
**Avoyells Parish, LA Correct Solutions Contract.pdf** 638k

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

<u>Customer's Responsibilities</u>

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

<u>Grievances, General and Medical Requests</u>

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

### MailGuard™ Patent Pending Postal Mail Elimination System

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.


Customer: Correct Solutions, LLC.

By:

Name: Patrick Temple

Title: Managing Director

Date: 9/13/17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By:

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: ████@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

 

## Schedule 1

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.


Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: _____

Email: ████ @correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: 8-31-17

Email: ████ @smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609



## FIRST AMENDMENT TO CONTRACT AND AGREEMENT

This FIRST AMENDMENT is effective as of the last date signed by either Party and amends and supplements that certain CONTRACT AND AGREEMENT ("Agreement") fully executed as of May 5, 2016, by and between Avoyelles Parish Sheriff's Office, located at 675 Government Street, Marksville, LA 71315 ("Customer") and Correct Solutions Group, LLC., located at 182 Bastille Lane, Ruston, Louisiana 71270 ("CSG").

WHEREAS, Customer desires and CSG agrees to amend the Agreement and provide inmate video visitation solutions ("Equipment").

WHEREAS, this FIRST AMENDMENT will become effective as of the date of the last signature by an authorized representative of each party ("Effective Date").

NOW, THEREFORE, as of the FIRST AMENDMENT Effective Date, the parties agree as follows:

1.  CSG will provide equipment and services as listed in Attachment A.


All terms and conditions of the original Agreement not amended by this FIRST AMENDMENT remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this FIRST AMENDMENT as of the date of the last signature by an authorized representative of each party.


Correct Solutions, LLC.
192 Bastille Lane, Suite 200
Ruston, LA 71270

BY: _____

NAME: _John Hemphill_

TITLE: _Sales_

DATE: _8-22-17_


Avoyelles Parish Sheriff's Office
675 Government St.
Marksville, LA 71315

BY: _____

NAME: _Doug Anderson_

TITLE: _Sheriff_

DATE: _8-14-17_

## ATTACHMENT A

## PROVIDED FEATURES

CSG will provide all current features of the inmate telephone system which include, but are not limited to, all investigative features, reporting, logging, scheduling of inmate phone calls.

In addition to the inmate phone system, CSG will provide:

### SmartKiosks and Secure Network

The SmartKiosk system and its entire supporting infrastructure are provided at no cost to Customer or inmate.
CSG will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

### Electronic Messaging

CSG will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. CSG is responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. CSG shall be entitled to all revenue derived from electronic messaging and photo delivery.

### Grievances, General and Medical Requests

CSG shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

### Law Library

CSG shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to Customer and inmates at no cost.  The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case.  Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

CSG will provide at no cost to Customer a fully functional remote video visitation system. CSG is exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. CSG shall be entitled to all revenue derived from remote video visitation system.

## <u>MailGuard™ Patent Pending Postal Mail Elimination System</u>

CSG shall provide MailGuard™, the patent pending postal mail elimination system exclusive to SmartKiosk.

CSG shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility.



## PROPOSAL CONTRACT AND AGREEMENT

This telephone service "Shared Revenue" Agreement is entered into, by and between **Avoyelles Parish Sheriff's Office**, for the **Avoyelles Parish Marksville Detention Center (DC1),** located at 675 Government St., Marksville, LA 71351, herein known as the "Customer" and Correct Solutions, LLC, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and charge-for-call telephones and services, and providing automated-operator assisted station-to-station or person-to-person collect telephone calls, and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail, or prison, herein known as the Facility, and with respect to those premises so noted, wishes to establish an inmate telephone vending arrangement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. Customer hereby grants CSG an exclusive license to install and operate pay for call telecommunications equipment at the Avoyelles Parish facility for the purposes of installing and operating such equipment.

2. CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection with the inmate telephones and processing of all calls and will be responsible for any bad debit and associated unbillables.

3. CSG shall install and maintain the inmate telephones in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all inmate telephones in good working order.

4. CSG shall be responsible for the managing of all call detail records for the system, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing intraLATA, interLATA, and interstate telecommunications services as filed with the Public Service Commission, for the blocking and unblocking of user billing numbers, and preparation and processing all qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Customer by CSG for the full duration of the contract.

5. CSG shall provide the Customer with a Polycom unit (pair) for the Facility to use with Court visitations and remote arraignments.

