# Smart Communications Holding, Inc.

## <u>Master Services Agreement</u>

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, hereinafter referred to as "you" or "Customer," located at 192 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services County Jail to access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. <u>Term.</u> This Agreement shall commence on the effective date and shall continue for a period of seven (7) years from the date of system going live. After the original seven (7) year term, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. <u>Limitation of Liability</u>. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to

any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure.  The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information.  The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure.  If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer.  Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its

employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. <u>Provider Personnel</u>. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. <u>Access to Management Information.</u> Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. <u>Public Entity Crime.</u> Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. <u>Waiver of Breach</u>. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. <u>Compliance with Laws</u>. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. <u>Governing Law</u>. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. <u>Attorney Fees</u>. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. <u>Completeness of Agreement</u>. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. <u>Force Majeure</u>. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. <u>Assignment</u>. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. <u>Matters to be Disregarded</u>. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. <u>Notices</u>. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

**THIS PORTION INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions                    Provider: Smart Communications Holding, Inc.

By: _____                    By: _____

Name: _____                    Name: James P. Logan

Title: _____                    Title: Vice President

Date: _____                    Date: _____

Email: _____                    Email: ▬▬▬@smartjailmail.com

Notice Address:                                Notice Address:
                                               4522 W. North B Street
                                               Tampa, Florida 33609

IN THE CIRCUIT COURT OF THE THIRTHEENTH JUDICAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

    Plaintiff.                                 Case No: 19-CA-008089

CORRECT SOLUTIONS, L.L.C. a/k/a
CORRECT SOLUTIONS GROUP, L.L.C.

    Defendant.
_____/

## NOTICE OF UNAVAILABILITY OF WITNESSES

Defendant/Counter-Plaintiff, Correct Solutions, L.L.C. a/k/a Correct Solutions Group, L.L.C. ("Correct Solutions"), by and through its undersigned counsel, hereby provides notice to the Court and the parties of the unavailability of principal witnesses from the Washington County, Arkansas Sheriff's Office that oversee the Washington County, Arkansas Detention Center.

1. The Emergency Motion for Temporary Injunction is specifically based on a notice of non-renewal of a contract between Correct Solutions and Smart Communications for Smart Communications to provide certain services to the Washington County, Arkansas Sheriff's Office and the Washington County, Arkansas Detention Center who is under contract with Correct Solutions. On October 4, 2019, Correct Solutions provided written notice to Smart Communications pursuant to paragraph 6 of the Master Services Agreement with

Smart Communications that the contract between Correct Solutions and Smart Communications as to this facility would not be renewed and would expire.

2.      The principal witnesses who Correct Solutions needs to call as witnesses at the hearing are key administration/command staff officials from the Washington County, Arkansas Sheriff's Office. These witnesses are conducting a retreat from December 9, 2019 through December 13, 2019 at a remote location in Madison County, Arkansas and therefore will be unavailable to appear in person or by video/teleconference at any potential hearing scheduled the week of December 9, 2019 through December 13, 2019 pertaining to Plaintiff/Counter-Defendant, Smart Communications Holding, Inc.'s ("Smart Communications") Emergency Motion for Temporary Injunction.

3.      The testimony of the witnesses from the Washington County, Arkansas Sherriff's Office are necessary to negate the factual allegations of irreparable injury asserted by Smart Communications in its Memorandum of Law in Support of Emergency Motion for Temporary Injunction filed on Thursday, December 5, 2019.

4.      It is reasonably anticipated that the key administration/command staff officials from the Washington County, Arkansas Sheriff's Office will be available to serve as witnesses for the hearing on Emergency Motion for Temporary Injunction after December 16, 2019.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David

A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North

Tampa Street, Suite 1900, Tampa, FL   33602; bbarrios@bajocuva.com;

dhayes@bajocuva.com; kturkel@bajocuva.com; tdeleo@bajocuva.com on the 8th

day of December, 2019.

HARLLEE & BALD, P.A.

By:  s/ *Kimberly A. Bald*
          KIMBERLY A. BALD
          Florida Bar No. 0434190
          JAMES E. LYNCH
          Florida Bar No. 046219
          202 Old Main Street
          Bradenton, FL 34205
          Telephone: 941-744-5537
          Facsimile: 941-744-5547
          KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

          and

          LUKE F. PIONTEK
          Roedel, Parsons, Kock, Blache,
          Balhoff & McCollister
          Louisiana Bar No. 19979
          8440 Jefferson Highway, Suite 301
          Baton Rouge, LA. 70809
          Telephone Number 225/929-7033
          Facsimile Number 225/928-4925
          LPiontek@roedelpartons.com

          Attorneys for Correct Solutions, LLC

IN THE CIRCUIT COURT OF THE THIRTHEENTH JUDICAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

     Plaintiff.

Case No: 19-CA-008089

CORRECT SOLUTIONS, L.L.C. a/k/a
CORRECT SOLUTIONS GROUP, L.L.C.

     Defendant.

_____/

## NOTICE OF UNAVAILABILITY OF COUNSEL

Defendant/Counter-Plaintiff, Correct Solutions, L.L.C. a/k/a Correct Solutions Group, L.L.C. ("Correct Solutions"), by and through its undersigned counsel, hereby provides notice to the Court and the parties of the unavailability of Kimberly A. Bald, Esquire as counsel for Defendant, Correct Solutions, on December 11-12, 2019 and December 16 and 18, 2019. In support, Correct Solutions states:

1.    The Emergency Motion for Temporary Injunction is specifically based on a notice of non-renewal of a contract between Correct Solutions and Smart Communications for Smart Communications to provide certain services to the Washington County, Arkansas Sheriff's Office and the Washington County, Arkansas Detention Center who is under contract with Correct Solutions. On October 4, 2019, Correct Solutions provided written notice to Smart Communications pursuant to paragraph 6 of the Master Services Agreement with

Smart Communications that the contract between Correct Solutions and Smart Communications as to this facility would not be renewed and would expire.

2.     Kimberly A. Bald, Esquire is the lead attorney for Correct Solutions and appeared before the Court in that role at the evidentiary hearing previously scheduled for September 20, 2019.

3.     Kimberly A. Bald, Esquire is unavailable December 11-12, 2019 as she is chairing the committee conducting the Board Retreat of the Board of Directors of the Florida Lawyer's Mutual Insurance Company in Orlando, Florida that requires her attendance in person, and Kimberly A. Bald, Esquire is unavailable December 16 and 18, 2019 as she will be conducting depositions in another matter. The Defendant is flying in from Houston Texas to be deposed by Ms. Bald. Kimberly A. Bald, Esquire, as counsel for Correct Solutions, has informed counsel for Plaintiff of the conflicts associated with the dates of December 11 and 12, 2019 and has proposed to counsel for Plaintiff alternative dates to conduct the hearing including December 13 and December 30, 2019 and January 3, 2020.

4.     It is reasonably anticipated that Kimberly A. Bald, Esquire will be able to conduct the hearing on December 13 and December 30, 2019 and January 3, 2020, and perhaps other dates available for this Court.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North

Tampa Street, Suite 1900, Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com; kturkel@bajocuva.com; tdeleo@bajocuva.com on the 9th day of December, 2019.

HARLLEE & BALD, P.A.

By: _s/ *Kimberly A. Bald*_____
     KIMBERLY A. BALD
     Florida Bar No. 0434190
     JAMES E. LYNCH
     Florida Bar No. 046219
     202 Old Main Street
     Bradenton, FL 34205
     Telephone: 941-744-5537
     Facsimile: 941-744-5547
     KAB@harlleebald.com
     JEL@harlleebald.com
     DDF@harlleebald.com
     CL@harlleebald.com

     and

     LUKE F. PIONTEK
     Roedel, Parsons, Kock, Blache,
     Balhoff & McCollister
     Louisiana Bar No. 19979
     8440 Jefferson Highway, Suite 301
     Baton Rouge, LA. 70809
     Telephone Number 225/929-7033
     Facsimile Number 225/928-4925
     LPiontek@roedelpartons.com

     Attorneys for Correct Solutions, LLC

4831-4683-8190, v. 1

IN THE CIRCUIT COURT OF THE THIRTHEENTH JUDICAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

    Plaintiff.                              Case No: 19-CA-008089

CORRECT SOLUTIONS, L.L.C. a/k/a
CORRECT SOLUTIONS GROUP, L.L.C.

    Defendant.

_____/

## NOTICE OF UNAVAILABILITY OF WITNESS

Defendant/Counter-Plaintiff, Correct Solutions, L.L.C. a/k/a Correct Solutions Group, L.L.C. ("Correct Solutions"), by and through its undersigned counsel, hereby provides notice to the Court and the parties of the unavailability of Mark Turner as the principal witness of Defendant, Correct Solutions, on December 11-12, 2019 and December 16-20, 2019.  In support, Correct Solutions states:

1.      The Emergency Motion for Temporary Injunction is specifically based on a notice of non-renewal of a contract between Correct Solutions and Smart Communications for Smart Communications to provide certain services to the Washington County, Arkansas Sheriff's Office and the Washington County, Arkansas Detention Center who is under contract with Correct Solutions. On October 4, 2019, Correct Solutions provided written notice to Smart Communications pursuant to paragraph 6 of the Master Services Agreement with

Smart Communications that the contract between Correct Solutions and Smart Communications as to this facility would not be renewed and would expire.

2.      Mark Turner is the Director of Sales for Correct Solutions and was the principal person for Correct Solutions responsible for negotiating the Master Services Agreement between Correct Solutions and Smart Communications including the relevant provisions contained in paragraph 6 as to term and non-renewal that form the basis for Plaintiff's Emergency Motion for Temporary Injunction.  Mark Turner was also the principal person responsible for approving the contract between Correct Solutions and its customer, the Washington County, Arkansas Sheriff's Office.

3.      Mark Turner is unavailable December 11-12, 2019 as he will be travelling for business in Oklahoma for a long-standing appointment.   Mark Turner will be unavailable December 16-20 as he will be attending several long-scheduled events in Colorado on behalf of Correct Solutions.   Therefore, Mark Turner will be unavailable to appear in person and it is not anticipated he will be able to appear by video/teleconference at any potential hearing during these dates. Counsel for Correct Solutions informed counsel for Plaintiff of the conflicts associated with these dates on both December 5 and December 6, 2019 and has proposed to counsel for Plaintiff alternative dates to conduct the hearing including December 13 and December 30, 2019 and January 3, 2020.

4.      The testimony of Mark Turner is necessary to negate the factual allegations in the Emergency Motion for Temporary Injunction, including but not limited to paragraphs 4-6 pertaining to the Master Services Agreement, the entire

section titled "Contractual Relationship of Smart, CSG, and Joint Customers," the entire section titled "Background and Facts," and to negate the claims that Smart Communications has met the elements required for injunctive relief.

5.     It is reasonably anticipated that Mark Turner will be available to serve as witnesses for the hearing on Emergency Motion for Temporary Injunction on December 13 and December 30, 2019 and January 3, 2020, and perhaps other dates available for this Court.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL   33602; bbarrios@bajocuva.com; dhayes@bajocuva.com; kturkel@bajocuva.com; tdeleo@bajocuva.com on the 9th day of December, 2019.

HARLLEE & BALD, P.A.

By: _s/ Kimberly A. Bald_____
        KIMBERLY A. BALD
        Florida Bar No. 0434190
        JAMES E. LYNCH
        Florida Bar No. 046219
        202 Old Main Street
        Bradenton, FL 34205
        Telephone: 941-744-5537
        Facsimile: 941-744-5547
        KAB@harlleebald.com
        JEL@harlleebald.com
        DDF@harlleebald.com
        CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033
Facsimile Number 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

4831-1282-5006, v. 1

4

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS HOLDING, INC.

                                                           Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

**PLAINTIFF'S RESPONSE TO NOTICES OF UNAVAILABILITY
AND REQUEST TO SCHEDULE HEARING ON DECEMBER 13, 2019**

Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel, responds to

Defendant, Correct Solutions, LLC's ("CSG"), Notices of Unavailability as follows:

1.      Smart filed emergency motions for leave to file an amended complaint and for

temporary injunctive relief and requested a hearing date prior to January 3, 2020. Smart referenced

that date in particular because Defendant, Correct Solutions Group, LLC ("CSG") sent a Notice of

Non-Renewal related to non-party Washington County and demanded that Smart's equipment and

services be removed as of that date. The primary issue raised in Smart's Motion for Temporary

Injunction is whether the contracts between Smart and CSG require Smart to remove its equipment

and services from Washington County on or before January 3, 2019.

2.      On December 5, 2019, the Court provided two potential dates for a hearing on the

emergency motions: December 11, 2019 and December 12, 2019. Smart is available on these dates.

3.      On December 9, 2019, CSG filed three Notices of Unavailability, which encompass

the two dates provided by the Court for a hearing on Smart's emergency motions. One Notice

addresses the unavailability of unnamed non-party witnesses with Washington County, one Notice

addresses the unavailability of CSG's lead counsel, and one Notice addresses the unavailability of CSG witness Mark Turner.

4.      The Notices related to Counsel and Turner state that counsel for CSG proposed alternative dates for the hearing to counsel for Smart, including December 13, December 30, 2019 and January 3, 2020. The referenced dates provided by counsel for CSG were never provided by the Court as available dates for the hearing.

5.      The Notices do not identify Smart's response to counsel for CSG's proposed hearing dates. However, counsel for Smart informed counsel for CSG that Smart is available on December 13, 2019 for the hearing should the Court be available on that date. Counsel for Smart informed counsel for CSG that Smart was unavailable on the other two offered dates (notwithstanding the fact that the Court never offered those dates), one of which is the same date CSG's demand expires—January 3, 2020.

6.      Accordingly, both parties and their counsel are available on December 13, 2019. The only witnesses who are unavailable on that date are non-party witnesses, whom Smart contends are not necessary to the resolution of the emergency motions and that their absence is not a compelling reason to refrain from scheduling the requested emergency hearing.

WHEREFORE, Smart Communications Holding, Inc., respectfully requests the Court to schedule an evidentiary hearing on its emergency motions for leave to amend the complaint and for temporary injunctive relief on December 13, 2019 if the Court is available, and for such further relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 9th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
            JEL@harlleebald.com
            DDF@harlleebald.com
            CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

Filing # 100201882 E-Filed 12/12/2019 10:40:56 AM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                    Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.
_____/

## <u>NOTICE OF EVIDENTIARY HEARING</u>

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing Room 514, Tampa, FL 33602, on **December 19, 2019, at 1:30 p.m.**, or as soon thereafter as counsel can be heard the following: (1) Plaintiff's Emergency Amended Motion for Leave to File Amended Complaint, and (2) Plaintiff's Emergency Motion for Temporary Injunction.

      Time Reserved:              2 hours

      Court Reporter:           U.S. Legal Support

      JAWS Confirmation No.:    12J-34967169949

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

{BC00271456:1}

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 12th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
            JEL@harlleebald.com
            DDF@harlleebald.com
            CL@harlleebald.com

/s/ Brad F. Barrios
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                       Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

## NOTICE OF CANCELLATION OF DEPOSITION

PLEASE TAKE NOTICE that the deposition the corporate representative of Correct

Solutions, LLC scheduled for December 19, 2019, at 9:00 a.m. is cancelled.  The deposition will

be rescheduled at a later date.

                                    */s/ Brad F. Barrios*_____
                                    Kenneth G. Turkel – FBN 867233
                                    E-mail:  kturkel@bajocuva.com
                                    Brad F. Barrios – FBN 35293
                                    E-mail:  bbarrios@bajocuva.com
                                    David A. Hayes – FBN  96657
                                    E-mail:  dhayes@bajocuva.com
                                    BAJO | CUVA | COHEN | TURKEL
                                    100 North Tampa Street, Suite 1900
                                    Tampa, Florida 33602
                                    (813) 443-2199 (telephone)
                                    (813) 443-2193 (facsimile)
                                    *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this 12th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
           JEL@harlleebald.com
           DDF@harlleebald.com
           CL@harlleebald.com

                                    */s/ Brad F. Barrios*
                                    Attorney

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                             Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

### DEFENDANT/COUNTERCLAIM PLAINTIFF'S NOTICE OF COMPLIANCE WITH PLAINTIFF'S FIRST AND SECOND REQUESTS FOR PRODUCTION

Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC, hereby provides notice of the production of documents to Plaintiff, Smart Communications Holding, Inc.'s First Request for Production served September 13, 2019, and Plaintiff's Second Request for Production served September 16, 2019 by producing the following documents on the following dates:

1.    Bates Nos. Correct Solutions 00001 – 00063 on October 25, 2019.

2.    Bates Nos. Correct Solutions 00064 – 00170 on November 8, 2019.

3.    Bates Nos. Correct Solutions 00171 – 00562 on November 15, 2019.

4.    Bates Nos. Correct Solutions 00563 – 00820 on November 19, 2019.

5.    Bates Nos. Correct Solutions 00821 – 01229 on December 9, 2019.

6.    Bates Nos. Correct Solutions 01230 – 02172 on December 13, 2019.

### CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A.

Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa

Street, Suite 1900, Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com;

kturkel@bajocuva.com; tdeleo@bajocuva.com on December 13, 2019.

