## Rules, Regulations & Communications

33. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

34. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 11 / 7 / 17

Email: ████@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 11 / 15 / 17

Email: ████@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No.  19-CA-008089

COMPOSITE
# EXHIBIT DD
*to Amended Complaint*

# CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between Sebastian County Sheriff's Office located at 800 South A Street, Fort Smith, AR 72901, herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1.  **TERM.** This Agreement is effective on the latest signature date ("Effective Date"), and shall continue in effect for a period of two (2) years ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement with annual extensions for up to four (4) additional years. Each renewal will be based on a yearly review of services provided by CSG.

2.  **SCOPE OF AGREEMENT**

    2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems within its building or on its private property ("Location") during the term of this Agreement. CSG and Facility have agreed upon specific rates for inmate collect, debit and advance pay calls as described in Attachment A of this Agreement.

    2.2 This Agreement includes all other premises, whether now existing (if a competing provider has a contract and equipment at such premises, this clause applies at the earliest termination opportunity) or subsequently acquired, under the control of Facility. Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

    2.3 CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility

equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated unbillable.

2.4 CSG shall install and maintain Equipment in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5 CSG agrees to provide Equipment as indicated in Attachment B for the Term of this Agreement.

2.6 CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.5 Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility. CSG will install and maintain all necessary infrastructure equipment at no cost to Sebastian County.

2.7 Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.8 Facility agrees to allow CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.9  Facility agrees to allow CSG access to and use of house cable and inside wire at no cost where available in order to install and provide inmate telephone service.

2.10 Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be agreed to by CSG in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11 Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.12 CSG shall provide Facility with value-added features as listed in Attachment C.

2.13 In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment D.

3. **OWNERSHIP.** Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment. Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment. Facility shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4. **LEGAL ENFORCEMENT.** If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5. **LAWFULNESS OF AGREEMENT.** The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6. **NONWAIVER.** The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7. **GOVERNING LAW.** This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State in which the Equipment is provided.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment B must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy such default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of telephones as described in Attachment B, must be in writing and signed by an authorized representative from each Party.

15. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**                                    **FOR CSG**

Attn: Honorable David Hudson             Attn: Patrick Temple

Address:                                               Address:
800 South A Street                               182 Bastille Lane
Fort Smith, AR 72901                          Ruston, LA 71270

16. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**For Sebastian County Sheriff's Office**

_____ **Signature**

_Bill Hollenbeck,_ _____ Print

_3/27/17_ _____ Date

**For Correct Solutions Group**

_____ Signature

_____ Print

_____ Date

# ATTACHMENT A

# RATE SCHEDULE

Rates for calls within the Inmate Call Control Platform will be programmed per the table below:

| Rates - Sebastian County, AR | |
|---|---|
| **PREPAID CALLS** | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| **PIN DEBIT CALLS** | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| **PREPAID CARDS** | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |

**Simple two fee structure for account funding:**
**$5.95 for Account Funding utilizing live operator**
**$3.00 for Account Funding utilizing IVR, Web, Kiosk**

## ATTACHMENT B

## PROVIDED EQUIPMENT

**Inmate Call Control Platform.**  The CSG provided Platform will be installed to accommodate the 31 inmate telephones or more as needed and portable telephones as listed in the Sebastian County RFP.  Platform will be programmed per the requirements of the County to reflect times of operation. This includes all existing facilities, future expansions or locations.

Inmate call platform, servers, routers and switches are the property of CSG and will be provided at no cost to Customer.

**Video Visitation Platform –** The CSG provided Video Visitation Platform equipment will consist of fifteen (15) inmate side video visitation terminals, seven (7) public side video visitation terminals, one (1) cart video visitation terminal, one (1) Lobby Scheduling Monitor and one (1) Lobby Registration and Scheduling Terminal.

The Video Visitation Platform will be installed by CSG.  All equipment will remain the property of CSG and will be provided at no cost to Customer for the duration of Initial Term and Annual Renewals.  The following table is demonstrates Customers obligation in the event that this Agreement is not renewed or cancelled for any reason prior to the Initial Term and Annual renewals not being met.

In the event that Agreement is not extended, cancelled or otherwise made to be not in effect, Customer agrees to the following schedule, based on six (6) years, as a payment for equipment and services.  Customer agrees that, should the aforementioned actions negating the original Agreement take place within the given year listed below, the scheduled amount shown would be paid to CSG in full.

   a.  Year 1 – beginning with installation and lasting one (1) year, Customer agrees to pay $129,000 to CSG.
   b.  Year 2 – beginning with the second year following installation, Customer agrees to pay $107,436 to CSG.
   c.  Year 3 – beginning with the third year following installation, Customer agrees to pay $85,872 to CSG.
   d.  Year 4 – beginning with the fourth year following installation, Customer agrees to pay $64,308 to CSG.
   e.  Year 5 – beginning with the fifth year following installation, Customer agrees to pay $42,744 to CSG.
   f.  Year 6 – beginning with the sixth year following installation, Customer agrees to pay $21,180 to CSG.

Customer agrees to pay CSG monthly maintenance and support cost per the following table. Monthly maintenance and support costs will be deducted from inmate telephone commission payments from CSG to Customer.

    a. Year 1 – There will be no monthly maintenance and support cost charged to Customer during the first year of this Agreement.

    b. Year 2-6 – A monthly maintenance and support cost of $1,290.00 per month will be deducted from inmate telephone commission payable to Customer by CSG.

    c. After Year 6, the maintenance and support cost paid by Customer to CSG ceases. Any support arrangements from this time period going forward will be negotiated between Customer and CSG at that time.

Provided Equipment and Value-Added Equipment will be installed and implemented per the timeline listed below:



## ATTACHMENT C

## VALUE-ADDED FEATURES

CSG will provide the CELLMATE Platform to Customer.  The Cellmate platform provides tablets to inmates for daily use.

Features included are:
- Talk – inmates will be able to place inmate phone calls, which adhere to all security measures, from the tablets.
- Text – inmates will be able to text numbers and receive text from numbers.  All security measures apply and all text will be available to investigators.  Family members must have an account established with CSG in order to receive or send texts.
- Games – inmates will be provided with games.
- Books – CSG utilizes a public domain repository of books that the inmate can choose and read on the tablet.

