# EXHIBIT 1

1   IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
    IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
2   CIVIL DIVISION

3   CASE NO.:  19-CA-008089

4   SMART COMMUNICATIONS HOLDING, INC.,

5           Plaintiff,

6   vs.

7   CORRECT SOLUTIONS, LLC, a/k/a CORRECT SOLUTIONS GROUP,
    LLC,
8
            Defendant.
9
    *    *    *    *    *    *    *    *    *    *    *
10

11

12                   TRANSCRIPT OF PROCEEDINGS
     Plaintiff's Emergency Amended Motion for Leave to File
                     Amended Complaint and
13    Plaintiff's Emergency Motion for Temporary Injunction

14
        BEFORE:           HONORABLE REX M. BARBAS
15
        DATE:             December 19, 2019
16
        PLACE:            Hillsborough County Courthouse
17                        Room 514
                          800 East Twiggs Street
18                        Tampa, Florida

19      TIME:             1:41 p.m. to 6:07 p.m.

20

21                        Volume 1
                       Pages 1 - 196
22

23
     Stenographically Reported By:  ELIZABETH W. CHORRUSHI,
24                     RPR, FPR
                 Registered Professional Reporter
25              Florida Professional Reporter

Page 2

```
 1                      APPEARANCES
 2  On Behalf of the Plaintiff:
 3      Bajo Cuva Cohen Turkel
        Suite 1900
 4      100 North Tampa Street
        Tampa, Florida 33602
 5      Kturkel@bajocuva.com
        Bbarrios@bajocuva.com
 6      BY:  KENNETH G. TURKEL, ESQUIRE
             BRAD F. BARRIOS, ESQUIRE
 7
 8  On Behalf of the Defendant:
 9      Harllee & Bald, P.A.
        202 Old Main Street
10      Bradenton, Florida 34205
        Kab@harlleebald.com
11      Jel@harlleebald.com
        BY:  KIMBERLY A. BALD, ESQUIRE
12           JAMES E. LYNCH, ESQUIRE
13
14  ALSO PRESENT:
        David L. Gann, Esquire, General Counsel for
15          Smart Communications Holding, LLC
        Jonathan Logan
16      James Logan
        Mark Turner
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2
 3  Transcript of Proceedings               Page
 4  Plaintiff's Motion for Leave to Amend and
    Plaintiff's Emergency Motion for Temporary
 5  Injunction                                 8
 6  Opening Statements:
        By Mr. Turkel                          8
 7      By Ms. Bald                           31
 8  Plaintiff Witness:
        JONATHAN LOGAN
 9          DIRECT EXAMINATION BY MR. BARRIOS  49
            CROSS-EXAMINATION BY MS. BALD      81
10          REDIRECT EXAMINATION BY MR. BARRIOS 112
11  Defendant Witnesses:
        CAPTAIN ALAN JOHNSON
12          DIRECT EXAMINATION BY MS. BALD    121
            CROSS-EXAMINATION BY MR. BARRIOS  132
13
        MARK TURNER
14          DIRECT EXAMINATION BY MS. BALD    147
            VOIR DIRE EXAMINATION BY MR. TURKEL 186
15          CONTINUED DIRECT EXAMINATION      189
                BY MS. BALD
16
        CERTIFICATE OF REPORTER              196
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                  E X H I B I T S
 2  (Exhibits admitted into evidence and retained by the
            Court, unless otherwise noted.)
 3
 4  Exhibit C
        E-mail Chain, 8/30/17.................... 54
 5  Exhibit CC
        Letter, Mark Turner to James P.
 6      Logan,.................................. 113
 7  Exhibit D
        E-mail Chain, 8/30/17.................... 59
 8
    Exhibit DD
 9      Request for Proposal, Inmate
        Communication Services, Hampshire
10      County Sheriff's Department.............. 77
11  Exhibit EE
        Lassen County Sheriff's Office,
12      Request for Proposal, Inmate
        Telephone Services...................... 78
13
    Exhibit F
14      E-mail, Ron Deglman to Jon Logan,
        8/30/17................................. 68
15
    Exhibit FF
16      Request for Proposal, Inmate
        Communication Services, East Baton
17      Rough Parish Sheriff's Office............. 78
18  Exhibit G
        E-mail with attachments, Rob
19      Deglman to Jim Logan, 9/21/17............. 57
20  Exhibit JJ
        E-mail Chain, 8/30/17.................... 118
21
    Exhibit K
22      E-mail Chain, 5/17/19.................... 137
23  Exhibit O
        E-mail Chain, 7/31/19.................... 142
24
    Exhibit P
25      E-mail Chain, 8/15/19.................... 115
```

Page 5

```
 1  EXHIBITS, continued
 2  Exhibit V
        Letter with attachments, Patrick
 3      Temple to James P. Logan, 10/4/19.......... 71
 4  Exhibit 1
        Correctional Communications Service
 5      Agreement regarding Washington
        County, Arkansas, marked for
 6      identification......................... 122
        Admitted into evidence ................... 180
 7
    Exhibit 2
 8      Contract and Agreement with
        attachments, Correct Solutions and
 9      Sebastian County, Arkansas................ 180
10  Exhibit 3
        Contract and Agreement with
11      attachments, Correct Solutions and
        Wayne County, Georgia..................... 180
12
    Exhibit 5
13      Schedule 1, regarding Washington
        County, Arkansas.......................... 182
14
    Exhibit 6
15      Schedule 1 regarding Sebastian
        County, Arkansas.......................... 182
16
    Exhibit 7
17      Schedule 1 regarding Wayne County,
        Georgia................................... 182
18
    Exhibit 10
19      Notice of Non-Renewal regarding
        Washington County, Arkansas,
20      10/4/19................................. 183
21  Exhibit 11
        Call Records, Washington County
22      Detention Center, 1/1-5/15, marked
        for identification only.................. 183
23
    Exhibit 12
24      Notice of Non-Renewal regarding
        Sebastian County, Arkansas,
25      11/21/19................................ 183
```

Page 6

```
1   EXHIBITS, continued
2     Exhibit 13
3         Notice of Non-Renewal regarding
          Wayne County, Georgia, 11/21/19............ 183
4     Exhibit 14
          E-mail Chain with attachment,
5         7/31/17.................................... 151
6     Exhibit 15
          E-mail Chain, 8/1/17...................... 155
7
8     Exhibit 16
          E-mail Chain with attachment,
          8/4/17.................................... 157
9
10    Exhibit 17
          E-mail Chain, 8/9/17...................... 158
11    Exhibit 18
          E-mail Chain, 8/17/17..................... 159
12
13    Exhibit 19
          E-mail with attachment, Mark Turner
          to Rob Deglman, 8/22/17................... 166
14
15    Exhibit 20
          E-mail Chain, 8/22/17..................... 168
16    Exhibit 21
          E-mail Chain with attachment,
17        8/22/17................................... 169
18    Exhibit 23
          E-mail, Rob Deglman to Jon Logan,
19        marked for identification only............ 86
20    Exhibit 24
          E-mail with attachments, Rob
21        Deglman to Mark Turner, 9/5/17........... 170
22    Exhibit 25
          Cease and Desist Notice regarding
23        Washington County, Arkansas,
          12/13/19, marked for identification
24        only...................................... 130
25
```

Page 7

```
1            Proceedings taken before Elizabeth W.
2   Chorrushi, Registered Professional Reporter, Florida
3   Professional Reporter, Notary Public, State of Florida at
4   Large.
5                    - - - - - - - -
6            MR. TURKEL:  If it may please the Court, Judge,
7   Ken Turkel and Brad Barrios on behalf of
8   Smart Communications Holdings, the plaintiff in this
9   action.
10           Judge, with us today are in-house counsel,
11  general counsel, David Gann -- he's seated to
12  Mr. Barrio's left -- and Jon and Jim Logan, who are
13  principals of Smart.
14           Two hours is a lot of time, Judge.  It's a lot
15  of time during the holidays.
16           THE COURT:  I'll give you an hour then.
17           MR. TURKEL:  But I'm going to have to try to --
18           THE COURT:  I'm more than willing to
19  accommodate you, counsel.
20           MR. TURKEL:  Yeah.  I think during the
21  holidays, you know, two hours is a formidable amount
22  of time, but there is a fair amount to cover.  So
23  I'm going to try and give a little bit of back
24  ground as to where we're at and why we're here,
25  refresh the Court's memory a bit about our last
```

Page 8

```
1   hearing.
2            THE COURT:  You don't have to.  I'm very
3   familiar with the case already.
4            MR. TURKEL:  That will make it somewhat easier,
5   Judge.
6            We have -- I believe we noticed up our motion
7   for leave to amend today, too, right?  So we have a
8   motion -- an emergency motion for temporary
9   injunction and a motion for leave to amend to file
10  an amended complaint.  Obviously, it hasn't been
11  consented to, which is why it's noticed for hearing.
12           Judge, if the Court's familiar with the
13  background, we were front of the Court on
14  September 20th.  What had prompted us to be there on
15  that day was a letter of termination that had been
16  sent by the defendant with respect to our role as
17  the provider of certain products and services under
18  a master services agreement.
19           Essentially, Your Honor, part and parcel to the
20  defendant's contracts with the number of inmate
21  facilities, we were providing tablets that provided
22  messaging and other services.
23           We had gotten a letter, Judge, that started
24  this dispute in July -- July 17th to be precise --
25  and that letter purported to terminate our contract
```

Page 9

```
1   with the defendant, our contract to provide the
2   tablets and related services based on
3   non-disclosure -- breach of a non-disclosure
4   agreement, essentially.  We had sent this blast
5   e-mail out to -- with no narrowing or no targeting,
6   to a mass list.  And they contended because it
7   landed in the laps of one of the clients that they
8   service, that we were breaching our confidentiality.
9   They backed off that position and we ended up
10  entering into a stipulation, ultimately.  But that
11  position had prompted us to file a lawsuit on
12  August 6th.
13           We were in front of you on an injunctive relief
14  hearing on September 20th, Judge.  And the net
15  result of that, because it had come shortly after
16  this stipulation that we had filed that we thought
17  would just preserve status quo and allow us to
18  continue to litigate, ultimately, bringing, you
19  know, these issues to the Court in final hearing for
20  injunctive relief or whatever form the case
21  ultimately took.
22           We had entered into the stipulation on
23  August 30th and we -- within, what, 13 days, we had
24  gotten what they called a notice to cure with
25  respect to one of the facilities.  As you recall,
```

Page 10

1  someone in law enforcement showed up at the last
2  hearing.
3      Judge, before I forget, I do want to invoke the
4  Rule as to third-party witnesses that are in here
5  right now.
6      THE COURT:  Are there any third-party witnesses
7  here?
8      MS. BALD:  Yes, Your Honor.  We have two
9  representatives from Washington County here to
10 testify, so.
11     THE COURT:  All right.  You can wait right
12 outside the door, and we need to close the door now.
13     (Potential witnesses left the room.)
14     THE COURT:  Just close the door behind you, if
15 you don't mind, please.
16     Okay.
17     MR. TURKEL:  And the reason we were in front of
18 you was because, in colloquial terms, we felt that
19 the notice of termination was bogus.  Our position
20 was it was a pretext, that they were trying to
21 terminate us, essentially, for no valid reason for,
22 essentially, day-to-day operational issues that were
23 not our fault -- things like, you know, tablets
24 being destroyed, et cetera -- and that the
25 overriding theory of the case, Judge, was that they

Page 11

1  just didn't like the contract.
2      If you recall, at the end of the contract -- I
3  mean, at the end of the hearing, you had asked a
4  question about how they get paid under it and we
5  told you they don't.  The deal that was negotiated
6  was that we get the money for the services we
7  provide.  And, you know, our feeling is, and has
8  been, that they just don't like the deal anymore,
9  and so that they tried this termination by
10 non-disclosure and then backed off that.
11     Then they tried to -- termination through these
12 trumped up, you know, performance defaults and what
13 the end result of that hearing, I think, to really
14 distill it to its most simple essence, was your
15 directive, your order -- we've submitted written
16 orders.  You haven't chosen one yet -- but what you
17 orally rendered that day was they couldn't terminate
18 the contract without bringing it back in front of
19 you so that you could adjudicate the alleged
20 performance default, and basically providing us with
21 that buffer that they couldn't just contrive
22 something and terminate this contract, that we could
23 at least have the due process of vetting it in front
24 of you, right?
25     We were comfortable with that.  We agreed to it

Page 12

1  because we felt that that would put a check on them
2  just pummeling us with these, you know, fabricated
3  defaults.  Because pointedly, Judge -- and really as
4  it relates to today, this is going to matter quite a
5  bit -- we've done some discovery now and we know
6  what happened.  And, really, the time frame for
7  today's hearing starts, for all intents and purposes
8  in April 2019.  At or around that time, they decide
9  that they want us out.
10     Your Honor, if you look at the binder we sent
11 over, there should be a summary in there.
12     MS. BALD:  Your Honor, we're going to object to
13 that summary.  They are -- they have taken -- we
14 don't believe this is an authorized summary under
15 the evidence code.  They have taken hearsay.  They
16 have taken unadmissible evidence that I do not
17 believe they're going to be able to introduce into
18 evidence today.
19     They are required to have the person who
20 prepared the survey or -- the summary here as well
21 as all of the evidence must be admissible and we do
22 not believe -- we believe the majority of that is
23 hearsay.
24     MR. TURKEL:  Judge, the summary I'm referring
25 to, we did use -- we filed a notice of intent to use

Page 13

1  it under the summary rule, but it literally --
2      THE COURT:  What number is it under?
3      MR. TURKEL:  It's not -- it's in the inside
4  pocket of the binder, Judge.  You may have to lift
5  that binder clip up.
6      THE COURT:  Okay.
7      MR. TURKEL:  -- just in an abundance of
8  caution.  But, really, it's more of a timeline.  And
9  every document that is referenced there was a
10 document -- as you can see the Bates numbers --
11     MS. BALD:  We do agree -- we renew our
12 objection to using the summary based upon hearsay.
13     MR. TURKEL:  I wasn't done.
14     THE COURT:  Well -- yeah.
15     MR. TURKEL:  You can --
16     THE COURT:  Finish.
17     MR. TURKEL:  You can use this as a guide.  We
18 don't have to put it into evidence like a summary,
19 because what it does is refers to documents that are
20 either attached to affidavits and/or attached to the
21 proposed amended complaint, the large percentage, if
22 not 100 percent, of which are documents that are
23 theirs -- e-mails from them that would be admissions
24 under 90.803(18), so I don't really know where the
25 hearsay comes from.

Page 14

1      But by the Bates labels, you can tell Correct
2  is the prefix, and they were from their production.
3  And what we tried to do, Judge, is just provide a
4  timeline with references to parts of these
5  documents.  All of the documents will be before the
6  Court and the ability to read all of them, in toto,
7  whenever you want is there.
8      So, really, we're using it more as a guide.
9  I'm not going to offer it into evidence and you can
10  rely on it as a timeline.  They can attack it if
11  they want.  I don't think there's anything in there
12  that doesn't come right out of a document that, for
13  the most part, if not entirely, was a document that
14  they prepared, which would be an admission.
15      THE COURT:  They did file a -- it's on
16  December 17th is when they filed the intent to
17  utilize summaries.
18      MS. BALD:  Yes, Your Honor.  But I believe that
19  in order to use summaries, it has to be voluminous.
20  It has to be placed on admissible evidence, which
21  the majority of that is not.  I think some of it is
22  even an affidavit from someone who is not here today
23  and some of it is an affidavit from their own
24  client.
25      There's e-mails that were authored by someone

Page 15

1  who is not here today that we do not have an
2  opportunity to cross-examine, so we just want to
3  make sure that we have our objection.
4      THE COURT:  Are the e-mails from their side or
5  your side?
6      MS. BALD:  From their side.
7      THE COURT:  We'll do it -- let's take it item
8  by item as opposed to --
9      MS. BALD:  Yes, sir.
10      MR. TURKEL:  I'm just going to use it as a
11  guideline.  Normally -- Ms. Bald is right -- when
12  you do a true, like, evidentiary summary, it's
13  usually thousands of financial documents.
14      THE COURT:  Right.
15      MR. TURKEL:  We're not using it like that.  We
16  filed in an abundance of caution.
17      THE COURT:  It's not a real summary.  It's more
18  like an index.
19      MR. TURKEL:  It's a demonstrative.  Yeah.  It's
20  really demonstrative.  I don't intend to offer it.
21  They can raise whatever issue they have with it, but
22  it will be easier for you to follow --
23      THE COURT:  Okay.
24      MR. TURKEL:  -- at least my argument, right
25  now, and -- but it's not a true summary.  I agree

Page 16

1  with that.  We just filed that because we wanted to
2  give them notice we were going to use it ahead of
3  the hearing.
4      Judge, if you look, what was referring to is
5  the time line of this case.  And we'll see, in
6  April 1, 2019, Captain Dumas, who I believe -- that
7  was the guy who was here last time who was going to
8  testify -- you'll see an e-mail.  And this e-mail is
9  from him to the people at Correct -- CSG is another
10  way we define Correct, the defendant in this case --
11  and thanks them for lunch the prior week and has
12  permission from the sheriff to move forward with
13  tablets.
14      MS. BALD:  Your Honor, hearsay.  That's all
15  hearsay.  Mr. Dumas is not here.
16      MR. TURKEL:  Judge, I can respond to the
17  hearsay objection if we want, but this is -- you
18  know, A, it's an e-mail thread between the party
19  opponent and a third-party.  Secondly, I'm not
20  offering that portion of it for the truth to prove
21  that they had lunch.
22      I'm just offering it to show the reaction that
23  it provoked from Correct, which is the response from
24  Mark Turner, which would be an admission by a party
25  opponent --

Page 17

1      THE COURT:  Right.
2      MR. TURKEL:  -- which is, we have to get --
3      THE COURT:  And even though it may be -- the
4  initial context may be hearsay, in order to
5  understand the response, you have to have the
6  hearsay statement, and that's an exception.
7      MS. BALD:  And I'm fine -- anything --
8  Mr. Turner is here today.
9      THE COURT:  Okay.
10      MS. BALD:  So he's here to testify.
11      THE COURT:  Okay.  Go ahead.
12      MR. TURKEL:  Judge, and so we see, you know,
13  his response is, "We have to get Smart out first
14  though, don't we?"
15      And as we go down this timeline, you see, on
16  April 8th, we sent out that mass marketing e-mail.
17  And you see, on April 22nd, the defendant, CSG,
18  asked Captain Dumas to forward bullet points on
19  Smart issues.
20      Judge, we argued it at the last hearing; I will
21  argue it again today.  Up until April 2019, we had
22  not received a notice of default for performance, a
23  notice to cure for performance from a lawyer,
24  anything putting us on notice we were in breach,
25  right?  In April, we see Correct asking the

Page 18

1  facilities to send them bullet points about
2  performance.
3      If you look now at May 17th, there's another
4  e-mail from Captain Johnson, the defendant, to
5  Washington County, one of the facilities, saying, "I
6  hope you made it back safe. I hobbled home
7  yesterday. I'm getting a lot of calls from my Smart
8  customers complaining about products, service and
9  overall performance to the point where I might be
10 replacing them."
11     The import of that, Judge, is we see in April
12 this sort of fabricated effort to try and create
13 this record of performance-related issues that
14 didn't exist before April. And we find out why on
15 June 21st in an internal e-mail from Correct in
16 which they discuss using the mass marketing e-mail
17 as a pretext for pulling the plug on all Smart
18 devices on a set day.
19     Mark Turner, the gentleman sitting in here,
20 says, "We have Tech Friends lined up to come in.
21 Rick Ferguson, another Correct employee, says --
22 agrees that "Captain Johnson should have a very
23 strategic plan with Tech Friends in place and brief
24 the customer before the blade falls because when it
25 does, the only panic taking place should be in

Page 19

1  Smart's conference room." That's internal, all
2  defendant back and forth about getting rid of us.
3      And when they reference Tech Friends, Judge, we
4  find out through their production that, on July 10,
5  2019, they actually execute an agreement with
6  another tablet provider, Tech Friends.
7      Obviously, they didn't start the negotiations
8  that day. They've objected to every effort we've
9  made to try and depose people. We've sent
10 third-party subpoenas to facilities; they have
11 objected to those. We tried to set their corporate
12 rep; we couldn't get that set.
13     My guess is they were negotiating before
14 July 10th. They didn't just call them up and cut
15 the deal that day.
16     So, Judge, on July 10th, they have already
17 entered into another agreement to do exactly what we
18 had contracted with them to do, effective June 1st.
19 That's the effective date by terms of that contract
20 and it's attached as Exhibit I to the proposed
21 amended complaint.
22     THE COURT: It's back-dated to June 1st?
23     MR. TURKEL: The effective date is, yes, Judge.
24 Yes.
25     And other than, essentially, moving what we

Page 20

1  allege to be the conspiracy earlier, I don't know
2  what import that really has because we're still
3  under our contract. And as of July 10th, the date
4  they signed this, we have no idea they're doing it.
5  We're still operating as normal. They haven't even
6  sent the non-disclosure proposed default letter to
7  us as of that date. So seven days later, we get
8  that, right? And that's the termination letter
9  saying you breached confidentiality because you sent
10 this mass e-mail out, et cetera.
11     So, Judge, unbeknownst to us, seven days before
12 we got that and when we were in front of you on
13 September 20th, nobody told us about this. They had
14 entered into a contract with a competitor to do the
15 same thing that we were supposed to be doing with
16 this background of e-mails saying they're going to
17 get us out.
18     Now, on July 31st, we get an e-mail from
19 Washington County telling us they're actively
20 looking for a new vendor to replace us. At that
21 point, Correct has already procured the new vendor.
22 We'll find out more in depositions, but based on the
23 e-mails that they wanted to have a very strategic
24 plan in place with the new vendor and, to use their
25 language, "should have a very strategic plan with

Page 21

1  Tech Friends in place and brief the customer before
2  the blade falls" because we can only assume that
3  they spoke to all their customers.
4      So everybody's in on it but us. They told the
5  customers they've got a new vendor, and we're
6  sitting out here trying to do our job under
7  contracts that we believe are valid. They try and
8  terminate it. We file our lawsuit. We do the
9  stipulation.
10     Shortly, after the stipulation, Your Honor --
11     THE COURT: Hold on for just a second.
12     MR. TURKEL: Yes, sir.
13     THE COURT: This is a thought I'm having.
14 That's all.
15     MR. TURKEL: That's all right. Go ahead.
16     THE COURT: Go ahead.
17     MR. TURKEL: Shortly after the stipulation, we
18 get the performance -- alleged performance default,
19 and that's what put us before you on the 20th.
20     We, obviously, contended that that was bogus
21 too; that it came out of the blue with respect to
22 issues that we had dealt with day to day for years
23 without any issue. What we didn't know that day is
24 there had been this concerted agreement behind our
25 backs to replace us, that a contract had been signed

Page 22

1  and that they were, essentially, doing everything
2  they could to solicit, from their customers, any
3  basis to try and get us out.
4       And you know, Judge, usually these cases -- you
5  know, two, three years of back and forth.  I mean,
6  we really have a discrete time line here from April
7  to September.
8       Judge, we cited from the transcript a few
9  comments in this time line on the last page of it,
10 that, you know, we felt just sort of sets some
11 context for the hearing today.  One of the
12 statements made by defense counsel was that Correct
13 Solutions was "encouraging Sebastian County to
14 continue working with Smart, and it wasn't until we
15 learned that the batteries could be removed in
16 September that it became serious enough and a risk
17 factor for Sebastian County that we had to put Smart
18 on notice."
19      Judge, we'll drill down on that if we get past
20 all the discovery objections.  But the bottom line
21 is they had already entered into a replacement
22 vendor contract.  These things weren't happening in
23 September.  They weren't encouraging people to do
24 business.  To the contrary, the evidence we do have
25 tells us they were encouraging people to try and

Page 23

1  tell them how they could terminate us.
2       Secondly, there was a statement that Correct
3  Solutions had been trying to get their customers to
4  continue working with us until, in September, they
5  learned of this fact that they can take the
6  batteries out.  Again, Judge, you've seen in this
7  timeline and you can look at these e-mails.  They're
8  not particularly long and we quoted anything that
9  really mattered out of them.
10      Back in April, they were already talking to
11 their customers about getting rid of us.  And in
12 July, they signed a contract for the replacement
13 vendor that would get rid of us.  And I'll be
14 interested to hear how they reconcile those
15 statements to the Court with what the documents
16 show.
17      So Your Honor's suspicions at that hearing
18 were -- you know, we had just entered into a
19 stipulation to preserve status quo and then we get
20 their ridiculous letter and we're in there trying to
21 fight about these contrived performance problems.
22 And then you enjoin termination subject to
23 subsequent order and hearing.  If you find that it's
24 a sham, there's another problem.
25      And, that's when I made -- you know, I made a

