# EXHIBIT 2

```
 1          IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
                IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
 2
                        CASE NO. 19-CA-008089
 3

 4    SMART COMMUNICATIONS
      HOLDING, INC,
 5
              Plaintiff,
 6
      -vs-
 7

 8    CORRECT SOLUTIONS, LLC, a/k/a
      CORRECT SOLUTIONS GROUP, LLC,
 9
              Defendant.
10    _____/

11
                              -  -  -
12

13
                  HEARING BEFORE THE HONORABLE REX BARBAS
14                      PAGES 192 THROUGH 300

15
                    Friday, December 27, 2019
16                   9:50  a.m. - 12:15  p.m.

17

18
                  HILLSBOROUGH COUNTY COURTHOUSE
19                   800 East Twiggs Street
                        Tampa, Florida
20

21

22

23                Stenographically Reported By:
                    Juli Bronkhorst, FPR
24

25
```

Page 193

```
 1              APPEARANCES:
 2
    On Behalf of the Plaintiff:
 3     BAJO, CUVA, COHEN & TURKEL, P.A.
       100 North Tampa Street
 4     Suite 190
       Tampa, FL 33602
 5     813-443-2199
       kturkel@bajocuva.com
 6     BY: KENNETH G. TURKEL, ESQUIRE
       BY: BRAD F. BARRIOS, ESQUIRE
 7
 8  On Behalf of the Defendant:
       HARLLEE & BALD, P.A.
 9     202 Old Main Street
       Bradenton, FL 34205
10     KAB@harlleebald.com
       BY: KIMBERLY A. BALD, ESQUIRE
11     BY: JAMES E. LYNCH, ESQUIRE
12
    Also Present:
13     John Logan
       Mark Turner (via telephone)
14
15
16
                                  -  -  -
17
18
19
20
21
22
23
24
25
```

Page 194

```
 1              PROCEEDINGS
 2                  -  -  -
 3       THE COURT:  Go ahead.
 4       MR. TURKEL:  Mr. Turner, this is Ken Turkel, can you
 5  hear me?
 6       MR. TURNER:  Yes, I can.
 7       MR. TURKEL:  All right.  Have we -- is he sworn?
 8       THE COURT:  I thought he was previously sworn.
 9       MR. TURKEL:  He's already sworn, right?
10       THE COURT:  Right, he's still sworn in.
11       MR. TURKEL:  Right.  All right, I'm going to try and
12  make this sort of as seamless as possible given that
13  you're not here.  But with respect to exhibits I just want
14  to direct you to one, maybe affirm for us that you're
15  there and that way, you know, we can make sure we're
16  looking at the same thing if I'm going to ask you
17  questions about a document, all right?
18       THE WITNESS:  Okay.
19       MR. TURKEL:  Do you have the exhibit binder that we
20  were using, our exhibit binder from the last hearing?
21       THE WITNESS:  Yes, the black binder.
22       MR. TURKEL:  Yes, sir, the exhibits.
23       THE WITNESS:  Yes.
24       MR. TURKEL:  All right, great.  I'm going to
25  generally go there.
```

Page 195

```
 1       THE COURT:  Is this the same?
 2       MR. TURKEL:  It's -- I handed you one.
 3       THE COURT:  This morning, it's this one.  Is it the
 4  same as the other day?
 5       MR. BARRIOS:  Yes, it is.
 6       THE COURT:  Why did you give me a second one?
 7       MR. BARRIOS:  I didn't know that you held on to one,
 8  Your Honor.
 9       MS. BALD:  That may be ours because we were missing
10  one.
11       THE COURT:  Here you go.  No, that's the one they
12  just gave me.
13       MS. BALD:  Okay.
14       MR. BARRIOS:  So that would be the same as the one I
15  just gave you earlier.
16       MS. BALD:  Okay.
17       THE COURT:  Okay, that's fine.
18       MR. TURKEL:  Did the ones, did we supplant the --
19  that one Exhibit, G or whatever?
20       MR. BARRIOS:  Yeah the G, I believe I e-mailed them
21  about it and they -- we haven't found --
22       MS. BALD:  Where it's been produced.
23       MR. BARRIOS:  Right.  We haven't found a version of
24  G with the correct attachments to it yet.
25       MR. TURKEL:  I just want to make sure whatever that
```

Page 196

```
 1  is -- whatever the Judge has is the same as we have.
 2       THE COURT:  Right, this is the one from the other
 3  day.
 4       MR. BARRIOS:  Yeah.  Actually Judge, we did make
 5  just a minor addition on a couple of the exhibits things
 6  that have not been referenced yet, so let me trade -- let
 7  me give you this one.
 8       THE COURT:  I marked this one.
 9       MR. BARRIOS:  Oh, okay.
10       THE COURT:  Remember I didn't have a clerk in here
11  so I'm the one marking everything.
12       MR. BARRIOS:  No problem it's just, I can tell you
13  what it is for the record real quick.
14       THE COURT:  Well you want to give them to me?
15  Because this is what's going to go to the clerk's office.
16       MR. BARRIOS:  Sure.  So --
17       THE COURT:  Along with this?
18       MR. BARRIOS:  This is a Exhibit A, we added an
19  additional page, the very first page.
20       THE COURT:  Is the amended complaint?
21       MR. TURKEL:  No that's --
22       THE COURT:  That's the other one.  All right, hold
23  on.
24       MR. TURKEL:  Yeah.
25       MR. BARRIOS:  Exhibit A should be the exhibit.
```

Page 197

1     THE COURT:  2371.
2     MS. BALD:  The first page states, but how do we know
3  that's what went with it.
4     MR. BARRIOS:  Well that's a reply to the same e-mail
5  you can see, those exhibits were created before there were
6  any Bates labelled versions.
7     THE COURT:  All right, A.
8     MR. BARRIOS:  So that goes right on top, on top of
9  Exhibit A, it's part of the same chain.
10    THE COURT:  All right.
11    MR. BARRIOS:  Exhibit P.
12    THE COURT:  All right.
13    MR. BARRIOS:  We have the same document with just
14 the Bates labeled version, we referenced this during
15 Mr. Logan's redirect the other day.  But it's the same
16 e-mail, just the Bates labeled version, it can be just
17 included together so they're both part of the same
18 exhibit.  And then I think that's it.
19    THE COURT:  Okay.
20    MR. BARRIOS:  Because G -- he's got original version
21 of G which that one has not been changed, one of the two
22 schedules.
23    MR. TURKEL:  Got it, okay.  All right.
24    THE COURT:  All right.
25    MR. TURKEL:  That's G, Brad?

Page 198

1     MR. BARRIOS:  Yeah, so your G is going to be a
2  different G, it still has the double schedules.
3     MR. TURKEL:  Okay, because nobody found --
4     MR. BARRIOS:  Right, the actual e-mail with the
5  attachment, so.
6     MR. TURKEL:  Okay. Everybody ready?
7     THE COURT:  Yes.
8                EXAMINATION
9  BY MR. TURKEL:
10    Q.  Mr. Turner, if you could I want you to turn to
11 Exhibit V, V as in victory, in the plaintiff's hearing binder
12 book.
13    A.  Okay.  I'm there.
14    Q.  All right.  Now what you should be looking at is the
15 October 4th, 2019 letter with a certified mail receipt on it
16 and a subject line that says, notice of non-renewal of Master
17 Services Agreement between Correct Solutions and Smart
18 Communications Holding, is that what you --
19    A.  Yes.
20    Q.  Okay.  Right now the reason why I'm referring you to
21 that is because it contains a copy of the Master Services
22 Agreement to which we've been referring, and I want to talk to
23 you about the agreement.  So if you go back two pages after
24 the letter, you see the Master Service Agreement there, right?
25    A.  Yes, I'm there.

Page 199

1     Q.  That Master Service Agreement is the contract
2  between Smart and Correct, is it not?
3     A.  Yes, it appears so.
4     Q.  If you look at page 6 on that you'll see the
5  signature lines there.  Can you turn to page 6?
6     A.  Okay.  I'm on page 6.
7     Q.  Right.  And as you see there Smart Communications
8  Holding is the provider, signed it on 8/31/17, right?
9     A.  Yes.
10    Q.  And Smart -- or I'm sorry, Correct Solutions LLC
11 signed it on September 13th, 2017, right?
12    A.  That's correct.
13    Q.  All right.  And then pursuant to the agreement
14 itself the effective date is the date on which the last
15 signature is made, right?
16    A.  Let's see.
17    Q.  Tell you what, turn to paragraph 6 of the agreement,
18 paragraph 6, it says term on page 2.
19    A.  Yes, that is correct.
20    Q.  All right.  Now, with respect to this -- in general
21 terms with respect to this Master Services Agreement, and you
22 used this Washington one as sort of an example; if you look
23 behind the actual 6 page agreement there are some attachments,
24 right?
25    A.  Okay.  Are we still in V as in victor, right?

Page 200

1     Q.  Yes, sir.
2     A.  Okay, yes.
3     Q.  All right.  So you see a schedule 1 that's attached
4  to the Master Services Agreement, right?
5     A.  Yes.
6     Q.  And that sets forth the services of products that
7  Smart was going provide for this specific county -- Washington
8  County, right?
9     A.  That's correct.
10    Q.  And then after that document, after that schedule
11 one you'll see a document that's titled Correctional
12 Communication Service Agreement; do you see that?
13    A.  Yes.
14    Q.  And that is Correct's contract with Washington
15 County, correct?
16    A.  That's correct.
17    Q.  Now, in general the way your contracts work is you
18 had this Master Service Agreement with Smart and then would
19 attach to it your specific product schedule and contract with
20 whatever facility that specific account was, right?
21    A.  Yes.
22    Q.  In other words you didn't redo the Master Service's
23 Agreement for each account, did you?
24    A.  No.
25    Q.  And the purpose of attaching your contract with the

Page 201

1  facility was so that the parties had a term that was defined
2  that they could reference for the purposes of the Master
3  Service's Agreement, correct?
4      A.   Yes.
5      Q.   If you look in paragraph 6 of the Master Services
6  Agreement on page 2 of that document --
7           THE COURT:  Where?
8           MR. TURKEL:  It's going be right there, behind that
9  page.
10 BY MR. TURKEL:
11     Q.   It provides this agreement shall commence on
12 effective date and shall be coterminous with customer's
13 agreement with facility as defined by facility addressed in
14 attached schedule, do you see that?
15     A.   Yes.
16     Q.   Now, we just discussed the fact that the way this
17 worked was you had this Master Service Agreement then you
18 attached the specific facility contracts, right?
19     A.   Correct.
20     Q.   And that's because the term may have changed from
21 facility to facility, isn't that right?
22     A.   Yes.
23     Q.   Is this -- paragraph 6 goes on it says, for purposes
24 of this agreement the effective date is defined as the last
25 date or date of the last signature on this agreement.  That's

Page 202

1  what you and I just discussed September what -- 13, 2017,
2  right?
3      A.   That's correct.
4      Q.   All right, and then this provision provides that
5  after the original term this agreement shall automatically
6  renew in accordance with the customer's agreement with
7  facility.  Customer is correct, is it not?
8      A.   Yes.  Are you saying that the word customer is
9  correct?
10     Q.   No, customer refers to Correct Solutions; doesn't
11 it?
12     A.   Yes, it does.
13     Q.   Because in your Master Services Agreement Smart's
14 referred to as the provider, isn't that right?
15     A.   Yes, that's correct.
16     Q.   All right.  And so this sentence we were reading to
17 go back to the beginning it says, after the original term this
18 agreement shall automatically renew in accordance with the
19 customer's agreement, meaning Correct's agreement with the
20 facility listed as attachment A; unless either party notifies
21 the other party with written notice of non-renewal at least
22 90 days prior to the expiration of the then current term,
23 right?
24     A.   Yes.
25     Q.   Now, the position you've taken and you testified to

Page 203

1  was that that means either Smart or Correct could send each
2  other a notice of non-renewal of the then current term, right?
3      A.   That's correct.
4      Q.   All right, and you and I can agree that the only
5  definition of a term in the Master Services Agreement is that
6  the agreement shall be coterminous with the customer's
7  agreement, right?
8      A.   Yes.
9      Q.   And the term that is set forth in the customer's
10 agreement is the term agreed upon between Correct and the
11 customer, right?
12     A.   Yes, that is -- that's correct.
13     Q.   So let's say Smart wanted to tell Washington County
14 that it was going to non renew it's services in Washington
15 County by sending Washington County a 90-day notice, does it
16 have a contractual right with Washington County to do that?
17     A.   No, it does not.
18     Q.   And basically Smart agrees that whatever you and
19 Washington County or any other client defined to be the term
20 is the term they're signing on for, right?
21     A.   Yes, they -- state that again, please.
22     Q.   Well, Smart -- I'll put it to you this way, Smart
23 basically agrees in paragraph 6 that this agreement, this MSA
24 is coterminous with customer's agreement with facility;
25 meaning it's going to terminate when provider's agreement with

Page 204

1  the facility terminates, right?
2      A.   Yes.
3           MR. BARRIOS:  You said provider's.
4           MR. TURKEL:  I mean provider -- I meant Correct's
5      agreement with the facility, right?
6           THE WITNESS:  Correct's agreement, yes.
7  BY MR. TURKEL:
8      Q.   And in that respect with respect to -- let's just
9  talk about Washington County, and we're going to dig into this
10 a little more later, but this letter that's in Exhibit B was
11 sent to inform Smart that you weren't renewing Smart with
12 respect to Washington county, right?
13     A.   Yes.
14     Q.   And with respect to Correct Solutions, Correct has
15 renewed its contract with Washington County, hasn't it?
16     A.   Yes, it automatically renewed.
17     Q.   Right.  Nobody sent each other a notice of 90 days
18 pursuant to your contract with Washington and said we're not
19 going to renew this contract, right?
20     A.   Correct.
21     Q.   You guys renewed, right?
22     A.   Yes, we did.
23     Q.   You're still in there, right?
24     A.   Yes, we are.
25     Q.   Business as usual.  Right?

