# EXHIBIT 3

# Checking In

email: "rob.deglman@smartjailmail.com Rob Deglman"   Tuesday, August 8, 2017 at 3:06:02 PM Eastern Daylight Time
To: email: "mturner@correctsolutionsgroup.com Mark Turner"

Good Afternoon Mark

I hope all is going well with your son.

My rep just asked me where we are at with getting a contract done for Avoyelles Parish. We got the go ahead from the Sheriff a couple weeks ago and I would like to get him a contract this week

I am attaching
1. Master Agreement between SCH and CS
2. Schedule of Services for Avoyelles Parish for you to incorporate into a CS Addendum

Let me know if there is anything from me you need

rob

--
Rob Deglman
Smart Communications
Director of Sales & Marketing
rob.deglman@smartcommunications.us
Cell [redacted]
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

Attachments:
SCH-Avoyelles LA Schedule of Services Kiosk.docx 21k
SCH-Correct Solutions Master Services Agreement.docx 31k

# Smart Communications
Holding, Inc.

## Schedule 1

This Schedule is between The Avoyelles Parish Sheriff's Office hereinafter referred to as "you" or "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility Name and address is: 675 Government Street, Marksville, Louisiana 71351

Provider shall install and/or provide the following Hardware, Software, Systems and Services:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

## Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

## Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

**MailGuard™ Patent Pending Postal Mail Elimination System**

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer:_____

By: _____

Name: Sheriff Doug Anderson

Title:_____

Date: _____

Email:_____

Notice Address:

Provider: Smart Communications Holding, Inc.

By:_____

Name: James P. Logan

Title: Vice President

Date: _____

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

# Smart Communications Holding, Inc.

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, hereinafter referred to as "you" or "Customer," located at 192 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. Systems. This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. Use of Systems. Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. Hardware and Software License. For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. License Restrictions: The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services County Jail to access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

(i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

(ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

(iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

(iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

(v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

(vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

(vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

(vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. <u>Title</u>. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. <u>Term.</u> This Agreement shall commence on the effective date and shall continue for a period of seven (7) years from the date of system going live. After the original seven (7) year term, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. <u>Limitation of Liability</u>. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. <u>Confidential Information and Non-Disclosure</u>. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to

any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. <u>Default and Termination</u>. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. <u>Insurance</u>. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. <u>Employees.</u> Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its

employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. <u>Warranty Against Contingent Fees.</u> Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. <u>Subcontracts.</u> Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. <u>Provider Personnel</u>. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. <u>Provider Cooperation.</u> Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. <u>Public Information.</u> Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. <u>Access to Management Information.</u> Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. <u>Permits and Licenses.</u> All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. <u>Third-party Rights.</u> The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. <u>Public Entity Crime</u>. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. <u>Waiver of Breach</u>. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. <u>Compliance with Laws</u>. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. <u>Governing Law</u>. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. <u>Attorney Fees</u>. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. <u>Completeness of Agreement</u>. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. <u>Force Majeure</u>. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. <u>Assignment</u>. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. <u>Matters to be Disregarded</u>. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. <u>Notices</u>. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement.  Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

**THIS PORTION INTENTIONALLY LEFT BLANK**

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions

By: _____

Name: _____

Title: _____

Date: _____

Email: _____

Notice Address:

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: _____

Email: jim.logan@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609