# EXHIBIT 35

*Smart Communications Holding, Inc. v. Correct Solutions, LLC*
*Case No: 19-CA-008089*

### DEFENDANT'S EXHIBIT 13

**November 21, 2019 Notice of Non-Renewal of MSA and Schedule 1
as to Wayne County, GA from Correct Solutions, LLC
to Smart Communications Holding, Inc.**



**C RRECT**
SOLUTIONS GROUP
PHONES | KIOSKS

182 Bastille Lane • Ruston, Louisiana 71270

November 21, 2019

**CERTIFIED MAIL RECEIPT #** <u>7014 2870 0002 3604 6695</u>
Smart Communications Holding, Inc.
10491 72nd Street
Seminole, Florida 33777

Attention: James P. Logan (also sent via email: jon.logan@smartcommunications.us)

RE:     Notice of Non-Renewal of Master Services Agreement between
        Correct Solutions, LLC and Smart Communications Holding, Inc.
        (Correct Solutions, LLC's customer: Wayne County)

Dear Mr. Logan:

You are hereby notified that Correct Solutions, LLC ("Correct Solutions") will not renew the Master Services Agreement ("MSA") between Correct Solutions and Smart Communications Holding, Inc. ("Smart"), dated September 13, 2017, or the terms of Schedule 1 – Wayne County, Georgia ("Schedule 1") of the MSA, dated March 16, 2018, with respect to Correct Solutions' customer, the Wayne County, Georgia facility ("Wayne County Facility"). Paragraph 6 of the MSA states that it "shall automatically renew in accordance with the Customer's Agreement with facility, listed in Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to expiration of the then current term." The MSA, Schedule 1, and the contract between Correct Solutions and the Wayne County Facility, dated February 6, 2018, are attached hereto.

Pursuant to paragraph 1 of the Wayne County Facility contract, the contract "is effective upon the date of installation of equipment ('Effective Date'), and shall continue in effect for a period of 1 year ('Initial Term') from the Effective Date." The installation of Correct Solutions' equipment at the Wayne County Facility contract was completed March 15, 2018, therefore, March 15, 2018 is the start date of the Wayne County Facility contract. The current contract between Correct Solutions and the Wayne County Facility expires March 14, 2020. Consequently, this written notice of non-renewal of the MSA and Schedule 1 with respect to the Wayne County Facility is timely.

The MSA, in paragraph 30, states that notice thereunder is sufficient if mailed via registered or certified United States mail, postage prepaid, to the following address for Smart: 4522 W. North B Street, Tampa, Florida 33609. That said, however, we understand from notices we received when our general counsel's office sent correspondence to Smart back in June of this year that this address is no longer valid. Accordingly, we are sending this notice of non-renewal to the

Phone: 318-232-1525     •     Fax: 318-255-8575     •     www.correctsolutionsgroup.com

address set forth on correspondence we have received from Mr. David Gann, General Counsel for Smart, at 10491 72nd Street, Seminole, Florida 33777. We are also emailing this notice of non-renewal to you at the email address shown on the MSA beneath your signature line, as follows: jon.logan@smartcommunications.us. Finally, we are emailing a courtesy copy of this letter to your counsel in the litigation, Kenneth Turkel and Brad Barrios, at the addresses below.

Upon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt at Correct Solutions promptly to make arrangements to exit the Wayne County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility.

Sincerely,

Mark Turner

*Director of Sales for Correct Solutions, LLC*

CC:   David L. Gann (via email only)
      General Counsel
      Smart Communications Holding, Inc.
      david.gann@smartjailmail.com

      Kenneth Turkel (via email only)
      Brad Barrios (via email only)
      Bajo Cuva Cohen & Turkel
      100 North Tampa Street, Suite 1900
      Tampa, FL 33602
      kturkel@bajocuva.com
      bbarrios@bajocuva.com

   

## Master Services Agreement

This Master Services Agreement (this "Agreement") is by and between Correct Solutions, LLC, hereinafter referred to as "Customer," located at 182 Bastille Lane, Ruston, Louisiana 71270 and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 West North B Street, Tampa, Florida 33609, hereinafter referred to as "Provider."

This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise.

