UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

                                              Case No: 8:20-cv-1469-T-30JSS

    Plaintiff,

vs.

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

    Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff, Smart Communications Holding, Inc. ("Smart") files this Second Amended Complaint against Defendant, Correct Solutions, LLC a/k/a Correct Solutions Group, LLC ("CSG"), and alleges as follows:

### Introduction

1.    This is a case where one party to a series of contracts is so covetous of the other party's financial success under the contracts that it will stop at nothing to acquire a portion of those benefits for itself.

2.    Smart and CSG both provide inmate communications services to correctional facilities. The parties mutually benefitted from a successful business arrangement for approximately two years in which Smart was the exclusive provider of certain services to the parties' joint customers (the "Joint Customers" as defined *infra*). However, having found another source for Smart's services that is apparently more financially lucrative, CSG concocted and engaged in a series of duplicitous, bad faith efforts to deprive Smart of its significant investment in the exclusive relationship and its ability to realize the benefits of the parties' bargain.

3.      In furtherance of its plot to wrongfully push Smart out of all the parties' Joint Customer facilities, CSG smeared Smart's name and reputation and solicited exaggerated complaints about Smart's products and services. CSG expanded its attack beyond stealing Smart's business from the parties' joint customers and additionally targeted Smart's own direct customers. CSG's stated goal was to replace Smart and deprive it of its exclusive relationships and significant revenue. On information and belief, CSG has systematically broadened its attack on Smart throughout the marketplace and has maligned Smart's reputation at every opportunity, especially when competing for the same business.

4.      Smart was forced to file this lawsuit when CSG recently attempted to terminate the parties' relationship and thereby remove Smart as the exclusive provider of certain services to the parties' several Joint Customers. However, as described below, CSG's stated grounds for termination have no merit and, in any event, do not qualify as grounds for termination under the exclusive agreements between the parties.

5.      With its first termination attempt halted, CSG continued to manufacture reasons to remove Smart and shift Smart's revenues to its own coffers. While doing so, CSG has repeatedly ignored its primary obligation under the parties' agreements—to provide exclusive access to the Joint Customers to allow Smart to provide its services and earn revenue. Worse yet, after realizing its termination attempts had no merit, CSG sent non-renewal notices that run afoul of the understanding and agreements between the parties. After the Court found Smart likely to succeed on its claim that CSG cannot renew contracts with Joint Customers without including Smart's services, CSG then caused some of the Joint Customers to send non-renewal notices to CSG. This strategy was employed strictly to remove Smart and neither CSG nor these Joint Customers have shown any sign that the customers will actually terminate their relationships with CSG.

4823-0463-6870, v. 1

6.    As the parties' relationship deteriorated, CSG interfered with Smart's relationship not only with the Joint Customers, including by slandering Smart's name and reputation, but also with other of Smart's customers throughout the state of Arkansas. Smart also discovered that CSG defrauded Smart by failing to obtain promised extensions and/or amendments to the contracts between CSG and the Joint Customers.

7.    Smart seeks declaratory and injunctive relief, in addition to damages for the significant harm Defendants have caused.

## Parties, Jurisdiction, and Venue

8.    Smart is a Florida corporation with its principal place of business in Pinellas County, Florida. Smart provides various services to correctional facilities throughout the country, including in the state of Florida.

9.    CSG is a foreign limited liability company registered to do business in Florida. Its principal place of business is in Lincoln Parish, Louisiana. This Court has jurisdiction over CSG: (a) pursuant to section 48.193(1)(a)(1), Florida Statutes, because it has a registered agent in Florida at 1200 South Pine Island Road, Plantation, Florida 33324; (b) pursuant to section 48.193(1)(a)(7), Florida Statutes, because it has breached a contract in this state by failing to perform acts required by the contract to be performed in this state; and (c) pursuant to section 48.193(2) because it is engaged in substantial and not isolated activity within Florida.

10.    The Florida Public Service Commission has granted CSG a certificate to provide pay telephone services in Florida. CSG solicits business from Florida institutions and has obtained contracts to provide services to Florida governmental entities. For example, CSG provides inmate telephone communications services in Florida pursuant to contracts with customers. Accordingly,

3

CSG is engaged in substantial business activity in Florida, such that it should anticipate being haled into court in Florida.

11.     Venue is proper in this Court because the causes of action accrued in this district and because the contracts upon which this action is based include mandatory forum selection clauses identifying courts in Hillsborough County as the exclusive venue for litigation arising under the contracts.

## Background of the Parties' Relationship

12.     CSG provides an inmate telephone platform through which it installs telecommunications equipment at correctional facilities and charges inmates or their contacts on a per-call basis. CSG derives revenue from its platform, a portion of which it agrees to share with the correctional facilities pursuant to a commission arrangement.

13.     CSG's contracts and communications with correctional facilities, including CSG's commission structure with each facility, are publicly-available documents. In particular, CSG's contracts and communications with correctional facilities and their corresponding governmental entities are subject to public disclosure under applicable state statutes.

14.     Historically, CSG has provided products and services focused on telephone communications. CSG did not offer alternative methods of communication, such as electronic mail or text messaging, to be deployed for the benefit of inmates at its customers' correctional facilities. As a result, CSG was unable to fully service its customers who desired a broader spectrum of communications options and services for their inmates.

15.     Historically, Smart has provided a suite of services available to inmates through kiosks and tablets, including electronic messaging, grievance and medical forms, video visitation, a law library, entertainment, and educational content. Smart has also provided correctional

4823-0463-6870, v. 1

facilities with the ability to monitor and control inmate communications through a proprietary and trade secret technology package and with patented mail scanning services to eliminate or control the flow of physical postal mail into facilities. Until early 2019, Smart did not provide telephone communication services.

16.    To meet the needs of their existing customers and remain competitive in the inmate communications industry, CSG approached Smart in 2017 about an arrangement whereby CSG's customers could obtain the benefits of Smart's state-of-the-art electronic communications system. CSG pursued Smart for many reasons. First, correctional facilities desired to provide inmates with communication options other than telephone calls, such as electronic messaging. Second, facilities sought a system that was easy to use and provided inmates with direct access to necessary forms, entertainment, and educational content. Third, facility staff desired more investigative features to easily monitor and track their inmates' routine, non-legal communications with the outside world. CSG could not meet these needs and knew that Smart had pioneered inmate messaging with a system, developed and refined over time, which presented an unmatched collection of features and functions. To be associated with Smart in the eyes of their customers was to be connected with innovation and quality and only served to increase CSG's ability to continue their customer relationships through contract renewals.

17.    Ultimately, due to its partnership arrangement with Smart, CSG was able to satisfy its existing customers and was also able to obtain new customers.

18.    The intent of the proposed business relationship was that CSG and Smart would each provide their respective services directly to a pool of customers. As opposed to CSG incorporating Smart's platform into its own system, the products and services of the parties remained separate and distinct. Neither an inmate nor a facility staff member had to access CSG's

telephone system in order to access Smart's messaging system. Smart trained and interfaced directly with facility staff on all issues related to Smart's services. Smart collected revenue in its ordinary course when facility inmates exchanged messages with outside contacts, without involvement of CSG. The facility customers, some of which were existing CSG customers, became Joint Customers of both parties by virtue of the services being directly provided by each party.[1]

19.     In contemplation of this potential business arrangement, on June 15, 2017, Smart and CSG entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA"). A true, complete, and authentic copy of the NDA is attached as **Exhibit A**.

20.     Pursuant to the NDA, the parties excluded from the definition of Confidential Information "any materials or information…generally known…by the public…", among other exclusions.

21.     In the Fall of 2017, Smart demonstrated its products and services, including its correctional grade tablets, to CSG at CSG's headquarters in Louisiana. Substantially all of CSG's company executives, sales representatives, IT personnel, and field services representatives were in attendance.

22.     During the demonstration, CSG's employees handled and operated Smart's tablets and could see and feel the construction of the tablets. CSG's employees expressed to Smart that they were very impressed and satisfied with all of Smart products, including the tablets.

### The Parties' Exclusive Dealing Contracts

23.     In August, 2017, Smart and CSG negotiated the terms of the parties' exclusive dealing contracts relating to the Joint Customers. Mark Turner ("Turner") handled the negotiations for CSG, while Rob Deglman and Jon Logan handled the negotiations for Smart.

---

[1] The group of facility customers that obtained the services of both CSG and Smart shall be hereinafter referred to as the Joint Customers, more specifically identified in Paragraph 39.

6

24.    The parties agreed that each contract would include a master services agreement, which included the general terms of the relationship between CSG and Smart and which attached and incorporated the contract between CSG and the Joint Customer, an amendment to the contract between CSG and the Joint Customer, which added Smart's services to the contract, and a Schedule, which defined the particular services that Smart was going to provide to the Joint Customer.

25.    Due to the significant financial investment Smart was going to undertake in installing its equipment and services and necessary infrastructure into each Joint Customer facility, Smart originally requested a seven year term for each exclusive dealing contract to ensure it had adequate time to recoup and obtain a return on its investment. However, given that CSG had existing agreements with some of the Joint Customers, all of which included favorable renewal terms, Smart and CSG instead agreed that the term of each master services agreement between Smart and CSG would be "co-terminous" with each contract between CSG and the Joint Customer. That is, Smart and CSG agreed that, as long as CSG provided services to a Joint Customer, then Smart would exclusively provide the services identified in the Schedule to the Joint Customer.

26.    Turner expressly represented to Smart that a "co-terminous" term was better than a seven year term because CSG's customers renewed their contracts with CSG customarily and without fail.

27.    Turner expressly represented to Smart that, for the period in which CSG provided its services to these facilities, then Smart would be the inmate messaging provider, as long as there were no un-cured performance related issues.

28.    Turner never told Smart that CSG may let a contract with a Joint Customer expire solely for the purpose of removing Smart's services from the relationship and then enter into a new

4823-0463-6870, v. 1

but substantially similar contract using one of Smart's competitors as the provider of Smart's messaging services.

29.    The first contract executed by Smart and CSG related to Avoyelles Parish, Louisiana, which was an existing CSG customer by virtue of the Proposal Contract and Agreement between CSG and Avoyelles (the "CSG/Avoyelles Contract").

30.    In late August, 2017, CSG sent Smart a copy of the CSG/Avoyelles Contract, a draft amendment which added the services to be provided by Smart, and a master services agreement for the Avoyelles project.

31.    On August 14, 2017 and August 22, 2017, Avoyelles and CSG, respectively, executed the First Amendment to Contract and Agreement (the "Amendment").

32.    On August 31, 2017, Smart executed the Master Services Agreement and Schedule for the Avoyelles project. As described above, although each agreement between Smart and CSG was to include a master services agreement, the master services agreement was the same in each case, as it described the general terms of the parties' relationship. Accordingly, the Master Services Agreement shall be referred to hereinafter as the "MSA" because its terms are the same whether it is the MSA for the Avoyelles agreement or the MSA for any other Joint Customer agreement.

33.    On September 13, 2017, CSG executed the MSA and Schedule for the Avoyelles project, completing the Avoyelles contract. A true, complete, and authentic copy of the CSG/Avoyelles Contract, Amendment, MSA, and Schedule (collectively, the "Avoyelles Agreement") is attached as **Exhibit B**.

34.    Turner expressly represented to Smart that each subsequent Joint Customer agreement would be structured the same way. Specifically, CSG would obtain amendments signed by each Joint Customer which would incorporate Smart's specific services into each CSG/Joint

8

Customer contract. Turner further represented that he would use Smart's services to secure contract extensions with Joint Customers and/or to further solidify relationships with Joint Customers.

35.    Smart and CSG subsequently executed Schedules for other Joint Customers, some of which were existing CSG customers and some of which CSG and Smart pitched and obtained as part of a collective effort. Rather than execute a new MSA for each Joint Customer, Smart and CSG agreed to use the same MSA as part of each Joint Customer agreement.

36.    CSG did not obtain amendments to directly add Smart's services to each of CSG's contracts with the Joint Customers as CSG had done with Avoyelles and as Turner had represented would occur.

37.    Smart and CSG executed a Schedule for the following Joint Customers (the "Joint Customers"):

a.    City of St. Louis, Missouri
b.    Sebastian County, Arkansas Sheriff's Office
c.    Washington County, Arkansas
d.    Bowie County, Texas
e.    Wayne County, Georgia
f.    Avoyelles Parish, Louisiana
g.    Lamar County, Mississippi
h.    Moore County, Tennessee

38.    The term of the MSA for each Joint Customer agreement was "co-terminous" with the term of the Joint Customer's contract with CSG, including any ongoing renewal periods, between CSG and the Joint Customer for CSG to continue to provide its services. Specifically, Paragraph 6 of the MSA provides:

> Term.  This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement

9

> shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

39. Accordingly, if CSG and a Joint Customer renew the term of their contract, then the MSA between Smart and CSG continues for that Joint Customer because Smart's term is "co-terminous." Further, based on Turner's representations and the intent of the parties, if CSG continues to provide service to a Joint Customer pursuant to a renewal, extension, or implied agreement, irrespective of any formal renewal, then Smart continues to provide its services to the Joint Customer for a co-terminous period.

40. Pursuant to the MSA, Smart obtained the ***exclusive right*** to install, provide, and derive revenue from its inmate communications systems and various other services identified on Schedules for each Joint Customer. In exchange, CSG was able to maintain its relationships with the Joint Customers by providing for them the additional high-quality inmate communications services they desired.

41. Pursuant to the MSA, Smart retains all revenue it generates from inmates using its messaging system through the Smart kiosks and tablets. In other words, CSG does not share in any revenue derived from messaging services at the Joint Customer facilities.

42. The MSA for each Joint Customer does not include a termination without cause or termination on convenience clause.

43. Paragraph 9 of the MSA provides the only grounds for termination, as follows:

> <u>Default and Termination.</u>   If either party defaults ***in the performance of any obligation*** under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as

4823-0463-6870, v. 1

long as the defaulting Party is has [sic] made good faith attempts to cure the default. Upon termination of this Agreement, Provider shall remove all hardware and software Systems except for the cabling and conduit which shall become the property of the Customer. Provider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement.
(emphasis added).

44.    Accordingly, pursuant to the MSA, only Smart, as the Provider, may terminate an MSA for a particular Joint Customer if CSG breaches the confidentiality or non-disclosure provisions of that MSA with respect to that Joint Customer.

45.    Indeed, CSG has no right to terminate an MSA during the term of any of the Joint Customer agreements other than by identifying a legitimate default in Smart's performance of the service obligations of the MSA, which are set forth in more detail in the Schedules, and then providing a reasonable opportunity to cure the default.

### CSG's Attempts to Seize Smart's Revenue and Market Share

46.    By early 2018, the Joint Customers were satisfied with Smart's services and Smart was earning significant revenue due to the popularity of its messaging platform with inmates. Under the terms of its agreements with CSG, Smart was not obligated to share any of its messaging revenue with either CSG or the Joint Customers.

47.    As a result, CSG became determined to obtain a more profitable arrangement to acquire some of the business, revenue, and/or market share that it had promised to Smart on an exclusive basis. Knowing that it had no basis or ability to terminate the MSA for any of the Joint Customers, CSG first tried lawful means.

48.    In March 2018, CSG attempted to purchase Smart; however, Smart was not interested in any such acquisition. CSG then attempted to hire multiple key employees of Smart. Presumably, CSG sought to obtain valuable business information or new or enhanced relationships

11

with customers; however, the Smart employees were not interested in working for CSG and rejected its offers.

49.     CSG also asked Smart to voluntarily relinquish its exclusive rights with respect to some Joint Customers, which Smart was not interested in doing.

50.     In or around January 2019, Smart expanded its portfolio to offer telephone communication services to correctional facilities. CSG had knowledge of Smart's intent to provide telephone services even before Smart obtained the ability to do so. CSG and Smart executives discussed Smart's new capabilities and CSG represented that it had no problem with Smart offering telephone services.

51.     Apparently, however, CSG was either not pleased with Smart's entry into the telephone business or believed it could leverage this fact in its quest to generate revenue from inmate messaging vendor partners. Within the next two months, CSG had already put a plan in motion to remove Smart from the Joint Customer facilities and replace it with a new partner who would share its revenue with CSG.

52.     In order to replace Smart's services, and in furtherance of its goal to derive substantial revenue from the replacement provider, CSG developed a relationship with Tech Friends, a competitor of Smart's which provides electronic messaging, entertainment, and educational services to inmates through tablets.

53.     By April 1, 2019, CSG had already pitched the Tech Friends tablets to at least one Joint Customer—Sebastian County. On April 1, 2019, Captain William Dumas thanked CSG for dinner and lunch the prior week and indicated that he had permission from the Sheriff to move forward with the Tech Friends tablets. CSG employee Rick Ferguson ("Ferguson") forwarded the

email to Turner and Turner responded: "We have to get Smart out first though don't we?" A true,

complete, and authentic copy of the April 1, 2019 email exchange is attached as **Exhibit C**.

54.     By this time upon information and belief, CSG and Tech Friends had negotiated or

were in the process of negotiating a revenue sharing deal whereby CSG would retain Tech Friends

as the inmate messaging subcontractor in facilities where CSG provided telephone services,

including the Joint Customer facilities where CSG had previously promised exclusivity of those

inmate messaging services to Smart. CSG's motivation to replace Smart with Tech Friends was

simple—Tech Friends promised to share up to 50% of its messaging revenue with CSG. If CSG

could "get Smart out," then CSG stood to gain significant revenue from a sharing mechanism that

was not part of its agreements with Smart.

### CSG's Response to Smart's Marketing Email

55.     On or about April 8, 2019, Smart sent a mass marketing email to its customers. The

email was a general advertisement—it was not tailored toward or directed at any particular

customer. A true, complete, and authentic copy of the marketing email is attached as **Exhibit D**.

56.     Because CSG was already hatching a plan to "get Smart out" in the months prior,

it ultimately decided to use this email advertisement as a pretextual springboard to launch its

unlawful termination, in accordance with that plan.

57.     But first, CSG began a campaign of tarnishing Smart's reputation and soliciting

exaggerated complaints from the Joint Customers about Smart's services in an effort to generate

support and additional pretext for its efforts to remove Smart.

58.     On April 22, 2019, Ferguson emailed Captain Dumas of Sebastian County and

asked him to "forward me bullet points on smart issues…" Captain Dumas responded the same

day with a list, saying, "If you need more I'm sure we can think of it." A true, complete, and

13

authentic copy of Ferguson's and Dumas's April 22, 2019 email exchange is attached as **Exhibit E.**

59.     Dumas's complaints can be categorized in three groups: (a) items that are not included in the Schedule for Sebastian County, *i.e.*, items Smart has no contractual obligation to provide ("Failed to install books, games" and "Failed to move to new platform for better performance"); (b) vague and unsubstantiated product and service issues ("Constant tablet failures and issues" and "Poor service, unstable product"); and (c) a blatant attempt to re-trade a deal to acquire a new source of revenue ("No increase on credits for revenue sharing"), which again was not a contractual obligation.

60.     Ferguson did not forward Dumas's email to Smart or otherwise notify Smart of these purported issues, thereby denying Smart the opportunity to respond, including to clarify the services that Smart was (and was not) contractually obligated to provide.  On information and belief, Ferguson made no effort to clarify or explain Smart's contractual obligations and instead continually reinforced the false notion that Smart was not meeting its service obligations.

61.     On May 17, 2019, at 3:28 p.m., Ferguson forwarded Dumas's email to Turner and asked him to draft a 30-day cure letter to Smart. Turner and Ferguson obviously did not think the issues identified in Dumas's April 22, 2019 email were either substantial or urgent enough to address at that time. Instead, CSG only later decided to use these issues as grounds to threaten termination of the Sebastian MSA by issuing a 30-day notice to cure approximately five months later, in September 2019.

62.     Ferguson continued CSG's campaign of tarnishing Smart and soliciting complaints about Smart. For example, on May 17, 2019, at 3:32 p.m., Ferguson sent an email to one of the Joint Customers, Washington County, and stated:

> Hey Alan
> I hope you made it back safe. I hobbled home yesterday afternoon.☺
> I'm getting a lot of calls from my SMART customers complaining
> about product, service, and overall performance. To the point where
> I might be replacing them…Soon. **I have not heard from you** but I
> wanted to follow up and see how you were being serviced by them.
> **I appreciate ya brother**.

A true, complete, and authentic copy of Ferguson's May 17, 2019 email is attached as **Exhibit F.**

63.     Ferguson's email admits that he had not previously heard from Washington County with any complaints about Smart. Yet, Ferguson went out of his way to tell his "brother" Alan Johnson about other customers supposedly complaining about Smart and his plans to terminate Smart. The clear implication was: "Brother, can you please help me out by providing me with any complaints and issues you can think of that I can use to replace Smart."

64.     Upon information and belief, Ferguson sent similar emails to other Joint Customers and other facilities throughout the region in an effort to both solicit complaints about Smart and to implicitly, if not expressly, ruin Smart's reputation as a service provider. Upon information and belief, CSG and Ferguson undertook these extensive, regional efforts in order to create a critical mass or "tipping point," whereby the false rumors and complaints they initiated became more and more believable based on their volume and wide-spread nature alone, which caused more scrutiny and snowballed to generate even more specious complaints. Upon information and belief, Ferguson also encouraged the Joint Customers and other customers throughout the region to discuss such "complaints" and issues amongst themselves, so that they could share ideas that may prove helpful in Ferguson's efforts to compile a list of complaints and to further spread his false narratives about Smart to pile on the harm to Smart's reputation.

**CSG's First Improper Termination Attempt**

65.     On June 21, 2019, CSG's leadership team discussed using Smart's advertisement as grounds for "pulling the plug on all Smart devices on a set day." Turner indicated that "we have TF [Tech Friends] lined up to come in…" Ferguson agreed that CSG should have "a very strategic plan with Tech Friends…in place and brief the customer before the blade falls, because when it does, the only panic taking place should be in Smart's conference room." A true, complete, and authentic copy of the June 21-22, 2019 CSG email exchange is attached as **Exhibit G.**

66.     Turner wanted to use Smart's advertisement as grounds to terminate Smart, as opposed to the service complaints CSG had been soliciting for the previous few months, because he believed that the NDA permitted CSG to immediately terminate Smart from all Joint Customer facilities at once without providing Smart with notice and an opportunity to cure.

67.     On July 10, 2019, CSG and Tech Friends executed the Master Services and Supply Agreement, which was effective June 1, 2019 (the "CSG/Tech Friends Agreement"). A true, complete, and authentic copy of the CSG/Tech Friends Agreement is attached as **Exhibit H**.

68.     The CSG/Tech Friends Agreement provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by Web Pack shipping fees" for the Legacy Accounts, which include four Joint Customers—Bowie County, Moore County, Sebastian County, and St. Louis County.

69.     The CSG/Tech Friends Agreement further provides that Tech Friends shall pay CSG "50% of the Net Revenue generated by user fees paid for debit movement, electronic mail, video visitation, and Tablet rentals."

70.     With the more favorable CSG/Tech Friends Agreement in place, which provided a substantial source of revenue for CSG where it previously had none, it could now execute the final step of its plan to "get Smart out."  Importantly, the revenue sharing arrangement between Tech

16

Friends and CSG was made possible at least in part because Smart had already installed the necessary infrastructure (e.g., networking and power distribution) for its equipment at the Joint Customer facilities, which was a significant upfront expense Tech Friends could avoid.

71.    By way of a letter dated July 17, 2019, CSG accused Smart of violating the NDA and breaching the MSA. The letter also purported to terminate all Joint Customer Agreements. A true, complete, and authentic copy of CSG's letter dated July 17, 2019 is attached as **Exhibit I.**

72.    Despite the fact that Ferguson had been attempting to solicit performance complaints about Smart for at least the previous few months, the letter does not raise any performance-related issues. Nor does the letter ask Smart to cure any service-related deficiencies. Instead, the letter sets forth the untenable position that, because Smart sent a mass email advertising that it pays 100% commission on telephone revenue, it must have stolen and used CSG's confidential information.

73.    But CSG did not even identify the Confidential Information that Smart supposedly used. The sum of the factual predicate for CSG's accusations is as follows:

> Specifically, Smart employee Jennifer Tongate has made contact with current CSG customer, city of St. Louis facility, offering greater commission to the facility than CSG pays to the customer. Smart employee Jennifer Tongate had no prior relationship with the St. Louis facility and had never met the contact at the St. Louis facility before being introduced by CSG as a result of the contractual relationship between Smart and CSG.

74.    By stating that Smart's employee had "no prior relationship," CSG appears to take the untenable position that the identity or contact information of the person at the City of St. Louis to whom the email was sent is somehow "confidential."

75.    But pursuant to Section 8 of the Agreement, "Confidential Information" does not include, among other things: "(a) Information which now is in the public domain or publicly known

at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party….or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party."

76.     In order to obtain the benefit of Smart's services, including regular direct communications on repair and maintenance issues, the City of St. Louis voluntarily identified and provided the contact information of Frank Turner as Smart's point of contact. Further, Frank Turner is a publicly-known government employee. His information is simply not "confidential" under any definition (including those in the NDA and MSA), especially when he voluntarily communicated with Smart on a regular basis. As described below, Frank Turner later confirmed the public nature of his email address to CSG and its outside counsel.

77.     The motivation behind the letter is clear: CSG had a more profitable arrangement in place for the business it had previously expressly and exclusively promised to Smart.

78.     Accordingly, CSG's claims that Smart violated the NDA and breached the MSA are based on accusations that have no merit as a matter of law.

79.     On July 26, 2019, just two days after Smart received CSG's July 17, 2019 letter, Smart sent a response letter. A true, complete, and authentic copy of the July 26, 2019 response letter is attached as **Exhibit J.**

80.     In its letter, Smart informed CSG that CSG may not terminate the MSA or Schedules for a breach of a confidentiality or non-disclosure provision of the MSA or NDA.

81.     Later on July 26, 2019, CSG responded by its counsel's email to Smart and affirmatively stated that "Correct Solutions has not slandered Smart, or spoken ill of Smart to any

Smart customers or potential customers." However, CSG's response did not substantively address Smart's letter.

82.     Moreover, CSG's counsel's statement was demonstrably false. As described above, just a couple of months earlier, Ferguson had not only slandered and spoken ill of Smart, he had repeatedly solicited complaints about Smart from the Joint Customers.

### CSG's Continued Attack on Smart

83.     After Smart informed CSG of the futility of its termination attempt, CSG ramped up its efforts to turn Joint Customers against Smart, including by secretly informing them that CSG and Smart no longer have a business relationship.  Upon information and belief, CSG notified the Joint Customers that it terminated Smart's contract after its counsel sent the July 17, 2019 letter.

84.     CSG did not limit its misinformation and smear campaign to the Joint Customers. By way of example, CSG informed Smart's own direct customer, Miller County, that the parties did not have a relationship. In particular, upon information and belief, Ferguson claimed CSG terminated Smart as a business partner servicing the many different Joint Customer facilities due to all the complaints CSG received about Smart's poor service—complaints that Ferguson himself had solicited, encouraged, amplified, and spread. But these statements and representations were false because, as described above, CSG had not effectively terminated any of the MSAs or Schedules. CSG and Smart, quite clearly, still had a business relationship. As a direct result of these false statements and bad faith conduct, Miller County accused Smart of being "misleading" and "not truthful" and threatened to discontinue doing business with Smart. A true, complete, and authentic copy of the July 29, 2017 email from Miller County is attached as **Exhibit K.**

85.     CSG's false statements have caused and continue to cause harm to Smart's reputation and goodwill throughout the industry. Upon information and belief, CSG has

19

systematically attacked and maligned Smart's reputation at every turn, and has wielded this false
and contrived narrative to its advantage against Smart in attempting to gain new business,
including, for example, at Greene County, Arkansas and Pope County, Arkansas.

86.     In addition, Ferguson's previous solicitation email and further efforts to smear
Smart damaged and ultimately destroyed Smart's relationship with Washington County. On July
31, 2019, Ferguson's "brother" Alan Johnson emailed complaining about supposed service issues
and advising Smart that Washington County will be "actively looking for a new vendor to replace
Smart Communications." Johnson immediately forwarded the email to Ferguson. A true, complete,
and authentic copy of the July 31, 2019 email string is attached as **Exhibit L.**

87.     By Ferguson's own prior admissions (at least in his solicitation emails),
Washington County did not have any significant issues with Smart's services. Any minor issues
had either been addressed or were in the process of being addressed when Washington County
abruptly changed its position and informed Smart of its decision to seek a new vendor.

88.     On August 6, 2019, Smart filed a Motion for Temporary Injunction, seeking to
prohibit CSG from terminating the MSA or Schedules. Shortly thereafter, counsel for Smart and
CSG began discussing a stipulation to maintain the status quo in lieu of attending a hearing on the
motion.

89.     On August 13, 2019, counsel for CSG confirmed that CSG would not disconnect
Smart's services or inform the Joint Customers that Smart has been terminated *or otherwise
disavow the relationship between CSG and Smart*.

90.     On August 15, 2019, two days after CSG's promise not to disavow its relationship
with Smart to the Joint Customers, Ferguson emailed his "Team," which included Washington and
Sebastian Counties, with his best attempt to ruin Smart's relationships with these entities:

**Team**
In order to move **our plight** quickly along please note the following
**instruction**:
Send all your Smart needs for repairs, questions, complaints (and
**don't hold back** other than 4 letter words or graphic sentences) etc
to:
arsupport@correctsolutionsgroup.com
please **do not send to Smart**
**CSG will now put them on the clock each time a ticket is opened**
and forwarded. Feel free to use a spread sheet or direct sentences.
Also, be very specific in your request when necessary, ie, cell, issue,
wiring…etc. If it's a generic fix just use your usual correspondence.
Please **call me if you have questions** or need additional
information. I sincerely apologize for **this most disappointing
service provider but we are on the downhill run and I want to
keep up the momentum**
**I really appreciate your assistance**.
See y'all soon.
Rick

A true, complete, and authentic copy of Ferguson's August 15, 2019 email is attached as

**Exhibit M**.

91.    Ferguson sent a similar email on the same day to another Joint Customer, Bowie

County. In the email, Ferguson again referred to "our plight," solicited complaints about Smart

from Bowie County, and directed Bowie to abstain from direct communication with Smart. A true,

complete, and authentic copy of Ferguson's August 15, 2019 email is attached as **Exhibit N**.

92.    Also on August 15, 2019, Rick Pruitt with CSG sent an internal email to CSG's

Sales team and Field Service Managers instructing them in detail on how to solicit, report, follow-

up with, and document Joint Customer complaints about Smart. Pruitt concluded his email with:

"This will be long enough for either Smart to comply with their service obligations or for their

equipment to be removed/turned off by the customers due to frustrations." A true, complete, and

authentic copy of Pruitt's August 15, 2019 email is attached as **Exhibit O**.

93.    Accordingly, contrary to the parties' ordinary course of dealing for the previous two years, and after agreeing to the "status quo" stipulation, CSG abruptly stepped in between Smart and the Joint Customers to seize control of all communications and, in particular, to prevent Smart from directly communicating with them.

94.    CSG was also now coaching the Joint Customers on how to complain about Smart in a way that might help CSG with its "plight." For example, the following day, Ferguson's "brother" Alan Johnson forwarded an email Smart had sent to Washington County about some service upgrades, along with Washington County's draft response to Smart. Johnson stated that Washington had not sent the response and asked: "What do you advise? Do you want us to send the response or do you want to handle it?" A true, complete, and authentic copy of the August 16, 2019 email string is attached as **Exhibit P.**

95.    While coaching Joint Customers on how to document complaints, CSG at the same time was acknowledging internally that Smart was promptly responding to service issues and inquiries from Joint Customers. On August 22, 2019, Pruitt emailed the CSG leadership team that Smart had responded within 24 hours to tickets submitted by Avoyelles and Washington County. In other words, to the public, Smart was inept, but, behind closed doors, Smart was responsive and efficient. Ironically, and perhaps because he could not bear to recognize Smart's own capabilities, Pruitt infers that Smart's prompt response time must be due to Smart copying CSG's field support and ticketing system. A true, complete, and authentic copy of Pruitt's August 22, 2019 email is attached as **Exhibit Q**.

96.    On August 23, 2019, "Team" member Sebastian County emailed Smart and requested "23 tablets and a single battery back in to be repaired or replaced." Smart immediately responded and tried to clarify Sebastian's request by questioning "What do you mean by battery

back? The battery's [sic] in the tablets are not removable." Sebastian County's response was elusive: "I am not understanding…the battery's [sic] are removable. I have several broken tablets with battery's [sic] hanging and a battery that is no longer in a tablet." Sebastian attached a photograph described as "a picture of a broken tablet and a battery from another tablet."

97.    Smart promptly sent Sebastian County 24 new tablets.

98.    Sebastian County forwarded this email exchange to CSG. Ferguson then sent the Sebastian County email exchange to his co-workers Mark Turner and Rick Pruitt with the phrase "Busted!!!  lol" So, rather than showing concern about an issue at a Joint Customer facility, Ferguson laughed out loud and relished in the apparent destruction of Smart's property. A true, complete, and authentic copy of the August 23, 2019 email string between Sebastian County and Smart, along with the related CSG email, is attached as **Exhibit R**.

99.    On August 27, 2019, Dumas emailed Ferguson about Smart. Dumas mistakenly declared that Smart "claimed that their product is inmate proof." The Schedule between Smart and CSG does not, however, claim that Smart's tablets are inmate proof. Rather, the Schedule describes the tablets as "ruggedized" and "corrections grade." Obviously, no tablet or similar electronic device is indestructible, particularly when it is operating in a corrections environment. Dumas also mistakenly claimed that Smart "has not fulfilled their agreement with Sebastian County to provide books and games on the tablets." The Schedule describes the services Smart is obligated to provide to Sebastian County, and it does not include entertainment content on tablets.

100.    Ferguson did not forward Dumas's email to Smart so that Smart had an opportunity to respond, including to clarify the services that Smart was contractually obligated to provide. Nor did CSG check the veracity of Sebastian County's claims and Smart's obligations under the MSA and Schedule. Instead, two weeks later, Ferguson used these issues as grounds to again threaten

termination of the MSA by issuing a 30-day notice to cure, as he knew he would when he declared Smart was "busted."

101.    On August 27, 2019, Ferguson again reminded Bowie County to continue to send complaints about Smart to CSG. Ferguson revealed his motivation for the instruction when he stated that "[w]e need to keep track of everything." Accordingly, Ferguson and CSG did not want the Joint Customers to send service issues or requests to CSG because CSG believed that procedure to be more efficient or effective. Rather, CSG wanted to "keep track of everything," so CSG could repeatedly "put Smart on the clock," in hopes of contriving or soliciting enough complaints to eventually terminate the relationship between Smart and CSG. Moreover, by inserting itself as a "gatekeeper" to filter through all complaints before Smart ever received them, CSG could artificially add to the delay in Smart's response time and allow the customer to assume or affirmatively blame the delayed response on Smart's poor service.  A true, complete, and authentic copy of Ferguson's August 27, 2019 email is attached as **Exhibit S**.

102.    Ferguson and CSG also set out to overburden Smart and make unreasonable service demands. For example, in his August 27, 2019 email, Ferguson specifically instructed Bowie County: "Don't hesitate to **request an onsite tech for issues regardless of what they are**." Upon information and belief, Ferguson gave a similar instruction to every Joint Customer.

103.    On August 29, 2019, outside counsel for CSG, Mark Turner of CSG, and Frank Turner of City of St. Louis participated in a telephone conference. CSG's attorneys asked Frank Turner if Smart was responsive to St. Louis's needs and Turner responded, "yes, they've always been quick to respond to my emails or phone calls." Further, on the call, Frank Turner confirmed that St. Louis City employee email addresses can be publicly obtained.

104.    On August 30, 2019, CSG and Smart finalized and entered into a Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits (the "Stipulation"). As part of the Stipulation, CSG agreed that is shall not induce or solicit complaints about Smart from any of the Joint Customers or Miller County. The Court entered the Stipulation on September 10, 2019.

105.    On September 3, 2019, just five days after Frank Turner confirmed to CSG and its counsel that Smart was always responsive to St. Louis's service communications, CSG initiated a service ticket to Smart stating that St. Louis "is requesting a technician on site to perform a walk through to repair numerous issues with charging stations…"

106.    On September 11, 2019, Smart emailed each of the Joint Customers to check in regarding Smart's services and the recent lack of communication from the Joint Customers. Smart offered to send a representative to each facility to discuss Smart's systems.

107.    The Joint Customers' responses, especially those of "Team" members Washington County and Sebastian County, demonstrate that CSG's "instruction" and plan to put Smart "on the clock" remained, even in light of the Stipulation.

108.    Ferguson's "brother" Alan Johnson immediately forwarded Smart's email to Ferguson and asked for instruction: "What do you want me to say to this?" A true, complete, and authentic copy of Johnson's September 11, 2019 email is attached as **Exhibit T**.

109.    Apparently upon Ferguson's instruction, Johnson responded to Smart's September 11, 2019 email with one question: "What do you expect to accomplish from this meeting?" Smart responded and then Washington ignored the response. A true, complete, and authentic copy of the email string between Washington and Smart is attached as **Exhibit U**.

25

110.    On September 13, 2019, "Team" member Sebastian County responded to Smart's email and stated, "I am going to have to pass on meeting with your representative." A true, complete, and authentic copy of Sebastian County's response email is attached as **Exhibit V**.

111.    Other Joint Customers, including the City of St. Louis, for example, also declined Smart's offers to engage in a productive dialogue about Smart's services and systems at the customers' facilities. City of St. Louis told Smart that they "have limited our communications to Correct Solutions…Any issues we may have will be directed to them."

112.    These Joint Customers declined Smart's attempts to communicate at CSG's direction because, by this point in time, CSG had already destroyed Smart's relationships with the facilities.

113.    Incredibly, on the same day that Sebastian County declined a meeting with Smart's representative, September 13, 2019, CSG sent Smart a Notice to Cure pursuant to the MSA (the "Notice to Cure"). CSG demanded that Smart provide "tamper-proof" tablets and electronic entertainment content to Sebastian County. The MSA and Sebastian Schedule do not obligate Smart to comply with either of those demands. A true, complete, and authentic copy of the September 13, 2019 Notice to Cure is attached as **Exhibit W**.

114.    In response to the Notice to Cure, Smart filed an emergency motion to enjoin termination based on the Notice to Cure. Captain Dumas flew from Arkansas to Tampa to testify for CSG at the hearing in opposition to Smart's motion.[2]

115.    Following CSG's second failed attempt to terminate the MSA through legal maneuvering, it has continued to engage in other bad-faith, coercive conduct, with the assistance of the "Team" members CSG had recently turned against Smart, in an effort to force Smart out of

---

[2] At the hearing, the Court did not permit a termination based on the Notice to Cure and fashioned a procedure, agreed to by CSG, by which it could not terminate the MSA without further Court order.

4823-0463-6870, v. 1

Joint Customer facilities, including by fatiguing Smart with repeated service tickets (regardless of how minor), requests for on-site visits (which require travel and significant time and expense), and worse, by harming Smart's economic interests through disabling its services and cutting off its source of income.

116.    For example, on or about September 19, 2019, Smart discovered that Sebastian County had disabled Smart's messaging system in numerous housing units within its facility. CSG either predicted this event the prior month (see Rick Pruitt's August 15, 2019 email foreshadowing that customers will "turn[] off" their equipment due to "frustrations"), or encouraged Sebastian County to take this approach. Yet, Sebastian County continued to use the other operational features of Smart's system, such as medical and grievance forms, intra-facility communication, and educational content, and continued to obtain the benefit of and labor from Smart's off-site MailGuard Postal Mail Elimination® services free of charge. CSG and Sebastian understand that Smart can only provide these services because it generates revenue from its messaging services, which Sebastian turned off. Moreover, CSG and Sebastian understand that Smart incurred significant out of pocket expenses to make its systems and services accessible to Sebastian County in reliance on obtaining exclusivity on the revenue-generating messaging function.

117.    Further, and similar to laughing out loud at the destruction of Smart's tablets in Sebastian County, CSG stood by while inmates severely damaged and destroyed Smart's kiosks at Avoyelles. Despite its contractual obligation to prevent third parties from modifying and disassembling Smart's hardware, CSG failed to prevent third-party inmates from destroying Smart's kiosks. CSG even blamed Smart for its own contractual defaults and for Avoyelles' failure to supervise the destructive conduct of its inmates.

4823-0463-6870, v. 1

**CSG's Notices of Non-Renewal**

118.    On October 4, CSG sent Smart a Notice of Non-Renewal of Master Services Agreement with respect to Washington County ("Notice of Non-Renewal"). A true, complete, and authentic copy of the Notice of Non-Renewal is attached as **Exhibit X**.

119.    The Notice of Non-Renewal attaches a Correctional Communications Service Agreement between CSG and Washington County (the "CSG/Washington Contract"). Both parties signed the CSG/Washington Contract on September 25, 2014.

120.    Section 14 of the Washington Agreement provides:

> The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

121.    Accordingly, unless either CSG or Washington County notified the other party in writing of its intent to terminate the CSG/Washington Contract at least 90 days prior to its expiration, the CSG/Washington Contract renewed for an additional 12 months.

122.    Neither party terminated the CSG/Washington Contract and, as a result, the CSG/Washington Contract renewed for another year, at least until January 4, 2021.

123.    As described above, each MSA is co-terminous with CSG's agreements with the Joint Customers. Because the CSG/Washington Contract was not terminated and automatically renewed, the MSA automatically renewed in accordance with the CSG/Washington Contract.

124.    The renewal of the MSA with respect to CSG/Washington Contract is consistent with the understanding of CSG and Smart when they executed the MSA. Due to Smart's significant

4823-0463-6870, v. 1

investment in the Joint Customer facilities, CSG and Smart understood and intended Smart to maintain its exclusive rights as long as CSG renewed any Joint Customer agreement.

125.    Further, Turner promised Smart that he would obtain amendments to each of CSG's contracts with the Joint Customers. These amendments would insert Smart's specific services into each Joint Customer contract such that, if a contract was renewed, then it would include Smart's services, which were included in the same contract as CSG's services.

126.    On November 21, 2019, CSG sent Smart similar Notices of Non-Renewal of the Sebastian County and Wayne County agreements. True, complete, and authentic copies of the Notices are attached as **Exhibit Y** and **Exhibit Z**.

127.    The Notices of Non-Renewal for Sebastian and Wayne County are also ineffective as CSG has not terminated its contracts with either of those counties. As a result, the "co-terminous" agreements with Smart remain in effect.

<u>Breaches of Smart's Exclusivity Agreements</u>

128.    Pursuant to the CSG/Tech Friends Agreement, and notwithstanding its obligations to Smart under the MSAs, CSG has apparently begun dismantling Smart's exclusivity rights in some of the Joint Customer facilities.

129.    Within one month of the Smart marketing email, on April 19, 2019, Ferguson emailed Commissioner Dale Glass of Joint Customer City of St. Louis about scheduling a presentation of Tech Friends' products. The presentation occurred at the City of St. Louis facility on April 23, 2019.

130.    On May 24, 2019, CSG set up a webinar between City of St. Louis and Tech Friends. On June 21, 2019, Ferguson emailed St. Louis to set up another meeting about the Tech Friends presentations, which took place on June 24, 2019.

4823-0463-6870, v. 1

131.    As described above, on July 10, 2019, CSG and Tech Friends executed the CSG/Tech Friends Agreement with retroactive effectiveness to June 1, 2019.

132.    On August 23, 2019, Tech Friends emailed Bowie County, one of the Legacy Accounts identified in the CSG/Tech Friends Agreement, regarding a Tablet/Kiosk Installation and stated:

> The current plan is to arrive onsite with hardware on 9/16 to install tablets and kiosks. If possible we would like to install our wall mounted tablets in the same place as the smart tablets so as to avoid unnecessary work with running electric and network cables. Do you know if by chance the previous vendor will come onsite to uninstall their tablets?

A true, complete, and authentic copy of the August 23, 2019 Tech Friends email is attached as **Exhibit AA**.

133.    It is not yet clear how many Joint Customers have met with Tech Friends or planned Tech Friends product installations. However, at least one Joint Customer, Washington County, used Tech Friends' services throughout the term of the MSA. Because CSG promised inmate messaging exclusivity in Washington County to Smart, any revenue generated by Tech Friends during the term of the MSA rightfully belongs to Smart.

**CSG's Final Attempt to Remove Smart**

134.    On March 23, 2020, the Court ruled that Smart was substantially likely to succeed on the merits of its position on the meaning of Paragraph 6 of the MSA. Specifically, the Court found that any renewal of a contract between CSG and a Joint Customer must also include Smart's services.

135.    In light of this ruling, and after failing on its multiple previous attempts to remove Smart from all of the Joint Customer facilities, CSG has begun to exercise its last-resort option –

30

4823-0463-6870, v. 1

having the Joint Customers terminate their contracts with CSG so that CSG may extract Smart's services from its relationships.

136.    On March 23, 2020, CSG sent Smart a notice providing that Sebastian County purportedly notified CSG that Sebastian County will not renew its contract with CSG and that, as a result, the MSA as it relates to Sebastian County will expire on April 24, 2020. A true, complete, and authentic copy of the March 23, 2020 notice is attached as **Exhibit BB**.

137.    As of May 15, 2020, as far as Smart knows, Sebastian County has not issued a request for proposals from providers of either telephone services or messaging services, despite the fact that such a process ordinarily takes several months.

138.    Upon information and belief, CSG is going to continue to service Sebastian County by providing the same telephone and related services it has been providing during the period of the MSA. However, CSG is going to substitute Tech Friends in Smart's place as the messaging provider.

139.    The March 23, 2020 notice also provides that Avoyelles notified CSG that Avoyelles will not renew its contract with CSG and that, as a result, the MSA as it relates to Avoyelles will expire on June 30, 2020.

140.    On its face, the CSG/Avoyelles contract provides for an initial term that expires on October 1, 2020. Nevertheless, Avoyelles and CSG have taken the position that the contract will become unenforceable on the day the newly-elected sheriff takes office.

141.    As of May 15, 2020, as far as Smart knows, Avoyelles has not issued a request for proposals from providers of either telephone services or messaging services, despite the fact that such a process ordinarily takes several months.

4823-0463-6870, v. 1

142.    Upon information and belief, CSG is going to continue to service Avoyelles by providing the same telephone and related services it has been providing during the period of the MSA. However, CSG is going to substitute Tech Friends in Smart's place as the messaging provider.

143.    At all material times, Smart has performed all of its duties and obligations pursuant to the NDA and each MSA and Schedule and remains ready, willing, and able to continue to perform such duties and obligations.

144.    All conditions precedent to the bringing and maintenance of this lawsuit and the relief requested herein have been met, have occurred, or have been waived.

145.    Plaintiff has retained the law firm of Bajo | Cuva | Cohen | Turkel to prosecute this action and is obligated to pay the firms' fees and costs for their services.

**COUNT I**
**<u>DECLARATORY RELIEF</u>**
Mutual Confidentiality and Nondisclosure Agreement

146.    Smart realleges paragraphs 1 through 145.

147.    This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

148.    In its July 17, 2019 letter, CSG alleged that Smart violated the terms of the NDA by using Confidential Information obtained through Smart's contractual relationship with CSG.

149.    The NDA was executed on June 15, 2017, in contemplation that the parties may enter other agreements with each other.

150.    Subsequently, the parties entered into the various Joint Customer agreements, each of which includes an MSA. Like the NDA, the MSA includes a Confidential Information and Non-Disclosure provision.

151.    The MSA provides that it supersedes the NDA and that it is the complete agreement, together with the Schedules, between the parties with respect to the subject matter of each MSA.

152.    Further, each MSA is part of a separate contract between Smart, CSG, and a Joint Customer. CSG may not terminate every Joint Customer Agreement due to an alleged breach of the NDA as it relates to one of the Joint Customer Agreements.

153.    However, CSG has accused Smart of violating the NDA and has used the alleged violation, at least in part, as a predicate to purportedly terminate every MSA. The information CSG accuses Smart of using is not confidential as a matter of law, nor as defined by the NDA or MSA.

154.    Therefore, Smart is in doubt concerning its rights under the NDA and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart and CSG concerning the proper interpretation of the NDA.

155.    Smart is entitled to have its uncertainty removed with respect to its rights and obligations under the NDA.

156.    The parties have an actual, present, or adverse and antagonistic interest regarding the NDA.

157.    All interested parties and potential adverse interests are before this Court.

158.    The relief sought by Smart in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

159.    Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart may obtain a declaration of rights under the NDA.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that each MSA superseded the NDA regarding each Joint

Customer agreement, such that neither Smart nor CSG can be in violation of the NDA; (b) declaring that CSG may not rely on a violation of the NDA as a predicate to terminate any MSA and that the termination was ineffective; (c) prohibiting CSG from terminating or taking steps in furtherance of terminating any MSA, including, disavowing, disconnecting, or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, based on alleged violation of the NDA; (d) awarding Smart its attorneys' fees and costs pursuant to Section 13 of the NDA; and (e) for such further relief as the Court deems just and proper.

## COUNT II
## DECLARATORY RELIEF
Master Services Agreement

160.    Smart realleges Paragraphs 1 through 145.

161.    This is an action for declaratory relief under Chapter 86 of the Florida Statutes.

162.    In its July 17, 2019 letter, CSG alleged that Smart violated the terms of the MSA by using Confidential Information obtained through Smart's contractual relationship with CSG.

163.    The information CSG accuses Smart of using is not confidential as a matter of law, nor as defined by the NDA or MSA.

164.    Even if Smart used CSG's Confidential Information, CSG may not terminate the MSA for such a violation.

165.    Further, each MSA is part of a separate contract between Smart, CSG, and a Joint Customer. CSG may not terminate every Joint Customer agreement due to an alleged breach of one of the Joint Customer agreements.

166.    However, CSG has accused Smart of violating the MSA and has used the alleged violation, at least in part, as a predicate to purportedly terminate every MSA.

4823-0463-6870, v. 1

167.    Further, CSG has sent notices purporting to "non-renew" Smart's services in Joint Customer facilities while CSG continues or intends to continue providing its services to the Joint Customer pursuant to the same or substantially similar contract.

168.    Therefore, Smart is in doubt concerning its rights under the MSA and attendant Florida law, and a justiciable, bona fide, and present controversy exists between Smart and CSC concerning the proper interpretation of the MSA.

169.    Smart is entitled to have its uncertainty removed with respect to its rights and obligations under the MSA.

170.    The parties have an actual, present, or adverse and antagonistic interest regarding the MSA.

171.    All interested parties and potential adverse interests are before this Court.

172.    The relief sought by Smart in this action is not merely to seek legal advice or to obtain answers to questions propounded out of curiosity.

173.    Pursuant to sections 86.011 and 86.021, Florida Statutes, Smart may obtain a declaration of rights under the MSA.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., respectfully requests this Court to enter an Order (a) declaring that CSG may not rely on a violation of the Confidential Information and Non-Disclosure provision of the MSA as a predicate to terminate any MSA and that the attempted termination was ineffective; (b) prohibiting CSG from terminating any MSA while continuing to provide services to a particular Joint Customer; (c) prohibiting CSG from taking steps in furtherance of terminating any MSA, including, disavowing, disconnecting, or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG; (d) declaring that each MSA is part of a separate contract between Smart, CSG, and a Joint

Customer, such that a termination of one cannot serve as a basis for a termination of any other contract; (e) declaring that the MSA prohibits CSG from terminating or non-renewing Smart's services with respect to a Joint Customer while CSG continues to provide its services to the Joint Customer; (f) awarding Smart its costs; and (g) for such further relief as the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
Washington County Agreement

174.    Smart realleges Paragraphs 1 through 145.

175.    Smart and CSG entered into a valid contract for Smart to be the exclusive provider of inmate communications services to Washington County. A true, complete, and authentic copy of the contract includes the MSA, *see* Exhibit B, the Services Contract between CSG and Washington County, and the Schedule for Washington County (the "Washington County Agreement"). The Services Contract and Schedule are attached as **Composite Exhibit CC.**

176.    CSG breached the Washington County Agreement by failing to provide the exclusivity it promised to Smart. Specifically, a competitor of Smart's, Tech Friends, was allowed to provide inmate communications services that conflicted with Smart's rights during the term of the Washington County Agreement.

177.    CSG further breached the Washington County Agreement by instructing Washington County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Washington County so that it could perform its duties.

178.    CSG further breached the Washington County Agreement by terminating Smart prior to the end of its co-terminous term. Paragraph 14 of the Services Contract between CSG and Washington County provides:

4823-0463-6870, v. 1

> The Term of this agreement shall be for 12 calendar months starting when CSG platform is installed and first call is successful. **This agreement will automatically renew for 12 additional months unless either party notifies the other in writing of its intent to terminate this agreement at least 90 (Ninety) days prior to the final date of expiration.** Upon termination of this agreement, each party agrees to satisfy any and all of its outstanding obligations arising under this agreement.

(emphasis added).

179.   Accordingly, the only way that the contract between CSG and Washington County does not renew is if either party provides the other party with written notice of non-renewal at least 90 days prior to the date of expiration, which did not happen.

180.   Instead, CSG renewed the Services Contract with Washington County and continues to provide its telephone services to Washington County.

181.   Yet, CSG improperly sent Smart a Notice of Non-Renewal regarding Washington County, allowing Washington County to remove Smart's services and equipment from its facility prior to the end of Smart's co-terminus term.

182.   Accordingly, CSG breached the Washington County Agreement by terminating Smart's services during a valid renewal term of the Washington County Agreement which should have included Smart's services.

183.   As a result of CSG's breaches, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

4823-0463-6870, v. 1

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Washington County Agreement

184.    Smart realleges Paragraphs 1 through 145.

185.    In every contract, including the Washington County Agreement, an implied covenant of good faith and fair dealing exists.

186.    CSG agreed that Smart had the exclusive right to provide messaging and related services to Washington County.

187.    CSG also agreed that it would not terminate the Washington County Agreement without cause based on an alleged performance default without following the proper procedures, including allowing for a reasonable cure period.

188.    CSG also agreed that the Washington County Agreement would be "co-terminous" with CSG's Service Contract with Washington County.

189.    CSG breached the covenant of good faith and fair dealing implied in the exclusivity, termination, and renewal provisions of the Washington County Agreement by manufacturing improper grounds to purportedly terminate the agreement and by sending a nonrenewal notice despite CSG's continued contractual relationship with Washington County.

190.    CSG breached the covenant of good faith and fair dealing implied in the Washington County Agreement by disparaging Smart's reputation, soliciting complaints about Smart, controlling the communications from Washington County, and enlisting Washington County in its "plight" to terminate Smart.

191.    CSG breached the covenant of good faith and fair dealing by using or allowing Tech Friends to provide the services which are exclusive to Smart under the Washington County Agreement.

38

192.    As a result of CSG's breaches, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT V
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### Washington County

193.    Smart realleges Paragraphs 1 through 145.

194.    Beginning in July 2018, Smart enjoyed an advantageous business relationship with Washington County.

195.    CSG intentionally and unjustifiably interfered with Smart's relationship with Washington County, using unlawful means.

196.    For example, CSG and Ferguson made unprompted comments to Washington County to intentionally create the false impression that Smart was a poor service provider and that CSG's other clients were almost unanimously complaining about Smart.

197.    CSG then cut off and controlled the communication between Smart and Washington such that Smart was unable to rectify CSG's improper and inaccurate impressions and misrepresentations.

198.    In addition to intentionally tarnishing and damaging Smart's name and reputation, CSG used the improper means of providing financial incentives to Washington County employees, such as frequent free trips and dinners, in order to persuade Washington County to go along with CSG's "plight" to get rid of Smart, including to assist in its litigation efforts against Smart.

199.    As a proximate result of CSG's interference, Smart lost its business relationship with Washington County and has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

### COUNT VI
### <u>BREACH OF CONTRACT</u>
### Sebastian County Agreement

200.    Smart realleges Paragraphs 1 through 145.

201.    Smart and CSG entered into a valid contract for Smart to be the exclusive provider of certain inmate communications services to Sebastian County. A true, complete, and authentic copy of the contract includes the MSA, *see* Exhibit B, the Services Contract between CSG and Sebastian County, and the Schedule for Sebastian County (the "Sebastian County Agreement"). The Services Contract and Schedule are attached as **Composite Exhibit DD.**

202.    CSG breached the Sebastian County Agreement by instructing Sebastian County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Sebastian County.

203.    CSG breached the Sebastian County Agreement by sending an improper notice to cure based on a requested hardware upgrade and entertainment services that Smart had no contractual obligation to provide.

204.    CSG breached the Sebastian County Agreement by entering into the CSG/Tech Friends contract and agreeing to provide exclusive rights to Tech Friends in Sebastian County that rightfully belong to Smart.

4823-0463-6870, v. 1

205.    As a result of CSG's breaches, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT VII
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Sebastian County Agreement

206.    Smart realleges Paragraphs 1 through 145.

207.    In every contract, including the Sebastian County Agreement, an implied covenant of good faith and fair dealing exists.

208.    CSG agreed that Smart had the exclusive right to provide messaging and related services to Sebastian County.

209.    CSG also agreed that it would not terminate the Sebastian County Agreement without cause based on an alleged performance default without following the proper procedures, including allowing for a reasonable cure period.

210.    CSG also agreed that the Sebastian County Agreement would be "co-terminous" with CSG's Service Contract with Sebastian County.

211.    CSG breached the covenant of good faith and fair dealing implied in the exclusivity, termination, and renewal provisions of the Sebastian County Agreement by manufacturing improper grounds to purportedly terminate the agreement, by sending an improper notice to cure, and by eliciting a nonrenewal notice from Sebastian County for the sole purpose of removing Smart, while CSG and Sebastian County intend to continue their relationship.

41

212.    CSG breached the covenant of good faith and fair dealing implied in the Sebastian County Agreement by disparaging Smart's reputation, soliciting complaints about Smart, controlling the communications from Sebastian County, preventing Smart from directly responding to or dealing with complaints or issues, and enlisting Sebastian County in its "plight" to terminate Smart.

213.    CSG breached the covenant of good faith and fair dealing by agreeing to use Tech Friends to provide the services which are exclusive to Smart under the Sebastian County Agreement.

214.    CSG breached the covenant of good faith and fair dealing by eliciting Sebastian County to send a notice of non-renewal to CSG for the sole purpose of using the notice to remove Smart's services from the parties' relationship, while CSG and Sebastian had every intention of continuing to work together under the CSG/Sebastian contract or a substantially similar one.

215.    As a result of CSG's breaches, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT VIII
## <u>TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP</u>
### Sebastian County

216.    Smart realleges Paragraphs 1 through 145.

217.    Beginning in January 2018, Smart enjoyed an advantageous business relationship with Sebastian County.

218.    CSG intentionally and unjustifiably interfered with Smart's relationship with Sebastian County, using unlawful means.

219.    For example, CSG and Ferguson made unprompted comments to Sebastian County to intentionally create the false impression that Smart was a poor service provider and that CSG's other clients were almost unanimously complaining about Smart.

220.    CSG then cut off and controlled the communication between Smart and Sebastian such that Smart was unable to rectify CSG's improper and inaccurate impressions and misrepresentations.

221.    Further, CSG failed to inform Sebastian of the services that Smart was contractually obligated to provide, which prompted Sebastian to become angry about services that were not being provided. Rather than correct Sebastian's mistakes, CSG fueled the fire and encouraged Sebastian to ramp up its complaints to Smart. CSG went as far as sending a Notice to Cure items that Smart is not contractually obligated to provide and then paid for Captain Dumas of Sebastian County to travel to Florida to testify at the hearing.

222.    In addition to intentionally tarnishing and damaging Smart's name and reputation, CSG used the improper means of providing financial incentives to Sebastian County employees, such as frequent free trips and dinners, in order to persuade Sebastian County to go along with CSG's "plight" to get rid of Smart, including to assist in its litigation efforts against Smart.

223.    Further, CSG elicited Sebastian County to send a notice of non-renewal to CSG for the sole purpose of using the notice to remove Smart's services from the parties' relationship, while CSG and Sebastian had every intention of continuing to work together under the CSG/Sebastian contract or a substantially similar one.

4823-0463-6870, v. 1

224.    As a proximate result of CSG's interference, Smart lost its business relationship with Sebastian County and has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

### COUNT IX
### BREACH OF CONTRACT
**Avoyelles Agreement**

225.    Smart realleges Paragraphs 1 through 145.

226.    Smart and CSG entered into a valid contract for Smart to be the exclusive provider of inmate communications services to Avoyelles. A true, complete, and authentic copy of the Avoyelles Agreement is attached as **Exhibit B.**

227.    CSG breached the Avoyelles Agreement by instructing Avoyelles to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Avoyelles.

228.    CSG breached the Avoyelles Agreement by failing to prevent Avoyelles and its inmates from damaging Smart's hardware.

229.    CSG breached the Avoyelles Agreement by entering into the CSG/Tech Friends contract and agreeing to provide exclusive rights to Tech Friends in Avoyelles County that rightfully belong to Smart.

230.    CSG has anticipatorily breached the Avoyelles Agreement by indicating it will remove Smart's services on June 30, 2020, even though the current term of the Avoyelles Agreement runs through October 2020.

4823-0463-6870, v. 1

231.     As a result of CSG's breaches, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT X
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### Avoyelles Agreement

232.     Smart realleges Paragraphs 1 through 145.

233.     In every contract, including the Avoyelles Agreement, an implied covenant of good faith and fair dealing exists.

234.     CSG agreed that Smart had the exclusive right to provide messaging and related services to Avoyelles.

235.     CSG also agreed that it would not terminate the Avoyelles Agreement without cause based on an alleged performance default without following the proper procedures, including allowing for a reasonable cure period.

236.     CSG also agreed that the Avoyelles Agreement would be "co-terminous" with CSG's Service Contract with Avoyelles.

237.     CSG breached the covenant of good faith and fair dealing implied in the exclusivity, termination, and renewal provisions of the Avoyelles Agreement by manufacturing improper grounds to purportedly terminate the agreement and by eliciting a nonrenewal notice from Avoyelles for the sole purpose of removing Smart, while CSG and Avoyelles intend to continue their relationship.

45

238.    CSG breached the covenant of good faith and fair dealing implied in the Avoyelles

Agreement by disparaging Smart's reputation, soliciting complaints about Smart, controlling the

communications from Avoyelles, preventing Smart from directly responding to or dealing with

complaints or issues, and enlisting Avoyelles in its "plight" to terminate Smart.

239.    As a result of CSG's breaches, Smart has been damaged in an amount to be proven

at trial.

WHEREFORE, Plaintiff, Plaintiff, Smart Communications Holding, Inc., demands

judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits,

disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just

and proper.

## COUNT XI
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### Avoyelles

240.    Smart realleges Paragraphs 1 through 145.

241.    Beginning in January 2018, Smart enjoyed an advantageous business relationship

with Avoyelles.

242.    CSG intentionally and unjustifiably interfered with Smart's relationship with

Avoyelles, using unlawful means.

243.    For example, CSG and Ferguson made unprompted comments to Avoyelles to

intentionally create the false impression that Smart was a poor service provider and that CSG's

other clients were almost unanimously complaining about Smart.

244.    CSG then cut off and controlled the communication between Smart and Avoyelles

such that Smart was unable to rectify CSG's improper and inaccurate impressions and

misrepresentations.

4823-0463-6870, v. 1

245.    Further, in addition to intentionally tarnishing and damaging Smart's name and reputation, CSG elicited Avoyelles to send a notice of non-renewal to CSG for the sole purpose of using the notice to remove Smart's services from the parties' relationship, while CSG and Avoyelles had every intention of continuing to work together under the CSG/Avoyelles contract or a substantially similar one.

246.    As a proximate result of CSG's interference, Smart lost the Avoyelles relationship and has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

**COUNT XII**
**FRAUD**

247.    Smart realleges Paragraphs 1 through 145.

248.    During the negotiation of the MSA, Turner made numerous misrepresentations, including:

a.    Turner represented to Smart that a "co-terminous" term was better than a seven year term because CSG's customers renewed their contracts with CSG customarily and without fail.

b.    Turner represented to Smart that, for the period in which CSG provided its services to these facilities, Smart would be the inmate messaging provider, as long as there were no un-cured performance related issues.

c.    Turner never told Smart that CSG may let a contract with a Joint Customer expire solely for the purpose of removing Smart's services from the relationship and then enter into a new but substantially similar contract using one of Smart's competitors as the provider of Smart's messaging services.

4823-0463-6870, v. 1

d.    Turner represented to Smart that each subsequent Joint Customer agreement would be structured the same way as the Avoyelles Agreement. Specifically, CSG would obtain amendments signed by each Joint Customer which would incorporate Smart's specific services into each CSG/Joint Customer contract.

e.    Turner represented that he would use Smart's services to secure contract extensions with Joint Customers and/or to further solidify relationships with Joint Customers.

249.    Turner made these misrepresentations knowing that they were false and that Smart would rely on and act in furtherance of the representations, including that Smart would expend significant amounts of time, money, and resources installing equipment and services for which an extensive term would be required to recoup such investments.

250.    Smart reasonably relied on the representations when it entered into the MSA and the Schedules and then purchased and installed its equipment and services.

251.    As a direct and proximate cause of CSG's fraudulent misrepresentations, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT XIII
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### Greene County Sheriff's Office

252.    Smart realleges Paragraphs 1 through 145 and 275 through 281.

253.    Beginning in April 2015, Smart enjoyed an advantageous business relationship with the Greene County Sheriff's Office ("Greene County"). The business relationship was memorialized by an Electronic Messaging System Agreement dated April 10, 2015 (the

"Smart/Greene County Agreement").[3] A true, complete, and authentic copy of the Smart/Greene County Agreement is attached as **Exhibit EE**.

254.     The current term of the Greene County Agreement runs through June 10, 2020. The Greene County Agreement then automatically renews each year for a one-year term.

255.     Pursuant to the Smart/Greene County Agreement, Greene County granted Smart the exclusive right to provide electronic messaging services during the term of the agreement. Smart agreed to pay Greene County a commission of 10% of the revenue Smart generated from its messaging services.

256.     From April 2015 to October 2019, Greene County was satisfied with the services provided by Smart pursuant to the Greene County Agreement. Greene County never provided notice of any default under the Greene County Agreement, never requested that Smart cure any performance-related issues, and never raised any serious concerns about Smart's products or services.

257.     Smart had a reasonable expectation that the parties would continue to operate under the current term of the Greene County Agreement and that the parties would continue to renew the Greene County Agreement for an additional renewal terms.

258.     CSG intentionally and unjustifiably interfered with Smart's relationship with Greene County, using unlawful means.

259.     For example, on July 24, 2019, during the initial term of the Smart/Greene County Agreement, CSG and Greene County executed a Contract and Agreement, which purports to grant CSG the exclusive right to provide inmate electronic messaging services to Greene County beginning August 1, 2019 (the "CSG/Greene County Agreement").

---

[3] Smart is the beneficial owner of the Greene County Agreement, as an affiliated holding company for the party to the Greene County Agreement, Smart Communications West, Inc.

4823-0463-6870, v. 1

260.     Attachment B to the CSG/Greene County Agreement provides that "CSG, through our partner Tech Friends, will place kiosks in cell blocks for inmate usage and will supply inmate tablets based on an agreed upon ratio." A true, complete, and authentic copy of the CSG/Greene County Agreement is attached as **Exhibit FF**.

261.     Pursuant to the CSG/Tech Friends Agreement, Greene County qualifies as a "New Account," an account for which the prime contract was entered into on or after the Effective Date of the CSG/Tech Friends Agreement. As a result, Tech Friends agreed to pay to CSG 50% of its net revenue generated by electronic messaging, video visitation, and tablet rentals in Greene County.

262.     In the fall of 2019, CSG and its "partner" Tech Friends, having secured a contract with Greene County under which they equally profited from messaging services, communicated with Greene County about how Greene County could attempt to terminate the Smart/Greene County Agreement. If successful, CSG and Tech Friends knew they would immediately begin to share in the proceeds that Smart would lose. Upon information and belief, CSG advised Greene County that it should no longer use Smart as a service provider and suggested ways in which Greene County could end its relationship with Smart.

263.     As of August 26, 2019, Tech Friends was scheduled to install its equipment and services at the Greene County facility on October 28, 2019. Tech Friends coordinated its installation schedule through CSG.

264.     On September 10, 2019, Greene County acknowledged to Tech Friends that its contract with Smart had automatically renewed. Nevertheless, CSG, Tech Friends, and Greene County continued to discuss Greene County's ability to terminate the Smart/Greene County Agreement. Such discussions took place after the "status quo" stipulation was agreed upon.

4823-0463-6870, v. 1

265.    In October 2019, without any prior notice, Greene County informed Smart that it

was terminating the Smart/Greene County Agreement and that Smart should promptly remove its

equipment and services. Not coincidentally, this communication came at nearly the same time that

Pope County notified Smart that Pope County would not be renewing the Pope County Agreement.

266.    In December 2019, Greene County forfeited its efforts to terminate the

Smart/Greene County Agreement by way of letter to Smart, in which Greene County stated it "will

continue to use the services of Smart Communication until June 10, 2020."

267.    By that point in time, CSG had destroyed Smart's relationship with Greene County

and Smart's ability to obtain additional extensions or renewals of the Smart/Greene County

Agreement.

268.    On March 4, 2020, CSG and Greene County executed the First Amendment to

Contract and Agreement (the "CSG/Greene County Amendment"), which purports to remove the

references to kiosks and tablets included in Attachment B of the CSG/Greene County Agreement.

A true, complete, and authentic copy of the CSG/Greene County Amendment is attached as

**Exhibit GG**.

269.    The CSG/Greene County Amendment is an obvious retrospective attempt to hide

the fact that CSG interfered with and facilitated the breach of the Smart/Greene County Agreement

by agreeing to provide Tech Friends' services in violation of Smart's exclusive rights to provide

electronic messaging services to Greene County.

270.    On April 24, 2020, Ferguson continued CSG's attempt to hide its past interference

when he sent an unprompted, self-serving email to Greene County that Tech Friends "installed

you independently." A true, complete, and authentic copy of Ferguson's April 24, 2020 email is

attached as **Exhibit HH**.

4823-0463-6870, v. 1

271.     Indeed, in an email dated August 14, 2019, Ferguson explained to Greene County that Tech Friends' equipment and services were being installed and implemented "under the same [CSG] agreement…."

272.     Even if Tech Friends installed its services in the Greene County facility "independent of" CSG, it did so with CSG's assistance, despite CSG having knowledge of the Smart/Greene County Agreement.

273.     As a proximate result of CSG's interference, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT XIV
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP
### Pope County Sheriff's Office

274.     Smart realleges Paragraphs 1 through 145 and 253 through 272.

275.     Beginning in March 2016, Smart enjoyed an advantageous business relationship with the Pope County Sheriff's Office ("Pope County").  The business relationship was memorialized by an Electronic Messaging System Agreement, which was subsequently amended by an Electronic Messaging Agreement – MailGuard Addendum. True, complete, and authentic copies of the agreement and addendum (collectively, the "Pope County Agreement") are attached as **Exhibit II**.

4823-0463-6870, v. 1

276.    The current term of the Pope County Agreement runs through April 15, 2022. The Pope County Agreement then automatically renews for an additional four-year term, followed by annual one-year extensions.

277.    From March 2016 to December 2019, Pope County was satisfied with the services provided by Smart pursuant to the Pope County Agreement. Pope County never provided notice of any default under the Pope County Agreement, never requested that Smart cure any performance-related issues, and never raised any serious concerns about Smart's products or services.

278.    Smart had a reasonable expectation that the parties would continue to operate under the current term of the Pope County Agreement, through April 15, 2022, with an additional four-year term thereafter through April 15, 2026.

279.    CSG intentionally and unjustifiably interfered with Smart's relationship with Pope County, using unlawful means.

280.    For example, in December 2019, without any prior notice, Pope County informed Smart that it would not be renewing the Pope County Agreement and that the Pope County Agreement would expire in March 2020. Not coincidentally, this communication came at nearly the same time that Greene County notified Smart that Greene County would not be renewing the Greene County Agreement.

281.    Pope County is also a customer of CSG, pursuant to a separate telephone contract. During the course of this litigation, and upon information and belief after the "status quo" stipulation was agreed to, CSG arranged for Tech Friends to replace Smart as Pope County's messaging provider. Upon information and belief, CSG advised Pope County that it should no longer use Smart as a service provider and suggested ways in which Pope County could potentially

53

terminate the Pope County Agreement. Upon information and belief, CSG's advised that Pope County complain of Smart's purported "bad service" and "bad equipment," consistent with the false narratives CSG had been spreading to other Joint Customers and throughout the region.

282.    As a proximate result of CSG's interference, Smart has been damaged in an amount to be proven at trial.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

## COUNT XV
## UNFAIR COMPETITION

283.    Smart realleges Paragraphs 1 through 145.

284.    Aside from partnering on providing services for the Joint Customers, Smart and CSG are competitors for purposes of marketing and selling their products—they compete for a common pool of customers.

285.    In the event that a Joint Customer either terminates CSG or does not renew CSG's services (which currently incorporate Smart's services), then CSG and Smart will be competitors with respect to the Joint Customers as well.

286.    CSG has and continues to engage in the conduct described above, including for example soliciting complaints about Smart, making false claims about Smart, disparaging Smart's reputation, improperly attempting to terminate Smart's relationships with CSG, the Joint Customers, and other customers, and conveying exclusive rights that belong to Smart to other competitors.

287.    As the direct and proximate result of the CSG's unfair competition, Smart has suffered damages and continues to suffer damages, including, but not limited to, loss of goodwill and loss of sales.

WHEREFORE, Plaintiff, Smart Communications Holding, Inc., demands judgment against Defendant, Correct Solutions, LLC, for damages, special damages, lost profits, disgorgement of CSG's profits, interest, costs, and for such further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

*/s/ Brad F. Barrios*
Kenneth G. Turkel
Florida Bar No. 867233
E-mail: kturkel@bajocuva.com
Brad F. Barrios
Florida Bar No. 35293
E-mail: bbarrios@bajocuva.com
David A. Hayes
Florida Bar No. 96657
E-mail: dhayes@bajocuva.com
**BAJO | CUVA | COHEN | TURKEL**
100 North Tampa Street, Suite 1900
Tampa, Florida 33602
(813) 443-2199 (telephone)
(813) 443-2193 (facsimile)
*Counsel for Plaintiff*

4823-0463-6870, v. 1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of August, 2020, I caused a true and correct copy of the foregoing to be served via the Florida Court's E-Filing Portal upon the following counsel of record:

Kimberly A. Bald
James E. Lynch
Harllee & Bald, P.A.
202 Old Main Street
Bradenton, FL 34205
E-mails: KAB@harlleebald.com
JEL@harlleebald.com
PT@harlleebald.com
CL@harlleebald.com

Luke F. Piontek
E-mail: lpiontek@roedelparsons.com
Roedel, Parsons, Koch, Blache,
 Balhoff & McCollister
8440 Jefferson Highway, Suite 301
Baton Rouge, LA 70809

/s/ Brad F. Barrios
Attorney

4823-0463-6870, v. 1