SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

vs.                   CASE NO. 8:20-cv-01469-T-30JSS

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant

_____/

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Counter-Plaintiff,

vs.

SMART COMMUNICATIONS HOLDING, INC.
and SMART COMMUNICATIONS COLLIER, INC.,

     Counter-Defendants.

_____/

## CORRECT SOLUTIONS, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and Middle District of Florida Local Rule 3.01, Defendant/Counter-Plaintiff, Correct Solutions, LLC ("Correct"), respectfully moves this Court for the entry of partial summary judgment against Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. ("Smart"), as to Counts II, III, IV, V, VI, VII, and X and Smart's claim for punitive damages set forth in Smart's Fourth Amended Complaint (Doc. 93) and Count II of Correct's Fourth Amended Counterclaim (Doc. 105). There is no genuine dispute as to any

material facts regarding the claims that are the subject of this Motion, and Correct is entitled to a judgment as a matter of law.

## Introduction

1.     This case relates to the MSA and Schedules between Smart and Correct for Smart to provide tablets, kiosks and related services to Correct's correctional facility customers. After disputes arose between the parties, Smart filed a lawsuit on August 2, 2019 in state court in Hillsborough County, Florida. Correct removed the case to this Court on June 26, 2020. (Doc. 1).

2.     Detailed facts supporting this Motion are set forth in the Statement of Material Facts served simultaneously with this Motion. Additional material facts are included in this Motion.[1]

## Summary Judgment Standard

3.     Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also, Celotex Corp. v. Catrett*, 477 U. S. 317 (1986); *Golden v. University of Miami*, 484 F. Supp.3d 1255, 1261 (Fla. S.D. 2020).

---

[1] Correct shall file the deposition transcript excerpts and hearing transcript cited in this Motion and the Statement of Material Facts and the related Motion. Citations to deposition transcripts shall be witness name and "V#" for volume (if applicable) and page:line number, hearing transcript shall be "T." date and page:line number, and exhibits shall be P-# for Smart's exhibits and D-# for Correct's exhibits and the Statement of the Facts shall be SF ¶#.

4.     "The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Golden*, 484 F.Supp.3d at 1261, *citing Celotex*, 477 U.S. at 323. Importantly, the judiciary has explained that "[a] moving party discharges its burden on a motion for summary judgment by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving party's case." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995), *quoting Celotex*, 477 U.S. at 325.

5.     If the moving party shows "that, on all the essential elements of its case on which it bears the burden of proof at trial no reasonable jury could find for the non-moving party then it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Golden*, 484 F.Supp.3d at 1261-1622, *citing Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013). The non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery*, 64 F.3d at 594 *quoting Celotex*, 477 U.S. at 324.

## Argument and Memorandum of Law

6.     For the reasons set forth herein, Correct is entitled to partial summary judgment as to Smart's Fourth Amended Complaint ("Complaint"); specifically, the claims for declaratory judgment (Count II), breach of contract (Counts III and

V), breach of duty of good faith and fair dealing (Counts IV and VI), fraud (Count VII), unfair competition (Count X), Smart's claim for punitive damages and as to Count II of Correct's Fourth Amended Counterclaim ("Counterclaim").

**ISSUE 1:** **The notices of non-renewal issued by Correct to Smart were authorized by the MSA.**

7.     Because Correct timely and properly exercised its right to non-renew pursuant to paragraph 6 of the MSA with respect to Washington County ("Washington") and Sebastian County ("Sebastian"), Correct is entitled to partial summary judgment as to Count II of its Counterclaim and as to the damages sought by Smart in Counts II (¶ 164), III (¶¶ 175-179), IV (¶¶ 184-186), V (¶¶ 192-195) and VI (¶¶ 201-204) of Smart's Complaint. (*See,* ████████████████[2]). The notices of non-renewal were Correct's exercise of its contractual right and are not a breach of contract or the duty of good faith and fair dealing.

8.     Paragraph 6 of the MSA authorized either Correct or Smart to non-renew the MSA/Schedules and afforded both Correct and Smart the right to terminate the co-terminous[3] relationship between the MSA/Schedules and Correct's contracts with its customers. Termination of the co-terminous

---

[2] Certain deposition exhibits and deposition testimony have been redacted pursuant to the Joint Motion for Leave to File Documents Under Seal and Incorporated Memorandum of Law filed October 29, 2021 and the Unopposed Motion to File Under Seal and Motion to File Under Seal dated November 1, 2021. An Amended Joint Motion shall be filed as directed by this Court.

[3] "Co-terminous" has been explained by the courts – in the context of criminal sentences – to mean "a sentence that runs concurrently with another sentence and is ordered to terminate simultaneously with the other sentence." *Whitfield v. Florida*, 95 So.3d 964, 965 n.3 (Fla. 5th DCA 2012).

relationship is accomplished under the MSA by issuing notices of non-renewal no later than 90 days prior to the renewal of the contract between Correct and its customer.

9.      Paragraph 6 of the MSA provides, in its entirety, as follows:

> Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

(Doc. 105-2) (emphasis added).

10.     Correct sent timely and proper notices of non-renewal to Smart for Washington and Sebastian, which caused the expiration of the MSA and Schedules for those facilities as a matter of law. Because the notices of non-renewal were authorized by the MSA, Correct's exercise of its right to non-renew the MSA and Schedules was not a breach of the MSA or any duty to Smart. Rather, it was the valid exercise of a contractual right and does not entitle Smart to any damages.

11.     In Florida, the construction and interpretation of an unambiguous written contract is a matter of law and is properly disposed of by summary judgment. *See, Saregama India, Ltd. v. Mosley*, 635 F.3d 1284, 1290, 1297 (11th Cir. 2011). Contract interpretation is a question of law to be decided by reading the words of the contract in the context of the entire contract and construing the

contract to effectuate the intent of the parties. *See, Golden*, 484 F.Supp.3d at 1255. *See also, Feaz v. Wells Fargo Bank, N.A.*, 745 F. 2d 1098 (11th Cir. 2014). The initial determination of whether a contract term is ambiguous is a question of law for the court. *See, Golden*, 484 F.Supp.3d at 1262. Contracts are to be construed in accordance with the plain meaning of the words contained therein. It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties. *See, Ferreira v. Home Depot*, 12 So.3d 866, 868 (Fla. 1st DCA 2009); *Churchville v. Gacs Incorp.*, 973 So.2d 1212, 1216 (Fla. 1st DCA 2008).

12.     The entire contract must be reviewed without fragmenting any section or portion. A court must read the contract as a whole, giving effect to each of the various provisions of the agreement if it can reasonably be done. *See, Golden*, 484 F.Supp.3d at 1262. "Courts must strive to read a contract in a way that gives effect to all of the contract's provisions." *Retreat at Port of the Islands, LLC v. Port of Islands Resort Hotel Condo. Assn., Inc.*, 181 So.3d 531, 533 (Fla. 2d DCA 2015).

13.     After applying the foregoing principles of contract interpretation to the MSA, the clear and only interpretation of paragraph 6 of the MSA is that both Correct and Smart had the right to issue a notice of non-renewal of the MSA and Schedule (at least 90 days prior to the expiration or renewal of Correct's contract with its correctional facility customer) which would cause the MSA and Schedule to expire – and not renew – at "the expiration of the then current term" of Correct's contract with its correctional facility customer. Any other interpretation would ignore the plain meaning of paragraph 6 and fail to give effect to all provisions of

the MSA. The Fourth District recently held that an almost identical non-renewal provision in a contract was clear and unambiguous. *See, Corporate Creations Intl., Inc. v. Marriott Intl., Inc.,* 276 So.3d 36, 38 (Fla. 4th DCA 2019).

14.     Parol evidence is not admissible because paragraph 6 is clear and unambiguous. *See, Scott v. Carrier Corporation,* 662 Fed. Appx. 798, 803 (11th Cir. 2016); *Olive v. Tampa Educational Cable Consortium,* 723 So.2d 883, 884 (Fla. 2d DCA 1998). Nevertheless, Smart's representative who negotiated the MSA confirmed the term "Party" in the last sentence of paragraph 6 referred only to Correct and Smart as the parties with the right to non-renew the MSA and Schedules. (SF ¶5; Deglman V2, 234:5-14, P-7). Moreover, the representatives of both Smart and Correct who negotiated the MSA confirmed that both Smart and Correct had the right to non-renew and that the only parties to the MSA were Smart and Correct. (SF ¶5; Deglman V2, 234:5-14, P-7; T. 12/19/19, 159:25-160:7).

15.     Based on the clear and unambiguous language of paragraph 6, the MSA/Schedule for Washington was non-renewed by Correct on October 4, 2019 and expired on January 3, 2020. (SF ¶28). The MSA/Schedule for Sebastian was non-renewed by Correct on November 21, 2019 and expired on April 24, 2020. (SF ¶¶19, 22).

16.     Smart has endeavored to create an ambiguity in the MSA by advancing two inconsistent positions. On December 19, 2019, counsel for Smart argued and represented to the Hillsborough County Circuit Court that "party" in the last sentence of paragraph 6 meant either Correct or the correctional facility,

but not Smart. (T. 12/19/2019, 28:10-30:3). In an effort to support that argument, Jon Logan, as CEO for Smart, testified "party" for the non-renewal language in paragraph 6 meant Correct and the correctional facility, but not Smart. (T. 12/19/2019, 101:11-18, 102:20-103:24, P-G). However, after Deglman's deposition admissions, Jon Logan changed his testimony to now assert paragraph 6 was sloppy drafting. (Smart V1, 186:3-15).

17. The two versions of testimony by Smart are irreconcilable and do not create any ambiguity in the MSA. Moreover, they would require this Court to ignore Deglman's admissions and rewrite the MSA and/or delete the last sentence of paragraph 6 entirely, which this Court cannot do. *See, BMW of North America, Inc. v. Krathen*, 471 So.2d 585, 587 (Fla. 4th DCA 1985); *City of Pompano Beach v. Beatty*, 222 So.3d 598, 600-601 (Fla. 4th DCA 2017).

18. Correct's notice of non-renewal did not cause Smart's removal at Sebastian or any loss of revenue. The March 3, 2020 notice of non-renewal by Sebastian County Judge Hudson caused the Sebastian Agreement between Sebastian and Correct to expire on its natural expiration date of April 24, 2020. (SF ¶22). Correct forwarded the notice of non-renewal to Smart on March 23, 2020 advising that, because Sebastian was not renewing Correct's contract, the co-terminous MSA/Schedule would expire on April 24, 2020. (Temple, 211:21-212:9, P-21). Judge Hudson's notice of non-renewal resulted in the expiration of the MSA/Schedule at Sebastian as a matter of law and there is no basis for Smart's claims. Smart's effort to seek damages in Counts V and VI for █████████████

8

████████████████████████████████ is unsupported by the facts or the law.

*See,* █████████████ . ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

**ISSUE 2:** **No evidence supports the breach of contract claim in Count III (¶¶ 174-179) or the breach of good faith and fair dealing claim in Count IV (¶¶ 184-188) of Smart's Complaint as to Washington County.**

19.     Smart contends Correct breached the MSA and Schedule for Washington by "instructing Washington County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Washington County so it could perform its duties." (Doc. 93, ¶174). Smart contends Correct breached its duty of good faith and fair dealing by "manufacturing improper grounds to purportedly terminate the agreement" (Doc. 93, ¶186), and by "soliciting complaints about Smart, controlling the communications from Washington County, and enlisting Washington County in its 'plight' to terminate Smart" (Doc. 93, ¶187). None of these allegations are supported by the evidence and, in fact, they are all refuted by the evidence.

20.     No one from Correct asked Washington to fabricate complaints about Smart, to do anything to help Correct get rid of Smart, to generate complaints about Smart (because the complaints were originated by the detainees), or to refrain from communicating with Smart. (Washington V2, 366:10-367:13). No complaints were false or fabricated. (Washington V2, 305:3-5).

21.     On August 15, 2019 Correct requested Washington send its complaints to Correct rather than Smart. Captain Johnson explained that it was Washington's decision to stop communicating with Smart and stated "didn't want to because it didn't do any good." (Washington V2, 366:25-367:8). From the date of installation in 2018 through weeks beyond Washington's July 31, 2019 email advising Smart that Washington was researching vendors to replace Smart, Washington continuously reported to and communicated with Smart about the extensive and ongoing problems with Smart's equipment and services, including: problems with kiosks; issues with visitation on the kiosks; no video visitation on tablets, Smart's failure to provide services it agreed and represented it would provide during the presentation made by Smart to Washington; Smart's delay in providing promised tablets until January 2019; and Smart's inability to ever get visitation on the tablets. (Washington V2, 326:5-327:13, D-7, 327:21-329:9, 333:5-16, 333:23-335:6, D-7, 344:5-345:9, 346:18-22, D-11, 347:12-15; SF ¶¶26, 27).

22.     Smart was never denied email, telephone or physical access to Washington. (Washington V2, 367:14-17). As late as January 2020, Lipsey of Smart was able to freely communicate with Washington and attempted to get Washington to "renew" its contract with Smart. (Washington V1, 85:2-86:21, 190:13-191:25, P-6). When Washington asked Smart a question about a September 2019 email from Smart's CEO, Jon Logan never responded. (Washington V2, 358:10-359:22, D-14). Washington's emails to Jon Logan and Smart in late 2019

and January 2020 were also ignored. (Washington V1, 85:2-90:2, 188:3-9, 188:25-190:12, D-3, 197:20-198:1).

23. All witnesses for Washington testified their decision not to use Smart was the result of Smart's conduct and had nothing to do with Correct. (Washington V1, 202:22-203:2; Washington V2, 310:10-23, 351:8-352:21). Washington testified Smart was a poor service provider because of its poor customer service and inferior product. (Washington V2, 367:25-368:8).

24. No one from Correct ever instructed anyone at Washington to create or fabricate complaints or to complain about Smart and no complaints were fabricated or false. Rather, Smart was fully aware of the problems with its tablets, kiosks and related services at Washington. (SF ¶¶26-29). When Smart took the position during Washington's deposition that Smart's Schedule did not include video visitation – which is entirely inconsistent with the fact that Smart made efforts to make the video visitation on the kiosks operational – Captain Johnson testified Smart represented directly to Washington that visitation would be provided and Washington thought "at that time that we could trust them at their word. Hindsight is 20/20, obviously. We found out we can't." (Washington V1, 43:22-44:21, 204:10-208:1).

25. In its Complaint, Smart mischaracterizes an August 2019 email from Rick Ferguson asking Washington and Sebastian to send to Correct, rather than to Smart, the complaints and problems they were continuing to experience with Smart's equipment and services. (Doc 93, ¶89). Smart was not responding timely

to the issues and Correct wanted a "data-mining system" because of Smart's lack of responsiveness. (Ferguson, 234:10-238:1; Washington V1, 129:16-130:13, 139:12-140:11, 254:19-255:12, 256:13-20). As explained by Sebastian, the reference to "plight" meant both Sebastian and Washington were experiencing the same issues with Smart. (Sebastian V1, 92:12-23, 94:10-96:9, P-13; Washington V1, 253:1-9, P-21). In that same email, Ferguson apologized to his customers for "this most disappointing service provider." (Washington V1, P-21). Based on Washington's experience with Smart, Captain Johnson agreed and testified that Smart's customer service was the worst that he had ever seen in his 23-year career. (Washington V2, 369:1-18).

26.    Correct had no role in Washington's decision as of July 31, 2019 and in January 2020 to no longer want to allow Smart at its facility. (Washington V2, 310:18-23). Rather, it was the result of the poor equipment, poor service and multitude of problems caused by Smart. (Washington V1, 244:14-245:24, 246:16-24; Washington V2, 307:19-310:23, D-8, 351:16-352:21, 374:10-15). Despite Captain Johnson's testimony in December 2019, Smart seeks damages ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████.

27.    Smart falsely claims Correct used or allowed Tech Friends to provide services exclusive to Smart in Washington. (Doc. 93, ¶188). Tech Friends was in

Washington before Smart made its 2017 presentation to Washington and Correct has no involvement in Tech Friends' tablets or services at Washington. (Washington V1, 177:9-19; Washington V2, 285:5-287:1; 311:21-312:1). Smart has no claim for damages based on Tech Friends' services after January 4, 2020.

28.     Paragraphs 175, 176, 178 and 179 of Count III and paragraph 186 of Count IV are addressed in Issue 1.

**ISSUE 3:   No evidence supports the breach of contract claim in Count V (¶¶ 192-194) or the breach of good faith and fair dealing claim in Count VI (¶¶ 199-203) of Smart's Complaint as to Sebastian County.**

29.     Smart contends Correct breached the MSA/Schedule for Sebastian by "instructing Sebastian County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Sebastian County." (Doc. 93, ¶192). Smart further alleges Correct committed a breach "by sending an improper notice to cure based on a requested hardware upgrade and entertainment services that Smart had no contractual obligation to provide." (Doc. 93, ¶193). Finally, Smart asserts Correct breached the MSA/Schedule by "entering into the CSG/Tech Friends contract and agreeing to provide exclusive rights to Tech Friends in Sebastian County." (Doc. 93, ¶194).

30.     Smart contends Correct breached its duty of good faith and fair dealing and claims Correct "manufactur[ed] improper grounds to purportedly terminate the agreement" in Sebastian, sent an improper notice to cure and elicited a nonrenewal notice from Sebastian. (Doc. 93, ¶201). Smart alleges Correct solicited complaints about Smart, controlled the communications from Sebastian,

prevented Smart from directly responding or dealing with complaints or issues, and enlisted Sebastian in its "plight" to terminate Smart. (Doc. 93, ¶202). Smart also reasserts its claim that Correct agreed to use Tech Friends as the tablet provider for Sebastian. (Doc. 93, ¶203).

31.    None of Smart's allegations are supported by the evidence. Rather, they all are refuted by the evidence and by Smart's own proposal submitted to Sebastian in November 2019.

32.    Correct did not instruct Sebastian to refrain from communicating with Smart or to deny Smart access and Sebastian never stopped communicating with or submitting its complaints directly to Smart. (SF ¶15). Although Sebastian received Correct's August 15, 2019 request to send the trouble tickets through Correct, Sebastian continued to send them directly to Smart. (SF ¶15). In its November 2019 proposal, Smart admitted it was fully aware of the problems Sebastian was encountering with Smart's equipment because they had been reported by Sebastian to Smart. (SF ¶20).

33.    Smart had full access to Sebastian through phone calls, emails and physical visits, as shown by the constant and numerous email exchanges between Smart and Sebastian during the entire time Smart provided equipment and services to Sebastian, as well as by Lipsey's emails with and two visits to Sebastian in October 2019 and January 2020. (SF ¶¶15, 18, 20, 21).

34.    Correct's notice to cure was not improper because it complied with paragraph 9 of the MSA. Correct's notice to cure directed Smart to cure its breach

of the MSA/Schedule by providing ruggedized correctional grade tablets, which is precisely what was required by the Schedule, and the entertainment Smart promised to Sebastian. (SF ¶¶12, 13, 17). Contrary to Smart's allegations, Correct never demanded that Smart provide any upgraded hardware; just that Smart cure the defective tablets, whatever that fix would be. (Correct V1, 175:11-176:9; Correct V2, 31:7-22, P-54; Smart V2, 337:22-338:1). It was ███████████████████ ███████████████████████████; ███████████████████████████ ███████████████████████████. (Lipsey, ██████████, D-6, D-7). Although Smart had the ability to provide improved tablets, which it acknowledged in its November 2019 proposal, it chose not to cure and only agreed to cure the tablets if Sebastian signed a new direct contract with Smart that included Smart providing the telephone services and equipment Correct was providing. (SF ¶20). Correct's notice to cure under the MSA did not result in Smart curing the problems at Sebastian. Moreover, the notice did not result in the termination of the MSA/Schedule or any damages to Smart. (Sebastian V2, 45:9-12; SF ¶17)

35.    No one from Correct ever asked Sebastian to manufacture grounds or fabricate problems with Smart's equipment or services. (Sebastian V2, 54:18-55:9). The problems experienced by Sebastian with Smart's defective equipment and poor service commenced soon after installation, were ongoing and were directly reported to Smart during the entire time that Smart provided equipment and services at Sebastian. (SF ¶14, 15). Correct did not solicit the non-renewal by Sebastian. The notice of non-renewal by Judge Hudson was issued on advice of

counsel to end its contractual relationship with Correct and Smart and allow Sebastian to directly and separately contract with its telephone and tablet vendors. (SF ¶22, 23).

36.    Correct had no role in Tech Friends being awarded a direct contract with Sebastian for tablets. (SF ¶23). Correct is not a party to the contract and receives no revenue from the tablets. (SF ¶23). There is no contract between Correct and Tech Friends wherein Correct agreed for Tech Friends to have any rights at Sebastian. Tech Friends was awarded a direct contract by Sebastian based on its submission in response to a request for information (RFI). Smart's failure to respond to the RFI eliminated Smart from consideration. (SF ¶23).

**ISSUE 4:    Smart's allegations of unfair competition set forth in Count X fail as a matter of law.**

37.    Smart alleges Correct engaged in unfair competition by "soliciting complaints about Smart, making false claims about Smart, improperly attempting to terminate Smart's relationship with [Correct], the Joint Customers, and other customers, and conveying exclusive rights that belong to Smart to other competitors." (Doc. 93, ¶236). The allegations of unfair competition relating to Washington and Sebastian are refuted by the arguments and facts set forth in Issues 1, 2 and 3 above.

**ISSUE 5:    Smart's claim for fraud in Count VII fails as a matter of law.**

38.    In Count VII Smart purports to allege a claim for fraudulent inducement contending Smart entered into the MSA/Schedules based upon

misrepresentations by Correct. Smart admits the representations forming the basis for its fraud claim were made prior to entering into the MSA/Schedules for each facility. Specifically, Smart acknowledges it "<u>reasonably relied on the representations when it entered into the MSA and the Schedules</u> and then purchased and installed its equipment and services." (Doc. 93, ¶209). The representations alleged by Smart are not actionable.

39.     The five purported "misrepresentations" by Mark Turner of Correct that Smart claims it relied upon in entering into the MSA and Schedules for the facilities are: (a) a "co-terminous" term was better than a seven-year term because Correct's customers renewed their contracts with Correct customarily and without fail (Doc. 93, ¶207.a.); (b) Smart would be the inmate messaging provider for the period in which Correct provided its services to the facilities so long as there were no uncured performance-related issues (Doc. 93, ¶207.b.); (c) Smart was not told Correct may let a contract with a facility expire solely for the purpose of removing Smart's services from the relationship and then enter into a new contract with another service provider (Doc. 93, ¶207.c.); (d) Correct would obtain amendments signed by each facility which would incorporate Smart's services into each contract between Correct and its customer (Doc. 93, ¶207.d.); and (e) Mark Turner would use Smart's services to secure contract extensions with facilities and/or to further solidify relationships with facilities. (Doc. 93, ¶207.e.). These "representations" and thus Smart's fraud claim are negated by the MSA and the evidence.

40. "Florida courts have made clear that no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract." *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*, 262 F.Supp.2d 1334, 1342 (S.D. Fla. 1999). The court in *Eclipse Medical* explained that "reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Eclipse Medical*, 262 F.Supp.2d at 1342, *citing Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996) (recognizing that "it is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties"). The *Eclipse Medical* court also clarified that "fraudulent inducement claims will fail <u>even where the subsequent contract simply says nothing about the allegedly false promise.</u>" *Id.* (Emphasis added).

41. The *Eclipse Medical* court pointed out that "[o]ther courts have expressed this same concept in terms of the materiality of the alleged fraud, i.e., if the representation was not important enough to make it into the comprehensive written agreement, it must not have been material." *Id.* at 1342-1343, *citing Saunders Leasing System, Inc. v. Gulf Central Distribution Ctr., Inc.*, 513 So.2d 1303, 1306 (Fla. 2d DCA 1987), rev. denied, 520 So.2d 584 (Fla. 1988) ("while Gulf Central argues that it would not have entered into the contract but for Saunders' alleged misrepresentations, that argument is contrary to the obvious fact that if

those terms were so material to Gulf Central's bargain, they would or should have been included in the contract").

42. The representations alleged by Smart for its fraud claim are either contradicted by the terms of the subsequent MSA/Schedules, or the MSA/Schedules simply say nothing about the alleged representations. Reliance on alleged representations, which contradict the MSA/Schedules, or which were not material when Smart entered into the MSA/Schedules, cannot sustain Smart's fraud claim.

43. Smart's allegations of fraud are further invalidated by the integration clauses Smart included in the MSA. The MSA states on the first page: "[t]his Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise." Moreover, paragraph 25 of the MSA, which is titled "Completeness of Agreement", provides, in pertinent part, as follows:

> This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto.

44. The purported representations Smart contends it relied upon in entering into the MSA/Schedule are not actionable based on the terms of the MSA.

45. The allegation that Turner said a "co-terminous" term was better than a seven-year term because Correct's customers renewed their contracts with Correct customarily is not actionable. (Doc. 93, ¶207.a.). Florida courts have

consistently held that "[a] claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact." *MDVIP, Inc. v. Beber*, 222 So.3d 555, 561 (Fla.4th DCA 2017) *citing Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So.2d 168, 172 (Fla. 4th DCA 1994). *See also, Silver v. Countrywide Home Loans, Inc.*, 760 F.Supp.2d 1330, 1342 (S.D. Fla. 2011) (a plaintiff may not maintain an action for fraud based on misrepresentations that were in the form of opinions and not statements of existing, material facts). "Puffing" or statements of opinion "do not constitute fraudulent misrepresentations." *Wasser v. Sasoni*, 652 So.2d 411, 412 (Fla. 3d DCA 1995). *See also, Thompson v. Bank of New York*, 862 So.2d 768, 770-771 (Fla. 4th DCA 2003). Turner's alleged statement that a "co-terminous" term was better than a seven-year term is nothing more than a statement of his opinion and was not a statement of existing fact. Moreover, Deglman testified that Turner never made any guarantee as to how long Correct's contracts with any of its customers would last. (SF, ¶5).

46.    The contention Turner represented Smart would be the inmate messaging provider for the period in which Correct provided its services to the facilities so long as there were no uncured performance-related issues (Doc. 93, ¶207.b.) is negated by the MSA. The MSA/Schedules address the term of the agreement between Correct and Smart, which includes a contractual right to non-renew, and an action for fraud is prohibited where "the alleged fraud contradicts the subsequent written contract." *Eclipse Medical*, 262 F.Supp.2d at 1342.

47. The allegation that Smart was not told Correct may let a contract with a facility expire solely for the purpose of removing Smart's services from the relationship and then enter into a new contract with another service provider (Doc. 93, ¶207.c.) is not fraud and is negated by the evidence. There is no evidence any contract expired solely for the purpose of removing Smart. The only contract that did expire, i.e., the Sebastian Agreement, was based upon the affirmative non-renewal of the Sebastian Agreement by Sebastian and Correct's new contract at Sebastian does not include any competitor of Smart nor does it include the right to provide any inmate messaging services. Further, Smart had the Sebastian Agreement before the MSA was signed so Smart was aware of the terms thus negating fraud. (SF ¶6).

48. The remaining allegations relied upon by Smart – that Correct would obtain amendments signed by each facility incorporating Smart's services into each contract between Correct and its customer (Doc. 93, ¶207.d.) and Turner would use Smart's services to secure contract extensions and/or to further solidify relationships with facilities (Doc. 93, ¶207.e.) – are not actionable fraud and did not cause any damages that Smart purports to seek in this lawsuit. To constitute actionable fraud, an alleged false statement of fact "must be of a past or existing fact, not a promise to do something in the future." *Bailey v. Covington*, 317 So. 3d 1223, 1228 (Fla. 3d DCA 2021). Thus, the purported promises to obtain amendments to the facility contract incorporating to use Smart's services and to

secure extensions to solidify relationships with facilities are at best alleged promises to do something in the future and are not actionable.

49.     None of the allegations in Count VII of Smart's Complaint for fraud caused Smart's exit from the facilities and termination of its right to earn revenue therefrom. Rather, Smart's demise was the result of its own inferior equipment and services. Indeed, both Washington and Sebastian did not want Smart at their facilities any longer for these very reasons. (SF ¶¶16, 17, 26, 27, 29).

**ISSUE 6:     Smart has failed to make any allegations concerning fraud or unfair competition by Correct relating to St. Louis and the St. Louis Agreement was always a fixed 5-year non-renewable agreement.**

50.     The allegations as to the City of St. Louis ("St. Louis") pertain to Count I of Smart's Complaint for declaratory judgment. The claim for declaratory judgment relates to Correct's notice of non-renewal sent after Smart sent marketing and solicitation materials offering Smart's new telephone services to St. Louis during the term of the MSA/Schedule for St. Louis. (Doc 93, ¶¶55, 150). Smart's Complaint is devoid of allegations of fraud, unfair competition or any acts of wrongdoing by Correct as to St. Louis. All three prior complaints filed by Smart have also been devoid of any such allegations. Smart has never attached Correct's contract with St. Louis or the Schedule between Correct and Smart relating to St. Louis to any of its four complaints filed in this case. (Doc. 1-2, p. 9; Doc. 1-21, p. 1, Doc. 32, Doc. 76).

51.     The term of Correct's contract with St. Louis was for a fixed 5-year term with no right of either party to renew. (Correct V1, 255:24-256:18, P-46).

Thus, the co-terminous MSA/Schedule between Correct and Smart for St. Louis was for a fixed 5-year term with no right to renew and it expired as a matter of law. On May 16, 2019, Correct provided a copy of its contract with St. Louis to Smart and advised the contract was expiring on July 31, 2020. (Correct V1, 255:24-256:18, P-46). Because the MSA and Schedule were co-terminous with Correct's contract with St. Louis, the MSA/Schedule expired on July 31, 2020.

52. Smart could not include any allegations of fraud or unfair competition because that there can be no such claim since the St. Louis contract with Correct was for a fixed 5-year term, and Smart was the messaging provider until the contract expired on its face.

53. Correct is entitled to summary judgment against Smart as to any claims for fraud and unfair competition relating to St. Louis.

**ISSUE 7: Plaintiff's Claim for Punitive Damages Fails Because the Claims for Fraud and Unfair Competition Fail and There is No Clear and Convincing Evidence to Support the Claim.**

54. On June 8, 2021, Smart filed its Motion for Leave to Amend Third Amended Complaint to Request Punitive Damages (Doc. 87) and represented that, as a result of depositions of Turner and Ferguson taken by Smart in May 2021, it now had a sufficient basis to amend to request punitive damages for its fraud (Count VII) and unfair competition (Count X) claims. The amendment incorporated only the following revisions to Smart's Complaint (Doc. 93):

- Expanding Paragraph 36 to include allegations related to deposition testimony on a difference in opinion between Correct employees Turner and Ferguson on how Correct should handle contract extensions of

23

certain of their correctional facility customers. (Correct V1, 74:9-75:18, 130:20-131:15, 145:5-146:20; Ferguson, 65:17-66:7, 70:11-73:14).

- Expanding Paragraph 78 to include allegations related to deposition testimony that Ferguson acquired general personnel and contact information for the City of St. Louis through a prior employer. (Ferguson, 8:21-9:25, 13:6-14:17, 19:5-20:24).

- Adding "punitive damages" to its prayers for relief. (Doc. 93, p. 51, 56).

55. If this Motion for Partial Summary Judgment is granted, Smart's claim for punitive damages are moot. Separately, Smart's claim for punitive damages is not supported by the record evidence. In Florida, a claim for punitive damages must show clear and convincing evidence the defendant was guilty of intentional misconduct or gross negligence. *See,* §768.72(2), Fla. Stat. Additionally,

> Defeating a motion for summary judgment on a claim for punitive damages is an extraordinarily high bar. Plaintiff, bearing the burden of proof on her claim, must meet the heightened standard of clear and convincing evidence in proving a heightened level of culpability in gross negligence. And, because Plaintiff bears the burden of proof in her claim for punitive damages, [Defendant's] burden in its motion for summary judgment is relatively low. [Defendant] is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. [Defendant] can simply "point out" that Plaintiff has failed to present sufficient evidence to support its claim at trial.

*Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1260, 1269 (S.D. Fla. 2020), citing in part to *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal citation omitted).

56. As explained herein, Smart has produced no evidence, let alone clear and convincing evidence, to show the alleged misrepresentations of Turner (Doc. 93, ¶207) and the alleged conduct of Correct (Doc. 93, ¶236) that form the basis of the fraud and unfair competition claims were intentional or grossly negligent, constitute outrageous conduct, or are causally related to damages alleged by Smart. This is equally true for the amended allegations above that form the basis for Smart's punitive damages claims.

57. Conversely, the record evidence submitted in support of this Motion, including sworn testimony of Smart's Deglman and the correctional facilities, is unequivocal that no fraudulent misrepresentations were made by Correct and that no conduct of Correct caused any damages to Smart. Accordingly, summary judgment as to the claim of punitive damages by Smart is appropriate. *See, Black v. Kerzner Int'l Holdings Ltd.*, 958 F. Supp. 2d 1347, 1352 (S.D. Fla. 2013).

WHEREFORE, Correct respectfully requests this Court to: (a) enter partial summary judgment in favor of Correct and against Smart as to Counts II, III, IV, V, VI, VII, and X, as well as Smart's claim for punitive damages, set forth in Smart's Complaint (Doc. 93); (b) enter partial summary judgment in favor of Correct and against Smart as to Count II of Correct's Counterclaim (Doc. 105); and (c) grant such other relief as the Court determines is proper.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 1, 2021, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

HARLLEE & BALD, P.A.

By: _s/ Kimberly A. Bald_
     KIMBERLY A. BALD, Trial Counsel
     Florida Bar No. 0434190
     ADAM MOHAMMADBHOY
     Florida Bar No. 0137367
     JAMES E. LYNCH
     Florida Bar No. 0046219
     202 Old Main Street
     Bradenton, FL 34205
     Telephone: 941-744-5537
     Facsimile: 941-744-5547
     E-mail: KAB@harlleebald.com
     E-mail: AM@harlleebald.com
     E-mail: JEL@harlleebald.com
     E-mail: LS@harlleebald.com
     E-mail: LLP@harlleebald.com
     E-mail: MAA@harlleebald.com
     Attorneys for Correct Solutions, LLC
     a/k/a Correct Solutions Group

        and

     LUKE F. PIONTEK
     Louisiana Bar No. 19979
     GEORGE HARDY
     Louisiana Bar No. 38012
     Roedel, Parsons, Blache,
     Fontana, Piontek & Pisano
     8440 Jefferson Highway, Suite 301
     Baton Rouge, LA. 70809
     Telephone: 225/929-7033
     Facsimile: 225/928-4925
     Email: LPiontek@roedelparsons.com

Email: GHardy@roedelparsons.com
Co-Counsel for Defendants Correct
Solutions, LLC a/k/a Correct
Solutions Group