UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

      Plaintiff,

vs.               Case No.: 8:20-cv-01469-T-30JSS

CORRECT SOLUTIONS, LLC,
a/k/a CORRECT SOLUTIONS
GROUP, LLC,

      Defendant.

_____/


VIDEOTAPED DEPOSITION OF JONATHAN D. LOGAN

VOLUME I


TAKEN BY:     Defendant Herein

DATE:         Thursday, May 20, 2021

TIME:         9:18 a.m. - 5:35 p.m.

PLACE:        Smart Communications
                Holding, Inc.
                10491 72nd Street
                Seminole, Florida 33777

REPORTED BY:  Linda C. Mead, CCR, CSR
                Notary Public, State of Florida


(Pages 1 - 307)

1    APPEARANCES:

2    BRAD F. BARRIOS, ESQUIRE
         Bajo, Cuva, Cohen & Turkel
3        100 North Tampa Street
         Suite 1900
4        Tampa, Florida 33602
         bbarrios@bajocuva.com
5          Appearing on behalf of Plaintiff

6

7    DAVID GANN, ESQUIRE
         Smart Communications Holding, Inc.
         10491 72nd Street
8        Seminole, Florida 33777
         david.gann@smartcommunications.us
9          Appearing on behalf of Plaintiff

10

11   KIMBERLY A. BALD, ESQUIRE
     JAMES E. LYNCH, ESQUIRE
12       Harllee & Bald, P.A.
         202 Old Main Street
13       Bradenton, Florida 34205
         kab@harlleebald.com
14       jel@harlleebald.com
           Appearing on behalf of Defendants

15

16   LUKE F. PIONTEK, ESQUIRE          (By Videoconference)
         Roedel, Parsons, Koch, Blache,
17       Balhoff & McCollister
         8440 Jefferson Highway
18       Suite 301
         Baton Rouge, Louisiana 70809
19       lpiontek@roedelparsons.com
           Appearing on behalf of Defendants

20

21   ALSO PRESENT:  James Logan
                     LaJuana Pruitt, Videographer

22

23

24

25

1    DEPOSITION OF:  JONATHAN D. LOGAN

2

3                         INDEX

4    EXAMINATION                                Page

5       By Ms. Bald                            8/314

6    CERTIFICATE OF OATH                      304/480

7    REPORTER'S DEPOSITION CERTIFICATE        305/481

8    ERRATA SHEET                             306/482

9    READ AND SIGN LETTER                     307/483

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           EXHIBITS

2     DESCRIPTION                                      PAGE

3     1    Smart Comm Holding Deposition Notice........  17

4     2    Smart Comm Collier Deposition Notice........  17

5     3    Division of Corporations Listing............  32

6     4    MailGuard Articles of Incorporation.........  46

7     5    Third Amended Complaint.....................  59

8     6    11/29/18 Tongate/Ferguson E-Mail............  98

9     7    5/23/17 Logan/Turner E-Mail................. 114

10    8    6/1/17 Deglman/Logan E-Mail................. 139

11    9    6/5/17 Deglman/Logan E-Mail/NDA............. 142

12    10   6/15/17 NDA E-Mail Chain/Signed NDA......... 149

13    11   10/24/17 E-Mail/Management Console.......... 163

14    12   8/8/17 Deglman/Turner E-Mail/MSA/Schedule... 172

15    13   Master Services Agreement................... 182

16    14   8/30/17 Deglman/Logan E-Mail................ 197

17    15   8/30/17 Deglman/Turner E-Mail............... 204

18    16   8/30/17 Deglman/Turner E-Mail/Schedule...... 209

19    17   9/21/17 Deglman/Logan E-Mail/Schedule....... 210

20    18   10/13/17 Deglman/Pinzon E-Mail.............. 212

21    19   10/14/17 E-Mail Chain/Schedule.............. 213

22    20   12/11/17 Logan/Turner E-Mail................ 221

23    21   12/17/18 Text Messages...................... 232

24    22   2/15/12 Letter from Hartman................. 244

25    23   2/15/12 Lattice Nexus Agreement............. 245

1    DESCRIPTION                                    PAGE

2    24  Iron Mountain Escrow Service Agreement...... 251

3    25  Beneficiary Enrollment Form/Amendment....... 252

4    26  Status Quo Stipulation...................... 252

5    27  Summons/Complaint........................... 253

6    28  8/10/19 Tuner/Tongate E-Mail/100 Phone...... 254

7    29  7/17/19 Letter from Peck.................... 262

8    30  Verified Complaint.......................... 263

9    31  9/11/19 Logan Form E-Mails.................. 274

10   32  10/13/17 Tongate/Ferguson E-Mail............ 288

11   33  11/1/17 Logan/Turner E-Mail/Letter.......... 292

12   34  2/13/18 Pruitt/Tongate E-Mail/Support....... 293

13   35  Charlotte County News Report................ 315

14   36  4/5/18 Logan/Turner E-Mail.................. 317

15   37  7/2/19 Logan/Longenberger E-Mail............ 323

16   38  8/23/19 Mzhickteno/Smith E-Mails............ 333

17   39  9/13/19 Letter from Piontek................. 337

18   40  Weapon Photographs.......................... 338

19   41  9/30/19 Logan/Dumas E-Mail.................. 342

20   42  5/14/19 Turner/Logan E-Mail................. 344

21   43  5/23/18 Turner/Logan E-Mail/Work Agreement.. 346

22   44  10/21/19 Logan/Lipsey E-Mail................ 350

23   45  10/30/19 Lipsey/Logan E-Mail................ 355

24   46  11/21/19 Letter from Turner................. 365

25   47  11/27/19 Lipsey/Dumas E-Mail/Proposal....... 367

1    DESCRIPTION                                         PAGE

2    48   10/30/19 Summary from Lipsey................ 382

3    49   2/10/20 Logan/Smith E-Mail.................. 384

4    50   3/23/20 Letter from Temple.................. 389

5    51   6/16/20 Memo from David Hudson............. 394

6    52   4/16/18 Logan/Longenberger/Smith E-Mails.... 403

7    53   8/15/18 Logan/Tongate E-Mail............... 409

8    54   6/31/19 Johnson/Tongate E-Mail............. 411

9    55   10/4/19 Letter from Temple/MSA............. 419

10   56   12/13/19 Letter from Turner................ 420

11   57   1/9/20 Logan/Lipsey E-Mail................. 420

12   58   6/21/17 Deglman/Logan/Turner E-Mails........ 424

13   59   5/26/19 Turner/Logan E-Mail/Agreement....... 431

14   60   10/11/18 Turner/Ferguson/Tongate E-Mails.... 435

15   61   Second Declaration......................... 442

16   62   2/28/18 Tongate/Ferguson E-Mails........... 445

17   63   Third Declaration.......................... 447

18   64   Supplement to Initial Damages Disclosures... 450

19   65   Revenue Reports............................ 468

20   66   1/31/19 Logan/Ferguson E-Mail.............. 472

21

22

23

24

25

1                       PROCEEDINGS

2                        * * * * *

3          THE VIDEOGRAPHER:  We are now on the record.

4     Today's date is May the 20th the year 2021.  The

5     time is 9:18 a.m.

6          We are at 10491 72nd Street in Seminole,

7     Florida to take the deposition of Jonathan D.

8     Logan taken in the matter of Smart Communications

9     Holding, Inc. versus Correct Solutions, LLC, also

10    known as Correct Solutions Group, LLC.

11         My name is LaJuana Pruitt.  I'm your

12    videographer.  Our court reporter is Linda Mead.

13         Will counsel please introduce themselves

14    beginning with Plaintiff counsel.

15         MR. BARRIOS:  Brad Barrios, counsel for Smart

16    Communications.

17         MS. BALD:  Kim Bald, counsel for Correct

18    Solutions.

19         MR. LYNCH:  James Lynch, counsel for Correct

20    Solutions.

21         THE COURT REPORTER:  Will you raise your

22    right hand.

23    THEREUPON,

24                    JONATHAN D. LOGAN,

25    a Witness herein, having been first duly sworn to tell

1   the truth, the whole truth, and nothing but the truth,

2   testified and said as follows:

3                          EXAMINATION

4   BY MS. BALD:

5       Q     Please state your full name.

6       A     Jonathan Logan.

7       Q     And, Mr. Logan, what is your profession or

8   occupation?

9       A     CEO of Smart Communications.

10      Q     And how long have you been CEO of Smart

11  Communications?

12      A     I don't remember the exact date of title

13  change, but I basically founded the company.  So that

14  was in 2009.

15      Q     And when you say founded the -- the company,

16  what is the full name of the company you founded?

17      A     It's switched through different corporations

18  over the years.  Right now it's Smart Communications

19  Holding.

20      Q     And what was the name of the entity when you

21  started?

22      A     A long time ago when it first started, wasn't

23  even I think operating, it was maybe put under a

24  corporation called Asset Recovery back in 2009.  It

25  maybe switched to Smart Communications US shortly



1    same thing with Mark Turner next week.  But -- But I

2    think since you are the CEO, the founder, most of this

3    testimony is probably going to be both your personal

4    knowledge as well as on behalf of the corporation.  So

5    I just want it to be clear.

6              MR. BARRIOS:  Yeah.

7              THE DEPONENT:  Okay.

8    BY MS. BALD:

9         Q    So my question, Mr. Logan, is are you the --

10   testifying as the representative, the corporate

11   representative, of Smart Communications Holding, Inc.?

12        A    Yes, ma'am.

13        Q    And are you also testifying as the corporate

14   representative of Smart Communications Collier, Inc.?

15        A    Yes, ma'am.

16        Q    And I'd like you to take a look at --

17             Your counsel has asserted some objections to

18   some of the -- the notice categories.

19             If you could take a look at what we've marked

20   as Exhibit Number 1 and identify for me any paragraphs

21   that we have listed that you are not prepared to

22   testify about today.

23             MR. BARRIOS:  Well, we asserted any

24        objections by category what he was going to be

25        prepared to testify about and what he's not going

1    to be prepared to testify about.  So...

2         MS. BALD:  If we could just have it on the

3    record what he's going to testify about today and

4    what -- what is being objected to.

5         MR. BARRIOS:  Yeah.  Well, he doesn't have

6    that e-mail correspondence in front of him.  I'm

7    more than happy to give him my copy which has the

8    topics listed and it has our objections listed

9    under each topic.

10        You know, I think the general -- You know,

11   these are legal objections.  So...

12   BY MS. BALD:

13   Q    Well, let me -- let me then do it the longer

14   way.

15        Looking at number one, do you have knowledge

16   as to the demonstrations that were made by Smart

17   Communications to Correct Solutions in 2017?

18   A    I believe so.

19   Q    All right.  Do you have knowledge regarding

20   the negotiations of the terms of the Mutual

21   Confidentiality and Non-Disclosure Agreement?

22   A    Yes, I do.

23   Q    The Master Services Agreement?

24   A    Yes, I do.

25   Q    And each of the schedules?

1    A    Yes, I do.

2    Q    Do you have knowledge about the discussions

3    about the meaning of the term "co-terminous"?

4    A    Yes, I do.

5    Q    Do you have knowledge as to the problems

6    experienced at Sebastian County, City of St. Louis

7    and/or Bowie County?

8    A    Can you clarify that question.

9    Q    Well, we've got a category here, Any problems

10   experienced at the following correctional facilities

11   with the SmartTablet hardware and/or software provided

12   by Smart Communications, and we specified Sebastian

13   County, City of St. Louis and Bowie County.

14        Do you have personal knowledge about the --

15   that category?

16        MR. BARRIOS:  Object to form.

17        THE DEPONENT:  Well, I guess I take objection

18        to the do I have problems experienced with them.

19        I guess that would be what I would object to.  I

20        mean, I don't really agree that there was

21        problems.

22   BY MS. BALD:

23   Q    All right.  How about any issues or problems

24   experienced at Washington County, Greene County or Pope

25   County as to the SmartKiosk hardware and software?

1      MR. BARRIOS:  And we have objected to the

2   relevance of Greene County and Pope County, which

3   are not related to any of the claims that are

4   remaining in the litigation.

5      MS. BALD:  Okay.

6      THE DEPONENT:  I guess my response to this

7   would be I'm aware of all of our clients and I'm

8   aware of all of your products in the field, but

9   I -- I don't agree with the terminology used to

10   describe this.  Because this is framing this as we

11   had problems, which I don't agree with.

12   BY MS. BALD:

13      Q    So you're going to -- You're -- You do not

14   believe there were ever any problems with any of the

15   correctional facilities that involved you and Correct

16   Solutions?

17      MR. BARRIOS:  Object to form.

18      THE DEPONENT:  I think there were problems.

19   I don't think they were necessarily equipment

20   problems.

21   BY MS. BALD:

22      Q    Okay.  What were they?

23      A    I think expectation problems, communication

24   problems, management problems.

25      Q    Do you have information about visits by Smart

1  Communications folks to any of the eight correctional

2  facilities?

3       A    Information?

4       Q    Or do you have knowledge?

5       A    Yes.  I have both.

6       Q    How about do you have knowledge as to

7  communications and -- and interactions between Smart

8  Communications and the eight correctional facilities?

9       A    Yes, I have knowledge.

10      Q    How about knowledge about the public records

11 requests submitted by Smart Communications, Smart

12 Collier and other affiliated entities to any of the

13 eight correctional facilities?

14      A    I have some general knowledge that we're

15 submitting FOIA requests to a lot of agencies.  So they

16 may have been part of that.

17      Q    And do you have knowledge about the

18 SmartTablet that was provided by Smart Communications

19 to the eight facilities at issue?

20      A    I have knowledge, yes.

21      Q    Do you have knowledge about the manufacture,

22 design and testing of that SmartTablet?

23      A    Yes.

24      Q    How about of the SmartKiosk?

25      A    Yes.

1      Q    Do you have knowledge regarding the design,
2  construction, components, durability and reliability of
3  the SmartKiosk?
4      A    Yes.
5      Q    Do you have knowledge regarding the design,
6  durability, defects and/or reliability of the
7  SmartTablet?
8      A    Yes.
9      Q    Do you have knowledge of testing of the
10  SmartTablet to determine whether it was ruggedized
11  and/or correctional grade?
12      A    Yes.
13      Q    How about of the SmartTablet 2.0?
14      A    Yes.
15      Q    Do you have knowledge regarding Smart
16  Communications' decision-making and criteria regarding
17  whether it would provide the SmartTablet or its
18  SmartTablet 2.0 to any of the facilities at issue?
19      A    Yes.
20      Q    How about the development of the SmartTablet
21  2.0?
22      A    Yes.
23      Q    Do you have knowledge of the timing and
24  circumstances surrounding the deployment of the
25  SmartTablet 2.0?

1      A    Yes.

2      Q    How about the treatment and/or handling of

3  information provided by Correct Solutions pertaining to

4  Correct Solutions' business, business plans,

5  connections and customer relations?

6           MR. BARRIOS:  And we objected to the

7      vagueness and lack of specificity in the request,

8      but generally you can answer.

9           THE DEPONENT:  I -- I'll be honest, I don't

10      even understand that question.

11  BY MS. BALD:

12      Q    Okay.  I'll have specifics for you on that

13  then.

14           Do you have knowledge of the damages that

15  Smart Communications is claiming in this action?

16      A    Yes.

17      Q    Do you have knowledge regarding

18  communications and interactions between Lattice and

19  Smart Communications Collier?

20      A    Can you repeat that.

21      Q    Do you have knowledge regarding

22  communications and interactions between Smart

23  Communications Collier and Lattice?

24      A    Yes.

25      Q    And do you have knowledge regarding the

1     Q    If you turned your blue tablet to the back,

2 would you see the same security screws on the blue

3 tablet?

4     A    Different color, but probably the exact same

5 bit and size security screw as on the original.

6     Q    And the same number?

7     A    I don't know about the number.

8     Q    Can you tell me when you first heard of

9 Correct Solutions?

10    A    I think it was at the Texas Jail Association.

11    Q    Do you recall what year?

12    A    Probably the same year we partnered with

13 them.

14    Q    And who did you meet?

15    A    I believe I met Mark Turner and probably

16 somebody else, but I don't really recall.

17    Q    And why was Smart Communications at the Texas

18 Jail Association?

19    A    Because we were providing our services to

20 correctional agencies.

21    Q    Were you a vendor there?

22    A    I was.

23    Q    Okay.  And were you actually the one at the

24 booth?

25    A    Yep.

1    Q    And did you know of Correct Solutions before

2    meeting them at the Association?

3    A    No.  They were a pretty small company and

4    didn't really have much outreach to the rest of the

5    country.  They're very reg -- still are, very

6    regionalized and I had never heard of them before that.

7    Q    So tell me how you met them.

8    A    I believe I was at the show and Mark was

9    walking around and started talking to me because we had

10   products and -- and technology that nobody else in the

11   industry had and I think it sparked his interest.

12         And we talked about a partnership that could

13   benefit both their company and my company.  Because I

14   think our company gives their company tools to go to

15   market with that they don't have, and I think our

16   company would benefit because if they go to market

17   using our -- our system, we grow.

18   Q    So where did you actually have this

19   conversation with Mark Turner?

20   A    In the exhibit hall of the Texas Jail

21   Association.

22   Q    Okay.  And did he make any statements to you

23   about whether or not Correct Solutions had the ability

24   to provide tablets?

25   A    Well, anyone would have the ability to

1    provide tablets.

2        Q    Do you know whether Correct Solutions had

3    tablets itself to provide its customers?

4        A    I believe he told me that they -- they don't

5    have anything themselves and that they're looking for a

6    partner for this technology.

7        Q    What technology was he saying he needed or

8    wanted?

9        A    He loved everything about our technology.

10   Because it was things that no one else in the industry

11   had and it was head and shoulders above what other

12   copycat vendors eventually came out with and he

13   recognized that.

14       Q    Well, tell me what -- what you told him.

15            Did he know what services you had or was he

16   learning it from you?

17       A    Well, he was learning it from there at the

18   exhibit hall.  He could see what services we had

19   because we have a display that explains what services

20   we have.

21       Q    So did you show him what services you had?

22       A    It was a combination of he looked at it, he

23   reviewed it, I showed him some of our system, just some

24   high level, you know, things about our system, and he

25   was blown away.

1        Is -- Did Smart Communications prepare the

2   initial draft of the Master Services Agreement between

3   Correct Solutions and Smart Communications?

4        A    I believe so.

5        Q    And did you have any discussions with Mark

6   Turner at any time as to who would be the specific

7   parties signing the Master Services Agreement?

8        A    Yeah, I believe we talked about it.  I

9   believe we talked about -- Typically we would prefer to

10  go direct to the customer and have them sign an

11  agreement with us directly, and I think it was Mark's

12  wish that we didn't contract with the customer, instead

13  they wanted us to contract directly with Correct

14  Solutions and then Correct Solutions would be

15  contracted directly with the customer.

16       Q    And is that for the schedule or is that for

17  the Master Services Agreement?

18       A    That's for -- for both.  It would typically

19  be we directly with our own customer or directly to the

20  agency, and then Mark wanted it, Nope, nope, nope, we

21  want it to be through Correct Solutions.

22       Q    So why is -- Why did then Smart draft the

23  schedule for Avoyelles to be a contract between Smart

24  and Avoyelles yet the Master Services Agreement was to

25  be a contract between Correct Solutions and Smart

1    contract.  That's part of the business model.

2  BY MS. BALD:

3    Q    So tell me how you understand the 90-day

4  non-renewal provision applies in paragraph six of the

5  Master Services Agreement between your company and

6  Correct Solutions.

7    A    I don't think it really does.  I think it's

8  sloppy just plugging and playing from existing

9  contracts that we had with existing agencies and trying

10  to make it a, you know, square peg fit into a round

11  hole and then was probably an oversight.

12        However, the word "co-terminous" is pretty

13  clear.  Co-terminous is co-terminous and you can't

14  non-renew something that's co-terminous.  That would be

15  against the term "co-terminous".

16    Q    So neither you, nor Correct Solutions had any

17  contractual right to severe that co-terminous provision

18  when a contract is renewing; is that your position?

19    A    When -- When a contract is renewing --

20    Q    Yes.

21    A    -- with --

22    Q    The facility.

23    A    -- the agency?

24    Q    Yes, sir.

25    A    No, because we're co-terminous.

1   BY MS. BALD:

2       Q    That's -- That's Smart's position?

3       A    I instruct position.

4            (Exhibit 14 was marked.)

5   BY MS. BALD:

6       Q    Mr. Logan, I'd like to go ahead and show you

7   a document that we've marked as Exhibit 14, and ask you

8   if you've seen that before?

9       A    Okay.  Yep.

10      Q    And this is an e-mail from Rob Deglman to you

11  on August 30th, 2017?

12      A    That's correct.

13      Q    Mr. Deglman states, It will be up to us to

14  get in and develop a relationship so that if CS loses,

15  we stay.

16           Did you have discussions with Mr. Deglman

17  about that -- his suggestion?

18      A    Yes.

19      Q    What did you discuss with Mr. Deglman?

20      A    That if Correct Solutions provides a system

21  that isn't up to -- to speed, isn't good and the agency

22  wants out of it, they probably will want to stay with

23  us if we provide a good service and they'll maybe do a

24  new contract with us.

25           So if Correct Solutions gets kicked out, we

1  have our own relationship, we can carry on a new

2  contract with our new customer under a new agreement

3  that has nothing to do with Correct Solutions.

4      Q   But the vice versa doesn't apply to Correct

5  Solutions, that if Correct Solutions did a great job,

6  you did a bad job, the facility wanted to remain with

7  Correct Solutions, they couldn't stay in without you,

8  correct?

9      A   It wasn't our contract that got canceled.  It

10  was Correct Solutions' contract that would get

11  canceled.  And then we would start our own new contract

12  that is irrelevant of Correct Solutions' services.

13  Right?

14      Q   So it was your plan as early as August of

15  2017 to make sure that if things went sour with Correct

16  Solutions at its facility you were going to keep that

17  customer, right?

18      A   It was our plan that if Correct Solutions

19  doesn't have a good technology or service platform and

20  the agency likes ours, that we would be able to go and

21  have our own service.  Not inclusive of Correct

22  Solutions' service, our own service.

23         If the agency wanted to dump Correct

24  Solutions and start a new contract with us and then get

25  a different phone provider, hey, that's up the agency

1   what we've marked as Exhibit 15, which is another -- an

2   e-mail from Mark Turner to Rob Deglman and then a

3   forwarding of that e-mail by Mr. Deglman to Jim Logan

4   and to you on August 30th of 2017.

5           Do you recall this e-mail and exhibits?

6       A    Okay.

7       Q    All right.  So do you recall this e-mail?

8       A    Vaguely.

9       Q    And this was an e-mail from Mr. Deglman to

10  you and Jim Logan providing the CSG-Sebastian County

11  contract and then the schedule that is to be signed by

12  Smart and Correct Solutions for Sebastian County,

13  correct?

14      A    Yes.

15      Q    And so I note on the document with Bates

16  Number 1525 is a memorandum from -- or an e-mail from

17  you to Rob Deglman copying your dad.

18          See that?

19      A    On which --

20      Q    It's Bates Number 1525 on the bottom.  It's

21  almost the -- not quite the last page.

22      A    Okay.

23      Q    So you reviewed the CSG-Sebastian County

24  facility contract, didn't you?

25      A    I did.

1    Q    And as of August 30th of 2017, you were aware

2    that it was a -- there was a two-year -- it was a

3    two-year contract?

4    A    Uh-huh.

5    Q    And you were aware that it only had the right

6    to renew for an additional four years, right?

7    A    Right.

8    Q    And then on the -- on the bottom you talk

9    about, Also there are some mistakes and incon --

10   inconsistencies in this with our name SmartKiosk or

11   SmartTablet.

12        Are you talking about the -- the typos in the

13   schedule?

14   A    Yeah, some things like that.

15   Q    And did you direct Mr. Deglman as to the

16   changes that should be made to the Sebastian County

17   schedule?

18   A    I believe what -- And I -- I don't know if I

19   wrote out specifics.  I mean, as you see, I pointed out

20   some of the mistakes.

21        But I do remember talking about this.  And

22   that gets back to the term -- the discussion about the

23   term versus seven years.  And I had again forgotten,

24   because I thought we were going with the seven years,

25   but we ended up going, as I remembered, with the

1    A    So they've been a direct competitor for us

2  and you're pointing out that now we'll be a direct

3  competitor for them.  I guess we'd become equal.

4    Q    My question is, prior to 2019 -- or 2018, '19

5  when you acquired the Lattice licensing agreement,

6  could you provide phone services for inmates at

7  correctional facilities?

8    A    If we wanted to we could, yes.

9    Q    But did you have the ability to do it?

10    A    Yes.  We could go partner, just like -- just

11  like Correct Solutions does, if we had Lattice sitting

12  there at any minute.  And there's others.  IC

13  Solutions.  We could partner with anyone.

14    Q    That's through a partnership, right?

15    A    Well, isn't that -- You get a license and

16  that's a form of partnership?

17    Q    Now can't you through the name Smart provide

18  the phone services?

19    A    We always could.

20    Q    Did you actually physically have phones to

21  provide other -- other than through a partner?

22    A    Have phones?

23    Q    Yes, sir.

24    A    Every vendor buys their own phones.  The --

25  The software is I think what you're referring to.

1    Because you don't need Lattice to go buy the hardware,

2    physical phones.

3        Q    So can you tell me the name of any facility

4    prior to January 1 of 2019 where Smart Communications

5    was providing the telephone services for inmates?

6        A    No, we didn't want to before.  And then as

7    the market started to shift into phone providers

8    providing our service, we had to start providing their

9    service as defense for our growth.

10       Q    So after acquiring the Lattice license, was

11   your intention then to try and acquire the telephone

12   services from correctional facilities?

13       A    Yes.

14       Q    Did you enter into more than one contract

15   with Lattice?

16           MR. BARRIOS:  I would instruct you not to

17       answer that.

18           MS. BALD:  I have to go through these

19       questions.

20           MR. BARRIOS:  Okay.

21   BY MS. BALD:

22       Q    What type of contracts were executed by Smart

23   and Lattice?

24           MR. BARRIOS:  Same instruction.

25   ///

# CS Partnership

email: "rob.deglman@smartjailmail.com Rob Deglman"

To: email: "jon.logan@smartjailmail.com Jon Logan"

This clause is in the Master agreement between CS and SCH that it follows the current CS agreement and it automatically renews with the customers renewals.

It will be up to us to get in and develop a relationship so that if CS loses, we stay.

6. Term. This Agreement
shall commence on the "Effective Date" and shall be co-terminous with
Customer's Agreement with Facility as defined by Facility Address in attached
Schedule. For purposes of this Agreement the "Effective Date" is defined as the
date of the last signature on this Agreement. After the original term, this
Agreement shall automatically renew in accordance with the Customer's Agreement
with facility, listed as Attachment A, unless either Party notifies the other
Party with written notice of non-renewal at least ninety (90) days prior to the
expiration of the then current term.

--
Rob Deglman
Smart Communications
Director of Sales & Marketing
rob.deglman@smartcommunications.us
Cell (941) 704-7448
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/



EXHIBIT

14

5/20/21  Logan

| From: | Rob Deglman [rob.deglman@smartjailmail.com] |
| --- | --- |
| To: | Jim Logan [jimlogan@smartjailmail.com]; Jon Logan [jon.logan@smartjailmail.com] |
| Subject: | Fwd: Sebastian County, AR |
| Date: | Wednesday, August 30, 2017 10:44:53 |
| Attachment 1: | Sebastian County signed agreement.pdf |
| Attachment 2: | CSG and SCH Schedules Sebastian County Final.docx |

Jim

Hopefully your signature hand will stay tired signing contract documents

rob

---------- Forwarded message ----------
From: **Mark Turner** <mturner@correctsolutionsgroup.com>
Date: Wed, Aug 30, 2017 at 10:40 AM
Subject: Sebastian County, AR
To: Rob Deglman <rob.deglman@smartjailmail.com>

Rob,

Here is the information we need to move forward with Sebastian County, AR.

Same process as last time (with the exception that we don't have do the MSA again).

We do need to get that MSA back quickly though as these Schedules will come quickly now.

I have attached the signed Agreement between CSG and Sebastian.

Thanks

MT



SMART COMM 1484

--

Rob Deglman
Smart Communications
Director of Sales & Marketing
rob.deglman@smartcommunications.us

Cell (941) 704-7448
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/

## CONTRACT AND AGREEMENT

This inmate telephone and services "Shared Revenue" Agreement is entered into, by and between Sebastian County Sheriff's Office located at 800 South A Street, Fort Smith, AR 72901, herein known as "Customer" and Correct Solutions, LLC, located at 182 Bastille Lane, Ruston, Louisiana 71720, herein known as "CSG".

WHEREAS, CSG is engaged in the business of providing certain telecommunications equipment and related service and financial equipment and systems and charge-for-call telephone services, and providing automated-operator assisted station-to-station or person-to-person collect, pre-pay and debit telephone calls (Equipment), and:

WHEREAS, Customer has full operating and management responsibility for the detention facility, jail or prison, herein collectively known as the "Facility", and with respect to those premises so noted, wishes to establish an inmate communications services agreement as described herein:

NOW, THEREFORE, the parties hereto, in consideration of the mutual covenants and agreements contained herein and other good and valuable considerations, do hereby agree as follows:

1. **TERM.** This Agreement is effective on the latest signature date ("Effective Date"), and shall continue in effect for a period of two (2) years ("Initial Term") from the Effective Date. Upon completion of the Initial Term, Facility will have the option to renew this Agreement with annual extensions for up to four (4) additional years. Each renewal will be based on a yearly review of services provided by CSG.

## 2. SCOPE OF AGREEMENT

2.1 In consideration of compensation provided herein, Facility grants to CSG exclusive rights to install and maintain telephones and/or inmate telephone systems within its building or on its private property ("Location") during the term of this Agreement. CSG and Facility have agreed upon specific rates for inmate collect, debit and advance pay calls as described in Attachment A of this Agreement.

2.2 This Agreement includes all other premises, whether now existing (if a competing provider has a contract and equipment at such premises, this clause applies at the earliest termination opportunity) or subsequently acquired, under the control of Facility. Facility will notify CSG, in writing, of newly opened, acquired, or available premises, promptly, so CSG can evaluate installation of its Equipment at these premises.

2.3 CSG shall the exclusive right to obtain usage and billing information, order, connect or disconnect inmate telephone services, select carriers, purchase available public utility

equipment, handle all billing and payments. CSG shall be responsible for the payment of all charges in connection the Equipment and will be responsible for any bad debt and associated unbillable.

2.4 CSG shall install and maintain Equipment in good working order. CSG will agree to have Technicians dispatched on an agreed upon scheduled basis to keep all Equipment in good working order.

2.5 CSG agrees to provide Equipment as indicated in Attachment B for the Term of this Agreement.

2.6 CSG shall be responsible for the managing of all call detail records for Equipment, including but not limited to: the rating of each record in accord with rates, terms and conditions, for providing local, intraLATA, interLATA, and interstate telecommunications services as filed with the Public Utilities Commission, for the blocking and unblocking of user billing numbers, and preparation and processing of qualifying message records for billing and collection of revenue. All call detail records and recordings will be maintained for Facility by CSG for the duration of the term of this Agreement, plus an additional 2 years after the term.

2.5 Facility agrees to provide adequate space for Equipment and easy accessibility for use during the normal operating hours of Facility. CSG will install and maintain all necessary infrastructure equipment at no cost to Sebastian County.

2.7 Facility agrees to maintain the area around Equipment and ensure safe and ready access to the users of Equipment to CSG.

2.8 Facility agrees to allow CSG to perform maintenance during the established hours of accessibility jointly agreed to by Facility and CSG, except when access must be denied to ensure the safety of CSG service personnel and/or maintain institutional control.

2.9 Facility agrees to allow CSG access to and use of house cable and inside wire at no cost where available in order to install and provide inmate telephone service.

2.10 Any relocation, expansion, addition, or deletion of Equipment for reasons other than safety, resulting in extraordinary expense and expected to be paid by CSG, must be agreed to by CSG in advance of the cost being occurred or alternatively, the cost paid by Facility.

2.11 Facility warrants that it has the authority to enter into this Agreement with CSG. Facility further warrants that the Equipment mentioned in Attachment A, attached hereto and incorporated herein by this reference, are on property owned by Facility or if Facility is not the owner of the premises, Facility has obtained permission from the building owner or owner's agent to enter into this Agreement.

2.12 CSG shall provide Facility with value-added features as listed in Attachment C.

2.13 In consideration for this Agreement, CSG shall pay Facility a monthly commission fee as listed in Attachment D.

3. **OWNERSHIP.** Facility agrees that legal title to all Equipment shall remain vested with CSG. Facility shall not remove or relocate Equipment without CSG's express consent. Relocation at Facility's request shall be at Facility's expense. CSG is to accept no liability for holes in walls, floors, or other surfaces that result from the installation or removal of Equipment. Upon termination of this Agreement, CSG shall be responsible only for the removal of Equipment. Facility shall restore the premises to their original condition. CSG shall not be responsible for damage to the premises that occur due to vandalism. CSG shall indemnify, defend and hold Facility harmless from liability in connection with the placement, maintenance, or usage of Equipment.

4. **LEGAL ENFORCEMENT.** If legal enforcement of the terms of this Agreement is necessary, the prevailing party shall be entitled to reasonable attorney's fees and costs. CSG and Facility mutually agree to cooperate to the fullest extent possible and the best of each party's ability to facilitate the provisioning of the terms described herein.

5. **LAWFULNESS OF AGREEMENT.** The parties acknowledge that this Agreement is subject to applicable federal, state, and local laws, rules, regulations, court orders, and governmental or agency orders governing the provision of Equipment.

6. **NONWAIVER.** The failure of either party to enforce strict performance of any provision of this Agreement shall not be construed as a waiver of its right to assert or rely upon such provision or any other provision of this Agreement.

7. **GOVERNING LAW.** This Agreement shall be interpreted, construed and enforced in all aspects in accordance with the laws of the State in which the Equipment is provided.

8. **SUCCESSORS AND ASSIGNS.** This Agreement shall be fully binding upon, inure to the benefit of and be enforceable by each party, their successors and assigns. No assignment of any right or interest in this Agreement (whether by contract, operation of law or otherwise) shall release or relieve either party of any of its obligations or liabilities under this Agreement.

9. **AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of Equipment as described in Attachment B must be in writing and signed by an authorized representative of each party.

10. **SEVERABILITY.** In the event that a court, governmental agency, or regulatory body with proper jurisdiction determines that this Agreement or a provision of this Agreement is unlawful, this Agreement, or that provision of this Agreement to the extent it is unlawful, shall terminate. If a provision of this Agreement is terminated but the parties can legally, commercially and practicably continue without the terminated provision, the remainder of this Agreement shall continue in effect.

**11. LIMITATION OF LIABILITY.** In the event of a service interruption caused by CSG, CSG liability shall be limited to the use of reasonable diligence under the circumstances, for restoration of service. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR INCIDENTAL, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES, INCLUDING LOST REVENUE, LOSS OF PROFITS OR OTHER COMMERCIAL OR ECONOMIC LOSS ARISING OUT OF THE PERFORMANCE OF THIS AGREEMENT, INCLUDING WITHOUT LIMITATION NEGLIGENT PERFORMANCE OR FAILURE TO PERFORM.

**12. DEFAULT.** If either party fails to perform its obligations under this Agreement, failure shall constitute default and, in such event, written notice shall be given to provide an opportunity to remedy such default. Should the defaulting party fail to remedy such default within ten (10) working days from date of such notice, the non-defaulting party shall have the right, in addition to all other rights and remedies available at law or in equity, to terminate this Agreement in whole or in part.

**13. REGULATORY.** The parties acknowledge that underlying telecommunications Equipment may be provided by regulated providers and where applicable, provider tariffs, catalogs and price lists may apply.

**14. AMENDMENTS AND MODIFICATIONS.** Amendments and modifications to this Agreement, except for additions or deletions of telephones as described in Attachment B, must be in writing and signed by an authorized representative from each Party.

**15. NOTICES.** Any notices or other communications to be given under this Agreement shall be sent to the following persons:

**FOR CUSTOMER**

**FOR CSG**

Attn: Honorable David Hudson

Attn: Patrick Temple

Address:
800 South A Street
Fort Smith, AR 72901

Address:
182 Bastille Lane
Ruston, LA 71270

**16. ENTIRE AGREEMENT.** This Agreement including all schedules, amendments and exhibits, constitutes the entire Agreement between the parties and supersedes all prior agreements and oral or written representations with respect to the subject matter hereto.

**For Sebastian County Sheriff's Office**

_Signature_

Sebastian County Judge
David Hudson County Judge

B.H Hollenbeck _____ Print

3/27/17 _____ Date

**For Correct Solutions Group**

_____ Signature

_____ Print

_____ Date

## ATTACHMENT A

## RATE SCHEDULE

Rates for calls within the Inmate Call Control Platform will be programmed per the table below:

| Rates - Sebastian County, AR | |
| --- | --- |
| **PREPAID CALLS** | |
| | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| | |
| **PIN DEBIT CALLS** | |
| | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |
| International | $1.00 |
| | |
| **PREPAID CARDS** | |
| | **Minute** |
| LOCAL | $0.40 |
| IntraLATA Toll | $0.40 |
| InterLATA | $0.40 |
| InterSTATE | $0.21 |

**Simple two fee structure for account funding:**
**$5.95 for Account Funding utilizing live operator**
**$3.00 for Account Funding utilizing IVR, Web, Kiosk**

# ATTACHMENT B

## PROVIDED EQUIPMENT

**Inmate Call Control Platform.** The CSG provided Platform will be installed to accommodate the 31 inmate telephones or more as needed and portable telephones as listed in the Sebastian County RFP. Platform will be programmed per the requirements of the County to reflect times of operation. This includes all existing facilities, future expansions or locations.

Inmate call platform, servers, routers and switches are the property of CSG and will be provided at no cost to Customer.

**Video Visitation Platform** – The CSG provided Video Visitation Platform equipment will consist of fifteen (15) inmate side video visitation terminals, seven (7) public side video visitation terminals, one (1) cart video visitation terminal, one (1) Lobby Scheduling Monitor and one (1) Lobby Registration and Scheduling Terminal.

The Video Visitation Platform will be installed by CSG. All equipment will remain the property of CSG and will be provided at no cost to Customer for the duration of Initial Term and Annual Renewals. The following table is demonstrates Customers obligation in the event that this Agreement is not renewed or cancelled for any reason prior to the Initial Term and Annual renewals not being met.

> In the event that Agreement is not extended, cancelled or otherwise made to be not in effect, Customer agrees to the following schedule, based on six (6) years, as a payment for equipment and services. Customer agrees that, should the aforementioned actions negating the original Agreement take place within the given year listed below, the scheduled amount shown would be paid to CSG in full.
> a. Year 1 – beginning with installation and lasting one (1) year, Customer agrees to pay $129,000 to CSG.
> b. Year 2 – beginning with the second year following installation, Customer agrees to pay $107,436 to CSG.
> c. Year 3 – beginning with the third year following installation, Customer agrees to pay $85,872 to CSG.
> d. Year 4 – beginning with the fourth year following installation, Customer agrees to pay $64,308 to CSG.
> e. Year 5 – beginning with the fifth year following installation, Customer agrees to pay $42,744 to CSG.
> f. Year 6 – beginning with the sixth year following installation, Customer agrees to pay $21,180 to CSG.

Customer agrees to pay CSG monthly maintenance and support cost per the following table. Monthly maintenance and support costs will be deducted from inmate telephone commission payments from CSG to Customer.

a. Year 1 – There will be no monthly maintenance and support cost charged to Customer during the first year of this Agreement.
b. Year 2-6 – A monthly maintenance and support cost of $1,290.00 per month will be deducted from inmate telephone commission payable to Customer by CSG.
c. After Year 6, the maintenance and support cost paid by Customer to CSG ceases. Any support arrangements from this time period going forward will be negotiated between Customer and CSG at that time.

Provided Equipment and Value-Added Equipment will be installed and implemented per the timeline listed below:

## Correct Solutions Group
## Sebastian County, AR Implementation Timeline



## ATTACHMENT C

## VALUE-ADDED FEATURES

CSG will provide the CELLMATE Platform to Customer. The Cellmate platform provides tablets to inmates for daily use.

Features included are:
- Talk – inmates will be able to place inmate phone calls, which adhere to all security measures, from the tablets.
- Text – inmates will be able to text numbers and receive text from numbers. All security measures apply and all text will be available to investigators. Family members must have an account established with CSG in order to receive or send texts.
- Games – inmates will be provided with games.
- Books – CSG utilizes a public domain repository of books that the inmate can choose and read on the tablet.

The tablet is manufactured with a clear back cover for security purposes.

No access to outside internet will be available for inmates utilizing tablets.

Charging stations for tablets will be provided by CSG as needed by Customer.

An initial 500 tablets will be provided to Customer. Initial inventory will be enough to supply each inmate with a tablet and provide Customer a spares inventory.

Tablets will not be repaired and should only be replaced. Once spares inventory is depleted, Customer and CSG will negotiate replacement program.

KIOSKS – CSG will provide, at no charge to the Customer, three (3) kiosks. Two (2) kiosks will be placed in the unsecured area of the facility and will be accessible to family and friends for deposit of funds onto inmate accounts. One (1) kiosk will be placed on the secured side of the facility within the booking area. This kiosk will be utilized for inmate fund acquisition at the time of booking and will be equipped to accept coins and cash and must be interfaced with appropriate Customer software to maintain accounting. All kiosks will accept U.S. currency only.

## ATTACHMENT D

## FINANCIAL SCHEDULE

In consideration for this exclusive Contract and Agreement, CSG shall pay Customer a Commission Fee of 74% (Seventy-Four Percent) of the Total Gross Revenue for completed inmate telephone calls regardless of call type, with exception to Interstate Calls due to FCC ruling.

CSG shall provide Customer with a monthly commission report that details all call types, call volumes and call rates. All rates and charges under this Agreement shall conform to the Public Service Commission regulations of Arkansas.



## Schedule 1 – Sebastian County, AR

This Schedule is between Correct Solutions, LLC, hereinafter referred to as "Customer," and Smart Communications Holding, Inc. and/or its designated subsidiary or assignee, with principal offices located at 4522 W North B St., Tampa, Florida 33609, hereinafter referred to as "We," "Us," or "Provider." This Schedule is part of and governed by the Master Service Agreement, the "Agreement", executed by the Parties. The terms and conditions of the Agreement are incorporated herein by reference. This schedule shall be coterminous with the Agreement.

The Customer's Facility address is: 800 South A Street, Fort Smith, AR 72901

Provider shall install and/or provide the following Hardware, Software, Systems and Services as required by Customer at the facility indicated above:

### SmartKiosks and Secure Network

1. The SmartKiosk system and its entire supporting infrastructure are provided at no cost to the Avoyelles Parish Sheriff's Office or inmate.

2. Provider will furnish the proprietary SmartKiosk on a 20:1 inmate to tablet ratio based on the Average Daily Population ("ADP").

3. The SmartKiosk is a custom, wired, ruggedized and correctional grade kiosk of our custom specifications that will connect to our secure network.

4. The SmartKiosk software operating system and applications are all custom-compiled for a corrections environment to ensure that only the minimum operating system components and applications are present. The inmate only has access to applications that are approved for their use, and the operating system is only allowed to connect to our own secure wireless network within the facility.

5. The network itself is designed to facilitate applications within a corrections environment. We utilize a deny-by-default policy on all traffic, so nothing may traverse the network unless specifically allowed and enabled. We utilize a defense-in-depth strategy which employs many layers of security. If any one layer of security is breached, there are many others to provide continuing protection.

### Electronic Messaging

6. We will provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from electronic messaging and photo delivery.

7. We will provide at no cost to Customer the labor for the installation of the electronic messaging system.

8. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system.

9. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the electronic messaging system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

10. Provider will maintain records for a period of seven (7) years from the date the record is made. Upon request, we will provide Customer with copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer.

11. Provider will provide each inmate of the Customer Jail Facilities, two (2) message credits per week at no charge to satisfy the needs of indigent inmates.

12. We will provide Customer with the capability of monitoring and reviewing all electronic messages and attachments sent through the electronic messaging system, except those messages deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all electronic messages sent through the electronic messaging system for a period of seven (7) years from the time the message is sent.

13. Friends and Family can access the electronic messaging and photo delivery system via the Smartjailmail.com website.

14. Electronic Messaging. Each email message is billed at one credit ($0.50).

15. Photo Delivery Service. Each approved photo is billed at two credits ($1.00).

### Customer's Responsibilities

16. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the electronic messaging system. Customer will provide at no cost the necessary escorts for the installation personnel. The escorts must have access to the necessary inmate housing areas, I.T. and utility rooms to facilitate a timely installation. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

17. Customer will include information regarding the Smart Jail Mail System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

18. Customer will provide information regarding Smart Jail Mail messaging system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

19. Upon completion of installation and appropriate system testing, Customer will allow the electronic messaging to go live within forty-eight (48) hours' notice of system availability.

20. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

21. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning of any individual kiosk in particular or the electronic messaging system as a whole.

### Grievances, General and Medical Requests

22. We shall provide at no cost to the Customer and Inmate electronic general and medical requests as well as well as electronic grievance forms via the SmartTablet.

23. Our System presents Inmates with a list of available forms, and once a form has been selected and submitted, it is automatically routed to the appropriate person or department for processing. Automated timers, alerts, and escalation paths help to ensure that requests are handled in a timely manner to ensure compliance with internal policies and accreditation standards (if applicable). Each type of request has a suite of controls to fine-tune policies around who can submit which requests, how often, and a variety of other restrictions to help prevent staff from becoming overloaded. Requests can be easily reassigned to another individual or department as needed, and like everything else, all actions and access to these systems are logged and audited. Reports are available to show

request aging, who is answering requests on time (or not), and one-click compliance reports to aide with accreditation reporting.

## Rules, Regulations & Communications

24. The SmartTablet is designed to provide at the Sheriff's Office discretion a mandatory electronic signature acknowledging that the inmate has received an electronic copy of the Inmate Handbook. The Inmate Handbook is always available on the SmartTablet for easy reference. Changes and additions to the handbook or other rules and regulations can be changed easily by staff members. Inmates also have access to the PREA Act at all times on the SmartTablet. The SmartTablet has the ability for the Administrators to post announcements, communications and notices to the entire inmate population, or certain housing units or individual inmates. A common posting is both the PREA Act and everyday items such as menus.

## Law Library

25. We shall provide access via the SmartTablet to a law library in partnership with Casemaker Legal to the Sheriff's Office and inmates at no cost. The law library provides access to Federal and State statutes and case law, as well as a legal dictionary, practice manual, and other legal aides to assist inmates with researching material appropriate for their case. Casemaker updates this library every day as new information becomes available and is used by a number of State BAR associations as the preferred platform for their registered attorneys to use for legal research.

## Video Visitation

26. We will provide at no cost to Customer a fully functional remote video visitation system for the inmates of the Customer's Jail Facilities. We are exclusively responsible for providing all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system. Provider shall be entitled to all revenue derived from remote video visitation system.

27. We will provide at no cost to Customer the labor for the installation of the video visitation system.

28. We will provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the video visitation system.

29. Provider is responsible for all the costs and future costs associated with any modification, reconfiguration, or upgrade of the video visitation system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

30. We will provide Customer with the capability of monitoring the video visitations, except those visitations deemed to be privileged under law between attorney and client. Further, Provider will maintain a record of all parties of the video visitation system for a period of seven (7) years from the time of the visitation.

31. Friends and Family can access and purchase and schedule the video visitation sessions via the Smartjailmail.com website. The video visitation sessions are only available in fifteen (15) or thirty (30) minute blocks.

32. Each fifteen (15) minutes video visitation block is billed at seven dollars and fifty cents ($7.50).

33. Each thirty (30) minutes video visitation block is billed at fifteen dollars and zero cents ($15.00).

## Customer Responsibilities

34. Customer will provide us with access to the Customer Jail Facilities and space within the Facilities, subject to operational security requirements, for the purposes of installing, networking, and maintaining of the video visitation system. Emergency access to the system will be granted as needed to Contractor Monday through Friday 8:00 am to 4:00 pm. Non-emergency access will be granted within twenty-four (24) hour notice from Contractor.

35. Customer will include information regarding the video visitation System in the Inmate Handbook and in all other areas where information on the Inmate Telephone System is located.

36. Customer will provide information regarding video visitation system in at least one location next to the inmate mailing address on the Customer website, with a link to the SmartJailMail.com website.

37. Upon completion of installation and appropriate system testing, Customer will allow the video visitation system to go live within forty-eight (48) hours' notice of system availability.

38. Customer will provide a list electronically twice each day of all inmates residing in the Customer Jail Facilities and their current housing assignments. Provider will use this listing to ensure that each inmate is authorized to use only those tablets appropriate to their housing assignment.

39. Customer will give prompt notice to Provider of any trouble or irregularity in the functioning the video visitation system as a whole.

## MailGuard™ Patent Pending Postal Mail Elimination System

40. Provider is the exclusive licensee of MailGuard™, the patent pending postal mail elimination system.

41. We shall provide MailGuard™ at no cost to Customer. MailGuard™ converts regular incoming postal mail into an electronic document that is delivered to the inmate recipient via the SmartKiosk™ within the Customer Jail Facility; and

42. We shall provide all of the equipment and support services to operate the MailGuard™ system and transmit incoming routine postal mail into an electronic document to be delivered to the inmate on the SmartKiosk™ at no cost to Customer; and

43. Customer Jail Facility shall provide the inmate the option of designating MailGuard as their Agent for processing incoming routine postal mail. For purposes of this contract, "routine mail" means all regular incoming correspondence between inmates, family and friends and excludes all legal mail, packages, books, magazines, periodicals and religious mail. All legal mail, packages, books, magazines, or other non-routine inmate mail will still be sent to the jail for delivery.

44. MailGuard will only integrate with and transmit incoming routine mail to the SmartKiosk™.

45. Provider is responsible for all the future costs associated with any modification, reconfiguration, or upgrade of the MailGuard™ system at the Customer Jail Facilities. These costs do not include the costs of the actual electrical power.

46. MailGuard shall become the Inmates designated Agent to process and electronically deliver incoming routine inmate mail pursuant to Customer's mail policy which shall promote the intent of this Agreement.

47. Customer will instruct and advertise on its website that all incoming routine mail must be sent to the designated Post Office Box for electronic delivery via the MailGuard™ system.

48. Provider shall be solely responsible for the cost of maintaining the Post Office Box designated by the Customer for incoming routine mail to be sent.

49. Provider will retrieve incoming routine mail from the designated Post Office Box and process and transmit that mail in an expeditious manner.

50. Provider will shred all processed mail unless the Customer requests in writing to Provider that all or particular inmate mail must be stored. All mail stored for more than thirty (30) days must be stored in a separate storage facility controlled by Provider and the Customer shall be billed monthly for the storage amount.

51. The MailGuard™ public website will allow inmates to log into their account and retrieve electronic copies of their processed incoming routine mail for twelve (12) months from the date of their release from the Customer's Jail Facility.

52. Provider will maintain electronic records for a period of seven (7) years from the date of the inmate's release from the Customer's Jail Facility. During the term of this Agreement and upon request, we will provide Customer with electronic copies of the requested record for the purpose of inspecting, examining, and auditing the Provider's records directly relevant to Customer's Jail Facility.

53. MailGuard will provide Customer with the capability of monitoring and reviewing all electronic mail sent through the MailGuard™ system, except those messages deemed to be privileged under law between attorney and client.

54. The work to be performed by MailGuard under this Agreement may, at its discretion, be performed directly by it wholly or in part through a subcontractor of its choosing.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the duly authorized Officers and Agents and have set their hands and seals hereto as of the day and year written below.

Customer: Correct Solutions, LLC.

By: _____

Name: Patrick Temple

Title: Managing Director

Date: _____

Email: Patrick@correctsolutionsgroup.com

Notice Address:
182 Bastille Lane
Ruston, LA 71270

Provider: Smart Communications Holding, Inc.

By: _____

Name: James P. Logan

Title: Vice President

Date: _____

Email: jim.logan@smartjailmail.com

Notice Address:
4522 West North B Street
Tampa, FL 33609

| From: | Jon [jon.logan@smartjailmail.com] |
| --- | --- |
| To: | Rob Deglman [rob.deglman@smartjailmail.com] |
| CC: | Jim Logan [jimlogan@smartjailmail.com] |
| Subject: | Re: Resend Schedule 1 Sebastian County |
| Date: | Wednesday, August 30, 2017 12:59:21 |

Guys I have a couple concerns maybe you can explain so I understand.

I don't see anywhere we're our term is? I just saw one where correct solutions had a 2yr contract but it started in 16 sometime and I didn't notice anywhere in there where it talked about our term being anything other than what correct term is?

Mailguard I notice a line in there that says we will open a PO mailbox that the client designates? The way it reads to me it seems like they will tell us where to open a mailbox of their choice?

Video visitation we have a note in there that says we will keep the video record for 7yrs. That is way overboard and I believe we said 1yr to our clients we do video for. I know many only do 90days because the video storage is huge.

Also there are some mistakes and inconsistencies in this with our name "smart kiosk" or "smarttablet" we also talk about a ratio of 1-20 tablets per inmate but I know that is referencing kiosks.   Not the end of the world but it's a little confused message and document.


Thank you

Jon
Smartjailmail.com

On Aug 30, 2017, at 10:53 AM, Rob Deglman <rob.deglman@smartjailmail.com> wrote:


Jim

Sebastian, AR for signature

Thanks

rob

---------- Forwarded message ----------
From: **Mark Turner** <mturner@correctsolutionsgroup.com>
Date: Wed, Aug 30, 2017 at 10:52 AM

Subject: Resend Schedule 1 Sebastian County
To: Rob Deglman <rob.deglman@smartjailmail.com>


Removed VV and renumbered.

MT



--

Rob Deglman
Smart Communications
Director of Sales & Marketing
rob.deglman@smartcommunications.us

Cell (941) 704-7448
10491 72nd Street
Seminole, Florida 33777
http://www.mailguardkiosk.com/


<CSG and SCH Schedules Sebastian County Final.docx>