UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

v.                                Case No:   8:20-cv-1469-JLB-JSS

CORRECT SOLUTIONS, LLC,

     Defendant.

---

## <u>ORDER</u>

This case arises out of a failed business relationship between two companies—Correct Solutions Group, LLC ("CSG") and Smart Communications Holding, Inc. ("Smart")—which provide various communications services and products to correctional facilities.  In 2019, Smart filed suit against CSG in state court, and in 2020, CSG removed the case to this court where it has since had a protracted and contentious litigation history.  Before the Court is Smart's Motion for Partial Summary Judgment.[1]  (Doc. 211).  CSG responded, and Smart replied.

---

[1] CSG also filed a Motion for Partial Summary Judgment (Doc. 214), however, given that (1) the Counts from Smart's Complaint and CSG's Counterclaim which are addressed in the two Motions for Partial Summary Judgment have very little overlap, (2) the significant number of issues to be addressed in each of the Motions for Partial Summary Judgment, and (3) the convoluted presentation of the issues in both Motions for Partial Summary Judgment, the Court will rule on the separate Motions for Partial Summary judgment in separate orders.  An order on CSG's Motion for Partial Summary Judgment will be issued shortly after this Order.

(Doc. 217; Doc. 218).  After careful review of the record, the Court **GRANTS in part** and **DENIES in part** Smart's Motion for Partial Summary Judgment.  (Doc. 211).

## BACKGROUND

Smart, which is based in Florida, provides a variety of communication services to correctional facilities through its correctional grade tablets and kiosks. (Doc. 93 at ¶ 8; Doc. 105 at ¶ 8).  CSG, which is based in Louisiana, offers inmate telecommunications services by installing its equipment in facilities and charging inmates, or their contacts, on a per minute basis for phone calls.  (Doc. 93 at ¶¶ 12–13; Doc. 105 at ¶¶ 5–7).  CSG has contracts with more than eighty correctional facilities located throughout the United States.  (Doc. 105 at ¶ 7; Doc. 134-1 at 147–48).

### A. Formation of the Business Relationship

In 2017, CSG's Director of Sales, Mark Turner, met Smart's CEO, Jon Logan, at a corrections industry conference in Texas.  (Doc. 128-2 at 4).  Mr. Turner was at the conference seeking vendors to provide additional services—such as correctional grade tablets equipped with electronic messaging services—to CSG's customers' facilities.  (*Id.*; Doc. 144-1 at 17–18).  Mr. Turner and Rick Ferguson, an account manager at CSG, approached Mr. Logan proposing an arrangement wherein CSG's customers could use Smart's products, particularly Smart's SmartTablet, in their facilities.  (Doc. 144-1 at 17–18; Doc. 134-3 at 8–9).  As Mr. Logan testified,

> there was a mutual interest because we had a unique platform that really was beneficial to their platform as they only license a phone platform from a company called Lattice.  And if they could combine our services with their

2

> services, they would have a complete communications package and it would come at no cost to them, no cost to the agency. It's a win for everybody.

(Doc. 1-14 at 51).

In May of 2017, Mr. Logan and Robert Deglman, Smart's Director of Sales, traveled to CSG's headquarters in Louisiana and demonstrated Smart's first generation SmartTablet. (Doc. 134-3 at 10–11; Doc. 132-9 at 7–11). Also in attendance were CSG's owner, Patrick Temple, Jr., and CSG's Director of Field Services, Rick Pruitt. (Doc. 128-2 at 83). Mr. Logan presented the SmartTablet to CSG, and CSG's employees handled the tablet, testing out its functions, but none of the tablets were operational at that time. (Doc. 128-3 at 8; Doc. 134-3). Although the SmartTablet was not fully functional at that meeting, CSG's representatives indicated that they found the SmartTablet acceptable. (Doc. 128-3 at 11–12). CSG's representatives attended two more demonstrations of the SmartTablet at two of the correctional facilities with which CSG already had contracts: Sebastian County and the City of St. Louis. (Doc. 128-2 at 5). The employees at those facilities also inspected and handled the SmartTablets during these demonstrations. (Doc. 128-2 at 5; Doc. 128-4 at 5).

Shortly after meeting with representatives from Smart, Mr. Turner and Mr. Ferguson met with Tech Friends, a competitor of Smart's, and viewed a demonstration of their tablets. (Doc. 128-3 at 7). CSG then chose Smart as its vendor. (Doc. 128-2 at 7).

On June 15, 2017, the parties entered into a Mutual Confidentiality and Nondisclosure Agreement (the "NDA") in contemplation of future business dealings. (Doc. 134-1 at 149–150; Doc. 93-1).  Thereafter, Mr. Deglman and Mr. Turner began negotiations on a Master Services Agreement ("MSA") which would apply to any correctional facility where Smart was the vendor servicing CSG.  (Doc. 132-9 at 26; Doc. 132-10 at 7–10; Doc. 134-1 at 149; Doc. 134-3 at 14, 37).  Smart and CSG finalized the MSA on September 13, 2017.  (Doc. 210 at 4).  The MSA states as follows: "This Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise."  (Doc. 93-2 at 2).  It further states, "Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and systems." (*Id.*)  The MSA also contains a "Confidential Information and Non-Disclosure" provision mirroring many of the terms found in the NDA.  (*Id.* at 3–4).  And it describes the procedures to be undertaken if either party defaults in the performance of any obligation under the MSA, explaining, "the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of the default.  The defaulting Party shall have thirty (30) days after receipt of notice of default to cure."  (*Id.* at 4).  Also relevant to this dispute, the MSA provides that "[i]n the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs."  (*Id.* at 6).

Importantly, Paragraph 6 of the MSA states that the MSA "shall be co-terminous with [CSG]'s Agreement with facility" and that "[a]fter the original term,

this Agreement shall automatically renew in accordance with [CSG]'s Agreement with facility . . . unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term." (*Id.* at 3).

Between September 13, 2017 and March 16, 2018, Smart and CSG prepared schedules for eight correctional facilities—which were existing clients of CSG—describing the services and equipment Smart would provide for each facility. (Doc. 132-9 at 16–19, 22–24, 46–48). These correctional facilities included the City of St. Louis, Missouri, Sebastian County, Arkansas, Washington County, Arkansas, Bowie County, Texas, Wayne County, Georgia, Avoyelles Parish, Louisiana, Lamar County, Mississippi, and Moore County, Tennessee. (*Id.*; Doc. 1-2 at 14). In each schedule, Smart contracted to provide its SmartTablet, which was required to be "a custom, wireless, ruggedized and correctional grade tablet of our custom specifications." (*See, e.g.*, Doc. 93-29; Doc. 93-30; Doc. 93-31; Doc. 132-9). Each schedule was governed by the MSA, coterminous with the MSA, and incorporated by the MSA. (*See, e.g.*, Doc. 93-29; Doc. 93-30; Doc. 93-31; Doc. 132-9). Further, CSG and Smart each had the ability to non-renew the MSA and related schedule by providing notice of at least 90 days before the contract between CSG and its correctional facility customer renewed. (Doc. 105-2 at 3). All of the schedules were executed under the parties' shared presumption that Smart was a subcontractor of CSG, and Smart did not have its own, independent relationships with the

correctional facilities referenced in these schedules.  (Doc. 134-1 at 152; Doc. 134-3 at 41).

### B. Sebastian County Facility

While this litigation involves dozens of unique disputes between the parties relating to each of the eight facilities, in its Motion for Partial Summary Judgment, Smart focuses predominantly on the parties' disputes related to the Sebastian facility.  For this reason, Sebastian will be the only facility that the Court will focus on in this background section.[2]

On April 24, 2017, CSG entered into a Services Contract with Sebastian under which CSG was to be the exclusive telephone and tablet service provider for the Sebastian County Jail.  (Doc. 133-1 at 10, Doc. 132-6 at 22–23; Doc. 128-9 at 9). The agreed-upon rate for local calls was $0.40 per minute.  (Doc. 128-9 at 17).  And Attachment B of the contract provided that "[i]n the event that Agreement is not extended, cancelled or otherwise made to be not in effect," Sebastian would pay CSG a fee depending on the number of years that had passed from the original agreement.  (*Id.* at 18).

---

[2] Certain facts surrounding the Washington facility and the St. Louis facility are discussed in Section B and Section C *infra*, however, the issues raised in Smart's Motion for Summary Judgment as to these facilities are issues of contract interpretation and do not require further elaboration as to the parties' relationship and the experiences of officials at those facilities with respect to the SmartTablets. Accordingly, the Court will not describe the parties' dealings with respect to those facilities with the same level of thoroughness as it will provide for the facts surrounding the Sebastian facility.

Later in 2017, two representatives from Smart, Jennifer Tongate and Mr. Deglman, presented Smart's products to officials at Sebastian. (Doc. 132-11 at 9–11). One of the attendees at this meeting, Sergeant Eddie Smith, Director of Inmate Services at Sebastian, testified that Ms. Tongate and Mr. Deglman "talked about the tablets and that . . . we were going to have pictures and messages and eventually we'd go to have music and videos and books." (*Id.* at 9). Mr. Smith added that a black SmartTablet was passed around at this meeting, and it was similar to the SmartTablets that Sebastian wound up receiving from Smart. (*Id.* at 10–11). The black SmartTablet was the first generation SmartTablet. (*Id.* at 9).

On September 13, 2017, Smart and CSG fully executed the Schedule for Sebastian. (Doc. 133-1 at 16–18; Doc. 128-3 at 15). In January of 2018, Smart shipped its SmartTablets to Sebastian. (Doc. 133-1 at 19–22). One month later, Sebastian began reporting performance issues with the SmartTablets, noting in particular that SmartTablets were being destroyed by inmates. (*Id.* at 57–58). Mr. Smith testified that "I saw . . . the backs were off, the batteries out of them. The backs were made into shanks. The screens were busted where it wasn't like . . . an accidental drop and just it was really I guess slammed down . . . it's completely shattered." (Doc. 132-11 at 15). Mr. Smith added that he believed the inmates were able to pry the backs off the tablets. (*Id.*) Ashley Smith, Director of Inmate Management Assistant at Sebastian, added:

> There was times that the chargers would not charge the tablets. There was times the tablets themselves just wouldn't charge. The screens would break easily. I mean, if you just accidentally dropped it, they were . . . breaking

7

> super easy.  The inmates were able to disassemble the
> tablets on numerous occasions . . . .  They would take out
> the batteries and they would use them for other purposes
> within the jail.  They would remove the wiring from the
> back of them.  They would remove screws for different
> things.  Just overall . . . not adequate for a jail . . . .
> [T]hey're inmates and . . . they're not in here for following
> the rules and taking care of things, and they . . . destroyed
> them.

(Doc. 132-2 at 13–14).  Officials at Sebastian also complained that Smart was taking

too long to replace broken or missing tablets.  (Doc. 133-1 at 60–63; Doc. 132-11 at

12–15, 19–22; Doc. 132-2 at 28–31).

On March 6, 2018, Mr. Pruitt, CSG's Director of Field Services, emailed Ms.

Tongate, stating:

> From our technician who got an earful this morning.  Just
> had a meeting with Sgt Eddie Smith at Sebastian.  He is
> extremely frustrated with [Smart].  Tablets are being
> destroyed at an alarming rate and the replacement tablets
> are being sent unassigned to dorms.  When he inquired
> about this with [Smart], all they did was send him a pdf
> user manual to the tablets.  He also has no authority in
> their system to assign the tablets which means they are
> useless.  Not getting any support from [Smart].

(Doc. 132-9 at 152).

According to staff at Sebastian, Smart continued to fail to timely repair the

SmartTablets.[3]  Ms. Smith testified that by May of 2019, Smart's communication

and response time to repairs was "a bad experience."  (Doc. 132-2 at 23).  On May

---

[3] The Washington, Bowie, and St. Louis facilities also reported similar issues with
the SmartTablet.  (Doc. 133-1 at 51; Doc. 132-16 at 15; Doc. 132-9 at 50–51).  But
since the disputes covered in this Motion for Summary Judgment primarily concern
Sebastian, the Court will not address the issues that Washington, Bowie, and St.
Louis had with their SmartTablets further.

22, 2019, Ms. Smith reported to Ms. Tongate that she "need[ed] to replace 125 tablets that were broken or inoperable and also needed to replace 137 chargers to be replaced or repaired throughout the entire jail." (*Id.* at 23, 62). On June 28, 2019, Ms. Smith reported to Smart representatives that she "need[ed] to replace 100 tablets." (*Id.* at 31, 69). She asked when Smart's technician would be out at the facility to finish repairs on the tablets and noted that "of the 100 tablets that I'm sending back, 14 of those were sent back to us in the last . . . batch not working or broken screens. Can you please make sure that when you send them back to us that they are repaired so we aren't doing extra work." (*Id.*)

On August 15, 2019, Mr. Ferguson, an Account Manager at CSG, emailed several officials at Sebastian instructing:

> In order to move our plight quickly along please note the following instruction: Send all your Smart needs for repairs, questions, complaints (and don't hold back other than 4 letter words or graphic sentences) etc to: arsupport@correctsolutionsgroup.com[.] [P]lease do not send to Smart. CSG will not put them on the clock each time a ticket is opened and forwarded. Feel free to use a spread sheet or direct sentences. Also, be very specific in your request when necessary, ie, cell, issue, wiring . . . etc. . . . . I sincerely apologize for this most disappointing service provider but we are on the downhill run and I want to keep up the momentum.

(Doc. 132-15 at 78).

And on August 23, 2019, Ms. Smith emailed Smart representatives asking for twenty-three replacement tablets and attaching images of a broken tablet where the back of the tablet had been pried off so that the SmartTablet's battery could be ripped out. (Doc. 132-2 at 71–74). Ms. Smith testified that inmates made shanks

out of those batteries, and Sebastian officials sent photos of those shanks to Smart. (*Id.* at 41).  Ms. Smith added that Smart never provided Sebastian with a tablet that she believed was appropriate for inmate use.  (*Id.* at 42).

On September 13, 2019, CSG sent Smart a Notice to Cure ("Notice") pursuant to the MSA, which stated that Smart was not providing adequate tablets.  (Doc. 128-2 at 70–73; Doc. 134-3 at 50–51; Doc. 134-4 at 6–7).  The Notice stated that "the tablets and supporting equipment provided by Smart to [CSG]'s customer, Sebastian County, were not 'correctional grade' in any functional sense.  The tablets provided by Smart have been rather easily dismantled and fashioned into crude weapons."  (Doc. 128-2 at 70).  The Notice added, "Smart has failed to timely install and/or provide electronic education and/or entertainment options" and "the tablets . . . experience near constant failures and performance deficiencies," which Smart has "fail[ed] or refus[ed] to repair."  (*Id.* at 71).  The Notice concluded by stating that Smart must provide Sebastian with proper tablets and repair inoperable tablets within thirty days of the Notice.  (*Id.*)

### C. State Court Litigation

Four days after receiving the Notice to Cure, Smart filed an "Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation" in Florida's Thirteenth Judicial Circuit.  (Doc. 1-3 at 63).  In that Motion, Smart complained that "[t]he Notice to Cure is premised upon two alleged breaches of contractual obligations that Smart simply does not have— the obligation to provide tablets that are impervious to destruction from

10

unsupervised inmates with access to multiple forms of contraband and the obligation to provide entertainment content on tablets." (*Id.* at 64).

On September 20, 2019, the Florida state court held a hearing on Smart's Emergency Motion to Temporarily Enjoin Improper Termination of Agreement. (*See* Doc. 1-9 at 20–21). Captain Dumas of Sebastian traveled to Florida to testify about the issues he had seen with the SmartTablets. (*Id.* at 28–30). At the hearing, the parties made arguments about the implications of the co-terminous provision of the Schedule. In particular, the parties discussed Smart's contention that if CSG non-renewed the Sebastian Schedule with Smart, but CSG continued to contract with Sebastian independently, CSG's purported non-renewal with Smart would really be an in-term termination. Stated in other words, if CSG and Smart intended for their relationship to continue with respect to a particular facility so long as CSG had a contract with that facility, non-renewal could only occur if CSG non-renewed with both Smart *and* the facility. (*Id.* at 27–33).

The state court determined that it would hear evidence on the co-terminous provision at a later date and told CSG and Captain Dumas to use the courtroom to meet separately with Smart to discuss the issues that Sebastian was encountering with the SmartTablets. (Doc. 133-1 at 75). That meeting "became hostile," and Captain Dumas swore that he would "turn the tablets off as soon as [his] feet hit . . . Arkansas soil" and that he was "done with Smart." (*Id.* at 33, 76). Recognizing the myriad issues to be decided, the state court orally determined that CSG's Notice to Cure was valid, ruling, "I'm enjoining termination subject to my subsequent order

and hearing" because it could "see this going way beyond the captain's testimony." (*Id.* at 32–33).

Before the Court issued that subsequent order or heard evidence on the co-terminous provision, however, on November 21, 2019, CSG sent Smart a Notice of Non-Renewal for the Sebastian Schedule.[4] (Doc. 128-11 at 14–15).  CSG advised Smart that the Schedule would expire on April 23, 2020 and provided, "[u]pon receipt of this letter, and pursuant to paragraph 9 of the MSA, please contact Rick Pruitt and [CSG] promptly to make arrangements to exit the Sebastian County Facility and to remove all of Smart's systems, except for the cabling and conduit, from such facility." (Doc. 134-6 at 12–13; Doc. 128-11 at 14–15).

On November 27, 2019, Smart filed a Motion for Temporary Injunction seeking to enjoin the non-renewal.  (Doc. 1-6 at 96).  The Motion was based on the argument that under the co-terminous provision of the MSA, CSG was not permitted to non-renew Smart's services while it continued to provide services to the joint customer correctional facilities.  (*Id.*)  That same day, Smart submitted a written proposal to Sebastian, independent of CSG, to provide telephone services and what Smart described as its "upgraded tablet system" to Sebastian.  (Doc. 133-2

_____

[4] CSG sent Smart a Notice of Non-Renewal as to Bowie on July 17, 2019.  (Doc. 93-9).  CSG also sent Smart a Notice of Non-Renewal as to Washington on October 4, 2019, advising that the Schedule between CSG and Smart for Washington would expire on January 3, 2020.  (Doc. 134-6 at 9–11).  Since the disputes covered in this Motion for Summary Judgment primarily concern Sebastian, the Court will not address the facts surrounding Bowie further.  The Court will only address the facts surrounding Washington's non-renewal as they pertain to a state court hearing whose holding was germane to the issues presented by the parties' litigation resolving Sebastian.  This hearing is discussed *infra*.

at 19–26; Doc. 132-4 at 16–20).  The proposal stated that Smart "would have been glad to provide Sebastian County with options for upgrading to our newest tablet system long ago, especially in light of the issues your facility communicated to us, but the contract we are bound by, through [CSG], does not provide for or even contemplate such an upgrade."  (Doc. 133-2 at 21).

Captain Dumas, who reviewed Smart's proposal, testified that the proposal included several incentives such as offering Sebastian officials a cruise for up to four people.  (*Id.* at 24).  Shortly thereafter, Jerry Lipsey, a quality assurance manager at Smart, made a trip to Sebastian to pitch Sebastian officials on Smart's proposal.  (*Id.* at 40).  Captain Dumas ultimately informed Mr. Lipsey that Smart's proposal would not be accepted and that "we felt the proposal was borderline criminal and definitely was unethical, and we weren't going to even take it any further."  (*Id.*; Doc. 132-4 at 21–25).

On December 19 and December 27, 2019, the state court held an evidentiary hearing on Smart's Motion for Temporary Injunction.  (Doc. 1-14 at 49).  While Smart's Motion addressed all of CSG's notices of non-renewal that Smart had received from CSG at that point, the hearing focused on the non-renewal of the Washington County Schedule because that was the only non-renewal that had ripened at that point given that the then current term had expired.  (Doc. 1-15 at 161).

On January 3, 2020, the state court advised the parties that it had determined that Smart had not demonstrated irreparable harm, and that the state

court would be issuing an order on those prongs of the preliminary injunction analysis in the coming months. (*See* Doc. 1-11 at 39). On January 31, 2020, Smart filed a Motion for Reconsideration as to the ruling the court indicated that it would issue and asked the court to consider the remaining prongs of the temporary injunction analysis, particularly, Smart's likelihood of success on the merits.

In mid-February, 2020, Mr. Ferguson of CSG told Sebastian that Sebastian could not end its relationship with Smart unless Sebastian also terminated its contract with CSG. (Doc. 128-3 at 20). Mr. Ferguson stated, "[m]y discussion with them was it was obviously hard to shake Smart away from this deal. They would have to terminate or let ours go to term and put out some type of [Request for Information]." (*Id.*) On February 26, 2020, Mr. Ferguson emailed a sample Request for Information ("RFI") to Captain Dumas. (*Id.* at 21).

On February 28, 2020, the state court held another hearing on Smart's Motion for Temporary Injunction, this time focusing on Smart's likelihood of success on the merits. (Doc. 1-16 at 25–52). Two days later, on March 2, 2020, the state court informed the parties via conference call that Smart had demonstrated a likelihood of success on the merits and a separate written order would be issued to that effect. (*Id.* at 84–85).

On March 3, 2020, Sebastian issued a non-renewal notice to CSG based on the advice of its counsel.[5] (Doc. 123-2 at 22; Doc. 128-11 at 4). As noted above,

---

[5] March 11, 2020, the Avoyelles Parish facility also sent CSG a notice of non-renewal. (Doc. 1-16 at 96). Since the disputes covered in this Motion for Summary

under Attachment B of its agreement with Sebastian, CSG could have collected a
fee based on the non-renewal, however, CSG did not elect to pursue that option.
(Doc. 128-9 at 17).

On March 23, 2020, the state court issued an order on Smart's Motion for
Temporary Injunction but only as to Smart's likelihood of success on the merits,
finding that:

> Smart has demonstrated a clear legal right to relief and is
> substantially likely to succeed on the merits of its claims
> for declaratory relief and breach of contract as they relate
> to the interpretation of the term and non-renewal
> provisions of the MSA. By issuing a notice of non-renewal
> to Smart and removing Smart's services while continuing
> its relationship with Washington, CSG is in violation of the
> MSA. To the extent that CSG removes Smart's services
> from facilities that had previously received those services
> pursuant to a notice of non-renewal and then maintains a
> contractual relationship with the facilities, CSG will also
> be in violation of the MSA.

(Doc. 1-15 at 171). The state court also determined "[i]t is clear that CSG and
Smart intended for their relationship to continue with respect to a particular
facility so long as CSG had a contract with that facility." (*Id.* at 170). The state
court added, "[i]f there are performance issues with Smart's services, then CSG has
the ability to terminate the agreement pursuant to [the MSA's] Section 9." (*Id.*)
The state court then determined that it would hold a hearing on Smart's Motion for
Reconsideration and hear argument as to the other elements of the preliminary
injunction analysis. (*Id.* at 172).

---

Judgment primarily concern Sebastian, the Court will not address the facts
surrounding the Avoyelles Parish's non-renewal further.

On April 15, 2020, Ms. Lowrimore of Sebastian emailed Sebastian's Request for Information for a telephone service provider to Mr. Ferguson of CSG. (Doc. 128-12 at 3). On May 6, 2020, CSG submitted a response to the Request for Information proposing the telephone services that it would provide. (Doc. 128-3 at 25). On June 16, 2020, Sebastian awarded CSG the telephone services contract, which had an initial term of July 20, 2020 through July 19, 2022. (Doc. 128-11 at 6; Doc. 128-9 at 43–52). While under CSG's earlier contract with Sebastian, the local call rate was $0.40 per minute, under the second contract, the local call rate was $0.30 per minute. (Doc. 128-9 at 43–52; Doc. 128-3 at 24). Further, CSG's second contract with Sebastian did not include tablet services. (Doc. 128-9 at 43–52). Throughout the entire non-renewal to Request for Information to proposal process, CSG did not remove its products or stop providing its services at Sebastian. (Doc. 128-3 at 23; Doc. 128-11 at 5).

After issuing a separate Request for Information for the tablets, Sebastian awarded the contract for tablet provider to Tech Friends, Smart's competitor in the correctional grade tablet space who Smart had originally beat out to win its initial contract with CSG. (Doc. 133-2 at 48; Doc. 132-6 at 9–10, 20). Smart never submitted a response to Sebastian's Request for Information for tablets. (Doc. 133-2 at 19). Unlike the prior arrangement between CSG and Smart, the contracts between Sebastian and Tech Friends and Sebastian and CSG are not related, and there is no fee sharing agreement. (Doc. 133-1 at 46; Doc. 132-14 at 13, 15). Furthermore, Ms. Lowrimore testified that no one at CSG had any role with her as

a member of the committee reviewing proposals for tablet providers.  (Doc. 132-6 at 24; Doc. 132-14 at 10).  Mr. Smith, of Sebastian, testified that the Tech Friends tablets were "a lot sturdier and not as easy to break.  They still get broke.  They're not inmate proof."  (Doc. 128-5 at 3).

On May 29, 2020, Smart amended its state court complaint adding twelve additional counts, new forms of damages, and two additional defendants from CSG, Mr. Turner and Mr. Ferguson.  (Doc. 1-16 at 168).  On June 26, 2020, CSG removed this case to federal court.  (Doc. 1-24).

## LEGAL STANDARD

A court may grant summary judgment if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party, and it is "material" if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party.  *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

In opposing a motion for summary judgment, the non-movant "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial."  *Sears v. Roberts*, 922 F.3d 1199, 1207 (11th Cir. 2019).  If the non-movant relies on evidence that is "merely

colorable, or is not significantly probative, summary judgment may be granted."

*Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1098 (11th Cir. 2015).

Importantly, the Court's role is not to "weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Sears*,

922 F.3d at 1205.

## DISCUSSION

Smart argues that it is entitled to summary judgment on Count I of its

Complaint; Counts I, III, and IV of CSG's Counterclaim; all of CSG's claims for

damages in its Counterclaim; Smart's First, Eighth, Ninth, Tenth, Eleventh,

Fourteenth, Sixteenth, and Twentieth Affirmative Defenses; and CSG's First,

Fourth, Fifth, Sixth, Eighth, Eighteenth, Nineteenth, and Twentieth Affirmative

Defenses.  (*See* Doc. 211).  Smart also argues that it is entitled to partial summary

judgment on Count II and Count III of its Complaint.  (*See id.*)

### A. Smart is entitled to partial summary judgment as to Count I of its Complaint.

Smart argues that it is entitled to summary judgment on Count I of its

Complaint.  (*Id.* at 2–4).  Count I seeks declaratory relief on a number of issues

related to the relationship between the NDA and the various MSAs agreed upon by

Smart and CSG for each correctional facility.  Specifically, Count I requests an

order:

> (a) declaring that each MSA superseded the NDA
> regarding each Joint Customer agreement, such that
> neither Smart nor CSG can be in violation of the NDA; (b)
> declaring that CSG may not rely on a violation of the NDA
> as a predicate to terminate any MSA and that the

termination was ineffective; (c) prohibiting CSG from terminating or taking steps in furtherance of terminating any MSA . . . based on alleged violation of the NDA; (d) awarding Smart its attorneys' fees and costs pursuant to Section 13 of the NDA; and (e) for such further relief as the Court deems just and proper.

(Doc. 93 at 40).

The Court finds, for the reasons below that Smart is entitled to summary judgment that (a) the MSA superseded the NDA, (b) CSG may not rely on a violation of the NDA as a predicate to terminate any MSA, and (c) CSG may not take steps in furtherance of terminating any MSA based on alleged violation of the NDA.  Smart is not entitled to summary judgment as to part (d) of Count I.

> **i.      There is no genuine dispute of material fact as to whether each MSA superseded the NDA regarding each Joint Customer Agreement.**

The parties agree that Florida law governs both the NDA and the MSA.  (*See* Doc. 93-1 at 4; Doc. 93-2 at 6).  Under Florida law, "[i]t is a fundamental rule of contract interpretation that a contract which is clear, complete, and unambiguous does not require judicial construction."  *Imagine Ins. Co. v. State ex rel. Dep't of Fin. Servs.*, 999 So. 2d 693, 696 (Fla. 1st DCA 2008) (citation omitted).  Rather, "the language itself is the best evidence of the parties' intent and its plain meaning controls, warranting summary judgment."  *Palm Beach Pain Mgmt., Inc. v. Carroll*, 7 So. 3d 1144, 1145 (Fla. 4th DCA 2009) (quotation omitted).  But when there are "two reasonable interpretations" of a contract, "summary judgment is inappropriate because there is a genuine issue of material fact."  *Fecteau v. Se. Bank, N.A.*, 585 So. 2d 1005, 1007 (Fla. 4th DCA 1991).  This is because "[w]hen a contract is ambiguous

and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties." *Id.* (quotation omitted).

"It is well established that the parties to a contract can discharge or modify the contract, however made or evidenced, through a subsequent agreement." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). And "[u]nder Florida law, the parties' subsequent conduct also can modify the terms in a contract." *See id.*; *see also Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1953) (holding that "the actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract").

Here, the NDA was entered into on June 15, 2017, after at least a month of discussions between the parties' representatives regarding CSG potentially deploying Smart's tablets at certain facilities where CSG had contracts to provide inmate communications. (Doc. 93-1 at 2; Doc. 132-9 at 7–12). It is undisputed that the NDA was entered into in contemplation of a later business transaction; the NDA explicitly states that, "[t]he Parties contemplate certain discussions with the potential that they may enter other agreements with each other" and that the purpose of the NDA was "[t]o facilitate such discussions." (Doc. 93-1 at 2). The NDA clarifies the nature of these contemplated agreements by providing "[a]bout the purpose of this Agreement and the disclosure of Confidential Information, certain personnel, representatives or agents of the receiving party, as are authorized by the disclosing party, may be granted access to the facilities of the

disclosing party at times and in numbers and identity as agreeable to the disclosing party." (*Id.* at 3). It is clear from the text of the agreement, therefore, that the subject matter of the NDA is the confidential information that will be exchanged between the parties in anticipation of CSG using Smart's technology at the correctional facilities with which CSG has existing contractual relationships.

The MSA was entered into on September 13, 2017, two months after the parties entered into the NDA. (Doc. 93-2 at 2). The first page of the MSA states, "[t]his Agreement supersedes any and all other agreements made between the Parties, written, oral or otherwise." (*Id.*) The Court is hard pressed to think of a more clear and unequivocal statement that the MSA took the place of every single agreement that the parties might have made leading up to their finalizing the MSA. The plain meaning of the phrase "any and all" indicates that the drafters of the MSA were referring to the entirety of the parties' agreements "written, oral or otherwise" that were made prior to the MSA.

And unlike other cases where the parties have limited the extent to which a later agreement superseded an earlier agreement based on some asserted subject matter, here the superseding agreement appears designedly all-encompassing. *Compare PB Legacy, Inc v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2020 WL 1820509, at *9 (M.D. Fla. Apr. 10, 2020) (holding that because the contract at issue specified that it only superseded prior agreements relative to the subject matter of the current contract it did not supersede a prior agreement on a different topic), *with Centennial Bank v. ServisFirst Bank Inc.*, No. 8:16-cv-88-CEH-CPT,

2022 WL 10219893, at *8 (M.D. Fla. Oct. 10, 2022) (granting summary judgment and finding that the prior agreement was "extinguished by merger" into the second agreement where "the two agreements concerned the same subjects, and the second agreement made clear that it reflected the 'entire understanding between the parties on those topics'").  Thus, based on a plain reading of the terms of the MSA, the MSA was intended to supersede the NDA, which indisputably was a prior written agreement made between the parties.

This intention is reaffirmed later in the MSA wherein the contract contains an integration clause attesting to the completeness of the MSA:

> This Agreement, together with any additional or supplementary Schedules or documents incorporated herein by specific reference contain all the terms and conditions agreed upon by the parties hereto, and no other agreements, oral or otherwise, regarding the subject matter of this Agreement or any part thereof shall have any validity or bind any of the Parties hereto.

(Doc. 93-2 at 6).  Read in its entirety, therefore, the MSA clearly establishes a mutual understanding between the parties that the MSA alone govern the terms of the business relationship at issue.  *See Strickland v. Wyndham Vacation Resorts, Inc.*, No. 6:13-cv-1000-Orl-28GJK, 2014 WL 12873407, at *6 (M.D. Fla. June 10, 2014) (finding in a Fair Labor Standards Act case involving a dispute over employee compensation that where employment agreements expressly stated that they superseded any prior agreements regarding "the matters addressed herein" and employment agreements contained terms regarding compensation—a subject which had been discussed in plaintiffs' earlier employment applications—the employment

agreements clearly established that they superseded the employment applications and thus governed the terms of compensation).

While CSG argues that the MSA cannot supersede the NDA because "the MSA does not even mention the NDA" and "[t]he NDA and MSA are entirely separate agreements, entered into for different purposes," (Doc. 217 at 20), it cites no authority for the proposition that a later agreement cannot supersede a prior agreement that it does not mention explicitly or that is geared towards a different aim than its predecessor.  And while it may be true that the MSA was entered into for a different purpose than the NDA insofar as the NDA was entered into in contemplation of the drafting of an MSA, as Smart notes, an agreement's purpose is not the same as an agreement's subject matter.  *See Atlanta & St. A.B. Ry. Co. v. Thomas*, 53 So. 510, 513 (Fla. 1910) (distinguishing, for the purposes of contract interpretation, between "the subject-matter of the contract, the language used, the purpose designed, the consideration furnished, and the circumstances that induced the making of the contract").  Furthermore, contrary to CSG's representations, it is not the case that the content of the NDA was unrelated to the content of the MSA. In fact, the MSA contains a lengthy provision on "Confidential Information and Non-Disclosure" that, in many instances, tracks the language of the NDA, but in other instances, contradicts the NDA.  (*Compare* Doc. 93-1 at 2–3, *with* Doc. 93-2 at 3–4).  It would seem redundant and confusing to have two separate sets of ongoing confidentiality and non-disclosure requirements related to the same business relationship between the parties.

Finally, though CSG notes that the NDA states "[t]he terms of this Agreement shall remain in full force notwithstanding . . . the achievement or abandonment of the purpose of this Agreement," and that the agreement will remain in effect for five years, CSG has directed the Court to no case law indicating that the Court should look to an earlier agreement, that has been explicitly superseded by a later agreement, to discern the parties' intentions as to the proposed lifespan and force of said earlier agreement.  (Doc. 93-1 at 4).  Nor would such a limitation make sense in the ambit of contract law.  No party would be permitted to draft a novation, make a modification, or negotiate ancillary agreements implicating the same underlying subject matter until the original contract between the parties had run its course.

As the Eleventh Circuit has instructed, "[w]hen, under state law, parties agree to supersede an old contract by forming a new one, basic contract principles require us to look only to the new agreement for evidence of the parties' intent." *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1113 (11th Cir. 2014).  Chief among the indicia as to the parties' intents towards superseding is the presence of a merger or integration clause in the new agreement.  *See Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 53 (Fla. 1st DCA 2005) (holding that an integration clause is "a highly persuasive statement that the parties intended the agreement to be totally integrated").  An integration clause indicates "that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract."  *Id.* at 53 n.1.

24

     **ii.**    **Smart is entitled to summary judgment as to Counts I(a), I(b), and I(c) of its Complaint as well as its First Affirmative Defense.**

In light of the precedents outlined above, the Court finds that there is no genuine dispute of material fact that the MSA superseded the NDA such that neither Smart nor CSG can be in violation of the NDA. *See AMTEC Corp. v. Non-Lethal Def., Inc.*, No. 4:15-cv-450-WS/CAS, 2017 WL 10446814, at *4 (N.D. Fla. Nov. 15, 2017) (holding that a claim regarding an alleged breach of an NDA which occurred years after the parties entered into a Consulting Agreement containing the clause, "[t]his Agreement . . . supersedes any and all prior agreements, contracts or discussions between the parties," failed as a matter of law).

Furthermore, because the MSA superseded the NDA, CSG may not rely on a violation of the NDA as a predicate to terminate the MSA because the NDA has no binding legal effect. *See Fowler v. Watts*, 659 So. 2d 374, 375 (Fla. 2nd DCA 1995) (explaining that the parties could not be made to comply with the terms of an earlier agreement which was expressly superseded by a later agreement that stated, "[t]his Agreement is intended to . . . replace all other shareholders' agreements, oral or written, made among the parties prior to the date of this Agreement" because the earlier agreement was superseded and therefore not valid); *Weaver v. Opera Tower, LLC*, No. 07-23332-CIV, 2008 WL 4145520, at *2, *4 n.12 (S.D. Fla. Aug. 1, 2008) (holding that plaintiffs could not rely on deviations from terms contained in defendant's promotional materials to claim breach of contract

where such promotional materials were expressly superseded by later agreements which did not contain those terms).

Finally, for the same reasons, CSG is prohibited from terminating or taking steps in furtherance of terminating any MSA, including, disavowing, disconnecting, or removing Smart's equipment or services from any Joint Customer during the term of the Joint Customer's agreement with CSG, based on alleged violations of the NDA.  Ultimately, no valid NDA exists, and all references to the parties' confidentiality and non-disclosure obligations are contained in the Confidentiality and Non-Disclosure portion of the MSA.

Thus, Smart is entitled to summary judgment as to Counts I(a), I(b), and I(c) in its operative Complaint.  Smart is also entitled to summary judgment as to its First Affirmative Defense, which provides that CSG's claims of breach of contract based on the NDA are negated because the MSA expressly supersedes the NDA. (Doc. 108 at 20–21).  Accordingly, CSG must omit its references to Smart's alleged violations of the NDA as a cognizable legal action separate and distinct from Smart's alleged violations of the MSA, which, per the Court's review, are found in Count I of CSG's Counterclaim, (*see* Doc. 105 at 39), as well as in CSG's First, Fourth, Fifth, and Sixth Affirmative Defenses (*see* Doc. 96 at 34–35, 36–37).

Importantly, this holding does not mean that CSG may not terminate the MSA based on some other reason aside from termination of the NDA, nor does it mean that CSG may not rely on the Confidentiality and Non-Disclosure provision in the MSA, which largely mirrors the NDA, as a predicate to terminate the MSA.

This holding merely states that the NDA was superseded by the MSA, and thus, because neither Smart nor CSG can be in violation of the NDA, CSG may not rely on a violation of the NDA as a predicate to terminate the MSA or to remove Smart's equipment from Joint Customers' facilities.  Such termination or removal must be predicated on some grounds other than a violation of the NDA.

### iii.    Smart is not entitled to summary judgment as to Count I(d) of its Complaint.

Finally, Smart is not entitled to summary judgment as to Count I(d) of its Complaint, which asks that the Court "award Smart its attorneys' fees and costs pursuant to Section 13 of the NDA."  (Doc. 93 at 40).  Section 13 of the NDA provides:

> If any civil action, arbitration, or legal proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, sales and use taxes, court costs and all expenses even if not taxable as court costs.

(Doc. 93-1 at 4).

But, because the MSA supersedes the NDA, and the MSA has its own attorneys' fees provision which directly contradicts the NDA providing that "[i]n the event of litigation concerning this Agreement, the Parties shall each be responsible for their own attorney's fees and costs," (*see* Doc. 93-2 at 6), the Court finds that there is a genuine dispute of material fact as to whether Section 13 of the NDA is also superseded.  *See, e.g.*, *Indus. Project Sols., Inc. v. Frac Tech Servs., Ltd.*, No.

CV-12-BE-3806-S, 2013 WL 444350, at *6 (N.D. Ala. Jan. 31, 2013) (holding that two terms contained in prior Work Orders which contradicted a later MSA negotiated by the parties were superseded by the MSA and could not be relied upon by the parties).

As the parties have not briefed this issue, but both have asked for attorneys' fees as provided in Section 13 of the NDA, (*see* Doc. 96 at 52), summary judgment as to Smart's request for attorneys' fees pursuant to this provision is inappropriate as the Court has been provided with no grounds upon which to determine, as a matter of law, that Section 13 of the NDA applies here.  Accordingly, the Court denies summary judgment as to Count I(d) of Smart's Complaint.

In sum, the Court DECLARES that each MSA superseded the NDA regarding each Joint Customer agreement, such that neither Smart nor CSG can be in violation of the NDA.  The Court DECLARES that CSG may not rely on a violation of the NDA as a predicate to terminate any MSA.  And the Court DECLARES that CSG is prohibited from terminating or taking steps in furtherance of terminating any MSA based on an alleged violation of the NDA.

### B. Smart is entitled to summary judgment as to Count I of CSG's Counterclaim, Count II of Smart's Complaint, and CSG's First, Fourth, Fifth, and Sixth Affirmative Defenses.

Smart also seeks partial summary judgment as to Count II of its Complaint and seeks summary judgment on Count I of CSG's Counterclaim.  (*See* Doc. 211 at 10).  Count I of CSG's Counterclaim alleges that Smart's actions "were a breach of material terms of the NDA and the MSA" in an effort to "try to steal" CSG's

customer, the City of St. Louis, Missouri.  (Doc. 105 at ¶ 81).  Specifically, CSG contends that Smart disclosed confidential information in violation of the confidential information and non-disclosure portion of the NDA.  (*Id.*)  CSG asks the Court to force Smart to "remove all hardware and software systems except for [CSG's property] from [CSG]'s customers' facilities identified on the Schedules" as well as award damages against Smart.  (*Id.* at ¶ 83(A)).

Count II of Smart's Complaint asserts that Smart did not violate the NDA or the MSA, and even if it did, violation of the confidentiality provision of the MSA cannot serve as a basis to terminate the MSA.  (*See* Doc. 93 at ¶¶ 157–70).  In Count II, Smart seeks declaratory judgment as to a number of issues relating to CSG's termination of the MSA, including, relevant to Count I of CSG's Counterclaim, "declaring that CSG may not rely on a violation of the Confidential Information and Non-Disclosure provision of the MSA as a predicate to terminate any MSA and that the attempted termination was ineffective."  (*Id.* at ¶ 170(a)).

> **i.      The "Default and Termination" provision of the MSA permits CSG to terminate the MSA for a default regarding confidentiality and non-disclosure requirements only if CSG provided notice to Smart describing the nature of the default and allowed Smart thirty days to cure.**

As outlined above, whether Smart's actions violated the NDA is irrelevant to this issue because the NDA was superseded by the MSA.  The only focus of Count I of CSG's Counterclaim, therefore, is the MSA.  The Confidential Information and Non-Disclosure portion of the MSA provides in relevant part:

As a condition to the receipt of the Confidential Information from the Disclosing Party, the receiving party (the "Receiving Party") shall, at all times during and after the term of this Agreement (i) not disclose in any manner, directly or indirectly, to any third party any portion of the Confidential Information; (ii) not use the Confidential Information in any fashion except to perform its duties hereunder or with the Disclosing Party's express prior written consent; (iii) disclose the Confidential Information, in whole or in part, only to employees and agents who need to have access thereto for the Receiving Party's internal business purposes; (iv) take all necessary steps to ensure that its employees and agents are informed of and comply with the confidentiality restrictions contained in this Agreement; and (v) take all necessary precautions to protect the confidentiality of the Confidential Information as it would with its own confidential information, and in no event shall apply less than a reasonable standard of care to prevent disclosure.

(Doc. 93-2 at 4).

The MSA contains a bifurcated provision for default and termination. Specifically, the MSA states, "[p]rovider shall have the right to immediately terminate this Agreement if Customer breaches the Confidentiality or Non-Disclosure provisions of this Agreement." (*Id.*) But "[i]f either party defaults in the performance of any obligation" under the agreement, the non-defaulting party must give written notice to the defaulting party specifically describing the nature of default within thirty days. (*Id.*) The defaulting party will then have thirty days (or more if agreed upon) to cure the issue. (*Id.*)

Smart asserts that based on this portion of the MSA alone, only it had the right to terminate the MSA upon breach of the MSA's confidentiality provision.

(Doc. 218 at 5). CSG, however, avers that it had the contractual right to terminate the MSA based on Smart's breach of the confidentiality provisions. (Doc. 217 at 24). But it is unclear what exactly in the text of the MSA supports CSG's contention that it is also permitted *to terminate* the MSA *immediately* upon breach. (*See id.*) Throughout the MSA, "Provider" is used to refer to Smart, and "Customer" is used to refer to CSG. (*See* Doc. 93-2 at 2). Reviewing the last line of the default and termination paragraph of the MSA, it is clear that only Smart may terminate the MSA immediately upon breach of the Confidentiality or Non-Disclosure provisions of the MSA. CSG does not have this automatic right and instead must give written notice to Smart describing the nature of any default so that Smart can cure the issue. (*Id.* at 4).

CSG next states that it was not required to provide notice to Smart as to the breach of the confidentiality and non-disclosure terms because the breach alleged could not be cured. (*See* Doc. 217 at 24). This argument is strained, however, as it effectively permits CSG to sidestep the MSA's notice requirement anytime it asserts that an incurable improper disclosure or misuse of confidential information has occurred. This is flatly tautological. It cannot be that CSG is not required to provide notice whenever it determines that it is not required to provide notice. *See Hunt v. First Nat'l Bank of Tampa*, 381 So. 2d 1194, 1197 (Fla. 2nd DCA 1980) ("A reasonable interpretation is preferred to one which is unreasonable, and an interpretation leading to an absurd conclusion must be abandoned for one more consistent with reason and probability."); *Fla Inv. Grp. 100, LLC v. Lafont*, 271 So.

3d 1, 5 (Fla. 4th DCA 2019) ("An interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect.").

Under the plain language of the contract, even if it is the case that "Smart cannot undue its improper disclosure or make St. Louis forget what it learned as a result of the breach," Smart's inability to cure such alleged defaults does not absolve CSG of its duty to provide written notice of Smart's alleged default.  Even the most irreparable, uncurable default on the MSA's confidentiality obligations would still require notice to the defaulting party as a matter of course.  In sum, the Court cannot read the CSG's preferred interpretation into a contract that explicitly provides otherwise.  *See Nabbie v. Orlando Outlet Owner, LLC*, 237 So. 3d 463, 467 (4th DCA 2018) ("We will not adopt [a party's proposed] interpretation when there is an obvious and better reading which has the added benefit of providing meaning to every term of the contract.").  Thus, the Court finds that the "Default and Termination" provision permitted CSG to terminate the MSA for a default regarding confidentiality and non-disclosure requirements only if it provided notice to Smart describing the nature of the default *and* allowed Smart thirty days to cure.

> **ii.   The meaning of the MSA is not ambiguous, and there is no genuine dispute of material fact that under a plain reading of the contract, the allegedly confidential information is not, in fact, confidential information.**

The undisputed evidence reflects that on April 8, 2019, Ms. Tongate, an employee of Smart, sent Frank Turner[6]—the IT Director of the St. Louis facility who was introduced to Smart by CSG—an email including a promotional advertisement for Smart's newly announced phone service.  (Doc. 105-6).  Smart asserts that the confidential information, which it allegedly misused, was Frank Turner's email address, which Smart already had access to because Frank Turner previously helped Smart set up its equipment at the St. Louis facility.  (Doc. 210 at 8; Doc. 128-6 at 3–4).  Smart used this contact information to first reach out to Frank Turner and then utilized Frank Turner as a contact point through which Smart could negotiate further agreements with the St. Louis facility.  (Doc. 210 at 8).  The testimony of Mark Turner supports this view.  Specifically, when asked to identify the confidential information at issue, Mark Turner stated, "[t]hat would be utilizing Frank Turner as a contract point to send the solicitation to" and later affirmed that "[t]he confidential information was Frank Turner and his contact information."  (Doc. 128-2 at 19).

CSG, however, asserts that the confidential information in question was not just Frank Turner's contact information, but all of the contacts that Smart obtained through CSG, which Smart then allegedly used to try to compete with CSG in the inmate telecommunications space at the St. Louis facility.  (Doc. 217 at 25–27).  CSG argues "Smart was introduced to the key personnel at St. Louis through the

---

[6] The Court will use Frank Turner's full name throughout to avoid confusion with Mark Turner, CSG's Director of Sales.

meetings scheduled by [CSG] for Smart to present its products and services." (*Id.* at 25). But aside from Frank Turner, CSG has only specifically identified one other individual—Robin Edwards, Assistant to the St. Louis Commissioner and CSG's contact for telephone services—who Smart was introduced to at these meetings. (Doc. 128-13 at 4–5). And CSG has introduced no evidence that any representatives from Smart ever contacted Ms. Edwards, nor does the email from Ms. Tongate to Frank Turner include any mention of Ms. Edwards. (*See* Doc. 217 at 25–28). Despite CSG's claims, the undisputed evidence is that the sum of CSG's "confidential information" is the contact information for Frank Turner, specifically his email address. (*See* Doc. 128-2 at 24; Doc. 128-13 at 4–5; 105-6 at 2). Thus, the crux of CSG's claim is that Smart never would have been able to reach Frank Turner without CSG having first introduced them and establishing some rapport between them.

Now, to determine whether using this information about Frank Turner to its advantage constituted a default by Smart on its obligations under the MSA, the Court must assess whether Frank Turner's contact information falls within the parameters of confidential information as described by the MSA. Again, the Court looks only to the MSA here, because, as discussed above, the MSA superseded the NDA.

The MSA describes "Confidential Information" as "including without limitation information concerning the party's services and know-how, technology, techniques, or business or marketing plans related thereto . . . all of which are

confidential and proprietary to, and trade secrets of, the disclosing party." (Doc. 93-2 at 3–4). "Confidential Information" specifically does not include:

> "(a) Information which now is in the public domain or publicly known at the time of disclosure or hereafter comes into the public domain or generally known through no fault of the Receiving Party, otherwise than by reason of breach of this Agreement; (b) Information the disclosure of which is requested or required by law, regulation, court order or a regulatory agency . . . ; (c) Information that was previously known to the Receiving Party free of any obligation of confidentiality; (d) Information that is independently developed by the Receiving Party without reference to or use of the Confidential Information; or (e) Information that is disclosed to the Receiving Party by a third party not under or in violation of, as the case may be, any confidentiality undertaking to the Disclosing Party."

(*Id.*) Smart argues that Frank Turner's contact information clearly is in the public domain given that he is a government employee. (Doc. 211 at 7). CSG counters that Frank Turner's contact information was shared with Smart only so that Smart could perform its obligations under the MSA. (Doc. 217 at 27). CSG asserts that it only shared Frank Turner's contact information because "Smart was not in the inmate telephone business" at the time, and it would not have done so otherwise, but it has introduced no pointed to no testimony from CSG representatives to that effect. (*Id.*)

The Court finds CSG's arguments unavailing. Information is in the public domain where it can be discovered by the public, even if that discovery requires some investigation. *See Adolph Coors Co v. Movement Against Racism and the Klan*, 777 F.2d 1538, 1542 n.2 (11th Cir. 1985) ("It must be emphasized that the information in question is *entirely* in the public domain. Though the task of

uncovering these names without the information at issue might be arduous it could nonetheless be done by computer-assisted research of newspaper databanks widely available."); *EarthCam, Inc. v. OxBlue Corp.*, 703 F. App'x 803, 811 (11th Cir. 2017) (noting that "information known throughout the industry" is information in the public domain). Here, the information is an email address for a government employee, which could easily be obtained by a FOIA request or records search. (*See* Doc. 128-2 at 15–16; Doc. 128-3 at 18).

Even if it was not in the public domain, it is hard to see how the email address concerned CSG's "services and know-how, technology, techniques, or business or marketing plans related thereto." (*See* Doc. 93-2 at 3–4). It is undisputed that Frank Turner was never CSG's primary point of contact for the facility. (Doc. 128-13 at 13). Rather, it was Ms. Edwards who was in charge of contracting with CSG on behalf of the St. Louis government and who delegated the installation of Smart's technology to Frank Turner given his technical skillset. (Doc. 128-3 at 6–7; Doc. 128-4 at 6; Doc. 128-13 at 6–7). Even under the most liberal interpretation of the MSA, to construe the MSA's provision requiring confidentiality for CSG's "services and know-how, technology, techniques, or business or marketing related thereto" as implicating the email address of an installation technician at the St. Louis facility seems to be a stretch. As such, the meaning of the MSA is not ambiguous, and there is no genuine dispute of material fact that under a plain reading of the contract, the allegedly confidential information in question is not, in fact, confidential information. *See Suncoast*

*Comm. Church of Boca Raton, Inc. v. Travis Boating Ctr. of Fla., Inc.*, 981 So. 2d 654, 657 (Fla. 4th DCA 2008) (explaining that whether a document is ambiguous depends upon whether it is *reasonably* susceptible to more than one interpretation; however, a true ambiguity does not exist merely because a document could be interpreted in more than one manner); *White v. Fort Myers Beach Fire Control Dist.*, 302 So. 3d 1064, 1073 (Fla. 2d DCA 2020) (finding there was no genuine dispute of material fact where it was clear that the agreement provided the terms the parties intended and could only yield one reasonable interpretation).

Thus, by emailing Frank Turner in a mass email advertising Smart's phone services, Smart did not default on its obligations regarding confidentiality and non-disclosure under the MSA.  *See Pearson v. Caterpillar Fin. Servs. Corp.*, 60 So. 3d 1168, 1171 (Fla. 4th DCA 2011) ("If a contract's terms are clear and unambiguous, the language itself is the best evidence of the parties' intent and its plain meaning controls, warranting summary judgment."); *see Pan American West, Ltd. v. Cardinal Com. Dev., LLC*, 50 So. 3d 68, 72 (Fla. 3d DCA 2010) (explaining that where the terms of a contract are clear and unambiguous, summary judgment is appropriate).  Smart is therefore entitled to summary judgment on Count I of CSG's Counterclaim as well as partial summary judgment on Count II of Smart's Complaint.

With respect to the relief requested in Count II of Smart's Complaint, the Court enters judgment declaring that CSG may not rely on a violation of the Confidential Information and Non-Disclosure provision of the MSA as a predicate to

terminate any MSA without first providing notice and an opportunity to cure to Smart, and any attempted termination of an MSA without such notice and opportunity to cure was ineffective.  (*See* Doc. 93 at ¶ 170(a)).

For the same reasons, Smart is also entitled to summary judgment on CSG's First, Fourth, Fifth, and Sixth Affirmative Defenses, which assert that Smart breached the MSA, and breached its implied duty of good faith and fair dealing, by misusing confidential information in its efforts to solicit CSG's customer.  (Doc. 96 at 36–37).  CSG asserts that as a result of the breach, it was entitled to terminate the MSA.  Again, the allegedly confidential information was not in fact confidential, and CSG did not properly terminate the contract under the MSA's default and termination provision.  Thus, summary judgment is appropriate.  *See South Florida Coastal Elec., Inc. v. Treasures on Bay II Condo Ass'n*, 89 So. 3d 264, 267 (Fla. 3d DCA 2012) ("Summary judgment on an affirmative defense to the complaint is only appropriate if there is no material dispute regarding the facts alleged in support of the defense.").

### C. Smart is not entitled to summary judgment as to Count III of its Complaint.

Smart next moves for partial summary judgment as to its breach of contract claims regarding Washington County, which are predicated on CSG's alleged failure to make Smart the exclusive provider of inmate communications services at the facility.  (*See* Doc. 93 at ¶ 173).  This claim is outlined in Count III of Smart's Complaint.  (*See id.*)  Smart asserts that it is entitled to partial summary judgment that CSG breached the MSA because Smart was not the exclusive provider of

electronic messaging services at Washington.  (Doc. 211 at 11).  Instead, Smart

argues, because TechFriends was already providing electronic messaging services at

Washington, Smart was never the sole provider of electronic messaging services at

Washington.  (*Id.*)  CSG responds that it did not breach the contract with Smart

because the MSA did not require exclusivity at the facility, just exclusivity under

the MSA.  (Doc. 217 at 29–30).  The Court finds for the reasons below that Smart is

not entitled to summary judgment as to Count III in its Complaint.

> The portion of the MSA which discusses exclusivity provides:

> > Customer grants Provider the exclusive right and license
> > to install, maintain and derive revenue from the Systems
> > through Provider's inmate services and Systems including,
> > without limitation, the related hardware and software,
> > located in the Customer facilities and contractually
> > obligated Customer facilities identified on the Schedules
> > . . . .  During and subject to the terms and conditions of this
> > Agreement, Provider shall be the sole and exclusive
> > provider in lieu of any other third party provider of the
> > inmate communications services contained within the
> > Schedules.

(Doc. 93-2 at 2).  Thus, from the language of the MSA alone, it is unclear whether

the MSA required that Smart be the exclusive provider of electronic messaging at

the facility or whether the MSA required that Smart be the exclusive provider of

electronic messaging retained as a subcontractor by CSG.  That is, the text of this

subsection does not appear to specifically clarify the MSA's position as to whether

the facilities with which CSG contracted could contract with other providers of

electronic messaging services—unaffiliated to CSG—without such contracts

running afoul of the exclusivity promised to Smart under the terms of the MSA.

When there are "two reasonable interpretations" of a contract, "summary judgment is inappropriate because there is a genuine issue of material fact." *Fecteau*, 585 So. 2d at 1007.  This is because "[w]hen a contract is ambiguous and the parties suggest different interpretations, the issue of the proper interpretation is an issue of fact requiring the submission of evidence extrinsic to the contract bearing upon the intent of the parties."  *Id.* (quotation omitted).  Accordingly, because there is a genuine dispute of material fact as to the extent of the exclusivity promised to Smart under the terms of the MSA, Smart is not entitled to partial summary judgment as to the breach of the exclusivity provision in the MSA claim in Count III of its Complaint.

### D. Smart is not entitled to summary judgment as to Count III or Count IV of CSG's Counterclaim, and Smart is not entitled to summary judgment as to CSG's Eighth, Eighteenth, Nineteenth, and Twentieth Affirmative Defenses.

Smart next argues that it is entitled to summary judgment as to Counts III and IV of CSG's Counterclaim.  (Doc. 211 at 21–22).  Count III of CSG's Counterclaim alleges that Smart breached the MSA and Schedule for Sebastian by:

> providing non-correctional grade tablets that were easily and regularly broken by inmates, by failing to address the complaints and problems experienced by Sebastian County, and by intentionally refusing to provide correctional grade tablets unless Sebastian County signed a contract for Smart Communications to provide inmate telecommunications services which [CSG] was under contract to provide at Sebastian County.

(Doc. 105 at ¶ 98).  Count IV of CSG's Counterclaim alleges that Smart purposely breached its duty of good faith and fair dealing with respect to Sebastian by, in relevant part:

> failing to cure its defective performance at Sebastian County . . . providing non-correctional grade tablets that were easily and regularly broken by inmates . . . failing to address the complaints and problems experienced by Sebastian County . . . intentionally refusing to provide correctional grade tablets unless Sebastian County signed a contract with Smart Communications which allowed Smart Communications to provide the same telephone services which [CSG] was providing at Sebastian County.

(*Id.* at ¶¶ 108–09).

Smart asserts that it did not violate the MSA and the Schedule for Sebastian because the "MSA does not include any specifications about the equipment or system, other than the fact that Smart shall have sole discretion over all hardware upgrades, modifications, and updates." (Doc. 211 at 22).  Smart further asserts that CSG and the correctional facilities accepted the tablets after reviewing them, and "[t]he fact that inmates at Sebastian destroyed tablets does not mean that the tablets were not correctional grade when measured against the average corrections facility when the MSA and Schedule were signed or when Smart's tablets were installed." (*Id.* at 23–25).  Thus, according to Smart, there is no genuine dispute of material fact that Smart did not breach the correctional grade description provided by the MSA and the Schedule for Sebastian because regardless of whatever happened to the tablets after they were delivered, Smart provided Sebastian with the tablets that were called for by the contracts.  (*Id.* at 24).  The Court is not

persuaded by this argument and finds that there is a genuine dispute of material fact as to whether Smart breached the MSA and the Sebastian Schedule.

Under Florida law, to prevail in a breach of contract action, a plaintiff must prove the following three elements: (1) the existence of a contract; (2) a breach of that contract; (3) damages resulting from that breach. *See Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1295 (M.D. Fla. July 30, 2018). Here, there is no dispute that the MSA between Smart and CSG existed, and there is no dispute that the Schedule for Sebastian County existed. (*See* Doc. 93-2; Doc. 93-25). The Court next turns to Smart's obligations under the MSA and the Schedule for Sebastian County to determine whether a breach occurred.

Looking first at the MSA, the MSA provides that Smart will provide inmate communications services:

> including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

(Doc. 93-2 at 2). The MSA further states that Smart will "provide free of charge all Software upgrades, modifications, and updates." (*Id.*) Finally, the MSA states that a party who defaults in the performance of any obligation contained within the MSA shall have thirty days to cure that default, and upon termination of the agreement, the provider shall remove all hardware and software systems from the facility. (*Id.* at 4). In sum, the MSA outlines a litany of features that are supposed to be

provided on the SmartTablet as well as the various responsibilities that Smart has to maintain the SmartTablet and ensure that it is functioning properly in response to requests from CSG.

The Schedule for Sebastian relays further obligations for Smart, including providing "sufficient reserve tablets" and providing a tablet that is "custom, wireless, ruggedized and correctional grade." (Doc. 93-25 at 10). The Schedule also states that when a SmartTablet "stops working, no longer holds a charge, is damaged, or is otherwise in need of service, facility staff can replace the malfunctioning tablet with a new working SmartTablet. [Smart] will provide pickup and delivery of malfunctioning and replacement SmartTablets at no charge to the Sheriff's Office." (*Id.* at 11). And "[u]sing remote network access and remote troubleshooting techniques, we can typically pinpoint the cause of a failure and dispatch the appropriate parts and personnel to repair infrastructure failures very quickly." (*Id.*)

The Schedule also outlines Smart's responsibilities with respect to electronic messaging services, stating that Smart will "provide at no cost to Customer a fully functional electronic messaging system for the inmates of the Customer's Jail Facilities[,]" "provid[e] all of the hardware tablets, the software to include the operating systems and application software, and all networking requirements needed for operation of the system[,]" and "provide at no cost to Customer the labor, hardware, and software needed for the continued operating, maintaining, and networking of the electronic messaging system." (*Id.*)

Here, there is a genuine dispute of material fact as to whether Smart fulfilled its duties under the MSA and the Schedule for Sebastian.  First, the record evidence indicates that Smart did not provide the entertainment services that it was required to provide under the MSA.  The record evidence also indicates that Smart did not provide software updates as required under the MSA, and Smart did not address the issues outlined in the Notice to Cure within thirty days as required by the MSA.  Next, as regards the Schedule for Sebastian, the record evidence indicates that Smart did not provide tablets that were "ruggedized and correctional grade," Smart did not send an adequate number of functional replacement tablets, and Smart did not timely dispatch personnel to repair defective tablets.  Further, Smart did not provide "fully functional electronic messaging" as its tablets were frequently broken and inoperable.  All of these failures may constitute a breach of the duties Smart owed under the MSA and the Schedule for Sebastian.

Accordingly, because there is a genuine dispute of material fact as to whether Smart breached its obligations under the MSA and the Schedule for Sebastian, Smart's Motion for Summary Judgment as to Counts III and IV of CSG's Counterclaim is denied.

Because of the same genuine disputes of material fact noted above, Smart's Motion for Summary Judgment is also denied as to CSG's Eighth, Eighteenth, Nineteenth, and Twentieth Affirmative Defenses.  These affirmative defenses all argue—at least in part—that Smart breached the MSA and the Schedule with Sebastian.  For example, CSG's Eighth Affirmative Defense argues that "Smart . . .

breached the MSA and each of the eight Schedules by failing to provide the equipment and perform the services required under the MSA and the Schedules and by failing to correct the deficiencies disclosed by several facilities." (Doc. 96 at 38). CSG's Eighteenth Affirmative Defense argues that Smart "fail[ed] to provide ruggedized, correctional grade tablets and [failed] to provide timely and competent services or address the numerous problems Sebastian County reported to Smart." (Doc. 132-2 at 41). CSG's Nineteenth Affirmative Defense argues that Smart "fail[ed] or refus[ed] to cure the defective equipment and services at Sebastian County after receiving the Notice to Cure from [CSG]." (*Id.* at 42). And CSG's Twentieth Affirmative Defense argues that Smart "refused to provide ruggedize, correctional grade tablets." (Doc. 96 at 42–43).

### E. Smart is not entitled to summary judgment on its Eighth or Sixteenth Affirmative Defenses.

In Smart's Eighth Affirmative Defense, Smart argues that Counts V and VI of CSG's counterclaim are barred by absolute or qualified litigation privilege, and in Smart's Sixteenth Affirmative Defense, Smart argues that CSG's claims related to Sebastian County are barred by the litigation privilege. (Doc. 108 at 24, 26). Count V in CSG's Counterclaim is a claim for tortious interference with a contract and/or business relationship with respect to Sebastian County. (Doc. 105 at ¶ 111). Specifically, CSG argues that Smart caused Sebastian to non-renew its contract with CSG by (1) intentionally ignoring Sebastian's requests for proper equipment, services, and repairs; (2) submitting a written proposal to Sebastian indicating that CSG could no longer provide the requisite telecommunications services; (3)

instructing the employees of Lattice that they could no longer maintain the Lattice software used by CSG to provide its telecommunications services; (4) seeking an injunction to prohibit Bruce Johnson from working for, and providing critical support to, CSG; and (5) using improper means of providing financial incentives to Sebastian County employees in order to persuade them to contract with Smart. (*Id.* at ¶¶ 114–120).

Count VI in CSG's Counterclaim is a claim for unfair competition and damages related to Smart's Lattice Acquisition, which CSG asserts caused it to lose goodwill, customers, and sales. (*Id.* at ¶¶ 123–125). Namely, CSG claims that Smart (1) endeavored to have CSG's customers believe that because of the Lattice Acquisition, CSG could not properly provide telecommunications services for its customers; (2) tried to prevent CSG from securing the software resources it needed to keep its telecommunications platform operational; and (3) attempted to prevent CSG from obtaining new customers. (*Id.* at ¶ 124).

As noted above, before contracting with Smart, CSG licensed its phone services from Lattice, Inc. (Doc. 1-14 at 51). In its Counterclaim, CSG asserts that Lattice sold CSG the Nexus Inmate Phone platform and thereafter provided maintenance and support to CSG's phone platform. (Doc. 105 at ¶ 30). According to CSG, under the agreement between Lattice and CSG, Lattice was obligated to provide CSG with a copy of the Nexus source code under certain conditions so that the phone services provided could be customized to the specific needs of CSG's customers. (*Id.*) CSG alleges that Smart schemed to steal CSG's customers by

acquiring Lattice's phone services and instructing Lattice not to assist CSG with maintenance and support.  (*Id.*)  Again, as best the Court can tell, based on CSG's Counterclaim, Answer, Motion for Partial Summary Judgment, and Response to Smart's Motion for Partial Summary Judgment, no record evidence has been introduced regarding Lattice aside from the quote from Mr. Logan as to CSG's use of Lattice referenced *supra*.

In its Eighth Affirmative Defense, Smart argues that these claims are barred because "they [are] based on lawsuits Smart or Smart Collier filed or [on] conduct or statements related to judicial proceedings."  (Doc. 108 at 24).  Smart asserts that it is entitled to summary judgment as to this affirmative defense because "[t]o hold Smart accountable for Sebastian's non-renewal of its contract with CSG would be to penalize Smart for its successful position within the litigation."  (Doc. 211 at 17).  Smart makes a similar argument in its Sixteenth Affirmative Defense, asserting that "Smart cannot be held to have caused damages because of its legal arguments, which were accepted by the [state] court."  (Doc. 108 at 26).

These arguments fail to address those aspects of Smart's purported conduct outlined in Counts V and VI of CSG's Counterclaim, which occurred prior to Smart filing its injunction motion in state court such as "intentionally ignoring Sebastian's requests for proper equipment, services, and repairs."  Because this conduct occurred prior to Smart filing its injunction motion in state court, it cannot possibly be barred by litigation privilege.  *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1274 (11th Cir. 2004) ("Florida's litigation privilege affords absolute

immunity for acts occurring during the course of judicial proceedings.  The privilege . . . extend[s] to cover all acts related to and occurring within judicial proceedings.").

The same is true of Smart's conduct related to its alleged relations with Lattice, Inc.  Smart has admitted in its Answer to CSG's Counterclaim that it entered into a license agreement with Lattice in early 2019, but Smart denies having acquired Lattice.  (Doc. 108 at ¶ 30, 32).  If record evidence exists elsewhere on the docket about Smart's 2019 acquisition of Lattice, it certainly has not been cited by the parties.

Still, given that based on the parties' representations it is undisputed that Smart entered into some sort of business relationship with Lattice in "early 2019," and Smart filed its state court lawsuit in August 2019, Smart's conduct with respect to Lattice would fall outside the ambit of litigation, and litigation privilege would not apply.  *See Jackson*, 372 F.3d at 1274.

Furthermore, the facts surrounding the cause of Sebastian's decision to not renew its contract with CSG remain disputed.  While CSG has introduced evidence that Sebastian's non-renewal decision arose from its frustration with the SmartTablet that CSG helped to provide via Smart, Smart introduced evidence that Sebastian decided to not renew its contract with CSG because officials at Sebastian heard that the state court appeared to accept Smart's argument as to its likelihood of success on the merits, indicating that Smart might succeed on its injunction motion.  Without undisputed record evidence that Sebastian chose to non-renew because of some feature of Smart and CSG's state court litigation, the Court cannot

48

determine that Smart is entitled to a summary judgment finding that Count V and Count VI are barred by litigation privilege.

Finally, even if Smart's theory as to the cause of Sebastian's decision to non-renew was supported by undisputed facts, it would not eliminate the possibility that Sebastian's non-renewal decision was based on dissatisfaction with the SmartTablets.  Specifically, Sebastian could have terminated its agreement with CSG after learning that it might be roped into further use of defective SmartTablets so long as it remained a client of CSG because a court looked poised to order CSG to maintain its contract with Smart.  In such a case, while Sebastian's decision to non-renew would be immediately predicated by acts related to the parties' litigation, the fundamental source of non-renewal could still be dissatisfaction with the SmartTablets arising from Smart's alleged tortious interference and unfair competition.  Thus, there is a genuine dispute of material fact as to why Sebastian decided to not renew its contract with CSG—whether it was because Sebastian heard hints of Smart's potential for success on its injunction motion or whether it was because Sebastian was dissatisfied with services provided by CSG (through Smart)—and this dispute precludes summary judgment.  Accordingly, summary judgment is denied for Smart as to Smart's Eighth and Sixteenth Affirmative Defenses.

### F. Smart is not entitled to summary judgment on its Ninth or Tenth Affirmative Defenses.

"[A]ffirmative defenses are pleadings, and as a result, must comply with all the same pleading requirements applicable to complaints."  *See Gomez v. Bird*

*Auto., LLC*, 411 F. Supp. 3d 1332, 1334 (S.D. Fla. Nov. 25, 2019).  To that end, a

"defendant must allege some additional facts supporting the affirmative defense."

*Cano v. South Florida Donuts, Inc.*, No. 09-81248-CIV, 2010 WL 326052, at *1 (S.D.

Fla. Jan. 21, 2010).  Specifically, "[a] defendant must admit the essential facts of the

complaint and bring forth other facts in justification or avoidance to establish an

affirmative defense."  *Gomez*, 411 F. Supp. 3d at 1335.

Smart's Ninth Affirmative Defense states, in its entirety, "CSG's claims in

Count V are barred because, at all material times, Smart was not a stranger to the

relationship between CSG and Sebastian County."  (Doc. 108 at 24).  No argument

was made as to this affirmative defense in Smart's Motion for Summary Judgment,

beyond merely listing that Smart is entitled to summary judgment as to its Ninth

Affirmative Defense.  (*See* Doc. 211 at 13–21).  Smart's Tenth Affirmative Defense

argues that CSG's claims in Counts V and VI are barred because Smart's alleged

conduct was "privileged and lawful competition, undertaken to protect its own

financial interests."  (Doc. 108 at 24).  Smart provides no definition from relevant

case law as to what constitutes "privileged and lawful competition," however, and

the Court cannot find one in its own search for those terms.  Further, Smart makes

no argument as to "privileged and lawful competition" in its Motion for Summary

Judgment and merely states that Smart is entitled to summary judgment as to its

Tenth Affirmative Defense.  (*See* Doc. 211 at 13–21).

Without any facts or legal argument pertaining to these defenses both within

the text of the affirmative defenses themselves and within Smart's Motion for

Summary Judgment, the Court cannot grant summary judgment in favor of Smart.

Accordingly, summary judgment is denied as to Smart's Ninth and Tenth

Affirmative Defenses. *See Home Mgmt. Sols., Inc. v. Prescient, Inc.*, No. 07-20608-

CIV, 2007 WL 2412834, at *3 (S.D. Fla. Aug. 21, 2007) ("Without some factual

allegation in the affirmative defense, it is hard to see how a defendant could satisfy

the requirement of providing . . . grounds upon which the defense rests.").  Instead

of *sua sponte* striking these affirmative defenses, the Court will simply note that

Smart's litigation strategy—wherein rather than move for summary judgment on

Count V of CSG's Counterclaim, Smart moves for summary judgment on various

poorly pleaded affirmative defenses related to that Count—is just the sort of "throw

everything at the wall and see what sticks" litigation that causes a waste of judicial

resources.

### G. Smart is not entitled to summary judgment on its Eleventh Affirmative Defense.

Smart's Eleventh Affirmative Defense argues that CSG's claims in Counts V

and VI are barred by the separate and independent tort doctrine.  (Doc. 108 at 24–

25).  Specifically, Smart asserts that Counts V and VI in CSG's counterclaim are

based on the same alleged conduct as CSG's breach of contract claims.  (*Id.*)

Under Florida law, the "independent tort doctrine" requires that a party

demonstrate a tort claim is "independent of any breach of contract claim." *Lamm v.*

*State Street Bank & Tr.*, 749 F.3d 938, 947 (11th Cir. 2014) (citations omitted).  As

the Eleventh Circuit explained, "[w]hile the exact contours of this possible separate

limitation . . . are still unclear, the standard appears to be that 'where a breach of

contract is combined with some other conduct amounting to an independent tort, the breach can be considered negligence.'" *Lamm*, 749 F.3d at 947 (quoting *U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc.*, 134 So. 3d 477, 480 (Fla. 2d DCA 2013)).   "[A] Plaintiff must plead an independent tort, separate and apart from their contract-based claims, in order to have a viable tort claim relating to activities governed by a contract." *Christie v. Royal Caribbean Cruises, Ltd.*, 497 F. Supp. 3d 1227, 1232 (S.D. Fla. Oct. 21, 2020); *see also Perez v. Scottsdale Ins. Co.*, No. 19-CV-22346, 2020 WL 607145, at *2 (S.D. Fla. Feb. 7, 2020) (finding that, under Florida law, "[t]o bring a tort claim concurrently with a contract claim, plaintiffs must plead a tortious action committed separate and apart from the breach of contract"). Further, to state a claim for a tort that is independent from a claim for breach of contract, "the damages stemming from that [tort] must be independent, separate and distinct from the damages sustained from the contract's breach." *Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. 3d DCA 2017).   The rule is the "fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1197 (S.D. Fla. Aug. 18, 2017).

Here, Counts V and VI in CSG's Counterclaim allege tortious interference with a contract and/or business relationship and unfair competition.   (*See* Doc. 105 at ¶¶ 111–125).   The elements of tortious interference with a business relationship under Florida law are "(1) the existence of a business relationship . . . ; (2)

knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). The elements of unfair competition under Florida law are "(1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." *Whitney Info. Network, Inc. v. Gagnon*, 353 F. Supp. 2d 1208, 1212 (M.D. Fla. Jan. 14, 2005).

Counts V and VI contain allegations of misconduct which are beyond the realm of the expectancy interests created by the parties' MSA and schedule for Sebastian and instead implicate Smart's duty of reasonable care as a subcontractor and service provider at Sebastian. For example, if, as alleged, Smart intentionally ignored Sebastian's requests for proper equipment, services, and repairs, this would constitute a breach of the Schedule with Sebastian County, which provides that "[Smart] will provide at no cost to [CSG] a fully functional electronic messaging system for the inmates of [CSG]'s Jail Facilities." (Doc. 93-25 at 12). But if Smart ignored those requests to interfere with the relationship between CSG and Sebastian and soliciting Sebastian as its own customer, (*see* Doc. 217 at 35 (wherein CSG argues that Smart "intentionally refused to cure at Sebastian so that it could steal the telephone business from [CSG's] customer by offering to upgrade the tablets at Sebastian if Sebastian terminated its relationship with [CSG] and retained Smart")), such conduct would constitute tortious interference with a business relationship or unfair competition separate and apart from the breach of

contract.  *See Christie*, 497 F. Supp. 3d at 1232; *see also Perez*, 2020 WL 607145, at

*2.  Further, the damages caused to CSG—loss of Sebastian as a customer, loss of

goodwill, reputational damage in the corrections industry, etc. (*see* Doc. 105 at ¶¶

120, 125)—would be separate from the damage caused to CSG as a result of Smart's

purported breach of its contractual duty to provide "fully functional electronic

messaging services," (*see* Doc. 93-25 at 12).  *See Peebles*, 223 So. 3d at 1068.  Finally,

neither CSG's tortious interference claim, nor its unfair competition claim require

CSG to plead the breach of any contractual duty.  *See Ethan Allen*, 647 So. 2d at

814; *see Whitney*, 353 F. Supp. 2d at 1212.

Accordingly, because CSG's tortious interference and unfair competition

claims would be separate and independent from any potential breach of contract

claim, Florida's independent tort doctrine does not bar CSG's claims in Counts V

and VI.  *See Matonis v. Care Holdings Grp., L.L.C.*, 423 F. Supp. 3d 1304, 1312

(S.D. Fla. June 25, 2019) (rejecting defendant's argument that Florida's

independent tort doctrine purportedly barred plaintiff's false advertising, unfair

competition, defamation, and tortious interference claims because such claims "did

not depend upon the breach of any contractual duty in the Consulting Agreement

and are separate and independent from any potential breach of contract claim").

Thus, summary judgment is denied as to CSG's Eleventh Affirmative Defense.

> **H. Smart is not entitled to summary judgment on its Fourteenth Affirmative Defense, nor is it entitled to summary judgment as to all of CSG's claims for damages in its counterclaim.**

Smart's Fourteenth Affirmative Defense provides that CSG's claims related to Sebastian County are barred because CSG has suffered no damages and has not lost its relationship with Sebastian as CSG continues to provide services to Sebastian.  (*See* Doc. 108 at 25).  Smart also argues in its Motion for Summary Judgment that it is entitled to Summary Judgment on CSG's Counterclaims for Damages.  (*See* Doc. 211 at 13–17).  CSG responds that it has suffered damages because Sebastian terminated its contract with CSG after determining that "the only way to unwind the relationship with Smart was to terminate its contract with CSG."  (Doc. 217 at 34 (citing Doc. 128-11 at 4)).

Here, testimony from Captain Dumas reflects that Sebastian sent CSG written notice on March 3, 2020 informing CSG that Sebastian would not renew its contract with CSG, and the contract would expire on April 24, 2020.  (*See* Doc. 133-1 at 40–41).  On April 15, 2020, Sebastian then sent out "Requests for Information" seeking proposals for vendors for its telephone services and, separately, its tablet services.  (Doc. 133-2 at 48; Doc. 128-12 at 3).  CSG submitted a proposal for telephone services, and Sebastian awarded the new telephone contract to CSG on June 16, 2020.  (Doc. 128-11 at 6).  On July 21, 2020, the Sebastian County court entered an order adopting the new contract between CSG and Sebastian.  (Doc. 128-9 at 43).  The rate for phone calls on the new contract between Sebastian and CSG was $0.10 less per minute of phone call than the earlier contract between Sebastian and CSG where Smart was acting as tablet vendor.  (*Id.* at 49; Doc. 128-3 at 24). Finally, Captain Dumas also testified that before the notice of non-renewal, during

the bid process on Sebastian's Request for Information, and after CSG's new bid for the phone contract was accepted, CSG's equipment was never removed from Sebastian's facility and remained in the Sebastian facility as of the date of his deposition on February 23, 2021.  (Doc. 133-1 at 41).

Accordingly, there is a genuine dispute of material fact as to whether CSG has suffered any damage as a result of Smart's conduct with respect to Sebastian. While CSG continues to provide telephone services to Sebastian, and CSG never had its equipment removed from Sebastian, CSG's initial contract with Sebastian was non-renewed, forcing CSG to submit a new proposal in response to Sebastian's Request for Information if it wanted to retain Sebastian's business.  Further, the undisputed evidence reflects that the terms of Sebastian's new contract with CSG were slightly less favorable than its prior contract with CSG in that CSG made $0.10 less per minute of phone call than it had in its prior contract.  Thus, summary judgment is due to be denied as to Smart's Fourteenth Affirmative Defense because there is a genuine dispute of material fact as to whether CSG has suffered damages as a result of Smart's allegedly tortious conduct outlined in Count V and Count VI of CSG's Counterclaim.  For the same reason, Smart's Motion for Summary Judgment is due to be denied as to CSG's claims for damages in its counterclaim.

**I. Smart is not entitled to summary judgment on its Twentieth Affirmative Defense.**

Smart's Twentieth Affirmative Defense argues that "CSG's claims are barred or limited by its failure to mitigate damages."  (Doc. 108 at 28).  In Smart's Motion for Partial Summary Judgment, Smart elaborates, "CSG could have recovered far in

excess of its claimed damages by exercising another contractual right—the right to recover a payment from Sebastian after Sebastian's non-renewal" pursuant to Attachment B in the contract between CSG and Sebastian. (Doc. 211 at 18). CSG responds that it did mitigate its damages by submitting a proposal to Sebastian in response to Sebastian's Request for Information after Sebastian sent its notice of non-renewal. (Doc. 217 at 32–33). Namely, because the payment contemplated by Attachment B was intended to offset CSG's loss of revenue in that event that CSG was no longer contracting with Sebastian, the payment was inapplicable after CSG submitted a proposal to Sebastian's April 2020 Request for Information. (*Id.* at 33).

The Florida Supreme Court has explained that

> [t]he doctrine of avoidable consequences, which is also somewhat inaccurately identified as the "duty to mitigate" damages, commonly applies in contract and tort actions. There is no actual "duty to mitigate," because the injured party is not compelled to undertake any ameliorative efforts. The doctrine simply "prevents a party from recovering those damages inflicted by a wrongdoer that the injured party could have reasonably avoided." The doctrine does not permit damage reduction based on what "could have been avoided" through Herculean efforts. Rather, the injured party is only accountable for those hypothetical ameliorative actions that could have been accomplished through "ordinary and reasonable care," without requiring undue effort or expense.

*Sys. Components Corp. v. Florida Dept. of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). Thus, a party only has a duty to mitigate those damages that it could have reasonably avoided. A party does not, however, have the duty to mitigate all damages, including those that would require undue effort or expense. Furthermore, a failure to mitigate defense is legally insufficient where it contains no allegations

connecting the defense to the plaintiff's claim.  *See Hernandez v. Ticketmaster, LLC*, No. 18-20869-CIV, 2018 WL 2198457, at *5 (S.D. Fla. May 14, 2018).

Here, the Court finds that Smart is not entitled to summary judgment as to its Twentieth Affirmative Defense.  First, as pleaded, Smart does not allege that CSG failed to mitigate damages caused by Smart in particular.  Instead, Smart asserts that CSG failed to mitigate damages caused by Sebastian's non-renewal by failing to seek out a remedy provided by CSG's initial contract with Sebastian to which Smart was not a party.  But one of the many theories alleged in Smart's pleadings is that Sebastian non-renewed CSG to get rid of Smart and that Smart did nothing which would encourage Sebastian to non-renew with CSG and incidentally cause damage to CSG.  (*See* Doc. 93 at ¶ 133).  Thus, irrespective of what is plead in CSG's Counterclaim, Smart's Twentieth Affirmative Defense does not contain any allegations explicitly connecting CSG's purported failure to mitigate damages to any of the counts in CSG's Counterclaim.  It therefore provides an insufficient legal basis for the Court to grant summary judgment.  *See Hernandez*, 2018 WL 2198457, at *5; *see also Diamond Resorts U.S. Collection Dev., LLC v. Neally*, No. 6:20-cv-1516-CEM-EJK, 2021 WL 8773523, at *5 (M.D. Fla. Oct. 15, 2021) (striking as legally insufficient plaintiff's affirmative defense of failure to mitigate damages where said affirmative defense did "not contain any allegations connecting the failure to mitigate damages to plaintiff's claim against defendant; in fact, it seems to be wholly unrelated to plaintiff's claim").

Even if Smart's Twentieth Affirmative Defense was thoroughly pleaded, following the Florida Supreme Court's opinion in *Sys. Components Corp.*, which instructed that there is no duty to mitigate damages, the Court cannot find as a matter of law that CSG was "compelled to undertake any ameliorative efforts."  14 So. 3d at 982.  For both of these reasons, the Court finds that Smart is not entitled to judgment as to CSG's purported failure to mitigate damages.

Further, there is a genuine dispute of material fact as to whether CSG *did* undertake ameliorative efforts to mitigate damages.  While CSG did not pursue damages via Attachment B in CSG's contract with Sebastian, CSG did respond to Sebastian's Request for Information and ultimately won a new contract with Sebastian, ensuring that the losses caused by Sebastian's non-renewal would be lessened.  For all of these reasons, the Court finds that Smart's Motion for Summary Judgment as to Smart's Twentieth Affirmative Defense is denied.

## <u>CONCLUSION</u>

In sum, summary judgment is **GRANTED** as to Count I(a), Count I(b), Count I(c), and Count II(a) of Smart's Complaint.  Summary judgment is **GRANTED** as to Count I of CSG's Counterclaim.  Further, summary judgment is **GRANTED** as to Smart's First Affirmative Defense as well as CSG's First, Fourth, Fifth, and Sixth Affirmative Defenses.

Summary judgment is **DENIED** as to Count I(d) and as to the breach of the MSA's exclusivity provision contained in Count III of Smart's Complaint.  Summary judgment is **DENIED** as to Count III and Count IV of CSG's Counterclaim.

Summary judgment is **DENIED** as to CSG's Eighth, Eighteenth, Nineteenth, and Twentieth Affirmative Defenses as well as Smart's Eighth, Ninth, Tenth, Eleventh, Fourteenth, Sixteenth, and Twentieth Affirmative Defenses.

The Court will rule on CSG's Motion for Partial Summary Judgment in short time.  In the interim, the parties are strongly encouraged to begin to engage in settlement talks.

**ORDERED** at Tampa, Florida on August 4, 2023.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE