UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

      Plaintiff,

v.                                                                                    Case No:   8:20-cv-1469-JLB-JSS

CORRECT SOLUTIONS, LLC,

      Defendant.

_____

**ORDER**

This cause comes before the Court on CSG's Motion for Partial Summary

Judgment.[1]  (Doc. 214).  Smart has responded, and CSG has replied.  (Doc. 216; Doc.

219).  After careful review of the record, the Court **GRANTS in part** and **DENIES**

**in part** CSG's Motion for Partial Summary Judgment.  (Doc. 214).

**BACKGROUND**

The undisputed facts surrounding the nature of the parties' business

relationship can be found in the Court's Order on Smart's Motion for Partial

Summary Judgment, (Doc. 232).  The facts set forth in that order, (Doc. 232) are

---

[1] Smart also filed a Motion for Partial Summary Judgment (Doc. 211), however, given that (1) the Counts from Smart's Complaint and CSG's Counterclaim which are addressed in the two Motions for Partial Summary Judgment have very little overlap, (2) the significant number of issues to be addressed in each of the Motions for Partial Summary Judgment, and (3) the convoluted presentation of the issues in both Motions for Partial Summary Judgment, the Court has ruled on the separate Motions for Partial Summary Judgment in separate orders.  The Court's Order on Smart's Motion for Summary Judgment is at Doc. 232.

incorporated herein.  This Court views the facts in the light most favorable to the nonmovant, which, here, is Smart.

## LEGAL STANDARD

A court may grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party, and it is "material" if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party.  *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

In opposing a motion for summary judgment, the non-movant "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial."  *Sears v. Roberts*, 922 F.3d 1199, 1207 (11th Cir. 2019).  If the non-movant relies on evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Likes v. DHL Express (USA), Inc.*, 787 F.3d 1096, 1098 (11th Cir. 2015). Importantly, the Court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Sears*, 922 F.3d at 1205.

## DISCUSSION

CSG argues that it is entitled to summary judgment on Counts III, IV, V, VI, VII, and X of Smart's Complaint and Smart's claims for punitive damages. (*See* Doc. 214). CSG also argues that it is entitled to partial summary judgment on Count II of CSG's Counterclaim. (*See id.*)

## I.   CSG is not entitled to partial summary judgment as to Count II of its Counterclaim.

CSG asserts that it is entitled to partial summary judgment as to Count II of its Counterclaim, which is an action for declaratory judgment on the interpretation of CSG's non-renewal notices. (*See* Doc. 214 at 4; Doc. 105 at ¶¶ 84–92). Specifically, CSG argues that "[b]ecause [CSG] timely and properly exercised its right to non-renew pursuant to paragraph 6 of the MSA with respect to [Washington] and [Sebastian], [CSG] is entitled to partial summary judgment as to Count II of its Counterclaim." (Doc. 214 at 4). Count II in CSG's Counterclaim asks this Court to enter a declaratory judgment:

> A.   Determining that paragraph 6 of the MSA gave both parties, [CSG] and [Smart], the right to non-renew the MSA and Schedule as to each of the eight facilities by providing written notice at least 90 days prior to the renewal date in contract between the Facility and [CSG];
> B.   That the Notices of Non-Renewal for Washington County, Sebastian County, and Wayne County were properly exercised and are valid;
> C.   That the MSA and Schedules for Washington County, Sebastian County and Wayne County have expired;
> D.   Awarding [CSG] its taxable costs; and
> E.   Such further relief as this Court deems proper.

3

(Doc. 105 at ¶ 92). After careful review of the MSA, schedules, and CSG's agreements with the various correctional facilities, the Court denies summary judgment for CSG as to Count II with one exception. It grants summary judgment to CSG as to the expiration of the Sebastian County schedule referenced in paragraph 92(C) of Count II of CSG's Counterclaim.

"In Florida, 'the plain meaning of the language used by the parties controls as the best indication of the parties' agreement,' so contract terms 'should be interpreted in accordance with their plain and ordinary meaning.'" *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) (quoting *In re Std. Jury Instructions— Contract & Bus. Cases*, 116 So. 3d 284, 315 (Fla. 2013)). "Florida courts look to dictionaries to determine the plain and ordinary meaning of words." *Id.* Where a contract is unambiguous, Florida law instructs that it must be interpreted so as to give effect to the contract as a whole. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013). The Court will "not resort to outside evidence or the complex rules of construction to construe the contract." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996). In construing the contract, the Court must be careful to avoid creating confusion "by adding hidden meanings, terms, conditions, or unexpressed intentions." *Id.*

## A. Summary judgment is denied as to the declaratory judgment requested in paragraph 92(A).

In paragraph 92(A) of Count II, CSG requests that the Court grant declaratory judgment that under paragraph 6 of the MSA, "both Parties" had "the right to non-renew the MSA and Schedule as to each of the eight facilities by

4

providing written notice at least 90 days prior to the renewal date in the contract between the Facility and CSG." (Doc. 105 at ¶ 92(A)). CSG argues that "both Parties" means CSG and Smart. (Doc. 214 at 4–6). Smart argues that "both Parties" means CSG and the relevant joint customer facility. (Doc. 216 at 24).

Paragraph 6 of the MSA provides:

> This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

(Doc. 93-2 at 3). The Court finds that a genuine issue of material fact remains as to the meaning of this provision and thus denies summary judgment as to paragraph 92(A) of Count II.

The last sentence begins with the phrase, "After the original term, . . . ." But the MSA does not have its own "original term" because it is "co-terminous with [CSG]'s Agreement with Facility as defined by Facility Address in attached Schedule." (*Id.*) For the same reasons, the MSA also does not independently have a "then current term." The contracts between CSG and the various facilities do, however, have original and then current terms. For example, the contract between CSG and Avoyelles, which is attached to the MSA, provides:

> The term of this agreement shall be for 48 calendar months starting at install date and expiring October 1, 2020. This

> agreement will automatically renew for 48 additional
> months unless either party notifies the other in writing of
> its intent to terminate this agreement at least 3 months
> prior to the final date of expiration.  Upon termination of
> this agreement, each party agrees to satisfy any and all of
> its outstanding obligations arising under this agreement.

(*Id.* at 16).  And, more pertinent to the declaratory relief sought in Count II of CSG's

Counterclaim, the agreement between CSG and Washington, which was entered

into after the MSA was signed, provides:

> The Term of this agreement shall be for 12 calendar
> months starting when CSG platform is installed and first
> call is successful.  This agreement will automatically renew
> for 12 additional months unless either party notifies the
> other in writing of its intent to terminate this agreement
> at least 90 (Ninety) days prior to the final date of
> expiration.

(Doc. 93-29 at 4).  Based on the foregoing, the Court determines that the first clause

of the last sentence of paragraph 6 of the MSA means that "after the original term"

of the contract between CSG and a particular facility, the MSA between Smart and

CSG "shall automatically renew in accordance with [CSG's] agreement with

facility."

The second clause in paragraph 6 of the MSA states that such automatic

renewal will occur "unless either Party notifies the other Party with written notice

of non-renewal at least ninety (90) days prior to the expiration of the then current

term."  (Doc. 93-2 at 3).  Once again, CSG argues that the references to "either

Party" refer to Smart and CSG, but Smart argues that the references to "either

Party" refer to CSG and the customer facility, *i.e.*, Washington.  The term Party is

undefined in the MSA, but it is used throughout the MSA to refer to both CSG and Smart.

On the one hand, because paragraph 6 of the MSA begins by discussing "this Agreement," meaning the MSA, the use of "Party" could reasonably refer to Smart or CSG, as they are the only two parties to the MSA.  This would mean that after the original term of the contract between CSG and a particular facility, the MSA between Smart and CSG shall automatically renew in accordance with [CSG's] agreement with the facility unless either Smart or CSG notified the other party with written notice of non-renewal at least ninety days prior to the expiration of the then current term of the contract between CSG and the facility.

However, this interpretation is complicated by the fact that the "Term" provisions in CSG's contracts with Avoyelles and Washington, which are quoted above, also require ninety days of notice for non-renewal.  (*See* Doc. 93-29 at 4; Doc. 93-2 at 16).  Thus, reading paragraph 6 in context, with the non-renewal provisions in CSG's contracts with Avoyelles and Washington in mind, the notice of non-renewal in the MSA could reasonably be read as discussing the non-renewal of the contract between CSG and the respective facility given that the MSA will not be automatically renewed if the agreement between CSG and the facility is itself non-renewed.

This interpretation is supported by the plain terms of paragraph 6 given that paragraph 6 states that the MSA's automatic renewal only occurs "in accordance" with the automatic renewal of CSG's agreement with the facility.  (Doc. 93-29 at 4).

Thus, paragraph 6 could reasonably be read as suggesting that when entering into the MSA, Smart and CSG understood that their relationship depended on CSG's relationship with the facility, and it would remain operative only so long as the CSG and facility agreement was renewed.  (Doc. at 1-15 at 169).  In sum, reasonable jurors could disagree as to whether paragraph 6 of the MSA gave Smart the right to non-renew the MSA so long as it provided ninety days' notice because there is ample evidence intrinsic to the MSA and attached schedules and facility agreements to support an interpretation of paragraph 6 wherein the "parties" referred to are CSG and *the facility*, not CSG and Smart.  CSG is therefore not entitled to summary judgment as to paragraph 92(A) of Count II of its Counterclaim.

### B. Summary judgment is denied as to the declaratory judgment requested in paragraph 92(B).

Next, CSG asks the Court to declare that the non-renewal notices that it sent to Smart regarding the Washington County, Sebastian County and Wayne County facilities were properly exercised and are valid.  (Doc. 105 at ¶ 92(B)).  The contract for Washington County was effective on November 15, 2017, the contract for Sebastian County was effective on April 24, 2017, and the contract for Wayne County was effective on March 16, 2018.  (Doc. 105-13 at 14, 35, 53).  And notices of non-renewal were sent on October 4, 2019 for Washington County and on November 21, 2019 for Sebastian County and Wayne County.  (*See* Doc. 105-13 at 2–3, 18–19, 41–42).  Thus, if CSG's interpretation of the two parties in paragraph 6 controlled, the non-renewal notices would be properly exercised and valid because ninety days' notice would have been provided.

8

Nevertheless, because a reasonable alternative potential interpretation of paragraph 6 exists, the Court cannot determine that the non-renewal notices sent by CSG were proper (even if they were sent more than ninety days before the expiration of the then current term) because at the time the notices were sent, the agreements between CSG and the facilities had not been non-renewed and were still active.  Therefore, CSG is not entitled to summary judgment as to paragraph 92(B) of Count II of its Counterclaim.

### C. Summary judgment is denied as to the declaratory judgment requested in paragraph 92(C).

CSG also asks that the Court grant declaratory judgment that the MSA and schedules for Washington County, Sebastian County, and Wayne County have expired.  (Doc. 105 at ¶ 92(C)).  Based on the Court's determinations as to paragraphs 92(A) and 92(B), however, the Court cannot determine that the schedules for Washington County and Wayne County have expired because, as best the Court can tell, Washington and Wayne never non-renewed their agreements with CSG.  Thus, insofar as Washington and Wayne never gave or received ninety-day notices to or from CSG, and CSG's contracts with those facilities remain active, under one plausible reading of paragraph 6 of the MSA, discussed above, the associated schedules for Washington and Wayne have also not been properly non-renewed and thus have not expired.  Accordingly, the Court cannot grant summary judgment for CSG as to the Washington and Wayne agreements.

The Court can determine as a matter of law that the schedule for Sebastian County has expired, however, because Sebastian non-renewed with CSG on March

3, 2020, which caused the schedule for Sebastian between Smart and CSG to non-renew on its "natural expiration," April 24, 2020.  (Doc. 128-3 at 22; Doc. 133-1 at 34–35, 41, 127; Doc. 132-6 at 11–13).  In sum, because of the ambiguities contained in the language of paragraph 6 of the MSA, the Court cannot determine as a matter of law that the schedules for Washington and Wayne have expired.  But the Court DECLARES that the MSA and Schedule for Sebastian has expired.

**D. Summary judgment is denied as to the declaratory judgment requested in paragraph 92(D).**

Finally, CSG requests that the Court grant declaratory judgment awarding CSG its "taxable costs."  (Doc. 105 at ¶ 92(D)).  The Court declines at this juncture to award CSG taxable costs based on the foregoing denials of summary judgment, but the Court reserves jurisdiction to award taxable costs in favor of CSG upon proper application.

**II.   CSG is entitled to partial summary judgment as to Count III and Count IV of Smart's Complaint.**

CSG next argues that it is entitled to partial summary judgment as to Smart's allegations regarding the Washington County Agreement.  (Doc. 214 at ¶ 19).  Those allegations are that: (1) CSG breached the Washington County Agreement and (2) CSG breached the implied covenant of good faith and fair dealing in the Washington County Agreement.  (Doc. 93 at ¶¶ 171–89).  The Court finds that CSG is entitled to partial summary judgment as to Count III and partial summary judgment as to Count IV.

**A. Breach of Washington County Agreement (Count III).**

As best the Court can discern, CSG only moves for summary judgment as to paragraph 174 in Count III of Smart's Complaint. (Doc. 214 at ¶ 19). There, Smart argues that CSG breached the Washington County Agreement by "instructing Washington County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Washington County so that it could perform its duties." (Doc. 93 at ¶ 174). CSG counters that no evidence supports these claims and that CSG is therefore entitled to partial summary judgment. (Doc. 214 at ¶¶ 19–28; Doc. 214 at 26). The Court finds that the undisputed record evidence reflects that CSG did not instruct Washington County to refrain from communicating with Smart and CSG did *not* fail to provide Smart with meaningful access to Washington County so that it could perform its duties. Thus, CSG is entitled to partial summary judgment as to Count III.

Under Florida law, which the Court applies in this diversity action, to prevail in a breach of contract action, a plaintiff must prove the following three elements: (1) the existence of a contract; (2) a breach of that contract; (3) damages resulting from that breach. *See Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992); *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1295 (M.D. Fla. July 30, 2018).

Here, there is no dispute that the MSA between Smart and CSG or the Washington Schedule exist, so the Court moves onto the second element of the breach of contract action. (*See* Doc. 93-2; Doc. 93-24 at 10–14).

The MSA is largely silent with respect to the duties owed by CSG in terms of facilitating the provision of Smart's services.  However, the MSA outlines Smart's responsibilities with respect to the communications issues complained of in paragraph 174 of Smart's Complaint.  For example, paragraph 15 of the MSA states that, "[t]he Provider shall maintain regular communications with the Customer and all contracted clients and shall actively cooperate in all matters pertaining to this Agreement."  (Doc. 93-2 at 5).  And paragraph 17 of the MSA states, "[c]ustomer shall have the complete and unlimited right to access any and all information maintained by Provider which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance.  The provider shall make available all records or data requested."  (*Id.*)

Here, once again, Smart argues that CSG breached the Washington County Agreement by "instructing Washington County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Washington County so that it could perform its duties."  (Doc. 93 at ¶ 174).  But two Washington County employees who dealt with the SmartTablets—Captain Alan Johnson and Lieutenant Nolan Ake—testified that no one working at Washington County was coached by CSG on how to complain about Smart, was asked by CSG to fabricate complaints about Smart, "ramped up complaints to provide to [CSG] about Smart," denied Smart email, telephone, or physical access to Washington County, or was instructed by CSG to deny Smart access to Washington County.  (Doc. 132-16 at 51–52).  Instead, as Captain Johnson and Lieutenant Ake testified, Washington

officials decided of their own accord to stop communicating with Smart because they were dissatisfied with Smart's services.  (*Id.* at 41, 52; Doc. 132-15 at 42–43).

Smart has introduced no evidence to refute the testimony of Captain Johnson and Lieutenant Ake.  Instead, Smart merely makes the vague allegation that a CSG official used his "close, personal relationship" with a representative from Washington County to "prevent[ ] Smart's ability to perform its services at Washington."  (Doc. 216 at 31).  To support this allegation, Smart references an email written by Rick Ferguson, an account manager at CSG, to Captain Johnson stating, "[i]n order to move our plight[2] along quickly . . . [s]end all your Smart needs for repairs, questions, complaints" to CSG.  (Doc. 155-19 at 14).  Mr. Ferguson testified that he sent this email "[b]ecause we needed a data mining system because of the lack of response from [Smart].  We needed our own records."  (Doc. 155-7 at 25).  Mr. Ferguson instructed Captain Johnson to not report issues to Smart, but instead to go straight to CSG because Smart was not responding to Washington, but he believed Smart would respond to CSG.  A complaint to CSG would "automatically generate a ticket" that would get sent to Smart automatically "to

---

[2] Smart seems to be particularly fixated on Mr. Ferguson's use of the term "plight" in his email to Captain Johnson.  (*See* Doc. 216 at 31; Doc. 93 at ¶¶ 89–90, 93, 187, 202, 229).  Specifically, Smart seems to construe "plight" as "scheme" or "plan," giving it a sort of nefarious connotation.  (*See, e.g.*, Doc. 93 at ¶ 187 (alleging that CSG breached the covenant of good faith and fair dealing by "enlisting Washington County in its 'plight' to terminate Smart")).  But this is not what "plight" means.  *See* Merriam-Webster Dictionary Online *Plight* https://www.merriam-webster.com/dictionary/plight (last accessed July 13, 2023) (defining "plight" as "an unfortunate, difficult, or precarious situation").  Accordingly, Smart's concern with this term is misplaced.

generate a response." (*Id.*)  As he included in his email, "CSG will now put them on the clock each time a ticket is opened and forwarded." (Doc. 155-7 at 80).

Mr. Ferguson's request would appear to be sanctioned under paragraphs 15 and 17 of the MSA, quoted above, given that under paragraph 17, CSG had "the complete and unlimited right to access any and all information maintained by [Smart] which may be needed to ensure compliance with the contract terms and conditions, and to monitor contractual compliance" and under paragraph 15, it would violate the MSA for Smart to fail to "maintain regular communications" with the facility. (*See* Doc. 93-2 at 5).

Finally, Smart has introduced no evidence that the complaints sent from Washington to CSG in lieu of Smart were not automatically relayed to Smart via CSG, undermining its argument that Mr. Ferguson's email prevented Smart from having "meaningful access to Washington County so that it could perform its duties." (*See* Doc. 93 at ¶ 174).  Thus, the email from Mr. Ferguson to Captain Johnson is hardly "conflicting evidence" as Smart suggests. (Doc. 216 at 31).  If anything, the email supports Captain Johnson's testimony that Washington County was unhappy with Smart's services because "Smart Communications wouldn't return calls or emails, and dealing with complaints from the public because of that, it was a constant struggle with my employees here," and that CSG intervened to smooth out communications issues. (Doc. 132-16 at 54).

Finally, nowhere in the email does Mr. Ferguson tell Washington County to stop communicating with Smart altogether, as Smart contends. (Doc. 93 at ¶ 174).

Instead, Mr. Ferguson's directive, "please do not send to Smart," refers solely to "needs for repairs, questions, complaints."  (Doc. 155-7 at 80).  Thus, Captain Johnson and other Washington officials would have been free to communicate with Smart about, for example, ordering more tablets or charging stations, expanding the types of media contained in the SmartTablet's library, or asking about the prices on the SmartTablet's entertainment options.  And Smart would not have been prevented from addressing the issues that arose at Washington because each complaint about the SmartTablets would have been automatically forwarded to Smart from CSG in an organized "ticket" fashion.

Based on this evidence, the Court finds that there is no genuine dispute of material fact that CSG did not instruct Washington County "to refrain from communicating with Smart" and that CSG did not "fail to provide Smart with meaningful access to Washington County so that it could perform its duties."  (Doc. 93 at ¶ 174).  Accordingly, partial summary judgment is granted in favor of CSG with respect to the allegations made in Paragraph 174 of Count III of Smart's Complaint.

### B. Breach of good faith and fair dealing with respect to the Washington County contract (Count IV).

As best the Court can tell, CSG only moves for partial summary judgment as to paragraphs 186 and 187 in Count IV in Smart's Complaint.  (Doc. 214 at 10–14). In those paragraphs, Smart argues that CSG breached the covenant of good faith and fair dealing in the Washington County Agreement by (1) manufacturing improper grounds to purportedly terminate the agreement and sending a

15

nonrenewal notice despite CSG's continued contractual relationship with Washington County, and (2) soliciting complaints about Smart and controlling communications from Washington County.  (Doc. 93 at ¶¶ 186–87).  The Court finds that CSG is entitled to partial summary judgment as to both of these allegations.

Under Florida law, every contract includes an implied covenant of good faith and fair dealing.  *Cnty. of Brevard v. Miorelli Eng'g, Inc.*, 703 So. 2d 1049, 1050 (Fla. 1997).  "[G]ood faith means honesty, in fact, in the conduct of contractual relations."  *Harrison Land Dev., Inc. v. R & H Holding Co., Inc.*, 518 So. 2d 353, 355 (Fla. 4th DCA 1988).  "A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, but attaches to the performance of a specific contractual obligation."  *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151 (11th Cir. 2005).

### i.   CSG is entitled to summary judgment as to paragraph 187 in Count IV of Smart's Complaint.

The Court has already determined above that CSG is entitled to summary judgment regarding Smart's allegations that CSG "instruct[ed] Washington County to refrain from communicating with Smart" and "fail[ed] to provide Smart with meaningful access to Washington County so that it could perform its duties," (*see* Doc. 93 at ¶ 174).  Thus, CSG did not breach the covenant of good faith and fair dealing by "controlling the communications from Washington County, and enlisting Washington County in its 'plight' to terminate Smart," as Smart contends in paragraph 187.  (Doc. 93 at ¶ 187); *see Centurion*, 420 F.3d at 1146 (holding that "a claim for a breach of the implied covenant of good faith and fair dealing cannot be

16

maintained under Florida law in the absence of a breach of an express term of a contract").

The only outstanding allegation from paragraph 187, which was not resolved by the Court's grant of partial summary judgment in favor of CSG as to paragraph 174 is whether CSG solicited complaints about Smart from Washington. Here, the Court finds that Smart has not introduced adequate evidence to create a genuine dispute of material fact about this claim and instead, the overwhelming evidence reflects that CSG did not solicit complaints about Smart from Washington.

First, Lieutenant Ake testified categorically that no one at CSG asked anyone at Washington to fabricate complaints about Smart. (Doc. 132-16 at 51). Lieutenant Ake added that Washington officials did not generate complaints about the SmartTablets because "the complaints [about the SmartTablets] come from the detainees." (*Id.*) He also testified that Washington County never fabricated any complaints. (*Id.* at 18). Furthermore, the record contains evidence of dozens of communications from Washington County officials to Smart about tablets that were not working properly or not working at all. (*See id.* at 65–76). Finally, apparently of his own accord, Captain Johnson emailed Jennifer Tongate, an employee of Smart, on July 31, 2019, outlining several issues that the Washington County Sheriff's Office had with the SmartTablets, stating, "[t]he tablets have never work[ed] correctly and the video visitation on the tablets has never worked (approximately a year later)." (*Id.* at 68). This email also indicated that

Washington County would be looking for a new provider for correctional grade tablets. (*Id.*)

Arguing that CSG solicited complaints from Washington, Smart points to the same "plight" email from Mr. Ferguson, discussed above, which was sent on August 15, 2019, after Captain Johnson's email to Ms. Tongate, and after many of the dozens of reports from Washington to Smart reporting that the tablets and kiosks were not working. Given that this email was sent in the wake of the bulk of Washington's complaints to Smart, and that nothing in the email states anything like "make up complaints" or "fabricate complaints"—it merely says, "don't hold back other than 4 letter words or graphic sentences"—the Court finds that a reasonable juror could not determine that CSG solicited complaints about Smart. Instead, the record indicates that CSG had heard numerous complaints that the SmartTablets were not working, and only at that point—when those complaints had already been lodged—did CSG decide to direct complaints to itself rather than to Smart. In this context, CSG saying, "don't hold back," reads as a directive to Washington officials to describe the issues that Washington was having with the SmartTablets in detail. Smart has introduced no evidence to the contrary. Accordingly, summary judgment is granted in favor of CSG as to the allegations made in paragraph 187 of Count IV of Smart's Complaint.

### ii.   CSG is entitled to partial summary judgment as to paragraph 186 of Count IV of Smart's Complaint.

CSG also moves for summary judgment as to Smart's allegation that CSG breached its covenant of good faith and fair dealing by "manufacturing improper

18

grounds to purportedly terminate the agreement and sending a nonrenewal notice despite CSG's continued contractual relationship with Washington County," which is contained in the first clause in paragraph 186 of Count IV of Smart's Complaint. (Doc. 93 at ¶ 186).  Here, as noted above, there is no genuine dispute of material fact that CSG did not ask Washington to fabricate or solicit complaints about the services provided by Smart.  Thus, CSG did not "manufacture improper grounds to purportedly terminate the agreement," as the grounds to terminate the agreement with Smart were the complaints made by Washington County officials, which were generated based on the "detainees'" own complaints about the tablets based on their experience using the tablets.  (*See, e.g.,* Doc. at 132-16 at 70 (email from a Sergeant at Washington County to tech support at Smart stating, "Detainee Balentine in B block had a Local/Onsite Visit at 7:30 A.M.  He stated that the visitor could hear him but he could not hear her'")).

The undisputed evidence reflects that Washington had numerous technical issues with the tablets.  (Doc. 134-1 at 124–25).  Specifically, Captain Johnson testified that "the product that was described to us is not the product we got" because, contrary to Smart's account of their tablets, the tablets delivered to Washington were not capable of video visitation.  (*Id.* at 125).  Per Captain Johnson, the tablets were "constantly being tore up" and were not "correctional-grade."  (*Id.* at 125–26).  Corrections officers reportedly "d[id] a shakedown and found a battery that [inmates] had pulled out of one of the tablets and had wires that they pulled out and was already crossed and setting different things on fire, cigarettes or

19

whatever." (*Id.* at 126). Washington also experienced issues with Smart's servers and customer service, leading to hours wherein the hundreds of inmates housed at the facility could not use Smart's tablets to communicate. (*Id.* at 125). Thus, no reasonable factfinder could find that CSG manufactured improper grounds to purportedly terminate the Washington agreement with Smart.

That said, the second clause of paragraph 186, which alleges breach of good faith and fair dealing based on "sending a nonrenewal notice despite CSG's continued contractual relationship with Washington County," is precluded from summary judgment at this stage because, as discussed above with respect to Count II of CSG's Counterclaim, the Court has not adjudicated the underlying breach of contract issues with respect to the nonrenewal notices. *See Centurion*, 420 F.3d at 1146 (holding that "a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract").

In sum, partial summary judgment is granted in favor of CSG as to the first clause of paragraph 186 of Smart's Complaint—breach "by manufacturing improper grounds to purportedly terminate the agreement"—but whether "sending a nonrenewal notice despite CSG's continued contractual relationship with Washington County" was a breach of contract or a breach of the implied covenant of good faith and fair dealing remains a triable issue.

### III.   CSG is entitled to partial summary judgment as to Count V and Count VI in Smart's Complaint.

CSG also moves for partial summary judgment as to Count V and Count VI in Smart's Complaint.  There, Smart alleges that CSG breached the Sebastian County agreement (Count V) and breached its duty of good faith and fair dealing with respect to the Sebastian County agreement (Count VI).  (Doc. 93 at ¶¶ 190–205).

### A.  Breach of Sebastian County Agreement (Count V).

Smart argues that CSG breached the contract with Sebastian County by (1) "instructing Sebastian County to refrain from communicating with Smart and failing to provide Smart with meaningful access to Sebastian County," (2) "sending an improper notice to cure based on a requested hardware upgrade and entertainment services that Smart had no contractual obligation to provide," and (3) "entering into the CSG/Tech Friends contract and agreeing to provide exclusive rights to Tech Friends in Sebastian County."  (Doc. 93 at ¶¶ 192–94).

The Court will avoid restating the elements for breach of contract, which are stated in the previous section regarding Washington County.  The Court notes that the existence of the MSA and the Sebastian Schedule are undisputed.

### i.   Summary judgment is granted in favor of CSG as to paragraph 192 in Count V of Smart's Complaint.

Turning to the first allegation of breach—which mirrors the allegation brought by Smart as to Washington County, discussed above—the Court finds that CSG is entitled to summary judgment as to Smart's claim that CSG "breached the

Sebastian County Agreement by instructing Sebastian County to refrain from communicating with Smart and by failing to provide Smart with meaningful access to Sebastian County." (Doc. 93 at ¶ 192).

Here, William Dumas, Jail Administrator for the Sebastian County Sheriff's Office, testified that CSG never instructed him, or anyone at Sebastian, to refrain from communicating with Smart. (Doc. 133-1 at 73–74). Instead, Mr. Dumas testified that there was never a point in time in which officials at Sebastian were not communicating with Smart or when Sebastian officials refused Smart access to the facility. (*Id.* at 54). In fact, Mr. Dumas stated that even after receiving the same "plight" email discussed above, wherein Mr. Ferguson instructed Mr. Dumas to direct complaints about the SmartTablets to CSG not Smart, Mr. Dumas would still email Smart and merely copy CSG so as to include both. (*Id.*)

As was the case with Washington County, Smart has referenced no evidence refuting the testimony of the Sebastian County employees and instead merely alleges, "[t]he evidence demonstrates that CSG had a long-standing relationship with Sebastian and could exert influence over Sebastian's decisions." (Doc. 216 at 32). Such conjecture is simply not sufficient to create a genuine dispute of material fact to defeat summary judgment.

Accordingly, given that (1) Mr. Dumas's unrefuted testimony indicates that CSG did not instruct Sebastian officials to refrain entirely from communicating with Smart, and (2) the emails between Smart and Sebastian after Mr. Ferguson's August 2019 email demonstrate that CSG did not fail to provide Smart with

meaningful access to Sebastian, summary judgment is granted in favor of CSG as to paragraph 192 of Count V of Smart's Complaint.

### ii. Summary judgment is granted in favor of CSG as to paragraph 193 of Smart's Complaint.

The second issue on which CSG seeks summary judgment in Count V is Smart's claim that "CSG breached the Sebastian County Agreement by sending an improper notice to cure based on a requested hardware upgrade and entertainment services that Smart had no contractual obligation to provide," (Doc. 93 at ¶ 193). Paragraph 9 of the MSA outlines proper notice to cure, explaining:

> If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure. If it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default.

(Doc. 93-2 at 4).

As background, on September 13, 2019, CSG sent Smart a Notice to Cure stating that (1) the tablets were not correctional grade because they "have been rather easily dismantled and fashioned into crude weapons" and inmates have removed the batteries, (2) "Smart has failed to timely install and/or provide electronic education and/or entertainment options," and (3) "the tablets Smart provided to Sebastian County experience near constant failures and performance deficiencies." (Doc. 134-4 at 10–11). The Notice also stated:

> Smart must provide Sebastian County with 'ruggedized and correctional grade tablet[s]', which naturally must be tamper-proof, with electronic education, and electronic entertainment (books and games) installed, and must repair any inoperable, broken, or defective tablets, within thirty (30) days of receipt of this notice to cure.

(*Id.* at 11).

The Schedule for Sebastian states that Smart will provide, "a custom, wireless, ruggedized and correctional grade tablet." (Doc. 93-30 at 12). And the MSA provides that Smart will provide inmate communications services,

> including inmate messaging and email, texting, photo delivery system, electronic education, electronic self-help, court mandated online courses, electronic entertainment, inmate electronic general requests, electronic grievances, electronic medical requests, electronic law library and electronic delivery of routine postal mail.

(Doc. 93-2 at 2). The MSA further states that Smart will "provide free of charge all Software upgrades, modifications, and updates. All hardware upgrades, modifications and updates will be done at Provider's sole discretion." (*Id.*)

While "ruggedized, correctional-grade tablet" is contained in the Schedule and entertainment capabilities are outlined in the MSA, there is no mention of the tablets specifically being "tamper-proof" in either document. Smart argues that this alone renders the Notice to Cure improper, while CSG argues that it "never demanded that Smart provide any upgraded hardware; just that Smart cure the defective tablets." (Doc. 214 at 16).

As the Court sees it, Smart is attempting to generate a genuine dispute of material fact by directing the Court's attention to assessing whether CSG's request

that Smart make the SmartTablet "tamper-proof" exceeded the scope of the MSA and Schedule by demanding that Smart do more than provide a "ruggedized, correctional-grade tablet." This, of course, is a question that the Court could not answer as the Court is not an expert in corrections industry hardware. But this is not the appropriate issue here for the purposes of summary judgment. Instead, the Court must determine whether asking Smart to cure an issue that was not specifically mentioned in the MSA and Schedule was a breach of contract. The Court finds, as a matter of law, that it was not.

At the outset, the Court notes that paragraph 9 of the MSA is silent as to what the Court has called the "mandate" portion of the Notice to Cure where CSG states explicitly what it believes Smart must provide Sebastian County to not be in default. Instead, paragraph 9 of the MSA outlines proper notice to cure by explaining, "[i]f either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default." (Doc. 93-2 at 4). Indisputably, CSG did that by explaining the issues with Smart's products and services at Sebastian, as quoted above. Paragraph 9 then provides, "[t]he defaulting Party shall have thirty (30) days after receipt of notice of default to cure." (*Id.*) A plain reading of this sentence in the context of paragraph 9 indicates that the defaulting party has thirty days to cure the issues that were described in the Notice.

Here, therefore, Smart would have thirty days to fix its tablets so that the tablets were correctional grade, the tablets could not be "rather easily dismantled

and fashioned into crude weapons," inmates could not remove the batteries, and the tablets would not "experience near constant failures and performance deficiencies," as CSG described.  (Doc. 134-4 at 10–11).  Further, Smart would have thirty days to "install and/or provide electronic education and/or entertainment options."  Based on the services and products described in the MSA and Schedule, quoted above, none of these cures would appear to ask Smart to provide something that it had no contractual obligation to provide.

Finally, paragraph 9 of the MSA concludes by stating, "[i]f it is not reasonable to cure the default within 30 days, then the right to cure period shall be extended to a reasonable cure period as long as the defaulting Party has made good faith attempts to cure the default."  (Doc. 93-2 at 4).  This portion of paragraph 9 provides Smart with an avenue to push back on CSG's request if it believed that it had been asked to provide something which it could not provide.  But Smart has introduced no evidence that it responded to CSG within thirty days stating that it could not provide CSG what it was asking for.  Instead, the undisputed evidence is that four days after receiving the Notice to Cure, Smart filed an "Emergency Motion to Temporarily Enjoin Improper Termination of Agreement and to Enforce Court Approved Stipulation" in Florida's Thirteenth Judicial Circuit.  (Doc. 1-3 at 63).  In that Motion, Smart complained that "[t]he Notice to Cure is premised upon two alleged breaches of contractual obligations that Smart simply does not have—the obligation to provide tablets that are impervious to destruction from unsupervised inmates with access to multiple forms of contraband and the obligation to provide

entertainment content on tablets." (*Id.* at 64). Of course, nowhere in the Notice to Cure does it say that Smart was required to provide tablets meeting those unique specifications.

Thus, based on the plain language of paragraph 9 of the MSA, as well as Smart's obligations described in the MSA and Schedule, and the issues discussed in CSG's Notice to Cure for Sebastian, the Court finds that CSG's Notice to Cure was not a breach of contract because it followed the instructions outlined in Paragraph 9 exactly. That is, CSG described the default—all in terms mirroring the requirements set forth in the MSA and the Schedule—and advised Smart that it had thirty days to cure that default. Accordingly, the Court finds that no reasonable factfinder could determine that CSG breached the MSA by sending a Notice to Cure that included the term "tamper-proof" in its "Mandate" section. Thus, summary judgment is granted in favor of CSG as to paragraph 193 of Count V of Smart's Complaint.

### iii. Summary judgment is denied as to paragraph 194 of Count V of Smart's Complaint.

Finally, CSG moves for summary judgment as to Smart's allegation that "CSG breached the Sebastian County Agreement by entering into the CSG / Tech Friends contract and agreeing to provide exclusive rights to Tech Friends in Sebastian County that rightfully belonged to Smart," (Doc. 93 at ¶ 194; Doc. 214 at ¶ 29). The Court finds, for the reasons below, that there is a genuine dispute of material fact as to whether CSG breached the Sebastian Agreement through its relationship with Tech Friends.

The portion of the MSA which discusses exclusivity provides:

> Customer grants Provider the exclusive right and license to install, maintain and derive revenue from the Systems through Provider's inmate services and Systems including, without limitation, the related hardware and software, located in the Customer facilities and contractually obligated Customer facilities identified on the Schedules . . . . During and subject to the terms and conditions of this Agreement, Provider shall be the sole and exclusive provider in lieu of any other third party provider of the inmate communications services contained within the Schedules.

(Doc. 93-2 at 2).

Thus, per the MSA, Smart was required to be the sole and exclusive provider of electronic messaging retained as a subcontractor by CSG in the "contractually obligated Customer facilities identified on the Schedules." (*See* Doc. 93-30). That is, where CSG had a contract with a particular facility, and Smart and CSG had a schedule for that facility, Smart was to be the exclusive provider for that facility. Thus, Smart was to be the exclusive provider subcontracted with by CSG under the MSA at Sebastian.

CSG argues that it did not breach the exclusivity provision of the MSA because it "had no role in Tech Friends being awarded a direct contract with Sebastian for tablets" after Sebastian non-renewed its contract with CSG and the Schedule between Smart and CSG for Sebastian expired. (Doc. 214 at ¶ 36). The record evidence reflects that on March 3, 2020, Sebastian issued a non-renewal notice to CSG and informed CSG that the contract would expire on April 24, 2020. (*See* Doc. 133-1 at 40–41; Doc. 123-2 at 22; Doc. 128-11 at 4). Thus, per a plain

reading of the portion of the MSA quoted above, once the agreement between CSG and Sebastian had expired, CSG no longer owed Smart the "exclusive right and license to install, maintain and derive revenue from the Systems through [Smart's] inmate services and Systems." (*See* Doc. 93-2 at 2).

On April 15, 2020, just before the agreement between CSG and Sebastian expired, Sebastian issued two separate Requests for Information: one for telephone services and one for tablets. (Doc. 128-12 at 3; Doc. 133-2 at 48; Doc. 132-6 at 9–10, 20). A number of phone providers and tablet providers responded to the Requests for Information, and on June 16, 2020, a selection committee from Sebastian reviewed the various proposals in a one-hour meeting. (Doc. 128-11 at 6, 68). The providers to the Requests for Information were ranked separately for telephone services and tablet services, and while at least two firms responded to the Requests for Information for both telephone services and tablet services, CSG responded only to the telephone services request, and Tech Friends responded only to the tablet services request. (*Id.* at 54). On June 16, 2020, Sebastian awarded the contract for telephone services to CSG and awarded the tablet contract to Tech Friends. (Doc. 128-11 at 6; Doc. 128-9 at 43–52; Doc. 133-2 at 48; Doc. 132-6 at 9–10, 20). Smart never submitted a response to Sebastian's Request for Information for tablets. (Doc. 133-2 at 19).

Unlike the prior arrangement between CSG and Smart, the contracts between Sebastian and Tech Friends and Sebastian and CSG are unrelated, and there is no fee sharing agreement. (Doc. 133-1 at 46; Doc. 132-14 at 13, 15).

Furthermore, a member of the committee at Sebastian charged with reviewing proposals for tablet providers testified that no one at CSG had any role in choosing the facility's tablet provider.  (Doc. 132-6 at 24; Doc. 132-14 at 10).  In sum, the record evidence suggests that Sebastian's relationship with Tech Friends was initiated *after* Sebastian non-renewed its contract with CSG, which in turn, obviated CSG's duty to provide Smart with exclusive license to provide its tablets and services to Sebastian.

But it is unclear to the Court whether the agreement between Sebastian and Tech Friends in June 2020 is the agreement to which Smart is referring in paragraph 194 of its Complaint.  While the pleadings are vague and potentially susceptible to multiple interpretations, the Court understands Smart as referring to an MSA purportedly made between Smart and Tech Friends while the MSA and Schedule between Smart and CSG for Sebastian were still in effect.

Specifically, on September 13, 2017, Smart and CSG executed the Schedule for Sebastian, and no attempt was made at terminating the Schedule until November 21, 2019 when CSG sent Smart a Notice of Non-Renewal relating to Sebastian.  (Doc. 128-3 at 15; Doc. 128-11 at 14–15).  The record evidence indicates that CSG executed an MSA with Tech Friends ("TFMSA") with an effective date of June 1, 2019, while the MSA and Schedule for Sebastian between CSG and Smart was still in effect.  (Doc. 128-2 at 40–67).  Under the TFMSA, Tech Friends had "the exclusive right during the Term and any Extended Term to provide, maintain, operate and manage the designated Services and Software, and provide the chosen

Hardware, required of or offered by [CSG]" for certain "legacy accounts," including Sebastian. (*Id.* at 42, 54–55). The TFMSA defined "legacy accounts" as "[c]ertain accounts where, as of the Effective Date, [CSG] was providing deposit services." (*Id.* at 42). The TFMSA also outlined the manner in which CSG and Tech Friends would share revenue as to these legacy accounts as well as any new accounts that the parties secured. (*Id.* at 60–65). Thus, as per the TFMSA, CSG was offering exclusive rights to Tech Friends at Sebastian at the same time as the Schedule for Sebastian between CSG and Smart remained in effect.

The TFMSA also indicates that even if the contracts between Sebastian and Tech Friends and Sebastian and CSG are not related, and there is no fee sharing agreement, under the TFMSA, CSG and Tech Friends intended to coordinate their services as to certain facilities, including Sebastian. For example, the TFMSA states, "For all Legacy Accounts, Tech Friends shall provide technical support directly to the Customer and to other Authorized Users of the Products in coordination with, as needed, [CSG]." (*Id.* at 57). All these data points might allow a reasonable factfinder to conclude that CSG's relationship with Sebastian was only nominally terminated such that Sebastian remained a "contractually obligated Customer facility" and CSG still owed certain rights such as exclusivity to Smart. If indeed Tech Friends began providing its tablet services under the TFMSA in June 2019, while CSG was still contractually obligated to provide exclusivity to Smart under the Sebastian Schedule, a reasonable factfinder could easily find that the exclusivity provision of the MSA was breached. Thus, the Court finds that there is

a genuine dispute of material fact as to whether CSG breached the Sebastian County Agreement by entering into a contract with Tech Friends and agreeing to provide exclusive rights to Tech Friends in Sebastian County that rightfully belonged to Smart.  Accordingly, summary judgment is denied as to paragraph 194 in Count V in Smart's Complaint.

### B. Breach of implied covenant of good faith and fair dealing.

CSG also moves for summary judgment as to paragraphs 201, 202, and 203 of Count VI of Smart's Complaint.  (Doc. 214 at ¶ 30).  In paragraph 201, Smart argues that CSG breached the covenant of good faith and fair dealing by (1) manufacturing improper grounds to purportedly terminate the agreement, (2) sending an improper notice to cure, and (3) eliciting a nonrenewal notice from Sebastian for the sole purpose of removing Smart, while CSG and Sebastian County intended to continue their relationship.  (Doc. 93 at ¶ 201).  In paragraph 202, Smart argues that CSG breached the covenant of good faith and fair dealing by soliciting complaints about Smart, controlling the communications from Sebastian County, preventing Smart from directly responding to or dealing with complaints or issues, and enlisting Sebastian County in its "plight" to terminate Smart.  (*Id.* at ¶ 202).  And in paragraph 203, Smart argues that CSG breached the covenant of good faith and fair dealing by "agreeing to use Tech Friends to provide the services which are exclusive to Smart under the Sebastian County Agreement."  (*Id.* at ¶ 203).

As to the allegations contained in paragraph 201, the Court has already determined in its analysis of Smart's breach of contract claims in Count V that CSG

32

did not manufacture improper grounds to purportedly terminate the schedule for Sebastian County, and CSG did not send an improper notice to cure. Accordingly summary judgment is granted in favor of CSG as to the first and second clauses of paragraph 201.

As the Court has outlined above, however, there is a genuine dispute of material fact as to whether CSG elicited a nonrenewal notice from Sebastian for the sole purpose of removing Smart because the Court has not adjudicated the underlying breach of contract issues with respect to the nonrenewal notices in Count II of CSG's Counterclaim. Thus, summary judgment is denied as to the third clause of paragraph 201. *See Centurion*, 420 F.3d at 1146 (holding that "a claim for a breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law in the absence of a breach of an express term of a contract").

As to the allegations contained in paragraph 202, the Court already determined that CSG did not solicit complaints about Smart, control the communications from Sebastian County, prevent Smart from directly responding to or dealing with complaints or issues, or enlist Sebastian County in its "plight" to terminate Smart. Accordingly summary judgment is granted in favor of CSG as to paragraph 202.

Finally, as to the allegations in paragraph 203, the Court determined in the preceding section that there is a genuine dispute of material fact as to whether CSG breached the MSA by contracting with Tech Friends and purportedly providing

Tech Friends with exclusivity that was owed to Smart. Accordingly, summary judgment is denied as to paragraph 203. *See id.*

**IV.    CSG is entitled to summary judgment as to Smart's fraud claim set forth in Count VII of Smart's Complaint.**

CSG also moves for partial summary judgment as to Count VII of Smart's Complaint. Specifically, CSG argues that CSG's Director of Sales, Mark Turner, made a number of misrepresentations during the negotiation of the MSA, Smart relied on these representations when it entered into the MSA and the Schedule, and Smart was damaged as a result. (*See* Doc. 93 at ¶¶ 207–210). CSG argues Smart's claim fails as a matter of law because Mr. Turner's statements were not fraudulent misrepresentations. (Doc. 214 at 17–23). For the reasons below, the Court agrees with CSG and grants summary judgment in favor of CSG as to Count VII.

The elements of a claim for fraudulent inducement are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012). "A claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact." *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172 (Fla. 4th DCA 1994). Further, "Florida courts have made clear that no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract." *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*, 262 F. Supp. 1334, 1342 (S.D. Fla. Jan. 20, 1999).

34

"It is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. Mar. 29, 1996) (citing *Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984)).

The alleged misrepresentations made by Mr. Turner of CSG are:

> (a)    stating that a "co-terminous" term was better than a seven-year term because CSG's customers renewed their contracts with CSG customarily and without fail.
>
> (b)    stating that, for the period in which CSG provided its services to these facilities, Smart would be the inmate messaging provider, as long as there were no un-cured performance related issues.
>
> (c)    failing to tell Smart that CSG may let a contract with a Joint Customer expire solely for the purpose of removing Smart's services from the relationship and then enter into a new but substantially similar contract using one of Smart's competitors as the provider of Smart's messaging services.
>
> (d)    stating that each subsequent Joint Customer agreement would be structured the same way as the Avoyelles Agreement.   Specifically, CSG would obtain amendments signed by each Joint Customer which would incorporate Smart's specific services into each CSG/Joint Customer contract.
>
> (e)    stating that he would use Smart's services to secure contract extensions with Joint Customers and/or to further solidify relationships with Joint Customers.

(Doc. 93 at 49–50).   Smart argues that it "reasonably relied on the representations when it entered into the MSA and the Schedules and then purchased and installed its equipment and services."   (Doc. 93 at ¶ 209).

35

**A. "Turner represented to Smart that a 'co-terminous' term was better than a seven year term because CSG's customers renewed their contracts with CSG customarily and without fail." (Doc. 93 at ¶ 207(a)).**

As for the first statement, CSG argues that the alleged misrepresentation was merely an opinion, not a statement of material fact. (*See* Doc. 214 at 20–21). The Court agrees. As Florida courts have determined, "[t]he status of being the 'finest' or the 'best' is a matter of opinion, and the allegations of fraud from the use of these terms cannot stand." *See MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561 (Fla. 4th DCA 2017). Thus, Mr. Turner's statement that one term was "better" than another term was a matter of opinion and cannot serve as grounds for a fraud claim.

**B. "Turner represented to Smart that, for the period in which CSG provided its services to these facilities, Smart would be the inmate messaging provider, as long as there were no un-cured performance related issues." (Doc. 93 at ¶ 207(b)).**

CSG argues that the second allegedly fraudulent statement was contradicted by the MSA. (*See* Doc. 214 at 21). The Court agrees. Paragraph 6 of the MSA provides:

> This Agreement . . . shall be co-terminous with Customer's Agreement with Facility . . . After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

(Doc. 93-2 at 3). The plain language of Paragraph 6 gives either party the option to non-renew the MSA, for any reason, so long as the party provides "written notice of non-renewal at least ninety days prior to the expiration of the then current term."

36

(*Id.*)  Accordingly, the MSA clearly contemplates a scenario wherein CSG may terminate Smart as the inmate messaging provider under circumstances where there were no un-cured performance related issues and CSG merely timely notified Smart of non-renewal.  Given that "no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent contract," *see Eclipse*, 262 F. Supp. at 1342, the Court finds that Smart cannot allege that Mr. Turner's statement that "for the period in which CSG provided its services to these facilities, Smart would be the inmate messaging provider, as long as there were no un-cured performance related issues" was fraudulent as this statement was not contained in the subsequent MSA between the parties.  *See Barnes*, 932 F. Supp. at 1428.

### C.  "Turner never told Smart that CSG may let a contract with a Joint Customer expire solely for the purpose of removing Smart's services from the relationship and then enter into a new but substantially similar contract using one of Smart's competitors as the provider of Smart's messaging services."  (Doc. 93 at ¶ 207(c)).

The third alleged misrepresentation complained of by Smart is that "Turner never told Smart that CSG may let a contract with a Joint Customer expire solely for the purpose of removing Smart's services from the relationship and then enter into a new but substantially similar contract using one of Smart's competitors as the provider of Smart's messaging services."  (Doc. 93 at 49–50).  As a matter of law, this is not a misrepresentation, however.  Paragraph 6 of the MSA provides, "This Agreement shall commence on the 'Effective Date' and shall be co-terminous with Customer's Agreement with Facility as defined by Facility Address in attached Schedule . . . .  After the original term, this Agreement shall automatically renew in

accordance with the Customer's Agreement with facility." (Doc. 93-2 at 3). The plain terms of the MSA therefore clarify by inference that if CSG's agreement with a facility was not renewed, Smart's agreement with CSG would also not be renewed as to that facility, as Smart's agreement with CSG was co-terminous with CSG's agreement with the facility. By the terms of the MSA, therefore, Smart was on notice that its relationship with CSG vis a vis a particular facility was contingent on CSG's relationship with that facility, but such contingency was one-sided. That is, if Smart did not renew with CSG, CSG's agreement with the facility would be unaffected, but if CSG did not renew with the facility, CSG's agreement with Smart would be non-renewed as well. Mr. Turner's failure to tell Smart that CSG could non-renew with a facility solely to non-renew its contract with Smart is therefore not a misrepresentation, but rather an immaterial omission about circumstances which Smart could have discerned by reading into the contract.

Because "Florida law consistently recognizes that a basic tenet of contract law [is] that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent agreement between the parties," *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 798 (11th Cir. 2005), by the inverse, reliance on an omission that is contained in the subsequent contract is also unreasonable. Accordingly, Mr. Turner's alleged omission is not actionable fraud or misrepresentation. *See White Const. Co., Inc. v. Martin Marietta Materials, Inc.*, 633 F. Supp. 2d 1302, 1326 (M.D. Fla. Apr. 7, 2009) (granting summary judgment in favor of defendant on plaintiff's

38

fraud claim where the terms of the MSA adequately covered the issue that was allegedly misrepresented).

Furthermore, even if Smart could not have read Mr. Turner's purported omission into the contract, there is no indication that the omission would have been a material misrepresentation. As noted above, a representation is not a basis for claiming fraud unless it concerns a material fact. *See Prieto*, 97 So. 3d at 917. "Under Florida law, a fact is material if, but for the misrepresentation, the aggrieved party would not have entered into the contract." *Ribak v. Centex Real Est. Corp.*, 702 So. 2d 1316, 1317 (Fla. 4th DCA 1997). "Conversely, a representation is not material when it appears that the contract would have been entered into notwithstanding it." *Morris v. Ingraffia*, 154 Fla. 432, 437 (Fla. 1944). Smart has introduced no evidence that it contracted with CSG *because* it believed that CSG could not let a contract with a joint customer expire in an effort to remove Smart. As a result, the Court cannot find that Smart would not have entered the MSA with CSG had it known that CSG could non-renew solely to terminate Smart. To assert that Smart relied on this purported omission to its detriment stretches the notion of fraudulent misrepresentation to a degree to which the Court cannot abide. Accordingly, Mr. Turner's third purported misrepresentation is not grounds for a fraud claim.

**D. "Turner represented to Smart that each subsequent Joint Customer agreement would be structured the same way as the Avoyelles Agreement. Specifically, CSG would obtain amendments signed by each Joint Customer which would incorporate Smart's specific services into each CSG/Joint Customer contract," (Doc. 93 at ¶ 207(d)), and "Turner represented that he would use Smart's services**

to secure contract extensions with Joint Customers and/or to further
solidify relationships with Joint Customers."  (Doc. 93 at ¶ 207(e)).

Finally, the fourth and fifth alleged misrepresentations are simply not
misrepresentations because they are statements regarding future performance.  To
be a ground for fraud, a false statement of fact must pertain to a past or existing
fact.  *See Thor Bear, Inc.*, 648 So. 2d at 172.  And "[a] successful action for
fraudulent misrepresentation may not ordinarily be premised upon a promise of
future action."  *Id.*  This is true even where a promise is made as a
misrepresentation to induce a party into entering into a contract.  *Brod v. Jernigan*,
188 So. 2d 575, 579 (Fla. 2d DCA 1966).

Here, Mr. Turner's statements about how "each subsequent Joint Customer
agreement would be structured" and how Mr. Turner "would use Smart's services to
secure contract extensions" were statements premised upon a promise of a future
action.  Accordingly, neither of these forward-looking statements are considered
fraud under Florida law.

Because none of the five statements in question meet the elements of
fraudulent misrepresentation under Florida law, summary judgment is granted in
favor of CSG as to Smart's fraud claim in Count VII of Smart's Complaint.

## V.   CSG is entitled to partial summary judgment as to Count X of Smart's Complaint.

Last, CSG seeks summary judgment as to Count X of Smart's Complaint,
which alleges that CSG engaged in "unfair competition" by "soliciting complaints
about Smart, making false claims about Smart, improperly attempting to terminate

Smart's relationship with [CSG], the Joint Customers, and other customers, and conveying exclusive rights that belong to Smart to other competitors," (Doc. 93 at ¶ 236). (Doc. 214 at 17).

Under Florida law, unfair competition requires injury to a competitor. *See Prac. Management Assocs., Inc. v. Old Dominion Ins. Co.*, 601 So. 2d 587, 587 (Fla 1st DCA 1992). As one Florida trial court explained in a decision that was affirmed by the First District Court of Appeal:

> Even giving the phrase "unfair competition" its broadest ordinary meaning, the offense must include at least two elements, "unfairness" and "competition." This requirement that the offense include an element of rivalry is consistent with the plain meaning of the words and with recognized definitions. To define "unfair competition" simply to mean any act of a commercial enterprise which is unfair would be to expand the phrase to include all alleged wrongdoing by business and therefore include all manner of breach of contract, torts and violations of statutes, administrative regulations and the like. Such a boundless definition is therefore unreasonable.

*Id.* at 587–88.

As a threshold matter, because summary judgment was granted in favor of CSG as to Smart's allegations that CSG solicited complaints about Smart and made false claims about Smart, partial summary judgment is granted in favor of CSG as to the first two clauses in paragraph 236 of Count X.

Next, while the Court has not granted summary judgment as to Smart's allegation that CSG "improperly attempt[ed] to terminate Smart's relationship with [CSG], the Joint Customers, and other customers," the Court finds, as a matter of law, that this allegation does not meet the elements of unfair competition. Given

41

that "unfair competition" must include "an element of rivalry" and "competition," CSG's allegedly improper attempts to terminate its own relationship with Smart cannot constitute unfair competition.  Smart was not a rival competing with CSG in the marketplace at the time that CSG attempted to end its relationship with Smart. Instead, Smart was CSG's business partner, with whom CSG had contracted to jointly provide services and products to third party customers.

Accordingly, by attempting to sever its relationship with Smart, CSG was not competing with Smart, but rather making a business decision that Smart now perceives as unfair.  Such allegations cannot sustain a claim for unfair competition as Florida courts have clearly cautioned that the phrase "unfair competition" is not to include "any act of a commercial enterprise which is unfair." *Practice Management Assocs.,* 601 So. 2d at 588.  Thus, the Court finds that partial summary judgment is granted in favor of CSG as to the third clause in paragraph 236 of Count X, which states that CSG has engaged in unfair competition by "improperly attempting to terminate Smart's relationships with CSG, the Joint Customers, and other customers."  (*See* Doc. 93 at ¶ 236).

Finally, for the reasons stated above in the Court's analysis of paragraph 203 of Count VI, summary judgment is denied as to Smart's allegation that CSG engaged in unfair competition by conveying exclusive rights that belong to Smart to other competitors.  If, as Smart alleges, CSG "agree[d] to use Tech Friends to provide the services which are exclusive to Smart under the" various facility agreements, such conduct would constitute unfair competition as it would reveal an

42

alignment between CSG and a rival of Smart's in order to damage Smart.  *See Practice Management Assocs.,* 601 So. 2d at 587.

In sum, summary judgment is granted in favor of CSG on Smart's unfair competition claim except as to Smart's allegation that CSG engaged in unfair competition by "conveying exclusive rights that belong to Smart to other competitors."

### VI.   CSG is entitled to summary judgment as to Smart's claims for punitive damages.

CSG also seeks summary judgment as to Smart's claims for punitive damages, which are presented in Count VII and Count X of Smart's Complaint, (*see* Doc. 93 at ¶¶ 210, 237).  (Doc. 214 at ¶¶ 54–57).

"Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future."  *Owens–Corning Fiberglas Corp. v. Ballard*, 749 So. 2d 483, 486 (Fla. 1999).  "Hence, punitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights and safety of others."  *Id.*  "The court is to decide at the close of the evidence whether there is a legal basis for recovery of punitive damages shown by any interpretation of the evidence favorable to the plaintiff."  *See Wackenhut Corp. v. Canty*, 359 So. 2d 430, 435–36 (Fla. 1978).

Here, because summary judgment was granted in favor of CSG as to Count VII, Smart's claim for punitive damages in that Count is moot.  However, because

summary judgment was denied as to the last clause of paragraph 236 in Count X, the Court must determine whether punitive damages are appropriate as to that Count.  Viewing the evidence in the light most favorable to Smart for the purposes of resolving CSG's motion for partial summary judgment, the Court cannot determine that there is a legal basis for recovery of punitive damages based on the alleged breach of the exclusivity agreement contained in the MSA.  Simply put, negotiating with another contractor to provide services—either as a backup or as a replacement for Smart—in the waning hours of what the record evidence indicates was a dysfunctional business relationship, cannot be the type of "fraudulent, malicious, deliberately violent or oppressive" conduct to warrant punitive damages.  *See Owens–Corning*, 749 So. 2d at 486.  Accordingly, summary judgment is granted in favor of CSG as to Smart's claim for punitive damages in Count X.

## CONCLUSION

For the foregoing reasons, CSG's Motion for Partial Summary Judgment is **GRANTED** in part and **DENIED** in part.  Specifically, the Court **GRANTS** summary judgment as to Count II paragraph 92(C) of CSG's Counterclaim, only as it pertains to Sebastian County; paragraph 174 of Count III of Smart's Complaint; paragraph 187 of Count IV of Smart's Complaint; the first clause of paragraph 186 of Count IV of Smart's Complaint; paragraph 192 of Count V of Smart's Complaint; paragraph 193 of Count V of Smart's Complaint; the first and second clauses of paragraph 201 of Count VI of Smart's Complaint; paragraph 202 of Count VI of Smart's Complaint; Count VII of Smart's Complaint; the first three clauses of

paragraph 236 of Count X of Smart's Complaint; and Smart's claims for punitive damages.

As a final note, this case has yielded a convoluted matrix of claims within claims, wherein only certain sentences of certain paragraphs may be properly adjudicated. This, among other reasons, has required this Court to issue two robust summary judgment orders. This approach to pleading and motions practice creates the impression that the parties are simply throwing every conceivable legal theory at the wall to see what sticks. The parties must now pour over every line of their filings and compare them with the Court's summary judgment orders to determine which sentences of which paragraphs of which Counts are triable issues. This form of legal practice is cumbersome, inefficient, and is simply not in accord with the precision and concision required of filings by the Local Rules for the Middle District of Florida. *See* M.D. Fla. L.R. 3.01(a). Accordingly, at the upcoming status conference and in their pretrial filings, the Court expects the parties to be able to organize and clarify the exact issues they intend to present to the jury.

**The Court strongly recommends that the parties make meaningful efforts to settle what is left of their respective claims.**

**ORDERED** at Tampa, Florida on August 9, 2023.

*John L. Badalamenti*
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE