UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

vs.                                 CASE NO. 8:20-cv-01469-JLB-TGW

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.

_____/

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Counter-Plaintiff,

vs.

SMART COMMUNICATIONS HOLDING, INC.
and SMART COMMUNICATIONS COLLIER, INC.,

     Counter-Defendants.

_____/

### SUPPLEMENTAL BRIEF OF DEFENDANT/COUNTER-PLAINTIFF CORRECT SOLUTIONS, LLC

Pursuant to this Court's Order dated January 29, 2024 (Doc. 262), Defendant, Counter-Plaintiff, Correct Solutions, LLC ("Correct"), respectfully submits its Supplemental Brief as to paragraphs "a" through "e" of the Joint Statement of Issues. (Doc. 259).

**(a)**
## Smart's Damages are barred by Section 7 of the MSA

Smart Communications Holdings, Inc. ("Smart") filed this action against Correct to recover lost profits as damages in connection with three of Correct's correctional facility customers. These damages are barred by the limitation of liability provision which Smart and Correct included in Section 7 of the Master Services Agreement ("MSA") and none of the damages sought by Smart are recoverable as a matter of law.

Smart's claims for damages are based on the projected loss of revenue which Smart asserts it could have received from families and friends of inmates after Smart was no longer the provider of tablets and related services at Correct's correctional facility customers. In its required disclosures and in its Expert's reports, Smart identified its damages as "lost revenue/lost profits." (Doc. 263-7; Doc. 263-8; Doc. 263-1, Exhs. at pgs. 11-14). Smart's expert projected Smart's damages as lost profits over 120-months (ten years) at Washington County, Sebastian County and Bowie County. (Doc. 263-1, 4:25-5:9). As explained in further detail below, the revenue used to project Smart's damages was based on credits sold by Smart to the friends and family members of the inmates. (Doc. 263-1, 6:3-12; 7:3-15; 8:23-9:6). All revenue received by Smart and all profits were calculated using monies received from third parties. Smart received no monies from Correct or from any of the above correctional facilities under the MSA or any of the Schedules at issue.

In the MSA, Smart and Correct agreed to a limitation of liability provision

which limits the liability of both parties in the event an action was filed on the

contract. In Section 7 of the MSA, the Parties agreed as follows:

7. <u>Limitation of Liability.</u> To the maximum extent permitted by applicable law, Provider shall indemnify and hold harmless Customer, his agents, servants and employees from any and all claims, actions, lawsuits, judgments or liabilities of any kind whatsoever deriving from negligent acts or omissions of the Provider, its agents or subcontractors. Each Party agrees that it shall be solely responsible for the negligent or wrongful acts of its own employees. However, nothing contained herein shall constitute a waiver by Customer of its sovereign immunity or other applicable State Statutes. **Notwithstanding anything to the contrary in this Agreement or Schedules, neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit, lost or corrupted data or software,** even if the Parties have been advised of the possibility of such damages and regardless of whether caused or contributed to by the negligence of Provider or others and not withstanding anything to the contrary in this Agreement, in no event will Provider's liabilities under this agreement, whether under contract law, tort law, warranty, or otherwise, exceed the total amount of revenue received by Provider pursuant to this agreement, during the twelve (12) month period before the date the claim arose. (emphasis added).

As numerous courts have held, parties may contractually limit damages for

breach of a contract. *Inlet Beach Capital Investments, LLC v. Federal Deposit*

*Insurance Corporation*, 778 F. 3d 904, 906-907 (11th Cir. 2014). See also, *Ament*

*v. One Las Olas, Ltd.*, 898 So. 2d 147 (Fla. 4th DCA 2005). A remedy limiting

provision constitutes an allocation of a risk known to the parties when entering

into a contract. *The Cadle Company, Inc. v. Menchion*, 808 Fed. Appx. 988 (11th

Cir. 2020). When a contract contains a provision limiting the damages recoverable

for breach of contract, such provisions are enforceable and greater compensatory damages may not be awarded. *Action Orthopedics, Inc. v. Techmedica, Inc.*, 759 F. Supp. 1566, 1569 (M.D. Fla. 1991).

Smart and Correct expressly provided in the MSA that neither party shall be liable for indirect, incidental, consequential, exemplary or special damages of any kind and expressly included "damages arising from lost profits." This provision is similar to the provision construed by this Court in *Nview Health, Inc. v. David V. Sheehan*, 2022 WL 16923585 (M.D. Fla. September 14, 2022). In *Nview,* the parties signed a License Agreement which included the following provision: "neither Dr. Sheehan nor Nview shall have any liability to the other party for any indirect, special, consequential or punitive damages, including loss of profits….incurred by any party, whether in an action in contract (including breach of warranty), tort or otherwise." *Id.* at *21. The limitation of liability provision in *Nview* was more expansive than the provision in the MSA between Smart and Correct because the *Nview* provision expressly applied to tort actions in addition to actions in contract. Both the *Nview* limitation and the limitation in the MSA at issue in this action barred lost profits in the form of consequential damages. Thus, the issue in *Nview* was whether the lost profits sought were direct damages, which were not barred, or were consequential damages which were barred.

In answering that question, this Court gave a thorough explanation of the difference between direct damages and consequential damages. As this Court explained, direct damages are those inherent to the breach and are the necessary

and usual result of the defendant's wrongful act. Consequential damages are damages that result naturally but not necessarily from the wrongful act because they require the existence of some other contract or relationship. *Nview Health, Inc.*, 2022 WL 16923585 at *21, citing *WSFS Fin. Corp. v. Great American Insurance Company,* No. CVN18CO9088, 2019 WL 232838, at *5 (Del. Super. Ct. May 31, 2019). The *Nview* Court cited to Delaware law which distinguishes profits lost on the underlying contract itself from profits lost on other tangential contracts with the former classified as direct damages and the latter classified as consequential. *Nview Health, Inc*, 2022 WL 16923585 at *22, citing *SLH General Contractor, Inc. v. Ambience, Inc.* 2020 WL 1130325 at *6 (Del. Com. Pl. Mar. 4, 2020). As explained in *SLH General Contractor, Inc.*, "lost profits are considered consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Id. at *6,* citing *eCommerce Industries, Inc. v. WA Intelligence, Inc.*, 2013 WL 5621678, at *56 (Del. Ch. September 30, 2015). Consequential damages do "not follow directly and immediately from the act of the [breaching] party, but only from some of the consequences or results of such act but were nonetheless reasonably foreseeable or contemplated by the partes at the time the contract was entered into as a probable result of a breach." *Pharmaceutical Product Development, Inc. v. TVM Life Science Ventures VI, L.P.*, 2011 WL 549163 *6 (Del. Ch. 2011).

In *Nview*, this Court concluded that the lost profits sought by Nview were based on its lost revenue from sublicenses to third parties and that these are "a

textbook example of consequential damages" as they stem from other contracts or licenses. *Nview Health, Inc.*, 2022 WL 16923585 at *22. Thus, the Court held that Nview could not recover consequential damages in the form of lost profits from agreements with third parties and summary judgment was granted in favor of Dr. Sheehan. *Id.*

Similar to *Nview*, Smart's lost profits are based on "other relationships." None are based on any revenue from Correct or from the correctional facilities under the MSA or any Schedule. Rather, the damages in the form of projected lost profits are solely based on revenue from third parties (i.e., families and friends of inmates). The gross revenue used by Smart's expert to project the lost profits was "the total amount of sales made to friends and family of inmates in exchange for credits to be used to send and receive electronic messages and for other communication and entertainment services offered." (Doc. 263-1, Exh. at pgs. 12-13). As in *Nview*, these projected lost profits constitute consequential damages which are barred.

Smart seeks projected lost profits based on the following contract claims in its Fourth Amended Complaint (Doc. 93): Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing as to Washington County (Counts III and IV), Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing as to Sebastian County (Counts V and VI), and Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing as to Bowie County (Counts VII and VIII). The damages as requested in the prayer

for relief in each Count, as stated in Smart's Disclosures, and as projected in Smart's Amended Expert Report are consequential damages based on lost profits and are barred. (Doc. 93; Doc. 263-1, 6:3-17, Exh. at pgs. 11-14; Doc. 263-7; Doc. 263-8).

The MSA executed by Smart and Correct in 2019 applies to the three correctional facility customers at issue in this case. (Doc. 93, Exh. B). Smart and Correct also executed Schedules which were specific to each of the three facilities. (Doc. 93, Exhs. CC, DD, EE). As stated, Smart received no monies from Correct or any correctional facility under the MSA or any Schedule as a result of Smart providing equipment and services to the inmates at any of the facilities. Rather, Smart's revenue was solely derived from the families and friends of the inmates. (Doc. 263-1, 10:21-25, Exh. at pgs. 11-13; Doc 263-2, 4:16-5:2, 6:16-7:6; Doc. 263-3, 4:21-5:8). Smart's revenue is from the sale of credits through on line transactions through Smart's website to the families and friends of the inmates housed in each facility. (Doc. 263-3, 4:21-5:8; Doc. 263-1, 6:3-12). The credits are purchased from Smart and then transferred to or shared with the inmates by the purchasing family members or friends for the inmates to use to access Smart's equipment and services. (Doc. 263-1, 7:3-15; Doc. 263-2, 6:16-23; Doc. 263-3, 4:21-5:8).

Smart's calculations of its damages, titled "lost revenue/lost profits," for the three facilities is detailed in its Confidential Supplement to Rule 26 Initial Disclosures Regarding Damages, in its Amended Rule 26 Disclosures of Smart Communications Holding, Inc., and in Smart Communications, Inc. and Smart's

Amended Expert Report. (Doc. 263-7; Doc. 263-8; Doc. 263-1, Exh. at pg. 14). Both

James Logan of Smart and its expert acknowledged that Smart's damages are

based on credits purchased by friends and family of inmates "on the outside." (Doc.

263-2, 4:16-5:2, 6:16-7:6; Doc. 263-1, 6:3-12, 163:11-25). Since all damages sought

by Smart are based on the credits purchased by the families and friends of inmates,

which is a relationship outside the MSA and Schedule, Smart's damages are

consequential damages and are barred by paragraph 7 of the MSA.

Smart also seeks the identical damages based on lost profits under its tort

claim of unfair competition in Count X of its Fourth Amended Complaint.

However, Smart's claim for unfair competition is based on the same conduct that

is the basis for its contractual claims - whether Correct conveyed to others (i.e.,

Tech Friends) exclusive rights that belonged to Smart under the MSA and

Schedule.  (Doc. 93, pg. 55 ¶236; Doc. 234, pg. 42). Since the claim for unfair

competition is based on Smart's contractual rights under the MSA and Schedules

and the same conduct Smart claims is a breach of the contract by Correct, and the

damages in all counts are consequential damages as they are based on the loss of

revenue from third parties and "other relationships," the damages sought by Smart

in all remaining claims are barred.

**(b)**
**Wages paid to Bruce Johnson by Correct**
**are not barred by Section 7 of the MSA**

Correct sued Smart and Defendant, Smart Communications Collier, Inc.

("Smart Collier") in Count V for Tortious Interference and in Count VI for Unfair

Competition based upon joint improper conduct of Smart and Smart Collier. Correct's claims for tortious interference and for unfair competition are actions in tort. Unlike Smart's claim for unfair competition, the conduct of Smart which is the basis for Correct's claims is unrelated to the contractual rights, obligations or expectations of Correct and Smart under the MSA and Schedules. Smart Collier's conduct is obviously not related as it is not a party to any contract with Correct.

Correct outlined in paragraphs 1 through 78 of the Fourth Amended Counterclaim the conduct and actions by Smart and Smart Collier which were intended to prevent Correct from operating its telephone platform and from servicing its correctional facility customers so that Smart and Smart Collier could solicit and steal Correct's customers and telephone business. (Doc. 105). Correct describes in paragraphs 53, 54, 117, 118 and 124 the efforts of Smart and Smart Collier directed to Bruce Johnson which were designed to prevent Correct from receiving the maintenance and updates required to keep Correct's software and telephone platform operational and how Smart and Smart Collier tried to prevent Correct from having the necessary resources to keep its telecommunications software and platform operational. (Doc. 105).

In ruling on Smart's Motion for Partial Summary Judgment, this Court analyzed the factual allegations for the claims of tortious interference and unfair competition and found that Counts V and VI contain "allegations of misconduct which are beyond the realm of the expectancy interests created by the parties' MSA and schedule for Sebastian." (Doc. 232, p. 53). In denying Smart's Motion for

Partial Summary Judgment on Correct's claim of unfair competition, this Court held that if Smart ignored the requests of Correct and Sebastian in order to interfere with Correct's relationship with Sebastain and to solicit Sebastian as its own customer, such conduct would constitute tortious interference and unfair competition "separate and apart from the breach of contract." (Doc. 232, pgs. 53-54).

Unlike the provision in *Nview*, Smart and Correct did not waive damages arising from intentional torts in the limitations of liability set forth in Section 7 of the MSA. Moreover, unlike in *The Cadle Company v. Menchion*, 808 Fed. Appx. 988 (11th Cir. 2020), Smart's subsequent efforts in conjunction with Smart Collier to tortiously interfere with Correct's contracts and to unfairly compete was not a risk known to Correct at the time of the execution of the MSA. Since the actions of Smart were outside the parties' contractual agreement or expectations, are unrelated to the MSA or Schedules, and are the basis of an intentional tort, Section 7 of the MSA does not bar the wages sought by Correct against Smart. Moreover, Section 7 does not bar any damages sought by Correct against Smart Collier as Smart Collier is not a party to the MSA and there is no such limitation of liability between Smart Collier and Correct.

**(c)**
**Correct's claim for Punitive Damages in Count VI of its
Fourth Amended Counterclaim is not barred by
Section 7 of the MSA or Common Law**

In its claim for Unfair Competition in Count VI of the Fourth Amended Counterclaim (Doc. 105), Correct seeks punitive damages against Smart and Smart Collier. As stated above, Smart Collier is not a party to the MSA with Correct and thus Section 7 does not bar Correct's claims for damages, including punitive damages, against Smart Collier. The only issue for this Court is whether Section 7 bars punitive damages against Smart.

The issue of punitive damages was also addressed by this Court in *Nview*. As stated above, the parties in *Nview* expressly included tort claims in the limitation of liability provision. This Court held in *Nview* that "the plain language of the License Agreement bars either party from seeking punitive damages in action in contract or in tort." *Nview Health, Inc.*, 2022 WL 16923585 at *22. Correct and Smart did not include actions brought in tort in Section 7 of the MSA and the plain language of that Section limits the waivers to actions in contract. Thus, based on the above and the arguments asserted in section (b) which also apply to this issue, Section 7 does not bar Correct's claims for punitive damages.

Correct's claims for punitive damages are also not barred by common law. Punitive damages have long been an available remedy for wanton, willful, or outrageous conduct. As the U.S. Supreme Court stated, English law during the colonial era accorded juries the authority to award such damages when warranted and American courts have also permitted punitive damages since 1874. *Atlantic Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 129 S. Ct. 2561, 2563 (2009). See also, *Florida East Coast Railway v. McRoberts*, 111 Fla. 278, 149 So. 631 (1933).

As explained by the Florida Supreme Court in *McRoberts*, 149 So. 632, punitive damages are:

> [D]amages over and above such sum as will compensate a person for his actual loss. And the law permits their imposition, in proper cases, at the discretion of the jury, not because the party injured is entitled under the law to recover punitive damages as a matter of right, but as punishment to the wrongdoer, for the purpose of deterring him and others committing similar violations of the law from such wrongdoing in the future. Therefore exemplary damages are, as it has been said, allowed by the law, not as a matter of compensation to the injured party, but because of the quality of the wrong done by the tort-feasor, from which the injured party suffers.

Under Florida law, a party's violation of the Florida common law of unfair competition entitles the opposing party to an award of punitive damages. *United Feature Syndicate, Inc. v. Sunrise Mold Co., Inc.,* 569 F. Supp. 1475, 1481 (S.D. Fla. 1983), citing *Miami Beach Lerner Shops, Inc. v. Walco Manufacturing of Florda, Inc.,* 106 So. 2d 233, 236 (Fla. 3d DCA 1958). See also, *Workplace Corp. v. Office Depot, Inc.,* 1990 WL 106727 (M.D. Fla. June 5, 1990). Thus, Correct's claim for punitive damages is not barred as a matter of law.

**(d)**
**The expiration of the MSA and Schedule for Sebastian bars Smart's claims for damages in Counts V, VI and X as to Sebastian**

Based on this Court's finding that the MSA and Schedule for Sebastian expired, and its Order granting, in part, Correct's Motion for Partial Summary Judgment, Smart's claims for damages as to Sebastian County are now moot. The only issue remaining for trial is in paragraph 201 of Count VI as will be explained below.

This Court granted Correct's Motion for Partial Summary Judgment in part as to Counts V, VI and X. In so ruling, this Court found that the MSA and Schedule between Correct and Smart as to Sebastian expired on April 24, 2020. (Doc. 234, pgs. 9-10). As a result of the Court's Order, one issue remains for trial on Count V of Smart's Fourth Amended Complaint and two issues remain in Count VI, one of which is the same as in Count V.

In paragraph 194 of Count V and paragraph 203 of Count VI, Smart asserted that Correct was in breach by agreeing to provide Tech Friends with exclusive rights in Sebastian County that rightfully belonged to Smart. (Doc. 93, pg. 47, ¶194; Doc. 234, pgs. 31-32). Correct's Motion was denied on this issue because it was unclear to the Court which agreement was the basis for Smart's claims. (Doc. 234, pg. 30). The Court held that if Smart's claim was based on Tech Friends installing tablets under its 2019 Master Services Agreement with Correct while Smart had exclusive rights, a factual dispute remained for trial. (Doc. 234, pg. 30). All parties agree and the undisputed evidence proves that Tech Friends did not install any tablets at Sebastian County until after June 2020, which was after the April 24, 2020 expiration date of the MSA and Schedule for Sebastian. (Doc. 263-4, 4:9-17). The installation of tablets by Tech Friends commenced after June 2020 when Tech Friends and Sebastian County had a direct contract. (Doc. 263-5, 4:23-5:9, 6:21-7:25). Since no tablets were installed by Tech Friends until after the MSA and Schedule between Correct and Smart expired, the expiration renders moot all of Count V and paragraph 203 of Count VI.

The sole remaining issue in Smart's Fourth Amended Complaint relating to Sebastian is contained in paragraph 201 of Count VI. (Doc. 234, pg. 33). Based on this Court's analysis in its Order on Correct's Motion for Partial Summary Judgment, whether Correct elicited a non-renewal notice from Sebastian for the sole purpose of removing Smart remains an issue for trial. (Doc. 234, pg. 33).

## (e)
## Correct adequately and timely disclosed that it was (and is) seeking to recover the wages it paid to Bruce Johnson as damages

Correct adequately and timely disclosed that the damages it is seeking in this action include wages paid to its employee, Bruce Johnson. Correct has pending claims against Smart in Count IV for Breach of the Duty of Good Faith and Fair Dealing as to Sebastian County, in Count V for Tortious Interference as to Sebastian County, and in Count VI for Unfair Competition, and seeks as part of its damages the wages paid to Bruce Johnson. (Doc. 105, pgs. 45-50). The hiring of Mr. Johnson by Correct in September 2019 was necessitated as a direct result of the actions of both Smart and Smart Collier.

Bruce Johnson was employed by Lattice, Inc. and their predecessor as a system technician, production engineer, and support technician since 1983. (Doc. 263-6, 8:6-13, 9:13-19). Correct became a customer of Lattice in approximately 2011. (Doc. 263-6, 23:16-19). In his role with Lattice, Bruce Johnson was the person directly responsible for providing Correct with the required maintenance, support, and updates for the Lattice Nexus Inmate Phone platform that Correct purchased from Lattice in order to provide telephone service to Correct's

correctional facility customers. (Doc. 263-6, 10:15–12:4; 13:6–9; 13:19-24; 23:20–24). In fact, Bruce Johnson testified that when he worked for Lattice, he spent close to half of his working time on Correct's account and Correct's various correctional facility customers. (Doc. 263-6, 14:25-15:17). Bruce Johnson also testified that there was nobody else at Lattice that Correct would contact if they had a problem with the Lattice Nexus Inmate Phone platform, going so far as to say, "it was always me." (Doc. 263-6, 15:18–22).

In mid-January 2019, Bruce Johnson began working for Smart following Smart entering into a license agreement with Lattice and acquiring all the employees and software engineers of Lattice. (Doc. 263-6, 18:1–4, 16:12–17:14; Doc. 105, pg. 15, ¶30; Doc. 105-12, pg. 4, first paragraph). Bruce Johnson continued to provide the same services to the Lattice customers when he was hired by Smart, and in fact Mr. Johnson testified that he was doing nothing different for the two employers. (Doc. 263-6, 20:17–24). In August 2019, Bruce Johnson received a call from Jon Logan, CEO of Smart, and Lisa Eddy, a former Lattice employee and then current Smart employee, instructing him to not provide any support to Correct. (Doc. 263-6, 20:25-21:23). Bruce Johnson contacted Correct to inform them of the instruction he received from Smart. (Doc. 263-6, 22:14–20).

Smart filed a Verified Complaint against Correct in state court in Hillsborough County, Florida on August 2, 2019. (Doc. 1-2, pgs. 9-55). Correct filed its Counterclaim against Smart on August 29, 2019. (Doc. 1-2, pg. 169 - Doc. 1-3, pg. 19). On August 30, 2019 Smart and Correct entered into a Stipulation to

Preserve Status Quo (Doc. 105-9, pg. 1-4) in the state court action, which was approved by Court Order (Doc. 1-3, pg. 59-60), that provided "neither of the parties shall solicit or attempt to hire an employee directly employed by the other; however, this provision does not apply to Bruce Johnson in the event he is an employee of [Smart]." (Doc. 105-9, pg. 3, ¶6).

Faced with losing the person that was essential to ensuring the Lattice Nexus Inmate Phone platform functioned properly due to Smart's instruction to no longer provide support to Correct, and in reliance on paragraph 6 of the Stipulation, Correct hired Bruce Johnson to continue providing the required maintenance, support, and updates for Correct's telephone system in September 2019. (Doc. 263-6, 19:2–21). The day following Bruce Johnson's start date with Correct he was served with a lawsuit filed by Smart and Smart Collier in Pinellas County, Florida seeking monetary damages and an injunction to prevent Bruce Johnson from "providing services to its direct competitor, Correct Solutions." (Doc. 263-6, 19:8–21; Doc. 105, pg. 29, ¶54). Notably, Bruce Johnson testified that if he stopped providing the maintenance and upgrades to the Lattice Nexus Inmate Phone platform purchased by Correct it "would eventually stop working" and that "would have destroyed" Correct's business. (Doc. 263-6, 25:10–22).

This action was removed to federal court on June 26, 2020 (Doc. 1, pg. 1-17). In its Amended Counterclaim (Doc. 32) dated August 17, 2020, Correct included allegations that Smart had acquired the licensing rights to software and systems owned by Lattice and had also hired certain employees of Lattice including Bruce

Johnson. (Doc. 32, pg. 51-52, ¶27-28). Correct alleged that those actions were taken by Smart to deprive Correct of the essential software maintenance and upgrades required by Correct to provide telephone service to its correctional facility customers, including those customers of Correct referenced in the MSA. (Doc. 32, pg. 51-52, ¶28). Moreover, Correct alleged that Smart used the acquisition of Lattice and Bruce Johnson to engage in deliberate and illicit attempts to steal Correct's correctional facility customers and damage Correct's ability to provide telephone service (Doc. 32, pg. 52, ¶29). The above allegations were all realleged into each of the causes of action, and Correct made further allegations pertaining to Bruce Johnson and Lattice in Count IV (Breach of Duty of Good Faith and Fair Dealing as to Sebastian County) (Doc. 32, pg. 75, ¶104), Count V (Tortious Interference as to Sebastian County) (Doc. 32, pg. 77, ¶113), and Count VIII (Unfair Competition) (Doc. 32, pg. 81, ¶134). Finally, Correct alleged in the Amended Counterclaim that its damages included "additional wages." (Doc. 32, pg. 82, ¶135).

Accordingly, as of August 17, 2020, nearly three and a half years ago, Correct disclosed to Smart that Smart's acquisition of Lattice, improper instruction as to Bruce Johnson, and subsequent lawsuit against Bruce Johnson formed a basis for Correct's claims and among the damages sought were additional wages paid to Bruce Johnson. These allegations remained consistent in the Second Amended Counterclaim filed on April 29, 2021 (Doc. 82, pg. 63-64, ¶32-33, pg. 74-75, ¶53-54, pg. 92-93, ¶109, pg. 94, ¶118, pg. 99-100, ¶140-141), the Third Amended

Counterclaim filed on July 21, 2021 (Doc. 102, pg. 17-18, ¶32-33, pg. 23, ¶43, pg. 28-29, ¶53-54, pg. 46-47, ¶109, pg. 48, ¶118, pg. 53-54, ¶140-141), and the currently operative Fourth Amended Counterclaim filed on August 2, 2021 (Doc. 105, pg. 17-18, ¶32-33, pg. 22-23, ¶41-43, pg. 28-29, ¶53-54, pg. 46-47, ¶109, pg. 48-49, ¶118, pg. 50, ¶124-125). Smart has not asserted an affirmative defense based on any purported failure on the part of Correct to disclose damages. (Doc. 108, pgs. 20-28).

Finally, Smart and Correct exchanged Supplements to their Rule 26 Disclosures to identify damages by count. (Correct's Supplemental Disclosure at Doc. 194-1). The September 27, 2021 Supplemental Disclosure served by Correct on Smart disclosed that pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Correct would be calculating the additional wages from the hiring of Bruce Johnson from his payroll records. (Doc. 194-1, pg. 4). The Supplemental Disclosure served by Correct also disclosed that the additional wages from the hiring of Bruce Johnson were being sought as damages in Count IV (Breach of Duty of Good Faith and Fair Dealing as to Sebastian County) (Doc. 194-1, pgs. 12-13), Count V (Tortious Interference as to Sebastian County) (Doc. 194-1, pgs. 13-14), and Count VI (Unfair Competition) (Doc. 194-1, pgs. 14-16) of the Fourth Amended Counterclaim, which was filed by Correct on August 2, 2021. The Correct payroll records for Bruce Johnson were then provided to Smart through discovery initially on December 14, 2021, and the payroll records from each subsequent year have

been produced to Smart since that time. As set forth above, Correct adequately and timely disclosed that it was seeking as damages the wages paid to Bruce Johnson.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 15, 2024, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

HARLLEE & BALD, P.A.


By: /s *Kimberly A. Bald*
    KIMBERLY A. BALD, Trial Counsel
    Florida Bar No.: 0434190
    ADAM MOHAMMADBHOY
    Florida Bar No.: 0137367
    JAMES E. LYNCH
    Florida Bar No: 0046219
    202 Old Main Street
    Bradenton, FL 34205
    Telephone: 941-744-5537
    Facsimile: 941-744-5547
    E-mail: KAB@harlleebald.com
    E-mail:  AM@harlleebald.com
    E-mail: JEL@harlleebald.com
    E-mail:  BLY@harlleebald.com
    E-mail: LS@harlleebald.com
    Attorneys for Correct Solutions, LLC
    a/k/a Correct Solutions Group


    and

    LUKE F. PIONTEK
    Louisiana Bar No. 19979
    DANIEL T. PRICE
    Louisiana Bar No. 39500
    Roedel, Parsons, Blache,
    Fontana, Piontek & Pisano

8440 Jefferson Highway, Suite 301
Baton Rouge, LA. 70809
Telephone: 225/929-7033
Facsimile: 225/928-4925
Email: LPiontek@roedelparsons.com
Email: Dprice@roedelparsons.com
E-mail: JSulzer@roedelparsons.com
Co-Counsel for Defendants Correct
Solutions, LLC