UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

       Plaintiff,

vs.                           CASE NO. 8:20-cv-01469-WFJ-TGW

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Defendant.

_____/

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

       Counter-Plaintiff,

vs.

SMART COMMUNICATIONS HOLDING, INC.
and SMART COMMUNICATIONS COLLIER, INC.,

       Counter-Defendants.

_____/

## TRIAL BRIEF OF CORRECT SOLUTIONS, LLC

Correct Solutions, LLC respectfully submits its Trial Brief for the non-jury trial commencing on August 19, 2024, before The Honorable William F. Jung.

### The Parties and Background Facts

Correct Solutions, LLC ("Correct") provides an inmate telephone platform to correctional facilities. Correct charges inmates or their contacts on a per-minute basis for use of the telephone services and shares a portion of the revenue with its

correctional facility customers. Correct's telephone services are provided to customers using the Nexus Inmate Telephone ("Nexus") platform, which Correct acquired from Lattice, Inc. ("Lattice"). Correct relied on Lattice to provide maintenance, service and upgrades for the Nexus platform. Correct does not provide tablets, electronic mail or video services. Rather, Correct contracts with other vendors to provide tablets, electronic mail, video and related services to Correct's customers as a subcontractor for Correct. The subcontractors have no direct contracts with Correct's customers. The trial of this action will pertain to three of Correct's correctional facility customers, namely Washington County ("Washington"), Sebastian County ("Sebastian") and Bowie County ("Bowie").

Smart Communications Holdings, LLC ("Smart") provides tablets and kiosks to correctional facilities for inmates to have access to email communications, video visitation with friends and family, games, movies and periodicals and to receive hard copy mail electronically. Friends and families of inmates purchase credits through Smart's website which they use to send messages to inmates. If they share the credits with the inmates, the inmates can use the credits to send a message back or to purchase other services such as games, movies, and video visitation. Neither the correctional facilities nor the inmates can purchase credits from Smart.

The business relationship between Correct and Smart began in May 2017. When the relationship began, Smart was not a direct competitor of Correct in the telecommunications arena because Smart did not offer telephone equipment or services to correctional facilities. Correct was interested in offering tablets and

electronic communication services to its correctional facility customers and was meeting with potential vendors to provide those services. For a brief time in 2016, Correct deployed a Lattice-manufactured iMate handheld device at two facilities for beta testing only, but the device was a failure and created safety issues. As a result, Correct pulled all devices and began searching for subcontractors who could provide tablets and electronic communications services.

Mark Turner of Correct met Jon Logan of Smart at a trade show in May 2017. Thereafter, Smart gave a presentation of its equipment and capabilities at Correct's office in Louisiana. Jon Logan gave a power point presentation to display the services and equipment Smart represented it was already providing and would provide for Correct's customers. Smart brought a first-generation SmartTablet to the presentation. Although the tablet was passed around and could be turned on, none of the services were available on the tablet at the presentation. This was the first tablet that Correct representatives had seen or touched. During the presentation, Smart represented its tablets were correctional grade and were appropriate for an inmate environment. Smart also represented it had the capability and expertise to provide the proper equipment and timely services which Correct sought to offer to its customers. At the initial presentation Jon Logan concealed that the SmartTablet was only in the development stage, that Smart had not yet deployed the SmartTablet at any correctional facility, and that Correct's customers would unwittingly serve as "beta testers" and test sites for Smart's SmartTablet. Jon Logan also concealed that he is a convicted felon, a material fact since Correct's customers are correctional facilities.

3

Correct dedicates significant resources, time, and human capital to develop and retain its business relationships with the roughly 80 facilities it serves. Correct has an excellent relationship with its customers. The evidence will prove that Smart's relationship with the three facilities at issue (i.e., Washington, Sebastian and Bowie) was poor and was caused entirely by Smart's defective equipment and poor service.

### The Master Services Agreement

In late July 2017, Robert Deglman of Smart and Mark Turner of Correct began negotiating the terms of the Master Services Agreement ("MSA") and the schedule of services to be used for Correct's customers. Mr. Turner and Mr. Deglman will both testify that all negotiations of the terms of the MSA were solely between them. Jon Logan did not participate. The MSA between Smart and Correct applied to every correctional facility where Smart became a subcontractor of Correct. The schedules were specific to the facilities and were to describe the equipment and services that Smart represented to the facility it would provide.

Mr. Deglman provided Mr. Turner with the initial draft MSA. The draft included Section 7 ("Limitation of Liability") and Section 6 ("Term") which included a seven-year term with automatic one-year renewals unless "either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term." The seven-year term was not acceptable to Mr. Turner because there were contracts already in place between Correct and several facilities for terms less than seven years. Mr. Turner did not want to obligate Correct for longer than it was under contract with the facilities. Although Correct enjoyed great

relationships with its customers and the contracts normally renewed, Mr. Turner could not guarantee future contracts with any facility. Thus, Mr. Turner revised the MSA to provide that its term would be "coterminous" with the term of the particular contract between Correct and its customer. The non-renewal provision in Section 6 and liability waiver in Section 7 remained in all future drafts and in the final MSA. Mr. Turner was not willing to sign an MSA that did not include the 90-day non-renewal notice provision. The MSA was signed by Smart and Correct on August 31, 2019 and September 13, 2019, respectively. (J1).

The term "coterminous" and the non-renewal language in Section 6 have been argued throughout this case. "Coterminous" means the term of the MSA and Schedule for each of the facilities at issue is the same as the term of the contract between the facility and Correct. If the facility renewed Correct's contract, and neither Correct nor Smart sent the 90-day non-renewal notice, the MSA and Schedule for that facility renewed. However, Section 6 allowed both Correct and Smart to sever the conterminous connection. Pursuant to Section 6, Correct and Smart both had the ability to non-renew the MSA and related schedule by providing notice at least 90 days before the contract between Correct and its customer renewed. Thus, if the facility renewed its contract with Correct, the MSA and Schedule also renewed unless either Correct or Smart had given written notice of non-renewal 90 days before the renewal of the facility's contract with Correct. Smart has asserted "party" in Section 6 means the correctional facility. Mr. Turner and Mr. Deglman will confirm the term "party" in the MSA only refers to Correct and Smart.

5

### Smart's Defective Equipment and Poor Service

In late 2017 Smart made presentations to Washington and Sebastian to demonstrate the equipment and services it would provide to those counties. Washington was a customer of Correct since September 2014 and Sebastian became a customer in April 2017. Smart was selected based on the representations it made to Washington and Sebastian during the presentations. Both facilities will testify that putting their trust in Smart was a mistake.

Tablets were not provided to Washington until more than 10 months after Smart signed the Schedule and many of the services promised by Smart were not provided or never worked. Smart represented it had the ability to provide remote video visitation on its tablets, a feature that was very important to the Sheriff and staff at Washington. Although the Schedule drafted by Smart for Washington did not list remote video visitation, Jennifer Tongate, Smart's sales representative, committed Smart to provide remote video visitation on the tablets at Washington. Smart sent an employee to the facility to try to get remote visitation working, but it never worked. Washington experienced issues with the promised facial recognition on the video visitation. Representatives of the Washington facility will describe what inmates with dark colored skin were required to place on their heads to be seen. On July 31, 2019, Captain Alan Johnson notified Smart and Correct of Washington's displeasure with Smart, and that Washington intended to look for a new vendor to replace Smart.

Smart represented to Sebastian during the presentation that it would provide games, movies, and books on the tablets, but none were ever provided. Smart failed to

6

include games, movies and books in the Schedule but Jennifer Tongate confirmed that Smart committed to provide those services to Sebastian.

In all three facilities at issue in this case, Smart obligated itself to provide ruggedized, correctional grade equipment, whether it be tablets or kiosks. (J31, J40, J41). The Schedule required Smart to provide the equipment on a stated equipment to inmate ratio and to provide the labor, hardware and software needed for the continued operation, maintenance and networking of the electronic system. Smart represented in each Schedule that it had the ability to monitor its equipment at the facility so that it could make repairs and needed maintenance "before a problem is reported."

Smart's tablets and kiosks were far from ruggedized or correctional grade. Representatives for Washington, Sebastian and Bowie will explain the tablets were easily broken and dismantled, and kiosks regularly froze. Washington and Albert Cantu of Bowie describe the tablets as something you can buy at Walmart. Smart's response time to issues was poor and dilatory, and as to Sebastian and Bowie, almost nonexistent at the end. Security risks were created for employees and inmates because Smart's defective equipment was turned into shanks and used to charge illegal cell phones. Each facility was unhappy with Smart because of the poor quality of the tablets and kiosks, the lack of promised services and Smart's failure to address problems.

Commencing in February 2018, Sebastian and Correct reported issues with tablets breaking and Smart's failure to comply with its contract obligations. The same issues occurred at Washington soon after the tablets were finally installed in early

2019, and at Bowie in 2019 and early 2020. Complaints from the facilities became more frequent throughout 2018 and in 2019, and Correct's customers were reaching their breaking point with Smart's poor equipment, poor service and lack of response. Correct was concerned it would lose its customers. As a result, Correct commenced discussions with Tech Friends, a competitor of Smart, about possibly replacing Smart at Sebastian and Bowie. Correct and Tech Friends never discussed Washington. Although the discussions continued through August 2019, Mr. Turner advised Correct's employees that Correct could not bring in Tech Friends while Correct remained under contract with Smart. Tech Friends never installed any equipment or services at any of the facilities in 2019. Correct terminated all discussions with Tech Friends as to Sebastian and Bowie after this lawsuit was filed in August 2019.

Soon after the first generation black SmartTablet was installed in 2018, Jon Logan began developing a new second generation blue SmartTablet, which was an entire redesign of the external casing of the tablet and allegedly reduced or eliminated the breakage problems the facilities were experiencing with the first generation SmartTablet. By the end of 2018 or start of 2019, Smart was no longer deploying the first generation SmartTablet at correctional facilities and was offering correctional facilities it's second generation SmartTablet. That was not the case for Correct's customers, Sebastian and Bowie, as Smart continued to replace broken tablets with its first generation tablets throughout 2019 until it ceased providing equipment to Sebastian and Bowie in 2020.

### The Lattice Acquisition and Smart's Initial
### Attempt to Steal Correct's Customer

In early 2019, Smart and/or its sister company, Smart Communications Collier, Inc., ("Smart Collier") acquired the licensing rights from Lattice for certain software systems. The maintenance, support and updates to the Nexus platform provided by Lattice were vital to Correct's ability to operate and provide its telecommunications services to its customers. After the Lattice acquisition, Smart and/or Smart Collier hired virtually all of Lattice's employees, including Bruce Johnson, a thirty-six-year employee who had provided the maintenance, support and updates for Correct's Nexus platform for seven years. Jon Logan sought to prevent Mr. Johnson from providing any further support for Correct. After Smart and Smart Collier acquired Lattice and its software licensing rights and hired Bruce Johnson, they attempted to deprive Correct of the essential maintenance, support and updates to the Nexus platform required by Correct to provide inmate telephone services to its customers. This was done so that Correct would be unable to continue to provide its telephone services to its customers and Smart and Smart Collier could steal Correct's correctional facility telephone customers.

Email exchanges in April 2019 between Frank Turner of the City of St. Louis, Missouri (one of Correct's largest clients) and Jennifer Tongate, the Smart representative assigned to Correct's correctional facility customers, reveal that Ms. Tongate provided solicitation materials from Smart offering to provide the same inmate telecommunications services Correct was under contract to provide for St.

Louis. Ms. Tongate's direct solicitation included the offer that Smart would pay St. Louis a 100% phone commission if St. Louis contracted with Smart to provide all equipment and services, including telephone services at its facility. Correct believed the solicitation by Smart violated the confidentiality requirements in the contracts with Smart and, on July 17, 2019, Correct provided written notice of termination to Smart. Smart filed its Verified Complaint on August 2, 2019. After suit was filed and on August 30, 2019, the parties signed a stipulation to preserve the status quo which required the parties to continue to perform under the MSA and Schedules. (J122). The stipulation provided that neither party could solicit, attempt to hire, or hire any employee of the other, but Bruce Johnson was excluded from this prohibition. Notwithstanding the stipulation, Smart continued to breach its duties under the MSA and Schedules for Sebastian, Washington and Bowie.

### Smart Breached the MSA and Schedules for
### Sebastian, Washington and Bowie

*Sebastian*

Smart breached its obligations under the MSA and Schedule for Sebastian and, despite a proper notice to cure, Smart did not cure. Rather, Smart used its defective tablets and refusal to cure to try to steal Correct's telephone business at Sebastian.

On September 13, 2019, Correct sent a Notice to Cure to Smart which addressed the defective equipment and performance at Sebastian. This Court ruled on summary judgment that Correct's Notice complied with Section 9 of the MSA exactly, and Correct was entitled to summary judgment on Smart's claim that the sending of the

Notice was a breach of contract. As the Court held, "[Correct] described the default – all in terms mirroring the requirements set forth in the MSA and the Schedule – and advised Smart that it has thirty days to cure that default." (Doc. 234, pg. 27). As stated in the Notice, Smart's tablets at Sebastian were not "correctional grade" in any functional sense and, as Smart was fully aware, the SmartTablets were being easily dismantled by inmates and fashioned into crude weapons. It is undisputed that Smart only provided Sebastian the original SmartTablet and not the "enhanced" second generation SmartTablet. Rather than cure, on September 17, 2019, Smart filed an Emergency Motion to Temporarily Enjoin Improper Termination of Agreement.

A hearing occurred in state court on Smart's Emergency Motion. Captain Dumas of Sebastian attended the hearing. At the end of the hearing, the state court judge instructed the parties to meet with Captain Dumas to discuss the problems Sebastian was experiencing and possible cures. Smart did not discuss the problems and possible solutions, but instead insulted Captain Dumas and called him a liar. That encounter "sealed the deal" that Captain Dumas was done with Smart.

In September 2019, Jon Logan tried to stop Bruce Johnson from providing further maintenance, support and updates to Correct's Nexus platform. Because Lattice under Smart's control was not continuing to support Correct's Nexus platform, on September 19, 2019 Correct hired Bruce Johnson to provide the required maintenance, support and updates for Correct's Nexus platform. On September 20, 2019 – the day of the emergency hearing – Smart and Smart Collier filed suit against Bruce Johnson in state court for injunctive relief and monetary damages based on, in

11

part, Bruce Johnson "providing services to its direct competitor, Correct Solutions." (D25). The suit was dismissed one year later. (D26; RJN - Doc. 286).

In the fall of 2019, Smart failed to cure or address the issues raised in the Notice to Cure, including failing to provide Sebastian with ruggedized, correctional grade tablets as required by the MSA and Schedule. As a result of Smart's failures, Correct sent a Notice of Non-renewal for Sebastian on November 21, 2019 informing Smart that the MSA and Schedule for Sebastian would not renew if the facility's contract with Correct renewed.

Meanwhile Smart sought to steal Sebastian as a customer from Correct. Jerry Lipsey of Smart made an unscheduled visit to Sebastian on October 30, 2019 and met with Captain Dumas to try to obtain Sebastian for Smart. Captain Dumas advised Mr. Lipsey of the numerous issues Sebastian had encountered with the defective tablets and poor service provided by Smart. Mr. Lipsey sent a memo to Jon Logan reporting his conversation with Captain Dumas.

As part of their efforts to steal Correct's customers, on November 27, 2019 Smart and Smart Collier submitted a written proposal to Captain Dumas for Smart to provide telecommunications services and "our upgraded tablet system at Sebastian". (J131). In the proposal Smart disclosed to Sebastian that Smart had upgraded tablets (i.e., the second generation SmartTablet) since "long ago" and that Smart "would have been glad to provide Sebastian County with options for upgrading to our newest tablet system long ago, especially in light of the issues your facility communicated with us, but the contract we are bound by, through Correct Solutions, does not provide for or

even contemplate such an upgrade." Smart made this false assertion because it was only willing to provide correctional grade tablets to Sebastian if Sebastian immediately signed a five-year contract with Smart and included the inmate telecommunications services being provided at that time by Correct. Thereafter, Smart continued to ignore the issues at Sebastian and refused to cure, including continuing to provide broken and defective tablets. Just prior to Sebastian terminating its contract with Correct, Sebastian asked for a technician to come to the facility. Jon Logan declined, stated that Smart was not available as requested and expressly referenced that Sebastian had not responded to Smart's proposal – an unmistakable signal that unless the proposal was accepted, Sebastian's problems would continue to be ignored by Smart. (J145).

Smart's actions resulted in Sebastian non-renewing Correct's contract. Based on the contract between Correct and Sebastian, Sebastian could issue a non-renewal notice at any time prior to the April 24, 2020 renewal date. Given the pending renewal date and the intentional refusal to cure by Smart, Correct filed a Motion for Order Terminating Sebastian County Contracts on February 26, 2020, which was set for hearing on March 27, 2020. Just prior to the filing of the Motion, Sebastian began efforts to non-renew Correct's contract and to obtain separate proposals and contracts for telephone services and for tablets through Requests for Information ("RFI"). Rick Ferguson was advised by Sebastian of its intent to move forward with RFIs and, as is customary in the industry, Rick Ferguson provided a sample form RFI used by another county. (J149). On March 3, 2020, prior to the hearing on Correct's Motion, Sebastian sent Correct a notice of non-renewal. (J150). As Judge Badalamenti ruled on summary

13

judgment, the schedule for Sebastian expired as a matter of law because Sebastian non-renewed with Correct and the Court declared "the MSA and Schedule for Sebastian has expired." (Doc. 234, pgs. 9-10).

In March-April 2020, Sebastian sent out separate RFIs for telephone services and for tablet services. Smart chose not to submit a response. Numerous telephone providers, including Correct, responded to the RFI for telephone business. (J166, J169). Correct continued providing its telephone services during the RFI process because the inmates would otherwise lose their ability to communicate to family and friends which creates a security issue and unrest in the facility. Smart also continued to provide its equipment and services at Sebastian until the summer of 2020, well after the contract expired in April 2020. After reviewing multiple responses from numerous telephone vendors and a thorough vetting process, Sebastian accepted the proposal from Correct and entered into a new contract, which was approved by The Honorable Judge David Hudson, for the inmate telecommunications services only, but at a reduced rate. (J180). Sebastian awarded the tablet contract to Tech Friends and executed a direct contract with Tech Friends. Correct was not in any way involved with the Tech Friends submission or the Tech Friends contract. Correct receives no revenue from Tech Friends for the equipment and services at Sebastian.

## *Washington*

Correct sent a Notice of Non-Renewal for Washington on October 4, 2019 informing Smart that the MSA and Schedule between Correct and Smart for Washington would not renew if the facility's contract with Correct renewed. The

14

notice was authorized under the MSA and was effective, but it was not the cause of Smart's removal from Washington. On December 11, 2019, Washington was advised it was in breach of its contract with Summit Food Services which gave Tech Friends exclusive rights to provide email services. (J133). Thus, by certified letter dated December 13, 2019, Washington notified Correct that Smart must cease and desist from providing email services at Washington, which letter was forwarded by Correct to Smart. (J133, J134, J135).

In response, Smart filed another emergency motion, and a hearing was held in December 2019. Captain Alan Johnson of Washington attended the hearing and testified that if the state court judge ruled that Smart must continue as the subcontractor under the contract between Washington and Correct, Washington would terminate its contract with Correct. On January 9, 2020, Jerry Lipsey of Smart contacted Washington to try to get the facility to sign a contract directly with Smart. Mr. Lipsey was informed by Washington that it was not interested in any further relationship with Smart. (D10). Instead of cooperating with Washington for a smooth transition, Jon Logan and Jim Logan decided to shut down Smart's system with no notice to Washington, the inmates or their families, and leave the facility "high and dry." (D12).

*Bowie*

Correct and Smart executed the Schedule for Bowie on November 15, 2017 (J40). Problems were encountered at Bowie with the SmartTablet, including that the tablets were easily broken and inmates were using the tablets to hide contraband and

charge cell phones. Correct attempted to have Smart address the issues at Bowie but Smart was not responsive.

Starting in April 2020, Smart attempted to contract directly with Bowie. Smart offered to upgrade its tablets at Bowie if Bowie would sign a direct contract for a longer period with Smart. Bowie declined. Smart continued its efforts to obtain a direct contract with Bowie through the summer of 2020. After learning of these efforts, Correct contacted Smart to determine if it was willing to provide its upgraded tablets with no contract. No response was received, so Correct sent a Notice to Cure for Bowie on September 8, 2020. In accordance with Section 9 of the MSA, Correct outlined the breaches of the MSA and Schedule and gave Smart 30 days to cure. Although Smart claims in this lawsuit that it tried to upgrade the tablets, Smart made no effort to cure or to install upgraded tablets. Smart continued to provide the original black SmartTablet to Bowie, many of which were refurbished, did not work, had missing screws, and had broken screens. Bowie was facing security issues from Smart's defective equipment. On March 22, 2021, seven months after the Notice to Cure was sent and after the entry of the Order by Judge Moody on March 12, 2021 ruling that Correct may exercise its rights under the MSA and terminate the MSA and Schedule for Bowie (Doc. 70), Correct terminated the MSA and Schedule for Bowie.

### Smart's Claims

Smart seeks damages as to Washington based on its assertion that (a) Correct used or allowed Tech Friends to provide inmate communications services at Washington that conflicted with Smart's exclusive rights, (b) Correct terminated Smart

16

prior to the end of its coterminous term, and (c) Correct sent an improper Notice of Non-Renewal. However, Correct was not involved with Tech Friends at Washington, Correct has never allowed Tech Friends to provide any services for Washington and Correct did not cause the removal of Smart. Had Washington not terminated Smart as the email provider based on its separate contract, Washington would have terminated its contract with Correct to get rid of Smart. Finally, the Notice of Non-Renewal sent by Correct pursuant to Section 6 of the MSA resulted in the expiration of the MSA and Schedule as a matter of law on January 3, 2020. Smart was the exclusive provider to Washington under its contract with Correct and it provided services and generated revenue beyond the expiration of the MSA and Schedule. Thus, there was no breach and Smart suffered no damages.

Smart also seeks damages as to Sebastian based on its assertions that (a) Correct provided exclusive rights to Tech Friends at Sebastain while the MSA and Schedule with Smart remained in effect, and (b) Correct elicited a non-renewal notice from Sebastian for the sole purpose of removing Smart. The issue for trial as to issue (a) is whether Tech Friends "began providing its tablet services under the [MSA with Correct] in June 2019 while Correct was still contractually obligated to provide exclusivity to Smart under the Sebastian Schedule." (Doc. 234, pg. 31). Tech Friends never installed any tablets or provided services to Sebastian under the June 2019 MSA with Correct at any time, and the first tablets and related services provided by Tech Friends at Sebastian were pursuant to its direct contract with Sebastian in July 2020. (J182). As to issue (b), the Court denied summary judgment finding that there was a

17

material issue on this point. (Doc. 234, p. 33). In denying Smart's Motion for Partial Summary Judgment the Court stated that a genuine issue remained for trial as to whether Sebastian non-renewed its contract with Correct because "Sebastian was dissatisfied with services provided by CSG (through Smart)". (Doc. 232, pg. 49). Sebastian non-renewed its contract with Correct because of the defective equipment and poor service provided by Smart, the poor treatment of Captain Dumas while in Florida, Smart's offensive proposal, and Sebastian's desire to contract directly with its vendors and receive revenue from the tablets.

Smart seeks damages against Correct as to Bowie based on its assertions that (a) Correct instructed Bowie to refrain from communicating with Smart, (b) Correct failed to provide Smart with meaningful access to Bowie, (c) Correct sent an improper notice to cure and refusing to allow a tablet upgrade, and (d) by improperly terminating the MSA and Schedule. The Court entered summary judgment for Correct on the identical assertions under (a) and (b) as to Washington and Sebastian and, as with those facilities, the evidence as to Bowie refutes these claims. The Notice to Cure sent by Correct as to Bowie tracked the language and requirements in the MSA and Schedule, and consistent with the Court's finding on summary judgment that the Notice to Cure for Sebastian was valid and not a breach, Correct's notice regarding Bowie was valid. The termination was also valid as Smart never cured and made no effort to cure.

### Correct's Claims Against Smart

Correct sued Smart for breach of contract, breach of good faith and fair dealing, tortious interference, and unfair competition and seeks to recover damages it suffered

18

from the reduced revenue through its new contract with Sebastian and the wages paid to Bruce Johnson that were required to keep its Nexus telephone platform operational, plus punitive damages. Witnesses for Sebastian will demonstrate Smart's breach under the MSA and the Schedule, and the testimony of Correct, Jon Logan, Bruce Johnson and Sebastian witnesses will show Smart's actions constitute unfair competition and tortious interference. *See, Remember Everyone Deployed, Inc. v. AC2T, Inc.*, 2021 WL 1200421 (S.D. Fla. Mar. 8, 2021) (the law of unfair competition is the umbrella for causes of action arising out of business conduct which is contrary to honest practice in commercial matters); *Nieves v. Donarra XT, LLC*, 2023 WL 10947150 (M.D. Fla. Sept. 25, 2023) (the elements of a tortious interference with business relations claim are (i) existence of a business relationship under which the plaintiff has legal rights, (ii) defendant's knowledge of the relationship, (iii) intentional and unjustified interference with the relationship by defendant, and (iv) damage to plaintiff as a result of the interference).

## Smart's Alleged Damages Are Barred

Smart's damages constitute consequential damages and, as a matter of law, they are barred by Section 7 of the MSA. Consequential damages "do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1222 (Fla. 1st DCA 2019), *quoting Hardwick Properties, Inc. v.*

*Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998). *See also, Crmsuite Corp. v. General Motors Co.*, 2021 WL 914170 (M.D. Fla. Mar. 10, 2021) (dismissing claims for lost profits based on a similar contractual provision). Stated another way, consequential damages are those that do not "flow[] directly from the parties' immediate transaction." *HCA Health Servs. of Fla., Inc. v. Cyberknife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 471 n.2 (Fla. 4th DCA 2016).

As the Court is aware, Smart calculates its damages based on the loss of future sales of credits to the families and friends of inmates. Smart concedes that it "collected revenue in its ordinary course when facility inmates exchanged messages with outside contacts, without involvement of [Correct]." (Doc. 93 at ¶ 18). Based on the damages sought by Smart, Section 7 of the MSA and the applicable law, all damages sought by Smart are barred.

## Conclusion

Based on the evidence to be presented at trial and application of the law, the Court should enter judgment in favor of Correct on all of Smart's claims as well as Correct's claims against Smart.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 14, 2024, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

HARLLEE & BALD, P.A.

By: */s/ Kimberly A. Bald*
  KIMBERLY A. BALD, Trial Counsel
  Florida Bar No.: 0434190
  ADAM MOHAMMADBHOY
  Florida Bar No.: 0137367
  JAMES E. LYNCH
  Florida Bar No: 0046219
  202 Old Main Street
  Bradenton, FL 34205
  Telephone: 941-744-5537
  Facsimile: 941-744-5547
  E-mail: KAB@harlleebald.com
  E-mail: AM@harlleebald.com
  E-mail: JEL@harlleebald.com
  E-mail: BLY@harlleebald.com
  E-mail: LS@harlleebald.com
  Attorneys for Correct Solutions, LLC

   and

  LUKE F. PIONTEK
  Louisiana Bar No. 19979
  DANIEL T. PRICE
  Louisiana Bar No. 39500
  Roedel, Parsons, Blache,
  Fontana, Piontek & Pisano
  8440 Jefferson Highway, Suite 301
  Baton Rouge, LA. 70809
  Telephone: 225/929-7033
  Facsimile: 225/928-4925
  Email: LPiontek@roedelparsons.com
  Email: Dprice@roedelparsons.com
  E-mail: JSulzer@roedelparsons.com
  Co-Counsel for Correct Solutions, LLC