UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

  Plaintiff,

vs.

CORRECT SOLUTIONS, LLC,
a/k/a CORRECT SOLUTIONS
GROUP, LLC,

  Defendants.
_____/

CORRECT SOLUTIONS, LLC,
a/k/a CORRECT SOLUTIONS
GROUP, LLC,

  Counter-Plaintiff,

vs.

SMART COMMUNICATIONS
HOLDING, INC. and SMART
COMMUNICATIONS
COLLIER, INC.

  Counter-Defendants.
_____/

Case No: 8:20-cv-1469-WFJ-TGW

## TRIAL BRIEF OF SMART COMMUNICATIONS

Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. and Counter-Defendant Smart Communications Collier, Inc. (collectively, "Smart") file their Trial Brief in advance of the August 19, 2024 trial against Defendant/Counter-Plaintiff, Correct Solutions, LLC ("Correct").

A.  **Introduction and Background**

Correct called on Smart to provide messaging and related services at its correctional facility customers because Correct was at risk of losing those customers to an all-inclusive competitor like Securus or GTL. Smart demonstrated its products and services to Correct and at least some of Correct's customers. Correct handled Smart's tablets during these demonstrations and accepted them as the tablets that Smart would install at the customer facilities. Ultimately, Smart and Correct entered into a Master Services Agreement ("MSA") and Schedules for eight customer facilities, three of which remain at issue—Washington, Bowie, and Sebastian Counties.

When Correct learned that Smart entered the phone business in December 2018, Correct began its "exit strategy" from Smart. Quite simply, Correct was not interested in partnering with a phone competitor. By March 2019, Correct had a comprehensive draft master services agreement in place with Smart's tablet competitor, Tech Friends. Once the agreement was finalized and Tech Friends was preparing to take Smart's place in each account, Correct sent Smart a July 17, 2019 letter purportedly terminating Smart from all eight customer facilities immediately for sending a marketing email to the City of St. Louis. Smart then filed this lawsuit to stop the unlawful termination attempt. This Court ruled that Smart did not use Correct's confidential information and that the attempted termination was ineffective. Doc. 232, p. 38.

Correct moved on to other exit strategies. Correct sent Smart notices of non-renewal pursuant to Section 6 of the MSA. But those, too, were ineffective because Correct continued to renew its facility contracts and, as described below, Smart's services were coterminous with those contracts and all renewals. Correct explored other exit strategies that will be discussed at trial. While Correct's relationships with Smart ended in different ways in Washington, Bowie, and Sebastian, they have common themes. Correct failed to honor perhaps its most fundamental obligation under the MSA at varying stages—providing Smart with exclusive messaging rights at the customer facilities. And then Correct proceeded to renew its contracts and/or status with the customer facilities without including Smart in the renewals.

**B.** <u>The Meaning of the MSA</u>

There are several relevant provisions of the MSA.

<u>Paragraph 2: Exclusivity</u>

…During and subject to the terms and conditions of this Agreement, **Provider [Smart] shall be the sole and exclusive provider in lieu of any other third party of the inmate communications services contained within the Schedules, including inmate messaging** and email, texting, photo delivery… MSA, ¶ 2.

Any ambiguity regarding whether the parties intended that Smart be the exclusive provider "under CSG," as CSG argued at summary judgment, or whether CSG incurred the obligation to grant Smart complete exclusivity for messaging at each facility, will be resolved by the testimony. Both parties have testified that they would not put their revenue-generating services (phones for CSG) into a facility that had

3

another vendor providing those same services. If CSG was not confident about its ability to provide that level of exclusivity, then it should not have agreed to do so.

Section 6: Term

Coterminous means that the term of the MSA and Schedule between Smart and CSG for each customer facility is the same as the term of the agreement between CSG and that facility. This includes all renewals of the CSG/facility agreement. The parties clearly intended and understood this, as evidenced by CSG's promise to amend its contract with the facility to identify and include Smart's services. Smart, thus, became a party to the CSG/facility contract. In reality, CSG only secured the amendment for the first facility on which CSG and Smart partnered, Avoyelles Parish. But Mark Turner testified that the parties did Avoyelles correctly and that Correct should have gotten the other amendments, but things were simply moving too quickly. Either way, Turner and Correct recognized that a facility could not renew Correct's contract without including Smart in the renewal.

Correct's position that it could simply send Smart a notice of non-renewal is not supported by the facts or the law. If Correct was right, then coterminous would lose its meaning and Smart would not get the benefit of the renewal terms. Moreover, the evidence will show that the parties intended to insert Smart's services into Correct's contracts with the facilities. A facility could not renew part of the amended contract, i.e., Correct's phone services, without renewing other parts of the contract, i.e., Smart's messaging and related services.

4

Section 7: Limitation of Liability

Smart has briefed its position on Section 7. The evidence will bear out that Smart's damages were direct because of the nature of the transaction and relationship between Smart, CSG, and the facilities. Smart bargained for the revenue it would earn by virtue of its access to the facilities and their captive customers. Once that access was removed, Smart was immediately damaged.

Section 9: Default and Termination

Smart bargained for an opportunity to cure any performance related issues and Correct promised to provide that opportunity. If Correct had issues with Smart's performance, it could not ignore its obligation by choosing, instead, to send Smart a non-renewal notice. *See World Triathalon Corp. v. SRS Sports Center SDN.BHD,* No. 8:04–CV–1594, 2005 WL 1924749, at *3 (M.D. Fla. Aug.10, 2005) (contractual default provision requires strict compliance).

Further, Smart could not have breached any of its contracts with Correct on performance grounds unless and until Correct provided a notice and opportunity to cure, which went uncured. *See Abecassis v. Eugene M. Cummings, P.C.,* 09-81846-CIV, 2010 WL 9452252, at *5–6 (S.D. Fla. June 3, 2010), *aff'd,* 467 Fed. Appx. 809 (11th Cir. 2012) (barring breach of contract claim when plaintiffs failed to provide notice of the alleged breach and an adequate opportunity to cure).

Section 25: Completeness of Agreement

This is a standard integration clause, which precludes reliance on any other oral agreements or representations. Correct intends to present evidence about

5

"representations" Smart made during demonstrations of its products and services. Quite simply, Correct could not rely on those representations as a matter of law, unless they were included in the written agreements between the parties.

### C. Correct Breached the MSAs for Washington, Bowie, and Sebastian

Correct breached each distinct contract with Smart related to Washington, Bowie, and Sebastian. Correct also, or alternatively, breached the implied covenants of good faith and fair dealing included within those contracts.

### i. Correct breached the MSA for Washington by failing to provide exclusive access, which led to Smart's removal.

Tech Friends was providing messaging services in Washington as a subcontractor of Summit during the entire tenure of Smart's presence at the facility. During the limited 18 months that Smart was allowed to provide its services and generate revenue in Washington, inmates sent more than 65,000 messages through the Tech Friends platform. Moreover, Smart's time in Washington was cut short because Correct failed to convey exclusive messaging rights to Smart in the first place. When Summit alerted Washington of its own exclusive rights to provide messaging services in Washington, Washington informed Correct that Smart must be removed from the facility. Correct forwarded Washington's correspondence to Smart and demanded that Smart exit the facility.

### ii. Correct breached the MSA for Bowie by failing to allow a cure.

Smart's products and services were performing well at Bowie by all accounts, including the Warden's Weekly Reports. Correct breached this contract by entering

into an agreement with Tech Friends to grant Smart's exclusivity to another provider. Later, in September 2020, without any request from Bowie, Correct sent Smart a default notice in which Correct demanded that Smart upgrade its tablets. Smart disagreed that it was in default but agreed to upgrade its tablets to the newer version. Correct acknowledged that Smart agreed to do so without the need for a new contract or extension of any kind, which Smart would customarily receive in exchange for the significant investment of a new tablet system. Smart followed up with efforts to install its new system. However, by that point in time, Correct and specifically Rick Ferguson, would not permit the upgrade because they did not want to continue to work with Smart. Correct then terminated Smart for failing to effectuate the very same cure Correct would not allow.

### iii. Correct breached the MSA for Sebastian by renewing without Smart.

Correct also breached the Sebastian contract by entering into the Tech Friends agreement and agreeing to provide Smart's exclusivity to a competitor. After this lawsuit was pending, Correct sent a notice to cure but did not end up terminating Smart based on the notice to cure. Instead, Ferguson told Sebastian to terminate Correct and then initiate a non-binding Request for Information process. Not surprisingly, Correct and Tech Friends prevailed, and Correct maintained its status as Sebastian's phone provider without its equipment ever being turned off or missing a day of phone revenue. Smart's position is that Correct's new contract is a de facto renewal of the contract with which Smart has coterminous rights.

> iv. **Correct unfairly competed when it conveyed Smart's exclusive rights to a competitor.**

As referenced above, Correct conveyed rights to Tech Friends that belonged to Smart. Correct and Tech Friends are both competitors of Smart to the extent that they pursue and bid on contracts at correctional facilities that require messaging services. Correct's conduct, which will be demonstrated at trial, of introducing customers to Tech Friends and facilitating those relationships, while signing its own expansive agreement with Tech Friends, amounts to unfair competition.

**D.   Smart's Damages**

Smart received only 18 months to generate revenue in Washington, 35 months in Bowie, and 27 months in Sebastian. Correct is still providing phone services under the same contracts with Washington and Bowie that were the subject of Smart's coterminous relationship. And Correct is still providing services to Sebastian under a new contract that was a de facto renewal of its prior contract. Thus, Smart's damages of the profits it lost by not being included in the renewals through the date of trial are not speculative.

In addition, Smart's lost profits damages are a direct result of the bargain with Correct for the reasons explained in its earlier briefing and considering the nature of the relationship between Smart, Correct, and the facilities, which will be evident throughout the trial.

### E.  Correct's Counterclaims are Meritless

#### i.  Correct's Tort Claims and Bruce Johnson's Wages

Correct did not disclose Johnson's wages as a basis for damages until 50 days after the close of discovery. Correct failed to comply with Rule 26 and, as such, Correct may not rely on this evidence or category of damages. *See* Fed. R. Civ. P. 37(c).

Even so, Correct's tort claims are legally insufficient and did not cause Correct to incur the loss of paying Johnson. With respect to Correct's tortious interference claim, Correct cannot prevail because Smart is not a stranger to the relationship between Correct and Sebastian. A sub-contractor (Smart) cannot be liable for tortious interference between the general contractor (Correct) and their customer (Sebastian). *See Williams Elec. Co., Inc. v. Honeywell, Inc.,* 772 F. Supp. 1225, 1235 (N.D. Fla. 1991). Correct's unfair competition claim is also insufficient, legally and factually. There is nothing improper about obtaining a license from a telephone platform provider (Lattice) to expand a business in the absence of any restrictive covenant prohibiting such expansion. Nor can a business be sued for instructing its employees not to work, on company time, for a competitor. To the extent Johnson's wages can even be categorized as "damages," the clear cause of those damages was simply that Correct was unprepared for an employee of a third party to go elsewhere.

#### ii.  Correct's Contract Claim and the Sebastian Contract-based Damages

First, Correct agreed to a relationship where Smart's services were coterminous with Correct's services to Sebastian. The legal effect of that relationship was that

9

Correct could not renew its contract with Sebastian without including Smart. Smart cannot be liable for asserting its accurate position on the meaning of coterminous.

When Correct obtained the new phone contract after the RFI process, it included a lower call rate than the prior contract included. The evidence will show that the lower rate had nothing to do with Smart. Correct volunteered the lower rate and, as such, cannot claim the rate difference as damages.

**F.    Conclusion**

Smart's trial presentation will be simple. Smart did not get what it bargained for. Once Correct realized that Smart became a competitor with its phone business, it looked for ways to get rid of Smart and close what it believed to be a better deal with Tech Friends. In doing so, Correct breached three contracts with Smart, causing Smart to incur direct lost profits damages.

*/s/ Brad F. Barrios*
Brad F. Barrios – FBN 035293
Trial Counsel
E-mail: bbarrios@tcb-law.com
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@tcb-law.com
David A. Hayes – FBN  096657
E-mail: dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 834-9191
Fax: (813) 443-2193
*Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on August 14, 2024, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

                                            */s/ Brad F. Barrios*
                                            Attorney