UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

     Plaintiff,

vs.                   CASE NO. 8:20-cv-01469-WFJ-TGW

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Defendant.
_____/

CORRECT SOLUTIONS, LLC, a/k/a
CORRECT SOLUTIONS GROUP, LLC,

     Counter-Plaintiff,

vs.

SMART COMMUNICATIONS HOLDING, INC.
and SMART COMMUNICATIONS COLLIER, INC.,

     Counter-Defendants.
_____/

## CLOSING ARGUMENT OF DEFENDANT/ COUNTER-PLAINTIFF, CORRECT SOLUTIONS, LLC

Defendant/Counter-Plaintiff, Correct Solutions, LLC ("Correct"), respectfully submits its Closing Argument for the Bench Trial held in this matter on August 19 through 23, 2024.

Correct is entitled to the entry of final judgment in its favor and against Smart Communications Holding, Inc. ("Smart") and Smart Communications Collier, Inc. ("Smart Collier"). The substantial competent evidence received at trial proved Correct's affirmative defenses and its claims in its Fourth Amended Counterclaim and negated Smart's claims in its Fourth Amended Complaint. All witnesses, including the numerous, disinterested correctional facility witnesses who dealt with Smart's products and services daily, proved that the tablets provided by Smart were not ruggedized or appropriate for correctional facilities, "party" and "parties" in the MSA means Smart and Correct, Smart failed to perform as required under its contracts with Correct and, commencing after the lawsuit was filed, Smart and Smart Collier attempted to destroy Correct's business so that they could steal Correct's customers.

The claims that were tried in this action were based on the contractual obligations of the parties under the Master Services Agreement ("MSA"), the Schedules for the three correctional facilities at issue and the contracts between Correct and those three correctional facilities, and the efforts of Smart and Smart Collier to steal Correct's customers which fell outside of Smart's contractual obligations. The MSA, which was effective on September 13, 2017, governed the contractual duties and responsibilities of Smart and Correct for any correctional facility customer where Correct subcontracted with Smart to provide equipment and services. (Doc. 346-1). The Schedules between Correct and Smart were specific to each of the three correctional facilities; Sebastian County ("Sebastian"), Bowie

County ("Bowie") and Washington County ("Washington"). (Doc. 346-31, 346-40, 346-41). Each Schedule was drafted by Robert Deglman of Smart and was intended to include all equipment and services Smart represented it would provide for the correctional facility. (Doc. 381-2, p. 39-40, 149:13-150:1; Doc. 363, 29:21-30:14).

### *The Claims as to Sebastian*

Many of Smart's allegations asserted for its claims against Correct as to Sebastian were resolved through summary judgment in favor of Correct. Judge Badalamenti ruled that there was no evidence to support Smart's allegations that Correct (a) instructed Sebastian to refrain from communicating with Smart, (b) failed to provide Smart access to Sebastian, (c) sent an improper notice to cure, (d) solicited complaints about Smart, (e) controlled Smart's communication with Sebastian, or (f) prevented Smart from responding to or dealing with the issues at Sebastian. (Doc. 234, p. 21-27, 32-33). Smart proceeded to trial on its Fourth Amended Complaint as to Sebastian on one remaining issue in Count V (breach of contract), two remaining issues in Count VI (breach of the implied covenant of good faith and fair dealing), and one remaining issue in Count X (unfair competition). (Doc. 93). Smart failed to prove any breach by Correct of any of the contractual provisions applicable to Sebastian, any breach by Correct of the implied covenant of good faith and fair dealing, or any actions by Correct that constituted unfair competition.

Correct proceeded to trial on its Fourth Amended Counterclaim as to Sebastian on Count III (breach of contract), Count IV (breach of the duty of good

faith and fair dealing), Count V (tortious interference), and Count VI (unfair competition). (Doc. 105). The substantial competent evidence introduced by Correct proved that Smart breached the MSA and Schedule for Sebastian and the duty of good faith and fair dealing by failing to provide ruggedized, correctional grade tablets as required by the Schedule, by failing to satisfy the tablet to inmate ratio mandated by the Schedule, and by failing to cure the problems experienced at Sebastian, including those outlined in the Notice to Cure. The evidence proved that Smart's actions and inactions resulted in the non-renewal by Sebastian of its contract with Correct and the damages incurred by Correct. The substantial competent evidence further proved that Smart and Smart Collier tortiously interfered with Correct's contract with Sebastian through the above breaches and their efforts to destroy Correct's business and steal its customer, and the totality of their actions constituted unfair competition resulting in damages to Correct.

Correct's contract with its customer, Sebastian, was dated April 24, 2017 and provided for a two-year initial term. (Doc. 346-5). Sebastian had the right to renew the contract for an additional four years based on an annual review of Correct's performance under the contract. The Schedule between Correct and Smart as to Sebastian was effective on September 13, 2017. (Doc. 346-31). Pursuant to the Schedule, Smart was required to provide Sebastian with its SmartTablet on a 1:1 inmate to tablet ratio and a sufficient number of extra SmartTablets so that the available number of SmartTablets at Sebastian would always exceed the actual inmate population. (Doc. 346-31, ¶¶2, 7). Although Smart, through its salesperson

Jennifer Tongate, assured Sebastian that the tablets would provide the inmates with an entertainment package and books, the Schedule drafted by Smart failed to include the agreed upon services. (Doc. 381-15, p. 55, 210:1-211:10; Doc. 381-18, p. 5-6, 12:11-15:23; Doc. 346-31).

In all Schedules, Smart was contractually obligated to provide custom, wireless, ruggedized and correctional grade tablets. Smart represented that it could see which tablets were being used, could identify charging, battery, and other issues before it resulted in tablet failures "so that service can be initiated before a problem is even reported," and further represented it had the ability to send "parts and personnel to repair infrastructure failures very quickly." (Doc. 346-31, ¶¶2, 3, 8; Doc. 346-40, ¶¶2, 3, 13; 346-41, ¶¶2, 3, 14). With this technology, Smart was acutely aware of the numerous problems at the correctional facilities. The overwhelming evidence proved that the SmartTablet provided by Smart to Sebastian, and to Washington and Bowie, did not comply with the requirements of the Schedules. As the evidence at trial proved, the tablets were not ruggedized, correctional grade, or otherwise suitable for a correctional environment. The evidence also proved that, notwithstanding its contractual obligations, Smart failed and refused to remedy the defective tablets or to address the issues created by its defective equipment and poor customer service at the correctional facilities.

Sebastian was the first of the three facilities to receive Smart's equipment and services. Throughout nearly its entire time at Sebastian, Smart was in breach of the MSA and Schedule with Correct. Soon after Smart's installation, Sebastian

5

began to experience issues with the SmartTablet and services from Smart and it expressed its displeasure to Correct and Smart. The seriousness of the issues created by Smart's tablets and the failure and refusal of Smart to cure throughout 2018, 2019, and part of 2020 were shown by the numerous emails to Smart from Sebastian Sergeant Eddie Smith, Deputy Ashley Smith, and Captain Dumas, the emails from Mark Turner to Smart CEO Jon Logan, and the reports provided by Smart's Jerry Lipsey directly to Jon Logan after Mr. Lipsey's meetings with Captain Dumas. (Doc. 346-44, 45, 47, 49, 51-53, 81, 85, 90, 115-116, 143; Doc. 345-1, 2-8).

Smart's failure to cure was in part based on Jon Logan's refusal to admit that Smart was at fault. Jon Logan acknowledged to Mark Turner soon after installation at Sebastian that Smart was not providing the correctional facilities with proper services and assured Mr. Turner that Smart "will get better organized and provide better service." (Doc. 346-45). However, Jon Logan had no intention of curing. As he admitted through deposition and during trial, neither he nor Smart were willing to accept any responsibility for or take any actions to cure the problems at Sebastian. (Doc. 361, 115:2-118:5; Doc. 381-9, p. 78, 302:5-303:5). Jon Logan blamed Sebastian for the problems and considered Captain Dumas and the employees at Sebastian "too stupid" to operate Smart's equipment and services. (Doc. 381-9, p. 77-78, 301:12-303:12). This attitude continued throughout the entire time Smart provided equipment and services at Sebastian and was one of the several reasons Sebastian wanted Smart gone from its facility.

As was clear from the evidence, including the testimony from each of the correctional facility employees who handled the tablets on a daily basis, the SmartTablet was not ruggedized or correctional grade and was not appropriate for use at a correctional facility. (Doc. 381-24, p. 6, 293:2-8; Doc. 381-1, p. 22, 78:2-79:25; Doc. 381-15, p. 55, 212:22-213:22). All three facilities described the SmartTablet as the kind that can be purchased from a store, such as Walmart. (Doc. 381-24, p. 6, 290:22-291:6; Doc. 381-1, p. 7, 19:17-20:5; Doc. 381-18, p. 7, 18:11-19:2). As the unrefuted evidence proved, the tablets were easily dismantled by inmates, parts were used to create weapons, batteries were removed to charge illegal cell phones, and the facilities were unhappy with Smart's product and poor customer service. (Doc. 381-24, p. 6, 291:7-293:8; Doc. 346-104; Doc. 381-1, p. 21, 75:6-77:11; Doc. 346-186; Doc. 346-117; Doc. 346-124).

As a result of the problems created by the tablets and poor service by Smart, coupled with its customers' complaints, Correct commenced discussions in 2019 with Tech Friends, its other tablet vendor, about Tech Friends potentially replacing Smart at Sebastian and Bowie. As the sole remaining allegation for Smart's breach of contract claim, one of the two remaining allegations for its claim of breach of implied duty of good faith and fair dealing, and the sole remaining allegation for its claim for unfair competition, Smart asserted that Correct was in breach by entering into a contract with Tech Friends and agreeing to provide exclusive rights to Tech Friends at Sebastian that belong to Smart under the MSA and Schedule. (Doc. 93, ¶¶194, 203, 236; Doc. 346-92).

In his Order on summary judgment, Judge Badalamenti identified the issue to be tried as to Smart's allegations regarding Tech Friends: if Smart's allegation referred to the June 1, 2019 master services agreement between Tech Friends and Correct <u>and</u> if Tech Friends began providing tablet services in June 2019 under that agreement while Correct remained contractually obligated to Smart under the Sebastian Schedule, the Court could conclude Correct was in breach. (Doc. 234, p. 30-31, emphasis added). The facts were undisputed. Tech Friends never provided any tablets or services for Sebastian in June 2019, or under the June 2019 master services agreement at any time and never provided any tablets or services for Sebastian under any contract with Correct. (Doc. 381-19, p. 38, 144:18-145:20, p. 44-45, 168:17-170:12). All discussions between Correct and Tech Friends in 2019 about replacing Smart as the tablet provider at Sebastian and Bowie because of Smart's failure or refusal to perform never went beyond discussions. As the unrefuted evidence proved, upon the filing of this lawsuit, all discussions between Correct and Tech Friends ceased. (Doc. 381-19, p. 23, 82:17-83:5). Furthermore, Smart and Correct confirmed that Smart would continue to be the tablet provider under the MSA and Schedules in accordance with the Stipulation to Preserve the Status Quo Pending Final Hearing on the Merits filed with the state court. (Doc. 346-122). Smart did not and could not prove its claims for breach of contract, breach of the implied duty of good faith and fair dealing, and unfair competition as to Sebastian, because Tech Friends never provided tablets or services to Sebastian pursuant to a contract with Correct.

The only other remaining basis for Smart's claim in Count VI for breach of the implied covenant of good faith and fair dealing was Smart's allegation that Correct elicited a non-renewal from Sebastian for the sole purpose of removing Smart while Correct and Sebastian intended to continue their relationship. (Doc. 93, ¶201). The non-renewal by Sebastian was also a basis for Correct's claims against Smart. (Doc. 105, ¶72). The evidence at trial proved that Correct did not elicit the non-renewal for any purpose and that the non-renewal by Sebastian was caused by Smart's own conduct. The substantial competent evidence as to Smart and Smart Collier's conduct as outlined below, which conduct became more purposeful and egregious from August 2019 forward, proved Smart breached the MSA and Schedule for Sebastian and its implied duty of good faith and fair dealing, and Smart and Smart Collier tortiously interfered with Correct's contract with Sebastian and through unfair competition tried to steal Correct's customers. Smart and Smart Collier's conduct directly resulted in damages to Correct.

By the end of August and early September 2019, Sebastian was encountering serious safety and security issues caused by Smart's defective tablets and lack of service. The emails sent by Sebastian Deputy Ashley Smith directly to Smart from August 23, 2019 through February 2020, and the testimony and evidence received at trial including photographs proved that Sebastian was dealing with numerous and constant problems created by Smart's defective tablets and poor service. Despite Sebastian's efforts to get Smart to address and cure the issues, Smart failed or refused to cure. (Doc. 346-116, 128, 143-145; Doc. 345-6, 26; Doc. 381-17, p. 15-

20, 50:24-72:5, p. 21-25, 77:2-91:10). On August 27, 2019, Captain Dumas wrote Correct advising that Smart's tablets were being used to make homemade knives, there was no customer support or timely responses to the issues by Smart, and he no longer had any confidence in the ability of Smart to provide a reliable and safe product for Sebastian. (Doc. 346-117).

The evidence was unrefuted at trial. Smart made no effort to cure at Sebastian, even after receipt of Correct's Notice to Cure dated September 13, 2019 which, as Judge Badalamenti held, followed the instructions outlined in paragraph 9 of the MSA "exactly." (Doc. 346-124; Doc. 234, pg. 27).  Rather, Smart chose to avoid its contractual duty to cure by filing an emergency motion with the state court and, after the hearing, commencing a hostile, heated verbal attack on Captain Dumas. Smart's post-hearing conduct, as Captain Dumas testified, "sealed the deal" for Sebastian wanting Smart gone from their facility. (Doc. 381-15, p. 65, 250:21-252:14).

Unbeknownst to Correct, Smart and Smart Collier intended to leverage their acquisition of the Lattice license and all the Lattice employees, and the problems created by the tablets and poor service, to steal Correct's customers. As was clear at trial, Correct's ability to operate its telephone platform and service its customers was critically dependent on Lattice and, in particular, Bruce Johnson, a longtime Lattice employee who provided the maintenance, updating, and servicing of the Lattice telephone platform used by Correct. (Doc. 363, 12:16-13:19; Doc. 364, 50:25-54:12).

In August 2019, Jon Logan and Lisa Eddy made Smart and Smart Collier's first effort to cripple Correct's ability to continue operating its telephone platform by instructing Bruce Johnson to stop supporting Correct and sign a noncompete agreement. (Doc. 381-5, p. 15-16, 52:6-54:20). Bruce Johnson complied with the first demand and stopped providing Correct with any assistance. (Doc. 381-5, p. 18, 63:6-14). Thus, Smart and Smart Coller successfully caused Correct to lose all support of its Lattice telephone platform. In September 2019, Jon Logan continued with his efforts to ensure that Correct had no support for its telephone platform. Jon Logan contacted Bruce Johnson again and stated that if he did not sign the noncompete agreement by the end of day, he would be sued. (Doc. 381-5, p. 13-14, 45:12-47:1). Bruce Johnson declined to sign the noncompete agreement. Because of its dependence on Lattice and more specifically Bruce Johnson, and to ensure that its Lattice telephone platform remained operational, Correct offered employment to Bruce Johnson at a significant expense. (Doc. 381-5, p. 19, 67:6-68:1; Doc. 346-121). After Bruce Johnson accepted employment with Correct, Jon Logan made good on his threat. On September 20, 2019, the same day as the hostile argument between Smart and Captain Dumas, Smart and Smart Collier sued Bruce Johnson for damages and injunctive relief and ignored the express promise that there was no restriction on Correct hiring Mr. Johnson in the Stipulation to Preserve Status Quo filed three weeks earlier. (Doc. 345-25; 346-11, ¶6).

Thereafter, Smart and Smart Collier directly solicited Sebastian for the same telephone services Correct was under contract with Sebastian to provide. As demonstrated through the testimony of Captain Dumas and as detailed by Jerry Lipsey in his reports, during Jerry Lipsey's October 2019 surprise visit to Sebastian he was educated by Captain Dumas about the reasons why Sebastian was "not willing to renew with [Smart]" which he reported directly to Jon Logan. (Doc. 381-16, p. 5, 8:25-9:23; Doc. 345-8). Importantly, Mr. Lipsey also learned from Captain Dumas that Correct's contract was in jeopardy as Captain Dumas blamed Correct for bringing Smart to the facility. (Doc. 345-7).

Despite Jerry Lipsey reporting the issues directly to Jon Logan, Smart made no effort to cure. (Doc. 345-7; Doc. 361, 120:8-122:18; Doc. 363, 50:24-51:15). Rather, Smart and Smart Collier used Captain Dumas' expressed frustration with Smart and Correct to try to steal Correct's customer including the telephone services at the facility. Smart submitted a proposal to Sebastian in November 2019 offering to cure the issues with the defective tablets by "upgrading to [Smart's] newest tablet system" but only on the condition that Sebastian sign a new, direct contract with Smart which included the telephone services Correct was providing. (Doc. 346-131, pg. 1-4; Doc. 381-10, p. 18-19, 371:12-373:7). The November 2019 proposal contained a clear admission that Smart was in breach of the MSA and Schedule with Correct at Sebastian and it was clear evidence of Smart and Smart Collier's plan, through tortious interference and unfair competition, to steal Correct's customer. Smart admitted that it had the ability to cure the non-

ruggedized, non-correctional grade tablets and issues the facility communicated to them "long ago" but falsely stated that Smart's contract with Correct did not provide for Smart to install its newest, upgraded tablet system. (Doc. 346-131, pg. 3; Doc. 381-10, p. 18, 371:12-21). Thus, Smart and Smart Collier were ensuring that Correct lost Sebastian as its customer and Smart remained in the facility pursuant to its express plan since August 30, 2017. (Doc. 346-30)(Robert Deglman's email to Jon Logan stating "it will be up to us to get in and develop a relationship so that if [Correct] loses, we stay").

In its November 2019 proposal, Smart parlayed its acquisition of Lattice and its employees to create the implication that Correct would no longer be able to service Sebastian. Smart represented that it had acquired the last available domestic licenses of the phone platform and had "hire[d] all the employees and software engineers that have designed and supported the phone system your current vendor is licensing and your agency is currently using." (Doc. 346-131, pg. 4). Correct was the "current vendor." Smart clearly intended to cause Sebastian to believe that Correct would be unable to continue operating its phone system at Sebastian and that Sebastian must use Smart going forward. In its further effort to steal Correct's customer, Smart offered to provide Sebastian 100% of its revenue from its phone services and a technology grant that would provide Sebastian with "**One Million dollars (1,000,000) more revenue**" than it would receive if it continued with its current vendor (Correct) during the same length of time. (Doc. 346-131, pg. 3-4, emphasis in original).

13

As Mr. Lipsey learned during his second unscheduled visit to Sebastian, Smart's November 2019 proposal "spooked the Sheriff," who considered the offer contained in the proposal as "borderline unethical" and "borderline illegal," and accepting the proposal "was not going to happen" as Sebastian was "done doing business with [Smart] by the time we got [the proposal]." (Doc. 345-8; Doc. 381-7, p. 22-23, 78:14-82:17; Doc. 381-16, p. 9-10, 25:7-26:1). As shown by the emails sent by Sebastian Deputy Ashley Smith and the response by Jon Logan dated February 10, 2020, the problems caused by the defective tablets and lack of response continued at Sebastian, but Smart was not willing to cure the issues or upgrade the tablets unless Sebastian provided Smart with a response to its proposal for a new contract with Smart for tablets <u>and</u> telephones. (Doc. 346-145; Doc. 381-17, p. 23, 82:8-84:20). However, Ashley Smith testified that she would never recommend that Sebastian utilize Smart's services. (Doc. 381-17, p. 26, 97:1-5).

Commencing in February 2020, Sebastian began discussions with its counsel about non-renewing its contract with Correct and submitting the tablet contract and the telephone contract out for bid. (Doc. 381-15, p. 34, 126:5-127:6). As relayed to its counsel, Sebastian was not willing to deal with Smart anymore because Smart was in a lawsuit with Correct, Smart would not fix the issues, the County was having major issues with Smart, and Smart was not willing to fix the issues unless Sebastian ended its contract with Correct. (Doc. 346-148).

Correct learned that Sebastian was planning on issuing requests for information ("RFI") in order to select providers for its telephone services and for

14

its tablets. (Doc. 381-15, p. 34, 127:15-128:12). To try to save its contract with Sebastian, Correct filed its Motion for Order Terminating Sebastian Contracts in the pending state court action on February 26, 2020 and sought an order from the Court allowing it to immediately terminate the MSA and Schedule with Smart. (Doc. 345-22). The hearing was scheduled for March 27, 2020. (Doc. 345-12). While the Motion was pending, Lauri Lowrimore used a sample RFI provided by Rick Ferguson and other forms she obtained, a practice she described as "not uncommon," to prepare RFI's for Sebastian to issue to tablet vendors and separately to telephone vendors. (Doc. 346-149; Doc. 381-15, p. 38, 145:8-146:11).

As Mark Turner testified, prior to the hearing on Correct's Motion, Correct received the notice from Sebastian advising that it non-renewed Correct's contract. (Doc. 363, 52:18-54:6). The written notice of non-renewal dated March 3, 2020 signed by the Honorable Judge Hudson was received by Correct on March 5, 2020 and it caused Correct's contract with Sebastian to terminate on April 24, 2020. (Doc. 346-150). As Judge Badalamenti declared, the nonrenewal by Sebastian resulted in the expiration of the MSA and Schedule between Correct and Smart. (Doc. 234, p. 9-10).

Sebastian's RFI process, which included a vetting committee and required approval by Judge Hudson, resulted in separate and direct contracts for its telephone equipment and services and its tablets and related services. (Doc. 346-180). Correct was selected to provide telephone services and Tech Friends was selected to provide tablets. As set forth in Judge Badalamenti's order, the contracts

between Sebastian and Tech Friends and Sebastian and Correct are unrelated, and there is no fee sharing agreement. (Doc. 234, pg. 29). Smart did not submit a response to the RFI issued by Sebastian. (Doc. 381-10, p. 24, 395:13-396:7).

Smart's assertion that the new contract between Correct and Sebastian was a de facto renewal was not supported by any evidence. The new contract between Correct and Sebastian was limited to telephone services, was for a two-year term with both parties having the right to non-renew at least ninety (90) days prior to renewal, and the rates received by Correct for calls from the correctional facility were lower than the rates in the April 2017 contract which was non-renewed. (Doc. 346-180).

The evidence proved that Correct's damages as a result of the lower rates in the new contract were caused by Smart. Sebastian's non-renewal of the April 2017 contract with Correct was necessitated as a result of Smart's conduct, and required Correct to participate in the RFI process to try to obtain a new contract and keep Sebastian as a customer. Upon non-renewing the Sebastian contract, Sebastian could and did entertain other bids and as Mark Turner testified, until Sebastian signed a new contract with Correct, it could choose another vendor for its telephone services. (Doc. 363, 55:6-24). As shown by the evidence at trial, the non-renewal and RFI process gave the Sebastian Sheriff the opportunity to obtain the lower rate he wanted "for the community." Correct was at risk of losing its telephone customer and as Mr. Turner testified, Correct had to give the Sheriff what he wanted. (Doc. 363, 53:19-56:6). The non-renewal caused by Smart

16

resulted in the lower revenue and damages to Correct. As Correct's expert testified, Correct incurred damages in the amount of $4,891.00 for Smart's breach of the MSA and Schedule and its duty of good faith and fair dealing as to Sebastian, which amount was unrefuted by Smart at trial. (Doc. 357, 16:19-19:11).

Correct is also entitled to recover its damages of $4,891.00 against Smart and Smart Collier based on their tortious interference. Correct proved all elements of the tort. Correct had a contractual relationship with Sebastian to provide telephone equipment and services. Smart and Smart Collier were fully aware of the terms of the contract as they were provided a copy by Correct on August 30, 2017. (Doc. 346-24; Doc. 346-25, pg. 7). Smart and Smart Collier intentionally and without justification directly interfered with that contract and relationship which caused Sebastian to non-renew its contract with Correct. The new contract awarded to Correct by the RFI bidding process was based on a lower compensation schedule causing the damages Correct proved, and which were unrefuted, at trial. See, *Nieves v. Donarra XT, LLC,* 2023 WL 10947150 (M.D. Fla. September 25, 2023).

Smart and Smart Collier's reliance at trial on *Williams Electric Company, Inc. v. Honeywell, Inc*., 772 F.Supp. 1225 (N.D. Fla. 1991) is misplaced. Unlike Honeywell, Smart and Smart Collier 1) did not install the telephone system used by Sebastian, 2) did not have a relationship with Sebastian prior to Correct and Sebastian's October 2017 contract, 3) were not expressly incorporated or even mentioned in Correct and Sebastian's October 2017 contract, and 4) never had a

17

contractual or business relationship with Sebastian at any time for the telephone services which Smart and Smart Collier attempted to steal and which are the basis of Correct's damages. Moreover, had Smart or Smart Collier been a party to Correct and Sebastian's October 2017 contract, Smart and Smart Collier would still be liable because its actions were not in good faith. See, *Burger King Corporation v. Ashland Equities, Inc.*, 161 F.Supp. 2d 1331, 1336 (S.D. Fla. 2001).

As Judge Badalamenti concluded in denying Smart's Motion for Partial Summary Judgment, if Smart ignored Sebastian's requests to provide proper equipment, services, and repairs to the facility "to interfere with the relationship between [Correct] and Sebastian and solicit Sebastian as its own customer, (*See*, Doc. 217 at 35 (wherein [Correct] argues that Smart "intentionally refused to cure at Sebastian so that it could steal the telephone business from [Correct's] customer by offering to upgrade the tablets at Sebastian if Sebastian terminated its relationship with [Correct] and retained Smart"), such conduct would constitute tortious interference with a business relationship or unfair competition separate and apart from the breach of contract." (Doc 232, pg. 53-54, emphasis added). That is exactly what the evidence proved. Moreover, it is undisputed that Smart Collier had no contract or business relationship with Correct or Sebastian. Thus, Smart and Smart Collier are liable for the loss of revenue in the amount of $4,891.00 caused to Correct by their tortious conduct, which amount was unrefuted at trial.

Correct is also entitled to recover the wages of $292,256.00 it was required to pay Bruce Johnson as a result of the tactics used by Smart and Smart Collier.

(Doc. 345-16; Doc. 364, 57:16-60:19). Smart and Smart Collier were not simply competitors of Correct. They controlled Lattice, the company that provided the critical updates, support, and maintenance for Correct's telephone platform which was the essence of Correct's business, and controlled the tablets which were causing the issues for Correct's correctional facility customers. Their tactics to steal Correct's customers and telephone business, including by refusing to cure, trying to prevent Correct's ability to operate its telephone platform, suing Bruce Johnson, offering cash to Correct's customers to terminate Correct, and making false implications about Correct's continued ability to perform, constitute unfair competition.

Under Florida's common law, an unfair competition claim is grounded in fairness, decency, and common honesty. *Remember Everyone Deployed, Inc. v. AC2T, Inc.*, 2021 WL 1200421 (S.D. Fla. March 8, 2021), citing *Global Tech Led, LLC v. Hilumz International Corp.*, 2017 WL 588669 at *7 (M.D. Fla. Feb. 14, 2017). Unfair competition is the umbrella for all statutory and non-statutory causes of action which arise out of business conduct that is contrary to honest practice in commercial matters. *Id.* Smart and Smart Collier's efforts to steal Correct's customers and their conduct to destroy Correct's business were not successful because of Correct's strong relationship with its customers, the quality of the equipment and services Correct provides, and Correct's hiring of Bruce Johnson after Smart and Smart Collier instructed Mr. Johnson to cease providing the needed maintenance, updates and support for Correct's telephone platform.

However, Correct did suffer damages as result of Smart and Smart Collier's actions constituting unfair competition in the form of decreased revenue and increased wages in protecting its business and customers.

Contrary to Smart and Smart Collier's argument at trial, the wages Correct incurred by the hiring of Mr. Johnson were foreseeable. Further, Smart and Smart Collier's actions were not just "hardball business tactics." They were part and parcel of a concerted effort to destroy Correct. Although Smart included in the Stipulation to Preserve Status Quo a ban on Correct hiring any of the employees it retained from Lattice, Bruce Johnson was expressly excluded from that ban. (Doc. 346-122, ¶6). Thus, Smart knew soon after the filing of this lawsuit that its targeted actions would force Correct to hire Mr. Johnson and incur additional costs through wages. As Patrick Temple testified, Correct had no choice but to hire Mr. Johnson as he was vital to the operation of Correct's platform and Correct could not afford for the platform to go down for a long period of time. (Doc. 364, 56:3-11). Mr. Temple further testified that Correct could not simply hire an IT technician and "plug and play" into Bruce Johnson's role; the knowledge gap was too great. (Doc. 364, 56:12-22). Since the hiring of Mr. Johnson and the payment of wages were expected by Smart as a result of the filed Stipulation to Preserve Status Quo and Smart's and Smart Collier's efforts to destroy Correct's ability to maintain its platform, the wages paid by Correct in the amount of $292,256.00 for the time period of September 2019 until November 1, 2021 are recoverable damages.

Correct's proof of its damages on wages was based on the pleadings, including the defenses pled by Smart, and was unrefuted. Smart attempted to assert set off for the first time at trial. As Correct argued, set off is an affirmative defense and since Smart failed to plead set off as a defense, it was waived. Based on the applicable case law, Smart's failure to plead renders the court without jurisdiction to consider any reduction based on a set off defense. *Udell v. Udell*, 950 So.2d 528 (Fla. 4th DCA 2007). See also, *Haught v. U.S. Engineering Contractors Corp*, 2009 WL 36591 (S.D. Fla. January 6, 2009). Had set off been plead, Correct's evidence and presentation at trial would have addressed this additional defense.

Smart's defense that its lawsuit against Bruce Johnson is privileged is not supported by the facts or the law. The litigation privilege only applies to judges, counsel, parties and witnesses in a judicial proceeding. *Pace v. Bank of New York Mellon Trust*, 224 So.3d 342, 343 (Fla. 5th DCA 2017). It covers statements or acts made or committed in the course of judicial or quasi-judicial proceedings and which are connected with or relevant or material to the cause in hand or subject of inquiry. *Id*. Correct was not a party to the lawsuit against Bruce Johnson and the pending suit was not the "cause in hand." (Doc. 345-25). Any privileges of Smart in its lawsuit against Bruce Johnson have no application to Correct or this action. *Fischer v. Debrincat*, 169 So.3d 1204 (Fla. 4th DCA 2015).

Although not asserted during trial, Smart cited to the temporary injunction in affirmative defenses. The temporary injunction is not a basis for any litigation

privilege defense. An order awarding a temporary injunction does not decide any material points in controversy. *Adoption Hot Line, Inc. v. State of Florida, Department of Health and Rehabilitative Services,* 385 So. 2d 682, 685, n.2 (Fla. 3d DCA 1980).  It is not conclusive; its provisions may be merged in, or dissolved by the final decree or it may be attacked while the suit is pending. *Id.* If the injunction was based on an incorrect legal ruling and is later shown to have caused damages to the enjoined party, damages are recoverable in favor of the enjoined party. *Jeffries & Company, Inc. v. International Assets Holding Corp.*, 830 So.2d 256, 259 (Fla. 5th DCA 2002). Further, since the order did not address a bond, Correct has the legal right to pursue all damages suffered. *Provident Management Corporation v. City of Treasure Island,* 718 So.2d 738, 739 (Fla. 1998)(concluding that where a court dispenses with a bond, the enjoined party is entitled to seek the full measure of the damages for the wrongfully issued preliminary injunction).

Based on the substantial evidence received during trial, Correct is entitled to the entry of judgment in its favor as to Sebastian on all remaining claims in Smart's Fourth Amended Complaint, and against Smart and Smart Collier for the claims in Correct's Fourth Amended Counterclaim.

### The Claims as to Washington

Smart's remaining claims at trial as to Washington were based on Count III (breach of contract), Count IV (breach of the implied covenant of good faith and fair dealing), and Count X (unfair competition) as limited by the summary judgment Order of Judge Badalamenti. (Doc. 93; Doc. 234, pg. 10-20). More

specifically, Smart alleges that Correct breached the MSA and Schedule and its implied duty of good faith and fair dealing, and unfairly competed with Smart by (1) serving the Notice of Non-Renewal as to Washington dated October 4, 2019 pursuant to paragraph 6 of the MSA thereby terminating Smart prior to the end of its co-terminous term, and (2) failing to provide exclusivity rights to Smart. (Doc. 93, ¶178, 186, 236; Doc. 93, ¶173, 188, 236).

Correct's defenses at trial included that the Notice of Non-Renewal was authorized by paragraph 6 of the MSA and caused the MSA and Schedule to expire on January 3, 2020, and at all times Smart was the exclusive provider of communication services under the MSA and Schedule with Correct. Further, Smart breached the MSA and Schedule which caused Washington to want Smart out and this prior breach was a legal bar to all claims asserted by Smart.

There was no evidence presented at trial to prove any breach by Correct. Rather, the evidence proved that the Notice of Non-Renewal was timely and effective to terminate the MSA and Schedule on January 3, 2020. (Doc. 346-125). The evidence further proved that Smart did not provide ruggedized, correctional grade tablets or related services as required under the MSA and Schedule for Washington, failed to provide tablets on the required 6 to 1 inmate to tablet ratio, and failed to correct the numerous deficiencies reported by Washington, which caused Washington to want Smart out of its facility. (Doc. 381-24, p. 5-6, 288:11-293:8). While the evidence showed that Tech Friends provided email services to the inmates at Washington through the Food Service and Commissary contract

between Washington and Summit Foods (Doc. 346-11), it is unrefuted that Smart was the exclusive provider under the MSA and Schedule with Correct for Washington, and Correct had no role with Tech Friends at Washington. Smart's exclusivity arose through the MSA and thus, Correct was not in breach. (Doc. 363, 104:21-105:6). Finally, as was clear at trial, Smart's removal from Washington was at the direction of Washington.

Paragraph 6 of the MSA titled "Term," which was discussed several times during trial, provides that the MSA is co-terminous with Correct's contract with its correctional facility customer. (Doc. 346-1, ¶6). As further stated in paragraph 6, the MSA automatically renewed in accordance with Correct's contract with its correctional facility customer unless either Party notified the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

Smart's claim for breach of contract is based on its nonsensical and unsupported assertion that "Party" and "Parties" in the MSA, which is used 46 times as counted by this Court, means Correct and Smart 44 of those times but means Correct and the correctional facility the two times it is used in the last sentence of paragraph 6. This erroneous interpretation suggested by Smart is contrary to the clear language of the MSA, the unrefuted testimony of Mark Turner and Robert Deglman as the sole drafters of the MSA, and the legal principles governing contract interpretation. (Doc. 381-2, p. 32, 119:9-120:6, p. 33-34, 125:1-129:2, p. 35, 132:11-133:6; Doc. 363, 32:24-35:9).

Contract interpretation is a question of law to be decided by reading the words of the contract in the context of the entire contract and construing the contract to effectuate the intent of the parties. See, *Golden v. University of Miami*, 484 F.Supp.3d 1255, 1262. See also, *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098 (11th Cir. 2014). Contracts are to be construed in accordance with the plain meaning of the words contained therein. It is never the role of a trial court to rewrite a contract to make it more reasonable for one of the parties. *See, Ferreira v. Home Depot*, 12 So.3d 866, 868 (Fla. 1st DCA 2009); *Churchville v. Gacs Incorp.*, 973 So.2d 1212, 1216 (Fla. 1st DCA 2008). "Courts must strive to read a contract in a way that gives effect to all of the contract's provisions." *Retreat at Port of the Islands, LLC v. Port of Islands Resort Hotel Condo. Assn., Inc.*, 181 So.3d 531, 533 (Fla. 2d DCA 2015). *See also*, *Golden*, 484 F.Supp.3d at 1262.

After applying the foregoing principles of contract interpretation to the MSA, the terms of the MSA are clear and are not ambiguous. The terms "Party" and "Parties" throughout the MSA means Smart and Correct who are the only parties to the MSA. Even Smart CEO Jon Logan could not testify otherwise. When asked directly by the Court if parties on the signature page of the MSA included the correctional facility even though it was not listed, Jon Logan testified "Honestly, I'm not sure Judge. I don't know." (Doc. 357, 54:22-56:5).

Pursuant to Paragraph 6 of the MSA, both Smart and Correct were authorized to terminate the MSA and Schedule for any of the three facilities so long as they provided written notice of non-renewal at least 90 days before Correct's

25

contract with its correctional facility customer renewed. (Doc. 346-1, ¶6; Doc. 363, 34:3-17). The inclusion of the 90-day nonrenewal notice in the MSA was "important" to Correct. The notice "gives [Correct] the ability – if things are going great, no notice, the thing automatically renews. But if things are not going great, you can provide a 90-day notice that the current term is going to end." (Doc. 363, 33:6-15). Correct exercised that right by providing the written notice on October 4, 2019. (Doc. 346-125). Therefore, in accordance with paragraph 6, the MSA and Schedule for Washington expired on January 3, 2020.

Although the Notice of Non-Renewal was timely, proper and effective to terminate the MSA and Schedule on January 3, 2020, it was not the cause of Smart's removal from Washington. Smart's removal at Washington was directed by Washington after it learned it was in breach of a separate, unrelated contract. However, by that time, Washington had tired of Smart's defective equipment, lack of services, and poor customer support.

This Court reviewed the written notice from Washington to Correct on December 11, 2019, which was sent as a result of Summit Foods notifying Washington that it was in breach of contract. (Doc. 346-133). To cure its breach, Washington sent written notice to Correct and directed that Smart remove its email services from Washington, which Correct forwarded to Smart by letter dated December 13, 2019. (Doc. 346-134). The evidence at trial was unrefuted. Correct had no involvement with Washington's contract with Summit Foods (formerly known as CBM Managed Services) or with the services that Tech Friends provided

26

under the Summit Foods contract. (Doc. 346-11, pg. 15, ¶2; Doc. 381-23, p. 46, 177:3-11). The evidence further proved that there was no breach by Correct and by its own evidence, Smart continued to provide its tablets and services at Washington until well past the January 3, 2020 expiration of the MSA and Schedule. (Doc. 346-176, p. 2 as to Washington).

The witnesses from Washington proved at trial that even without the timely Notice of Non-Renewal or the breach by Washington of the Summit Foods contract, Washington was no longer willing to continue with Smart. (Doc. 381-24, p. 27, 374:4-15). The witnesses testified about Smart's defective equipment, Smart's failure to provide the promised services, Smart's lack of any customer support, and Smart's unprofessional conduct caused Washington to no longer want Smart at its facility. (Doc. 381-23, p. 43-44, 165:25-166:23, p. 47, 178:2-23, p. 51, 194:15-195:10; Doc. 381-24, p. 5-6, 287:2-293:8, p. 25, 369:1-18; Doc. 381-6, p. 35, 131:11-132:18). As Captain Johnson testified, it was the "totality" of Washington's experience with Smart that caused the Sheriff to have no interest in Smart being a vendor for Washington. (Doc. 381-23, p. 55, 213:13-23).

Correct's contract with Washington was effective on September 25, 2014 and it renewed on January 3 of each year. (Doc. 346-2). Although Smart and Correct executed the Schedule for Washington on November 15, 2017, Smart did not install tablets at Washington until January 2019, approximately 14 months later. (Doc. 346-41; Doc. 346-67; Doc. 381-24, p. 9, 302:22-303:3). In the Schedule, Smart was obligated to provide Washington ruggedized and correctional grade tablets on a 6

to 1 inmate to tablet ratio and sufficient reserve tablets. (Doc. 346-41, ¶¶2, 3). As with Sebastian, Smart represented that it could see which tablets were being used, could identify charging, battery, and other issues before it resulted in tablet failures "so that service can be initiated before a problem is even reported," and had the ability to send "parts and personnel to repair infrastructure failures very quickly." (Doc. 346-41, ¶14). Smart was therefore acutely aware of the numerous problems at Washington. Although the Schedule failed to include video visitation on the tablets, Smart through Jennifer Tongate confirmed Smart's agreement to provide those services as a "selling point" to Washington. (Doc. 381-23, p. 10, 32:3-10, p. 33, 123:20-124:25, p. 47, 178:2-23, p. 58, 224:24-225:24, p. 63, 243:11-245:24).

Similar to Sebastian, Washington's problems with Smart's tablets and poor service commenced soon after installation and continued through 2019. The witnesses from Washington detailed the issues encountered with the defective tablets and the lack of services or response by Smart. (Doc. 381-23, p. 43-44, 165:25-166:23, p. 47, 178:2-23, p. 51, 194:15-195:10; Doc. 381-24, p. 5-6, 287:2-293:8, p. 25, 369:1-18; Doc. 381-6, p. 35, 131:11-132:18). By July 2019, Washington was done with Smart. In his email dated July 31, 2019, Captain Johnson notified Smart of Washington's extreme displeasure with Smart's equipment and services and advised Smart that the County would be looking for another vendor for tablets and related services to replace Smart. (Doc. 346-104). During the December 2019 state court hearing, Captain Johnson testified that as far as he was concerned, Washington's relationship with Smart was over. He listed the reasons as being the

customer service, the product, the lack of visitation on the tablets, and the accumulation of everything and stated, "Smart Communications will not be able to do business in my jail." (Doc. 363, 119:7-120:3). Finally, in response to the question "If the Court determines that Smart Communications must be part of your continued contract with Correct Solutions, what is your intention then?," Captain Johnson told the state court judge that his recommendation would be for Washington to also cut ties with Correct.  (Doc. 363, 120:8-14).

Just as he attempted to do with Sebastian, Jerry Lipsey contacted Washington in late 2019 and early 2020 to attempt to get a direct contract between Smart and Washington. (Doc. 381-23, p. 23-24, 85:5-86:8). His lack of success was shown by his report dated January 9, 2020 which summarized the reasons provided by Washington for its decision not to continue to use Smart's services. (Doc. 345-9). Those reasons included that the tablets were of poor quality and were never updated, customer service was lacking, Smart was not staying in contact with the facility, and the breach of the Summit Foods contract. (Doc. 345-9). The evidence further showed that Smart continued to destroy its relationship with Washington when Jon Logan and James Logan rejected Captain Yates' request for Smart's cooperation for a smooth transition and chose to abruptly terminate Smart's services at Washington and leave the facility and inmates "high and dry." (Doc. 345-9; Doc. 345-11; Doc. 381-23, p. 52, 198:11-17).

Smart failed to prove any of its claims as to Washington. Rather, the substantial evidence proved that the MSA and Schedule expired on January 3,

2020 and that Smart's departure from Washington was at the direction of Washington based on Washington's breach of the Summit Food contract and Smart's own failure to perform. The evidence further proved Smart's exclusivity was under the MSA with Correct. (Doc. 346-1, ¶2). Correct did not allow any other provider to provide services or equipment through the MSA, the Schedule, or Correct's contract with Washington, and the evidence proved that Correct was not in breach of the MSA or Schedule or the implied duty of good faith and fair dealing.

Based on the evidence received at trial, Correct is entitled to the entry of judgment in its favor as to Washington on all claims in Smart's Fourth Amended Complaint.

### *The Claims as to Bowie*

Smart proceeded to trial on all claims plead as to Bowie. Neither of the Motions for Partial Summary Judgment were directed to Bowie. Smart's claims for breach of contract (Count VIII), breach of the implied covenant of good faith and fair dealing (Count IX), and unfair competition (Count X) were based on its allegations that Correct sent an improper Notice to Cure dated September 8, 2020, failed to accept Smart's "offer" to install an upgraded tablet system, improperly terminated the MSA and Schedule, and by Correct entering into a contract with Tech Friends to provide tablets at Bowie while Smart claims it had exclusive rights. (Doc. 93, ¶¶219, 220, 221; Doc. 93, ¶¶228, 230, 231; Doc. 93, ¶236).

Smart's allegations that Correct solicited complaints about Smart at Bowie, prevented Smart's communication with and access to Bowie, and enlisted Bowie in

its "plight" to terminate Smart were identical to those allegations by Smart as to Sebastian and Washington. (Doc. 93, ¶¶218, 229, 236; compare with Doc. 93, ¶¶174, 187, 192, 202). Summary judgment was granted in favor of Correct on those identical allegations as to Sebastian and Washington. (Doc. 234, p. 10-23). Smart did not even attempt to offer any evidence at trial to support these allegations as to Bowie and the unrefuted testimony of Albert Cantu proved these allegations were untrue. (Doc. 381-1, p. 13, 44:11-15, p. 14, 49:12-15, p. 16, 56:4-9, p. 23, 83:16-84:11). As with Sebastian and Washington, the facts refuted each of these allegations.

As to both Sebastian and Bowie, Smart alleged that Correct sent an improper notice to cure based on a requested hardware upgrade that Smart had no contractual obligation to provide. (Doc. 93, ¶193; compare with Doc. 93, ¶220, 228, 236). Judge Badalamenti ruled that Correct's Notice to Cure as to Sebastian was not a breach of contract because it followed the instructions outlined in paragraph 9 "exactly" and described the default in terms mirroring the requirements set forth in the MSA and the Schedule. (Doc. 234, p. 27). As with Sebastian, the Notice to Cure for Bowie was not a breach.

Instead, Smart breached the MSA and Schedule for Bowie which caused its removal. The Notice to Cure was authorized and timely under the MSA. Smart failed to cure, and Correct's Notice of Termination following the Notice to Cure properly terminated the MSA and Schedule for Bowie.

The evidence at trial negated each of Smart's allegations. Smart breached the MSA and Schedule for Bowie by failing to provide the required equipment and services, by failing to repair or replace the defective equipment, by failing to provide timely and competent services, failing to address issues at Bowie, and by failing to cure after receipt of the September 8, 2020 Notice to Cure. Tech Friends did not begin to install any equipment or services until July 2021, well after Correct properly terminated the MSA and Schedule in March 2021 based on Smart's breaches and failure to cure. Thus, the evidence did not prove any of Smart's claims as to Bowie.

Correct's contract with Bowie was executed in October 2014, The term was for 36 months and provided both parties with the right to renew annually. (Doc. 346-3). The Schedule between Correct and Smart was effective on November 15, 2017 and required Smart to provide Bowie ruggedized and correctional grade tablets on a 6:1 inmate to tablet ratio. (Doc. 346-40).

As with Sebastian and Washington, Smart never provided Bowie with ruggedized, correctional grade tablets. Rather, at all times, Smart continued to provide Bowie with non-ruggedized, non-correctional grade tablets. The tablets were easily broken and dismantled, and the batteries were removed. (Doc. 381-1, p. 29, 107:6-16). The inmates used the dismantled tablets to hide contraband such as cell phones which created a safety hazard for Bowie. (Doc. 381-1, p. 10, 32:8-20, p. 21, 75:15-23, p. 26, 94:13-20, p. 29, 107:17-22). Albert Cantu described the tablets as regular tablets - the kind his children have - and he did not consider the

32

tablets provided by Smart at Bowie to be correctional grade. (Doc. 381-1, p. 22, 78:2-79:8). Smart also did not provide Bowie with sufficient reserves as required by the Schedule. (Doc. 381-1, p. 22, 80:24-81:1). As Albert Cantu testified and the photos in evidence proved, the replacement tablets provided by Smart were refurbished from other jails and were themselves defective as they were missing screws, had cracked screens and some did not charge. (Doc. 381-1, p. 27, 100:11-101:11; Doc. 345-24, pgs. 48-56). As time passed, Smart took longer to replace tablets and by the end of the relationship, Bowie could not get tablets from Smart and only had one or two tablets per cell block, which held 24 inmates (Doc. 381-1, p. 21, 76:13-77:11, p. 27, 101:12-102:19).

As it tried with Sebastian and with Washington, Smart used the problems created by its defective tablets and poor services to attempt to steal Bowie as a customer from Correct. Albert Cantu testified that a man with Smart called and offered to upgrade the tablets if Bowie signed a contract with Smart. (Doc. 381-1, p. 17, 60:13-24, p. 18-19, 65:24-66:7). Mr. Cantu reported to Bowie Sheriff Jeffrey Neal that Smart was asking for a contract and trying to go around Correct. (Doc. 381-12, p. 11, 36:4-36:11). Paige Grofe's follow up email dated April 23, 2020 confirmed in writing that Smart's offer to upgrade at Bowie required signing a new, direct contract with Smart. (Doc. 346-163; Doc. 381-1, p. 26, 95:5-97:4). In fact, the evidence was clear that at no time was Smart willing to change its equipment at Bowie without getting a benefit. As early as September 10, 2018, Jon Logan

33

wanted an additional year added to Smart's contract or a payment of $25,000 before Smart would agree to replace tablets with kiosks at Bowie. (Doc. 346-58).

The evidence at trial proved that prior to sending the Notice to Cure, Correct sought Smart's commitment to cure the defective tablets without the new contract requirement. On August 19, 2020, Paige Grofe emailed Albert Cantu which included an offer to upgrade the tablets at Bowie and avoid the necessity of a walk through. However, she was silent as to whether Smart was waiving its requirement for a contract. (Doc. 346-183). Rick Ferguson's clarification email to Paige Grofe dated September 1, 2020 wherein he asked that she confirm that Smart was willing to replace the existing equipment with new equipment without the requirement of a new contract was ignored by Ms. Grofe and by Smart. (Doc. 346-185).

The September 8, 2020 Notice to Cure based on Smart's failure to comply with its contractual duties was proper pursuant to paragraph 9 of the MSA and it commenced Smart's duty to cure its breach within thirty (30) days. As set forth in the Notice, Smart was obligated to cure by providing Bowie ruggedized, correctional grade tablets and functioning replacement tablets and charging cables, timely replacing tablets and cables, and providing technical support of its equipment. (Doc. 346-186). In response, Smart continued replacing the broken and nonworking tablets at Bowie with its non-ruggedized, non-correctional grade first generation black tablets. As Albert Cantu testified, and as shown by the photographs introduced into evidence, many of the replacement tablets had broken screens, were missing screws, and simply did not work. (Doc. 381-1, p. 27,

100:11-101:11; Doc. 345-24, p. 48-56). There was no credible evidence, no testimony, no subsequent emails, and no letters wherein Smart ever offered to upgrade the tablets at Bowie without a new contract and there was no evidence of any actions by Smart to cure the defective tablets at any time. (Doc. 381-1, p. 28, 105:7-13).

Smart's introduction of a January 27, 2021 email from Lisa Eddy to Rick Ferguson was not evidence that Smart was willing to cure. (Doc. 344-3). This email was sent over four months after the Notice to Cure, well beyond the thirty (30) day cure period. Notably, the email was sent one day prior to the scheduled deposition of Paige Grofe on January 28, 2021 in an apparent attempt to create evidence of an offer. (Doc. 345-14). However, it was again silent as to whether the cure was contingent on a new contract. Smart's assertion in its opening statement that Correct's salesman, Rick Ferguson, would not allow the upgrade was refuted by the evidence at trial including Rick Ferguson's testimony that upgrading at Bowie was "not my call." (Doc. 381-4, p. 72, 281:20-24). Finally, the Maintenance Request & Service Order relied on by Smart in its Fourth Amended Complaint and offered into evidence by Smart was signed after a technician repaired a kiosk and was not evidence of any cure. (Doc. 93, ¶216; Doc. 93-34; Doc. 346-189). As Albert Cantu testified, the "everything good" handwritten remark on the Maintenance Request was limited to the repair of a screen on a kiosk and had nothing to do with the tablet issues at Bowie. (Doc. 381-1, p. 19, 68:3-25, p. 28-29, 103:10-106:10).

As shown at trial, Correct terminated the MSA and Schedule by filing a Motion with this Court in accordance with the restrictions and requirements orally issued by the state court judge. Correct's Amended Motion for Order Authorizing Correct Solutions to Exercise its Right to Terminate Master Services Agreement and Schedules for Bowie and to Revisit Oral Announcements by State Court Judge and Memorandum of Law was granted by Order dated March 12, 2021 by the Honorable James S. Moody, Jr. (Doc. 345-24; Doc. 345-13). After the Order was entered, Correct sent Smart its Notice of Termination dated March 22, 2021 which terminated the MSA and Schedule between Correct and Smart for Bowie on March 22, 2021. (Doc. 346-192). The installation by Tech Friends at Bowie, which was occurring in July 2021, was well after the March 22, 2021 expiration of Smart's rights at Bowie and is not a basis for any claims of Smart. (Doc. 381-12, p. 5, 12:3-12; Doc. 381-12, p. 2)(noting the deposition of the Bowie County Sheriff's Office Corporate Representative occurred on July 13, 2021).

Based on the evidence received at trial, Correct is entitled to entry of judgment in its favor as to Bowie on all claims of Smart in its Fourth Amended Complaint.

### *Legal Issues at Trial*

Summary judgment was entered in favor of Correct on Smart's entire fraud claim contained in Count VII of the Fourth Amended Complaint, including Smart's allegation that Correct agreed but failed to obtain amendments to its contracts with its facilities. (Doc. 93, p. 49-51; Doc. 93, p. 50, ¶207(d); Doc. 234, p. 34-40). At

36

trial and over Correct's objection, Smart attempted to raise the amendment argument as part of its claims for breach of contract and breach of the implied duty of good faith and fair dealing. All evidence of amendment discussions presented by Smart predated the execution of the MSA. This was not an issue for trial and moreover any "discussions" were not actionable in accordance with the MSA. Judge Badalamenti agreed with Smart's argument on summary judgment that paragraph 25 of the MSA was an integration clause which superseded all informal understandings and oral agreements relating to the subject matter of the contract, which would include these alleged amendment discussions. (Doc. 232, p. 22, 24). As this Court acknowledged at trial, the parties are "all married to this incorporation clause." (Doc. 363, 22:18-20).

Additionally, this Court heard an extensive amount of unrefuted evidence at trial that Smart breached the MSA and Schedules by failing to provide Sebastian, Washington, and Bowie with ruggedized or correctional grade tablets, failing to meet the required inmate to tablet ratio, failing to provide customer service, and refusing to cure the significant issues each facility suffered from Smart's defective tablets and poor service. Correct asserted the prior breach of Smart under the MSA and Schedules related to its conduct at the correctional facilities as its eighth affirmative defense. (Doc. 96, p. 38). Given that Smart materially breached the MSA and Schedules first, Correct has a valid defense to Smart's breach of contract claims. *Focus Management Group USA, Inc. v. King*, 171 F.Supp.3d 1291, 1299 (M.D. Fla. 2016).

### *Damages*

The Court has heard extensive argument about section 7 of the MSA titled "Limitation of Liability" barring consequential damages. (Doc. 346-1, ¶7). While section 7 bars the lost profit damages Smart introduced at trial, it is not a bar to the damages Correct proved at trial. Correct incurred damages in the form of lost revenue and increased wages as a result of Smart and Smart Collier's efforts to steal Correct's telephone business and telephone customers, which actions do not arise from or relate to the MSA and Schedules between Correct and Smart. Further, Smart Collier is not a party to the MSA or any Schedule and therefore section 7 is not applicable to Smart Collier. See, *Costa Investors, LLC. v. Liberty Grande, LLC*, 353 So.3d 627 (Fla. 4th DCA 2022)(independent tort doctrine only applies to the parties to the contract).

Smart is not entitled to an award of damages. The evidence at trial refuted each of Smart's claims and the claims for damages are moot. Moreover, the damages sought by Smart were the quintessential definition of consequential damages which are barred by section 7 of the MSA. As Steven S. Oscher, CPA, James Logan, and Jon Logan each testified, Smart's lost profit damage calculations were based on the amount of credits purchased by the friends and families of inmates directly through Smart's website, which purchase includes a transaction fee payable to Smart. (Doc. 355, 48:16-49:4; Doc. 381-8, p. 21, 76:12-77:8; Doc. 354, 30:12-31:18). These alleged lost profit damages are consequential damages

and are not recoverable as a matter of law under the MSA. See, *Keystone Airpark Authority v. Pipeline Contractors, Inc.*, 266 So.3d 1219 (Fla. 1st DCA 2019).

As shown by Correct in its pretrial filing, Smart's prior reliance on *Shady Hills Energy Cir., LLC v. Seminole Electric Corp.*, 2022 WL 4774450, at *17 (M.D. Fla. October 3, 2022) was misplaced. (Doc. 299, p. 3-4). In *Shady Hills*, this Court stated that "when the non-breaching party seeks only to recover money <u>that the breaching party agreed to pay under the contract</u>, the damages sought are general damages." *Id.* (Emphasis added). Unlike in *Shady Hills*, Smart is seeking lost profits based on revenue from third parties who are not parties to the MSA or Schedules. Neither Correct nor any of the correctional facilities agreed to pay any monies to Smart under the MSA or Schedules. Thus, Smart's lost profits are consequential, not direct, damages. Smart also attempted to fit the facts of this case into the rubric of *Local Access, LLC v. Peerless Network, Inc.,* 2016 WL 5373326 (M.D. Fla. September 26, 2016). However, the facts in *Local Access* are plainly distinguishable. Neither Correct nor any of the correctional facilities had any duty to assign to Smart, or involvement with, the "outside contacts," families, and friends who purchased the credits from Smart through its website and which form the basis of Smart's claim of lost profits. Smart's lost profits rely <u>exclusively</u> on its sales of credits to third parties who are not parties to the MSA or Schedules, and therefore are consequential damages and barred by section 7 of the MSA.

Finally, although Smart's damages were presented through Steven S. Oscher, CPA, his testimony proved that he was not the person who performed the

analysis. Mr. Oscher's calculations were prepared based on the figures and percentages provided by James Logan, and neither he nor anyone from his company did any independent investigation to determine if the conclusions of James Logan were accurate. (Doc. 355, 57:18-57:25). In fact, in response to a question by this Court, Dr. Oscher testified that James Logan provided him the percentages to use for the damages and that Mr. Logan was "doing the analysis for his own company." (Doc. 355, 70:6-19).

## *Conclusion*

The evidence and the testimony from all three correctional facilities was consistent and convincing. Smart breached its contracts with Correct by failing to provide ruggedized or correctional grade tablets at the facilities, by failing to meet the required inmate to tablet ratio, by failing to provide customer service, and by failing and refusing to cure the substantial issues each facility suffered from Smart's defective tablets and poor service. Smart and Smart Collier purposely and tortiously interfered with Correct's contract with Sebastian causing Correct to incur damages. Moreover, the totality of Smart and Smart's Collier's conduct rose to the level of unfair competition entitling Correct to recover its lost revenue and the payment of Bruce Johnson's wages. Correct is entitled to the entry of judgment in its favor as to all claims in the Fourth Amended Complaint and all claims in the Fourth Amended Counterclaim.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on November 27, 2024, the foregoing document

was filed with the Court's CM/ECF system, which will send electronic notice to all

counsel of record.

HARLLEE & BALD, P.A.


By:___*/s/ Kimberly A. Bald*_____
    KIMBERLY A. BALD, Trial Counsel
    Florida Bar No.: 0434190
    ADAM MOHAMMADBHOY
    Florida Bar No.: 0137367
    JAMES E. LYNCH
    Florida Bar No: 0046219
    202 Old Main Street
    Bradenton, FL 34205
    Telephone: 941-744-5537
    Facsimile: 941-744-5547
    E-mail: KAB@harlleebald.com
    E-mail: AM@harlleebald.com
    E-mail: JEL@harlleebald.com
    E-mail: BLY@harlleebald.com
    E-mail: LS@harlleebald.com
    Attorneys for Correct Solutions, LLC


    and


    LUKE F. PIONTEK
    Louisiana Bar No. 19979
    DANIEL T. PRICE
    Louisiana Bar No. 39500
    Roedel, Parsons, Blache,
    Fontana, Piontek & Pisano
    8440 Jefferson Highway, Suite 301
    Baton Rouge, LA. 70809
    Telephone: 225/929-7033
    Facsimile: 225/928-4925

Email: LPiontek@roedelparsons.com
Email: Dprice@roedelparsons.com
E-mail: JSulzer@roedelparsons.com
Co-Counsel for Correct Solutions, LLC