UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.

      Plaintiff,

vs.

CORRECT SOLUTIONS, LLC,
a/k/a CORRECT SOLUTIONS
GROUP, LLC,

      Defendants.

_____/

CORRECT SOLUTIONS, LLC,
a/k/a CORRECT SOLUTIONS
GROUP, LLC,

      Counter-Plaintiff,

vs.

SMART COMMUNICATIONS
HOLDING, INC. and SMART
COMMUNICATIONS
COLLIER, INC.

      Counter-Defendants.

_____/

Case No:  8:20-cv-1469-WFJ-TGW

## <u>SMART'S CLOSING ARGUMENT</u>

Plaintiff/Counter-Defendant, Smart Communications Holding, Inc. and Counter-Defendant Smart Communications Collier, Inc. (collectively, "Smart") file this Closing Argument regarding the bench trial held on August 19-23, 2024 and states as follows:

I. **Introduction**

Smart and Correct Solutions LLC ("Correct" or "CSG") both provide communication services to correctional facilities. Correct's business model focuses on providing telephone services, while Smart provides messaging and other related services. Smart and Correct entered into a Master Services Agreement ("MSA") and Schedules pursuant to which Smart was to provide messaging services at eight customer facilities, three of which—Washington, Bowie, and Sebastian Counties—are at issue in this case. For its part, Correct was required to ensure that Smart was the exclusive provider of the messaging services at the facilities. Under this mutually beneficial relationship, Smart was able to earn revenue from the facilities and Correct was able to offer a complete package of services (i.e. telephone, tablets, and messaging) to the customer.

Although Smart and Correct's relationship started strong, it quickly soured. In December 2018, Correct learned that Smart entered the phone business. [Doc. 346-61]. Mark Turner and Rick Ferguson were incensed. Ferguson couldn't believe that Smart would offer prospective customers 100% commissions knowing CSG's business model. Ferguson, 186:21-187:18 [Doc. 381-4 at 49]. Correct emailed internally about its "exit strategy" from Smart, discussing various options. [Doc. 346-84; 346-86; 346-87]. By May 2019, Correct had a comprehensive draft master services agreement in place with Smart's tablet competitor, Tech Friends. [Doc. 346-77; 346-83; 346-92]. Once the agreement was finalized and Tech Friends was preparing to take Smart's place in each account, Correct sent Smart a July 17, 2019 letter purportedly

terminating Smart from all eight customer facilities immediately for sending a marketing email to the City of St. Louis. [Doc. 346-102]. Smart then filed this lawsuit to stop the unlawful termination attempt. This Court ruled that Smart did not use Correct's confidential information and that the attempted termination was ineffective. [Doc. 232, p. 38.]

That did not stop Correct's efforts to sever its relationship with Smart. During the pendency of this lawsuit and as an end-around to providing Smart its bargained-for notice and opportunity to cure, Correct sent Smart "notices of non-renewal" pursuant to Section 6 of the MSA. But as described below, Smart's services were coterminous with Correct's facility contracts, including all renewals, and the notices of non-renewal were ineffective. In other words, so long as Correct remained in a facility then so would Smart.

Ultimately, Correct forced Smart out of Washington, Bowie, and Sebastian and breached the MSA and corresponding agreement for each facility. For Washington, Correct failed to convey exclusive messaging rights to Smart as promised in the MSA. Instead, Washington utilized the services of Smart's competitor, Tech Friends, at the same time it was using Smart's services. Moreover, even though Smart's services were supposed to be coterminous with Correct's contract with any particular facility, Smart was removed from Washington while Correct continued to provide its services.

As to Bowie, Correct entered into an agreement with Tech Friends to provide messaging services even though, under the MSA, Smart was the exclusive provider of such services. In an effort to remove Smart from Bowie, Correct sent a default notice

demanding that Smart upgrade its tablets in the facility. Even though Smart agreed to complete the upgrade, Correct prohibited it from happening. Correct then terminated Smart for failing to effectuate the very same cure that Correct would not allow.

With respect to Sebastian, Correct also entered into an agreement with Tech Friends to provide messaging services. Again, in an effort to terminate Smart, Correct sent a notice to cure based on various alleged performance issues. However, Correct did not terminate the agreement based on a failure to cure the purported performance issues. Instead, Correct instructed Sebastian to terminate the Correct-Sebastian contract, and Sebastian obliged. Sebastian initiated a non-binding Request for Information process and, uncoincidentally, Correct and Tech Friends were chosen as the "new" providers of phone and messaging services. Correct's equipment was never turned off and it never missed a day of phone revenue. Correct's "new" contract was a de facto renewal for which Smart had coterminous rights.

In short, Correct failed to provide Smart with the exclusive right to provide its messaging services in Washington, Bowie, and Sebastian and caused Smart direct lost profit damages. Correct's "non-renewal" and termination attempts were ineffective and did not excuse Correct's breaches. Accordingly, the Court should enter final judgment in Smart's favor on each of its breach of contract counts and its unfair competition count.

## II.   The Terms of the Contracts

"To ascertain the intention of the parties to a contract, the trial court must examine the whole instrument, not just particular portions, and reach an interpretation

4

consistent with reason, probability, and the practical aspects of the transaction between the parties." *Bucacci v. Boutin*, 933 So. 2d 580, 585 (Fla. 3d DCA 2006) (internal quotations omitted).

### A.     The Meaning of the MSA

There are several relevant provisions of the MSA.

<u>Section 2: Exclusivity</u>

…During and subject to the terms and conditions of this Agreement, **Provider [Smart] shall be the sole and exclusive provider in lieu of any other third party of the inmate communications services contained within the Schedules, including inmate messaging** and email, texting, photo delivery… <u>MSA, ¶ 2.</u>

This provision is not ambiguous and, as such, the Court should construe the meaning without resorting to parol evidence. *CSX Transp., Inc. v. Prof'l Transp., Inc.*, 467 F. Supp. 2d 1333, 1338 (M.D. Fla. 2006) ("when a court determines a contract is complete and unambiguous, the parol evidence rule prohibits a party from introducing any evidence which contradicts or modifies the terms of the written agreement." citing *Spear v. MacDonald,* 67 So.2d 630, 635 (Fla.1953)). The plain language of the paragraph provides that Smart will be the exclusive provider *in lieu of any other third party*…The provision does not state that Smart will be the only provider *that Correct will hire* to provide messaging services.

Even if there was any ambiguity and parol evidence was considered, such evidence supports construction in favor of Smart. The key material term that Smart received in exchange for providing its services was the exclusive right to be the only provider offering those services at each particular facility. TT 8/19/24 pm, 42:11-43:21

5

[Doc. 361][1]. Smart requires complete exclusivity in "100% of the contracts" it enters and "[t]here has never been an exception in 15 years." *Id.*, 43:22-44:2. Correct has the exact same policy with respect to its phone services and would not place its services into a facility that had another simultaneous phone provider. Depo. Temple, 67:9-17 [Doc. 381-20 at 18]. Any attempt by CSG to argue that it was only obligated to grant Smart exclusivity *under CSG* was manufactured after-the-fact and is inconsistent with the language of the MSA, Smart's practice, Correct's practice, and the industry standard.

Given that neither party would ever enter into a non-exclusive agreement and especially considering the clear language of Paragraph 2, Smart's interpretation must prevail. Correct was obligated to deliver Smart complete exclusivity in Washington, Bowie, and Sebastian for the length of the term of each of those agreements. If Correct was not confident about its ability to provide that level of exclusivity, then it should not have agreed to do so. A failure to deliver that exclusivity during the term of its agreement(s) with Smart amounts to a material breach by Correct.

Section 6: Term

Section 6 of the MSA provides:

This Agreement shall commence on the "Effective Agreement with Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party

---

[1] The trial transcript shall be cited as TT, followed by the date, session, and docket entry.

notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

[Doc. 346-1].

The meaning of "coterminous" as used in Section 6 of the MSA is significant because CSG sent Smart a notice of non-renewal related to Washington and Sebastian. The relevant timeline and circumstances of each notice of non-renewal is discussed below; however, the Court can determine the meaning of the provision based on its plain language and the evidence admitted at trial. The starting point for the Court's analysis can be taken from its previous ruling:

> The last sentence begins with the phrase, "After the original term, . . . ." But the MSA does not have its own "original term" because it is "co-terminous with [CSG]'s Agreement with Facility as defined by Facility Address in attached Schedule." (*Id.*) For the same reasons, the MSA also does not independently have a "then current term." The contracts between CSG and the various facilities do, however, have original and then current terms.

Doc. 234, p. 5.

The Court determined that "the first clause of the last sentence of paragraph 6 of the MSA means that 'after the original term' of the contract between CSG and a particular facility, the MSA between Smart and CSG 'shall automatically renew in accordance with [CSG's] agreement with facility.'" *Id.*

Thus, the Court has already found that Smart is entitled to any renewal terms between Correct and the customers. The only remaining question is whether Correct may terminate Smart's right to participate in the renewal term by sending a non-

renewal notice. The answer to that question depends on the identity of each "party" in the following sentence of Section 6:

> After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

In its summary judgment order, the Court addressed Smart's argument that the parties described in *that sentence* are Correct and the customer facility:

> Thus, reading paragraph 6 in context, with the non-renewal provisions in CSG's contracts with Avoyelles and Washington in mind, **the notice of non-renewal in the MSA could reasonably be read as discussing the non-renewal of the contract between CSG and the respective facility** given that the MSA will not be automatically renewed if the agreement between CSG and the facility is itself non-renewed. **This interpretation is supported by the plain terms of paragraph 6** given that paragraph 6 states that the MSA's automatic renewal only occurs "in accordance" with the automatic renewal of CSG's agreement with the facility.

[Doc. 234, p. 7] (emphasis added).

This Court's analysis is even more persuasive when examining the parol evidence of the parties' negotiation of *the exact sentence* at issue. Deglman originally sent Turner a draft MSA with a fixed seven-year term. *See* [Doc. 346-12 and 346-13]. Section 6 in that draft ended with the following: "After the original seven (7) year term, this Agreement shall automatically renew annually for additional one (1) year terms unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term." *Id.*

8

When Turner returned the draft MSA, he told Deglman, "[t]he changes I made were in some small wording and **reference to how each party is identified**. I changed the term to define when it starts etc and how it is tied to our contract with the facility." [Doc. 346-19] (emphasis added). Turner's revised language stated: "After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term." *Id.*

At Deglman's request, Turner further clarified the facility language in the draft that became final. *See* [Doc. 346-20]. Turner added the reference to Attachment A, which was "a copy of our contract with the facility so there will be transparency to the terms we have with the facility itself." *Id.* Accordingly, Turner changed the very sentence that included the non-renewal language to insert the facility and to change how each party was identified. Turner's explanation referred to the term**s** Correct had with the facility, which could only be a reference to renewal terms between Correct and the facility. Again, only the Correct/facility contracts had original terms and renewal terms. The MSA could not renew, so it could likewise not be non-renewed.

On a broader level, the intent of the parties defeats Correct's ascribed meaning. First, Turner testified that Correct and Smart did the Avoyelles Parish agreement the right way and that future contracts would be done the same way. Turner 5-27-21, 132:7-9 [Doc 381-21, p. 35] Correct and Avoyelles Parish amended their agreement to include Smart's specific services. [Doc. 346-21]; TT, 8/23/24 am 59:6-60:5 [Doc. 357].

Moreover, Turner testified that his understanding of coterminous included an amendment to add Smart to the CSG/Avoyelles facility contract. Turner 5-27-21, 79:13-80:4 [Doc. 381-22, p. 22]. Turner acknowledged that Smart's services could not be removed from Avoyelles while Correct continued to operate under the contract. *Id.*, 132:25-133:22 [Doc. 381-21 at 35]. Similarly, Ferguson knew that Correct could not renew its contract with Sebastian without including Smart in the renewal. Ferguson, 268:1-8 [Doc. 381-4 at 69].

If Correct intended to obtain amendments inserting Smart's products into each facility, then Correct intended for Smart's services to be included in any renewal. Thus, Correct knew that it could not send a notice of non-renewal to Smart and then renew with the facility because Smart was part of the facility contract by virtue of the amendment. Whether Turner got the amendments is inconsequential.[2] The fact that he promised and intended to obtain amendments demonstrates his understanding of coterminous—that only the facility could send a notice of non-renewal, which would apply equally to Smart's services. *See* Turner 5-27-21, 76:4-77:1 [Doc. 381-21 at 21] ("I can't be obligated to help you return a profit in seven years, if I'm gone in four. There's no place for you to do it"); *Id.*, 66:8-67:1 [Doc. 381-21 at 19] ("what I didn't want to happen is for us to have, like, a three year contract, it not get renewed, and us be obligated to four additional years of having some place that we could not place the

---

[2] Smart is not asserting a claim for Correct's failure to obtain amendments to any of the facility contracts at issue. Rather, the importance of the amendment is that it illustrates the meaning the parties ascribed to coterminous.

product"); *Id.* 85:12-87:1 [Doc. 381-21 at 23-24] (confirming that amendment was important because Smart's services needed to be attached to the Washington contract).

Correct also acted consistent with the parties' intent that Smart's services, in particular, would become part of the contracts between Correct and customer facilities. For example, Turner told Deglman that Smart's services would be more broadly described within the facility contracts for new customers that Correct and Smart began servicing at the same time (as opposed to Smart's existing customers). *Id.*, 102:23-103:13 [Doc. 381-21 at 28]. And the parties followed through on that plan, identifying Smart's products and services as an attachment to the contracts between Correct and Lamar County and Correct and Moore County. *See* [Doc. 344-6 and 344-7]. Again, this demonstrates the parties' intent that Correct could not non-renew Smart. If Correct was truly concerned with being able to non-renew Smart for any reason or no reason, then Correct never would have added Smart to its facility contracts, including Avoyelles Parish, Lamar, and Moore.

In addition, Correct's ascribed meaning renders the non-renewal portion of Section 6 absurd and potentially illusory. The Washington agreement is illustrative. Correct and Washington had a one-year contract that has automatically renewed each year since 2015. [Doc. 346-2]. The renewal date was January 4th each year. *See* [Doc. 346-125].

Smart began providing its services on July 18, 2018. [Doc. 346-176]. If Correct's position controls, then Correct could have sent Smart a notice of non-renewal in October 2018—for no reason at all—causing Smart's services to expire less than six

11

months after Smart's installation, while continuing to provide its services under the same agreement with Washington. That result would be absurd. *S & S Packing, Inc. v. Spring Lake Ratite Ranch, Inc.*, 702 Fed. Appx. 874, 878 (11th Cir. 2017) ("Under Florida law, a court must construe a contract in a manner that accords with reason and probability and avoid an absurd construction." (citations and quotations omitted)). Moreover, Smart never would have entered into an agreement that required a free installation of its products and services if it could be removed after even 18 months, let alone six months. *See* TT, 8/19/24 pm 73:3-6 [Doc. 361].

Finally, Correct's ascribed meaning would render Section 9 (discussed below) meaningless because Correct would not have to follow the notice and opportunity to cure procedure upon performance default by Smart.  It could simply elect to wait until 90 days before the expiration of its current term with a facility and then "non-renew" Smart, avoiding its obligation to prove a performance default. For all of these reasons, the Court should declare that Smart's interpretation of Section 6 is correct.

Section 7: Limitation of Liability

Section 7 limits recovery of consequential damages, including lost profits. But Smart's damages are direct, as discussed in detail below.

Section 9: Default and Termination

Section 9 of the MSA provides, in relevant part:

> If either party defaults in the performance of any obligation under this agreement, then the non-defaulting Party must give written notice to the defaulting Party specifically describing the nature of default. The defaulting Party shall have thirty (30) days after receipt of notice of default to cure.

[Doc. 346-1].

Smart bargained for an opportunity to cure any performance related issues and Correct promised to provide that opportunity. Such a notice provision must be strictly construed to protect Smart's bargained-for rights. *See World Triathalon Corp. v. SRS Sports Center SDN.BHD,* 2005 WL 1924749, at *3 (M.D. Fla. Aug.10, 2005) (contractual default provision requires strict compliance). As a result, Smart could not have breached any of its contracts with Correct on performance grounds unless and until Correct provided a notice and opportunity to cure, which went uncured. *See Abecassis v. Eugene M. Cummings,* 2010 WL 9452252, at *5–6 (S.D. Fla. June 3, 2010), *aff'd,* 467 Fed. Appx. 809 (11th Cir. 2012) (barring breach of contract claim when plaintiffs failed to provide notice of the alleged breach and an adequate opportunity to cure).

Because Correct never sent a notice and opportunity to cure with respect to Washington, Correct cannot use purported performance issues to justify Smart's termination at Washington in support of either a breach claim or prior material breach defense. At Bowie, Smart could not have committed a performance-related breach until thirty days after receipt of the one-and-only notice to cure related to that facility (i.e. October 8, 2020) And at Sebastian, Smart could not have committed a performance-related breach until thirty days after the first notice to cure (i.e. October 13, 2019).

13

Section 25: Completeness of Agreement

This is a standard integration clause, which precludes reliance on any other oral agreements or representations. Correct presented evidence about "representations" Smart made during demonstrations of its products and services, including that Smart would provide remote video visitation or entertainment features that were not included in the parties' Schedules. Quite simply, Correct could not rely on those representations as a matter of law, unless they were included in the written agreements between the parties. *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *6 (S.D. Fla. Jan. 22, 2013) ("With regard to prior oral representations, Florida courts consistently find that "[w]here a plaintiff relies on oral statements at variance with written documents he or she has signed, the plaintiff's reliance is not reasonable as a matter of law.")

## B.     The Meaning of the Schedule (Correctional Grade)

Correct claims that Smart breached the MSA for each facility by failing to provide correctional grade tablets, as required by the Schedule between Smart and Correct for each facility. Each Schedule provides: "The SmartTablet is a custom, wireless, ruggedized and correctional-grade tablet of our custom specifications that will connect to our secure network."

### i.     Smart established a general industry standard for tablets at the relevant time period and Correct did not prove any other standard.

Correctional grade is not defined in any Schedule. "Under Florida law, unless the parties agree that disputed terms should have another meaning, disputed terms in

a contract should be given the meaning used by people in that trade, business, or technical field." *Apple Glen Invs., L.P. v. Express Scripts, Inc.*, 2016 WL 909322, at *11 (M.D. Fla. Mar. 10, 2016) (internal quotations omitted).

Smart presented evidence of the industry standard for what constituted a correctional grade tablet during the timeframe of the MSA and Schedules, *i.e.*, late 2017. First, Jon Logan testified that the tablet market for corrections was new in May 2017 when Smart demonstrated its tablets to Correct. TT, 8/19/24 pm 33:1-34:8 [Doc. 361]. Logan explained that all tablets available on the market were similar to Smart's in that they had a hard plastic casing with specialized security screws. *Id.* Logan drew on his first-hand experience and knowledge of other tablet providers in the industry, including GTL and J-Pay, to determine that Smart's correctional grade tablet was similar, if not superior, to other tablets on the market. *Id.*, 35:7-24. Further, Logan testified about the importance of software security for a corrections environment and that Smart's tablets included a lockdown feature required to prevent inmates from accessing unapproved internet sites and WiFi networks. *Id.*, 27:18-28:19; 35:7-24.

Second, Mark Turner explained Correct's response to a Request for Proposal issued by Montgomery County, Alabama dated October 19, 2017. TT 8/19/24 pm, 8:7-12:9 [Doc. 361]. The RFP is a real-time example of what a correctional facility required of tablets that would be placed into its facility. The RFP asked respondents to confirm that a tablet would (a) be minimum six-inch Android; (b) be customizable to prevent unauthorized access to unproved programs; (c) have antivirus software;

(d) have a charging dock; (e) be in "a protective covering to reduce breakage;" and (f) accept a generic headset. *Id*. Correct responded to these requirements and included Smart as the tablet provider. Turner understood that Montgomery County did not require unbreakable or indestructible tablets and expressly understood that there would be tablet breakage. *Id*.

> Ferguson, with his significant experience in corrections, agreed:
>
> Q. Did you have an understanding of what correctional-grade meant at the time of the demo?
> A. To me I did, yes, because I've worked in a jail.
> Q. So what was your understanding as of May 2017, as to what correctional-grade meant?
> A. That it was going to be pretty sturdy. It wasn't going to be easily destroyed.
> Q. Anything else?
> A. That's about all you need.
> Q. Well, you need software that the inmates can't manipulate in the wrong ways, right?
> A. That's true.
> Q. You need security monitoring of some sort, right?
> A. You do.
> Q. Okay. And you need to make sure that inmates can't just get online surf the internet however they want to do it, right?
> A. This is true.

Ferguson Depo, 50:25-51:19 [Doc. 381-4 at 15].

Correct did not offer any evidence to establish what constitutes a "correctional grade" tablet. CSG did not call an industry expert to give an opinion on the meaning. Nor did Correct elicit any evidence to establish what type of tablet damage or what percentage of tablet breakage would be within or in excess of industry standard.

### ii.      Smart's tablets met the industry standard for correctional grade.

As a threshold matter, Washington received Smart's second-generation (blue) tablet. TT 8/23/24 am, 61:20-23 [Doc. 357]. Correct did not present any evidence that the tablets installed at Washington were not ruggedized or correctional grade.

Correct approved and accepted the same tablets that were ultimately installed at Bowie and Sebastian after having numerous opportunities to handle them. The Correct leadership team, including Turner, Ferguson, and Temple, attended Smart's presentation at Correct's headquarters. They passed around a black, first-generation SmartTablet and all had a chance to handle the tablet. Turner saw the tablets at other demonstrations as well. Turner 5-27-21, 46:26-47:14 [Doc. 381-21 at 14]. No one at Sebastian raised any concerns about the durability or structure of the tablet during the Sebastian demonstration. E. Smith Depo. 85:15-23 [Doc. 381-18 at 23]. Turner even noticed the security screws around the tablet and assumed they were security screws like Correct used for its phones. Turner 5-27-21, 55:7-17 [Doc. 381-21 at 16]. In sum, Turner was satisfied with the tablet. *Id.*, 54:16-18 [Doc. 381-21 at 16].

Ferguson admitted:

Q. Do you believe that the Smart tablets that were placed into those four facilities were correctional-grade?
A. At the time, yes. They were the only ones I had ever seen.
Q. So when they were installed into those four facilities, is it your opinion that the Smart tablets were correctional-grade at that time?
A. At that time, yes.

Ferguson Depo, 86:8-16 [Doc. 381-4 at 24].

Accordingly, CSG did not present evidence that Smart's black tablets were not correctional grade when Smart and CSG entered into the MSA and Schedules.

Evidence of other tablets on the market also confirms that Smart's tablets were consistent with the industry standard. When Sebastian conducted its Request for Information process, its officers reviewed tablet submissions and generated written feedback to support their vendor rankings. Captain Dumas reviewed submissions from the two largest corrections vendors, GTL and Securus, and found that they "did not look rugged" and "basically looked like what we were getting rid of with Smart." Sebastian (Dumas) Depo. 2-23-21, 184:25-185:16, 185:22-186:19, 187:17-188:02 [Doc. 381-15 at 48]. And GTL and Securus submitted their tablets in response to an RFI issued in 2020, nearly three years after Smart's tablets were defined amongst the parties as correctional grade, proving that Smart's tablets were certainly consistent with the industry standard in 2017.

With respect to breakage, Correct failed to submit any data about the rate or ratio of damage of Smart's tablets, instead choosing to rely on anecdotal evidence from corrections officers. A broken tablet here or there means nothing to the overall question of whether Smart provided correctional grade tablets. Numerous witnesses testified that inmates can break anything, including Correct's own equipment, and have fashioned weapons out of everything from toothbrushes to pencils *See, e.g.*, Turner 5-27-21, 55:07-56:18 [Doc. 381-21 at 16]; E. Smith, 98:04-20 [Doc. 381-18 at 27]. Moreover, most of Correct's tablet evidence emanated from Sebastian County. Jon Logan testified that Smart has never seen the rate of damage that Sebastian County

inmates inflicted on tablets. TT 8/19/24 pm, 59:23-61:4 [Doc. 361]. Logan's testimony was supported by Joshua Oliver, who testified that the Sebastian County jail was, "[a]s far as like cleanliness, violence – just every aspect, it was just absolutely horrible, honestly." Depo. Oliver, 10:11-11:14 [Doc. 381-13 at 5].

## III.   Smart's Claims

### A.    Counts III and IV: Correct Breached the Washington Agreement

The contract between Smart and Correct relating to Washington County included the MSA, the Schedule for Washington, and the Services Contract between Correct and Washington. *See* Fourth Amended Complaint, ¶ 172, Ex. CC [Doc. 93]; *see also* J1, ¶ 6 (identifying Correct's agreement with facility as Attachment A) [Doc. 346-1]; J17 (Turner telling Deglman that "[o]ur agreement with the account will be included as an Addendum to our Agreement with Smart since it will be referenced for term and deliverables.") [Doc. 346-17]

Correct breached the Washington agreement by failing to provide Smart exclusive rights to provide its messaging services in Washington and by renewing its contract with Washington without including Smart in the renewal. Correct also, or alternatively, breached the implied covenants of good faith and fair dealing included within those contracts related to the exclusivity and term provisions.

#### i.       Correct breached the MSA for Washington by failing to provide exclusive access, which led to Smart's removal.

Tech Friends was providing messaging services in Washington as a subcontractor of Summit during the entire tenure of Smart's presence at the facility.

During the limited 18 months that Smart was allowed to provide its services and generate revenue in Washington, inmates sent more than 65,000 messages through the Tech Friends platform. *See* J137 [Doc. 346-137]. Thus, from day one, Smart never received its primary right under the Washington agreement—exclusivity.

Moreover, Smart's time in Washington was cut short because Correct failed to convey exclusive messaging rights to Smart in the first place. On December 11, 2019 Summit alerted Washington of its own exclusive rights to provide messaging services in Washington and gave Washington 15 days to cure the breach. *See* J133 [Doc. 346-133]. In turn, Washington informed Correct that Smart must be removed from the facility within that same 15-day deadline. *Id.* Correct forwarded Washington's correspondence to Smart and demanded that Smart "must cease providing email services to inmates at the Washington County facility immediately." *See* J134 [Doc. 346-134]. Correct's stated reason for the demand was that "Washington County…had previously entered a contract with a third-party vendor, Summit Food Services ("Summit"), for commissary goods and services at the Washington County Facility that provides Summit the exclusive right to provide email services to the inmates at the facility." *Id.*

Accordingly, there is no dispute that Smart's rights in Washington were extinguished in December 2019 because Correct failed to provide exclusivity. Correct's failure to provide Smart with the exclusivity required by the MSA was the legal cause of Smart being removed from the Washington facility and being damaged.

###### ii.    Correct did not Non-Renew the MSA for Washington.

As described above, Correct could not send a notice of non-renewal to Smart and remove Smart from the relationship while continuing its contract with Washington. But, even if a non-renewal was permitted, it did not occur for Washington. Correct sent its notice of non-renewal to Smart on October 4, 2019. Ex. J125 [Doc. 346-125]. The non-renewal, or expiration of the Smart/Correct MSA for Washington would then have occurred 90 days later, on January 2, 2020.

So, before the non-renewal could have possibly become effective, Smart was removed from Washington due to another entity having exclusive rights to Smart's revenue-generating service. In its December 13, 2019 demand, Correct even acknowledged that the non-renewal had not become effective: "…it seems as though Washington County would like Smart to continue providing mail scanning services, if possible, at the facility – at least until the dispute regarding Correct Solutions' Notice of Non-Renewal to Smart concerning the MSA between Correct Solutions and Smart and the terms of Schedule 1 – Washington County, Arkansas to the MSA, is resolved." [Doc. 346-134].

###### iii.    None of Correct's other Affirmative Defenses Excuse its Breach.

Correct did not prove any defenses that would excuse its breach. For example, Smart provided Washington with its second-generation blue tablets. Correct did not advance evidence that these tablets failed to meet any defined standard of "correctional grade" or "ruggedized." Moreover, Correct never sent Smart a notice to cure during

the entire tenure of Smart's services at Washington. Without such a notice, Smart could not have breached a performance-related obligation.

At best, Correct may point to testimony from Alan Johnson that he notified Smart in July 2019 that Washington was displeased and wanted to search for a new messaging vendor. Importantly, Johnson's communication came after Ferguson contacted him, saying he had not heard from Washington, but that CSG was having problems with Smart with other customers. [Doc. 346-88]. But this does not qualify as the notice to which Smart was entitled under the MSA, which must strictly comply with Section 9 of the MSA. Smart was Correct's subcontractor and it was Correct's obligation to ensure that Washington acted consistent with the promises Correct made to Smart. Notwithstanding, as described above, neither Washington nor Correct terminated Smart's services due to Smart's performance.

### iv.      Damages Caused by Correct's Breach at Washington.

Smart received only 18 months to generate revenue in Washington. After Smart's removal, Correct continued to renew its contract with Washington County— the same contract that would have included Smart's services but for Correct's breach of the exclusivity provision of the contract. Smart's damages related to Washington through the date of trial, based on historical monthly revenue data offset by the incremental costs associated with Smart providing ongoing services at Washington, total $1,461,993. *See* TT, 8/21/24 am 34:14-44:5 [Doc. 355]; Oscher Demonstrative [Doc. 380-1, 3]. These damages include the profit Smart would have generated for the Tech Friends messages sent during Smart's exclusive term.

These damages are not speculative because Correct did, in fact, renew its contract with Washington for 2020 through the date of trial and, pursuant to the parties' agreement, Smart should have been included with those renewals. Even if this Court were to find that damages beyond one contract term are speculative, then it should still find in favor of Smart for being left out of the 2020 renewal, which totals damages of $323,123.22 (twelve times the average monthly revenue times the profit percentage).

**B.    Counts VIII and IX: Correct breached the MSA for Bowie**

The contract between Smart and Correct relating to Bowie County included the MSA, the Schedule for Bowie, and the Services Contract between Correct and Bowie.

**i.    Correct breached by not allowing a cure.**

Correct first breached this contract by entering into an agreement with Tech Friends to grant Smart's exclusivity to another provider. Turner testified that he began discussions with Tech Friends about replacing Smart at Bowie because he "continued to receive notification of problems after problems in the field, and our customers were getting upset. I had to begin formulating, well, what happens? What happens if this thing doesn't work out…" TT, 8/21/24, pm, 44:3-15 [Doc. 363].

Turner's testimony is not credible. Correct began exchanging drafts of the MSA with Tech Friends in March 2019. *See* P44 [Doc. 344-8] This was months before Bowie testified that it was still having no issues with Smart. *See* Cantu, 42:7-13 [Doc. 381-1 at 13] (as of June 24, 2019, Bowie had no issues with Smart's performance); P22 [Doc. 344-1] (no issues with Smart as of November 2019). Moreover, there is no

evidence of Turner receiving "notification of problems after problems" from Bowie. If it was such an issue, why didn't Bowie send a notice or at least an email to Correct to memorialize service complaints? And why didn't Correct send a notice of non-renewal (ever) or a notice to cure to Smart until more than a year into this lawsuit, in September 2020? [Doc. 346-186]. Bowie did not request the notice to cure and did not consult with Correct about the notice or even review the notice. *See* Cantu, 69:13-70:4 [Doc. 381-1 at 19-20].

At trial, the Court expressed concern about whether Smart required a direct contract or extension with Bowie before agreeing to upgrade its tablets. In April 2020, Smart's salesperson, Paige Grofe, sent the email requesting the contract extension in accordance with company policy. TT 8/20/24, pm, 12:19-13:25 [Doc. 362]. Ferguson contacted Grofe and told her that Correct controls the contract with Bowie and that there was no interest in upgrading the tablets. [Doc. 346-164]. Ferguson told Cantu the same thing. Ferguson, 290:13-21 [Doc. 381-4 at 75]. There was no further discussion about an upgrade until four months later and, during those communications, Smart did not mention a direct contract or extension. *See* Cantu, 116:17-118:1 [Doc. 381-1 at 31-32]. Smart also complied with Ferguson's directive and copied Correct on further communications.

On September 8, 2020, Correct sent its notice to cure. Smart responded, indicating that Smart would upgrade the tablet system. Correct responded to Smart, acknowledging that Smart agreed to the upgrade without an extension or direct contract with Bowie. However, Ferguson testified that he would not allow the upgrade

24

because he did not want to continue to work with Smart. Ferguson, 226:21-228:6 [Doc. 381-4 at 59]; 252:15-253:6 [Doc. 381-4 at 65]; 281:10-282:3 [Doc. 381-4 at 72-73] (nothing Smart could have done to allow an upgrade in Bowie); 292:3-19 [Doc. 381-4 at 75] (acknowledging Smart's offer to upgrade without a new contract and stating that CSG was not willing to do it).

Thus, the timeline illustrates that Smart never requested a contract from Bowie after the date of Correct's notice to cure. Instead, Smart offered to cure, which CSG acknowledged.

| OFFERS TO UPGRADE TABLETS IN BOWIE COUNTY | | |
|---|---|---|
| **DATE** | **EVENT** | **EXHIBIT** |
| April 23, 2020 | Email from Smart to Bowie County:<br><br>"My management team would really like to resolve the issue with the old tablets and upgrade to new ones. We would simply need a new contract to be signed so we can securely invest in the upgrade throughout the facility.<br><br>Thank you so much and please let me know what we need to do to make this happen!" | J163 |
| April 23, 2020 | Email from Ferguson to Smart:<br><br>CSG controls the contract for this facility and currently there is no interest in upgrading your product. | J164 |

| OFFERS TO UPGRADE TABLETS IN BOWIE COUNTY | | |
|---|---|---|
| DATE | EVENT | EXHIBIT |
| August 19, 2020 | Email from Smart to Bowie County:<br><br>"As per our conversation, please discuss with the Warden that we would like to upgrade the tablets to our latest version rather than coming to do another walk thru of the existing infrastructure.<br><br>We are prepared to come immediately upon approval." | J183 |
| August 31, 2020 | Email from Smart to Bowie; copying Correct:<br><br>"We have not yet heard from you regarding our request to upgrade your facility to our latest tablet system. As we discussed, this will alleviate the need for the walk through that has been requested via our trouble ticket system, as well as address any outstanding issues with charging cables or otherwise, since we will be replacing the current system.<br><br>Per your request, we have also copied Rick Pruitt on this email.<br><br>Please advise when we can schedule the installation. We look forward to hearing from you." | J184 |
| September 1, 2020 | Email from Correct to Smart:<br><br>"I reviewed the note and wanted to make sure I understood correctly your intentions in Bowie County TX. Smart wants to replace existing equipment with new equipment? This is to be done with no new agreement correct? | J185 |
| September 8, 2020 | Correct sends Smart a Notice to Cure asserting that the tablets are non-ruggedized and not correctional grade. | J186 |

| OFFERS TO UPGRADE TABLETS IN BOWIE COUNTY | | |
|---|---|---|
| DATE | EVENT | EXHIBIT |
| September 17, 2020 | Smart responds to the Notice to Cure and requests access to provide the upgrade. | P26 |
| September 18, 2020 | Correct responds to Smart's letter: ". . . based on your letter of September 17, 2020, it appears that Smart Communication is now willing to provide Bowie County with the necessary fixes through upgrades without any new contract." | J187 |
| January 27, 2021 | Smart emails Correct; copying Bowie County "Rick, Mr. Cantu asked that we coordinate the tablet install with you before proceeding. Please let me know next steps." | P28 |
| February 1, 2021 | Smart emails Correct; copying Bowie County "Just checking in again on this. If there is someone else I should reach out to, please let me know. | P28 |
| March 22, 2021 | Correct terminates Smart at Bowie County | J192 |

Correct then terminated Smart for failing to effectuate the very same cure Correct would not allow. Yet, CSG continued to provide service to Bowie under the same contract. Depo. Temple, 81:4-13 [Doc. 381-20 at 22]. On these facts, CSG breached its contract with Smart by failing to accept a cure, terminating the contract, and continuing to work under its contract with Bowie without including Smart.

ii.     **Smart's Damages.**

Smart completed its installation of equipment and began providing its services in Bowie County in June 2018. Smart's services were disabled in June 2021. Accordingly, Smart had only approximately 3 years to service and generate revenue in Bowie County.

Smart's damages related to Bowie through the date of trial, based on historical monthly revenue data offset by the incremental costs associated with Smart providing ongoing services at Bowie, total $594,986. *See* Oscher Demonstrative [Doc. 380-1]. Even if this Court were to find that damages beyond one contract term are speculative, then it should still find in favor of Smart for being left out of the 2021-2022 renewal, which totals damages of $196,400.74 (twelve times the average monthly revenue times the profit percentage).

C.     **Counts V and VI: Correct breached the MSA for Sebastian**

Correct also breached the Sebastian contract by entering into the Tech Friends master services agreement and agreeing to provide Smart's exclusivity to a competitor. After this lawsuit was pending, Correct sent a notice to cure but did not end up terminating Smart based on the notice to cure. Instead, Ferguson told Sebastian to terminate Correct and then initiate a non-binding Request for Information ("RFI") process. Ferguson even gave Captain Dumas the RFI form that was used.

In a normal RFI process, a facility will publish a very detailed and specific request that includes certain submission deadlines and communications rules. [TT 8/23/24 am, 56:19-24 - Doc. 357]. Typically, the RFI stays open for one to two

28

months to give everyone adequate time to respond, and then the agency usually takes an additional couple of months to make a decision. [TT 8/23/24 am, 57:3-20 – Doc. 357]. In total, the process takes anywhere from three or four months to well over a year. *Id.*

With respect to Sebastian's RFI, Correct and Tech Friends quickly prevailed and were chosen as the "new" providers. The meeting to review the RFI submissions lasted an hour and Correct was awarded the phone contract on the same day. Depo. Sebastian 2-23-21, 189:01-13 [Doc. 381-15 at 49]. In stark contrast to the ordinary, lengthy process, Correct maintained its status as Sebastian's phone provider the entire time without its equipment ever being turned off or missing a day of phone revenue. Although Correct had a "new" contract with Sebastian, in reality it was nothing more than a de facto renewal of the contract with which Smart has coterminous rights.

### i.    None of Correct's Affirmative Defenses Excuse its Breach.

Correct alleges that Smart's performance was a material breach. On September 13, 2019, while the lawsuit was pending, Correct sent its first Notice to Cure regarding Sebastian County. J124 [Doc. 346-124]. Correct's demand included repairing any broken or defective tablets. Three days later, Smart replaced 24 tablets. J127 [Doc. 346-127]. CSG never pursued the Notice to Cure to fruition and never terminated the contract with Smart for any performance reason. Instead, as discussed above, Ferguson and Sebastian pursued the non-renewal of CSG's contract followed by the RFI process. Thus, Smart did not breach the agreement prior to CSG's breach.

ii.     **Smart's Damages.**

Smart completed its installation of equipment and began providing its services in Sebastian County in or around January 2018. Smart's services were disabled on May 18, 2020. Accordingly, Smart had less than 2.5 years to service and generate revenue in Sebastian County.

Smart's damages related to Sebastian through the date of trial, based on historical monthly revenue data offset by the incremental costs associated with Smart providing ongoing services at Sebastian, total $435,159. *See* Oscher Demonstrative [Doc. 380-1]. Even if this Court were to find that damages beyond one contract term are speculative, then it should still find in favor of Smart for being left out of the 2020-21 renewal, which totals damages of $124,382.16 (twelve times the average monthly revenue times the profit percentage).

**D.     Count X: Correct unfairly competed when it conveyed Smart's exclusive rights to a competitor**

As referenced above, Correct conveyed rights to Tech Friends that belonged to Smart. Correct and Tech Friends are both competitors of Smart to the extent that they pursue and bid on contracts at correctional facilities that require messaging services. During the term of the MSA and while Smart was not in default, Correct introduced Bowie and Sebastian to Tech Friends and facilitated those relationships. In March 2019, Ferguson texted with Captain Dumas about bringing Tech Friends into Sebastian County. P50 [Doc. 344-12 at 2]. In June 2019, Dumas asked Ferguson when he could see the agreement with Tech Friends. *Id.* at 3.

Correct signed an expansive agreement with Tech Friends, effective June 1, 2019, that included Sebastian and Bowie as "Legacy Accounts" that would fall under the agreement. [Doc. 346-100]. Once their agreement became effective, CSG conveyed Smart's exclusive rights in Bowie and Sebastian to a competitor. CSG's conduct resulted in Bowie and Sebastian switching from Smart to Tech Friends for messaging and tablet services. *See* Depo. Neal, 12:3-21 [Doc. 381-12 at 5]; Depo. Sebastian, 2-23-21, 79:9-80:19 [Doc. 381-15 at 22].

As a result of Correct's unfair competition, Smart was damaged in the form of lost profits at Bowie and Sebastian in the amounts described above.

### E.     All of Smart's Damages are Direct and Permitted by the MSA

As explained above, the MSA and corresponding Schedules granted Smart the right to be the exclusive provider of messaging services at certain facilities. The MSA specifically provides that Correct "grant[ed] [Smart] the exclusive right and license to install, maintain and derive revenue from the Systems through [Smart's] inmate services and Systems . . ." [Doc. 346-1]. When Correct improperly terminated Smart and forced it out of the facilities, it deprived Smart of its exclusivity rights and its right to "derive revenue" as promised. Smart seeks recovery of the profits it lost as a result of Correct's breach.

### i.     The MSA does not preclude recovery of direct damages.

Section 7 of the MSA provides, in part, that neither party shall have any liability for "indirect, incidental, consequential, exemplary or special damages of any kind, including damages arising from lost profits…" [Doc. 346-1]. Although Section 7

31

references "lost profits," lost profit damages are only barred if they are properly characterized as "indirect, incidental, consequential, exemplary, or special damages." *See Nview Health, Inc. v. David V. Sheehan,* No. 8:21-cv-385, 2022 WL 16923585, at *22 (M.D. Fla. Nov. 14, 2022), citing *Arwood v. AW Site Services, LLC*, 2022 WL 973441, at *2 (Del. Ch. Mar. 31, 2022) ("including" indicates that the following clause is a subset or part of the precedent whole); *Shady Hills*, 2022 WL 4774450, at *17 (finding direct lost profits were "definitionally excluded from the term 'lost profits'" as used in the agreement at issue). Thus, lost profits that are not "indirect, incidental, consequential, exemplary, or special damages" are not barred by the MSA and can be recovered by Smart.

### ii. Smart's damages for its breach of contract claims are direct damages.

"General damages are those damages which naturally and necessarily flow or result from the injuries alleged." *Hardwick Properties, Inc. v. Newbern,* 711 So. 2d 35, 39 (Fla. 1st DCA 1998). "Stated differently, 'general damages are commonly defined as those damages which are the direct, natural, logical and necessary consequences of the injury.'" *Underwriters at Interest v. All Logistics Group, Inc.*, No. 1:19-CV-21889-KMM, 2020 WL 13220631, at *3 (S.D. Fla. Oct. 15, 2020) (quoting *Fla. Power Corp. v. Zenith Indus. Co.*, 377 So. 2d 203, 205 (Fla. 2d DCA 1979)). In contrast, "consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably

foreseeable by the breaching party at the time of contracting." *Newbern*, 711 So. 2d at 40.

Lost profits are often categorized as consequential damages rather than general damages. However, as this Court has explained, "lost profits do not ***always*** constitute consequential damages as a matter of law. For example, lost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract." *Shady Hills Energy Ctr., LLC v. Seminole Elec. Coop., Inc.*, 2022 WL 4774450, at *17 (M.D. Fla. Oct. 3, 2022); *see also Nview,* 2022 WL 16923585, at *22 (recognizing that "lost profits cannot mechanically be classified as consequential damages."); *Bird Lakes Dev. Corp. v. Meruelo*, 626 So. 2d 234, 238 (Fla. 3d DCA 1993) ("Lost profits are recoverable as general damages where they flow directly and immediately from the breach of a contract"); *HCA Health Services of Florida, Inc. v. CyberKnife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469, 471 (Fla. 4th DCA 2016). As one court put it, "[l]ost profits may be either general or consequential damages, depending on whether the non-breaching party bargained for such profits and they are the 'direct and immediate fruits of the contract.'" *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.,* 22 N.Y.3d 799 (2014) (citing *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 109 (2d Cir. 2007)).

Here, Smart's lost profits damages constitute direct general damages. When Smart entered into the MSA and Schedules with Correct, it bargained for the exclusive right to provide messaging services in the relevant facilities, along with the

corresponding exclusive right to earn revenue from those services. Indeed, the MSA explicitly grants Smart the "exclusive right" to "derive revenue" from its messaging services. This was the very essence of Smart's agreement with Correct. When Correct breached the MSA by ousting Smart from the facilities and depriving Smart of its exclusivity rights,  the "direct, natural, logical and necessary" consequence of those actions was that Smart was unable to earn *any* revenue or profit from the relevant facilities. Lost profits from thwarted sales are direct damages when that business was "precisely what the nonbreaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed." *M & G Polymers USA, LLC v. Carestream Health*, 2010 WL 1611042, at *31-32 (Del. Super. Apr. 21, 2010). And the lost revenue and profit from these facilities is precisely what Smart bargained for in the MSA and Schedules.

Moreover, Smart's damages only depend on its relationship with Correct and not some tangential or collateral agreement. Each MSA and Schedule were part of a contractual arrangement that *also included* the agreement between Correct and a customer facility. The Correct/facility contract is referenced as Attachment A to the MSA. Further, each Schedule between Smart and Correct was unique to each customer facility and identified the facility address, equipment and services that Smart would provide "as required by Customer at the facility," and the revenue Smart would generate for each service. Correct assumed the additional obligations to provide Smart with access to the facility and a twice-daily electronic list of all inmates residing in the

facility. Clearly, Smart's ability to sell its services in each customer facility was fundamental to the contract between Smart and Correct.

Further evidencing the fact that Smart's lost profits are direct damages is the fact that Correct was supposed to insert Smart's services into its facility contracts by using an amendment, as it did with the first contract between the parties for Avoyelles Parish. [Turner, v.1, Doc. 381-21 at 24 (87:18-88:16); Doc. 381-21 at 35 (131:16-132:9)]. As discussed above, Correct understood that the facility could not renew CSG's contract without including Smart, as Smart was now integrated into Correct's facility agreement and relationship. [Turner, v.1, Doc. 381-21 at 35-36 (132:25-134:06)].

Case law from other jurisdictions further supports that the Smart's damages are direct damages. In *Biotronik,* the plaintiff, a medical device distributor, and defendant, the developer and manufacturer of a coronary stent, entered into an agreement designating the plaintiff as the exclusive distributor of the stent throughout much of the world. Due to an issue with FDA trials, the defendant recalled the stent and removed it from the market.  *Id.* at 679. The plaintiff sued for breach of contract and sought lost profits; however, the parties' agreement explicitly excluded the recovery of consequential damages. The trial court held that plaintiff's lost profits were consequential damages and thus were precluded. *Id.*

The Court of Appeal reversed and held that under the exclusive distribution agreement, lost profits should be characterized as general, not consequential, damages. *Id.* The Court explained, "[t]he contract clearly contemplated that plaintiff would resell

defendant's stents. That was the very essence of the contract. Any lost profits resulting from a breach would be the natural and probable consequence of that breach." *Id.* at 682 (citations and quotations omitted). The court rejected the dissent's argument that plaintiff's lost profits were consequential damages because the contract did not require any payments from defendant to plaintiff, stating that this is an argument that placed "form over substance." *Id.* "Whether lost profits are the natural and probable result of a breach does not turn on which party actually takes out the checkbook at the end of the fiscal quarter. Instead, we look at the nature of the agreement." *Id.*

In *Gardensensor, Inc. v. Stanley Black & Decker, Inc.,* 2014 WL 4764628 (N.D. Cal. Sep. 24, 2014), the plaintiff developed a sensor that a customer would insert into the ground to take readings of the soil, light, and temperature. The customer could then connect the device to his or her computer and get recommendations for growing house or garden plants based on the readings. The plaintiff generated revenue from sales of the product itself and related web-based revenues. The plaintiff subsequently entered into an agreement with the defendant pursuant to which Black & Decker had the exclusive right to manufacture and sell the device and was also obligated to market the device. Black & Decker agreed to pay plaintiff 10% of the net sale price of each unit sold during the term of the contract. However, Black & Decker did not have any claim to plaintiff's web revenue or subscription revenue, which the plaintiff would retain after collecting from third parties. *Id.* at 1, 4.

The plaintiff sued Black & Decker arguing that it breached the contract by not marketing the device as required. The agreement included a damages limitation

provision that precluded consequential damages. The plaintiff argued that it was entitled to recover web-based revenues and royalties because 'selling the [sensor] and related web-based services, on which both parties depended for their respective payments ... was the 'very essence' of the Agreement," and that the loss of profits it is seeking "was the natural and probable consequence of B & D's breach and are, therefore, properly categorized as direct damages." *Id.* at 4. Considering the "agreement in its entirety, the Court finds that a reasonable juror could conclude that the lost profits sought by [plaintiff] are what [plaintiff] bargained for when it entered into the agreement. Therefore, Gardensensor's lost profits are not barred by the damages limitation provision in the agreement." *Id.*

In a different context, this Court in *Local Access, LLC v. Peerless Network, Inc.*, No. 6:14-cv-399, 2016 WL 5373326, at *8 (M.D. Fla. Sept. 26, 2016) also found that direct lost profits were not barred by a contractual limitation barring consequential damages, including lost profits. The plaintiff alleged that Peerless failed to assign or refer prepaid calling card clients who desired to purchase origination services and sought to recover the revenue it would have earned had Peerless held up its end of the bargain. *Id.* This Court found that "[t]here should be no doubt that lost revenues are the type of damages one would normally associate as directly flowing from a broken promise to assign clients who would have supplied those revenues." *Id.*

Although the cases cited above apply law from other jurisdictions, the legal concepts concerning damages are not novel or unique to those jurisdictions. Here, Smart's damages are direct damages akin to those suffered by the plaintiffs in *Biotronik,*

37

*Gardensensor,* and *Local Access.* The MSA is an exclusivity agreement just like the agreements in *Biotronik* and *Gardensensor.* The "very essence" of CSG's obligations under the MSA was to provide Smart with "**the exclusive right** and license to install, maintain and **derive revenue** from the Systems through [Smart's] inmate services" and to ensure Smart was "the exclusive provider in lieu of any other third-party provider of the inmate communications services contained within the Schedules." *See* Doc. 346-1, ¶ 2.  The Schedules to the MSA further provide that Smart "shall be entitled to all revenue derived from electronic messaging and photo delivery." [Doc. 346-31, 346-40, 346-41]. The fact that Correct did not pay Smart directly is of no consequence and is an argument of "form over substance." *Biotronik.,* 22 N.Y.3d at 682; *see also Optima Media Group Ltd. v. Bloomberg L.P.*, 2021 WL 1941878, at *20 (S.D.N.Y. May 14, 2021) ("Though the advertising slots and revenue sharing payments technically require additional transactions with third parties, profits which require a collateral transaction can still constitute general damages even though they involve a third-party transaction.") The holdings of *Biotronik* and *Gardensensor* instruct that, when an exclusive provider loses its exclusive status due to a breach, the provider suffers direct damages.    Based on the foregoing, Smart's lost profits damages are direct damages.

*    *    *

Because Section 7 of the MSA does not preclude recovery of direct damages and because Smart's lost profits are properly characterized as direct damages, the

damages Smart seeks are not precluded by Section 7 and may be awarded by this Court.

## III.   Correct's Counterclaims

Correct sought damages at trial related only to Sebastian County under three claims: (i) tortious interference; (ii) breach of contract and/or breach of the implied covenant of good faith and fair dealing; and (iii) unfair competition.

### A.   Smart Has No Liability

Smart cannot be liable to Correct under a tortious interference theory because Smart is not a stranger to the relationship between Correct and Sebastian. *Williams Elec. Co. v. Honeywell, Inc.*, 772 F. Supp. 1225 (N.D. Fla. 1991) (finding no cognizable tortious interference claim against a party that is not a stranger to the relationship, including a subcontractor to the relationship between the contractor and a customer). Whether a traditional subcontractor or not, there is no doubt that Smart, Correct, and Sebastian were part of the same relationship that involved the provision of Smart's services.

In addition, Correct did not prove that Smart engaged in unjustified and improper conduct. *Networkip, LLC v. Spread Enterprises, Inc.*, 922 So. 2d 355, 358 (Fla. 3d DCA 2006) ("A cause of action for tortious interference requires a showing of both an intent to damage the business relationship and a lack of justification to take the action which caused the damage."). Correct's tortious interference claim is predicated, in part, on the idea that Smart purportedly instructed its employee, Bruce Johnson, to no longer maintain or support the software Correct used to provide its services.

However, there is nothing improper or unjustified about Smart directing its employee to only perform work for Smart and not for the benefit of Smart's competitor. Jon Logan testified that all Smart employees are permitted to work only for Smart and not for a competitor. And, as the Court recognized, Smart did not have a noncompete with Correct. Moreover, Correct did not actually lose any maintenance or upgrades to its phone system and did not suffer any negative effects. Thus, Correct failed to prove its tortious interference claim. *Genet Co. v. Anheuser–Busch, Inc.,* 498 So.2d 683, 684 (Fla. 3d DCA 1986). ("There can be no claim [for tortious interference with a business relationship] where the action complained of is undertaken to safeguard or promote one's financial or economic interest.")

Further, Correct did not prove that Sebastian breached its contract with Correct due to interference by Smart. Rather, the evidence established that Sebastian exercised a contractual right to non-renew its agreement with Correct. Because Smart did not cause Sebastian to breach its contract with Correct, Correct's tortious interference claim fails as a matter of law. *See Am. Med. Intern., Inc. v. Scheller,* 462 So. 2d 1, 9 (Fla. 4th DCA 1984) ("The evidence was that no doctor breached his relationship with the plaintiff. Unsuccessful interference is simply not the kind of interference upon which a tort may be founded or upon which damages may be assessed."); *Hager v. Venice Hosp., Inc.,* 944 F.Supp. 1530, 1535 (M.D. Fla. 1996) (granting summary judgment on tortious interference claim because plaintiff failed to establish an underlying breach of contract).

For the same reasons, Correct did not prove that Smart engaged in unfair competition. *See Manufacturing Research Corp. v. Greenlee Tool Co.,* 693 F.2d 1037, 1040 (11th Cir.1982) (explaining that an unfair competition claim based on an act of tortious interference has the same elements as a tortious interference claim including "damage to the plaintiff as a result of the defendant's actions").

With respect to its contract claim, CSG supposedly lost profits due to a lower call rate in the "new" contract it obtained with Sebastian. An action for breach of contract requires the plaintiff to prove that the defendant's breach caused the complained of damages. *See Cole v. Plantation Palms Homeowners Association, Inc.,* 371 So. 3d 413, n. 2 (Fla. 2d DCA 2023) ("The elements of a breach of contract claim are (1) the existence of a contract; (2) a breach of the contract; and (3) **causation of damages as a result of the breach**" (emphasis added)); *Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784 (11th Cir. 1999) ("A party cannot recover damages for breach of contract unless it can prove that the damages were proximately caused by the breach") Here, Correct failed to prove that Smart's breach, as opposed to other factors, caused the decreased value of its new contract with Sebastian. Sebastian awarded the telephone contract to Correct without regard to phone rates. After it already had the contract, Correct voluntarily offered Sebastian the lower rate of $.30 because its contract was too high to begin with because it was premised on an obligation that Correct never had to perform. Ferguson, 284:23-285:21. Further, CSG voluntarily chose to lower the old rate of $.40 to the new rate of $.30 because it would be "a heck of an olive branch…" J139 [Doc. 346-139]. And Sebastian signed the very

first draft of the contract prepared and sent by Correct. Ferguson, 288:5-7 [Doc. 381-4 at 74]; Depo. Lowrimore, 79:21-80:14 [Doc. 381-11 at 22]. Even if Sebastian requested the lower rate in the new contract, it had nothing to do with Smart's services. Ferguson, 286:10-16 [Doc. 381-4 at 74]. It was strictly to help out the community. *Id.*

Given CSG's voluntary conduct in lowering the rate, it did not prove that Smart caused damages resulting from the lower rate.

### B.    Correct Has No Recoverable Damages

Correct cannot recover either category of its claimed damages for the reasons described above. Correct cannot recover Bruce Johnson's wages as damages for several additional reasons. First, Correct did not disclose them in accordance with its Rule 26 obligations. Smart raised this objection throughout the case and during trial. *See, e.g.,* TT, 8/22/24 pm, 57:20-58:3 [Doc. 364].

Second, it was not foreseeable that Correct could not operate its telephone system without a person that did not work for Correct and over which Correct had no control. Jon Logan testified that he had no idea about how Smart's instruction to only work for Smart and to cease providing service to any Smart competitors would affect Correct. TT, 8/22/24 pm 42:3-43:25 [Doc. 364]. To the contrary, Patrick Temple testified that CSG did not have a backup plan if Bruce Johnson could no longer assist CSG and that CSG employees had expressed concern about that reliance on Johnson. TT, 8/22/24 pm 71:17-72:4 [Doc. 364].

Third, Correct did not present any evidence of the costs it saved by hiring Johnson to help maintain its phone system. For example, Correct had a license

agreement with Lattice when Johnson worked for Lattice. *See* J194 [Doc. 346-194]. Under the agreement, Lattice was required to provide maintenance services. In exchange, Correct paid Lattice a license fee. However, Correct did not deduct these costs savings from its claimed damages. TT, 8/22/24 pm, 60:21-61:17 [Doc. 364]. Nor did Correct account for the benefits it received by employing Johnson. *Id.*, 61:18-62:13.

Damages in tort are aimed at "restor[ing] the injured party to the position it would have been in had the wrong not been committed." *Simmons v. USI Ins. Services, LLC*, 721 F. Supp. 3d 1333, 1341 (M.D. Fla. 2024) (internal quotations omitted). Similarly, damages for breach of contract are aimed at restoring the injured party to the position the party would have occupied had the breach not occurred. *Id.* This scenario is analogous to a common UCC occurrence, where one party incurs a cost to "cover" a breach. In such a case, the covering party "may recover as damages the difference between the cost of the cover goods and the contract price, together with any incidental or consequential damages but less expenses saved as a result of the seller's breach." *Gulf Power Co. v. Coalsales II, L.L.C.*, 2011 WL 3269412 (N.D. Fla. July 29, 2011). The non-breaching party has the burden to account for the expenses saved. *Id.* Here, CSG did not account for expenses saved and its claimed damages would undoubtedly place it in a better position than it would have been in had the breach or tort not occurred. As the Court noted, CSG would not have hired Johnson and paid him unless it received at least that much value in return.

Fourth, Correct failed to mitigate its damages. When Lattice stopped providing Correct with maintenance because Johnson went to work for Smart, Correct could

have sued Lattice for breaching the License Agreement. Further, Correct could have demanded that Lattice release the source code for the telephone software. Correct did neither. *Id.*, 66:23-24, 68:3-4, 71:10-16  [Doc. 364].

## IV.   <u>Conclusion</u>

The MSA and Schedules provided that Smart would be the exclusive messaging service provider in Washington, Sebastian, and Bowie County, and that it would serve as such provider coterminous with Correct's contract with the facility. When Correct learned that Smart became a competitor with its phone business, it looked for ways to get rid of Smart. Ultimately, Correct breached the MSA and Schedule for Washington, Sebastian, and Bowie, depriving Smart of the coterminous exclusivity for which it bargained. As a result, Smart incurred direct lost profit damages in the amounts described above. As to Correct's counterclaims, Correct failed to prove liability or damages for each of its claims. Accordingly, Smart respectfully requests that the Court enter judgment in its favor on each of its remaining claims and on each of Correct's remaining counterclaims.

*/s/ Brad F. Barrios*
Brad F. Barrios – FBN 035293
Trial Counsel
E-mail: bbarrios@tcb-law.com
Kenneth G. Turkel – FBN 867233
E-mail:  kturkel@tcb-law.com
David A. Hayes – FBN  096657
E-mail: dhayes@tcb-law.com
TURKEL CUVA BARRIOS, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 834-9191 | Fax: (813) 443-2193
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 27, 2024, the foregoing document was filed with the Court's CM/ECF system, which will send electronic notice to all counsel of record.

<u>*/s/ Brad F. Barrios*</u>
Attorney