UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART COMMUNICATIONS
HOLDING, INC.,

    Plaintiff,

v.                                                   Case No. 8:20-cv-1469-WFJ-TGW

CORRECT SOLUTIONS, LLC a/k/a
Correct Solutions Group, LLC,

    Defendant.
_____/

## ORDER

The Court held a bench trial from August 19-23, 2024, in this matter. The claims remaining after summary judgment rulings were addressed at trial. The Court enters the following findings of fact, conclusions of law, and judgment.

## Findings of Fact

This case involved Correct Solutions, LLC ("Correct") as contractor and Smart Communications Holdings, Inc. ("Smart") as a sub-contractor. The relevant business was providing computer tablets and kiosks to county sheriffs for use by jail inmates. Three counties were involved in this case. [1]

---

[1] Smart's Fourth Amended Complaint is at Dkt. 93. The summary judgment rulings are at Dkt. 234. Smart's claims related to Sebastian County that remained after summary judgment were

**1. Smart was Non-compliant:** Smart did not provide contract-compliant jail-grade tablets. The contractual obligation at issue required Smart to provide custom "ruggedized and correctional-grade" tablets for usage by jail inmates within the jail environment. The tablets provided to customers Sebastian County and Bowie County by Smart were first-generation tablets, that Smart had never provided in any jail setting before. They were ordered from the Chinese manufacturer to fulfill the subject contracts here. They had not been beta-tested or used anywhere. Dkt. 381-2 at 13, pp. 42–45; at 24, p. 88. They had two black covers or shells, held together with approximately ten visible hex screws. The overwhelming evidence was that these tablets were noncompliant and not jail-worthy by any reasonable

---

several. The first was breach of contract, related to exclusive rights to supply the County that ended up with a competitor, Tech Friends. Smart's other clams were breach of implied good faith/fair dealing covenant, and common law unfair competition. These counts also asserted a claim based upon Tech Friends replacing Smart as supplier at Sebastian. The implied covenant breach also asserted that Correct solicited Sebastian to non-renew the underlying contract in order to eject Smart from serving Sebastian. Correct's counterclaims related to Sebastian, Dkt. 105, were breach of contract for failure to supply the promised goods; breach of the implied covenant of good faith/fair dealing; tortious interference; and common law unfair competition. As part of these latter two tort counterclaims Correct also sued a Smart-related party, Smart Communications Collier, Inc. ("Smart Collier").

Smart's claims related to Washington County that survived summary judgment mirrored the three it asserted concerning Sebastian. In essence, it claimed Correct breached the Master Service Agreement by causing Smart to be removed from that county jail or not delivering exclusivity in Washington County, and by terminating under paragraph 6 when the contract term had to be coterminous with Correct's relationship with the County.

Smart's claims as to Bowie County were in a similar vein. Smart complained of improper notice to cure, improper termination, and the tortious insertion of the competitor Tech Friends who took over Smart's job at this County in derogation of Smart's contractual exclusivity.

measure. It appears the Chinese company that provided the second generation tablets to Smart went out of business. Dkt. 355 at 23, 28. The tablets had multiple flaws and were easily abused and misused by the inmates in various ways, some of which were dangerous. By any examination of this record, they were not rugged. To anyone familiar with a jail environment they were not fit for use inside a jail.

Smart notes that the tablets provided to Washington County were second generation and improved. Notwithstanding this, the credible evidence is that they suffered similar, material flaws and were likewise non-compliant and not suitable for a jail environment. Dkt. 381-24 at 5–6, pp. 288–93; Dkt. 346-104; Dkt. 363 at 119–20; Dkt. 345-9.

This failure in product was exacerbated by a Smart's failure to provide the appropriate number of tablets to the customers for use, and very poor customer service. The failure of these Smart tablets is evidenced throughout this record, and is almost uncontested by any competent evidence. The tablets (first generation) had "pigtail" plugs for recharging that could be broken or abused. The tablets could be disassembled due to the exposed screws. They were credibly described as almost toy-like, as from a Wal-Mart. Dkt. 381-24 at 6, pp. 290–92; Dkt. 381-1 at 7, pp. 19–20; Dkt. 381-18 at 7, pp. 18–19. Inmates could fairly easily make shanks out of them, or other tools like tattoo guns or cigarette lighters. Relatively soon after placement these faults became very evident, and were exacerbated by first

lackadaisical and then abysmal customer service from Smart. The Court need not expand upon this abundant competent evidence of Smart's noncompliance here. Those interested in this sad proof further may consult the references, *supra*, and the margin.[2]

The main defender of the Smart products was Jon Logan, Smart's principal. The Court did not find this witness to be accurate or worthy of credit—the Court makes an adverse credibility finding. His testimony about the tablets was contradicted by multiple credible witnesses. He stated the customers who complained extensively were lying, and they were all engaged in a "sham" or a multi-faceted anti-Smart conspiracy. Or they were "idiots," Dkt. 381-9 at 78, or stupid. *Id*. A great weight of evidence contradicted this witness. Mr. Logan's testimony as to the tablets and relevant history was greatly outweighed by contrary evidence, and was materially contradicted by six or more credible witnesses.

It is not surprising that the customers showed nearly uniform criticism of Smart. Its products were poor and some presented a danger in the jail environment. The customers were often "shorted" in number, and were poorly

---

[2] Dkts. 345-1–9; Dkts. 346-44–53; Dkts. 346-81–90; Dkt. 346-104; Dkts. 346-115–117; Dkt. 346-124; Dkt. 346-143; Dkt. 346-148; Dkt. 346-186; Dkt. 381-1 at 9–10, pp. 27–31; at 13–16, pp. 44–56; at 21–23, pp. 75–84; at 26, p. 94; at 27–29, pp. 100–07; Dkt. 381-6 at 35, pp. 131–32; Dkt. 381-7 at 22, pp. 78–82; Dkt. 381-9 at 77–78, pp. 293–96; Dkt. 381-15 at 65, pp. 250–52; Dkt. 381-16 at 5, pp. 8–9; at 9–11, pp. 25–30; Dkt. 381-17 at 15–20, pp. 50–72, at 21–25, pp. 77–91; at 26, p. 97; Dkt. 381-23 at 43–44, pp. 165–66; at 47, p. 178; at 51 pp. 194–95; at 55, p. 213; at 60–61, pp. 231–33; Dkt. 381-24 at 5–6, pp. 287–93; at 25–27, pp. 368–74.

serviced. Smart's principal in turn showed disdain for the customers, *see supra*, including an overnight, unannounced stark and sudden exit from Washington County, leaving the jail "high and dry." Dkt. 345-9; Dkt. 345-11; Dkt. 381-23 at 52, p.198. Only a small amount of exhibits and testimony (vastly outweighed) support Smart's position as to these tablets.

## Conclusions of Law

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a). *See* Dkt. 1 at 2–11.

2. The parties waived consequential damages in Section 7 of the Master Services Agreement ("MSA"), Dkt. 93-2. *See* Dkts. 265 at 2–5; 266 at 2–8. This controlling contract was written from a Smart template without help from lawyers. Section 7 states that "neither Party shall have any liability for indirect, incidental, consequential, exemplary or special damages <u>of any kind</u>, including damages arising from lost profits, lost saving, lost income, loss of use or other benefit . . . ." Dkt. 93-2 at 3 (emphasis added). And this limitation applies "[n]otwithstanding anything to the contrary in this Agreement or Schedules."

"Consequential damages" are those that stem from losses incurred by the non-breaching party in its dealing, often with a third party. *HCA Health Servs. of Fla., Inc. v. Cyberknife Ctr. of Treasure Coast, LLC*, 204 So. 3d 469 (Fla. 4th DCA

5

2016).  "What makes a loss consequential is that it stems from relationships with third parties, while still reasonably foreseeable at the time of contracting." *Keystone Airpark Auth. v. Pipeline Contractors, Inc.*, 266 So. 3d 1219, 1223 (Fla. 1st DCA 2019); *see also Nview Health, Inc. v. Sheehan*, No. 8:21-cv-385-VMC-TGW, 2022 WL 16923585, at *21–22 (M.D. Fla. Nov. 14, 2022) (applying Delaware law).  Here "any kind" of consequential damages including lost profits are disclaimed by Section 7.  Smart's claimed damages are, entirely, lost profits for sales from third parties (jail inmates or families), not parties to the MSA or its schedules.  *See* Dkt. 355 at 48–49; Dkt. 381-8 at 21, pp. 76–77; Dkt. 354 at 30–31.  Those claims (all of Smart's asserted damages) are barred by Section 7.

3.   Likewise, the approximately $4800.00 in damages sought by Correct due to the reduction in phone rates incurred in the new, subsequent Sebastian contract are barred by Section 7.  All of these come from lost profits from sales to third persons, *i.e.*, jail inmates or families.  Thus Correct's breach of contract counterclaim as to Sebastian County fails due to this provision of the MSA.

Beyond the contractual disclaimer, this set of Correct damages related to a reduction in phone rates at Sebastian County also fails substantially.  The phone rate reduction at Sebastian was not proven at trial by a preponderance of evidence to have been proximately caused by a Smart breach or by any tort committed by Smart or Smart Collier.  *See, e.g.*, J139 at Dkt. 346-139 (Correct discusses

proposed rate reduction in the new contract as "olive branch" to sheriff). There was no proof Smart caused this rate reduction proximately, and in any event the reduction was not a foreseeable consequence of any breach by Smart in failing to provide compliant product.

4.      Like the Sebastian rate reduction, all of Correct's counterclaims for tortious interference or unfair competition (Amended Counterclaim Counts V and VI), are not proven at trial. The two Smart defendants and Correct were not fiduciaries. There were no non-competes. They were free to compete ferociously. And in much of the factual scenario related to these claims, Smart was not a stranger to the contract and relationships—Smart was free to assert its interests forcefully. No credible proof exists that competition by the Smart defendants with Correct was tortious or unfair and damaged Correct.

Smart or Smart Collier was free to take ownership of the key supplier Lattice, and could tell its Lattice employees like Bruce Johnson what to work on. Johnson had a brief hiatus in working for Correct when Smart or Smart Collier told him to cease. There was no competent proof that this brief hiatus damaged Correct. One lawsuit brought by the Smart interests in this affair was settled and the other went nowhere, with no claims asserted here for costs or actual damages from either lawsuit.

As to the salary Correct paid Bruce Johnson, he provided value to Correct both when Correct was paying Lattice for his services and thereafter when Correct hired him outright. Correct would not have paid and then hired Johnson if the cost of doing so exceeded the benefit to Correct. His value is not accounted for in Correct's counterclaim.

5.  The "Term" provision of the MSA was in dispute here. *See* ¶ 6, Dkt. 93-2. The Court must read plain English text to define the term:

> 6. Term. This Agreement shall commence on the "Effective Date" and shall be co-terminous with Customer's [Correct's] Agreement with [jail] Facility as defined by Facility Address in attached Schedule. For purposes of this Agreement the "Effective Date" is defined as the date of the last signature on this Agreement. After the original term, this Agreement shall automatically renew in accordance with the Customer's Agreement with facility, listed as Attachment A, unless either Party notifies the other Party with written notice of non-renewal at least ninety (90) days prior to the expiration of the then current term.

A party to a contract is a signator, or person bound to its terms. The MSA contains a signature line for "the Parties" and it is signed by Correct and Smart only. Dkt. 93-2 at 7. The MSA identifies the two parties. The MSA uses the word "party" or "parties" 46 times. It means "party." But for two times only, in paragraph 6 above Smart states "party" means something else. Smart claims it means Correct and county sheriffs who run jails. In other words, Smart states that its relationship as a subcontractor of Correct must continue as long as Correct has a

contract with a jail, and the jail is what a "party" means for ¶ 6 but not 42 other times in the MSA.

This is an improper reading of contract. "Party" means "party" throughout and does not change meaning. "Courts must strive to read a contract in a way that gives effect to all of the contract's provisions." *Retreat at Port of the Islands, LLC v. Port of the Islands Resort Hotel Condo. Ass'n, Inc.*, 181 So. 3d 531, 533 (Fla. 2d DCA 2015). These very sophisticated parties made a bargain and set their terms, including an integration agreement. Dkt. 93-2 at 6. Paragraph 6 is plain and not ambiguous. *See CitiMortgage, Inc. v. Turner*, 172 So. 3d 502, 504 (Fla. 1st DCA 2015). This meant that either party could properly terminate by giving notice under paragraph 6, above.

This plain reading of paragraph 6, that "party" means the signatories Smart and Correct, is shared by Smart's own drafting witness who provided the contract templates. Dkt. 381-2 at 32–35, pp. 119–33. *See also* Dkt. 363 at 32–35 (90-day nonrenewal notice for Smart and Correct was important to Correct during drafting).

6. Beyond the contractual disclaimer of Smart's asserted damages, the Court previously found as a matter of fact that Smart did not provide conforming goods. The essence of the contract was to provide customized, "ruggedized" correction

grade product.  This Smart did not do.  The evidence of this is fairly overwhelming.  This has been proven both by contractor Smart's inability to prove its contract performance in its case-in-chief and by Correct's proof as part of its affirmative defense.  Dkt. 96 at 38.  Smart's contract claims thus fail for this reason.  *See 777 Partners, LLC v. Pagnanelli*, No. 20-20172-civ-Martinez, 2023 WL 11965485, at *23 (S.D. Fla. July 17, 2023), citing cases.  Smart's breach of contract discharged Correct from contract liability.  *Id*.

7.    Because the underlying breach of contract claims by both parties fail, the claims for implied covenant of good faith/fair dealing cannot survive.  *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1152 (11th Cir. 2005); *Progressive American Ins. Co. v. Rural/Metro Corp. of Fla.*, 994 So. 2d 1202, 1207 (Fla. 5th DCA 2008); *Insurance Concepts and Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

   Both parties are successful here in that each defeated every claim against it.  Smart shall take nothing by its claims in the Fourth Amended Complaint.  Correct shall take nothing by its Fourth Amended Counterclaims.  Each party shall go hence without day.  The Clerk will enter judgment in favor of Smart on all Correct's counterclaims, and in favor of Smart Collier on counterclaims V and VI.  The Clerk will enter judgment in favor of Correct on Smart's Fourth Amended Complaint.  The Clerk will then close this case.

**DONE AND ORDERED** at Tampa, Florida, on December 13, 2024.

/s/ William F. Jung
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of record