Customer initials: _____

CSG initials: _____

1



6. CSG shall provide the Customer with 1 Cellsense cell phone detector.

7. In consideration for this exclusive license and lease agreement CSG shall pay the Customer a Commission Fee of **70 %** of the Total Gross Revenue; all completed calls regardless of call type with exception to Interstate Calls due to FCC ruling.
   a. CSG shall also pay the Customer a $10,000 signing bonus.

8. CSG will follow all rulings, regulations and orders set forth by the FCC and the state's Public Service Commission.

9. CSG shall provide Customer with a monthly commission report that details all call types, call volumes, and call rates. All rates and charges under this agreement shall conform to the Public Service Commission regulations of Louisiana. On-line Revenue reports will be available to Customer at any time.

10. Legal title to all telephones and installed equipment shall remain vested with CSG. Customer shall not remove or relocate the installed equipment without CSG's express consent. Relocation at Customer's request shall be at Customer's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of the equipment. Upon termination of this agreement, CSG shall be responsible only for the removal of the equipment. Customer shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Customer harmless from any liability in connection with the placement, maintenance, or usage of the telephone equipment.

11. If the FCC makes any regulation changes on rates and/or commissions, then CSG must comply with those regulations. However, the Customer will be able to keep any offered incentives, such as the Polycom, Cellsense, and the cash bonus.

12. CSG shall provide assistance with the inside wiring, programming, and replacement of the ESI administrative phone system at the Facility.

13. Customer hereby represents that the Facility is owned and/or exclusively operated by the Customer and Customer is authorized to enter into this agreement with respect to the Facility, and that the undersigned is authorized to bind the Facility to this agreement.

14. If legal enforcement of the terms of this agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and the Customer mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of terms and services described herein.

Customer initials: _____

CSG initials: _____

2



15. This agreement shall be deemed to be a contract made under the laws of the State of Louisiana and the interpretation and performance of the agreement shall be governed by all applicable State laws, and shall be binding upon the parties hereto, their successors, and assignees. CSG may assign this agreement to any other competent person or entity capable of performance with written consent of the Customer.

16. The **Term** of this agreement shall be for 48 calendar months starting at install date and expiring October 1, 2020. This agreement will automatically renew for 48 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 3 months prior to the final date of expiration. Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

17. This is the entire agreement between the parties; there are no oral arrangements of any kind; any future modifications to this agreement shall be in writing and signed by both parties.

IN WITNESS WHEREOF, CSG and Customer have executed this Agreement as of the date and year first set forth above.

Correct Solutions, LLC
182 Bastille Lane
Ruston, LA 71270

By: _____

Name: _____John Hunch ll_____

Title: _____Sales_____

Date: ____May 5th____, 2016

Avoyelles Parish Sheriff's Office
675 Government Street
Marksville, LA 71351

By: ___Doug Anderson_____

Name: ___Doug Anderson_____

Title: ____Sheriff_____

Date: ____May 5.____, 2016

Customer initials: _____

CSG initials: _____

3

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT 3

### *to Notice of Filing*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                              Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

## DECLARATION OF ROB DEGLMAN

I, Rob Deglman, declare under penalty of perjury as follows:

1.     I am over the age of 18 years and competent to testify to the matters set forth in this Declaration.

2.     Prior to my current employment, I worked at Smart Communications Holding, Inc. ("Smart Comm") as Vice President and Director of Sales and Operations. I was at Smart Comm at all relevant time periods discussed in this Declaration and have first hand knowledge of the facts set forth herein.

3.     During my time at Smart Comm, Correct Solutions, LLC ("CSG") expressed a desire to partner with Smart Comm so that it could market and provide Smart Comm's products and services to complement its phone service offerings to the corrections industry. In particular, CSG desired to provide Smart Comm's messaging platform, by way of its proprietary kiosks and tablets, to certain facilities such as Avoyelles Parish, Sebastian County, Washington County, and the City of St. Louis, among others.

1

4.     In my role at Smart Comm, among other things, I was a main point of contact on behalf of Smart Comm in its negotiations with CSG regarding their partnership arrangement, including certain aspects of their partnership agreements. An agreement had to be entered into for each facility to define the specific products and services that would be provided to each. During the negotiations, I communicated regularly with Mark Turner, who was a main point of contact for CSG regarding the partnership arrangement, and I regularly reported on and discussed the status of the negotiations with Smart Comm's senior leadership team (Jon Logan and Jim Logan).

5.     One of the main issues from Smart Comm's perspective in the proposed partnership was ensuring that Smart Comm had adequate guarantees relating to the length of term at each facility. Because Smart Comm's business model was to provide its equipment to the facility free of charge, it would front a significant expense for each roll out to cover all communications hardware (i.e., the kiosks and/or tablets), all required networking and power infrastructure (including wireless access points and tablet charging stations), all labor for the installation and setup (including back-end IT support), and all necessary training. Depending on the size of a facility, for example, Smart Comm's upfront costs for installing its system could be in excess of two-hundred thousand dollars.

6.     Smart Comm obtained a return on its investment over an extended period of time through inmates' (and the public's) use of its services to send electronic messages. For reference, at the time, it charged only $.50 per message, which meant that it could take a significant amount of time to recoup the initial investment, and even more time to realize reasonable returns. For these reasons, Smart Comm initially requested a length of term of seven (7) years for each facility. This is reflected in the draft contract for Avoyelles Parish that I sent to Mark Turner by email on August 8, 2017.

7.     A true, complete, and authentic copy of my August 8, 2017 email to Mark Turner, which included the initial draft of the Master Service Agreement and Schedule for Avoyelles, is attached as Exhibit A.

8.     In my discussions with Mark Turner following that email, it was explained that CSG could not give Smart Comm the requested seven-year term, for several reasons.  First, because Smart Comm was situated as a sub-contractor, its term was subject to the term of CSG's contract at a given facility.  Moreover, in at least some instances, applicable laws prevented CSG from entering into a term of that length, and there were some laws or provisions that additionally allowed a new sheriff to terminate vendor contracts after an election.

9.     As a result, Mark revised the draft contract to reflect that Smart Comm's term should be "co-terminous" with CSG's term for a given facility.  Mark explained to me that although CSG often had short terms in place with these facilities (including some that were only one year in length) their contracts all had automatic renewals and that because CSG had such good relationships with these facilities, being "co-terminous" with CSG was as good as, if not better than, having a lengthy term in place that would eventually expire.

10.    In particular, Mark explained that as long as a facility continued to renew with CSG, Smart Comm's contract would also renew.  In this way, Smart Comm would be in a partner facility as long as CSG continued to have a contract with that facility.  It was understood that Smart Comm's contract would be continually co-terminous with CSG's, subject only to termination by way of a "default in performance," where Smart Comm would have the opportunity to cure.

11.    Given its business model, Smart Comm would never have agreed to provide and install its equipment at any facility where there there was not a guarantee in place for an extended

3

length of term.   In particular, Smart Comm would never have agreed to service a facility for only a one-year term, because it would not be able to recoup its investment during such a short time.

Under penalties of perjury, I declare that I have read the foregoing and that the facts stated in it are true.  Executed November 22, 2019.

ROB DEGLMAN

4

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# EXHIBIT A

### *to Declaration of Rob Deglman*

# Checking In

email: "████████@smartjailmail.com Rob Deglman"   **Tuesday, August 8, 2017 at 3:06:02 PM Eastern Daylight Time**
To: email: ████████@correctsolutionsgroup.com Mark Turner"

Good Afternoon Mark

I hope all is going well with your son.

My rep just asked me where we are at with getting a contract done for Avoyelles Parish. We got the go ahead from the Sheriff a couple weeks ago and I would like to get him a contract this week

I am attaching
1. Master Agreement between SCH and CS
2. Schedule of Services for Avoyelles Parish for you to incorporate into a CS Addendum

Let me know if there is anything from me you need

rob

--
Rob Deglman
Smart Communications
Director of Sales & Marketing
████████@smartcommunications.us
Cell (941)████████
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

Attachments:

**SCH-Avoyelles LA Schedule of Services Kiosk.docx** 21k
**SCH-Correct Solutions Master Services Agreement.docx** 31k

# Smart Communications
#### Holding, Inc.

### Schedule 1

This Schedule is between The Avoyelles Parish Sheriff's Office hereinafter referred to as "you" or "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility Name and address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

40.  Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42.  We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46.  MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48.  Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51.  The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: _____

By: _____

Name: Sheriff Doug Anderson

Title: _____

Date: _____

Email: _____

Notice Address:


Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: _____

Email: ▮▮▮▮▮@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609