HARLLEE & BALD, P.A.

By: _____

KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941-744-5537
Facsimile: 941-744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033
Facsimile Number 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

4827-5055-8638, v. 1

2

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                                                      Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

**DEFENDANT'S THIRD REQUEST FOR PRODUCTION
OF DOCUMENTS TO PLAINTIFF**

Pursuant to Florida Rule of Civil Procedure 1.350, Defendant Correct Solutions,

LLC a/k/a Correct Solutions Group, LLC ("CSG") requests Plaintiff, Smart

Communications Holding, Inc. ("Smart"), to serve its written Response within thirty (30)

days after service of this Request and to produce the documents for inspection and

copying on January 17, 2020 beginning at 11:00 A.M. at the offices of Bajo Cuva Cohen &

Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL 33602, or at such other

reasonable time and place as mutually agreeable by the parties, the originals and all non-

identical copies of the following designated documents in your possession, custody or

control or which can be discovered by reasonably diligent efforts.

**DEFINITIONS**

1.     The term "you" or "your" shall mean Smart Communications Holding, Inc.

to whom this Third Request for Production of Documents is addressed, and all other

persons acting on behalf of Smart Communications Holding, Inc.

2.      The term "communication(s)" means any documents that are, or which relate to or refer to, correspondence, letters, notes, memoranda, telegrams, inquiries, discussions, conversations, translations, telephone conversations, facsimiles, electronic mail messages, instant messages, text messages, negotiations, agreements, meetings, and any other forms of written communication or documents that in any way relate to or refer to verbal or other communications.

3.      The term "document(s)" means any written or graphic material or other means of preserving thought or expression, any tangible thing and electronically stored information (ESI) from which information can be obtained, including but not limited to the complete original or true copy thereof and any non-identical copy and all drafts of correspondence, electronic mail (email), social media postings, social media communications (i.e. direct messages), memoranda, notes, messages, bulletins, notes of meetings or other communications, notes of interoffice and intraoffice telephone calls, diaries, calendars, logs, chronological data, minutes, books, reports, appraisals, charts, ledgers, invoices, worksheets, data compilations, data sheets, data processing cards, receipts, tax returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, agreements, transcripts, statistics, surveys, magazine or newspaper articles, photographs, graphs, microfiche, microfilm, videotape, recordings, and electronic, mechanical or electric recordings or representations of any kind (including without limitation, tapes, cassettes, discs and recordings), hard copy printouts of any "e-mail" communications or the equivalent and "deleted" but recoverable electronic files.

4.      The term "document(s)" also includes all data (even if available only in computer readable form), text, or information stored on a computer, computer disk, CD-ROM, USB memory stick, e-mail, e-mail file, voicemail, or other archive medium and

all information in any computer database although not yet printed out.

5.    "Amended Complaint" shall mean the proposed Amended Complaint attached to the Emergency Amended Motion for Leave to File Amended Complaint.

6.    If any document has been prepared in several copies which are not identical, or if the original identical copies are no longer identical by reason of subsequent notation or other modification, including, but not limited to, notations on the backs of pages thereto, each non-identical copy is a separate document within the meaning of the term "document(s)" as defined above.

7.    All responsive electronically stored information (ESI) shall be provided in a reasonably usable native format with metadata preserved and shall be free from any impediment affecting access and evaluation of the information. Excel® spreadsheets shall be provided in native format.

## INSTRUCTIONS AS TO ELECTRONIC DATA

Electronic data is a source for discovery and/or evidence. Florida law and court rules pertaining to the preservation of records applies to electronic data in substantially the same manner as applied to paper records. Therefore, electronic data pertaining in any manner whatsoever to this lawsuit, whether stored on-line or archived off-line, should be preserved.

## INSTRUCTIONS AS TO CLAIM OF PRIVILEGE, WORK PRODUCT, ETC.

With respect to those documents withheld from production as being privileged or subject to protection as trial preparation material, please submit with your response to the document production a "Privilege Log" as required by Fla. R. Civ. P. 1.280(b)(5).

## DOCUMENTS REQUESTED

1.    Any documents pertaining to your allegations that the business

3

arrangement between Smart and CSG was a successful business arrangement for the last 2 years as alleged in paragraph 2 of the Amended Complaint.

2.    Any documents pertaining to CSG's targeting of Smart's own direct customers as alleged in paragraph 3 of the Amended Complaint.

3.    Any documents pertaining to defamatory comments allegedly made by Ferguson about Smart as set forth in paragraph 10 of the Amended Complaint.

4.    Any documents pertaining to the demonstration by Smart of its products and services as alleged in paragraph 22 of the Amended Complaint.

5.    Any documents pertaining to the negotiation of the terms of the parties' Schedules which are at issue in this action.

6.    Any documents pertaining to the significant financial investment Smart made for each of the eight correctional facilities as described in paragraph 25 of the Amended Complaint.

7.    Any documents supporting your allegation in paragraph 25 of the Amended Complaint that Smart and CSG agreed that as long as CSG provided services to a joint customer pursuant to the original or any subsequent renewal term of a CSG/joint customer contract, then Smart would exclusively provide the services identified in the schedule to the joint customer.

8.    Any documents pertaining to the negotiation and meaning of the 90-day non-renewal provision set forth in Paragraph 6 of the Master Services Agreement.

9.    Any documents pertaining to the meaning of "co-terminous" as described in paragraph 33 of the Amended Complaint and Paragraph 6 of the Master Services Agreement.

10.   Any documents pertaining to how either Smart or CSG could terminate the

"co-terminous" nature of the Master Services Agreement.

11. Any documents pertaining to how Smart may exercise the non-renewal provision of the Master Services Agreement.

12. Any documents that support your allegation that Smart provided high quality inmate communication services as alleged in paragraph 38 of the Amended Complaint.

13. Any documents pertaining to the allegations in paragraph 44 of the Amended Complaint that customers of CSG were satisfied with Smart's services by early 2018.

14. Any communications received by Smart from January 1, 2019 forward regarding any issues Sebastian County was encountering with Smart's equipment or services.

15. Any documents pertaining to your allegations that CSG engaged in a "misinformation and smear campaign" as described in paragraph 85 of the Amended Complaint.

16. Any documents pertaining to any efforts or actions taken by Smart to remedy any of the complaints raised by Sebastian County in the meeting subsequent to the September 20, 2019 hearing on Smart's emergency motion held before the Honorable Rex M. Barbas.

17. Any documents reflecting any efforts or actions by Smart to address the items identified in the Notice to Cure dated September 30, 2019 pertaining to Sebastian County.

18. Any documents provided by CSG establishing the date of the first successful call as described in paragraphs 124 and 125 of the Amended Complaint.

19.   Any documents pertaining to the allegation in paragraph 127 of the Amended Complaint that "because the Washington Agreement was not terminated and automatically renewed, the MSA automatically renewed in accordance with the Washington Agreement."

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com; kturkel@bajocuva.com; tdeleo@bajocuva.com on this _13_ day of December, 2019.

HARLLEE & BALD, P.A.

By: _____

KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941-744-5537
Facsimile: 941-744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com

and

LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone Number 225/929-7033

Facsimile Number 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

4839-3291-6654, v. 1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

      Plaintiff,

v.                                                          Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

### CORRECT SOLUTIONS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY INJUNCTION

Defendant/Counter-Plaintiff, Correct Solutions, LLC ("Correct Solutions"), respectfully submits this Memorandum in Opposition to Plaintiff/Counter-Defendant, Smart Communications Holding, Inc.'s ("Smart Communications") Emergency Motion for Temporary Injunction. Smart Communications is not entitled to the injunctive relief requested as Florida law does not permit a court through injunctive relief to extend the terms of an expiring contract, to rewrite contracts, to interfere with the freedom of contract or to substitute its judgment for that of the Parties.

### Introduction

The Emergency Motion for Temporary Injunction is filed in response to Correct Solutions' exercise of its contractual right of non-renewal of the Master Service Agreement as to three (3) Schedules between Correct Solutions and Smart Communications under which Smart Communications has been providing tablets and other services to inmates at three (3) correctional facilities who are under contract with

Correct Solutions. The Notice of Non-Renewal sent on October 4, 2019 for Washington County is the basis for the Emergency Motion. The issue for this Court to address is the right of both Parties to non-renew the Master Service Agreement when any of the contracts between Correct Solutions and eight (8) correctional facilities are up for renewal. Contrary to Smart Communications' arguments in its Emergency Motion and Memorandum in Support, termination of the Master Service Agreement is not at issue or relevant for this hearing.

Based on the pleadings, the allegations in the Emergency Motion for Temporary Injunction, and Florida law, the Notice of Non-Renewals and expiration of the contracts do not create any emergency or any right to injunctive relief and the required elements for entitlement to a temporary injunction do not exist.

## The Parties

1. Correct Solutions is a Louisiana limited liability company that is authorized to do business in the State of Florida. Since 2014, Correct Solutions has provided inmate telephone platforms through installed telecommunication equipment at correctional facilities in numerous states. Correct Solutions derives its revenue by charging inmates or their contacts on a per-call basis and shares a substantial portion of this revenue with the correctional facilities pursuant to a commission agreement.

2. Smart Communications is a Florida corporation that makes available to inmates, through kiosks and tablets, electronic messaging, grievance and medical forms, video visitation, a law library, and entertainment and educational content. Contrary to the allegations in Smart Communications' Complaint, Correct Solutions does not itself provide electronic messaging services to its correctional facility customers and has no

plans to do so. Rather, Correct Solutions enters into separate contracts with third party vendors such as Smart Communications to provide those services to Correct Solutions' correctional facility customers.

## The Contracts at Issue

3.    Since 2014, Correct Solutions has executed contracts with correctional facilities located throughout the United States to provide telecommunication equipment and pay-for-call telephones and services including automated operator assisted station-to-station or person-to-person collect telephone calls. Only eight (8) of those facilities involve Smart Communications.

4.    In early 2017, Correct Solutions interviewed vendors for the purpose of expanding the telephone related services it was providing for its customers. In June 2017, Correct Solutions met with Smart Communications to discuss whether Smart Communications had the capability and equipment to provide the additional services desired by Correct Solutions including tablets allowing inmates access to e-mails and other services.

5.    On June 15, 2017, Correct Solutions and Smart Communications executed a Mutual Confidentiality and Nondisclosure Agreement ("NDA") pursuant to which they agreed to hold discussions and exchange confidential and/or proprietary information to determine if a future business agreement should be reached. The NDA required both parties to "hold all Confidential Information in trust and confidence" received by the opposing party.

6.    On September 13, 2017, Correct Solutions and Smart Communications entered into a Master Services Agreement ("MSA") wherein Smart Communications, as

the Provider, agreed to provide and perform certain inmate related services and systems for Correct Solutions, as the Customer.

7.    Correct Solutions and Smart Communications negotiated the terms of the MSA including its duration and expiration which are set forth in paragraph 6 of the MSA. Both Parties to the MSA, which are Correct Solutions and Smart Communications, agreed that the Effective Date of the MSA would be the date of the last signature on the MSA, which was September 13, 2017. The Parties further agreed that the MSA would be co-terminous with Correct Solutions' contracts with certain correctional facilities, subject to the following negotiated provision:

> Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, **unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.**

(emphasis added).

8.    The Parties also negotiated a separate provision to address how the MSA could be terminated before it renewed or expired. In paragraph 9, the Parties provided that if one Party defaults in the performance of any obligation under the MSA, the non-defaulting Party must give written notice to the defaulting Party describing the nature of the default. The defaulting Party then has thirty (30) days to cure the defective performance. If it is not reasonable to cure the default within thirty (30) days after receipt of the written Notice to Cure, the right to cure period is extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default.

The termination provisions set forth in paragraph 9 are not relevant to this Emergency Motion for Temporary Injunction.

9.    The Parties agreed that the MSA would apply to eight (8) of Correct Solutions' correctional facility customers. By separate contract, Correct Solutions has the exclusive license to install and operate the pay-for-call telephone communications equipment at these correctional facilities and to provide Smart Kiosks and secure network, electronic messaging, grievance, general, and medical requests, access to the law library and a fully functional remote video visitation system. Because Correct Solutions does not provide the latter equipment and services, Correct Solutions and Smart Communications agreed through the MSA that Smart Communications would be the actual and sole provider of the kiosks, tablets, equipment and related services to the eight (8) facilities subject to the terms and conditions of the MSA. Correct Solutions remained the sole and exclusive provider of the pay-for-call telephone equipment and services.

10.    To memorialize the specific services Smart Communications would provide each of Correct Solutions' eight (8) correctional facility customers, Correct Solutions and Smart Communications executed agreements titled "Schedules" which identified the specific hardware, software, systems and services required by each particular correctional facility. The Schedules are part of and governed by the MSA. Consistent with the MSA, Correct Solutions is the customer of Smart Communications in each Schedule and Smart Communications is the Provider to Correct Solutions. Contrary to the assertions by Smart Communications, the correctional facility customers of Correct Solutions are not customers or "Joint Customers" of Smart Communications. Rather, each correctional facility customer is only the customer of Correct Solutions.

## This Litigation

11.   The MSA and the Schedules limit Smart Communications to be the provider of the tablets and related services. They do not permit Smart Communications to provide any telephone services to any of the eight (8) customers.

12.   In early 2019, Smart Communications decided to expand into the same market as Correct Solutions by providing telephone services and equipment in addition to the tablets and other related services to correctional facilities. It is now a direct competitor of Correct Solutions for telephone services to correctional facilities.

13.   Smart Communications also acquired an interest in or contractual relationship with Lattice, Inc., which is a company whose principal headquarters are located in New Jersey and is the company who provides the software maintenance and updates to the software requested by Correct Solution to operate its telephone systems.

14.   During the contractual relationship between Correct Solutions and Smart Communications, a number of the eight correctional facilities articulated complaints to Smart Communications about its poor service, faulty equipment, and slow response time. One customer, Washington County, provided Smart Communications with numerous notices of the poor performance, inoperable equipment, defective equipment, and untimely response time. These complaints were also reported by the facilities to Correct Solutions.

15.   In the spring of 2019, Smart Communications began to directly solicit Correct Solutions' customers in an effort to provide the telephone services Correct Solutions was already contractually providing.

16.   On or about April 8, 2019, Frank Turner of the City of St. Louis, Missouri, one of Correct Solutions' customers, notified Correct Solutions that he had received an

e-mail from Jennifer Tongate of Smart Communications wherein Ms. Tongate provided to Frank Turner solicitation materials on behalf of Smart Communications. In her e-mail, Ms. Tongate offered for Smart Communications to provide the same telephone services which Correct Solutions was providing under its existing contract with the City of St. Louis and quoted a 100% commission to be paid to the City of St. Louis which was a higher commission than the existing commission agreement between the City of St. Louis and Correct Solutions. The e-mail address utilized by Jennifer Tongate for Mr. Turner was part of the confidential proprietary information disclosed by Correct Solutions pursuant to the NDA and the MSA

17. After learning of the violation of the NDA and the improper use of the confidential information to directly solicit its customer, Correct Solutions provided written notice of termination to Smart Communications dated July 17, 2019 that Smart Communications violated the material terms of both the NDA and MSA by using the confidential information obtained from Correct Solutions to directly solicit and attempt to steal Correct Solutions' customer.

18. Smart Communications filed this action to prevent the termination of the MSA based on the July 17, 2019 notice sent by Correct Solutions. As set forth in the July 17, 2019 letter, Correct Solutions asserted that the use of confidential information by Smart Communications to solicit the customers of Correct Solutions violated Smart Communications' obligations under the NDA and the MSA and was a direct interference with Correct Solutions' contractual agreement with the St. Louis, Missouri correctional facility customer. Correct Solutions filed a counterclaim based on the improper conduct of Smart Communications.

19.    On August 30, 2019, the Parties submitted to this Court a Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits to determine whether Correct Solutions was entitled to terminate the MSA based on the July 17, 2019 termination letter. The Parties remained obligated to perform under the MSA and they expressly agreed in paragraph 7 of the Stipulation that the Parties were not waiving any rights or remedies as set forth in the MSA or the NDA including any based upon any default or failure to perform by a Party prior to or subsequent to the execution of the Stipulation.

20.    Immediately prior to the execution of the Stipulation, Correct Solutions learned that Smart Communications was instructing employees of Lattice, including Bruce Johnson who was the main servicer for Correct Solutions' software, to stop providing any maintenance or support to Correct Solutions. The Parties agreed in the Stipulation that Bruce Johnson would be excluded from persons who Correct Solutions could not solicit or hire as an employee. This Court approved the Stipulation by Order dated September 10, 2019.

21.    Subsequent to this Court's Order, Smart Communications has directly and purposefully continued to solicit the eight (8) correctional facilities under contract with Correct Solutions, has failed to address the complaints of the facilities as to its defective equipment and services including those based on the notice to cure for Sebastian County which was the subject of the last hearing and has attempted to interfere with Correct Solutions ability to maintain the software that is necessary in order for Correct Solutions to service all of the correctional facilities under contract with Correct Solutions. Examples are as follows:

(a) During the pendency of this action, representatives of Smart Communications sought meetings with some of the eight (8) customers at issue in this case to discuss marketing their company rather than to address the defective products and services it has been providing.

(b) Smart Communications made no effort to correct any of the issues with defective tablets or poor service which Sebastian County was experiencing with Smart Communications despite a hearing on the issue. In fact, after the hearing, Smart Communications chose to criticize and offend Captain Dumas of Sebastian County and has never visited the facility to address the issue since that time.

(c) After the Stipulation and this Court's Order as to Bruce Johnson, Smart Communications prohibited Lattice employee, Bruce Johnson from continuing to provide the needed software maintenance and upgrades to Correct Solutions. Notwithstanding the Stipulation and this Court's Order, Smart Communications sued Bruce Johnson in the Circuit Court for Pinellas County the day after Mr. Johnson accepted employment with Correct Solutions.

22.    Notwithstanding the above, Correct Solutions has not sent any further notices to cure to Smart Communications as is authorized by paragraph 9 of the MSA and by this Court at the hearing pertaining to Sebastian County. The only notice of termination which has been sent is the the initial notice dated July 17, 2019, which started this litigation.

23.     Correct Solutions has exercised its right pursuant to paragraph 6 of the MSA to prevent the automatic renewal of the MSA with Smart Communications as to three (3) facilities by providing written notice of non-renewal for Wayne County, Washington County and Sebastian County well prior to the 90-day deadline agreed to by the Parties. Correct Solutions has been threatened with termination of one of its contracts with one facility if Smart Communications remained the vendor providing the services to that facility.

24.     The first notice of non-renewal was provided by Correct Solutions to Smart Communications on October 4, 2019, almost two months ago, for Washington County as the contract between Washington County and Correct Solutions is up for renewal on January 3, 2020. Two additional Notices of Non-Renewal were provided by Correct Solutions to Smart Communications on November 21, 2019 for Sebastian County and Wayne County.

25.     On November 27, 2019 Smart Communications moved to amend its Complaint and filed the Emergency Motion in an effort to try to prevent Correct Solutions from enforcing its contractual right of non-renewal and to avoid the expiration of the MSA as to these three (3) facilities.

26.     Smart Communications' argument that Correct Solutions is prohibited from sending the Notices of Non-Renewal and non-renewing these contracts as the Parties authorized in the MSA is refuted by the clear unambiguous language of the MSA and Florida law. Nevertheless, Smart Communications is asking this court to ignore the Parties' contract, by way of injunction, to extend the expiring contracts and actually rewrite the terms of the contracts which the Florida Supreme Court and numerous

appellate courts hold courts may not do. In reality, Smart Communications' intent is to use this action to cause Correct Solutions to lose its contracts with each of the three (3) facilities at issue.

## Washington County

27.    Smart Communications assertion that this Motion is an emergency is based on the expiration of the MSA and the Schedule for Washington County.

28.    The Washington County Sheriff's Office has been a customer of Correct Solutions under a Correctional Communications Service Agreement between Washington County and Correct Solutions since September 25, 2014. The correctional facility is located in Fayetteville, Arkansas. There is no written contract between Smart Communications and the Washington County Sheriff's Office or any other agent for this facility.

29.    In November 2017, Smart Communications became the provider of certain services to Washington County pursuant to the Schedule 1 Agreement between Correct Solutions and Smart Communications.

30.    As Smart Communications is fully aware, Washington County has been and remains unhappy with Smart Communications because of the defective services and poor performance by Smart Communications. Washington County has provided notices directly to Smart Communications of Smart Communications' failure to provide the services required under the contract between Washington County and Correct Solutions and the MSA.

31.    Correct Solutions and Smart Communications became aware last week that Washington County also is under contract with another company who is contractually entitled to provide e-mail services to the inmates at the Washington County facility. By

written notice dated December 11, 2019, Washington County notified Correct Solutions that it was no longer authorized to provide e-mail services to the inmates at the facility. Correct Solutions provided that notice to Smart Communications with a written notice from Correct Solutions on December 13, 2019. Thus, neither Correct Solutions nor Smart Communications have any further rights to provide any e-mail services for Washington County.

### Smart Communications is Not Entitled to Injunctive Relief

32.     Despite the clear and unambiguous terms of the MSA, Smart Communications is inviting this Court to commit reversible error by requesting that this Court enjoin Correct Solutions from exercising its contractual right of Non-Renewal, a right that is available to both Correct Solutions and to Smart Communications.

33.     As this Court is aware, a temporary injunction is an extraordinary remedy which should be sparingly granted and only after the moving party has alleged and proven facts entitling it to relief. *Concerned Citizens for Judicial Fairness, Inc. v. Yacucci,* 162 So. 3d 68 (Fla. 4th DCA 2014).

34.     In order for a party to be entitled to a temporary injunction, that party must prove (a) the party will suffer irreparable harm unless the status quo is maintained; (b) there is no adequate remedy at law; (c) the party has a clear legal right to the relief granted and (d) a temporary injunction will serve the public interest. *Agency for Health Care Administration v. Continental Car Services, Inc.,* 650 So. 2d 173 (Fla. 2d DCA 1995). Based on the facts and the applicable contractual provisions of the MSA, no injunctive relief should be granted.

*There is no Irreparable Injury or Inadequate Remedy at Law*

35.     In an effort to establish the first two elements for injunctive relief, Smart Communications contends that if Correct Solutions is permitted to exercise its contractual right of non-renewal: (1) Smart Communications will be unable to market its ongoing contractual relationship with Washington County; (2) it will suffer reputational damages and lose goodwill and market share; and (3) it will suffer significant monetary damages. These assertions are not supported by the facts and do not establish irreparable injury or an inadequate remedy at law.

36.     There is no ongoing contractual relationship to market. Washington County does not have any direct contractual relationship with Smart Communications nor is there a contract obligating Washington County to use Smart Communications for any equipment or services. The recent notice from Washington County dated December 11, 2019 establishes that neither Correct Solutions nor Smart Communications have any right or expectation to provide any e-mail services to Washington County effective immediately.

37.     The fact that Correct Solutions may continue to provide services to Washington County after its contract with this facility renews on January 3, 2020 does not create any right, entitlement or expectancy for Smart Communications to continue to have any relationship with Washington County. Under the MSA, Correct Solutions and Smart Communications agreed that Smart Communications is "an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and [sic; an] employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which [Smart] performs hereunder."

38.    Smart Communications tries to argue the same reputational damages and loss of goodwill that it argued to try to prevent the early termination of the Sebastian Contract if it failed to cure the defects identified in the Notice to Cure addressed by this Court at the last hearing.  To justify this assertion, Smart Communications represented that it would have to disclose in further applications that a prior contract was terminated. If this were even true, this argument has no relevance to a contract that is expiring. If a party's disappointment that a contract is expiring supports injunctive relief, no contract could ever expire despite the negotiated terms and agreement of the parties. Moreover, and importantly, Washington County does not desire for Smart Communications to provide any further equipment or services to the inmates at the facility after the contract between Washington County and Correct Solutions renews.

39.    Smart Communications cannot establish an inadequate remedy at law. It agreed when the MSA could be non-renewed for each of the eight (8) facilities.  It has no basis to claim damages. In fact, its assertion that it will suffer "substantial damages", while unfounded, negates its claim for injunctive relief.

40.    Irreparable injury will not be found if money damages are available as a remedy. *Jacksonville Electric Authority v. Beemik Builders & Constructors, Inc.*, 487 So. 2d 372 (Fla. 1st DCA 1986), citing *First National Bank in St. Petersburg v. Ferris*, 156 So. 2d 421 (Fla. 2d DCA 1963).  Where the potential loss can be compensated by a monetary award, irreparable harm is not established and injunctive relief will not issue. *B. G. H. Insurance Syndicate, Inc. v. Presidential Fire & Casualty Company*, 549 So. 2d 197 (Fla. 3d DCA 1989). Further, money damages and loss of business to a competitor will not

suffice to demonstrate irreparable injury. *State Agency for Health Care Admin. v. Continental Car Services, Inc.*, 650 So. 2d 173 (Fla. 2d DCA 1995).

41.    In *Jacksonville Electric Authority,* the First District held that the testimony that the contract's cancellation might have a detrimental effect upon the plaintiff's ability to obtain construction bids in the future is pure speculation, is not irreparable injury and cannot justify the issuance of a temporary injunction. That decision was based on a cancellation of a contract. Smart Communications has cited no case that holds that a party can recover substantial damages or be entitled to injunctive relief when a contract is expiring on its terms.

*Smart Communications Has No Legal Right to the Relief Requested*

42.    Smart Communications argues that the co-terminous language in paragraph 6 means that the MSA and Schedules between Smart Communications and Correct Solutions will never expire if the contracts between Correct Solutions and any or all of the eight (8) correctional facilities renew. This ignores the clear and unambiguous non-renewal provision in that paragraph and applicable law.

43.    The term "coterminous" is often found in criminal cases. A coterminous sentence "runs concurrently with another and terminates simultaneously." *Cottengim v. State*, 44 So. 3d 209 (Fla. 5th DCA 2010).

44.    The Florida Bar published an article that discussed drafting techniques when a contract would be coterminous with a separate contract. In *The Practice of Music in Florida, Chapter VI*, by Julee L. Milham (2006), the author, who is a Florida attorney practicing in St. Petersburg, Florida, discussed management contracts for recording artists. The author states when recording artists have a record deal, the management contract is often timed to coincide, or be coterminous, with the album contract periods,

15

touring cycles or other activities. The author advised that the coterminous contract should clearly set forth whether the term automatically renews or requires notice to exercise or avoid renewal.  See Article attached as Exhibit A.

45.    Smart Communications initially proposed that the MSA would have a seven (7) year term and would automatically renew unless either Party to the MSA sent a notice of non-renewal at least 90 days prior to the renewal. Correct Solutions and Smart Communications agreed that the MSA as to each facility would be coterminous with, or in other words, have the same duration as the separate contracts between the correctional facilities and Correct Solutions. Correct Solutions and Smart Communications provided in the MSA that the coterminous contract would automatically renew unless either party gave notice of non-renewal. They retained the non-renewal provision of the MSA from the initial draft by Smart Communications so that either Party can sever the coterminous relationship between the MSA and the contracts. While Smart Communications argues the coterminous language of paragraph 6 of the MSA, it is ignoring the remaining provision of that paragraph, which it drafted. Thus, upon the exercise of the timely notice of non-renewal for any of the eight (8) correctional facilities, the MSA and Schedules between Correct Solutions and Smart Communications expire regardless of the status of Correct Solutions' contract with its customer.

46.    Notwithstanding the clear terms of the MSA, Smart Communications is asking this Court to commit reversible error by ignoring the balance of paragraph 6 in the MSA, extending an expired contract, and changing the terms of the contract.

47.    As a general rule, a trial court cannot by the entry of an injunction extend the terms of a contract after its termination. *Vela v. Kendall*, 905 So.2d 1033 (Fla. 5th

DCA 2005). *See also, Sanz v. R.T. Aerospace Corp.*, 650 So.2d 1057 (Fla. 3d DCA 1995). The limited exception to that rule that allows a court to extend a contract where the parties are negotiating an extension does not apply. Correct Solution and Smart Communications are not and will not be in negotiations for any further contractual relationship or extension of the MSA. Rather, they are in litigation over Correct Solutions' notice of termination from July 2019. *See Florida Power Corp. v. Town of Belleair,* 830 So.2d 852 (Fla. 2d DCA 2002), *decision quashed,* 897 So.2d 1261 (Fla. 2005). *See also Florida Power Corp. v. City of Winter Park,* 887 So.2d 1237 (Fla. 2004).

*Smart Communications' Affidavits are Not Admissible*

48.     In an effort to avoid the clear terms of the MSA, Smart Communications has filed affidavits which seek to alter the terms of the MSA and to cite to provisions that only apply when the MSA is being terminated;  not when it is being non-renewed. The affidavits and testimony are not admissible.

49.     The determination of whether a contract is unambiguous and the interpretation of an unambiguous contract are questions of law, subject to de novo review on appeal. When the language of the contract is clear and unambiguous, courts cannot indulge in construction or interpretation of its plain meaning. *Detroit Diesel Corp. v. Atlantic Mutual Insurance Company*, 18 So. 3d 618 (Fla. 4th DCA 2009).

50.     Courts may not rewrite a contract or interfere with the freedom of a contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain. *Home Dev. Co. of St. Petersburg v. Bursani*, 178 So.2d 113 (Fla. 1965). See also, *Steiner v. Physicians Protective Trust Fund*, 388 So.2d 1064 (Fla 3d DCA 1980) and *Twenty-Four Collection, Inc. v. Keller*, 389 So.2d 1062 (Fla. 3d DCA 1980).

17

51.     Smart Communications admits that the language in the MSA is not ambiguous. On September 13, 2019, Smart Communications filed a Motion for Partial Summary Judgment based on its assertion that the MSA superseded the Non-Disclosure Agreement (NDA). In its Motion, it argues that it is permitted to violate the NDA and use confidential materials to directly solicit Correct Solutions' customers and its actions are not a basis for Correct Solutions to terminate the MSA based on the July 17, 2019 termination notice. On page 3 of its Motion for Partial Summary Judgment, Smart Communications argued that "this Court need only interpret two unambiguous contracts to partially resolve the declaration relief actions as a matter of law." In response to Correct Solutions notice of Smart Communications' corporate deposition before the hearing on the Motion for Partial Summary Judgment, Smart Communications filed a Motion for Protective Order and argued that the language of the MSA "is plain and unambiguous."

52.     Despite its prior admissions and arguments that the language in the MSA is plain and unambiguous, Smart Communications now seeks to improperly have this Court accept parol evidence testimony by affidavit of current and former employees of Smart Communications as a basis for this Court to modify the clear and unambiguous language pertaining to the right to non-renew as set forth in paragraph 6 of the MSA. The language contained in paragraph 6 is clear and gives both Parties the right to non-renew the MSA and each of the Schedules. The provisions for termination contained in paragraph 9 have no relevance to either Party's right to non-renew.

*No Public Interest Would Be Served*

53.     Smart Communications has made no showing that an injunction would serve the public interest in this matter. In fact, an injunction would harm Washington County and the inmates that are being served. As Washington County shall testify, the

equipment and services provided by Smart Communications are deficient and are not of the nature Washington County needs or desires to provide to its inmates. As Smart Communications argues, the public has an interest in preserving the integrity of the competitive process in government contract bidding. Thus, both Correct Solutions and Washington County have the right to place another vendor at Washington County when the contract between Washington County and Correct Solutions and the contract between Smart Communications and Correct Solutions are expiring based upon the non-renewal provision between Correct Solutions and Smart Communications.

54.     Smart Communications' argument discloses its true intent for this injunction. It argues that Correct Solutions must terminate Correct Solutions' contract with a correctional facility such as Washington and then bid new contracts with a new vendor. Smart Communications wants the opportunity to solicit Washington County, Sebastian County and Wayne County and to avoid the contractual provisions it entered into with Correct Solutions in order to gain access to these facilities. This does not serve the public interest. To the contrary, it violates Florida law which prohibits courts from re-writing contracts and fails to recognize the validity of contracts between parties.

55.     Based on the above, Correct Solutions requests this Court to deny the Emergency Motion and to uphold the clear and unambiguous terms of the MSA that authorize either Party to non-renew with timely notice.

### CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa

Street, Suite 1900, Tampa, FL 33602; bbarrios@bajocuva.com; dhayes@bajocuva.com;

kturkel@bajocuva.com; tdeleo@bajocuva.com on 16th day of December, 2019.

HARLLEE & BALD, P.A.

By: s/ *Kimberly A. Bald*
 KIMBERLY A. BALD
 Florida Bar No. 0434190
 JAMES E. LYNCH
 Florida Bar No. 046219
 202 Old Main Street
 Bradenton, FL 34205
 Telephone: 941-744-5537
 Facsimile: 941-744-5547
 KAB@harlleebald.com
 JEL@harlleebald.com
 DDF@harlleebald.com
 CL@harlleebald.com

 and

 LUKE F. PIONTEK
 Roedel, Parsons, Kock, Blache,
 Balhoff & McCollister
 Louisiana Bar No. 19979
 8440 Jefferson Highway, Suite 301
 Baton Rouge, LA. 70809
 Telephone Number 225/929-7033
 Facsimile Number 225/928-4925
 LPiontek@roedelpartons.com

 Attorneys for Correct Solutions, LLC

4847-8576-1198, v. 1

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
*Case No: 19-CA-008089*

**EXHIBIT A**

*to Defendant/Counter-Plaintiff's Memorandum in Opposition to*
*Plaintiff/Counter-Defendant, Smart Communications Holding, Inc.'s*
*Emergency Motion for Temporary Injunction*

PMLF FL-CLE 29

(Main Handbook)

The Florida Bar

2006
Fastrain™
The Practice Of Music Law In Florida
Chapter VI

VI. PERSONAL MANAGERS
Julee L. Milham, J.D. [FNa]
Copyright © 2006 by the Florida Bar

A. In General

B. Management Agreements

    1. In General
    2. Duration Of Contract
    3. Parties' Duties
    4. Commissionable Income
        a. Gross Income
        b. Activities Covered
        c. Post-Term Commission
    5. Manager's Expenses
    6. Accounting And Auditing
    7. Personal Provisions
        a. Power Of Attorney
        b. Rights Of Publicity And Warranties
        c. Personal Commitments

## A. IN GENERAL

The manager plays the most personal of all roles in music industry relationships. Although some producers have managers (as addressed in Section **VII.**), the vast majority of managerial relationships are with performing and recording artists. The manager is entrusted with the shaping of the artist's career in exchange for a percentage of the artist's income. This relationship with the artist is fiduciary and intimate in the sense that the manager (also known as the "personal manager") is the artist's liaison to the world and the artist's day-to-day handler. Managers often refer to themselves as "babysitters" in that they find themselves embroiled in many personal aspects of their artists' lives and are usually the first to be called in the event of an arrest, a domestic brawl, or a bad relationship.

NOTE The artist is exclusive to the manager but the manager may represent several artists.

## B. MANAGEMENT AGREEMENTS

### 1. IN GENERAL

The management agreement, although memorializing the most personal of entanglements with the artist, is fundamentally an uncomplicated document. Yet, the attorney should encourage all parties to a management agreement to first spend time getting to know each other and to check each others' reputations thoroughly. This is because the management relationship is potentially the most fruitful while also potentially the most destructive.

The following paragraphs outline some of the significant terms of the agreement. A short-form letter-style management agreement is contained in this FASTRAIN™ as **Form 5**, and a more formal. exclusive management agreement is presented as **Form 6**.

2. DURATION OF CONTRACT

The management agreement generally lasts for (a) a discrete term. (b) an initial term with "contingent" renewal. or (c) a coterminous term.

A discrete term lasts for a certain specified number of years. The selection of a term definite is appropriate for those parties who want an ongoing business relationship whereby the manager counsels the artist and handles matters for the artist but is not necessarily expected to launch the artist's career to another level. For example, an artist who has steady work and a low key career but who needs someone to handle practical matters and act as an advisor will likely find a management agreement with a discrete term to be the better approach. A term definite also may work well when the relationship has existed de facto for a long time.

A contingent renewal management agreement continues past an initial period only if the manager has accomplished certain stated objectives of the agreement. Contingent contracts represent the majority of those entered into by artists. These agreements require a particular level of performance during an initial period. usually one to two years. If the manager meets this designated goal, he or she then has the option of extending the agreement for an additional three to five years. If the manager fails to meet the designated goal, the parties may part ways with no further obligations owed to one another other than those that may survive the management agreement termination date in accordance with the agreement. The agreement should clearly state whether the renewal option is automatic or requires notice to exercise or avoid it.

The performance goal in a contingent contract is typically the manager's acquisition of a record deal within a certain period of time or the generation of a certain level of income. If the parties use acquisition of a record deal as the gauge for performance, the parties need to define the "stature" of the record deal required to meet the standard for continuing the agreement (*e.g.*, a deal with a major label or with a major independent with major label distribution). If the parties use generation of an income level as the gauge. the parties need to take into account "imputed" income (*e.g.*, that which would have constituted income but did not because the artist rejected the offer, or that which was earned but not collected). Determining which income is imputed for purposes of composing the income threshold can be controversial, so specifics should be clearly set forth in the management agreement.

NOTE Artists are usually looking for a manager who can acquire the elusive "record deal" (or propel them to fame and fortune after they have one). In this case, the worst possible scenario for an artist is to be trapped in a management agreement in which nothing is being accomplished. The manager is not succeeding but the artist cannot accept an offer from another manager. Likewise, a manager has the same risk of being stuck with an uncooperative or unproductive client. Contingent contracts help avoid both of these situations.

A coterminous contract often is used with acts signed to a record deal, and the management contract is timed to coincide with album contract periods, touring cycles, or other corresponding activity. As with the contingent contract, the coterminous contract should clearly set forth whether the term is automatically renewed or requires notice to exercise or avoid renewal. The "short-form" management agreement contained in this FASTRAIN™ as **Form 5** incorporates a coterminous term. The form is drafted in the increasingly popular "letter" format.

3. PARTIES' DUTIES

The management contract should set forth the parties' respective duties. The manager's duty consists largely of counseling the artist and supervising third parties. The contract generally does not impose concrete or specific obligations on the manager. Because the main role of the manager is as "advisor," determining when a breach of duty has occurred can be difficult and is the subject of much debate.

NOTE Having a manager serve also as the artist's record label or vice versa, although sometimes done by independent or small record labels, is fraught with potential conflicts in that one of the manager's main duties is to monitor the label. The attorney should also keep in mind that the manager's negotiation of agreements on behalf of the artist or editing of contracts in a legally substantive way may constitute the unauthorized practice of law. A manager who edits substantive provisions of a contract may impliedly (and often expressly) be making a representation to the client as to the legal effect of these edits.

A manager may also be responsible for more distinct activities such as running an artist website or fan club. If the manager is not a licensed talent agency (see **IV.B.** regarding the Talent Agency Act), the management contract should expressly state that

this is the case and that the manager will provide no such services. Although the purpose of this provision is to avoid application of the Talent Agency Act, substance will prevail over form.

The artist's duties will include using best efforts to pursue an entertainment career, referring all inquiries about the artist to the manager; and consulting with the manager on all career-related decisions (although the artist will want to retain final say on all such decisions). The management contract should specify whether the artist has particular commitments to educational or family needs that will impact this "best efforts" obligation to the artist's career. The manager may want to have the right to obtain life insurance on the artist, which will require the artist's express cooperation.

### 4. COMMISSIONABLE INCOME

#### a. Gross Income

Most managers seek a commission on the artist's gross income. "Gross income" typically has an extremely broad definition and includes every type of consideration, interest, and property, without deduction of any kind. Because a manager's income is based on a percentage of the artist's income (typically 15%-25% of gross income), numerous money-related provisions are included in management agreements. The artist will want the gross income provision to apply to only the amounts actually received rather than to those "earned" but never received.

Money specifically excepted from gross receipts for purposes of calculating a commission on income may include certain sums advanced to the artist to pay bills. These sums are reimbursable from the artist's subsequent income (*i.e.*, the artist does not keep these expense funds as income). The most important of these sums to be excluded are those used to pay recording expenses, video expenses, tour support, and similar expenses.

NOTE Managers may contend that their efforts so increase the total sums of money payable to the artist that these expense payments should be included in commissionable income. Artists, on the other hand, will always seek to exclude these sums since the artist did not "pocket" them and must reimburse them and, therefore, would have to pay a commission based on sums never actually received.

Other items specifically excepted from gross receipts for purposes of calculating a commission might include certain fixed costs of the artist. Fixed costs may include such expenses as a talent agency fee, opening act performance fees, or business manager fees.

NOTE An artist who has sufficient bargaining power may contract for commissions to be taken from net income, but such a provision requires well-crafted language. The expenses to be deducted from gross income to arrive at net income must be very specifically listed; a standard based generally on "net income" without definition will invite dispute over which expenses should be subtracted from the total received.

#### b. Activities Covered

Another determination important to the gross income calculation involves the activities covered in the calculation; that is, which of the artist's services will be subject to commission. These activities are characteristically very broad, including all of the artist's activities that are even tangentially related to the entertainment and amusement industries.

If the artist has considerable bargaining power or is pursuing an entertainment-related field sufficiently distinct from a musical career, certain exemptions may be made. For example, if the artist is already establishing a career in the art world, the computer graphics world, or the book industry, these areas may be excluded from the definition of services performed in the entertainment industry for the purposes of designating income subject to commission. Such exceptions should be expressly set out in the management contract by defining what "services in the entertainment industry" includes, or by specifying which types of income are not subject to commission.

NOTE The manager may maintain that the attention brought by the manager to the artist's musical career will bolster the artist's profile in other entertainment areas as well, thereby justifying a commission on all of the artist's sources of income in the entertainment or amusement industries.

Some management contracts will exempt from gross income a minimum amount of money per week that the artist derives from local live performances and merchandise sales. Also, union-scale wages (minimums the music unions require their members to be paid for their services) may be exempted for purposes of calculating the manager's commission. In some cases, entire sources of income, such as songwriting, may be excluded, although most managers would agree to such an exclusion only in exceptional circumstances. Property received from a sponsorship or merchandise agreement are a more common exemption, as long as they are good-faith receipts rather than items accepted in lieu of payments.

Specific smaller sources of income may also be exempted from activities covered in the gross income calculation. Smaller sources of income may include a day job that otherwise may technically fit the definition of the services performed in the entertainment industry (*e.g.*, a salary from operating a record store).

When a management contract covers a group rather than an individual artist, the agreement should expressly state whether income from the separate entertainment-related activities of each member, apart from the group, is commissionable income.

c. Post-Term Commission

The parties to the management contract must also specify what money, if any, the manager may continue to commission after the contract term expires. A former manager will want to continue to reap the benefits of having built the artist's career. The artist, on the other hand, will not want to be paying both a former and a current manager from the same sources of income. As a middle ground, the manager may agree to be paid from income derived from term and related post-term activities, for a three-to five-year period after the term, on a decreasing percentage basis. A compromise provision of this nature is called a "fade-out" or "sunset" clause. Some managers will continue to commission income sources generated during the contract term forever, but will sunset income from work derived from those sources post-term.

5. MANAGER'S EXPENSES

The management agreement should set forth the type and amount of expenses the manager can incur on behalf of the artist without express artist consent. The limits may be both per month and per expense (*e.g.*, no more than $300/month or $100/ expense item). These figures should strike a balance between a manager's need to operate pragmatically and an artist's need to avoid unnecessary costs.

Managers usually make these expenses reimbursable rather than recoupable, meaning that at some point the artist must pay the money back regardless of whether the artist generates sufficient income to do so. The manager should provide a time frame for such repayment (typically, due on demand) and, perhaps, provide as well for interest on unpaid expenses. The contract should also clarify that the duty to repay these expenses remains after the termination of the contract or the exit of a member. The management contract will entitle the manager to recover these expenses from the first income payable to the artist but, for pragmatic reasons, the manager may choose to stagger the repayment.

6. ACCOUNTING AND AUDITING

When it appears to be economically feasible, the prudent lawyer will advise the artist to have a third-party accountant collect and distribute the artist's income and the manager's commission. Typically, before such time, the manager will fulfill this role, although situations arise in which the artist collects and disburses. If the manager is collecting all of the artist's income, the contract should direct the manager to disburse money owed to the artist shortly after its receipt.

If one party to the management contract is given authority to collect and disburse money, the other party will want to retain the right to audit and review the records. The contract should provide for the frequency of statements and payments; the information to be included; whether expenditures will be only recouped or payable at a time definite; and the right to recover audit fees in the event of a certain amount of underpayment (typically 5%-10%). The accounting statement should reflect the sources and amount of income received along with all deductions thereto (commission and expenses).

7. PERSONAL PROVISIONS

a. Power Of Attorney

In the past, one of the most controversial provisions in a management contract was the granting of an unfettered power of attorney to the manager to sign contracts, collect money, and act in almost all ways in the artist's place and stead. Perhaps due to the vast possibilities for miscommunication and abuse that can derive from such authority, most agreements now grant to the manager only limited rights, such as the right to enter into a short-term live performance agreement on behalf of the artist. The artist will want the manager to exercise a power of attorney only in the absence of and with the consent of the artist. In the technology age, acquiring and documenting such permission is much easier than it once was.

NOTE The attorney for the artist should avoid any provision granting to the manager a right "coupled with an interest" in the manager's power of attorney or in the artist's income. Such a right may permit a manager to continue exercising the power of attorney even in the event of a breach of contract by the manager.

b. Rights Of Publicity And Warranties

VI. PERSONAL MANAGERS, PMLF FL-CLE 29

The manager needs permission to exploit the artist's persona to promote the artist's career. However, the contract should provide a means for the artist to approve any promotional materials.

The manager may seek express affirmation that managing other acts will not be deemed to be a breach of fiduciary duty. The manager may also want the artist to acknowledge that if the artist and manager later enter into a recording or similar agreement together, the subsequent transaction will not constitute a conflict of interest or breach. The parties should agree to provide to each other, on request, copies of any third-party contracts (*e.g.*, merchandising, publishing, etc.) to which the artist is committed.

   c. Personal Commitments

Artists may seek a "key person clause" if they wish to work with a particular individual at a management company or on a management team. This clause gives the artist the right to terminate the agreement if the "key" person on the management team ceases to personally manage the artist.

NOTE For a discussion of the word "manager" as an industry term of art, as well as a strong reminder of the difference choice of law can make, see *Erhlich v. Diggs*, 169 F.Supp.2d 124 (E.D. N.Y. 2001).

The manager may seek the same termination right when a "key person" leaves an act consisting of more than one artist. Additionally, when managing a group, the manager will want a "leaving member" provision, stating that the group members are bound to the contract individually as well as collectively, and that the exiting member and the remaining members continue to be obligated under the management agreement. A management agreement with a group should establish a leaving member's liability for outstanding costs and commissions. The manager may seek a time frame within which to determine whether to continue working with the leaving member as well as the remainder of the group. The provision may also condition the addition of a new person to the act upon that party's entering into the management agreement.

FNa. Julee L. Milham, J.D. 1986, Stetson University. Ms. Milham is a member of The Florida Bar and the California Bar, and is also admitted to practice in the District of Columbia, the U.S. District Court for the Middle District of Florida, and the U.S. Court of Appeals for the Eleventh Circuit. She is a former chair and current member of the Entertainment, Arts & Sports Law Section of The Florida Bar and is a panelist on the American Arbitration Association's regional Arts, Entertainment and Sports Advisory Committee. Ms. Milham provides private mediation services in copyright-related cases, serves as a frequent lecturer on music-related issues, and works with Volunteer Lawyers for the Arts. She has practiced in St. Petersburg in the area of music law for the past seventeen years. Ms. Milham can be contacted through her website at www.eMusicLaw.com.

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

      Plaintiff,

v.                                                         Case No: 2019 CA 008089

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.

_____/

### NOTICE TO PLAINTIFF/COUNTERCLAIM-DEFENDANT, SMART COMMUNICATIONS HOLDING, INC., TO PRODUCE DOCUMENTS AT DECEMBER 19, 2019 EVIDENTIARY HEARING

PLEASE TAKE NOTICE that pursuant to Rule 1.410, Florida Rules of Civil Procedure, Plaintiff/Counterclaim-Defendant, Smart Communications Holding, Inc., is hereby commanded to produce the following documents at the hearing scheduled before The Honorable Rex M. Barbas, Circuit Judge, at the George Edgecomb Courthouse, 800 E. Twiggs Street, Courtroom/Hearing Room 514, Tampa, Florida 33602 on December 19, 2019, for purposes of the evidentiary hearing scheduled on Plaintiff/Counterclaim-Defendant's Emergency Motion for Temporary Injunction and Emergency Amended Motion for Leave to File Amended Complaint, as well as for a possible *in camera* review by the Court if any privileged objections are raised:

### Documents to be Produced:

### See Exhibit "A"

Good cause exists for the production of these documents at the December 19, 2019 hearing, including their relevance to and use as evidence concerning Plaintiff/Counterclaim-Defendant's Emergency Motion for Temporary Injunction and

Plaintiff/Counterclaim-Defendant's Emergency Amended Motion for Leave to File Amended Complaint, which are incorporated herein by reference.

PLEASE GOVERN YOURSELVES ACCORDINGLY.

## CERTIFICATE OF SERVICE

I hereby certify that this document has been filed through the Florida Courts E-filing Portal for service via automatic e-mail to Brad F. Barrios, Esquire, David A. Hayes, Esquire, and Kenneth G. Turkel, Bajo Cuva Cohen & Turkel, 100 North Tampa Street, Suite 1900, Tampa, FL   33602; bbarrios@bajocuva.com;  dhayes@bajocuva.com; kturkel@bajocuva.com; tdeleo@bajocuva.com on 16th day of December, 2019.

HARLLEE & BALD, P.A.

By: _Kimberly A. Bald_____
KIMBERLY A. BALD
Florida Bar No. 0434190
JAMES E. LYNCH
Florida Bar No. 046219
202 Old Main Street
Bradenton, FL 34205
Telephone: 941/744-5537
Facsimile: 941/744-5547
KAB@harlleebald.com
JEL@harlleebald.com
DDF@harlleebald.com
CL@harlleebald.com
         and
LUKE F. PIONTEK
Roedel, Parsons, Kock, Blache,
Balhoff & McCollister
Louisiana Bar No. 19979
8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone: 225/929-7033
Facsimile: 225/928-4925
LPiontek@roedelpartons.com

Attorneys for Correct Solutions, LLC

2

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
*Case No: 19-CA-008089*

## EXHIBIT A

*to Defendant/Counterclaim-Plaintiff's Notice to*
*Plaintiff/Counterclaim-Defendant, Smart Communications Holding, Inc., to*
*Produce Documents at December 19, 2019 Evidentiary Hearing*

## EXHIBIT "A"

### Definitions

A.     The term "communication(s)" means any documents that are, or which relate to or refer to, correspondence, letters, notes, memoranda, telegrams, inquiries, discussions, conversations, translations, telephone conversations, facsimiles, electronic mail messages, instant messages, text messages, negotiations, agreements, meetings, and any other forms of written communication or documents that in any way relate to or refer to verbal or other communications.

B.     The term "document(s)" means any written or graphic material or other means of preserving thought or expression, any tangible thing and electronically stored information (ESI) from which information can be obtained, including but not limited to the complete original or true copy thereof and any non-identical copy and all drafts of correspondence, electronic mail (email), social media postings, social media communications (i.e. direct messages), memoranda, notes, messages, bulletins, notes of meetings or other communications, notes of interoffice and intraoffice telephone calls, diaries, calendars, logs, chronological data, minutes, books, reports, appraisals, charts, ledgers, invoices, worksheets, data compilations, data sheets, data processing cards, receipts, tax returns, computer printouts, prospectuses, financial statements, schedules, affidavits, contracts, agreements, transcripts, statistics, surveys, magazine or newspaper articles, photographs, graphs, microfiche, microfilm, videotape, recordings, and electronic, mechanical or electric recordings or representations of any kind (including without limitation, tapes, cassettes, discs and recordings), hard copy printouts of any "e-mail" communications or the equivalent and "deleted" but recoverable electronic files.

C.     The term "document(s)" also includes all data (even if available only in computer readable form), text, or information stored on a computer, computer disk, CD-ROM, USB memory stick, e-mail, e-mail file, voicemail, or other archive medium and all information in any computer database although not yet printed out.

### Documents to be Produced

1.     Any documents or communications, including internal documents and communications, concerning the negotiation of the Master Services Agreement by and between Smart Communications Holding, Inc. and Correct Solutions, LLC.  This request shall specifically include, but is not limited to, documents and communications between Rob Deglman, James Logan, and Jon Logan.

2.     Any documents or communications, including internal documents and communications, concerning the term, length, and non-renewal provision of the Master Services Agreement by and between Smart Communications Holding, Inc. and Correct Solutions, LLC.  This request shall specifically include, but is not limited to, documents and communications between Rob Deglman, James Logan, and Jon Logan.

3. Any documents or communications, including internal documents and communications, concerning drafts of the Master Services Agreement ultimately executed by and between Smart Communications Holding, Inc. and Correct Solutions, LLC. This request shall specifically include, but is not limited to, documents and communications between Rob Deglman, James Logan, and Jon Logan.

4. Any documents or communications, including internal documents and communications, concerning Paragraph 6 of the Master Services Agreement by and between Smart Communications Holding, Inc. and Correct Solutions, LLC. This request shall specifically include, but is not limited to, documents and communications between Rob Deglman, James Logan, and Jon Logan.

5. The "parol evidence" and any documents regarding the "parol evidence" alleged by Smart Communications Holding, Inc. in its Memorandum of Law in Support of Emergency Motion for Temporary Injunction to support its position.

6. Any documents reflecting the revenue earned from the messaging services provided by Smart Communications Holding, Inc. to the eight (8) correctional facility customers under contract with Correct Solutions, LLC and subject to the Master Services Agreement by and between Smart Communications Holding, Inc. and Correct Solutions, LLC.

7. For the time period of January 1, 2018 to date, any documents or communications regarding issues with any of the services provided to Washington County, AR by Smart Communications Holding, Inc. pursuant to the Master Services Agreement and Schedule. This request shall specifically include, but is not limited to, documents and communications received from Washington County, AR or sent to Washington County, AR and documents and communications contained within the "real time" asset management system or monitoring system referenced in the Schedules.

8. Any documents or communications with Rob Deglman concerning the Declaration he executed on November 22, 2019 that was filed in the above-styled action on December 5, 2019.

9. Any non-disclosure agreements executed between Smart Communications Holding, Inc., or any of its affiliates or subsidiaries, and Rob Deglman.

4843-9254-6990, v. 1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

       Plaintiff,

Case No: 19-CA-008089

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

**NOTICE TO DEFENDANT, CORRECT SOLUTIONS, LLC, TO PRODUCE
DOCUMENTS AT DECEMBER 19, 2019 EMERGENCY EVIDENTIARY HEARING**

PLEASE TAKE NOTICE that, pursuant to Rule 1.410, *Fla. R. Civ. P.*, Defendant,

Correct Solutions, LLC a/k/a Correct Solutions Group, LLC, is hereby commanded to produce

the following document(s) at the hearing scheduled before the Honorable Rex M. Barbas,

George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing Room 514, Tampa, FL 33602 on

**December 19, 2019, at 1:30 p.m.**, for purposes of the emergency evidentiary hearing scheduled

on (1) Plaintiff's Emergency Amended Motion for Leave to File Amended Complaint, and

(2) Plaintiff's Emergency Motion for Temporary Injunction, as well as for a possible *in camera*

review by the Court if any privilege objections are raised:

**Documents to be Produced:**

**See Exhibit A**

Good cause exists for the production of these documents at the December 19, 2019 hearing,

including their relevance to and use as evidence concerning Plaintiff's Emergency Amended

Motion for Leave to File Amended Complaint and Plaintiff's Emergency Motion for Temporary Injunction, which is incorporated herein by reference.

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail:  bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail:  dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## EXHIBIT A

### Definitions

(a)  "Joint Customers" means Avoyelles Parish Sheriff's Office, LaSalle Corrections-Bowie County Jail, Lamar County Jail, Moore County Jail, Sebastian County Sheriff's Office, City of Saint Louis, Missouri, Washington County, Arkansas, and Wayne County, Georgia,. This should be construed broadly when any of the foregoing are referenced in Requests to include any entity related to the foregoing list which has contracted with Correct for inmate communication services and such entities' agents, attorneys and consultants therefor, and all other persons acting or purporting to act on its behalf.

(b)  "Documents" means the original and any copy (except for identical copies) of any document or thing subject to production under the Florida Rules of Civil Procedure, that is in your actual or constructive possession, custody, or control. "Documents" specifically includes memoranda, letters, emails, faxes, text messages, and any other form of written communication.

(c)  "Communication" means any correspondence, contact, discussion, or exchange between any two or more Persons. Without limiting the foregoing, "Communication" includes all Documents, telephone conversations or face-to-face conversations, electronic messages, text messages, meetings and conferences.

(d)  "Person" means any individual, firm, partnership, association, proprietorship, joint venture, corporation, governmental agency, or other organization or legal or business entity, as well as any agents, attorneys and consultants therefor, and all other Persons acting or purporting to act on its behalf.

### Documents to be Produced

1.  Any documents or communications, including internal documents and communications, concerning the negotiation of the Master Services Agreements by and between Smart Communications Holding, Inc. ("Smart") and Correct Solutions, LLC ("CSG"), including specifically Paragraph 6 of the MSA.

2.  Any documents or communications, including internal documents and communications, concerning the inclusion of Smart's services into CSG's contracts with any Joint Customer, as defined in the Complaint, by amendment, addendum, or otherwise.

3.  Any documents or communications, including internal documents and communications, about the term or length of the contractual relationships between Smart and CSG.

4.  Any documents or communications, including internal documents and communications, relating to the notices from Summit and Washington County forwarded by CSG to Smart on December 13, 2019. This request shall specifically include, but is not limited to, any requests or solicitations made by CSG to Summit, Washington, or Tech Friends about the notices and any investigation by CSG into the effectiveness or validity of the notices.

{BC00271456:1}

5.      The complete, fully-executed contract between Summit and Washington County referenced in CSG's December 13, 2019 letter.

6.      All internal communications, including between Mark Turner and any other CSG officers or employees, from April 8, 2018 to April 8, 2019 regarding removing Smart's services in the Joint Customer facilities, getting rid of Smart, and/or lining up or contracting with Tech Friends in order to replace Smart as the messaging vendor in the Joint Customer facilities.

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                    Case No: 19-CA-008089

        Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

        Defendant.

_____/

## <u>AMENDED NOTICE OF EVIDENTIARY HEARING</u>

PLEASE TAKE NOTICE that the undersigned will call up for hearing before the

Honorable Rex M. Barbas, George Edgecomb Courthouse, 800 E. Twiggs Street, Hearing

Room 514, Tampa, FL 33602, on **December 19, 2019, at 1:30 p.m.**, or as soon thereafter as

counsel can be heard the following: (1) Plaintiff's Emergency Amended Motion for Leave to File

Amended Complaint, (2) Plaintiff's Emergency Motion for Temporary Injunction, and

(3) Defendant's Objection to Notice of Intent to Serve Subpoenas for Documents in Another

State.

        Time Reserved:             2 hours

        Court Reporter:           U.S. Legal Support

        JAWS Confirmation No.:    12J-34967169949

**PLEASE GOVERN YOURSELVES ACCORDINGLY.**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

                                    /s/ Brad F. Barrios
                                    Kenneth G. Turkel – FBN 867233
                                    E-mail:  kturkel@bajocuva.com
                                    Brad F. Barrios – FBN 35293
                                    E-mail: bbarrios@bajocuva.com
                                    David A. Hayes – FBN  96657
                                    E-mail: dhayes@bajocuva.com
                                    BAJO | CUVA | COHEN | TURKEL
                                    100 North Tampa Street, Suite 1900
                                    Tampa, Florida 33602
                                    (813) 443-2199 (telephone)
                                    (813) 443-2193 (facsimile)
                                    *Counsel for Plaintiff*

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                    Case No: 19-CA-008089

       Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.
_____/

**SMART COMMUNICATIONS HOLDING, INC.'S**
**<u>NOTICE OF INTENT TO USE SUMMARY CHARTS</u>**

       Plaintiff, Smart Communications Holding, Inc. ("Smart"), by counsel and pursuant to Section 90.956, Florida Statutes, has compiled two summary charts of relevant documents referenced in Smart's Emergency Motion for Leave to File Amended Complaint (and Proposed Amended Complaint), and Emergency Motion for Temporary Injunction and proposes to use the summary charts at the hearing on these motions scheduled for December 19, 2019. The source documents for the summary are identified on the summaries and have been produced in discovery or are in court documents. Timely notice of intent to utilize the summaries is given to opposing counsel and such notice is filed with the Court.  The summaries comply with Florida Statutes, Section 90.956.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
Case No.  19-CA-008089

# ATTACHMENT

***to Smart Communication Holding, Inc.'s Notice of Intent to Use Summary Charts***

**BACKGROUND**

| Date | Event | Source |
|------|-------|--------|
| March 2019 | CSG takes Sebastian County Captain Dumas to lunch and dinner and discuss a switch in tablets. | Correct 00343 |
| April 1, 2019 | Captain Dumas thanks CSG for dinner and lunch the prior week and indicates that he has permission from the Sheriff to move forward with the tablets. CSG (Mark Turner) responds: "**We have to get Smart out first though don't we?**" | Correct 00343 |
| April 8, 2019 | Smart sends a mass marketing email to its contacts. The email was a general advertisement—it was not tailored toward or directed at any particular customer. | Smart 0191 |
| April 22, 2019 | CSG asks Captain Dumas to "forward me bullet points on smart issues…" Captain Dumas responds with a list, saying, "If you need more I'm sure we can think of it." | Correct 00631 |
| May 17, 2019 | CSG emails Washington County, and states:<br><br>Hey Alan<br>I hope you made it back safe. I hobbled home yesterday afternoon. **I'm getting a lot of calls from my SMART customers complaining about product, service, and overall performance. To the point where I might be replacing them…Soon. I have not heard from you** but I wanted to follow up and see how you were being serviced by them.<br>I appreciate ya brother. | Correct 00553 |
| June 21, 2019 | CSG's leadership team discusses using Smart's advertisement as grounds for "pulling the plug on all Smart devices on a set day." Turner indicates that "**we have TF [Tech Friends] lined up to come in**…" Rick Ferguson (CSG) agrees that CSG should have "a very strategic plan with Tech Friends…in place and brief the customer before the blade falls, because when it does, **the only panic taking place should be in Smart's conference room.**" | Correct 00376 |
| July 10, 2019 | <u>CSG and Tech Friends</u> execute the Master Services and Supply Agreement, which was effective June 1, 2019 (the "CSG/Tech Friends Agreement"). Exhibit C provides for **Revenue Sharing** between CSG and Tech Friends. | Correct 00695 |
| July 17, 2019 | CSG sends **Termination Letter** to Smart premised on Smart's alleged use of CSG's confidential information. | Ex. J, (Proposed) Amended Complaint |
| July 31, 2019 | Alan Johnson (Washington County) emails Smart that they will be "actively looking for a new vendor to replace Smart Communications." Johnson immediately forwards the email to CSG. | Correct 00727 |
| August 6, 2019 | Smart files Lawsuit. | Docket |

| Date | Event | Source |
|------|-------|--------|
| August 13, 2019 | Counsel for CSG confirms that CSG will not inform Joint Customers that Smart has been terminated or otherwise disavow the relationship between Smart and CSG. | Aug. 13 email |
| August 15, 2019 | CSG (Ferguson) emails his "Team," which included Washington and Sebastian Counties and CSG:<br><br>Team<br><br>In order to move our plight quickly along please note the following instruction:<br><br>Send all your Smart needs for repairs, questions, complaints (**and don't hold back other than 4 letter words or graphic sentences**) etc to:<br><br>arsupport@correctsolutionsgroup.com<br><br>**please do not send to Smart**<br><br>**CSG will now put them on the clock each time a ticket is opened** and forwarded. Feel free to use a spread sheet or direct sentences. Also, be very specific in your request when necessary, ie, cell, issue, wiring…etc. If it's a generic fix just use your usual correspondence.<br><br>Please call me if you have questions or need additional information. **I sincerely apologize for this most disappointing service provider but we are on the downhill run** and I want to keep up the momentum<br><br>I really appreciate your assistance.<br>See y'all soon.<br>Rick | Washington County public records request response; Correct Solutions 002019 |
| August 30, 2019 | Parties finalize Stipulation to Preserve the *Status Quo* Pending Final Hearing on the Merits (adopted by Court Order on September 10, 2019). | Docket |
| September 11, 2019 | Smart emails each Joint Customer, including Washington County, to check in and request an on-site meeting. | First Declaration of Jon Logan |
| September 11, 2019 | Washington County asks CSG how to respond and then responds to Smart with "What do you expect to accomplish from this meeting." Washington County ignores Smart's follow-up. | Correct 00554 |
| September 13, 2019 | CSG sends Smart Notice to Cure re Tablets in Sebastian County. | Ex. X to (Proposed) Amended Complaint |

| Date | Event | Source |
|---|---|---|
| September 20, 2019 | Hearing on Smart's Motion to Enjoin termination based on Notice to Cure.<br><br>• MS. BALD: Correct Solutions was encouraging Sebastian County to continue working with Smart, and it wasn't until we learned that the batteries could be removed in September of 2019…that it became serious enough and a risk factor enough for Sebastian County, that we had to put Smart on notice. (p. 37)<br>• MS. BALD: …Correct Solutions has been trying to get their customers to continue working with Smart until, in September 2019, when they learned of the fact that they can take the batteries out. (p. 39)<br>• COURT: …it sounds very suspicious when you…enter into a stip today, and then…literally right after that you give another notice – a notice to correct, which leads to a termination. (p. 43-44)<br>• COURT: I'm enjoining termination subject to my subsequent order and hearing…If I find that it is a sham, then there is another problem. (p. 53)<br>• MR. TURKEL: I would argue that that's probably their big problem with the contract because we're the only ones making money.<br>MS. BALD: Your Honor, if Smart is not doing it, another vendor is going to do it, and the other vendor is going to get all the money. This is not a financial benefit to Correct Solutions. (p. 58) | Transcript |
| October 4, 2019 | CSG sends Notice of Non-Renewal re Washington County | Ex. Y to (Proposed) Amended Complaint |

**CONTRACTS**

| Date | Event | Source |
|------|-------|--------|
| September 25, 2014 | <u>CSG and Washington</u> execute their Services Contract<br><br>• The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement. | Correct 00054 - 56 |
| January 4, 2015 | The beginning of the Term of the CSG/Washington Contract, according to CSG (CSG has not provided supporting documents). | Ex. Y to (Proposed) Amended Complaint |
| January 4, 2016 | The automatic of renewal of the CSG/Washington Contract. | Ex. Y to (Proposed) Amended Complaint |
| January 4, 2017 | The automatic of renewal of the CSG/Washington Contract. | Ex. Y to (Proposed) Amended Complaint |
| August-September 2017 | <u>Smart and CSG</u> execute the MSA<br><br>• Term.  This Agreement shall commence on the "Effective Date" and shall be co-terminus with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term. | Ex. B to (Proposed) Amended Complaint |
| August 8, 2017 | Smart sends CSG draft MSA with a seven year term and a Schedule for first Joint Customer account – Avoyelles Parish | Smart Comm 1279 - 1290 |
| August 29, 2017 | Mark Turner emails Smart the contract for Avoyelles, which includes CSG's contract with Avoyelles and <u>Amendment</u> to CSG's contract **adding Smart's services** | Smart Comm 1297 |
| August 30, 2017 | Turner emails Smart that, "in the future, we will [cut and paste Smart's Schedule of Services into the <u>Addendum</u> that CSG is having the customers sign] | Smart Comm 1298 |

| Date | Event | Source |
|---|---|---|
| November 2017 | CSG and Smart execute Schedule for Washington | Correct Solutions 00054 - 00056 |
| December 1, 2017 | CSG and Lamar County execute Services Contract. Attachment C identifies Smart's services and hardware as part of the Contract. | Correct Solutions 00016 - 00027 |
| January 4, 2018 | The automatic of renewal of the CSG/Washington Contract. | Ex. Y to (Proposed) Amended Complaint |
| January 19, 2018 | CSG and Moore County execute Services Contract. Attachments B and C identify Smart's services and hardware as part of the Contract. | Correct Solutions 00028 - 00037 |
| January 4, 2019 | The automatic of renewal of the CSG/Washington Contract. | Ex. Y to (Proposed) Amended Complaint |
| October 4, 2019 | CSG sends Smart a Notice of Non-Renewal for Washington County. | Ex. Y to (Proposed) Amended Complaint |
| October 5, 2019 | The deadline for either CSG or Washington County to provide written notice of non-renewal to the other party. No such notice has been provided to Smart. | Correct Solutions 00054 - 00056 |
| January 4, 2020 | The automatic renewal of the CSG/Washington Contract (according to Smart). Also, the deadline for Smart to remove its equipment and services from Washington. | Correct Solutions 00054 – 00056; Ex. Y to (Proposed) Amended Complaint |

Case 8:20-cv-01469-WFJ-TGW   Document 1-10   Filed 06/26/20   Page 78 of 98 PageID 1482

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                                 Case No: 19-CA-008089

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

      Defendant.
_____/

**PLAINTIFF'S RESPONSE TO DEFENDANT'S NOTICE TO PRODUCE**
**DOCUMENTS AT DECEMBER 19, 2019 EVIDENTIARY HEARING**

Plaintiff, Smart Communications Holding, Inc. ("Smart"), responds to Defendant, Correct

Solutions, LLC ("CSG") Notice to Produce Documents at December 19, 2019 Evidentiary Hearing

as follows:

      1.      Smart has produced all responsive documents.

      2.      Smart has produced all responsive documents.

      3.      Smart has produced all responsive documents.

      4.      Smart has produced all responsive documents.

      5.      Smart has produced all responsive documents.

      6.      Smart objects to this request on the grounds that it is overbroad, as it is not limited

in time or scope, not reasonably calculated to lead to the discovery of admissible evidence, and

seeks confidential, proprietary, and trade secret information.

      7.      Smart has produced responsive documents by producing documents obtained from

Washington County pursuant to a public records request. Smart objects to any further production

pursuant to this request on the grounds that it is overbroad, as it is not limited in time or scope, and unduly burdensome, as Smart has provided services to Washington County for approximately two years. Further, the request seeks documents that are equally available to CSG.

8.      Smart objects to this request on the grounds that it seeks documents that are protected from disclosure by the work product doctrine. Smart will provide a privilege log identifying the responsive, privileged document.

9.      Smart has produced all responsive documents.

*/s/ Brad F. Barrios*
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@bajocuva.com
Brad F. Barrios – FBN 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
          JEL@harlleebald.com
          DDF@harlleebald.com
          CL@harlleebald.com

                              /s/ Brad F. Barrios
                              Attorney

3

Filing # 100570824 E-Filed 12/19/2019 11:31:35 AM

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

              Case No: 19-CA-008089

   Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

   Defendant.

_____/

## **PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY**

   Plaintiff, Smart Communications Holding, Inc. ("Smart"), files this Notice of

Supplemental Authority and directs to the Court to the following cases in support of its Emergency

Motion for Temporary Injunction:

1. *NRD Investments, Inc. v. Velazquez*, 976 So. 2d 1, 3-4 (Fla. 3d DCA 2007) (affirming and order granting a temporary injunction and finding that conduct which arguably constituted a breach of contract was sufficient to demonstrate irreparable harm and the unavailability of an adequate remedy at law)

2. *Walsh v. Walsh,* 262 So. 3d 212 (Fla. 5th DCA 2018) (noting that if "a contract is reasonably susceptible to more than one interpretation, it is ambiguous, [and] [i]n that instance, the issue of proper interpretation of the ambiguous contract is a question of fact requiring the submission of extrinsic evidence to the show the intent of the parties when the contract was drafted")

3. *Mariner Cay Property Owners Association v. Topside Marina, Inc.,* 714 So. 2d 1130 (Fla. 4th DCA 1998) ("While each side in this case maintains that the agreement is clear and unambiguous, . . . the interpretations advocated by both sides, while reasonable, differ.  We find that this paradox renders the agreement ambiguous because it is fairly susceptible to different constructions.")

             */s/ Brad F. Barrios*_____
             Kenneth G. Turkel – FBN 867233
             E-mail:  kturkel@bajocuva.com
             Brad F. Barrios – FBN 35293

E-mail: bbarrios@bajocuva.com
David A. Hayes – FBN  96657
E-mail: dhayes@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of December, 2019, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Luke F. Piontek
E-mail:  lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache, Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA  70809

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL  34205
E-mails:  KAB@harlleebald.com
            JEL@harlleebald.com
            DDF@harlleebald.com
            CL@harlleebald.com

*/s/ Brad F. Barrios*
Attorney

*Smart Communications, Inc. v. Correct Solutions, LLC,* Case No:  19-CA-008089

**Attachment 1**

**To Plaintiff's Notice of Supplemental Authority**

976 So.2d 1
District Court of Appeal of Florida,
Third District.

NRD INVESTMENTS, INC., Appellant,

v.

Dr. Nelvis VELAZQUEZ, Appellee.

No. 3D07–1243.
|
Dec. 5, 2007.
|
Rehearing Denied March 20, 2008.

**Synopsis**

**Background:** Tenant, who had commenced action for breach of contract against landlord, filed motion seeking temporary injunction, after landlord began construction on tenant's leased office space, in alleged violation of tenant's lease. The Circuit Court, Miami–Dade County, Ronald M. Friedman, J., issued injunction, requiring landlord to restore tenant's office to its condition prior to start of construction, and, subsequently, denied landlord's motion for modification of injunction or rehearing. Landlord appealed.

**[Holding:]** The District Court of Appeal, Cortiñas, J., held that tenant was entitled to temporary injunction.

Affirmed.

West Headnotes (6)

**[1]**   **Injunction**
    👉 Landlord and tenant

Tenant was entitled to temporary injunction requiring landlord to restore her leased office to its condition prior to start of construction, in context of tenant's breach of contract action against landlord, after landlord began construction on tenant's office, in alleged violation of parties' agreement; construction, and consequent loss of office space had deprived tenant of full use of her leasehold, present condition of her office could have damaging

impact upon her doctor practice that would be neither easily quantifiable nor easily corrected, tenant demonstrated likelihood of success on the merits, given ambiguities in agreement, threatened injury to tenant outweighed any possible harm to landlord, and injunction did not disserve public interest.

1 Cases that cite this headnote

**[2]**   **Injunction**
    👉 Grounds in general;  multiple factors

Requirements for establishing the right to preliminary injunctive relief are: (1) the likelihood of irreparable harm, and the unavailability of an adequate remedy at law, (2) the substantial likelihood of success on the merits, (3) that the threatened injury to petitioner outweighs any possible harm to the respondent, and, (4) that the issuance of the injunction will not disserve the public interest.

1 Cases that cite this headnote

**[3]**   **Appeal and Error**
    👉 Granting or refusing
    **Appeal and Error**
    👉 Continuing, vacating, or dissolving
    **Injunction**
    👉 Discretionary Nature of Remedy
    **Injunction**
    👉 Authority and discretion of court in general
    **Injunction**
    👉 Authority and discretion of court
    **Injunction**
    👉 Authority and discretion of court

Trial court is afforded broad discretion in granting, denying, dissolving, or modifying injunctions, and unless a clear abuse of discretion is demonstrated, an appellate court must not disturb the trial court's decision.

1 Cases that cite this headnote

**[4]**   **Contracts**
    👉 Construction against party using words

There is a general preference to interpret contractual ambiguities against the drafter.

1 Cases that cite this headnote

[5] **Injunction**
 Preservation of status quo

The primary purpose of entering a temporary injunction is to preserve the status quo pending the final outcome of a cause; the status quo which will be preserved by a preliminary injunction is the last, actual, peaceable, uncontested condition which preceded the pending controversy.

Cases that cite this headnote

[6] **Appeal and Error**
Injunction

Landlord failed to preserve for appeal issue of whether issuance of temporary injunction to tenant was improper based on alleged lack of evidentiary hearings in the matter, as landlord never objected to manner in which hearings were being conducted.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*2** Hinshaw & Culbertson and Monica T. Cronin and Ronald L. Kammer; Berman Rennert Vogel & Mandler, Miami, for appellant.

De Cardenas, Freixas, Stein & Zachary and Barry A. Stein, for appellee.

Before RAMIREZ, SHEPHERD, and CORTIÑAS, JJ.

**Opinion**

CORTIÑAS, Judge.

Appellant, NRD Investments, Inc. ("NRD"), seeks review of an order granting a temporary injunction (the "Injunction Order") in favor of appellee, Dr. Nelvis Velazquez ("Dr.Velazquez"), and a subsequent order denying modification of the injunction or rehearing (the "Denial Order").

Dr. Velazquez is a tenant in a building presently owned by NRD where she has been leasing office space since approximately two years prior to NRD's purchase of the building in November, 2006. On or about October 9, 2006, Dr. Velazquez and NRD entered into an agreement (the "Agreement") whereby NRD would reduce Dr. Velazquez's leased office space by an area of fifty square feet in exchange for providing Dr. Velazquez with an outside door and a proportionate reduction in rent. [1] The language of the Agreement provides, in pertinent part:

1. NRD shall construct, at zero cost to Dr. Velazquez, the outside entrance door to Unit 110 on the South side of the Building (the "New Door"), as specified in plans to be provided within 30 days of the date of this Agreement. **NRD will commence the preparation of the plans and construction of the New Door immediately.**

   2. Unit 110 shall be reduced by approximately 50 square feet (a 10x5 square foot space located on the northwest corner of the current waiting room), which shall be used to construct the Building's security area, **as specified in plans to be provided within 30 days of the date of this Agreement. NRD shall immediately commence the preparation of plans and construction of replacement walls in the waiting area of Unit 110** (the "Replacement Walls").

   3. Access to Unit 110 in order to perform the work on both the New Door and the Replacement Walls **shall be coordinated with Dr. Velazquez,** however, it is agreed that access to Unit 110 shall be available **and that all work can begin immediately.**

(Emphasis added.)

On November 9, 2006, thirty-one days after the execution of the Agreement, Dr. Velazquez hand-wrote "[t]oday is Nov. 9, 2006[.] This Agreement is now null and void," on a copy of the Agreement. She then signed this notation and delivered the annotated Agreement to NRD. More than two months later, on January 18, 2007, NRD advised Dr. Velazquez in writing that construction would commence on January 20, 2007. On January 19, 2007, Dr. Velazquez delivered another copy of the Agreement with her "null and void" notations to NRD's in-house counsel. NRD's counsel then went to Dr. Velazquez's suite **\*3** and the two engaged in an argument that

ultimately resulted in both parties calling the North Miami Police Department ("NMPD").

The NMPD officer arrived and after being apprised of the situation, "counseled both parties and recommended that [NRD] delay construction in [Dr. Velazquez's] office until [Dr. Velazquez] agreed or a judge issued an appropriate order." Demolition of the outside wall of the doctor's suite commenced on Saturday, January 20, 2007, and by the time Dr. Velazquez arrived at her office, construction was well underway and the interior drywall had been erected to mark off a sixty-square-foot area. In what was apparently a burst of anger and frustration, Dr. Velazquez kicked two drywall panels in the construction causing damage to the drywall. She was subsequently arrested by an off-duty NMPD officer hired by NRD to serve as security during the course of construction. The arresting officer had not been informed of the events that had transpired previously. Dr. Velazquez was charged with criminal mischief and resisting arrest without violence. The latter charge resulted from Dr. Velazquez's attempts to explain the situation to the officer while protesting her arrest.

 [1]    Construction in Dr. Velazquez's office remains incomplete. NRD has not yet installed the New Door, despite the language in the Agreement stating that it would be done "immediately." The Injunction Order includes, among the findings of fact, that "Dr. Velazquez's professional practice has been harmed, in that she has been forced to practice in an office with unsightly and dust-filled physical conditions, thus reflecting, to a reasonable person, on her personal judgment and the viability of her practice."

The circuit court, after carefully reviewing the facts and evidence before it, determined that the most equitable resolution was the issuance of a temporary injunction requiring NRD to restore the condition of Dr. Velazquez's office to its condition prior to the commencement of construction on January 20, 2007.

 [2]    NRD argues that Dr. Velazquez did not demonstrate entitlement to injunctive relief. "The requirements for establishing the right to preliminary injunctive relief are: (a) the likelihood of irreparable harm, and the unavailability of an adequate remedy at law, (b) the substantial likelihood of success on the merits, (c) that the threatened injury to petitioner outweighs any possible harm to the respondent, and, (d) that the issuance of the injunction will not disserve the public interest." *Sanchez v. Solomon,* 508 So.2d 1264, 1265 (Fla. 3d DCA 1987). The circuit court, upon reviewing

the evidence before it during multiple hearings, concluded that Dr. Velazquez had properly demonstrated entitlement to a preliminary injunction.

 [3]    In Florida, the "trial court is afforded broad discretion in granting, denying, dissolving, or modifying injunctions, and unless a clear abuse of discretion is demonstrated, an appellate court must not disturb the trial court's decision." *Jackson v. Echols,* 937 So.2d 1247, 1249 (Fla. 3d DCA 2006) (citing *Wise v. Schmidek,* 649 So.2d 336, 337 (Fla. 3d DCA 1995)). We find no abuse of discretion by the circuit court.

With respect to the first requirement, Dr. Velazquez has demonstrated that the new construction by NRD and the consequent loss of the sixty-square-foot area has deprived her of the full use of her leasehold. The present condition of her office, it stands to reason, could have a damaging impact upon her practice which would be neither easily quantifiable nor  **\*4**  easily corrected. This potential harm, which includes but is not limited to, the loss of goodwill and patronage from her patients, may be irreparable. Moreover, while there may exist a remedy at law, nothing presented demonstrates that any such available legal remedy is adequate. Florida courts have held that when both legal and equitable remedies exist, in order to determine which of the two provides the most adequate remedy, one must consider which will offer the most expeditious relief. *McNorton v. Pan Am. Bank,* 387 So.2d 393, 399 (Fla. 5th DCA 1980). Given the dispute over the contractual entitlement to perform the construction in Dr. Velazquez's office, and the present and continuing damage to Dr. Velazquez's practice, the most sensible and expedient remedy is to restore the office to its pre-construction condition and prevent any further construction until the contractual disputes are resolved.

Dr. Velazquez has likewise demonstrated the likelihood of success on the merits. There are numerous portions of the Agreement which either create an ambiguity or lend themselves to being interpreted in favor of Dr. Velazquez when considering her claim for breach of contract. One major issue is the discrepancy between the amount of space called for in the initial plans prepared by NRD's engineer and the amount of space specified in the Agreement. While the Agreement specifically noted the surrender of a fifty-square-foot area by Dr. Velazquez, the plans and the construction ultimately performed occupy an area of sixty square feet. Although the Agreement provides that the plans are to be prepared "immediately," the plans demonstrating the sixty-square-foot space were prepared and in NRD's possession

prior to the drafting of the Agreement. These plans were not provided to Dr. Velazquez at the time the Agreement was signed.

[4]    The Agreement contains multiple references to the preparation of plans and construction commencing "immediately," even though NRD did nothing other than file plans with the City until commencing construction in January. Lastly, there is an issue as to whether or not NRD properly entered into the Agreement with Dr. Velazquez because, when the Agreement was executed, NRD was not the owner of the building and despite constant references to aspects of performance that were to occur or commence "immediately," there was no timeframe set up within which the building had to be acquired. Consequently, the Agreement is ambiguous as to when NRD's promises would be fulfilled. There is a general preference in Florida to interpret contractual ambiguities against the drafter. *City of Homestead v. Johnson,* 760 So.2d 80 (Fla.2000); *Hurt v. Leatherby Ins. Co.,* 380 So.2d 432 (Fla.1980); *Am. Agronomics Corp. v. Ross,* 309 So.2d 582 (Fla. 3d DCA 1975). In light of this preference, and because of the numerous ambiguities in the Agreement, Dr. Velazquez has adequately demonstrated a likelihood of success on the merits of this case.

[5]    Appellant also argues that the injunction is overbroad and alters the status quo. The circuit court was correct in stating in its order that "[t]he primary purpose of entering a temporary injunction is to preserve the status quo pending the final outcome of a cause." *Yardley v. Albu,* 826 So.2d 467, 470–71 (Fla. 5th DCA 2002). "The status quo which will be preserved by a preliminary injunction is the last, actual, peaceable, uncontested condition which preceded the pending controversy." *Id.* at 471. quoting *Chicago Title Ins. Agency of Lee County, Inc. v. Chicago Title Ins. Co.,* 560 So.2d 296, 297 (Fla. 2d DCA 1990). Given the dispute over **\*5** NRD's entitlement to perform the work under the Agreement and whether or not there has been a breach or termination of the Agreement, the last, uncontested condition of Dr. Velazquez's office was that which existed prior to the January 20, 2007 construction. The court correctly ordered NRD to return the office to its pre-construction condition.

Based upon the facts in the record, it is also apparent that the threatened injury to Dr. Velazquez outweighs any possible harm to NRD. Other than the possible costs of demolishing the new construction returning the office to its former condition, and the costs of reconstruction should NRD be successful at the trial level, there appear to be no other damages to NRD. However, Dr. Velazquez faces the possibility of losing an unascertainable amount of business, clientele, and goodwill due to the unsightly and uncomfortable condition of her office. Taking into account the possibility that NRD may suffer damages if it is ultimately adjudicated that the Agreement is enforceable and NRD may proceed with construction, the circuit court required Dr. Velazquez to post a $15,000 bond, which she has already done. As such, NRD is safeguarded against any foreseeable damages, whereas absent the injunction, the threatened injury to Dr. Velazquez would not be adequately addressed.

Furthermore, the circuit court's order specifically provided that the court "shall hold a final hearing on the parties' rights under the [Agreement] as quickly as possible but no later than 30 days of NRD's notice that it is ready for trial on these issues. The parties shall be entitled to immediate discovery limited to the scope of the hearing." NRD had the option to notice the matter for trial and proceed on the merits in an expeditious fashion, which did not occur.

The injunction as entered does not disserve the public interest. When NRD's counsel and Dr. Velazquez argued prior to construction, they contacted their local police department for guidance. The officer's instructions to NRD were clear: do not perform construction in the absence of agreement from Dr. Velazquez or a court order. NRD chose to ignore the officer's peaceable and facially sound solution and, nevertheless, commenced demolition and construction. As noted in the Injunction Order, "[i]t is in the public interest that private parties who seek the assistance of the police abide by their suggestions when they are facially sensible." To find otherwise would remove any force or effectiveness from police officers instructing private citizens on peaceful, albeit temporary, solutions to disputes pending further determination from another authority.

There is also a public interest in protecting leaseholds against incursions not authorized by either law or contract. Given the nature of the dispute between the parties, it is important to have the contractual issues resolved before any interference in the lessee's enjoyment of her property occurs. The nature of Dr. Velazquez's profession necessitates that her patients have a comfortable environment, the disruption of which poses a very real threat of loss of business. The injunction, as issued in this case, prevents further damage from occurring and disallows unnecessary interference of Dr. Velazquez's practice and livelihood. Accordingly, it is in the public interest

to prevent the unnecessary disruption of a lessee's business without a clear contractual right.

NRD also argues that allowing the injunction to stand as ordered would allow parties to unilaterally declare a contract to be invalid midway through a project and require the performing party to deconstruct the work performed until all contractual disputes are resolved. NRD misses the point. Here, NRD's demolition commenced *after* Dr. Velazquez had nullified **\*6** the Agreement and twice given NRD notice of the cancellation. Whether or not the Agreement was properly nullified is, under our legal system, left to trial courts and finders of fact. The circuit court in this matter was uniquely situated to hear and weigh the evidence before deciding whether or not an injunction was the most appropriate and judicious remedy. As is evident from the circuit court's comprehensive, detailed, and well-reasoned order, consideration was given to the myriad of facts in this case and the applicable law before a decision was rendered.

 [6]    Lastly, NRD argues that there were no evidentiary hearings held in this matter and, therefore, that the injunction was improper. The transcripts of the numerous hearings held by the circuit court demonstrate that on, multiple occasions, the parties presented evidence, including but not limited to, plans, correspondence, and photographs. Moreover, NRD never objected to the manner in which the hearings were being conducted, thus the issue has not been preserved for appeal.

For the foregoing reasons, we affirm the order granting the temporary injunction and the order denying modification of the injunction or rehearing.

**All Citations**

976 So.2d 1, 32 Fla. L. Weekly D2894

---

Footnotes

1    Johnson & Wales University, the actual owner of the building when the Agreement was executed, was also a signatory to the Agreement.

---

**End of Document**                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*Smart Communications, Inc. v. Correct Solutions, LLC,* Case No:  19-CA-008089

**Attachment 2**

**To Plaintiff's Notice of Supplemental Authority**

43 Fla. L. Weekly D2779

262 So.3d 212
District Court of Appeal of Florida, Fifth District.

Helen Joyce WALSH, Appellant,

v.

David M. WALSH, Appellee.

Case No. 5D17-1655
|
Opinion filed December 14, 2018

**Synopsis**

**Background:** In post-dissolution proceeding, ex-wife moved for enforcement and contempt sanctions against ex-husband, claiming ex-husband violated final judgment of dissolution of marriage by paying her alimony based upon his adjusted gross income after deferrals were made. The Circuit Court, Seminole County, John D. Galluzzo, J., denied the motion for enforcement as well as ex-wife's subsequent motion for attorney fees. Ex-wife appealed.

**Holdings:** The District Court of Appeal, Wallis, J., held that:

[1] term "periodic income," as used in parties' marital settlement agreement (MSA), which was incorporated into judgment dissolving marriage, was ambiguous, such that parties' intent in drafting that provision was a question of fact the trial court needed to resolve before ruling on ex-wife's enforcement motion;

[2] trial court violated ex-wife's due process rights when it awarded ex-husband a credit for his overpayment of alimony; and

[3] trial court was required to consider ex-wife's need for fees and ex-husband's ability to pay prior to denying ex-wife's request for attorney fees.

Reversed and remanded.

West Headnotes (10)

**[1]    Divorce**
  👈 Contract principles;  intent of parties

A marital settlement agreement is a contract subject to the well-settled principles of contract interpretation.

**[2]    Divorce**
  👈 Contract principles;  intent of parties

When interpreting a marital settlement agreement, the language itself is the best evidence of the parties' intent, and its plain meaning controls.

**[3]    Divorce**
  👈 Construction and Operation

When interpreting a marital settlement agreement, the entire contract should be considered and provisions should not be considered in isolation to other provisions in the contract.

**[4]    Contracts**
  👈 Subject, object, or purpose as affecting construction
**Contracts**
  👈 Reasonableness of construction

The goal of contract interpretation is to arrive at a reasonable interpretation of the text in order to accomplish its stated meaning and purpose.

**[5]    Contracts**
  👈 Language of Instrument

When a contract is unambiguous and clear, it must be interpreted in accordance with its plain meaning.

**[6]    Contracts**
  👈 Existence of ambiguity
**Contracts**
  👈 Ambiguity in general
**Evidence**
  👈 Showing Intent of Parties as to Subject-Matter

If a contract is reasonably susceptible to more than one interpretation, it is ambiguous; in that instance, the issue of proper interpretation of the ambiguous contract is a question of fact requiring the submission of extrinsic evidence to show the intent of the parties when the contract was drafted.

**[7]**    **Divorce**
🔑 Non-property provisions in general

**Evidence**
🔑 Showing Intent of Parties as to Subject-Matter

Term "periodic income," as used in parties' marital settlement agreement (MSA), which was incorporated into judgment of marital dissolution, was ambiguous, such that parties' intent in drafting that provision was a question of fact the trial court needed to resolve through consideration of extrinsic evidence before ruling on ex-wife's post-dissolution motion for enforcement, which motion was based on ex-wife's claim that ex-husband violated final judgment of dissolution by paying her alimony based upon his adjusted gross income after deferrals were made; one reasonable interpretation was that something was periodic when it occurred more than once and at regular intervals, but second reasonable interpretation could mean income received repeatedly from time to time.

**[8]**    **Constitutional Law**
🔑 Spousal support; alimony

**Divorce**
🔑 Judgment and Order

Trial court violated ex-wife's due process rights when it awarded ex-husband a credit for his overpayment of alimony when denying ex-wife's motion for enforcement of final judgment of marital dissolution that incorporated parties' marital settlement agreement; such issue was not raised in the pleadings and was not tried by consent. U.S. Const. Amend. 14.

**[9]**    **Divorce**
🔑 Stipulations and agreements

Language of parties' marital settlement agreement (MSA), which agreement was incorporated into parties' judgment of marital dissolution, did not specifically waive the right to pursue statutory attorney fees, and, thus, trial court was required to consider ex-wife's need for fees and ex-husband's ability to pay prior to denying ex-wife's request for attorney fees in post-dissolution enforcement action. Fla. Stat. Ann. § 61.16.

**[10]**    **Divorce**
🔑 Stipulations and agreements

A party can waive his right to attorney's fees, under statute allowing attorney fees in proceedings related to dissolution of marriage, in a marital settlement agreement; however, such a waiver depends upon express language to that effect. Fla. Stat. Ann. § 61.16.

**\*213**  Appeal from the Circuit Court for Seminole County, John D. Galluzzo, Judge.

**Attorneys and Law Firms**

Marcia K. Lippincott, of Marcia K. Lippincott, P.A., Lake Mary, and Clayton D. Simmons, of Clayton D. Simmons, P.A., Lake Mary, for Appellant.

Andrew Joseph Chmelir, of Jacobson, McClean & Ferwerda, Winter Springs, for Appellee.

**Opinion**

WALLIS, J.

**\*214**  Helen Walsh (Wife) appeals the order denying her amended motion for enforcement and contempt sanctions against David Walsh (Husband) and the order denying her motion for attorney's fees. She contends that the trial court erred in several respects, many of which stem from the trial court's misinterpretation of the parties' Marital Settlement Agreement (MSA). Finding the trial court committed numerous errors, we reverse and remand.

In March 2008, Husband and Wife entered into the MSA in order to resolve financial issues related to the dissolution of their long-term marriage. Although Wife raises numerous claims on appeal, the central issue relates to the parties' interpretation of the definitions of the terms "gross income," "periodic income," and "periodic alimony" as used in the MSA.

The MSA states, *inter alia*:

> 8. **ALIMONY FOR WIFE.** The Husband shall pay to the Wife for her support and maintenance as permanent, periodic alimony thirty percent (30%) of the Husband's gross income. **Gross income is to be defined as the periodic income that Husband receives as a direct result of his employment efforts, before considering any deferrals and tax affected retirement savings husband may elect to have deducted from his pay.** Income that Husband receives as a result of his assets and/or savings that were previously divided with Wife, pursuant to this agreement, or income from any of Husband's new investments and/or savings, after April 26, 2005 or thereafter, are not gross income to be used to determine Wife's future alimony payments .... Husband's business expenses and related reimbursements are not to be considered income to Husband.
>
> ....
>
> Payments may be made bi-monthly on the first and fifteenth of the month.

(emphasis added). Additionally, Husband and Wife executed an Addendum to the MSA, which they agreed would control if the Addendum and the MSA were in conflict. Paragraph 1 of the Addendum provides that Husband agrees to pay Wife "periodic alimony in the minimum amount of $2,000.00 per month inclusive of the 30% of Husband's income until she dies or remarries, or cohabitates with another individual per section 3 below." Subsequently, the court entered the Final Judgment dissolving the parties' marriage, which incorporated the MSA and the Addendum by reference.

In March 2017, Wife filed her amended motion for enforcement and contempt sanctions (Motion for Enforcement), claiming Husband violated the Final Judgment by paying Wife alimony based upon his adjusted gross income after deferrals were made. Wife additionally requested that Husband pay her attorney's fees. In response, Husband moved

in limine to exclude the admission of parol evidence at the hearing on Wife's Motion for Enforcement, claiming that the language in the MSA is clear and unambiguous when it defines Husband's income and corresponding alimony obligation.

During the hearing on the Motion for Enforcement, the court granted the motion in limine and refused to consider parol evidence, finding that paragraph 8 of the MSA clearly defines the term "gross income." However, the court permitted Wife to proffer a tax code expert's testimony into the record.

After the proffer, Husband provided detailed testimony regarding his compensation structure for his job as a corporate executive. Husband explained that he was subject to different compensation programs **\*215** that, at times, included base pay, "income deferrals," and the opportunity for performance-based bonuses. He also testified that he routinely paid Wife 30% of his yearly bonuses. [1] According to Husband, he overpaid Wife alimony in the amount of $263,912.10 because he wanted to be cautious, even though he did not believe it was necessary to do so under the MSA. At the hearing, Husband's attorney clearly informed the trial court and Wife that Husband was not seeking a credit for any overpayment of alimony.

After considering the matter, the trial court entered an order denying the Motion for Enforcement and granting the motion in limine to exclude parol evidence. The court specifically found that the MSA and the Addendum are clear and unambiguous and are not subject to attack by parol evidence. The court additionally found that Husband overpaid Wife $263,912.10 in alimony, and that Husband's obligation to pay no less than $2000 per month as stated in the Addendum was exceeded by cumulative alimony payments that he made in 2016. The court, therefore, awarded Husband a credit for his alimony overpayments.

Wife thereafter filed a supplemental motion for attorney's fees and a motion for rehearing. The trial court granted Wife's motion for rehearing solely for the purpose of interpreting the meaning of paragraph 4(D) of the MSA and determining if it controls whether the court may award attorney's fees. Paragraph 4(D) of the MSA reads, *inter alia*:

> A party who fails on demand to comply with this provision or any other obligation contained in this

43 Fla. L. Weekly D2779

Agreement shall pay to the other party all attorney's fees, costs and other expenses reasonably incurred as a result of that failure or the enforcement of the obligation.

The court ultimately denied Wife's motion for attorney's fees, finding that Paragraph 4(D) was never triggered because Husband did not fail to comply with the requirements of the parties' agreements and, in fact, overpaid his alimony obligation under the MSA.

Wife appeals the order denying the Motion for Enforcement and the order denying her motion for attorney's fees. She specifically claims that the trial court misinterpreted the MSA, improperly excluded parol evidence at the hearing, abused its discretion when it awarded Husband a credit for alimony overpayments against future alimony, and erred when it denied her request for attorney's fees.

[1]  [2]  [3]  [4]  A marital settlement agreement is a contract subject to the well-settled principles of contract interpretation. Crawford v. Barker, 64 So.3d 1246, 1255 (Fla. 2011). When interpreting a marital settlement agreement, "the language itself is the best evidence of the parties' intent, and its plain meaning controls." Id. (quoting Richter v. Richter, 666 So.2d 559, 561 (Fla. 4th DCA 1995) ). Courts routinely consult dictionaries to ascertain the plain meaning of words used in contracts. Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker, 160 So.3d 955, 958 (Fla. 5th DCA 2015). "The entire contract should be considered and provisions should not be considered in isolation to other provisions in the contract." Id. The goal of contract interpretation is to arrive at a reasonable interpretation of the text in order to accomplish its stated meaning and purpose. *216 Am. K-9 Detection Servs., Inc. v. Cicero, 100 So.3d 236, 238–39 (Fla. 5th DCA 2012).

[5]  [6]  When a contract is unambiguous and clear, it must be interpreted in accordance with its plain meaning. Washington Nat'l Ins. v. Ruderman, 117 So.3d 943, 948 (Fla. 2013). If, however, a contract is reasonably susceptible to more than one interpretation, it is ambiguous. Elias v. Elias, 152 So.3d 749, 752 (Fla. 4th DCA 2014). In that instance, the issue of proper interpretation of the ambiguous contract is a question of fact requiring the submission of extrinsic evidence to show the intent of the parties when the contract was drafted. Id.

[7]  Contrary to the court's findings, paragraph 8 of the MSA does not clearly show that the parties intended to exclude from income for alimony calculation purposes "incentive based payments or bonuses" and other types of income. Rather, the definition of "gross income" included in paragraph 8, and, specifically, the term "periodic income" is susceptible to two reasonable interpretations.

For example, the dictionary defines "periodic" as "occurring or recurring at regular intervals" or "occurring repeatedly from time to time." *Periodic*, Merriam-Webster's Collegiate Dictionary 921 (11th ed. 2012). This definition reveals two reasonable interpretations. First, based on the first portion of the definition of periodic, one reasonable interpretation is that something is periodic when it occurs more than once and at regular intervals. Based on this definition, it is reasonable to find, as the trial court found, that the parties meant for the term "periodic income" to mean only that income that Husband receives at "regular intervals" like base pay, and they meant to exclude other types of income that Husband did not receive on a regular basis or that he usually received but that were not guaranteed income. Second, based on the second part of the dictionary definition of "periodic," another reasonable interpretation of "periodic income" could mean income that Husband received "repeatedly from time to time" like bonuses and incentive pay that he received more than once. Even though the bonuses and incentive pay were not paid at regular intervals, they would still qualify as "periodic income" for purposes of the MSA because Husband received them from "time to time" as a "direct result of his employment efforts."

Because the term "periodic income" is susceptible to two reasonable interpretations, those terms are ambiguous, and the court erred in finding otherwise. See Washington Nat'l Ins., 117 So.3d at 949; Elias, 152 So.3d at 752. Accordingly, the parties' intent in drafting that provision was a question of fact that the lower court needed to resolve. See Land O'Sun Realty Ltd. v. REWJB Gas Invs., 685 So.2d 870, 872 n.3 (Fla. 3d DCA 1996). Therefore, the trial court should have allowed the introduction of extrinsic evidence to establish the parties' intent in drafting the MSA as it relates to the definition of "gross income" for purposes of calculating alimony. See Elias, 152 So.3d at 752; Land O'Sun, 685 So.2d at 872.

[8]  We additionally conclude that the trial court erred when it awarded Husband a credit for his overpayment of alimony because the issue was not raised in the pleadings and it was

not tried by consent. [2]  See *217  Pro-Art Dental Lab, Inc. v. V-Strategic Grp., LLC, 986 So.2d 1244, 1252 (Fla. 2008) (allowing a court to rule on a matter without proper pleading and notice violates party's due process rights). Therefore, the trial court violated Wife's due process rights when it awarded Husband a credit against alimony in its order on the Motion for Enforcement. [3]  See id.

 [9]  [10]  Finally, we conclude that the trial court erred by denying Wife's request for attorney's fees pursuant to section 61.16, Florida Statutes. As previously explained, marital settlement agreements are governed by contract principles. Mott v. Mott, 800 So.2d 331, 333 (Fla. 2d DCA 2001). A party can waive his right to attorney's fees under section 61.16 in a marital settlement agreement. DeCampos v. Ferrara, 90 So.3d 865, 869 (Fla. 3d DCA 2012). However, such a waiver "depends upon express language to that effect." Id. Here, there is no provision in the MSA that specifically states that the parties waived their right to attorney's fees under section 61.16. Moreover, none of the provisions discussing attorney's fees can be read as an implicit waiver of the right to recover fees pursuant to section 61.16. Because the language of the MSA does not specifically waive the right to pursue fees under section 61.16, it was error for the lower court to deny Wife's motion for attorney's fees without considering her need for fees and Husband's ability to pay. See Caryi v. Caryi, 119 So.3d 508, 511 (Fla. 5th DCA 2013) (finding provision in MSA that stated "[t]he parties shall each be responsible for his or her own attorneys' fees and costs associated with this matter" did not reflect intent by either party to waive right to seek attorneys' fees award in subsequent action); Planes v. Planes, 477 So.2d 42, 42–43 (Fla. 3d DCA 1985) (finding footnote in parties' agreement stating that wife waives "any and all claims that she now has, or may ever have, to ... attorney's fees" does not prevent award of section 61.16 fees in enforcement proceeding).

For the previously explained reasons, we reverse the order denying Wife's Motion for Enforcement and remand so that the trial court can determine the parties' intent regarding alimony when they drafted the MSA. On remand, the trial court shall consider relevant extrinsic evidence offered by the parties regarding their intent in drafting the MSA. Additionally, we remind the trial court that it should not award relief beyond the scope of the pleadings. We finally reverse the order denying Wife's motion for attorney's fees and remand so that the trial court can determine whether it is appropriate to award Wife attorney's fees under section 61.16.

REVERSED and REMANDED with Instructions.


EDWARDS and HARRIS, JJ., concur.

**All Citations**

262 So.3d 212, 43 Fla. L. Weekly D2779

---

Footnotes

1    During this litigation, Husband has taken inconsistent positions regarding his bonuses. Although Husband argues on appeal that any bonuses he received throughout his career were neither guaranteed payments nor periodic income as defined by the MSA and the Addendum, he routinely paid Wife 30% of those bonuses.

2    Normally, Wife's failure to request rehearing on the credit issue would preclude appellate review. See Hall v. Marion Cty. Bd. of Cty. Comm'rs, 236 So.3d 1147, 1153 (Fla. 5th DCA 2018). However, the deprivation of Wife's due process rights was fundamental error that may be raised for the first time on appeal. See id. at 1153–54.

3    We also note that the trial court erred when it awarded Husband a credit for his overpayment of alimony because there is no evidence from the hearing that: (1) the parties agreed that Husband would overpay Wife alimony in certain years and then receive a credit for that overpayment later; or (2) it would be equitable to award Husband a credit for the overpayment, especially since he deducted those overpayments on his taxes. See Martinez v. Martinez, 383 So.2d 1153, 1155 (Fla. 3d DCA 1980) (finding husband not entitled to a refund of overpayments of alimony where they were voluntarily made and not contemplated as a loan from husband to wife); Hubshman v. Hubshman, 379 So.2d 670, 671 (Fla. 4th DCA 1980) (holding court erred in awarding husband credit toward future alimony where neither party had considered overpayments as advances on future alimony payments and they were more in nature of gifts to wife).

---

                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

*Smart Communications, Inc. v. Correct Solutions, LLC,* Case No:  19-CA-008089

**Attachment 3**

**To Plaintiff's Notice of Supplemental Authority**

Mariner Cay Property Owners Ass'n, Inc. v. Topside Marina, Inc., 714 So.2d 1130 (1998)

23 Fla. L. Weekly D1654

714 So.2d 1130
District Court of Appeal of Florida,
Fourth District.

MARINER CAY PROPERTY OWNERS
ASSOCIATION, INC., a not-for-profit Florida
corporation, Appellant,
v.
TOPSIDE MARINA, INC., a Florida corporation,
as successor in interest to Lee A. Ray and Nancy J.
Ray, his wife, Martin County, a political
subdivision of the State of Florida, Charles F.
Kehoe and Phyllis Kehoe, his wife, Appellees.

No. 97–2811.
|
July 15, 1998.

**Synopsis**
Homeowner's association brought suit against marina
seeking enforcement of a settlement agreement executed
by the parties. The Circuit Court, Martin County, Cynthia
Angelos, J., denied relief, and the association appealed.
The District Court of Appeal, Polen, J., held that
settlement agreement between homeowner's association
and marina for construction of common wall was
ambiguous.

Reversed and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (2)

**[1]** **Contracts**
⬅ Ambiguity in general

Construction of all written instruments is a
question of law and belongs to the courts,
provided the language used is clear, plain,
certain, undisputed, unambiguous, unequivocal,
and not subject to conflicting inferences.

14 Cases that cite this headnote

**[2]** **Compromise and Settlement**
⬅ Construction of Agreement

Settlement agreement between homeowner's
association and marina for construction of
common wall was ambiguous because it was
fairly susceptible to different constructions.

4 Cases that cite this headnote

**Attorneys and Law Firms**

*1130 Steven L. Perry of Steven L. Perry, P.A., Stuart,
for appellant.

*1131 John W. Madden of Jones & Madden, Stuart, for
appellee Topside Marina, Inc.

**Opinion**

POLEN, Judge.

Mariner Cay Property Owners Association, Inc. ("Mariner
Cay"), a homeowner's association, timely appeals from a
final order denying its motion to enforce a 1984
settlement agreement against Topside Marina, Inc.
("Topside"), the marina adjacent to Mariner Cay. It
argues that the trial court, in denying the motion, erred in
finding that the agreement was unambiguous. We agree
and reverse.

The 1984 settlement agreement called for the construction
of a common wall between Mariner Cay and the marina,
and provided, in pertinent part:

The following Agreement ... represents the intent of the
respective parties to protect the health, safety and
welfare of the residents in the Mariner Cay
Development ... as well as protection of the rights of
the owners of the marina property to live peacefully on
their property and conduct their business and pursue
their livelihood free of interference....

The [owners of the marina] will construct a six foot (6')
concrete block wall on or immediately north of the
common property line between the [marina] and
Mariner Cay....

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Mariner Cay Property Owners Ass'n, Inc. v. Topside Marina, Inc., 714 So.2d 1130 (1998)

23 Fla. L. Weekly D1654

Said wall shall be kept in good repair by the [marina].

The wall shall be constructed to eliminate water runoff from the marina onto Mariner Cay....

This Agreement shall be binding on all heirs, successors and assigns of the parties.

The wall replaced a continuous, unbroken chain link fence that had existed at the same site. The wall, however, stopped short of the seawall, and remained attached to a portion of the original fence via a padlock.

In 1995, Charles and Rachel Scott, members of Mariner Cay, requested permission from Mariner Cay to install a gate in the wall. Mariner Cay denied their request. Nevertheless, the Scotts, who owned a boat, installed the gate in 1997, providing them access to the marina.[1]

Mariner Cay then sued Topside to enforce the agreement and, thus, to remove the gate. At the evidentiary hearing that followed, parol evidence was admitted, without objection, as to the parties' intent in forming the agreement. James Herbert, the former president of Mariner Cay, testified that the parties intended that the wall prevent any access to and from the marina to secure the residents at Mariner Cay. He testified that the parties did not contemplate that a gate could be installed within the wall because any interruptions in the wall would disturb the privacy and security of the residents.

However, James Groat, the owner of Topside, testified that one resident of Mariner Cay, Phyllis Kehoe, had keys to the padlock at the end of the wall which provided her access to the marina. Her access, Topside argued, showed that the parties did contemplate that structures could be installed within the wall to provide residents access to the marina.

Following Groat's testimony, the trial court stopped the hearing. Basing its decision solely on the "four corners" of the settlement agreement, it found that the agreement was clear and unambiguous. Because the agreement did not expressly prohibit the installation of a gate within the wall, it then denied the motion to enforce.

[1] [2] It is a cardinal rule that the construction of all written instruments is a question of law and belongs to the courts, provided "the language used is clear, plain, certain, undisputed, unambiguous, unequivocal, and not subject to conflicting inferences." *Okeelanta Corp. v. Bygrave,* 660 So.2d 743, 747 (Fla. 4th DCA 1995) (citation omitted). While each side in this case maintains that the agreement is clear and unambiguous, just as the trial court found, the interpretations advocated by both sides, while reasonable, differ. We find that this paradox renders **\*1132** the agreement ambiguous because it is fairly susceptible to different constructions. *See Royal Am. Realty, Inc. v. Bank of Palm Beach and Trust Co.,* 215 So.2d 336, 338 (Fla. 4th DCA 1968).

Accordingly, we believe it was error for the trial court to have concluded that the agreement was unambiguous. We, thus, reverse the final judgment and remand this case to the court to resolve the ambiguity and make specific findings, based on the testimony offered at the prior hearing, as to what the parties intended by the construction of the common wall. On remand the court, should it desire, may entertain the proffered testimony of Phyllis Kehoe, whom the court previously precluded from testifying.

REVERSED and REMANDED in accordance with this opinion.

WARNER and SHAHOOD, JJ., concur.

**All Citations**

714 So.2d 1130, 23 Fla. L. Weekly D1654

**Footnotes**

1    It is undisputed that the Scotts have since removed the gate. However, this does not moot this court's jurisdiction, because the questions raised in the briefs are likely to recur. *See Pace v. King,* 38 So.2d 823 (Fla.1949).

© 2019 Thomson Reuters  No claim to original U S  Government Works

WESTLAW  © 2019 Thomson Reuters  No claim to original U.S. Government Works

**Mariner Cay Property Owners Ass'n, Inc. v. Topside Marina, Inc., 714 So.2d 1130 (1998)**

23 Fla. L. Weekly D1654