The tablet is manufactured with a clear back cover for security purposes.

No access to outside internet will be available for inmates utilizing tablets.

Charging stations for tablets will be provided by CSG as needed by Customer.

An initial 500 tablets will be provided to Customer.  Initial inventory will be enough to supply each inmate with a tablet and provide Customer a spares inventory.

Tablets will not be repaired and should only be replaced.  Once spares inventory is depleted, Customer and CSG will negotiate replacement program.

KIOSKS – CSG will provide, at no charge to the Customer, three (3) kiosks.  Two (2) kiosks will be placed in the unsecured area of the facility and will be accessible to family and friends for deposit of funds onto inmate accounts.  One (1) kiosk will be placed on the secured side of the facility within the booking area.  This kiosk will be utilized for inmate fund acquisition at the time of booking and will be equipped to accept coins and cash and must be interfaced with appropriate Customer software to maintain accounting.  All kiosks will accept U.S. currency only.

## ATTACHMENT D

## FINANCIAL SCHEDULE

In consideration for this exclusive Contract and Agreement, CSG shall pay Customer a Commission Fee of 74% (Seventy-Four Percent) of the Total Gross Revenue for completed inmate telephone calls regardless of call type, with exception to Interstate Calls due to FCC ruling.

CSG shall provide Customer with a monthly commission report that details all call types, call volumes and call rates. All rates and charges under this Agreement shall conform to the Public Service Commission regulations of Arkansas.

 

## Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartTablets and Secure Network

1. The SmartTablet system and its entire supporting infrastructure are provided at no cost to the Sebastian County Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartTablet on a 1:1 inmate to tablet ratio based on the Average Daily Population ("ADP"). Sufficient reserve tablets shall also be provided. Customer shall determine which inmates have access to the SmartTablets. Provider reserves the right to periodically evaluate and adjust the ratio based on usage and with agreement of Customer.

3. The SmartTablet is a custom, wireless, ruggedized and correctional grade tablet of our custom specifications that will connect to our secure network.

4. The SmartTablet software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Distribution and Refurbishment Plan

6. We will provide a tablet charging station and "home base" within each housing unit within the facility. These home bases can be permanently installed into a housing area (e.g. wall mounted) or can be provided as mobile carts to allow for bulk transportation of tablets as needed. Each home base provides the necessary connections for charging the tablets, as well as a convenient storage location to ensure all tablets are accounted for during non-usage times.

7. Each tablet is assigned to a specific housing area and will only allow inmates within that housing area to sign in and use a tablet. Individual tablets are not assigned to specific inmates. Any inmate in a given housing unit may use any tablet that is assigned to that housing unit. If a tablet that an inmate is using stops working, they can return it to the home base or to a deputy for maintenance, and then take a different tablet and sign on and gain full access to their account and content. Provider will provide to the Customer a sufficient number of extra SmartTablets so that the available number of SmartTablets will always exceed the actual inmate population. In the event a tablet stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. We will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office.

### Maintenance and Support Plan

8. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each tablet checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

### Electronic Messaging

9. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

10. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

11. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

12. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

13. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

14. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

15. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

16. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

17. Electronic Messaging. Each email message is billed at one credit ($0.50).

18. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

19. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

20. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

21. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

22. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

23. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

24. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

25. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

26. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

27. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

28. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Customer Responsibilities

29. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

30. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

31. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

32. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

33. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

34. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

35. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

36. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

37. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

38. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

39. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Tablet Solutions™.

40. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

41. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

42. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

43. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

44. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

45. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

46. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

47. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

48. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

49. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.                    Provider: Smart Communications Holding, Inc.

By: _____                       By: _____

Name: Patrick Temple                                 Name: James P. Logan

Title: Managing Director                             Title: Vice President

Date: 9/13/17                                        Date: 8-31-17

Email: ████@correctsolutionsgroup.com                Email: ████@smartjailmail.com

Notice Address:                                      Notice Address:
182 Bastille Lane                                    4522 West North B Street
Ruston, LA 71270                                     Tampa, FL 33609

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No.  19-CA-008089

# EXHIBIT EE

*to Amended Complaint*

*LIVE 6-10-15*

# ELECTRONIC MESSAGING SYSTEM AGREEMENT

**THIS AGREEMENT** by and between the Greene County Sheriff's Office, with principal offices located at 1809 N Rockingchair Rd, Paragould, AR 72450, hereinafter referred to as "CLIENT", and Smart Communications West, Inc. or its designated assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "CONTRACTOR", is entered into as of the _10th_ day of _April_, 2015.

## WITNESSETH:

**WHEREAS,** Contractor desires to provide Client, at no cost to Client, a complete two-way, closed circuit, secure electronic messaging system for the inmates at the Client Jail Facility located at 1809 N Rockingchair Rd, Paragould, AR 72450 ("Facilities"), and

**WHEREAS,** Contractor is willing to provide all of the equipment and support services to operate the electronic messaging system at no cost to Client, including the kiosks, software, installation, maintenance, networking and support for the system, and

**WHEREAS,** Contractor is willing to provide Client with a percentage of the fees collected from the users of the electronic messaging system, and

**WHEREAS,** Client desires to provide the inmates of the Client Jail Facilities with this electronic messaging system and is willing to provide Contractor with access to Client Jail Facilities for the purposes of installing and maintaining this electronic messaging system.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

## SECTION 1: ENGAGEMENT OF CONTRACTOR

1.1.    Client hereby engages Contractor to provide, on an exclusive basis, a fully functional electronic messaging system to the inmates residing in the Client Jail Facilities. The parties agree that this Agreement shall be governed by all federal, state and county laws applicable to Hillsborough County, Florida.

## SECTION 2: CONTRACTOR'S RESPONSIBILITIES

2.1.    Contractor will provide at no cost to Client a fully functional electronic messaging system for the inmates of the Client's Jail Facilities. Contractor is exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system.

1

2.2.    Contractor will provide at no cost to Client the labor for the installation of the electronic messaging system.

2.3.    Contractor will provide at no cost to Client the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

2.4.    Contractor is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Client Jail Facilities. These costs do not include the costs of the actual electrical power.

2.5.    Contractor will maintain records for a period of seven (7) years from the date the record is made. Upon request, Contractor will provide Client with copies of the requested record for the purpose of inspecting, examining, and auditing the Contractor's records directly relevant to Client.

2.6.    Contractor will provide each inmate of the Client Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates. Client grants Contractor exclusive rights to sell advertising space within the electronic messaging system provided said advertising complies with all applicable laws. All advertisements placed on the system must include a disclaimer that it is a paid advertisement and its inclusion on the system does not constitute an endorsement or recommendation by Client.

2.7.    Contractor will provide Client with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Contractor will maintain a record of all electronic messages sent through the electronic messaging system for a period of Seven (7) years from the time the message is sent.

2.8.    The work to be performed by Contractor under this Agreement may, at its discretion, be performed directly by it or wholly or in part through a subcontractor of its choosing.

**SECTION 3: CLIENT'S RESPONSIBILITIES**

3.1    Client will provide Contractor with access to the Client Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

3.2.    Client will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

3.3.    Client will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Client website, with a link to the Smart Jail Mail website.

3.4.    Upon completion of installation and appropriate system testing, Client will allow the electronic messaging to go live within forty-eight (48) hours notice of system availability.

3.5.    Client will provide a list electronically twice each day of all inmates residing in the Client Jail Facilities and their current housing assignments. Contractor will use this listing to insure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

3.6.    Client will give prompt notice to Contractor of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## SECTION 4: TITLE

4.1.    The Smart Jail Mail System, including kiosks, hardware, software, networking, cabling, etc., shall at all times remain the property of the Contractor.

4.2.    Upon termination of this Agreement, Contractor shall remove the Smart Jail Mail System except for the cabling and conduit which shall become the property of the Client.

4.3.    Upon removal of the Smart Jail Mail System from the Client Jail Facilities, Contractor will insure that all Client specific information, forms and graphics are removed from all hardware and software used in connection with the System.

## SECTION 5: TERM AND TERMINATION

5.1    This Agreement shall commence on the effective date and shall continue for a period of three (3) years from the date of system going live. After this original three (3) year term, this Agreement shall automatically renew each year for a one year term. This agreement may be terminated after the original three (3) year term upon written notice at least sixty (60) days prior to the expiration of the current term.

5.2.    Either party may terminate this Agreement by giving the other party thirty (30) calendar days written notice on any of the following:

3

5.2.1.  The other party's failure to comply with any provision of the Agreement within thirty (30) calendar days after receipt of written notification and be given the opportunity to cure/comply with the provision.

5.2.2.  Mutual agreement of both parties.

5.3.     Either party may terminate this Agreement immediately upon thirty (30) calendar days written notice to the other upon the occurrence of any of the following special situations:

5.3.1.  In the event there is a change in the Office of Sheriff due to an election, resignation or death and the Sheriff-elect makes the decision not to continue this Agreement.

5.3.2.  Insolvency, bankruptcy, or receivership of Contractor.

5.3.3. Failure of contractor's system to function as described above.

5.3.4. Failure of contractor to maintain functionality of system as described above.

## SECTION 6: FINANCIAL ARRANGEMENTS

6.1.     Client agrees to provide the general population inmates in the Client Jail Facilities with access to the electronic messaging system at the same time the inmate phone system is available for use; however, due to security and disciplinary concerns, Client reserves the exclusive right to determine the time of access, the location of access, the method of access, and identification of those individual inmates who may access the electronic messaging system.

6.2.     Contractor agrees to provide the electronic messaging service to inmates at the Client Jail Facilities for a cost of $.50 (fifty cents), per message transmitted through the electronic messaging system. Not including indigent and promotional messaging.

6.3.     Contractor agrees to pay Client a commission of ten percent (10%) of gross revenues collected from message credits used, excluding non-paid credits to indigents and non-paid promotional credits. Said commission is based upon Contractor providing service to Client which includes secure two way messaging between inmates and public users; jail administrative services, including customized information routing of grievances, medical request forms, etc., to appropriate units with memorialized no charge two-way communication; commissary menu and electronic ordering as well as all maintenance to system, including price changes, product drop and add, etc.; and all administrative tools.

4

6.4.    Contractor will pay commissions to Client on a monthly basis, no later than thirty (30) calendar days from the end of each calendar month for which services are provided, together with all appropriate reports necessary to substantiate the amount remitted.

6.5.    Contractor agrees that Client does not incur any financial obligations to Contractor as a result of this Agreement.

6.6.    Should the parties mutually agree to a change in the scope of services provided under this Agreement, a mutually agreed to adjustment in the commission rate paid will be allowed.

## SECTION 7: EMPLOYEES

7.1.    Contractor represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. Such personnel shall not be employees of Client or have any contractual relationship with Client. All of the services required hereunder will be performed by the Contractor or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services.

7.2.    Client acknowledges that the Contractor is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Client to exercise control or discretion over the manner by which Contractor performs hereunder.

7.3.    Contractor expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tagout procedures, material safety data sheets and labeling.

7.4.    Contractor certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Client shall consider the employment of unauthorized aliens a violation of Section 274A (e) of the Immigration and Nationality Act (8 U.S.C. 1324a). Contractor agrees that such violation shall be cause for the unilateral and immediate termination of this Agreement by Client.

7.5.    Contractor certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

7.6.    Client will take all reasonable and customary steps necessary to screen all Contractor's employees providing services requiring entry into the Client Jail Facilities, up to and including conducting law enforcement background checks, to provide that such

5

personnel will not constitute a security risk to the institution or the inmates and further, Contractor will cooperate as required to execute this provision up to an including providing a Federal Form I-9, Employment Eligibility Verification, on all Contractor's employees and all subcontractor's employees needing admission to the Client Jail Facilities.

7.7.    Each party agrees that it shall be solely responsible for the negligent or wrongful acts of its employees. However, nothing contained herein shall constitute a waiver by Client of its sovereign immunity or the provisions of Section 768.28, Florida Statutes.

## SECTION 9:MISCELLANEOUS

9.1.    Public Entity Crime. Contractor confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Contractor hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

9.2.    Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.3.    Compliance with Laws. Contractor shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

9.4.    Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida and other pertinent Florida courts and further that neither party shall seek to remove such litigation from Circuit Courts or Appellate Courts of the State of Florida by application of conflict of laws or any other removal process to any Federal Court or court not in Florida.

9.5.    Attorney Fees. In the event of litigation concerning this Agreement, the Client and Contractor shall each be responsible for their own attorney's fees and costs.

9.7.    Drug-Free Workplace. Contractor and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy and said policy must include pre-employment testing of their employees.

9.8.    Completeness of Contract. This Agreement and any additional or supplementary document or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the parties hereto.

9.9.    Force Majeure. Contractor will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Client to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either party.

9.10.   Assignment. Contractor may assign this Agreement to any parent, successor, or subsidiary corporation without the express written consent of Client.

9.11.   Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not effect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

9.12.   Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

9.13.   Notices. Any notices, payments or reports required by this Agreement shall be sufficient if sent by the parties hereto in the United States mail, postage paid, to the addresses noted below:

    9.13.1. As to Client for notices and reports:
        ***TBD***
        Greene County Sheriff's Office
        1809 N Rockingchair Rd.
        Paragould, AR 72450

    9.13.2 As to Contractor:
        James Logan, President
        Smart Communications West, Inc.
        4522 W North B ST
        Tampa, Florida 33609

9.11.   Entire Agreement. This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. This Agreement may be amended or revised only in writing and signed by all the parties.

IN WITNESS WHEREOF, the parties have set their hands and seals hereto as of the day and year first above written.

GREENE COUNTY SHERIFF'S OFFICE ~ JUDGE'S OFFICE

By: _____          Date: 3/30/15
***TBD***
BY: Rusty A. McMillon, JUDGE

Witness: SHMccabee_____

SMART COMMUNICATIONS WEST, INC.

By: _____          Date: 4-18-15
James Logan, President

Witness: _____

8

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No. 19-CA-008089

# EXHIBIT FF

*to Amended Complaint*



## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between **Greene County Sheriff's Office** located at 1809 N Rockingchair Rd., Paragould, AR 72450 herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective on August 1, 2019 or date of equipment cut ("Effective Date"), and shall continue in effect ("Initial Term") from the Effective Date until July 31, 2023. Upon completion of the Initial Term, Facility will have the option to renew this Agreement for a period of 1 year. Each renewal will be based on a yearly review of services provided by CSG. This Agreement will automatically renew under the terms described as Initial Term unless either party notifies the other in writing of its intent to terminate this Agreement at least 90 days prior to the final date of expiration. Upon termination of this Agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this Agreement.

2. **SCOPE OF AGREEMENT**

   2.1  This Agreement includes all other premises, whether now existing (if a competing provider has a contract and equipment at such premises, this clause applies at the earliest termination opportunity) or subsequently acquired, under the control of Facility. Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

*mT*
*7/18/19*

2.2  CSG shall have the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments as it relates specifically to inmate telephone lines.  CSG shall be responsible for the payment of all charges in connection of the Equipment and will be responsible for any bad debt and associated unbillables related to the inmate telephone lines.

2.3  CSG shall install and maintain Equipment in good working order.  CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order. CSG will attempt to respond on same day service request but will guarantee next day or next business day response.

2.4  CSG agrees to provide Equipment as indicated in Attachment B for the Term of this Agreement.

2.5  CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the , for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue.  All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.6  Exclusivity and Rigth of First Refusal. In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems within its building or on its private property ("Location") during the term of this Agreement.  CSG and Facility have agreed upon specific rates for inmate collect, debit and advance pay calls as described in Attachment A of this Agreement.  Except for existing third party vendors and only until such third party vendor's contract expires, Customer will not allow any products or services that compete with those supplied by CSG during the term of this Agreement to be, or to remain, installed at Customer facility, including present and future Customer facilities.  CSG will have the exclusive right to provide the products and services implemented at Customer facility through this Agreement, and those other inmate communication, educational or entertainment products or services, kiosk services, inmate banking services, tablets, video visitation, inmate electronic messaging, inmate electronic mail, sought by Customer during the term of this Agreement, whether the products or services are for inmates located at Customer facility or at third-party facilities; provided, however, that CSG may choose not to exercise this exclusive right.

2.7  Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility.  In the event Facility is not the owner of the premises, Facility shall, where necessary, obtain permission from building owner or owner's agent for the placement of CSG's Equipment, and shall be responsible for any fees for use of required riser cable and electric power.

JMT
7/18/19

2.8  Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.9  Facility agrees to all CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.10  Facility agrees to allow CSG access to and use of house cable and inside wire at no cost, in order to install and provide inmate telephone service.  Any new house cable or inside wire required during the contract term will be at the sole expense of Facility, unless otherwise negotiated by CSG.

2.11  Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be agreed to by CSG in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.12  Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.13  CSG shall provide Facility with value-added features as listed in Attachment C.

2.14  In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment D.

3.  **OWNERSHIP.**  Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment.  Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment.  Facility shall restore the premises to their original condition.  CSG shall not be responsible for damage to the premises that occur due to vandalism.  CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4.  **LEGAL ENFORCEMENT.**  If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5.  **LAWFULNESS OF AGREEMENT.**  The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

MY
7/18/19

6. **NONWAIVER.** The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

**GOVERNING LAW.** This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State in which the Equipment is provided.

7. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

8. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment B must be in writing and signed by an authorized representative of each party.

9. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

10. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

11. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy usch default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

12. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

MT
7/18/19

13. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of telephones as described in Attachment B, must be in writing and signed by an authorized representative from each Party.

14. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**

Attn: Greene County Sheriff's Office

Address:    1809 N Rockingchair Rd

          PParagould, AR 72450

**FOR CSG**

Attn:  Patrick Temple

Address: 182 Bastille Ln.
Ruston, LA 71270

15. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**Signatures: The persons signing below signify that they have the authority from their respective business entities to execute this Agreement.**

**Facility**

_Signature_

**Printed Name**
RUSTY A. MCMILLON

**Title**
COUNTY JUDGE    7.24.2019
                    _Date_

**CSG**

_Signature_

**Mark Turner**
**Printed Name**

**VP Sales**
_Title_
7/18/19
          _Date_

## ATTACHMENT C

## PROVIDED FEATURES

CSG will provide all current features of the inmate telephone system which include, but are not limited to, all investigative features, reporting, logging, scheduling of inmate phone calls.

In addition to the inmate phone system, CSG will provide:

**PREA Hotline**

Correct Solutions Group will provide the Facility convenient access to PREA Hotline for inmates, with email alerts to Facility administration for immediate review.

**Inmate Voice Mail**

The ITS Integrated Voice Mail Exchange (VMX) provides individualized voice messaging for each enrolled inmate. VMX is a not a typical voice mail system, but has been specifically engineered as an integral part of the ITS. As such the system provides complete security and control over all aspects of the inmate's use of the system. Administrators can search for and listen to any message on the VMX even after the inmate has deleted the message from the mailbox. The VMX provides all necessary class of service controls for inmate users such as the number of messages allowed, message retention and deletion. Administrators can provision additional controls over how many messages a caller can leave in the inmate's mailbox.

**Inmate Hotline**

Inmate Hotline creates a more real-time interactive approach to servicing correctional telecom. Inmate Hotline will serve to virtually eliminate telephone related complaints at the facility, significantly reduce the number of failed call attempts, and increase prepaid collect call revenues. **Further, use of the Inmate Hotline service reduces overall staff time by allowing inmates to directly report issues.**

MT
7/18/19

**ATTACHMENT B**

**PROVIDED EQUIPMENT**

CSG shall provide all inmate telecommunication related equipment including, but not limited to, switches, routers, computers, telecommunication interfaces, inmate phones and handsets, kiosk, video visitation terminals.

All equipment required to provide the features as listed in Attachment C.

**PHONE PLATFORM**

Correct Solutions Group (CSG) will proposes a **Phone Platform Solution** with a complete turnkey, non-coin, fully-integrated and self-contained call-processing unit. All components for placing calls, monitoring and data collection are contained within a single unit. It is, indeed, state-of-art, and the most efficient system of its kind. The CSG package consists of call control configuration, database management, system security, and additional processes for monitoring and reporting.

**KIOSK**

CSG will supply customer with lobby kiosk to take deposits for inmate telephone usage. Should Customer decide to utilize CSG kiosk or other deposit services in the future for Commissary, CSG will comply. Additionally, CSG , through our partner Tech Friends, will place kiosks in cell blocks for inmate usage and will supply inmate tablets based on an agreed upon ratio.

**PTS Jail Management System   are.**

CSG will provide Customer the Jail Management Software (JMS) by PTS.  See attached product description. JMS will be supplied by CSG at no cost to Customer over the life of the Agreement.

**MOBILE 10-8 APP**

CSG will provide at no charge to Customer, over the term of this Agreement, the Mobile 10-8 App for usage by the Sheriff's Office in providing the public general information as well as inmate information.  The App will also allow the public the ability to make deposits directly from their smartphones.  Customer will be responsible for providing access to inmate data to populate the App.

*M T*
*7/18/19*

## ATTACHMENT B

### PROVIDED EQUIPMENT

**In-Pod Wall Mount Kiosks**

Correct Solutions Group will provide 18 in-pod wall mounted kiosks in the inmate area and 2 public facing wall mounted kiosks the lobby area.

**Inmate Tablets**

Correct Solutions Group will provide 75 inmate tablets which will include but not limited to electronic messaging and law library.

MFT
7/18/19

**ATTACHMENT D**

**COMMISSION SCHEDULE**

In consideration for this exclusive Contract and Agreement, CSG shall pay Customer a minimum monthly guarantee inmate telephone commission in the amount of $13,000. This guarantee will be based on an average daily population of 350 offenders.  In the event that the average daily population is lower than 350 offenders for a one month period, or in the event that phone service is denied to inmates for a period of time greater than five days due to jail operations within the Customer facility, CSG will pay Customer a 60% commission rate on completed inmate phone calls with the exception of interstate calling per FCC ruling.

Additionally, 30% or Net Revenue for Video Visitation will be shared with Customer.

**ATTACHMENT A**

**RATE SCHEDULE**

Rates will be set according to mutual agreement between CSG and Customer.  Rates will be in compliance with all State and Federal FCC regulations.  Local, InterLata, IntraLata calls will be set at .35/min.

Interstate rates will conform to FCC regulations of .21/min for prepaid and .25/collect.

Transacation Fees:

- No Setup Fee. No Connect Fee. No License Fees like other providers.
- Consumer Transactions via Kiosk/Web/IVR:
  - $3.00 Transaction Fee* (for credit card & cash payments)
  - No minimum - $50 max (credit card)
  - No minimum - $100 max (cash)
- Consumer Transactions via Call Center – Live Operator:
  - $5.95 Transaction Fee* (for credit card payments)
- Money Order Payments are also optional, $0 Transaction Fee
- Inmate messaging/emails - $0.50 per message/email.
  - Inmates must have access to the kiosks/tablets as the financial model requires that the inmates have several hours per day to access
- Video Visitation - $0.35 per minute
- Debit Calling Movement Fee - $1.00 per movement
- Tablet Gold Pass Rental
  - Inmates may use tablet at no cost for 15 minutes every 4 hours
  - Inmates may rent tablet for 1 hour for $0.99

MT
7/18/19

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No.  19-CA-008089

# EXHIBIT GG

*to Amended Complaint*



## FIRST AMENDMENT TO CONTRACT

## AND AGREEMENT

This FIRST AMENDMENT is effective as of the last date signed by either Party and amends and supplements that certain CONTRACT AND AGREEMENT ("Agreement") effective July 24, 2019 by and between Greene County Sheriff's Office located at 1809 N Rockingchair Rd, Paragould, AR 72450 ("Customer") and Correct Solutions Group, LLC., located at 102 Bastille Lane, Ruston, Louisiana 71270 ("CSG").

WHEREAS, Customer desires and CSG agrees to amend the Agreement.

NOW, THEREFORE, as of the FIRST AMENDMENT Effective Date, the parties agree as follows:

ATTACHMENT B - PROVIDED EQUIPMENT will be modified to remove "In-Pod Wall Mount Kiosks" and "Inmate Tablets" and any references to these.

ATTACHMENT D - COMMISSION SCHEDULE will be modified to remove "Additionally, 30% or Net Revenue for Video Visitation will be shared with Customer".

ATTACHMENT A - RATE SCHEDULE will be modified to delete any/all references to Transaction Fees associated with Inmate messaging/emails, Video Visitation, Debit Calling Movement Fee and Tablet Gold Pass Rental.

All terms and conditions of the original Agreement not amended by this FIRST AMENDMENT remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this FIRST AMENDMENT as of the date of the last signature by an authorized representative of each party.

Correct Solutions, LLC.
192 Bastille Lane, Suite 200
Ruston, LA  71270

BY: _____

NAME: __Mark Turner_____

TITLE: ___Sales Director_____

DATE: __3/4/20_____

Greene County Sheriff's Office
1809 N Rockingchair Rd.
Paragould, AR 72450

BY: _____

NAME: _Rusty A. McMellon____

TITLE: Greene County Judge

DATE: _3/4/20_____

Greene County Sheriff's Office
1809 N Rockingchair Rd
Paragould, AR 72450

BY: _____

NAME: _____

TITLE: Greene County Sheriff

DATE: _____

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No.  19-CA-008089

# EXHIBIT HH

*to Amended Complaint*

Monday, May 4, 2020 at 4:30:05 PM Central Daylight Time

**Subject:** RE: contract
**Date:** Friday, April 24, 2020 at 3:52:46 PM Central Daylight Time
**From:** cojudge@greene▮▮
**To:** bcox@greenecounty▮▮, 'Kimberly'
**Attachments:** image002.gif, Amendment 1 and signature page.pdf

Brent,

Thank you. I have attached the signed copy of the First Amendment to the Contract.

rusty

*Rusty A. McMillon*
**GREENE COUNTY JUDGE**
**320 WEST COURT STREET, PARAGOULD, AR 72450**
**OFFICE 870-239-6300  MOBILE ▮▮▮**

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential or privileged material. Any review, distribution, or other unauthorized use of the information by persons or entities other than the intended recipient is prohibited. If you received this communication in error, please contact the sender and delete the material from any computer.

**From:** bcox@greenecounty▮▮ <bcox@greenecounty▮▮>
**Sent:** Friday, April 24, 2020 3:29 PM
**To:** cojudge@greene▮▮; 'Kimberly' <▮▮@paragouldlawyer.com>
**Subject:** FW: contract

**From:** Rick Ferguson <▮▮@lasallecorrections.com>
**Sent:** Friday, April 24, 2020 3:03 PM
**To:** bcox@greenecounty,▮▮
**Subject:** contract

Here ya go sir

I also attached an amendment removing us from Tech Friends.  They installed you independently.  All else remains the same..
When you can please get that signed and return

Call if you have any questions

Many thx and be safe

Rick

*Rick Ferguson*
*Correct Solutions Group*

Page 1 of 2

*Smart Communications Holding, Inc. v. Correct Solutions, LLC, et al.*
Case No.  19-CA-008089

# EXHIBIT II

*to Amended Complaint*

# ELECTRONIC MESSAGING SYSTEM AGREEMENT

**THIS AGREEMENT** by and between the Pope County Sheriff's Office, with principal offices located at #10 County Complex Circle, Russellville, AR 72802, hereinafter referred to as "CLIENT", and Smart Communications Collier, Inc. or its designated assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "CONTRACTOR", is entered into as of the *15* day of *April*, 2016.

## WITNESSETH:

**WHEREAS,** Contractor desires to provide Client, at no cost to Client, a complete two-way, closed circuit, secure electronic messaging system for the inmates at the Client Jail Facility located at #10 County Complex Circle, Russellville, AR 72802 ("Facilities"), and

**WHEREAS,** Contractor is willing to provide all of the equipment and support services to operate the electronic messaging system at no cost to Client, including the kiosks, software, maintenance and support for the system, and

**WHEREAS,** Client has agreed to provide for the installation of Category 5e network data cabling and electrical service to each kiosk, and

**WHEREAS,** Contractor is willing to provide Client with a percentage of the fees collected from the users of the electronic messaging system, and

**WHEREAS,** Client desires to provide the inmates of the Client Jail Facilities with this electronic messaging system and is willing to provide Contractor with access to Client Jail Facilities for the purposes of installing and maintaining this electronic messaging system.

**NOW THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound, agree as follows:

## SECTION 1: ENGAGEMENT OF CONTRACTOR

1.1.    Client hereby engages Contractor to provide, on an exclusive basis, a fully functional electronic messaging system to the inmates residing in the Client Jail Facilities. The parties agree that this Agreement shall be governed by all federal, state and county laws applicable to Pope County, Arkansas.

## SECTION 2: CONTRACTOR'S RESPONSIBILITIES

2.1.    Contractor will provide at no cost to Client a fully functional electronic messaging system for the inmates of the Client's Jail Facilities. Contractor is exclusively responsible

1

for providing all of the hardware kiosks, the software to include the operating systems and application software needed for operation of the system.

2.2.    Contractor will provide at no cost to Client the kiosk hardware.

2.3.    Contractor will provide at no cost to Client the labor, hardware, and software needed for the continued operating and maintenance of the electronic messaging system.

2.4.    Contractor is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Client Jail Facilities. These costs do not include the costs of the actual electrical power.

2.5.    Contractor will maintain records for a period of seven (7) years from the date the record is made. Upon request, Contractor will provide Client with copies of the requested record for the purpose of inspecting, examining, and auditing the Contractor's records directly relevant to Client.

2.6.    Contractor will provide each inmate of the Client Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates. Client grants Contractor exclusive rights to sell advertising space within the electronic messaging system provided said advertising complies with all applicable laws. All advertisements placed on the system must include a disclaimer that it is a paid advertisement and its inclusion on the system does not constitute an endorsement or recommendation by Client.

2.7.    Contractor will provide Client with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Contractor will maintain a record of all electronic messages sent through the electronic messaging system for a period of Seven (7) years from the time the message is sent.

2.8.    The work to be performed by Contractor under this Agreement may, at its discretion, be performed directly by it or wholly or in part through a subcontractor of its choosing.

## SECTION 3: CLIENT'S RESPONSIBILITIES

3.1    Client will provide Contractor with access to the Client Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of maintaining of the electronic messaging system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

3.2    Client will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

2

3.3.    Client will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Client website, with a link to the Smart Jail Mail website.

3.4.    Upon completion of installation and appropriate system testing, Client will allow the electronic messaging to go live within forty-eight (48) hours notice of system availability.

3.5.    Client will provide a list electronically twice each day of all inmates residing in the Client Jail Facilities and their current housing assignments. Contractor will use this listing to insure that each inmate is authorized to use only those kiosks appropriate to their housing assignment. (Tiger Commissary will be providing this information through the Tiger accounting system while their commissary contract is in place).

3.6.    Client will give prompt notice to Contractor of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

3.7.    Client will be responsible for providing for the installation of network data cabling and electrical service to each kiosk location. Network data cable should be Category 5e and appropriately rated for the areas where it is run (e.g. general, plenum, riser, etc. if required by applicable building code). Electrical service required is grounded 120 volt which will be hard-wired directly into the kiosk enclosure.

## SECTION 4: TITLE

4.1.    The Smart Jail Mail System, including kiosks, hardware, software, networking, cabling, etc., shall at all times remain the property of the Contractor.

4.2.    Upon termination of this Agreement, Contractor shall remove the Smart Jail Mail System except for the cabling and conduit which shall become the property of the Client.

4.3.    Upon removal of the Smart Jail Mail System from the Client Jail Facilities, Contractor will insure that all Client specific information, forms and graphics are removed from all hardware and software used in connection with the System within 60 days of the effective contract termination date.

## SECTION 5: TERM AND TERMINATION

5.1    This Agreement shall commence on the effective date and shall continue for a period of three (3) years from the date of system going live. After this original three (3) year term, this Agreement shall automatically renew each year for a one year term. This agreement may be terminated after the original three (3) year term upon written notice at least sixty (60) days prior to the expiration of the current term.

3

5.2.   Either party may terminate this Agreement by giving the other party thirty (30) calendar days written notice on any of the following:

> 5.2.1.   The other party's failure to comply with any provision of the Agreement within thirty (30) calendar days after receipt of written notification and be given the opportunity to cure/comply with the provision.

> 5.2.2.   Mutual agreement of both parties.

5.3.   Either party may terminate this Agreement immediately upon thirty (30) calendar days written notice to the other upon the occurrence of any of the following special situations:

> 5.3.1.   In the event there is a change in the Office of Sheriff due to an election, resignation or death and the Sheriff-elect makes the decision not to continue this Agreement.

> 5.3.2.   Insolvency, bankruptcy, or receivership of Contractor.

> 5.3.3.   Failure of contractor's system to function as described above.

> 5.3.4.   Failure of contractor to maintain functionality of system as described above.

## SECTION 6: FINANCIAL ARRANGEMENTS

6.1.   Client agrees to provide the general population inmates in the Client Jail Facilities with access to the electronic messaging system at the same time the inmate phone system is available for use; however, due to security and disciplinary concerns, Client reserves the exclusive right to determine the time of access, the location of access, the method of access, and identification of those individual inmates who may access the electronic messaging system.

6.2.   Contractor agrees to provide the electronic messaging service to inmates at the Client Jail Facilities for a cost of $.50 (fifty cents), per message transmitted through the electronic messaging system. Not including indigent and promotional messaging.

6.3.   Contractor agrees to pay Client a commission of ten percent (10%) of gross revenues collected from message credits used, excluding non-paid credits to indigents and non-paid promotional credits. Said commission is based upon Contractor providing service to Client which includes secure two way messaging between inmates and public users; jail administrative services, including customized information routing of grievances, medical request forms, etc., to appropriate units with memorialized no charge two-way communication; commissary menu and electronic ordering as well as all maintenance to system, including price changes, product drop and add, etc.; and all administrative tools.

4

6.4.   Contractor will pay commissions to Client on a monthly basis, no later than thirty (30) calendar days from the end of each calendar month for which services are provided, together with all appropriate reports necessary to substantiate the amount remitted.

6.5.   Contractor agrees that Client does not incur any financial obligations to Contractor as a result of this Agreement.

6.6.   Should the parties mutually agree to a change in the scope of services provided under this Agreement, a mutually agreed to adjustment in the commission rate paid will be allowed.

## SECTION 7: EMPLOYEES

7.1.   Contractor represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. Such personnel shall not be employees of Client or have any contractual relationship with Client. All of the services required hereunder will be performed by the Contractor or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services.

7.2.   Client acknowledges that the Contractor is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Client to exercise control or discretion over the manner by which Contractor performs hereunder.

7.3.   Contractor expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tagout procedures, material safety data sheets and labeling.

7.4.   Contractor certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Client shall consider the employment of unauthorized aliens a violation of Section 274A (e) of the Immigration and Nationality Act (8 U.S.C. 1324a). Contractor agrees that such violation shall be cause for the unilateral and immediate termination of this Agreement by Client.

7.5.   Contractor certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

7.6.   Client will take all reasonable and customary steps necessary to screen all Contractor's employees providing services requiring entry into the Client Jail Facilities,

5

up to and including conducting law enforcement background checks, to provide that such personnel will not constitute a security risk to the institution or the inmates and further, Contractor will cooperate as required to execute this provision up to an including providing a Federal Form I-9, Employment Eligibility Verification, on all Contractor's employees and all subcontractor's employees needing admission to the Client Jail Facilities.

7.7.    Each party agrees that it shall be solely responsible for the negligent or wrongful acts of its employees. However, nothing contained herein shall constitute a waiver by Client of its sovereign immunity or the provisions of Section 768.28, Florida Statutes.

## SECTION 9:MISCELLANEOUS

9.1.    Public Entity Crime. Contractor confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Contractor hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

9.2.    Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

9.3.    Compliance with Laws. Contractor shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

9.4.    Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Pope County, Arkansas and other pertinent Arkansas courts and further that neither party shall seek to remove such litigation from Circuit Courts or Appellate Courts of the State of Arkansas by application of conflict of laws or any other removal process to any Federal Court or court not in Arkansas.

9.5.    Attorney Fees. In the event of litigation concerning this Agreement, the Client and Contractor shall each be responsible for their own attorney's fees and costs.

9.7.    Drug-Free Workplace. Contractor and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy and said policy must include pre-employment testing of their employees.

6

9.8.   Completeness of Contract. This Agreement and any additional or supplementary document or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the parties hereto.

9.9.   Force Majeure. Contractor will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Client to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either party.

9.10.   Assignment. Contractor may assign this Agreement to any parent, successor, or subsidiary corporation without the express written consent of Client.

9.11.   Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not effect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

9.12.   Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

9.13.   Notices. Any notices, payments or reports required by this Agreement shall be sufficient if sent by the parties hereto in the United States mail, postage paid, to the addresses noted below:

      9.13.1. As to Client for notices and reports:
              Shane Jones, Sheriff
              Pope County Sheriff's Office
              #10 County Complex Circle
              Russellville, AR 72802

      9.13.2 As to Contractor:
              James Logan, President
              Smart Communications Collier, Inc.
              4522 W North B St.
              Tampa, FL 33609

9.14.   Entire Agreement. This Agreement constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. This Agreement may be amended or revised only in writing and signed by all the parties.

**IN WITNESS WHEREOF**, the parties have set their hands and seals hereto as of the day and year first above written.

**POPE COUNTY SHERIFF'S OFFICE**

By: _____          Date: _3-31-16_____
      Shane Jones, Sheriff

By: _____          Date: _3-31-16_____
      Jim Ed Gibson, Judge

Witness: _____

**SMART COMMUNICATIONS COLLIER, INC.**

By: _____          Date: _4-15-16_____
      James Logan, President

Witness: _____

8

## ELECTRONIC MESSAGING AGREEMENT -MAILGUARD ADDENDUM

This Addendum and Extension Agreement is between Pope County Jail, hereinafter referred to as "you" or "Customer," and Smart Communications Collier, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider."

This Addendum and Extension is part of and governed by the Electronic Messaging Agreement, the "Original Agreement", executed by the Parties on April 15, 2016. The terms and conditions of the Original Agreement are incorporated herein by reference.

The Customer's Facility Name and address is: Pope County Sheriff's Office #10 County Complex Circle, Russellville, Arkansas 72802

WHEREAS, the Parties entered in an Electronic Messaging System Agreement on June 10, 2015, the "Original Agreement".

WHEREAS, the Parties hereby agree to extend the term of the Original Agreement in accordance with the terms provided herein.

In consideration of the mutual covenants contained herein, both of the Parties mutually covenant and agree as follows:

The Original Agreement, original term and extension will end on April 15, 2019.

The Parties agree to extend the Original Agreement for three (3) years through April 15, 2022 which will begin immediately upon the execution of this document. The contract will then automatically renew for four (4) years. After this four (4) year extension, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

This Addendum and Extension binds and benefits both Parties and successors or assigns. This document, including the Original Agreement dated April 15, 2016, is the entire agreement between the Parties.

The Parties wish to add the following language to the Original Agreement:

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### Electronic Messaging

1. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware Kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system.

2. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

3. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

4. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

5. Provider will maintain records for a period of seven (7) years from the date the record is made. During the term of this Agreement and upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

6. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

7. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

8. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

9. Electronic Messaging. Each email message is billed at one credit ($0.50).

10. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities.

11. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining the electronic messaging system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

12. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

13. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

14. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability and shall allow inmates access to the Kiosks and systems in keeping with the hours inmates have access to telephones.

15. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

16. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### MailGuard™ Patent Pending Postal Mail Elimination System

17. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

18. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ or SmartKiosk™ within the Customer Jail Facility; and

19. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

20. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

21. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™ or SmartKiosk™.

22. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

23. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

24. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

25. Provider shall be solely responsible for the cost of maintaining the Mail Box designated by the Customer for incoming routine mail to be sent.

26. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

27. Provider will shred all processed mail after 30 days unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

28. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

29. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

30. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

31. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**Customer's Responsibilities**

32. Customer shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail.

33. Customer shall be responsible for informing inmates and inmates friends and family that all routine correspondence must be sent to the designated MailGuard Mail Box. Customer will include information regarding the MailGuard™ system in the Inmate Handbook and in all other areas where information regarding the Inmate Mail Policy and Procedures are located.

34. Customer will provide information regarding Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures in at least one location next to the inmate mailing address on the Customer's website and very clearly state that all incoming routine mail MUST be mailed to the MailGuard designated Mail Box.

35. Customer will instruct on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system and display information regarding the Customer's incoming postal mail policy, the MailGuard™ system and the MailGuard procedure for processing and/or disposing of all incoming mail and pictures.

36. Should the Customer receive incoming routine mail instead of the designated Mail Box, the Customer will be responsible for the delivery of said mail to MailGuard for processing.

37. Upon completion of installation and appropriate system testing, Customer will allow the MailGuard™ system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments.

39. Customer will give prompt notice to MailGuard of any trouble or irregularity in the functioning of the MailGuard™ system.

### Grievances, General and Medical Requests

40. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

41. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

42. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

   **IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Pope County Sheriff's Office

By:

Name: Shane Jones

Title: Sheriff

Date: 8-29-17

Email: ~~~~~~~~~~~ appcoso.net

Notice Address:
#10 County Complex Circle
Russellville, AR 72802

Provider: Smart Communications Collier, Inc.

By:

Name: ~~James P. Logan~~ JON LOGAN

Title: ~~President~~ CEO

Date: 9/14/17

Email: ~~~~~~~ @smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, FL 33609

Page **4** of 4