Page 24

1  comment at that -- at the end of the hearing that I
2  would argue that their big problem with the contract
3  is we were the only ones making money.  And they
4  said, "Your Honor, if Smart's not doing it, another
5  vendor is going to do it" -- Ms. Bald said this --
6  I'm sorry -- "and the other vendor is going to get
7  all the money."  And that's not how the new contract
8  works.  Okay?  The other vendor isn't getting all
9  the money -- and that contract is attached to the
10 proposed amended complaint -- and they're getting a
11 split on some of these customers.
12      So everything -- you know, it's rare when you
13 can suspect that much and actually find that it's
14 exactly what's happening.
15      But, Judge, we're here today because you're the
16 only place we can go.  This is it.  This is our only
17 way to remedy what they're trying to do.  Their most
18 recent effort to get rid of us is this idea that
19 they're not terminating us; they're not renewing us.
20      So they sent us this letter with respect to
21 Washington County on October 4, 2019, saying "We're
22 not renewing you on this contract."
23      As we have briefed, Judge -- and I think we've
24 done a pretty good job of illustrating why that
25 position makes no sense under the contract -- they

Page 25

1  don't have the right, if they're going to renew
2  their contract with the customer, to non-renew us.
3       The way these contracts work and the way the
4  term provision is in our contract, it provides that
5  we are coterminous, right?  They get the business;
6  we question the business.
7       They have argued -- and I'll let Ms. Bald
8  handle this -- but it's clear unambiguous and you
9  shouldn't hear the evidence, but what we will tell
10 you is that the evidence is clear -- not just
11 self-serving statements from our guys -- that the
12 intent of this, from Day 1, was that if they renewed
13 and they stayed in the facility, we stayed on as the
14 subcontractor for tablets and related services.
15      So if you look at what's happened, you know, at
16 first, they try and terminate it with this
17 confidentiality thing; it doesn't work.  Then they
18 try the performance thing.  This is their new spin
19 on how they're trying to get out of the contract.
20      And, Judge, you know, business is business and
21 people don't like deals all the time, but the bottom
22 line is we're here because they're not playing by
23 the rules.  And the only way to enforce the rules is
24 to come back to you because it doesn't matter how
25 hard we try, they're just coming up with new angles

Page 26

1  every time.
2       And I will tell you this -- you know, your
3  statement about this being a sham, your suspicions,
4  your caution about it, was foreshadowing in the
5  greatest sense.  I mean, that's exactly what this
6  is.  They made a decision back in April they were
7  going to get rid of us.  They told their customers
8  that.  They signed a new vendor.  And everything
9  else is trying to reverse-engineer.  It's a sham.  I
10  mean -- and at the end of the day, we want an
11  injunction.  We want to stop the sham.  We'll put up
12  a bond.  It will secure them if the injunction is
13  wrongfully entered because the law requires that.
14       And if, by the end of a final hearing, you find
15  that this wasn't a sham, then they can go after the
16  bond because that will protect them from whatever.
17  But we have no other alternative.
18       Judge, with respect to the actual language of
19  the contract, I don't know if you read it.
20       THE COURT:  I had previously read it.
21       MR. TURKEL:  The term provision provides -- you
22  know, we really have, like, essentially, one
23  paragraph on which -- where is that -- oh, it's on
24  the back end?
25       I think it's on the last page.  Yeah, if you

Page 27

1  look on the last page of this timeline -- or could
2  be the second to last page.
3       MR. BARRIOS:  Separate time line for just the
4  contracts.
5       MR. TURKEL:  Oh, yeah, yeah, yeah.  There's a
6  separate one that says "Contracts" at the top.  Do
7  you see that?
8       THE COURT:  Yes.  There it is.
9       MR. TURKEL:  So if you look down to -- the
10  first entry there, September 25, 2014, says "CSG and
11  Washington."  That's their contract with their
12  customers which defines the term, right?  And it
13  says the term of this is for 12 calendar months.  So
14  they signed, for instance, with Washington County on
15  September 25, 2014, a contract in which the term is
16  12 calendar months starting when Captain Johnson
17  platform is installed and first call is successful.
18  It automatically renews for 12 months unless either
19  party notifies the other in writing of its intent to
20  terminate this agreement in 90 days, right?  That's
21  them with the customer.
22       If you look down a few entries, Judge, and if
23  you see that particular contract, Washington County
24  renews in '15, '16, '17, right?  We get to '17 and
25  we execute our MSA, our master services agreement,

Page 28

1  with them.  And the term provision in that
2  provides -- and this is between our client, Smart,
3  and CSG -- "This agreement shall commence on the
4  effective date and shall be coterminous with
5  customer's agreement with facility as defined by
6  facility."  "Customer" in that respect refers to
7  Correct, okay?  So we're coterminous with their
8  agreement with the facility as defined by the
9  facility.
10       "For purposes of this agreement, the effective
11  date is defined as the date of the last signature on
12  this agreement.  After the original term, this
13  agreement shall automatically renew in accordance
14  with the customer's agreement with facility unless
15  either Party," with a capital P, "notifies the other
16  Party with written notice of non-renewal at least
17  90 days prior."  Okay?
18       Our argument, Judge, and what we think this
19  reads -- and we don't think it's a fanciful reading
20  at all, which they have a reading that they don't
21  think is fanciful which puts us in a parol evidence
22  place, which is why we're here -- is that, first of
23  all, this is coterminous, meaning when they're doing
24  business with the customer, they're doing business
25  with the customer.  When they stop, we stop.

Page 29

1       When you look at the word "term," right, the
2  word "term" is not defined in our agreement.  The
3  word "term" is defined in their customer agreement,
4  meaning 12 calendar months which automatically
5  renews.  That's the little excerpt I read earlier.
6       And after the original term which is 12 months,
7  right, "this agreement automatically renews in
8  accordance with the customer's agreement with the
9  facility."  Now the original term is defined in that
10  customer agreement, so when you read the next
11  sentence, right -- "unless either party" -- the way
12  we read it, the way the course of dealing was
13  between the parties and the way all the discussions
14  were is that when they're saying "either party"
15  there, they mean either the facility or Correct.  We
16  have no ability to terminate -- to non-renew
17  anything.  We're a sub.  The facility can non-renew
18  them.  They can non-renew the facility.
19       So the way that's read and the way the intent
20  of the parties bears out through the evidence is
21  that, "unless either party notifies the other party"
22  means unless the facility notifies them or they
23  notify the facility that the agreement between them
24  and the facility is not going to renew, in which
25  case, somebody says, "Hey, we didn't renew with the

Page 30

1  facility," 90 days ahead of time, you know, "we're
2  letting you know because we don't have a contract
3  anymore."
4      We argue in our briefs, Judge, and -- and the
5  evidence is so clear on that being the expressed
6  intent of this, that they had actually entered into
7  amendments on three of the eight facilities that
8  memorialized our attachment to that customer
9  contract.  The other five didn't get done for
10 reasons we don't know.  They represented, "We're
11 going to do this on every one," and they just never
12 got done.  But those amendments, essentially,
13 memorialize that ultimate intent also.
14     So where this breaks down today, Judge, is can
15 they non-renew us under that provision when we
16 believe that that provision only gives them the
17 right to non-renew us if they don't renew with the
18 facility and they have renewed with the facility.
19     Does that make sense, Judge?
20     THE COURT:  Yes.
21     MR. TURKEL:  Okay.  So that's all --
22     THE COURT:  That doesn't mean I'm ruling in
23 your favor.
24     MR. TURKEL:  No, Judge --
25     THE COURT:  Your argument makes sense.

Page 31

1      MR. TURKEL:  So, Judge, that's where we are at.
2  We have witnesses we're prepared to put on and prove
3  up the salient facts to entitle us to injunctive
4  relief.
5      THE COURT:  Ms. Bald?
6      MS. BALD:  Thank you, Your Honor.  May it
7  please the Court.
8      We're here on behalf of the Correct Solutions.
9  I'm here with my partner James Lynch, and we have
10 Mark Turner who is probably one of the most
11 knowledgeable folks of the -- of today's hearing
12 with us today from Correct Solutions.  He's here
13 from Louisiana.
14     Your Honor, we're here today because Correct
15 Solutions had wonderful relationships with
16 facilities.  This is only eight of approximately 81
17 facilities that they have contracts with, so Smart
18 is just one of their many vendors.  They enter into
19 direct contracts with these facilities.  They have
20 for years.  They have wonderful relationships with
21 them.
22     But as the needs started and the tablets needs
23 started and the e-mail needs started, they wanted to
24 be able to expand the services that they could
25 provide to their facilities.  They don't do it, so

Page 32

1  what they do is they enter into contracts with their
2  facilities.  The only contract with the facility is
3  with Correct Solutions.  The description of what
4  those services are going to be are an obligation of
5  the contract to be provided by Correct Solutions.
6      But because they don't do it, they enter --
7      THE COURT:  They have a sub.
8      MS. BALD:  Right -- which is what Smart is,
9  so --
10     THE COURT:  That part, I understood.
11     MS. BALD:  So they gave -- Smart had an
12 opportunity for the last few years to join -- to be
13 able to provide services to these facilities, and
14 quite frankly, they blew it.
15     And we are here today -- we were here for the
16 notice to cure hearing because Sebastian County was
17 so unhappy with the poor quality of the products and
18 the poor service and the lack of response time -- we
19 had Captain Dumas down to tell the Court about his
20 unhappiness with them -- that Correct Solutions sent
21 out the notice to cure.
22     The bottom line is Correct Solutions is the one
23 contracted to provide these services well to their
24 facilities and they brought in a subcontractor that
25 has done a very poor job.  So they -- it's

Page 33

1  interesting to hear the argument that they're
2  bringing in a great deal of stuff that occurred
3  before this lawsuit was filed but they're not
4  talking about what occurred since this lawsuit is
5  filed.
6      They are still providing the equipment and the
7  products poorly to every facility at issue, all
8  eight facilities at issue.  No subcontractor has
9  been brought in, and we have done that status quo as
10 this Court directed us where the party agreed to
11 from the beginning.  It has been status quo since.
12     We did the notice to cure.  The Court, at that
13 hearing, said, "I don't want you to terminate
14 without a further hearing, but that does not
15 prohibit you from sending out further notices to
16 cure."
17     So we have Washington County, and we have
18 Captain Johnson and Nolan Ake -- Lieutenant
19 Nolan Ake from Washington County, who are going to
20 tell you all of the problems they had with Smart and
21 how they want them out.  They don't want Smart
22 anymore.
23     So most of what you heard was Tech Friends.
24 Tech Friends is under contract with Correct
25 Solutions and is providing the same stuff that Smart

Page 34

1  is doing at many of the other facilities that
2  Correct Solutions has contracts with.  But Tech
3  Friends has not been brought in for any of these
4  eight facilities and as the Court -- as we all
5  agreed, status quo since this case has been pending.
6      THE COURT:  But let -- so I'm understanding,
7  are you saying that Tech Friends -- the contract
8  with Tech Friends did not involve these eight
9  facilities?
10     MS. BALD:  They're not providing services to
11 any of the eight facilities.
12     THE COURT:  No, that's not what my question
13 was.  My question was, was there a contract entered
14 into between -- I get the names all --
15     MS. BALD:  Correct Solutions.
16     THE COURT:  -- Correct Solutions and Tech
17 Friends entered into to provide the services to
18 these eight facilities?
19     MS. BALD:  No, sir.
20     THE COURT:  Okay.
21     MS. BALD:  There is what is -- what both Smart
22 did with -- and I'm going to walk through the
23 negotiation because it -- what the parties agreed to
24 do is different than what Smart initially wanted to
25 do.

Page 35

1      There is a master service agreement that
2  Correct entered into with vendors.
3      THE COURT:  Right.
4      MS. BALD:  And that described what they're
5  going to do, but that doesn't say any facility.  So
6  then there is a separate schedule, and that's the
7  contract between the vendor and Correct as to this
8  is what you're going to do for this facility.
9      THE COURT:  Right.
10     MS. BALD:  So it's two different contracts.
11     THE COURT:  But why don't --
12     MS. BALD:  The master service agreement is just
13 a blank agreement.  It doesn't apply to any
14 particular facility.  So for all of these other 81
15 facilities, if they decide to use Tech Friends on
16 the 73 or 74, that master service agreement that
17 exists between Correct Solutions and Tech Friends
18 will be used and schedules will be done for all of
19 these other 70-some facilities.
20     So it wasn't done for these eight facilities.
21 It was done just like we have one with them.  If --
22 if this relationship had worked out and Smart had
23 done a nice job and Correct Solutions wanted to
24 expand them into another facility, the master
25 service agreement would not change.  They would just

Page 36

1  do another schedule and attach it.
2      So no termination other than the one that
3  started this lawsuit has ever been sent by Correct
4  Solutions.  We did the notice to cure.  We
5  decided not -- they decided not to terminate
6  Sebastian, not to ask this Court to go ahead and
7  terminate.  They decided to wait and exercise a
8  different provision under the contract.  What we
9  were before Your Honor at the hearing was
10 Paragraph 9 about notice to cure, the opportunity to
11 cure and all that stuff.
12     THE COURT:  Right.
13     MS. BALD:  That has nothing to do with today.
14 What we're under is the provision in Paragraph 6
15 that says the effective date of the master service
16 agreement is going to be the last signature date,
17 which was the date that Correct signed it -- it was
18 September 2017 -- and it said this is going to be
19 coterminous.  This master service agreement will
20 be -- will run at the same time as, for example, the
21 contract they have with Washington County and it
22 will automatically renew when the contract between
23 Washington County and Correct renews.
24     THE COURT:  Right.  So far you guys agree on
25 that.

Page 37

1      MS. BALD:  We agree with that.
2      They want to ignore the rest of it that they
3  put in.  They were the ones that put this language
4  in, not us.  We said this is fine; this is a
5  requirement for us to do this deal, but this was
6  their language.
7      They said, "After the original term, this
8  agreement will automatically renew in accordance
9  with the customer's agreement with the facility and
10 our -- Mr. Turner will tell you that he is the one
11 that added "in accordance with the customer's
12 facility."  But what they put in was "unless either
13 party notifies the other party with written notice
14 of non-renewal at least 90 days prior to the
15 expiration of the current term."
16     Mr. Turner's going to introduce into evidence
17 that what they initially wanted and what they
18 initially drafted was a master service agreement
19 that was going to be for seven years.  The only
20 parties to that master service agreement are Correct
21 and Smart.  They said this is going to be a
22 seven-year term; it's going to automatically renew,
23 unless either party gave written notice of
24 non-renewal at least 90 days before the renewal.
25     Mr. Turner is going to tell you that was too

Page 38

1  long; we can't do that, but I'm willing to have the
2  master service agreement be -- have the same term,
3  same renewal terms with the eight facilities, but
4  we're keeping that non-renewal provision in there so
5  that if this relationship goes south or if they're
6  not making money on these facilities and either
7  party wants to get out of this deal, either party
8  can give the written notice.  And when the contract
9  with -- between Correct and the facility expires, so
10 does the master service agreement as to that
11 facility.
12     They want to argue these folks are married for
13 the rest of their lives.  Under their argument,
14 there would never be a reason -- I mean, if that's
15 their argument, the 90 days, that language is
16 completely gone from this contract.
17     THE COURT:  Hold on for a second.
18     This is Smart and Correct, right?
19     MS. BALD:  Yes.
20     THE COURT:  Contract.
21     All right.  Go ahead.  That's not really a
22 clear sentence, to be honest with you, not to this
23 Court.  I mean, either way, when I -- that's why I
24 keep reading it.
25     MS. BALD:  We plan to introduce into evidence

Page 39

1  the draft that they prepared where that was the
2  seven-year and their non-renewal, which was it
3  renews automatically after seven years unless, prior
4  to the renewal, the party -- either party gives a
5  notice of non-renewal.
6      What they did was they changed -- instead of
7  seven years, we're going to have the term the same
8  as the term of the separate contract.  But again,
9  this -- this is the initial term of this agreement,
10 is going to be the same as the initial term with
11 that facility.  But 90 days before that separate
12 contract with the facility renews, they have 90 days
13 to non-renew.
14     So Correct Solutions -- and we have the e-mails
15 back and forth and then we have Mr. Turner's e-mail
16 with his revised master service agreement to
17 Smart Communications to introduce into evidence.  We
18 also have the documents where Smart initially want
19 the schedules to be a contract directly between them
20 and the facility.  And Correct Solutions said, "No,
21 that's our customer, our facility.  We sign the
22 contracts with our facility, then we will do a
23 schedule with you and the schedule is between the
24 two of us."  So there is no contract between Smart
25 and any of these facilities.

Page 40

1      So -- and it was interesting, the document --
2  and we have very little documents produced by Smart
3  to date including today, but one of the documents
4  they did produce was an e-mail between Mr. Deglman
5  and Mr. Logan -- Jon Logan -- when they were
6  negotiating with Mr. Turner.  And Mr. Turner is
7  going to tell you Mr. Logan was not part of any of
8  the discussions.  It was all between Mr. Deglman,
9  who is no longer with Smart, and Mark Turner.
10     And in this e-mail, it said, "Let's try and
11 establish our relationships with these facilities,
12 so if Correct Solutions loses them, we stay in."
13 That was their goal from the beginning.
14     So we brought -- because Washington County is
15 the basis for their emergency, we have -- we brought
16 Lieutenant Nolan Ake and we brought Captain Johnson.
17 Lieutenant Nolan Ake is the person who handled all
18 of the problems that came -- that were caused by
19 Smart, both service, lack of response, and the
20 products.  And he's going to be here to tell you the
21 problems that they've been having from the get-go.
22     Captain Johnson is the person who made the
23 decision to bring in Smart.  I think one of your
24 questions at the last hearing was what kind of
25 presentation was made by Smart with the tablets.

Page 41

1  Well, in fact, Smart and Tech Friends and a third
2  company came to Washington County and they made the
3  presentation directly to Washington County.  And
4  Washington County decided to choose Smart because
5  they could -- they represented they could do a
6  service that Tech Friends could not.  And so they
7  based it on the representations they got from Smart.
8  And Captain Johnson is going to tell you that one of
9  the critical things that they -- the reasons that
10 they chose Smart was that they would have this
11 visitation program through the tablets that, to this
12 day, has not happened.
13     Captain Johnson is going to tell you that they
14 have had problems with service, problems with lack
15 of response time, problems with no one answering the
16 phone, problems with the products, how it is not
17 correctional-grade tablets -- and that was another
18 question that was raised at the last hearing.  He
19 can tell you what is correctional grade and how he
20 knows what's correctional grade.  This is not.
21     And he's also going to tell you that, last
22 week, Washington County was notified by the company
23 that provides -- it's a company called Summit --
24 that provide their commissionary or -- commissary
25 stuff.  And in the contract, it also authorizes that

Page 42

1  company to provide e-mails.  And so on
2  December 11th, Washington County received a de- --
3  cease and desist letter from Summit saying you
4  will -- you have 15 days to stop Correct Solutions
5  and any other person from providing e-mail services
6  because we have the prior contract.
7      They provided Correct Solutions -- put them on
8  notice, on December 11th, that within 15 days you
9  are no longer allowed to provide the service.  And
10  two days later, we provided both of those notices to
11  Smart Communications.  So at this point neither
12  Correct Solutions nor Smart are authorized to
13  provide those services to Washington County.
14      More importantly --
15      THE COURT:  Well, that doesn't void the
16  contract, though.
17      MS. BALD:  Well, but more importantly --
18      THE COURT:  That would never void the contract.
19      MS. BALD:  But it's not voiding -- we're not
20  voiding the contract.  It's just --
21      THE COURT:  No.  I'm saying Washington County
22  can't void a contract that they entered into just
23  because they entered into a prior contract with
24  somebody else.
25      MS. BALD:  It may be more litigation,

Page 43

1  unfortunately.  It may be more litigation involving,
2  now, Washington County because they had this
3  contract that they --
4      THE COURT:  Yeah.  But that has nothing to do
5  with -- I'm sorry.  I keep getting the names
6  confused --
7      MS. BALD:  Correct Solutions.
8      THE COURT:  -- Correct Solutions and Smart and
9  their contract.
10      MS. BALD:  But, more importantly, what does is
11  Captain Johnson is going to testify to this Court,
12  he has -- he's going to have Smart out of his
13  facility.
14      THE COURT:  Well, I don't want to get into a
15  hearing that is irrelevant to this hearing.  Just
16  because Washington County has entered into two
17  separate contracts to provide -- to have certain
18  services provided, the same services by two
19  different companies, is not a basis of anything in
20  this case, is it?
21      MS. BALD:  No.  What's -- well, it is
22  partially.
23      THE COURT:  How?
24      MS. BALD:  That, and the fact that they are
25  going to tell you that, as of January, Smart is out

Page 44

1  regardless.  They have asserted that for their
2  irreparable injury for this injunction, they will be
3  unable to market their continued good relationship
4  with Washington County.  They will be unable to --
5      THE COURT:  Back up and say that again.
6      MS. BALD:  Okay.  Smart has argued, as the
7  basis to try and establish irreparable injury that
8  is required for an injunction, that if the
9  Washington County contract lapses, they will be
10  unable to market its good relationship, their
11  continued contractual relationship with
12  Washington County to others.
13      Washington County -- Captain Johnson is going
14  to tell you he is going to get them out regardless,
15  even if he has to get Correct Solutions -- even if
16  he has to terminate his contract with Correct
17  Solutions.
18      And, Your Honor, I would submit, based upon the
19  e-mail that we saw and their own argument in their
20  motion, that what Washington County would have to do
21  is terminate its contract with Correct Solutions,
22  that's exactly what they are trying to accomplish by
23  this.
24      We've had -- we tried a relationship with them.
25  It has been poor service, poor product.  It's put

Page 45

1  Correct Solutions in a very bad contractual position
2  with its facilities.  It has not terminated the
3  contract.  It is exercising the non-renewal
4  provision in the contract.
5      It's almost like these folks had a short
6  courtship.  They married, but they put a provision
7  in their contract that allowed either party to opt
8  out of the marriage, either party.
9      Under their argument, there would be no
10  reason -- there would be no reason -- if Smart is
11  losing tons of money on their contract, under their
12  argument, Smart could not get out of a bad deal.
13  That's what they put in here from the beginning,
14  Smart allowed either party to, if this contract was
15  renewing, to end this relationship because they
16  can't be married forever.
17      And if there's ever a situation where you've
18  got a vendor that is not providing the services that
19  your clients require and your clients want, this
20  non-renewal provision, as Mr. Turner will tell you,
21  was critical to sign this deal.  And now they've got
22  the right to exercise it.
23      In the stipulation, the parts agreed from the
24  very beginning of this case that the parties do not
25  waive any rights or remedies as set forth in the

Page 46

1  MSA.  And so Correct Solutions did not waive its
2  right to allow on renewal time to non-renew these
3  contracts.  We believe the language is very clear.
4  We don't believe that any parol evidence as to the
5  parties' intent is permissive.
6      And I do want to point out -- it was very
7  interesting -- Smart moved for summary judgment
8  early on in this case.  They -- every time we tried
9  to schedule a deposition of their representative, in
10 their motion they asserted the MSA -- the terms of
11 the MSA are unambiguous.  That is in the motion that
12 they filed with this Court.
13     When we finally just noticed the deposition
14 because we could not get it cleared, they filed a
15 motion for protective order, wanted -- said "You can
16 only take our corporate deposition if it's the same
17 day as your corporate deposition," which was a
18 problem.  Their folks are local; ours are not.  And
19 in their motion for protective order, they once
20 again asserted that the terms of the MSA are
21 unambiguous and should be construed as a matter of
22 law.  We agree that this is -- should be -- can be
23 construed or should be construed as a matter of law.
24     Now, they're taking the position that it's
25 ambiguous.  And we would submit, Your Honor, these

Page 47

1  parties negotiated the right to non-renew these
2  contracts.  Correct Solutions is exercising that
3  right for a very, very necessary, good reason.
4  Otherwise, they're going to be out of the contract
5  too.
6      And if I can remind the Court, at the last
7  hearing, Smart argued irreparable damage if the
8  contract is terminated.  They're not going to suffer
9  any damage by the contract not renewing.  The damage
10 is what they're trying to do is to Correct Solutions
11 if their contract with their facilities are
12 terminated.
13     And we would ask this Court to enforce the
14 terms of the contract and deny their injunction.
15     THE COURT:  Okay.  Call your first witness.
16     MR. BARRIOS:  Your Honor, we would call
17 Jon Logan.
18     THE COURT:  Okay.
19     MR. BARRIOS:  Where would you like --
20     THE COURT:  He can stay where he is.  It's a
21 lot easier in this room.
22     Would you raise your right hand to be sworn?
23     THE WITNESS:  (Complying.)
24     THE COURT:  Do you solemnly swear or affirm to
25 tell the truth, the whole truth and nothing but the

Page 48

1  truth?
2      THE WITNESS:  Yes, sir.
3              JONATHAN LOGAN,
4  called on behalf of the Plaintiff, having duly sworn or
5  affirmed to tell the truth, the whole truth and nothing
6  but the truth, was examined and testified as follows:
7      THE COURT:  Thank you.
8      And could you spell your name and spell it for
9  the benefit of the court reporter, both first and
10 last?
11     THE WITNESS:  J-o-n-a-t-h-a-n L-o-g-a-n,
12 Jonathan Logan.
13     THE COURT:  All right.  You my proceed,
14 counsel.
15     MR. TURKEL:  Judge, may it please the Court,
16 it's a notebook with exhibits in it.
17     THE COURT:  Okay.
18     MR. TURKEL:  And for the record, a copy has
19 been provided to opposing counsel.
20     THE COURT:  Yes, sir.
21     MR. BARRIOS:  Your Honor, I'm handing an
22 exhibit binder to the witness.  We intend that to be
23 used for all the witnesses today that we will either
24 call or cross, has all of our exhibits in it.
25 There's one for the Court as well, so I will refer

Page 49

1  to the exhibits by the tabbed exhibit tabs in the
2  binder.
3      THE COURT:  Okay.
4              DIRECT EXAMINATION
5  BY MR. BARRIOS:
6      Q   Mr. Logan, what's your role at Smart
7  Communications?
8      A   I am a founder and CEO.
9      Q   And can you tell the Court, just generally,
10 what your business model is with respect to contracting
11 with correction facilities?
12     A   Sure.  So we provide unique communications
13 services.  In fact, we invented the first e-mail system
14 for inmates.  We provide our system at no cost to
15 agencies.  We install our custom-made computer kiosks,
16 our custom-made tablets along with the infrastructure,
17 the electrical, the network, the Internet service,
18 software training, all of the above, all at zero cost to
19 the agency.
20     We make our money over time -- a little at a
21 time, 50 cents at a time -- by use of the inmates and
22 public communicating through the platform.
23     Q   Okay.  And does Smart generally seek a certain
24 duration of a contract in order to recoup some of those
25 investments?

Page 50

1    A    Yeah.  Our initial term is usually seven years.
2    Q    All right.  Now, you mentioned installation and
3    sort of hard costs.  Are there other investments that the
4    a company makes into these facilities?
5    A    Yeah.  Not only is there hardware but there's
6    tons of resource from staff and time involved with
7    training and programming equipment and getting things
8    like request grievances, routing set done.  So we
9    automate the entire facility into a paperless
10   environment.
11         So it's a massive undertaking.  It's kind of
12   company-wide.  Everyone in the company has their hands
13   involved in the process.
14   Q    And did -- does Smart normally contract
15   directly with a correctional facility?
16   A    Normally, we do.
17   Q    So is this arrangement with Correct Solutions a
18   little bit different than what you usually do?
19   A    Yes.  In fact, I would say it's extremely
20   different.  We have 100 facilities -- over 100 facilities
21   that we contract with and they're all direct except
22   through Correct Solutions.
23   Q    Except for these eight facilities that we've
24   been talking about here?
25   A    (Nodding head.)

Page 51

1    Q    Okay.  Now, how did the relationship between
2    Smart Communications and Correct Solutions start?
3    A    In, I believe, the spring of 2017, I met Mark
4    Turner at the Texas Jail Association, and there was a
5    mutual interest because we had a unique platform that
6    really was beneficial to their platform as they only
7    license a phone platform from a company called Lattice.
8    And if they could combine our services with their
9    services, they would have a complete communications
10   package and it would come at no cost to them, no cost to
11   the agency.  It's a win for everybody.
12   Q    And then, eventually, did you start discussing
13   an actual contract between the entities?
14   A    We did.  We discussed a contract.  And we even
15   went -- all of our team hopped on a plane and flew to
16   their headquarters in Louisiana and demonstrated our
17   hardware and software to their entire staff.
18   Q    You mentioned previously your normal duration
19   of a contract that you ask for is seven years.  Ms. Bald
20   actually referenced that in her opening as well.
21         Is that what you initially presented to Correct
22   Solutions too, that --
23         MS. BALD:  Objection, Your Honor.  Failure to
24   lay proper predicate.
25         THE COURT:  Sustained.

Page 52

1    BY MR. BARRIOS:
2    Q    What was your initial involvement in the
3    negotiation, the bigger-picture negotiation of what the
4    relationship was going to be between Smart and Correct?
5    A    I pretty much was spearheading a lot of the
6    big-picture negotiations with Correct.  I met Mark.  I am
7    the CEO of the company, and he's, in my eyes, kind of the
8    representative of that company with Correct.  He's the
9    one that's kind of the main leader at their shows.
10         And so I had most of the discussions.  Rob
11   Deglman, who was our operations manager was kind of my
12   right-hand man and was involved in a lot of negotiations
13   as well as far as, kind of, the details.  He and I would
14   go back and forth and he would keep me updated, and I
15   would have direct conversations with Mark and Rick
16   Ferguson, one of their top sales reps as well as Patrick
17   Templeton I've met a few times as well, the owner of the
18   company.
19   Q    Do you recall what the first facility that you
20   teamed up with Correct Solutions on was?
21   A    I believe it's Avoyelles Parish, Louisiana.
22         THE COURT:  Avoyelles Parish?  I don't remember
23   that one.
24         MR. TURKEL:  It's in the center between
25   Shreveport and New Orleans.

Page 53

1         THE COURT:  Okay.  It doesn't mean I know all
2    the parishes but -- can you spell that for me?
3         THE WITNESS:  Oh, A -- I don't really -- your
4    guess is as good as mine.
5         MR. TURNER:  A-v-o-y-e-l-l-e-s.
6         THE COURT:  Okay.
7    BY MR. BARRIOS:
8    Q    Mr. Logan, can you flip to Exhibit C in the
9    binder?
10   A    Yes.
11   Q    And can you tell the Court what this appears to
12   be?
13   A    This appears to be a conversation between
14   Rob Deglman, our employee, with -- with Mark Turner, and
15   Rob has communicated also with Jim Logan and myself, this
16   correspondence.
17   Q    So Mr. Deglman is forwarding the e-mail he
18   received from Mr. Turner to you?
19   A    That's Correct.
20   Q    And was there some discussion with respect to
21   the contents of the e-mail as well between you and
22   Mr. Deglman?
23   A    Yes, there was.
24   Q    And based on this e-mail, what was your
25   understanding of how the structure of each particular

Page 54

1  facility contract was going to be?
2      A   Sure.  So Correct Solutions is under contract
3  with the facility, themselves.  They would take their
4  original contract and they would have an amendment added
5  to that contract as it would see in the bullet points
6  here, current CSG agreements with the term with
7  Avoyelles, and then the amendment to their agreement for
8  our services and then our agreement, master service
9  agreement for Avoyelles Parish with Correct Solutions and
10 then Smart Communications and Correct Solutions' schedule
11 of service for Avoyelles.
12     Q   All right.  And then when you look at the top
13 and you see Mr. Deglman's forward to you, was he sort of
14 explaining how that was all going to work to you as well?
15     A   Yeah, where he's saying they'll be signing a
16 master service and schedule of service for each client.
17 There were also -- contract with client addendum to
18 include our services.
19     Q   Okay.  So let go ahead and flip to Exhibit G.
20         MR. BARRIOS:  Your Honor, I would like to move
21 Exhibit C into evidence.
22         MS. BALD:  No objection.
23         THE COURT:  All right.
24         All right.  Be so received.
25         (Exhibit C admitted into evidence.)

Page 55

1  BY MR. BARRIOS:
2      Q   And can you tell the Court what Exhibit G is?
3      A   It looks like it's the agreement for Avoyelles
4  Parish contracts between Correct Solutions and Avoyelles
5  and Correct Solutions and Smart Communications.
6      Q   Okay.  And do these, as we flip through, look
7  like accurate representations of the fully executed
8  contracts relating to Avoyelles?
9      A   They do, correct.
10     Q   There's a tab in the binder.  Can you flip to
11 that tab?
12         THE COURT:  Which tab?  The same one?
13         MR. BARRIOS:  The yellow tab that's within
14 Tab G.
15         THE COURT:  Okay.
16 BY MR. BARRIOS:
17     Q   And can you tell the Court what this is, what
18 this document is?
19     A   Yes.  This is Attachment A, and it's an
20 amendment to the agreement with Correct Solutions and
21 Avoyelles Parish where it lists out the specific features
22 and services that are going to be amended into their
23 contract with the agency that include our services, such
24 at Smart Kiosk, which is our trademark brand name of our
25 kiosk system, also things like Smart Tablet, which is

Page 56

1  also our trademark name for our tablet system and -- if
2  you flip to the next page -- which is MailGuard, which is
3  now a registered trademark updated from just TM.  And
4  it's also now a patented system exclusive to
5  Smart Communications.
6      Q   Okay.  So this -- you were reading from
7  Attachment A to the first amendment to the contract
8  between Correct Solutions and Avoyelles Parish, right?
9      A   Yes.
10     Q   And you just ran through it, but just
11 generally, where does this information come from that
12 lists out Smart Kiosks, Smart Tablets, MailGuard, that
13 type of thing?
14     A   Right.  So this is actually, I believe, a
15 copy-and-paste from our standard agreement with -- we
16 have with facilities, our standard schedule.
17     Q   The schedule that outlines the particular --
18     A   -- services that the Smart Communications
19 provides, correct.
20     Q   So, now, I guess it's fair to say you
21 understood that there was going to be an amendment,
22 actually, incorporating Smart's services into the
23 contract between Correct Solutions and the facilities?
24     A   That's what Mark Turner had assured us and
25 that's also what he had provided as evidence that they

Page 57

1  did do.
2      Q   Okay.  Well, that's what this Exhibit G shows,
3  right, this amendment?
4      A   That is correct.
5      Q   Okay.  Now, go ahead, please and flip to
6  Exhibit D.
7          THE COURT:  Are you moving admission of G?
8          MR. BARRIOS:  Yeah.  I would like to, Your
9  Honor.
10         THE COURT:  Any objection?
11         MS. BALD:  No, Your Honor.
12         THE COURT:  Be so admitted.
13         (Exhibit G admitted into evidence.)
14 BY MR. BARRIOS:
15     Q   Exhibit D, again, briefly describe what this
16 is.
17     A   So this is a conversation --
18         THE COURT:  What letter is this?  I'm sorry.
19         MR. BARRIOS:  D.
20         THE COURT:  As in dog?
21         MR. BARRIOS:  As in dog, yes.
22         THE COURT:  Okay.
23     A   So this is a conversation where Mark Turner had
24 sent an e-mail to our employee Rob Deglman and Rob had
25 then sent it to Jim Logan and myself, where it just

Page 58

1  outlines where Mark had assured us that we're moving
2  forward with Sebastian County now and they will do -- as
3  he says here on the second line down -- "same process as
4  last time with the exception that we don't have to do the
5  MSA, master service agreement, again."
6  BY MR. BARRIOS:
7      Q   All right.  When he said "the same process as
8  last time," what did you understand that to mean?
9      A   I understood that to mean they would be doing
10  the amendment documents the same as they did with
11  Avoyelles and all the same documents in place.
12     Q   All right.  Did you actually -- did you ever
13  follow up with Mr. Turner or anybody at Correct Solutions
14  to make sure that an amendment was, in fact, done for
15  every single customer that you were working together on?
16     A   I didn't follow up with him to make sure he did
17  something he assured me he would do and he'd proven the
18  first time that they did do.  And the fact that we will
19  be installing our system in the correctional facility and
20  the correctional facility would actually be having their
21  staff utilize the system every day to operate, obviously,
22  I would assume that they had to have followed through and
23  gotten the amendment to their -- there has to be a
24  contract for that.
25     Q   Well, why do you say there has to be a contract

Page 59

1  that would actually outline Smart's services that you
2  were going to perform inside of a correctional facility?
3      A   Correct.  Because that would be the only way
4  that a correctional facility would allow a vendor to come
5  in, install a system throughout the whole facility and
6  then have their staff actually utilize that system to
7  operate that facility and also have the inmates, and the
8  public then, utilizing that system to communicate with
9  inmates that the County was responsible for.
10     MR. BARRIOS:  Your Honor, I would like to move
11  Exhibit D into evidence.
12     THE COURT:  Any objection?
13     MS. BALD:  No, Your Honor.
14     THE COURT:  It will be so admitted.
15     (Exhibit D admitted into evidence.)
16  BY MR. BARRIOS:
17     Q   Please turn to Exhibit F.  Can you explain what
18  Exhibit F is, please?
19     A   Yes.  Well, it outlines our partnership.  It
20  looks like this is Rob Deglman outlining the agreement
21  that he had discussed with Mark Turner, and he had sent
22  that e-mail to myself, and I believe, Jim Logan, maybe.
23  But it outlines the term of our agreement with Correct
24  Solutions.
25     Q   And what is that -- on Section 6, this is a cut

Page 60

1  out of your master services agreement.  Is that right?
2      MS. BALD:  Your Honor, we're going to object to
3  any testimony about this document.  It's hearsay.
4      THE COURT:  Argument?
5      MR. BARRIOS:  Again, it's not offered to prove
6  the truth of -- that that's what the agreement says.
7  It's offered to prove what his understanding was
8  of -- based on the negotiations.
9      MS. BALD:  Your Honor, I would agree if that
10  was from Correct Solutions.  This is their internal
11  memo based upon what their employee is telling them,
12  and I would object.  Hearsay.
13     Mr. Deglman is not here.  I don't have a chance
14  to cross.
15     THE COURT:  Hold on.  Let me read.
16     Repeat your question and answer again just so I
17  make sure I understand what the question and answer
18  were.
19     MR. BARRIOS:  Well, it --
20     THE COURT:  I can have her read it back.
21     MR. BARRIOS:  Yeah.  Go ahead.  Sure.
22     THE COURT:  Go ahead and read it back, please.
23     (The reporter read the requested portion.)
24     THE COURT:  You didn't get to the question.
25     MR. BARRIOS:  Didn't get there.

Page 61

1      THE COURT:  Ask your question and then I'll
2  determine whether --
3  BY MR. BARRIOS:
4      Q   Where it says "6, Term," what does that appear
5  to be to you?
6      MS. BALD:  Objection, Your Honor.  Hearsay.
7      A   That looks --
8      THE COURT:  Well, that's part of the actual
9  agreement, so that portion that -- in reading it, it
10  looks like the exact language used in the agreement.
11     MR. BARRIOS:  Right.
12     THE COURT:  Isn't it, counsel?
13     MS. BALD:  So if we're just going to read
14  this --
15     THE COURT:  That's all he's reading right now.
16     MS. BALD:  Okay.
17     THE COURT:  That's all he's been asked to read.
18  Go ahead.
19     A   Yes.  I believe that that is a copy-and-paste
20  from the agreement term in the agreement between Correct
21  Solutions and Smart Communications.
22  BY MR. BARRIOS:
23     Q   If you look at the date of this, this is
24  August 30th.  I think August 30th -- if you want to flip
25  back -- it was the same date as some of the other e-mails

Page 62

1   we've already looked at.
2        Was this stuff -- is this formation and
3   negotiation of this deal happening pretty quickly?
4        A   It was.  They were in a major hurry to get this
5   done as they needed this to secure their agreement with
6   clients because clients were out shopping other vendors,
7   phone vendors that had a complete technology solution.
8   And so they needed this to make sure they really didn't
9   lose their clients.
10       Q   And, at first, were you at all confused about
11  how this was being set up as "coterminous" is the word
12  that was ultimately used in the agreement?
13       A   Typically, we go with a seven-year term, but
14  Mark Turner assured me that a coterminous term is better
15  than seven years because all of their terms automatically
16  renew.  He literally said to me, "As long as we're in
17  there, you're in there.  It's the best agreement you can
18  have."
19       Q   Okay.  So -- and Mr. Deglman, I think you
20  testified earlier, would often come to you after
21  discussions with Mr. Turner and inform you and keep you
22  appraised, so you were in the loop the entire time, right?
23       A   That is correct.  It was like Rob and I were
24  married, so every day.
25       Q   Okay.  Does Mr. Deglman's statement above the

Page 63

1   except from the contract there reflect your understanding
2   of what "coterminous term" meant?
3        A   That is correct.
4        Q   And what does he say there?
5        MS. BALD:  Objection, Your Honor.  Hearsay.
6        A   He says --
7        THE COURT:  Hold on.
8        Just the first sentence?
9        MS. BALD:  I think, Your Honor, Mr. Deglman's
10  interpretation -- I don't have a chance to
11  cross-examine him.  He's not here today.  I think
12  this is hearsay.
13       THE COURT:  He isn't asking his interpretation.
14  He asked is that his interpretation of it.
15       MR. BARRIOS:  Right.
16       MS. BALD:  Rob's interpretation that he's
17  reporting to Mr. Logan.
18       THE COURT:  But that's not what the question
19  was.
20       MR. BARRIOS:  That is not the question.
21       THE COURT:  Repeat the question.
22       Repeat the question.
23  BY MR. BARRIOS:
24       Q   Is Mr. Deglman's statement in the top of this
25  e-mail consistent with your understanding of what

Page 64

1   "coterminous" meant within the context of the agreement?
2        MS. BALD:  Same objection.  Hearsay.
3        THE COURT:  Overruled.
4        A   Yes, it is.  He assured me, just like
5   Mr. Turner --
6        THE COURT:  No.  That -- you're going too far.
7        THE WITNESS:  Okay.
8        THE COURT:  Now you're going into straight
9   hearsay.
10       THE WITNESS:  Okay.
11       THE COURT:  It's your understanding that you
12  agree with that term.  But beyond that, you can't
13  go.
14  BY MR. BARRIOS:
15       Q   So what, specifically, about Mr. Deglman's
16  statement reflects your understanding?
17       MS. BALD:  Same objection, Your Honor.
18  Hearsay.
19       A   That it --
20       THE COURT:  As to his understanding, I'll allow
21  it.
22       My understanding was if Correct Solutions'
23  agreement renewed, our agreement renewed because we were
24  coterminous.
25       MR. BARRIOS:  Okay.

Page 65

1        MR. TURKEL:  Judge, just so we have it on the
2   record, I think that Deglman's understanding would
3   either be non-hearsay state of mind, meaning not
4   offered for the truth, or an exception under
5   803(18)(3) -- or 803(3), which is the state of mind
6   exception, then-existing state of mind when offered
7   to prove what the state of mind was.  "To prove a
8   declarant's state of mind, emotion or physical
9   sensation at that time or any other time when such
10  state is at issue in the action or to prove or
11  explain subsequent acts of conduct."  I mean --
12       THE COURT:  But, usually, that's used for,
13  like, "Did you see that car hit that boy?"  That's a
14  state of mind and it's a statement -- it's hearsay
15  to prove the matter asserted therein, but it's an
16  exception to the rule.
17       There's no -- if you're using it to prove
18  subsequent acts or conduct, whose acts or conduct
19  are you trying to prove?  Theirs or somebody else's?
20       MR. TURKEL:  It would just be your standard --
21  you know, when you're proving parol and you're
22  dealing with intent, subsequent acts that you took
23  to the contract or anything else.  But, essentially,
24  you're not proving a fact there, right?  It's one
25  corporate employee to another one saying, "Here's

Page 66

```
 1    how this works, based on how I understand it,"
 2    right?
 3        So there's no truth being asserted other than
 4    his own state of mind.  That's why it's generally an
 5    exception.
 6        THE COURT:  It's a nice try, but I'm not buying
 7    it.
 8        MR. TURKEL:  I just wanted to make sure we have
 9    that position on the record.
10        THE COURT:  It's on the record.
11        But it's a nice try, Mr. Turkel.
12        MR. TURKEL:  Thank you.
13        THE COURT:  Go ahead.  Next question.
14    BY MR. BARRIOS:
15        Q   Were you comfortable not having your sort of
16    standard seven-year term based on your understanding that
17    if the current Correct Solutions agreement renews then
18    your agreement would renew as well?
19        A   I was comfortable because it would
20    automatically renew, and they were a relationship-based
21    company.  We are assured if they are in there, we're in
22    there.
23        MR. BARRIOS:  Okay.  I would like to move
24    Exhibit F into evidence.
25        MS. BALD:  Your Honor, we're going to object.
```

Page 67

```
 1    Hearsay.
 2        MR. BARRIOS:  Which I believe Your Honor
 3    already overruled.
 4        THE COURT:  I'm sorry?
 5        No.  I didn't overrule the last objection,
 6    which was -- well, the question was, what is your
 7    understanding, not the statement.
 8        MR. BARRIOS:  That's correct, Your Honor.
 9        THE COURT:  So the statement is not going to
10    come in.
11        MR. BARRIOS:  We're using it to reflect his
12    understanding -- its true intent of the parties'
13    evidence.  I'm not offering it to prove that the --
14    if the CS agreement renews, then our agreement will
15    renew.  I'm offering it to prove his understanding
16    that that's what it meant.
17        THE COURT:  Response?
18        MS. BALD:  Your Honor, that understanding is
19    based upon his -- the hearsay of some -- of one of
20    his former employees who is not here for me to
21    cross-examine that statement.  And if the employee
22    was wrong, it doesn't matter really what his
23    understanding is.  The contract is the contract.
24        THE COURT:  Well, his --
25        MS. BALD:  I mean, it would be one thing.
```

Page 68

```
 1        THE COURT:  I'll allow in this Section 6 which
 2    is Term.  The previous statement are not coming in
 3    because that would be hearsay.
 4        Your question wasn't the statement.  Your
 5    question to him was, is it your understanding
 6    that --
 7        MR. BARRIOS:  Right.
 8        THE COURT:  So you weren't asking him to
 9    confirm the statement.  You can't because it wasn't
10    his statement.
11        So I will -- if you want me to, I will strike
12    out those terms, and I will allow the remainder of
13    it to come in, noting your objection to that.
14        MR. BARRIOS:  Yes, Your Honor.
15        THE COURT:  And you still have an objection?
16        MS. BALD:  With you redacting his --
17    Mr. Deglman's comments, I do not have an objection.
18        THE COURT:  Okay.
19        MR. BARRIOS:  So then, just to be clear,
20    everything that's not the copy of the contract term
21    is not admitted, correct?
22        THE COURT:  Correct.
23        MR. BARRIOS:  All right.
24        THE COURT:  F, otherwise, is coming in.
25        (Exhibit F admitted into evidence.)
```

Page 69

```
 1    BY MR. BARRIOS:
 2        Q   Mr. Logan, can you flip to Exhibit V, as in
 3    Victor?  Do you recognize this document?
 4        A   Yes, I do.
 5        Q   You understand this document is, essentially,
 6    why we're here today?
 7        A   Yes, I understand.
 8        Q   If you flip to -- there's a tab behind this
 9    letter as an enclosure which is the contract -- which
10    I'll let you look at it.
11        First of all, did you receive and review this
12    letter?
13        A   Yes, I did.
14        Q   And its contents including this Correctional
15    Communications Service Agreement between
16    Washington County Sheriff's Office and Correct Solutions
17    Group?
18        A   Yes.
19        Q   Will you take a look at Paragraph 14 of that
20    contract?
21        A   Yes.
22        Q   Read that out loud, please.
23        A   "The term of this agreement shall be for 12
24    calendar months starting when CSG platform is installed
25    and first call is successful.  The agreement will
```

Page 70

1  automatically renew for 12 additional months unless
2  either party notifies the other in writing of its intent
3  to terminate this agreement at least 90 days prior to the
4  final date of expiration.
5        "Upon" -- do you want me to keep going?
6     Q   No, that's fine.
7        And can you tell the dates that the parties
8  executed this contract?
9     A   It looks like 9/25/14.
10    Q   When did you and Correct Solutions start
11 entering into your contracts?
12    A   Midway through '17, I believe.
13    Q   Right.  So based on your interpretation, this
14 agreement would already be in a renewal period?  It
15 wouldn't be in an initial time, right?
16    A   Multiple renewals, yes.
17    Q   And based on the fact that this agreement had
18 just 12-month renewals, is that the type of agreement
19 that you would enter into and invest all of your
20 company's resources if you knew that you could be
21 non-renewed in less than a year?
22    A   No.  That would be not at all our business
23 model.
24    Q   So what was it that made it acceptable to do
25 your installation at Washington County?

Page 71

1     A   We were assured that our contract would renew
2  when their contract renewed and that they assured, as
3  long as they're in there, we're in there and they had
4  good relationships and they carried their contracts.
5        MS. BALD:  Your Honor, I'm going to move to
6     strike.  I think that's contrary to the terms of the
7     contract.
8        THE COURT:  Say again.  I'm sorry.
9        MS. BALD:  I'm going to move to strike.  I
10    think that's contrary to the terms of the contract.
11       THE COURT:  How is that a legal objection now?
12    What objection is that?
13       MS. BALD:  I think their argument was that --
14    withdrawn.
15       THE COURT:  Okay.  Next question.
16       MR. BARRIOS:  Okay.
17       THE COURT:  Oh, are you moving to admit
18    Exhibit V?
19       MS. BALD:  No objection.
20       THE COURT:  Victory.
21       MS. BALD:  No objection.
22       MR. BARRIOS:  Yes, Your Honor.
23       THE COURT:  All right.  It will be so admitted.
24       (Exhibit V admitted into evidence.)
25 BY MR. BARRIOS:

Page 72

1     Q   So if you look at the letter, do you understand
2  the position that Correct Solutions --
3        THE COURT:  What letter are we referring to
4     now?
5        MR. BARRIOS:  We're still on Exhibit V.
6        THE COURT:  V or B?
7        MR. BARRIOS:  V, as in Victor, the non-renewal
8     letter for Washington County.
9        THE COURT:  All right.
10 BY MR. BARRIOS:
11    Q   Do you understand why Correct Solutions was
12 conveying that Smart Communications was being non-renewed
13 or the contractual provision they were relying on is
14 probably a better way to say it?
15    A   I do understand what they're attempting to say,
16 yes.
17    Q   Okay.  Let's -- well, it's handy.  It's right
18 behind the letter.
19       So three pages into this exhibit, is this the
20 master services agreement we've all been talking about?
21    A   Yes, it is.
22    Q   Okay.  And Paragraph 6 is what?
23       THE COURT:  Now, where are you looking at now,
24    counsel?
25       MR. BARRIOS:  So this is attached to the

Page 73

1  non-renewal letter.
2        THE COURT:  Right.
3        MR. BARRIOS:  It's the master services
4     agreement with Smart.
5        THE COURT:  The term?
6        MR. BARRIOS:  Yeah, the term provision.
7  BY MR. BARRIOS:
8     Q   Okay.  Can you read the first sentence of that
9  provision?
10    A   "This agreement shall commence on the effective
11 date and shall be coterminous with customer's agreement
12 with facility as defined by facility address in attached
13 schedule."
14    Q   All right.  So the agreement, did you
15 understand, was the agreement between Correct, and the
16 facility was actually going to be attached to your master
17 services agreement, right?
18    A   That's Correct.
19    Q   All right.  And is that what we were looking at
20 before that had the agreement with Avoyelles and then an
21 amendment with Avoyelles that added your services?
22    A   That's correct.
23    Q   All right.  And then there's another sentence,
24 if you skip one, that starts "After the original term,"
25 yeah, will you read that?

Page 74

1    A    "After the original term, this agreement shall
2  automatically renew in accordance with customer's
3  agreement with facility listed as Attachment A."
4    Q    Keep going.
5    A    "Unless either party notifies the other party
6  with written notice of non-renewal at least 90 days prior
7  to the expiration of the then-current term."
8    Q    Why were you okay with that sentence being
9  included in the term provision?
10   A    I believe that is necessary in this agreement
11 because if the agency decides not to renew their
12 agreement with Correct Solutions, obviously, Correct
13 Solutions couldn't provide us a term to a agreement they
14 no longer have.  So they would have to have the ability
15 to give us notice that they have been non-renewed, and
16 therefore, our contract would be non-renewed.
17   Q    And so there's -- the beginning of that
18 sentence says, "After the original term," that you just
19 read.
20   A    That is correct.
21   Q    Does this MSA have an original term?
22   A    No, it doesn't.
23   Q    Is there any type of term that you're aware of,
24 other than coterminous?
25   A    That is the only term I know of with our

Page 75

1  agreement with Correct Solutions is coterminous.
2    Q    Okay.  And did you understand that the contract
3  between Correct Solutions and Washington County, for
4  example, had an original term and renewal terms?
5    A    That is correct.
6    Q    All right.  How will -- so you understand we've
7  asked the Court to enjoin Correct Solutions from acting
8  on this notice of non-renewal for not renewing you out of
9  Washington County?
10   A    Yes.
11   Q    How would Smart be harmed if this non-renewal
12 notice was accepted and allowed to go forward?
13   A    We would be harmed greatly in our reputation.
14 Washington County, I believe, is the second largest
15 agency in that region and our services have been in there
16 now for a couple of years.
17        And to not be able to say we provide services
18 to an agency that large is harmful to us as far as
19 competitive bidding process and reputation.  It's a small
20 community.  There's about six vendors we actively compete
21 with.  And to have lost one of the largest agencies in
22 the region would -- would be a bad rumor to have spread.
23   Q    Will you flip to Exhibit DD for me in the back
24 of the binder?  Can you tell me what this is?
25   A    This looks like a RFP, so a request for

Page 76

1  proposal for inmate communications services that's been
2  put out for an agency that's asking for our services.
3    Q    And so this is the type of request that you as
4  a company would respond to, to try to get a new client,
5  essentially?
6    A    We respond to these every week.
7    Q    Now, we didn't attach -- it's voluminous so we
8  only attached a couple of pages here that we're going to
9  look at.  The entire thing has been produced to -- to the
10 opposing party.
11        But will you go ahead and look at the
12 Section 5.5, Vendor References, and go ahead and read the
13 first provision there?
14        THE COURT:  I'm sorry.  Go off the record for a
15    second.
16        (Break taken from 2:59 p.m. to 3:01 p.m.)
17 BY MR. BARRIOS:
18   Q    So, Mr. Logan, could you read 5.5.1 in this
19 RFP.
20   A    "Please provide a list of agreements not
21 renewed, lost or prematurely canceled in the last five
22 years."
23   Q    All right.  So if the non-renewal was to stand,
24 is that something that you would need to disclose, for
25 instance, if you responded to this RFP for Hampshire

Page 77

1  Sheriff's Office?
2    A    We would be forced to disclose that.
3    Q    Okay.  If you can flip to the --
4        THE COURT:  Any objection to admitting that?
5        MS. BALD:  No, Your Honor.
6        THE COURT:  Okay.  So admitted.
7        (Exhibit DD admitted into evidence.)
8  BY MR. BARRIOS:
9    Q    The next exhibit, EE, again, quickly just what
10 is this?
11   A    This is another request for proposal for inmate
12 communications services.
13   Q    And next page -- can you read 5.5.1?
14   A    "Please provide a list of agreements not
15 renewed, lost or prematurely canceled in the last five
16 years."
17   Q    So, again, you would have a disclosure
18 requirement on this RFP?
19   A    That's correct.
20   Q    And one more.  Exhibit FF.
21        THE COURT:  For the same proposition?
22        MR. BARRIOS:  Same proposition.
23        THE COURT:  Any objection to EE or FF?
24        MS. BALD:  No, Your Honor.
25        MR. BARRIOS:  Okay.

Page 78

1    THE COURT:  So received.
2        (Exhibits EE and FF admitted into evidence.)
3  BY MR. BARRIOS:
4    Q   Quickly, FF, Paragraph 2(1) --
5    THE COURT:  You don't have to go into it,
6  counsel.  That was the whole purpose of that.
7    MR. BARRIOS:  All right.
8    THE COURT:  The only reason I'm saying that is
9  because I've got only 30 minute left, and we haven't
10  gotten to the other witnesses.
11    MR. BARRIOS:  So just one more exhibit and --
12  with this witness.
13  BY MR. BARRIOS:
14    Q   Exhibit CC.
15    A   Okay.
16    Q   Do you recognize this document?
17    A   Yes, I do.
18    Q   Is there a letter that you received dated
19  December 13th, which was just last Friday?
20    A   Yes, it is.
21    Q   All right.  And did you review the contents of
22  this letter?
23    A   I did.
24    Q   What's your understanding as to what they're
25  claim in this letter, what Correct Solutions is conveying

Page 79

1  to you?
2    A   Correct Solutions is conveying that we have to
3  dis- --
4    THE COURT:  What letter is this?
5  I'm sorry.  What is the exhibit?
6  MR. BARRIOS:  CC.
7    THE COURT:  CC.  Okay.  Go ahead.
8    A   Correct Solutions is saying that we have to
9  discontinue our service in Washington County and that
10  there was another vendor that was contracted to provide
11  our exclusive service that they didn't know about and we
12  have to discontinue our service.
13  BY MR. BARRIOS:
14    Q   How long have you been providing your service
15  to Washington County?
16    A   About two years.
17    Q   Has anyone ever said anything like this to you
18  before?
19    A   That's the first I have heard that, that we
20  have to discontinue our service.
21    Q   Do you recall your installation with
22  Washington County about two years ago?
23    A   Yes, I do.
24    Q   Was there anything in particular to -- a delay
25  in installation or anything like that that you recall?

Page 80

1    A   Yes.  They specifically said we had to wait --
2  this was one of their biggest accounts.  They were really
3  trying to get us in there, but they have had to wait
4  because there was another vendor providing messaging
5  service currently in Washington County.  I believe it was
6  Tech Friends.  So we had to wait before we could actually
7  install our system.
8    Q   And that was Correct Solutions telling you that
9  you had to wait --
10    A   Yes.
11    Q   -- for this other vendors's contract to expire?
12    A   That's correct.
13    Q   Did Correct Solutions, eventually, give you the
14  go-ahead for the install?
15    A   They obviously did, yes.
16    Q   And what did you take that to mean?
17    A   Took that to mean that the other vendor's
18  contract had expired and they had discontinued the
19  service.  We had our exclusive clause in our contract
20  that we provide the service for no cost; we need
21  exclusive rights to it.
22    Q   And in your contract, you mean in the master
23  services agreement with Correct Solutions?
24    A   That's correct.
25    MR. BARRIOS:  I have no further questions for

Page 81

1  this witness, Your Honor.
2    THE COURT:  Okay.  Cross?
3    MS. BALD:  Thank you, Your Honor.
4    CROSS-EXAMINATION
5  BY MS. BALD:
6    Q   Mr. Logan, is your company now a direct
7  competitor of Correct Solutions?
8    A   Yes.
9    Q   And that started after this -- your contract
10  with Correct Solutions, correct?
11    A   I believe it probably always was a direct
12  competitor.
13    Q   How about for the telephone services that
14  Correct Solutions provides?  Is that something that you
15  started after you entered into a contract with Correct
16  Solutions?
17    A   Formally, yes.
18    Q   Now, you testified that Mr. Turner told you
19  that the contracts with Correct -- Correct Solutions's
20  contracts with its facility always automatically renew.
21  Is that what you said?
22    A   Mmm-hmm.
23    Q   And didn't he say that as long as the
24  relationship is good with the facility, as long as you
25  keep it good with the facility, then it typically renews?

Page 82

1      A    No.  I guess I don't know -- I never said that.
2      Q    No.  Didn't Mr. Turner tell you that as long as
3  the relationship is good with that facility, it typically
4  automatically renews?
5          THE COURT:  What typically automatically
6  renews?
7          MS. BALD:  The contract between Correct
8  Solutions and its customer.
9          THE COURT:  Okay.
10     A    I don't remember him ever saying that.  I
11  remember him saying "As long as we're in there, you're in
12  there" and "We're a relationship-based company."  I mean,
13  they take all their clients to dinner, flew them here.
14  They're pretty tight.  They do lose clients.
15  BY MS. BALD:
16     Q    They -- because it's -- it's important to them
17  to have a good relationship with their client, isn't it?
18     A    Important with every vendor.
19     Q    Do you have a good relationship with
20  Washington County?
21     A    I think we used to.
22     Q    Have you ever met anyone at Washington County?
23     A    No, I -- I don't typically meet our customers
24  directly.
25     Q    And have you ever been out to Washington County

Page 83

1  to help them with any of their problems?
2      A    Me, personally?
3      Q    Yes, sir.
4      A    No.
5      Q    How many seven-year agreements do you have with
6  your other locations?
7      A    Off the top of my head, I don't know how many.
8  We have many.
9      Q    More than five?
10     A    Yes.
11     Q    More than 10?
12     A    Probably, yeah.
13     Q    Do they -- do they typically negotiate a
14  shorter term?
15     A    It's getting more competitive the last few
16  years.  It's difficult.  When we started this years ago,
17  it was really easy.  A few years ago, it was still pretty
18  easy.  But I think, the past two years, there's other
19  vendors that now copied our equipment and it's a little
20  more competitive, so it's harder, but.
21     Q    Do your contracts typically include the 90-day
22  non-renewal provision that Mr. Deglman included in the
23  initial draft to Correct Solutions?
24     A    After the initial term with our customers?
25     Q    Yes.

Page 84

1      A    If it's a renewal term, it depends.  Sometimes
2  it automatically renews.  And if there's an option for
3  them to not renew -- yeah, it just depends.  Every
4  contract is different.
5      Q    But have you used 90-day non-renewal provisions
6  in other contracts?
7      A    I'm sure there are some, yeah.
8      Q    Okay.  Now, you didn't negotiate any of this
9  contract directly with Mr. Turner, did you?
10     A    That's untrue.
11     Q    What -- what terms did you negotiate directly
12  with Mr. Turner?
13     A    All of the contract terms.
14     Q    You had direct communications with Mr. Turner?
15     A    Many times.
16     Q    By phone?  In person?
17     A    Both.
18     Q    Which terms did you discuss with Mr. Turner?
19     A    All the terms.
20     Q    Of the master service agreement?
21     A    In general, we talked about all the terms.
22  I --
23     Q    Before you signed the contract?
24          THE COURT:  Hold on.  Let him finish the
25  question.

Page 85

1  BY MS. BALD:
2      Q    I'm sorry.  Before you signed the contract?
3      A    I have communicated with him many times.  I --
4  we have cellphones.  We go to dinners.  We've done a lot
5  of things.  It's hard to narrow down exactly when and
6  where each contact was.  But, yeah, many times we've
7  talked about a lot of things.
8      Q    How about e-mail communications with Mr. Turner
9  where you were negotiating agreements?
10     A    What was your question?
11     Q    How about any e-mail communications with
12  Mr. Turner when you were negotiating the terms of the
13  agreement?
14     A    I don't -- I don't recall specifically.  We've
15  had a lot of e-mails.  I don't know which ones were for
16  specifically the terms of the agreement or not.  This is
17  years ago and -- I mean, I have communicated with him
18  many times.
19     Q    Have you tried to search for those e-mails to
20  produce to us?
21     A    I believe we've done some document searches.
22     Q    Did you find any e-mails between you and
23  Mr. Turner where you were negotiating the terms of the
24  agreement?
25     A    I don't specifically know that.

Page 86

1    Q    Now, when you -- when Mr. Deglman and you were
2    negotiating the terms of the agreement, that -- I believe
3    most of the documents of the time period that your
4    counsel showed you was around the August 2017 time
5    period.  Does that sound right?
6        A    Sure.
7        Q    I would like you to take a look at Exhibit 23.
8            THE COURT:  That is your book?
9            MS. BALD:  This is out of our book.
10           THE COURT:  Okay.  Hold on.  You have a
11   different book.
12           MR. LYNCH:  Yes, Your Honor.  That's 23.
13           THE COURT:  Okay.
14           (Exhibit 23 marked for identification.)
15   BY MS. BALD:
16       Q    Mr. Logan, is this an e-mail communication
17   between you and Mr. Deglman during the time that you were
18   negotiating the terms of the contract with Correct
19   Solutions?
20       A    Yes.
21           THE COURT:  Hold on.  Let me get to it.
22           All right.  Go ahead.
23       A    It looks like the same --
24           MR. TURKEL:  This is the same document they
25   just objected to.

Page 87

1            MR. BARRIOS:  This is the same document that
2    they objected to.
3            MS. BALD:  No.  It's different.
4            MR. BARRIOS:  No.  It's the same one.
5            THE COURT:  It's the exact same one, counsel.
6            MR. BARRIOS:  Which is why, Your Honor --
7            THE COURT:  It's the exact same one.
8            MS. BALD:  Right.
9            MR. BARRIOS:  So what's good for the goose is
10   good for the gander.
11           THE COURT:  Well, she hasn't moved it -- I
12   haven't --
13           MS. BALD:  I think I -- well, let me ask this.
14           THE COURT:  Go ahead and ask your question.
15   BY MS. BALD:
16       Q    Was it your intention or did you discuss with
17   Mr. Deglman while why you were negotiating the terms of
18   the contract with Correct Solutions that it was important
19   for you-all to develop a relationship with Correct
20   Solutions's facilities so that if Correct Solutions loses
21   its customers, you would stay in?
22       A    Yeah.  That would be a good thing to do.
23       Q    And the way you were getting introduced to
24   these customers was through Correct Solutions, correct?
25       A    Some cases.  Some we already had negotiations

Page 88

1    with.
2        Q    Such as whom?
3        A    I have to go back and look.  I mean, we have a
4    lot of customers and we have hundreds of customers we're
5    already talking to, so -- but I -- I mean, we have a lot
6    of sales reps.
7        Q    Of the eight facilities, can you tell me which
8    one you were already in communication with?
9        A    Miller County already in contract with.
10           I'll have to go back and look at the list,
11   honestly.  We -- it's an everyday thing for me so --
12   these are just eight of many, so.
13       Q    But did you have any prior contact or
14   discussions with any of the eight facilities before
15   Correct Solutions introduced you to them?
16       A    I don't know one way or another exactly which
17   ones, but I am pretty confident we've had contact with
18   them, yes.
19           THE COURT:  Before or after?
20           THE WITNESS:  Before.
21   BY MS. BALD:
22       Q    Can you tell me any of them --
23       A    I don't have --
24       Q    -- identify any of them?
25       A    I don't have specifics at the moment.

Page 89

1        Q    Now, you have no direct contract between --
2    with any of these eight facilities, correct?
3        A    I believe --
4            THE COURT:  We already know that, don't we?
5            There's no direct contract between you and the
6            eight facilities?
7            THE WITNESS:  Miller County --
8            THE COURT:  You can't ask him.
9            THE WITNESS:  Sorry.
10           THE COURT:  You can only answer the question.
11   BY MS. BALD:
12       Q    I think we're at issue on three contracts
13   today, Washington, Wayne and Sebastian.
14       A    Okay.
15       Q    Isn't it true you have no -- your company has
16   no contract with any of those three facilities?
17       A    That's correct.
18       Q    And isn't it true that the addendums that were
19   done to the contracts to provide the services that you
20   would provide, the party that was required to provide it
21   to the facility was Correct Solutions?
22           MR. BARRIOS:  Objection to -- it's a legal
23           conclusion.  Obligations under a contract.
24           THE COURT:  Do you want to rephrase, counsel?
25   BY MS. BALD:

Page 90

```
1      Q    Well, let's take a look at Exhibit -- the
2   Avoyelles contract that was admitted into evidence.
3           THE COURT:  Hold on.  Let me get to that
4   document.
5           MS. BALD:  It's Exhibit G, Your Honor, from
6   their book.
7           MR. TURKEL:  Remember 20 years ago when
8   everybody said we would be paperless?
9           THE COURT:  I remember that.
10          Getting closer.
11  BY MS. BALD:
12     Q    And you were looking at the -- I think you
13  talked about an amendment.  If you can take a look at
14  Exhibit A?
15          THE COURT:  All right.  A?
16          MS. BALD:  Yes, sir.
17          THE COURT:  Okay.
18          MS. BALD:  Oh, I'm sorry.  Exhibit A to the
19  Avoyelles contract, which is Exhibit G.  I think
20  they put a yellow tab on it -- maybe not on yours.
21          THE COURT:  That's in this.  Hold on.
22          MR. BARRIOS:  Different binder.
23          THE COURT:  Different binder.
24          Okay.
25  BY MS. BALD:
```

Page 91

```
1      Q    Now, Attachment A, does that describe the
2   products and services that Smart provides as a vendor for
3   Correct Solutions?
4      A    Provided -- actually, it looks like it's
5   provided for Avoyelles.
6      Q    But isn't it CSG -- which is Correct
7   Solutions -- which is contractually obligated to provide
8   these services to its customer?
9           MR. BARRIOS:  Same objection.  Legal
10          conclusion.
11          THE COURT:  I mean, the document speaks for
12          itself.
13          MR. BARRIOS:  Right.
14          MS. BALD:  They were just reading from it, so I
15          wanted just to make sure.
16  BY MS. BALD:
17     Q    It's CSG and not you, correct?
18          THE COURT:  That's all it is, the question.
19          Go ahead.  Answer.
20     A    Well, it looks like we're a provider for CSG.
21  BY MS. BALD:
22     Q    But it's -- okay.  But it's CSG that was the
23  one that was required to provide it to the facility,
24  correct?
25     A    I don't know.  Our name is the one named in it,
```

Page 92

```
1   so I mean, I guess --
2           THE COURT:  Where are you looking when you say
3   your name is the one that is named in it?
4           THE WITNESS:  Smart Kiosk -- and if you flip to
5   the other page -- MailGuard trademark, that's our
6   legal trademark owned by Smart Communications.
7           (Discussion off the record.)
8           (Break taken from 3:16 p.m. to 3:18 p.m.)
9   BY MS. BALD:
10     Q    Mr. Logan, under the Avoyelles contract, who is
11  the one responsible for -- to the facility for providing
12  a network and electronic messaging, grievances, law
13  library and video visitation that works?
14     A    Smart Communications was providing all that.
15     Q    Through Correct Solutions?
16     A    Yeah.  We were under -- we were in their
17  contract, yeah.
18     Q    But if it's not being provided properly, can
19  the facility sue you?
20          MR. BARRIOS:  Objection.
21          THE COURT:  That's -- that calls for a legal
22          conclusion, counsel.
23  BY MS. BALD:
24     Q    Isn't it true, sir, that Correct Solutions is
25  the one who is responsible with each facility to ensure
```

Page 93

```
1   that the services that are described in Attachment A are
2   properly provided?
3           MR. BARRIOS:  Objection.  Asked and answered.
4           THE COURT:  Overruled.
5      A    I believe if the question is an issue of our
6   service, there's remedies in the contract that they can
7   take to rectify and notice to cure our service
8   deficiency.
9   BY MS. BALD:
10     Q    Like they did in Sebastian County?
11     A    Sure.
12     Q    Have you been to Sebastian County since the
13  hearing before this court?
14     A    Our staff has, yeah.
15     Q    Have you?
16     A    Me, personally?
17     Q    Yes.
18     A    No.
19     Q    Did you review the Washington County contract
20  prior to seeing the Washington County contract with
21  Correct Solutions before signing any of the contracts
22  with --
23          THE COURT:  Can you repeat -- can you rephrase
24          your question?  I'm not following it.  I'm sorry.
25  BY MS. BALD:
```

Page 94

1    Q    Do you review the Washington County --
2         THE COURT:  Did you review or renew?
3         MS. BALD:  Review.
4         THE COURT:  Review.  I'm sorry.
5  BY MS. BALD:
6    Q    Did you review the Washington County contract
7  between Washington County and Correct Solutions before
8  you signed the master service agreement with the
9  schedule?
10   A    I don't recall.
11   Q    Did you sign -- review any of the facility
12 contracts with Correct Solutions before you signed the
13 schedule for that facility?
14   A    I think I've seen some.  I don't think I have
15 personally reviewed all of them, but I think there's been
16 some.
17   Q    Have you ever heard of a vendor not being
18 awarded an RFP because they were not renewed?
19   A    Yeah.  I'm sure.  There's vendors that don't
20 get awarded RFPs all of the time.  And it's part of a
21 scoring system, so that would all be part of the
22 cumulative score.
23   Q    When you submit an RFP, do they contact
24 facilities where you have provided services?
25   A    That's -- yes, very common.

Page 95

1    Q    Do you anticipate that they will be contacting
2  Washington County to find out from Washington County the
3  experience that they've had with you?
4         MR. BARRIOS:  Objection.  Speculation.
5         THE COURT:  As to what --
6         MR. BARRIOS:  There's no specific "they"
7    either.
8         She said, "Do you anticipated that they will
9    contact Washington County."  I don't know who she's
10   talking about.
11        THE COURT:  Do you want to rephrase your
12   question?  Just rephrase it.
13 BY MS. BALD:
14   Q    When you submit an RFP to a facility do you
15 anticipate that that facility will contact
16 Washington County to find out the experience they've had
17 with you as a vendor at their facility?
18   A    They could.  We typically would, you know, give
19 our best references first, where I feel Correct Solutions
20 has done a marvelous job with their team to soil the
21 reputation we have with Washington County.  But we would
22 obviously use them as a reference as "list agencies that
23 you service of this size," here's an agency.
24        I would give phone numbers to agencies we are
25 close with that really familiar with our system and

Page 96

1  we're in direct contract with.  It's probably not best to
2  use a reference you subcontract with, but it's nice to
3  list an agency you service.
4    Q    So is it your experience that the facility to
5  whom you submitted an RFP is not going to contact any
6  other facility who you served as a vendor unless you've
7  listed them as a reference?
8    A    Can you repeat the question?
9    Q    You expressed concern about your reputation.
10   A    (Nodding head.)
11        THE COURT:  That's a yes.  You have to answer
12   out loud for the court reporter.
13   A    Yes.
14 BY MS. BALD:
15   Q    Is it your belief that a facility -- let's say
16 a facility in Arkansas that you submit an RFP for -- it's
17 your belief they would not contact Washington County to
18 find out what kind of experience they had with you as a
19 vendor?
20   A    They may.
21   Q    And what do you think Washington County is
22 going to tell people?
23   A    Probably whatever Correct Solutions tells them
24 to tell them because that's what we've seen in the
25 instructions from Correct Solutions.

Page 97

1    Q    Have you spoken with anyone at
2  Washington County, personally, about the experience
3  they've had with the equipment and products and service
4  from your company?
5    A    Well, I've reached out to them personally, and
6  they will not speak with me and given the instructions of
7  Correct Solutions not to communicate with us.
8    Q    Who told them that Correct Solutions gave them
9  instructions not to speak with you?
10   A    I've seen e-mails from Correct Solutions
11 employees telling Washington County, "Do not communicate
12 directly with Smart Communications."
13   Q    And you've seen those in this production?
14   A    I don't know if they're in this production but
15 I've seen those e-mails specifically to the team, which
16 includes Washington County, Sebastian County, Miller
17 County, many other counties, a lot of these in here where
18 your employee of Correct Solutions, Rick Ferguson, refers
19 to the team of "here's the plan, team," and gives
20 specific instructions how to respond to us.
21        And Washington County employees -- these two
22 gentlemen you brought in -- specifically forward e-mails
23 to Mark Turner where Mark Turner instructs them how to
24 respond to us.
25        So I have attempted to make a site visit,

Page 98

1  personally.  They have declined our offer.
2       Q    So you are telling this Court that there is an
3  e-mail from Correct Solutions to Washington County
4  instructing them not to meet with you?
5       A    I believe there is an e-mail from Correct
6  Solutions to Washington County and all the counties --
7  agencies that you brought up in this list, under the team
8  e-mail, that instructs them, specifically, "Do not
9  forward anything to Smart.  Communicate directly through
10 Correct Solutions."
11      Q    My question, sir, is, are you telling this
12 Court that there is an e-mail from Correct Solutions to
13 Washington County instructing them not to meet with you?
14      A    I believe we're still missing production on the
15 response from Mark Turner to that e-mail that
16 Washington County sent him saying "How do you want me to
17 respond to this?"  However, they have neglected to meet
18 with us.  They said they decline.
19      Q    When did they tell you that they were not going
20 to meet with you?
21      A    When I e-mailed them to get the specific dates.
22 I believe we put it in as evidence where I offered to
23 meet with them personally and to, basically, discuss our
24 services and deficiencies that they were now bringing up
25 and the communication lack, and they declined to meet

Page 99

1  with us.  In fact, I think he did respond, "What do
2  you" -- "What do you expect to accomplish with this
3  meeting?"  And then he said, "I decline to meet with
4  you" -- or maybe that was Sebastian County.  I'm getting
5  all these counties confused, whether it was Sebastian,
6  Avoyelles or Washington.  They're all part of the team,
7  and they have the same instructions.
8       Q    Has Washington County expressed any -- or said
9  to you whether they want you to continue providing any
10 services to them after January 2017?
11      THE COURT:  After January 2017?
12      MS. BALD:  Excuse me.  2020.
13      Boy, the mouth is not wanting to work this
14 afternoon.  That's for sure.
15      THE WITNESS:  Can you repeat the question?
16 BY MS. BALD:
17      Q    Has anyone from Washington County indicated
18 that they have interest in continuing a relationship with
19 Smart Communications after January 2020?
20      A    I guess I don't recall them saying they want
21 to -- I -- like I said, they don't communicate with me,
22 so, no.
23      Q    I want to ask you about the 90-day non-renewal.
24 How does -- or when does Smart Communications exercise
25 that 90-day non-renewal?

Page 100

1       A    When do we exercise the 90-day?
2       Q    How -- when or how would Smart Communications
3  exercise the 90-day non-renewal provision under the
4  master service agreement?
5       A    I don't think we've ever -- our company has
6  never given a notice of 90 days non-renewing a contract.
7  I don't think we do that.
8       Q    Under this master service agreement, can you
9  tell me an instance or how -- when, any type of
10 circumstances where you would exercise --
11      THE COURT:  You mean Smart?
12 BY MS. BALD:
13      Q    -- Smart Communications would exercise the
14 90-day non-renewal?
15      A    I don't really view the 90-day non-renewal as
16 something Smart Communications would utilize.  That's
17 really for the agency.  If they're not going to renew
18 with us, they have 90 days to give us notice and if they
19 don't, then that means that contract is going to renew.
20 BY MS. BALD:
21      Q    So you're losing money -- excuse me --
22 Smart Communications is losing money.
23      It is your position that Smart Communications
24 could not exercise a non-renewal prior to the 90 days and
25 get out of this contract?

Page 101

1       A    This contract?
2       Q    Out of any of the schedules.
3       A    I guess you'd have to give me an example of
4  that contract because I don't know what contract you're
5  referring to.  Is it the contract with Correct Solutions?
6       Q    You have a master service agreement with
7  Correct Solutions that that has a 90-day non-renewal,
8  correct, under the term?
9       MR. BARRIOS:  Objection.
10 BY MS. BALD:
11      Q    Well, let's talk about the Paragraph 6 in the
12 master --
13      THE COURT:  Paragraph 6.  Let's be specific.
14 BY MS. BALD:
15      Q    Let's talk about Paragraph 6 in the master
16 service agreement, and then you have eight schedules for
17 eight separate facilities, right?
18      A    Right.
19      Q    And if -- say you're not making money; you're
20 losing a lot of money with one of those facilities.  Is
21 it your position that Smart Communications could not
22 exercise that 90-day non-renewal and end its obligation
23 to provide products and services to that facility it's
24 losing money for when the contract between that facility
25 and Correct Solutions renews?

Page 102

1    A    I don't really read that 90-day as that.
2  That's for them to give us notice of their contract not
3  renewing.
4    Q    Okay.
5    A    That was really built in so that we could not,
6  not renew.  That would make no sense.  We've already
7  installed the equipment.  We've already spent the money.
8  The longer we're in there, the more we're going to
9  produce revenue and get our money back.  So we were never
10 worried about, "Oh, we want to pull out."
11       We've already spent the money.  It's like
12 building a house and saying "I'm going to take it back
13 down and build it somewhere else."  That would make no
14 sense.  You might as well recoup your investment in that
15 house you already spent the money to build.
16       So I think you're taking the 90-day notice of
17 non-renewal and trying to twist it into something that
18 Smart Communications built in so that we could all pull
19 out, and I don't really view it that way.
20    Q    Actually, isn't the first -- the 90-day
21 provision was in the initial seven-year term drafted by
22 Mr. Deglman.  Isn't that correct?
23    A    I believe the 90-day term is in all of our
24 master service agreements with the agency.  And I believe
25 that agreement was tried to kind of morph into this

Page 103

1  agreement so -- yeah, it was in there.  Obviously, it's
2  in there.
3    Q    So when it says either party can exercise its
4  right to non-renew so long as it gives notice at least 90
5  days before the renewal, the contract with the
6  facility -- tell me a circumstances where
7  Smart Communications could exercise that non-renewal.
8    A    Well, as you just said, with the facility.
9  Since that renewal would be talking about Correct
10 Solutions because they're contracted with the facility,
11 that's what that 90 days is referring to.  It's not
12 referring to us and Correct Solutions.  It's referring to
13 Correct Solutions and the agency, as they are the parties
14 to the agency.
15    Q    But the parties in non-renewal -- when you said
16 "either party" -- excuse me -- when Smart Communications
17 included that language, that was -- "either party" was
18 Correct Solutions or Smart Communications, wasn't it?
19    A    No.  That was Correct Solutions and the agency
20 as it was talking about, the customer's agreement with
21 the agency.
22    Q    So you're --
23    A    The parties, Correct Solutions or the agency,
24 could non-renew.
25    Q    So is it your position that

Page 104

1  Smart Communications could never non-renew the master
2  service agreement?
3    A    The master service agreement didn't really have
4  a term, if I recall.
5    Q    Isn't that Paragraph 6?
6    A    Right.  But the master service agreement
7  between Smart Communications and Correct Solutions, I
8  don't believe, has a term.
9    Q    What is the 90-day -- the term is --
10    A    The term is coterminous.
11    Q    The term is coterminous.  How do you sever that
12 coterminous?
13    A    It's coterminous.
14    Q    So it can never be severed?
15    A    Well, I suppose you could breach the agreement.
16    Q    So is it your position that so long as Correct
17 Solutions had good customer relation with its facilities
18 and the facilities wanted to continue to renew with
19 Correct Solutions, that they were stuck with
20 Smart Communications no matter what the quality or lack
21 thereof was?
22    A    Well, not to get off in the weeds about quality
23 or lack thereof, but we saved Correct Solutions behind on
24 a lot of these agency because they were about to leave
25 Correct Solutions.  So in our opinion, without us, they

Page 105

1  wouldn't each have these agencies.
2       So for us now to be kicked out two years later,
3  after we saved the account for them, really makes no
4  sense and that's not how the agreement was structured.
5  And that's a fact.
6    Q    My question, sir, is, is it Smart
7  Communications's position that as long as Correct
8  Solutions is renewed with its facility, it could never
9  non-renew with you?
10    A    We were part of that agreement, as you'll see
11 in Avoyelles.
12    Q    Can you tell me to who Bruce Johnson is?
13    A    He's a former employee of mine.
14    Q    And is he the gentleman that was provided for
15 in the stipulation that was the -- a person that Correct
16 Solutions was not prohibited from hiring away?
17       MR. BARRIOS:  Objection to relevance.
18       THE COURT:  What does that have to do with
19 this?
20       MS. BALD:  I think, Your Honor, we put in our
21 memorandum that this is -- the whole intention of
22 this case has been to try and harm Correct Solutions
23 and damage Correct Solutions.
24       MR. BARRIOS:  Your Honor, this hearing is about
25 whether the notice of non-renewal is valid and

Page 106

1  effective.
2      THE COURT:  Right.  That's what this is about.
3      MR. BARRIOS:  Nothing to do with a former
4  employee.
5      MS. BALD:  But they got in -- well, they got
6  into all the other earlier stuff that has nothing to
7  do with it as well.
8      THE COURT:  All right.
9  BY MS. BALD:
10     Q   Do you think you have a --
11     THE COURT:  Hold on.  Hold on.  I have a
12 hearing at 3:30 for an hour.
13     MS. BALD:  Okay.
14     THE COURT:  I'll bring you guys back in at 4:30
15 go for an hour and a half but I'm not going past
16 6:00.  All right?
17     So measure your thoughts accordingly and your
18 witnesses accordingly, so if you're going to -- if
19 you have out-of-town witnesses, I suggest we call
20 those --
21     MS. BALD:  I agree.
22     THE COURT:  -- and we can always recall him
23 later.
24     MS. BALD:  Do we have -- do you have another
25 witness --

Page 107

1      MR. BARRIOS:  No.
2      MS. BALD:  -- if we have time?
3      Okay.
4      THE COURT:  No.  I'm talking about out-of-town
5  witnesses.  I will take them out of order.
6      You're not out of town.  You're here.
7      THE WITNESS:  Sure.
8      MS. BALD:  Yes.
9      THE COURT:  You're out of town.
10     MS. BALD:  Yes.  I just wanted to make sure
11 they had no other witnesses.
12     THE COURT:  And the other two are out of town.
13 I don't see how we're going to get through three
14 witnesses.
15     MS. BALD:  We'll go fast.
16     (Break taken from 3:34 p.m. to 4:32 p.m.)
17     THE COURT:  Go ahead.
18 BY MS. BALD:
19     Q   Mr. Logan, for the term coterminous in the
20 master service agreement, is it your belief, then, that
21 if the contract between Correct Solutions and the
22 facility renews, then the contract between Correct
23 Solutions and Smart Communications renews?
24     A   Yes.  That's my understanding.
25     Q   And is it your understanding that, if the

Page 108

1  contract between Correct Solutions and the facility
2  terminates or expires, then the master service agreement
3  between your two companies expires?
4      A   Yes.  As long as they give us the 90-day notice
5  that they're given the 90-day notice.
6      Q   So if the contract with a facility expires with
7  Correct Solutions and they have not given you the 90-day
8  notice, what does that mean with your contract?
9      A   Well, I guess we would have to work that out
10 with Correct Solutions.  But, you know, if they're not
11 given the 90-day notice by -- sorry.  Are you asking me
12 if their contract continues?
13     Q   No.
14     THE COURT:  No.  Let's assume for a
15 amendment -- and I apologize for interrupting, but
16 to get to the point -- assume for a amendment that
17 contract that Correct has with facility is
18 terminated but they failed to give you the 90-day
19 notice, what happens then?
20     THE WITNESS:  I guess that would be a legal
21 question.  I don't really know what would happen
22 then.  In my mind, I would kind of feel like you
23 may -- Correct Solutions may be responsible for
24 owing us for a term because we were not issued a
25 proper notice of non-renewal if you didn't give us a

Page 109

1  notice of non-renewal and your agreement was
2  terminated.  That's why we have that 90-day notice.
3  You have to give us a window to get our equipment
4  out, prepare for taking, you know, the loss.
5  BY MS. BALD:
6      Q   So was it your position, then, that the
7  coterminous only applies when the contract with the
8  facility renews but it doesn't apply with the contract
9  with the facility does not renew?
10     THE COURT:  Hold on a second.  Say that again.
11     MS. BALD:  Is it his position that the
12 coterminous language, it only applies to the renewal
13 and not the expiration.
14     MR. BARRIOS:  Judge, I need to object just to
15 the extent we're getting pretty --
16     THE COURT:  I'm not following the question,
17 frankly.
18     MR. BARRIOS:  It's a legal argument.
19     THE COURT:  I'm not following the question.
20     MS. BALD:  Okay.  Let me ask this next
21 question.
22 BY MS. BALD:
23     Q   If Washington County terminates Correct
24 Solutions -- Washington County contract renews in
25 January, and in March, Washington County and Correct

Page 110

1  Solutions have -- something happens and Washington County
2  terminates the contract.  What does that do with your
3  contract with Correct?
4           MR. BARRIOS:  Objection.  Speculation.
5           THE COURT:  I'm not -- I'm not following the
6  question.
7           In their contract -- if Correct's contract
8  terminates in March --
9           MS. BALD:  If they terminate the contract in
10 March, what does that do -- I'm trying to understand
11 the coterminous, what he thinks the coterminous --
12           THE COURT:  Is it at the end of the term of the
13 contract or during the term of the contract?  I'm
14 not following your question.  That's what my problem
15 is.
16           Until I understand the question, I really can't
17 rule on an objection.
18           MS. BALD:  Okay.
19 BY MS. BALD:
20     Q    Maybe my better question is, you've talked
21 about coterminous.  Is it your position that the
22 coterminous provision only applies when the contract
23 between the facility and correct renews?
24     A    Yes.  I believe if they renew -- as he said,
25 "If we're in there, you're in there."

Page 111

1           So if they're not in there and we were under
2  that contract, we're in that contract.  We wouldn't have
3  a contract with that agency because that contract was
4  then terminated, right?
5      Q    Okay.  So you agree, then, that if
6  Washington County's contract with Correct does not renew,
7  that means the contract that you have with correct for
8  Washington County does not renew?
9      A    I don't see how that -- yes, I believe that's
10 accurate.
11     Q    So then why was -- why have a 90-day
12 non-renewal provision if your contract automatically
13 non-renews when the contract with the facility
14 automatically non-renews?
15     A    Can you repeat the question?
16     Q    Why have a 90-day non-renewal provision in the
17 master service agreement between your company and Correct
18 Solutions if your contract with Correct Solutions
19 automatically non-renews when the contract between
20 Correct and the facility non-renews?
21     A    Well, I believe you said the master service
22 agreement, correct?
23     Q    Yes.
24     A    The master -- so the schedule with the
25 particular agency, from my understanding, is what

Page 112

1  determines the term.  The master service agreement is
2  coterminous with Correct Solutions.  So our master
3  service agreement is coterminous with them.
4           I don't know that if -- if we're providing
5  services to agencies that are part of that service
6  agreement, we're coterminous, so it wouldn't end.  So.
7      Q    It's coterminous with what contract?
8      A    Our agreement with Correct Solutions.
9      Q    Which agreement?  You have a master service
10 agreement --
11     A    We've a master service agreement.
12     Q    -- and you have a schedule.
13     A    Right, which is coterminous with Correct
14 Solutions's agreement with the agency.
15     Q    Isn't it the master service agreement that
16 provides -- that has the coterminous language?
17     A    I -- it may be the schedule as well.  I'm not
18 sure.  Do they both have that?  I don't know.
19           THE COURT:  Any other questions?
20           MS. BALD:  No, Your Honor.
21           THE COURT:  Any redirect?
22           MR. BARRIOS:  Yeah.  Three brief redirect
23 questions.
24                REDIRECT EXAMINATION
25 BY MR. BARRIOS:

Page 113

1      Q    Mr. Logan, do you recall when Ms. Bald was
2  asking you about your understanding that there was an
3  e-mail where Correct Solutions was instructing
4  Washington County not to correspond directly with you?
5      A    Yes, I recall that.
6      Q    All right.  Can you flip to Exhibit P in the
7  exhibit binder?
8           THE COURT:  Which binder is it now?
9           MR. BARRIOS:  The black one.
10           THE COURT:  The black one.
11           Okay.  And by the way, we never did admit to my
12 recollection -- while we're here -- FF and CC -- oh,
13 I'm sorry.  FF was.  CC was never moved to be
14 admitted.
15           MR. BARRIOS:  CC is the letter that I believe
16 is in both exhibit binders.  Are you good with that
17 going in?
18           THE COURT:  Any objection?
19           MS. BALD:  That's fine.
20           THE COURT:  That will be so admitted.
21           (Exhibit CC admitted into evidence.)
22           MR. BARRIOS:  Exhibit P, as in Paul.
23           THE COURT:  Okay.
24           MR. BARRIOS:  And I have -- Your Honor, if it
25 please the Court, there's another copy of the same

Page 114

1    e-mail.  This is just the copy that was produced, as
2    you can tell by the Bates label, by Correct
3    Solutions.  And it's just a little more complete
4    version of the same e-mail that's in the binder.
5         You can tell the recipients of the e-mail a
6    little more clearly.
7    BY MR. BARRIOS:
8         Q    Can you tell a look, Mr. Logan, at this e-mail
9    and let me know if this refreshes your recollection about
10   that line of questioning that Ms. Bald was asking you
11   about?
12        A    Yes.  This is one of, I think, the e-mails that
13   I remember seeing about the instructions not to
14   communicate with Smart Communications.
15        Q    And do you know who Rick Ferguson is?
16        A    Yes.  Rick Ferguson is, I believe, their lead
17   salesperson.
18        Q    When you say theirs, Correct Solutions?
19        A    Correct Solutions.
20        Q    And do you know who these people -- or can you
21   tell by their e-mail addresses that in the To line that
22   this e-mail was sent to?
23        A    Yes.  So this was, again, the team e-mail I was
24   referring to where Rick Ferguson from Correct Solutions
25   calls all these agency employees "the team."  Alan

Page 115

1    Johnson, which I believe is out in the hall.
2         Q    With Washington County?
3         A    With Washington County.
4         Q    Okay.
5         A    And then Captain Dumas, who was here at the
6    last hearing, the team members.
7         Q    Can you read just the two -- the first two
8    lines have that e-mail?
9         A    "Team.  In order to move our plight quickly
10   along, please note the following instructions:  Send all
11   your Smart needs for repairs, questions, complaints and
12   don't hold back other than four-letter words or graphic
13   sentences, et cetera to
14   AccountARSupport@CorrectSolutionsGroup.  Please do not
15   send to Smart."
16        Q    And then one more line, please?
17        A    "CSG will now put them on the clock each time a
18   ticket is opened and forwarded."
19        MR. BARRIOS:  Your Honor, I'd like to move this
20   Exhibit P into evidence.
21        MS. BALD:  No objection.
22        THE COURT:  It will be so received.
23        (Exhibit P admitted into evidence.)
24   BY MR. BARRIOS:
25        Q    And now, do you remember the line of

Page 116

1    questioning Ms. Bald asked you if you ever actually even
2    reviewed you the Sebastian County contracts?
3         A    I do remember that.
4         Q    I'd like to show you what is not in the exhibit
5    binder but is a document that Smart Communications has
6    produced in this case.
7         THE COURT:  Do you want to mark me to mark
8    this?
9         MR. BARRIOS:  Yeah.  Can you mark it
10   Exhibit JJ?
11   BY MR. BARRIOS:
12        Q    Mr. Logan, can you explain what this e-mail is?
13        A    I don't have it.
14        Q    I'm sorry.
15        THE COURT:  It helps if you give it to him.
16        MR. BARRIOS:  It sure does.
17        A    Yes.  So this is an e-mail that I had sent to
18   Robert Deglman, who was a direct contact for contract
19   negotiations with Correct Solutions, and also Jim Logan
20   expressing some concerns I had over our agreement and
21   asking some questions about the Sebastian County
22   agreement as I had reviewed it.
23   BY MR. BARRIOS:
24        Q    So if you look down to the bottom, it says
25   "Sebastian, AR, Signature.  Thanks."

Page 117

1         Do you see that?
2         A    Mmm-hmm.
3         Q    So when you were reviewing this e-mail, did you
4    pull up the attachments that are actually referenced on
5    the next page due to the fact that there was an
6    attachment, you actually did review the agreement -- or
7    all the agreements between Correct Solutions and
8    Sebastian County related to this project, right?
9         A    That is correct.
10        Q    And you had questions, not only about the term
11   but about MailGuard, video visitation and some other
12   stuff, right?
13        A    That is correct.
14        Q    So is this consistent with the fact that you
15   were involved and you did review the documents at issue?
16        A    That is correct.
17        Q    Okay.  And after your -- you sort of had a
18   question here about what -- "I don't see our term being
19   talked about anywhere other than what Correct term is,"
20   right?
21        A    That is correct.
22        Q    And you may recall, during direct at the
23   beginning, I talked about whether you had any confusion
24   about this structure of the relationship because it was
25   different than your other ones, right?

Page 118

1    A    Correct.
2    Q    And was this just you sort of hashing out that
3 confusion?
4    A    That's exactly it.  We just had to make sure
5 that I understood specifically that we were coterminous
6 with Correct Solutions because it's different than how we
7 form normally do our contracts.
8    Q    Did Mr. Deglman get back to you about this and
9 explain that fact to you?
10   A    Yes.
11   Q    All right.  If you --
12        MR. BARRIOS:  I would like to move JJ into
13   evidence, please.
14        MS. BALD:  No objection.
15        THE COURT:  All right.  Be so admitted.
16        (Exhibit JJ admitted into evidence.)
17        MR. BARRIOS:  One more exhibit, M in the
18   binder, in the white binder.
19        THE COURT:  The white binder?
20        MR. BARRIOS:  Yes.
21        (Discussion off the record.)
22        THE COURT:  Okay.
23 BY MR. BARRIOS:
24   Q    Okay.  Can you take a look at this document?
25 First, please, just note the date on the top of this

Page 119

1 e-mail?
2    A    This looks like Wednesday, July 10th of this
3 year, 2019.
4    Q    And the e-mail is from Mark Turner to -- or
5 from Lee Aspinwall to Mark Turner.  Do you know either of
6 those gentlemen?
7    A    I know Mark Turner.  I believe Lee Aspinwall is
8 an executive with Tech Friends.
9    Q    Okay.  So he's attaching the executed agreement
10 between their companies, right?
11   A    That is correct.
12   Q    And I know this isn't your contract, but if you
13 would do me a favor and flip to -- you see at the bottom
14 right, there are Bates labels on the documents?  If you
15 would flip to the one that says 710?
16   A    Okay.
17   Q    It should say "Legacy Accounts" on top?
18   A    Yes.  I do see that.
19   Q    Can you review that list and see if any of
20 those accounts are the accounts that Smart providing
21 services to in partnership with Correct Solutions?
22   A    Yes.  The very first one, Bowie County, Texas,
23 is one of the accounts in our agreement.
24   Q    Okay.  I might be able to speed this along.
25        Do you provide services to Moore County Jail?

Page 120

1    A    Yes, we do.
2    Q    Under the same arrangement with Correct
3 Solutions?
4    A    Yes, we do.
5    Q    What about Sebastian County Jail?
6    A    Yes, we do.
7    Q    What about St. Louis City Justice Center?
8    A    Yes, we do.
9    Q    Okay.  So you've got four contracts that look
10 to be included in the new contract between Tech Friends
11 and Correct Solutions that you are currently providing
12 services to under your exclusive agreement, right?
13        MS. BALD:  Object to the form.
14   A    That's correct.
15        THE COURT:  I'll overrule.
16        MR. BARRIOS:  No further questions, Your Honor.
17        THE COURT:  Okay.  Hold on.
18        Okay.  Who are you going to call?
19        MS. BALD:  Your Honor, we're going to call
20   Captain Johnson.
21        (Mr. Logan left the witness chair and Captain
22 Johnson entered the room.)
23        THE COURT:  Do you solemnly swear or affirm
24   that the evidence you are about to give will be the
25   truth, the whole truth and nothing but the truth?

Page 121

1        THE WITNESS:  I do.
2            CAPTAIN ALAN JOHNSON,
3 called on behalf of the Defendant, having duly sworn or
4 affirmed to tell the truth, the whole truth and nothing
5 but the truth, was examined and testified as follows:
6        THE COURT:  You may be seated.
7        Please state your name, spelling both first and
8 last for the benefit of the court reporter.
9        THE WITNESS:  Alan Johnson, A-l-a-n
10 J-o-h-n-s-o-n.
11       THE COURT:  All right.  You made proceed,
12 counsel.
13       MS. BALD:  Thank you, Your Honor.
14            DIRECT EXAMINATION
15 BY MS. BALD:
16   Q    Captain Johnson, could you please tell the
17 Court your profession or occupation?
18   A    I'm the captain over the Washington County Jail
19 Detention Center.
20   Q    And what is the Washington County Jail
21 Detention Center?
22   A    It's part of the Washington County Sheriff's
23 Office.  I'm not sure of the question.
24   Q    Where is that located?
25   A    Oh, Fayetteville, Arkansas.

Page 122

1    Q    And what is -- what type of facility is it?
2    A    It's a 710-bed facility.
3    Q    And are you currently under contract with
4  Correct Solutions?
5    A    I am.
6    Q    And I'd like you to take a look at
7  Exhibit Number 1.
8         THE COURT:  This is in your --
9         MS. BALD:  In the white book.
10        THE COURT:  In the white book?
11        MS. BALD:  In the white book, yes, sir.
12        (Exhibit 1 marked for identification.)
13 BY MS. BALD:
14   Q    Captain Johnson, is that the contract that you
15 had with Correct Solutions?
16   A    I believe so, yes.
17   Q    And what type of services does Correct
18 Solutions provide to your facility under this contract?
19   A    Inmate phones.
20   Q    And when did you first enter into a contractual
21 relationship with Correct Solutions?
22   A    I can't remember.  This one here is dated 2014.
23   Q    And has that renewed annually?
24   A    Yes.
25   Q    And can you tell me what is the nature of the

Page 123

1  relationship between your facility and Correct Solutions?
2    A    Excellent.
3    Q    And has it always been excellent?
4    A    Yes.
5    Q    Now, did there come a point if time where
6  Smart Communications began providing services and product
7  to your facility?
8    A    Yes.
9    Q    Can you tell me how you met
10 Smart Communications?
11   A    I believe the initial introduction was through
12 Correct Solutions.
13   Q    Okay.  And did they make a presentation to your
14 facility and to you?
15   A    They did.
16   Q    And were they the only vendor making a
17 presentation to you?
18   A    No.  We had several vendors present to us.  We
19 had Tech Friends, for one, that was presented to us, and
20 there were several other ones.  But them were the two
21 main ones, the top prospects.
22   Q    And did you or your facility select
23 Smart Communications to provide product and service?
24   A    We did.
25   Q    Why did you check -- why did you decide to go

Page 124

1  with Smart rather than any of the other customers?
2    A    Because Tech Friends -- one of the big selling
3  points for Smart Communication was the inmate mail
4  scanning solution.  And Tech Friends was not -- they
5  didn't feel comfortable.  They were just now starting the
6  process, and they didn't feel comfortable -- because we
7  currently had services with Tech Friends through our
8  commissary services.
9         And -- but they didn't feel comfortable with
10 that.  They were just getting it started, so that's why
11 we chose Smart over them.
12   Q    So you do have a relationship with Tech
13 Friends?
14   A    Yes.
15   Q    But that's -- that's not through Correct
16 Solutions?
17   A    No.
18   Q    That's through a different company?
19   A    Correct -- or also.
20   Q    And so based upon the representations made by
21 Smart, did you -- you chose to go with them?
22   A    Yes.
23   Q    And since -- have you had any problems with the
24 services that Smart Communications has provided to your
25 facility for the past two years?

Page 125

1    A    Enormous amount of problems.
2    Q    Can you describe to the Court the problems that
3  you've had with Smart Communications over the past two
4  years?
5    A    We've had problems starting with the product
6  that was described to us is not the product we got.  We
7  was advised that they had video visitation on the
8  tablets.  Our very first visitation scheduled was
9  July 20, 2018, and to date, today, we still have no video
10 visitation on the tablets.
11        We constantly have problems with the server
12 going down.  Sometimes it's a simple reboot solution.
13 But calling customer service, you rarely get an answer.
14 And when you do, at best, it's several hours before you
15 get a call back.  And when you're dealing with 710
16 inmates trying to schedule visitations and it's down for
17 several hours, at best -- a lot of times, it's next day
18 before you hear anything -- that puts a bind on
19 everything.
20        The product itself, the tablets theirselves are
21 constantly being tore up.  I think this combination is
22 from an inferior product that's poorly designed to it not
23 working properly and the inmates getting upset about it
24 and destroying them because of that.  So there's -- I
25 mean, it's a lot of different things.

Page 126

1    Q    Now, are you familiar with correctional-grade
2  tablets?
3    A    I have seen some, yes.
4    Q    And where have you seen them?
5    A    Through trade shows that I attend all over the
6  country.
7    Q    And can you -- in your opinion, is the tablet
8  that Smart Communications has provided your facility
9  correctional-grade tablet?
10   A    Absolutely not.
11   Q    Why not?
12   A    I believe that tablet could be purchased -- I
13 compare it to a children's tablet that I can purchase at
14 Walmart.  It's two pieces put together of plastic with
15 rubber moldings on all four corners.
16        Immediately, the rubber pieces are pulled off
17 and then they have access to pry them open.  The day
18 before we come in here, which would have been Tuesday, we
19 had a battery -- we done a shakedown and found a battery
20 that they had pulled out of one of the tablets and had
21 wires that they pulled out and was already crossed and
22 setting different things on fire, cigarettes or
23 whatever -- we're not sure.  They had burn marks on it,
24 so I know they used it to burn something.
25   Q    Now, describe for the Court the visitation that

Page 127

1  you meant via tablets.  What was that supposed to do?
2    A    We had -- we're supposed to have visitation on
3  a wall kiosk including visitation on the tablets.  It was
4  supposed to have facial detection on both ends, the
5  incarcerated side and the public side.  It took forever
6  to get that turned on to begin with.  Then, once they
7  turned it on, the entire system shut down because they
8  said their software or server or something was not
9  compatible.
10        So to date, today, we still don't have facial
11 detection on the inmate side.  We still have no facial
12 detection on the public side which causes a big concern
13 for people putting on displays on that side that other
14 inmates can see when they're visiting.  Because it's on
15 the wall kiosk, you know, they can't even visit in
16 private.  So there's a lot of issues, security concerns
17 that go along with that, not having facial detection on
18 the public side.
19   Q    Now, when Washington County was having problems
20 with the products that Smart was providing and the
21 services that Smart was providing, was Washington County
22 reporting those directly to Smart Communications?
23   A    Yes, we were.
24   Q    And how long did you report those directly to
25 Smart Communications?

Page 128

1    A    I can't give you a time frame without going
2  back and looking at notes and stuff, but it was several
3  months -- six, eight, nine, ten months, probably, that we
4  reported directly to them.
5    Q    And were you dissatisfied with the response
6  time that you were experiencing with
7  Smart Communications?
8    A    Every time.  I don't remember one time that I
9  got an immediate response.
10   Q    Did there come a point in time where you
11 started reporting the problems that you were having with
12 Smart to Correct Solutions?
13   A    Yes, there is.
14   Q    And can you tell us about that?
15   A    Basically, our service provider is Correct
16 Solutions Systems, not Smart Communications.  So I
17 contacted our representative with Correct Solutions, Rick
18 Ferguson, and advised him of the issues we were having.
19        Our representative with Smart Communications
20 was a Jennifer Tongate.  I couldn't even get her to
21 return my calls, so I called Rick and said, "How do
22 you" -- "We've got to get this fixed."  You know, "This
23 is not working for us."
24        So he said, "Start sending all the stuff to us,
25 and we will address them."

Page 129

1    Q    And is there one particular person at
2  Washington County that's responsible for organizing and
3  transmitting the complaints and problems that you were
4  having?
5    A    At that point, after contacting Rick Ferguson,
6  Lieutenant Nolan Ake is our person at the sheriff's
7  office.  Prior to that, when we was dealing straight with
8  Correct -- I mean, Smart -- any jail sergeant in there,
9  when they would get grievance from a detainee or
10 something they even observed, they could send in a
11 request to Smart Communications.
12        But at the point that we seen nothing is
13 working, we generalized it to one lieutenant, which is
14 Lieutenant Nolan Ake, who would forward all the responses
15 to Correct.
16   Q    Did the -- did it improve?  Deteriorate?  What
17 was -- was there any change after you started reporting
18 the problems that you were having with Smart directly to
19 Correct Solutions?
20   A    Immediately, there was.  We would get responses
21 a whole lot sooner, but it was short-lived.  I mean, it
22 was -- within months or -- I mean, weeks or months, you
23 know, it started slowly deteriorating back.
24   Q    Have you ever met or spoken with a gentleman by
25 the name of Jon Logan?

Page 130

1     A     No.  I couldn't even tell you who he was.
2     Q     Has anyone from Correct Solutions ever
3  instructed you not to meet with anyone from
4  Smart Communications?
5     A     No, they have not.
6     Q     I would like you to take a look at -- did there
7  come a point in time recently that you were put on notice
8  of a problem with your contract with Correct Solutions?
9     A     Yes.
10    Q     Can you tell us about that?
11    A     Our current food service provider who also does
12 our commissary, Summit Foods, notified us in the last 30,
13 45 days -- I can't give you exact dates -- that we was
14 in breach of contract with them -- that our contract with
15 them, that they were -- have exclusive right to any
16 messaging service we provide to the detainees that we was
17 unaware of that was in our contract.
18    Q     And did you provide notice to Correct
19 Solutions?
20    A     I did.
21    Q     And did you also forward to Correct Solutions
22 the notice that you received from the company?
23    A     I did.
24         (Exhibit 25 admitted into evidence.)
25 BY MS. BALD:

Page 131

1     Q     If you could take a look at Exhibit 25 in your
2  book, and, Captain Johnson, if you could take a look at
3  the fourth page of Exhibit 25, and is that the notice
4  that your -- that the Washington County Sheriff's Office
5  sent to Correct Solutions upon learning or getting a
6  notice from Summit?
7     A     Yes.
8     Q     And if you could take a look at the next page,
9  is that the notice that you received from Summit?
10    A     Yes.
11    Q     What is your intention as to your continued
12 relationship with Smart Communications after -- from
13 January 2020 forward?
14    A     As far as I'm concerned, our relationship with
15 Smart Communications is over.
16    Q     Why?
17    A     Well, we're, first of all, in breach of
18 contract with an existing contract.  Second of all, the
19 product --
20         THE COURT:  What do you mean?  Breach of what
21    contract?
22         THE WITNESS:  The breach of contract we have
23    with Summit Food, that they have exclusive rights to
24    our message services that we provide to the inmates.
25    A     But most importantly is the customer service,

Page 132

1  the product, the lack of -- like, the visitation that
2  they say we was going to have on the tablets that we
3  still, today, do not have.  I mean, accumulation of
4  everything -- Smart Communication will not be able to do
5  business in my jail.
6  BY MS. BALD:
7     Q     Do you -- what is your intention, or do you
8  desire to continue to maintain your relationship with
9  Correct Solutions?
10    A     Absolutely.
11    Q     If the Court determines that
12 Smart Communications must be part of your continued
13 contract with Correct Solutions, what is your intention
14 then?
15    A     My recommendation would be cut advertise to --
16 with them also.
17    Q     Correct Solutions?
18    A     Yes.
19         MS. BALD:  That's all I have.
20         THE COURT:  All right.  Cross?
21              CROSS-EXAMINATION
22 BY MR. BARRIOS:
23    Q     Sir, how did you get here today?
24    A     Airplane.
25    Q     Who paid for that airplane?

Page 133

1     A     Correct Solutions.
2     Q     You have a longstanding relationship with
3  Correct Solutions, right?
4     A     I do.
5     Q     Do they invite you to dinners, excursions,
6  trips, that kind of thing?
7     A     Dinners, yeah.
8     Q     You attend those?
9     A     Mmm-hmm.
10    Q     What about trips out of state?
11    A     There's been some, yeah.
12    Q     How many?
13    A     I don't -- me, personally, I don't think I've
14 been part of any, me, personally.
15    Q     Your agency has?
16    A     Yes.
17    Q     Okay.  I'm going to hand you -- this is a
18 different exhibit binder, if you could switch to that one
19 and flip to Exhibit K, please?
20         THE COURT:  Hold on.  Let me get that book out.
21         Before we go on, I need to make a phone call.
22         (Break taken from 5 p.m. to 5:04 p.m.)
23         THE COURT:  All right.  Go ahead.
24 BY MR. BARRIOS:
25    Q     When did Smart Communications install their

Page 134

1   equipment services in your facility?
2      A   I can't tell you exact date.  I know our very
3   first visitation was up and running on the wall kiosk
4   July 20, 2018.
5      Q   So --
6      A   I think it was prior to that date, but that's
7   the first date -- that's the only date I know off the top
8   of my head.
9      Q   Okay.  So it would have been, at least, in the
10  first half of 2018?
11     A   Yes.
12     Q   All right.  Let's take a look at Exhibit K.
13     A   Mmm-hmm.
14     Q   Do you know recognize this document?
15     A   I do.
16     Q   And this is your e-mail address, Alan Johnson,
17  right?
18     A   It is.
19     Q   And who is Rick Ferguson?
20     A   He's our representative for Correct Solutions.
21     Q   Is he a good friend of ours?
22     A   I consider him a friend, yes.
23     Q   What -- what was Rick Ferguson talking about
24  when he said, "Hope you make it back safe.  I hobbled
25  home yesterday."

Page 135

1      A   To be perfectly honest, I cannot remember what
2   this is.  I mean, I know we was somewhere, but I couldn't
3   tell you where off the top of my head.
4      Q   The day of this e-mail from Ferguson to you is
5   May 17, 2019, right?
6      A   I see that.
7      Q   So you've been in -- or Smart had been in your
8   facility for a year or so?
9      A   Close, yeah.
10     Q   Okay.  And Mr. Ferguson is telling you that
11  he's getting "calls from my Smart customers complaining
12  about products, services and overall performance," right?
13     A   Correct.
14     Q   And he even tells you they might be replacing
15  them soon, right?
16     A   Yes.
17     Q   Do you see here where he acknowledges, "I have
18  not heard from you"?
19     A   Yes.
20     Q   All right.  Was Mr. Ferguson telling the truth
21  there?
22     A   He was.
23     Q   So a year into the services, you've got no
24  issues; you've never reached out to Correct Solutions?
25     A   That's not correct at all.

Page 136

1      Q   Okay.  What --
2      A   But I had not relayed to him.  I was dealing
3   directly with Smart --
4      Q   Okay.
5      A   -- until I exhausted all efforts of
6   communicating directly with Smart, did I go to Rick
7   Ferguson with my problems.
8      Q   All right.  Well, let's look at your response.
9   And you note, in the second paragraph there, "It's been
10  one problem after another ever since the beginning."
11     All right.  But then you note, "They are always
12  helpful and working on the problems but there is always
13  problems," right?
14     A   That's correct.
15     Q   Okay.  So in contradiction to what you said
16  earlier about them not being responsive, here you're
17  saying that "they're always helpful and working on
18  problems," right?
19     A   They are, but sometimes it takes them two days
20  before they call me back.
21     Q   Okay.  Are you --
22     A   But they are helpful when they do.
23     Q   Are you aware, to this day, whether Correct
24  Solutions has ever sent a performance-related notice to
25  cure to Smart Communications about your facility?

Page 137

1      A   I have no clue.  I don't even know what that
2   is.
3      Q   Okay.  So you've never seen anything like that?
4      A   No.
5      Q   A formal notice of any kind?
6      A   No.
7      Q   Okay.  Let's take a look at Exhibit O, please,
8   in that binder.
9          MR. BARRIOS:  Judge, I would like to move
10     Exhibit K.
11         THE COURT:  Any objection?
12         MS. BALD:  No, Your Honor.
13         THE COURT:  It will be so received.
14         (Exhibit K admitted into evidence.)
15         THE COURT:  Go ahead.
16  BY MR. BARRIOS:
17     Q   So do you recognize this e-mail?
18     A   I do.
19     Q   And this is from you to Jennifer Tongate, who
20  is at Smart Communications, right?
21         THE COURT:  I'm sorry.  Which one?  I was just
22     marking K.
23         MR. BARRIOS:  This is O.
24         THE COURT:  All right.  Go ahead.
25  BY MR. BARRIOS:

Page 138

1    Q    What's the date of this e-mail, and who is it
2    to?
3    A    July 31st, and it was addressed to Jennifer
4    Tongate.
5    Q    July 31, 2019?
6    A    2019, correct.
7    Q    So, now, we're more than -- or approximately
8    two years into Smart's being in your facility, right?
9    A    No.  A year.
10   Q    Oh, a year.  My mistake.
11        Okay.  And on the last line here, it says, "I
12   wanted to advise you Washington County Sheriff's Office
13   will be actively looking for a new vendor to replace
14   Smart Communications."  Do you see that?
15   A    That's correct.
16   Q    Okay.  Were you aware, at this time, that
17   Correct Solutions had already entered into a contract
18   with Tech Friends to be that replacement that you're
19   referring to?
20   A    No, I did not.
21   Q    So Correct Solutions hadn't told you that they
22   had signed a contract that was going to affect your
23   facility?
24        MS. BALD:  Object to the form.
25   A    Not at this time.

Page 139

1    BY MR. BARRIOS:
2    Q    Okay.  Do you -- do you understand -- let me
3    ask you this.  Has Tech Friends come to do any kind of a
4    walk-through or an inspection at your facility any time
5    in the last year?
6    A    Yes.  I mean, they're a vendor of ours.  We use
7    them already, before Smart Communications even come on
8    board.
9    Q    Do you use them for messaging services?
10   A    They have messaging service, I believe, but I
11   don't know if -- how it's working because I know -- how
12   many messages are going through Smart Communications now.
13   I don't know if the inmates are still using it, but I
14   think it's still an option.
15        THE COURT:  I'm not following your answer.  I'm
16   sorry.
17        THE WITNESS:  Okay.
18        THE COURT:  Wait a minute.  Is Tech Friends in
19   your facility as a communications vendor?
20        THE WITNESS:  No.
21        THE COURT:  Okay.
22        THE WITNESS:  But I think that is an option on
23   their -- on their product.
24        THE COURT:  On their plate, right, on their
25   product.

Page 140

1        THE WITNESS:  But I don't know if it's up and
2    running or not.  I couldn't tell you that.
3    BY MR. BARRIOS:
4    Q    So you don't know, if a friend or family member
5    went on to the Tech Friends website and chose to
6    communicate with an inmate in your facility, whether they
7    could actually engage in that communication through Tech
8    Friends's products?
9    A    I can't tell you.  I know I have not
10   personally -- as the assistant jail administrator, I have
11   not checked the Tech Friends site for messaging since we
12   went online with Smart Communications, and I'm daily on
13   Smart Communications checking the messaging and
14   visitations.
15        THE COURT:  Now, Tech Friends is the one who
16   claimed that they had exclusive right to
17   communications, right?
18        THE WITNESS:  Right.
19        THE COURT:  And that's why you sent out
20   the notice to Correct and Correct sent the notice
21   to --
22        MS. BALD:  Summit.
23        THE WITNESS:  Summit.
24        THE COURT:  Summit -- I'm sorry Summit.
25        THE WITNESS:  Summit, right.

Page 141

1        Tech Friends is a subcontractor of
2    Summit Foods.  It's Summit Foods that we have the
3    contract with.
4        THE COURT:  Okay.
5    BY MR. BARRIOS:
6    Q    And Summit Foods provides commissary services?
7    A    Right.
8    Q    Well, what does Tech Friends do then?
9    A    They have our kiosk system in there that takes
10   care of all of our grievances, requests, commissary, all
11   of our copays for the medical service provider.  I think
12   that's it off the top of my head.
13   Q    Aren't those the same exact things that Smart
14   does this your facility?
15   A    No, they do not.
16   Q    They don't do grievances and have kiosks in
17   place and that type of thing?
18   A    Not in our facility, they do not.
19   Q    No?
20   A    No.
21   Q    Okay.  Do you know if Smart generates revenue
22   through messaging services that are done -- messaging
23   that your inmates use to communicate with the outside?
24   A    Smart does, yeah.
25   Q    Do you know what else Smart does in your

Page 142

1  facility?
2      A    They have visitation.  They have entertainment.
3  They have messaging.  I think that's it.
4      Q    Let's take a look at Exhibit P, please?
5           THE COURT:  Do you want to admit O?
6           MR. BARRIOS:  Yes, Your Honor.
7           THE COURT:  Any objection?
8           MS. BALD:  No, Your Honor.
9           (Exhibit O admitted into evidence.)
10          THE WITNESS:  Did you say O?
11          MR. BARRIOS:  P.  We just did O.
12          THE WITNESS:  Is this it?
13          MR. BARRIOS:  P is the -- no, it's the one
14     actually in the binder.
15 BY MR. BARRIOS:
16     Q    So P is in the binder.  Do you recognize that
17  e-mail?
18     A    Yes, I do.
19     Q    And, again, that's from Rick Ferguson, your
20  contact?
21     A    Correct.
22     Q    And that's your response up there -- "Will do.
23  Thanks," right?
24     A    Yes.
25     Q    Okay.  And Rick Ferguson was telling you not to

Page 143

1  communicate with Smart Communications about service
2  issues, right?
3      A    That's correct.
4      Q    And that's what you were confirming you would
5  not do?
6      A    Right.
7      Q    And he was telling you about "don't hold back,"
8  give him everything you've got, right?
9      A    Right.
10     Q    Did you follow that instruction?
11     A    We did.
12     Q    Did you always follow the instructions that
13  Correct Solutions gave you with respect to the
14  relationship involving Smart Communications?
15     A    Yes.  Just everything that was said in this
16  e-mail right here, we forwarded all of our requests and
17  grievances through them instead of doing it straight with
18  Smart.
19     Q    After you got this, did you ramp up your effort
20  at your facility to make more complaints than usual?
21     A    No.  The complaints and grievances are
22  generated by the detainees.  I can't make them grief
23  more.
24     Q    After this e-mail -- strike that question.
25          Will you flip to Exhibit CC, please?

Page 144

1           THE COURT:  CC.  Okay.
2           Are you moving Exhibit P into evidence?
3           MR. BARRIOS:  Yes, Your Honor.
4           MS. BALD:  No problem.  No objection.
5           THE COURT:  Thank you.
6           It will be so received.
7  BY MR. BARRIOS:
8      Q    So CC is actually the same, I believe, as one
9  you looked at on your direct examination, which was an
10  e-mail -- or a letter from Correct Solutions to
11  Smart Communications and attaching it is a
12  Washington County letter, right?
13     A    The Washington County letter I'm familiar with,
14  and the --
15     Q    The Summit letter?
16     A    -- letter from Summit.  This one from Correct
17  Solutions, this is -- I haven't seen this, personally.
18     Q    Between the time that Smart installed their
19  services in early to mid-2018 and the date of this letter
20  from Summit, had you ever heard anything else from Summit
21  about the fact that they should be providing messaging
22  services --
23     A    No.
24     Q    -- in your facility?
25          This is the first time?

Page 145

1      A    Yes.
2      Q    Had you heard anything about -- from Tech
3  Friends about the fact that they should have exclusive
4  rights to provide messaging services?
5      A    No.  And when I say, no, within 30 days of this
6  letter, they advised us that they were -- had determined
7  that we was in breach of contract and they would be
8  serving us this.  So probably when 30 days of this
9  letter, I was made aware of it but not prior to that.
10     Q    Did you -- before you sent your letter to --
11  and I say "your letter" -- Washington County's letter,
12  were you involved at all in the preparation --
13          THE COURT:  What do you mean, Washington
14  County's letter?
15          MR. BARRIOS:  There's a letter from
16  Washington County.
17          THE COURT:  Hold on.
18          Oh, I see.  Okay.  I didn't see that before.
19          Go ahead.
20 BY MR. BARRIOS:
21     Q    Were you involved in the preparation of this
22  letter at all?
23     A    I was not.
24     Q    Were you involved in the decision to notify
25  Correct Solutions about the Summit letter?

Page 146

1      A    I'm not sure I'm understanding.  I can explain,
2  I'm sure.
3           Another captain at the jail dictated this
4  e-mail and it was shared with the other command staff
5  that this is what we're going to be sending to Correct
6  Solutions, if that answer your question.  I was aware of
7  this before it was sent to them, yes, but I was not
8  involved in writing it.
9      Q    Were you aware of the fact that, when Smart was
10  installing their services in your facility, that they had
11  to hold off for a while because they were told that there
12  was an existing provider in; they had to wait for their
13  contract to expire?
14      A    I cannot remember that.
15      Q    Did you -- have you been in contact with
16  counsel for Correct Solutions about your testimony today?
17      A    Not until this morning.
18           MR. BARRIOS:  Okay.  I've got nothing further,
19  Your Honor.
20           THE COURT:  Any redirect?
21           MS. BALD:  No, Your Honor.
22           THE COURT:  All right.  Thank you, sir.
23           Next witness?
24           MS. BALD:  Your Honor, we would call Mark
25  Turner.

Page 147

1           (Captain Johnson left the room and Mr. Turner
2  took the witness chair.)
3           THE COURT:  Okay.  Would you raise your right
4  hand, please?
5           THE WITNESS:  (Complying.)
6           THE COURT:  Do you solemnly swear or affirm
7  that the evidence you are about to give will be the
8  truth, the whole truth and nothing but the truth?
9           THE WITNESS:  Yes, I do.
10                MARK TURNER,
11  called on behalf of the Defendant, having duly sworn or
12  affirmed to tell the truth, the whole truth and nothing
13  but the truth, was examined and testified as follows:
14           THE COURT:  All right.
15                DIRECT EXAMINATION
16  BY MS. BALD:
17      Q    Mr. Turner, could you please tell us your
18  professional or occupation?
19      A    Yes.  I'm working with Correct Solutions Group.
20      Q    And what is Correct Solutions Group?
21      A    A provider of technology services to the inmate
22  industry.
23      Q    And where is its principal place of business?
24      A    Ruston, Louisiana.
25      Q    And approximately how many facilities does

Page 148

1  Correct Solutions have contracts with?
2      A    It would be approximately 80.  We have a lot of
3  privately-owned facilities that have sub facilities
4  within them that make that up.
5      Q    And how long has Correct Solutions been in
6  business?
7      A    Since 2000-- -- I've got to think when I started
8  there -- 2012, '13.
9      Q    Okay?
10      A    Before I -- before I came.
11           THE COURT:  Before what?
12           THE WITNESS:  Before I -- before I joined on,
13  at least a couple of years.
14           MR. TURKEL:  Okay.
15           THE WITNESS:  I don't remember how long I've
16  been there.
17  BY MS. BALD:
18      Q    Okay.  And does Correct Solutions provide
19  tablets, e-mail, those type of services to facilities?
20      A    Yes.
21      Q    How do they provide those type of facilities --
22  those type of products and services to facilities?
23      A    Through subcontractors.
24      Q    Okay.  And what subcontractors does Correct
25  Solutions use?

Page 149

1      A    Smart Communications and Tech Friends.
2      Q    Okay.  Were you the person, on behalf of
3  Correct Solutions, who negotiated with
4  Smart Communications the terms of the non-disclosure
5  agreement the master service agreement and the schedules?
6      A    Yes.
7      Q    And who from Smart Communications did you
8  directly negotiate with?
9      A    Rob Deglman.
10      Q    And how did you negotiate with Mr. Deglman?
11      A    We would --
12           THE COURT:  Can you spell list name for the --
13  for us?
14           MR. LYNCH:  D-e-g-l-m-a-n.
15           THE COURT:  Go ahead.
16      A    We would talk on the phone and codify whatever
17  he had in e-mails.
18  BY MS. BALD:
19      Q    And did you negotiate the terms of the
20  non-disclosure agreement, master service agreement or
21  schedules directly with Jon Logan?
22      A    No.
23      Q    And did Correct Solutions and
24  Smart Communications enter into a non-disclosure
25  agreement?

Page 150

1   A   Yes.
2   Q   And was that the first document that was done?
3   A   That's correct.
4   Q   Okay.  And after the non-disclosure agreement
5   then, did you and Mr. Deglman start negotiating the terms
6   of the master service agreement?
7   A   Yes.
8   Q   Okay.  I'd like you to take a look at
9   Exhibit 14.
10      THE COURT:  That's your Exhibit 14?
11      MS. BALD:  From the white book.
12      THE COURT:  Okay.  Hold on.
13      Go ahead.
14  BY MS. BALD:
15  Q   Mr. Turner, can you tell us, what Exhibit 14
16  is?
17  A   E-mail chain between Rob and myself concerning
18  Avoyelles Parish.
19  Q   In the bottom e-mail, where it's from
20  Mr. Deglman to you, there's a reference to a presentation
21  and "You guys are fantastic to work with."  Do you know
22  what he was referencing?
23  A   It's our relationship between us and him.
24  Q   Okay.  And he said the presentations went well
25  in Tulsa and St. Louis.  What was that?

Page 151

1   A   Pilot demonstrations.
2   Q   Okay.  And did Mr. Deglman provide the first
3   draft of the master service agreement --
4   A   Yes.
5   Q   -- for consideration?
6   A   Yes.
7   Q   And where did the 90-day non-renewal provision
8   first arise?
9   A   I believe it was in the very first draft they
10  had with the seven-year.
11  Q   Okay.
12  A   I think the wording on the initial one was
13  seven years.
14  Q   Okay.  And if you could take a look at --
15      THE COURT:  Are you going to move 14 into
16  evidence?
17      MS. BALD:  Yes.  I would move 14 in evidence.
18      THE COURT:  Any objection?
19      MR. BARRIOS:  No objection.
20      (Exhibit 14 admitted into evidence.)
21  BY MS. BALD:
22  Q   And if you could take a look at the master
23  service agreement that's part of Exhibit 14 that is Bates
24  Number 2307 --
25  A   I'm getting to it -- okay.

Page 152

1   Q   -- and is this -- this is the master service
2   agreement that Mr. Deglman drafted and provided to you?
3   A   Yes.
4   Q   And the parties to the agreement, are they
5   Correct Solutions and Smart Communications Holding?
6   A   That's correct.
7   Q   Is there ever -- is there any contract between
8   Smart Communications and any of your facilities?
9   A   No.
10  Q   And if you can take a look at Paragraph 6 of
11  the draft master service agreement that Mr. Deglman
12  drafted, which is Bates Number 2308, was that the term
13  that Smart Communications was proposing, seven years?
14  A   That's correct.
15  Q   And what did you understand the word -- or
16  the -- Mr. Deglman's inclusion meant for "this agreement
17  will automatically renew annually for additional one-year
18  terms unless either party notifies the other party with
19  written notice of non-renewal at least 90 days prior to
20  the expiration of the then-current term"?
21  A   That was referring to this master service
22  agreement.
23  Q   And who did you understand the parties were in
24  the master service agreement that Mr. Deglman drafted?
25  A   Correct Solutions and Smart.

Page 153

1   Q   And if you would take a look at Paragraph 19,
2   entitled "Third-party Rights," was that -- that was
3   drafted by Mr. Deglman?
4   A   Yes.
5   Q   And where it reads, "The rights, obligations
6   and duties contained in this agreement shall exist
7   exclusively between the parties."  Was -- who were the
8   parties?
9   A   As described in the first paragraph, Correct
10  Solutions and Smart.
11  Q   Okay.  And then if you could also take a look
12  at the draft of the schedule that is Bates Number 2032,
13  is that a draft schedule that Mr. Deglman provided -- or
14  drafted and provided to you?
15  A   Yes.
16  Q   And I note that this schedule is originally --
17  reads "between Avoyelles and Smart Communications."
18  A   Yes.
19  Q   Was that acceptable to you, for Smart
20  communications to have a direct account with your
21  facilities?
22  A   No.
23  Q   Now, I would like you to take a look at
24  Exhibit 15, if you can tell --
25      THE COURT:  Hold on for a second.

Page 154

1    Was Exhibit 14 ever utilized?
2         MS. BALD:  The Exhibit 14, the schedule was
3    changed to be between Correct Solutions and Smart,
4    not -- they were --
5         THE COURT:  Okay.  So this particular document
6    was never utilized?
7         MS. BALD:  Yes.  That's correct.
8         THE COURT:  Okay.  And are you -- okay.  Go
9    ahead.
10   BY MS. BALD:
11   Q    I'd like for you to take a look at Exhibit 15.
12   A    Okay.
13   Q    If you could, tell us what that is, sir.
14   A    "Please begin reviewing the master agreement
15   and schedule of services and begin tweaking it."
16   Q    And was it your proposal to -- that Correct
17   Solutions and Smart Communications would have a -- just a
18   single master service agreement?
19   A    Yes.
20   Q    Why did you want just a single master service
21   agreement?
22   A    That way, we didn't have to go through all
23   paperwork every time.  One master service agreement to
24   cover everything, and then each site, we would go and
25   do -- would just be a schedule.  Simplicity.

Page 155

1    Q    Okay.  So did the master service agreement
2    reference any particular facility?
3    A    No.
4    Q    Were those referenced in the schedules?
5    A    Yes.
6         MS. BALD:  Okay.  And I would like to move
7    Exhibits 14 and 15 in evidence.
8         THE COURT:  14, you already did.
9    You want to do 15?
10        MS. BALD:  Yes, Your Honor.
11        THE COURT:  Any objection?
12        MR. BARRIOS:  No, Your Honor.
13        THE COURT:  So admitted.
14        (Exhibit 15 admitted into evidence.)
15   BY MS. BALD:
16   Q    I'd like you to take a look at Exhibit 16, if
17   you could tell us what that is, sir.
18   A    Referring to the Avoyelles Parish, "As we move
19   forward with the master service agreement and schedule."
20   Q    What did you mean by "I informed Rob that the
21   agreement would be between CSG and Smart and CSG will
22   have the agreement with the county/parish as the case
23   is"?
24   A    The reason we bring in the subcontractors is we
25   become sticker in the site.  By allowing the

Page 156

1    subcontractor to have a deal directly with a county
2    facility, they could get rid of us at any time and go
3    with another phone provider and stay with that
4    subcontractor.  It does us no good as far as our contract
5    goes.
6         So the reason you bring them in, they stand
7    behind you -- here we are and here's the facility -- that
8    way, that can't -- that can't happen.  It gives us a
9    longer term.
10   Q    And under your contract with each of the
11   facilities, was Correct Solutions the one obligated
12   contractually to provide the tablets and the messaging
13   and all that to the facilities?
14   A    Yes.
15        MR. BARRIOS:  Objection.  Leading.
16        THE COURT:  Overruled.
17   A    Yes.
18        THE COURT:  I mean, that's been in here
19   throughout the whole thing.
20   BY MS. BALD:
21   Q    And is this --
22        THE COURT:  Is this the final draft, or is this
23   another draft.
24        MS. BALD:  This is just -- this is still their
25   draft, Your Honor.

Page 157

1    BY MS. BALD:
2    Q    So then let's take a look at Exhibit 17.
3         THE COURT:  Are you moving 16?
4         MS. BALD:  Yes, Your Honor.  I would move 16.
5         THE COURT:  Any objection?
6         MR. BARRIOS:  No, Your Honor.
7         THE COURT:  It would be so admitted.
8         (Exhibit 16 admitted into evidence.)
9    BY MS. BALD:
10   Q    If you could like a look at Exhibit 17, and let
11   us know what that document is.
12   A    This looks like we have sent the completed
13   documents and the MSA and schedules.
14   Q    You indicate that "I have completed the CSG
15   documents between us and the County."  What document is
16   that?
17   A    That would be -- probably that one had to do
18   with the addendum to our contract.  I don't see it there,
19   but probably the addendum to our contract where we said
20   we are going to deliver the services to the facility.
21   Q    And did you require that the County sign the
22   contract before you moved forward with Smart?
23   A    Yes.
24   Q    Okay.  And in this -- in this e-mail, you
25   reference "coterminous."  Can you tell us what you meant

Page 158

1  by that?
2       A    Yes.  The term for us providing the services to
3  the County, Smart is providing them through us.  When our
4  term ends with the County, it will end with Smart.  And
5  if it were to be renewed, it could be renewed.
6       Q    Okay.
7            MS. BALD:  Your Honor, I would move Exhibit 17
8  into evidence.
9            THE COURT:  Any objections?
10           MR. BARRIOS:  No objection.
11           (Exhibit 17 admitted into evidence.)
12  BY MS. BALD:
13      Q    I would like to ask you to take a look at
14  Exhibit 18.  And is this an e-mail exchange between you
15  and Mr. Deglman?
16      A    Yes.
17      Q    I note that Mr. Turner was not copied on any of
18  these e-mails that we have looked at so far.  Did you
19  copy Mr. Logan with any of your negotiations with
20  Mr. Deglman?
21      A    It would have been rare.  It was mainly Rob.
22  Rob handled things.
23      Q    And it indicates, "Our account" -- "Our
24  agreement with the account will include, as an addendum
25  to our agreement with Smart since it will be referenced

Page 159

1  into the terms and the deliverables."
2            Is that the items that Smart will be
3  providing --
4       A    Yes.
5       Q    -- through you to the facility?
6       A    Right.
7            MS. BALD:  Okay.  I think may have been the --
8  BY MS. BALD:
9       Q    And I'd like you to take a look at 19.
10           THE COURT:  18 admitted?
11           MS. BALD:  I think that 18 may already be
12  admitted, but I'll have to check.
13           MR. BARRIOS:  No objection.
14           MS. BALD:  Okay.  So, Your Honor, we would move
15  it in with no objection.
16           THE COURT:  Okay.  So received.
17           (Exhibit 18 admitted into evidence.)
18  BY MS. BALD:
19      Q    Okay.  Take a look at 19.
20      A    Okay.
21           THE COURT:  I need to get another pad.
22           (Break taken from 5:32 p.m. to 5:32 p.m.)
23           THE COURT:  All right.  Sorry.
24  BY MS. BALD:
25      Q    Mr. Turner, we're looking at Exhibit Number 19.

Page 160

1  Ask you if you can tell me what that document is?
2       A    Looks like we finished our final tweaks on the
3  master service agreement and schedule.
4       Q    And were you the one making the tweaks to the
5  master service agreement and the schedules?
6       A    I believe I had some wording changes in the
7  term.
8       Q    And then you indicate, "I changed the term to
9  define when it starts, et cetera, and how it is tied to
10  our contract with the facility."
11      A    Right.
12      Q    Is that the coterminous language?
13           THE COURT:  Where are you reading?
14           MS. BALD:  The one, two, three -- fourth
15  paragraph down.
16           THE COURT:  Okay.
17      A    Yes.
18  BY MS. BALD:
19      Q    And was that -- that was a shorter period than
20  what Smart had initially proposed in the draft that
21  Mr. Deglman --
22           MR. BARRIOS:  Objection.
23  BY MS. BALD:
24      Q    -- contained?
25           THE COURT:  Say again now.  What's your

Page 161

1  question?
2  BY MS. BALD:
3       Q    Is that a shorter period, initial shorter
4  period than what Mr. Deglman proposed in the master
5  service agreement?
6            THE COURT:  What do you mean?  I don't know
7  what you mean by that.
8            MS. BALD:  Well, there was a seven-year term.
9            THE COURT:  And that's what you're referring
10  to?
11           MS. BALD:  Yes, sir.
12           THE COURT:  Okay.
13           MR. BARRIOS:  Objection.  It's a legal question
14  because the term is -- it's not like it changed from
15  a seven-year term to a four-year term.  It's
16  coterminous.  It's not shorter.  It depends on what
17  the other contracts are.
18           THE COURT:  As phrased.  I understand what his
19  objection is.
20           MS. BALD:  I can rephrase the question.
21           THE COURT:  It's a different terminology.
22           MS. BALD:  Yes.
23           THE COURT:  Utilized to indicate the
24  termination.
25           MS. BALD:  Yes.

Page 162

1      THE COURT:  How about that?
2      MS. BALD:  That works.
3  BY MS. BALD:
4      Q    Did you, in any way, revise or remove the
5  non-renewal language that Mr. Deglman had included in the
6  master service agreement?
7      A    The non-renewal -- let me read it.
8           Can you reference a -- one of them for me?
9      Q    If you look at Bates Number 2386.
10     A    2386.  I'll just read it to make sure.
11          No.
12     Q    Now, is the Paragraph 6 that is part of the
13  Exhibit 19, is that the Paragraph 6 as you revised it?
14     A    Yes.
15     Q    And you made -- are you the one that made the
16  effective date as the date of the last signature of this
17  agreement?
18     A    Yes.
19     Q    And you -- are you the one that added "after
20  the original term, this agreement shall automatically
21  renew in accordance with the customer's agreement with
22  the facility"?
23          MR. BARRIOS:  Objection.  Asked and answered.
24          THE COURT:  Overruled.
25     A    I believe that -- I believe the 90 days was

Page 163

1  part of the original seven-year language.
2  BY MS. BALD:
3      Q    Yeah.  Excluding -- I'm just talking about the
4  language that reads "after the original term, this
5  agreement shall automatically renew in accordance with
6  the customer's agreement with facility."
7      A    Yes.
8      Q    Is that the changes that you made?
9      A    Yeah.
10     Q    What did you mean by "after the original term"?
11     A    When we first -- whatever the first -- wherever
12  they get in.  Let's say we were in a one-year term, for
13  example, and they came in on the third month, the next
14  time, if that renewed, they would be able to renew.
15     Q    Okay.
16     A    Because these were all existing facilities for
17  us, so there would be no initial term for Smart on these
18  facilities.  We had already experienced that initial
19  terms --
20     Q    Okay.
21     A    -- at all these facilities.  So they would be
22  coming in, so whatever -- if they came in midway whenever
23  the contract would renew, they would be part of it then.
24     Q    And under -- did your understanding change at
25  all from the -- this non-renewal provision that

Page 164

1  Mr. Deglman drafted and included in the original master
2  service agreement that "party" under the non-renewal
3  provision of Paragraph 6 referred to Correct Solutions
4  and Smart Communications?
5      A    Yes.
6          THE COURT:  Repeat that again.
7          I'm sorry.  I wasn't -- I'm getting tired,
8      obviously, because I've been in here for quite a
9      while now.
10         MS. BALD:  Okay.
11  BY MS. BALD:
12     Q    Was it still your understanding that the
13  reference of "party" as to who can non-renew this master
14  service agreement in Paragraph 6 was Correct Solutions
15  and Smart Communications?
16     A    Yes.
17     Q    Okay.  And would you have signed a master
18  service agreement with Smart Communications that did not
19  have a 90-day non-renewing provision?
20     A    No.
21     Q    And how did you understand Correct Solutions
22  could exercise that 90-day non-renewal provision?
23     A    In every contract we have with an account,
24  we've been using that 90-day provision on every contract
25  we have between us and a facility.

Page 165

1          THE COURT:  Between you and the facility?
2          THE WITNESS:  Between us and the facility.
3      A    So, you know, in my mind I see that 90 days, it
4  refers to that document specifically.  When I read this,
5  I believed it referred to this document, specifically,
6  the MSA.
7  BY MS. BALD:
8      Q    Now, what was your understanding if -- Correct
9  could do under that paragraph if your facility was going
10  to renew with Correct Solutions but you were not happy
11  with the product and the services that
12  Smart Communications was providing under the schedule?
13     A    Then we could exercise the 90-day for that
14  particular facility.
15     Q    And would you have signed this master service
16  agreement if you did not have that ability to do that?
17     A    No.  Because when everything is going great and
18  it's wonderful, it's fantastic.  And in our discussions,
19  that's what we had discussed.  And it was brought up
20  earlier.  I said, you know, as long as we were there,
21  they were there, things were going great.
22          When things go sideways, though, you have to
23  have your out, and that's been in there from the
24  beginning.  I never questioned it meant anything other
25  than having to do with this agreement.  So it was really

Page 166

```
1   never discussed as far as a verbal discussion going back
2   and forth about this.
3       Q    And did things go sideways with
4   Smart Communications?
5       A    We started receiving all the complaints from
6   the customers and they had -- just like you heard
7   testified, they were upset.  They wanted out.
8            MR. BARRIOS:  Objection.  Hearsay.
9            THE COURT:  Sustained.
10      A    Yes.
11  BY MS. BALD:
12      Q    Did you become concerned that Correct Solutions
13  was not providing the services under its contracts with
14  the facilities that it was contracted to provide under
15  the -- for the tablets and the e-mails?
16      A    Yes.
17           MS. BALD:  Your Honor, we would move Exhibit 19
18  into evidence.
19           THE COURT:  Any objection?
20           MR. BARRIOS:  None.
21           THE COURT:  You said "no"?
22           MR. BARRIOS:  No.  No objection.
23           (Exhibit 19 admitted into evidence.)
24  BY MS. BALD:
25      Q    And if you could look at Paragraph 19 of the
```

Page 167

```
1   draft master service agreement as you revised it, which
2   is Bates Number 2388, and did you make any changes to
3   Mr. Deglman's wording as the third-party rights that
4   provided that this agreement shall exist exclusively
5   between the parties?
6       A    No.
7       Q    Okay.  If you could take a look at Exhibit 20,
8   is that an e-mail communication between you and
9   Mr. Deglman?
10      A    Yes, it is.
11      Q    And what was the purpose of this e-mail
12  communication?
13      A    Clarifying the "in accordance with the
14  customer's agreement with facility," talking about the
15  termination -- the term, if you will.
16      Q    When you said, a few minutes ago, that when the
17  relationship is great, it renews, did you have
18  discussions with Mr. Logan about your expectation of
19  renewals with these facilities?
20      A    No.
21      Q    Did you ever tell Mr. --
22      A    Well, in regard of that we had great
23  relationships and our contracts always got renewed.
24      Q    Okay.  Did you ever tell him that you expected
25  Smart's contracts to be automatically renewed regardless?
```

Page 168

```
1       A    I don't know if I would say -- I wouldn't say
2   "regardless."  Every discussion we had was in the context
3   of greatness, everything is going great.
4       Q    Okay.  Has to be great, good relationship?
5       A    Yeah.  The relationship is always key.
6       Q    Okay.  And that's been important to your
7   company?
8       A    Yes.
9            MS. BALD:  Your Honor, we would move Exhibit 20
10  into evidence.
11           THE COURT:  Any objection?
12           MR. BARRIOS:  No.
13           THE COURT:  Be so received.
14           (Exhibit 20 admitted into evidence.)
15  BY MS. BALD:
16      Q    If you would take a look at Exhibit 21, and ask
17  you if that is your e-mail transmitting the master
18  service agreement that you revised?
19      A    Okay.  Your question again?
20      Q    Is that what you submitted?
21      A    Yes.
22      Q    Okay.  Did you also change the schedule that
23  Mr. Deglman had drafted to be a contract between Correct
24  Solutions and Smart Communications, rather than the
25  facility?
```

Page 169

```
1       A    Yes.
2            MS. BALD:  Okay.  Your Honor, we would move
3   Exhibit 21 into evidence.
4            THE COURT:  Any objection?
5            MR. BARRIOS:  No objection.
6            (Exhibit 21 admitted into evidence.)
7            THE COURT:  So received.
8   BY MS. BALD:
9       Q    And did you utilize the master service
10  agreement and the schedules for the eight facilities that
11  you -- that Smart was providing the tablets for?
12      A    I believe we did.
13      Q    Okay.  And then if you would take a look at
14  Exhibit 24, and ask you if that is the signed agreement
15  by master -- of the master service agreement that
16  Smart Communications sent to you?
17      A    Yes.
18      Q    And they sent -- they signed it first?
19      A    Yes.
20      Q    Did either Jon Logan or Jim Logan, at any time,
21  raise any objection or questions to you about the
22  non-renewal provision set forth in the master service
23  agreement, either when it was being negotiated or when it
24  was being executed?
25      A    No.
```

Page 170

1    Q    Now, you've -- I'd like to actually have a look
2    at -- so we can get these into evidence, I'd like you to
3    take a look at the -- Exhibit 25.
4         THE COURT:  Do you want 24 admitted?
5         MS. BALD:  Yes, Your Honor.
6         THE COURT:  Any objection?
7         MR. BARRIOS:  No, no objection, Your Honor.
8         (Exhibit 24 admitted into evidence.)
9    BY MS. BALD:
10   Q    I'd like you to take a look at Exhibit 25.
11   A    Okay.
12   Q    There's a -- starting with the second page on
13   Correct letterhead, is that a letter that you authored or
14   you signed on behalf of Correct Solutions to
15   Smart Communications?
16   A    Yes, it is.
17   Q    And what was the purpose of this letter?
18   A    Notifying them we had received information from
19   Washington County about stopping the use of e-mail
20   because they had received a letter from Summit.
21   Q    Okay.  Did that have anything to do with Tech
22   Friends?
23   A    No.
24   Q    Can you tell me who Tech Friends is?
25   A    They're a tablet-service provider, much like

Page 171

1    Smart.
2    Q    And do you have a contract with Tech Friends?
3    A    Yes, we do.
4    Q    You've seen today a contract that was
5    identified as part of Smart Communications's records, and
6    I think there was a reference to legacy accounts?
7    A    Yes.
8    Q    Can you tell me what that is?
9    A    That was put in the contract because there are
10   two different ways that services with Tech Friends is
11   paid for.  One is on the legacy accounts, and the other
12   would be on any new accounts that we acquire after.  So
13   we listed all of the legacy accounts so there would never
14   be any question as we move forward going in.
15        So it's simply a list of the accounts that we
16   currently have.  If we ever do anything with one of those
17   accounts, it would fall under the provisions on how we
18   move forward financially -- okay -- versus a brand-new
19   account that's not in there.
20   Q    And since the stipulation and the filing of
21   this suit, have you moved Tech Friends into any of the
22   eight facilities that Smart Communications has been
23   providing services for?
24   A    No.
25   Q    And have you stopped any action to move forward

Page 172

1    by any facility with Tech Friends as to those eight
2    facilities?
3    A    Stopped all action.
4    Q    Okay.  Now, which contract --
5         THE COURT:  Wait a minute.  Why -- that is a
6    very strange question because it implies some action
7    had already been taking place.
8         MS. BALD:  Well, they introduced all of these
9    e-mails in 2017 that we were bringing in Tech
10   Friends and I wanted to clear.
11        THE COURT:  Well, I want to know what actions
12   were being done -- you said you stopped all actions.
13   That implies that were actions being done.  I want
14   to know if those were the actions referred to in the
15   e-mails or were there additional actions.
16   BY MS. BALD:
17   Q    Can you tell us what Correct Solutions was
18   doing with Tech Friends?
19   A    Okay.  We had started receiving complaints from
20   customers -- actually, two avenues.  One is we had a
21   customer that needed a banking software system.  Tech
22   Friends has a product called Lockdown.  We were working
23   with them on that, totally separate from any of this.
24   Q    Who was that county?
25   A    Tulsa County.

Page 173

1    Q    Not one of the eight?
2    A    No.
3    Q    Okay.
4    A    -- and started working with them on that.  We
5    start receiving complaints from customers, "We don't like
6    the product.  What can we do?"  So we -- we know our
7    neck's on the line because we have the contract with the
8    County, so we said, "Let's bring some other people in for
9    you to look at."  So they had some demos at some of these
10   accounts.
11   Q    Which accounts?
12   A    I believe -- I think Washington County,
13   Sebastian.  I don't think we did anything in Moore or
14   Wayne.  There were a few of them, not all of them.  But
15   yes, there were a few.
16   Q    And what did you do to stop that?
17   A    To stop it?
18   Q    Yes.
19   A    As soon as we got the status quo order, I told
20   everybody, "Do not go anywhere near it.  Don't do
21   anything else."
22   Q    Okay.  Now --
23   A    Stop any efforts of even planning or doing
24   anything with that.
25   Q    Now, you heard today, as you sat here, some

Page 174

1   comments about the compensation that you are paid from
2   Tech Friends.  Which contract is more profitable to
3   Correct Solutions?  Its contracts with
4   Smart Communications or its contract with Tech Friends?
5        A    Smart.
6        Q    Why?
7        A    In the Smart contract, we don't pay for
8   anything.  It's -- it's placed in and they keep all the
9   revenue but it doesn't cost us anything and we use it to
10  extend the life of the contract, where possible, with the
11  counties.
12            Tech Friends, we buy the equipment.  We have to
13  buy the equipment up front and then split some of the
14  revenue.  Actually we don't split the top line revenue.
15  We split the net revenue.  So as far as a strict business
16  model, it makes more sense if I never have to spend a
17  dime.
18       Q    Okay.  Now, you also --
19            THE COURT:  Which one has the better return?
20  That's a different question.
21            THE WITNESS:  The better return?  In this case,
22  I really believe, if you look at a three-year
23  contract, which most contracts are, if it is a large
24  facility and the assumption is the e-mail product
25  carries the load for everything -- if the e-mail

Page 175

1   product really works, we get a net which means they
2   take their piece out of it and then we split their
3   net.  We would be near a break-even, according to
4   what Tech Friends tells us.
5            So it's still -- it would be a Smart deal if I
6   wasn't getting anything because I don't have to
7   spend 60-, 80-, $100,000 up front.  So if you figure
8   awe the cost of money into it, over the time, I'm
9   going to get it back but it's going to be a long
10  period.
11  BY MS. BALD:
12       Q    Is today the first time Washington County has
13  stated in your presence that they do not
14  Smart Communications at their facility commencing
15  January 2020?
16       A    No.
17       Q    It's not the first time?
18       A    Not the first time.
19       Q    When did they start telling you they no longer
20  wanted Smart Communications to provide any services to
21  them?
22       A    Gosh.  I don't know the exact date, but it
23  would have been several months ago.
24       Q    And is today the first time that
25  Washington County has stated in your presence that if

Page 176

1   your -- in Smart Communications continues or is required
2   to provide the services of the tablets and other related
3   services to Washington County, that it would terminate
4   its contract with you?
5        A    No.  That would have been yesterday.
6             MR. TURKEL:  Judge, I object to that.  It's
7   hearsay, if there was an out-of-court statement like
8   that.  Johnson was here.  She could have asked him
9   while he was here.
10            MS. BALD:  I'm commenting on his testimony in
11  court.
12            THE COURT:  That wasn't the last question.
13            MR. TURKEL:  That wasn't the question.
14            THE COURT:  That was the question previous to
15  that one.
16            You can rephrase it.
17            MS. BALD:  Okay.
18            THE COURT:  Just rephrase.
19  BY MS. BALD:
20       Q    Did you hear Mr. -- or Captain Johnson today
21  say that they would terminate Correct Solutions if
22  Smart Communications has to be the provider?
23       A    Yes, I did.
24       Q    And have you heard that before today?
25            MR. TURKEL:  Judge, objection.  That's -- it's

Page 177

1   improper to have a witness comment on another
2   witness's testimony in court, and it's hearsay.
3   Again, she's just back-dooring it by saying, "You
4   heard him say it.  Did you hear him say it outside
5   of courtroom too?"
6             THE COURT:  It's hearsay.  Sustained.
7   BY MS. BALD:
8        Q    Do you know the names of any major competitors
9   of Smart Communications?
10       A    Yes.
11       Q    Let me ask this.  Are you -- in your
12  experience, when you submit RFPs, do you list when --
13  that a contract has expired?
14       A    Yes.
15       Q    And has that impacted your ability to get
16  business?
17       A    No.
18       Q    And can you tell me the names of the two major
19  competitors of Smart Communications?
20       A    That would be Securus and GTL.
21       Q    Are they major companies?
22       A    Yes, the two largest.
23            THE COURT:  GTL and?
24            THE WITNESS:  Securus, S-e-c-u-r-u-s.
25  BY MS. BALD:

Page 178

```
1       Q    And are you aware of any lawsuits involving
2  those companies?
3            MR. TURKEL:  Judge, objection.
4            THE COURT:  Wait a minute.  I'm not -- I'm
5  not -- that's a little broad, counsel.
6  BY MS. BALD:
7       Q    Let me ask you this --
8            THE COURT:  That could be involving anybody.
9  Could be suing their customers.  I don't know what
10 that means.
11 BY MS. BALD:
12      Q    Are you aware of either of those companies
13 being terminated on contracts with facilities?
14      A    Yes.
15           MR. TURKEL:  Relevance, Judge.
16           MS. BALD:  I think they --
17           THE COURT:  They'll get to it.  Go ahead.
18 BY MS. BALD:
19      Q    And are they major players in the facility
20 business that you're involved with?
21      A    Yes.
22      Q    Based upon your observation in this industry,
23 has that impacted their ability to get customers?
24      A    No.
25           MR. TURKEL:  Objection, Judge.  Speculation.
```

Page 179

```
1  Opinion.  Improper opinion.
2            THE COURT:  I'll sustain the objection.
3  BY MS. BALD:
4       Q    Other than the initial notice of termination
5  that started this lawsuit, has Correct Solutions sent any
6  termination notices to Smart Communications?
7       A    No.
8       Q    And other than the notice to cure to Sebastian
9  County which was the subject of the last hearing, have
10 you sent any other notices about the defective services
11 to Smart Communications?
12      A    No.
13      Q    And have you moved -- attempted to terminate
14 the Sebastian County contract?
15      A    No.
16      Q    Were you aware that the three facilities at
17 issue -- Wayne, Washington and Sebastian -- were coming
18 up for renewal?
19      A    Yes.
20      Q    I'd like you to take a look at Exhibit 10 --
21 actually, first, let's go ahead and get Exhibits 1, 2 and
22 3.  Are those your contracts with Washington County,
23 Sebastian County and Wayne County?
24      A    Yes.
25           MS. BALD:  And, Your Honor, we would move
```

Page 180

```
1  Exhibit 1, 2 and 3 into evidence.
2            THE COURT:  Any objection?
3            MR. BARRIOS:  We're on 10?  Is that what you
4  said?
5            THE COURT:  1, 2 and 3.
6            MR. BARRIOS:  Oh, the contracts?  No objection.
7            THE COURT:  Yes.
8            MR. BARRIOS:  No objection.
9            (Exhibits 1, 2 and 3 admitted into evidence.)
10 BY MS. BALD:
11      Q    I'd like you to take a look at Exhibit 1, which
12 is the Washington County, and there's a first amendment
13 are Correctional Communication Service Agreement
14 attached?
15      A    Okay.
16      Q    Was that agreement ever accepted by
17 Washington County?
18      A    No.
19      Q    So was that amendment in force?
20      A    No.
21      Q    I'd like you to take --
22           THE COURT:  Hold on.  Let me get there.
23           MS. BALD:  I'm sorry.
24           THE COURT:  I don't know what you're talking
25 about.
```

Page 181

```
1            MS. BALD:  There's an amendment as part of
2  Exhibit 1.
3            THE COURT:  What is the significance of that?
4  What is the significance of this?
5            MS. BALD:  It's part of the exhibit but we
6  learned today that it's not in force and effect; it
7  was not executed.  We didn't want the Court to think
8  that the first amendment was part of this document.
9            THE COURT:  Okay.  Go ahead.
10 BY MS. BALD:
11      Q    And if you would take a look at Exhibits 5, 6
12 and 7 --
13           THE COURT:  Do you want -- all right.
14           1, 2 and 3 are admitted, right?  Yes.
15           MS. BALD:  They had no objection.
16           MR. BARRIOS:  No objection.
17           THE COURT:  Right.  Yeah.  Fine.
18           MR. TURKEL:  Judge, I mean, for record sake,
19 relevance, but understood.
20           THE COURT:  Okay.
21           MR. TURKEL:  Because you just sort of addressed
22 that yourself.
23           MS. BALD:  And Exhibits -- I have no problem
24 pulling out that first amendment if had we want to
25 just take it out.
```

Page 182

1          MR. TURKEL:  No.  I just wanted to note, based
2     on what the judge said.
3  BY MS. BALD:
4     Q    If you could take a look at Exhibits 5, 6 and
5  7, and ask you if those are the schedules between Correct
6  Solutions and Smart Communications for the three
7  facilities at issue?
8     A    Yes, they are.
9          MS. BALD:  Your Honor, we would move into
10    evidence Exhibits 5, 6 and 7.
11         THE COURT:  Any objection?
12         MR. BARRIOS:  No objection.
13         THE COURT:  All right.  5, 6 and 7.
14         (Exhibits 5, 6 and 7 admitted into evidence.)
15 BY MS. BALD:
16    Q    And, Mr. Turner, if you could take a look at
17 Exhibits 10, 12 and 13, and ask you if those are notices
18 of non-renewal that were sent by Correct Solutions to
19 Smart Communications?
20         THE COURT:  This is 19?
21         MS. BALD:  It's Exhibits 10 --
22         THE COURT:  I'm sorry.
23         MS. BALD:  -- 12, 13.
24         THE COURT:  Okay.
25 BY MS. BALD:

Page 183

1     Q    Are those the notices of non-renewal that were
2  sent by Correct Solutions to Smart Communications for the
3  three facilities?
4     A    Yes, they are.
5          MS. BALD:  Your Honor, we would move those into
6     evidence.
7          THE COURT:  Any objection?
8          MR. BARRIOS:  No, Your Honor.
9          THE COURT:  So received.
10         (Exhibits 10, 12 and 13 admitted into
11    evidence.)
12 BY MS. BALD:
13    Q    If and you can take a look at
14 Exhibit Number 11?
15         THE COURT:  You said 10, 12 and 13?
16         MS. BALD:  10, 12 and 13.
17         THE COURT:  Okay.
18         (Exhibit 11 admitted into evidence.)
19 BY MS. BALD:
20    Q    Mr. Turner, if you could take a look at
21 Exhibit Number 11 and tell us what that document is.
22    A    Showing when the first calls that went through
23 Washington County inmate phone system.
24    Q    And what is the first call that -- or what was
25 the significance of the first call for Washington County?

Page 184

1     A    The contract became effective upon the first
2  completed call.
3     Q    And what was the date of the first completed
4  call?
5     A    2015, January 5th.
6     Q    So when does the Washington County contract
7  with Correct Solutions renew?
8     A    January 4, 2020, at this point.
9          MR. BARRIOS:  Your Honor, objection to entering
10    in evidence of this exhibit it's offered because
11    it's -- there's no predicate established as to what
12    this is, and it's hearsay as well.
13         THE COURT:  Response?
14         MS. BALD:  Your Honor, I think he just
15    established what the document is.  It's a document
16    from Smart Communications's call records -- or
17    Correct Solutions's call records.
18         THE COURT:  I'm sorry?
19         MR. BARRIOS:  It hasn't been authenticated as
20    to what this is.
21         THE COURT:  That's what he's saying.
22         MS. BALD:  I'm happy to ask another question or
23    two.
24         THE COURT:  I don't know how he's going to
25    authenticate their business records.

Page 185

1          MS. BALD:  It's a Correct Solutions business
2     record.
3          THE COURT:  Okay.  Go ahead.
4  BY MS. BALD:
5     Q    Okay.  Can you tell us how this business record
6  is maintained?
7     A    Yes.  You can actually log into the system and
8  pull call record completions.
9     Q    And is this maintained by Correct Solutions --
10    A    Yeah.
11    Q    -- by facility?
12    A    Call detail records are maintained, yes, by
13 facility.
14    Q    And in connection with determining the renewal
15 date for Washington County, did Correct Solutions pull
16 this information?
17    A    Yes.
18    Q    And this is a true and accurate copy of the
19 call summaries that Correct Solutions maintains in its
20 business for Washington County?
21    A    Yes, it is.
22         MS. BALD:  Your Honor, at this time we would
23    move Exhibit 11.
24         MR. TURKEL:  I've got about three questions of
25    voir dire.

Page 186

1        THE COURT:  Go ahead.
2            VOIR DIRE EXAMINATION
3   BY MR. TURKEL:
4        Q    Yeah.  When you say Correct Solutions pulled
5   this, are you the person at Correct Solutions who is
6   responsible for maintaining that record?
7        A    No, I did not pull the record.
8        Q    Are you the person who was responsible at
9   Correct Solutions for maintaining those types of call
10  records in your database?
11       A    Describe "maintaining."
12       Q    Is it your job, as part of your job at Correct
13  Solutions, to maintain the database that maintains the
14  record that you just said was pulled?
15       A    No.
16       Q    All right.  And is there someone who does that
17  on a day-to-day basis?
18       A    Yes.
19       Q    And when you say this was pulled, do you have
20  personal knowledge of the process, both on how it was
21  pulled and how it was maintained?
22       A    Yes.
23       Q    Who pulled it?
24       A    Rick Pruitt.
25       Q    Is Rick Pruitt your custodian of records or is

Page 187

1   he another executive-level person.
2        A    No, he is.  He's in charge of all of our field
3   support.
4        Q    Field support being he interfaces with
5   customers, right?
6        A    Yes.
7        Q    All right.  So do you know --
8        A    He maintains the systems.
9        Q    Do you have personal knowledge as to how this
10  record's created, how it's maintained, whether it's a
11  function of your day-to-day business to do that and then
12  whether this is an authentic version of whatever it was
13  that was pulled from that database?
14       A    Yeah.  I can explain to you how the system
15  creates a call detail record, how they are stored.
16       Q    That's not what I asked.  I asked -- counsel
17  kept asking you Correct Solutions pulled this.  Correct
18  Solutions, right?
19       A    Yes.
20       Q    You're not the person that pulls this, right?
21            THE COURT:  He already said that.
22            MR. TURKEL:  Yeah.
23       A    Right.
24  BY MR. TURKEL:
25       Q    Okay.  What I'm asking is, can you testify as

Page 188

1   to how this is created, how it's maintained and how it
2   was pulled in this specific instance here?
3        A    No.  Since I did not pull it, I couldn't tell
4   you under what circumstances he logged into the system.
5   I know how we do it, if I had to do it right, how I would
6   do it.
7        Q    Or he could tell us how, right?
8        A    Yeah.
9        Q    Rick Pruitt?
10       A    Yeah.
11            MR. TURKEL:  So, Judge, he's not really
12       qualified to lay that predicate without --
13            THE COURT:  He doesn't have to be a records
14       custodian, but he does have to establish the
15       elements of it.
16            MS. BALD:  And I think he was able -- he would
17       be able to explain how this is compiled.
18            THE WITNESS:  Yeah.
19            THE COURT:  Maintained.
20            MS. BALD:  Maintained.  How is this --
21            MR. TURKEL:  No.  I mean, he has to have
22       personal knowledge of the six elements.  He can't
23       say Rick Pruitt did it.
24            THE COURT:  As far as, Rick Pruitt pulling
25       it --

Page 189

1            MR. TURKEL:  Truth be told, Judge --
2            THE COURT:  Usually, it's the person who pulled
3       it themselves.
4            So how do you know where he pulled it from?  Is
5       there something marking it as a business record?
6            MS. BALD:  What if I ask this, is this -- is
7       this -- if he could explain how these are compiled
8       and if anybody can pull them up?  I mean, if it's
9       maintained in their system so that anybody can
10      access it, I think that would be business record.
11           THE COURT:  Yeah.  But how do you know this
12      record came from that system?
13           MS. BALD:  Because he didn't print it -- well,
14      I think if he would -- I mean, quite frankly, the
15      question is, when does --
16           CONTINUED DIRECT EXAMINATION
17  BY MS. BALD:
18       Q    When does your contract with Washington County
19  renew?
20            THE COURT:  Do you know, independently?
21            THE WITNESS:  Yes.
22       A    January 4, 2020.
23            THE COURT:  Okay.
24            MS. BALD:  Now --
25            MR. TURKEL:  Well --

Page 190

1    THE COURT:  So we're not admitting the record?
2    MS. BALD:  No.
3    MR. TURKEL:  Wait a minute.  We're not going to
4    admit the record, and he said he knows the date
5    independently.
6    THE COURT:  Right.
7    MR. TURKEL:  Upon what do you base it?
8    MS. BALD:  All right.  Wouldn't that be cross?
9    THE COURT:  That's cross-examination.
10   MR. TURKEL:  I mean, he's just back-dooring his
11   personal knowledge based on the inadmissible
12   document.  I mean --
13   THE WITNESS:  Back when the first call went
14   through the system.
15   THE COURT:  Okay.
16   BY MS. BALD:
17   Q    Mr. Turner, do you know if -- let me strike
18   that.
19        Are you -- do you have any concerns about
20   losing your contracts with Washington County, Wayne
21   County and Sebastian County if you are -- if you cannot
22   cause -- or if the master service agreement with
23   Smart Communications for those three facilities does not
24   lapse?
25   MR. TURKEL:  What --

Page 191

1    BY MS. BALD:
2    Q    Let me rephrase it.
3         Are you concerned about Washington County,
4    Wayne County or Sebastian County terminating their
5    contracts with Correct Solutions if the Court rules that
6    you are not permitted to exercise your non-renewal?
7    MR. TURKEL:  Relevance.  Relevance and hearsay,
8    Judge.
9         Concern would only be based on them telling
10   them something like that.  And if he has a concern
11   that's just some sort of organic feeling or thought,
12   it doesn't matter.
13   THE COURT:  I'm let him answer the question as
14   long as he can qualify it in some fashion.
15   A    Yes.  After you heard Washington County today
16   say that would be their solution.
17   BY MS. BALD:
18   Q    Has any other facility indicated --
19   THE COURT:  Right.
20   BY MS. BALD:
21   Q    -- indicated to you -- has any other facility
22   indicated to you that they intend to terminate you if
23   Smart is remaining in?
24   MR. TURKEL:  Objection, Your Honor.  Hearsay.
25   THE COURT:  Sustained.

Page 192

1    BY MS. BALD:
2    Q    Kind what kind of monetary or economic impact
3    will it have on Correct Solutions if it losses
4    Washington County as its facility?
5    MR. TURKEL:  Objection.  Relevance.
6    MS. BALD:  Your Honor, this is bond.
7    THE COURT:  Yeah.
8    MR. TURKEL:  Oh, okay.
9    A    About 600,000 a year, top line revenue.
10   BY MS. BALD:
11   Q    Have you quantified for Sebastian County?
12   THE COURT:  The first one was
13   Washington County?
14   MS. BALD:  The first one was Washington County.
15   THE COURT:  I just want to make sure.
16   BY MS. BALD:
17   Q    Do you have a quantity?
18   A    It would run about 300,000, about half of
19   Washington County.
20   Q    And how about Wayne County?
21   A    And they are about half of that one, so it's
22   about 150,000 a year.
23   THE COURT:  And what was the second one?  I'm
24   sorry.
25   THE WITNESS:  300,000.

Page 193

1    THE COURT:  No.  The facility?
2    THE WITNESS:  Oh, Sebastian.
3    THE COURT:  Okay.
4    BY MS. BALD:
5    Q    For a total of about 900- --
6    THE COURT:  -- -50,000 to be exact.
7    A    It would be a million, 50.
8    BY MS. BALD:
9    Q    1,050,000 per year?
10   A    Yes.
11   THE COURT:  950- -- you're right.
12   1,050-.
13   MS. BALD:  That's all we have, Your Honor.
14   THE COURT:  All right.  Cross?
15   MR. TURKEL:  I mean, Judge --
16   THE COURT:  I know.
17   MR. TURKEL:  I mean, it's 6:00.  I can start,
18   but it's not going to get done unless we're all
19   sitting here for another hour or 40 minutes.
20   THE COURT:  Yeah.  And I'll be honest with you,
21   I've been doing straight except for the two minutes
22   I took to make a phone call and go to the bathroom.
23   I'm -- that's why I'm having you-all to repeat
24   questions because I'm not concentrating, frankly.
25   If I had to maybe a break here -- can we finish him

Page 194

1   on the phone maybe?  He would still be under oath.
2        MR. TURKEL:  I mean, that's fine with me.  I
3   mean, I would want to come here because I have
4   documents and all that stuff.  If them to phone him
5   in or video him in or whatever or -- I mean, Judge,
6   here's the issue.
7        THE COURT:  Okay.
8        MR. TURKEL:  This is an emergency because they
9   want to do this on January 3rd.
10       THE COURT:  I know.
11       MR. TURKEL:  January 4th, right?  And, you
12  know, we've offered a number of times to not make
13  this an emergency.  Toll it until we can get the
14  hearing done, but that's why we ended up on an
15  emergent basis.
16       If you want to toll it, we can get back in
17  front of you when you have time.  I don't think we
18  have a ton more.  You know, we've got to cross him.
19  It will be 30 -- I mean, I wouldn't want to cap, but
20  probable 30 to 45, an hour if it gets contentious.
21       THE COURT:  How many more witnesses besides
22  him?
23       MR. TURKEL:  I don't know how many they have.
24       MS. BALD:  We're done, Your Honor.
25       THE COURT:  You're done?

Page 195

1        MR. TURKEL:  We'll probably call a very short,
2   10-, 15-minute rebuttal.
3        THE COURT:  Can you stay one more day?
4        MR. TURKEL:  I live here.  I'm good.  I can
5   stay.
6        THE COURT:  I know you live.
7        THE WITNESS:  Oh, me?  No, I can't.  I've
8   got -- I've got grandchildren duty tomorrow
9   afternoon when I get home.  The kids are going out
10  of town to their in-laws.
11       THE COURT:  When are you leaving tomorrow?
12       THE WITNESS:  7 a.m., in the morning.
13       MR. TURKEL:  I'll be here at 4:00, Judge.
14       MS. BALD:  You might be here by yourself.
15       THE COURT:  You will be here by your testify.
16  Let's go off the record right now.
17       (Proceedings adjourned at 6:07 p.m.)
18
19
20
21
22
23
24
25

Page 196

1                    CERTIFICATE OF REPORTER
2
3
4   STATE OF FLORIDA
5   COUNTY OF HILLSBOROUGH
6
7        I, ELIZABETH W. CHORRUSHI, Registered
8   Professional Reporter, Florida Professional Reporter,
9   certify that I was authorized to and did stenographically
10  report the foregoing proceedings and that the transcript,
11  Pages 1 through 196, is a true record of the testimony
12  and proceedings.
13
14       I further certify that I am not a relative,
15  employee, attorney, or counsel of any of the parties, nor
16  am I a relative or employee of any of the parties'
17  attorney or counsel connected with the action, nor am I
18  financially interested in the action.
19
20       Dated:  12/30/2019.
21
22
23       ELIZABETH W. CHORRUSHI
24       Registered Professional Reporter
25       Florida Professional Reporter