Page 205

1    A.   Yes.
2    Q.   All right.  Now if you look at the back of Exhibit V
3    which is the last page of the facility agreement -- the
4    customer agreement.  Look at paragraph 14 of Correct's
5    agreement with Washington, do you see that?
6    A.   Yes, provider personnel?
7    Q.   Paragraph 14 of Correct's agreement with Washington
8    county says --
9    A.   Oh, sorry.
10   Q.   -- the term.
11   A.   Okay.
12   Q.   All right.  And the agreement between Correct and
13   Washington County provides that the term of this agreement
14   shall be for 12 calendar months starting when CSG, that's an
15   acronym for Correct, isn't it, CSG?
16   A.   Yes.
17   Q.   When CSG platform is installed and first call is
18   successful this agreement will automatically renew for 12
19   additional months, unless either party notifies the other in
20   writing of its intent to terminate this agreement at least
21   90 days prior to the final date of expiration, do you see
22   that?
23   A.   Yes, I do.
24   Q.   So as between you and Washington, either one of your
25   companies can provide a 90-day non-renewal notice to the

Page 206

1    other, right?
2    A.   Yes.
3    Q.   At any time before this litigation, and the letters
4    that you sent out including this letter V, Exhibit V and the
5    other non-renewal notices.  At any time prior to that did
6    Correct ever inform Smart as a matter of routine practice
7    annually, the dates of contracts that were coming up affirming
8    that they had been non renewed, or renewed, or provide any
9    information, let's say to Smart about what the status was of
10   renewals coming up to a renewal point with any of the clients?
11   A.   Not that I'm aware.
12   Q.   The contracts would just renew and you would keep
13   doing business, right?
14   A.   Yes.
15   Q.   Now the way that, if you look again at the Master
16   Services Agreement you have this paragraph 6 that relates to
17   term, we just discussed that in some detail.  Now I want you
18   to look at paragraph 9, it's on page 3 of Exhibit -- the
19   Master Services Agreement.  It's attached to the letter that's
20   Exhibit V, do you see that?
21   A.   All right.  I'm there.
22   Q.   And that provision is styled default and
23   termination, right?
24   A.   Yes.
25   Q.   And in that provision Correct and Smart agreed that

Page 207

1    if either party defaults in the performance of any obligation
2    under this agreement then the non-defaulting party must give
3    written notice to the defaulting party specifically describing
4    the nature of default, right?
5    A.   Yes.
6    Q.   The defaulting party shall have 30 days after
7    receipt of notice of default to cure, that's what it provides
8    next, right?
9    A.   Correct.
10   Q.   If it is not reasonable to cure the default within
11   30 days then the right to cure period shall be extended to a
12   reasonable cure period, as long as the defaulting party has
13   made good faith attempts to cure the default, do you see that?
14   A.   I see it.
15   Q.   All right.  And you would agree with me that both
16   how I read that and how this represents on exhibit B is what
17   you agreed to with Smart, right?
18   A.   Yes.
19   Q.   The last sentence of that paragraph provides that
20   the provider shall have the right to immediately terminate
21   this agreement if customer breeches the confidentiality or
22   non-disclosure provisions of this agreement, correct?
23   A.   Yes.
24   Q.   All right.  So the way it breaks down is, if there's
25   a breach of the contract the party that's not breaching has to

Page 208

1    send a 30-day notice and provide an opportunity to cure,
2    right?
3    A.   Yes.
4    Q.   If it's not reasonable to cure in 30 days this
5    agreement even provides that period shall be extended to a
6    reasonable period, right?
7    A.   Yes, it does.
8    Q.   Now you want -- is the customer -- let's not stick
9    with those definitions.  But as someone who has the contract
10   with the facility, you want Smart to be successful as the
11   provider of e-mail, messaging, video visitation, and the other
12   services or hardware that it provides for those services,
13   right?
14   A.   Yes.
15   Q.   I mean, you brought Smart on board to provide these
16   services to those facilities, didn't you?
17   A.   That's correct.
18   Q.   And in fact, I think that you testified at some
19   point that you actually used the provision of these various
20   services to market some of these clients for renewals,
21   extensions, or whatever, didn't you?  And if I got that wrong
22   -- my memory lapses, but I thought you said that.
23        MS. BALD: Object to the form.
24        THE COURT:  I'll allow.
25   BY MR. TURKEL:

Page 209

1    Q.   Is that true?
2    A.   Yes, I said sometimes that we use those services for
3    the stickiness in an account.
4    Q.   What was that word?
5         THE COURT:  I didn't get the word either.
6         MR. TURKEL:  Stickiness?
7         THE WITNESS:  Stickiness, the ability to stay within
8    the account.
9         THE COURT:  Oh, okay.
10        MR. TURKEL:  Was it stickiness?
11        THE COURT:  Yeah, stickiness.  Court Reporter, is
12   that a word?
13        THE COURT REPORTER:  I think so.
14        THE WITNESS:  It's a marketing term.
15        THE COURT:  Okay.
16   BY MR. TURKEL:
17   Q.   I got it, all right.  And so to the extent there's
18   been defaults for notice for performance reasons.  Wouldn't it
19   be in Correct's best interest to do everything it could to
20   help Smart cure those defaults to service your customers?
21   A.   Say that once again, it would be?
22   Q.   In Correct's best interest to help Smart cure the
23   defaults to service the customers, right?
24   A.   Yes.
25   Q.   You want your customers happy, right?

Page 210

1    A.   That's correct.
2    Q.   And if Smart's done something that can be cured you
3    want to do everything you can to help them cure it, right?
4    A.   Yes.
5    Q.   All right.  Now just for general purposes Mr. Turner
6    -- by the way I forgot, what's your title again in Correct?
7    A.   I really don't have a title per se, they just call
8    us the director of sales.
9    Q.   Okay.  Director of sales?
10   A.   Yes.
11   Q.   With respect to this paragraph 9, are you familiar
12   with the term termination without cause?
13   A.   Yes, I am.
14   Q.   All right.  This contract doesn't provide in
15   paragraph 9 either party the right to terminate this without
16   cause, other than for a breach of the confidentiality or non-
17   disclosure agreement, right?
18   A.   That's correct.
19   Q.   In other words, if there's a performance based
20   problem you've got to provide notice and opportunity to cure,
21   that's a contracted for right, isn't it?
22   A.   Yes.
23   Q.   Now in general, and we had talked about this a
24   little earlier, the other contracts were done the same way as
25   this Washington contract in the sense that you had the Master

Page 211

1    Service Agreement and then some attachments, right?
2    A.   Yes, they were.
3    Q.   Was Avoyelles, is it Avoyelles or Avoyes?  I don't
4    know if those L's are silent.  Avoyelles?
5    A.   Avoyelles.
6    Q.   All right.  I've been to a lot of Louisiana, I've
7    never settled right in between Shreveport and Ruston.  Isn't
8    that where it's at?
9    A.   It's a little south.
10   Q.   Right.  So was Avoyelles the first account that
11   Smart was brought into when you all started your relationship?
12   A.   If I recall, that's correct.
13   Q.   All right.  Turn to Exhibit 1 if you could.
14        MR. BARRIOS:  A.
15        MR. TURKEL:  A, I'm sorry.
16        THE COURT:  Isn't V in evidence?
17        MR. TURKEL:  V? It's already in I think, Judge.  If
18   not -- yeah that's it.
19        THE COURT:  Okay.
20   BY MR. TURKEL:
21   Q.   All right.  Are you in Exhibit A?
22   A.   Yes.
23   Q.   Now Exhibit A is an e-mail from you responding to an
24   e-mail from Rob Deglman, do you see that?
25   A.   Yes, I do.

Page 212

1    Q.   All right.  Is that your correct -- do you recognize
2    that e-mail?
3    A.   My e-mail?
4    Q.   Yeah, well either the one you received or the one
5    you responded.  It's Bates Number 20--
6    A.   Yes.
7    Q.   -- 2361 on the bottom corner?
8         MR. BARRIOS:  If it's not in his binder, he took the
9    old binder, then it's in his e-mail.
10        THE COURT:  Did you hear that?
11        THE WITNESS:  Yeah, mine doesn't have a number.  At
12   the top of the page it says checking in?
13        MR. TURKEL:  Yeah. Okay so Brad, my partner e-mailed
14   you your response to that e-mail.  So if you look at --
15        MR. BARRIOS:  It's the e-mail labelled Correct's
16   2371, if you can open that, please.
17        THE WITNESS:  2371, okay I have it.
18   BY MR. TURKEL:
19   Q.   All right.  And that e-mail address there, M Turner
20   Correct Solutions Group.com, that is your e-mail, right?
21   A.   Yes, it is.
22   Q.   All right.  Do you remember getting this e-mail from
23   Rob Deglman?
24   A.   Yes, I do.
25   Q.   All right.  And just for general sort of date

## Page 213

1  purposes, when we looked at the Master Services Agreement it
2  was signed by Smart on 8/31 and Correct on September 13th,
3  does that sound consistent to you?
4      A.   Yes, it does.
5      Q.   All right.  So we're a few weeks before that Master
6  Services Agreement is signed here, right?
7      A.   Right.
8      Q.   And he's -- Deglman is sending over to you a Master
9  Agreement between Smart and Correct, and the schedule of
10  services for Avoyelles Parish for you to incorporate into a CS
11  addendum, do you see that?
12     A.   Yes, I do.
13     Q.   Now you responded as follows, hi Rob I've completed
14  the CSG documents between us and accounting, CSG refers to
15  Correct, doesn't it?
16     A.   It does.
17     Q.   When we get the county to sign we will then complete
18  our agreement between CSG and Smart, and that particular
19  contract will be coterminous with the one CSG signed with the
20  county, all right.  Now that's consistent with the language
21  that's in paragraph 6 of the Master Services Agreement, right,
22  coterminous?
23     A.   Yes.
24     Q.   With respect to this particular e-mail, if you look
25  to the exhibits that were attached right, you see a schedule

## Page 214

1  one, right?
2      A.   Are we back in the A portion or is this something
3  that was sent as well?
4      Q.   We're back in the A portion, that's part of A.
5      Okay. All right.
6      Q.   So after the checking in page you'll see schedule
7  one, do you see that?
8      A.   Yes, I see it.
9      Q.   All right.  And that's a draft schedule one that
10  sets forth the products and services that Smart would be
11  providing to Avoyelles, right?
12     A.   Yes, it is.
13     Q.   All right.  And if you look behind it then you're
14  going to see a draft Master Services Agreement.
15     A.   Okay.  I'm there.
16     Q.   I want you to turn to page 2 of that agreement and
17  look at what the term is in that one, do you see paragraph 6?
18     A.   Yes, I do.
19     Q.   All right.  So the original draft agreement for
20  Avoyelles was commencing on the effective date and continuing
21  for a period of seven years from the date of the system going
22  live, do you see that?
23     A.   I do.
24     Q.   And after the original seven year term this
25  agreement shall automatically renew annually for additional

## Page 215

1  one year terms, unless either party notifies the other party
2  with written notice of non-renewal, do you see that?
3      A.   I do.
4      Q.   All right.  Now the way the contract for Avoyelles
5  was originally drafted, and this was the first Master Services
6  Agreement, wasn't it?
7      A.   Yes, it was.
8      Q.   Was it -- it was going to be a seven-year term as
9  between Smart and Correct, right?
10     A.   Yes.
11     Q.   It didn't have language in there saying it would be
12  coterminous with the facilities, did it?
13     A.   No, it did not.
14     Q.   You were going to have a seven-year deal with one
15  year renewals unless either Correct or Smart notified the
16  other, right?
17     A.   Yes.
18     Q.   You had a define term, didn't you?
19     A.   Yes, we did.
20     Q.   All right.  Now we can agree that this draft
21  Avoyelles, the draft Master Services Agreement there wasn't
22  the one that was ultimately signed, right?
23     A.   Yes.
24     Q.   All right.
25         MR. TURKEL:  Judge, can I offer Exhibit A?

## Page 216

1          THE COURT:  Any objection?
2          MS. BALD:  No, Your Honor.
3          THE COURT:  Be so received.
4  BY MR. TURKEL:
5      Q.   Now if you could flip to Exhibit B.  All right?
6      A.   Okay.  I'm there.
7      Q.   All right.  Now Exhibit B is an e-mail from you to
8  Rob Deglman on August 17th, 2017, right?
9      A.   Yes, it is.
10     Q.   All right.  And if you look back, this thing's kind
11  of spaced in a peculiar way like it's not -- a short e-mail
12  that's spread out over three pages for -- printing I guess did
13  it.  If you look at page 2 it -- the language -- well, I
14  guess, at the bottom of page 1 you see Deglman is e-mailing
15  you at 8 p.m. roughly on August 15th and you see the word
16  market on the bottom of page 1.  And then at the top of
17  page 2, can you send me what contract documents you have sent
18  to Avoyelles, Louisiana and Lamar, Mississippi for signature
19  that include our services, right?
20     A.   Yes.
21     Q.   And if you go back to page 1 you responded the next
22  morning at 9 a.m., when we get the signed ones back I will
23  forward.  These guys can take some time to get things signed
24  even though they give the thumbs up, sending anything other
25  than the completed agreement would be premature as you know

Page 217

1  how things can change.  And then you state, our agreement with
2  the account will include as an addendum to our agreement with
3  Smart since it will be referenced for term and deliverables,
4  right?
5     A.   Yes.
6     Q.   All right.  Now, when you say your agreement with
7  Smart you're referring to the MSA right, or what would become
8  the MSA, aren't you?
9     A.   The MSA and schedules.
10    Q.   Right.  And the schedules addendum -- attachments,
11 whatever you want to call them, were going to be referenced
12 for terms and deliverables, right?
13    A.   Yes.
14    Q.   And when you say deliverables that would be like
15 schedule one that kind of discusses what Smart has to provide,
16 the hardware, the software, the services, et cetera, right?
17    A.   Yes.
18    Q.   That's what is deliverable is, right?
19    A.   Yes.
20    Q.   Okay.
21        MR. TURKEL:  Judge, I'm offering Exhibit B at this
22 time.
23        THE COURT:  Any objection?
24        MS. BALD:  No problem Your Honor, it's already in as
25 Exhibit 18 of the Defendant's.  It's the same document.

Page 218

1        THE COURT:  Okay.
2
3  BY MR. TURKEL:
4     Q.   Now Mr. Turner, if you could turn to Exhibit C.
5     A.   Okay.  I'm there.
6     Q.   All right. Now this is actually an e-mail from you
7  to Mr. Deglman attaching CSG's current agreement where you
8  will find the term with Avoyelles, right?
9     A.   Yes.
10    Q.   CSG's First Amendment which inserts your products
11 with Avoyelles, right?
12    A.   Yes.
13    Q.   CSG and Smart Master Agreement for this project,
14 right?
15    A.   That's correct.
16    Q.   And CSG and Smart Schedule of Services, correct?
17    A.   Yes.
18    Q.   All right.  Now you attached all those to this
19 e-mail, did you not?
20    A.   I believe so.
21    Q.   And as you had just discussed with me earlier,
22 between the Master Services Agreement and the attachments you
23 had a group of contracts for each facility that would define
24 the deliverables, the term, and your broader agreement with
25 Smart; is that right?

Page 219

1     A.   Yes.
2     Q.   All right.  Now in your e-mail again for the second
3  time, you reference the fact that CSG's current agreement with
4  Avoyelles is where Smart can find the term, right?
5     A.   That's correct.
6     Q.   And that's the term agreed upon between Avoyelles
7  and Correct, right?
8     A.   Yes.
9     Q.   All right.
10        MR. TURKEL:  Exhibit C Judge, the best I can tell is
11 in evidence already.
12        THE COURT:  It is.
13        MR. TURKEL:  Yeah. I've got the yes on my chart
14 so...
15 BY MR. TURKEL:
16    Q.   Now, if you could Mr. Turner, turn to Exhibit D.
17 Let me ask you this --
18    A.   I'm here.
19    Q.   With Avoyelles, were you already servicing Avoyelles
20 when Smart came on to provide the services it provides?
21    A.   Yes, we were.
22    Q.   Did Smart pick up that job kind of midterm?
23    A.   Yes, they would have.
24    Q.   All right.  With respect to Sebastian County
25 discussed on expect D, was that the same or was that a new

Page 220

1  contract?
2     A.   That was a new contract.
3     Q.   All right.  And so on August 30th at 10:40 a.m. you
4  e-mailed Rob Deglman and tell him here's the information we
5  need to move forward with Sebastian County, AR; same process
6  as last time with the exception of we don't have to do the MSA
7  again, right?
8     A.   Yes, that's right.
9     Q.   And the way it was going to work for Sebastian
10 County was you would use the same MSA that you had signed for
11 the Avoyelles deal, right?
12    A.   Yes.
13    Q.   And then attach all these different schedules, your
14 facility contract and so forth, to define the term, the
15 deliverables, et cetera; is that right?
16    A.   Yes, it is.
17    Q.   All right.
18        MR. TURKEL:  Now Judge, I've got Exhibit D showing
19 as admitted also, so if that's consistent with everybody I
20 don't need to offer it again.
21 BY MR. TURKEL:
22    Q.   Now take a look at Exhibit E, if you could.
23    A.   You said E, as in echo?
24    Q.   E, as in echo.
25    A.   Okay.

Page 221

1    Q.    Now, this is an e-mail at the top of the thread from
2  you to Rob Deglman on August 30th at 2:24 p.m., responding to
3  a question that he had asked.  If you see where the threads
4  starts on page 2 Deglman had e-mailed you, is there a reason
5  you are not simply copying and pasting all the language from
6  our schedule of services into the addendum having the client
7  sign.  Now, when he says addendum you're having the client
8  sign, did you know what he was referring to?
9    A.    Would be the part of our contract where we add the
10  addendum to our contract between CSG and the account, so it
11  would be our addendum between us two.
12    Q.    And what was the purpose of the addendum?
13    A.    To describe what we would do with product, I
14  believe.
15    Q.    So you would do --
16    A.    I don't have it if front of me.
17    Q.    All right.  I think we'll have one that -- there
18  should be an exemplary one of those addendums somewhere in
19  here that we can look at.
20    A.    Okay.
21    Q.    In answering Mr. Deglman's question you responded,
22  in the future we will do this for everything we already had in
23  process and depending on how much the sheriff wanted to see,
24  in the case of Avoyelles wanted a one page don't raise
25  awareness type thing, we're doing it this way.  For future

Page 222

1  contracts that start from the beginning we will place it in
2  our document, but it will still have to be in the document
3  between our two companies which creates the tie-in; right?
4    A.    Yes.
5    Q.    Now, to define with a little more precision some of
6  those pronouns and less than define terms here, in the future
7  we will do this, this meaning we will put the scheduled into a
8  addendum and amendment that will be part of the customer
9  contract; is that was you mean there?
10    A.    No, I meant we would -- he's wanting, I believe he
11  was asking to copy the entire schedule into our addendum.
12    Q.    Right.
13    A.    What I meant was we would take and we would place
14  all of those individual pieces within the addendum.
15    Q.    Right.
16    A.    All of the services we would be offering.
17    Q.    Got it. So what you're saying is, in the future we
18  will do this, this being for everything we had in process.
19  And depending on how much the sheriff wanted to see, we are
20  doing it this way; which is this addendum, right?
21    A.    Yes.
22    Q.    And that's for contracts you had in process, right?
23    A.    Yeah, all of our existing.
24    Q.    Got it.  And then for the ones that start from the
25  beginning you'll place it in our document, our document

Page 223

1  meaning what, the amendment or the MSA?
2    A.    Yes -- no, it would be the agreement, the 20 Correct
3  solution, and customer.
4    Q.    Right.  But it will still have to be in the contract
5  between our two companies, meaning the MSA, right?
6    A.    Yes, the schedule.
7    Q.    Right.  It's attached --
8    A.    To the MSA, yes.
9    Q.    Right.  And that creates the tie-in, to use your
10  words, right?
11    A.    Yes.
12    Q.    All right.
13        MR. TURKEL:  And what is that?  Judge, at this time
14  we'd offer E.
15        THE COURT:  Any objection?
16        MS. BALD:  No objection.
17        THE COURT:  So as admitted.
18  BY MR. TURKEL:
19    Q.    All right.  Now I want you to turn -- we're taking
20  kind of a big jump here, and I want you to go to Exhibit GG,
21  way in the back.
22    A.    Okay, I'm there.
23    Q.    That's an e-mail from you to Rick Ferguson October
24  2nd, of 2018; do you see that?
25    A.    Yes, I do.

Page 224

1    Q.    And you're responding to an e-mail that he forwarded
2  you, correct?
3    A.    Yes, I am.
4    Q.    The e-mail that Mr. Ferguson forwarded you was an
5  e-mail from Saint Louis to Vision of Corrections expressing
6  some issues they were having with tablets, right?
7    A.    Yes, it does.
8    Q.    And this is October of 2018, right; this is over a
9  year ago, correct?
10    A.    That's correct.
11    Q.    All right.  Now, at that point in time there's an
12  agreement in place between Correct and Saint Louis, pursuant
13  to which you've agreed that Smart will be providing their
14  standard battery of services and hardware to Saint Louis as
15  part of Correct's contract, right?
16    A.    Yes.
17    Q.    Your response to Mr. Ferguson was, sounds like we
18  need to get TF ready on the sidelines; right?
19    A.    Yes, it was.
20    Q.    TF stands for Tech Friends, right?
21    A.    That's correct.
22    Q.    You would agree with me the Master Services
23  Agreement provides Smart the exclusive right to provide
24  tablets, video visitation, e-mail messaging, mail scanning, et
25  cetera, would you not?

Page 225

1    A.   That's correct.
2    Q.   Now what, in October of '18 did you already have a
3  contractural relationship to Correct -- strike that.  Did
4  Correct already have a contractural relationship with Tech
5  Friends?
6    A.   No, we did not.
7    Q.   How did you know them?
8    A.   They had been to Correct Solutions even prior to me
9  joining the company.
10       THE COURT:  Say that again, I'm sorry.
11       THE WITNESS:  They had been to Correct Solutions and
12       presented to them prior to me joining the company.  They
13       had been there in like 2013, and do know them from all of
14       the trade shows.
15  BY MR. TURKEL:
16    Q.   Had you ever done business with them?
17    A.   No.
18    Q.   Had they been soliciting your business to include
19  them as a provider of tablets and related services in your
20  facility contracts?
21    A.   I would say not since I was there, I had only met
22  them at trade shows.  Prior to me coming there they were
23  actively soliciting the business.
24    Q.   And with respect to this specific e-mail regarding
25  Saint Louis, was a notice to cure ever sent to Smart regarding

Page 226

1  the -- a list of issues that Saint Louis expressed to
2  Mr. Ferguson?
3    A.   No, it was not.
4    Q.   You see on this that Smart was actually copied on
5  the e-mail, right?  From --
6    A.   Yes.
7    Q.   Okay.  And so whatever these issues were didn't rise
8  to a level where Correct sent a notice to cure claiming there
9  was a default in the contract, right?
10    A.   That's right.
11    Q.   As far as you know these issues were cured, were
12  they not?
13    A.   I don't believe they were.
14    Q.   Did you ever -- as we sit here in court today has
15  Correct ever sent Smart a notice to cure the defaults
16  regarding Saint Louis, the specific defaults that were set
17  forth in this October 2nd, 2018 e-mail?
18    A.   Not that I'm aware of.
19    Q.   All right.
20       MR. TURKEL:  Judge, I'm going to offer Exhibit G.
21       THE COURT:  Any objection?
22       MS. BALD:  No.
23       THE COURT:  Be so received.
24       MR. TURKEL:  All right.  Now, I want you to flip
25       back to Exhibit H.

Page 227

1       THE COURT:  Hold on, I'm just making notes.
2       THE WITNESS:  Okay.
3       THE COURT:  Hold on.
4       MR. TURKEL:  The Judge is --
5       THE COURT:  I'm just writing my notes.
6       THE WITNESS:  I'm sorry.
7       MS. BALD:  So what exhibit are we on?
8       THE COURT:  Okay.  Go ahead.
9  BY MR. TURKEL:
10    Q.   All right.  Exhibit H is an e-mail -- that starts
11  with the e-mail from Wdumas@CO.Sebastian.AR.US to Rick
12  Ferguson, do you see that?
13    A.   Yes, I do.
14    Q.   All right.  And who is Dumas, is that Captain Dumas?
15    A.   Yes.
16    Q.   I don't think you were here at the September 20th
17  hearing, but were you aware of the fact that he came to court
18  that day in this proceeding?
19    A.   Yes, I was.
20    Q.   All right.  Now, he references to Mr. Ferguson,
21  thank you for dinner and lunch last week, I spoke with the
22  sheriff and I have permission to move forward with the
23  tablets.  Now, during the week prior to April 1st, 2019 did
24  you attend any lunch or dinner with Captain Dumas or Rick
25  Ferguson?

Page 228

1    A.   No, I did not.
2    Q.   Were you aware that Rick Ferguson was going to lunch
3  with Captain Dumas, or dinner with Captain Dumas?
4    A.   I can't say that I recall, but it's not surprising.
5    Q.   Why isn't it surprising?
6    A.   That's part of his job, to take clients to dinner
7  and lunch.
8    Q.   And with respect to this statement that Dumas makes
9  to Ferguson that gets forwarded to you, he says I spoke with
10  the sheriff and I have permission to move forward with the
11  tablet, do you know what he's referring to there?
12    A.   I can speculate what he's referring to.
13    Q.   Well, I mean --
14    A.   I wasn't there.
15    Q.   Well, did you know what him and Ferguson were going
16  to be talking about at lunch and dinner?
17    A.   No.
18    Q.   Were they talking about replacing Smart with Tech
19  Friends?
20    A.   I don't know.
21    Q.   Was Tech Friends at the lunch and dinner with them?
22    A.   I don't know.
23    Q.   Well when this gets forwarded to you, right,
24  Ferguson's forwarding it to you because it tells Ferguson and
25  Correct that Dumas has permission to move forward with the

Page 229

1    tablets, right?
2        A.   Yes.
3        Q.   And it says, at your convenience we can start the
4    process, right?
5        A.   Yes.
6        Q.   And your response to Ferguson is, we have to get
7    Smart out first though, don't we?
8        A.   Yes.
9        Q.   And when you responded to that and you responded by
10   saying we have to get Smart out first, you knew who you'd be
11   replacing smart with, right?
12       A.   Yes.
13       Q.   And that was Tech Friends, wasn't it?
14       A.   Correct.
15       Q.   And in that regard, when you sent this to
16   Mr. Ferguson you're under contract still under the Master
17   Services Agreement for Sebastian County with Smart, are you
18   not?
19       A.   Yes, we are.
20       Q.   And as of April 1, 2019 you hadn't sent Smart any
21   notice of default with respect to Sebastian County, right?
22       A.   No, we have not.
23       Q.   And as of April 1st, 2019 you hadn't sent one of
24   these notices of non-renewal, had you?
25       A.   No.

Page 230

1        Q.   And I'm not conceding that those notices were
2    non-renewal or of any meaning.  Whether we agree with that
3    process or not, you hadn't sent one to Smart with respect to
4    Sebastian County on April 1st, 2019, had you?
5        A.   No, I had not.
6        Q.   All right.  So to the extent that there were
7    performance issues that would have been subject to Smart's
8    contracted for -- bargained for right to cure, they had not
9    been put on notice of that by April 1st, 2019, had they?
10       A.   No.
11       Q.   All right.  But in that respect, the decision's been
12   made and Tech Friends is going to come in and you have to get
13   Smart out, right?
14       A.   No, the decision was not made.
15       Q.   It wasn't?
16       A.   No.
17       Q.   Well, we'll look at it a little later.  But you
18   sign a contract with Tech Friends that's effective as of
19   June 1st, 2019?
20       A.   Yes, we did.
21       Q.   When did you start negotiating that contract with
22   Tech Friends, when did the dialogue start?
23       A.   Probably -- I don't recall, but it would have to be
24   in the month and a half before.
25       Q.   May?

Page 231

1        A.   Yes, could possibly be in May.
2        Q.   All right.  But, but --
3             THE COURT:  Wait, when was the contract signed with
4    Tech Friends?
5             MR. BARRIOS:  Signed, July 10th.  But it has an
6    effective date, June 1.
7             THE COURT:  I remember it coming up earlier.
8    July 10.
9             MR. TURKEL:  The effective date's June 10, it was in
10   the -- well get it.
11            THE COURT:  We've talked about it before I just
12   wanted to...
13   BY MR. TURKEL:
14       Q.   To the extent that Dumas is informing Ferguson who
15   informed you that they have the permission to move forward
16   with the tablets, a specific proposal was made to Dumas, was
17   it not?
18       A.   I believe Tech Friends -- Rick got Tech Friends to
19   go in and do a presentation for Dumas, yes.
20       Q.   While you were under contract with Smart, right?
21       A.   Yes.
22       Q.   All right.
23            MR. TURKEL:  Judge, we'd offer Exhibit H.
24            MS. BALD:  No objection.
25            THE COURT:  Be so received.

Page 232

1    BY MR. TURKEL:
2        Q.   I want you to turn to Exhibit J, all right.  If we
3    go back to Exhibit -- the one we were just talking about,
4    those were on April 1st.  Exhibit J is another series of
5    e-mails that are forwarded to you by Ferguson and if you go to
6    the second page of it, the one that's got a Bates number 406
7    on the bottom right.
8        A.   Okay.
9        Q.   This thread starts on April 22nd, right?
10       A.   Yes.
11       Q.   And that's an e-mail from Ferguson to Dumas where
12   Ferguson is soliciting Dumas to forward him bullets on Smart
13   issues; non-functioning applications that were promised and
14   anything else you need to add, telling him he appreciates him
15   very much, right?
16       A.   Yes.
17       Q.   All right.  Now organically without being asked by
18   Rick Ferguson, between April 1st and April 22nd had Dumas sent
19   any e-mails to you setting forth bullet points of issues that
20   Sebastian County was having with Smart?
21       A.   Not that I'm aware of, not to me, no.
22       Q.   All right.  So then Ferguson on April 22nd asks him
23   to send him issues he's having and gets this response at
24   12:46 p.m. from Dumas telling him; never put books or games,
25   still waiting on the important update, the last update we had

Page 233

1  to ship over a hundred tablets back, anything we'd ever
2  request it could not be done, any time there was an issue they
3  didn't send someone to fix it they would instruct us to, if
4  you need more I'm sure I can think of it -- or we can think of
5  it.  Do you see that?
6      A.   Yes, I do.
7      Q.   All right.  As of April 22nd had Correct ever sent a
8  notice of cure with respect to the list that Dumas was putting
9  on his e-mail at 12:46?
10     A.   No, we did not.
11     Q.   All right.  So we see this e-mail, right?  And then
12 if you look at the first page of this, at or around the same
13 time he sends what appears to be another e-mail if you look --
14 one second, if you look at the second page, the 12:46 p.m.
15 April 22nd Dumas to Ferguson e-mail was forward to you, right?
16     A.   Yes, it was.
17     Q.   And what did you do, did you talk to Ferguson about
18 it?
19     A.   I don't recall, but surely I must have.
20     Q.   Did somebody tell Dumas that he needed to rewrite
21 his bullet points with more specifics?
22     A.   Not that I'm aware of.
23     Q.   Look at the first page of Exhibit J right, that
24 e-mail.
25     A.   631?

Page 234

1      Q.   Yes, yes, sir.
2      A.   Okay.  All right, I'm there.
3      Q.   So we see Dumas e-mailing Ferguson literally within
4  a minute of the e-mail on second page, this time setting forth
5  these same kind of complaints with a little different format
6  and you know, what appears to be some more specificity, right?
7      A.   Yes, looks like it.
8      Q.   That's forwarded to you from Ferguson who tells you,
9  hey Mark, please draft a 30-day cure letter to Smart regarding
10 an extreme poor performance at Sebastian County, AR and
11 failure to meet expectations or however you want to put it.
12 Their last comment to me on this matter was we want them out,
13 right.  Do you see that?
14     A.   Yes.
15     Q.   All right.  Now, do you know whether before Ferguson
16 sends this e-mail asking Dumas to forward him bullets on Smart
17 issues, Sebastian had said any of these things?
18     A.   I'm sorry, would you repeat the question?
19     Q.   I'll put it to you this way, do you have one e-mail
20 from Sebastian County saying any of this before Ferguson tells
21 them to send it?
22          MS. BALD:   Object to the form.
23          THE COURT:   What's the objection, the legal
24 objection?
25          MS. BALD:   Improper predicate, it's also

Page 235

1  speculative.
2          THE COURT:   Not the way he asked it, overruled.  Did
3  you understand the question?
4          THE WITNESS:   Yes, did Sebastian -- let me see if I
5  understand it.  Did Sebastian tell me verbally, any of
6  these things prior to this e-mail.
7          THE COURT:   No, it was a little bit broader than
8  that.  Did you have any communication from Ferguson
9  regarding any of these bullet points, prior to these
10 e-mails?
11         THE WITNESS:   I'm sure we had talked on the phone
12 about it, but nothing more than what you see here.
13 BY MR. TURKEL:
14     Q.   All right.  Now it's May 17th, so about what 8 --
15 3 weeks later when this e-mail --
16         THE COURT:   First of all before you keep going, is
17 Exhibit J in?
18         MR. BARRIOS:   Not yet.
19         MR. TURKEL:   I'd offer it at this time, Judge.
20         THE COURT:   Any objection?
21         MS. BALD:   No, Your Honor.
22         THE COURT:   All right.  I just wanted to do that
23 before I turned the page.
24 BY MR. TURKEL:
25     Q.   So if you look at page 1 of Exhibit J up at the top,

Page 236

1  Turner -- I mean, Ferguson forwarded you this e-mail on
2  May 17th, 3 weeks after he gets what appears to be this
3  revised version from Dumas on April 22nd, right?
4      A.   Yes.
5      Q.   So for 3 weeks he waits and then sends you an e-mail
6  telling you to draft a 30-day cure letter, right?
7      A.   Yes.
8      Q.   You didn't draft that letter in May, did you?
9      A.   No, I did not.
10     Q.   Or June, right?
11     A.   No.
12     Q.   Or July, right?
13     A.   No.
14     Q.   Or August, right?
15     A.   Not that I'm aware of, I don't know what date we
16 actually sent it.
17     Q.   You sent it on September 13th, isn't that right?
18     A.   I believe, is it in here for reference?
19     Q.   Yeah, absolutely.
20         THE COURT:   You want to refer it to him?
21         MR. TURKEL:   Yeah.  Look at Exhibit U.
22         THE WITNESS:   Yes, September 13th.
23 BY MR. TURKEL:
24     Q.   All right.  Now presumably what you're being told in
25 April is that your customer is having these terrible problems,

Page 237

1   right?
2        A.   Yes.
3        Q.   And the mechanism you agreed to with Smart when a
4   customer was having terrible problems with their performance
5   was that you would tell them so they had 30 days to fix it,
6   right?
7        A.   Yes.
8        Q.   But you all let these terrible problems exist for
9   what; April, May, June, July, August.  For almost five more
10  months before you decided to tell Smart about these problems,
11  right?
12       A.   I don't know that I'd phrase it like that, Smart was
13  aware of them.
14       Q.   Well they've been aware of them, but when they arose
15  to the level that you would consider contractural breach your
16  job is to give them 30 days to cure that breach, right --
17            MS. BALD:  I'm actually --
18            THE WITNESS:  Yes.
19            MS. BALD:  I'm going to object to -- we're talking
20       about non-renewal and this whole line of questioning has
21       been on breach, notice to cure --
22            THE COURT:  There are two issues here, if I'm
23       correct.  One is, they're alleging -- you're alleging that
24       there's a termination, then the 90 days asking for
25       termination.   There's a second where you're alleging that

Page 238

1   they actually breached the contract because they had not
2   cured the defects that they were supposed to be curing.
3        MS. BALD:  But I don't think for today's hearing
4   that -- the notice to cure and the termination of the
5   contract was the subject of the hearing we had before,
6   Your Honor, in Sebastian County.  Termination was not
7   before today.
8            THE COURT:  I thought it was because I've been --
9       that's why I knew what the issues were.
10           MS. BALD:  Because that was terminated in the
11      contract while it's still in effect.  What they're trying
12      to prevent is a non-renewal when the contract renews, not
13      termination.  It has nothing to do with termination and
14      they've gone down this whole line, basically relitigating
15      to the Sebastian County notice to cure --
16           THE COURT:  Let's assume for a moment I rule in
17      their favor regarding their interpretation of the 90-day
18      termination, assuming that, all right; does that end the
19      hearing or are you saying they can still terminate?
20           MS. BALD:  I don't think anyone here is --
21      termination of the contract has never been pursued,
22      there's no -- the termination -- the only Notice of
23      Termination of the contract that has been filed by any
24      party in this case was the notice that we sent in the
25      summer, that started this lawsuit.  There's one that is a

Page 239

1   July 2019 Notice of Termination based upon their discloser
2   of information that Correct Solution has served was
3   subject to the non-disclosure agreement.  So that's what
4   started this lawsuit, that's the only notice of
5   termination that's ever been sent by any party.  So going
6   down this termination and notice to cure and all of that
7   has nothing to do with today's hearing.  This is purely
8   whether the paragraph 6, not paragraph 9 but paragraph 6,
9   dealing with non-renewal gives either Smart or Correct
10  Solutions --
11           THE COURT:  Yeah but you just gave us cause.  A
12      moment ago you just argued cause.
13           MS. BALD:  I don't think we've ever argued cause, I
14      think they're trying to argue cause.  I don't think cause
15      has anything to do with how you rule.
16           THE COURT:  Well no you said, cause would be
17      disclosure to non -- a disclosure of information, that's
18      cause.
19           MS. BALD:  That's correct, and that's what started
20      this whole lawsuit.  That's the subject of the Stay Order,
21      we all agreed we would not pursue termination based upon
22      that notice.  So no one has pursued termination of the
23      contract based upon that notice.  So the next instant we
24      had was the notice to cure of Sebastian, which was the
25      hearing we had before, Your Honor.  And Your Honor ruled

Page 240

1   that before a termination could be pursued a motion needed
2   to be filed.
3            THE COURT:  Right.
4            MS. BALD:  No motion's been filed, so termination is
5       not an issue for today.  And I understand why they want to
6       go there, but termination is not an issue.  No one is
7       trying to terminate contracts.
8            THE COURT:  You are trying to terminate, you've been
9       using the 90-day clause.
10           MS. BALD:  It's just non-renew it, big difference.
11      Non-renewing and expires versus terminating while it's
12      still in force.
13           MR. TURKEL:  Without getting too deep into it you
14      know, at the end of the last hearing, that September 20th
15      hearing the Court -- I put on the outline from you, I'm
16      enjoying termination subject to my subsequent order of
17      hearing; if I find that it is a sham then there is another
18      problem.
19           We think this whole thing is a sham -- I mean and
20      hopefully we'll straighten it out, but we think from day
21      one everything they did was trying to reverse and engineer
22      a decision that they had made to play my client.  And
23      that's what the record's going to show; and that this
24      non-renewal isn't really a subject of contract
25      interpretation.  Although to the extent it is the parol

Page 241

1  evidence of what these guys intended, that coterminous to
2  mean we think is already pretty clear but I got to prove
3  it, substantial likelihood of success on there.
4       So part of proving that is to show that all of this
5  was just these guys checking box after box trying to
6  figure out how to get us out of it, and that none of it
7  was legit within the terms of the contract.  Whether you
8  want to call it renewal, or termination, a non-disclosure
9  agreement, or whatever, okay.  And because I have that
10 standard and because you have to rule on that standard, I
11 want my record to support that standard.  And this is all
12 fair game to both show how we got to this ridiculous
13 non-renewal letter that they sent, and what they tried to
14 do before it that led to it, okay; and completely relevant
15 to that.
16      I understand they withdrew their effort to terminate
17 for cause after it became obvious they'd have to go to
18 court to prove it, okay and that's where we left.  They
19 sent a letter and then it's, well you all can do this but
20 we're going to come to the Court, right; so you don't just
21 unilaterally do what you've been doing, and then they
22 abandon that.
23      And The next thing up is the series of non-renewals,
24 which in essence are just terminations without cause,
25 that's what they are.  They can call it what they want but

Page 242

1  it's relevant, it's all relevant.  It's very relevant for
2  that and I'd like to finish my cross, so.
3       Ms. BALD:  And Your Honor, I guess that's my concern
4  is what they're trying to do is paragraph 9, which is the
5  termination provision, the notice to cure, giving them the
6  opportunity to cure; and then if they don't cure then the
7  right to terminate.  We've not been able to move to
8  terminate because we're not sure what the procedure is;
9  because we talked about it but I think  we had conflicting
10 orders.  Correct Solutions has opted not to terminate, so
11 if they're trying to make that -- change the terms of
12 paragraph 6, which is what Your Honor has to construe and
13 is somehow having that there has to be cause to non-renew,
14 that's not even what they put in their motion for
15 injunction.  And that's very different than what we've --
16 what their motion said.  Their motion was --
17      THE COURT:  Let me go look at the motion.  Here it
18 is.
19      MR. TURKEL:  Judge, what are you looking for?
20      THE COURT:  Emergency motion.
21      MS. BALD:  I have a copy here.
22      THE COURT:  I've got it.  This is the one dated --
23 filed on December 4th?
24      MR. BARRIOS:  Yes.
25      THE COURT:  Okay.  I just wanted to make sure I was

Page 243

1  looking at the right one.
2       MR. TURKEL:  Judge.
3       THE COURT:  Yes?
4       MR. TURKEL:  If it helps to speed anything up, in
5  the emergency motion paragraph 25 we get into a pretty
6  detailed discussion of the very background that I'm going
7  through.
8       MS. BALD:  But if you look at paragraph 5 and 6 and
9  you look at what they've argued for what the contract
10 interpretation is, paragraphs 37 through 41, and that's
11 what their motion is that if the contract interpretation
12 does not allow Correct Solutions to exercise a non-renewal
13 of it's contract with it's facility automatically renews.
14 That's the position they took in this motion.
15      MR. TURKEL:  Judge, why did they fly this guy in on
16 their own dime to tell you that we weren't performing
17 under his contract, if that's what this is about why did
18 they pay for this guy to come, this third party witness?
19      THE COURT:  Okay, okay, hold on.  Arguing with each
20 other doesn't work, I'm sure you're not going to convince
21 him and he's not going to convince you.
22      However, based on the totality of the motion all
23 right, and at this -- and I sit as a court of equity, I
24 have to take into account he's saying your entire side of
25 this is a sham.  So I think I need to hear what he's

Page 244

1  claiming to be that portion of the sham, this is just
2  another -- basically what he's claiming is that your
3  actions are just to subterfuge to terminate the contract
4  that really doesn't exist.  So I think I have to give him
5  the leeway.  And the fact of the matter is, I think you
6  opened the door when you brought Mr. Turner in to talk
7  about the things that they had not performed under the
8  contract.  So I think for those reasons I want to overrule
9  the objection.
10      MR. TURKEL:  I think we're on K, can you take a look
11 at Exhibit K?
12      THE COURT:  Did Exhibit U come in?
13      MR. TURKEL:  I'm sorry, Judge.  What was U?
14      MR. BARRIOS:  Notice to cure.
15      MS. BALD:  Your Honor, that's already in evidence.
16 Oh, no it's not, I take it back.  We have no objection.
17      THE COURT:  Okay.  It will be so admitted.  All
18 right, now K?
19      MR. TURKEL:  Yeah, I want to move onto K.
20 BY MR. TURKEL:
21      Q.  Do you see Exhibit K, Mr. Turner?
22      A.  Yes.
23      Q.  All right.  So this is being forwarded to you to,
24 the e-mail exchange between Rick Ferguson and Allen Johnson;
25 right?

Page 245

1    A.   Yes.
2    Q.   Rick Allen Johnson is the guy -- was the captain at
3  Washington County?
4    A.   That's correct.
5    Q.   He's the guy that you all flew in to testify last
6  week?
7    A.   Yes.
8    Q.   Now, on May 17th, which was actually the same day
9  per Exhibit J that Ferguson forwarded you the revised list of
10 grievances from Dumas.  On that same day he sends an e-mail to
11 Allen Johnson saying, hey Allen I hope you made it back safe
12 yesterday afternoon.  Getting a lot of calls from my Smart
13 customers complaining about product service and overall
14 performance, to the point where I might be replacing them
15 soon.  I have not heard from you, but I wanted to follow-up
16 and see how you were being serviced.  Johnson responds and
17 says, made it home safe and really appreciate you.  Do you
18 know where they were on May 16th, 2019?
19   A.   Texas Sheriff's Association.
20   Q.   What's the reference to hobbling home, was there
21 drinking, is that what it is?
22        MS. BALD:  Object.
23        THE WITNESS:  No, Rick Ferguson had had some
24   problem, he was on crutches.
25        MR. TURKEL:  Got it.  I thought they may have been

Page 246

1    hunting or something, that's why I asked.
2         THE COURT:  All right.
3  BY MR. TURKEL:
4    Q.   But long/short of it is, he sends you this e-mail
5  where Johnson responds, made it home safe and really
6  appreciate you, Rick.  It's been one problem after another
7  since the beginning -- every since the beginning.  They are
8  always helpful on working the problems, but there is always
9  problems.
10        Now prior to this May 17th e-mail from Rick Ferguson
11   in which he solicits Johnson for complaints -- prior to this
12   May 17th e-mail from Ferguson to Johnson had you received any
13   e-mails from Ferguson forwarding e-mails from Johnson with
14   complaints about Smart?
15   A.   Not that I recall.  I won't say no without taking a
16   look at all my e-mails, but not that I recall.
17   Q.   And in fact Ferguson tells Johnson that he's getting
18   a lot of calls from Smart customers about product service and
19   overall performance, to the point where he may be replacing
20   them.  But he has not heard from you, meaning Johnson, right?
21   A.   Where are you reading that I have not heard from you
22   -- yes.  Meaning Johnson.
23   Q.   And so he sends us to Johnson and Johnson says, it's
24   been one problem after another since the beginning.  They're
25   always helpful on working on the problems but there is always

Page 247

1  problems, right?
2    A.   Yes.
3    Q.   And you get that e-mail from Ferguson who says, we
4  can discuss this weekend; right?
5    A.   Yes.
6    Q.   By the way, in Johnson's e-mail that was forwarded
7  to you, the one to Ferguson where he says they're always
8  helpful working on the problems but there is always problems;
9  he doesn't say anything about how it's taking them long times
10 to solve the problems, does he?
11   A.   No.
12        MR. TURKEL:  Judge, we'd offer K into evidence.
13        THE COURT:  Any objection?
14        MS. BALD:  No, Your Honor.
15        The COURT:  Be so received.
16 BY MR. TURKEL:
17   Q.   And we can agree that as of May 17th when this
18 e-mail is forwarded, notice of default had been sent to Smart
19 with respect to Washington County; right?
20   A.   No.
21   Q.   And in fact, as we sit here today the only notice of
22 default that's ever been sent based on a performance reason
23 was the Sebastian County one we discussed earlier, right?
24   A.   That's correct.
25        MS. BALD:  Object to the form.

Page 248

1         THE COURT:  I'm sorry?
2         MS. BALD:  Object to the reference of notice of
3    default.  That's what it was referred to.
4         MR. TURKEL:  Notice of cure, whatever.
5         THE COURT:  Notice of cure.
6  BY MR. TURKEL:
7    Q.   That's only one right?
8    A.   Correct.
9    Q.   All right.  Now, I want you to turn to Exhibit L.
10 This is an e-mail from you on Friday June 21st, 2019, at
11 4:45 p.m. to a whole bunch of people at Correct Solutions
12 regarding Smart Communications, right?
13   A.   Yes.
14   Q.   And actually if you go to the second page of Exhibit
15 L there's an e-mail from you on May 16th saying, I'm
16 collecting data on Smart Communications please respond with
17 the sites where we are engaged together, I could find them but
18 would have to look in every folder -- ever folder, I assume
19 that's a typo.
20   A.   Yes.
21   Q.   In this, right?
22   A.   Correct.
23   Q.   And that's like a day before you got those two
24 e-mails from Ferguson about Sebastian and Washington, right,
25 on May 17th?

Page 249

1    A.   Yes.
2    Q.   So on June 21st you send an e-mail to what I assume
3  is your team and say, anyone have a problem with pulling the
4  plug on all Smart devices on a set day?  We are proceeding
5  with the discontinuance of our MSA and subjective schedules as
6  a result of breach of contract with regard to our NDA.  Smart
7  reached out to the city of Saint Louis in an e-mail showing
8  where they are now in the phone business and are offering one
9  hundred percent commission, right?
10   A.   Yes.
11   Q.   You proceed to say, the NDA offers no cure period,
12  so I want to make the disconnect effective immediately; right?
13   A.   Yes.
14   Q.   And then you asked your team the question, what
15  negative ramifications do we expect?  Know that we have TF
16  lined up to come in, but it can't all happen at once; right?
17   A.   Yes.
18   Q.   And TF is Tech Friends, right?
19   A.   That's correct.
20   Q.   And when you talk about this -- this NDA breach,
21  this city of Saint Louis thing; I want you to look back at
22  Exhibit I.
23   A.   Okay.
24   Q.   And Exhibit I is an e-mail from Frank Turner to Rick
25  Ferguson and you, forwarding a communication between him and

Page 250

1  Jennifer Tongate who works for Smart; right?
2    A.   Yes.
3    Q.   And attached to that communication was this e-mail
4  that you guys ultimately claim somehow violated your
5  confidentiality NDA, right?
6    A.   Yes.
7    Q.   And that's what you're referring to in exhibit L
8  when you e-mail your team right, that Smart reached out to the
9  city of Saint Louis in a e-mail?
10   A.   Yes.
11   Q.   All right.
12        MR. TURKEL:  Judge, we'd offer Exhibit I.
13        THE COURT:  Any objection?
14        MS. BALD:  Other than Your Honor, relevancy to
15  non-renewal.
16        THE COURT:  I note the objection and I'll overrule
17  it.  Okay, L too.
18  BY MR. TURKEL:
19   Q.   Let me ask you this, when you got Exhibit I did you
20  actually read the e-mail exchange between Tom Gate and Turner?
21   A.   I believe when I got the -- I, I don't recall
22  whether I read it or not.
23   Q.   All right.  Now, that happens on April -- what,
24  April 10th is when it happens, but the e-mail's forwarded from
25  Saint Louis to you and Ferguson on August 29th, right?

Page 251

1    A.   That's correct.
2    Q.   Had you seen it before then?
3    A.   No, not that I recall.
4    Q.   All right.  None the less, on June 21st two months
5  before that, you're telling the team you're pulling the plug
6  based upon that e-mail; right?
7    A.   Just a minute.  I had not seen the e-mail.  We had
8  been told by Frank that it had happened, but we had not seen
9  the e-mail.
10        THE COURT:  Say that again?  I'm not following, I'm
11  sorry.
12        MR. TURKEL:  He said they had been told by Frank --
13        THE WITNESS:  We had been told by Frank that Smart
14  reached out to him with a hundred percent offer.
15        THE COURT:  Oh.
16  BY MR. TURKEL:
17   Q.   But you had not seen the e-mail, right?
18   A.   We had not seen the e-mail.
19   Q.   All right.  Did I offer -- I think I offered that.
20        THE COURT:  Yes, you did.
21        MR. TURKEL:  Okay.
22  BY MR. TURKEL:
23   Q.   Now we're back.  I want you to go back to Exhibit L
24  now.
25   A.   Okay.

Page 252

1    Q.   And Ferguson responds to your e-mail to the team by
2  saying, I'm all for terminating the agreement especially since
3  it was Saint Louis that they initially targeted.  However, I
4  believe a very strategic plan with Tech Friends is going to be
5  necessary due to implications it may cause with the customers.
6  And he ends that e-mail by saying, I feel we should have a
7  plan in place and brief the customer before the blade falls,
8  because when it does the only panic taking place should be in
9  Smart's conference room; right?
10   A.   Yes.
11   Q.   Did you go brief your customers and tell them about
12  the plan?
13   A.   No, I don't -- we did have some prior
14  demonstrations, but there was absolutely no plan.  That's why
15  I was reaching out in this e-mail, because we were under
16  contractual obligation, and we had to wait until our notice
17  that was served; because the NDA was filed to see if it was
18  going to work.  What I was trying to do was set up things --
19  if everything holds, and is true, and everything is canceled,
20  we have to be able to respond.
21   Q.   Got it.  And the question I asked was whether you
22  actually talked to your customers in any sort of systemic
23  way to discuss this change with them?
24   A.   I personally did not.
25   Q.   Do you know if Ferguson did?

Page 253

1    A.   I don't know for sure, I can only assume.
2    Q.   All right.
3         MR. TURKEL:  Judge, we'd offer Exhibit L.
4         THE COURT:  Any objection?
5         MS. BALD:  No, Your Honor.
6         THE COURT:  Be admitted.
7   BY MR. TURKEL:
8    Q.   If you look at Exhibit M it's the next one, this is
9   your -- an e-mail from Lee Aspinwall of Tech Friends to you on
10  July 10th, right?
11   A.   Yes.
12   Q.   And attached to it is the executed agreement between
13  Tech Friends and Correct Solutions, right?
14   A.   That's correct.
15   Q.   And at the time you signed this you're still under
16  an Exclusive Master Services Agreement with Smart, are you
17  not?
18   A.   Yes, but the fact that we had with them.
19   Q.   Right.  Eight sites, right?
20   A.   Yes.
21   Q.   And those eight sites -- just so we're clear, city
22  of Saint Louis, right?
23   A.   Yes.
24   Q.   Sebastian County, right?
25   A.   That's correct.

Page 254

1    Q.   Washington County, Arkansas, right?
2    A.   Yes.
3    Q.   Bowie County, Texas, right?
4    A.   Yes.
5    Q.   Wayne County, Georgia?
6    A.   Yes.
7    Q.   Avoyelles Paris, Louisiana?
8    A.   Yes.
9    Q.   Lamar County, Mississippi?
10   A.   That's correct.
11   Q.   And Moore County, Tennessee, right?
12   A.   Yes.
13   Q.   All right.  Now if you look at Exhibit B to this
14  agreement, which is Exhibit M to the binder.
15   A.   All right.  Okay.
16   Q.   Exhibit B describes legacy accounts, right?
17   A.   That's right.
18   Q.   And in the interest of time, we can agree that the
19  way you were paid under this contract was different between
20  contracts, which were defined as legacy accounts verses new
21  accounts; right?
22   A.   That's right.
23   Q.   New accounts you split the revenue 50/50, right?
24   A.   Yes.
25   Q.   The legacy accounts have a different formula that's

Page 255

1   set forth in the contract.  But you basically made less on
2   them, is that right?
3    A.   The legacy accounts -- if they were to go into a
4   legacy account they would bare the expense we would bare, I
5   believe -- if I recall correctly, the day the network pays
6   that we would have some extent, but not nearly as much if we
7   go into something new.
8    Q.   Right.  And they have -- with respect to the legacy
9   accounts, if you look at that Exhibit B Buoy County is on
10  there; right?
11   A.   Yes, it is.
12   Q.   That's a Smart account, is it not?
13   A.   Yes, it is.
14   Q.   Moore County is on there, is it not?
15   A.   Yes, it is.
16   Q.   That's a Smart account, right?
17   A.   Correct.
18   Q.   Sebastian County is on there, right?
19   A.   Yes, it is.
20   Q.   That's another Smart account, isn't it?
21   A.   It is.
22   Q.   And Saint Louis City Justice Center is on there too,
23  correct?
24   A.   Yes, it is.
25   Q.   And that's another Smart account, right?

Page 256

1    A.   Correct.
2    Q.   Did you tell Smart that you had entered into a
3   contract with one of its competitors, to service at least four
4   of the accounts that they were servicing?
5    A.   Say that again.
6    Q.   Did you tell Smart on or about July 10, 2019, when
7   you signed this contract with Tech Friends, that you had
8   entered into a contract with a competitor to provide the
9   services they were providing for at least four of the
10  facilities they were providing them at?
11   A.   Well, I didn't enter into a contract to provide for
12  those facilities.  I entered into a contract that should I
13  ever need to, that it would fall under a certain aspect of how
14  we handle the business.  But to date we don't have any Tech
15  Friend product in any of those accounts.
16   Q.   The e-mail you sent back on -- when is it, June 22nd
17  to your team; Exhibit L, right?
18   A.   Exhibit L, okay.
19   Q.   Yeah.  When Ferguson responded the entire premise of
20  his response was to have a plan in place to replace Smart when
21  you pulled them, right?
22   A.   Yes.
23   Q.   All right.  You were sued -- do you remember when
24  this lawsuit was filed?
25   A.   No, I don't.

Page 257

1    Q.   Do you recall when you sent --
2         MR. TURKEL:  Judge, let me go ahead and offer
3    Exhibit M; which is the Tech Friends contract.
4         MS. BALD:  I thought it was already in evidence.
5         MR. TURKEL:  It may be, I'm just --
6         MS. BALD:  No objection.
7         THE COURT:  Okay.  Be so received.
8    BY MR. TURKEL:
9    Q.   Now, the Tech Friends contract has an effective date
10   of what, June 1st, right; that's a define term?
11   A.   Yes.
12   Q.   All right.  Any reason why that date was picked?
13   A.   No, not that I recall.
14   Q.   This agreement was sent over to you on July 10th,
15   right?
16   A.   Yes.
17   Q.   If you look at Exhibit N, which is the termination
18   letter relating to this non-discloser issue, that's on
19   July 17th; right?
20   A.   Yes.
21   Q.   Seven days after you signed the Tech Friends
22   contract, right?
23   A.   Let me check the signatures.
24   Q.   I didn't see a date on the signature block, it's
25   just got an effective date defined.  I'm just assuming by

Page 258

1    July 10th if he's forwarding a fully executed -- if it's a
2    different day, let me know.
3    A.   Yeah, I don't know what day it was actually signed.
4    Q.   But we can agree you had a fully executed version by
5    July 10th, right?
6    A.   No, I don't know what date it was actually signed.
7    Q.   I understand that.  I'm saying that there's a
8    executed agreement, fully executed, being sent to you on
9    July 10th.  That's the cover sheet to Exhibit M.
10   A.   All right.  Yes, July 10th.
11   Q.   So we know it wasn't signed any later than
12   July 10th, right?
13   A.   Right.
14   Q.   All right.  So going back to N, this Roedell
15   Parsons, is that a law firm authorized to represent your
16   company?
17   A.   Yes, it is.
18   Q.   And you authorize them to send this letter trying to
19   terminate the Master Services Agreement based on the Saint
20   Louis e-mail, right?
21   A.   Terminate the NDA and MSA, yes.
22   Q.   And the --
23        MR. TURKEL:  Judge, will you go ahead and offer
24   Exhibit N?
25        THE COURT:  Any objection?

Page 259

1         MS. BALD:  I thought it was already in there.
2         THE COURT:  I'm sorry?
3         MS. BALD:  I thought it was already in there.
4         MR. TURKEL:  It may be.
5         THE COURT:  All right.
6    BY MR. TURKEL:
7    Q.   Ultimately you're aware that the parties entered
8    into a stipulation after this letter was sent, right?
9         THE COURT:  What parties?
10        MR. TURKEL:  The parties to this case, Smart and
11   Correct.
12        THE COURT:  Entered into a?
13        MR. TURKEL:  A stipulation.
14   BY MR. TURKEL:
15   Q.   Are you aware of that Mr. Turner?
16   A.   Yes, which stipulation are you referring to?
17   Q.   The stipulation was --
18   A.   Status quo?
19   Q.   Yeah, the -- we'll call it the status quo
20   stipulation, that's fine.
21   A.   Yes.
22   Q.   All right.  And you ultimately found out, did you
23   not, that Saint Louis wasn't specifically targeted, but this
24   had been a blast e-mail that was essentially sent to anyone
25   and everyone in Smart's system?

Page 260

1    A.   I believe that was on one of the responses from
2    Smart.
3    Q.   All right.
4    A.   I did not get sent that directly.
5    Q.   Understood.  So if you would look at Exhibit O, this
6    is a e-mail from Allen Johnson to Jennifer Tongate of Smart
7    that's ultimately forwarded to Rick Ferguson, and then to you
8    and Rick Pruitt; do you see that?
9    A.   Yes.
10   Q.   All right.  And were you aware of why Captain
11   Johnson was keeping you -- your company posted about what he
12   was sending to Smart?
13   A.   We had been receiving all these complaints, and yet
14   our customer had been contacting Smart directly with these
15   complaints.  So while we were hearing about them we had no way
16   to know exactly what was going on.  And I believe that's when
17   we began inserting ourselves into the communications channel,
18   so that we could be aware of what was happening.
19   Q.   Right.
20        MR. TURKEL:  Judge, we can go ahead and offer O.
21        MS. BALD:  No objection.
22        THE COURT:  Be so received.
23   BY MR. TURKEL:
24   Q.   And if you look at Exhibit P then, would that be why
25   Mr. Ferguson on August 15th, 2019 --

Page 261

1    THE COURT:  Be why, you said?  I'm sorry.

2    MR. TURKEL:  Y -- no, Exhibit P.  I'm sorry, Judge,

3    I was asking him why.

4    THE COURT:  Okay, sorry.

5    BY MR. TURKEL:

6    Q.   Would that be why Mr. Ferguson was sending out this

7    e-mail to a number of your customers instructing them on how

8    to report repairs, complaints, et cetera?

9    A.   Yes.

10   Q.   Did you tell Ferguson to do that?

11   A.   Yes.

12   Q.   At that point in time this lawsuit was already in

13   place, was it not?

14   A.   Let's see, yes.

15   Q.   So if you look at this e-mail, Exhibit P, there's

16   this initial page here that I think Captain Johnson may have

17   testified about.  But then there's a page behind it, I don't

18   know if you got that one.  That has a actual address of the

19   e-mail recipients, basically it was Dumas, A. Smith,

20   E. Smith, all of Sebastian County, Allen Johnson, and

21   Randall Denzer.  Who is Randall Denzer with?

22   A.   Washington County.

23   Q.   And in this you tell them, don't send your

24   complaints to Smart right -- or Rick Ferguson tells them that,

25   right?

Page 262

1    A.   Yes.

2    MR TURKEL:  Judge, we can go ahead and offer Exhibit

3    P.

4    MS. BALD:  No objection.

5    BY MR. TURKEL:

6    Q.   All right.  Now, I want to shift, quickly.  I want

7    you to take a look at Exhibit R.

8    A.   Okay.

9    Q.   Who is -- do you know who Albert Cantu (phonetic)

10   is?

11   A.   No.

12   Q.   Do you know whether he's someone who works at Buoy

13   County?

14   A.   I do not know.

15   Q.   Do you know who Seth Dozer is?

16   A.   No, sir.

17   Q.   Okay.  I want you just to look at this document to

18   see whether it refreshes your memory as to whether Tech

19   Friends was moving into Buoy County on August 20th -- or,

20   August 23rd, 2019?

21   A.   Looks like moving somewhere, I couldn't tell you

22   where.  It doesn't make any reference to Buoy on there.

23   Q.   That's why I asked you who Albert Cantu was, you

24   don't know who he is?

25   A.   Yeah -- no, I don't know.

Page 263

1    Q.   Take a look now if you could, sir at Exhibit S.

2    THE COURT:  And I'm moving to admit that?

3    MR. TURKEL:  No Judge, I wanted to see if he --

4    THE COURT:  All right.  Okay.

5    MR. TURKEL:  S.

6    THE COURT:  S as in Sam.  All right.

7    BY MR. TURKEL:

8    Q.   Now, Exhibit S is an e-mail from John Logan reaching

9    out to Allen Johnson, which is self-evident.  He was reaching

10   out to try to fix a disconnect on communication.  And if you

11   read through just to sit down and talk with them about their

12   service, et cetera.

13   MS. BALD:  Your Honor, I'm going to move to strike,

14   I think that's testimony of the counsel.

15   THE COURT:  Yeah, it's testimony.

16   MR. TURKEL:  I was just trying to paraphrase the

17   e-mail.

18   BY MR. TURKEL:

19   Q.   You can read the e-mail yourself, the question I had

20   related to Rick Ferguson.  So we can strike everything I said

21   it says -- it says what it says.  But Allen Johnson forwards

22   this to Rick Ferguson asking Rick Ferguson, what do you want

23   me to say to this, right?  Did you talk to Rick Ferguson --

24   A.   Right.

25   Q.   -- about this?

Page 264

1    A.   Yes.

2    Q.   What did you tell Rick Ferguson to tell Allen

3    Johnson with respect to responding to Mr. Logan?

4    A.   I told him to stay out of it, don't even respond.

5    That's between -- and Allen Johnson can answer however he

6    wants, it's not any trouble ticket.  So we instructed them to

7    run their trouble ticket.  I think even by this time we had

8    switched back to the way it had been and were copied on

9    trouble tickets instead of running through them.  So you know

10   I just said that the way things are right now, just leave it.

11   Q.   Did you do anything to try and facilitate the

12   meeting between John Logan and Captain Johnson?

13   A.   No, I didn't even know there was one until we saw

14   this; there wasn't even anything trying to be set up.

15   MR. TURKEL:  Judge, we can go ahead and offer S.

16   MS. BALD:  I think this is all hearsay.

17   Mr. TURKEL:  Rick Ferguson's an employee of Correct,

18   we're offering it against Correct and he talked to him

19   about it on top of it, but it's an admission.

20   MS. BALD:  I think --

21   THE COURT:  You know I think -- what, go ahead.

22   MS. BALD:  Go ahead.

23   THE COURT:  No, go on, go ahead.

24   Ms. BALD:  I just think it's hearsay, he's explained

25   his role and said he told him to stay out of it.  So I

Page 265

1    don't know if the rest of this is hearsay.
2         THE COURT:  Hold on, let me read this.
3         MS. BALD:  We'll withdrawal objection, it's fine.
4         THE COURT:  All right.
5    BY MR. TURKEL:
6         Q.   All right.  So if you move forward to Exhibit T, you
7    had just told me you didn't know they were trying to meet or
8    whatever you just said when I asked you whether you did
9    anything to help coordinate the meeting.  I want you to look
10   at Exhibit T now and read that, I want to ask you a few
11   questions about it.
12        A.   Okay.  I've read it.
13        Q.   All right.  So Ferguson forwards to you Captain
14   Johnson's response to Mr. Logan asking him, what do you expect
15   to accomplish from the meeting and Mr. Logan replies set forth
16   in the middle of the page.  From that point did you do
17   anything to help Smart coordinate that meeting with Johnson to
18   try and service the customer?
19        A.   No, I did not.
20        Q.   Do you know where this communication between Logan
21   and Johnson went after this e-mail was forwarded to you on
22   September 12th?
23        A.   No.
24        Q.   Do you know if Johnson ever met with Smart to
25   discuss these things?

Page 266

1         A.   I don't know.
2         Q.   All right.  We had previously discussed Exhibit U,
3    which was this notice to cure from Sebastian, right?
4         THE COURT:  Right.
5    BY MR. TURKEL:
6         Q.   And was Tech Friends in September of 2019 being
7    allowed access to customers being serviced by Smart, to do
8    walk-through's and install equipment?  I'm sorry.
9         A.   The only time they were allowed on site was if
10   Correct Solutions was there.
11        THE COURT:  I'm sorry, I didn't understand what you
12   just said.
13        THE WITNESS:  The only time Tech Friends was allowed
14   on site with a Correct Solution's customer is if Correct
15   Solutions actually set it up and allowed them to be there,
16   and once we all understood the status quo nothing
17   happened.
18   BY MR. TURKEL:
19        Q.   Now, with respect to Exhibit V which we discussed
20   earlier, this is the notice to cure sent regarding performance
21   issues at Sebastian, right?
22        MR. BARRIOS:  U.
23        MS. BALD:  Are you talking about U?
24        MR. TURKEL:  I'm sorry, U.  My bad.
25   BY MR. TURKEL:

Page 267

1         Q.   Exhibit U?
2         A.   U?
3         Q.   Yeah.
4         A.   U, hold on.  Yes.
5         Q.   All right.  Now, to sort of make short work of it,
6    at least based on what counsel was arguing; you're not trying
7    to terminate this contract anymore based upon the notice that
8    you sent on September 13th with respect to Sebastian, right?
9         A.   Correct.
10        Q.   Is Tech Friends currently servicing Sebastian?
11        A.   No.
12        Q.   They have no equipment set up inside of Sebastian
13   County's facility?
14        A.   Not through Correct Solution's they don't.
15        Q.   That was already in -- in Exhibit V is now the, what
16   we call the non-renewal, right; the notice of non-renewal with
17   respect to --
18        A.   Yes.
19        Q.   -- Washington County, right and --
20        THE COURT:  Hold on a second.  I'm glad I set this
21   for two and a half hours.  Go ahead.  You ready?
22        MR. TURKEL:  Yes.
23   BY MR. TURKEL:
24        Q.   This October 4th letter, which is Exhibit V, right;
25   this is your notice of non-renewal with respect to Washington

Page 268

1    County, right?
2         A.   Yes, it is.
3         Q.   And as we discussed earlier, Correct is actually
4    renewed with Washington County; right?
5         A.   Yes.
6         Q.   All right.  Take a look at Exhibit W.
7         A.   Okay.
8         Q.   That's a November 21st, 2019, notice of non-renewal
9    with respect to Sebastian County; right?
10        A.   Yes.
11        Q.   And essentially you're sending the same notice of
12   non-renewal regarding Sebastian that you sent with respect to
13   Washington, right?
14        A.   Yes.
15        MR. TURKEL:  Judge, we'd offer Exhibit W.
16        THE COURT:  Any objection?
17        MR. BARRIOS:  The notices are in.
18        MS. BALD:  They're all in.
19        THE COURT:  Oh, okay.
20        MR. TURKEL:  I've just got my chart, if it doesn't
21   have a yes by it then --
22        THE COURT:  That's fine.  Just in case, do you have
23   any objection?
24        MS. BALD:  No, Your Honor.
25        THE COURT:  Be so admitted.

Page 269

BY MR. TURKEL:
Q.   And with respect to Exhibit X, you sent the same
notice with respect to Wayne County; right?  I know it's in,
I'm just asking to refer on.
A.   Yes, that's correct.
Q.   All right.  Now, in addition to sending those
notices, if you look at Exhibit CC -- are you there yet?
A.   Yes, I'm there.
Q.   CC is a December 13th, 2019, notice in which you're
informing Jim Logan that you have to cease provide -- that
Smart has to cease providing service in Washington County
because Washington County has informed Correct Solutions that
it previously entered a contract with a third party vendor,
Summit, for commissary goods and services that provide Summit
the exclusive right to provide e-mail; right?
A.   Yes.
Q.   And in paragraph 2 you write that Correct was
unaware of the contract between Washington County and Summit
for commissary goods and services, much less the provision
contained that provides Summit the exclusive right to provide
e-mail to the inmates at the facility; right?
A.   Yes.
Q.   Have you ever read the Summit-Washington County
Contract?
A.   The -- only the piece that I believe they attached,

Page 270

that they sent to us.
Q.   And that's attached to your letter, right, the third
page is a letter from Captain Kenny Yates telling you how
Summit has had the exclusive right to provide e-mail for
Washington County Detention Center; right?
A.   Yes.
Q.   And that's --
A.   I believe they attached something from Summit that
had the exhibits on there.
Q.   Right.  He's got a letter from Summit to him?
A.   Yes.
Q.   Did you talk to Captain Johnson or Captain Yates
about this before they sent the letters?
A.   No, I did not.
Q.   These letters came out of the blue, is that your
testimony?
A.   Yes.
Q.   And if you look -- as we sit here today have you
ever looked at the Summit contract?
A.   No.
Q.   You've looked at the letter they sent, right, and
that's it?
A.   Yes.
Q.   All right.  So if you look at what was excerpted in
the letter.

Page 271

A.   Okay.
Q.   Right, from Summit right, it says Exhibit A -- it's
like a cutout, it says Exhibit A commissary.
A.   Right.  I'm there.
Q.   Right.  And under operational responsibilities it
grants contractor, who in that case is Summit, certain rights,
deliverables that they have to provide; right?
A.   Right.
Q.   And they shall provide a selection of food products,
right; do you see that?
A.   Yes.
Q.   They shall provide CBM caring packs, right?
A.   Right.
Q.   They shall provide a snack cart, right?
A.   Yes.
Q.   And then it says the contractor will offer secure
inmate e-mail, right?
A.   Yes.
Q.   Doesn't say contractor shall provide secure inmate
e-mail, right?
A.   That's correct.
Q.   And your testimony was you were unaware of this, or
I guess Correct was unaware of this?
A.   That's right.
Q.   All right.  I want you to look at one of the e-mails

Page 272

Mr. Barrios sent you this morning.
THE COURT:  Where is that at?
MR. TURKEL:  Judge, I've got a loose copy.  Did you
stick that in your binder?
MR. BARRIOS:  No.
THE COURT:  How about me?
MR. TURKEL:  I was going to get you one, Judge.
MR. BARRIOS:  The attachment to the e-mail I sent to
Mr. Turner on Ferguson October 2nd, 2017, e-mail.
MS. BALD:  Did you give us a copy?
MR. BARRIOS:  I did in that initial pile I handed
you.
MR. TURKEL:  Here.
MR. BARRIOS:  There's another one right there.
MR. TURKEL:  All right.  Can you pull that one
first --
THE COURT:  And this is going to be called what, for
the purposes of the record?
MR. BARRIOS:  We already have a JJ.
MS. BALD:  We can call it KK, Your Honor.
THE COURT:  J, K?
MR. TURKEL:  K.
THE COURT:  KK.
MR. TURKEL:  Yeah, we already had a supplement that
was JJ.

Page 273

1    THE COURT:  Okay.
2    THE WITNESS:  All right.  I'm there.
3  BY MR. TURKEL:
4    Q.  All right.  So this is an e-mail from Rick Ferguson
5  to Jennifer Tongate back in October 2nd, 2017; right?
6    A.  Yes.
7    Q.  And Rick Tongate (sic) was working for Correct at
8  that time right or Lastal (phonetic) apparent?
9    MR. BARRIOS:  Ferguson.
10    MR. TURKEL:  Rick Ferguson, I'm sorry.
11    THE WITNESS:  Yes.
12  BY MR. TURKEL:
13    Q.  All right.  And just to refresh your memory, we can
14  agree that September 13th was the date Correct signed the MSA,
15  right; September 13th, 2017?
16    A.  Yes.  Yeah, yeah.
17    Q.  So a couple weeks later Ferguson sends this e-mail
18  to Tongate of Smart saying, just to recap on what to expect,
19  Washington County, AR; Tuesday afternoon TBD.  They currently
20  have an e-mail system in place via Tech Friends who is
21  contract with CBM Commissary.  They do not have a mail feature
22  and are strongly looking at the video visitation package.  I
23  would be prepared to talk on all points.  Do you know what CBM
24  Commissary is?
25    A.  I'm just familiar with the company.

Page 274

1    Q.  And they were bought by Summit, were they not?
2    A.  Yes.
3    Q.  And the company that was providing e-mail under
4  CBM's commissary contract prior to CBM being acquired by
5  Summit was Tech Friends, right?
6    A.  That I don't know.
7    Q.  Well Rick Ferguson in his October 2nd, 2017 e-mail
8  certainly knew, did he not?
9    A.  It would appear so, yes.
10    Q.  And did you ever discuss that with him, the fact
11  that Tech Friends had been in Washington County through CBM;
12  now known as Summit back in 2017?
13    A.  Not that I recall.
14    Q.  All right.  And if you look at this letter where we
15  started this Exhibit CC.
16    THE COURT:  CC?
17    MR. TURKEL:  Yeah, CC which is --
18    THE COURT:  Right.
19    MR. TURKEL:  Judge, let me go ahead and offer KK.
20    THE COURT:  Any objection?
21    MS. BALD:  No, Your Honor.
22  BY MR. TURKEL:
23    Q.  And going back to CC, when you wrote this letter,
24  which was another I guess reason you were trying to terminate
25  the Washington contract with Smart; you certainly didn't

Page 275

1  represent anything that reflected Ferguson's knowledge of the
2  Washington County and Summit contract when you said that
3  Correct Solutions was unaware of it, right?
4    MS. BALD:  Your Honor, I'm going to move to strike.
5  He's testifying --
6    THE COURT:  Right, that's testifying, sustained.
7    MR. TURKEL:  I'll withdrawal it.
8  BY MR. TURKEL:
9    Q.  When you wrote Correct Solutions was unaware of the
10  contract between Washington County and Summit for commissary
11  goods, did you discuss that representation with Rick Ferguson?
12    A.  Yes.
13    Q.  And did Ferguson not tell you that he knew back in
14  October that Tech Friends had been servicing CBM's commissary
15  contract for e-mail and -- e-mail system?
16    A.  No, he knew there were some Tech Friend's tablets in
17  the facility; but they were used for commissary.  No one ever
18  talked about that they were ever used for e-mail.
19    Q.  Did he not talk to you about this October 2, 2017
20  e-mail that he sent to Smart, where he said they currently
21  have an e-mail system in place via Tech Friends who is in
22  contract with CBM Commissary; did he tell you that?
23    A.  No.
24    Q.  All right.
25    A.  No.

Page 276

1    MR. TURKEL:  Judge, we'll offer CC.
2    MS. BALD:  I think CC's already in.
3    THE COURT:  Yeah, I think it was in a while back.
4  But just in case, any objection?
5    MS. BALD:  No, Your Honor.
6    THE COURT:  Thank you.
7    MR. TURKEL:  Judge, I think I'm about done.  Let me
8  just have one moment to check my notes here.
9  BY MR. TURKEL:
10    Q.  If you could go back to Exhibit BB, Mr. Turner.
11    A.  BB, as in boy, boy?
12    Q.  Yes, sir.
13    A.  All right.
14    Q.  That's a May 13, 2019 e-mail from Rick Ferguson to
15  you.  Some of it's redacted, but he identifies some items for
16  you all to talk about that week; one of them is an exit
17  strategy from Smart for both Saint Louis and Sebastian,
18  right?
19    A.  Yes.
20    Q.  And what he tells you is you need to get -- I know
21  you've tossed it around, but need to get definitive in case of
22  push back, right?
23    A.  Yes.
24    Q.  And he also identifies TF which I assume is Tech
25  Friends; is that right?

Page 277

1   A.   I would assume that's correct.
2   Q.   TF's agreement or did you say this was complete,
3 right?
4   A.   Right.
5   Q.   Did you meet with him to discuss those items?
6   A.   I don't recall.
7        MR. TURKEL:  Yes, that's what -- I was looking for
8   that, thank you.
9        MR. BARRIOS:  Uh-huh.
10 BY MR. TURKEL:
11  Q.   All right. I want you to look also at document -- I
12 don't know how this was identified on Mr. Barrios's e-mail.
13 Confidential TF 74.  Here guys, in case you need one.
14       THE COURT:  Those will be LL.
15       MR. TURKEL:  Yes, Your Honor.
16       THE WITNESS:  Okay.  Is that an e-mail from Mark
17  Haney (phonetic)?
18 BY MR. TURKEL:
19  Q.   Yeah.  It's an e-mail from you to Mark Haney and
20 then a response from him.  But take a look at the bottom.
21  A.   Okay.
22  Q.   That is your e-mail to Mark Haney forwarding the
23 signature sheet for your agreement with Tech Friends, right?
24  A.   Yes.
25  Q.   All right.  So that should help you remember the day

Page 278

1 you signed it, right?
2   A.   July 10th, okay.
3   Q.   And you tell him you're so happy right now and truly
4 look forward to working with you guys as partners, right?
5   A.   Yes.
6   Q.   He responds to you and says, thank you brother.  I
7 don't think I've been this excited in the ten years I've been
8 in this industry.  We are going to make some money but we're
9 also going to have a great time, right?
10  A.   Yes.
11  Q.   Are you social friends with Mark Haney?
12  A.   Well, it was after we developed our relationship we
13 found out we had a lot in common.
14  Q.   You're friends with him now?
15  A.   Yes.
16  Q.   All right.
17       MR. TURKEL:  Judge, we'd offer LL.
18       THE COURT:  Any objection?
19       MS. BALD:  No, Your Honor.
20       THE COURT:  Be so received.  Counsel, do you have a
21  master sheet where you've been marking admitted?
22       MR. TURKEL:  I've been trying to as I go, I don't
23  know if Brad had.
24       THE COURT:  He's been doing it.
25       MR. BARRIOS:  I do with respect to our exhibits, but

Page 279

1 we'll have to cross reference with theirs.
2        THE COURT:  I know.
3        MR. BARRIOS:  I don't have all of theirs.
4        THE COURT:  Do you have a master list?  What I'm
5 going to do is I'm going to have my JA, if you don't mind,
6 copy that.  So I can go back through my notes and just
7 make sure.
8        MS. BALD:  Okay.
9        THE COURT:  Okay?  And if there are any
10 discrepancies I'll give you both a call and tell you the
11 discrepancy.
12       MR. BARRIOS:  Your Honor, we have the transcript
13 from the first as well.
14       THE COURT:  Okay.  Hillary, please.
15       MR. TURKEL:  Judge, if I can have one minute.
16       THE COURT:  Sure.
17       MR. TURKEL:  I just want to talk to my partner real
18 quick.
19            (Brief break.)
20       MR. BARRIOS:  For the record when I put the Ys the
21 other day I did not note whether they was an objection but
22 I have been today.
23       THE COURT:  Okay.
24       MR. BARRIOS:  So really the -- only the admitted
25 column should be taken for it.

Page 280

1        THE COURT:  Okay.  I got it.  And for the record, so
2   the -- because of the way we did it in here and I didn't
3   have the clerk -- if there were objections made; I'm
4   preserving all objections on the record for your benefit
5   even though the written record may indicate otherwise,
6   okay.
7 BY MR. TURKEL:
8   Q.   Mr. Turner, I just had a quick question about your
9 numbers the other day.  How much -- You were asked some
10 questions related to the potential bond, were you giving us --
11 what's that?  Okay.  Were those numbers -- do you remember the
12 numbers you testified to?
13       THE COURT:  You mean the potential damages?
14       MR. TURKEL:  Yeah.
15       THE WITNESS:  I believe that --
16 BY MR. TURKEL:
17  Q.   Yeah.
18  A.   Did somebody say something.
19  Q.   The Judge said the --
20       THE JUDGE:  I'm sorry.
21 BY MR. TURKEL
22  Q.   -- potential damages, if you're enjoying from
23 terminating these contracts?
24  A.   Yes.  It was -- see if I can recall, Washington
25 County we do about 600,000 a year revenue, I think Sebastian

Page 281

1  was 3, they were all about half of each other.  Sebastian was
2  300.
3              THE COURT:  That's right.
4              THE WITNESS:  And Wayne was 150.
5              THE COURT:  All right.
6              THE WITNESS:  I believe it was Wayne, was the third.
7  BY MR. TURKEL:
8       Q.   And when you say we do those numbers, you're relying
9  on what, your 2019 annual or your 2018, or how many years
10  trailing do you use for that?
11      A.   Yeah.  I usually just take a years worth of revenue
12  divided by twelve to get the monthly average.
13      Q.   Right.  Okay.  So that year, that year -- let's say
14  it's this year, that's an operational year which Smart was
15  providing e-mail and all that stuff?
16      A.   Yes.
17      Q.   And you get no money off Smart's part of that
18  contract, right?
19      A.   No.
20      Q.   You make zero --
21      A.   That -- it actually takes away because the families
22  only have so much money to spend and they have to take some of
23  the phone money to put for e-mail.
24      Q.   Right.  But the revenue numbers you gave don't
25  include any money you would be making off the Smart suite of

Page 282

1  hardware and software because you make none on it, right?
2       A.   That's correct.
3       Q.   So when you say you're going to be damaged if it's
4  enjoined that's assuming that each of those facilities tells
5  Correct that they have to get out?
6       A.   Yes.
7       Q.   I mean that's what you're saying is we're going to
8  lose revenue, because if the Judge enjoins you from
9  non-renewing Smart the position you have is you're going to
10  get told to leave all three of those facilities; right?
11      A.   That'd be speculation, but that's an option by the
12  actual facility.
13      Q.   Right, whether you --
14             THE COURT:  No, he's just asking you -- you're
15      saying if your contract is terminated this is the damages
16      you'll sustain?
17             THE WITNESS:  Yes, that will be the loss of revenue.
18             THE COURT:  Okay.
19  BY MR. TURKEL:
20      Q.   Right.  But again when we say the loss of revenue,
21  the loss of revenue means you've been told by all three of
22  these facilities that you're out as the phone services
23  provider and whatever else you all do, right?
24      A.   Yeah.
25      Q.   Okay.

Page 283

1       A.   Yes.
2       Q.   If those places don't kick you out and let you stay
3  in with Smart, then you have no damages, right?
4       A.   Correct.  We'd still have the revenue.
5       Q.   And the numbers that you gave me, are those gross or
6  net -- the three numbers you gave by facility, are those gross
7  or net?
8       A.   Yeah.  The top line is gross revenue.
9       Q.   That's gross revenue.  What's your net on those
10  three?
11      A.   Oh, I'd have to go into each contract and look at
12  commissions.  I don't recall the commission percentage off the
13  top.
14      Q.   But you can get that information?
15      A.   Yes.
16      Q.   Your net's going to be lower than your gross, right?
17      A.   Yes.
18      Q.   There is some cost to doing this that comes off of
19  it, right?
20      A.   I wish there wasn't, but yes, there is.
21      Q.   You all provide what percent back to the county in
22  these contracts, of your cost?
23      A.   It's varies contract to contract.
24      Q.   But the gross you're giving me, is it net of what
25  you give back to the county?

Page 284

1              THE COURT:  Or is it before?
2              THE WITNESS:  No before, that's total gross revenue
3      before anything is taken out.
4  BY MR. TURKEL:
5       Q.   Okay.  So one thing you would take out of that is
6  what you give back to the county, right?
7       A.   Yes.
8       Q.   That percentage changes, that's in your contracts
9  though, right?
10      A.   That's correct.
11      Q.   Like we could figure that out, okay.  All right.
12  Would there be anything else other than that, any cost of
13  operation or anything?
14      A.   Yeah, it's minimal.
15      Q.   Okay.  The big number?
16      A.   The largest piece in our business is commissions.
17      Q.   Got it.  All right.  That's it, I've got nothing
18  else.
19             THE COURT:  Redirect.
20             MS. BALD:  Yes, Your Honor.
21  BY MS. BALD:
22      Q.   Mr. Turner, why did you bring Smart into these
23  facilities?
24      A.   There was a need as the market was changing, the
25  demand for tablets was increasing; basically being pushed by

Page 285

1   Securus and GTL.  Everyone from the large guys to the small
2   guys had began wanting tablets.  We did not have a tablet
3   solution so we -- I ran into John at a -- it was Texas
4   sheriffs or Texas jailers trade show.  They were offering
5   tablets and that's where we began our discussion.
6       Q.   When you contracted for Smart to provide these
7   products and facilities to your customers, did you believe
8   that Smart had the qualifications and proper equipment to
9   provide those services and equipment?
10      A.   Yes.
11      Q.   And did you through -- or did you -- excuse me, did
12  Smart have direct access to the folks at the facilities for
13  the eight facilities that are at issue?
14      A.   Direct access meaning?
15      Q.   Could they go on to the facility themselves?
16      A.   Yes.
17      Q.   And did they ever have to ask your permission in
18  order to go on to a facility to fix a problem that the
19  facility was encountering, either with its service or with its
20  product?
21      A.   No.
22      Q.   And when you brought in Smart, was it your belief
23  that they were qualified and capable of providing the services
24  and the equipment that you were contracted to provide to each
25  facility?

Page 286

1       A.   Yes.
2       Q.   Now, did you -- or when did problems start, or when
3   did you start learning that there were problems with either
4   the product, or the services, or both, that Smart was
5   providing to your eight customers?
6       A.   It came at different times for different customers.
7       Q.   Okay.
8       A.   I would only hear from the sales people that they
9   had been out to the site, hearing it from the customer.
10      Q.   Okay.  Well let's take a look at what Mr. Turkel had
11  you take a look at as Exhibit GG.  Do you have that in front
12  of you?
13      A.   Yes, I do.
14      Q.   Now, Smart introduced into evidence an e-mail from
15  Robin Edwards dated October 2, 2018 addressed to Jennifer
16  Tongate and John Logan, listing issues that Saint Louis had
17  encountered.  Is this -- were you or was Correct Solutions
18  aware that at least St. Louis was already encountering
19  problems with the services and product from Smart
20  Communications as early as October 2nd of 2018?
21      A.   Yes, it would be brought up in our meetings with the
22  jail commissioner.
23      Q.   And is it --
24      A.   We would meet with him periodically, and his staff;
25  Robin was part of his staff.

Page 287

1       Q.   And is this an e-mail of the problems sent directly
2   from St. Louis directly to Smart Communications?
3       A.   Yes.
4       Q.   And in the beginning, I think you mentioned
5   something about a trouble ticket system.  In the beginning did
6   you establish the system so that the facilities were reporting
7   the problems directly to Smart Communications?
8       A.   Yes.
9       Q.   And were you expecting Smart Communications to
10  directly handle those problems with each facility?
11      A.   Yes.
12      Q.   And did there come a point in time where that
13  changed, the trouble ticket system changed?
14      A.   Yes.
15      Q.   Why did it change?
16      A.   I actually kept receiving feedback from the sales
17  people that there were problems.  Sales people have a tendency
18  to lean toward the emotion and not the data, so we set it up
19  to where the actual trouble ticket would flow through us so
20  that we could keep track of the data.  If someone were to say,
21  I'm having all these problems, well "all" to them maybe two or
22  three, all to someone else may be twelve or fifteen.  We have
23  to have the data.  So they drive it through us, we open the
24  ticket, and then open a ticket with Smart.  That way we're in
25  the loop and we know exactly how many tickets we're talking

Page 288

1   about; we're able to quantify the issues.
2       Q.   And generally, how quickly did Correct solutions
3   provide the problems to Smart that were being reported now
4   from the facility to Correct Solutions?
5       A.   Depending on the time it came in most everything was
6   an immediate turn around.  If Rick was anywhere near his
7   computer it would be immediate, if not, as soon as he got to
8   it.
9       Q.   And were you provided that information to an e-mail
10  address that had been provided to Correct Solutions by Smart?
11      A.   I believe that is correct.  I don't know what that
12  e-mail is but I believe that's the way it happened.
13      Q.   And did that improve the correction or the response
14  time by Smart, to the problems the facilities were
15  encountering?
16      A.   Many had at first, what I hear.  But we changed it
17  shortly thereafter, back to where the -- they would send Smart
18  the e-mail directly and copy us so that we would have a copy.
19      Q.   And throughout your contract with Smart, can you
20  describe to the Court the experience that your -- that you've
21  had with the products, the tablets, and the services, that
22  Smart has been providing to your eight facilities?
23      A.   I would have to describe that as what I get as
24  feedback from my guys who deal with the customers.
25      Q.   And what is that feedback?

Page 289

1    A.   That would be that their inmates break them too
2  easily, they're able to take the batteries out of them, making
3  shanks with some of the metal in them and using -- one of
4  the entertainment ports for chatting, or backroom chat.
5    Q.   And --
6    A.   And mainly the fact that they had so many.  The
7  breakage cost of terminal, broken tablets, whether the inmate
8  broke them or whether the software locked up.
9    Q.   And what problem was that creating for Correct
10  Solutions with its customers?
11    MR. TURKEL:  Objection, foundation, vague.
12    THE COURT:  Actually I've heard all of this already
13  on direct.
14    MR. TURKEL:  But when she says customers with no
15  specifics, I don't know who he's talking about or when.
16  It becomes difficult to deal with.
17    THE COURT:  It's always been a generality other than
18  what I've heard from regarding Sebastian County and I
19  think St. Louis County was the other one I heard about.
20    MS. BALD:  Let me look at my notes.
21    THE COURT:  I can go back and look at my notes.
22    MS. BALD:  Let me then focus on Sebastian County.
23    THE COURT:  All right.
24  BY MS. BALD:
25    Q.   Mr. Turkel asked you about the notice to cure, I

Page 290

1  think it's Exhibit U that was sent to Sebastian County.
2    A.   Yes.
3    Q.   Do you have that -- that was September 13th of 2019?
4    A.   Let me get it here.  Okay, I have it.
5    Q.   And why did Correct solutions make the decision to
6  send a notice to cure as to Sebastian County?
7    A.   Well, we collected enough data from them that we
8  said, time to send out a cure letter to give them the
9  opportunity to cure the problems that they were experiencing.
10    Q.   And Mr. Turner, since the September 13th, 2019
11  notice to cure, do you know or are you aware of whether Smart
12  Communications cured the issues raised in that notice to cure
13  at Sebastian County?
14    A.   I'm not aware that they have, I have not heard that
15  they have.
16    Q.   Have you received any further complaints from
17  Sebastian County since the notice to cure letter on September
18  13th, as to the product and services that Smart Communications
19  has been providing to that facility?
20    A.   Only as far as verbal, when I was with -- around
21  Sebastian county at a trade show.  But I don't know that I've
22  been around them since September 13th.
23    Q.   Okay.  Are you aware of anyone else at Correct
24  Solutions being notified of any further problems at Sebastian
25  County since the notice to cure?

Page 291

1    A.   Yes, I believe Rick Ferguson would be that guy.
2    Q.   And was the notice to cure for Sebastian County
3  successful in addressing the problems that Sebastian County
4  was experiencing with the product and services by Smart
5  Communications?
6    A.   I don't believe it is.  I believe if they were to be
7  -- asked to be.
8    THE COURT:  I'm sorry, say it again.
9    THE WITNESS:  I don't believe it's been addressed.  I
10  believe if Sebastian were asked today they would say it's
11  not addressed.
12  BY MS. BALD:
13    Q.   Now, is that the only notice to cure that has been
14  sent since this lawsuit was filed?
15    A.   Yes.
16    Q.   And Mr. Turkel asked you about a number of e-mails
17  back in the April, May, June, 2019 time frame.  Why were you
18  addressing, prior to the filing of this lawsuit, the
19  possibility of replacing Smart Communications in any of the
20  facilities?
21    A.   Well, after we received so many complaints from our
22  customers, from a business perspective I have to start looking
23  at what do I have to do to keep my customer if they're not
24  satisfied with what they have; what can I do to make them
25  satisfied.

Page 292

1    Q.   Now, I'd like to ask you about -- Mr. Turkel in the
2  beginning was asking you about the Master Service Agreement,
3  and if you could take a look at Exhibit V.
4    A.   B as in boy, or V as in victor?
5    Q.   V, as in victor.
6    A.   Okay, I'm there.
7    Q.   Okay.  Under paragraph 6 what was your
8  understanding --
9    THE COURT:  He's already testified to this, Counsel.
10  He's testified to this, hasn't he?
11    MS. BALD:  I just wanted to ask him about the one
12  question that Mr. Turkel asked him.
13    THE COURT:  All right, go ahead.  I just don't want
14  to repeat things, I've been taking very copious notes.
15    MS. BALD:  Okay.  Let me move forward.
16  BY MS. BALD:
17    Q.   Mr. Turkel was asking you about the -- when you were
18  drafting the contracts with the facility and then referencing
19  the services that Smart Communications would provide, and I
20  think that you referenced a tie-in.  At any time did you
21  intend for your contracts with your facilities to be part of
22  the contracts between Correct Solutions and Smart
23  Communications?
24    A.   So the question -- the way I'm understanding it, did
25  I intend for Smart Communications to be contractually

Page 293

1  obligated to our facility?
2       THE COURT:  No, that's not what the question was.
3  BY MS. BALD:
4       Q.  I think my question Mr. Turner was, did you intend
5  for your contracts with the facilities and your contracts with
6  Smart to all be one -- in essence one contract, or did you
7  intend for them to remain separate?
8       A.  Separate.
9       THE COURT:  Didn't the master contracts though refer
10  to the contract between Smart and the facilities, I
11  thought they incorporated them?
12       MS. BALD:  The Master Service Agreement incorporates
13  the schedules.
14       THE COURT:  Hold on, let me -- where are you at so I
15  make sure --
16       MS. BALD:  If you could take a look at V, as in
17  victor.
18       THE COURT:  Okay.  That's the non-renewal, are you
19  looking at yours?
20       MS. BALD:  I'm looking at their V, as in victor.
21       THE COURT:  Okay.
22       MS. BALD:  The Master Service Agreement's attached
23  to that document.
24       THE COURT:  Okay, go ahead.
25  BY MS. BALD:

Page 294

1       Q.  So in paragraph 6 where you are referencing, this
2  agreement shall commence on the effective date and shall be
3  coterminous with the customers agreement with the facility, as
4  defined by facility address and attached schedule.  The
5  attached schedule was the schedule between Correct Solutions
6  and Smart Communications, correct?
7       THE COURT:  That's not what they're referring to.
8  The facility agreement with corrections, didn't that
9  incorporate the agreement between Smart and Correct,
10  that's what I was getting at.
11       MS. BALD:  The agreement between Correct and each
12  facility?
13       THE COURT:  Yeah.
14       MS. BALD:  I do not believe it referenced.
15       THE COURT:  Can we look back at that?
16       THE WITNESS:  No, it doesn't.  Our contract with our
17  clients doesn't reference anything about our agreement
18  with Smart.
19       THE COURT:  Do we have any -- huh?
20       MR. TURKEL:  It's the other way around.
21       THE COURT:  Oh, okay.
22       MS BALD:  I think the schedules between Smart and
23  Correct Solutions --
24       THE COURT:  The Smart and corrections incorporates
25  the contract between the facilities and corrections.

Page 295

1       MR. TURKEL:  Yes.
2       THE COURT:  Okay.  Is that --
3       MR. BARRIOS:  That's in paragraph 6.
4       THE COURT:  Do you agree with that?
5       MS. BALD:  In paragraph 6 of?
6       THE COURT:  The Master Services Agreement.
7       MS. BALD:  I don't think it incorporates it.  I
8  think It's just -- I don't think it incorporates it's
9  just, will automatically renew --
10       THE WITNESS:  Reference.
11       MS. BALD:  In accordance with customer's agreement
12  with facility, listed as attachment A.  I don't think the
13  terms of the contract between -- I don't think there's
14  anything in this Master Service Agreement that
15  incorporates the terms of the separate contract between
16  Correct Solutions and its facilities.
17       THE COURT:  All right.  The only portion then -- if
18  I'm reading this correctly, the only portion is the
19  coterminous provisions; paragraph 6.
20       MR. TURKEL:  That refers to the Correct facility
21  agreement.
22       THE COURT:  Right.
23       MR. TURKEL:  Yeah.
24       THE COURT:  All right.  I'm corrected.
25       MS. BALD:  Okay.

Page 296

1  BY MS. BALD:
2       Q.  Mr. Turner, why did you -- or why did Correct
3  Solutions send out the notice of non-renewal for the three
4  facilities that are at issue today?
5       A.  Because I believe that the 90-day non-renewal
6  affected the Master Services Agreement, and we want to be able
7  to place another provider into that facility after Smart and
8  our term with them is up.
9       Q.  And is this the first effort that you've made since
10  this suit was filed, to non-renew any of the agreements with
11  Smart Communications?
12       A.  Yes.
13       Q.  And why do you feel it necessary to put a different
14  provider of those services for Washington County, Sebastian
15  County, and Wayne County?
16       A.  Our customers are upset with the performance as they
17  see it now and it's being reflected on Correct Solutions,
18  since we have the contract with the facility.
19       MS. BALD:  That's all we have, Your Honor.
20       THE COURT:  All right.
21       MR. TURKEL:  I just have one question to make
22  sure --
23       THE COURT:  You need to follow the federal rules.
24       MR. TURKEL:  That's fine, I don't need it.  It was
25  really to clarify that little --

Page 297

1   THE COURT:  Okay.
2   MR. TURKEL:  -- of what contract is attached to what
3   other thing but...
4   THE COURT:  No.
5   MR. TURKEL:  We're good.
6   THE COURT:  The contracts speaks for themselves, so.
7   MR. TURKEL:  I'm good.
8   THE COURT:  I'm not going to make any ruling right
9   now.  What I'm going to do is I'm going to get your phone
10  number, Mr. Turkel.  And, I'm sorry --
11  MS. BALD:  Ms. Bald.
12  THE COURT:  It would be so easy to remember that.
13  And Turkel I remember, right.  Ms. Bald, what's your phone
14  number?
15  MS. BALD:  941-713-2362 is cell, and then office
16  is 941--
17  THE COURT:  I'll just call you on your cell.
18  MS. BALD:  Okay.  That's easier.
19  THE COURT:  Okay, Mr. Turkel?
20  MR. TURKEL:  813-924-2732.
21  THE COURT:  And that's your, also, cell phone?
22  Mr. TURKEL:  Yes, Your Honor.
23  THE COURT:  Okay.  I'll be probably calling you --
24  I'm going to work on over the weekend and I'll probably be
25  calling you on Monday.  But I'm not going to say what

Page 298

1   time.
2   MS. BALD:  Do you want us to present any kind of
3   type of closing arguments?  Because I think we'd like to
4   present either in writing, or verbally, however Your Honor
5   prefers.
6   THE COURT:  If I cap it.  Otherwise I won't be able
7   to get to it on Monday.  I mean, are you talking about
8   making an argument now?
9   MS. BALD:  It's up to Your Honor, I know we're way
10  past what you had given us.
11  MR. TURKEL:  I don't care, we can do a short one in
12  writing.  I don't have a strong preference.
13  THE COURT:  What about 500 words, 2 pages?
14  MR. TURKEL:  I mean, 5 pages or less, 3 pages, 2
15  full pages of text; we'll do it.  You got a deal.
16  THE COURT:  You're talking about single space, I
17  know you.
18  MR. TURKEL:  No objections.
19  THE COURT:  All right.  I'll tell you what, why
20  don't we make it a thousand words, all right; which is 4
21  pages.
22  MS. BALD:  Okay.
23  THE COURT:  All right.  Double spaced, so I can make
24  notes in between.
25  MS. BALD:  I think I should be glad that my English

Page 299

1   PHD daughter is home and I can give it to her and say get
2   out all of the lawyer words.
3   THE COURT:  All right, we can go off the record.
4   (Whereupon the proceeding concluded at 12:15 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 300

1
2
3                   CERTIFICATE
4   STATE OF FLORIDA,
5   COUNTY OF HILLSBOROUGH.
6
7
8        I, Juli Bronkhorst, a Notary Public for the State of
9   Florida at Large, do hereby certify that I was authorized to
10  and did stenographically report the foregoing proceedings and
11  that the transcript is a true and complete record of my
12  stenographic notes.
13
14        Signed this 12th day of January, 2020.
15
16
17
18  _____
    Juli Bronkhorst, FPR
19  Notary Public, State of Florida
    Commission No.: 029322
20  Commission Expires: September 30, 2020
21
22
23
24
25