Whereas, the Customer desires that Provider install an inmate communications system(s) and provide inmate communications and maintenance services according to the terms and conditions in this Agreement, and according to the Schedules, which will be incorporated by facility and referenced to this Agreement, and;

Whereas, the Provider agrees to install the inmate communications system(s) and provide inmate communications and maintenance services according to the to the terms and conditions in this Agreement, and according to the Schedules, which are incorporated by reference into this Agreement;

Now therefore, in consideration of the mutual covenants and agreements hereinafter set forth, the Parties, intending to be legally bound, agree as follows:

1. <u>Systems.</u> This Agreement specifies the general terms and conditions under which Provider will perform certain inmate related services and systems (the "System(s)") for the Customer. Additional terms and conditions with respect to the Systems will be specified in the Schedules entered into by the Parties and attached (the "Schedules"). The Schedules are incorporated into this Agreement and are subject to the terms and conditions of this Agreement. In the event of any conflict between this Agreement and a Schedule, the terms of the Schedule shall govern.

2. <u>Use of Systems.</u> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules. Customer agrees that they will not resell or provide access to Provider's services and Systems directly or indirectly to third parties unless agreed upon in a separate written Agreement. During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules, including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

3. <u>Hardware and Software License.</u> For the term of this Agreement, Provider grants Customer a non-exclusive, non-transferable license to access and use certain proprietary computer software and hardware products and materials in connection with our inmate services and Systems. Provider will provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion.

For services and systems that allows Customer to monitor and archive inmate postal mail, electronic messages, grievances, medical requests, educational and entertainment, by providing the inmate services and Systems, Provider makes no representation or warranty as to the legality of monitoring or archiving such communications and activities.

4. <u>License Restrictions:</u> The Software is to be used solely in connection with Provider's Services by Customer and inmates housed at the clients referenced in Schedule of Services in connection with Provider's services and Systems. The Hardware is to be used solely by inmates housed at the clients referenced in the Schedule of Services Facility to

Page 1 of 6

## Attachment  A to Notice of Non-Renewal

access Provider's services and Systems. Unless and only to the extent that this Agreement expressly permits, Customer must not:

> (i) permit any parent, subsidiary, affiliated entity or third party to use the Hardware or Software;

> (ii) Rent, lease, lend, assign, sublicense, encumber or otherwise transfer or attempt to transfer the Hardware or Software or any portion thereof;

> (iii) alter, create derivatives of, or modify the Hardware or Software in any way, or allow a third party to do so;

> (iv) connect the Software or Hardware to any third-party products or services that were not approved of in writing by Provider;

> (v) distribute or otherwise make the Hardware or Software or any password, key, or other access code for the Software available to any third party;

> (vi) reverse engineer, decompile, or disassemble the Hardware or Software, or allow a third party to do so;

> (vii) defeat or work around any access restrictions or encryption in the Software, or allow a third party to do so;

> (vii) remove, minimize, block, or modify any titles, logos, trademarks, copyright and patent notices, digital watermarks, disclaimers, or other legal notices that are included in the Software, whether or not they are Provider's or a third party's;

5. Title. Provider shall have and retain all rights, title, and interest in the products and services provided to Customer. The Hardware, Software, Systems, networking, and cabling, including all modifications and updates of Software, shall at all times remain the sole and exclusive property of the Provider. Any trade secrets, methodology and processes of our services and Systems constitute proprietary information of Provider, regardless of any part or portion thereof is the subject of a valid copyright or patent. During the term of this agreement and for the time period(s) as stated in the Schedule for Systems, we will provide you access to the records.

6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

7. Limitation of Liability. To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or sub-contractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software, even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose.

8. Confidential Information and Non-Disclosure. The parties acknowledge that in their performance of their duties hereunder either party may communicate to the other (or its designees) certain confidential and proprietary

information, including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto (collectively, the "Confidential Information") all of which are confidential and proprietary to, and trade secrets of, the disclosing party (the "Disclosing Party"). As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information received hereunder and exercise at least the same degree of care in safeguarding the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure. The Receiving Party shall promptly notify the Disclosing Party of any unauthorized disclosure or use of the Confidential Information. The Receiving Party shall cooperate and assist the Disclosing Party in preventing or remedying any such unauthorized use or disclosure. The term "Confidential Information" does not include, and the obligations and undertakings set out in this section do not apply to: (a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency, provided that, prompt notice of such requested disclosure shall be given to the Disclosing Party, if legally permitted, so that Disclosing Party may seek appropriate remedy to prevent such disclosure or waive compliance with the provisions of this Agreement and the Receiving Party, its directors, officers, employees, agents and advisers shall reasonably co-operate with the Disclosing Party, at the Disclosing Party's sole cost and expense, if the Disclosing Party elects to challenge the validity of such requirement and/or take such steps as the Disclosing Party may reasonably require to avoid or limit such disclosure; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party. Subsections (a) through (e) of this paragraph notwithstanding, the parties agree that the technology behind the Providers Services and Systems is Confidential Information and is a trade secret of Provider.

9. Default and Termination. If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party is has made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.

10. Insurance. Provider shall maintain General Liability Insurance including but not limited to bodily injury, property damage and personal injury with limits of not less than $300,000 combined single limit covering all work performed under this contract. Provider shall maintain automobile insurance including bodily injury and property damage including all vehicles owned, leased, hired and non-owned vehicles with limits of not less than $300,000 combined single limit covering all work performed under this contact. Provider shall provide Worker's Compensation Insurance, on behalf of all employees who are to provide a service under this contract, as required by Florida (LAS), Chapter 440, and Employers Liability with limits of not less than $100,000 per employee per accident. Customer agrees to furnish to Provider timely written notice of any claim, demand, or cause of action made or brought against Customer or where Provider is listed as a Co-Defendant arising out of or relating to the Systems and Services We provide to You.

11. Employees. Provider represents that it has, or will secure at its own expense, all personnel required in performing its obligations under this Agreement. All of the services required hereunder will be performed by the Provider or under its supervision and all personnel engaged in the work shall be fully qualified to perform such services. Provider and

any subcontractors used in the performance of the responsibilities listed herein must maintain a drug-free workplace policy. Customer acknowledges that Provider is an independent contractor and nothing in this Agreement is intended nor shall be construed to create an agency relationship, and employer/employee relationship, a joint venture relationship or any other relationship allowing Customer to exercise control or discretion over the manner by which Provider performs hereunder. Provider expressly agrees that it shall be solely responsible for supervising its employees, that it shall comply with all rules, regulations, orders, standards and interpretations promulgated pursuant to the OSHA Act of 1970, including but not limited to training, recordkeeping, providing personal protective equipment, lock/tag out procedures, material safety data sheets and labeling. Provider certifies that neither it nor any subcontractors used to accomplish its obligations hereunder, shall employ unauthorized aliens. Provider certifies that in accordance with the provisions of Title VII of the 1968 Civil Rights Act as amended by the Equal Employment Opportunity Act of 1972 and Executive Order 11914, that neither it nor any subcontractors used to accomplish its obligations hereunder discriminate on the basis of race, color, sex, religion, age, national origin or disability in their employment practices.

Miscellaneous

12. Warranty Against Contingent Fees. Provider warrants that no person or selling agency has been employed or retained to solicit this contract upon an agreement of understanding for commission, percentage, brokerage or contingency, except bona fide employees or selling agents maintained by the Provider for the purpose of securing business.

13. Subcontracts. Provider shall be allowed to use subcontractors for the purpose of completing the provisions of this Agreement.

14. Provider Personnel. All Provider personnel being permitted to work in the Customer Jail Facility will be subject to a security/background check by the Office of the Sheriff.

15. Provider Cooperation. Provider shall, at all times observe and comply with all Federal, State, and local municipal laws, ordinances, rules and regulations in any way affecting the Agreement. The Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement.

16. Public Information. Neither the Provider nor the Customer shall publish any findings based on data obtained from the operation of this agreement without the prior consent of the other party, whose written consent shall not be unreasonably withheld.

17. Access to Management Information. Customer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance. The Provider shall make available all records or data requested.

18. Permits and Licenses. All permits and licenses required by Federal, State, local laws, rules, and regulations necessary for the implementation of the work undertaken by the Provider pursuant to the Agreement shall be served and paid for by the Provider. It is the responsibility of the Provider to have and maintain the appropriate certificate(s) valid for work to be performed and valid for the jurisdiction in which the work is to be performed for all persons working on the job for whom a certificate is required.

19. Third-party Rights. The rights, obligations and duties contained in this Agreement shall exist exclusively between the Parties. The Parties expressly agree and intend that they alone shall have the exclusive rights to seek legal or equitable enforcement, remedy, injunctive relief or to bring a breach of Agreement action. The Parties do not intend to create, nor shall this is Agreement be construed to create in any other individual or entity the status of a third party beneficiary.

20. Public Entity Crime. Provider confirms its understanding that a "public entity crime" as defined in Paragraph 287.133(1)(g), Florida Statutes, means a violation of any state or federal law by a person with respect to and directly related to the transaction of business with any public entity or with an agency or political subdivision of any other state or of the United States, including but not limited to, any bid or contract for goods or services to be provided to

any public entity or an agency or political subdivision of any state or of the United States and involving antitrust, fraud, bribery, collusion, racketeering, conspiracy, or material misrepresentation. Provider hereby certifies that neither its officers, directors, executives, partners, employees, members, nor agents who are active in the management of Contractor have been charged with and convicted of a public entity crime subsequent to July 1, 1989.

21. Waiver of Breach. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

22. Compliance with Laws. Provider shall comply with all Federal, State and local laws, rules, and regulations applicable to the services or payments for services under this Agreement.

23. Governing Law. The parties mutually agree that any litigation arising hereunder shall be brought and completed in Hillsborough County, Florida.

24. Attorney Fees. In the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs.

25. Completeness of Agreement. This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto. This Agreement may be amended or revised only in writing and signed by all the parties.

26. Force Majeure. Provider will not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including without limitations, strikes, inmate disturbances, failure of Customer to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, terrorism, accidents, fires, explosions, earthquakes, floods, or any similar cause beyond the reasonable control of either Party.

27. Assignment. Provider may assign this Agreement or any interest herein at any time to any parent, successor, or subsidiary with prior written notice to Customer.

28. Severability. In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

29. Matters to be Disregarded. The titles of the several sections, subsections and paragraphs set for in this Agreement are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of the provisions of this Agreement.

30. Notices. Any notices, demands, payments or reports required by this Agreement shall be in writing and sufficient if sent by the parties hereto via registered or certified United States mail, postage prepaid, to the notice addresses noted below the Parties signatures on the signature page.

31. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute the same Agreement. Any signature page of any such counterpart, or any telecopy or other electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other electronic transmission of a signature shall be deemed an original and shall bind the party who made such signature.

THIS PORTION INTENTIONALLY LEFT BLANK

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple
Title: Managing Director

Date: _9/13/17_____

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan
Title: Vice President

Date: _8-31-17_____

Email: jim.logan@smartjailmail.com

Notice Address:
4522 W. North B Street
Tampa, Florida 33609

 

## Schedule 1

This Schedule is between Correct Solutions, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," "Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is:   Wayne County, Georgia - 1892 South Macon Street, Jesup, Georgia 31545

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above.

## SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Correct Solutions or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to kiosk ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility. The inmate will be able to utilize kiosks that are from assigned to their housing unit in designated classroom areas.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

## Maintenance and Support Plan

6. Our asset management system keeps records of all devices throughout their lifecycle so that we can see the full history of any device in real-time. Each kiosk checks with our network when it is powered on and relays its current status information for tracking and pre-emptive notification for service. We see which devices are being used, how often, identify charging and battery issues, and other common problems before they result in device failure so that service can be initiated before a problem is even reported. Our monitoring systems watch our remote infrastructure 24/7 and alert our technicians in real-time if any issues are detected. Using remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly. We also utilize backup external network connectivity by using a local wireline broadband provider as our primary transit, and utilize a cellular data connection as a backup which automatically comes online in the event that the primary connection becomes unavailable. This helps to ensure that the system can continue to operate even in the event of an outage at a third-party connectivity provider.

## Electronic Messaging

7. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

8. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

9. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

10. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

11. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

12. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

13. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

14. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

15. Electronic Messaging. Each email message is billed at one credit ($0.50).

16. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

17. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas. I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

18. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

19. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

20. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

21. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

22. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

23. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartKiosk.

24. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

### Rules, Regulations & Communications

25. The SmartKiosk is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartKiosk for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartKiosk. The SmartKiosk has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

### Law Library

26. We shall provide access via the SmartKiosk to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

### Video Visitation

29. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware kiosks, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

30. We will provide at no cost to Customer the labor for the installation of the video visitation system.

31. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

32. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

33. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation. Audio Files will be stored for 180 days and Video Files will be stored for 90 days.

34. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

35. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

36. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

### Customer Responsibilities

37. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

38. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

39. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website

40. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

41. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those kiosks appropriate to their housing assignment.

42. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

### MailGuard™ Patent Pending Postal Mail Elimination System

43. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

44. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

45. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

46. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

47. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk/Kiosk Solutions™.

48. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

49. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

50. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Mail Box for electronic delivery via the MailGuard™ system.

51. Provider shall be solely responsible for the cost of maintaining the Mail Box for incoming routine mail to be sent.

52. Provider will retrieve incoming routine mail from the designated Mail Box and process and transmit that mail in an expeditious manner.

53. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

54. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

55. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

56. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

57. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.


**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.


Customer: Correct Solutions Group

By: _____

Name: Patrick Temple

Title: Managing Director

Date: 3/16/18

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270


Provider: Smart Communications Holding, Inc.

By: _____

Name: Jon Logan

Title: CEO

Date: 3/16/18

Email: jon.logan@smartcommunications.us

Notice Address:
4522 West North B Street
Tampa, FL 33609



## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between **Wayne County Sheriff's Office** located at 266 East Walnut Street, Jesup, GA 31546 herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and;

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective upon the date of installation of equipment ("Effective Date"), and shall continue in effect for a period of 1 year ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement for a period of 4 (four) successive one year periods. Each renewal will be based on a yearly review of services provided by CSG. This Agreement will automatically renew under the terms described as Initial Term unless either party notifies the other in writing of its intent to terminate this Agreement at least 90 days prior to the final date of expiration. Upon termination of this Agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this Agreement.

2. **SCOPE OF AGREEMENT**

   2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems and /or inmate video visitation within its building or on its private property ("Location") during the term of this Agreement.

2.2  This Agreement includes all other premises, whether now existing or subsequently acquired, under the control of Facility.  Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

2.3  CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility equipment, handle all billing and payments.  CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated unbillables.

2.4  CSG shall install and maintain Equipment in good working order.  CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5  CSG agrees to provide Equipment as indicated in Attachment A for the Term of this Agreement.

2.6  CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue.  All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.7  Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility.  In the event Facility is not the owner of the premises, Facility shall, where necessary, obtain permission from building owner or owner's agent for the placement of CSG's Equipment, and shall be responsible for any fees for use of required riser cable and electric power.

2.8  Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.9  Facility agrees to all CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.10  Facility agrees to allow CSG access to and use of house cable and inside wire at no cost, in order to install and provide inmate telephone service.  Any new house cable or inside wire pertaining to the commnications services expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11  Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be mutually agreed upon in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.12  Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.13  CSG shall provide Facility with value-added features as listed in Attachment A.

2.14  In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment B.

3.  **OWNERSHIP.**  Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense.  CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment.  Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment.  Facility shall restore the premises to their original condition.  CSG shall not be responsible for damage to the premises that occur due to vandalism.  CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4.  **LEGAL ENFORCEMENT.**  If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5.  **LAWFULNESS OF AGREEMENT.**  The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6.  **NONWAIVER.**  The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7.  **GOVERNING LAW.**  This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State of Georgia.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment A must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

11. **LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

12. **DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy usch default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

13. **REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

14. **NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**                              **FOR CSG**

Attn:      John Carter, Sheriff          Attn:      Patrick Temple

Address:   266 East Walnut Street        Address:   182 Bastille Lane
           Jesup, GA 31546                          Ruston, LA 71270

## ATTACHMENT A

## PROVIDED EQUIPMENT

Telephone/Video Communication Service-Related Equipment/Systems

Correct Solutions ITS Call Processing, including:
- Inmate Telephones
- Cart Phones
- TDD/TTY units
- Inmate Visitation Phones
- Offender & Public Video Visitation Kiosks (Law Library, Requests\Grievances, etc)
- Unlimited ITS User Licenses
- Unlimted SMART User Licenses
- Interface to JMS Platform
    - Automated Inmate ID\PIN\Voice Recognition
    - Automated Offender access JMS Information via Kiosk (Court Date, Bond Amount, Charges, etc.)
- Interface to Commissary Platform
    - Automated Debit Calling
    - Kiosk Commissary Ordering
- Inmate Voice Mail
    - Messages priced at $.50 per Message with 60% Revenue Share

**ATTACHMENT B**

**FINANCIAL COMPENSATION**

| ALL CALLING RATES | | |
|---|---|---|
| Call Type | Per Call Charge | Per Minute Charge |
| Local | $0.00 | $0.18 |
| Intrastate/Intralata | $0.00 | $0.31 |
| Intrastate/Interlata | $0.00 | $0.31 |
| Interstate | $0.00 | $0.25 |

Compensation

Correct Solutions shall pay County a commission of 60% of the gross call revenue for all call types with the exception of interstate calls due to FCC ruling. Correct Solutions will also pay County 60% for any service fees collected for inmate voicemail.

15. **ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**Signatures:  The persons signing below signify that they have the authority from their respective business entities to execute this Agreement.**

Wayne County Sheriff's Office

_____
Signature

John G. Carter
Printed Name

Sheriff
Title

2/6/2018
Date

CSG

_____
Signature

Bobby L. McLamore          Patrick M. Temple
Printed Name

Sales Consultant       Manager
Title

2/6/2018          2/6/18
Date

March 15, 2018 - Last day for Paytel Contract

**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Smart Communications Holdings, Inc.
10491 72nd Street
Seminole, Florida 33777
Attn: James P. Logan & David Gann

9590 9402 1391 5285 9668 09

2. Article Number *(Transfer from service label)*

7014 2870 0002 3604 6695

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Kanderson_   ☐ Agent
                 ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt